1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3   ----------------------------------X
                                      :
4   UNITED STATES OF AMERICA,         :
                                      :  18-CR-00224 (ALC)
5                                     :
                 v.                   :  March 28, 2018
6                                     :
    ALI SADR HASHEMI NEJAD,           :  500 Pearl Street
7                                     :  New York, New York
                     Defendant.       :
8   ----------------------------------X

9        TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
           BEFORE THE HONORABLE BARBARA C. MOSES
10             UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES:

12

    For the Government:       UNITED STATES ATTORNEY
13                            BY: ANDREW JAMES DeFILIPPIS, ESQ.
                                  MATTHEW JOSEPH LAROCHE, ESQ.
14                            ASSISTANT U.S. ATTORNEYS
                              1 Saint Andrews Plaza
15                            New York, New York 10007

16

    For the Defendant:        ANDREW BAUER, ESQ.
17                            TAL RACHEL MACHNES, ESQ.
                              Arnold & Porter Kaye Scholer LLP
18                            250 West 55th Street
                              New York, New York 10117
19

20

    Court Transcriber:        SHARI RIEMER, CET-805
21                            TypeWrite Word Processing Service
                              211 N. Milton Road
22                            Saratoga Springs, New York 12866

23

24

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

2

1            THE CLERK:  USA v. Sadr.  Counsel, state your name

2     for the record.

3            MR. LAROCHE:  Good afternoon, Your Honor.  Matt

4     Laroche, Andrew DeFilippis and Garret Lynch [Ph.] for the

5     Government.  And with us is Mike Gerbanowitz [Ph.] from the

6     Federal Bureau of Investigation.

7            THE COURT:  Welcome.  Be seated.

8            MR. BAUER:  Hello, Your Honor.  Andrew Bauer and Tal

9     Machnes and we are here with our client Ali Sadr.

10            THE COURT:  Welcome.  Be seated.  And your last name

11     is Sadr?

12            MR. BAUER:  It's actually Sadr.  Sorry.

13            THE COURT:  Sadr.  All right.  But it's -- but

14     that's the right last name, S-A-D-R, correct?  All right.  I

15     am Magistrate Judge Moses.  You speak and understand English,

16     correct?

17            MR. SADR:  [inaudible].

18            THE COURT:  All right.  May I have the date and time

19     of the arrest, please?

20            MR. LAROCHE:  Yes, Your Honor.  The defendant was

21     arrested in the Eastern District of Virginia on March 19th and

22     was presented in that district the next day.  He was then

23     transferred to this district and arrived last night.

24            THE COURT:  All right.  And are we araigning this

25     afternoon or just doing bail?

3

1          MR. LAROCHE:  It's been referred for both

2     presentment and arraignment, Your Honor.

3          THE COURT:  By Judge Carter?

4          MR. LAROCHE:  That's correct.

5          THE COURT:  All right.  Well we're going to go

6     through a number of items this evening, Mr. Sadr.  Among them

7     I will advise you of certain rights that you have.  This may

8     be a bit repetitive.  You've heard some of the same items in

9     Virginia -- inform you of the charges against you, consider

10    whether counsel should be appointed for you and decide, under

11    what conditions, if any, you should be released pending trial.

12    You will also have the opportunity to plead guilty or not

13    guilty to the charges.

14          I'm going to begin with some of your constitutional

15    rights.  You have the right to remain silent.  You are not

16    required to  make any statements.  Even if you've already made

17    statements to the authorities, you do not need to make any

18    further statements.  Any statements that you do make can be

19    used against you.

20          You have the right to be released; either

21    conditionally or unconditionally pending trial, unless I

22    determine that there are no conditions that will reasonably

23    assure your presence in court and the safety of the community.

24          If you are a foreign national, you have the right to

25    request that a consular officer from your country of origin be

4

1   notified of you arrest.  In some cases, a treaty or other

2   agreement may require the U.S. government to give that notice

3   whether you request it or not.  Is there such an agreement,

4   counsel, with the government of Iran?

5          MR. LAROCHE:  Not with Iran, Your Honor, but St.

6   Kitts -- St. Kitts has been notified.

7          THE COURT:  St. Kitts has been notified and you may

8   request that Iran be notified as well but that is not

9   automatic.  You have the right to be represented by an

10  attorney during all court proceedings, including this one and

11  during all questioning by the authorities.  If you cannot

12  afford an attorney, I will appoint one today to represent you,

13  but I understand Mr. Bauer, you are retained and there is no

14  such application; is that correct?

15         MR. BAUER:  Yes, Your Honor.

16         THE COURT:  All right.  I have been provided with a

17  copy of the indictment in your case, sir.  That is the

18  document formally containing the charges against you.  I note

19  that in Count 1, you are charged with Conspiracy to Defraud

20  the United States in violation of 18 USC, section 371.

21  Specifically, to defraud the Office of Foreign Assets Control.

22         I see that in Count 2, you are charged with

23  conspiracy to violate the International Emergency Economic

24  Powers Act, in violation of 50 USC section 1705, and Title 31

25  of the Code of Federal Regulations, sections 560.203, 560.204,

5

1   and 560.205.  In Count 3, I see that you were charged with

2   bank fraud.  That's a violation of 18 USC sections 1344 and 2.

3   In Count 4, you are charged with conspiracy to commit bank

4   fraud in violation of 18 USC section 1344.  In Count 5, you

5   are charged with money laundering, which is a violation of 18

6   USC section 1956(a)(2)(A) and section 2.  And in Count 6, you

7   are charged with a conspiracy to commit money laundering in

8   violation of 18 USC section 1956(h).  I think that is the

9   entire list.

10          MR. LAROCHE:  That's correct, Your Honor.

11          THE COURT:  Counsel, have you had an opportunity to

12   review the indictment and to go over it with your client, and

13   do you waive its public reading?

14          MR. BAUER:  We have that opportunity, Your Honor,

15   and we do waive the public reading.

16          THE COURT:  And is your client prepared to enter a

17   plea at this time?

18          MR. BAUER:  Yes.

19          THE COURT:  What is your plea?

20          MR. SADR:  Not guilty, Your Honor.

21          THE COURT:  A plea of not guilty will be entered and

22   the record will reflect that the defendant has been arraigned.

23   Has Judge Carter set a conference date?

24          MR. LAROCHE:  Yes, Your Honor.  The conference --

25   next conference is scheduled for April 9th, at 3:00 p.m.

6

1           THE COURT:  Is there an application to exclude time?

2           MR. LAROCHE:  Yes, Your Honor.  The Government moves

3  to exclude time until the next conference in the interest of

4  justice under the speedy trial act.  And the basis for the

5  exclusion is so the Government can begin producing discovery

6  so defense counsel can begin reviewing that discovery and so

7  the parties can begin discussing potential dispositions of

8  this matter.

9           THE COURT:  Any objection?

10          MR. BAUER:  No, Your Honor.

11          THE COURT:  At the request of the Government, with

12  the consent of the defendant, I will exclude time through

13  April the 9th, 2018.  I find that the ends of justice served

14  by taking such action outweigh the interest of the public and

15  the defendant in a speedy trial.

16          Let us turn to the question of conditions of release

17  or detention as the case may be.  Do I understand that the

18  Government seeks detention?

19          MR. LAROCHE:  That's correct, Your Honor.

20          THE COURT:  Do I understand that the defendant seeks

21  release?

22          MR. BAUER:  Yes, Your Honor.

23          THE COURT:  All right.  So Mr. Sadr, as you may

24  know, I am required, under the law to release you either with

25  or without conditions imposed unless I determine that there

7

1    are no conditions that will reasonably assure your appearance

2    in court as required and the safety of the community.  In this

3    case, the Government has asked that you be detained without

4    bail.  I am therefore required to determine whether there are

5    any conditions or combination of conditions that will protect

6    the safety of the community and reasonably assure your

7    appearance at trial.  This is not a presumption case; is that

8    correct?

