UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

ALI SADR HASHEMI NEJAD,

　　　　　*Defendant*.

ECF CASE

18 Cr. 224 (ALC)

# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANT'S MOTION FOR BAIL

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew DeFilippis
Matthew Laroche
Assistant United States Attorneys

Garrett Lynch
Special Assistant United States Attorney
　　　*Of Counsel*

## <u>**TABLE OF CONTENTS**</u>

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................3

I.    The Indictment...................................................................................................3
      A.    Statutory Background .............................................................................3
      B.    Offense Conduct......................................................................................5

II.   The Defendant's Arrest and Bail Proceeding Before Judge Moses ........................7

III.  History Regarding the Defendant's Immigration Status, Travel and Assets .........10
      A.    U.S. Immigration Status.........................................................................10
      B.    Residency, Passports, and Travel History................................................12
      C.    Business Interests and Assets .................................................................14
      D.    Pilatus Bank ........................................................................................17

DISCUSSION ............................................................................................................18

I.    Applicable Law................................................................................................18

II.   The Defendant Presents an Incurable Risk of Flight...........................................18
      A.    Nature and Circumstances of the Offense ...............................................19
      B.    Weight of the Evidence ..........................................................................21
      C.    History and Characteristics of the Defendant ...........................................24
      D.    The Defendant's Bail Arguments and Proposed Package are
            Unpersuasive ........................................................................................25

CONCLUSION...........................................................................................................30

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's renewed application for bail in the above-referenced matter.  On March 28, 2018, the Honorable Barbara C. Moses detained the defendant concluding that there are no conditions that can reasonably assure the defendant's appearance.  Judge Moses is correct.  The defendant's application for bail should be denied, and the defendant should remain detained pending trial.

Ali Sadr Hashemi Nejad, an Iranian national, is a sophisticated, well-connected, international businessman with immense wealth and influence, who is alleged to have funneled approximately $115 million through the United States on behalf of Iranian entities and individuals in flagrant violation of U.S. sanctions.  Sadr has also repeatedly been untruthful with the United States government—most recently in his Pretrial Services interview and during his bail argument before Judge Moses—by making material misrepresentations about his residency in the United States, his purported fear of returning to Iran, and the vast scope of his assets and income.  To give one clear example, Sadr has repeatedly represented in sworn affidavits submitted to U.S. immigration authorities, during his bail proceeding before Judge Moses, and, again in his application for bail (the "Bail Application") that he "could not flee to Iran" because that "would endanger Mr. Sadr's life."  *See* Bail Application at 19; *see infra* Part III.A.[1]  In actuality, Sadr has traveled on over *twenty* occasions to Iran between 2010 and 2015, both before and after making many of these sworn statements.  *See generally* Ex. A (compiling numerous examples of Sadr's travel to and from Iran between 2010 and 2015, including emails to and from Sadr discussing his presence in Iran, as well as travel itineraries and e-tickets showing his travel to Iran); *see e.g.*, Ex.

---

[1] "Ex." refers to exhibits to the Government opposition to the defendant's application for bail; and "Tr." refers to the transcript of the defendant's presentment, arraignment, and bail proceeding on March 28, 2018.

A, Tab 1 (2010.08.11 Email from Sadr to CC-1 (Sadr states to CC-1 "I just arrived in Frankfurt, and should be getting into Tehran at 3:30am on Thursday morning.  We're all set for our meeting on Thursday. . . . Looking forward to seeing you in Tehran.")); Ex. A, Tab 8 (2011.07.03 Email from Sadr to Individual-1 (Sadr states "I won't be able to make it on those dates since I'll be very tied up with our General Assembly Meeting of EN bank in Tehran, from the 16th til Thursday the 21st. . . . On the other hand we can meet in Dubai or Tehran as well, please let me know what suits you best.")).

       In addition to his history of duplicity, Sadr has significant incentive and ability to flee from the United States.  He has substantial family and business ties abroad, access to vast resources, as many as five passports, and the ability easily to travel to and remain in countries from where he cannot be extradited.  He faces prosecution for serious offenses that carry a statutory maximum term of imprisonment of 125 years and a likely sentencing range under the United States Sentencing Guidelines of decades.  The evidence of Sadr's participation in the charged offenses is overwhelming: his culpability is captured in voluminous and unimpeachable email communications among Sadr and his subordinates and co-conspirators, business records, and financial evidence that document his orchestration of the charged schemes.  As a dual citizen of Iran and St. Kitts & Nevis, who is also being investigated by Maltese authorities for a money laundering scheme involving a bank he established in their country, the defendant poses an extraordinary risk of flight and there are no bail conditions that will assure his presence in Court. For these reasons, and those set forth more fully below, the defendant's application for bail should be denied.

# BACKGROUND

## I.      The Indictment

The Indictment charged Sadr in six counts with, from at least in or about 2006, up to and including in or about May 2014: (1) conspiracy to defraud the United States and to impede the lawful functions of the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), in violation of Title 18, United States Code, Section 371 (Count One); (2) conspiracay to violate the International Emergency Economic Powers Act ("IEEPA"), and the Iranian Transactions and Sanctions Regulations ("ITSR") (Count Two); (3) bank fraud, in violation of Title 18, United States Code, Section 1344 (Count Three); (4) conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349 (Count Four); (5) money laundering, in violation of Title 18, United States Code, Sections 1956 and 2; and (6) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956 (Count Six).

### A.      Statutory Background

The IEEPA authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, 50 U.S.C. § 1702. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

The President has repeatedly declared such a national emergency with respect to the Government of Iran: beginning with Executive Order No. 12170, issued on November 14, 1979, President Jimmy Carter found in response to the Islamic Revolution in Iran and the takeover of the American Embassy in Tehran, that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and

declare[d] a national emergency to deal with that threat." Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979). A few years later, in 1987, President Ronald Reagan issued an Executive Order finding "that Government of Iran is actively supporting terrorism as an instrument of state policy" and "has conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region." Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987)

On March 15, 1995, President William Jefferson Clinton again found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]" Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995). On two other occasions in 1995 and 1997, President Clinton again found that the actions and policies of the Government of Iran constituted a threat to the national security, foreign policy, and economy of the United States. *See* Exec. Orders 12959 (May 6, 1995) and 13059 (Aug. 19, 1997). These orders, among other things, prohibited the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person and authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.

