I4insadc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          18 Cr. 224 (AJC)

ALI SADR HASHEMI NEJAD,

                Defendant.                  Bail Hearing

------------------------------x

                                            New York, New York
                                            April 18, 2018
                                            2:30 p.m.


Before:

                    HON. ANDREW L. CARTER, JR.,

                                            District Judge


                            APPEARANCES

GEOFFREY S. BERMAN
        Interim United States Attorney for the
        Southern District of New York
ANDREW DeFILIPPIS
GARRETT LYNCH
        Assistant United States Attorneys

ARNOLD & PORTER KAYE SCHOLER LLP
        Attorneys for Defendant
BARUCH WEISS
ANDREW BAUER
TAL RACHEL MACHNES

ALSO PRESENT:

Michael Urbanowicz, Special Agent, FBI

I4insadc

1          (Case called)

2          MR. DeFILIPPIS:  Good afternoon, your Honor.  Andrew

3     DeFilippis and Garrett Lynch, for the government.

4          With us at counsel table is Special Agent Michael

5     Urbanowicz, of the FBI.

6          THE COURT:  For the defendant?

7          MR. WEISS:  Good afternoon, your Honor, Baruch Weiss

8     of Arnold & Porter, along with Andrew Bauer and Tal Machnes

9     and, of course, we have Mr. Sadder.

10         THE COURT:  Good afternoon.

11         We are here for a continued bail hearing.

12         The defense wanted to adjourn the hearing from last

13    week in order to respond to the government's response or file

14    their reply submission, which they have done.  The government

15    has also filed something as of yesterday so I think we're ready

16    to go.

17         Let me just hear from the defense.  Then I will hear

18    from the government.

19         I will probably have a few questions for folks, but

20    let me hear from the defense.

21         MR. WEISS:  Thank you, your Honor.

22         I would like to begin by trying to answer the

23    questions that your Honor posed to us last week.  I think you

24    left us with three questions or three issues that you wanted

25    our argument or position or guidance on.

I4insadc

1         In no particular order, one was the ties of Mr. Sadr

2    to the United States, which I understand to be an important

3    issue, and I am going to address that.

4         The second one is flight to Iran, and what is there to

5    demonstrate that he would not flee or not have the opportunity

6    to flee to Iran -- flee generally, of course, but I think most

7    specifically to Iran.

8         Then the third question which I think you put to us,

9    was, given the assets and the government's depiction of the

10   wealth and affluence in the family, how do we guard against a

11   situation, where even though there is a terrific bail package,

12   he just flees, and say the father reimburses the cosigners for

13   any losses they may suffer.

14        I think those were the three questions that the Court

15   put to us.  I'm prepared to direct myself to those questions

16   and to address some other issues that the government has raised

17   in its pleadings.

18        THE COURT:  Before you do that, again, I have read

19   your submissions.

20        In terms of the last concern that you have just talked

21   about, I have seen the affirmations/affidavits from the

22   proposed suretors indicating that they haven't had any

23   communication with anyone who has promised them that they would

24   reimburse them and the like, so you don't need to get into

25   detail about that.

I4insadc

1          My concern is still I am not exactly certain about the

2    how close some of the suretors are to him.  Some of suretors

3    are putting up quite a bit of money and quite a bit of their

4    assets.  There are others who are proposing to sign a bond for

5    $10,000 and the like.

6          MR. WEISS:  Right.

7          THE COURT:  I don't know what that means relative to

8    what their means are.  I still do have this concern, I am still

9    concerned about risk of flight, given his apparent financial

10   means and the financial means of his father.

11         Even if I take it at face value that these individuals

12   certainly haven't been promised that anyone is going to

13   reimburse them for some of these individuals, they are not U.S.

14   citizens.  They are citizens of the other places.

15         Again, we don't need to get into too much speculation

16   about that, but my concern is still that if he flees then it is

17   certainly likely, based on what you have submitted, that these

18   individuals may not get reimbursed, they would still be out in

19   the cold, and I am still not sure how much that is a sting to

20   him for some of these individuals if that were to happen.

21         So you can address that that way.

22         You don't need to go into the information about the

23   affidavits and that these folks haven't been promised, no one

24   has said anything to them about reimbursing them.  I want to

25   see if you can short circuit some of that.

I4insadc

1          MR. WEISS:  OK.

2          Thank you, your Honor.

3          THE COURT:  Yes.

4          MR. WEISS:  I was going to start with his ties to the

5   United States, although if it is OK, alternatively I will pick

6   up on this point, whichever your Honor prefers.  I am obviously

7   here to try to persuade you.

8          But maybe if the Court would let me address that issue

9   a little bit later in the course of my presentation, because I

10  think that once the Court sees the ties that he does have to

11  the United States that will color all of this.

12          I think it will play a role in assessing all of this.

13          THE COURT:  Let me ask you this, then, before you

14  begin to talk about the ties to the United States.

15          It seems that prior to his arrest he had no plan on

16  staying in the United States, and the only thing that would be

17  keeping him in the United States would be this case, but I will

18  hear from you.

19          MR. WEISS:  Yes.

20          He did have a plan to return to the United States.

21  This is a plan that's been 18 years in the formulation.

22          I know that sounds a little cryptic, so let me explain

23  who he is, what his plans were with respect to the United

24  States, all of which will then explain what he was thinking of

25  doing when he was arrested, about to fly out of the United

I4insadc

1   States at Dulles Airport to London.

2           So, he came to the United States, as the Court may

3   know from the pleadings, about 18 years ago, roughly the year

4   2000.

5           He left Iran with the intent never of returning to

6   live in Iran, and he has never returned to live in Iran.  There

7   have been visits along the way, which I will address, but he

8   has never lived in Iran since the day that he left.

9           His plan was and he succeeded in coming to the United

10  States.  He went to Cornell undergrad.  He got a graduate

11  degree from Cornell.  He went to Wharton.

12          His intent was at the time to stay in the United

13  States.

14          In 2003, roughly 2003, he filed for asylum.  He wanted

15  to stay in the United States beyond his period as a student,

16  and in the asylum application he made clear the extent of the

17  persecution that he had suffered in Iran.

18          And he went to some lengths to talk about how

19  difficult it was for him in Iran.  Indeed it was difficult for

20  his family.  His father had also suffered, despite his

21  financial successes, at the hands of the authorities there.

22          His asylum application was originally successful, and

23  his plan was to stay in the United States, to make his life in

24  the United States, not to make the life abroad, and certainly

25  not to make a life in Iran.

I4insadc

1              He had essentially cut his ties with Iran.  At this

2    period of time he was not visiting Iran.  He was not going back

3    to Iran.  He was staying in the United States.  This is where

4    he lived, this is where he studied, and his family was here

5    except for his father.  His mother had come here, his two

6    sisters had come here.

7              His mother eventually became a citizen.  His two

8    sisters are green cards that live in California.  His plan,

9    after graduating school he opened up a small private equity

10   firm here in the United States -- this is where he lived, this

11   is where he worked -- when he ran into immigration problems.

12             The immigration problems stemmed from the fact that

13   the attorney who had represented him in the asylum proceedings

14   was indicted for immigration fraud in a whole array of cases.

15             There was nothing to his understanding that this

16   immigration attorney had done in his particular case, but as

17   one could imagine, given the indictment of the attorney and

18   given the number of cases that were implicated, DHS was

19   conducting a review of essentially all of the cases that this

20   attorney had handled, including Mr. Sadr's case.

21             They started as an almost routine matter filing some

22   sort of fraud proceeding against asylees who were represented

23   by that attorney.  In his particular case, Mr. Sadr's case, he

24   was here in the United States.

25             DHS then said, you know, we think that your asylum

I4insadc

1     status is no longer valid.  We are going to revoke it unless

2     you can show us again that you deserve it.

3          This created a problem, because when DHS made that

4     announcement, made that decision, he automatically lost his

5     asylee status, even while he was here contesting their decision

6     to withdraw his asylee status.

7          Why is that important?

8          He now had no status.  He was here, and there are a

9     lot of asylum seekers who are here in kind of this semi-legal

10    but semi-not-legal status as they try to maintain their asylum

11    status even while the government is trying to remove them.

12         Having lost that asylee status created serious

13    problems for him in terms of his ability to work here and to

14    run his business.

15         So what he decided to do, because he wanted to stay in

16    the United States and he still wants to stay in the United

17    States, is, after consulting with immigration counsel, he

18    decided he would apply for a green card.  He was eligible for a

19    green card because his wife at the time was an American citizen

20    studying in -- I think it was G.W., George Washington or

21    Georgetown in Washington, D.C.

22         But in order to apply for the green card, he had to

23    leave the country.  That's often the case in green card

24    applications.

25         So, despite the fact that he was married to an

I4insadc

1   American citizen, and despite the fact that he wanted to stay

2   in the United States, despite the fact that he had been in the

3   United States now for about 10 years and this was his home and

4   he hoped it would always be his home, he left for what he

5   thought would be no more than a year to reapply, but this time

6   as a green card, to come to the United States so he could make

7   the United States his home.

8           He left the United States in order to be able to gain

9   the status, the immigration status that would enable him to

10  come back and live in the United States as a green card.

11          THE COURT:  Where did he go?

12          MR. WEISS:  So, very good question.  Where did he go?

13  The question is he wandered.  He spent some time in Dubai.  He

14  spent some time in Europe.

15          Essentially did not have a fixed permanent home.  His

16  wife would come visit him from time to time, but it was a

17  lonely existence, and he decided at that point perhaps what he

18  would do temporarily, while he was abroad he started thinking

19  about maybe he could go to Iran to visit his father.  Until now

20  he had not visited Iran since the time that he had left.

21          But he was living in various places.  He was doing a

22  lot of traveling.  He was living in a lot of hotels, waiting

23  and hoping for the green card to be granted, and he decided to

24  take a chance to visit his father.

25          Many years had passed since his 2003, several years

I4insadc

1    had passed since his 2003 asylum application, many years had

2    passed since the time that he had suffered at the hands of the

3    Iranian government, and he was ready to take a chance to see if

4    he could go just to visit.

