# Arnold&Porter

**Baruch Weiss**
Baruch.Weiss@arnoldporter.com

+1 202.942.6819 Direct
601 Massachusetts Ave., NW
Washington, DC  20001-3743

May 17, 2018

**VIA ECF**

Honorable Andrew L. Carter, Jr.
United States District Judge
United States District Court
Southern District of New York
40 Foley Square, Room 435
New York, NY 10007

   Re: *United States v. Ali Sadr Hashemi Nejad*, No. 18 Cr. 224 (ALC)—Enclosures
     __Further Addressing Mr. Sadr's Proposed Conditions for Pretrial Release__

Dear Judge Carter:

  As the Court knows, we represent Ali Sadr Hashemi Nejad ("Mr. Sadr") in this action. On April 9, 2018, we submitted an application for Mr. Sadr's pretrial release. *See* Dkt. 14, 17. The Court considered that application at a bail hearing held on April 18, 2018 and expressed its openness to release Mr. Sadr on bail—holding that conditions may exist to reasonably assure Mr. Sadr's appearance in Court—but asked for additional information before making that determination. Pursuant to the Court's Order on May 16, 2018, we submit that supplemental information now. With this additional information, we believe the Court has what it needs to allow Mr. Sadr to exercise his Eighth Amendment and statutory right to bail.

  As modified, the proposed bail package consists of a series of conditions and bonds (totaling nearly $34 million, secured by over $39 million in property or cash) as follows:

- A $20 million bond co-signed by Mr. Sadr, as well as his mother and two sisters (all financially responsible persons in the United States); to be secured by all of Mr. Sadr's assets, which total approximately $24 million, and the assets of his mother and two sisters, which together total approximately $9 million;

- A series of additional bonds—nearly 40 if the Court wishes—to be signed by Mr. Sadr's family, friends and colleagues, which in aggregate would total almost $14 million, secured by over $6 million in these individuals' assets;

- Mr. Sadr's mother, who lives in nearby Bethesda, Maryland, to serve as a third-party custodian;

May 17, 2018
Page 2

- Travel restricted to the Southern District of New York, the Eastern District of New York, the Eastern District of Virginia, the District of Maryland, and the District of Columbia, as necessary to appear in court, attend meetings with his attorneys, visit physicians, as approved by Pretrial Services;

- Surrender passports and other travel documents, and agree not to obtain new ones;

- Waive any right to contest extradition from any countries of concern; and

- If necessary, Mr. Sadr will be subject to electronic monitoring.

At the hearing on April 18, 2018, the Court held that although the Government had met its burden of showing that Mr. Sadr posed a risk of flight, the Government had failed to meet its burden of showing that there were no combination of conditions that would reasonably assure Mr. Sadr's appearance. *See* 18 U.S.C. § 3142(c)(1); April 18 Tr. at 66. In other words, the Court determined that under the right combination of conditions, Mr. Sadr should be released. The Court considered the comprehensive bail package presented by the defense—a package that even the Government conceded was "unprecedented"—and sought some additional information to determine whether the proposed conditions were sufficient. *See* April 18 Tr. at 65-66.

Specifically, the Court requested that Mr. Sadr provide additional information on the following discrete topics: (1) Mr. Sadr's financial circumstances, and whether he was offering and disclosing all available assets to secure his release; (2) what money might be available to Mr. Sadr "through his father or other relatives;" and (3) Mr. Sadr's relationships with the nearly 40 friends and family "who wish to sign [Mr. Sadr's] bond and their relative financial means," in order to assess whether the prospective loss to those individuals would inflict a serious enough "sting"—by virtue of the amount they were pledging and by virtue of their relationships with Mr. Sadr—to reasonably assure Mr. Sadr's appearance. *Id.*

After working around-the-clock to address these topics, we now provide the Court with the relevant additional, comprehensive information. As set forth below, this submission leaves no question that the conditions proposed by Mr. Sadr's bail application are eminently reasonably to assure his appearance at trial.

I.      **The Proposed Bail Package Includes Meaningful Pledges from Dozens of Co-Signers**

Although the Government has focused largely on Mr. Sadr and his father in these proceedings, we ask the Court to give due weight to the admittedly "unprecedented" (April 18 Tr. at 65) outpouring of support for Mr. Sadr by dozens of close friends and family members who have offered to sign separate  bonds—totaling almost $14 million, secured by over $6 million of real property, cash, and retirement accounts—to assure Mr. Sadr's appearance. These nearly 40 proposed co-signers are law-abiding, ordinary people—teachers, contractors, retirees; mostly Americans—who have known Mr. Sadr since he was a child, and who universally view Mr. Sadr as trustworthy, honest, and a role model for their own families.

