# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALI SADR HASHEMI NEJAD,<br><br>*Defendant*. | Case No. 18 Cr. 224 (ALC)<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ALI SADR HASHEMI NEJAD'S MOTION
## TO DISMISS ALL IEEPA-BASED COUNTS BECAUSE THE IRAN
## SANCTIONS REGIME EXCEEDS THE AUTHORITY IN IEEPA AND IEEPA
## IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY
## (Pretrial Motion No. 3)

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  February 25, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.  COUNTS ONE AND TWO ARE BASED ON AN *ULTRA VIRES* REGULATORY SCHEME .................................................................................. 2

    A.  The President Has Ignored IEEPA's Limits on His Authority .......................... 3

    B.  Congress and the President Have Failed to Follow IEEPA's Procedural Requirements ........................................................................................ 5

II. IEEPA UNCONSTITUTIONALLY DELEGATES LEGISLATIVE AUTHORITY TO THE PRESIDENT .......................................................................... 8

CONCLUSION .................................................................................................................. 12

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ............................................................................................................. 9

*Aiken v. United States*,
   358 F. Supp. 87 (S.D.N.Y. 1972) ....................................................................................... 11

*Beacon Prods. Corp. v. Reagan*,
   814 F.2d 1 (1st Cir. 1987) .................................................................................................. 11

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ............................................................................................................. 7

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ......................................................................................................... 2, 3

*Fahey v. Mallonee*,
   332 U.S. 245 (1947) ........................................................................................................... 10

*Fed. Express Corp. v. Holowecki*,
   552 U.S. 389 (2008) ............................................................................................................. 6

*Gundy v. United States*,
   138 S. Ct. 1260 (cert. granted Mar. 5, 2018) ..................................................................... 10

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983) ........................................................................................................ 7, 11

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ............................................................................................................. 9

*Loving v. United States*,
   517 U.S. 748 (1996) ............................................................................................................. 8

*Mistretta v. United States*,
   488 U.S. 361 (1989) ........................................................................................................ 9, 10

*Panama Ref. Co. v. Ryan*,
   293 U.S. 388 (1935) ............................................................................................................. 9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................................................................. 7

*Touby v. United States*,
     500 U.S. 160 (1991)..................................................................................................9

*United States v. Dhafir*,
     461 F.3d 211 (2d Cir. 2006).............................................................................. *passim*

*United States v. Robel*,
     389 U.S. 258 (1967)..................................................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer*,
     343 U.S. 579 (1952)..................................................................................................3

**Statutes**

22 U.S.C. § 8512a (2013).......................................................................................................7

34 U.S.C. § 20913(d)............................................................................................................10

50 U.S.C. § 1622(b)................................................................................................................7

50 U.S.C. § 1701(a) .............................................................................................................1, 3

50 U.S.C. § 1701(b)..............................................................................................................3, 4

50 U.S.C. § 1702(a)(1)(A) ........................................................................................................2

50 U.S.C. § 1703.................................................................................................................5, 6

50 U.S.C. § 1705.................................................................................................................1, 2

International Emergency Economic Powers Act, 50 U.S.C. § 1701 e*t seq.* .......................... *passim*

National Emergencies Act, 50 U.S.C. § 1601 e*t seq.* ......................................................3, 7, 10, 11

Trading with the Enemy Act, 12 U.S.C. §§ 95a-95b................................................................3

**Other Authorities**

Black's Law Dictionary (10th ed. 2014).......................................................................................4

Bruce Ackerman, *The Emergency Constitution*, 113 Yale L.J. 1029, 1091 n.116
     (2004)....................................................................................................................6, 7

Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979) .......................................................4

Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995)....................................................2, 4

Exec. Order No. 13,059 (Aug. 21, 1997)........................................................................................5

Exec. Order No. 13,553, 77 Fed. Reg. 60,567 (Oct. 1, 2010) ........................................................5

