**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18 Cr. 224 (ALC) |
| v. | |
| ALI SADR HASHEMI NEJAD, | ORAL ARGUMENT REQUESTED |
| *Defendant*. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ALI SADR HASHEMI NEJAD'S MOTION TO**
**DISMISS COUNTS THREE THROUGH SIX FOR FAILURE TO STATE AN OFFENSE**
<u>**(Pretrial Motion No. 4)**</u>

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  February 25, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 5

I.     APPLICABLE LEGAL PRINCIPLES .................................................................... 5

II.    COUNTS THREE AND FOUR FAIL TO ALLEGE ANY
MISREPRESENTATIONS TO A U.S. BANK ....................................................... 6

III.   COUNTS THREE AND FOUR FAIL TO ALLEGE A SCHEME TO OBTAIN
MONEY FROM A U.S. BANK .............................................................................. 8

IV.   COUNTS THREE AND FOUR FAIL TO ALLEGE A SCHEME TO DEFRAUD
INVOLVING AN INTENT TO CAUSE TANGIBLE ECONOMIC HARM .................. 9

     A.    The Indictment Does Not Contain Any "Right to Control" Allegations ............. 10

     B.    There Is No Viable "Right to Control" Theory of Fraud Based on the
Allegations in the Indictment .................................................................. 12

V.    THE PORTIONS OF COUNTS FIVE AND SIX THAT ARE ENTIRELY
DERIVATIVE OF THE BANK FRAUD COUNTS MUST ALSO BE
DISMISSED ......................................................................................................... 18

CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Grain Traders, Inc.* v. *Citibank, N.A.*,
  960 F. Supp. 784 (S.D.N.Y. 1977)................................................................................9

*Loughrin v. United States*,
  573 U.S. 351 (2014)..........................................................................................6, 8

*Shaw v. United States*,
  137 S. Ct. 462 (2016)................................................................................1, 6, 8, 9

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir. 2012)..................................................................................5

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)..........................................................................10, 12

*United States v. Binday*,
  908 F. Supp. 2d 485 (S.D.N.Y. 2012)................................................................11

*United States v. Bongiorno*,
  No. 05-cr-390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)........................5

*United States v. Bonnett*,
  877 F.2d 1450 (10th Cir. 1989) ..........................................................................7

*United States v. Bouchard*,
  828 F.3d 116 (2d Cir. 2016)..................................................................................8

*United States v. Briggs*,
  939 F.2d 222 (5th Cir. 1991) ..............................................................................7

*United States v. Brumley*,
  79 F.3d 1430 (5th Cir. 1996) ............................................................................18

*United States v. Crowley*,
  236 F.3d 104 (2d Cir. 2000)..................................................................................5

*United States v. D'Alessio*,
  822 F. Supp. 1134 (D.N.J. 1993) ......................................................................18

*United States v. Doherty*,
  969 F.2d 425 (7th Cir. 1992) ..............................................................................7

ii

*United States v. Finazzo,*
  850 F.3d 94 (2d Cir. 2017)..............................................................2, 10, 16

*United States v. Heicklen,*
  858 F. Supp. 2d 256 (S.D.N.Y. 2012)..........................................................5

*United States v. Kurtz,*
  No. 04-cr-155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) ...........................11

*United States v. Marchese,*
  46 F.3d 1020 (10th Cir. 1995) ...................................................................18

*United States v. Mittelstaedt,*
  31 F.3d 1208 (2d Cir. 1994)......................................................................12

*United States v. Mowad,*
  641 F.2d 1067 (2d Cir. 1981)......................................................................5

*United States v. Nkansah,*
  699 F.3d 743 (2d Cir. 2012)..................................................................13, 14

*United States v. Novak,*
  443 F.3d 150 (2d Cir. 2006)............................................................. *passim*

*United States v. Pirro,*
  212 F.3d 86 (2d Cir. 2000)...................................................................2, 5, 12

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007).......................................................................6

*United States v. Rodriguez,*
  140 F.3d 163 (2d Cir. 1998).......................................................................7

*United States v. Schwartz,*
  924 F.2d 410 (2d Cir. 1991)......................................................................17

*United States v. Shellef,*
  507 F.3d 82 (2d Cir. 2007).............................................................2, 10, 11, 18

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017)......................................................................18

*United States v. Starr,*
  816 F.2d 94 (2d Cir. 1987).........................................................................1

*United States v. Zarrab,*
  No. 15-cr-867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016)...................7, 15, 16, 17

*Williams v. United States*,
    458 U.S. 279 (1982)..................................................................................................7

