UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                      :

UNITED STATES OF AMERICA

                      :

       - v. -                      18 Cr. 224 (ALC)

                      :

ALI SADR HASHEMI NEJAD,

                      :

          Defendant.

                      :

                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ALI SADR HASHEMI NEJAD'S MOTIONS TO DISMISS THE INDICTMENT, SUPPRESS EVIDENCE, AND FOR THE RETURN OF PROPERTY

 

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Andrew J. DeFilippis
Jane Kim
Michael K. Krouse
Assistant United States Attorneys

Garrett Lynch,
Special Assistant United States Attorney
    *Of Counsel*

## **Table of Contents**

PRELIMINARY STATEMENT .................................................................... 1

Background ............................................................................................ 1

Discussion ............................................................................................ 3

I.    THE MOTIONS TO DISMISS AND TO STRIKE LANGUAGE FROM THE
INDICTMENT SHOULD BE DENIED ................................................. 3

    A.   The Motion to Dismiss the Sanctions and Money Laundering Counts for Failure to
State an Offense Should Be Denied ........................................3

        1.   Applicable Law ...................................................... 4

        2.   Discussion ............................................................. 7

            a.   The Indictment Properly Alleges the Export and Supply of Services to
Iran or the government of Iran........................... 10

            b.   The Transactions Alleged in the Indictment Were Not Expressly
Authorized by the ITSR.................................. 19

    B.   The Motion to Dismiss Count One for Failure to State a Conspiracy to Defraud the
United States Should Be Denied ...........................22

    C.   The Motion to Dismiss the IEEPA Charges on Constitutional Grounds Should Be
Denied ............................................................23

        1.   Applicable Law ................................................... 23

        2.   Discussion .......................................................... 25

    D.   The Motion to Dismiss the Bank Fraud Charges Should Be Denied......................27

        1.   The Indictment Alleges False Statements in Connection with the Scheme to
Defraud.............................................................. 30

        2.   The Indictment Alleges a Scheme to Obtain Money or Property from a U.S.
Bank ................................................................... 36

        3.   The Scheme Involved Risk of Tangible Economic Harm........................... 38

    E.   The Motion to Dismiss Purportedly Multiplicitous Counts Should Be Denied.......45

    F.   The Motion to Dismiss for Lack of Specificity and for a Bill of Particulars Should
Be Denied...........................................................45

        1.   The Indictment Is Sufficiently Specific .................... 46

        2.   A Bill of Particulars Is Not Warranted .................... 47

    G.   The Motion to Strike Surplasage Should Be Denied ............................. 50

        1.   Applicable Law ................................................... 50

        2.   Discussion .......................................................... 51

II.   SADR'S MOTION TO SUPPRESS SHOULD BE DENIED WITHOUT A HEARING 56

    A.   The Defendant Is Not Entitled to a Franks Hearing ................................................56

        1.   Factual Background ................................................................................... 56

        2.   Applicable Law ........................................................................................ 60

        3.   Discussion ................................................................................................ 63

            a.   The Defendant's Motion Is Conclusory, Not Supported by Any Evidence, and Does Not Meet the Burden to Obtain a Hearing ........ 64

            b.   The Affidavits Do Not Contain False or Misleading Information or Omit Material Facts ............................................................................ 65

            c.   The Motion Does Not Make Any Showing of Intentional or Reckless Misstatements or Omissions ............................................................. 72

            d.   The Alleged Misstatements and Omissions Were Not Material to the Findings of Probable Cause ................................................................ 74

    B.   The Search Warrants Do Not Lack Particularity and Are Not Overbroad ...............79

        1.   Applicable Law ........................................................................................ 79

        2.   Discussion ................................................................................................ 82

            a.   The Search Warrants Did Not Lack Particularity ............................. 83

            b.   The Search Warrants Were Not Overbroad ...................................... 87

    C.   Law Enforcement Officers Relied on the Search Warrants in Good Faith .............89

        1.   Applicable Law ........................................................................................ 89

        2.   Discussion ................................................................................................ 91

III.   SADR'S MOTION FOR THE RETURN OF PROPERTY SHOULD BE DENIED ...... 94

Conclusion ................................................................................................................... 97

## Table of Authorities

*Andresen* v. *Maryland*, 427 U.S. 463 (1976) ..................................................................... 80, 83, 86

*Asgrow Seed Co.* v. *Winterboer*, 513 U.S. 179 (1995) ................................................................ 15

*Assocs. Against Outlier Fraud* v. *Huron Consulting Grp., Inc.*, 817 F.3d 433 (2d Cir. 2016) .... 13

*Boyce Motor Lines* v. *United States,* 342 U.S. 337 (1952) ........................................................... 4

*Coolidge* v. *New Hampshire*. 403 U.S. 443 (1971) ...................................................................... 81

*Corley* v. *United States*, 556 U.S. 303 (2009) ............................................................................ 13

*Corona* v. *Lunn*, 2002 WL 550963 (S.D.N.Y. 2002) ................................................................... 70

*Franks* v. *Delaware*, 438 U.S. 154 (1978)........................................................................... passim

*Groh* v. *Ramirez*, 540 U.S. 551 (2004) ....................................................................................... 81

*Hamling* v. *United States*, 418 U.S. 87 (1974) ...................................................................... 4, 46

*Heller* v. *Doe*, 509 U.S. 312 (1993)............................................................................................ 25

*Herring* v. *United States*, 555 U.S. 135 (2009) .......................................................................... 89

*In re Warrant for* xxxxxxx@gmail.com, 33 F. Supp. 3d 386 (S.D.N.Y. 2014) .................... 85, 86

*J.W. Hampton, Jr., & Co.* v. *United States*, 276 U.S. 394 (1928) ................................................ 24

*Jay* v. *Boyd,* 351 U.S. 345 (1956) ............................................................................................... 15

*Jones* v. *United States*, 526 U.S. 227 (1999) ................................................................................ 4

*King* v. *Burwell*, 135 S. Ct. 2480 (2015) .................................................................................... 13

*Leocal* v. *Ashcroft*, 543 U.S. 1 (2004) ........................................................................................ 15

*Leung* v. *Law*, 387 F. Supp. 2d 105 (E.D.N.Y. 2005) ................................................................. 43

*Lo-Ji Sales, Inc.* v. *New York*, 442 U.S. 319 (1979) .................................................................... 91

*Lopresti* v. *Pace Press, Inc.*, 868 F. Supp. 2d 188 (S.D.N.Y. 2012) ........................................... 15

*Loughrin* v. *United States*, 573 U.S. 351 (2014) ......................................................................... 36

*Mistretta* v. *United States*, 488 U.S. 361 (1989)......................................................................... 24

*Montclair* v. *Ramsdell*, 107 U.S. 147 (1883)............................................................................. 13

*Nat'l Ass'n of Home Builders* v. *Defs. of Wildlife*, 551 U.S. 644 (2007) .................................... 15

*Neder* v. *United States*, 527 U.S. 1 (1999)................................................................................. 29

*People* v. *Thompson*, 51 Misc. 693 (N.Y. Sup. Ct. 2016) ........................................................... 95

*Rivera* v. *United States*, 928 F.2d 592 (2d Cir. 1991) ................................................................ 61

*Screws* v. *United States*, 325 U.S. 91 (1945)............................................................................... 17

*Shaw* v. *United States*, 137 S.Ct. 462 (2016) ........................................................ 39, 41

*SUPERVALU, Inc.* v. *Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d 334 (3d Cir. 2007) ........................................ 15

*Texas v. Brown*, 460 U.S. 730, 742 (1983) ........................................................... 80

*United States* v. *$1,879,991.64 Previously Contained in Sberbank of Russia's Interbank*, 2016 WL 2651424 (D.N.J. 2016) .............................................................................. 44

*United States* v. *Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ........................................ 18

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998) ...................................... 4, 9, 46

*United States* v. *All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999 (S.D.N.Y. 2003) .............................................................................................. 8

*United States* v. *Atilla*, No. S4 15 Cr. 867 (RMB) .................................................. 53

*United States* v. *Awadallah*, 349 F.3d 42 (2d Cir. 2003) ..................................... 60, 61

*United States* v. *Bando*, 244 F.2d 833 (2d Cir. 1957) ............................................. 16

*United States* v. *Banki*, 685 F.3d 99 (2d Cir. 2012) ............................................ 7, 17

*United States* v. *Barrett*, 178 F.3d 643 (2d Cir. 1999) ............................................ 45

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ........................... 50, 53

*United States* v. *Binday*, 804 F.3d 558 (2d Cir. 2015) ............................................ 39

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ................................... 47, 48

*United States* v. *Bouchard*, 2016 WL 3632591 (2d Cir. 2016) .................................. 28

*United States* v. *Briggs*, 939 F.2d 222 (5th Cir. 1991) ............................................ 33

*United States* v. *Briggs*, 965 F.2d 10 (5th Cir. 1992) .............................................. 33

*United States* v. *Brown*, 676 F. Supp. 2d 200 (S.D.N.Y. 2009) ................................. 63

*United States* v. *Brown*, 744 F. Supp. 558 (S.D.N.Y. 1990) ..................................... 63

*United States* v. *Burnett*, 10 F.3d 74 (2d Cir. 1993) ............................................... 32

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004) ................................. 50

*United States* v. *Canfield*, 212 F.3d 713 (2d Cir. 2000) .................................... passim

*United States* v. *Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ........................ passim

*United States* v. *Chen*, 378 F.3d 151 (2d Cir. 2004) ............................................... 48

*United States* v. *Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) .............................. 81, 84

*United States* v. *Clark*, 638 F.3d 89 (2d Cir. 2011) ......................................... passim

iv

*United States* v. *Cohen*, 518 F.2d 727 (2d Cir. 1975)...................................................... 52

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012) ........................................................ 23

*United States* v. *Crisci*, 273 F.3d 235 (2d Cir. 2001) .............................................. 28, 38

*United States* v. *Curcio*, 712 F.2d 1532 (2d Cir. 1983) ................................................... 17

*United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ........................... 25

*United States* v. *Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ............................................... 48

*United States* v. *Dayan*, 2005 WL 757250 (S.D.N.Y. 2005)........................................... 33

*United States* v. *Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003) ...................................... 95

*United States* v. *Dhafir*, 461 F.3d 211 (2d Cir. 2006) ...................................... 23, 25, 26

*United States* v. *DiNome*, 86 F.3d 277 (2d Cir. 1996)..................................................... 39

*United States* v. *Dupree*, 781 F. Supp. 2d 116 (E.D.N.Y. 2011) ................................... 82

*United States* v. *Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990)...................................... 48

*United States* v. *Ferguson*, 758 F.2d 843 (2d Cir. 1985) ............................................... 62

*United States* v. *Finazzo*, 850 F. 3d 94 (2d Cir. 2017) ................................................... 44

*United States* v. *Fishenko*, 2014 WL 4804215 (E.D.N.Y. 2014) ................................... 54

*United States* v. *Galpin*, 720 F.3d 436 (2d Cir. 2013) ...................................... 82, 84, 87

*United States* v. *Ganias*, 755 F.3d 125 (2d Cir. 2014)................................................... 95

*United States* v. *Ganias*, 824 F.3d 199 (2d Cir. 2016)................................................... 95

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) ..................................................... 93

*United States* v. *Gonzalez*, 2004 WL 2297341 (S.D.N.Y. 2004) .................................. 47, 48, 49

*United States* v. *Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999)......................................... 50

*United States* v. *Groos*, 616 F. Supp. 2d 777 (N.D. Ill. 2008)....................................... 54

*United States* v. *Grubbs*, 547 U.S. 90 (2006) ................................................................. 93

*United States* v. *Halloran*, 821 F.3d 321 (2d Cir. 2016) ............................................... 15

*United States* v. *Hernandez*, 2010 WL 26544 (S.D.N.Y. 2010)..................................... 89

*United States* v. *Homa Int'l Tr. Corp.*, 387 F.3d 144 (2d Cir. 2004) .................... 7, 14

*United States* v. *Jacobson*, 4 F. Supp. 3d 515 (E.D.N.Y. 2014)............................. 82, 89

*United States* v. *Jimenez*, 824 F. Supp. 351 (S.D.N.Y. 1993) ....................................... 50

*United States* v. *Josephberg*, 459 F.3d 350 (2d Cir. 2006)........................................... 45

*United States* v. *Kassir*, 2009 WL 995139 (S.D.N.Y. 2009)............................... 50, 52, 53

*United States* v. *Klump*, 536 F.3d 113 (2d Cir. 2008) ............................................................. 60, 61

*United States* v. *Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ...................................... passim

*United States* v. *Laljie*, 184 F.3d 180 (2d Cir. 1999) ................................................................. 45

*United States* v. *LaSpina*, 299 F.3d 165 (2d Cir. 2002) ............................................................. 4

*United States* v. *Leon*, 468 U.S. 897 (1984) ................................................. 89, 90, 91, 93

*United States* v. *Levasseur*, 816 F.2d 37 (2d Cir. 1987) ........................................................... 62

*United States* v. *Levy*, 2013 WL 664712 (S.D.N.Y. 2013) ..................................................... 82

*United States* v. *Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014) ......................................... 82, 88

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................... 63

*United States* v. *Mayo*, 230 F. Supp. 85 (S.D.N.Y. 1964) ....................................................... 52

*United States* v. *Melendez*, 2016 WL 4098556 (S.D.N.Y. 2016) ........................................... 63

*United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ......................................... 86

*United States* v. *Miller*, 70 F.3d 1353 (D.C. Cir. 1995) .......................................................... 33

*United States* v. *Moore*, 968 F.2d 216 (2d Cir. 1992) ............................................................. 90

*United States* v. *Morgenstern*, 933 F.2d 1108 (2d Cir. 1991) ......................................... 31, 32

*United States* v. *Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ................................... 50

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001) ....................................................... 50, 53

*United States* v. *Novak*, 443 F.3d 150 (2d Cir. 2006) ............................................................. 43

*United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000) ............................................................. 4, 39

*United States* v. *Pope*, 189 F. Supp. 12 (S.D.N.Y. 1960) ....................................................... 52

*United States* v. *Post*, 2013 WL 2934229 (S.D.N.Y. 2013) ..................................................... 4

*United States* v. *Purcell*, 2018 WL 4378453 (S.D.N.Y. 2018) ..................................... 47, 48, 49

*United States* v. *Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005) ................................................... 53

*United States* v. *Rahimi*, 2017 WL 2984169, at *1-2 (S.D.N.Y. 2017) ............................... 46

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) .................................. passim

*United States* v. *Regan*, 706 F. Supp. 2d 1102 (S.D.N.Y. 1989) ....................................... 81

*United States* v. *Reilly,* 76 F.3d 1271 (2d Cir. 1996) ....................................................... 71, 92

*United States* v. *Riley,* 906 F.2d 841 (2d Cir. 1990) ............................................................. 86

*United States* v. *Rodriguez*, 1999 WL 820558 (S.D.N.Y.1999) ........................................... 49

*United States* v. *Rosa*, 626 F.3d 56 (2d Cir. 2010) ............................................................. 81

*United States* v. *Rossomando*, 144 F.3d 197 (2d Cir. 1998)........................................ 39

*United States* v. *Rowe*, 56 F.2d 747 (2d Cir. 1932) ................................................ 41

*United States* v. *Rudaj*, 2006 WL 1876664 (S.D.N.Y. 2006)...................................... 29

*United States* v. *Salemo*, 499 F. App'x 110 (2d Cir. 2012) ...................................... 29

*United States* v. *Scarpa*, 913 F.3d 993 (2d Cir. 1990)............................................ 50

*United States* v. *Scully*, 109 F. Supp. 3d 59 (E.D.N.Y. 2015) ...................................... 81

*United States* v. *Shellef*, 507 F.3d 82 (2d Cir. 2007) ....................................... 40, 41

*United States* v. *Skelos*, 2015 WL 6159326 (S.D.N.Y. 2015) .................................. 4, 10

*United States* v. *Smith*, 9 F.3d 1007 (2d Cir. 1993) ........................................... 80

*United States* v. *Soliman*, 2008 WL 4757300 (W.D.N.Y. 2008).................................. 95

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ............................... passim

*United States* v. *Stringer*, 730 F.3d 120 (2d Cir. 2013) ......................................... 54

*United States* v. *Swanson*, 210 F.3d 788 (7th Cir. 2000)...................................... 63

*United States* v. *Thompson*, 2013 WL 6246489 (S.D.N.Y. 2013)................................... 4

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) .................................... 47, 48, 49

*United States* v. *Tramunti*, 513 F.2d 1087 (2d Cir. 1975) ...................................... 9

*United States* v. *Ulbricht*, 858 F.3d 71 (2d Cir. 2017)........................... 81, 83, 84, 87

*United States* v. *Velastegui*, 199 F.3d 590 (2d Cir. 1999) ...................................... 31

*United States* v. *Vilar*, 2007 WL 1075041 (S.D.N.Y. 2007) ............................... passim

*United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993) ........................................... 80

*United States* v. *Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ............................... 84, 85

*United States* v. *Young*, 952 F.2d 1252 (10th Cir. 1991)......................................... 33

*United States* v. *Zarrab*, 2016 WL 6820737 (S.D.N.Y. 2016)............................... passim

*United States* v. *Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ....................... 84, 85, 88

*Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)......................................... 25

*W. V. Min. & Reclamation Ass'n* v. *Babbitt*, 970 F. Supp. 506 (S.D.W. Va. 1997).................... 15

*Williams* v. *United States*, 458 U.S. 279 (1972) ............................................... 33

*WNET, Thirteen* v. *Aereo, Inc.*, 722 F.3d 500 (2d Cir. 2013)..................................... 15

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus memorandum of law in opposition to the nine separate motions filed by defendant Ali Sadr Hashemi Nejad ("Sadr" or the "defendant") (1) to dismiss the indictment, (2) to suppress evidence obtained pursuant to search warrants for several email accounts, and (3) for the return of certain property. For the reasons stated below, all of Sadr's motions are without merit and should be denied without a hearing.

## BACKGROUND

On March 19, 2018, a grand jury sitting in this District returned the Indictment, which charges Sadr with (i) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (ii) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705; (iii) bank fraud, in violation of 18 U.S.C. § 1344; (iv) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; (v) money laundering, in violation of 18 U.S.C. § 1956; and (vi) conspiracy to commit money laundering, in violation of Section 1956.

As alleged in the Indictment, in August 2004, the governments of Iran and Venezuela entered into an agreement (the "Agreement"), whereby they agreed to cooperate in certain areas of common interest. The following year, both governments supplemented the Agreement by entering into a Memorandum of Understanding regarding an infrastructure project in Venezuela (the "Project"), which was to involve the construction of thousands of housing units in Venezuela.

The Project was led by Stratus Group, an Iranian conglomerate controlled by Sadr and his family with international business operations in the construction, banking, and oil industries. In December 2006, Stratus Group incorporated a company in Tehran, Iran, which was then known as the Iranian International Housing Corporation ("IIHC"). IIHC was responsible for construction for the Project. Thereafter, IIHC entered into a contract with a subsidiary of a Venezuelan state-

owned energy company (the "Venezuelan Subsidiary"), which called for IIHC to build approximately 7,000 housing units in Venezuela in exchange for approximately $475,734,000. Stratus Group created the Venezuela Project Executive Committee to oversee the execution of the Project. Sadr was a member of the committee and was responsible for managing the Project's finances.

In connection with his role on the Project, Sadr and his co-conspirators devised and executed a scheme to evade U.S. economic sanctions and defraud U.S. banks by concealing the role of Iran and Iranian parties in U.S. dollar payments sent through the U.S. banking system. For example, in 2010, Sadr and a co-conspirator used St. Kitts and Nevis passports and a United Arab Emirates address to incorporate two entities outside Iran that would receive U.S. dollar payments related to the Project on behalf of IIHC. The first entity, Clarity Trade and Finance ("Clarity"), was incorporated in Switzerland, and the second, Stratus International Contracting, J.S., a/k/a "Stratus Turkey," a/k/a "Straturk," was incorporated in Turkey. Stratus Turkey and Clarity were both owned and controlled by Sadr and his family members in Iran. Sadr then opened U.S. dollar bank accounts for Clarity and Stratus Turkey at a financial institution located in Switzerland.

Thereafter, Sadr and others conducted a series of international financial transactions using Clarity and Stratus Turkey for the benefit of Iranian parties in a manner that concealed the Iranian nexus to the payments, in violation of U.S. economic sanctions. Specifically, between April 2011 and November 2013, the Venezuelan Subsidiary, at the direction of Sadr and others, made approximately 15 payments to IIHC through Stratus Turkey or Clarity, totaling approximately $115 million.

Sadr and others directed that payments be routed through banks in the United States to Stratus Turkey's or Clarity's bank accounts at the financial institution in Switzerland. The

majority of the funds were then transferred to another offshore entity located in the British Virgin Islands, which had been incorporated by Sadr and others in 2009.  In addition, on February 1, 2012, Clarity wired more than $2,000,000 in proceeds from the Project directly into the United States.  Those proceeds were then used to purchase real property in California.

## DISCUSSION

### I.   THE MOTIONS TO DISMISS AND TO STRIKE LANGUAGE FROM THE INDICTMENT SHOULD BE DENIED

Sadr's first seven motions seek to attack the Indictment by alleging a series of purported insufficiencies and constitutional infirmities.  But all of these motions rely on arguments that courts have rejected, and make assertions that fatally misconstrue the allegations in this case and the governing legal framework.   Accordingly, each of these seven motions should be denied.

#### A.   The Motion to Dismiss the Sanctions and Money Laundering Counts for Failure to State an Offense Should Be Denied

The defendant's first motion moves to dismiss Count One and Count Two on the ground that the Indictment fails to allege a conspiracy to violate the IEEPA and the ITSR.  (First Mot. at 1).  According to the defendant, dismissal is required because  (1) "the Indictment does not allege that any services were exported to Iran or the government of Iran"; and (2) "nearly all of the wire transfer processing services allegedly exported in violation of the ITSR in fact were authorized, and therefore lawful, under a general license in the ITSR aimed specifically at such transactions." (*Id.*).