9              MR. LAROCHE:  That's correct, Your Honor.

10             THE COURT:  All right.  The Government ultimately

11   bears the burden here of establishing either by clear and

12   convincing evidence that you are a danger to the community,

13   economic or otherwise, or alternatively by establishing by a

14   preponderance of the evidence that you are a flight risk.

15   Because the Government has the burden of proof on both of

16   these prongs, I will hear from the Government first.

17             MR. LAROCHE:  Thank you, Your Honor.  At the outset,

18   I would note that the defendant -- we have confirmed -- has an

19   immigration detainer.  So today's proceeding, in some ways is

20   a bit leu in that even if the Court does grant him a bail

21   package, he would be put into immigration custody.  I know

22   that the pretrial services report indicates that there is no

23   detainer, but we have confirmed that there is in fact such a

24   detainer.  But put it --

25             THE COURT:  Well the pretrial services report -- if

8

1   I recall correctly -- indicated that there was, I think what

2   they called a warrant for deportation.  I'm not sure what that

3   is.

4            MR. LAROCHE:  That's correct.  Yeah, that's correct,

5   Your Honor.  And it's our understanding that there is now a

6   detainer in place as well.

7            THE COURT:  And the final order of removal; is that

8   correct?

9            MR. LAROCHE:  I'm not sure if that is the case, Your

10  Honor.  We're trying to get more information from ICE

11  authorities regarding the immigration status and the detainer

12  itself.  I'm simply just letting the Court know that that

13  detainer is now in place which is not the information that was

14  in the pretrial --

15           THE COURT:  Right.

16           MR. LAROCHE:  -- services.

17           THE COURT:  So you're understanding is, regardless

18  of any conditions I set, if the marshals were to let him go,

19  ICE would pick him up?

20           MR. LAROCHE:  That's my understanding, Your Honor,

21  yes.  That's correct.

22           THE COURT:  All right.  What else would you like to

23  tell me?

24           MR. LAROCHE:  So putting aside the detainer, the

25  defendant is a substantial flight risk.  He is a well-

9

1   connected, wealthy, sophisticated businessman -- an

2   international businessman with immense wealth and ties with

3   countries around the world.  As alleged, he is alleged to have

4   aided the government of Iran in the export of over 100 million

5   dollars in services for Iran's benefit.  And because of his

6   conduct, he faces very serious charges with a maximum penalty

7   together of about 125 years in prison.  So we do believe that

8   he is --

9              THE COURT:  What would the guidelines look like?

10             MR. LAROCHE:  I think the guidelines, based on the

11   loss amount, would be decades in prison, Your Honor.  It would

12   be a very long guidelines which would be driven by the loss

13   amount.

14             With that said, I think each of the factors in this

15   case that go -- the Court must consider in determining whether

16   bail was appropriate, Counsel in favor of detention in this

17   case.  First, just to start with the nature and circumstances

18   of the offense.  Since 1979, president after president has

19   reiterated that the government of Iran presents an unusual

20   threat to the government of the United States.  And because of

21   that, they put in sanctions that prevent the export of

22   services to Iran.

23             The defendant, fully knowing that those sanctions

24   were in place, engaged in a years' long scheme to export over

25   150 million dollars worth of services for the benefit of Iran.

1   And the way he did that, was by creating a series of shell

2   companies to funnel money from Venezuela through the shell

3   companies for Iran's benefit.  And he --

4           THE COURT:  Money from Venezuela?

5           MR. LAROCHE:  So the underlying activity in this

6   case was a contract between -- an understanding between the

7   governments of Venezuela and Iran to build a housing project

8   in Venezuela.  The government of Venezuela asked Iran to do

9   the construction for that project.  The construction was given

10  to Stratus Group [Ph.] in Iran.  Stratus Group is a company

11  that is owned and controlled by the defendant's family.

12  Stratus Group is one of the wealthiest corporations in Iran

13  and it includes not just construction companies, but banks

14  within the Stratus Group is the largest private bank in Iran.

15  And that company was founded by the defendant's father.

16          THE COURT:  All right.  I'm waiting to hear where we

17  are exporting goods or services from the United States.

18          MR. LAROCHE:  Sure.  So Iran wanted to get paid in

19  dollars, Your Honor.  And they know that -- they knew they

20  couldn't do that because of the sanction.  So what the

21  defendant did, was set up two shell companies, one in

22  Switzerland, and one in Turkey.  And he told Venezuela to pay

23  those shell companies through correspondent banks in New York

24  City.  So they funneled payments from Venezuela, which were

25  actually -- their funds were located in Portugal -- those

11

1  funds were --

2          THE COURT:  The Venezuelan government's funds were

3  located in Portugal?

4          MR. LAROCHE:  Yeah.  Pedabeso [Ph.] was the state

5  owned corporation that was essentially paying for the project.

6  And those funds were held in banks in Portugal.  The way the

7  transactions worked was Venezuela essentially wired those

8  funds through correspondent banks that then went to bank

9  accounts for the two front companies that Mr. Sadr himself,

10 had set up.  So the money was funneled from Portugal, through

11 New York correspondent banks, then back to Iranian companies,

12 which is a clear violation of the export laws.

13         THE COURT:  I'm a little confused.  You're saying

14 that Venezuelan money went to Iran?

15         MR. LAROCHE:  In dollars, Your Honor.  In U.S.

16 dollars.

17         THE COURT:  Via New York?

18         MR. LAROCHE:  That's correct, Your Honor.

19         THE COURT:  Where it got turned into dollars?

20         MR. LAROCHE:  No, no, no.  It was U.S. dollars that

21 were transferred --

22         THE COURT:  It was already in dollars?

23         MR. LAROCHE:  That's correct, Your Honor.  And it

24 was transferred through New York correspondent banks to the

25 front companies in Switzerland or Turkey, which is a clear

12

1   violation of the export of services.  So the export of

2   services can be a bank transaction from a New York

3   correspondent bank to a company --

4           THE COURT:  So had the money gone direct from

5   Venezuela or Portugal, for that matter, to Iran we wouldn't be

6   here?

7           MR. LAROCHE:  Potentially, Your Honor.  We wouldn't.

8   But they also wouldn't have been able to do the transaction in

9   dollars.

10          THE COURT:  Okay.

11          MR. LAROCHE:  And again, they want to do the

12  transaction in dollars because the dollar is a more stable way

13  to do business.  And that's the whole point of the sanctions,

14  is that the Iranian government --

15          THE COURT:  To deprive Iran of dollars?

16          MR. LAROCHE:  Absolutely, Your Honor.  Because the

17  Iranian government is supporting terrorist organizations and

18  president after president has determined that they're a threat

19  to the United States.  And so those sanctions are in place to

20  prevent -- to punish them for that type of activity and to

21  prevent them from gaining access to the international

22  financial markets.  And that's exactly what the defendant did,

23  through this scheme.

24          And so this was a years' long scheme, Your Honor,

25  that in total was about 115 million dollars in U.S. dollars

13

1   that went to the benefit of Iranians and Iranian companies.

2   So the nature and circumstances of this offense --

3   THE COURT:   I mean dollars presumably didn't go

4   straight from New York banks to Iran?  They must have gone

5   somewhere else in between?

6   MR. LAROCHE:  That's correct, Your Honor.  They went

7   to two front companies.  So Stratus Turkey and a company

8   called Clarity.  Clarity was --

9   THE COURT:  All right.

10  MR. LAROCHE:  -- set up in Switzerland.

11  THE COURT:  And the Government's allegation is that

12  both of these companies were the defendant and his family,

13  correct?

14  MR. LAROCHE:  That's correct, Your Honor.  And the

15  email correspondence on this is very, very clear that the

16  defendant is saying that these companies are controlled by him

17  and his family.  And in fact, Clarity was created -- was

18  incorporated based on the defendant's -- I believe his -- he

19  incorporated himself using his own St. Kitt's passport.  So

20  there's really no dispute that the defendant, himself, set up

21  these companies.  There is no dispute -- at least from the

22  Government's perspective -- that these companies received a

23  total of 115 million dollars worth of U.S. dollar transactions

24  and that these transactions were in clear violations of the

25  sanctions.

1          THE COURT:  And the defendant did this for a cut or

2    for some other reason?