Every President since President Clinton has continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States. The most recent continuation of this national emergency was on March 9, 2016. *See* 81 Fed. Reg. 12793 (Mar. 9, 2016). In this most recent continuation, President Barack Obama noted that, despite the Joint Comprehensive Plan of Action ("JCPOA") entered into among the United States and

others, and Iran concerning Iran's nuclear program, "certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

Pursuant to this authority, the Secretary of the Treasury promulgated the ITSR, implementing the sanctions imposed by the Executive Orders. Section 560.204 prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC. The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203. [2]

**B.    Offense Conduct**

Sadr participated in a scheme in which more than $115 million in payments for a Venezuelan infrastructure project was illegally funneled through the U.S. financial system for the benefit of Iranian individuals and entities. The evidence is clear that Sadr was aware of U.S. sanctions and purposefully structured transactions in order to avoid them.

---

[2] On January 16, 2016, the International Atomic Energy Administration certified that Iran had met its obligations under the JCPOA to dismantle its nuclear program. On that date, known as "Implementation Day," the JCPOA formally went into effect. As part of the United States' obligations under the JCPOA, OFAC removed certain Iranian companies from the list of Specially Designated Nationals ("SDN"). The practical effect of their removal was that non-U.S. persons and companies no longer risked U.S. sanctions for doing business with those entities that did not involve U.S. goods or services. However, it remains unlawful to engage in U.S. dollar transactions for the benefit of Iran or Iranian companies. Sadr's conduct is just as illegal today as it was when he repeatedly evaded U.S. sanctions.

In August 2004, the Governments of Iran and Venezuela entered into an agreement (the "Agreement"), whereby they agreed to cooperate in certain areas of common interest. The following year, both governments supplemented the Agreement by entering into a Memorandum of Understanding regarding an infrastructure project in Venezuela (the "Project"), which was to involve the construction of thousands of housing units in Venezuela.

The Project was led by Stratus Group, an Iranian conglomerate controlled by Sadr and his family with international business operations in the construction, banking, and oil industries. In December 2006, Stratus Group incorporated a company in Tehran, which was then known as the Iranian International Housing Corporation ("IIHC"). IIHC was responsible for construction for the Project. Thereafter, IIHC entered into a contract with a subsidiary of a Venezuelan state-owned energy company (the "VE Company"), which called for IIHC to build approximately 7,000 housing units in Venezuela in exchange for approximately $475,734,000. Stratus Group created the Venezuela Project Executive Committee to oversee the execution of the Project. Sadr was a member of the committee and was responsible for managing the Project's finances.

In connection with his role on the Project, Sadr took repeated, calculated steps to evade U.S. economic sanctions and to defraud U.S. banks by concealing the role of Iranian parties in U.S. dollar payments sent through the U.S. banking system. For example, in 2010, Sadr and a co-conspirator used St. Kitts and Nevis passports and a United Arab Emirates address to incorporate two entities outside of Iran that would receive U.S. dollar payments related to the Project on behalf of IIHC. The first entity, Clarity Trade and Finance, was incorporated in Switzerland, and the second, Stratus International Contracting, J.S., a/k/a "Stratus Turkey," a/k/a

"Straturk," was incorporated in Turkey.  Stratus Turkey and Clarity were both owned and controlled by Sadr and his family members in Iran.

Thereafter, Sadr and others conducted a series of international financial transactions using Clarity and Stratus Turkey for the benefit of Iranian parties in a manner that concealed the Iranian nexus to the payments, in plain violation of U.S. economic sanctions.  Specifically, between April 2011 and November 2013, the VE Company, at the direction of Sadr and others, made approximately fifteen payments to IIHC through Stratus Turkey or Clarity, totaling approximately $115,000,000.

Sadr and others directed that the payments be routed through banks in the United States to Stratus Turkey's or Clarity's bank accounts at a financial institution in Switzerland.  The majority of the funds were then transferred to another offshore entity located in the British Virgin Islands, which had been incorporated by Sadr and others in 2009.

## II.    The Defendant's Arrest and Bail Proceeding Before Judge Moses

On March 18, 2018, Sadr flew from Dublin, Ireland to Washington, D.C., arriving in the evening for what was scheduled to be a one day trip.[3]  Sadr was arrested the next day at Ronald Reagan Washington National Airport before boarding a flight to London.  On March 20, 2018, Sadr was presented in the Eastern District of Virginia and consented to detention.

Before doing so, Sadr was interviewed by Pretrial Services (the "EDVA Pretrial Interview").  As relevant here, Sadr stated that he has approximately $1.625 million in assets, comprised of a $1.5 million Washington, D.C. residence (the "Washington Residence"); $20,000

---

[3] During Sadr's initial bail proceeding in Magistrate Court, the Government stated that Sadr flew from the United Arab Emirates to Washington, D.C.  (Tr. at 15).  This information was conveyed to the Government by a law enforcement officer who mistook the airport code for Dublin ("DUB") as the airport code for Dubai, United Arab Emirates, which is actually DBX.

in cash; $70,000 in a personal checking account; and a $35,000 vehicle.  Sadr also stated that he has a monthly income of approximately $21,000 and that "he has been the owner and operator of the following companies":  Altitude Capital, Pilatus Bank, Sapene LLC, and Pitache LLC.  Sadr also stated that he has resided at the Washington Residence since 2013.  Sadr also reported, although it does not appear in the Pretrial Services report, that he has an additional 50,000 euros located in Turkey and additional business accounts in Cyprus that "generate" approximately $2 to $3 million per year.[4]  On March 28, 2018, a day after arriving in New York, Sadr was interviewed by Pretrial Services officers in this District.  As relevant here, Sadr stated that his Washington Residence was worth $2 million, not $1.5 million.