5           To put it bluntly, the man was lonely, and he could

6    not come back to the States.  His home had become the States.

7    His wife was here in the States, and his family was here in the

8    states.

9           THE COURT:  Can you tell me, why did he take this

10   chance if in fact there is this abiding fear of political

11   persecution?

12          MR. WEISS:  Yes.  There were a few things.

13          One is that a significant amount of time had passed

14   since the filing of his 2003 affidavit and the events that they

15   related to, which were three years earlier.

16          So there had been quite a bit of time that had

17   elapsed.  He was also -- not now, but then -- quite a small

18   fish, somebody who, although he was concerned about the

19   Iranians and how they would treat him, was not going to be

20   number one -- in contrast to his situation now -- on the

21   Iranian's list of people that they have to track down and trace

22   and punish.

23          And so he decided to take a chance.  It was also

24   commonly known and proved correct that if you go for a short

25   visit, if you are not making a presence there, if you are not

I4insadc

1    buying property, if you are not investing, if you are not

2    opening a bank account, at the time there wasn't super-careful

3    scrutiny by the Iranians at the border with respect to the

4    smaller fish.

5            He decided to take a chance, and he went, with some

6    trepidation, but he went for a few days.

7            THE COURT:  Just back up for a second.

8            MR. WEISS:  Yes.

9            THE COURT:  At this time are you saying that there's

10   still this fear of political persecution?

11           MR. WEISS:  At this time his fear of political

12   persecution was still there, but diminished because of the

13   passage of time, since he had suffered the persecution and the

14   very significant amount of time since he had last been in Iran.

15           Then there's always the political situation.  These

16   Iranian expats are always looking at Iran and what is the

17   political situation like today.  Is it better than yesterday?

18   Is it worse than yesterday?  Is it more dangerous today?  Is it

19   less dangerous today?

20           He decided to take that chance and to go.  It was a

21   chance.

22           THE COURT:  It seems like a mighty big chance if in

23   fact there's this fear of political persecution.

24           MR. WEISS:  I think it was a big chance.  I think it

25   was not as great a chance as it was in 2003, given the passage

I4insadc

of time, and it certainly was not as big a chance as now, which
we'll get to later, where the risk to him would be vastly
greater.

          But he took a chance, and he went and nothing
happened.

          THE COURT:  You are saying that in his mind at that
time in taking this chance he had hoped, and it turned out to
be correct, that he could sort of slip through?

          MR. WEISS:  Under the radar.

          And the two expert opinions that we provided to you,
one from professor Amir Amadi -- who is here today, by the way,
and one from Colonel Martin support that, that there is the
ability for people to go in under the radar, especially when
they are the kind of small fish that we are talking about the
characterization of Mr. Sadr at the time as opposed to the
characterization of him now.

          It was not his intent originally when he went in for a
short visit to make as many visits as he eventually did, but
there were two things that happened, one of particular
significance.

          The first, and I think particularly important, is that
early on he learned that his father had bladder cancer.  At the
time it was believed to be a virtual death sentence, although
the father is still alive and well, as you know -- maybe not
well, but he is alive, as you know from the pleadings.

I4insadc

1              That vastly added to the impetus to come to Iran when

2       he could very often for a short visit.  These were all very

3       short visits of a few days either to visit his father or in

4       some instances to go and get his father and take him out of the

5       country to Europe for medical treatment that he needed, first

6       as a result of the bladder cancer and then as a result of some

7       other serious physical ailments.

8              THE COURT:  How was that done?

9              MR. WEISS:  How was?

10             THE COURT:  The father being taken.

11             You seem to imply in some of the other submissions

12      that the father is being closely guarded and closely watched,

13      but at this time he was able to take his father out of the

14      country --

15             MR. WEISS:  Right.

16             THE COURT:  -- to Europe.

17             Was there some subterfuge involved in that, or how was

18      that done?

19             MR. WEISS:  As I understand it, the father's passport,

20      he needs essentially to go to court and get permission from the

21      authorities each time he wants to leave.  He has to explain why

22      he wants to leave.

23             It's not like -- you or I could just go out and

24      travel.  We don't have to explain to the authorities here where

25      it is where we want to go or for how long.

I4insadc

1          He actually has to go to Court and get permission to

2     leave, and they did give him permission to leave for medical

3     reasons.  Sometimes they would give him permission to leave for

4     other reasons I think, but medical reasons was one of the

5     reasons that they would authorize this as they kept a careful

6     watch on him and authorized him to leave for certain short

7     periods of time.

8          And it's also at this time -- I don't want to leave

9     out the business side of this -- that Mr. Sadr, the son, was

10    not engaged in business in the States now.

11         He was waiting to get back in on his green card, and

12    his father suggested to his son, you know, at least while this

13    is going on, why don't you come work for me.

14         This is exactly when the government in the indictment

15    claims that the whole Venezuela project was taking place, the

16    Venezuela project that is alleged in the indictment.

17         So the connection between father and son was filial,

18    it was medical, and then it also developed into this business

19    arrangement taking place.

20         THE COURT:  He was working for the father where?

21         MR. WEISS:  This was a Venezuela project.  He could

22    work anywhere on the globe.  He was not working out of Iran.

23    He occasionally had an e-mail or a conversation when was in

24    Iran, but he was primarily not in Iran.  Wherever he was, he

25    sometimes was in Turkey, he was sometimes in Venezuela, he was

I4insadc

in Dubai for a short period of time, wherever he was, he was
working with the father on this project.

A year passed -- and, by the way, when you look, you
know, the government goes on about how many trips there were to
Iran.  Those trips to Iran, with just a few exceptions that
came afterwards, were generally during this period, which
turned out, instead of being one year, to be two and a half
years that Mr. Sadr was abroad applying for and waiting to come
back to the United States on his green card to get into the
United States.  The vast, vast majority were during that
period.

The number of visits which they catalogue, with just a
tiny handful after he got his green card, which was in November
of 2012, and then came back to the United States.

One footnote with respect to 2012.  The government
makes a big deal of the fact that as part of the immigration
process Mr. Sadr provided another affidavit about his
persecution in Iran in 2012, the very period where he was
entering Iran with some frequency on these short trips.  They
claim that shows essentially that he is a liar.

That reveals a fundamental misunderstanding and a
misreading of what was going on at the time.  Let me explain
that, because there was no misstatement or misrepresentation at
the time.

What was going on was, in the course of his green card

I4insadc

application process, DHS was reviewing the history of his

earlier asylum application, and they wanted to be sure that on

the green card they were not admitting anybody or granting a

green card to anybody who had made false statements in the

past.

He had filed his original affidavit when represented

by the problematic attorney.  So they said was it true that in

2003 you were not going to Iran because you had a fear of

persecution at the time?

In 2012, referring back to 2003, he confirmed via

another affidavit that when he had applied for the asylum

application he had what he felt to be a well-founded fear of

persecution.

He was not stating in the affidavit that in 2012 he

could no longer go to Iran, but what he was doing was he was

affirming, confirming the accuracy of the affidavit that he had

filed back then.  The purpose for asking the affidavit was the

DHS wanted to be sure that they were not granting a green card

to somebody who had intentionally made some sort of fraudulent

application back in 2003.

So he finally gets the green card in 2012, and he

returns to the United States.  He returned to the United

States, again where his mother lives and his two sisters live,

and it was the intention when he came to the United States to

live in the United States.

I4insadc

1          It's important to note that in that period that he was

2    out, although he visited Iran, he did not move back to Iran.

3    He could have moved back with his father.  He didn't.  He

4    didn't want to live in Iran.  He would rather wander than live

5    in Iran.  He was going back to Iran because of his father.

6          THE COURT:  We are talking now about 2012?

7          Is that what we are talking about?

8          MR. WEISS:  November 2012 is when he finally got the

9    green card and came back to the States.

10          THE COURT:  That's when he's still married to the wife

11    who is a U.S. citizen?

12          MR. WEISS:  Yes.

13          THE COURT:  And his current wife is not that wife?

14          MR. WEISS:  Correct.

15          THE COURT:  The current wife is a Turkish citizen?

16          MR. WEISS:  Right.

17          They subsequently got divorced and he remarried to his

18    current wife, with whom he has two children who are American

19    citizens, both of whom I may add really need their father, a

20    baby and a two-and-a-half-year-old, and they are, the children

21    are American citizens his wife is not.  His current wife is

22    not.

23          THE COURT:  OK.  The first marriage, when did that

24    dissolve?

25          MR. WEISS:  May I check?  I don't know off the top of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4insadc

1    my head.

2           THE COURT:  Sure.

3           MR. WEISS:  The divorce was finalized in 2015.

4           THE COURT:  OK.

5           All right.  His current children are how old?

6           MR. WEISS:  A baby and a two-year-old.

7           THE COURT:  OK. I thought it was two and half, but

8    whatever.  That is fine.  I'm trying to make sure I have the

9    chronology here.

10          MR. WEISS:  Yes.

11          THE COURT:  When you were talking before about his

12   wife visiting him when he was wandering before --

13          MR. WEISS:  That was not his current wife.

14          THE COURT:  That was the first wife?

15          MR. WEISS:  That's correct.

16          And she was a U.S. citizen, and it was on that basis

17   that he was eligible for the green card at the time.

18          THE COURT:  OK.  The wife is a Turkish citizen?

19          MR. WEISS:  Yes.

20          THE COURT:  And the current wife's parents are in

21   Turkey.  Is that correct?

22          MR. WEISS:  The dad is actually here in the courtroom,

23   but, yes, they live in Turkey, yes.

24          The dad and many other family members and potentially

25   cosigners are here in the courtroom, your Honor.

I4insadc

THE COURT:  Other than your client, what is the
current wife's connection to the United States?

MR. WEISS:  Right.

So she currently has or is coming to the end of this
ten-year visa authorization that she has that would allow her
to come in as a tourist only, not as a green card.

But they currently, as I was going to get to, when he
came to the United States and after he and his first wife got
divorced and he remarried his Turkish, his wife who is Turkish,
they rented an apartment in London -- didn't buy but rented for
a number of reasons.