May 17, 2018
Page 3

At the April 18 Conference, the Court sought more information on these proposed co-signers, including how close each individual is to Mr. Sadr and each of their relative financial means in order to assess whether their proposed bonds would truly "sting." April 18 Tr. at 66. Exhibit A is a list of all proposed co-signers, followed by their declarations, letters, and/or supplemental letters—the latter newly drafted in response to the Court's inquiry—to demonstrate the "sting" that both they *and Mr. Sadr* would feel if he were to flee and betray his supporters. One example among many, from Mr. A and Mrs. S, both U.S. citizens, reads in part as follows:

> We are Ali Sadr's close family friends and have known him…since his birth. We observed Ali grow up and become an outstanding human being. Ali is a caring and trustworthy individual who genuinely cares for others and puts other's needs ahead of his… [W]e are executing a bond for him in the amount of $5,000,000 secured by our home that we have been living in for the past nine years and our investment property as well as our 401Ks…. Our total net worth is approximately $4,000,000. As such our pledge of support for Ali represent[s] more than our total net worth…. [H]owever, based on our knowledge and experience with Ali, we firmly trust and believe, we do not have to worry at all. (Ex. A-5.)

Similarly, Mrs. H (also a U.S. citizen)—who is pledging a bond of $103,000, representing her entire net worth—writes:

> I always saw Ali as a wise son who had carried a lot of the family responsibilities on his shoulders thou[gh] it never deterred him from supporting his family and friends. I remember when my husband died he came to all of his services along with his mom…. [H]e asked me to think of him as my son and if he could help in any way possible to please let him know. During the course of my life I have seen very few people as loyal, dedicated and companionate as Ali Sadr…. My total net worth is approximately $103,000. As such my pledge of support for Ali presents a significant portion of my total net worth. If Ali flees U.S. . . . I would be devastated and homeless. (Ex. A-13.)

Yet another supporter, Ms. S (a U.S. lawful permanent resident)—who has also known Mr. Sadr since they were children and is "closer to Ali [than] to [her] own brother"—is offering to post a $2,500,000 bond, secured by her property (worth $1,000,000), and by her 401-K (worth $44,700), which is nearly double her net worth. She writes:

> Ali is the type of person that I can always rely on. Besides his big heart, Ali has been always such an inspiration to me…. What I admire about Ali the most is that he remains humble in the face of his achievements. As a single woman who is supporting herself, losing the bond that I am posting for Ali would make me devastated. However, based on a deep understanding of Ali's character, and the type of relationship I have with him and the strong bond between us since childhood, I post this bond without any hesitations …." (Ex. A-30.)

May 17, 2018
Page 4

In short, these letters—along with those already submitted to the Court (compiled as Exhibit B)—demonstrate that the proposed bail package includes dozens of *meaningful and significant* pledges, beyond Mr. Sadr's own $20 million bond, which undoubtedly carry extraordinary "sting" to assure Mr. Sadr's appearance in Court.

## II.   Mr. Sadr's Financial Circumstances and Access to Other Assets

To address the Court's questions surrounding Mr. Sadr's financial circumstances, we, on behalf of Mr. Sadr, retained Guidepost Solutions, a noted forensic investigative firm.  Guidepost deployed a team of independent, highly reputable forensic accountants to conduct a comprehensive, objective analysis of Mr. Sadr's assets immediately following the April 18 conference.  That team of accountants, led by Alan Katz—a CPA and former IRS agent with 22 years of experience in law enforcement and investigating individuals attempting to hide assets—reviewed nearly *27 GB* of data over the course of over *700 hours*.  The results of Mr. Katz's independent analysis are enclosed as Exhibit B.

### A.   Mr. Sadr's Assets

Consistent with Mr. Sadr's prior representations to the Court, Mr. Katz summarizes Mr. Sadr's assets as follows (*see* Ex. B, Part V.A):

- Equity in Pilatus Bank in Malta, worth approximately $12.9 million;[1]

- Apartment in Washington, D.C., worth approximately $1.5 million;

- Interest in A&H Urban Lifestyle Investments LLC, worth approximately $227,115;

- Interest in various entities that own interests in pistachio farms in California, in which Mr. Sadr has collectively invested approximately $9.8 million, less $4.1 million in debt on those farms, for a net value of $5.7 million;

- Two bank accounts in Cyprus, worth approximately $3.1 million;[2] and

- Other bank accounts, collectively worth approximately $70,000.