Exec. Order No. 13,599, 77 Fed. Reg. 6,659 (Feb. 5, 2012) ..........................................................5

Exec. Order No. 13,608, 77 Fed. Reg. 26,409 (May 1, 2012) .......................................................5

Exec. Order No. 13,716, 81 Fed. Reg. 3,693 (Jan. 16, 2016).........................................................5

Exec. Order No. 13,846, 83 Fed. Reg. 38,939 (Aug. 6, 2018) .......................................................5

H.R. Rep. No. 95-459 (1977)..................................................................................................4, 5, 6

Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560.201 *et seq.*....................... *passim*

Jason Luong, *Forcing Constraint: The Case for Amending the International
    Emergency Economic Powers Act*, 78 Tex. L. Rev. 1181, 1208 (2000) .................................10

Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385,
    1416 (1989)...........................................................................................................................6, 7

Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency
    Law Regime*, 46 U. Mich. J.L. Reform 737, 758 (2013) .........................................................11

S. Rep No. 95-466 (1977)................................................................................................................3

U.S. Const. art. I, § 1......................................................................................................................8

## INTRODUCTION

The Court should dismiss Counts One and Two of the Indictment because the Iran sanctions regime, as implemented, exceeds the authority granted under the International Emergency Economic Powers Act, 50 U.S.C. § 1705 ("IEEPA") and IEEPA is an unconstitutional delegation of legislative authority to the Executive Branch. First, the Indictment is premised on Treasury regulations and Executive Orders that exceed the authority granted under IEEPA. IEEPA grants the Executive authority only during temporary, narrowly defined emergencies, and it specifies a comprehensive policy of inter-Branch consultation and reporting that the Executive must follow to invoke the Act. These safeguards—the central purpose of enacting IEEPA—were not observed in this case, which is the result of a perpetual state of emergency spanning the last forty years. The prosecution of Sadr pursuant to Counts One and Two is therefore an *ultra vires* act. Second, IEEPA is an unconstitutional delegation of Congress's power to define criminal penalties and punishments without providing an "intelligible principle" to bind the Executive's powerful discretion. All charges based on IEEPA—including Counts One and Two and the portions of the money laundering charges in Counts Five and Six derived from Count Two—must be dismissed.

The Second Circuit has rejected the argument that IEEPA violates the nondelegation doctrine. *See United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006). Sadr presents the argument here to preserve the issue for further review.

## BACKGROUND

IEEPA authorizes the President to regulate or prohibit transactions with foreign countries upon declaring that a temporary national emergency exists and that such transactions pose a threat to the national security, foreign policy, or economy of the United States. *See* 50 U.S.C. § 1701(a). President Carter initially declared a national emergency relating to the Iran hostage

crisis in 1979, through Executive Order 12170.  This temporary emergency has remained in continuous effect over the last forty years.  In 1995, President Clinton extended the state of emergency, and the resulting sanctions against Iran, in Executive Order 12959.  The prohibitions set forth in these Executive Orders have been reproduced by the Treasury Department's Office of Foreign Assets Control ("OFAC") in the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. § 560.201 *et seq.*, which prohibit, among other things, the unauthorized exporting of services to Iran.  Both IEEPA and its regulations provide for criminal penalties for violations of the ITSR.  *See* 50 U.S.C. § 1705(b); 31 C.F.R. § 560.701(a)(2).

Counts One and Two of the Indictment are premised on 31 C.F.R. §§ 560.203 and 204.  Ind. ¶¶ 4-5, 19-20.  Counts Five and Six allege that the "specified unlawful activity" in those money laundering charges includes, in part, the conduct alleged in Count Two.  *Id.* ¶¶ 29, 32.