**Statutes**

18 U.S.C. § 1344..................................................................................................6, 8

18 U.S.C. § 1956...................................................................................................19

International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ............................7, 15

**Other Authorities**

Iranian Transactions and Sanctions Regulations, 31 C.F.R. pt. 560............................2, 13, 14, 15

OFAC FAQ #116...................................................................................................15

Press Release, U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA
    N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit
    $1,256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012) ......................................17

U.S. Treasury Dep't, Appendix D – Fundamentals of the Funds Transfer Process ......................4

## INTRODUCTION

The Court should dismiss the bank fraud and conspiracy to commit bank fraud charges in Counts Three and Four for failure to state an offense.  The Indictment fails to allege any misrepresentation by Sadr to a U.S. bank or anyone else, that Sadr obtained money belonging to a bank or one of its accountholders, or that Sadr intended to defraud a U.S. bank by exposing it to a risk of tangible economic harm.  The U.S. banks in this case merely engaged in routine, automated, and instantaneous "clearing" transactions to process the transfer of U.S. dollars from one foreign bank to another.  There is no allegation that the money transferred was anything other than payments for the legitimate business of building low-income housing in Venezuela. The money transferred did not belong to a U.S. bank, and was not stolen from any accountholder.  The allegations in the Indictment bear no resemblance to a heartland bank fraud offense in which a defendant makes a false statement to a bank to obtain money belonging to the bank or a bank customer.  *See Shaw v. United States*, 137 S. Ct. 462, 469 (2016).

The alleged "fraud" involved efforts by Sadr to appoint non-Iranian companies as agents to receive installment contract payments due to the Iranian International Housing Corporation ("IIHC")—the party that contracted with a Venezuelan state-owned company to build the housing—supposedly to deceptively induce the U.S. banks to conduct financial transactions on behalf of Iranian entities.  However, a fraud charge requires a showing of "intended harm." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006).  "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  Because the Indictment does not allege that Sadr intended to harm the U.S. banks, Counts Three and Four fail to state bank fraud offenses and must be dismissed.

The government may argue that the fraud was intended to deprive the U.S. banks of the right to control their assets.  But the Indictment contains no "right to control" allegations, and the government cannot save a deficient indictment by invoking a theory not considered by the grand jury.  "Because the requirement of a sufficient indictment serves [] important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

In any event, there is no viable "right to control" theory of fraud based on the Indictment's allegations.  Not every deceit or misrepresentation constitutes criminal fraud.  The "right to control" theory of fraud, as recently clarified by the Second Circuit in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), requires the defendant to have intended to inflict tangible economic harm to a U.S. bank.  The risk of loss must be concrete and not remote, unclear, or hypothetical.  Here, the U.S. banks processing the foreign-bank-to-foreign-bank wire transfers faced no risk of losing money because the funds did not belong to them.  Further, even if Sadr violated the Iran Transactions and Sanctions Regulations ("ITSR") by engaging in the underlying transactions—which he did not—the U.S. banks faced no meaningful, non-hypothetical risk of exposure to any penalties because, as victims of the alleged deceit, they were unwitting actors.  Any claim that they could be held liable and exposed to loss in this scenario is illogical.  Such non-existent exposure cannot support bank fraud liability even under a right-to-control theory.  The allegation that a defendant's misrepresentations induced the victim "to enter into a transaction it would otherwise have avoided," without an allegation that the misrepresentation would cause economic harm or deprive the victim of an essential element of the contractual bargain, is not "legally sufficient."  *United States v. Shellef*, 507 F.3d 82, 108-09 (2d Cir. 2007).  Here, the Indictment does not allege that Sadr intended to cause any U.S. bank economic harm or

deprive it of an essential element of any economic bargain.  Accordingly, the Court should dismiss Counts Three and Four, as well as the portions of the money laundering charges in Counts Five and Six derivative of those bank fraud charges.

## BACKGROUND

Count Three alleges that Sadr committed bank fraud by "inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran[1] and Iranian entities and persons using money owned by and under the custody and control of such financial institutions, by deceptive means."  Ind. ¶ 23.  Count Four alleges a conspiracy to commit bank fraud based on the same underlying allegations.  *Id*. ¶¶ 25-27. Neither count specifies the nature of the scheme or any alleged misrepresentations to U.S. financial institutions.  Both counts incorporate the introduction and the overt acts in support of the deficient Count One, thereby attempting to recast the government's sanctions allegations as bank fraud.  Sadr is left to guess at how the overt acts supporting the sanctions charges also constitute bank fraud.