Both arguments lack merit.  Because the Indictment sufficiently alleges that the defendant conspired to violate the IEEPA and the ITSR, the defendant's motion to dismiss Count One and Count Two should be denied.

3

### 1.      Applicable Law

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States* v. *Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones* v. *United States*, 526 U.S. 227, 232 (1999); *Hamling* v. *United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)).  "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States* v. *Thompson*, 2013 WL 6246489, at *6 (S.D.N.Y. 2013) (quoting *United States* v. *Post*, 2013 WL 2934229, at *5 (S.D.N.Y. 2013)).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117.  "An indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States* v. *Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998).  Accordingly, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States* v. *Skelos*, 2015 WL 6159326, at *2 (S.D.N.Y. 2015) (citing *Boyce Motor Lines* v. *United States,* 342 U.S. 337, 343 n.16 (1952)).

The IEEPA authorizes the President to deal with "unusual and extraordinary threat[s] [] to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, *Id.* § 1701(a), and to take steps to address such threats, including the authority (among other things) to investigate, regulate, or prohibit "any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country

or a national thereof," and "the importing or exporting of currency or securities" "by any person, or with respect to any property, subject to the jurisdiction of the United States," 50 U.S.C. § 1702(a)(1)(A).   Since 1979, and through the present day, U.S. presidents have repeatedly declared that Iran poses a threat to the United States' national security for, among other reasons, its pursuit of nuclear weapons and its sponsorship of terrorism.

On March 15, 1995, President Clinton found that "the actions and policies of the government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]"  Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).[1]   On two other occasions in 1995 and 1997, President Clinton again found that the Iran's actions and policies constituted a threat to the national security, foreign policy, and economy of the United States.  *See* Exec. Orders 12959 (May 6, 1995) and 13059 (Aug. 19, 1997).  Every president since President Clinton has continued the national emergency with respect to Iran, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States.

Pursuant to these authorities, the Secretary of the Treasury promulgated the ITSR, Title 31, Code of Federal Regulations, Part 560, implementing the sanctions imposed by the Executive

---

[1] Presidents have repeatedly declared such a national emergency with respect to the government of Iran, beginning with Executive Order No. 12170, issued on November 14, 1979. President Carter found, in response to the Islamic Revolution in Iran and the takeover of the American Embassy in Tehran, that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."  Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).  In 1987, President Reagan found "that the government of Iran is actively supporting terrorism as an instrument of state policy" and "has conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region."  Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987).

Orders.  Section 560.204 prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person,[2] of goods, technology, or services to Iran or the government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the government of Iran, without a license from OFAC.  A "service" performed in the United States or by a U.S. person is exported or supplied to Iran if the services are performed on behalf of a person in Iran or the government of Iran, or where the benefit of such services is received in Iran.  *Id.* § 560.410(a). The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.  The IEEPA makes it a crime for any person to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation or prohibition issued under that Act, including the ITSR.  50 U.S.C. § 1705(a), (c).

In 1995, OFAC adopted a general license for U.S. banks—which are "U.S. persons" under the ITSR, *see* 31 C.F.R. § 560.314—to conduct certain correspondent-account transactions that were for the direct or indirect benefit of persons in Iran or the government of Iran, so long as neither the originating bank nor the beneficiary bank was Iranian.  *See* 60 Fed. Reg. 47069 (Sept. 11, 1995) (previously codified at 31 C.F.R. § 560.516).  This license was commonly known as the "U-turn license" because it authorized U.S. banks to participate in certain funds transfers between foreign originators and foreign beneficiaries that would otherwise have violated the ITSR.  OFAC revoked the U-turn license in 2008 because of "the need to further protect the U.S. financial system

---

[2] A U.S. person is "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 560.314.

from the threat of illicit finance posed by Iran and its banks." 73 Fed. Reg. 66541 (Nov. 10, 2008).
The effect of terminating the license was "precluding transfers designed to dollarize transactions
through the U.S. financial system for the direct or indirect benefit of Iranian banks or other persons
in Iran or the government of Iran." *Id.* In other words, revocation of the U-turn license was
intended to prohibit the very conduct in which Sadr is alleged to have engaged.

### 2.   Discussion

As an initial matter, the Indictment properly alleges the essential elements of the charged
offenses, and the IEEPA and the ITSR apply by their plain language to the alleged offense conduct.
Count Two of the Indictment charges Sadr with participating in a conspiracy to violate the IEEPA
and the ITSR by exporting, reexporting, selling, and supplying international financial transactional
services from the United States directly or indirectly to Iran and the government of Iran in violation
of Section 204 of the ITSR, and by engaging in transactions that evaded or avoided, had the
purpose of evading or avoiding, caused violations of, and attempted to violate the ITSR in violation
of Section 203. In short, and for the reasons described below, the Indictment on its face properly
alleges that Sadr and his co-conspirators criminally violated the IEEPA, under 50 U.S.C. § 1705,
because they willfully conspired to violate Sections 203 and 204 of the ITSR.

First, it is settled law (and the defendant does not dispute) that the execution of bank
transactions is a "service" under the ITSR. *See United States* v. *Banki*, 685 F.3d 99, 108 (2d Cir.
2012) ("[T]he execution of money transfers from the United States to Iran on behalf of another,
whether or not performed for a fee, constitutes the exportation of a service."); *United States* v.
*Homa Int'l Tr. Corp.*, 387 F.3d 144, 145-46 (2d Cir. 2004) (executing financial transfers from the
U.S. to Iran constitutes an exportation of a service); *United States* v. *Zarrab*, 2016 WL 6820737
*6-7 (S.D.N.Y. 2016) (noting that the "Second Circuit has made clear that the execution of money

transfers on behalf of others from the United States to Iran may constitute the exportation or supply of a prohibited service") (citation and internal quotation marks omitted); *United States* v. *All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at *2 (S.D.N.Y. 2003) ("*UBS*") ("[O]ffering to exchange a customer's money and deliver it (by whatever method) to a foreign country for a fee is well within the ordinary meaning of supplying a 'service.'").  The Indictment also alleges, and the defendant does not dispute, that U.S. persons (the banks) provided this service from the United States (the U.S. correspondent-account activity).

Second, the Indictment also alleges that these transactions were on behalf of, and for the benefit of, a person or entity in Iran.  *See* 31 C.F.R. § 560.410(a) (stating that the prohibition in Section 204 "applies to services performed *on behalf of a person in Iran* or the government of Iran or where *the benefit of such services is otherwise received in Iran*, if such services are performed . . . in the United States" (emphasis added)).

As such, these alleged transactions were prohibited by Section 204 unless authorized by a license from OFAC.  Since the U-turn license (permitting, prior to 2008, U.S. dollar transactions for the benefit of Iranian parties if they originated and terminated outside the United States) was revoked in 2008, all correspondent account transactions of this type have been banned and continue to be banned.  *See* 73 Fed. Reg. 66541; OFAC, *Frequently Asked Questions Relating to the Lifting of Certain U.S. Sanctions Under the Joint Comprehensive Plan of Action (JCPOA) on Implementation Day*, at 4, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/jcpoa_faqs.pdf ("[N]on-U.S. persons continue to be prohibited from knowingly engaging in conduct that seeks to evade U.S. restrictions on transactions or dealings with Iran or that causes the export of goods or services from the United States to Iran."); *id.* at 14 ("The so-called 'U-turn general license'… was not reinstated . . . and

U.S. financial institutions continue to be prohibited from clearing transactions involving Iran [except as authorized by OFAC].”); U.S. Dept. of the Treasury, *Testimony of Acting Under Secretary for Terrorism and Financial Intelligence Adam J. Szubin Before the House Committee on Foreign Affairs* (May 25, 2016) *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0466.aspx (“[W]e have not promised, nor do we have any plans, to give Iran access to the U.S. financial system, or to reinstate what's called the 'U-turn' authorization.”).

Accordingly, because the Indictment essentially tracks the statutory language and alleges the time period and location of the offense charged, it sufficiently alleges an IEEPA conspiracy. *See United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (“We have often stated that 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'”) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975), *cert. denied*, 423 U.S. 832 (1975)).  Because “the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment,” *Alfonso*, 143 F.3d at 777, and because the Indictment properly alleges the essential elements of these offenses, Sadr's motion to dismiss Counts One and Two should be denied.

Although the Indictment properly alleges the essential elements of the IEEPA violation charged in the Indictment, Sadr nonetheless asserts that Counts One and Two should be dismissed because (i) the indictment fails to allege that the services at issue were exported to Iran or the government of Iran (First Mot. at 6-18); and (ii) the transactions alleged in the indictment were expressly authorized by the ITSR (First Mot. at 18-25).  As discussed more fully below, both contentions mischaracterize the alleged offense conduct, selectively cite to the case law and regulatory materials, and flatly conflict with the regulatory language and binding precedent.

At bottom, Sadr attempts to paint his scheme as the conduct of lawful foreign business with only incidental or *de minimis* involvement of the U.S. financial system. But his conduct as alleged in the Indictment falls squarely within the heartland of what the U.S. sanctions intend to prohibit—*i.e.*, the illicit use of the U.S. banking and financial system to transact in U.S. dollars for the benefit of parties in Iran. On a motion to dismiss, where the Court "must take the allegations of the indictment as true," *Skelos*, 2015 WL 6159326, at *2, Sadr's efforts to alter the nature of the charges against him fail. Sadr is not charged with conducting foreign business transactions with merely incidental involvement of the U.S. financial system. He is charged with knowingly and willfully conspiring to export and supply services from the United States to Iran, and to cause U.S. banks to export and supply services from the United States, directly and indirectly to Iran and the government of Iran, without a license from OFAC. The use of the U.S. financial system in this manner was not lawful or "incidental" to Sadr's business; rather, allowing Iranian persons and entities to secretly access the U.S. financial system, and to transact in U.S. dollars in violation of sanctions, was the very purpose of his scheme.

### a. The Indictment Properly Alleges the Export and Supply of Services to Iran or the government of Iran

Sadr's first contention that the Indictment fails to allege that any services were exported specifically "to Iran or the government of Iran" (First Mot. at 6) is meritless. Although Sadr concedes that the Indictment properly alleges that "services" were exported (the processing of transactions in U.S. dollars by U.S. banks) (*id.* at 8-9), he asserts that the Indictment does not allege that Sadr conspired to export these services "*to the territory of Iran*, or *to the government of Iran*" (*Id*. at 7) (emphasis in original). This argument, however, is premised on a misinterpretation of the IEEPA and ITSR, and an inaccurate description of the charges in this case.

10

As explained above, Section 1705 of the IEEPA defines the scope of unlawful activity under the statute: "It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a). It also provides a criminal penalty for anyone who, among other things, willfully conspires to commit any of the unlawful acts described in Section 1705(a). *See id.* § 1705(c). Therefore, those who conspire to violate any of the executive orders or regulations promulgated under Title 50, like the ITSR, have violated the IEEPA and may be prosecuted.

Section 560.204 of the ITSR prohibits, among other things "the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the government of Iran." Section 560.203 of the ITSR states that "any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited," and that "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part is prohibited."

Applying these regulations to the scheme described in the Indictment makes clear that the charged conduct violates the IEEPA and the ITSR. As alleged, Sadr, Sadr's father, and other family members owned and controlled Stratus Group, a construction business incorporated in Iran. (Ind. ¶ 7). The Indictment alleges that Sadr and others "conspired to evade U.S. sanctions by conducting international financial transactions using Clarity and Stratus Turkey on behalf of and for the benefit of Iranian individuals and entities, including themselves and IIHC, in order to conceal from U.S. banks and others that services were being provided to Iran in violation of the IEEPA and the ITSR." (Ind. ¶ 12). Specifically, between April 2011 and November 2013, the Venezuelan Subsidiary, at the direction of Sadr, made approximately 15 payments to IIHC totaling

11

approximately $115,000,000.  (Ind. ¶ 13).  These payments were routed through U.S. banks located

in the United States to bank accounts in Switzerland controlled by Status Turkey and Clarity.  (*Id.*).

In sum, the Indictment alleges that Sadr conspired with others to cause U.S. persons (the

U.S. banks) to supply and export their services (the processing of U.S.-dollar clearing transactions)

directly and indirectly to Iranian individuals (including Sadr and Sadr's father), Iranian-controlled

entities (Stratus Group, IIHC, Clarity, and Stratus Turkey), and entities located and incorporated

in the territory of Iran (Stratus Group and IIHC).

The Indictment also alleges, and the evidence will show at trial, that Sadr intentionally

caused U.S. banks to unwittingly conduct these sanctioned transactions on behalf of and for the

benefit of these Iranian individuals and entities, without a license from OFAC.  Specifically, Sadr

and his co-conspirators designed layered transactions using intermediary shell companies in third

countries.  (*See, e.g.*, Ind. ¶¶ 11, 13, 16).  Sadr and his co-conspirators also attempted to hide their

Iranian connections by using the abbreviation "IIHC" instead of that entity's full name (Iranian

International Housing Corporation), and then discussed changing the name to "International

Housing Company," "International Industrial Housing Company," "International Iron Housing

Company," or "Industrial International Housing Company."  (*See* Ind. ¶ 16(o), (bb), (dd)).  The

obvious purpose of disguising and changing the name was to hide the IIHC's connection to Iran,

and to thus evade and avoid sanctions.  As Sadr himself said in one email, the use of the abbreviated

name would "make our transactions a bit easier," which had become "a bit more crucial," because

"we have requested our last invoice to be paid in USD"—*i.e.*, U.S. dollars.  (Ind. ¶ 16(o)).  Sadr

knew that his companies could not be paid lawfully in dollars through U.S. banks, so he took steps

to hide these payments' Iranian nexus and thereby violate the sanctions.  Because this conduct

constitutes both violating the ITSR and evading and avoiding the ITSR, the allegations in the Indictment sufficiently charge a conspiracy to violate the IEEPA.

In arguing that Counts One and Two should nonetheless be dismissed, Sadr relies on a flawed and baseless reading of the statutory and regulatory language.  In particular, Sadr argues that the "Indictment does not allege that, as a factual matter, [the U.S. banks'] processing services were re-exported to Iran."  (First Mot. at 11).

This argument fails for several reasons.  First, Sadr ignores part of Section 204's text.  As explained above, Section 204 prohibits the "exportation, re-exportation, sale, or supply, *directly or indirectly*, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the government of Iran."  31 C.F.R. § 560.204 (emphasis added).  It is an "elementary principle" of statutory and regulatory interpretation that Courts are to "'give effect, if possible, to every clause and word of a statute.'"  *King* v. *Burwell*, 135 S. Ct. 2480, 2498 (2015) (quoting *Montclair* v. *Ramsdell*, 107 U.S. 147, 152 (1883)); *see also Corley* v. *United States*, 556 U.S. 303, 314 (2009) (stating that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant"); *Assocs. Against Outlier Fraud* v. *Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) ("[W]e must attempt to give effect to the plain meaning of each word in the statute.").  Section 204 makes it a crime to export services from the United States to Iran "directly or indirectly"—and the Indictment incorporates that language.  (*See* Ind. ¶ 19 (alleging that the services at issue were exported to Iran directly and indirectly)).  The plain meaning of the word "indirectly" is "[d]iverging from a direct course; roundabout" and "not proceeding straight to the point or object." Am. Heritage Dictionary (5th ed. 2017) (available at https://ahdictionary.com).  Under this

13

definition, fund transfers to third-country shell companies controlled by Sadr and his family plainly constitute the exportation of services "*indirectly*" from the United States to Iran.

Second, Sadr tries to downplay the importance of Section 410, which interprets Section 204's prohibition on the exportation of services to apply to "services performed *on behalf of a person in Iran* or the government of Iran or where *the benefit of such services is otherwise received in Iran*, if such services are performed . . . in the United States."  31 C.F.R. § 560.410 (emphasis added).  As stated above, the Indictment alleges that the transactions at issue were performed on behalf of individuals in Iran, and that the benefit of such services was received in Iran (by these individuals, and by Iranian and Iranian-controlled companies like Stratus Group, IIHC, Clarity, and Stratus Turkey).

Apparently recognizing that this regulation fatally undermines his argument, Sadr urges the Court to ignore it.  According to Sadr, Section 410 "is only an *interpretive* provision—it is not the substantive prohibition that may form the basis for a criminal violation under 50 U.S.C. § 1705(c)." (First Mot. at 13 (emphasis in original)).  But that is not the law in the Second Circuit. In *Homa*, the Second Circuit asserted that Section 410 interprets the scope of Section 204's prohibition on the exportation of services and therefore defines the scope of potential criminal liability arising from the statute.  *See Homa Int'l Trading Corp.*, 387 F.3d at 146 ("The Embargo's prohibition on the exportation of services applies 'where the benefit of such services is . . . received in Iran, if such services are performed . . . [i]n the United States.'") (quoting 31 C.F.R. § 560.410(a)).  While Sadr urges this Court to read Section 204's prohibition of exporting services "to Iran" narrowly and to ignore Section 410, that path is foreclosed by *Homa*.

Third, Sadr fails to account for the inclusion of evasion and avoidance as bases for liability. As charged in the Indictment, and based on the plain language of the regulations, the ITSR is

violated through conspiracies involving at least three means:  (i) direct violations; (ii) evasion; and (iii) avoidance.  In interpreting these phrases, the Court "must give effect to every word of a statute wherever possible."  *United States* v. *Halloran*, 821 F.3d 321, 333 (2d Cir. 2016) (quoting *Leocal* v. *Ashcroft*, 543 U.S. 1, 12 (2004)); *Jay* v. *Boyd,* 351 U.S. 345, 360 (1956) (court "must read the body of regulations . . . so as to give effect, if possible, to all of its provisions").  Moreover the Supreme Court has long "cautioned against reading a text in a way that makes part of it redundant," *Nat'l Ass'n of Home Builders* v. *Defs. of Wildlife*, 551 U.S. 644, 669 (2007), and the Court must accordingly "presume Congress intends different terms in the same statute to have different meanings."  *WNET, Thirteen* v. *Aereo, Inc*., 722 F.3d 500, 507 (2d Cir. 2013).  "When terms used in a statute are undefined, [courts] give them their ordinary meaning."  *Asgrow Seed Co.* v. *Winterboer*, 513 U.S. 179, 187 (1995).

To "violate" a prohibition is to "[t]o disregard or act in a manner that does not conform" to a duty.  Am. Heritage Dictionary (5th ed. 2017) (available at https://ahdictionary.com).  To "evade" a prohibition means "[t]o avoid complying with or fulfilling a requirement."  *Id*.  And "the common and ordinary meaning of 'avoid' is 'to prevent the occurrence of' something."  *W. V. Min. & Reclamation Ass'n* v. *Babbitt*, 970 F. Supp. 506, 515 (S.D.W. Va. 1997) (quoting Webster's Third New International Dictionary 151 (3rd ed. 1981)); *see also SUPERVALU, Inc.* v. *Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 341 (3d Cir. 2007) (defining "avoid" as "[t]o keep from happening" (quoting Am. Heritage Dictionary 128 (3d ed. 1992)); *Lopresti* v. *Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012) (same (quoting *Supervalu*)).

Sadr argues that "if the Indictment does not allege any exportation of services to Iran or the government of Iran . . . then there is no predicate for a § 560.203 'avoid or evade' violation,

and that object adds nothing." (First Mot. at 8). As noted above, the Indictment here does allege the exportation of services to Iran. But even if it did not, Sadr's assertion misstates the law. To establish liability for avoiding sanctions, the Government need only establish that Sadr structured and concealed his activities in order to *avoid* such sanctions. This common-sense conclusion is reinforced by analogy to another criminal statute that prohibits "avoidance" to frustrate the enforcement of U.S. law—the prohibition on interstate travel "to avoid prosecution" codified in Section 1073 of Title 18. There, courts have long recognized that it is not necessary for a defendant to have been charged in order to "avoid prosecution." In the leading case interpreting the statute, the Second Circuit specifically rejected a "narrow and strained construction" of the statute that interpreted the word "prosecution" to require "the filing of a formal charge," holding instead that "[i]t is sufficient if the fleeing felon is subject to prosecution." *United States* v. *Bando*, 244 F.2d 833, 843 (2d Cir. 1957). Accordingly, it is well-established that in order to prove that a defendant intended to "avoid prosecution," "the government need not prove that the defendant had already been indicted or charged . . . . It is sufficient to satisfy this element if the defendant believed he would be charged . . . and acted in that belief" by traveling "from one state to another for the purpose of avoiding prosecution." Modern Federal Jury Instructions, Instr. 38-15 (2012).

The same principles apply here. The IEEPA and the ITSR create a coherent scheme of prohibitions, making it illegal (and, pursuant to 50 U.S.C. § 1705 (c), a crime) to (i) breach a prohibition by violating it, (ii) sidestep a prohibition by evading it, and (iii) prevent the imposition of a prohibition by avoiding it, and the Court must give effect to all three of these aspects of the regulatory scheme. Accordingly, it is sufficient to prove such a violation if the defendant *believed* that a prohibition under the ITSR would be imposed, and then acted in that belief by structuring

16

transactions that otherwise would be subject to the sanctions in a way intended to avoid the imposition of sanctions.

This conclusion flows not only from the language of the statute, but also its purpose. Iran's activities present a threat to the national security of the United States, and the IEEPA and the ITSR are some of the measures adopted to quell that threat. "The Second Circuit also recognized that 'the Iranian embargo is intended to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by the actions and policies of the government of Iran . . . [and] by design[,] the embargo is deliberately overinclusive.'" *Zarrab*, 2016 WL 6820737, at *7 (quoting *Banki*, 685 F.3d at 108)). Thus, prohibiting transactions that violate, evade, or avoid the proper imposition of, or compliance with, appropriate sanctions serves the statutory and regulatory purpose of the U.S. embargo on Iran.