3          MR. LAROCHE:  Well it's the --

4          THE COURT:   In the Government's view?

5          MR. LAROCHE:  In the Government's view, it's the

6    defendant's companies.  I mean, he is -- the Stratus Group,

7    the group that got this construction contract from the

8    beginning in Iran, is the defendant's family's company.  It's

9    his -- his father's company that he was working for and

10   clearly the defendant -- the inference can be drawn that he

11   was getting a financial -- his family was getting benefits

12   from this from having such a huge contract.  And this

13   contract, in total, Your Honor, was actually for close to half

14   a billion dollars.  And 115 million dollars' worth had

15   actually gone through the correspondent banks in the U.S. to

16   the Iranian companies.  So that's the nature of the offense.

17          With respect to the weight of the evidence, in the

18   Government's view, its' overwhelming.  And that's included in

19   numerous email search warrants including on the defendant's

20   email accounts where he both acknowledges that he understands

21   sanctions, acknowledges that these transactions can't go

22   directly back to Iran, where he talks about hiding the Iranian

23   control fo these front companies.

24          These are very clear emails.  Some of which are laid

25   out in the indictment that the defendant just acknowledges

1    that he understands that he's doing this to avoid the

2    sanctions.  So we think the weight of the evidence here is

3    very strong.

4         And I think the nature of the offense is not only --

5    it's very serious, there's a lot of crime -- but also that the

6    shell companies and the shell games the defendant played, are

7    another reason to really not have faith that he's going to

8    stick in the United States.  And it gets to why the history

9    and characteristics of this defendant really reinforce that he

10   would flee if he had the opportunity to do so.

11        On that front, I think it's really important to

12   focus on the pretrial services report.  There are significant

13   misrepresentations and omissions in that report.

14        THE COURT:  Including, for example, his immigration

15   status?

16        MR. LAROCHE:  Putting aside his immigration status,

17   Your Honor, the defendant saying that he has resided in the

18   United States, I think since 2000 and specifically in

19   Washington since 2013, is completely inconsistent with the

20   travel records.  Just to give an example, he came in the

21   country on March 18th, last week, or two weeks ago, from the

22   United Arab Imeritz [Ph.].  He was staying for one night.  He

23   was flying out the next evening going to London.

24        Before that, it's our understanding, based on our

25   records, that he hadn't been in the United States for six

16

1   months.  And before that, throughout this case, it was our

2   understanding that he was traveling across the world from the

3   UAE.  There's talk of him going back and forth to Iran.  He

4   simply does not stay in Washington.  He doesn't.

5              THE COURT:  When was he last in Washington before

6   March of 2018, or last in the United States?

7              MR. LAROCHE:  So our travel records show that it had

8   been six months -- since October 2017 -- since he had last

9   been here.  In October 2017, he only stayed for about a week.

10  So the idea that he's been residing --

11             THE COURT:  Just out of curiosity, if he is flying

12  into and out of the United States, regardless of how

13  frequently and he is a non citizen with some form of

14  deportation order against him, why isn't he being picked up at

15  the airport?

16             MR. LAROCHE:  That's a good question, Your Honor.  I

17  -- we are trying to gain more information from ICE on that,

18  Your Honor.  We just don't have a lot of visibility as to why

19  he wasn't picked up before that.  But we're trying to get more

20  information.  We understand that as of today, a detainer is in

21  place.  So --

22             THE COURT:  All right.

23             MR. LAROCHE:  And with respect to his travel, what

24  is troubling is he is -- our evidence shows that he has three

25  separate passports recently.  He has an Iranian passport, he

17

1    has a St. Kitts passport.  We also had evidence that he had a

2    Belarus passport that may have expired in 2017.  But the

3    defendant has the ability to travel anywhere in the world.

4    And he has the motivation now, especially, to go to countries

5    that will not extradite him.  He's traveled to Turkey, he's

6    traveled to the UAE, and he can travel to Iran.  Three

7    countries where if he goes back to, we will never see him

8    again.

9            THE COURT:  I don't think we have an extradition

10   treaty with St. Kitts and Nevis either.  Am I wrong on that?

11           MR. LAROCHE:  I don't believe --

12           MR. BAUER:  We do, Your Honor.

13           THE COURT:  There is a treaty?

14           MR. BAUER:  Yes.  We researched it, Your Honor.

15           MR. LAROCHE:  That -- St. Kitts would be the least

16   of the worries of the government where he would go back to.

17   He would go back to Iran, he'd go back to Turkey, he'd go back

18   to the UAE.  We are not getting him back from any of those

19   countries.  And there's simply no set of conditions where we

20   believe that the defendant would stay here.

21           And  more misrepresentations, Your Honor, that I

22   think, and these are some key ones, he's reported that -- he's

23   reported four companies to the Court.  Altitude [Ph.], Pilatus

24   Bank, Sapine [Ph.], and Patashy, LLC [Ph.].  It's important

25   three of these, Altitude, Sapine, and Patashy -- it's

18

understandable that he reported these because we've

specifically identified properties in California that relate

to these companies.  He also identified Pilatus Bank.

Also understandable that he identified Pilatus Bank

because it's been in the news lately since the defendant was

arrested.  Pilatus Bank is in Malta.  Pilatus Bank was seized

because it is -- the defendant is apparently  under

investigation in Malta for substantial money laundering,

including that there is open source reporting on this as well

that several weeks ago, he apparently was in Malta and someone

approached him leaving the bank at approximately midnight with

several bags in his hand when he is under investigation for

money laundering.  Then he gets arrested in this case and his

bank is immediately seized.  So the --

THE COURT:  All right.  We're getting a little far

afield here.

MR. LAROCHE:  Well, I think it shows that it's not

only the United States that has investigations into him, it's

also Malta.  So he has more of a reason to go to a country

that is not going to extradite him and not going to be

cooperative.

But back to what he's reported.  So he's reported

companies that are in open source, that have been all over the

news.  And he's reported three companies that clearly the

Government has identified through the forfeiture property

19

1    that's already been identified.

2          But there are numerous other companies that we have

3    evidence that the defendant has controlled or owned including

4    companies that have been registered in Hong Kong, St. Kitts,

5    Austria, Switzerland, UAE.  We have evidence that at least of

6    2017, here's a list of companies the defendant has either

7    owned or controlled; Brittstone [Ph.], Clarity, Spanrise

8    [Ph.], First Canton [Ph.], Alpese [Ph.], Per Swiss [Ph.],

9    Pilatus Holding, Pilatus Capital, Stratus Turkey.  These are

10   all companies that have been in the defendant's name, does not

11   report them to pretrial services.

12         Bank accounts.  He has bank accounts in UAE, Malta,

13   both personal and business accounts.  He hasn't reported them.

14   Because just like the offense conduct, he engages in shell

15   games, not just when he's committing his crimes, but with the

16   Court because he wants to hide his access to assets, to

17   countries he would have the ability to go to.  So ultimately,

18   Your Honor, we just don't think there are any set of

19   conditions that can assure the Court that the defendant is

20   going to show up for his court appearances.  We believe he is

21   a substantial flight risk and will likely flee on the first

22   opportunity he has to do so.

23         THE COURT:  I expect, although I never know quite

24   what to expect, but I suspect the defendant's counsel is about

25   to tell me that the defendant will pledge millions of dollars

20

1  worth of property and consent to electronic monitoring at his

2  own expense.  Why would that not assuade some of your

3  concerns?

4          MR. LAROCHE:  Because the defendant's family -- the

5  defendant -- the defendant's father is in our view, the

6  equivalent of Bill Gates, in Iran.  This is a billion dollar

7  corporation.  The fact that he might put up a couple million

8  dollars in cash or in property, which likely are going to be

9  subject to the forfeiture order anyways in this case, is not

10 much reassurance that the defendant still isn't going to flee.

11         THE COURT:  All right.  Let me hear from defense

12 counsel.