During Sadr's presentment, the Government argued for detention on the ground that Sadr is a substantial flight risk.  The Government noted at the outset that the nature and circumstances of the offense—a multi-year scheme involving over $100 million that was designed to avoid U.S. sanctions on Iran—and the weight of the evidence—numerous emails between Sadr and his co-conspirators showing Sadr's clear understanding of the sanctions and desire to avoid them—both counseled in favor of detention.  The Government also argued that Sadr's history and characteristics reinforce that he is a flight risk.  Among other things, the Government stated that Sadr is an extremely wealthy and well-connected individual whose family controls a billion dollar corporation in Iran. (Tr. 16).  Sadr also has a long history of traveling to countries including Iran, Turkey, and United Arab Emirates, and the Government argued that it would not be able to obtain his extradition from those countries. (Tr. 16-17).  The Government also argued that Sadr had made several misrepresentations to Pretrial Services, including that he has resided in Washington since 2000, and that he underreported his companies and bank accounts.  (Tr. 18-19).  Finally, the

---

[4] This information was included in an addendum created by Pretrial Services in this District.

Government stated that Sadr was separately under investigation for money laundering in Malta and that, since his arrest, the Government of Malta had seized a bank Sadr controlled in Malta named Pilatus Bank.  (Tr. 18).

In response, defense counsel argued that Sadr has family, friends, and assets in the United States.   (Tr. 27).   In particular, Sadr has the Washington Residence that counsel acknowledged was purchased with $2 million from the scheme charged in this case.  (Tr. 28). Counsel also represented that Sadr would not flee to Iran because he would be in "danger" if he returned.  (Tr. 32).  Counsel further claimed that Sadr had only two passports (one from St. Kitts and one from Iran), that the St. Kitts passport was surrendered at the time of his arrest, and that the Iran passport was in London but would be surrendered by his wife in the coming days.  (Tr. 35-36).  With respect to the companies and bank accounts the Government asserted had not been disclosed, counsel acknowledged that Sadr had not disclosed a holding company in Hong Kong, but stated that the other companies and bank accounts had been closed.  (Tr. 44).

Sadr proposed a bail package, including a $10 million bond to be secured by the equivalent of $2 million in cash or property, as well as four financially responsible persons.  (Tr. 34-35).  In this regard, Sadr initially proposed securing the bond with his Washington Residence and his mother's $250,000 apartment in Maryland.  (*Id.*).  However, defense counsel stated that he could "amend that number" and, after speaking with his client, proposed posting $1 million in cash that he had available in Cyprus.  Counsel represented that half the money in the Cyprus account was personal and the other half "is in a business in which [Sadr is] looking to build a four story building in Cyprus."  (Tr. 48).  The unidentified business in Cyprus does not appear to have been reported to Pretrial Services in either Virginia or New York.

After taking a brief recess to consider the parties' arguments and to speak again with Pretrial Services, Judge Moses detained Sadr, concluding that "the defendant's personal history and characteristics as well as his financial circumstances do make it very difficult for me to come up with any package that reasonably assures, in my mind, his presence in Court here in the United States."  (Tr. 50-51).  Judge Moses reasoned:

> [Sadr] holds multiple citizenships, not any one of which is a United States citizenship. He holds multiple passports.  At least two, possibly three. He wasn't sure where one of them was for the past couple of days. He has significant family ties abroad. He has ties here, to be sure, but he also has significant family ties abroad in Turkey, in Iran, in Cypress [sic]. He has business ties abroad in those countries and in other countries, including Hong Kong. He is a frequent and sophisticated business traveler. And he has access to significant financial resources. So much so that the original offer of a two million dollar pledge has increased over the course of our conversations this evening and I cannot assure myself that that amount or any other particular amount is to quote myself earlier this evening, enough to sting.

(Tr. 51).

## III.    History Regarding the Defendant's Immigration Status, Travel, and Assets

### A.    U.S. Immigration Status

Sadr has made several false statements to U.S. immigration authorities over the years in an effort to gain asylum in this country.  As described below, Sadr repeatedly represented—as he did during the bail proceeding and again in his Bail Application—that his life would be in danger if he returned to Iran.  However, both before and after Sadr made these statements, he regularly traveled to Iran.

Sadr initially sought asylum in this country in 2003.  In support of that application, Sadr submitted a signed affidavit to immigration authorities in which he stated that he was "applying for asylum now because I am certain that if I return to Iran my life would be in danger." Ex. B.  Sadr also described how his family had problems with the ruling regime in Iran and how

Sadr was once tortured by Iranian authorities because of his political beliefs. *Id.* In 2004, immigration authorities granted Sadr's application for asylum.

In 2010, immigration authorities revoked Sadr's asylum because they determined that Sadr's attorney had submitted a fraudulent affidavit on Sadr's behalf. Specifically, Sadr had submitted an affidavit in Farsi to his attorney that described his fear of persecution in Iran. However, the translation of that affidavit submitted by Sadr's attorney (and signed by Sadr (Ex. B)) contained significant omissions and embellishments when compared with Sadr's original Farsi affidavit. Sadr was ordered to appear in immigration court in November 2010, but left the country voluntarily prior to that appearance. In 2012, Sadr submitted another affidavit to immigration authorities explaining why he had not appeared in immigration court as directed. *See* Ex. C. Sadr stated that he left the country in 2010 because he was in "dire" financial circumstances and that his financial situation in the United States and Europe had "deteriorated." Sadr also reiterated that "[t]he **only** reason I filed the asylum case was because I possessed a genuine fear of return to Iran." *Id.* (emphasis in original).

Sadr's statements regarding his fear of returning to Iran are demonstrably false. Sadr's own emails obtained through a series of search warrants as part of this investigation demonstrate that between 2010 and 2015, Sadr traveled to Iran on well over twenty occasions to conduct business and visit his family. *See* Ex. A, Tabs 1-20. For example, in one email, dated November 21, 2011, Sadr discussed travel with his father and stated: "Ok baba, I've changed the tickets, and changed your appointments, and I'll see you in Tehran tomorrow morning." *See* Ex. A, Tab 8. In another email, dated December 21, 2011, Sadr told another individual that he was currently in Venezuela but would bring materials with him "to Tehran." *See* Ex. A, Tab 11. And yet in another email, dated May 28, 2015, Sadr's assistant sends Sadr his plane ticket from Tehran

to Istanbul.  *See* Ex. A, Tab 19.  Sadr's statements in his 2012 immigration affidavit regarding his financial circumstances also appear, at best, to be grossly exaggerated.  Despite reporting that he was in dire economic circumstances as of 2010, by 2012, Sadr reported to the United States Department of the Treasury (as described below) that he had approximately $37 million in assets.