One reason is because she and he want to live in the
United States and want her to apply for a green card.  And if
she's in the United States under her tourist visa, she cannot
apply for a green card, because on a tourist visa you say I am
here just to be a tourist, and then I am going to leave, which
is inconsistent with the green card application.

This is another example of how you have to be abroad
to apply to get a green card to live in the United States.  The
other reason they rented an apartment in London was because one
of the businesses that he embarked on soon after coming back to
the United States was he invested in a bank in Malta.

The bank in Malta, which he was running until this
arrest essentially destroyed the bank, was going to open an
office or a branch or some sort in London.

I4insadc

1        So, he and his wife made the decision to temporarily

2   rent an apartment in London so that he can take care of the

3   business, which was pulling him away from the United States in

4   any event, and they could -- and she could apply from London

5   for a green card that would allow them to do what they were

6   planning to do, which was come back to the United States and

7   settle in the United States.

8        They bought an apartment in Washington, D.C., and they

9   spent about a million dollars on the apartment.  They spent

10  about $500,000 on the amount.

11       The intent originally was to live in that apartment in

12  Washington, D.C.   The reason for Washington, D.C., is

13  Mr. Sadr's mother lived in suburban Washington, D.C.  She lived

14  in the area.

15       THE COURT:  Hold one second.

16       Go ahead.

17       MR. WEISS:  Thank you.

18       That plan was adjusted because the two sisters, as

19  I've mentioned, live in California.  They changed their plans

20  and decided that, although they do want to live in the United

21  States, they want to make it California rather than the

22  Washington, D.C., area.

23       The mother sold her home -- it was a very large

24  home -- and moved into a much smaller apartment pending the

25  shift to California.

I4insadc

1          They took the apartment which they had originally

2    planned to live in and recently put it up for sale so that they

3    can move to California.  Indeed, the family already purchased a

4    piece of land in California, which has now ended up in the

5    forfeiture allegations in the indictment, in Malibu.

6          So they came back to the United States intending to

7    live in the United States, but there were a number of things

8    that drew him abroad quite often.

9          One was the bank, this bank in Malta, which became

10   more and more and more of the work that he was doing, and the

11   other was the plan to set up this apartment in London to enable

12   the wife to apply for a green card to come back to the United

13   States.

14         When his wife became pregnant, they made sure that she

15   would give birth here in the United States both times because

16   they wanted their children to be U.S. citizens, because they

17   were intending to moving to the United States and making the

18   United States their home along with his mother and his sister

19   in California.

20         So, yes, the government has made quite an argument

21   about how in the recent past Mr. Sadr has not been in that home

22   in Georgetown, Washington, D.C., and he's not been that much in

23   the United States.  That is true.

24         In the arc of his life, coming from Iran to the United

25   States until from 2000 until now, there are a couple of things

I4insadc

1      that are important to note.  He has lived in the United States

2      more than any other country by far.  His adult life has been

3      more in the United States than anywhere else.

4              He has filed tax returns ever since he got a Social

5      Security number when he was back at Cornell, U.S. tax returns.

6              Even during those years when he was -- the two and a

7      half years when he was in this immigration purgatory waiting to

8      come back to the United States, he still filed U.S. tax

9      returns.

10             He has never owned an apartment to live in in his name

11     except in the United States.

12             The credit cards that he has are issued by banks in

13     the United States.

14             If you had stopped him the day before he was arrested

15     and said, which is the country that you feel to be your home,

16     he would have said the United States.

17             If you would have asked him, where do you want to

18     spend the rest of your life, he would have said the United

19     States.

20             If you would have asked him -- I mean, he speaks

21     English at home.

22             If you asked him what his values -- his values are

23     westernized values.  They are very, very far from the very

24     different values and culture in Iran today.

25             If you had asked him where he wanted to live, he would

I4insadc

| | |
|---|---|
| 1 | have said, We were going to live in Washington, D.C., but our |
| 2 | plan is to live in California. |
| 3 | So his ties to the United States are stronger than |
| 4 | they are to any other country.  There's no other country where |
| 5 | his ties are stronger, certainly not Iran, and there's no other |
| 6 | country where he's lived in his adult life compared to the |
| 7 | United States. |
| 8 | In terms of values, culture, time spent, it's the |
| 9 | United States. |
| 10 | He's never lived in Iran since he left, although he's |
| 11 | visited, but he's never lived in Iran since then, and he's |
| 12 | lived now temporarily -- he has an apartment in London for the |
| 13 | reasons that I have explained.  He was sojourning for two and a |
| 14 | half years abroad in different places while he was waiting to |
| 15 | come back to the United States. |
| 16 | His ties are to the United States.  They are not as |
| 17 | tight as your ties.  They are not as tight as my ties in the |
| 18 | sense of counting up the days in the past year how many of |
| 19 | those days did he spend in the United States. |
| 20 | But where else is he going to go?  Iran is not home to |
| 21 | him, and I'm going to get in a minute about his inability to |
| 22 | flee to Iran even if he were inclined to go there. |
| 23 | So the other thing I should add in terms of ties to |
| 24 | the United States is he has also purchased real estate here |
| 25 | apart from his apartment, or more accurately he has business |

I4insadc

interests that own pistachio farms in California which he helps
run.

It's not his everyday job, but that is part of what he
does.  Indeed, the family has invested in a series of pistachio
farms in California which he helps run, and some of those have
found their way also into the indictment in the forfeiture
allegations.

In addition to his personal ties, now I think I want
to start getting finally to the question that you were asking
at the beginning.

His community and his ties are here in the United
States.  His friends from Cornell and from his school days, his
friends in the community here in the United States, these are
the people that he's gotten to know, and these are the people
who are ready to put up their homes, their 401(k)s, and their
bank accounts for him.

The majority of the people who are signed up in this
extraordinary package are U.S. citizens.  I don't remember if
the number was 23 or 24 out of the close to 40 -- maybe 25.  I
don't remember the exact number, but it was a clear majority of
the people who are ready to sign up are U.S. citizens, and we
have a fair number -- let me just pull out the -- we have a
fair number who have offered to put up their homes.

There are, I think, seven different people are couples
who have offered -- amongst the cosigners who have offered to

I4insadc

put up their homes that aggregate in the many millions of
dollars.  These are people who are close to him.

        What we're proposing in terms of a package, although,
you know, we're open to suggestions, I mean, we will do
anything that we feasibly can, is there will be one package
that we are proposing that he would sign a $20 million bond and
put up his assets, all his significant assets that he can to
secure that.  It would be cosigned by his two sisters and by
his mother, all of whom are financially responsible persons
here in the United States.  Again, the two sisters are green
cards.  The mother is a citizen.

        The assets that he would put up are the assets that we
put in our brief, and I should note that some of his assets,
some of which are located abroad, are now temporarily blocked
or frozen by certain foreign governments.

        For example, Malta has essentially installed a
trustee -- they call it a competent person -- to wind down the
bank.  Once they do wind down the bank, any money left over
will return to him as the owner.

        He has a bank account, he has some assets in Cyprus
which he's disclosed.  They've put a temporary block.

        But we have actually, in terms of the technical
details, various suggestions about how his interest in those
foreign assets can be locked in in a way that would effectively
help with respect to the bail.  Those are details that I'm

I4insadc

happy to address if we get there, and hopefully we will get there.

But he is ready to put up his major assets.  I say "major" because he has some bank accounts that, if he's released, we would like him to have access to to live, for expenses and so on.

His wife and children would live with him.

He would live in the apartment in Washington, D.C., and he could be in the custody of his mother, who is a psychologist, and who is, as I said, a U.S. citizen.  That would be kind of one bail package.

The second bail package would be the other individual cosigners.  We have up to 36.

They are ready -- these numbers have changed a little bit.  They've gotten a little bit better than the numbers that we put in the papers, but they've got almost $14 million worth of bonds that they've volunteered to sign, and it would be secured by about $8 million in cash.  Some of it is apartments; some of it is 401(k)s and other assets.

These are people who are close to him.  Some are family.  Some are cousins in the United States.  Some are childhood friends.  Some are colleagues.  This is his community.

The way these people came forward, your Honor, was when he was arrested, the family reached out to anybody and

I4insadc

1    said, Is there anybody who wants to help Ali?

2           And these people came forward and volunteered.  Those

3    are people who have -- these are people, some of whom have

4    known him since he was a baby, family and otherwise.

5           These are people who know him, who know his character,

6    who have faith in his character and are therefore not afraid to

7    put up in many instances their homes or their assets, confident

8    that he's not going to flee.

9           They've sent a series of letters, which we have

10   attached to the filings that we've made.  They attest really to

11   his character and their confidence in him that he will not

12   flee.

13          For example, to give you one example, this is an

14   excerpt from Katherine Wharton (phonetic), who was a friend of

15   15 years from California.  This is typical of a lot of these,

16   and I think it goes to your question:  Are these people who are

17   close to him, who will feel a sting?  Will he feel a sting if

18   he hurts them?

19          So she writes, "Amidst the many distractions of

20   teenage-hood, Ali was a pillar of strength and respect, someone

21   I admired for his ability to prioritize his family and his

22   values.  He pushed Nagarin" (phonetic) -- that's one of his

23   sisters.

24           "He pushed Nagarin and I in a positive direction,

25   reminding us of the importance of education and focusing on our

I4insadc

1    goals.  He has an old soul and was often at home spending time

2    with his mother and grandmother and tending to household

3    responsibilities.  Though I knew Ali was originally from Iran,

4    I always saw him as an American.  He embodies the ideals that

5    America espouses, and his dreams were to start his own family

6    and to be an entrepreneur where he could provide opportunities

7    to others."

8           I mean, we've got so many letters like that from

9    people who really know him and people who have demonstrated

10   this confidence they have in him by putting up their assets.

11          Let me read to you, if I could, one or two more.

12          This is from in Andrew James Yalsin (phonetic), who is

13   here today, if I may ask him to stand.  He is Mr. Sadr's

14   brother-in-law he.  Married the sister Pegga (phonetic).  In

15   his letter he talks about a glacier mountain climbing trip, and

16   he goes on at some length the travails they suffered, and he

17   said, "Ali and I were tied together on a glacier at midnight in

18   the middle of a blizzard, and together we made it through by

19   relying on and supporting each other.  I trust Ali with my

20   life.  I trust him to come to trial."