In sum, Mr. Sadr's net worth is approximately $24 million.  Only a small portion of these assets are "reasonably subject to forfeiture."  April 18 Tr. at 66.  The defense understands, based on the Indictment and conversations with the Government, that the only asset of Mr. Sadr's

---

[1] Mr. Sadr originally estimated his value in Pilatus Bank as $12.3 million. Any minor discrepancy between Mr. Sadr's valuation and those in Mr. Katz's report demonstrates Mr. Katz's extensive efforts to be as exact as possible. In addition, as the Court is aware, the Malta Financial Services Authority (the "MFSA") has taken control of, and frozen Mr. Sadr's interest in, Pilatus Bank.  We understand that the MFSA has since appointed a "competent person" to unwind the assets of the bank; and any assets that remain (likely to be significantly less than the $12.9 million valuation) will be provided to Mr. Sadr.  We are prepared to propose a mechanism through which any remaining assets are provided to Arnold & Porter for bail purposes and/or Mr. Sadr's defense.

[2] As we previously informed the Court, the Cypriot authorities have frozen these accounts.  We are currently attempting to secure the release of those funds for attorneys' fees, other expenses, and bail.

May 17, 2018
Page 5

subject to the forfeiture allegations is his ownership interest in one pistachio farm, worth approximately $4 million in initial capital investment. *See* Ex. B, Part V.A.4. Subtracting that portion of the Mr. Sadr's pistachio farm investments only, Mr. Sadr's current assets *not* subject to forfeiture total approximately $19 million.

Mr. Katz's forensic analysis corroborates the financial picture Mr. Sadr has consistently described from the beginning of these proceedings: his total net worth is roughly equivalent to $24 million, made up of mostly long-term, illiquid investments. *See* Ex. B, Part VI ("We conclude with a reasonable degree of certainty that Sadr Jr. has accurately identified and disclosed to the Court his assets and financial accounts."). More importantly, Mr. Katz is "reasonably certain based on the documents provided that there are no undisclosed assets or financial accounts." *Id.* Indeed, based on the forensic investigation he undertook, Mr. Katz concludes that Mr. Sadr "does not fit the profile of a person attempting to conceal assets from the government. … [T]he comprehensiveness of the information Sadr Jr. provided to his tax return preparers (and to Guidepost) is uncommon in our experience." *Id.* at Part V.C.

**B.    Mr. Sadr's Family**

Mr. Katz conducted a similar analysis of the assets of Mr. Sadr's father, to address the Court's second question and to address the Government's assertions in its proposed sur-reply (*see* April 18 Tr. at 74). There, too, the forensic report corroborates Mr. Sadr's prior submissions that the hyperbole about Mr. Sadr's father's wealth is "inaccurate and overstated." *See* Ex. B, Part V.D.1. Indeed, based on Mr. Katz's forensic analysis, Mr. Sadr's father's assets are in the realm of the tens of millions—nothing close to billions. *Id.* Moreover, Mr. Sadr's father's assets are currently located entirely in Iran (*id.*); and in light of the recent intensification of U.S. sanctions against Iran, it is simply not feasible that Mr. Sadr's father could make money available to Mr. Sadr for funding Mr. Sadr's *entirely hypothetical* life as a fugitive. *See* Ex. B, Part VI ("We did not uncover any evidence to suggest that Sadr Sr. has access to liquid assets outside of Iran. Moreover, based on the interviews we conducted and our understanding of existing Iranian Government restrictions, we believe it would be extremely difficult for Sadr Sr. to provide financial assistance to Sadr Jr.").[3]

Finally, the remaining members of Mr. Sadr's family—his mother, a U.S. citizen with a PhD in Psychology from the University of Vermont; and two sisters, both U.S. green card holders residing in California—now submit supplemental declarations to provide the Court with a complete picture of their financial circumstances. *See* Exs. A.1-A.3. Although it is not required, Mr. Sadr's mother and sisters—like Mr. Sadr himself from the beginning of these proceedings—are pledging all of their significant assets to leave no question about the prospective "sting." *Id.* These affidavits make clear that Mr. Sadr's mother and sisters will not have any money left over after bail to finance any supposed, *entirely hypothetical* life of a fugitive. *Id.* Mr. Katz's report further confirms that Mr. Sadr's mother and sisters are simply not in a position to do so. *See* Ex. B, Part V.B.5.

---

[3] In fact, Mr. Katz concludes that Mr. Sadr's father would be unable to satisfy his previous pledge of $1.5 million for Mr. Sadr's bail, as such a figure is "incompatible with Sadr Sr.'s current financial wherewithal," and that Mr. Sadr's father would currently be hard-pressed to make even $200,000 available if asked to do so. *See* Ex. B, Part V.D.4.