## ARGUMENT

**I.   COUNTS ONE AND TWO ARE BASED ON AN *ULTRA VIRES* REGULATORY SCHEME**

IEEPA grants the President "sweeping and unqualified" powers to deal with national emergencies.  *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).  Under IEEPA, the President may "investigate, regulate, or prohibit" various commercial activities including: (i) "any transactions in foreign exchange," (ii) "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and (iii) "the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ."  50 U.S.C. § 1702(a)(1)(A).  These powers, taken together, permit the President to regulate or even ban a wide swath of economic activity involving entire nations.

2

Because the President's powers are so robust and susceptible to abuse, Congress specifically provided two crucial means to limit his authority. First, Congress strictly limits the circumstances under which the President may invoke his powers under IEEPA. Second, the statute requires the President to work with Congress before and while exercising those powers. Neither restriction was honored in the case of the Executive Orders and ITSR at issue here. Count One and Two are based on *ultra vires* Executive actions and must therefore be dismissed.

### A.  The President Has Ignored IEEPA's Limits on His Authority

The Framers "knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring).

In recognition of the danger of granting the President such vast and expansive emergency powers, Congress made sure that the President could exercise them only in narrowly defined circumstances. *See Dames & Moore*, 453 U.S. at 673 (IEEPA was enacted to "limit the President's emergency power in peacetime"); S. Rep No. 95-466, at 2 (1977) (IEEPA was enacted to "revise and delimit" the President's emergency authority). To invoke IEEPA, the President must declare a temporary "national emergency" under the National Emergencies Act ("NEA"), and may do so only in response to an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy." 50 U.S.C. § 1701(a). The President's emergency authority "may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

The statutory language confirms Congress's intent in enacting IEEPA to rein in the unaccountable abuse of the sanctions power under the Trading with the Enemy Act, 12 U.S.C. §§ 95a-95b. Congress intended that a President would declare emergencies "only with respect to a specific set of circumstances" and exercise his emergency authority only with respect to those

3

circumstances.  H.R. Rep. No. 95-459, at 10 (1977).  Congress expressly warned that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id.*  Indeed, the term "emergency" by its plain meaning denotes a limited, unusual circumstance.  *See* Black's Law Dictionary (10th ed. 2014) (defining "emergency" as "[a] sudden and serious event . . . that calls for immediate action," and "[a]n urgent need for relief or help.").  The statute thus expressly contemplates that a national emergency will end after a discrete time period, and that any further use of the President's emergency powers requires a new declaration of emergency.  "Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat."  50 U.S.C. § 1701(b).

In this case, the invocation of IEEPA is based on a "national emergency" that is almost forty years old.  President Carter initially declared a national emergency relating to the Iran hostage crisis in 1979 through Executive Order 12,170.  *See* 44 Fed. Reg. 65,729 (Nov. 14, 1979).  In 1995, more than twenty-three years ago, President Clinton extended the sanctions against Iran in Executive Order 12,959, in response to its sponsorship of terrorism, including Iran's death threats against novelist Salman Rushdie, Iran's then-nascent nuclear energy program, and Iran's violence against dissident Iranian politicians abroad.  *See* 60 Fed. Reg. 24,757 (May 6, 1995).  These shifting justifications for a perpetual state of emergency are precisely what IEEPA was designed to prevent.  *See* H.R. Rep. No. 95-459, at 7 (1977) ("The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances.  A state of national emergency should not be a normal state of affairs.").  The government has not pointed to any "new declaration of

national emergency" since 1995 that would justify the President's expansive use of powers under IEEPA in the twenty-first century.

Indeed, different administrations have failed to take a consistent sanctions policy against Iran. In 2016, pursuant to the Joint Comprehensive Plan of Action (JCPOA), President Obama issued Executive Order 13,716 lifting several sanctions against Iran imposed by previous executive orders. *See* 81 Fed. Reg. 3,693 (Jan. 16, 2016). Then, in 2018, President Trump withdrew Executive Order 13,716 and reinstated those sanctions, "to take additional steps with respect to the national emergency declared in Executive Order 12,957 of March 15, 1995." Exec. Order No. 13,846, 83 Fed. Reg. 38,939 (Aug. 6, 2018). Thus, President Trump's latest Executive Order regarding Iran sanctions simply extended the emergency declared in 1995.[1] It strains credulity—and is contrary to the purpose of IEEPA—to maintain that a "national emergency" has persisted continuously from 1995—or 1979—to the present day despite the Executive's about-face and our nation's ever-changing diplomatic posture toward Iran.