It is apparent, however, that Sadr did not obtain any money from the alleged U.S. bank victims that belonged to another person or the banks themselves.  Instead, the financial transactions at issue were legitimate payments for construction of low-income housing in Venezuela.  The payments were sent from a Venezuelan company's foreign bank to the construction company, IIHC, by way of a Swiss company (Clarity) and a Turkish company (Stratus Turkey) that IIHC designated to receive the payments in their foreign bank accounts. *Id.* ¶¶ 6-11.  IIHC, Clarity, and Stratus Turkey were all private companies.  The Indictment does

---

[1] The claim that Sadr acted on behalf of the Government of Iran is false and not supported by any specific allegation in the Indictment.  Sadr has moved to strike this and other references to the Government of Iran as irrelevant and prejudicial surplusage.  *See* Motion to Strike Surplusage (Pretrial Motion No. 7).

not allege that the housing was not built, or that IIHC, Clarity, or Stratus Turkey were not entitled to this money.  In other words, the funds involved were legitimately earned by IIHC and its subcontractors in constructing the low-income housing project.

The alleged bank fraud scheme appears to be based on the claim that Sadr and others "conduct[ed] international financial transactions using Clarity and Stratus Turkey on behalf of and for the benefit of Iranian individuals and entities, including themselves and IIHC, in order to conceal from U.S. banks and others that services were being provided to Iran" in violation of the Iran sanctions regime.  *Id.* ¶ 12.  The only alleged connection to the alleged U.S. financial institution victims is that the payments from the Venezuelan company's foreign bank accounts were allegedly "routed" through U.S. banks to the foreign bank accounts of Clarity or Stratus Turkey.  *Id.* ¶ 13.  The foreign banks entered into correspondent banking transactions with U.S. banks that processed or "cleared" the fund transfers by making accounting entries that reflected the updated U.S. dollar holdings of the foreign banks' accounts with the U.S. correspondent banking institutions.[2]

---

[2] No money was actually transferred to or from any U.S. bank as a result of these transactions.  In an electronic funds transfer of this type, a company or individual notifies their bank that they wish to debit their account and credit an equal amount to the account of the intended recipient.  In transactions involving senders and recipients with accounts at different banks, those banks may use a "correspondent bank."  The correspondent bank typically does not have customer accounts with the sender or recipient, but instead has commercial accounts with both the sender's bank and the recipient's bank.  The correspondent bank will record that the commercial account held by the sender's bank now has less money than before the transfer, and the commercial account held by the recipient's bank now has more money than before the transfer.  The correspondent bank neither receives nor sends any money except for a nominal administrative fee from the sender's bank.  *See* Appendix D – Fundamentals of the Funds Transfer Process at 56, U.S. Treasury Dep't, https://www.fincen.gov/sites/default/files/shared/Appendix_D.pdf.

## ARGUMENT

### I.    APPLICABLE LEGAL PRINCIPLES

"The sufficiency of an indictment and the interpretation of a federal statute are both matters of law" and therefore "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).  "[A] claim that an indictment does not charge an offense may be raised at any time, and may be considered by a court *sua sponte*." *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000).  Whether the facts alleged in an indictment fall within the scope of a criminal statute is a question of law, and thus is appropriate for consideration on a motion to dismiss. *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 & n.5 (S.D.N.Y. 2012) ("When a motion to dismiss an indictment is made solely upon an issue of law, consideration of the motion is appropriate. . . .  [I]t would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish at trial."); *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments.").  Indeed, "it would be improper . . . [to] submit the case to a jury only to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial." *United States v. Bongiorno*, No. 05-cr-390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006)*; see also United States v. Mowad*, 641 F.2d 1067, 1069 (2d Cir. 1981) (concluding that a federal firearms statute did not apply to defendant's conduct as a matter of law and thus should not have been presented to the jury).

The bank fraud statute prohibits "knowingly execut[ing] . . . a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any . . . moneys . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses,

representations, or promises."  18 U.S.C. § 1344.  These two prongs "overlap substantially but not completely."  *Shaw*, 137 S. Ct. at 468.  Both prohibit the core bank fraud offense of "making a false representation to a bank in order to obtain property belonging to that bank."  *Id.* at 469.