Applying the statute and regulations in this manner does not, as Sadr suggests (First Mot. at 18), implicate any due process concerns. First, as a straightforward matter of statutory interpretation, willfulness is an element of the offense, precluding any "fair warning" problem. "The requirement that the act must be willful or purposeful . . . relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws* v. *United States*, 325 U.S. 91, 102 (1945); *see also United States* v. *Curcio*, 712 F.2d 1532, 1543 (2d Cir. 1983) (noting established doctrine that "scienter argument may save a statute which might otherwise have to be condemned for vagueness"). Moreover, the statutes and regulations are not ambiguous, and their application to international financial transactions through the U.S financial system has long been clear. The U-turn license was in effect for over a decade prior to its revocation in 2008. When OFAC revoked the license, it publicly and unambiguously noted that the effect was to "preclud[e] transfers designed to dollarize transactions through the U.S. financial

system for the direct or indirect benefit of Iranian banks or other persons in Iran or the government of Iran." 73 Fed. Reg. 66541 (Nov. 10, 2008).[3]  Moreover, contrary to his claim, using Section 410 to interpret the prohibition in Section 204 would not violate due process rights, as the Second Circuit made clear in *Homa* that Section 410 interprets the scope of Section 204's prohibition on the exportation of services.  *Homa* was decided in 2004, and the conspiracies charged here started in 2006.

Finally, Sadr's contention that the United States sanctions laws are impotent to proscribe and punish his conduct is inconsistent with the purpose of the IEEPA and the ITSR to protect and defend the United States' national security, foreign policy, and economy from threats from a foreign power.  Sadr must concede that if the Venezuelan Subsidiary had sent dollar payments *through* a U.S. bank *to* one of IIHC's Iranian bank accounts, then those transactions would plainly violate the IEEPA.  However, according to Sadr, because he created third-country shell companies to receive the payments instead, there is no violation.  It does not matter, in Sadr's view, that these shell companies were owned by Iranian individuals, some of whom lived continuously in Iran, and that these shell companies received payments for construction work performed entirely by Iranian companies (Stratus Group and IIHC).[4]

This would be an absurd result, which this Court should seek to avoid.  *See United States* v. *Al Kassar*, 660 F.3d 108, 125 (2d Cir. 2011) (stating that courts must generally "interpret statutes to give effect to congressional purpose," and rejecting narrow interpretation of criminal liability as one that would "undermine" statutory purpose to prevent "harm [to] the national security or

---

[3] All of the transactions alleged here post-dated the revocation of the U-turn license.  (*See* Ind. ¶¶ 13, 16(q), (v), (y), (aa), (ee), (hh), (ii), (ll), (mm), (qq), (tt), (uu), (vv), (xx), (zz)).

[4] *See* 31 C.F.R. § 560.303 ("Iranian means pertaining to Iran as defined in this section").

foreign relations of the United States").  Sadr's conduct is exactly what the IEEPA and the ITSR intended to prohibit, and U.S. sanctions laws would be largely meaningless if they could not reach it.

Accordingly, Sadr's contention that the Indictment does not allege a conspiracy to violate Sections 203 and 204 of the ITSR should be rejected, and the motion to dismiss Counts One and Two on that basis should be denied.

> **b.     The Transactions Alleged in the Indictment Were Not Expressly Authorized by the ITSR**

Sadr next argues that the transactions alleged in the Indictment were expressly authorized by the ITSR.  (First Mot. at 18-25).  They were not.

As an initial matter, there is no dispute that transactions of the type charged in the Indictment would have been permitted before November 10, 2008.  In 1995, OFAC adopted a general license for U.S. banks to conduct certain correspondent-account transactions that were for the direct or indirect benefit of persons in Iran or the government of Iran, so long as neither the originating bank nor the beneficiary bank was Iranian.  *See* 60 Fed. Reg. 47069 (Sept. 11, 1995) (previously codified at 31 C.F.R. § 560.516).

Sadr makes much of the fact that the charged conspiracies began in 2006, when the U-Turn license was still in effect, arguing on this basis that "the transactions at issue were expressly authorized by [] the ITSR" for much for the conspiracy.  (First Mot. at 18).  But that is because the Stratus Group incorporated the IIHC in 2006, which is when the charged conspiracy to evade sanctions allegedly began.  (Ind. ¶ 8).  Then, in 2007, IIHC entered into a contract with a subsidiary of the Venezuelan Subsidiary to build housing units.  (Ind. ¶ 9).  And in 2009, the Stratus Group created the Venezuela Project Executive Committee to oversee the project; Sadr was assigned to manage the Project's finances.  (Ind. ¶ 10).  From that point forward, Sadr took steps to receive

19

U.S. dollar payments through shell companies, including by incorporating Clarity and Stratus Turkey (Ind. ¶¶ 11-13, 16).  And all of this conduct, including every charged transaction, post-dated the revocation of the U-Turn license in November 2008.  (Ind. ¶¶ 16(q), (v), (y), (aa), (ee), (hh), (ii), (ll), (mm), (qq), (tt), (uu), (vv), (xx), (zz)).

After the U-Turn license was repealed, an amended version of Section 516 was in effect from November 10, 2008 to October 22, 2012.  That version provided, in relevant part:

> (a)  United States depository institutions are authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the government of Iran, if the transfer is covered in full by any of the following conditions and does not involve debiting or crediting an Iranian account:
>
> . . .
>
> (2) The transfer arises from an underlying transaction that is not prohibited by this part, such as a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family owned enterprise)[.]

31 C.F.R. § 560.516 (2008 version).

Sadr asserts that this version of Section 516 somehow authorized the transactions he engaged in until October 22, 2012, since, according to Sadr, those transactions "arose out of underlying transactions that were not prohibited by the ITSR."  (First Mot. at 23).  But Sadr's interpretation of this provision is completely unsupported by legal authority, and is flawed for several reasons.  As an initial matter, a nearly identical provision was already in place *before* November 2008.  *Compare* 31 C.F.R. § 560.516(a)(3) (1995 version) (authorizing a transfer if it "arises from an underlying transaction that is not prohibited or is exempted from regulation pursuant to Section 203(b) of  the International Emergency Economic Powers Act, 50 U.S.C. 1702(b), such as an exportation of information or informational materials to  Iran, a travel-related remittance, or payment for the shipment of a donation of articles to relieve human suffering or a

third country transaction not involving a United States person nor otherwise prohibited by this part"), *with* 31 C.F.R. § 560.516(a)(2) (2008 version) (authorizing a transfer it "arises from an underlying transaction that is not prohibited by this part, such as a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family owned enterprise").   Therefore, under Sadr's theory, the revocation of the U-Turn license would have had absolutely no effect on the permissibility of Sadr's conduct.

Moreover, it is clear from the example of a "family remittance" given in the 2008 version of the regulation—and from the fact that the 2008 version was nearly identical to the 1995 version—that this provision was intended only to carry over (from the 1995 version) the limited exceptions to the Iranian sanctions for transactions related to humanitarian relief and family remittances.   This common-sense conclusion is underscored by the fact that, in the press release announcing the revocation of the U-Turn license, the Department of the Treasury stated:

> To ensure that transactions relating to humanitarian aid for the Iranian people and other legitimate activities continue to flow, today's action will not affect funds transfers by U.S. financial institutions arising from several types of underlying transactions, including:
>
> - Payment for the shipment of a donation of articles to relieve human suffering;
> - A non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise);
> - The exportation to Iran or importation from Iran of information and informational materials;
> - Travel-related remittances; and
> - An underlying transaction authorized by Treasury's Office of Foreign Assets Control (OFAC) through a specific or general license.
>
> Allowable funds transfers under specific or general OFAC licenses would include: payments arising from over-flights of Iranian airspace; legal services; intellectual property protection; and authorized sales of agricultural products, medicine, and medical devices to Iran.

*See* U.S. Treasury Dept. Press Release, "Treasury Revokes Iran's U-Turn License" (Nov. 6, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp1257.aspx.   Clearly, the transactions alleged in the Indictment were not related to humanitarian relief or non-commercial remittances.   Instead, they were commercial payments for construction work performed in Venezuela by an Iranian company—*i.e.*, transactions within the heartland of what the ITSR intended to, and did, prohibit.

Sadr's motion does not cite *any* legal authority for the argument that these charged transactions were expressly authorized, even after the U-Turn license was revoked.   That is because there is no such authority.   The 2008 version of Section 516(a)(2) was plainly a carve-out for transactions related to humanitarian relief and family remittances—not a general authorization for Iranian individuals and entities to conduct commercial transactions through U.S. banks, as Sadr did here.   Adopting Sadr's unsupported interpretation would transform a provision intended for humanitarian relief into an enormous loophole in the regulatory framework, and would completely vitiate OFAC's purpose for revoking the U-Turn license.

Accordingly, the Court should reject Sadr's argument, which is devoid of any legal support. The revocation of the U-turn license in 2008 was intended to prohibit the very conduct in which Sadr is alleged to have engaged.   Because every transaction charged in the Indictment post-dated this revocation, and because none of these transactions was authorized by the ITSR, the Court should deny Sadr's motion to dismiss Counts One and Two.

### B.     The Motion to Dismiss Count One for Failure to State a Conspiracy to Defraud the United States Should Be Denied

Sadr's second motion seeks dismissal of Count One for failure to state a conspiracy to defraud the United States.   (Second Mot. at 1).   As Sadr acknowledges, "his legal challenge to the *Klein* conspiracy charged in Count One of the Indictment is foreclosed at this stage of the case."

(Second Mot. at 8 (citing *United States* v. *Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  The sole and stated reason for the motion is "to preserve the issue for further review."  (*Id.*).  Because the Second Circuit's decision in *Coplan* authorizes the *Klein* conspiracy charged in Count One, the motion to dismiss Count One should be denied.

### C.    The Motion to Dismiss the IEEPA Charges on Constitutional Grounds Should Be Denied

Sadr's third motion advances two additional arguments in an effort to challenge the IEEPA counts of the Indictment.  (Third Mot. at 1).  Neither is persuasive.  First, while recognizing that the Second Circuit has already upheld the IEEPA as a constitutional and proper delegation of congressional authority to the President in *United States* v. *Dhafir*, 461 F.3d 211 (2d Cir. 2006), the defendant contends that this established precedent may have been wrongly decided.  (Third Mot. at 8-11.)  Second, the defendant argues that the President has somehow exceeded the authority granted to him by Congress under the IEEPA by declaring an ongoing national emergency with respect to Iran.  (*Id.* at 2-8).  The defendant's second argument was also effectively rejected by the Second Circuit in *Dhafir* and is thus equally unavailing.  For the reasons set forth below, the defendant's third motion should be denied.

### 1.    Applicable Law

The IEEPA authorizes the president to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority (among other things) to investigate, regulate, or prohibit "any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities" "by any

person, or with respect to any property, subject to the jurisdiction of the United States," *Id.* § 1702(a)(1)(A).  "To trigger this authority, the President must declare a 'national emergency' with respect to the threat."  *United States* v. *Chalmers*, 474 F. Supp. 2d 555, 556 (S.D.N.Y. 2007) (quoting 50 U.S.C. § 1701(b)).  The President must also, "in every possible instance" consult with and report to Congress before exercising the authorities granted under the statute and after such authority has been exercised.  *Id.* (citing 50 U.S.C. § 1703(a)-(c)).  Congress may terminate the national emergency declared by the President at any time by concurrent resolution.  *Id.* (citing 50 U.S.C. § 1706(b)).

As noted above, on March 15, 1995, President Clinton found that "the actions and policies of the government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]"  Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995), and every president since then has continued this national emergency.

As the defendant concedes, in *Dhafir*, the Second Circuit upheld the IEEPA as a constitutional and proper delegation of congressional authority to the President.  461 F.3d at 216 (*see also* Third Mot. at 8).  In so holding, the Second Circuit explained that the "Constitution vests in Congress the legislative power to define criminal conduct," but that Congress may delegate such authority, as a practical matter, to "do its job."  *Id.* at 215 (quoting *Mistretta* v. *United States*, 488 U.S. 361, 372 (1989)).  The Second Circuit observed that "impermissible delegation has rarely been found."  *Id.*  "Delegations of congressional authority are upheld so long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform."  *Id.* (internal quotations marks and brackets omitted) (quoting *Mistretta*, 488 U.S. at 371; *J.W. Hampton, Jr., & Co.* v. *United States*, 276 U.S. 394, 406 (1928)).  Such delegation, moreover, is afforded particularly broad discretion in cases

24

involving foreign affairs. *Id.* (citing cases). Indeed, even "delegation to the executive that may be improper if confined to internal affairs might 'nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory.'" *Id.* (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-22 (1936)).

In *Dhafir*, the Second Circuit also rejected defendant-appellant's contention that the IEEPA was unconstitutional because the President had not complied with the IEEPA's reporting requirements. *Id.* at 217. At the outset, the Circuit explained that it was "aware of no court that has placed on the government the burden to prove compliance with a statute's requirements in order to defeat a claim that the statute is unconstitutional." *Id.* at 218 (citing *Heller* v. *Doe*, 509 U.S. 312, 320 (1993) ("[T]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it.")); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."). The Circuit also found that the public record indicated that the President had complied with IEEPA's reporting requirements through executive order or otherwise under both the IEEPA and under the National Emergencies Act ("NEA"), 50 U.S.C. § 1622, to continue the national emergency with respect to Iraq. *Dhafir*, 461 F.3d at 218-19.

### 2. Discussion

The defendant claims that the IEEPA unconstitutionally delegates legislative authority to the President. (Third Mot. at 8). But the law in this Circuit is clear: The IEEPA's criminal provisions are constitutional, and the defendant's motion to dismiss Counts One, Two, Five, and Six on the grounds of unconstitutional delegation should be denied. Specifically, the IEEPA's

criminal provisions are constitutional delegations of congressional authority because—as the Second Circuit has found—the IEEPA's delegation is "subject to constraints" on the President's discretion such that presidential authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." *Dhafir*, 461 F.3d at 216-17 (quoting 50 U.S.C. § 1701(b)); *see also Chalmers*, 474 F. Supp. 2d at 567-68.  In addition, the IEEPA relates to foreign affairs, an area where the President has greater discretion, and Congress has further endorsed the President's actions and enacted legislation codifying the sanctions.  *Dhafir*, 461 F.3d at 217 (citing cases).

Likewise, the IEEPA is not, as the defendant contends, an "ultra vires" exercise of presidential authority.  The defendant argues that the President has exceeded his authority under the IEEPA in declaring a national emergency with respect to Iran.  The defendant also questions the legitimacy of the "national emergency" and the national security threat posed by Iran, arguing that a national emergency should be "sudden and serious" rather than decades long.  (Third Mot. at 4).  And the defendant also argues that the President is required to report to Congress before and after exercising its authority under the IEEPA.  (*Id.* at 5-6).

As an initial matter, the IEEPA is presumed to be constitutional.  *See Dhafir*, 461 F.3d at 219.  It is the defendant's burden to show that it is not.  *Id.*  Here, the President has determined that there is a national emergency with respect to Iran and that Iran poses a national security threat given, among other things, Iran's proliferation and development of missiles and other weapons and its support for terrorist groups.  *See* 84 Fed. Reg. 9219 (March 13, 2019).  The defendant has not presented any evidence to the contrary, just a hollow contention that perhaps emergencies should not be so lengthy in duration.  The defendant's argument is unpersuasive and belied by history, current events, and basic common sense.  Certainly, international conflicts, foreign threats,

proliferation, terrorism, and national emergencies can endure for extended and even indefinite periods of time. Moreover, if at any point over the last 40 years, Congress disagreed with the President's declaration of a continuing national emergency with respect to Iran, Congress is and has been empowered to terminate the national emergency by concurrent resolution. 50 U.S.C. § 1706(b). It has not.

In addition, as the Circuit so found in *Dhafir*, the President has satisfied his reporting requirements under the IEEPA and the NEA by continuing the national emergency with respect to Iran. *See, e.g.*, 83 Fed. Reg. 56251 (Nov. 8, 2018) ("Continuation of the National Emergency With Respect to Iran," noting that "[o]ur relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing," and that "[f]or this reason, the national emergency declared on November 14, 1979, and the measures adopted on that date to deal with that emergency, must continue in effect beyond November 14, 2018.").

The defendant has thus failed to show that the President has exceeded his authority under the IEEPA in declaring a national emergency with respect to Iran and in reporting such to Congress on a regular basis. His motion to dismiss the IEEPA counts on a non-delegation or "ultra vires" theory is unsupported by Second Circuit precedent and should be denied.

### D.     The Motion to Dismiss the Bank Fraud Charges Should Be Denied

Sadr's arguments to dismiss Counts Three and Four of the Indictment (Fourth Mot. at 1-33), which charge him with committing and conspiring to commit bank fraud, are similarly meritless. Sadr contends that the bank fraud counts are deficient in that they fail to allege: (i) misrepresentations to a U.S. bank; (ii) a scheme to obtain money from a U.S. bank; and (iii) an intent to cause tangible economic harm to a U.S. bank. (Fourth Mot. at 6-19). As with his

arguments to dismiss the IEEPA charges, Sadr's arguments are based on a fundamental misconstruction of the law and the conduct charged in the Indictment.

The Indictment properly alleges that Sadr committed, and conspired with others to commit, bank fraud.  (*See* Ind. ¶ ¶ 22-26).  The bank fraud statute, 18 U.S.C. § 1344, has two prongs under which a defendant may commit the crime of bank fraud.  The first prong, Section 1344(1), requires the Government to prove that the defendant engaged in a deceptive course of conduct in an effort to defraud a financial institution.  *See United States* v. *Crisci*, 273 F.3d 235, 240 (2d Cir. 2001).  The second prong, Section 1344(2), requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses.  *See United States* v. *Bouchard*, 2016 WL 3632591 at *6 (2d Cir. 2016).

The Indictment specifies the time period of the offenses as between in or about 2006 and in or about May 2014.  (*See* Ind. ¶¶ 23, 25).  The substantive bank fraud count (Count Three) alleges that:

> [I]n the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, [Sadr], and others known and unknown, did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which where then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such financial institution, by means of false and fraudulent pretenses, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(*Id. ¶¶* 22-23).  The bank fraud conspiracy count (Count Four) alleges that Sadr "did combine, conspire, confederate and agree together and with each other to commit [bank fraud]," and then sets forth the same language as Count Three to describe the object of the conspiracy.  Count Four

also alleges the same series of overt acts as alleged in Count One.[5]  (*Id.* ¶¶ 24-25).  The allegations contained in Counts Three and Four use the language of 18 U.S.C. §§ 1344 and 1349, and the Indictment provides dozens of examples of deceptive conduct and fraudulent transactions in which Sadr and his co-conspirators engaged.  Accordingly, Sadr's motion to dismiss Counts Three and Four should be denied because the Indictment tracks the language of the relevant statutes and provides the approximate timeframes and locations of the alleged crimes.  *See Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (internal citation and quotation omitted)).

What Sadr's motion raises are factual issues that cannot be adjudicated on a motion to dismiss, but rather must be resolved through a trial.  In particular, he claims that there were no misrepresentations made to the U.S. banks (Fourth Mot. at 6-7); that the banks were not exposed to harm as a result of these transactions (Fourth Mot. at 9-18); and that Sadr did not intend to actually "obtain" any funds or cause any economic as a result of these transactions (Third Mot. at 8-9). These are all issues of fact.  *See Neder* v. *United States*, 527 U.S. 1, 8 (1999); *United States* v. *Rudaj*, 2006 WL 1876664, at *7 (S.D.N.Y. 2006); *cf. United States* v. *Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012).  As such, these issues are appropriately decided not by the Court as a matter of law based on contentions in a brief, but rather by the jury based on the evidence presented at trial.  And, as the evidence at trial will prove beyond a reasonable doubt, none of Sadr's contentions has any merit.

---

[5] The Government is under no obligation to allege and prove overt acts for a bank fraud conspiracy charged under Title 18, United States Code, Section 1349.  *See United States* v. *Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("We agree with these courts and conclude that a conspiracy conviction under § 1349 does not require proof of an overt act.").

### 1.     The Indictment Alleges False Statements in Connection with the Scheme to Defraud

This court should reject Sadr's argument that the Indictment does not allege false statements in connection with the alleged scheme to defraud U.S. banks (Fourth Mot. at 6-7). Sadr and his co-conspirators orchestrated the processing of millions of dollars of financial transactions through U.S. banks on behalf of entities and persons who were barred by the sanctions from using or receiving services from those financial institutions. Because these banks would not have processed such illegal transactions had they known their true beneficiaries – *i.e.*, the IIHC and Stratus Group, both of which were located and incorporated in Iran – the involvement of those beneficiaries was undoubtedly material. Sadr and his conspirators carefully concealed that fact from U.S. banks. They did so by layering these transactions through multiple front companies and by taking steps to eliminate reference to Iran or Iranian persons in the underlying transaction documents and correspondence. Through these transactions, Sadr and his co-conspirators defrauded several U.S. financial institutions.

Sadr argues that he cannot be guilty of bank fraud because such a charge requires misrepresentations to financial institutions, and here, the wire transfer instructions themselves did not constitute representations, and, in any event, were not false. (Fourth Mot. at 8-10). The wire transfer orders which Sadr and his co-conspirators submitted were themselves misrepresentations. They concealed the fact that the transactions' true participants were Iranian persons and entities (not companies based in Turkey and Switzerland) and that, as a result, these transactions were illegal under U.S. sanctions. That is a straightforward application of the bank fraud statute. Moreover, to the extent Sadr wishes to contest the falsity or materiality of any of those misrepresentations, he must wait until trial, as the Indictment properly alleges that these misrepresentations were material, and no more is required at this stage. *See United States* v.

30

*Velastegui*, 199 F.3d 590, 593, n.2 (2d Cir. 1999) (court must assume the truth of the allegations in the Indictment on a motion to dismiss).