13         MR. BAUER:  Thank you, Your Honor.  Let me start

14 with the immigration detainer which, as you can tell, nobody,

15 I don't think the Government nor defense counsel knew about,

16 nor pretrial until just a few minutes before our hearing.  And

17 the reason I want to start with it is because it's based on a

18 big mistake.  And it's an easily verifiable mistake that I

19 expect will be cleared up in short order.

20         Let me give you just a little background of his

21 immigration status here in the U.S.  He came here first in

22 2000 to study.  He went to Cornell.  Got a joint bachelor's

23 and master's.  Graduated in 2005.  In 2004 he applied for

24 asylum.  Even before 2004, he applied for asylum.  In 2004, it

25 was granted under the theory of political persecution.  So

21

1   we'll get to it in a moment, but all these ties to the Iranian

2   government, that the Government is alleging, it falls --

3            THE COURT:  So what is his immigration status?

4            MR. BAUER:  So in 2009 that asylum status was

5   revoked.  It was revoked based on his lawyer -- his

6   immigration lawyer turned out to had been not abiding by the

7   law and therefore every one of her client's immigration

8   status' were revoked.  And so --

9            THE COURT:  That isn't by any chance the immigration

10  lawyer who I saw earlier this afternoon in this courtroom, is

11  it?

12           MR. BAUER:  I don't think so, Your Honor.  I think -

13  -

14           THE COURT:  I had an immigration lawyer presented to

15  me this afternoon on charges involving immigration fraud.

16           MR. BAUER:  No, I think this was -- this was years

17  ago.

18           THE COURT:  All right.

19           MR. BAUER:  This was years ago, Your Honor.  But --

20  so in May 2009, he was notified by ICE that his asylum status

21  had been revoked and that he had one year to remove himself or

22  defend against this status.  He elected to remove himself,

23  Your Honor.  So in March 2010, before that year time period

24  had expired, he removed himself.  He left the United States.

25           He -- I missed an important part of it, which is

22

1   that in 2009 he married a U.S. citizen.   So in November of

2   2012, he applied for and received a green card based in part

3   on his status as having been married to a U.S. citizen.   He

4   got the green card.   The same green card that he's been

5   traveling on for the last almost six years.   The same green

6   card that every time he goes gallivanting across the globe, as

7   the Government says he has, he swipes it and he openly shows

8   the world that he's been traveling.

9          It -- the Government said that -- or told us that

10  the reason for the warrant was based on some sort of false

11  green card.   How can that possibly be?   It's incorrect.   My

12  suspicion, Your Honor, is that there was a warrant of removal

13  -- it says it in the pretrial report from 2010.   But that

14  warrant of removal was based on the asylum revocation from

15  2010.   He self deported and then came back after he got a

16  green card.   I think all that needs to happen, Your Honor, is

17  that that warrant needs to be lifted, and therefore the

18  detainer will be lifted.

19         Unfortunately, we haven't been able to research it

20  more, but that seems to be what happened.   And it's the main

21  reason why we're continuing with the bail application even

22  though there's an immigration detainer because we think that

23  this can be lifted, hopefully within the next 24 hours.

24         I wanted to start with that, Your Honor, because it

25  sounds credible and it sounds credible because it's easily

1   verifiable.  We'll very quickly get the immigration records

2   and we'll see that green card application and we'll see

3   whether this is just an administrative error by ICE or not.  I

4   mean, his name is not a typical name here in the U.S. and who

5   knows if because based on a spelling error or some other

6   clerical error, that warrant had never been lifted.  But

7   that's what I suspect has happened.  The reason I want to

8   focus on that, Your Honor, is so much of what the Government -

9   -

10          THE COURT:  How could he have possibly qualified for

11  asylum if his family is in secure economic status in Iran and

12  he travels back and forth frequently?

13          MR. BAUER:  That's a good question, Your Honor.

14  Because his -- because contrary to what the Government is

15  telling you his family, and his father in particular is not

16  affiliated with the Iranian government.  To the contrary, he

17  served time in jail in Iran as an opponent of the government.

18  His father, to this day, the Bill Gates of Iran, he is subject

19  to an order where he's not allowed to leave Iran for more than

20  10 days at a time or all of his assets that he has in Iran

21  will be seized by the Iranian government.  He's not friendly

22  to the Iranian government.

23          And if you'd noticed, and I'll get to it in a

24  moment, the Government, repeatedly, when talking to you about

25  the nature of the offense, talked about how these shell

24

1    companies were for Iran's benefit and Iran wanted the money in

2    dollars.  It's not Iran.  It's -- they're private Iranian

3    citizens who wanted this money.  So the Government just has it

4    wrong.

5              THE COURT:  I don't think that makes it any less

6    unlawful if the Government's allegations are --

7              MR. BAUER:  If the --

8              THE COURT:  -- accurate.

9              MR. BAUER:  -- allegations are correct, that is --

10   but what is relevant is the seriousness of the offense.  And I

11   want to distinguish a case -- the allegations against a client

12   like mine, Your Honor, and other notable Iranian nationals who

13   have been prosecuted here in the SDNY.  Most notably and most

14   publicly, Rezza Zarab [Ph.].  Rezza Zarab, he, unlike Mr.

15   Sadr, he -- what he was alleged to have been doing was

16   literally facilitating financial transactions in the United

17   States for the Iranian Revolutionary Guard Counsel, the IRGC.

18             THE COURT:  Right.  Now I think you're getting a

19   little far afield from our task this evening.

20             MR. BAUER:  Respectfully, Your Honor, I disagree.

21   They're whole reason for the sanction -- the whole reason for

22   the -- like the seriousness of the offense -- the seriousness

23   of the offense -- it's one thing if you're benefitting

24   organizations that have been designated by our government as

25   terrorist organizations.  They were benefitting private

25

1  citizens.  They were building housing projects in Venezuela

2  for poor -- for poor Venezuelans.  It's very different than

3  benefitting the IRGC.  So I think it actually is very relevant

4  both in terms of the weight of the evidence, the seriousness

5  of the offense, the likely sentence, --

6              THE COURT:  The private --

7              MR. BAUER:  -- if he ever is convicted.

8              THE COURT:  -- as well as public transactions are

9  prohibited by the sanctions, correct?

10             MR. BAUER:  Your Honor.  That's a different point.

11  But, yeah, I agree with you, Your Honor.

12             THE COURT:  No.  That's a key point.

13             MR. BAUER:  But, Your Honor, I doubt that you

14  disagree that a defendant who is conducting transactions to

15  benefit terrorist organizations versus someone --

16             THE COURT:  But that's not what he's charged with

17  here.  He's charged with the economic crime of violating the

18  economic sanctions.

19             MR. BAUER:  That's correct.

20             THE COURT:  And I don't think it matters to the

21  nature of the current charges against him what his politics

22  are.

23             MR. BAUER:  I think it -- it certainly matters what

24  his connections to the Iranian government are.  But we can

25  agree to disagree on that, Your Honor.

26

1          Okay.  So, Your Honor, let's just take a look at

2    some of the other -- some other points here that the

3    Government made.  And I'll start also with those travel

4    documents.  Again, it's going to be easily verifiable.  They

5    just have it wrong.  For some -- their records about my client

6    are just wrong.  They said that he was in the UAE as of, I

7    think it was last week.  He hasn't been there since 2016.

8    Easily verifiable.

9          THE COURT:  Where was he --

10         MR. BAUER:  He' hasn't been --

11         THE COURT:  -- excuse me.  Where was he last before

12   he reentered the United States.

13         MR. BAUER:  He was in London, Your Honor.  In

14   London, right now, he was -- they -- he is the sole owner of

15   one of the companies that was mentioned, Pilatus Bank.  And

16   they're working on starting a branch in London.  He's been --

17   that's -- he's been devoting his time there.  What else is in

18   London?  His wife and his two children -- a two-year old and a

19   toddler.  So that's why he's been spending a lot of time in

20   London over the last five months.  Prior to that, he was

21   spending a lot more time here in the United States.

22         THE COURT:  And do they reside in London or were

23   they just hanging out there while the DC house was being

24   renovated?