**B.      Residency, Passports, and Travel History**

Sadr represented to Pretrial Services and at the bail proceeding that he has resided in the Washington Residence since 2013 and that he only has two passports.  As described below, Sadr does not reside in the United States—a point he does not appear to contest in his Bail Application—and it appears that Sadr in fact has as many as five passports.

As an initial matter, Sadr's Washington Residence was listed for sale on or about February 1, 2018, and that listing was removed on about March 31, after Sadr's presentment, which suggests that he had no intention of residing at that property before he was arrested.  An employee who works at the front desk of the building of the Washington Residence stated during an interview with FBI agents that Sadr has ***never*** lived in the Washington Residence and that the employee had not seen Sadr since before Christmas.  Another employee stated that Sadr does not permanently reside at the Washington Residence and that the employee had not seen Sadr in five or six months.

These statements are unsurprising given Sadr's travel history, which shows that Sadr spent only approximately seven weeks in the United States in 2017 and approximately eleven weeks in the United States in 2016.  In fact, prior to arriving in the country on March 18, Sadr had not been in the United States for almost six months, and his wife and children were in London.  During the past two years alone, Sadr spent substantial time in London, Turkey, and Malta.  And previously, between 2013 and 2015, Sadr traveled over 100 times, including multiple trips to Istanbul, Zurich, Dubai, London, Malta, and Tehran.  Moreover, at various times since 2010, Sadr has represented that he resides in Dubai, Belarus, Switzerland, and the United States.  *See, e.g.,*

Ex. D (2010.05.17 Email from Sadr to another individual providing copy of St. Kitts passport and Dubai "residency visa," as well as a Dubai address); Ex. E (2010.10.28 Email from Sadr to another individual providing same Dubai address); Ex. F 2015.05.29 (Settlement Agreement signed by Sadr representing that Sadr's address is in Switzerland).  At bottom, Sadr's travel and residency record undermine the Bail Application's contention that "[t]he past two decades of Mr. Sadr's life paint a picture of a man dedicated to building a life in the United States for himself and his family." *See* page 1.

Sadr also appears to have potentially as many as five passports—four from St. Kitts & Nevis and one from Iran, none of which have expired.  *See* Ex. G (copies of four St. Kitts passports).  Sadr has used these passports interchangeably when traveling.  For example, based on information provided by Customs and Border Protection, one St. Kitts and Nevis passport ("St. Kitts Passport-1") was used to enter the United States on February 10, 2015.  On February 14, 2015, Sadr then used another St. Kitts and Nevis passport ("St. Kitts Passport-2") to exit the country to Frankfurt, Germany.  On February 28, 2015, Sadr used St. Kitts Passport-2 to reenter the United States.  However, on March 11, 2015, Sadr went back to using the St. Kitts Passport-1 to depart the United States.[5]

The Government stated during the bail proceeding that Sadr had an expired passport from Belarus.  That was incorrect.  In fact, in 2012, Sadr reported to law enforcement in Turkey that his Iranian passport, which was issued in Belarus and which reflected that Sadr resided in Belarus, was stolen.  *See* Ex. H.  This passport, which reflects residency in Belarus, rather than the United States, is additional evidence that Sadr never actually resided in this country.

---

[5] Sadr has reported at times that some of his passports were lost or stolen.  Nevertheless, it appears that he has at least five active passports.

Finally, Sadr obtained his St. Kitts & Nevis citizenship through the citizenship-by-investment program, which essentially permits an individual to donate a certain amount of money to the government of St. Kitts & Nevis in exchange for citizenship.  Sadr paid a company approximately $250,000 to obtain his St. Kitts & Nevis citizenship.  *See* Ex. I (2009.05.27 Email from Sadr in which Sadr directs another individual to wire approximately $250,000 to a company that advertises itself as facilitating citizenship-by-investment in St. Kitts, among other places).  In 2014, the Financial Crimes Enforcement Network ("FinCen") issued an advisory warning that the citizenship-by-investment program was being used to obtain St. Kitts & Nevis passports for the purpose of engaging in illicit financial activity.  *See* Ex. J.  In particular, the FinCen advisory noted that "illicit actors are abusing this program to acquire [St. Kitts & Nevis] citizenship in order to mask their identity and geographic background for the purpose of evading U.S. or international sanctions or engaging in other financial crime."  As alleged in the Indictment, Sadr did, in fact, evade sanctions and commit financial crimes using his St. Kitts & Nevis citizenship.

### C.    Business Interests and Assets

During the Pretrial Services interview, Sadr claimed to have approximately $1.6 million in assets in the United States and an additional $2 to $3 million in assets in Cyprus.  These representations appear to significantly underrepresent the defendant's assets and various business interests.  In fact, there is substantial evidence that Sadr has for years consistently underrepresented his assets and overseas entities and accounts to the Department of the Treasury.

In connection with Sadr's immigration status, he was required to file a Report of Foreign Bank and Financial Accounts, commonly known as an "FBAR," with the Department of the Treasury.  The FBAR requires the annual reporting of an individual's direct or indirect financial interest in, or signature authority (or other authority that is comparable to signature authority) over, any financial account maintained with a foreign financial institution if, for any calendar year, the

aggregate value of all foreign accounts exceeded $10,000 at any time during the year. Sadr's FBARs since 2012 not only demonstrate his vast wealth, but also a pattern of underrepresenting his assets. *See* Ex. K (FBARs for calendars 2012 through 2016).

For example, for calendar year 2012, Sadr reported approximately $37 million on his FBAR, including individual bank accounts in Zurich and Dubai totaling approximately $4.2 million and an account for a Hong Kong entity totaling approximately $33 million. For calendar year 2013, Sadr reported approximately $46 million on his FBAR, including individual accounts in London, Dubai, and Zurich totaling approximately $11 million and business accounts for entities based in Hong Kong, Switzerland, Turkey, Malta, and the United Kingdom totaling at least $35 million. For calendar year 2014, Sadr reported approximately $47 million on his FBAR, including individual accounts in London and Malta totaling approximately $8 million and business accounts for entities based in Hong Kong, Switzerland, Turkey, Malta, and the United Kingdom totaling at least $39 million. For calendar year 2015, Sadr reported approximately $16 million on his FBAR, including two individual accounts in Malta totaling approximately $320,000 and business accounts for entities based in Hong Kong, Turkey, and the United Kingdom in the amount of approximately $16 million. And for calendar year 2016, Sadr reported approximately $1.5 million on his FBAR, including an individual account in Malta of approximately $290,000 and business accounts for entities based in Hong Kong totaling approximately $1.25 million.