21          Again, this is present again and again.  They are

22   putting up their home.  His sister Pegga and his brother-in-law

23   Andrew are putting up real property and their home.

24          If I can return for one moment to the sort of core

25   bond which Mr. Sadr would sign, we're offering $20 million,

I4insadc

signed by his mother and his two sisters.  The mother has a

million dollars, a little bit more than a million dollars in

equity in two different apartments that she would add to his

package.  The sister Pegga has over a million dollars that she

and Andrew would add to the package as well.

I might also add that we didn't include but are

prepared to include the sister Pegga has probably over $4

million in additional assets, which we didn't include because

they are part of the forfeiture allegations, and the government

said we don't want any forfeitable assets to be put up for

bail.

Well, we don't think they will be forfeited at the end

of the day.  We are prepared to put them up.  We think that we

have, as I'll get to in a moment, a strong case, and we think

that ultimately they will not be forfeited.

We think that the family and Mr. Sadr have confidence

that they'll win the case, and it therefore will provide added

assurance that he will not flee.

This is an amazing package, your Honor.

I did this for 18 years when I was in the U.S.

Attorney's Office.  I never saw a package like that when I was

a prosecutor, perhaps you have.  I am not going to say there's

never been a package like this, but from up to 40 people who

are prepared to come forward and sign people who know Mr. Sadr

and have faith in Mr. Sadr and are ready to demonstrate that

I4insadc

1    faith, I think that's pretty unusual.

2           I should add that I think it's far in excess of what

3    the two pretrial services officers had recommended, both the

4    pretrial services officer in the Eastern District of Virginia

5    and the pretrial services officer here.

6           I, again, would like to turn to the flight to Iran and

7    the risk of flight to Iran, and I would like to talk about the

8    expert opinions that we've provided, two expert opinions and

9    then two supplemental expert opinions.

10          THE COURT:  OK.  I've read those.  We don't need to go

11   into detail on that.

12          I may have some questions about that --

13          MR. WEISS:  Yes, your Honor.

14          THE COURT:  -- later.

15          Again, the concern again is about him being a risk of

16   flight outside of the United States.  Iran is one of those many

17   places that he's been.

18          MR. WEISS:  Right.

19          THE COURT:  But there are a lot of places he could

20   flee to, some of which are places from which he could not be

21   extradited.

22          That is sort of -- not sort of.  That's the concern.

23   That is the concern.

24          Also let me just focus your attention on this.

25          MR. WEISS:  Yes, your Honor.

I4insadc

1          THE COURT:  We didn't talk about this the last time

2     because you said you wanted some time to respond to the

3     government's response, but I am disquieted by the fact that in

4     these asylum applications he talked about fearing political

5     persecution in Iran.

6          You've explained that the 2012 application was really

7     just referring back to the application in 2003.

8          MR. WEISS:  Yes, your Honor.

9          THE COURT:  But it seems to me that it's either one of

10    two things:  Either when he says that he fears political

11    persecution in Iran, when you take that statement and you

12    combine it with the fact that he traveled to Iran on multiple

13    occasions --

14         MR. WEISS:  Yes.

15         THE COURT:  -- it means to me -- maybe there is

16    another way of looking at this -- either that he lied in that

17    application and didn't fear any political persecution, or

18    perhaps it's, I think what you are saying is that he takes very

19    big chances.  But that is a mighty big chance.

20         Someone who is taking those kinds of chances on

21    multiple occasions certainly seems like someone who is more of

22    a risk of flight.  Someone who's taking that kind of chance and

23    trying to sneak into a country in which this person fears being

24    locked up and tortured and does that on multiple occasions

25    doesn't give me a lot of confidence that this person is the way

I4insadc

1    the person in the letter described him as a teenager, sort of

2    this very sober, calm, homebody, designated-driver type.

3             Can you talk about that?

4             MR. WEISS:  Yes, I'm happy to talk about that.

5             Let me first address the most pressing issue:  Is he a

6    risk of flight now?

7             Then I will go back and I think further address the

8    issue of how truthful he was then.

9             There are a host of reasons which were I think pointed

10   out by the experts to believe that no matter what chance he

11   might have taken then, he will not take that chance now.

12            That is because the situation is far more perilous for

13   him now than it was then.  That's because of a whole series of

14   factors.  Each one would be enough I think to change the

15   calculus, but in the aggregate it makes it almost a certainty,

16   which is not the standard we need here, of course.

17            THE COURT:  Before you go there, let me just pose this

18   to you.

19            MR. WEISS:  Yes.

20            THE COURT:  You are talking about taking risks and

21   taking chances.  One usually weighs the potential benefits

22   against the potential risks.

23            If we go back to what you were talking about before,

24   when he went to Iran --

25            MR. WEISS:  Yes.

I4insadc

1              THE COURT:  -- after he had these issues with his

2      asylee status.

3              MR. WEISS:  Yes, your Honor.

4              THE COURT:  You mentioned the fact that he was lonely.

5              MR. WEISS:  Yes.

6              THE COURT:  He was wandering around, but, again, that

7      wandering that talking about is not sort of wandering around

8      like the fictional Bruce Banner in The Incredible Hulk backing

9      around in tattered clothes going from town to town.

10             MR. WEISS:  Right.

11             THE COURT:  He's traveling all over the globe.

12             MR. WEISS:  Right.

13             THE COURT:  And that he felt lonely and thought this

14     was a good opportunity to connect with his father.  I certainly

15     don't want to minimize his father's medical situation, but as

16     you explained later, the father was able to leave Iran and go

17     to other countries --

18             MR. WEISS:  For medical treatment.

19             THE COURT:  -- to get treatment.

20             It seems to me your client certainly could have met

21     with his father in those other countries when his father went

22     to get that treatment.

23             I am not sure what the benefit was for going to Iran

24     when you weigh it against the potential risk.  I understand if

25     you are saying that then there was a 75 percent chance that he

I4insadc

might get caught, or even if you say it was a 40 percent chance

that he might get caught, but the result of him being caught

according to you is that he would face real persecution and

perhaps be tortured.

          MR. WEISS:  Now.

          THE COURT:  But even then, face real political

persecution --

          MR. WEISS:  Yes.

          THE COURT:  -- for the benefit of seeing his father in

Iran as opposed to seeing his father in Europe and for curing

his loneliness somewhat, even though you indicated that his

previous wife was visiting him in all of these other countries

or some of these other countries where he was.

          That seems like a pretty big risk to take.  If now

what you are saying is hypothetically it is an 85 percent or a

95 percent chance that he would get caught and that he would

suffer grave consequences for going back to Iran, it still

seems that what I am faced with is someone who, according to

you, is a pretty big gambler, takes some pretty big risks.

          Again, it may be, and I think the government's

position is it's not that he's taking risks.  It is that he

lied on the asylum application and he doesn't face any

political persecution.

          MR. WEISS:  Right.

          THE COURT:  But just going on your version of events,

I4insadc

1   let me hear you talk about that.

2          MR. WEISS:  I think, first of all, if you look at the

3   expert opinions -- and these are two very different experts who

4   converge in this area, a former colonel in the U.S. army who is

5   responsible for antiterrorism and anti-Iran actions and a

6   professor with a very impressive CV who himself is Iranian

7   born.  So he has the academic approach but also the language

8   skills and sort of the culture.

9          They all say that, as a westernized person with his

10  background, he was taking some chance when he went there at the

11  time.  They also both say that the chances that he would take

12  now make it much closer to a certainty.  And also the

13  consequences now -- they talk about torture.  The consequences

14  now would be far more severe, as severe as they might have been

15  then.

16          Why is that?

17          Well, there are a number of things that have happened

18  since then.  One is the political situation now is different.

19          There was a fair amount of unrest in Iran this past

20  fall, and it was not just concentrated, as it typically has

21  been in the, past in kind of the more liberal universities, but

22  it was spread much more across the country and amongst many

23  groups that had previously been supporters of the regime.  That

24  has put the regime on edge, in a crackdown mode that --

25          THE COURT:  OK.  I got it.  I understand that.

I4insadc

1          Again, I have read the reports.  I understand all

2     that.

3          MR. WEISS:  OK.

4          THE COURT:  My concern is based on what you are saying

5     is that he, in terms of his history and characteristics,

6     doesn't show himself in regards to traveling to Iran to be

7     someone who is particularly cautious when weighing the risks

8     and benefits.  And now he faces this other real risk of being

9     convicted of a crime and sentenced to jail.

10          MR. WEISS:  Yes.

11          THE COURT:  If he went to Iran facing potential danger

12     because he was lonely before, how much more is the incentive to

13     go somewhere, whether it is Iran, whether it's St. Kitts,

14     whether it's to London on his way to Brazil, whether it's

15     somewhere else.  It seems that there is a great incentive for

16     him to leave the United States.  I understand that your

17     position is that of the, whatever number we want to say, the 20

18     countries that he has visited, the United States is his number

19     one.  Well, it seems like that calculus may change now with

20     this indictment.

21          Let me just hear you if you want to address that.

22          Again, I have read the reports.

23          MR. WEISS:  OK.

24          THE COURT:  I understand the reports.

25          MR. WEISS:  OK.

I4insadc

1          THE COURT:  I understand their position.

2          My concern is about him, now being faced with this

3     criminal indictment, being faced with the potential of being

4     convicted and going to jail, fleeing the United States when he

5     has had all of this international travel and has traveled to

6     all of these different countries.

7          MR. WEISS:  Right.

8          THE COURT:  That's what my concern is.

9          MR. WEISS:  So, there are a few different responses to

10    that.

11         One is we've cited for you a number of cases where

12    sanctions defendants in criminal cases were granted bail with

13    connections to the United States that were nonexistent.

14         There was one case, for example, that we quoted, we

15    cited for you, it was the *Kearny* case out of D.C., where the

16    defendant was an Israeli South American who had no connections

17    to the U.S. except he was here on a ski trip.  He was charged

18    with selling nuclear triggers to Pakistan, and he got bail over

19    the government's objection.