The comprehensiveness of Mr. Katz's review, and the significant resources that he deployed to support that review, is overwhelming.  Based on Mr. Katz's analysis and the supplemental declarations submitted by Mr. Sadr's mother and sisters, there is no question that Mr. Sadr's proposed bond of $20 million—secured by nearly all of his family's liquid assets and co-signed by Mr. Sadr's mother and two sisters, all financially responsible persons in the United States—is beyond sufficient to assure his appearance.

### III.   Mr. Sadr's Proposed Package Far Exceeds the Legal Standard to Assure a Defendant's Appearance at Trial

The only question for this Court is whether the proposed package—now supported by the report of an independent forensic accountant and multiple rounds of letters and declarations from proposed co-signers—creates reasonable conditions that will assure Mr. Sadr's appearance.  Based on these facts alone, the answer is a resounding yes.

Countless courts have granted pretrial release to defendants with access to extraordinary wealth, international travel, and who were facing charges of massive fraud on bail packages with far less onerous conditions.  In addition to the cases that we have already cited for the Court in cases involving criminal sanctions,[4] we bring to the Court's attention numerous other cases in this Circuit and beyond involving foreign defendants of significant means, in a variety of other relevant criminal cases, who were granted pretrial release.

As an initial matter, there is no question that U.S. citizens of far greater means are readily granted pretrial release.  For instance, in *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009), the defendant was charged with "colossal criminality" in an action alleging securities fraud in the range of $400 million, ultimately leading Judge Rakoff to find that the defendant posed a risk of flight.  *Id.* at 832-33.  The court ultimately found, however, that "the bail package [went] far to minimize this risk."  *Id.*  The defendant was released on a $10 million unsecured bond, co-signed by his son and mother, with other conditions including strict supervision.  *Id.*[5]

Moreover, in *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), the Second Circuit reversed the district court's detention order of two defendants, husband and wife, who were nationals of India and Indonesia, respectively, later becoming naturalized U.S. citizens.  *Id.* at 65.  The defendants in *Sabhani* allegedly faced at least 17 years in prison on charges of forced labor; and they had "vast financial resources" and "personal and professional contacts with numerous foreign countries," "most particularly in the Middle East."  *Id.* at 65, 67 ("The government noted that, between June 2005 and October 2006, one of the defendants' corporate bank accounts had

---

[4] *See* Dkt. 14 at 6-7; *see also U.S. v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (bail granted in criminal sanctions case where defendant had exported military-grade aerial vehicle autopilot components to Chinese government).

[5] Even Bernie Madoff—who had his own private jet and personal yacht, and was charged with a $50 *billion* Ponzi scheme—was granted bail *on a $10 million bond*, a nightly curfew, and travel restricted to the tristate area.  *See* N.Y.T, *Authorities Ease Madoff's Bail Terms*, https://www.nytimes.com/2008/12/18/business/18madoff.html (Dec. 17, 2008) ("Madoff…will not be going to jail even though he failed to meet the original terms of his $10 million bail agreement.  Federal prosecutors said on Wednesday that they had modified the terms of Mr. Madoff's agreement so that he would not need to find four people to co-sign his bond. Mr. Madoff was unable to meet that condition, prosecutors said. Even his sons, Andrew and Mark, were apparently unwilling to help.").

May 17, 2018
Page 7

received wire transfers totaling $17,241,902, most[ly] originating from the Kingdom of Bahrain, Qatar, and the United Arab Emirates."). Despite the allegations of wealth and ties abroad, the Second Circuit held that the law set forth a presumption of defendants' pretrial release, and that a $4.5 million secured bond with other conditions, would reasonably assure the defendants' appearance in Court. *See id.* at 77-79.

Courts also regularly grant bail to defendants with *no* ties to the United States and with extensive ties abroad, as demonstrated not only by the sanctions cases cited previously, *see supra* n. 1, but also by countless other white collar criminal cases.

For example, in *United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989), Judge Keenan granted pretrial release to an "enormously wealthy and well-known Saudi Arabian businessman," who was charged with mail fraud and obstruction of justice. *Id.* at 1048. In *Khashoggi*, the defendant's wife at the time resided in France, the defendant had not visited the United States for at least two years at the time of his arraignment, and he possessed "the means to procure staggering amounts of cash in fewer than 24 hours." *Id.* at 1050. Yet, even he was released on a $10 million bond secured by $5 million in cash, with two co-signers, electronic monitoring, and the condition that defendant relinquish any travel documents. *Id.* at 1052.