### B. Congress and the President Have Failed to Follow IEEPA's Procedural Requirements

The ITSR underlying Counts One and Two are invalid also because both the President and Congress have failed to comply with the "strict procedural limitations" in IEEPA. H.R. Rep. No. 95-459, at 10 (1977). In keeping with Congress's intent to circumscribe the President's powerful authority, the statute further restricts the President by requiring him both to consult with Congress before exercising his temporary emergency powers, and then to regularly report to Congress while utilizing them. "The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter . . . ." 50 U.S.C.

---

[1] Other Executive Orders regarding the Iran sanctions likewise rely on the 1995 declaration of emergency. *See* Exec. Order No. 13,608, 77 Fed. Reg. 26409 (May 1, 2012); Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012); Exec. Order No. 13,553, 77 Fed. Reg. 60567 (Oct. 1, 2010); Exec. Order No. 13,059 (Aug. 21, 1997).

5

§ 1703(a). And "[w]henever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report" explaining his decision. 50 U.S.C. § 1703(b). Finally, the President "shall" supplement his report "[a]t least once during each succeeding six-month period." 50 U.S.C. §1703(c).

The use of the term "shall" renders consultation and reporting mandatory. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 400 (2008) ("Congress' use of the term 'shall' indicates an intent to 'impose discretionless obligations'"). The statute's language permits no exceptions or wiggle room. "[I]n every possible instance," and "whenever" the President exercises his authorities, he must "immediately" work with Congress. 50 U.S.C. § 1703. As the Second Circuit has recognized, "[t]he IEEPA reserves a continuing role for Congress." *United States v. Dhafir*, 461 F.3d 211, 213 (2d Cir. 2006). The legislative history confirms that this Congressional role is non-negotiable. Indeed, the entire purpose of IEEPA was to make the President's power "subject to congressional review." H.R. Rep. No. 95-459, at 1 (1977). Without Congressional review, the President exceeds his statutory authority. *Id.* at 16 (outlining the President's duty to consult and report).

The President has not adequately honored that role with regard to the ITSR at issue in this case. There is no evidence in the record that the President fulfilled his statutory duties to meaningfully consult with Congress and to periodically report and explain his actions. *See* Bruce Ackerman, *The Emergency Constitution*, 113 Yale L.J. 1029, 1091 n.116 (2004) (discussing "President Carter's failure to meet the six-month reporting requirements during the Iran hostage crisis"); Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1416 (1989) ("Every six months the executive submits pro forma reports to Congress."). Instead of consulting with Congress, the President has delegated the responsibility of issuing

6

ITSR to OFAC, thereby further insulating the regulations from Congressional oversight. Counts One and Two in this case are therefore premised on an *ultra vires* regulatory regime not authorized by IEEPA.

Moreover, the NEA requires that "not later than the end of each six-month period . . . such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated." 50 U.S.C. § 1622(b). There is no evidence on record indicating that Congress has met every six months to consider a vote suspending the 1979 emergency. *See Dhafir*, 461 F.3d at 217 n.3 (noting Congress's failure to fulfill this requirement); *Emergency Power*, 98 Yale L.J. at 1416 ("Congress has *never* considered whether to terminate any of these purported emergencies, despite their continuation for years."); *The Emergency Constitution*, 113 Yale L.J. at 1080 (same). Thus, neither Congress nor the Executive has abided by the mandatory terms of this statute with regard to the Iran sanctions, and the President may not exercise his powers pursuant to it.