## II.   COUNTS THREE AND FOUR FAIL TO ALLEGE ANY MISREPRESENTATIONS TO A U.S. BANK

Counts Three and Four fail to state the offenses of bank fraud and conspiracy to commit bank fraud because they completely lack any alleged misrepresentations.  To establish bank fraud, "the government must prove that the defendant engaged in a deceptive course of conduct by making material misrepresentations."  *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).  Under Section 1344(1), the material misrepresentations must be directed at the U.S. financial institution; indeed, "the requirement that a defendant intend to 'defraud a financial institution' . . . is § 1344(1)'s whole sum and substance."  *Loughrin v. United States*, 573 U.S. 351, 357 (2014).  Section 1344(2), on the other hand, requires a "false statement" functioning as "the mechanism naturally inducing a bank . . . to part with its money."  *Id.* at 365.  Under either prong, liability requires a material misrepresentation made with intent to cause the U.S. bank to incur economic harm or part with its money.

The Indictment does not allege any misrepresentations by Sadr to any U.S. financial institution.  In fact, the Indictment does not allege that Sadr made any representations to any U.S. financial institution at all.  Nor does the Indictment allege that Sadr caused a third party to make a misrepresentation to a U.S. financial institution.  The Venezuelan company initiated the wire transfers to pay IIHC for the construction services it performed.  The Indictment alleges that Sadr and his alleged co-conspirators wrote letters directing the Venezuelan company to send the payments to agents IIHC designated to receive the funds—either Stratus Turkey or Clarity—at their bank in Switzerland, using correspondent banks in the United States for U.S. dollar

transactions. *See, e.g.*, Ind. ¶¶ 16.n, 16.t. The designated recipients then received the funds, just as the letters said they would. The Indictment does not allege any misrepresentations made by the Venezuelan company to any U.S. financial institution. Indeed, the Indictment does not allege a single representation—false or otherwise—by anyone to a U.S. financial institution. This failure alone requires the dismissal of Counts Three and Four.

The mere act of causing a funds transfer is not a factual representation and thus cannot be a misrepresentation constituting fraud. *Williams v. United States*, 458 U.S. 279, 284 (1982) (check kiting scheme does not involve "false statements" because "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'"); *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998) ("A course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false or fraudulent pretenses or representations.").[3]

Finally, although a false statement to a third party may constitute bank fraud in limited circumstances, *see Loughrin*, 134 S. Ct. at 2394, the Indictment fails to allege that Sadr made

---

[3] *Accord United States v. Briggs*, 939 F.2d 222, 226 (5th Cir. 1991) ("The bare act of instructing a bank to transfer funds is not a factual representation; thus, it cannot be a *mis*representation, a *false* representation, or *any* kind of representation."); *United States v. Doherty*, 969 F.2d 425, 427 (7th Cir. 1992) ("[A] check . . . cannot be characterized as true or false."); *United States v. Bonnett*, 877 F.2d 1450, 1456 (10th Cir. 1989) ("[A] criminally prohibited statement or representation cannot be formed from an implied representation that the maker of a check will have sufficient funds to pay the check upon presentment.").

This case is readily distinguishable from *United States v. Zarrab*, No. 15-cr-867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016), where the court upheld bank fraud charges as containing material misrepresentations to a bank in a case based on alleged underlying violations of IEEPA and the ITSR. The indictment in *Zarrab* alleged specific misrepresentations in wire transfer requests submitted by the defendant to the victim financial institutions. *Id.* at *12 (indictment alleged that a wire transfer request falsely stated that a payment was related to fire equipment). Here, in contrast, the Indictment contains no allegations describing any false wire transfer requests or any other misrepresentations to the alleged U.S. victim banks.

any misrepresentations to the Venezuelan company that initiated the fund transfers.  On the

contrary, the letters quoted in the Indictment transparently explained to the Venezuelan company

that IIHC was appointing Clarity or Stratus Turkey to act as its agent to receive payments under

the construction contract.  *See, e.g.*, Ind. ¶¶ 16.n, 16.t.  The Venezuelan company was not

deceived in any respect.  Indeed, IIHC performed real construction work, and the Venezuelan

company paid for the low-income housing it received.  IIHC directed the Venezuelan company

to send the money it had legitimately earned to Clarity or Stratus Turkey.  And the money was

actually sent from the Venezuelan company's foreign bank accounts to Clarity's and Stratus

Turkey's foreign bank accounts.  Counts Three and Four should be dismissed for failure to allege

any misrepresentation.

## III.   COUNTS THREE AND FOUR FAIL TO ALLEGE A SCHEME TO OBTAIN MONEY FROM A U.S. BANK

Counts Three and Four also fail to state an offense because they do not allege that Sadr

engaged in a scheme to obtain money or property "owned by, or under the custody or control of"

a U.S. bank.  18 U.S.C. § 1344(2).  The Supreme Court has described this element "as intent 'to

obtain bank property.'"  *Loughrin*, 573 U.S. at 355; *United States v. Bouchard*, 828 F.3d 116,

126 (2d Cir. 2016) (noting that under *Loughrin* "intent to obtain bank property is an element of a

conviction under § 1344(2) and that a defendant must at least know that the property belongs to

or is under the custody or control of a bank") (quotation marks omitted); *Shaw*, 137 S. Ct. at 468

(government must show "knowledge that he would likely harm the bank's property interest")

(emphasis omitted).