To the extent Sadr inappropriately seeks to look beyond the Indictment at this stage, his argument is based on the fundamentally flawed premise that instructions to transfer funds can never carry with them misrepresentations.  Sadr is wrong.  Indeed, the Second Circuit has recognized that checks—which are themselves instructions to transfer funds—submitted with implicit misrepresentations as to the legality of the transaction can constitute fraud on a bank.  For example, in *United States* v. *Morgenstern*, 933 F.2d 1108 (2d Cir. 1991), the Second Circuit considered the prosecution under the bank fraud statute of an accountant who had defrauded clients whom he helped with their taxes.  *Id*. at 1110.  After the accountant advised the clients of their tax liability, the clients would write checks made out to Chemical Bank.  *Id*.  Chemical Bank would then forward the deposited amount to the Internal Revenue Service in satisfaction of the client's tax liability.  *Id*.  As part of the scheme, the accountant began inflating the amount of taxes owed by the client, and then having the client execute checks in the inflated amounts.  *Id*.  The accountant then would deposit those checks at Chemical Bank not into the client's account, but instead into a corporate account that he controlled.  *Id*.  The accountant also continued to deposit legitimate checks made out to Chemical Bank on his client's behalf.  *See id*.

The Government charged the accountant with violating the second prong of Section 1344, which prohibits using false and fraudulent pretenses to obtain money or property in the custody of a financial institution.  *Id*. at 1113.  In challenging the prosecution, the accountant argued that he had not made any misrepresentations to the banks because a check did not constitute an assertion of fact. *Id*.  The Second Circuit, however, rejected this argument and found that there was a sufficient misrepresentation implicit in the defendant's conduct of "mixing negotiation of

legitimate checks with unauthorized deposits of fraudulently procured checks, [which] sought to convey the misleading impression that he was acting within the scope of his legitimate authority and that there was nothing extraordinary about these transactions." *Id.*   The Second Circuit concluded that "[t]his deceptive course of conduct toward Chemical Bank extended well beyond the silent presentation of individual checks and deposit tickets. It amounted to a false representation that he was properly authorized to deposit the . . . checks payable to Chemical Bank into the [accountant's] account." *Id*. at 1114.

*Morgenstern* demonstrates the flaw in Sadr's argument.   In both cases, the defendant's interaction with the bank involved instructions to transfer funds—in *Morgenstern*, checks, and here, wire transfer instructions.  In both cases, the defendants claimed that the payment instructions could not constitute misrepresentations to the bank because the instructions did not contain factual assertions.  In both cases, the defendants knew that the banks would not execute those instructions if they were fully informed of the nature of the transactions—in *Morgenstern*, because the accountant did not have authority to deposit checks into his own account, and in Sadr's case, because the transactions were for the benefit of sanctioned entities.  And so, in both cases, to trick the banks into participating in those transactions, the defendants presented those transactions in a misleading manner to the financial institutions—in *Morgenstern*, by commingling fraudulently procured checks with legitimate checks, and here, by layering the transactions through front companies.  Thus, in both cases, the defendants' conduct "amounted to a false representation," *Morgenstern*, 933 F.2d at 1114; *see also United States* v. *Burnett*, 10 F.3d 74, 78 (2d Cir. 1993) (when a defendant knowingly cashes a check for purposes of falsely boosting the balance in a bank account so that he can later withdraw the artificially inflated balance, the defendant has made a misrepresentation under the first prong of the bank fraud statute); *United States* v. *Dayan*, 2005

32

WL 757250, at *3 (S.D.N.Y. 2005) (denying Rule 29 motion in check-kiting case where defendant claimed that the Government had failed to prove a misrepresentation); *United States* v. *Miller*, 70 F.3d 1353, 1355 (D.C. Cir. 1995) (material misrepresentation "[e]ach time Miller inserted Rolark's card into an ATM and entered her personal four-digit code"); *United States* v. *Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (implicit misrepresentation of defendant's authority to negotiate checks submitted for payment).

Indeed, one of the cases upon which the defendant principally relies, *United States* v. *Briggs*, 939 F.2d 222 (5th Cir. 1991) (Third Mot. at 7, n.3), further demonstrates this point. *Briggs*, like *Morgenstern*, involved a prosecution under the second prong of the bank fraud statute.  There, while the Fifth Circuit held that the mere act of sending a wire did not involve a misrepresentation, it made clear that its opinion was not "suggest[ing] that there can never be an implied misrepresentation of authority in such circumstances" capable of supporting bank fraud.  *Briggs*, 939 F.2d at 226.  Indeed, after remand, the Fifth Circuit affirmed the defendant's conviction of bank fraud based on an "an *implicit misrepresentation* by Briggs that she was acting under her employer's authority."  *Briggs*, 965 F.2d at 12 (emphasis added).[6]

Finally, the recent decision in *Zarrab*, 2016 WL 6820737 at *12, rejected the very argument the defendant makes in the instant motion.  In *Zarrab*, the indictment similarly charged the defendant with conspiracy to commit bank fraud based on allegations that he had defrauded U.S. banks by carrying out "layered transactions using intermediate shell companies in third

---

[6] *Williams* v. *United States*, 458 U.S. 279, 284-85 (1982), on which Sadr relies, does not support his position either.  *Williams* stands only for the limited proposition that the implicit representation of a funds transfer order that the funds are in fact available for transfer does not "make any representation as to the state of petitioner's bank balance" that would constitute a violation of Section 1344.  *Id.*

countries" in order to conceal the Iranian beneficiaries.  *Id.*  Like Sadr, Zarrab argued that the indictment should be dismissed because it did not allege a specific misrepresentation to a U.S. bank.  *Id.*  In rejecting this argument, Judge Berman held that "[b]ecause Zarrab and his co-conspirators are alleged in the Indictment to have provided false and misleading statements through the use of multiple layered entities and by stripping material information from wire transfer instructions which influenced the decision-making of the U.S. banks . . . he made material misrepresentations under both prongs of [the bank fraud statute]."  *Id.* at *12-13.

Sadr seeks to distinguish *Zarrab* by asserting that in that case, the indictment not only alleged the use of front companies to receive payments but also "specific misrepresentations in wire transfer requests," including "a wire transfer request" that "falsely stated that a payment was related to fire equipment."  (Fourth Mot. at 7, n.4).  But nothing in the *Zarrab* decision—or in any of the above-cited cases—suggests that a wire transfer instruction itself must contain an additional affirmative misrepresentation in order to satisfy the elements of bank fraud.  To the contrary, Sadr's wire requests were also "specific misrepresentations" because they, similar to the instructions in *Zarrab*, purposely misled U.S. banks into believing that the beneficiaries of the funds transfers were entities based in Turkey and Switzerland, not Iran.  What these transactions and wire instructions studiously concealed from the U.S. banks was that the Turkey- and Switzerland-based front companies were merely, in Sadr's own words, "agents" of Iranian companies, *see, e.g.*, Ind. ¶ 16(m), which were established for the sole purpose of concealing the transactions' illegality under U.S. laws.  Indeed, the overt acts alleged in the Indictment set forth in stark detail the measures Sadr devised and implemented to ensure that U.S. banks were kept in the dark regarding the Iranian nexus and true beneficiary of these transactions.  For example, and as noted above, the Indictment details numerous instances in which Sadr and/or his co-conspirators

34

sent letters bearing Iranian company letterhead to employees of the Venezuelan Subsidiary instructing them to list the aforementioned front companies in wire instructions, rather than the IIHC.  (*See, e.g.*, Ind. ¶¶ 16(t), (x), (z), (cc), (ff), (gg), (kk), (nn), (pp), (ss), (yy)).  Several of these letters also stated that the reason why these companies had been appointed to act as "agents" for the aforementioned Iranian entities was "in view of the current difficulties for transfer and movements of funds," referring to the effects of U.S. sanctions.  (*See, e.g.*, *id.* ¶ 16(nn)).   By contrast, those same letters instructed employees of the Venezuelan Subsidiary that when making payments in Bolivian currency, they should list the IIHC as the beneficiary—thus evidencing an intent to conceal information from U.S. banks that was not hidden from others.  (*See, e.g.*, *id.* ¶  16(pp)).

As noted above, the Indictment further details how upon deciding in 2011 that they would receive payments in U.S. dollars, Sadr and his co-conspirators discussed using the abbreviated name of the Iranian International Housing Company, "IIHC," in order to "make our transactions a bit easier."  (*Id.* ¶ 16(o)).  Sadr added that the reason for this change was because "we have requested our last invoice to be paid in [U.S. dollars] which makes this name change a bit more crucial," referring to the need to hide the Iranian domicile of the company in light of U.S. sanctions.  (*Id.*)  And Sadr later directed that the company's name be formally changed to the "*Industrial International Housing Company*," another apparent effort to hide the Iranian nexus of the funds.  (*Id.* ¶¶ 16(o), (bb), (dd)) (emphasis added).  These efforts to conceal the Iranian beneficiaries of the relevant funds, both from U.S. banks and third parties,[7] fall within the heartland of the bank fraud statute and therefore fatally undermine the defendant's argument that the Indictment fails to

---

[7] Indeed, the defendant concedes in his motion that misrepresentations to third parties "may constitute bank fraud[.]"  (Fourth Mot. at 7).

allege false representations. *See, e.g.*, *Loughrin* v. *United States*, 573 U.S. 351, 363 (2014) (holding that a counterfeit check is "no less" a "means" of fraudulently obtaining bank funds when offered as payment to a third party rather than to the bank itself).

Accordingly, the Court should reject Sadr's argument and find that the Indictment properly alleges a misrepresentation.

### 2.   The Indictment Alleges a Scheme to Obtain Money or Property from a U.S. Bank

The court should also reject Sadr's argument that the Indictment fails to allege a scheme to obtain money or property from a U.S. bank (Fourth Mot. at 8).  The Indictment specifically alleges in both Counts Three and Four that the defendant and others knowingly "execute[d]," and conspired to execute, "a scheme or artifice to defraud a financial institution [] and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the control of such financial institution" (Ind. ¶¶ 22-26), which would violate the second prong of Sections 1344 and 1349.  Similar to the defendant in *Zarrab*, the defendant here claims that "the Indictment does not allege that Sadr obtained any money from a U.S. bank or one of its accountholders" because the monetary transfers at issue were not funds held by U.S. banks but were instead, "installment payments for the low-income housing construction project described in the Indictment."  (Fourth Mot. at 8).  But because the Indictment here tracks the language of the relevant statutes, Sadr's arguments—like Zarrab's—cannot succeed.  *See Zarrab*, 2016 WL 6820737, at *11; *see also Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal citation and quotation omitted).

Even if the Court were to consider them, Sadr's arguments here rely on the same mischaracterizations of fact and law as his other arguments with respect to other counts.

The defendant asserts that the U.S. banks at issue here merely "process[ed] U.S. dollar transfers between foreign banks," and therefore that the scheme was not designed to "obtain" money or property owned by or under the custody or control of a U.S. bank. (Fourth Mot. at 31). This argument is unavailing. First, it is well-settled law that processing funds transfers based on false and fraudulent pretenses constitutes bank fraud, even if the funds belong to someone other than the bank. *See, e.g.*, *Crisci*, 273 F.3d at 241 (upholding bank fraud conviction where defendant cashed forged checks that were drawn on another's account); *Miller*, 70 F.3d at 1355 (material misrepresentation "[e]ach time Miller inserted Rolark's card into an ATM and entered her personal four-digit code"); *United States* v. *Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (implicit misrepresentation of defendant's authority to negotiate checks submitted for payment). But in any event, the defendant's description of the transactions here is fatally flawed. The defendant implies that the U.S. banks' role was entirely passive and thus immaterial because the money "came from [Sadr's] companies' Swiss bank, which lawfully received the money from the Venezuela company's foreign bank." (Fourth Mot. at 9). This contention is based on the same fallacy that underlies Sadr's claims regarding the alleged IEEPA violations—*i.e.*, that no service was exported or re-exported by a U.S. bank to Iran when it processed the transactions at issue here. Try as he might, Sadr simply cannot write the U.S. bank's involvement out of the equation. He cannot avoid the fact that U.S. banks transferred U.S. dollars, which were in their possession and/or control, as a result of his and his co-conspirator's duplicity.[8]

---

[8] This distinguishes this case from *Grain Traders, Inc.* v. *Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997), in which Citibank accepted an incoming wire transfer and then used those funds to satisfy a debt owed to Citibank. In that case, there was no outflow of money. Here, there is.

For example, the Indictment alleges that on February 23, 2012, a U.S. bank processed a wire transaction of more than $7 million, which the Venezuelan Subsidiary sent via the U.S. bank to Clarity's account at a Swiss bank. (*See* Ind. ¶ 16(ll)). Contrary to Sadr's misleading characterization, the U.S. bank in this transaction – acting as a correspondent or intermediary bank – sent those U.S. dollars from its own custody to the Swiss bank.  This occurred when the U.S. bank debited its own store of U.S. dollars and credited those funds into a U.S. dollar account that the Swiss bank held with the U.S. bank.  After receiving those funds, the Swiss bank then credited them to Clarity's account.  In this type of transaction, the role of the U.S. bank in receiving and then parting with funds is crucial.  Indeed, if the Swiss bank in this example had its own store of U.S. dollars that it wished to send to Clarity, then it could simply have done so, without involving the U.S. bank. There would be no need for the foreign bank to use (and thus pay for) the services of the U.S. bank.  The entire purpose behind the banking relationship that Sadr exploited was to gain access to the dollars in the custody of U.S. banks.  Accordingly, the Indictment adequately alleges that Sadr sought to obtain the funds of a U.S. bank.  *Crisci*, 273 F.3d at 235; *see also Zarrab*, 2016 WL 6820737 at *11-14 (rejecting without expressly discussing Zarrab's assertion that the processing of transfers by U.S. correspondent banks did not constitute an effort to "obtain" the funds of such banks).

### 3.    The Scheme Involved Risk of Tangible Economic Harm

Sadr next claims that he lacked the intent to expose the U.S. banks to tangible economic harm (Fourth Mot. at 10-15).[9] The fact is, however, that his scheme robbed the U.S. banks of

---

[9] As explained at pages 41-42, *infra*, the Supreme Court has held that intent to cause tangible economic loss is not a required element of bank fraud.  *See Shaw* v. *United States*, 137 S. Ct. 462, 466-67 (2016).

critical information with respect to these fund transfer instructions, and thus, the concrete harm contemplated by Sadr was to deny the victim banks "the right to control [their] assets by depriving [them] of information necessary to make discretionary economic decisions." *See United States* v. *Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (holding that defendant who deliberately supplied false information to obtain a bank loan "intended to inflict a genuine harm upon the bank—*i.e.*, to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant"); *United States* v. *Binday*, 804 F.3d 558, 574 (2d Cir. 2015) (finding sufficient for insurance fraud charge proof that defendants "exposed the insurers to an unbargained-for economic loss" based on the features of the insurance policies the defendants obtained based on their fraud); *United States* v. *DiNome*, 86 F.3d 277, 283-84 (2d Cir. 1996) (affirming wire fraud conviction where fraudulent intent was proven by showing that withheld information substantially diminished value of the mortgage transaction).

Sadr's initial argument that the Government fails to allege sufficient (or any) details regarding Sadr's intent to violate the banks' "right to control" their assets (Fourth Mot. at 10-11) is without merit. One of the cases on which the defendant relies, *Pirro*, 212 F.3d at 91, involved allegations of subscribing a false tax return and held that the indictment was insufficient because it alleged "the omission of a fact [from a tax return] that Pirro might not have been required to report" for tax purposes. *Id.* Thus, unlike in the instant case, the *Pirro* indictment's core factual allegations were flawed because they were potentially inconsistent with liability under the relevant statute. Indeed, the court in *Pirro* acknowledged that what is required in an indictment is to "state *the essential elements* of the charge against [the defendant]." *Id.* (emphasis added). The violation of the "right to control" at issue here is neither a required element of bank fraud nor an express

component of the bank fraud statute's language.  Rather, it is a doctrinal concept that describes one category of conduct that may satisfy the element of a "scheme or artifice to defraud."  Because the Indictment here "track[s] the language of the statute[s] charged and state[s] the time and place. . . of the alleged crime[s]," *Stavroulakis*, 952 F.2d at 693, and because the facts set forth in the Indictment are entirely consistent with liability under the bank fraud statutes, it adequately alleges bank fraud and conspiracy to commit bank fraud.

Another case on which Sadr principally relies, *United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (Fourth Mot. at 10, 11, 18), similarly does not aid his argument.  In that case, the court held an indictment's allegations of tax fraud to be insufficient where it alleged only that the defendant's misrepresentation induced his victim "to enter into a transaction it would otherwise have avoided," but did not allege exposure to a tangible economic loss.  *Id.* at 109.  The defendant argues that the Indictment here similarly fails to allege sufficient facts concerning Sadr's intent to deprive his victims of the "right to control" their assets.  (Fourth Mot. at 10-11)  But the Indictment does contain sufficient allegations in this regard, because it alleges that Sadr and others "conspired to evade U.S. sanctions by conducting international financial transactions . . . [for] Iranian individuals and entities . . . in order *to conceal from U.S. banks and others that services were being provided to Iran in violation of IEEPA and the ITSR*."  (Ind. ¶ 12 (emphasis added)).  Thus, the Indictment plainly alleges "a discrepancy between benefits reasonably anticipated and actual benefits received." *Shellef*, 507 F.3d at 109.  In particular, it asserts that Sadr lured U.S. banks into processing illegal transactions for the benefit of Iranian parties, which necessarily carried a high risk of damage to these U.S. banks' business, reputation, and bottom line.  *See* pgs. 42-45, *infra.* Similarly, the Indictment alleges, in essence, that Sadr "misrepresented the nature of the bargain," *Shellef*, 507 F.3d at 108, because it states that he "conceal[ed] from U.S. banks and others" that

the transactions they agreed to conduct were for Iranian parties and were thus illegal.  (Ind. ¶ 12.)  Accordingly, the allegations in the Indictment are more than sufficient to survive a motion to dismiss.

Equally flawed are Sadr's arguments that the alleged facts themselves do not support a "right to control" theory in this case because there was no risk of tangible economic loss to the U.S. banks.  (Third Mot. at 12).  As an initial matter, Sadr ignores the Supreme Court's recent contrary holding in *Shaw* v. *United States*, 137 S. Ct. 462, 466-67 (2016), which held that the bank fraud statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."  *Id.*  As the Court in *Shaw* observed, a victim "is none the less cheated out of his property, when he is induced to part with it by fraud, even if he gets a quid pro quo of equal value."  *Id.*  (quoting *United States* v. *Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).  Accordingly, Sadr's efforts to defraud U.S. banks into providing U.S. dollars and U.S. dollar processing services to his companies meet the elements of the bank fraud statute, regardless of whether Sadr intended to cause tangible losses to those banks.

In any event, Sadr's argument that he did not expose the U.S. banks to, or intend to cause, such losses is factually incorrect.  In *Zarrab*, the court considered and rejected a nearly identical argument.  2016 WL 6820737 at *13-16.  Here, as in *Zarrab*, by concealing the true Iranian beneficiaries of these transactions from the U.S. banks, Sadr and his co-conspirators robbed them of the ability to assess the risk from engaging in these transactions.  Indeed, the very reason for OFAC's revocation of the U-Turn license in 2008 was "the need to further protect the U.S. financial system from the threat of illicit finance posed by Iran and its banks."  73 Fed. Reg. 66541 (Nov. 10, 2008).  Thus, the ability to evaluate the risks of any particular overseas transaction is

critical because the potential consequences for the bank from executing barred transactions is tremendous.

First, the bank runs the risk that a regulator at some point might investigate whether, or make a determination that, the bank knowingly facilitated sanctions avoidance or violations, which could expose the bank to massive fines and forfeiture.  For example, BNP Paribas SA was ordered to forfeit more than $8 billion and to pay a $140 million fine for, among other things, knowingly facilitating sanctions violations.  Similarly, HSBC Bank N.A. was ordered to forfeit more than $1.2 billion, and to pay hundreds of millions of dollars in civil penalties for similar conduct.[10]

Sadr glibly attempts to dismiss the potential for harm to the banks by claiming that the charged scheme was allegedly "designed to *conceal* from the U.S. banks that monetary transfers were being conducted in violation of the ITSR," and that "no bank so deceived would face any tangible threat of criminal or regulatory exposure" (Fourth Mot. at 13 (emphasis in original)).  But the fact is that even if the scheme had worked perfectly, and the banks had been completely fooled, that still may not have saved them from regulatory scrutiny.  For instance, while a criminal violation of the IEEPA and the ITSR requires knowledge of the violation, a civil breach does not.  The ITSR prohibits "[a]ny transaction . . . that evades or avoids . . . any of the prohibitions set forth in this part," 31 CFR § 560.203, and the IEEPA imposes civil penalties "on any person who

---

[10]*See* https://www.justice.gov/opa/pr/bnp-paribas-agrees-plead-guilty-and-pay-89-billion-illegally-processing-financial;   https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations.

commits an unlawful act" under the promulgated regulations, 50 U.S.C. § 1705(b).[11]  While it may

be true, as Sadr suggests, that ""it is OFAC policy not to pursue enforcement action against U.S.

intermediary banks . . . for engaging unwittingly in transactions with sanctioned parties" (Third

Mot. at 14-15), OFAC has made clear that it can determine that an entity violated its sanctions

even if there was no actual knowledge of the violation, but merely a "reason to know."  (OFAC

FAQ # 166 (cited in Third Mot. at 15)).  For example, in 2016, OFAC determined that Humana,

an insurance company, had violated OFAC's Kingpin sanctions because it had "reason to know"

it was providing services to barred entities.[12]  Similarly, also in 2016, OFAC concluded that

Mastercard had violated U.S. sanctions with respect to Iran, even though none of the company's

employees had actual knowledge of the improper conduct, because Mastercard was a "large and

commercially sophisticated company that deals primarily with banks and other financial

institutions," and so had "reason to know" of the violations.[13]

---

[11] Sadr's reliance on *United States* v. *Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (reversing mail fraud conviction where union representative concealed kickback scheme from a contractor who was the alleged victim), and *Leung* v. *Law*, 387 F. Supp. 2d 105, 117 (E.D.N.Y. 2005) (dismissing RICO claims predicated on bank fraud where the defendants falsely understated a company's income and assets both to the alleged victim bank and to U.S. tax authorities), is misplaced.  In those cases, the relevant illicit activity was carried out in a manner that did not expose the victims (*i.e.*, the contractor in *Novak* and the bank in *Leung*) to direct legal liability.  That is to say, while the alleged kickback scheme in *Novak* and the tax crimes in *Leung* involved activities that related to agreements made with the alleged victims, the defendants in those cases did not lure the victims themselves into committing or facilitating illegal acts.  Here, by contrast, Sadr fraudulently induced U.S. banks to process funds transfers that were themselves prohibited by U.S. sanctions, thus exposing those banks to serious risk of tangible loss and direct legal liability, and thereby "affect[ed] an essential element of those bargains."  *Novak*, 443 F.3d at 159.