25         MR. BAUER:  Exactly.  They've been renting month to

1   month in London while the DC house is being renovated and

2   while he was starting this branch in London.  I will tell you,

3   it's not untrue that this Malta bank -- Malta-based bank, the

4   assets have been frozen.  It's likely about to be wound down.

5   That branch in London is not going to happen anymore.  They

6   have no reason to be in London anymore.  In fact, his wife and

7   children are coming here to the United States on Saturday.

8   There's no return trip scheduled.  They're going to be here in

9   the United States.

10           So they just have the travel wrong.  They have the

11  immigration wrong, they have the travel wrong.  And without

12  the documents we're at a bit of a disadvantage here.  But it's

13  going to be easily verifiable and I don't think it will be

14  very particularly fair to our client for he to be detained

15  based on a series of errors that have not been verified.

16           Your Honor, let's talk about the -- let's talk about

17  Mr. Sadr himself, and let's talk about his history and

18  character.  I mean he, this weighs so in favor of release that

19  it's mind boggling that the Government uses this to the

20  opposite argument.  Contrast him with Mr. Zarab who had no

21  ties whatsoever to the United States.  Mr. Sadr -- and they're

22  here.  His mother is a U.S. citizen, lives in the Washington

23  area.  His two sisters are green card holders.  They live in

24  California.  He has other family, his grandmother.  They all

25  live here in the United States.  His wife and his children --

28

1  his children are U.S. citizens.  They're going to be here in

2  the United States.  He has significant ties here to the U.S.,

3  Your Honor.

4          Like I said, he went to college here.  He owns his

5  apartment in here.  It's the only apartment that he owns, it's

6  here in Georgetown.  And to the extent that the evidence in

7  this case is that Mr. Sadr was hiding his identity in this web

8  of shell companies the Government's alleging, he openly

9  withdrew two million dollars from -- of the proceeds from this

10 alleged scheme and bought this apartment in Georgetown in his

11 own name.  He also, I mean, as Mr. Laroche said, he actually

12 even -- he opened one of these shell companies in his own

13 name.  There was no -- he was hiding in plain view, Your

14 Honor.  There was no hiding.  It was open and transparent.

15         He also, Your Honor, he has no criminal history, he

16 has no physical impairments, he has this huge support system

17 here in the United States.  And we'll get to the financials,

18 but what I would tell you is that we have lined up the

19 possibility of dozens of people that are here ready to support

20 him either by signing a bond or otherwise supporting the fact

21 that he will reside here.

22         To the issue of where he might flee.  It's important

23 to note, so he -- so we talked about the -- the Government

24 talked about the UAE, talked about Turkey, talked about Iran

25 as possible places for him to go.

29

1          THE COURT:  And don't forget Nevis.

2          MR. BAUER:  And Nevis.  But I am telling you, Your

3    Honor, that there is an extradition treaty and we'd be happy

4    to share information with that -- about that treaty with you,

5    as of course, you know, they had to have this apartment in

6    London they've been renting, but obviously there's an

7    extradition treaty with the UK.

8          Iran --

9          THE COURT:  I don't think the Government's worried

10   that he's going to flee to London.

11         MR. BAUER:  I don't know what the Government's

12   worried about right now, Your Honor.  They've gotten all their

13   immigration information wrong.  So who knows.  What -- Judge,

14   what we have here is in --

15         THE COURT:  With regard to the immigration status --

16   forgive me for interrupting.

17         MR. BAUER:  Sure.

18         THE COURT:  But assuming that what you are telling

19   me turns out to be correct, which is that your client is a

20   green card holder with no legitimate order of deportation or

21   the equivalent against him.  He still, upon conviction, should

22   he be convicted of this crime, would be subject to

23   deportation, correct?

24         MR. BAUER:  Yes, Your Honor.

25         THE COURT:  All right.  So doesn't that give someone

1   in his situation a significant motivation to skip the whole

2   conviction and imprisonment part of the story and simply self-

3   deport ahead of that?

4          MR. BAUER:  Well, Your Honor, as you -- as we were

5   discussing, he has significant assets here in the United

6   States.  He also has significant family ties that he would be

7   leaving behind.  There's a case out of --

8          THE COURT:  Presumably they have passports as well,

9   his wife and children?

10         MR. BAUER:  And if it was something that was

11  appealing to Your Honor in order to be comfortable with his

12  release they would be willing to surrender their passports as

13  well.  Because there's no mistake here that Mr. Sadr is

14  staying here and willing to fight.

15         The Government talked about the weight of the

16  evidence here, Your Honor.  The weight of the evidence --

17  there are emails, no doubt.  But there is no -- there is

18  literally no evidence, nothing in the indictment, either A,

19  connecting him to Iran, but also that he knew that what he was

20  doing as a non-U.S. citizen violated the law here in the

21  United States.  So we have a very strong defense, Your Honor.

22  These cases are --

23         THE COURT:  So you're suggesting to me that your

24  defense may be that he did those things, but did not

25  understand that the U.S. sanctions applied to him because he

1  was not a U.S. citizen?

2          MR. BAUER:  Well because he's -- right.  And that --

3  and that --

4          THE COURT:  He was merely a green card holder?

5          MR. BAUER:  And that -- and that simply doing a

6  transaction in U.S. dollars triggers the -- triggers U.S.

7  sanctions.  There are -- there's just simply no evidence to

8  suggest otherwise.  These are complicated cases, Your Honor.

9  The law is complicated.  I'll point you to a case that --

10 which one of our partners  handled.  Another Iranian sanctions

11 case here in the SDNY in 2010, it's the Bankee [Ph.] case,

12 where the defendant was convicted.  After trial, served 22

13 months in jail only to have his conviction reversed by the 2nd

14 Circuit because of a misreading by Judge Keenan of the law.

15 And after those 22 months were served he was -- the one

16 conviction that stood was a 1001 charge.

17         Judge Englemayer resentenced him and at the

18 resentencing said that conviction should have resulted in only

19 in a $10,000 fine, not 22 months of wrongful imprisonment.

20 This is a -- these are complicated cases and he has every

21 intent to fight it because we have viable defenses here.  So,

22 you ask -- you ask why he wouldn't just skip it.  Because he

23 doesn't have a life outside of the United States.

24         Now -- especially now that Malta -- his Malta bank

25 has been frozen, his family is going to be here, and all of --

32

1   and his biggest asset, his apartment will be here.  Guilty by

2   association with his father, the Bill Gates of Iran, that's

3   not fair, Your Honor.  He is -- Mr. Sadr's father remains in

4   Iran, simply because, as I told you, if he were to leave for

5   more than 10 days he would have to forfeit --

6            THE COURT:  He would forfeit his assets.

7            MR. BAUER:  Right.  Your Honor, in order to travel

8   to the UAE, he needs a visa.  He doesn't have a UAE visa.  So

9   for him to -- so it's actually not a viable place for him to

10  escape and hide for the rest of his life.  UAE is off the

11  table.  Turkey, he -- his in-laws live in Turkey, admittedly,

12  but as I said, if his wife and his kids are here, and their

13  passports are surrendered, there's really nothing -- there's

14  nothing for him in Turkey.

15           And Iran, let me tell you this last piece, Your

16  Honor, which is after the most recent series of political

17  unrest in Iran, the riots and other arrests that have

18  happened, and that's happened since he's last been to Iran,

19  he's -- he might be arrested, Your Honor.  He actually is the

20  type of person who is actually in danger if he goes to Iran.

21  He's not fleeing to Iran.  There are no places for him --

22           THE COURT:  Why would he be arrested?

23           MR. BAUER:  Right, Your Honor.  It's part of the

24  political -- the political battle there is that they're

25  viewing outsiders -- Iranians who have moved abroad and have

1  done business abroad, that they're supporting the uprising in

2  Iran.  So people similarly situated to Mr. Sadr who have

3  returned have been arrested.  So he fits the profile of

4  somebody who might be arrested.  And in fact, Your Honor,

5  we've spoken to a number of experts who agree and are willing

6  to draft affidavits in support of this concept that he is

7  actually in danger of going to Iran.

8          I'm sorry, Your Honor.

9               [Pause in Proceedings.]