Significantly, Sadr consistently failed to disclose several entities and accounts, including some related to the offense conduct in this case. For example, for calendar year 2012, Sadr failed to report the Clarity and Stratus Turkey accounts at a Swiss bank ("Swiss Bank-1") despite those accounts receiving at least approximately $23 million and $4 million, respectively, that year. *See* Indictment 18 Cr. 224 (ALC) at ¶ 16(kk)-(vv). Sadr also never disclosed a business

15

account for Stratus Global Investments at Swiss Bank-1 even though he had signatory control over the account and the account contained approximately $33.5 in 2013 alone. *See* Ex. L (2013.02.05 Email copying Sadr and attaching letter from Swiss Bank-1 reflecting a $33.5 million balance in Stratus Global Investments); Ex. M (2013.04.10 Payment instruction letter on Stratus Global Investments letterhead and signed by Sadr, authorizing a $1.79 million transfer to an entity in the British Virgin Islands). Similarly, Sadr controlled two other entities and their associated bank accounts in the United Arab Emirates which he failed to disclose: (a) First Canton General Trading (UAE); and (b) Stark General Trading (UAE) both with accounts at a bank in the United Arab Emirates. *See* Ex. N (2014.07.21 Letter from Sadr on First Canton General Trading LLC letterhead, directing the transfer of 264,181 Dirhams (equivalent of approximately $72,000) from First Canton's account at a bank in the United Arab Emirates); Ex. O (2014.07.15 Letter from Sadr on Stark General Trading LLC letterhead directing the transfer of approximately $500,000 from Stark General Trading's account at a bank in the United Arab Emirates to Pilatus Bank). Sadr never reported these business accounts even though they also contained significant assets during the relevant time period and were located in a high-risk jurisdiction mere miles away from Iran.

A number of facts indicate that Sadr's 2016 FBAR and his representations to Pretrial Services grossly undervalue his assets. First, Sadr admitted during the bail proceeding that he had failed to disclose a Hong Kong-based holding company to Pretrial Services and that he has a $1 million interest in an undisclosed company involved in a construction project in Cyprus. He has also identified new, additional assets in his Bail Application, which are discussed *infra* Discussion, Part I.D. By his own admission, Sadr significantly underrepresented his assets. Second, Sadr offered no explanation for the precipitous decline of his assets between 2014 and today, a period in which he established and controlled a private bank in Malta that reportedly

managed approximately 300 million euros in assets.  In fact, according to Sadr's representations to the U.S. government, his assets have inexplicably been depleted by almost 97% since 2014. Finally, Sadr's failure to disclose the existence or the true value of his assets to the Department of the Treasury reinforces the degree to which he failed to be forthcoming with Pretrial Services and the Court during his bail proceeding, and undermines any possible confidence this Court could have in the full extent and location of the assets he controls or has ready access to today.

### D.    Pilatus Bank

Sadr is the founder and owner of Pilatus Bank in Malta, which was opened in or about 2014.  As of 2016, Pilatus Bank reported 300 million euros in assets and represented that it provided "private and corporate banking services to high net-worth individuals and financial institutions mainly in Europe, Asia, and the Americas."  *See* The Banks.eu, Pilatus Bank, *available at* https://thebanks.eu/banks/18070.

According to public media reports, Pilatus Bank, Sadr, and others were under investigation by Malta's anti-money laundering unit for laundering funds from allegedly corrupt schemes on behalf of off-shore companies and individuals, including the chief of staff to the Maltese prime minister (who is alleged to have engaged in a widespread passport sale scheme) and the President of Azerbaijan.  *See The Maltese Connection with Iran Sanctions Busting:  An Investigative Reporter's Killing Has Shone New Light on a Shadowy Deal She Uncovered*, The Financial Times (Apr. 5, 2018).  During the course of the investigation, an investigative reporter who had published stories about Pilatus Bank online was killed in a car bomb.  *Id.*  Following Sadr's arrest in this case, Sadr was removed from his role at Pilatus Bank and his voting rights were suspended.  *Id.*  The Maltese Financial Services Authority also reportedly appointed an individual to take control of the bank's assets and stopped all transactions.  *Id.*

**DISCUSSION**

The Government respectfully submits that, in light of the foregoing, the defendant presents a significant flight risk, which cannot be mitigated by the proposed bail conditions.

**I.      Applicable Law**

Title 18, United States Code, Section 3142(e) provides that, if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," he or she shall order the defendant detained pending trial. 18 U.S.C. § 3142(e).  In assessing a defendant's risk of flight and the danger to the community presented by his release, courts must consider several factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *see also United States* v. *Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

**II.     The Defendant Presents an Incurable Risk of Flight**

Sadr presents a substantial risk of flight that cannot be addressed through bail conditions, due to the serious nature of the charged conduct, the weight of the evidence against him, and his personal characteristics, including his wealth, foreign ties, lack of any meaningful connection to the United States, and duplicity during his Pretrial Services interviews and other disclosures to the Government.  *See United States* v. *Reza Zarrab*, 15 Cr. 867, Dkt. No. 41 (RMB) (S.D.N.Y. 2016) (denying bail to defendant charged with export violations based on defendant's

lack of ties to the United States; his significant wealth and resources; his extensive international travel; and his strong ties to foreign countries without extradition); *United States* v. *Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) (denying bail to defendants charged with export violations where defendants faced substantial sentences, had no domestic ties, extensive foreign ties, and had access to large quantities of cash).[6]

### A.   Nature and Seriousness of the Charges Against the Defendant

In 1979, the President determined that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."  Executive No. 12170.  As discussed above, to address that national emergency, Presidents have adopted a coordinated regime of economic sanctions, including the ITSR, the IFSR, and the WMD Sanctions, against the Government of Iran and other Iranian entities.  For almost 40 years, the sanctions regime has been one of the key ways in which the United States has sought to curb the Iranian threat.