20         THE COURT:  Let me see if I can make sure I am being

21    clear about what I am concerned about.

22         MR. WEISS:  Yes.

23         THE COURT:  It is not simply a matter of his lack of

24    ties to the United States.  Hypothetically speaking, if we were

25    talking about a different kind of criminal defendant, someone

I4insadc

1    who was charged with, say, a similar crime or even the same

2    crime --

3              MR. WEISS:  Yes.

4              THE COURT:  -- and he was a citizen of Canada and had

5    one passport, a Canadian passport, and the government had that

6    passport and that person had left Canada twice in his life,

7    once 15 years ago and once 10 years ago --

8              MR. WEISS:  Yes.

9              THE COURT:  -- the fact that person isn't a U.S.

10   citizen, the fact that that person doesn't have connections to

11   the U.S. isn't as troubling as it is when someone has traveled

12   all over the globe and is more of a risk of flight in that

13   regard.

14             So it's not simply the fact that he doesn't have ties

15   to the United States.  He has some ties to the United States.

16             What concerns me is I am not sure he has a lot of ties

17   anywhere.  He tends to wander around, which is fine, but it

18   presents a problem in this sort of situation.

19             MR. WEISS:  Right.

20             THE COURT:  But he's not particularly solid in terms

21   of his connections here, nor is he particularly solid anywhere,

22   but he has connections in London and Dubai and Iran and St.

23   Kitts and all sorts of other places.

24             So it's not simply a matter of someone who doesn't

25   have connections to the United States.

I4insadc

1            MR. WEISS:  Right.

2            THE COURT:  It's someone who has traveled extensively

3   and has quite a bit of money.  Again, I know we talked about

4   this the last time as well.  It is not a matter of just someone

5   who is wealthy.  If you have a wealthy individual who is

6   charged with this crime, again, who hadn't had much extensive

7   international travel and had one passport that the government

8   had, that's different than what we are talking about here.

9            MR. WEISS:  OK.  Your Honor, you have raised a big

10  question with a lot of subparts, and I think I can address

11  them.

12           THE COURT:  OK.

13           MR. WEISS:  Let me address the passports.

14           There's been a lot going on here about the passports.

15  The government started off by claiming he had passports from

16  four countries.  No, he didn't.  Three countries.

17           THE COURT:  I am sorry to cut you off, but I want you

18  to move past some of the facts that I am already very familiar

19  with from the submissions.

20           MR. WEISS:  All right.

21           THE COURT:  You have explained in your submissions

22  that the government was mistaken when the government said he

23  has four passports from St. Kitts.

24           MR. WEISS:  Right.

25           THE COURT:  And you've explained that he's had four

I4insadc

1    passports, but the other two basically got filled up, the third

2    one is almost full, and he has this fourth one.

3              MR. WEISS:  Right.

4              THE COURT:  But therein lies my concern.  It is all

5    the travel that is filling up all of these different passports.

6              I know that lawyers like to go back and forth at each

7    other and point out when their opponents make mistakes.  The

8    fact that the government seems to have made some mistakes here

9    in terms of the facts regarding this bail application is

10    somewhat more understandable because there is a lot of

11    confusion dealing with all the travel that he's had and given

12    the fact that at one point he told pretrial he had $5 million

13    and at another point he said $27 million.

14              There's a lot of things that are moving.  There are a

15    lot of different moving parts here, but I understand your

16    position --

17              MR. WEISS:  OK.

18              THE COURT:  -- on the passports.

19              I think your position is that he has passports from

20    two countries.

21              MR. WEISS:  Correct.

22              THE COURT:  From Iran and from St. Kitts.

23              MR. WEISS:  Correct.

24              THE COURT:  So I got that.

25              MR. WEISS:  Correct.

I4insadc

1          As a condition of bail, of course, he has to turn in
2    every passport he has, expired or not, to the Court or the
3    government.  So he will not have any passports in hand.
4          THE COURT:  Where are they now?
5          MR. WEISS:  The family has them, and we can turn them
6    over to the Court as part of bail.
7          THE COURT:  OK.  Go ahead.
8          Continue.
9          MR. WEISS:  And we could, of course.
10         With respect to the countries that he's traveled to,
11   your Honor, with one exception, which I will address in a
12   moment, they all have extradition treaties, enforceable
13   treaties with the United States.
14         The U.K. of course has an extradition treaty with the
15   United States.
16         St. Kitts, although he hasn't spent much time there,
17   although he is a citizen, has an extradition treaty with the
18   United States.
19         Turkey has an extradition treaty with the United
20   States.
21         I mentioned last time, by the way, that we found an
22   announcement by the president of turkey where he said they had
23   extradited 12 people to the United States over the past few
24   years.
25         And you said something that I interpreted as that's

I4insadc

1  really not a very large number.  Does that give much

2  confidence?

3          So I went to check see how many the U.K. has

4  extradited.  No one is going to question the relationship

5  between the U.K. and the United States.  And the number was the

6  same order of magnitude.

7          In other words, the number of international requests

8  that are made for extradition is not that many.  The question

9  is not how many were actually granted.  The question is how

10  many were not granted or turned down.

11          We have no reason to think he is not a Turkish

12  citizen, that Turkey would not extradite.

13          Malta, where he has his bank, has an extradition

14  treaty with the United States.

15          If you go through all the countries that he's traveled

16  to a regular basis that the government keeps talking about, the

17  only country that we don't have a current extradition treaty

18  with is Dubai.

19          Now, that doesn't mean that the United States would

20  not easily get him even in the absence of a formal extradition

21  treaty.

22          First of all, Dubai has a statute that says -- and

23  we've looked into this -- that they can turn over people even

24  without an extradition treaty upon a request from foreign

25  nations.  And the relationship between United States and Dubai

I4insadc

1    is such that the United States has tens of thousands of

2    citizens who live in Dubai.  It has a huge naval base in Dubai.

3           The relationship between the United States and Dubai

4    is very close, and the relationship between Dubai and Iran is

5    very tense.  Dubai is closely allied with the Saudi Arabia in

6    the whole Shiite/Sunni schism, which is my way of simply saying

7    that I think if the government would check with its Office of

8    International Affairs and with the State Department, what it

9    will find is that, as a practical matter, even if he were to

10   flee to Dubai, and in the absence of an extradition treaty, if

11   the United States were to make a request to Dubai for him to be

12   turned over to the United States, I dare say it would be

13   granted.

14          And I think that if we check with the experts in the

15   Justice Department and the State Department, we would find out

16   that that request would likely be granted.

17          THE COURT:  But is it true that the argument that you

18   are making now in terms of him being able to be extradited from

19   these other countries presumes that if he went to one of those

20   countries that he would stay there?

21          Doesn't it presume that, as opposed to him going to

22   London and then flying somewhere else?

23          MR. WEISS:  If he flees the United States -- and how

24   would he do that?  We should talk about the logistics of how he

25   would be expected to do that.  That is not so easily done these

I4insadc

days.  Would he swim the Rio Grande and go to Mexico and

then -- what? -- knock on the Iranian door and ask them for a

passport.  It is not easily done.

As soon as he flees, there are arrest warrants in

Interpol, and they are across the globe when he flies.  Unless

he ends up in North Korea or a series of countries almost like

North Korea, given his citizenship, the United States is going

to be able to get him.

We understand his international lifestyle.  To

counterbalance that, that's why we've offered an unusual

package, a bail package.

I normally would not come in with a bail package like

that in a case like this.  It is not a presumptive detention

case.  It is not a crime of violence.  It is not a crime of

drugs.

I might also add, in terms of his incentive to flee,

that I think the Court should give zero credence to the

so-called guidelines calculation that the government has made,

where at one point they said, oh, he's going to get a 360-month

sentence for building low-cost housing in Venezuela.

Had he done that and been paid in euros instead of

dollars, we wouldn't be here.  Even if you willfully -- which

we are going to challenge -- used dollars instead of euros, if

you look, as I have, at criminal sanctions cases, none of the

cases that are remotely comparable have gotten sentences like

I4insadc

1    that.  They've gotten sentences, as we've documented for you,

2    of a couple of years, 13 months.  Those have been the range of

3    sentences that have been imposed on similar sanctions

4    defendants.

5              This is not somebody --

6              THE COURT:  Wouldn't you agree that, for someone who

7    hasn't been to jail, that 13 months is still an incentive to

8    flee?

9              MR. WEISS:  It depends where.  To Iran?  No, I don't

10   think that is an incentive to flee to Iran given what these

11   experts say about that.

12             I don't think it's incentive for somebody like this

13   man, what he does, to spend the rest of his life sort of

14   wandering in fear from country to country trying to escape the

15   long arm of the government in the United States Attorney's

16   Office.  No, I don't.

17             And he's got some very good defenses, some very good

18   defenses, and they are going to be very hard pressed to prove

19   that he, as a non-U.S. person, a person who is not a citizen

20   and was outside the United States, Iranian born, working for

21   his Iranian dad, should have known that, because Venezuela paid

22   him in dollars, that converted his business into a crime in the

23   view of the United States.

24             Most people don't know that.  Most people don't know

25   that, because Iranians are allowed to build low-cost housing in

I4insadc

Venezuela.

            THE COURT:  The government did turn over some e-mails.

            Have you seen them?

            MR. WEISS:  I have.

            THE COURT:  OK.

            MR. WEISS:  And I think we've already demonstrated in many instances that the government has made certain misinterpretations or taken things out of context, and we are not intimidated by those e-mails.  We are not.

            I understand at first glance why you would look at some of those e-mails, and -- I don't want to say fall into the trap, but be convinced that the maybe the government has a good case.

            I do Iran sanction cases.  I've done them on the government side, I do them now on the defense side, and those cases are not always easy to win.  This is one of those cases where it's not going to be easy for the government to win.  This is going to be a hard-fought case, your Honor.

            The willfulness defense, amongst others, is going to be, I think, a very vigorous defense.  We have not shown you all our defenses because partly I don't do that before I get discovery, and don't like to show the government my defenses in a criminal case until we go to trial.