There are numerous other examples from this Court. *See, e.g.*, *United States v. Ng*, No. 15cr706 (S.D.N.Y. Oct. 23, 2015) (in bribery case, releasing "wildly wealthy" Chinese defendant with virtually no U.S. ties and ties to Chinese government); *United States v. Benhamou*, No. 10 Mag. 2424 (S.D.N.Y. Nov. 17, 2010) (in insider trading case, releasing wealthy French doctor with no meaningful U.S. ties despite Government's argument that "in practice . . . France has not extradited any of its nationals"); *United States v. Bodmer*, 2004 WL 169790, at *2-3 (S.D.N.Y. Jan. 28, 2004) (Swiss national, arrested in South Korea for alleged bribes to Azerbaijani government officials, released on $1,500,000 bond despite government argument that defendant had not disclosed full net worth in part because "our judicial system favors bail"); *id.* at *3 ("[Defendant] faces serious criminal charges, and pretrial detention may 'hinder his ability to gather evidence, contact witnesses, or otherwise prepare for his defense.'") (citation omitted).[6]

Importantly, not a single one of the defendants in any of the cases set forth above fled. These courts trusted that imposed bail conditions would reasonably assure the defendants' appearance in court, and they were right. So too should this Court trust that the proposed conditions here will provide a more than reasonable assurance of Mr. Sadr's appearance.

---

[6] The same in true in district courts of other jurisdictions. *See United States v. Marin*, No. 15-cr-00252-PKC-RML (E.D.N.Y. Nov. 12, 2015) (Brazilian citizen released on $2 million corporate surety bond and $1 million cash bond, and other conditions in money laundering conspiracy case); *United States v. Bagios*, No. 11-MJ-6030-RSR (S.D. Fla. March 2, 2011), Dkt. 48-8 at 61-68 (granting bail to Greek citizen with no ties to the U.S., as well as "a Porsche and a Jaguar and a boat" in Switzerland, his country of residence, on $500,000 corporate security, $100,000 cash bond, and other conditions; in part because of concern about "detaining him pretty much solely because of his status as a foreign national without ties to the country"); *United States v. Ogiermann*, No. 10-cr-80157-KAM (S.D. Fla. Jan. 26, 2011), Dkt. 25 at 4-5 (Luxembourg citizens granted bail on $300,000 cash bond—where bond size was "based upon the unverified financial resources information" provided by defendants and despite evidence of far greater wealth—and allowing defendants to travel back and forth from Luxembourg in part because the "Defendants' self-interest in resolving [the] case outweigh[ed] the benefits of hiding in Luxembourg").

May 17, 2018
Page 8

     There is nothing to distinguish Mr. Sadr from the defendants in *Khashoggi* and other precedent in this Circuit and beyond.  If anything, the package proposed by Mr. Sadr is vastly <u>more</u> robust than the packages proposed, and accepted, in these other cases—cases involving defendants who had access to far more wealth than Mr. Sadr.  Even the Government in this case has acknowledged the extraordinary nature of the proposed bail package, characterizing it as "unprecedented."  April 18 Tr. at 65.

* * *

     Mr. Sadr has been detained since March 19, 2018—nearly two months.  In order to debunk repeated misstatements about Mr. Sadr's character and financial circumstances (including that he has access to undisclosed assets), Mr. Sadr and his counsel have had to file multiple rounds of legal briefs, appear at five separate bail hearings, hire no fewer than three experts, and impose on dozens of Mr. Sadr's closest friends and family to write multiple rounds of letters and submit declarations under penalty of perjury to demonstrate the strength of Mr. Sadr's proposed bail package.  The Court is not required to "guarantee" a defendant's appearance (April 18 Tr. at 66)—that would be impossible.  *See, e.g.*, *United States v. Orta*, 760 F.2d 887, 888 n. 4, 892-93 (8th Cir. 1985) ("The legal standard required by the [Bail Reform] Act is one of reasonable assurances, not absolute guarantees.").  The Court should not countenance the Government's attempt here to shift their own burden under 18 U.S.C. § 3142 onto to Mr. Sadr.

     It is time to grant Mr. Sadr bail, consistent with the recommendations of two Pre-Trial Services officers and with the fundamental principle that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987).  We implore the Court to reject any further fishing expeditions sparked by the Government.  There is simply no question that the robust conditions proposed by Mr. Sadr's bail application would reasonably assure his appearance at trial.

     We thank you in advance for your consideration and look forward to the conference scheduled for May 24, 2018 in this matter.

                         Sincerely,

                         Baruch Weiss

cc:     All ECF Counsel