It is no answer to say that Congress through inaction has acquiesced to the Executive's overreach. "To allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with" Article I. *I.N.S. v. Chadha*, 462 U.S. 919, 958 n.23 (1983); *see Clinton v. City of New York*, 524 U.S. 417, 451-52 (1998) (Kennedy, J., concurring). And to be sure, Congress has enacted statutes codifying certain Iran sanctions. *See, e.g.*, National Defense Authorization for Fiscal Year 2012, 22 U.S.C. § 8512a (2013). But the implication drawn from Congress's general approval of different Iran sanctions cannot override the specific requirements, spelled out in the statute, for the President to impose his own sanctions under IEEPA. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

7

566 U.S. 639, 645 (2012) (in statutory interpretation, "the specific governs the general," especially where Congress has "deliberately targeted specific problems with specific solutions").

The government has brought this prosecution under regulations promulgated according to the Executive's emergency powers, not a statute. The government may not rely on these subsequent statutes to repair the President's *ultra vires* exercise of emergency powers toward Iran, where the President has consistently flouted IEEPA's express requirements since 1979. This is especially so where the Executive has imposed criminal penalties for violating the ITSR. The procedural safeguards in IEEPA are not mere formalities, but important protections for individual liberty. Counts One and Two must be dismissed because they are premised on the ITSR that exceed the Executive's authority.

## II. IEEPA UNCONSTITUTIONALLY DELEGATES LEGISLATIVE AUTHORITY TO THE PRESIDENT

The Court of Appeals has already held that IEEPA does not violate Article I of the Constitution or the nondelegation doctrine derived from it. *Dhafir*, 461 F.3d at 216. Sadr presents this nondelegation argument in order to preserve the issue for further review.[2]

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ." U.S. Const. art. I, § 1. The Supreme Court has repeatedly held that "the lawmaking function belongs to Congress . . . and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996). Indeed, "[t]he

---

[2] Congress's failure to adequately monitor and limit the President's exercise of emergency authority with regard to the Iranian sanctions is an independent ground justifying dismissal. The Court of Appeals in *Dhafir* expressly noted that Congress's failure to fulfill its oversight responsibilities raises "complicated and sensitive issues concerning separation of powers," but it declined to decide that issue due to an inadequate factual record. 461 F.3d at 217 n.3. Those concerns are squarely presented in this case—the government cannot dispute that Congress has failed to meet every six months to consider terminating the emergency regarding Iran—and therefore *Dhafir* does not foreclose this Court from invalidating the ITSR underlying Counts One and Two for the reasons discussed in Part I.

nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). This is not to say the doctrine is blind to the need for Congress to rely on the Executive Branch to administer the laws in today's complex world. "[T]he nondelegation doctrine . . . do[es] not prevent Congress from obtaining the assistance of its coordinate Branches." *Id.* at 371. "If Congress shall lay down by legislative act an intelligible principle" to guide the Executive's discretion, the delegation is generally constitutional. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

However, substantial Supreme Court authority indicates that something more than an intelligible principle is required when Congress delegates the power to criminalize conduct and deprive individuals of their liberty. In fact, the two cases in which the Supreme Court has invalidated a statute under the nondelegation principle involved impermissibly vague delegations of the power to define crimes. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (reversing convictions under the National Industrial Recovery Act); *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 415 (1935) (invalidating orders under the National Industrial Recovery Act as an illegal delegation of legislative power where "disobedience to [the Executive's] order is made a crime punishable by fine and imprisonment"). This case falls squarely within this precedent. It is a threat to individual rights and liberty for the Executive to create and enforce its own criminal law absent meaningful oversight by Congress.