The Indictment does not allege that Sadr obtained any money from a U.S. bank or one of

its accountholders.  The monetary transfers at issue were installment payments for the low-

income housing construction project described in the Indictment.  There is no allegation that

IIHC failed to perform the work or that the Venezuelan company was deceived into paying for the work. The monetary transfers involved IIHC's own money, and IIHC had the right to instruct the Venezuelan company how it wanted to be paid.

Moreover, the money that Sadr obtained came from his companies' Swiss bank, which lawfully received the money from the Venezuela company's foreign bank. As described above, the sole involvement of the U.S. banks in the transactions alleged in the Indictment was to process U.S. dollar transfers between foreign banks by debiting the correspondent account of one foreign bank and crediting the account of another. A corresponding or intermediary bank does not "receive any funds" from the originating bank or send funds to the recipient bank. *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1977). Thus, Sadr did not obtain any money owned by or in the custody or control of a U.S. bank. Given the absence of any allegation that Sadr schemed to obtain bank property, Counts Three and Four fail to state an offense and must be dismissed.

## IV. COUNTS THREE AND FOUR FAIL TO ALLEGE A SCHEME TO DEFRAUD INVOLVING AN INTENT TO CAUSE TANGIBLE ECONOMIC HARM

To satisfy the bank fraud statute, "the scheme must be one to deceive the bank *and* deprive it of something of value." *Shaw*, 137 S. Ct. at 469. The statute can be violated if a bank is "'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss." *Id.* at 467 (citing *Carpenter v. United States*, 484 U.S. 19 (1987), involving "the analogous mail fraud statute"). The requisite "intent to defraud" requires the government to prove that the defendant acted "knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another." *Finazzo*, 850 F.3d at 108.

Although not pled in this Indictment, the "property interests protected" by the federal fraud statutes "include the interest of a victim in controlling his or her own assets." *United*

*States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (citation omitted).  However, "not every non–disclosure or misrepresentation that could affect someone's decision of how to use his or her assets is sufficient" under this "right to control" theory.  *Finazzo*, 850 F.3d at 111; *see also Binday*, 804 F.3d at 570 ("The 'right to control one's assets' does not render every transaction induced by deceit actionable under the mail and wire fraud statutes.  Rather, the deceit must deprive the victim of 'potentially valuable economic information.'") (citation omitted).  "[M]isrepresentations or non–disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non–disclosures can or do result in tangible economic harm."  *Finazzo*, 850 F.3d at 111; *see also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.").

This "right to control" theory of fraud is viable only "where the deceit affected the victim's economic calculus or the benefit and burdens of the agreement."  *Binday*, 804 F.2d at 570.  "This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received."  *Finazzo*, 850 F.3d at 111.

### A.     The Indictment Does Not Contain Any "Right to Control" Allegations

When the government proceeds on a "right to control" theory of fraud, it must allege in the indictment "that there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received," and that the defendant "misrepresented 'the nature of the bargain.'"  *Shellef*, 507 F.3d at 109 (citations omitted).  An indictment alleging only that the defendant's

misrepresentation induced the victim "to enter into a transaction it would otherwise have avoided," without alleging that the misrepresentation "had 'relevance to the object of the contract,'" is not "legally sufficient." *Id.* (citation omitted); *see United States v. Kurtz*, No. 04-cr-155A, 2008 WL 1820903, at *5-6 (W.D.N.Y. Apr. 21, 2008) (dismissing indictment where biological materials provider received the essential elements of its bargain when it was paid by a straw purchaser to provide biological agents to an ineligible end user and the indictment failed to allege that the scheme "depended on a misrepresentation of an essential element of the bargain"); *cf. United States v. Binday*, 908 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2012) (upholding an indictment because it had detailed "'*Shellef*' language" clearly specifying at length how the defendants' lies "affected the [victims'] bottom line"), *aff'd* 804 F.3d 558 (2d Cir. 2015).