[12] *See* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160802_humana_fov.pdf.

[13] *See* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160316_MasterCard.pdf

In addition to potential civil penalties, if a U.S. bank unwittingly aids a foreign bank that is engaged in sanctions avoidance through correspondent banking services, that could lead to the foreign bank's correspondent bank account *held at the U.S. bank* to be seized by federal authorities. *See*, *e.g., United States* v. *$1,879,991.64 Previously Contained in Sberbank of Russia's Interbank*, 2016 WL 2651424, at *1 (D.N.J. 2016) (foreign bank's correspondent bank account held at U.S. bank seized pursuant to 18 U.S.C. § 981(k)).  While, in such a situation, the U.S. bank may have recourse against the foreign bank to recoup certain assets or may have the opportunity to contest or secure the removal of the seizure, these avenues would likely lead to the U.S. bank incurring substantial legal fees and costs and exposing itself to risk of loss that it had not otherwise considered, and come with no certainty of success.  Finally, even where a U.S. bank lacks a "reason to know" that it is processing illegal transactions, the bank's mere involvement in such transactions may trigger regulatory and/or investigative scrutiny that could last for years, requiring the bank to respond to government requests, hire lawyers, and suffer reputational damage, all of which would likely have direct and tangible effects on the bank's business and bottom line.[14]

Moreover, and most significantly for the purpose of this motion, exposure to potential loss is an element of the offense that must be proven at trial.  While the Government need not prove actual loss, *see United States* v. *Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999) (Government can

---

[14] Sadr's argument that the decision in *Zarrab* is rendered incorrect by the Second Circuit's subsequent decision in *United States* v. *Finazzo*, 850 F. 3d 94 (2d Cir. 2017), is without merit. Sadr claims that, both here and in *Zarrab*, the factual allegations establish "merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations (*see* Third Mot. at 16 (citing *Finazzo*, 850 F.3d at 112)), but do not properly meet the requirement articulated in *Finazzo* that the purported "misrepresentations or non-disclosures can or [would] result in tangible economic harm" (Third Mot. at 14 (citing *Finazzo*, 850 F.3d at 111)).  But as explained above, Sadr's alleged actions in carrying out these transactions did in fact expose the victim banks to real and tangible economic harm, and the factual allegations as pled in the Indictment therefore meet the requirements articulated in *Finazzo*.

44

prove "actual or potential loss" to the bank), the question of whether and how the alleged scheme did (or would have) harmed the financial institution is a question of fact.  *See*, *e.g.*, *United States* v. *Laljie*, 184 F.3d 180, 191 (2d Cir. 1999) (examining the potential for loss created by each alleged misrepresentation on a case-by-case basis, after trial).

### E.      The Motion to Dismiss Purportedly Multiplicitous Counts Should Be Denied

Sadr seeks dismissal of several counts in the Indictment on the ground that such counts are multiplicitous.  (*See* Fifth Mot.)  In particular, Sadr asserts that "the Court Should dismiss all but one of Counts One and Six to the extent they are multiplicitous of Count Two and dismiss Count Four to the extent it alleges an attempt." (*Id*. at 12.)  But the defendant concedes that *United States* v. *Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) precludes such relief, and thus raises these arguments "to preserve the issue for further review." (Fifth Mot. at 11).   Accordingly, the Court should deny the defendant's Fifth Motion.

### F.      The Motion to Dismiss for Lack of Specificity and for a Bill of Particulars Should Be Denied

The defendant moves to dismiss the Indictment for failure to state an offense and for lack of specificity, or, in the alternative, for a bill of particulars.  (Sixth Mot. at 1.)  The Indictment is 34 pages, charging the defendant in six counts.  Each statutory allegation tracks the statute at issue. And 54 overt acts are alleged with respect to Counts One, Two, Four, and Six.  (Indictment ¶¶ 16, 21, 27, 33).  As discussed below, under longstanding federal precedent, the Indictment is wholly sufficient.  It contains the elements of the offenses charged and advises the defendant of the charges against him and the specific acts for which he stands accused.  The defendant's motion to dismiss the Indictment and, alternatively, for a bill of particulars should thus be denied.

### 1.    The Indictment Is Sufficiently Specific

It is well-established that "[a]n indictment is sufficient if it contains the elements of the offense(s) charged and fairly informs a defendant of the charge(s) against which he must defend." *United States* v. *Rahimi*, 2017 WL 2984169, at *1-2 (S.D.N.Y. 2017) (citing *Chalmers*, 474 F. Supp. 2d at 559; *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)). "As the Second Circuit has explained, 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Chalmers*, 474 F. Supp. 2d at 559 (quoting *Stavroulakis*, 952 F.2d at 693). When deciding a motion to dismiss, moreover, a court must accept all factual allegations in the indictment as true. *Id.* "A court should not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for 'the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'" *Id.* (quoting *Alfonso*, 143 F.3d at 776-77).

The Indictment contains more than adequate allegations. Each count of the Indictment clearly states the elements of the crimes charged, tracking the language of the relevant statutes and including the nature, time, and place of the alleged offenses. (Indictment ¶¶ 14-16 (Count One), 17-21 (Count Two), 22-23 (Count Three), 24-27 (Count Four), 28-29 (Count Five), 30-33 (Count Six); *see Chalmers*, 474 F. Supp. 2d at 559-60). The Indictment sets out, with considerable detail, a criminal scheme to funnel more than $115 million in payments for a Venezuelan infrastructure project through the U.S. financial system for the benefit of Iranian individuals and entities, as well as the defendant's role and participation in this scheme, the steps he and other co-conspirators took to further the scheme, and the approximate dates and locations of those events. *See Chalmers*, 474 F. Supp. 2d at 559-60. The Indictment need not, as the defendant contends (Sixth Mot. at 1-2), name or state the identities of the defendant's co-conspirators or victims, or specify each financial

transaction or piece of evidence the Government intends to introduce against the defendant at trial. *See Chalmers*, 474 F. Supp. 2d at 559; *see also United States* v. *Gonzalez*, 2004 WL 2297341, at *1-2 (S.D.N.Y. 2004). Nor should it; such a requirement would be impracticable, harmful to victims, and absurd. For example, naming the identities of victims, uncharged co-conspirators, or witnesses within a charging instrument would implicate the privacy rights of such witnesses and victims and would violate the statutory protections afforded to victims. Specifying each piece of the Government's evidence against a defendant within an indictment, moreover, would turn the charging instrument into a trial by paper. Because the Indictment is sufficient under longstanding federal precedent, the defendant's motion to dismiss for failure to state a claim or for lack of specificity should be denied.

### 2. A Bill of Particulars Is Not Warranted

Sadr's alternative motion for a bill of particulars is equally without merit. "The purpose of a bill of particulars is to 'to identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States* v. *Purcell*, 2018 WL 4378453, at *7-8 (S.D.N.Y. 2018) (quoting *United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)). "Where an indictment provides insufficient detail to permit a defendant to defend against the charges against him, a bill of particulars may be required." *Id.* That is, a bill of particulars is "required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Id.* (citing *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States* v. *Chen*, 378 F.3d 151, 163 (2d Cir. 2004)). A bill of particulars is not required, however, "if the information sought by [the] defendant is provided in the indictment or in some acceptable alternate form."

47

*Gonzalez*, 2004 WL 2297341 at *1-2 (citing *Bortnovsky*, 820 F.2d at 574; *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (stating same standard and noting that "[t]he principles governing requests for a bill of particulars are well settled")).

A bill of particulars is not a "device for obtaining evidentiary detail." *Purcell*, 2018 WL 4378453, at *7-8. Rather, in deciding a motion for a bill of particulars, "[t]he important question is whether the information sought is necessary, not whether it is helpful." *Gonzalez*, 2004 WL 2297341, at *1-2 (citing *United States* v. *Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)). The Court should also consider both the charging instruments and the discovery provided to the defendant. *See Purcell*, 2018 WL 4378453, at *7-8 (citing *Torres*, 901 F.2d at 234). "Courts have been highly reluctant to require a bill of particulars when a defendant has asked for specific identities of co-conspirators or others allegedly involved." *Gonzalez*, 2004 WL 2297341, at *1-2.

Here, the 34-page Indictment clearly states the crimes with which the defendant has been charged. (Indictment ¶¶ 1-5, 14-33). It gives reasonably approximate times and places in which the alleged crimes occurred. (*Id.* ¶¶ 15-16(a)-(bbb), 18, 23, 25, 29, 31). It names various companies and entities, as well as their roles in the defendant's criminal conduct, including Stratus Group, Stratus International Contracting Company, Clarity Trade and Finance, Stratus International Contracting, and the Iranian International Housing Corporation. =o(*Id.* ¶¶ 7-11). The Indictment also lists 54 overt acts committed by the defendant and his co-conspirators in furtherance of the conspiracies charged. (*Id.* ¶¶ 16(a)-(bbb), 24, 27). In addition, the Government has produced a substantial amount of discovery to the defendant, which has included emails, bank records, wire transfer records, and other documents, including search warrant affidavits that set forth in distilled fashion much of the evidence supporting the criminal allegations in this case.

The Indictment is thus more than sufficient to advise the defendant of the charges against him and the specific acts of which he is accused.  *See Torres*, 901 F.2d at 234.  Altogether, between the facts contained in the Indictment and the discovery provided to the defendant, the defendant has more than enough information available to him to prepare his defense and to avoid surprise at trial.  *See Gonzalez*, 2004 WL 2297341, at *1-2 (citing *Torres*, 901 F.2d at 233-34) (upholding district court's denial of a bill of particulars where "a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits"); *see also United States* v. *Rodriguez*, 1999 WL 820558 at *2 (S.D.N.Y.1999) (denying motion for a bill of particulars identifying known co-conspirators where the indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

The defendant's motion for a bill of particulars appears to be little more than a request for further "evidentiary detail," including the names and identities of co-conspirators and victims.  *See Purcell*, 2018 WL 4378453, at *7-8.  A motion for a bill of particulars, however, should not be a method to obtain the early production of material pursuant to 18 U.S.C. § 3500, or for the defendant to ascertain the "specific identities of co-conspirators," victims, or others involved in the Government's investigation.  *Gonzalez*, 2004 WL 2297341, at *1-2.[15]  Accordingly, the defendant's motion for a bill of particulars should be denied.

---

[15] The Government plans to produce Section 3500 material, exhibits, and a witness list well in advance of trial, and will confer with defense counsel to set a reasonable schedule for the production of such materials.

### G.       The Motion to Strike Surplasage Should Be Denied

The defendant next moves to strike certain portions of the Indictment as prejudicial.  (*See* Seventh Mot.).  For the reasons that follow, the defendant's motion is without merit and should be denied.

### 1.       Applicable Law

"'It has long been the policy of courts within the Southern District [of New York] to refrain from tampering with indictments.'"  *United States* v. *Kassir*, 2009 WL 995139, at *2 (S.D.N.Y. 2009) (quoting *United States* v. *Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000); citing *United States* v. *Jimenez*, 824 F. Supp. 351, 369 (S.D.N.Y. 1993)).  "Motions to strike surplusage will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  *United States* v. *Mulder*, 273 F.3d 91, 100 (2d Cir. 2001) (quoting *United States* v. *Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted)).  "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."  *Scarpa*, 913 F.2d at 1013.  Because this is an "exacting standard," *id.*, "'only rarely is alleged surplusage stricken from an indictment,'" *Kassir*, 2009 WL 995139, at *2 (quoting *United States* v. *Gotti*, 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999)).

Courts in this District, moreover, "routinely await presentation of the Government's evidence at trial before ruling on a motion to strike."  *Scarpa*, 913 F.2d at 1012; *United States* v. *Mostafa*, 965 F. Supp. 2d 451, 466-67 (S.D.N.Y. 2013) (citing cases)).  Indeed, as Judge Gerald E. Lynch explained in *United States* v. *Butler*, 351 F. Supp. 2d 121, 125 (S.D.N.Y. 2004), "it should be noted that motions to strike purported surplusage are largely meaningless, at least in this Court."  This is because "[i]t is not the usual practice of this Court to provide the jury with a copy of the indictment in any event, and if it should be appropriate to give a copy of the indictment to

the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." *Id.*  Moreover, "[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges." *Id.*

### 2. Discussion

The defendant moves to strike certain portions of the Indictment that are either central to the charges against the defendant or are not inflammatory or unfairly prejudicial.  Specifically, the defendant seeks to strike (i) the words "among others" in relation to the overt acts committed by the defendant in furtherance of the conspiracies charged in Counts One, Two, Four, and Six (*see* Indictment ¶¶ 16, 21 27, 33); (ii) five paragraphs setting forth the background of the IEEPA and the orders, regulations, and prohibitions the defendant violated (*see Id.* ¶¶ 1-5); (iii) certain statutory citations, (*see Id.* ¶¶ 18, 19, 20, 21); and (iv) references to the "government of Iran" within the Indictment's statutory language (*see Id.* ¶¶ 19, 23) (Seventh Mot. at 3-10).  The defendant fails to state a valid basis for the relief he requests.

*First*, the defendant fails to justify his request to remove allegations that the defendant committed certain overt acts, "among others," in furtherance of the conspiracies charged in Counts One, Two, Four, and Six (Indictment ¶¶ 16, 21, 27, 33).  For Count One, the Indictment outlines 54 overt acts, "among others."  (*Id.* ¶ 16(a)-(bbb)).  For Counts Two and Six, the Indictment references and incorporates the 54 overt acts alleged in connection with Count One, "among others."  (*Id.* ¶¶ 21, 33).

The phrase "among others" within the overt acts sections of the Indictment does not broaden the charges against the defendant, is relevant to the charges, and should not be stricken. Broadening phrases, such as "among others," "among other things," "and elsewhere," "in or

about," and "others known and unknown," are commonly used in charging instruments.  Such phrases "may be struck if [they] impermissibly expand[] the charge."  *Mostafa*, 965 F. Supp. 2d at 466-67 (citing *Kassir*, 2009 WL 995139, at *3; *United States* v. *Pope*, 189 F. Supp. 12 (S.D.N.Y. 1960)).  But when broadening language appears within the "overt acts" section of an indictment, "alleging the means and methods by which the defendant committed the charged offense," these phrases do "not impermissibly broaden the charge but instead [go to] the proof the Government would offer to sustain it."  *Kassir*, 2009 WL 995149, at *3 (citing *United States* v. *Mayo*, 230 F. Supp. 85, 86 (S.D.N.Y. 1964)).  Such broadening language thus need not be stricken when it is contained in "allegations of overt acts in a charged conspiracy where the government is not required to set forth all the acts relied upon to effectuate the conspiracy."  *Id.* (collecting cases).

In *Kassir*, this Court denied the defendant's motion to strike the phrase "among others," within an allegation that the defendant committed certain overt acts, "among others."  *Id.*  The court stated that the "Government need not, when charging conspiracy, set out with precision each and every act committed by the conspirators in furtherance of the conspiracy."  *Id.* (citing *United States* v. *Cohen*, 518 F.2d 727, 733 (2d Cir. 1975); *Mayo*, 230 F. Supp. at 86).  The court further explained that the phrase "among others" clarifies that "the list of overt acts which follows is not exhaustive."  *Id.*

Here too, the phrase "among others" is contained in the Indictment prior to a non-exhaustive list of overt acts committed by the defendant in furtherance of the conspiracies charged in Counts One, Two, and Six.  (Indictment ¶¶ 16, 21, 27, 33).  The words do not expand the charges against the defendant.  *See Kassir*, 2009 WL 995149, at *3.  But they are relevant in conveying that not every act committed by the conspirators in furtherance of the conspiracy is contained in the Indictment.  *Id.*

*Second*, with respect to paragraphs 1 through 5 of the Indictment setting forth background regarding the IEEPA, courts have routinely held that "statements providing background are relevant and need not be struck" from an indictment. *Bin Laden*, 91 F. Supp. 2d at 621 (citing *Mulder*, 273 F.3d at 99; *Kassir*, 2009 WL 995139, at *1). These five paragraphs are certainly relevant to the charges against the defendant. These paragraphs outline the background of the IEEPA, including when the ITSR was promulgated to implement the sanctions imposed by the Executive Orders of the President, and they advise the defendant as to the regulations, orders, and prohibitions he violated. Given that violations of the IEEPA require a willfulness component, moreover, information and evidence as to when, through what means, and why prohibitions on the export, re-export, sale, or supply of goods to Iran were promulgated and imposed is relevant. Because these background statements in the Indictment are relevant to the charges, they should not be stricken. *See Bin Laden*, 91 F. Supp. 2d at 621.[16]

The defendant points to two out-of-district cases that are distinguishable. In *United States* v. *Quinn*, 401 F. Supp. 2d 80, 98-99 (D.D.C. 2005), the indictment went beyond the Indictment in this case and discussed Iran's support for international terrorism and the threat it poses to the

---

[16] Should the jury ask to view a copy of the Indictment during the course of their deliberations, the parties and the Court can certainly determine, at that stage of the case, whether these background paragraphs should be redacted from the copy of the Indictment provided to the jury. *See Butler*, 351 F. Supp.2d at 124 (noting that motions to strike surplusage have little purpose because it is not the usual practice in this Court to provide the jury with a copy of the Indictment, and any copy could be redacted "according to the charges, allegations, and evidence that remain relevant in light of the entire trial"); *United States* v. *Atilla*, No. S4 15 Cr. 867 (RMB), ECF Doc. No. 293 ¶¶ 1-85 (indictment setting forth the background of the IEEPA and relevant regulations, orders, and prohibitions, which were not struck from the Indictment but redacted from the copy provided to the jury on request); *United States* v. *Chalmers*, Indictment No. S5 05 Cr. 59 (DC) (S.D.N.Y.), ECF Doc. No. 181 ¶¶ 32-37 (indictment setting forth the background of the IEEPA and the relevant regulations, orders, and prohibitions); *Chalmers*, 474 F. Supp. 2d at 577 (denying defendant's motion to strike references to the Iraqi Sanctions Act from the Indictment).

United States. *Id.* (striking "Iran's support for international terrorism" and "a country whose regime had for years been designated by the United States government as a supporter of international terrorism"). Likewise, in *United States* v. *Groos*, 616 F. Supp. 2d 777, 790 (N.D. Ill. 2008), the District Court for the Northern District of Illinois found that references to terrorism were prejudicial when presented in an indictment regarding violations of a trade embargo.[17] Nowhere in the Indictment is there a reference to Iran's support for "international terrorism." Rather, the Indictment has been carefully crafted to exclude inflammatory language regarding Iran's proliferation of weapons, development of missiles, or support for terrorist groups. *See* 83 Fed. Reg. 38,939 (Aug. 6, 2018).

*Third*, the defendant seeks without a valid basis to strike certain statutory citations within the Indictment as overbroad and prejudicial. With respect to the statutory citations, under Federal Rule of Criminal Procedure 7(c), for each count "the indictment . . . must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c). A grand jury indictment serves several constitutional functions, including informing the defendant of the nature and cause of the accusations against him, as required by the Sixth Amendment. *United States* v. *Stringer*, 730 F.3d 120, 124 (2d Cir. 2013). Here, the inclusion of citations to 50 U.S.C. §§ 1701 to 1707, the ITSR, and the IFSR, provide notice to the defendant as to the statutes and regulations relevant to the charges against him, including definitions of certain terms, in order to inform him as to the nature

---

[17] The defendant also cites *United States* v. *Fishenko*, 2014 WL 4804215, at *8 (E.D.N.Y. 2014), but in *Fishenko*, the parties agreed to strike certain background paragraphs of the indictment at issue.

of these charges. It is difficult to imagine what prejudice providing such notice to the defendant presents.

*Fourth*, there is no merit in the defendant's argument that the Court should strike two of the "to wit" clauses in the Indictment that reference the "government of Iran." (Indictment ¶¶ 19, 23). Specifically, Count Two of the Indictment alleges that the defendant conspired to violate IEEPA, and that:

> It was a part and object of the conspiracy that [the defendant], and others known and unknown, would and did export, reexport, sell, and supply, and cause to be exported, reexported, sold, and supplied, directly and indirectly from the United States, services, to wit, international financial transactions to Iran and to the government of Iran, without first obtaining the required approval of OFAC.

(Indictment ¶ 19).

> Count Three of the Indictment alleges that:

> the defendant, and others known and unknown, did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the government of Iran and Iranian entities . . . .

(*Id.* ¶ 23).

The defendant argues that references to "Iran" or the "government of Iran" are inflammatory and highly prejudicial. This case, however, is about the defendant's violations of the IEEPA by, among other things, exporting, directly or indirectly, financial services to Iran as part of a project agreed upon by the Governments of Venezuela and Iran. Inclusion in the Indictment of financial transactions to the government of Iran or on behalf of and for the benefit of the government of Iran are part of the very allegations against the defendant and should remain within the Indictment because of their core relevance to the charges.