10          MR. BAUER:  I'm sorry.  And Mr. Sadr reminds me that

11  the other reason that he fits the profile is that he is a dual

12  citizen, an Iranian and the prevailing powers --

13          THE COURT:  But not of the United States?

14          MR. BAUER:  No.  But of St. Kitts and in Iran, that

15  is viewed as somebody who could be a spy or working for a

16  government other than Iran.  And so, again, the profile as to

17  why he might be in danger.  There's no way he's going to Iran.

18  There's no way he can go to UAE.  And anything that could

19  possibly be in Turkey will be here in the United States.  So

20  you ask of incentives.  The incentives are for him to stay.

21  His incentives are to fight.  And to fight and to win this

22  case just like Mr. Bankee would have had the proper jury

23  instructions and the understanding of the law been made back

24  in --

25          THE COURT:  I understand your --

34

1          MR. BAUER:  -- 2010.

2          THE COURT:  -- interested in cases that are not the

3    case in my court room this evening.  But I'm considerably less

4    interested in those other cases.

5          MR. BAUER:  Okay, Your Honor.  That's fine, Your

6    Honor.  I -- listen, I think that precedent is obviously

7    important in cases like this, but I understand the facts.  The

8    facts here are prohibitive.  But they are -- the facts here

9    are also the facts that support -- support release.  I mean,

10   we have --

11         THE COURT:  All right.  Do you have -- do you have a

12   proposal?

13         MR. BAUER:  We do, Your Honor.

14         THE COURT:  Okay.

15         MR. BAUER:  We do.  We propose a bond of  10 million

16   dollars to be secured by property or the cash equivalent of

17   approximately  2 million dollars.  His apartment in Georgetown

18   in DC is valued at approximately 2 million dollars and his

19   mother is willing to put up her apartment, which is in

20   Bethesda and that is worth approximately $250,000 so we'd be -

21   - both of them are willing to pledge those properties.

22   Although we would like -- we would like to have the option of

23   pledging either of those properties or the 2.25 million

24   dollars in cash.

25         THE COURT:  The mom's property in Bethesda is worth

1  250,000?

2          MR. BAUER:   Exactly.

3          THE COURT:   In Bethesda?

4          MR. BAUER:   In Bethesda, yes.

5          THE COURT:   It must be an efficiency.

6          MR. BAUER:   It's an apartment, Your Honor.

7          THE COURT:   Okay.

8          MR. BAUER:   We propose that it be also secured by

9  the signature of four other financially responsible people.

10  Two of them are here today, Your Honor.  Sister and family

11  friend.  And those people could be interviewed and vetted by

12  the U.S. Attorney's office.  We will follow the pretrial's

13  recommendation which is just a regular pretrial supervision,

14  but I will -- I'll play my hand a little bit, Your Honor, and

15  say that if you're inclined to release him that we would be

16  amenable to electronic monitoring.

17          There is an issue that we want -- that I also want

18  to address, which is passports.  As we said, he has two

19  passports.  The fact that he has -- that he may or may not --

20  we don't think it's true, but if he had a Belarus passport, he

21  doesn't have -- it's not -- he doesn't have one now.  So

22  there's two passports at issue.  One is St. Kitts.  That was

23  seized upon his arrest.  The other is his Iranian passport.  I

24  will tell you that was not seized upon his arrest.

25          He actually did not know where it was at the time of

1   his arrest.  Luckily, we've located it.  It was in London with

2   his wife.  His wife, as I told you, is planning on coming to

3   the United States on Saturday --

4             THE COURT:  What passport was he traveling on when

5   he came here?

6             MR. BAUER:  The St. Kitts' passport.  And when he --

7   and she can bring the passport.  But she's also willing to

8   bring it to the embassy tomorrow in London if that will

9   expedite his removal.

10            THE COURT:  And the defendant would live where?

11  With his mom in Bethesda?

12            MR. BAUER:  Well we would propose that he would live

13  in his apartment in Georgetown with -- with his --

14            THE COURT:  Has it -- have the renovations been

15  completed?

16            MR. BAUER:  Yes, they have, Your Honor.  And that

17  his wife and children live there as well.  And his mother will

18  live nearby in Bethesda.  And the mother is willing to check

19  in on him as much as Your Honor would want.  She wishes she

20  could even live there, although, it's a 2,000 square foot

21  apartment.  I think his wife might vote against having her

22  mother-in-law there.  But we'll allow -- she'll do it, again,

23  if it gives you that comfort.

24            THE COURT:  And that's the 1015 33rd Street?

25            MR. BAUER:  Yes, Your Honor.

37

1          THE COURT:  Which is around N Street, Northwest.

2          UNIDENTIFIED SPEAKER:  M and [inaudible] --

3          THE COURT:  I grew up there.  Go ahead.

4          MR. BAUER:  Okay.  Travel will be restricted to the

5     Southern and Eastern districts of New York as well as the

6     District of Columbia and the Eastern district of Virginia.

7          THE COURT:  Would the defendant be willing to pay

8     for his supervision and electronic monitoring?

9          MR. BAUER:  Yes, Your Honor.  But that, again is --

10         THE COURT:  It --

11         MR. BAUER:  -- I don't know --

12         THE COURT:  -- can get pricey.

13         MR. BAUER:  Again, it's not our proposal, but the

14    answer is we'll do whatever is necessary --

15         THE COURT:  Okay.

16         MR. BAUER:  -- in order for him to be out and defend

17    himself --

18         THE COURT:  And let me have the --

19         MR. BAUER:  -- in this case.

20         THE COURT:  -- Government's response.

21         MR. BAUER:  Sorry, Judge, just one more --

22         THE COURT:  Go ahead.

23         MR. BAUER:  -- one more term of his release, and

24    that is that the ICE detainer be lifted.  The last thing we'd

25    want, as you say today --

1              THE COURT:  I can't --

2              MR. BAUER:  No, I'm not saying --

3              THE COURT:  -- lift an ICE detainer.

4              MR. BAUER:  -- that you would order that it be

5    lifted.  That it be lifted by ICE.

6              THE COURT:  I'm not -- what are you saying?

7              MR. BAUER:  I'm saying, Judge, that it -- let's say

8    that you said he could walk out the door today, that wouldn't

9    happen.  He would, because of this detainer, he would --

10             THE COURT:  I have no control over the ICE detainer.

11             MR. BAUER:  Your Honor, I'm not suggesting that you

12   do.  What I'm suggesting, what I'm asking is that one of the

13   terms that needs to be satisfied before he be released --

14             THE COURT:  Oh, I see.

15             MR. BAUER:  -- is that ICE lift the detainer.  And

16   that we're going to work with the Government after today to

17   have it lifted as expeditiously as possible.  We don't want

18   him --

19             THE COURT:  So he would remain in custody until a

20   number of conditions are satisfied including presumably the

21   setup of the apartment, the pledging of the property, the

22   electronic monitoring, the cosigners, and the lifting of the

23   ICE detainer?

24             MR. BAUER:  We did not propose that the property be

25   pledged before he be released, but that was the recommendation

39

1  of pretrial services.

2  THE COURT:  All right.

3  MR. BAUER:  Thank you, Your Honor.

4  MR. LAROCHE:  Your Honor, it's hard to imagine a

5  bigger flight risk in this case in a package that is just so

6  inadequate based on this defendant's assets and assets that he

7  hasn't disclosed to the Court.  First off, just the apartment,

8  a 2 million dollar apartment that has actually been up for

9  sale by the defendant and would otherwise be subject to

10  forfeiture in this case.  So he is really essentially putting

11  up his mother's home.

12  And that he's proposed four cosigners only two of

13  which he's identified to the Court today.  That is simply not

14  a package for an individual like the defendant who has access

15  to multiple passports, who has traveled across the world, who

16  has a father who is one of the richest people in Iran.

17  THE COURT:  What do you think would put the fear of

18  God into him?

19  MR. LAROCHE:  I don't think there's anything that

20  would,  Your Honor.  I think that he is going to flee if he is

21  --

22  THE COURT:  Then why are we talking about adequacy?

23  That's not really your argument.

24  MR. LAROCHE:  No, it's not, Your Honor.  I just

25  think that this package --

40

1              THE COURT:  If the defendant offered 10 million,

2    that wouldn't do it in your book, right?