At the time of the charged conduct, one of the purposes of the sanctions regime was

---

[6] In three cases, the United States District Court for the District of Columbia concluded that bail conditions could be set for violators of IEEPA and the Export Administration Act (the "EAA"). *See United States* v. *Hassanshahi*, 989 F. Supp. 2d 110, 112 (D.D.C. 2013) (defendant charged with violating the EAA and IEEPA by transporting electrical relays to Iran); *United States* v. *Hanson*, 613 F. Supp. 2d 85, 86 (D.D.C. 2009) (defendant charged with violating the EAA and IEEPA by transporting unmanned aerial vehicle components to China); *United States* v. *Karni*, 298 F. Supp. 2d 129, 129 (D.D.C. 2004) (defendant charged with violating the EAA and IEEPA by transporting devices capable of triggering nuclear weapons to Pakistan via South Africa).  The Government respectfully submits that these cases are readily distinguishable from Sadr's case. Initially, while the Government believes that the nature of the crimes charged in *Karni*, *Hanson*, and *Hassanshahi* support detention, the conduct here is of a different nature.  Sadr is charged with engaging in over $100 million in prohibited financial transactions.  This is a massive scheme that is qualitatively different than *Karni*, *Hanson*, and *Hassanshahi*.  Furthermore, none of the opinions in *Hassanshahi*, *Hanson*, or *Karni*, suggest that those defendants had the financial wherewithal, global business network, or connections that Sadr does, all of which further his ability to flee, or that those defendants made the same kinds of serious misrepresentations that Sadr did, which demonstrate his untrustworthiness and corresponding inability to be trusted with bail.

to place pressure on Iranian industries, thus limiting Iran's ability to engage in conduct that threatened U.S. interests.   As Robert J. Einhorn, Special Advisor for Arms Control and International Security, testified to the House Committee on Oversight and Government Reform, sanctions on the Iranian financial sector, among other efforts, caused Iran to have "great difficulty in obtaining access to financial services that are the lifeblood of international commerce and Iranian proliferation," and "raised the cost of doing business for Iranian procurement agents as they [were] forced to find alternative financial arrangements and engage in more complex deceptive practices, sacrificing time and resources to do so."  *See* Testimony of Robert J. Einhorn to House Comm. on Oversight and Govt. Reform (July 29, 2010).  Sanctions on Iranian industries similarly limited Iranian entities from accessing international markets, including U.S. markets, encouraging Iran to cease its nuclear program and hostility against the United States.  *See id*.

For years, Sadr flouted these sanctions and provided his family's businesses with over $100 million dollars in assets related to an Iranian government-backed project in Venezuela. In doing so, Sadr eased the sanctions' pressure on Iran and Iranian companies.  Sadr's actions, in a very real sense, compromised the well-being and security of the United States.  The seriousness of Sadr's criminal conduct is demonstrated by the potential sentence that he faces should he be convicted.  The total statutory maximum term of imprisonment for the six charges in the Indictment is 125 years.  Moreover, while the Government's investigation is ongoing, even a preliminary Guidelines analysis shows that Sadr may face decades in prison.  Specifically, after accounting for the volume of illegal transactions in which he engaged, offense-level enhancements that are likely to apply—such as the 4-point increase for his role in the offense and the 4-point increase for operating a money laundering business—and the grouping of the offenses, the applicable offense

level would be at least a 42.  Even at a Criminal History Category I, this offense level results in a Guidelines range of 360 months to life imprisonment.

**B.     Weight of the Evidence Against the Defendant**

The possibility of more than 30 years in prison is certainly sufficient to motivate Sadr to flee.  That incentive, however, is only increased when the strength of the evidence against Sadr—and thus the likelihood of conviction—is factored into the equation.  Here, the case against the defendant is overwhelming.

The evidence against Sadr includes unimpeachable documentary evidence, in the form of emails obtained from, among others, Sadr's own email accounts, and those used by his co-conspirators, and bank records showing the illegal transactions.  That evidence establishes conclusively that Sadr was aware of U.S. sanctions and purposefully structured multi-million dollar transactions to disguise Iranian participation in the Project.  For example, beginning in at least 2008, Sadr sent or received numerous emails discussing sanctions against Iran, attaching articles regarding those sanctions, and even attaching the sanctions legislation itself.  *See* Ex. P (2008.10.04 Email to Sadr in which sender remarks that Iran "is under heavy U.S. sanctions over its nuclear program and support for groups the United States labels terrorist organizations"); Ex. Q (2010.08.22 Email from Sadr to his father attaching Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010); Ex. R (2012.02.16 Email from Sadr's sister to Sadr attaching publication titled *Impact of U.S. Sanctions on Iran Against You*).

Sadr established Clarity and Stratus Turkey for the principal purpose of evading U.S. sanctions.  At all times, Sadr (on behalf of his family) was the sole beneficial owner of Clarity, either directly or through a series of other entities that he also controlled.  For example, on October 6, 2011, Sadr sent an email to an individual at a bank in Switzerland ("Swiss Bank-1"), stating: "Per our conversation, I am the sole shareholder and the sole bearer of all the shares of Clarity

Trade & Finance SA." Ex S; *see also* Ex. T (2011.07.18 Email from Sadr to Family Member-1 in which Sadr refers to Stratus International Contracting, Clarity, and other entities and states: "All of these companies belong to our family including you, me and [Sadr's other family member]).").

Like Clarity, Stratus Turkey was established as another front company for USD payments and was at all times controlled by the Sadr family. Although Stratus Turkey's ownership structure included non-Iranians, emails show that the corporate structure was designed to hide the true owners and operators of the company. For example, the incorporation documents identify the nationality of Sadr, Sadr's father, and another family member (who together owned 90% of the company's shares and are all Iranian citizens) as St. Kitts, and lists the same Dubai address for all three. *See* Ex. E. Notably, on May 9, 2011, CC-1, who was a 4% owner of Stratus Turkey, sent an email to Sadr with the subject line "restructuring of Stratus International Turkey" stating:

> [c]onfirmed that either 5 persons or combination of persons and legal entities with a minimum number 5 required. Therefore, 1 Austrian company is not sufficient. 4 more persons or legal entities should be added to the new structure. Since we, none of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran, we have to find 4 more legal entities or names for the minor shares.