            But we given you a few samples of some of the arguments with respect to willfulness, and this will be a case

I4insadc

1    with a real defense, your Honor.

2              THE COURT:  OK.  Let me hear from the government.

3              MR. DeFILIPPIS:  Thank you, your Honor.

4              I think it would be worth stepping back just a bit out

5    of the details of some of the specific arguments that have been

6    made in this case and just look at the picture of the defendant

7    that we have that has been built through the parties' arguments

8    and filings and the pretrial report and everything we know

9    about this defendant.

10             As your Honor suggested and alluded to, there could

11   not be more indicators and there could not be more serious

12   indicators of an incentive to flee here than we have in this

13   case.

14             Your Honor, it is unprecedented, and if not

15   unprecedented then certainly extraordinary to have a defendant

16   with the travel history that this defendant has, leapfrogging,

17   sojourning, whatever word we want to use, wandering from

18   country to country to country with no real anchor in any one

19   place.

20             The defendant's ties to the United States that have

21   been set out by the telling of defense counsel are for the most

22   part aspirational.

23             In the context of a bail argument, aspirational ties

24   to the United States, a desire to someday settle down here are

25   not what moves the needle for incentive to flee and for bail.

I4insadc

1          What moves the needle is actual ties, actual

2   residence, actual grounding in the community that the defendant

3   is arrested in, and he has none of that or very little of that.

4          But, your Honor, just to point to some of the most

5   salient factors in this picture of the defendant, he has

6   multiple passports, including two from one country, and one

7   from Iran.

8          He has claimed multiple primary countries of residence

9   in the course of several years.

10          He has claimed in a financial application with his

11   father to be a primary resident of Dubai.

12          He has claimed in an Iranian passport application to

13   be a primary resident of Belarus.

14          And he has claimed most recently in his pretrial

15   interview to have resided in Washington, D.C., since 2013,

16   something that I think now he would not even claim, something

17   that the FBI's interview of the doorman in his building has

18   flatly refuted and something that, frankly, the record we've

19   developed flatly refutes.

20          The defendant does not live in the United States and

21   has not in the recent past.

22          Your Honor, the other salient factor here that points

23   very, very strongly in favor of this defendant incentive to

24   flee is the access he maintains to massive amounts of wealth

25   through his company, through his family's business empire.

I4insadc

 1          It truly is in a sense, your Honor, an empire.  It is

 2     a conglomerate of many companies in many countries that by the

 3     defendant's own telling and by his father's own telling has

 4     revenues in the billions and possibly many billions of dollars.

 5          We've attached to our filings documents in which the

 6     defendant's father claims to be in projects, individual

 7     projects that themselves are worth billions of dollars.

 8          They own the largest private bank in Iran, which, by

 9     the family's own telling, grosses 20 to 30 billion dollars or

10     has revenues of 20 to 30 billion dollars.

11          What the record also makes clear, your Honor, is that

12     these are not assets cabined in Iran or isolated from the

13     defendant.  They are available to defendant and to his entire

14     family.

15          So, in our filing of yesterday, your Honor, we

16     attached numerous e-mails in which you see the defendant's

17     father instructing him to move 11.5 million euros from one

18     country to be another, to move 1.5 million euros and to keep

19     some for himself.

20          It is very clear, your Honor, from the evidence that

21     the government has produced to the Court that there is great

22     fluidity and ease of access to the massive amounts of capital

23     and wealth that has family has access to and has generated.  So

24     the notion that they're cabined in some sort of hermit

25     environment where they don't have access to their wealth is

I4insadc

1    simply not true.

2                Now, your Honor, why is that relevant?

3                That is all relevant because, at the end of the day

4    here, the strongest incentives that this defendant will face

5    will be to maintain his liberty, will be to go back to his

6    family, will be to maintain the continuity and the continued

7    existence of his family's business, and it will be to flee.

8                Your Honor, the asylum application is emblematic of

9    that.  We spend a lot of time I think trying to listen to

10   strained arguments imposed in hindsight as to why at one

11   particular time the defendant had a deathly fear of going to

12   Iran; why for a course of years in which he traveled there 50

13   times he didn't seem to have that fear and why now again he has

14   that fear.

15               The simple common thread of when he has the fear and

16   when he doesn't, your Honor, is when he's asking the U.S.

17   government or this court for something.  He had the fear when

18   he was applying for asylum.  He now has the fear again because

19   he is applying for bail.

20               But the plain facts, the simplest interpretation of

21   that history, your Honor, is that the defendant did not have a

22   genuine fear when he filed his asylum application, then

23   traveled to Iran 50 times.

24               Now the defense lawyer inserted in court today, your

25   Honor, that this was to protect his father's health, to visit

I4insadc

his father.

          Your Honor already pointed out some of the oddities or
inconsistencies in that desire to go back to Iran.  However,
the e-mails that the government has uncovered in its
investigation shows that his father's health was not the
primary fact, the primary reason he went back there.

          Just as an example, your Honor, in July of 2011, the
government attached to its submission an e-mail in which the
defendant said that he was going to Tehran for about a week in
order to attend meetings of the general assembly of this
private bank that they run in Iran.

          So it's clear to the government, it's clear I think
from our submissions and the evidence uncovered to date that
these trips to Iran were done in the normal course of the
defendant's business operations, in the normal course of his
globetrotting, which he does with no real anchor in any
particular country, and therefore no real ties that would
ground him anywhere, much less in the United States, your
Honor.

          Just, your Honor, as an example, because I think it is
illustrative, to pick a time period from February 2015 to April
2015 -- and this is representative of the entire time period
that we are talking about -- these were the flights, the
international flights that the defendant took during that
merely seven-month period:

I4insadc

1        Istanbul to Malta; Malta to Istanbul; London to

2   Washington Dulles; Dulles to Frankfurt; Frankfurt to Malta;

3   Malta to Istanbul; Istanbul to Malta; Istanbul to Tehran;

4   Tehran to Istanbul; Istanbul to Malta; Malta to Frankfurt.

5        And it goes on, your Honor.  It is a dizzying pattern

6   of travel around the world that shows just how easily, just how

7   quickly, and just how thoughtlessly the defendant is able to

8   take advantage of the international global travel system and

9   how he does so with ease.

10        Your Honor, I do want to focus for a moment on the

11   cosigners and on the defendant's package which he has put

12   together.

13        Let's look at this proposed bail package in the

14   context of everything that I have just spoken about, in the

15   context of the family's global business conglomerate worth many

16   billions of dollars or certainly several billion dollars.

17        What will a $20 million or even a $30 million or even

18   a $40 million bond mean to the defendant?  Will it sting him?

19   Will it anchor him?

20        Your Honor, it will not.

21        His incentives in this case in the charges he's facing

22   are going to be to preserve his liberty, as I said before, to

23   preserve his ties to his family, and to preserve their

24   well-being, his well-being and his lifestyle.

25        Whether 40 or 400 people put their money or their

I4insadc

 1    property or their lives on the line is not going to affect that

 2    calculus, because, first, 13 of those people are people already

 3    in his family, people whose property very well may be subject

 4    to forfeiture anyway, so it's not a real sacrifice to put that

 5    up if they are going to lose it anyway after a conviction.

 6            And those 13 people –– excuse me, your Honor, these 13

 7    people are either in his family or reside in Turkey outside the

 8    United States.

 9            So those are people who, as I said, it's not really a

10    meaningful sacrifice in the sense that, if much of it is

11    subject to forfeiture, they are going to lose it anyway.

12            Secondly, again, our office would not typically

13    approval a cosigner in Turkey because they have no meaningful

14    ties here, and the ability to seize their assets were the

15    defendant to flee is likely nonexistent.

16            But, your Honor, the reason why all of these cosigners

17    don't change his incentives are, first, because, as I said,

18    many of them are already within his orbit.

19            In addition, your Honor, the defendant would much

20    rather reunite with his family, preserve their well-being,

21    preserve their lifestyle, even if that means that some of his

22    father-in-law's friends or his college friends face the

23    prospect that the government would seize their assets.

24            Because, like anyone, the people who matter are those

25    closest to him.  The thing that matters most to him is his

I4insadc

liberty, and no amount of cosigners is going to change that,
particularly in light of the massive difference between the
value of the wealth that he has access to by virtue of his
family business, as compared to what to anyone else would be an
enormous bond, but to him and his family is not proportionally
a huge sting or something that will meaningfully change his
incentives.

         I would also point out, your Honor, that the
defendant's father is referred to in the indictment as a
coconspirator.  It was, in fact, the defendant's father for
whom the defendant was working and with whom he was working
when he committed the conduct that he is charged in the
indictment.

         His father is in many ways the leader of this family
business conglomerate, and so he is described as a
coconspirator in the indictment.  He as much or more than the
defendant will have every incentive to help the defendant evade
responsibility for these proceedings, protect the family's
business, and protect the defendant's liberty.

         Your Honor, I would also note -- and your Honor made
this point, but I want to emphasize it, which is it is not the
government's burden to prove that the defendant would flee to
Iran.

         We heard some discussion of various countries and what
their extradition treaties are, but, just as one example,

I4insadc

Turkey, Turkey would be in many ways a very high danger of a place to which the defendant might flee.

Why?  Because, first, as we see from the cosigners' letters that the defendant submitted, many of those people reside in Turkey.  As I understand it, his wife is Turkish, and so there are a lot of family ties to Turkey.

Second, and speaking as a prosecutor for the United States government and a member of a unit in our office that deals with extradition on a frequent basis, whatever 12 extraditions occurred in the past -- and, in fact, we researched that.  They were not extraditions, they were deportations from Turkey of U.S. citizens who had been charged with crimes.  So there were 12 instances in recent memory in which they deported citizens, but did not extradite.

That climate, to the extent that it permitted, that before has changed markedly now.  Extraditions from Turkey are -- again speaking from experience and from speaking to others in the government -- is at a standstill, a virtual standstill.

I would note a recent case in this district, the Zarrab prosecution, in which Zarrab and another defendant, Atilla, were charged with sanctions violations.  It is a good test case as to how the Turkish government might react to this defendant's charges and his presence in Turkey.