The Supreme Court's decisions in *Schechter Poultry* and *Panama Refining* demonstrate that, where Congress seeks to delegate its powers to the Executive to rule by regulation, "[t]he area of permissible indefiniteness narrows . . . when the regulation invokes criminal sanctions . . . ." *United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring); *see Touby v.*

9

*United States*, 500 U.S. 160, 166 (1991) (assuming without deciding that "greater congressional specificity is required in the criminal context"); *Mistretta*, 488 U.S. at 374 n.7 (distinguishing a proper delegation of legislative authority where "[t]he Act does not make crimes of acts never before criminalized."); *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947) (noting a stricter standard for the "delegation of a power to make federal crimes of acts that never had been such"). Here, the ITSR criminalize a wide variety of ordinary financial transactions and other conduct. Moreover, the Supreme Court this term is considering a challenge of Congress's delegation of legislative power in the criminal context. *See Gundy v. United States*, 138 S. Ct. 1260 (cert. granted Mar. 5, 2018) (questioning whether the federal Sex Offender Registration and Notification Act's delegation of authority to the attorney general to issue regulations under 34 U.S.C. § 20913(d) violates the nondelegation doctrine). In short, there is a substantial body of Supreme Court precedent indicating that a delegation of authority to criminalize conduct—just as IEEPA does—violates the Constitution.

Even under the more relaxed standard, IEEPA fails to provide any "intelligible principle" to guide the President's discretion in wielding his expansive emergency powers. IEEPA does not indicate which actions the President should ban or regulate, or for how long, or what emergent circumstances would justify imposing such restrictions. *See* Jason Luong, *Forcing Constraint: The Case for Amending the International Emergency Economic Powers Act*, 78 Tex. L. Rev. 1181, 1208 (2000) ("The degree of discretion accorded the president by virtue of the IEEPA's and the NEA's lack of any meaningful intelligible principles effectively accomplishes a transfer of legislative authority . . . [which] violate[s] the separation of powers and the nondelegation doctrine."). IEEPA is an unconstitutional delegation of Congress's legislative authority.

IEEPA particularly offends the Constitution by granting the President undefined discretion to criminalize otherwise innocuous conduct and infringe on individual liberty. "The economic regulations made by the president pursuant to the IEEPA often come at the expense of fundamental constitutional rights." *Id.* "This summary power to block persons from accessing their assets extends even to basic life necessities." Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency Law Regime*, 46 U. Mich. J.L. Reform 737, 758 (2013). There is thus substantial law indicating that the Second Circuit's holding in *Dhafir* is incorrect, and likely to be overruled by the Supreme Court. IEEPA is unconstitutional, and a criminal indictment may not be based on an unconstitutional statute. *See Aiken v. United States*, 358 F. Supp. 87, 91 (S.D.N.Y. 1972).

Indeed, part of the delegation scheme prescribed by IEEPA has been invalidated as unconstitutional. Section 1706 provides that the President's emergency powers "may not continue to be exercised under this section if the national emergency is terminated by the Congress by concurrent resolution," but this legislative veto scheme is now recognized as unconstitutional. *See Chadha,* 462 U.S. at 959; *see, e.g.*, *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 2-3 (1st Cir. 1987) (recognizing that only a joint resolution signed by the President can terminate the President's emergency powers under IEEPA). Without resort to a concurrent resolution, Congress would presumably have to override a President's veto in order to terminate his use of emergency powers—a state of affairs that would exist absent the NEA or IEEPA, thus largely rendering both statutes dead letter.

Put another way, through IEEPA Congress unlawfully delegated vast legislative powers to the President, and then tried to rein in those powers through unconstitutional means. The entire scheme is constitutionally defective and must be removed, root and branch. Congress's

inability to terminate the President's authority reveals how ineffective it has been in defining an intelligible principle limiting the extraordinary delegation of legislative and criminal-law authority in this area. This Court should invalidate IEEPA's unconstitutional delegation of unchecked, unbounded legislative power to the President and dismiss Counts One and Two of the Indictment.

## CONCLUSION

For the reasons set forth above, the Court should dismiss Counts One and Two, and the portions of Counts Five and Six derivative of those charges, from the Indictment.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  February 25, 2019