In this case, the Indictment does not contain any "right to control" or *Shellef* language specifying any discrepancy between the benefit that the alleged victim U.S. banks anticipated and the actual benefits received.  The Indictment contains even less than the language deemed insufficient in *Shellef*.  *Compare Shellef*, 507 F.3d at 109 ("the indictment states only that Shellef's misrepresentation induced [the victim] to enter into a transaction it would otherwise have avoided"), *with* Ind. ¶ 23 (Sadr "induc[ed] U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons . . . by deceptive means").  The government cannot save a fatally defective indictment by invoking a theory that was not considered by the grand jury.  *See Pirro*, 212 F.3d at 92 ("Because the requirement of a sufficient indictment serves [] important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn."); *Russell*, 369 U.S. at 768, 770-71 (requiring the indictment to specify the facts constituting the offense also prevents the prosecution from shifting theories up through and even during trial, regardless of

whether those were the facts presented to the grand jury).  The absence of any "right to control" or *Shellef* language in the Indictment is fatal to Counts Three and Four.

**B.     There Is No Viable "Right to Control" Theory of Fraud Based on the Allegations in the Indictment**

Even absent this fatal pleading defect, the allegations in the Indictment demonstrate that there is no viable "right to control" theory of fraud in this case.  The Second Circuit has "repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic value of its bargain."  *Binday*, 804 F.3d at 570 (collecting cases).  For example, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), the Second Circuit reversed a fraud conviction of a union boss who directed contractors to pay for "no-show" labor hours and obtained kickbacks from the laborers without the contractors' knowledge.  The government argued that fraudulent intent was established because the contractors would not have paid for the no-show hours if they had known about the kickbacks, "since doing so would have exposed them to criminal liability for unlawful payments to an employee representative."  *Id.* at 157.  The court rejected that "hypothetical contention" as "inadequate to support a finding of fraudulent intent," because the "contractors received all they bargained for, and [the defendant's] conduct did not affect an essential element of those bargains."  *Id.* at 159; *see also see United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) (holding that deception regarding an objectionable person's participation in a transaction does not deprive a counterparty of their right to control that transaction merely "because the [counterparty] would have refused to deal with [the objectionable person] on general principles").

Similarly, Sadr's alleged conduct did not affect an essential element of any bargain with the alleged victims of the purported fraud.  The U.S. banks were paid small fees by the Venezuelan company's foreign bank for the ministerial service of processing wire transfers from

one foreign bank to another foreign bank.  To the extent there was any "bargaining" in these automated, routine bank transactions—a highly debatable proposition absent from the Indictment—the banks got the fees they bargained for to perform ministerial services.  The Indictment does not and could not allege that the banks failed to receive the full economic value of their bargain for these clearing services.

A bank fraud charge cannot survive if "the actual exposure of a bank to losses is unclear, remote, or non-existent."  *United States v. Nkansah*, 699 F.3d 743, 750 (2d Cir. 2012), *abrogated on other grounds by United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016).  The Court should thus reject any attempt by the government to argue that the property interest implicated by Sadr's alleged scheme is the risk that the U.S. banks were exposed to fines or regulatory liability for engaging in transactions that violated the ITSR.[4]

Courts have rejected claims that fraudulent intent is established by risk of bank exposure to criminal liability where the underlying scheme *concealed* the illegality from the victim bank.  For instance, in *Novak*, the Second Circuit deemed insufficient to establish fraudulent intent the "hypothetical contention" that contractors were exposed to criminal liability for making payments to an employee representative, where the defendant's scheme was designed to conceal these kickbacks from the contractor victims.  *See Novak*, 443 F.3d at 159.  Similarly, in *United States v. Perez-Ceballos*, the court rejected the government's argument that the alleged victim bank "became vulnerable when it became the way-station for money transferred to a fraudulently-opened brokerage account," because the defendant did not engage in any fraud

---

[4] As set forth in the Motion to Dismiss the Sanctions Counts (One & Two) and Derivative Money Laundering Counts (Five & Six) for Failure to State an Offense (Pretrial Motion No. 1), the underlying transactions and monetary transfers in the Indictment did not violate the ITSR.  If the Court grants Sadr's motion, then the U.S. banks necessarily faced no regulatory exposure as a result of the conduct in the Indictment.

when opening her account at the bank.  907 F.3d 863, 868 (5th Cir. 2018) (reversing bank fraud

conviction).  The court held that "generalized observations about banking industry regulations

are a far cry from demonstrating that [a bank] faced any risk of loss for depositing [the

defendant's] own money into her savings account and then transferring it."  *Id.* at 868-869.