For the foregoing reasons, the defendant's motion to strike certain portions of the Indictment as purported surplusage should be denied.

## II.   SADR'S MOTION TO SUPPRESS SHOULD BE DENIED WITHOUT A HEARING

### A.   The Defendant Is Not Entitled to a Franks Hearing

The defendant contends that multiple search warrants authorizing the seizure and search of various email accounts are invalid because the Government deliberately misled the reviewing court by making a series of false and misleading statements in the warrant affidavits, and by omitting material information from the affidavits.  (*See* Eighth Mot.).  This motion should be denied without a hearing because the defendant has failed to offer any support for these allegations and makes no showing that the affidavits intentionally contained any material misrepresentations or omissions.

### 1.   Factual Background

This case originated as an investigation by the New York County District Attorney's Office ("DANY") into illicit U.S. dollar payments made through banks in Manhattan in furtherance of a scheme to evade U.S. sanctions against Iran.  As part of this investigation, DANY investigators identified numerous email accounts that appeared connected to the investigation.

On April 16, 2014, the Honorable Michael Obus, Justice of the Supreme Court, New York County, issued several search warrants (the "April 2014 Warrants") authorizing DANY to obtain and search the contents of sixteen target email accounts hosted by Microsoft, Google, Yahoo, and Media Layer.  Six of the accounts were linked to the defendant; the other ten accounts belonged to relatives and associates of the defendant, as well as other individuals linked to the complex criminal scheme outlined in the search warrant affidavit.  The April 2014 Warrants identified the crimes for which the affidavit had established probable cause (Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records, and an attempt and conspiracy to commit said

crimes); described the places to be searched (specified target email accounts); and specified the items to be seized (*e.g.*, subscriber and account information, sent and received email messages, attachments, and log-in data "which shows or tends to show" either the identity of the user, or involvement in the enumerated crimes).   The April 2014 Warrants did not contain any date restrictions.

In support of the application for the April 2014 Warrants, DANY Supervising Investigator Santiago Batista submitted a detailed, 19-page affidavit (the "April 2014 Affidavit") (Defense Exhibit A).  First, the April 2014 Affidavit set forth Supervising Investigator Batista's training and experience investigating white collar crime, including international money laundering and bank fraud investigations, many of which involved the illicit movement of U.S. currency in violation of United States Office of Foreign Assets Control ("OFAC") sanctions against Iran.  (Def. Ex. A ¶ 1). The affidavit then identified the accounts to be searched, the evidence to be seized, and the New York State crimes for which the investigation had established probable cause: Money Laundering, under Article 470 of the Penal Law; Offering a False Instrument for Filing and Falsifying Business Records, under Article 175 of the Penal Law, as well as an attempt and conspiracy to commit said crimes.  Next, the Affidavit provided an overview of DANY's investigation and the evidence and information gathered in support of probable cause to seize and search the target email accounts. (*Id.* ¶¶ 2, 5-9).  In detail, it outlined a highly complex, multinational criminal scheme to move millions of dollars through and into the United States with the apparent intent to evade U.S. economic sanctions laws and regulations by using a series of front companies and bank accounts located in Switzerland and elsewhere, as well as other non-transparent means.  Last, the affidavit showed how the various target accounts were linked to the criminal scheme and used by its participants.  (*Id.* ¶¶ 45-53).

Two months later, on June 16, 2014, DANY sought and obtained search warrants for three additional accounts linked to the defendant: an Apple iCloud account associated with the email address ali-sadr@hotmail.com; an email account hosted by Google (sadrhas@gmail.com); and an email account hosted by Microsoft (sadrhasemi@hotmail.com) (the "June 2014 Warrants") (Def. Ex. B, Warrants).  The June 2014 Warrants also were signed by the Honorable Michael Obus, Justice of the Supreme Court, New York County.  (*Id.*).  The June 2014 Warrants identified the crimes for which the affidavit had established probable cause (Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records, and an attempt and conspiracy to commit said crimes); they described the place to be searched (the specified target accounts); and specified the items to be seized (e.g., subscriber and account information, sent and received email messages, attachments, and log-in data "which shows or tends to show" either the identity of the user, or involvement in the enumerated crimes).  The June 2014 Warrants did not contain any date restrictions.  (*Id.*).

In support of the application for the June 2014 Warrants, Supervising Investigator Batista again submitted a detailed affidavit focused on the target email accounts and how they were being utilized in connection with the criminal scheme outlined in the April 2014 Affidavit to commit the crimes of Money Laundering under Article 470 of the Penal Law, and Offering a False Instrument for Filing and Falsifying Business Records, under Article 175 of the Penal Law.  (Def. Ex. B, Affidavit).  The June 2014 Warrant incorporated by reference the April 2014 Warrants and Affidavit, but also included an overview of the investigation and evidence and information gathered.  (*Id.* ¶ 5).    Additionally, it identified and quoted several emails obtained pursuant to April 2014 Warrants, which included emails sent to and from the target accounts sought by the June 2014 Affidavit, and which pertained to the specified conduct under investigation, including

emails referencing (1) participants in the Venezuelan project under investigation; (2) Iranian entities involved in the project and associated with the defendant; and (3) efforts to transfer U.S. dollars and to convert them into other currencies related to the "Project" and "Project Owner." (*Id.* ¶¶ 6, 8). In addition, the Affidavit identified emails sent to the target email accounts that attached bank statements for Swiss bank accounts the defendant controlled, which were funded by entities controlled by the defendant, his family, and their companies in Iran, as well as an email containing a spreadsheet of U.S. dollar amounts owed to employees of the Venezuela project "to be handled from Iran." (*Id.* ¶ 13).

Later, on October 21, 2015, DANY obtained a follow-up search warrant for one of the defendant's target email accounts included in the April 2014 Warrants (the ali.sadr.h@gmail.com account, or "gmail Account"). This warrant again was signed by Justice Obus (the "October 2015 Warrant"). The October 2015 Warrant identified the crimes for which the affidavit had established probable cause (Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records, and an attempt and conspiracy to commit said crimes); it described the place to be searched (the gmail Account); and specified the items to be seized (*e.g.*, subscriber and account information, sent and received email messages, attachments, and log-in data "which shows or tends to show" either the identity of the user, or involvement in the enumerated crimes). The October 2015 Warrant authorized the search and seizure of material only from April 16, 2014 to the date of the warrant, October 21, 2015 (*i.e.*, the period that had elapsed since the April 2014 Warrants).

In support of the application for the October 2015 Warrant, Supervising Investigator Batista submitted a detailed affidavit (Defense Exhibit C) showing that the gmail Account was being used to commit the crimes of Money Laundering under Article 470 of the Penal Law, and Offering a False Instrument for Filing and Falsifying Business Records, under Article 175 of the

Penal Law.  (Def. Ex. C ¶ 1).  The October 2015 Warrant incorporated by reference the April 2014 Warrants and Affidavit, as well as three additional warrants and affidavits, dated October 2, 2014, February 17, 2015, and October 2, 2015.  (*Id.* ¶ 5).  The October 2015 Affidavit included an overview of the investigation and evidence and information gathered, and identified several emails from the gmail Account dated between February 2010 and December 2014 demonstrating, among other things (i) that the defendant was one of the beneficial owners and operators of the IIHC, which was the subject of the investigation, as well as of the primary front company, whose bank account in Switzerland was used to receive money on behalf of IIHC; (ii) that the defendant acted to hide the involvement of any Iranian entity and persons in the Venezuelan Project and to hide U.S. dollar-denominated payments related to the Project; and (iii) that payments related to the project in fact were being made in U.S. dollars.  (*Id.* ¶¶ 6-11, 12, 14).

### 2. Applicable Law

A search warrant affidavit is presumed reliable.  *See Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008).  "The task of a reviewing court is simply to ensure that the totality of the circumstances afforded the [issuing judge] a substantial basis for making the requisite probable cause determination."  *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (internal quotation marks omitted).

"In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  *United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164-72).  These circumstances are quite limited, however.  *See United States* v. *Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  Every statement in a warrant affidavit does not have to be true.  *See United States* v. *Lahey*, 967 F. Supp. 2d 698, 708 (S.D.N.Y. 2013).  To invoke

the *Franks* doctrine and successfully challenge the validity of a search warrant affidavit, the defendant must demonstrate that (i) there were intentional misstatements or omissions in the search warrant affidavit, and (ii) those misstatements or omissions were material. *See Klump*, 536 F.3d at 119. The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *Id.* "The *Franks* standard is a high one." *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991).

With respect to the intent requirement, to find that there were intentional misstatements or omissions in the search warrant affidavit, the "reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *Awadallah*, 349 F.3d at 68). Thus, a misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18. Moreover, an affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical'" and "an inference [of reckless disregard for the truth] is not to be automatically drawn simply because a reasonable person would have included the omitted information." *Rajaratnam*, 719 F.3d at 154 (citation and brackets omitted). Instead, the test is subjective. "To prove reckless disregard for the truth, the defendant[ ] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Id.*

With respect to materiality, a misstatement or omission is material if it is "necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718 (internal citation and quotation marks omitted). "To determine if misrepresentations or omissions are material, a court

corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711.  "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718.  In particular, in assessing whether an alleged omission was material, courts look to "whether the omitted information was 'necessary to the finding of probable cause,' and not just what might have been relevant to that finding, let alone of interest to a magistrate judge." *United States* v. *Vilar*, 2007 WL 1075041, at *27 (S.D.N.Y. 2007) (quoting *Franks*, 438 U.S. at 156).  Ultimately, "the defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States* v. *Levasseur*, 816 F.2d 37, 43-44 (2d Cir. 1987) (quoting *United States* v. *Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)).

Finally, a defendant is not entitled to a hearing on the truthfulness of an affidavit.  The defendant must first make a "'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155-56, 170-71).  Thus, "to avoid fishing expeditions into affidavits that are otherwise presumed to be truthful," *id.*, for a court "to award an evidentiary hearing" on the basis of *Franks*,

> [t]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses

should be furnished, or their absence satisfactorily explained.  Allegations
of negligence or innocent mistake are insufficient.

*United States* v. *Brown*, 676 F. Supp. 2d 200, 226 (S.D.N.Y. 2009) (quoting *Franks*, 438 U.S. at

171) (internal quotation marks omitted)).

As a result, "[t]he burden to obtain a [*Franks*] hearing is a heavy one, and such hearings

are exceedingly rare." *United States* v. *Melendez*, 2016 WL 4098556, at *7 (S.D.N.Y. 2016); *see*

*also United States* v. *Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) ("Hearings under *Franks*

are not freely granted."); *United States* v. *Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A

defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *see also*

*United States* v. *Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove,

and thus *Franks* hearings are rarely held.").

### 3.     Discussion

The defendant's motion identifies a number of factual statements contained in the search

warrant affidavits that the defendant alleges, in conclusory fashion, were intentionally false and

misleading, and identifies several omissions that the defendant contends were material and

designed to mislead the issuing court.  (*See* Eighth Mot.).  But the defendant's motion fails both

prongs of the *Franks* standard—intent and materiality—and falls far short of meeting the burden

to obtain a hearing.  The alleged misstatements and omissions the defendant identifies were neither

false nor misleading, and the defendant offers no credible or probative evidence to the contrary.

The defendant makes no showing, let alone a *substantial* showing, that the claimed misstatements

or omissions were the result of the affiant's deliberate falsehood or reckless disregard for the truth.

Moreover, even if the defendant's allegations were true, the defendant makes no showing that the

issuing court in fact was misled, as the affidavits contain ample other unchallenged evidence

supporting the probable cause findings.  In short, the defendant's motion fails every aspect of the *Franks* standard to obtain a hearing.

> **a.  The Defendant's Motion Is Conclusory, Not Supported by Any Evidence, and Does Not Meet the Burden to Obtain a Hearing**

As a threshold matter, the defendant's motion fails to satisfy the essential requirement to obtain a *Franks* hearing because it offers no "credible and probative evidence," *Rajaratnam*, 719 F.3d at 154 (internal quotation omitted), in support of the defendant's various allegations that the affidavits contain factual misstatements or omissions at all, let alone evidence that they were intentional or reckless and material.  Instead, the defendant relies solely on unsupported conclusory assertions that various statements must have been intentionally false.  As a matter of law, that is plainly insufficient.  *See Falso*, 544 F.3d at 125-126.  To obtain a hearing, the defendant must make a "substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-156.  A "substantial preliminary showing" requires a defendant to provide offers of proof, affidavits, or sworn statements.  *Id.* at 171*; Falso*, 544 F.3d at 125-26.  In other words, a defendant must demonstrate why a statement is false, not merely say it is, and must show that the allegedly false statement or omission was made knowingly or with reckless disregard for the truth.  *See Falso*, 544 F.3d at 128.

Here, the defendant's motion is accompanied by no offers of proof, no affidavits or sworn statements, or any other supporting evidence.  The defendant merely asserts that the applications contain numerous "demonstrably false and unsupported statements" which "deliberately misled the reviewing court" (Eighth Mot. at 1), yet fails to demonstrate how or why each is false in the first instance, and offers no "credible and probative evidence" that the "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth."

*Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *Canfield*, 212 F.3d at 717-18. Accordingly, the defendant's conclusory allegations and request for a hearing resembles the "fishing expedition" the *Franks* standard explicitly is intended to avoid, and the defendant's motion should be denied on this basis alone.  *See Falso*, 544 F.3d at 125.

> **b.     The Affidavits Do Not Contain False or Misleading Information or Omit Material Facts**

An examination of the substance of the defendant's arguments and allegations fairs no better as, even on their face, they fail to establish the intent and materiality components of the *Franks* standard.  But first, the defendant has not established even that the affidavits even contained false or inaccurate information, or omitted essential information, at all.

The defendant's motion principally challenges the affidavit supporting the April 2014 Warrants.  (*See* Def. Ex. A).  From a 19-page, single-spaced affidavit filled with facts and information about the criminal scheme ultimately charged and outlined in the Indictment, as well as the defendant's central role and involvement, the defendant identifies approximately 12 statements that he alleges are false or inaccurate, and inflates them with rhetoric by characterizing them as "inflammatory" and "deeply consequential."  Setting aside for the moment the truth or accuracy of the alleged misstatements, it is essential to recognize at the outset that "every statement in a warrant affidavit does not have to be true," and that "the Government need not prove the precision of every detail in a challenged search warrant affidavit, because an affiant is entitled to engage in selective storytelling."  *Lahey*, 967 F. Supp. 2d at 716 (citing *Vilar*, 2007 WL 1075041, at *27).  Instead, "the burden is on the defendant to demonstrate that a specific statement or detail is false."  *Id.*  Here, the defendant plainly has not done so.

The defendant first identifies four factual statements contained in the April 14, 2014 search warrant affidavit that he alleges not only were false and misleading, but were intentionally or recklessly included to mislead the issuing court:

1. The defendant's family had "substantial ties to the government of Iran."  (Def. Ex. A ¶ 5).

2. The defendant, his company (Clarity), his family, and his father's company (Stratus Group) had "links" to "entities that have been sanctioned by OFAC . . . for supporting Iran's nuclear program, proliferation activities, and support of terrorism."  (Def. Ex. A ¶ 29).

3. "[T]here is reason to believe that some of the funds transferred are for covert projects between the government of Iran and Venezuela outside the scope of the Project." (Def. Ex. A ¶ 5).

4. "[E]ntities involved in the Project engaged in large, U.S.-dollar transactions between Venezuela and Iran . . . involving a variety of non-transparent entities, banks in high-risk jurisdictions, and . . . Swiss bank accounts."  (Def. Ex. A. ¶ 5).

(*See* Eighth Mot. at 7-11).

The defendant also identifies additional factual "inaccuracies and inconsistencies" which he concedes are not material (thereby failing the second *Franks* prong), but which he asserts nonetheless "reflect a systemic pattern of intentional or reckless disregard for the truth," including:

5. The defendant filed only one Report of Foreign Bank and Financial Accounts ("FBAR") with the Internal Revenue Service ("IRS") despite having an interest in numerous offshore entities.  (Def. Ex. A ¶ 44).

6. The IIHC is an "ostensibly private entity."  (Def. Ex. A ¶ 5).

7. An informant believed that "representatives of the IIHC" at a meeting he attended in Venezuela were "Iranian government officials." (Def. Ex. A ¶ 9.)

8. The affidavit's description of transactions involving certain entities allegedly on the OFAC Specially Designated Nationals ("SDN") list that are unrelated to the defendant and the project in Venezuela.  (Def. Ex. A ¶18).

(*See* Eighth Mot. at 12-16).

The defendant further identifies four additional statements that he does not allege are false, but which he believes are misleading because, in his view, they are irrelevant and, when strung together, lead to a false implication:

9.  Individuals and entities connected to the project in Venezuela had previously been subject to U.S. and international sanctions.  (Def. Ex. A ¶ 5.)

10.  OFAC publishes a specially designated national (SDN) list, which includes individuals, groups, and entities, such as terrorists and narcotics traffickers.  (Def. Ex. A ¶ 5 n. 5.)

11.  The description of incidents unrelated to the project in Venezuela where PDVSA, the Venezuelan state-owned entity responsible for making the U.S. dollar payments for the project engaged in other transactions designed to evade U.S. sanctions laws. (Def. Ex. A ¶ 8.)

12.  The description of the defendant's leadership position at a Maltese bank, and that OFAC previously had sanctioned Maltese entities for acting as fronts for sanctioned Iranian entities.  (Def. Ex. A ¶ 34 n. 12.)

(Eighth Mot. at 12-13).  The defendant makes no showing, and offers no evidence, that any of these statements is false or inaccurate.  In fact, the defendant acknowledges that nearly half are true; he simply believes that they necessarily misled the issuing court because, in his view, they were not relevant, or, when grouped together, they painted a misleading picture.  But this argument (which is factually wrong) finds no support in the *Franks* case law as a basis to invalidate a warrant. A *Franks* challenge must be based on intentional or reckless misstatements of *fact*; not on the inclusion of true but arguably irrelevant or misleading information.  *See Id.* ("[a]n affiant is entitled to engage in selective storytelling . . . . [T]he burden is on the defendant to demonstrate that a specific statement or detail is false." (citing *Vilar*, 2007 WL 1075041, at *27)).

Nevertheless, each statement in this category indeed was relevant to the narrative in the warrant affidavit, which outlined a sprawling, multinational criminal scheme to illicitly move U.S.

dollars through banks located in New York, and which involved the governments of Iran and Venezuela, entities and individuals in each country, and entities and bank accounts located in offshore jurisdictions like Switzerland, Saint Kitts & Nevis, and Malta.  In effect, the defendant is arguing that his version of events is different and that, in his view, various information included in the warrant affidavit is not relevant or is prejudicial.  But that is an argument for trial, not a basis to invalidate a search warrant pursuant to *Franks*.

Similarly, none of the statements the defendant alleges to be false in fact is untrue.  Rather, the defendant appears to believe that most are not fully accurate or fair characterizations.  The only statement that he forcefully alleges is "entirely false"—that he had filed only one FBAR with the IRS at the time of the affidavit—not only is immaterial in the context of the whole affidavit, as he acknowledges (Eighth Mot. at 10), but was accurate based on the information available at the time the warrant was issued.  As of April 16, 2014, only one FBAR filed by the defendant with the IRS was available to law enforcement based upon a search of the relevant United States Department of the Treasury database.[18]  Accordingly, this statement, while later revealed to be inaccurate, was not false at the time (and certainly not deliberately so), as the defendant contends, and in fact was entirely accurate based on available information.

The remaining six allegedly false and misleading statements all fall into one of three categories: (i) true statements of fact supported by the evidentiary or public record; (ii) accurate and fair characterizations of the evidence based on available information; (iii) accurate descriptions of an informant's statement of belief; or (iv) sufficiently qualified statements of belief.

---

[18] The defendant had filed two additional FBARs prior to June 16, 2014, but these records were not available on the Treasury's database until August  and December 2014, respectively—after the date of the initial warrant and affidavit.

*See Falso*, 544 F.3d at 127 (issuing court not misled by statements that were qualified by "it appears").  An example of the first category is the challenged statement that the defendant, his company (Clarity), his family, and the Stratus Group had "links" to "entities that have been sanctioned by OFAC . . . for supporting Iran's nuclear program, proliferation activities, and support of terrorism."  (Def. Ex. A ¶ 29.)  This statement is true and accurate.  The Stratus Group—the entity founded by the defendant's father and for which the defendant worked in various capacities—owned and/or controlled both Eghtesad Novin Bank (EN Bank), a Tehran-based bank, and Oriental Oil Kish, an Iranian energy company, and publicly advertised these facts on its website.  OFAC designated EN Bank as an SDN in July 2012, during the period of the alleged conspiracy, and the defendant sat on the bank's board of directors.  OFAC designated Oriental Oil Kish as an SDN in October 2007, also during the period of the alleged conspiracy.  Significantly, Oriental Oil Kish was designated pursuant to Executive Order 13382, aimed at proliferators of weapons of mass destruction ("WMD") and their supporters, for its close ties to the Islamic Revolutionary Guard Corps ("IRGC"), also designated as an SDN for its proliferation of WMD.  Accordingly, the challenged statement is accurate and is based on information in the public record.

An example of the second category—accurate and fair characterizations based on available information—is the challenged statement that the defendant's family had "substantial ties to the government of Iran."  (Def. Ex. A ¶ 29.)  The defendant's family, and the companies they owned and controlled, unquestionably had ties to the Iranian government, and this is supported by the evidentiary and public record.  In the context of the Venezuelan Project alone, the record established that the Stratus Group and its subsidiary entity IIHC led a consortium of companies awarded the construction contract in Venezuela by the government of Iran; Iranian government ministers visited the project site in Venezuela; and IIHC representatives enlisted the Iranian

ambassador to Venezuela to intervene on their behalf to resolve various disputes between IIHC and the Venezuelan Subsidiary (*i.e.*, DUCOLSA) related to the project.  Thus, on that basis alone (setting aside evidence outside the scope of the project of connections between the defendant's family and companies and the Iranian government), it is fair to characterize the defendant and his family (either directly, or through their companies) as having "substantial ties to the government of Iran."   Again, the defendant may disagree with this characterization, or with the use of "substantial" in lieu of some other adjective to describe the relationship over time, but it certainly is not a demonstrably false or inaccurate statement.