3              MR. LAROCHE:  Well clearly, no.  But I think that

4    this package is just so inadequate compared to what his assets

5    are.  I think it's --

6              THE COURT:  What are his assets?

7              MR. LAROCHE:  So we don't know because he hasn't

8    disclosed them.  But we do know, Your Honor, we do know that

9    he has hidden a number of companies that we went through a

10   second ago from -- that are registered in Hong Kong, Austria,

11   other locations that he just simply hasn't disclosed.

12             The only thing he has disclosed to the Court are

13   stuff that is in the indictment, that has been specifically

14   identified property, and Pilatus Bank which has been in the

15   news.  So he knew that he had to disclose those things.  And

16   again, he misrepresented to the Court that he resides in

17   Washington.  He doesn't.  He has -- he's been -- he travels

18   across the world.  There are simply no basis to believe that

19   he is going to be truthful with the Court and arrive for court

20   appearances.

21             And if I could add one more point to the immigration

22   issue, I think it's interesting the defense counsel is

23   essentially admitted that in his asylum application he

24   permitted his lawyer to submit a fraudulent application.  And

25   this isn't a defendant who has not --

1          THE COURT:  I'm not sure he would characterize it

2    that way.

3          MR. LAROCHE:  Well he would say that there was a

4    fraudulent application submitted on his behalf and he had to

5    voluntarily leave the country.  And this isn't an individual

6    who is not sophisticated.  He has a Cornell education and I

7    just think it is interesting that there was a fraudulent

8    application submitted for him for asylum --

9          MR. BAUER:  Your Honor, that's not what I'm saying.

10         THE COURT:  One at a time --

11         MR. BAUER:  Sorry.

12         THE COURT:  -- counsel.

13         MR. LAROCHE:  Whatever happened, he was -- his

14   asylum application was revoked and he had to voluntarily leave

15   the country.  And what I heard from defense counsel -- perhaps

16   he's going to clarify -- was that there was something wrong

17   with that application because of something fraudulent that the

18   attorney did or had been doing that the defendant -- that was

19   submitted on the defendant's behalf and he had to voluntarily

20   leave the country.

21         So I just think it's interesting and consistent with

22   what we see not just in his immigration issues, but also with

23   the conduct in this case in setting up shell companies to

24   engage in fraudulent conduct that there's simply no way the

25   Court can be assured that he's going to appear for court based

42

1    on this package that's been proposed by defense counsel.

2         MR. BAUER:  Your Honor, if I may, just a couple of

3    things.  I -- what I said is that the application was tainted

4    by what appears to have been a fraudulent attorney.  I don't

5    know so I'm not going to represent one way or the other

6    whether the application itself was fraudulent.  I beg a reason

7    to think that it wasn't.  But, again, I don't -- I don't know.

8    It was tainted by a fraudulent attorney.  Second of all, those

9    companies -- the companies in Hong Kong and elsewhere that the

10   Government referred to originally, those are old companies

11   that have been closed.  Their information is old.  This case

12   and the conduct is from 2011 on.

13        So it -- he didn't disclose to pretrial companies in

14   Hong Kong that have been closed and defunct since 2010.

15   There's no evidence that he misrepresented to Your Honor.  He

16   is the -- old conduct was not called for and I just want you

17   to -- I'm sorry. Old companies and old assets.  That's not

18   what was asked for by pretrial.  So to say that our client

19   misrepresented himself to pretrial and to the Court is just

20   not fair.

21        THE COURT:  Anything further from the defendant?

22        MR. BAUER:  Your Honor, just on the question --

23   sorry, Your Honor, I just want one thing here.  Your Honor, on

24   the question of funds and the adequacy of our proposal, I will

25   note that if there is a dollar figure that would make you more

43

1  comfortable than what we proposed, that we would be amenable

2  to it.  I think this is more than adequate given all of the

3  other factors here.

4         THE COURT:  Well -- what's adequate?  If I were

5  inclined to order release on condition of a certain bond or

6  secured by a certain amount, adequacy in that context, as you

7  know it, is a relative term.

8         MR. BAUER:  Right.

9         THE COURT:  In federal court, the purpose of the

10  bond is to assure the defendant's return.  Not to make it

11  impossible for the defendant to pay it.  So it has to be high

12  enough so that it would hurt a lot to lose it, but not so high

13  that it can't be met.  I don't know what that number is.

14         MR. BAUER:  Well let -- can I amend my number

15  because I actually think that the Government made a good

16  point.  Which is that his apartment is forgettable property.

17  So he might view that as gone anyway.  That's a fair point to

18  make.  Not conceding that we're going to lose and that we're

19  going to have to forfeit anything, but I think it's a good

20  point.  And so he does have other assets, so if you could just

21  give me one moment to talk to my client about what else we can

22  add to the package --

23         THE COURT:  Sure.

24         MR. BAUER:  -- I think if we --

25         Thank you, Your Honor.

44

1          [Pause in Proceedings.]

2          MR. BAUER:  All right.  Your Honor?

3          THE COURT:  Yes, I am listening to you.

4          MR. BAUER:  Your Honor, just one clarification on

5   the Hong Kong, I think I misunderstood what my client had

6   said.  The Hong Kong company -- the holding company for the

7   Malta bank.  The other companies he referenced were -- had

8   been closed and were --

9          THE COURT:  But Hong Kong --

10         MR. BAUER:  -- defunct.

11         THE COURT:  -- is still in existence?

12         MR. BAUER:  Right.  But it's associated with Malta,

13  so he did effectively disclose it to pretrial.  So I'm sorry -

14  -

15         THE COURT:  They may not see it that way.

16         MR. BAUER:  Okay.  Well I -- I certainly think that

17  he was not trying to hide anything here.  Your Honor, we've

18  spoken to a number of family and family friends about their

19  willingness to put up their property in order to secure his

20  appearance.  And so rather than he pledge his apartment, and

21  we're happy to pledge his apartment as well if that's -- if

22  you think that's appropriate.

23         We would propose that two million dollars of

24  property from other individuals with more suasion over the

25  client secure the bond as well as one million dollars of cash

1   from the client.  And that million dollars we -- we'll be

2   happy to talk with the Government as to the source of that

3   million dollars.  But I'm confident that it's not part of this

4   scheme and so therefore would not be tainted and not be

5   something that would be subject to forfeiture.

6          So in other words, what I'm saying is, I had

7   offered, besides the mother's apartment, a two million dollar

8   apartment in the defendant's name that was taken from proceeds

9   of this alleged scheme.

10          THE COURT:  So for example, an apartment belonging

11   to a sister or other relative?

12          MR. BAUER:  Exactly.  Or a family -- or a close

13   family friend.  And, you know, we -- I'm just trying to make

14   the numbers match up.  We, you know, we have the dollars -- we

15   have the value of a number of their family friend's houses

16   here.  And so what I'm recommending is that we work with the

17   Government to find something as close to two million dollars

18   with properties of family or close friends.

19          THE COURT:  So your proposal is a ten million dollar

20   bond secured by two million in property acceptable to the

21   Government --

22          MR. BAUER:  That's a good way of saying it, yes.

23          THE COURT:  -- that is not forgettable.  And the

24   million dollars in case from a non-forgettable source

25   controlled by the defendant himself?

46

1          MR. BAUER:  Yes, Your Honor.

2          THE COURT:  That's the proposal?

3          MR. BAUER:  Plus his mother's apartment because --

4          THE COURT:  Plus his --

5          MR. BAUER:  -- [inaudible] --

6          THE COURT:  -- mother's apartment?

7          MR. BAUER:  -- because I think that's tremendous

8    moral suasion there that he leave his mother homeless should

9    he flee.