Ex. U. Sadr and CC-1 also specifically communicated about hiding from others any connection between Stratus Turkey and Iran. For example, on December 20, 2010, Sadr sent an email to CC-1 stating that a business partner would not question Stratus Turkey's transactions unless invoices reference Iran: "Even if you have an invoice that only mentions 'IIHC,' then we are still fine, but if that invoice show the name 'Iranian' anywhere then we will have serious problems." Ex. V.

Even after Sadr and his co-conspirators began receiving payments for the Project, Sadr continued to take additional, sophisticated steps to hide Iranian involvement. For example, on March 7, 2011, Sadr sent a co-conspirator an email stating that they would begin referring to

the Iranian International Housing Company by its abbreviation only, IIHC.  Sadr explained that "we have requested our last invoice to be paid in USD which makes this name change a bit more crucial." Ex. W.  Several weeks later, on March 26, 2011, Sadr instructed another co-conspirator not to disclose to a "client" that Clarity or Stratus Turkey were controlled by Iranians, stating "[t]here's no Iranian behind any accounts provided.  This is the simple answer." *See* Ex. X.  In another email, on July 6, 2011, after the initial USD payment to Clarity went though, Sadr even remarked that the way in which they had structured payments to avoid sanctions had been successful:  "Please find attached the swift confirmation for the income funds from Venezuela for the amount of USD20,692,579.48.  It seems like our strategy has worked so far." *See* Ex. Y.

Sadr apparently believed that his strategy with Clarity and Stratus Turkey worked so well that he expressed displeasure when the same structure was not followed for other entities he controlled.  For example, in September 2012, Sadr expressed strong displeasure when paperwork for one of his other companies, Cirrus, reflected that the company had connections to Iran.  Sadr wrote to another employee: "Why the hell do I see the name of Iran in there.  Why wasn't the same format of Clarity followed?!!!!" *See* Ex. Z.

Just a few weeks later, Sadr took additional steps to remove all references to Iran in contracts for the Project, and he backdated and altered invoices and contracts to give the appearance that no Iranian entity had been involved in the Project from its inception.  For example, in September 2012, Sadr sent an email attaching a subcontract between IIHC and Stratus Turkey and remarked "no trace and mention of Iran . . . only Stratus Turkey that has been behind everything." *See* Ex AA.

These emails are but a few examples of the paper trail that shows Sadr knowingly engaged in millions of dollars' worth of sanctioned financial transactions.

### C.    History and Characteristics of the Defendant

Finally, the history and characteristics of the defendant, including his wealth and extensive foreign connections, exacerbate the risk of flight created by the seriousness of the criminal conduct alleged and the strength of the Government's case.

Despite his attempt to downplay his considerable assets, it is indisputable that the defendant is a man with access to striking wealth. Sadr admitted to Pretrial Services that he has millions of dollars' worth of currency at his disposal in Cyprus and over a million dollars of assets in the United States. As recently as 2015, Sadr had also reported to the Department of the Treasury that he had over $40 million in assets. Sadr also has a history of using and controlling numerous holding and shell companies, and has used this network of corporate entities to move large sums of currency around the world (including U.S. dollars, Euros, United Arab Emirates dirham, and Venezuelan Bolivars). With this financial wherewithal, the defendant has the means to travel whenever he wants and wherever he wants, and to do so covertly.

Sadr's personal wealth does not even account for his family's fortune. His father founded one of the largest conglomerates in Iran, the Stratus Holding Group. According to documents obtained during the course of the investigation, Stratus Holding Group is worth billions of dollars and includes a variety of business interests, including the largest private bank in Iran. *See* Ex. BB (2013 presentation for Stratus Holding Group, representing that it is "the first, biggest and most diversified economic group in Iran, extensively active in different fields such as banking affairs, finance, investment, stock exchange, leasing, insurance, technical-engineering projects . . . , import-export of essential goods and commodities, and other areas").

Sadr's wealth is particularly conducive to flight in this case when combined with the defendant's access to foreign countries that would likely not extradite him back to the United States to face the pending charges, including Iran, Turkey, and the United Arab Emirates. Having

a safe place to which to escape only increases his motivation to flee.  Sadr currently holds an Iranian passport and as many as four St. Kitts and Nevins passports, all of which appear to be active.  Iran does not have an extradition treaty with the United States, and thus, if Sadr were able to travel to Iran, as he has done on numerous occasions since 2010, he would be beyond the reach of the Government and the Court.  Moreover, Sadr regularly travels to other countries without extradition treaties with the United States, including the United Arab Emirates.

Sadr implicitly acknowledged the flight risk that his wealth and foreign connections create by lying about both during the Pretrial Services interview and to the Court during the bail proceeding.  As discussed above, Sadr falsely represented that he has resided in the United States since 2013, but his travel records show he is rarely in the country, and other documents show he has represented that his residence is in Dubai, Switzerland, and Belarus.  Sadr also lied by claiming that he would not travel back to Iran because he would be in danger there, but his travel records show that he has regularly traveled to Iran between at least 2010 and 2015—without apparent incident.  Sadr minimized his business income and company holdings, but records submitted to the Department of the Treasury reflect that at least as of a few years ago he had at least $40 million in self-reported assets.

The reason for these far-reaching misrepresentations is obvious.  Sadr knew that if he had been honest about his residence, the breadth of his travel, and the extent of his resources that would lead to the inescapable conclusion that he is a flight risk.  So he chose to lie instead. Sadr's dishonesty should give the Court no confidence in his pledge to return for court proceedings.

### D.     The Defendant's Bail Arguments and Proposed Package Are Unpersuasive

The defendant devotes much of his Bail Application to arguing that Judge Moses based her detention decision on purported misrepresentations of the Government.  *See* Bail Application at 12-25.  He is incorrect.  Judge Moses' decision to detain Sadr was based exclusively

on factors that are not meaningfully in dispute and that have nothing to do with the Government's purported misstatements. *See* Tr. at 51 (basing decision on Sadr's multiple citizenships, multiple passports, significant family ties abroad, significant business ties abroad, and frequent travel abroad). Nevertheless, the Government addresses each of its alleged misstatements below.