In response to that case, the Turkish government,

I4insadc

among other things, initiated a criminal investigation of two

of our now former U.S. attorneys and of others in our office

because the Turkish government was so upset at the prospect

that these individuals have been charged with evading Iranian

sanctions through Turkey.

So their reaction was to take law enforcement action

against the United States government, not in any way to help

find fugitives of justice.

So, your Honor, I think it simply belies common sense

and is wildly implausible to think that the Turkish government

would extradite Mr. Sadr were he to go there.  So he would have

every incentive to flee there or elsewhere.

Again, given his vast access to the global travel

network and his ability to travel easily, he could do it in any

number of ways.

Your Honor, the final point here is that the passports

are emblematic of a problem that I think we have and that this

Court has in getting any kind of reasonable assurance that the

defendant will return to court, which is that the St. Kitts and

Nevis passports, which he bought under an investment program

that has been criticized for facilitating fraud and

facilitating sanctions violations, those the government found

out about in the course of researching for these bail

proceedings, but were not something that were volunteered by

the defendant.

I4insadc

1        The fact that he had more than one St. Kitts and Nevis

2   passport, had Judge Moses bailed him last week, we never would

3   have known about it, and perhaps he could have fled on that

4   other passport.

5        So, the fact is, your Honor, there seems to be a lot

6   of changing of the goalposts here, a lot of confusion that is

7   confusion made of the fact that the defendant simply plays

8   shell games in which he moves from one place to another, moves

9   money from one place to another, buys passports from multiple

10  places, and it's very difficult to get a handle on what he's

11  doing, where his assets are where his travel might be, and it's

12  that uncertainty that I think, your Honor, adds to the

13  government's argument in favor of detention.

14        THE COURT:  OK.  Thank you.

15        Anything else from the defense on this?

16        MR. WEISS:  Just a few things, your Honor.

17        The first thing I would like to mention is, with

18  respect to the acquisition of the St. Kitts passports, that was

19  done entirely legally through a program that is analogous to a

20  program that we have in the United States.

21        In other words, they seem to be faulting him for

22  having acquired a St. Kitts passport by making investments in

23  the St. Kitts economy.  St. Kitts has a program whereby if you

24  invest a certain amount you can get a passport.  We have that

25  here.  It's the EB-5 program.  There are many people -- in the

I4insadc

United States it's 500,000 to a million dollars, depending on
the circumstances.  It's simply a different price.

So if you condemn St. Kitts for providing passports
for those who invest in the economy, you are condemning the
United States for the same program.

But Turkey -- let me just talk about briefly in
Turkey.  The situation is not the least bit comparable.  That
was a situation where, outside the extradition context.  The
U.S. nabbed a Turkish citizen.

We are talking here about whether Turkey would turn
over an Iranian citizen who was requested through the standard
extradition process, an entirely different case.

Saying that Turkey gets upset with the United States
which it acts outside the extradition process is no indication
of what it would do when the U.S. acts within the judicial
process.

But, most importantly, I want to talk about the
package.  That is, we seem to have moved from a position -- and
the government has moved the goalposts more times than it
accuses the defendant of having done so, where they originally
said he's going to reimburse the cosigners, and now what
they're saying is he's just going to leave the cosigners high
and dry because he doesn't care.  His liberty is more important
to him.

THE COURT:  I don't think the government necessarily

I4insadc

said that.  I raised that concern.

MR. WEISS:  But I heard the government say it just now.

I think that the reason we had these individuals submit the statements or the affidavits that they are not going to accept anything is to show that this is going to be a real sting, unless the government or somebody is of the view that all these people have lied in these affidavits.

So the question is, will Mr. Sadr flee knowing that the people who are putting up their homes and their 401(k)s, many of them will be left destitute if he flees without any hope of compensation for them.

And he talked about some of them are from Turkey. That's true.  But, as I said before, 24, 25 of them are U.S. citizens, some of whom are putting up not only their homes but also their retirement plans.

And these are people who have known him and who he has known who have contacts with him and who have contacts with the family and will be hurt and will be stung.  He will destroy his family and his family's relationship with their cousins and their friends and the people in their community if he destroys them by casting many of them out on the street without a place to live.  May I have just one moment, your Honor.

THE COURT:  Yes.

MR. WEISS:  A couple of things.

I4insadc

One is let me add to the Turkey example.  There are a number of foreign countries, including Turkey and Cyprus, that have already taken steps against him.  Malta is another one.

In other words, the mere fact of this indictment, without his having been there, has already caused a number of these countries that the government is supposedly concerned about to take steps adverse to him, closing accounts, closing down his bank, and so on.

So that I think what we are seeing is the beginning of exactly what we are predicting, is that these are countries that will extradite him, will turn him over back to the United States should he try to flee.

Also, I should add that we're prepared to agree that he be -- a bracelet, home monitored under the strictest conditions.

So just the logistics of how he would do it, I mean, we will turn over the passports, we will turn over all the passports.  We will provide an affidavit that is it is all the passports.

How will he flee?  How will he travel?

In this day and age it's not what it used to be anymore, where you just run -- he can't -- he's not going to just flee and then disappear into -- melt into the population here in the United States.  It's not -- so just the logistics of how he would do that are virtually incomprehensible to me.

I4insadc

1          We think, your Honor, with this unprecedented bail

2     package and with appropriate monitoring that the government

3     cannot meet its burden of demonstrating and it has the burden

4     of demonstrating that he is a risk of flight.

5          THE COURT:   To the extent that you can, can you tell

6     me what percentage of the assets that you wish to pledge to

7     secure this bond are not being sought for forfeiture by the

8     government?

9          MR. WEISS:   OK.

10          Yes, your Honor.

11          The assets that -- let me start with the -- apart from

12     him and his immediate family, all the other cosigners, those

13     are not forfeitable assets.   So, that package, the homes that

14     they are prepared to put up, the 401(k)s, those are not

15     forfeitable.

16          With respect to his assets, your Honor -- let me just

17     have one moment.

18          If you look at the assets that we've listed out in our

19     brief, the one asset or set of assets that the government

20     claims are forfeitable are the pistachio farms that have a

21     series of corporate names.

22          That leaves about $16.8 million out of the roughly 27

23     that he could put up.

24          Some of that is located abroad.   For example, the

25     amount that he invested in the Malta bank is included in that

I4insadc

amount.  But I do have suggestions as to the ways that he can

post the amounts that he has abroad, including those amounts

that have been temporarily blocked or frozen by the foreign

governments, all as a result of this indictment.

As I indicated, the sisters are ready to put up --

some of their property is not forfeiture related, and then they

have -- one of the sisters, Pegga, is prepared, has about

another $4 million or so that she's prepared to put up.  In

addition to the home that she owns are the two pieces of

property that she owns, which is forfeitable property.

Your Honor, I have to say, I mean, the two children

here need their father and we need him, too.  This is a very

complicated case, your Honor.  And it is very hard -- it's a

case that he is very active in participating in.

There is a terabyte of data that he needs to review

along with us, and when the cases get this complex, the ability

to mount a defense is significantly compromised when we have to

go and see him at the MDC.

Even with -- I know we talked about it last week --

getting some assistance from the government and the Court, but

with all that, he needs to come into my offices to be able to

sit for weeks on end in front of a computer and go through the

documents and advise us of the significance of the documents

that we're being provided.

In the few instances that we have been able to do so,

I4insadc

1    he's already persuaded me that we have some real defenses, that

2    what he did did not violate this statute.

3           A case that requires this much involvement, this much

4    intense involvement on the part of the client becomes very hard

5    to prepare when he is detained and we have to get access

6    through the MDC or the MCC.

7           THE COURT:  OK.  Let me just have a couple of quick

8    questions for the government.

9           The government does have the burden to show risk of

10   flight by a preponderance of the evidence.  I do believe the

11   government has shown that.

12          The government also needs to show by a preponderance

13   of the evidence that there are no conditions or combination of

14   conditions that can reasonably assure that he'll show up in

15   court.

16          So let me hear from you a little bit more on that

17   latter part.

18          MR. DeFILIPPIS:  Yes, your Honor.

19          A few points in response to that.

20          The first is that the overall point we made about the

21   sting that the defendant would feel from this package as

22   compared to the resources available to him and his family

23   members through their global companies is one very strong

24   reason why the government cannot be sure of that.

25          And to use another example, it is not only the

I4insadc

defendant who has access to those resources, we attached an

e-mail in which the defendant and his father signed a mortgage

for his sister's home in London in which his father used the

fact that he claimed to have 115 million in personal assets and

the defendant claimed to have millions of dollars in personal

assets as well.

So, again, your Honor, it goes to the point that we

cannot be sure that these cosigners, that this package as a

whole will be any anchor on the defendant.

Is that along the lines of what your Honor is

thinking?

THE COURT:  Yes.  I want to make sure that I fully

understand your position.  I will give you a chance to consult

were your colleagues if you like.

is your position that there is no condition or

combination of conditions that will reasonably assure that he

comes to court, or is your position that this proposed package

doesn't cut it?

MR. DeFILIPPIS:  Sorry, your Honor.

Yes, our position is that there is no combination of

conditions that will reasonably assure the defendant's

appearance in court, and that is because I think this package

itself illustrates on some level a concession from the

defendant and his lawyers that the incentives are enormous in

favor of flight here.

I4insadc

1      So, in order to come up with something that even might

2  be considered plausible for the Court, they had to get 40,

3  almost 40 cosigners, something that's unprecedented in my

4  experience, you know, huge amounts of money.

5      But when we are in those sorts of numbers and we're

6  looking at the numbers of the wealth that is available to this

7  family, our position is, yes, that whether it's 40 or 20 or a

8  hundred, it's not going to move the needle in terms of the

9  enormous incentives and the pull here to flee.

10      Combined with the practical -- your Honor, if it were

11  true that turning in a passport closed off the ability of

12  someone to leave a country and travel, then we would never

13  detain defendants who turn in their passports.

14      That's simply not the case, and it is certainly not

15  the case that we encounter often, or even ever, defendants who

16  have shown such ability to travel with ease and to move from

17  one country to the next.  I think it's hard to imagine a case

18  where the ability to assure the defendant's appearance in court

19  would be harder.