Likewise, in *Leung v. Law*, the court dismissed a civil RICO case predicated on bank fraud

where the bank's exposure would only have materialized upon discovery of the defendant's own

illicit scheme.  387 F. Supp. 2d 105, 117 (E.D.N.Y. 2005).  Dismissing the claims based on bank

fraud, the court held:

> Leung's theory of potential loss thus requires this court to accept
> the proposition that the defendants intended to victimize the Bank
> by exposing the Bank to a set of potential losses that would have
> become manifest only if the defendants' own misdeeds had been
> exposed.  This theory does not make an ounce of sense.  There are
> a number of fraudulent intentions that plausibly can be inferred
> from the allegation that the defendants intentionally understated
> the income and assets of the corporations they controlled to Leung
> and to state and federal tax authorities.  However, defrauding [the
> bank] clearly is not among them.

*Id*. at 118.

Similarly, any claim by the government that Sadr could have exposed the U.S. banks to

risk of regulatory penalties is too unclear, remote, or non-existent to state a bank fraud offense.

The charged scheme was allegedly designed to *conceal* from the U.S. banks that monetary

transfers were being conducted in violation of the ITSR.  No bank so deceived would face any

tangible threat of criminal or regulatory exposure.  Not surprisingly, neither OFAC nor the

Department of Justice has any enforcement history of pursuing unknowing financial institutions

in these circumstances.

In fact, *it is OFAC policy not to pursue enforcement action* against U.S. intermediary

banks—like the alleged victim U.S. financial institutions here—for engaging unwittingly in

transactions with sanctioned parties under the ITSR.  OFAC FAQ #116 answers the question:

"Does OFAC expect banks that are acting as financial intermediaries to research non-account

parties that do not appear on the SDN List, but are involved with or referenced in transactions

that are processed on behalf of correspondents?"  OFAC FAQ #116, *available at*

https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_compliance.aspx#116.  In

that scenario, "OFAC would not expect the bank to research the non-account parties listed in the

wire transfer that do not appear on the SDN List."  *Id.*  Therefore, OFAC "would not pursue an

enforcement action against the bank for having processed such a transaction" where a U.S. bank

"(1) is operating solely as an intermediary, (2) does not have any direct relationship with the

entity (e.g., the entity is a non-account party), and (3) does not know or have reason to know the

entity's ownership or other information demonstrating the blocked status of the entity's

property."  *Id.*  Thus, the risk that the alleged victim U.S. banks in this case faced criminal or

regulatory exposure was non-existent and cannot satisfy the bank fraud statute.

Finally, although a conspiracy to commit bank fraud charge based on alleged

IEEPA/ITSR violations survived dismissal in *Zarrab*, the reasoning there was inconsistent with

the evolution of the "right to control" theory subsequently articulated by the Second Circuit in

*Finazzo*.[5]  In *Zarrab*, the court held that the indictment adequately alleged potential losses to

U.S. banks based on allegations that the defendant "stripp[ed] or conceal[ed] material

---

[5] *Zarrab* also involved a very different set of facts than the allegations in this case.
There, the underlying transactions were performed on behalf of "sanctioned entities," detailed in
the *Zarrab* indictment as (a) Iranian state-owned banks or national oil companies identified in
Appendix A to the ITSR as "persons determined to be the Government of Iran," (b) banks and
companies designated by OFAC as Specially Designated Nationals ("SDNs") under the ITSR,
and (c) a company identified as an agent of Iran's Islamic Revolutionary Guard Corp.  Ind. ¶¶ 6-
8, *United States v. Zarrab*, No. 15-cr-867-RMB, Dkt. No. 2 (S.D.N.Y. Dkt. 15, 2015).  In sharp
contrast, there is no allegation here that Sadr engaged in any transactions on behalf of SDNs or
other sanctioned entities.

information and otherwise provid[ed] misleading wire transfer information intended to hide the fact that the transactions were performed on behalf of sanctioned entities."  2016 WL 6820737, at *14.  The court stated that the contemplated harm to the bank "need not be pecuniary in nature," and can be satisfied by a showing that the victim *engaged in transactions that it would not have "but for the fraudulent misrepresentations.*"  *Id.* (quoting *Schwartz*, 924 F.2d at 420-21) (emphasis added).  The court also noted that intentionally withholding information from a bank is itself enough to constitute bank fraud because the defendant "den[ied] [the bank] the right to control [its] assets by depriving [the bank] of the information necessary to make discretionary economic decisions."  *Id.* (quoting *United States v. Watts*, 934 F. Supp. 2d 451, 471 (E.D.N.Y. 2013)).  The Second Circuit has since clarified, however, that "it is not sufficient to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations."  *Finazzo*, 850 F.3d at 112 (decided after *Zarrab*) (quoting *Binday*, 804 F.3d at 570).  Thus, *Zarrab*'s rationales are all inconsistent with the current state of the "right to control" doctrine in the Second Circuit.