The one example of the third category—accurate descriptions of an informant's statement of belief—is the allegedly false statement that an informant believed that "representatives of the IIHC" at a meeting he attended in Venezuela were "Iranian government officials." (Def. Ex. A ¶ 9.)  But *Franks* made explicit that the standard it set forth to challenge the validity of a warrant based on deliberate falsity or reckless disregard for the truth must be "that of the affiant, not of any nongovernmental informant."   *Franks*, 438 U.S. at 171; *cf. Corona* v. *Lunn*, 2002 WL 550963, at *6 (S.D.N.Y. 2002) (*Franks* claims based on omissions less likely to justify suppression, particularly where information concerns the credibility of sources of information).  And this makes sense because the basis for the rule is to ensure that issuing courts are not knowingly or recklessly misled by the government.  As discussed below, the defendant makes no showing that the affiant had any reason to doubt this statement, let alone that he knew it was false or acted in reckless disregard of the truth.

Last, the defendant challenges multiple statements that included qualifying language and, thus, were not presented as statements of absolute fact, but rather reflections of what DANY believed to be true at the time based on its investigation.  For example, the April 16, 2014 affidavit

states that "*there is reason to believe* that some of the funds transferred are for covert projects between the government of Iran and Venezuela outside the scope of the Project." (Def. Ex. A ¶ 5.) Similar, it states that IIHC was an "*ostensibly* private entity." (*Id.*) As the Second Circuit observed in *Falso*, "it is hard to understand how the [issuing] court could have been misled" by qualified statements such as these, 544 F.3d at 127, precisely because they are not statements of absolute fact, but, rather, signal to the court that they are based on reasonable inferences and may or may not ultimately prove to be true. In any complex investigation, the investigators' information and belief evolves and shifts over time. These statements, like the rest of the information contained in the affidavits, represent the investigator's best effort to describe relevant facts, information, and beliefs at a certain point in time. "The Government need not prove the precision of every detail in a challenged search warrant affidavit." *Lahey*, 967 F. Supp. 2d at 716 (citing *Vilar*, 2007 WL 1075041, at *27). Rather, "the burden is on the defendant to demonstrate that a specific statement or detail is false." *Id.* Here, the defendant makes no showing, and offers no credible, probative evidence that these statements are not in fact entirely true.

In addition to the foregoing alleged misstatements, the defendant also contends that the affidavits contained certain material omissions. (Eighth Mot. at 11-13). Upon inspection, however, none of the alleged omissions is an omission of necessary factual information. Instead, they are omissions of self-interested legal conclusions, arguments, and facts, which the defendant believes are relevant and should have been included in the search warrant affidavits. But this is not a proper basis upon which to challenge a search warrant under *Franks*. *Cf. United States* v. *Reilly,* 76 F.3d 1271 (2d Cir. 1996) (good faith exception did not apply where affiant knew certain facts that would undermine probable cause yet failed to provide these facts to the issuing court). Again, these arguments are more suitable for trial or, as is the case here, for other motions; they

71

do not support holding a *Franks* hearing.  There is no obligation to include in a search warrant affidavit immaterial information that does not undercut probable cause, nor is there any obligation to include interpretations of federal regulations (particularly where, as here, a state court issued the warrants based on probable cause to believe state crimes had been committed).

Ultimately, "every statement in a search warrant affidavit does not have to be true," and "[a]ll storytelling involves a level of selectivity" such that not all arguably relevant information need be included in an affidavit.  *Lahey,* 967 F. Supp. 2d at 708 (internal quotations omitted).  In the context of a multi-year investigation into a complex international scheme, the investigation's information necessarily is going to evolve, and different facts and information will be included in different search warrant affidavits.  *See id.* at 716 ("The fact that the Government chose to include different information in different search warrant affidavits is hardly surprising.").  The ultimate issue is not whether certain facts prove to be true or false, or whether information that was omitted "in retrospect, seem[s] significant."  *Id.* at 708.  The fundamental issue is whether deliberately or recklessly false information or omissions were used to obtain a search warrant, and whether they were necessary to the issuing court's probable cause finding.  The defendant cannot make any of these showings.

### c.    The Motion Does Not Make Any Showing of Intentional or Reckless Misstatements or Omissions

Even assuming, for the sake of argument, that any of the statements or omissions identified by the defendant were in fact false and misled the issuing court (they were not and did not), the defendant has not met his burden of showing that the affiant made the alleged misrepresentations and omitted material information knowingly or recklessly—*i.e.*, with the intent to mislead the court.  *See Falso*, 544 F.3d at 128.  The defendant has failed to make any showing, let alone a "substantial preliminary showing," that the "claimed inaccuracies or omissions are the result

72

of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18.

Rather, without any "credible and probative evidence" of impropriety, *Rajaratnam*, 719 F.3d at 154, the defendant is left with only the grasping, speculative, and conclusory arguments that (i) the affiant must have intended to mislead the issuing court because certain allege misstatements were "deeply consequential" and were omitted from later search warrant applications, thereby evincing an acknowledgement that the prior April 16, 2014 affidavit was "false" and "deceitful;" (ii) the failure to specify that OFAC designated EN Bank as an SDN in July 2012 showed a "reckless disregard for the truth and an effort to knowingly mislead the issuing judge;" (iii) the inclusion of "tenuous and unrelated" information "knowingly misled the issuing court by distracting it from the lack of probable cause;" and (iv) the nakedly conclusory assertion that the omission of the defendant's interpretation of certain OFAC regulations "intentionally or recklessly misled the issuing court." (Eighth Mot. at 7-11).

Such bald assertions based on mere conjecture and with no evidentiary basis cannot satisfy the burden of making a "'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125, 128 (defendant offered only conjecture, no offer of proof or evidence). As stated above, the unsurprising fact that two warrant affidavits separated by 18 months contained different information fails to establish any intent by the affiant, let alone a retrospective acknowledgement of improper intent. *See, e.g.*, *Lahey*, 967 F. Supp. 2d at 716 ("The fact that the Government chose to include different information in different search warrant affidavits is hardly surprising, and the Government's selective storytelling does not call into question the validity of either affidavit" (internal quotation

marks omitted)).   Similarly, the defendant's arguments that because a fact was "deeply consequential" and an omission was "material" they therefore must have been intended to mislead the issuing court conflates the two separate *Franks* prongs of materiality and intent—a conflation the Second Circuit has rejected.  *See Rajaratnam*, 719 F.3d at 154  (an affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical'" and "an inference [of reckless disregard for the truth] is not to be automatically drawn simply because a reasonable person would have included the omitted information." (citation and brackets omitted)).

Ultimately, the defendant's motion fails because he has offered nothing beyond conclusory assertions—he makes no offer of proof, includes no affidavits or sworn statements, and offers no evidence in any form to support his allegation that any statement or omission contained in the search warrant affidavits was intentionally false or that "the affiant in fact entertained serious doubts as to the truth of his allegations."  *Id.*

> ### d.      The Alleged Misstatements and Omissions Were Not Material to the Findings of Probable Cause

Last, even assuming, *arguendo*, that that the affidavits contained false and misleading facts and omissions *and* that those misstatements and omissions were made knowingly or recklessly, the defendant's motion also fails the materiality test—*i.e.*, those alleged misstatements and omissions were not necessary to the findings of probable cause.  The search warrant affidavits still contained ample information supporting the probable cause findings—*i.e.*, putting aside the allegedly erroneous information and material omissions, "there remains a residue of independent and lawful information to support probable cause," *Canfield*, 212 F.3d at 718 (internal quotation marks omitted).

Critically, the defendant does not challenge the vast bulk of the abundant information contained in the 19-page April 16, 2014 warrant affidavit, which outlines in tremendous detail the scope of DANY's investigation into the criminal conduct outlined, including:

1. There was a multi-million dollar infrastructure project in Venezuela involving the Venezuela state-owned energy company PDVSA, its subsidiary entity DUCOLSA, and the Tehran-based IIHC.

2. A contract was signed between DUCOLSA and IIHC for $475 million.

3. The contract was entered into pursuant to an agreement between the government of Venezuela and the government of Iran.

4. IIHC is part of the Stratus Group, an Iranian conglomerate controlled by the defendant's family, the Sadr Hashemi Nejads.

5. IIHC began construction on the project in 2011.

6. U.S. dollar payments for the project were made by PDVSA to IIHC and were processed through correspondent banks located in New York, New York, in ways that appeared designed to circumvent U.S. sanctions laws by moving Iranian money through U.S. banks and obscuring the involvement of Iranian end-users.

7. U.S. dollar payments to IIHC went to Swiss bank accounts controlled by the Stratus Group and members of the Sadr Hashemi Nejad family, including the defendant.

8. The project was suspended in 2011 over a payment dispute between PDVSA and IIHC.

9. The head of DUCOLSA told an informant that sanctions against Iran made it impractical to pay for the project in U.S. dollars, and that the head of DUCOLSA repeatedly had requested that the Iranians accept Bolivars.

10. An Iranian IIHC representative pressured the informant to help facilitate payments from PDVSA/DUCOLSA to IIHC in U.S. dollars.

11. On July 22, 2011, IIHC sent DUCOLSA a letter instructing DUCOLSA that, "[i]n view of the current difficulties for transfer and movement of funds and to facilitate the process we already appointed Clarity to act as our agent receiving the payment of IPCs [project-related payments]," and instructing DUCOLSA to make U.S. dollar payments to a Clarity Trade & Finance S.A. bank account at a Swiss bank through a bank located in New York.

75

12. Sadr was the Director of Clarity and was the signatory on the account at the Swiss bank.

13. On July 27, 2011, DUCOLSA officials instructed PDVSA officials to pay IIHC approximately $5.4 million via Clarity pursuant to the routing instructions provided by IIHC in the July 22, 2011 letter.

14. On November 15, 2011, DUCOLSA officials instructed PDVSA officials to pay IIHC approximately $12.3 million via Clarity's Swiss bank account pursuant to the same routing instructions through the United States.

15. PDVSA sent multiple U.S. dollar wires to Clarity's Swiss bank account through the United States, consistent with the payment instructions provided in the IIHC letter of July 22, 2011: (i) a July 5, 2011 payment in the approximate amount of $20.7 million; (ii) an October 12, 2011 payment in the approximate amount of $5.8 million; (iii) a February 23, 2012 payment in the approximate amount of $7.4 million; and an April 13, 2012 payment in the approximate amount of $15.8 million.

16. According to the Stratus Holdings (Iran) website, an Stratus Global Investments held controlling interests in Stratus International Co. in Tehran, First Canton General Trading LLC in Dubai; Clarity Trade & Finance S.A. in Switzerland; and TMD Systems; among other entities.

17. On April 28, 2011, First Canton sent approximately $22 million to the Swiss bank account of Stratus Global Investments.

18. Sadr was the signatory on the Swiss bank account of SGI.

19. Sadr was the CEO of Stratus International Contracting Company, which was another name for Stratus International Co.

20. Sadr's father was the Chairman and founder of the Tehran-based Stratus Holding Group.

21. Stratus Group Holdings was an owner of EN Bank, which was a bank on OFAC's specially designated nationals (SDN) sanctions list, and Mohammad Sadr was on the board of directors of EN Bank.  Some of EN Banks' other shareholders also were on the OFAC SDN list.

22. The Stratus Group also owned a controlling interest in Oriental Oil Kish, an Iranian energy company that has been on the OFAC SDN list since 2008.

23.  Many of the Venezuela Project-related entities held bank accounts at the same bank in Switzerland and the defendant was the signatory on all of the accounts, including accounts in the name of: (i) the defendant individually; (ii) Clarity; (iii) Stratus Global Investments; (iv) Stratus International Contracting; (v) Straturk; and (vi) Perse Swiss.

24. Multiple transactions using these Swiss bank accounts appeared designed to camouflage the source of the funds and to avoid mandatory reporting requirements under U.S. law.

25. In 2012 and 2013, bank accounts in California that we controlled by one of Sadr's relatives received more than $1 million from Clarity and Stratus Global Investments bank accounts the defendant controlled, with the apparent purpose of purchasing property in California with U.S. dollar funds from Clarity and SGI during the period of the Venezuela project.

26. Sadr incorporated an entity in Maryland called A&R Capital Partners in 2008.  The email address ali.sadr@ar-capital.com was listed as a contact on the A&R website.  The defendant was a signatory on the A&R bank account, and there was significant U.S. dollar activity between A&R and Clarity and Stratus Global Investments' accounts in Switzerland during the period of the Venezuela project, as well as payments from the A&R account to Iranian employees of IIHC.

27. A review of bank records showed layers of financial transactions and co-mingling of funds between various business and personal accounts controlled by the defendant that appeared designed to disguise the audit trail and to disassociate the funds from their Iranian source, and allowing the funds to be integrated into the U.S. financial system.

28. Sadr registered the ali.sadr.@ar-capital.com email account and provided a contact email account of ali.sadr.h@gmail.com.  There was activity and usage on the ar-capital.com email address between 2008 and 2013, during the period of the Venezuela project, and during the period of financial transactions between the Clarity and Stratusu Global Investments bank accounts in Switzerland and the A&R bank account.

29. The ali.sadr.h@gmail account was an active gmail account registered in the defendant's name.  Google records showed frequent logins and IP activity up to the date of the search warrant affidavit.

30. The defendant listed the ali.sadr@hotmail.com email account as the secondary account on the ali.sadr.h@gmail.com account.  The Hotmail account was opened in 2000 and was an active account as of the date of the warrant affidavit.

(Def. Ex. A ¶¶ 5, 7- 9, 14-15, 17, 21, 27, 30-32, 37-38, 41, 43, 51, 53).

Collectively, these allegations establish probable cause to believe that Sadr was engaged in criminal conduct designed to evade U.S. sanctions by falsifying records and disguising the criminal nature of U.S. dollar payments flowing through banks in New York.  Set against this highly detailed narrative about the background and context of the infrastructure project in Venezuela—including the governments, entities, and individuals involved; the defendant's unique role in controlling the critical entities and bank accounts used to move Iranian funds through the United States, and ultimately back into the United States; the intricate connections between the defendant's entities, his family's entities, and the entities involved in the project; the significant movement of funds between these entities with the apparent intent to obscure the transactions; and the various email accounts linked to these entities and to the defendant—the handful of allegedly false statements identified by the defendant, even if deliberately or reckless false, could not have tipped the balance in the issuing court's finding of probable cause because, even when set aside, there remains an abundance of information supporting that finding.

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711.  In particular, in assessing whether an alleged omission was material, the Court looks to "whether the omitted information was 'necessary to the finding of probable cause,' and not just what might have been relevant to that finding, let alone of interest to a magistrate judge." *Vilar*, 2007 WL 1075041 at *27 (S.D.N.Y. 2007) (quoting *Franks*, 438 U.S. at 156).  "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id*. (internal quotation marks and citation omitted).  Under this standard, the unchallenged facts and information outlined above establish far more than a "residue" of

information supporting probable cause, regardless of whether any alleged omission might have been interesting or relevant in the defendant's view.

Accordingly, the defendant's arguments also fail the materiality prong of the *Franks* standard.  To merit a hearing, the defendant must establish both components—intent and materiality.  *Id*.  Here, the defendant has made no showing, let alone the necessary "substantial preliminary showing" to overcome the presumption of a search warrant's validity, and his request for a hearing should be denied.  *See Falso*, 544 F.3d at 125.

### B.  The Search Warrants Do Not Lack Particularity and Are Not Overbroad

The defendant also contends that the warrants authorizing the seizure and search of his email accounts violated the Fourth Amendment's particularity and overbreadth requirements, primarily because the warrants authorize the seizure of all emails in the accounts and contained no temporal restrictions.   (Eighth Mot. at 17-21).   However, the warrants satisfied all three particularity requirements enumerated by the Second Circuit—they specified the offenses for which the government had established probable cause; they identified the places to be searched (specified email accounts); and they identified the items to be seized (*e.g.*, subscriber information and sent and received messages involving the specified offenses).  And the breadth of the warrants was supported by the broad nature of the government's investigation and the probable cause outlined in lengthy affidavits, which detailed a highly complex, multi-year criminal scheme involving numerous companies, bank accounts, and email accounts controlled and used by the defendant.

### 1.  Applicable Law

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  **Probable cause**

is a "fluid concept" turning "on the assessment of probabilities in particular factual contexts," and as such is not "readily, or even usefully, reduced to a neat set of legal rules." *Falso*, 544 F.3d at 117 (quoting *Illinois* v. *Gates*, 462 U.S. 213, 232 (1983) (internal quotation marks omitted)). Rather, probable cause is a "flexible, common-sense standard" that requires a case-by-case analysis of the totality of the circumstances. *Texas* v. *Brown*, 460 U.S. 730, 742 (1983); *see also Gates*, 462 U.S. at 230. In evaluating probable cause in any given case, a judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Falso*, 544 F.3d at 117 (quoting *Gates*, 462 U.S. at 238). In close cases, where the existence of probable cause is in doubt, resolution "should be largely determined by the preference to be accorded to warrants." *United States* v. *Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (internal quotation marks omitted). Moreover, "a court reviewing a challenged warrant—whether at the district or appellate level—must accord considerable deference to the probable cause determination of the issuing magistrate." *Clark*, 638 F.3d at 93 (internal quotation marks omitted); *see also United States* v. *Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) ("A reviewing court must accord substantial deference to the finding of an issuing officer that probable cause exists . . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause.") (citations omitted).

In addition to its probable cause requirement, the Warrant Clause contains a prohibition against "general warrants." *Andresen* v. *Maryland*, 427 U.S. 463, 480 (1976). "The problem [posed by a general warrant] is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings . . . [the Fourth Amendment addresses the problem] by requiring a

'particular description' of the things to be seized'" as well as the place to be searched.  *Id*. at 480 (quoting *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971)).

To satisfy the particularity requirement, a warrant must:  (i) "identify the specific offense for which the police have established probable cause"; (ii) "describe the place to be searched"; and (iii) specify the items to be seized by their relation to designated crimes."  *United States* v. *Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotation marks omitted).  "The Fourth Amendment does not require a perfect description of the data to be searched and seized."  *Id.* at 100.  Rather, the requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized him or her to seize.  *See Groh* v. *Ramirez*, 540 U.S. 551, 557-59 (2004); *United States* v. *Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).  Additionally, "[t]he degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated."  *United States* v. *Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) (quoting *United States* v. *Regan*, 706 F. Supp. 2d 1102, 1113 (S.D.N.Y. 1989)).  "The type of evidence sought is also relevant; in particular, courts have recognized that documentary evidence may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property."  *Id; see also United States* v. *Scully*, 108 F. Supp. 3d 59, 65-66 (E.D.N.Y. 2015) ("The level of specificity required by the Fourth Amendment depends on many factors, including the nature of the crime, and where complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents.") (internal quotation marks and citation omitted).

The probable cause and particularity requirements intersect in the doctrine of overbreadth. "[A] warrant is overbroad if its 'description of the objections to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'"  *United States* v. *Lustyik*, 57

F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States* v. *Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). Naturally, the broader the crime or crimes under investigation, the broader the categories of documents and records that may properly be seized.  *See, e.g.*, *United States* v. *Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014) (breadth of warrant was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States* v. *Levy*, 2013 WL 664712, at *8 (S.D.N.Y. 2013) (broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit); *United States* v. *Dupree*, 781 F. Supp. 2d 116, 149 (E.D.N.Y. 2011) ("The nature of the crime . . . may require a broad search . . . .").

### 2.    Discussion

The defendant's motion contends that the email search warrants at issue lacked sufficient particularity because they authorized the seizure of entire email accounts and "were not limited to certain date ranges, email recipients/users, domains, subjects, or any other particularized places." (Eighth Mot. at 19).   But the challenged warrants satisfy all three particularity requirements outlined in *Ulbricht*; the cases relied upon by the defendant fail to support his argument; and courts routinely have upheld the search of all emails in an account.  The defendant also contends that the warrants were overbroad because they allowed the full search of the defendant's email accounts "without establishing probable cause to believe the seized materials would contain evidence of the offense alleged in the warrant applications."  (Eighth Mot. at 19).  But the scope of the warrants was supported by lengthy, highly detailed affidavits outlining a complex scheme committed over the course of many years and involving the use of numerous companies and bank accounts by the defendant, which were linked to the target email accounts.  In other words, the breadth of the probable cause supported the breadth of the warrants.

### a.      The Search Warrants Did Not Lack Particularity

The warrants satisfied all three particularity requirements set forth in *Ulbricht*.  First, they identified the specific New York State Penal Law offenses for which law enforcement had established probable cause: Money Laundering, Offering a False Instrument for Filing, and Falsifying Business Records.  *See Ulbricht*, 858 F.3d at 99.  Second, the warrants described the places to be searched: specified target email accounts.  Last, the warrants specified the items to be seized by their relation to the designated crimes.  *See id.*  The warrants limited the seizure of information to certain categories of evidence and records, including subscriber and account information, Internet Protocol log history, sent and received messages, draft email messages, and attachments, which "show[ed] or tend[ed] to show . . . . the identity of the user of the email address and account . . . and  . . . .  involvement in Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records, and an attempt and conspiracy to commit said crimes."  *See Scully*, 108 F. Supp. 3d at 69 (generally, a warrant that authorizes a search for documents and things that constitute evidence of a particular crime is not overbroad); *see also Ulbricht*, 858 F.3d at 100 ("[t]he Fourth Amendment does not require a perfect description of the data to be searched and seized.").  Thus, the warrants were sufficiently particularized under the standard set forth in *Ulbricht*, and did not authorize the "general, exploratory rummaging in a person's belongings" the particularity requirement prohibits, *Andresen*, 427 U.S. at 480 (internal quotation marks omitted).  That should end the matter.