10          MR. LAROCHE:  Just one more note.  I mean, all of a

11   sudden there's now a million dollars in cash --

12          THE COURT:  I did notice that, yes.

13          MR. LAROCHE:  -- that defendant's going to put up.

14   It's not reported here.  And this is --

15          MR. BAUER:  Of course it is.

16          MR. LAROCHE:  -- another --

17          MR. BAUER:  Of course it is, Your Honor.

18          THE COURT:  Counsel --

19          MR. BAUER:  It's right here.

20          THE COURT:  -- you really have to wait your turn.

21          MR. BAUER:  Sorry.

22          THE COURT:  Unless, of course --

23          MR. LAROCHE:  Your Honor --

24          THE COURT:  -- Mr. Laroche is done, in which case it

25   will be his turn.

1          MR. LAROCHE:  Your Honor, unless I'm missing

2   something, I'm not seeing a million dollars reported here from

3   the defendant that has just been proposed and I think it's

4   another example of the defendant not reporting the true level

5   of his assets.  And that's concerning.

6          THE COURT:  Well the assets reported initially in

7   Virginia add up to a million six.  And that includes

8   substantially, you know, most of that is the residence.  So it

9   does not appear to have been disclosed, at least initially.

10         MR. BAUER:  So it has, Your Honor.

11         THE COURT:  I understand there was some additional

12   disclosures made here in New York.

13         MR. BAUER:  If you -- the bottom of page one.

14   Defendant reported to the Eastern District of Virginia,

15   additional business accounts in Cypress which generate

16   approximately two million to three million dollars per year,

17   omitted from original bail report.  It was, and we saw the

18   original notes from the Eastern District of Virginia pretrial

19   services officer, he or she had them in their notes, and for

20   whatever reason didn't put it in their report.  He's not --

21   we're not --

22         THE COURT:  Now what --

23         MR. BAUER:  -- hiding --

24         THE COURT:  -- are these additional business

25   accounts in Cypress that generate so much money?

48

1          MR. BAUER:  One is a personal account, Your Honor.
2    And one is a --
3          THE COURT:  That generates --
4          MR. BAUER:  Well --
5          THE COURT:  -- two to three million dollars?
6          MR. BAUER:  -- well I -- we --
7          THE COURT:  Or is that the principal?
8          MR. BAUER:  We didn't use the word generate, that
9    was the pretrial officer.
10         THE COURT:  That's why I'm asking.
11         MR. BAUER:  Their holdings.  So what it is is half
12   of it, or give or take, is his personal money, the other half
13   is in a business in which he's looking to build a four story
14   building in Cypress.  So it's a real estate development
15   company.
16         THE COURT:  All right.
17         MR. BAUER:  I'm sorry.  And that money -- well, I'll
18   just say it's not money that was generated from this alleged
19   scheme.
20         THE COURT:  All right.  We're going to have to bring
21   this to a close.
22         MR. BAUER:  I'm done, then, Your Honor.
23         THE COURT:  Thirty seconds.
24         MR. LAROCHE:  I just think it's very troubling that
25   it appears that the defendant is now using his wealth in

49

1   finding additional funds when he knows that he needs to

2   present more of a package to the Court when it appears that he

3   has clearly not been forthcoming with the full scope of his

4   assets to the Court.  And I think that's very troubling.

5   Another factor that the Court could -- should consider when

6   determining whether or not this defendant is going to show up,

7   these misrepresentation just suggest that he won't.

8              THE COURT:  All right.  Thank you very much.  I

9   would like to speak with pretrial if you can indulge me for a

10  few minutes.  So we'll take a quick break.  And then I will be

11  back.

12             MR. BAUER:  Thank you, Your Honor.

13             THE COURT:  Be seated.

14  [Off the record]

15  [On the record]

16             THE COURT:  All right.  Ladies and gentlemen, thank

17  you very much for your patience.  I know it's late in the

18  evening.  And thank you to the U.S. Attorney's Office and to

19  the defendant's counsel for their very helpful presentations.

20  It's always difficult to make bail determinations within the

21  compressed time that we have to do so at an initial

22  presentment and often on inadequate information one way or the

23  other.

24             In this case, I have considered all of the

25  information that I do have access to.  The pretrial services

1    report, the supplement thereto, the information that has been

2    presented to me this evening by counsel.  And taking all of

3    that into account, I find that the Government has established

4    by preponderance of the evidence that you are a flight risk,

5    sir.  And that has been the basis on which this application

6    has been argued.

7            So I will address the flight risk factors rather

8    than the danger factors.  The offense is a serious one and the

9    offense is a serious one regardless of whether the motivation

10   was to allegedly -- to assist the government of Iran or some

11   political subdivision within Iran, or to assist private

12   business or family interests within Iran.  It is still the

13   same felony.  The weight of the evidence, according to the

14   Government, is strong.  They have significant documentary

15   evidence including emails.  The defendant argues that he has

16   viable defenses not withstanding the exact same emails because

17   the defendant did not understand that as a non-U.S. citizen he

18   was subject to the same standards that would govern a U.S.

19   citizen engaging in the same financial transaction.

20           It is far to early to make a legal determination as

21   to who may have the better end of that argument.  So I would

22   say that that particular factor does not weigh heavily one way

23   or the other at this stage of the case.  However, the

24   defendant's personal history and characteristics as well as

25   his -- his financial circumstances do make it very difficult

1    for me to come up with any package that reasonably assures, in

2    my mind, his presence in Court here in the United States to

3    face these charges when he needs to be here.

4            He holds multiple citizenship, not any one of which

5    is a United States citizenship.  He holds multiple passports.

6    At least two, possibly three.  He wasn't sure where one of

7    them was for the past couple of days.  He has significant

8    family ties abroad.  He has ties here, to be sure, but he also

9    has significant family ties abroad in Turkey, in Iran, in

10   Cypress.  He has business ties abroad in those countries and

11   in other countries, including Hong Kong.  He is a frequent and

12   sophisticated business traveler.  And he has access to

13   significant financial resources.  So much so that the original

14   offer of a two million dollar pledge has increased over the

15   course of our conversations this evening and I cannot assure

16   myself that that amount or any other particular amount is to

17   quote myself earlier this evening, enough to sting.

18           Because I don't know what else he has and whether

19   one million or two million or three million would be enough to

20   make him think twice before departing the country.  Regardless

21   of what his immigration status actually is, and it appears to

22   be murky.  The circumstances of the detainer appear to be

23   murky this evening.  The one thing which is clear is that he

24   is not a United States citizen.  At best he is a green card

25   holder who does not have a current immigration detainer or

1   will not shortly have a current immigration detainer against

2   him.  And that, in and of itself is not favorable to him

3   because it means that should he be convicted on this crime, he

4   will be facing serious prison time followed by deportation

5   which does provide a powerful incentive, in my view, to skip

6   the crime and punishment part of the narrative and just go

7   straight to the self deportation.

8           His wife and children are U.S. citizens.  I

9   understand that.  But they are also highly mobile.  In fact,

10  they're not even here now.  So the fact that they have U.S.

11  citizenship, and an apartment in Washington, D.C. does not

12  give me sufficient comfort.  So for all of these reasons, I

13  will detain you, Mr. Sadr, this afternoon -- this evening, I

14  should say.  I have considered alternatives to incarceration

15  including a high bond package but for the reasons I have

16  previously articulated, that does not give me sufficient

17  reasonable assurance that you will remain here to face these

18  charges.  I have also considered various forms of electronic

19  monitoring but unfortunately, in the real world, those devices

20  are not as effective as they  may look like on TV.  Particular

21  for people who may have access to non commercial airline

22  flight.  So you will be detained, sir.

23          This, of course, does not mean that you can't enter

24  into additional communications and negotiations with the

25  Government.  It may be that you can come to some understanding

53

1   in the days and weeks to come.  But for tonight, you will be

2   detained.  Is there anything further from the Government?

3           MR. LAROCHE:  No, Your Honor.

4           THE COURT:  Anything further from the defense?

5           MR. BAUER:  No, Your Honor.

6           THE COURT:  Thank you, ladies and gentlemen.

7           MR. LAROCHE:  Thank you, Judge.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1           I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7           Shari Riemer, CET-805

8    Dated:  April 1, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25