As noted above, the Government has corrected the record on two points: (i) Sadr arrived to the United States on March 18 from Dublin, not Dubai, and (ii) Sadr once possessed an Iran passport representing he resided in Belarus, not a Belarus passport. (The Government subsequently learned that Sadr apparently has as many as five passports, not two, as the Government asserted at the bail hearing.) While the Government regrets its misstatements, these two points—which were made in the context of a last-minute bail application that defense counsel had indicated it would not raise until a later date—were not the focus of the Government's detention argument (nor Judge Moses' detention decision) and are trivial in light of all of the information set forth above. Furthermore, there is no dispute that Sadr has traveled throughout the world for much of the past decade, that he is still able to do so, and that he has had access to multiple passports.[7]

Regardless, the Government did not mislead the Court during the bail proceeding. First, the Government correctly proffered that Sadr and Pilatus Bank—the bank Sadr owns—are under investigation in Malta for money laundering. *See, e.g.*, John O'Donnell, *Malta Freezes Pilatus Bank's Operations After Chairman's Arrest*, Reuters (Mar. 22, 2018), *available at* https://www.reuters.com/article/us-malta-banks/malta-freezes-pilatus-banks-operations-after-

---

[7] Sadr also makes much about his immigration detainer. *See* Bail Application at 13-14. The Government simply noted at the outset of the bail proceeding that there was a detainer in place and that the Government was attempting to obtain additional information from the Department of Homeland Security. It did not rely on the detainer as a basis for detention.

chairmans-arrest-idUSKBN1GY0Z9; Cynthia O'Murchu, *Malta Bank Chief Held in US Over Iran Links*, Financial Times (Mar. 21, 2018), *available at* https://www.ft.com/content/b25a6c14-2d0b-11e8-a34a-7e7563b0b0f4.   In his Bail Application, Sadr quibbles with the Government's "present tense" use of the word "investigation," arguing that it is the bank under investigation, not Sadr, and that Sadr is not currently under investigation.   Putting aside Sadr's strained attempts to parse one statement made during an extensive bail argument, an appropriate inference to be drawn from media reports is that Sadr and Pilatus Bank are currently under investigation.   In any event, since the March 28 bail proceeding, the Government has confirmed through law enforcement officials that Pilatus Bank *and* Sadr are *currently* under Maltese investigation for money laundering.

Second, Sadr has substantially underrepresented his assets.   As an initial matter, the Government notes that Sadr made a stunning admission in his Bail Application—namely, that he has a $10.2 million investment in Altitude Capital LLC, Sapene LLC, and Pistache LLC.   The value of his interest in these companies does not appear anywhere in the Pretrial Services report. This $10.2 million interest more than doubles the assets Sadr represented to Judge Moses that he had available.   Sadr also for the first time in his Bail Application has disclosed A&H Urban Lifestyle Investments, which is worth an additional $250,000.   Sadr also admitted during the course of the bail proceeding that he had failed to disclose a Hong Kong-based holding company to Pretrial Services and that he has a $1 million interest in an undisclosed company involved in a construction project in Cyprus.   Sadr's subsequent disclosures during the bail proceeding and now in his Bail Application call into question his truthfulness with the Court and the true scope of his assets.

In fact, as noted above, despite Sadr's protestations in his Bail Application (*see* page 18), Sadr has consistently failed to report the full value of his assets to the Department of the

Treasury in his FBARs.  This includes (i) failing to report in 2012 the existence of the Clarity and Stratus Turkey accounts at Swiss Bank-1 despite those accounts receiving at least approximately $23 million and $4 million, respectively, that year; (ii) failing to report in 2013 a business account for Stratus Global Investments at Swiss Bank-1 even though he had signatory control over the account and the account received approximately $33.5 million that year; and (iii) failing to report in 2014 access to large sums of money in foreign accounts for First Canton General Trading and Stark General Trading.  In short, based on a review of Sadr's financial and business records, as well as Sadr's belated disclosures during the bail proceeding, it is highly unlikely that Sadr has been forthcoming with Pretrial Services or the Court regarding his net worth.

Third, the Government was correct during the bail proceeding that Sadr, through his attorney, submitted a fraudulent application for asylum and that he is a flight risk to Iran.  As explained above, Sadr signed an affidavit for his original asylum application that contains several apparent lies.  Among those false representations is that Sadr has a genuine fear of returning to Iran—which is a position he reiterated in his 2012 affidavit to immigration authorities and again in his Bail Application.  As discussed throughout this submission, Sadr's fear of returning to Iran is demonstrably false.  Sadr's emails and travel records show that he has traveled to Iran more than twenty times since 2010, and his efforts to mislead the Court are an enormous red flag that Sadr is likely to flee in this case.  *See* Ex. A.

Finally, the 36 family, friends, and associates of Sadr who have agreed to pledge assets and property on Sadr's behalf do not diminish, much less overcome, Sadr's serious risk of flight.  Even assuming these individuals' ties to Sadr and ability to pledge substantial assets, it is extremely unlikely that they will have any deterrent effect on Sadr should he decide to flee or avoid returning to Court.  Indeed, Sadr's extensive history of lies and misrepresentations to U.S.

immigration authorities, to financial authorities, to his lawyers, and to this Court suggest that he cannot be trusted in asserting that these people would maintain any moral suasion over him. Moreover, Sadr's repeated past efforts to evade U.S. laws through elaborate and evasive fraudulent schemes—as alleged in the Indictment—underscore his willingness to manipulate others and exploit the U.S. legal and financial systems.  Accordingly, the defendant's history suggests that he would have little compunction in fleeing or otherwise evading U.S. legal requirements despite the support and commitments of these associates—in effect, using their financial support to finance his freedom.

In light of the foregoing—Sadr's dual citizenships, multiple passports, extensive travel history, enormous wealth and resources, failure to disclose assets, and unequivocal misrepresentations about his fear of returning to Iran—it is clear that Sadr's proposed bail package is insufficient to ensure his appearance in this case.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the defendant's motion for bail should be denied.

Dated: New York, New York
      April 10, 2018

                                      Respectfully submitted,

                                      GEOFFREY S. BERMAN
                                      United States Attorney for the
                                      Southern District of New York

By:                    _____
                                        Andrew DeFilippis
                                      Matthew Laroche
                                      Assistant United States Attorneys

                                      Garrett Lynch
                                      Special Assistant United States Attorney