20      THE COURT:  OK.  I'll be back.

21      (Recess)

22      THE COURT:  I believe the government has proven by a

23  preponderance of the evidence that the defendant is a risk of

24  flight, that he poses a risk of flight.

25      However, at this stage I do not believe that the

I4insadc

government has proven by a preponderance of the evidence that there are no conditions or combination of conditions that can reasonably assure that he will appear in court as directed.

I do find that this package is insufficient based on the information that I have now.

I would like to have more information about Mr. Sadr's financial circumstances.  I would like to find out more information about how many of his assets are not reasonably subject to forfeiture.

I would like to get a sense, if possible, of how much money is available to him through his father or other relatives, and I would like to get a clearer sense of the relationships that these other individuals have to him who wish to sign the bond and their relative financial means, how much it will actually sting them.

From some of the affidavits it's clear that it will sting some of these people quite a bit.  From some of the others I am not so sure.

Again, the government is required to prove by a preponderance of the evidence that there are no conditions or combination of conditions that can reasonably assure that he will appear in court.

I am not required to determine whether or not there is a guarantee that he will come to court, but the government must prove by a preponderance of the evidence that the there are no

I4insadc

1   conditions or combination of conditions that will reasonably

2   assure that he will come to court.

3           So I will deny the defendant's request for bail at

4   this point.

5           How do the parties wish to proceed?

6           MR. WEISS:  May we have a moment, your Honor.

7           THE COURT:  Sure.

8           (Pause)

9           MR. WEISS:  Your Honor.

10          THE COURT:  Yes.

11          MR. WEISS:  Thank you for your patience.

12          We will take on the challenge of trying to get for you

13  the additional information that will hopefully allow you to

14  make the finding that by a preponderance of the evidence we

15  have put together a package that will assure his appearance.

16          We are going to start work on that right away.  I

17  can't tell you exactly how long it will take us to do it.

18          What I would propose is, we are going to get out of

19  here and start working, and that we do two things:

20          We'll take it upon ourselves within a relatively short

21  period to notify the Court of when we think we will be ready to

22  proceed with the next stage, and then we will provide a written

23  submission to the Court and the government and ask for a

24  continued bail detention hearing as soon thereafter as

25  possible.

I4insadc

1        THE COURT:  OK.

2        MR. WEISS:  I would also ask, since at least for now

3    he is detained, I would ask that we accordingly change some of

4    the discovery dates, one date in particular which you set when

5    we were here last time.

6        We sort of set up two tiers of discovery, more

7    important stuff which is due to us in one week, but you did

8    give them 60 days for what they characterize as the lesser

9    stuff.

10        Since there's the possibility that Mr. Sadr is going

11    to be detained, we think unless and until we get him out we

12    would like to put this case on a fast track.

13        I don't think, after working on the case for five

14    years, they should take 60 days -- or now it would be 60 days

15    minus a week -- to get us all of the discovery in the case.

16        So I would ask that you give them a deadline of next

17    week to get us all the discovery, not just the first-tier

18    discovery in one week.  There's no reason they should not be

19    able to do that in a case they have been working on since 2013.

20        THE COURT:  Let me hear from government.

21        MR. DeFILIPPIS:  Yes, your Honor.

22        The government opposes that application.  At the time

23    of our last court appearance, we made an honest assessment,

24    which I think we described as one that we wanted to leave -- we

25    thought we would get the discovery sooner, but in an abundance

I4insadc

of caution we made it 60 days.

At that time the government certainly didn't know the outcome of the bail proceedings, but I think we all contemplated the defendant might be either detained or not detained, and we set the deadline under those parameters.

So we don't see any reason to change that.  I think everyone could have foreseen that he might be detained at our next appearance and beyond.

THE COURT:  OK.  Let me ask you this, then, counsel for the government:  This other category of discovery, what form will this take?  This will be in an electronic form I take it?

MR. DeFILIPPIS:  Yes, your Honor.

It will be probably in large quantity just because of many -- much of the e-mail discovery and other documents, there will likely be the process of putting together thumb drives or hard drives.  And we will certainly endeavor to do it faster than 60 days, as we said at the first conference, and I expect we probably will.

THE COURT:  This first batch of discovery that's going out sometime next week I believe, how much discovery is that?

MR. DeFILIPPIS:  You mean in gigabytes or --

THE COURT:  Sure.

MR. DeFILIPPIS:  Your Honor, again, maybe it's my lack of technical savvy.  I am not sure.  It's subpoena returns in

I4insadc

1    the dozens of subpoenas, plus some additional documents.  So

2    it's voluminous but not -- because we are focusing on what we

3    call the important discovery, it is not massive, what we intend

4    to get out next week, but it's -- it would probably fit on a

5    USB or a thumb drive, your Honor.

6                THE COURT:  OK.

7                All right.  My sense is that from the defense's

8    perspective, you would want to start working on this discovery

9    as soon as you get it.  It sounds like what you may be getting

10   next week very well may keep you busy for the next 45 to 60

11   days.

12               So my inclination is not to order the government to --

13   let me find out from the government first, before I make that

14   decision, why would it take the government 60 days to turn over

15   this other information, or would it actually take 60 days?

16               MR. DeFILIPPIS:  Your Honor, I expect it will take

17   less, but when we're compiling large amounts of e-mail data

18   from multiple accounts on drives and making decisions about

19   what's discoverable and what's not, you know, including any

20   applications, I think it's the technical process that we just

21   want to build room, that if there's some kind of holdup going

22   back and forth, some hard drives, asking for, you know, defense

23   counsel, getting it to the MCC.  You know, typically when

24   there's voluminous discovery, you know, if the standard case

25   would take a month, it's not particularly voluminous, we would

I4insadc

1    like to build in a little more time.  But we will certainly

2    endeavor to do it sooner than 60 days.

3              THE COURT:  OK.

4              Understanding the potential limits of technology and

5    the like, let's have the government endeavor to turn over this

6    second-tier discovery in, let's call it 40 days.

7              OK?

8              MR. DeFILIPPIS:  Yes, your Honor.  We will.

9              THE COURT:  All right.

10             Anything else from defense counsel?

11             MR. WEISS:  Your Honor, we are, of course, not

12   prepared today to talk about a trial date, but I do want to

13   alert the court that we will be seeking, if he is detained, a

14   very speedy trial.

15             THE COURT:  OK.

16             MR. WEISS:  I think once we get the discovery we will

17   be in a much better position to do so.  We are not in a

18   position to do so today, but I do want to let the court know.

19             THE COURT:  Let me find out from the government, do

20   you have an estimate at this point as to how long the trial

21   would be?

22             MR. DeFILIPPIS:  Your Honor, I would expect

23   approximately two weeks.

24             THE COURT:  OK.

25             Does defense counsel at this point have any estimate

I4insadc

1   as to hypothetically, if there were a defense case, how much

2   longer that would take?

3           MR. WEISS:  Well, of course, much of the defense case

4   in this case is done through cross-examination of the

5   government's witnesses, as the Court knows.  But, from having

6   done these cases, I would be surprised if this case doesn't

7   take a month.

8           THE COURT:  OK.

9           MR. WEISS:  I'm happy to update that once we get the

10  rest of the discovery and I know more.

11          Now I'm guessing.

12          THE COURT:  OK.

13          Let's do this.  I understand that the government is

14  going to be turning over some discovery and the defense is

15  going to be consulting with their client.  Let's have another

16  date.  Let's just set another control date so that we have a

17  date on the calendar.

18          How about May the 16th just as a date for a status

19  conference?

20          Does that day work for everyone.  That is a Wednesday.

21          MR. DeFILIPPIS:  Fine for the government, your Honor.

22          MR. WEISS:  I don't have permission yet to bring my

23  phone to court, which I didn't take care of.  Based on my

24  memory of my calendar, I think May 16 is OK.  Once I get my

25  phone, I will check.  If it's a problem, I will let the Court

I4insadc

1    know.  I will also take steps to get me to a place where I can

2    do that.

3                THE COURT:  OK.

4                MR. WEISS:  Just to make it clear, that's --

5                THE COURT:  That is a control date.

6                MR. WEISS:  A control date.

7                THE COURT:  I understand that you may well wish to

8    come to Court before then.  That is fine.  Just let know in a

9    letter.

10               MR. WEISS:  Yes.

11               THE COURT:  I just want to have a control date.

12               MR. WEISS:  Thank you.  Yes.

13               THE COURT:  Let's have a status conference set for May

14   16 at 11 a.m.

15               This does seem to me -- let me hear from counsel --

16   that based on the representations about the voluminous

17   discovery and the nature of the discovery in this case that

18   this is a complex case that would take it out of the ambit of

19   the Speedy Trial Act, although I know that the defense wants to

20   have a speedy trial and we will do what we can to get that done

21   as expeditiously as possible, but regardless, my intention is

22   to exclude time from today's date until May 16, to exclude time

23   under the Speedy Trial Act so that the defense will have an

24   opportunity to review the discovery that will be turned over

25   quickly to be better prepared for trial.

I4insadc

1      Let me hear from the government or the defense as to

2 whether or not you have any objection to that.

3      MR. DeFILIPPIS:  No objection from the government,

4 your Honor.

5      MR. WEISS:  No objection, your Honor.

6      THE COURT:  OK.

7      Then, again, I will exclude time than the Speedy Trial

8 Act from today's date until May 16.  I find that it's in the

9 interest of justice to exclude that time.

10      I further find that the interest of Mr. Sadr and the

11 interest of justice outweigh the public's interest in a speedy

12 trial, and I will enter an order to that effect.

13      Let me also say this:  I know that the defense is

14 contemplating coming back with another package.  The government

15 in their recent submission has given me some more information

16 about the finances that are potentially available to Mr. Sadr

17 outside of the country of Iran, and the defense should

18 certainly address those as well.

19      Anything else from the government?

20      MR. DeFILIPPIS:  No, your Honor.

21      THE COURT:  Anything else from the defense?

22      MR. WEISS:  No, your Honor.  Thank you.

23      THE COURT:  OK.  We are adjourned.

24      (Adjourned)

25