The *Zarrab* court also noted the government's argument that the alleged victim U.S. banks supposedly faced "'massive fines and forfeiture'" by "'executing barred transactions.'" 2016 WL 6820737, at *14 (quoting Department of Justice press release regarding HSBC's $1.256 billion settlement for Iran and other sanctions violations).  Although it is not clear from the *Zarrab* opinion whether the court endorsed the government's argument, the conduct of HSBC bears no resemblance to the conduct of the alleged victim U.S. banks in this case. According to the press release cited in *Zarrab*, HSBC *intentionally* facilitated illegal financial transactions for sanctioned parties by, among other things, telling them "'do not mention Iran'"

16

in payment instructions.[6]  The fact that HSBC faced massive consequences for its own willful

criminal conduct does not establish that the allegedly unwitting U.S. banks in this case faced any

meaningful, non-speculative risk of regulatory exposure from the alleged bank fraud scheme.

*Zarrab*'s reliance on *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), was also

misplaced.  In *Schwartz*, the defendants bought and illegally exported night-vision goggles after

making misrepresentations to the seller in both the contract and in response to the seller's

specific inquiries that they would not export the products in violation of the arms export laws.  In

those circumstances, the misrepresentations "went to an essential element of the bargain" and

caused the victim not to receive "all it bargained for," while also costing it "good will" because

its equipment was exported illegally despite repeated "*explicit* promises" not to do so.  *Id.* at 420-

21.  This case is easily distinguished from *Schwartz*, and indistinguishable from both *Shellef*, 507

F.3d at 108-09, and *Novak*, 443 F.3d at 158, where the Second Circuit deemed fraud allegations

insufficient.  The Indictment does not allege that the victim U.S. banks demanded specific

representations about the fund transfers.  Nor does the Indictment allege that the banks made any

inquiries to Sadr or the Venezuelan state-owned entity about the fund transfers, much less that

they were deceived by some explicit promise that went to an essential element of their bargain.

In sum, because the Indictment does not allege a sufficient risk of tangible harm to a U.S.

bank, Counts Three and Four should be dismissed.

---

[6] *See* Press Release, U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1,256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), *available at* www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations ("The bank also removed information identifying the countries from U.S. dollar payment messages; deliberately used less-transparent payment messages, known as cover payments; and worked with at least one sanctioned entity to format payment messages, which prevented the bank's filters from blocking prohibited payments.").

## V.  THE PORTIONS OF COUNTS FIVE AND SIX THAT ARE ENTIRELY DERIVATIVE OF THE BANK FRAUD COUNTS MUST ALSO BE DISMISSED

The Court should also dismiss the portions of Counts Five and Six derived entirely from the bank fraud charges for failure to state an offense.  *See United States v. Silver*, 864 F.3d 102, 124 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018) (reversing conviction for money laundering because "the money laundering count against [Defendant] was predicated on the verdicts rendered on [his] honest services fraud and extortion counts and must fall with those verdicts").[7]  Count Five charges money laundering based on the alleged transfer of monetary instruments in amounts exceeding $10,000 with the intent to promote the specified unlawful activity of (i) the illegal export of services to Iran as charged in Count Two, and (ii) bank fraud as charged in Counts Three and Four, in violation of 18 U.S.C. § 1956(a)(2)(A)  Ind. ¶¶ 28-29.  Count Six charges a conspiracy to commit money laundering with the identical two objects, in violation of 18 U.S.C. § 1956(h).  *Id.* ¶¶ 30-33.  Because Counts Three and Four fail to state an offense, the portions of Counts Five and Six derived entirely from those charges must be dismissed as well.

## CONCLUSION

For the reasons set forth above, the Court should dismiss Counts Three and Four, and the portions of Counts Five and Six derivative of those charges, from the Indictment.

---

[7] *See also United States v. D'Alessio*, 822 F. Supp. 1134, 1146 (D.N.J. 1993) (following dismissal of mail fraud counts, "there is no basis upon which to support the money laundering charges" predicated on them); *United States v. Brumley*, 79 F.3d 1430, 1442 (5th Cir.), *vacated on other grounds,* 91 F.3d 676 (5th Cir. 1996), *and on reh'g en banc*, 116 F.3d 728 (5th Cir. 1997) (dismissing money laundering charges because "[e]ach of the money laundering counts against [Defendant] makes a cross-reference to the wire fraud counts" that were dismissed); *United States v. Marchese*, 46 F.3d 1020, 1022 (10th Cir. 1995) (noting that the district court dismissed "the money laundering charges which stemmed from the predicate charges of mail fraud").

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  February 25, 2019