Nonetheless, the defendant contends that the warrants lacked particularity because they authorized the search of the entire contents of his email accounts and lacked temporal restrictions.  Both arguments are unavailing and find no support in the cases cited by the defendant or in the prevailing case law.  First, the lack of any specified date ranges or other temporal restrictions alone

does not render a warrant insufficiently particular, and the cases cited by the defendant do not hold otherwise.  Rather, each case the defendant cites involved warrants that were insufficiently particular because they failed to identify any particular crime for which evidence was sought.  In *United States* v. *Wey*, for example, the warrants "fail[ed] to set forth the crimes under investigation . . . . they neither cite[d] criminal statutes nor in any way describe any suspected criminal conduct." 256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017).  In *United States* v. *Zemlyansky*, the warrant at issue "[did] not direct the searching officers to seize evidence *related to*, or *concerning*, any particular crime or type of crime."  945 F. Supp. 2d 438, 456 (S.D.N.Y. 2013).  Similarly, in *Vilar*, *Cioffi,* and *Galpin*, the deficiency which led to suppression was the lack of any "provision limiting the emails to be seized to those containing evidence of the crimes charge in the indictment or, indeed, of any crime at all."  *Cioffi*, 668 F. Supp. 2d at 389; *see also Vilar*, 2007 WL 1075041, at *22 (S.D.N.Y. 2007) ("nowhere does the Warrant indicate what specific acts of wrongdoing are being investigated); *Galpin*, 720 F.3d at 447 (warrant authorizing officers to search generally for evidence of "NYS Penal Law and or Federal Statutes" violated the *Fourth Amendment* particularity requirement).  Accordingly, in each case, the fatal flaw with the challenged warrants was the "failure to identify the specific offense for which the police have established probable cause." *Ulbricht*, 858 F.3d at 99.  Here, the warrants suffer no such flaw.

While *Wey*, *Zemlyansky*, and other cases cited by the defendant also noted that the lack of a temporal limitation may be "relevant" to the particularity analysis, no court has held that the lack of such a limitation alone renders a warrant insufficiently particular.  For example, the courts in *Wey*, *Vilar*, and *Zemlyansky* merely observed that the lack of such a limitation "reinforce[d]" the conclusion that the warrants at issue already were insufficiently particular, and that the "lack of particularity [was] only compounded by the absence of any date restriction on the items to be

84

seized." *Wey*, 256 F. Supp. 3d at 388 (quoting *Zemlyansky*, 945 F. Supp. 2d at 459-560, and *Vilar*, 2007 WL 1075041, at *23).  Moreover, the court in *Wey* recognized that the "complexity and duration of the alleged criminal activities" in a given case may render temporal limitations "less significant." *Id.* (internal quotation marks omitted).  In other words, while the presence or absence of a temporal limitation may be a secondary consideration, it is not a dispositive factor in determining whether a warrant lacks particularity.

Moreover, here, the lack of temporal limitations was entirely appropriate given the breadth and scope of the conduct under investigation, as outlined in the search warrant affidavits, which justified seeking the entirety of the email accounts.  Accordingly, the defendant's related argument that the challenged search warrants' "sweeping authorization to seize and search the entire contents of [the defendant's] email accounts effectively amounts to no particularization at all" also is unavailing.  (Eighth Mot. at 19).  First, courts routinely have upheld search warrants authorizing the seizure and search of entire email accounts.  *See In re Warrant for* xxxxxxx@gmail.com, 33 F. Supp. 3d 386, 390 (S.D.N.Y. 2014) ("Notably, every case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant.").  As the Second Circuit observed in *Ulbricht*, "a search warrant does not necessarily lack particularity simply because it is broad." *Id.*  The Court reasoned:

> Since a search of a computer is akin to a search of a residence, searches of computers may sometimes need to be as broad as searches of residences pursuant to warrants.  Similarly, traditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the object of the search to at least superficial examination in order to identify and seize those records that are.  And in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast.

*Id.* (internal quotation marks and citation omitted).  Accordingly, "courts have long recognized the practical need for law enforcement to exercise dominion over documents not within the scope of the warrant in order to determine whether they fall within the warrant."  *In re Warrant for* xxxxxxx@gmail.com, 33 F. Supp. 3d at 392.  As the Supreme Court observed in *Andresen*, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized."  427 U.S. at 481 n. 11.  "[A]lowing some latitude in this regard simply recognizes that few people keep documents of their criminal transactions in a folder marked 'drug records.'"  *United States* v. *Riley,* 906 F.2d 841, 845 (2d Cir. 1990).

Significantly, these principles have been applied by courts to digital evidence, including email accounts, as courts have "developed a more flexible approach to the execution of search warrants for electronic evidence."  *United States* v. *Metter*, 860 F. Supp. 2d 205, 214 (E.D.N.Y. 2012) (suppressing evidence based on the Government's "prolonged retention of images of seized electronic data without any review of the data").  This includes the practical need "to access an entire email account in order to conduct a search for emails within the limited categories contained in the warrant."  *In re Warrant for* xxxxxxx@gmail.com, 33 F. Supp. 3d at 392.  Courts have acknowledged that "[s]earches for documents (whether in electronic or paper form) pose unique Fourth Amendment Concerns"  *Metter*, 860 F. Supp. 2d at 213.  "As technology and white collar and other complex criminal litigation evolved," courts have begun to "distinguish between the execution of search warrants seeking physical evidence such as guns and narcotics, and the execution of warrants seeking documents (whether in electronic or paper form)."  *Id.*  Accordingly, while it is true that there is "a heightened sensitivity to the particularity requirement in the context of digital searches," *Galpin*, 720 F.3d at 447, there is a concurrent sensitivity to the need to extend

86

the principle highlighted in *Andresen* and *Riley* to email searches.  While "remain[ing] senstitive to the difficulties associated with preserving a criminal defendant's privacy while searching through his electronic data," the "invasion of a criminal defendant's privacy is inevitable, however, in almost any warranted search because 'in searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'"  *Ulbricht*, 858 F.3d at 103 (quoting *Andresen*, 427 U.S. at 482 n.11).

Accordingly, the instant warrants did not lack particularity simply because they authorized the search of the defendant's entire email accounts to identify the particular evidence outlined in the warrants.

### b.      The Search Warrants Were Not Overbroad

Similarly, the searches and seizures authorized by the challenged warrants were not overbroad because they authorized the search of the defendant's entire email accounts "without establishing probable cause to believe the seized materials would contain evidence of the offenses alleged in the indictment."  (Eighth Mot. at 18).   Rather, the search of the defendant's email accounts for evidence of the crimes enumerated in the warrants was supported by ample evidence contained in the search warrant affidavits.

At the outset, "[t]he task of the issuing magistrate [or judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Falso*, 544 F.3d at 117 (quoting *Gates*, 462 U.S. at 232).   Accordingly, a reviewing court must afford "great deference" to the issuing court's probable cause determination.  *Id.* (internal quotation marks omitted).  "Thus, the task of a reviewing court is simply to ensure that the 'totality

of the circumstances' afforded the magistrate a 'substantial basis' for making the requisite probable cause determination."  *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

As discussed above, the challenged search warrant affidavits outlined in great detail a highly complex, multi-year criminal scheme to evade U.S. sanctions laws by moving millions of dollars through the U.S. financial system and banks in New York using offshore front companies, Swiss bank accounts, structured transactions, and other non-transparent means to disguise illicit transactions to and through the United States, in violation of New York State laws—in particular, Money Laundering, Falsifying Business Records, and Offering a False Instrument for Filing—the crimes enumerated in the search warrant affidavits and the warrants themselves.  Moreover, the affidavits outlined in detail the defendant's central role in the scheme, including his ownership and control of a variety of business entities, front companies, and bank accounts used to perpetrate the scheme, as well as his use of personal bank accounts, family members and business associates to comingle, layer, and move money illicitly through and into the United States as part of apparent efforts to disguise the scheme, and the defendant's role and conduct.  Additionally, the affidavits listed the variety of email accounts the defendant used in association with the described entities and activities outlined in the affidavits.

Accordingly, the warrants' description of the information to be seized—emails evidencing the crimes of Money Laundering, Offering a False Instrument for Filing, and Falsifying Business Records—was fully supported by the substantial probable cause upon which it was based.  *See Lustyik*, 57 F. Supp. 3d at 223; *Zemlyanksy*, 945 F. Supp. 2d at 464 ("In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'") (quoting *United States* v. *Hernandez*, 2010 WL 26544, *8 (S.D.N.Y. 2010)).  The breadth of a warrant depends on the nature of the crime, and in

this case the facts outlined in the warrant affidavits justified a broad search of the target email accounts.  *See Jacobson*, 4 F. Supp. 3d at 522 (breadth of warrant was justified given complexity of crimes and length of time covered).

### C.    Law Enforcement Officers Relied on the Search Warrants in Good Faith

Finally, the defendant argues that the warrants at issue are not subject to the good faith exception because (i) the warrants affidavits knowingly misled the issuing court; (ii) the warrant affidavits were "so lacking in basic details necessary to establish probable cause" that no reasonable officer could have relied upon them; and (iii) the warrants were "so facially deficient" that they could not reasonably have been relied upon.  (Eighth Mot. at 23).  The foregoing discussion has addressed and refuted the premises underlying each of these conclusory assertions, but, even assuming, *arguendo*, that any has merit, it is well established that a deficient warrant does not "automatically dictate the suppression of all physical evidence seized." *Clark*, 638 F.3d at 99.  Indeed, the Second Circuit has remarked that "suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment." *Id*. (quoting *Herring* v. *United States*, 555 U.S. 135, 140 (2009)).  As a result, the Supreme Court has long recognized an exception to the exclusionary rule for "evidence obtained on objectively reasonable reliance on a subsequently invalidated search warrant." *United States* v. *Leon*, 468 U.S. 897, 922 (1984).  Here, even accepting the defendant's arguments as true, there is no basis to conclude that a "reasonably well trained officer would have known that the search was illegal despite the [issuing court's] authorization." *Id*. at 922 n.23.

### 1.    Applicable Law

The logic of the "good faith exception" is straightforward: "the nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently

invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. Indeed, "[t]he animating principle of the exclusionary rule is deterrence of police misconduct, but the extent to which the rule is so justified varies with the culpability of the law enforcement conduct." *Clark*, 638 F.3d at 99 (internal quotation marks omitted). For that reason, evidence seized pursuant to a judicially authorized warrant should remain admissible, "even if the warrant lacks probable cause or is technically deficient," where the agents executing the warrant "relied upon it in objective good faith." *United States* v. *Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

Although the Government bears the burden to "demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant," the Second Circuit has observed that "in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Clark*, 638 F.3d at 100 (internal quotation marks omitted). Thus, there are only four circumstances in which the good faith exception does not apply, which are to be viewed "against [a] presumption of reasonableness." *Id.* These include: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Moore*, 968 F.2d 216 at 222 (citing *Leon*, 468 U.S. at 923). As the Supreme Court has observed, however, "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921.

### 2.      Discussion

The good faith exception applies in this case.  The starting point for this analysis is the indisputable fact that the searches were conducted pursuant to judicially authorized warrants. Next, none of the triggers for exclusion under *Leon* supports relief here.  First, as discussed above, the defendant has made absolutely no showing that the warrant affiant deliberately or recklessly misled the issuing court.  Second, the issuance of the email search warrants here was far from a situation in which the issuing judge "wholly abandoned" his judicial role—a concern that is "animat[ed by] . . . a common precept: that someone independent of the police and prosecution must determine probable cause."  *Clark*, 638 F.3d at 101.  As the Second Circuit has explained, such abandonment must be "wholesale rather than partial" and "in the manner condemned in *Lo-Ji Sales*"— a case in which the Supreme Court held that the judge "had 'allowed himself to become a member, if not the leader, of the search party which was essentially a police operation.'"  *Id.* at 100-01 (quoting *Lo-Ji Sales, Inc.* v. *New York*, 442 U.S. 319, 327 (1979)).  Specifically, a judge abandons the "neutral and detached function" required when he ceases to "act as a judicial officer" and "assume[s] the role of an adjunct law enforcement officer."  *Id.* at 101 (internal quotation marks omitted).

The issuing judge here was an independent arbiter with no prior involvement in the investigation who considered a lengthy affidavit outlining in detail a highly complex multinational criminal scheme.  In light of the facts presented in the affidavit, the judge's determination that probable cause existed, even if incorrect, was far from an instance of a judge serving as a mere "rubber stamp."  *See id.* ("[A]bandonment of judicial neutrality and detachment properly cannot be inferred from the fact that the magistrate committed legal error in his assessment of probable

cause"; "rubber stamp" cannot be established "merely on the basis of the substantial inadequacy of the probable cause showing in the affidavit" (internal quotation marks and citation omitted)).

The third exception to the good faith rule, where a warrant "application is so lacking in indicia of probable cause as to render reliance upon it unreasonable," is also absent here. *See id.* at 102 (noting that use of the good faith exception is barred "when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations"); *Reilly*, 76 F.3d at 1280, *aff'd on reh'g*, 91 F.3d 331 (2d Cir. 1996) (describing a lacking affidavit as containing "bare-bones description[s] . . . almost calculated to mislead" and material from a prior illegal search). Rather, the detailed email affidavits here contained ample probable cause supporting the search that was authorized. At a bare minimum, it contained indicia of probable cause, including that the defendant, alone and through his family and its companies, was involved in a lengthy, multi-million dollar scheme to illicitly moved U.S. dollars through and into the United States in violation of U.S. sanctions laws and regulations and New York State laws; the defendant controlled the corporate entities and front companies that were used to effectuate the scheme; the defendant controlled both the domestic and overseas bank accounts used to effectuate the scheme; that some of those bank accounts were linked to corporate entities and email accounts that the defendant controlled; and that the defendant used personal email accounts in relation to those corporate emails accounts. Those facts alone provided an objectively reasonable basis for the executing officers to rely on the search warrants and to presume that they were valid. To hold otherwise and to suppress the evidence under such circumstances would "[p]enaliz[e] the officer[s] for the [judge's] error, rather than [their] own, [which] cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921.

Finally, the search warrants themselves were not facially deficient, and certainly not so facially deficient that the executing officers could not have reasonably presumed the warrants to be valid.  A warrant is facially defective when it "omits or misstates information specifically required to be contained therein, *i.e.*, 'the place to be searched, and the persons or things to be seized,'" *id*. at 102 (quoting U.S. Const. amend. IV); *see also United States* v. *Grubbs*, 547 U.S. 90, 97 (2006) (The Fourth Amendment "specifies only two matters that must be particularly described in the warrant: [i] the place to be searched and [ii] the persons or things to be seized" (internal quotation marks omitted)), or where a warrant includes a "catch-all" description of evidence to be seized that generally "relates to the commission of a crime" without any limiting description as to the type of crime, thereby amounting to a "general warrant."  *See United States* v. *George*, 975 F.2d 72, 74, 77-78 (2d Cir. 1992).  Only such glaring deficiencies may preclude reasonable reliance on a warrant by the executing officers.  In contrast, the search warrants here (i) specified the location to be searched (specific target email addresses); (ii) plainly stated the electronic data and communication records to be seized and searched in connection with the target email addresses; and (iii) specified that the items sought "show[ed] or tend[ed] to show . . . . involvement in Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records, and an attempt and conspiracy to commit said crimes, and/or involvement in the planning of, recruiting for, or commission of those crimes."  (*See, e.g.*, Def. Ex. A, April 16, 2014 Warrant, p. 1). The defendant has identified no actual defect in the warrants themselves, and this inquiry does not properly address itself to any alleged defect in the Affidavit.  *See* Clark, 638 F.3d at 103.

For all the foregoing reasons, the Court should deny the defendant's motion to suppress email evidence obtained pursuant to the aforementioned search warrants.

### III.    **SADR'S MOTION FOR THE RETURN OF PROPERTY SHOULD BE DENIED**

Finally, the Court should deny the defendant's motion for the return of property.  (*See* Ninth Mot.)  The defendant's final motion seeks the return of property "seized from Sadr or any of his companies except the pertinent documents produced to Sadr on May 15, 2018[.]"  (*Id.* at 1).  The motion asserts that the Government should return such property "by destroying all originals and copies of the property to be returned in the government's possession, custody, or control." (Ninth Mot., Proposed Order).  In particular, the defendant seeks the return of "all emails that do not reflect evidence of the crimes alleged in the search warrant affidavits."  (Ninth Mot. at 1).  Sadr argues that because the Government identified the responsive documents as relevant no later than May 15, 2018, the Government no longer has the legal right to retain the remainder of Sadr's property." (Ninth Mot. at 1).

The relief sought by the defendant—purging the Government's files of all electronic data not previously identified as pertinent—is unwarranted, impractical, and would be overly burdensome on the Government and on the conduct of litigation in this case.  Depriving the government of access to the full forensic copies of these search warrant returns would, among other things, present obstacles to authenticating those returns at trial.  It would also prevent the Government from maintaining, as the defense does, a forensic record of all the emails that were seized, reviewed, and produced in discovery in this case.  Maintaining such a record is particularly important given the ongoing review of potentially privileged documents that the Government and defense are conducting jointly pursuant to the Court's orders.

As an initial matter, the defendant does not identify a single federal case that supports such a result with regard to email evidence.  Two of the federal cases the defendant cites in which courts ordered the return of property, *United States* v. *Soliman*, 2008 WL 4757300 (W.D.N.Y. 2008), and

*United States* v. *Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003), did not involve email search warrants.   Rather, they involved search warrants for an office and home, respectively.   The circumstances of those cases—involving boxes, documents, and other discrete items seized from physical premises—did not present the enormous practical difficulties that would be associated with culling through, identifying, and then returning various portions of large volumes of electronic data that are contained on hard drives or similar media.[19]

Sadr's reliance on *United States* v. *Ganias*, 755 F.3d 125, 139 (2d Cir. 2014), *rev'd en banc*, 824 F.3d 199 (2d Cir. 2016), does not aid his argument.   While that case involved search warrant returns that included electronic evidence (*i.e.*, computer hard drives), the *en banc* decision of the Second Circuit in *Ganias* expressly  decided "not [to] resolve the ultimate question whether the Government's retention of forensic copies of Ganias's hard drives during the pendency of its investigation violated the Fourth Amendment," and acknowledged "the complex and rapidly evolving technological issues, and the significant privacy concerns, relevant to its consideration." *Id.*  Thus, Sadr cites no federal case that supports or requires the remedy he now seeks.

The state case on which Sadr relies, *People* v. *Thompson*, 51 Misc. 693, 716 (N.Y. Sup. Ct. 2016), also does not support the return of Sadr's emails.   The circumstances in *Thompson* were fundamentally different from the instant case because there, the Government sought "to retain 100,000 of the defendant's emails *and continue to search them for responsive material for* a period which has now extended for more than four years." *Id.*  (emphasis added).  Here, by contrast, the

---

[19] While *Debbi* appears to have involved at least some "electronic" files, that case is easily distinguishable from the instant case on the ground that at the time the defendant filed a suppression motion in *Debbi*, the Government had made "*no meaningful attempt . . .*  to separate from what was actually seized the only items that the warrant permitted to be seized." 244 F. Supp. 2d at 238 (emphasis added).

Government's prosecution team ceased accessing and conducting searches of Sadr's non-pertinent communications at least as early as May 2018. Thus, little if any harm has resulted from the Government's continued retention of those emails because no member of the prosecution team has even accessed them since that date. Nor can the defense plausibly argue that the Government's retention of these emails has deprived Sadr of possessory control of, or access to, the emails because the Government produced their full contents in discovery. Indeed, since the issuance of the Court's September 2018 order concerning the ongoing privilege review in this case, the prosecution team has been permitted to access and review only the far narrower universe of emails that have been deemed pertinent *and* have been reviewed and cleared by the government's privilege review wall team and defense counsel. Thus, Sadr's primary concern that the government should not be able to "continue to *hold and search* private documents that it has not flagged as non-privileged and pertinent" (*see* Ninth Mot. at 5 (emphasis added)), is inapposite and misplaced. While the Government continues to hold these "unflagged" emails in its custody, the prosecution team is not currently searching or accessing those emails—and has not done so for nearly one year. It is therefore difficult to conceive of what harm the defendant has suffered, or continues to suffer, on account of the Government's continued retention of these emails.

Requiring the Government to "return" these emails would be particularly burdensome and unnecessary given the difficulties it would impose on the conduct of the litigation in this case. First, depriving the government of access to the full forensic copies of these search warrant returns would, as noted above, present obstacles to authenticating those returns at trial. That is because testifying witnesses from the relevant email providers would have to review the complete files as they were produced to the Government in order to verify the emails' authenticity using a feature known as a hash value.

96

Second, ordering the "return" of this property would be meaningless and redundant when the defendant is already in possession of the emails.  And it would require the government to undertake the lengthy and tedious process of purging from all systems, hard copy files, and review platforms any copies of the non-pertinent emails that are in the government's possession.

For all of these reasons, the defendant's Ninth Motion seeks relief that is unreasonable and should be denied.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court deny all of the defendant's motions without a hearing.

Dated: New York, New York
     April 26, 2019

                    Respectfully submitted,

                    GEOFFREY S. BERMAN
                    United States Attorney

by:     __/S/_____
                    Andrew J. DeFilippis
                    Jane Kim
                    Michael K. Krouse
                    Assistant United States Attorneys
                    (212) 637-2231/2038/2279

                    Garrett Lynch
                    Special Assistant United States Attorney

cc:    Defense counsel of record (by ECF)