J99KNEJC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              18 CR 224 (AJN)

5   ALI SADR HASHEMI NEJAD,

6               Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            September 9, 2019
9                                           10:10 a.m.

10  Before:

11                  HON. ALISON J. NATHAN,

12                                          District Judge

13                          APPEARANCES

14

15  GEOFFREY S. BERMAN,
        United States Attorney for the
16      Southern District of New York
    MICHAEL KIM KROUSE
17      Assistant United States Attorney

18  REID WEINGARTEN
    BRIAN M. HEBERLIG
19      Attorneys for Defendant

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  I'll take appearances of counsel, starting

3     with the government.

4          MR. KROUSE:  Good morning, your Honor.  Michael

5     Krouse, for the United States.

6          THE COURT:  Good morning, Mr. Krouse.

7          MR. WEINGARTEN:  Good morning, your Honor.  Reid

8     Weingarten and Brian Heberlig, from Steptoe & Johnson.  My

9     client is here.

10         THE COURT:  Good morning, Mr. Weingarten,

11    Mr. Heberlig.

12         Good morning, Mr. Sadr.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  We are here today for a hearing pursuant

15    to the case of United States v. Curcio to advise Mr. Sadr of

16    his right to counsel without conflict, and if he desires to

17    confirm on the record, after time to consult with counsel,

18    including independent counsel, if he wishes, that he is

19    prepared to go forward with his current representation.  We are

20    also here for a status and scheduling conference.

21         Let me just indicate what I received in advance of

22    today's proceeding.  I received from the government, related to

23    the Curcio issues, a July 26th, 2019 letter; from defense

24    counsel, a July 28th, 2019 letter; and a letter from the

25    government -- joint letter, but filed by the government on

1   September 3rd, 2019, and that included as an attachment a

2   written waiver from JP Morgan Chase.  And then I did receive a

3   letter pertaining to scheduling, dated September 3rd, 2019.

4           Counsel, anything else I should have in front of me

5   for purposes of today's proceeding?

6           MR. KROUSE:  No, your Honor.

7           MR. WEINGARTEN:  No, Judge.

8           THE COURT:  I have one preliminary question for

9   counsel before jumping into the Curcio, and that's this:  The

10  letters indicate that Steptoe & Johnson currently represents

11  JP Morgan Chase, which the government alleges is a victim bank

12  in the case.  There is also indication -- and I have some

13  information related to the specific representation of JP Morgan

14  Chase, which appears to be unrelated to the criminal matter

15  before us.  It's also indicated that Steptoe has previously

16  represented other alleged victims, so not a current

17  representation, but that Steptoe has represented Citibank, UBS,

18  and Commerzbank, correct?

19          MR. HEBERLIG:  That is correct, your Honor.

20          THE COURT:  And that has been indicated, also, as

21  unrelated representation, but I don't think that I know

22  anything further about that representation.

23          The proposed script -- I don't know if it's a joint

24  proposed script or, Mr. Krouse, if that is from the

25  government -- that discusses only the current representation of

1    JP Morgan Chase, and I just wanted to understand the thinking

2    behind not -- it seems to me, at first blush, that essentially

3    the same issues arise -- potential issues arise with respect to

4    the former representations.  Mr. Krouse?

5            MR. KROUSE:  Sure, your Honor.  And I will say for the

6    record that the proposed script was sent to defense counsel and

7    was worked on jointly.  So, while it was filed by the

8    government, it is from both counsel.

9            In conversations with the defense, the view was

10   expressed by them that their prior representations of those

11   banks would not give rise to a conflict because they weren't

12   ongoing, they didn't occur during the time frame of the

13   representation of Mr. Sadr, and, for that reason, the focus

14   became their current representation of JP Morgan, giving rise

15   to a conflict of interest with the firm with respect to

16   Mr. Sadr and JP Morgan, and that that prior representation of

17   these banks, with no active case, didn't give rise to the same

18   concerns.

19           THE COURT:  I suppose it doesn't give rise to the same

20   concerns.  The walling-off process for an ongoing

21   representation presents different issues, but it's still the

22   case that the duty of confidentiality is owed to the former

23   clients, the duty of loyalty is owed to the former clients,

24   right?

25           MR. KROUSE:  That is correct, your Honor.  I guess it

1    would be helpful to hear from defense counsel their view and

2    also the nature of those representations, but the government's

3    understanding is that the nature of those prior representations

4    was obviously separate from this case --

5           THE COURT:  Unrelated?

6           MR. KROUSE:  Unrelated.

7           THE COURT:  As is the case with the JP Morgan?

8           MR. KROUSE:  Yes, your Honor.

9           -- and also predated their representation.

10          THE COURT:  That is just another word for former

11   representation, I guess.

12          MR. KROUSE:  Yes.  I guess what I'm saying is there

13   was no overlap in time.  Because they have represented Mr. Sadr

14   for a fairly long period of time, that there was no overlap

15   when they were representing both at the same time.

16          THE COURT:  Always former?

17          MR. KROUSE:  Yes.

18          THE COURT:  In respect to this case?

19          MR. KROUSE:  Yes.

20          THE COURT:  Mr. Heberlig?

21          MR. HEBERLIG:  Thank you, your Honor.

22          So, my knowledge of those prior representations is

23   somewhat deliberately limited.  When this issue was raised by

24   the government, neither Mr. Weingarten, nor myself worked on

25   those other matters for Citibank, UBS, or Commerzbank.  We have

J99KNEJC

1      an internal conflicts team, a general counsel team at the firm.

2              THE COURT:  I would hope so.

3              MR. HEBERLIG:  Yeah.  We made a deliberate decision

4      that it didn't make sense for us to learn the details of those

5      prior representations.  We disclosed the issue to our internal

6      counsel.  They reviewed those cases and concluded they were

7      unrelated, and the firm did not obtain any confidential

8      information from the banks that would give rise to a conflict

9      issue where we might be able -- well, obviously, we personally

10     wouldn't be able to use it on Mr. Sadr's behalf, but it

11     wouldn't even be imputed to the firm that we had some

12     confidential information relevant to this matter.  But I don't

13     know the details of those prior representations by that

14     deliberate choice, so if that is important for this inquiry, we

15     can find out.

16             We have discussed this issue with Mr. Sadr, and to the

17     extent there is even a potential conflict because of the same

18     sort of pulling punches kind of issues, he would be prepared to

19     waive, just like he's prepared to waive the issues related to

20     JP Morgan.

21             The other difference between those prior

22     representations of the JP Morgan representations is obviously

23     we're not, as a firm, earning any revenue from any of those

24     former clients, so there's not that sort of financial potential

25     conflict either.  But we're happy to proceed however the Court

1    prefers.  That's really all I know about those prior matters,

2    though.

3              THE COURT:  Okay.

4              Well, I think, for purposes of today's proceeding, I

5    have reviewed the proposed script, and we'll follow it -- we'll

6    rely on it to some extent.  In most instances, I will simply

7    substitute the victim banks where it's proposed that I say

8    JP Morgan Chase, because I think, although you've indicated

9    reasons to think there's even less of a concern of a potential

10   conflict, you've indicated that although you're not aware of

11   the nature of those representations deliberately, I presume it

12   has been indicated to you that they are unrelated, correct,

13   Mr. Heberlig?

14             MR. HEBERLIG:  Yes, we have indicated that to Mr. Sadr

15   and also to the government in correspondence.

16             THE COURT:  But it has been -- you've been informed by

17   conflict counsel that has reviewed the issue that the

18   representation of the -- the prior representations of the

19   banks, those were unrelated matters?

20             MR. HEBERLIG:  That is correct, your Honor.

21             THE COURT:  And you've indicated that conflict counsel

22   has informed you that no one -- no one at the firm obtained any

23   confidential information that could in any way bear on this

24   case?

25             MR. HEBERLIG:  That is what I have been informed, yes,

1    your Honor.

2          THE COURT:  And you've further indicated that all

3    representation by the firm of the alleged victim banks, other

4    than JP Morgan Chase, ceased prior to your representation of

5    Mr. Sadr, and, as a result, there has never been any ongoing

6    financial interest of the firm in the representation of those

7    banks?

8          MR. HEBERLIG:  So I think that's correct.  I know we

9    no longer represent any of those three banks.  I'm not

10   absolutely certain when those prior representations ended, and

11   if that's material, I can find out.

12         THE COURT:  Mr. Krouse, you had indicated that that

13   was the case.  What was your basis for that?

14         MR. KROUSE:  That was my understanding from previous

15   conversations with counsel, but that could have been a

16   misunderstanding.  My recollection of those conversations was

17   that there were prior representations, which we put a footnote

18   in our original letter stating that while our primary focus was

19   on the JP Morgan relationship since it was ongoing and an

20   ongoing source of revenue for the firm, those prior

21   representations preceded their representation of Mr. Sadr.

22         THE COURT:  All right.  Thank you.

23         Counsel, any other preliminary matters to raise before

24   I proceed?

25         MR. KROUSE:  Not from the government, your Honor.

1          MR. HEBERLIG:  No, your Honor.

2          THE COURT:  All right.

3          Mr. Sadr, how are you this morning, sir?

4          THE DEFENDANT:  Good.  Good morning, your Honor.

5          THE COURT:  Good morning.  You can remain seated.

6    I'll just ask you to pull up the microphone?

7          THE DEFENDANT:  Sure.

8          THE COURT:  As you know, we are here to conduct a

9    hearing pursuant to a case called United States v. Curcio.  I'm

10   going to advise you of your right to counsel without conflict

11   and give you an opportunity to discuss the issues any further

12   with your counsel, if you'd like.  I'll also give you the

13   opportunity to adjourn today's proceeding and discuss the issue

14   with independent counsel, if you like, and make sure that you

15   understand all the issues and determine whether you'd like to

16   go forward with your current representation.

17          Because this will be a colloquy between you and me,

18   and I want to make sure that you are knowingly and voluntarily

19   waiving your right to conflict-free counsel, if that is what

20   you choose to do, I will first place you under oath.  I will

21   ask you to please rise and raise your right hand.

22          (Defendant sworn)

23          THE COURT:  Thank you, sir.  You may be seated.  I'm

24   going to ask some preliminary questions to determine that you

25   are competent to proceed with today's proceeding.

J99KNEJC

1          What is your full name?

2          THE DEFENDANT:  My name is Ali Sadr.  Sadr is spelled

3   S-a-d-r.

4          THE COURT:  And, Mr. Sadr, how old are you?

5          THE DEFENDANT:  I'm 39 years old, your Honor.

6          THE COURT:  How far did you go in school?

7          THE DEFENDANT:  I have both a Bachelor's and Master's

8   from Cornell University.

9          THE COURT:  I went to Cornell.

10         In the past 24 hours, have you taken any pills, drugs,

11  or medication of any kind?

12         THE DEFENDANT:  No, your Honor.

13         THE COURT:  Have you consumed any alcoholic beverages

14  in the past 24 hours?

15         THE DEFENDANT:  No, your Honor.

16         THE COURT:  Have you ever been treated for any type of

17  mental illness?

18         THE DEFENDANT:  No, your Honor.

19         THE COURT:  Are you currently, or have you recently

20  been, under the care of a psychiatrist?

21         THE DEFENDANT:  No, your Honor.

22         THE COURT:  How about a doctor other than a general --

23         THE DEFENDANT:  No, your Honor.

24         THE COURT:  Your mind is clear today?

25         THE DEFENDANT:  Yes.  Thank you, your Honor.

J99KNEJC

1          THE COURT:  And you understand what's happening here

2     today?

3          THE DEFENDANT:  Yes, yes.

4          THE COURT:  Does either counsel have any doubt as to

5     Mr. Sadr's competence to proceed here today?

6          MR. KROUSE:  No, your Honor.

7          MR. HEBERLIG:  No, your Honor.

8          THE COURT:  Based on Mr. Sadr's demeanor, as he

9     appears in court, his responses to my questions and the

10    representations of counsel, I do find that he is fully

11    competent to proceed with this Curcio hearing.

12         I'm going to explain the purpose of the proceeding to

13    you.  I'm going to review various scenarios with you and ask

14    you some questions.  As I've indicated, at some point, I am

15    going to ask you to state your understanding of these issues in

16    your own words to help assure me that you understand the

17    issues.  And, ultimately, I'll ask you who you want to act as

18    your attorneys in this case.  The purpose of this is to make

19    sure that you understand any potential risks to you from having

20    your current lawyers from the law firm of Steptoe & Johnson

21    continue to serve as your attorneys and to make sure that you

22    have carefully considered these risks, and you are making an

23    informed and voluntary decision about who you want as your

24    attorneys.

25         While I want you to be able to choose who you want to

1    serve as your lawyers in this case, I do need to make sure that

2    you have a full understanding of the issues that a defendant

3    should consider in making such a choice.  It is important that

4    you make a wise decision for yourself, and that's the purpose

5    of this proceeding.

6            Do you understand that?

7            THE DEFENDANT:  Yes, your Honor.

8            THE COURT:  So, I want to provide just a few

9    background issues for you to help understand the specific

10   matters in this case.

11           I'm going to describe some duties that an attorney

12   has.  An attorney has a responsibility to represent a client to

13   the best of his or her ability, giving that client the

14   attorney's best advice about the client's legal options and

15   keeping confidential any information that the client gives to

16   the attorney.

17           Do you understand that?

18           THE DEFENDANT:  Yes, I understand.

19           THE COURT:  Two of the responsibilities there are the

20   duty of loyalty and the duty of confidentiality.

21           As to the duty of loyalty, an attorney has a duty of

22   undivided loyalty to a client.  That duty never ends, so it

23   does pertain to former clients.  Do you understand that?

24           THE DEFENDANT:  Yes.  Yes, your Honor.

25           THE COURT:  There is also the duty of confidentiality

1   toward a client, keeping confident any information received

2   during the course of representation.  That duty never ends.  Do

3   you understand that?

4          THE DEFENDANT:  Yes, I understand that.

5          THE COURT:  Okay.

6          So, with that brief background in mind, I'm going to

7   ask some questions to assess your understanding of the issues

8   here.  Let's begin with the nature of the representation.

9          Who currently represents you?

10         THE DEFENDANT:  Your Honor, I'm represented by

11  Mr. Reid Weingarten and Mr. Brian Heberlig.

12         THE COURT:  They are both attorneys at Steptoe &

13  Johnson LLP?

14         THE DEFENDANT:  That's correct, your Honor.

15         THE COURT:  Are you aware -- are you satisfied with

16  your attorneys' representation?

17         THE DEFENDANT:  Absolutely satisfied.  And I'm

18  grateful and lucky to have them.

19         THE COURT:  Are you aware that Steptoe represents --

20  currently represents a bank, JP Morgan Chase, that the

21  government alleges is a victim in this matter?  You understand

22  that?

23         THE DEFENDANT:  Correct, I understand.

24         THE COURT:  And they represent -- the firm represents

25  JP Morgan Chase in two unrelated matters, one of which relates

1    to JP Morgan Chase's status as a qualified professional asset

2    manager and the other which relates to an investigation by the

3    Commodity Futures Trading Commission.

4               You understand that?

5               THE DEFENDANT:  I understand, your Honor.

6               THE COURT:  It's also the case that lawyers at

7    Steptoe & Johnson previously represented other alleged victim

8    banks in the case, specifically Citibank, UBS, and Commerzbank.

9               THE DEFENDANT:  I understand that, yes.

10              THE COURT:  And those representations by lawyers at

11   Steptoe ceased, but with respect to JP Morgan Chase, the

12   representations described are ongoing.

13              THE DEFENDANT:  That's correct.

14              THE COURT:  You understand that the government may

15   call a JP Morgan Chase employee to testify against you at

16   trial?

17              THE DEFENDANT:  That's my understanding, correct.

18              THE COURT:  And may call employees of the other victim

19   banks?

20              THE DEFENDANT:  That's my understanding, yes.

21              THE COURT:  And those employees may provide testimony

22   that the jury could use to support a guilty verdict against

23   you.  You understand that?

24              THE DEFENDANT:  Yes, your Honor.

25              THE COURT:  For example, a witness may testify that

1    certain transactions for the benefit of you, your companies,

2    your employees, or your agents were made through the victim

3    banks.  Let me just define that term here.  When I say victim

4    banks here, I mean alleged victim banks, and I mean

5    specifically JP Morgan Chase, or Citibank, or UBS, or

6    Commerzbank.

7            THE DEFENDANT:  Correct, your Honor, yes.

8            THE COURT:  Representations made by you, your

9    companies, your employees, or your agents -- I'm going through

10   some potential testimony that employees from the banks might

11   raise.  So we've talked about certain transactions for the

12   benefit of you or your companies that were made through the

13   victim banks' representations made by you, your companies, your

14   employees, or your agents that were material to the business

15   decisions made by the victim banks, that victim banks have

16   procedures in place to prevent transactions through its

17   accounts for the benefit of businesses or individuals in Iran,

18   that victim banks face potential liability if they allow

19   transactions through its accounts for the benefit of businesses

20   or individuals in Iran, and/or victim banks had known all of

21   the facts about certain transactions for the benefit of you,

22   your companies, your employees, or agents, the banks would not

23   have engaged in those transactions.

24           Do you understand I was describing potential testimony

25   from employees of these banks?

J99KNEJC

1            THE DEFENDANT:  Yes, your Honor, I understand that.

2            THE COURT:  You understand that such testimony could

3    be harmful to your defense?

4            THE DEFENDANT:  Yes, your Honor, I understand.

5            THE COURT:  Are you aware that in the course of

6    representing JP Morgan Chase now, or the other banks -- other

7    victim banks previously, lawyers at the law firm of Steptoe &

8    Johnson may have learned confidential information that they're

9    not permitted to disclose to anyone, even to you, and even if

10   the information is helpful to your defense?

11           THE DEFENDANT:  That's correct, your Honor.

12           THE COURT:  And not only must they keep that

13   information secret, they're also forbidden from using it in any

14   way, even if doing so would be helpful in your case.  Do you

15   understand that?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  So, specifically, Steptoe lawyers are

18   likely to examine or cross-examine any victim bank witnesses

19   called at trial --

20           THE DEFENDANT:  Yes, your Honor.

21           THE COURT:  -- and your lawyers will not be permitted

22   to use any confidential information that they or any other

23   Steptoe lawyer learned during Steptoe's representation of the

24   victim banks, they may not use that during examination or

25   cross-examination.

1    THE DEFENDANT:  Correct, your Honor.

2    THE COURT:  Are you aware that the victim banks may

3  have interests that are in conflict with your interests; for

4  example, that an alleged victim -- as an alleged victim, the

5  victim banks may have an inherent interest in you being

6  convicted that is in conflict with your interests in being

7  acquitted?

8    THE DEFENDANT:  Yes.  Yes, your Honor.

9    THE COURT:  You understand that?

10    THE DEFENDANT:  Yes.

11    THE COURT:  If you are convicted, the victim banks may

12  be entitled to address the Court at your sentencing, and that

13  could increase the severity of the sentence that I impose, and

14  that, of course, is in conflict with your interests in

15  receiving a less severe sentence.

16    You understand that?

17    THE DEFENDANT:  Yes, your Honor.

18    THE COURT:  If you are convicted, the victim banks

19  might be entitled to restitution from you and may, therefore,

20  have an interest in receiving as much restitution from you as

21  permitted by law, which is in conflict with your interests in

22  paying no restitution.

23    You understand that?

24    THE DEFENDANT:  Yes, your Honor.

25    THE COURT:  Regardless of whether you're convicted,

1    the victim banks may institute adversarial proceedings against

2    you seeking monetary damages, which is, of course, in conflict

3    with your interests in not paying monetary damages.

4                THE DEFENDANT:  Correct.

5                THE COURT:  Do you understand that?

6                THE DEFENDANT:  Correct, your Honor.

7                THE COURT:  You understand there may be other

8    significant ways beyond what I have just described in which the

9    victim banks' interests could be adverse to yours and that it's

10   impossible for me or anyone else to predict what those other

11   ways might be?

12               THE DEFENDANT:  Yes, your Honor.

13               THE COURT:  You understand that if the victim banks'

14   interests do conflict with your interests, your lawyers may

15   have ethical obligations to the victim banks that conflict with

16   their ethical obligations to you?

17               THE DEFENDANT:  Yes, your Honor.

18               THE COURT:  And you understand that that would be the

19   case even though none of your lawyers are permitted to

20   participate in Steptoe's representation of JP Morgan Chase now?

21   Do you understand that?

22               THE DEFENDANT:  That's my understanding, yes.

23               THE COURT:  And none of the lawyers who previously

24   represented the other victim banks would be permitted to

25   participate here?

J99KNEJC

1              THE DEFENDANT:  Yes, your Honor.  Yes.

2              THE COURT:  You understand that those conflicting

3     ethical obligations might cause your lawyers to put the victim

4     banks' interests ahead of your interests?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  And you understand that because JP Morgan

7     Chase is a current client of Steptoe, some portion of your

8     lawyers' compensation may be derived from legal fees paid by

9     the victim banks?

10             THE DEFENDANT:  Correct, your Honor.

11             THE COURT:  And, as a result, you understand that your

12    lawyers might have financial interests, financial incentives,

13    to put JP Morgan's interests ahead of your interests?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Do you understand the limitations your

16    lawyers have discussed -- that we've discussed could have an

17    adverse effect on your defense in this case?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  So, we've gone through it a bit, but I'd

20    like to hear, in your own words, how those limitations could

21    adversely affect your defense in this case.

22             THE DEFENDANT:  Thank you, your Honor.  My

23    understanding is that, your Honor, it seems that there might be

24    some underlying potential conflict from the two unrelated

25    matters of JP Morgan Chase that other associates within the

1   firm are engaged with.  And to the extent that those potential

2   conflicts would cause my lawyers in this case to pull their

3   punches when it comes to JP Morgan Chase, that would be a

4   potential negative impact.  And to that extent, I believe that,

5   given the arm's-length relationship between the two, it would

6   not pose any negative impact in this case.

7           THE COURT:  When you say the arm's length --

8           THE DEFENDANT:  The fact that they're not engaged on

9   those engagements and they're unaware of -- at this point in

10  time and during my engagement with the firm, they're unaware of

11  any information that is happening with those two matters.

12          THE COURT:  To be clear, even if they were aware of

13  any confidential information --

14          THE DEFENDANT:  They cannot disclose it to me, and it

15  might turn --

16          THE COURT:  And can't use it in any way to help you?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Even if it would help you?

19          THE DEFENDANT:  Yes, absolutely.

20          THE COURT:  You understand that?

21          THE DEFENDANT:  Yes.

22          THE COURT:  I also want to think through ways in which

23  your lawyers' allegiance to the victim banks could adversely

24  affect the way that they advise you in this case.  Some

25  examples include advice as to whether you should plead guilty

1  or go to trial.

2          THE DEFENDANT:  Yes, your Honor, I understand that.

3          THE COURT:  Which defenses you should raise?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Whether you should testify at trial?

6          THE DEFENDANT:  Correct, your Honor.

7          THE COURT:  Which witnesses should be cross-examined

8  and what questions they should be asked?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Which witnesses to call and what other

11  evidence to offer on your behalf?

12          THE DEFENDANT:  Correct.

13          THE COURT:  How to examine or cross-examine any victim

14  bank witnesses at trial?

15          THE DEFENDANT:  Correct.

16          THE COURT:  And what arguments to make on your behalf

17  to the jury?

18          THE DEFENDANT:  Correct, your Honor.

19          THE COURT:  And what arguments to make to me and what

20  facts to bring to my attention before trial, after trial, and

21  if you are convicted, at your sentencing?

22          THE DEFENDANT:  That's correct, your Honor, yes.

23          THE COURT:  Just to flesh those out a little bit:  You

24  understand that your attorneys may not wish to take positions

25  in this case before trial, during trial, or at sentencing that

1    are critical of the victim banks even if doing so may help your

2    defense, the sort of --

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  -- pulling the punches concern?

5              THE DEFENDANT:  Yes.

6              THE COURT:  You're aware that your attorneys may have

7    access to or may have learned information from the victim banks

8    that may be helpful in defending you, but they are absolutely

9    prohibited from using it to defend you, or to examine, or

10   cross-examine any victim bank witnesses because of the

11   attorney-client privilege that applies to the communications

12   between your attorneys and the victim banks?

13             You understand that?

14             THE DEFENDANT:  Yes, your Honor.  Yes.

15             THE COURT:  You understand that your attorneys may be

16   limited in making arguments about your level of involvement in

17   the offense, role in the offense, and culpability?  You

18   understand that?

19             THE DEFENDANT:  That's correct.

20             THE COURT:  Mr. Sadr, have you had an adequate

21   opportunity to discuss the limitations and possible adverse

22   effects on your defense in this case with your current lawyers?

23             THE DEFENDANT:  Yes.  Yes, your Honor.  I have, yes.

24             THE COURT:  You understand -- I mentioned this, but

25   the greatest danger to you is the inability of me or anyone

1  else to foresee all of the possible conflicts that might arise

2  because of Steptoe's simultaneous representation of JP Morgan

3  Chase, its previous representation of other alleged victim

4  banks, at the same time as representing you?

5  THE DEFENDANT:  That's correct, your Honor, yes.

6  THE COURT:  As a result, the limitations on your

7  lawyers' ability to defend you in this case could adversely

8  affect you more severely than anyone might currently

9  anticipate.

10  You understand that?

11  THE DEFENDANT:  That's correct, your Honor, yes.

12  THE COURT:  And you do understand that the potential

13  conflicts we have been discussing have existed ever since

14  Steptoe began representing you --

15  THE DEFENDANT:  That's correct.

16  THE COURT:  -- in August 2018?

17  THE DEFENDANT:  Yes.

18  THE COURT:  You understand that you have the right to

19  object to your lawyers' continued representation of you based

20  on the existence of actual and potential conflicts?

21  THE DEFENDANT:  Yes, I understand, your Honor.

22  THE COURT:  You do have the right to counsel free of

23  any conflict whose loyalty to you is absolutely undivided, who

24  is not subject to any factor that might in any way intrude upon

25  his or her loyalty to your interests.

1          You understand that?

2          THE DEFENDANT:  Correct, your Honor.

3          THE COURT:  In other words, you are entitled to

4     attorneys who have only your interests in mind and not the

5     interests of any prior or current clients.  You understand

6     that?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Have you received any inducements,

9     promises, or threats with regard to your choice of counsel?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  Have you had an adequate opportunity to

12     discuss the dangers I've described with your current lawyers?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  You do have the right to consult with an

15     attorney who is free from any conflict of interest, so an

16     independent -- what we sometimes call a conflict counsel,

17     someone who has nothing to do with Steptoe & Johnson, you have

18     a right to that.  If you can't afford to hire such an

19     independent counsel, I will appoint an independent counsel for

20     you free of any charge to discuss these issues.

21          You understand that?

22          THE DEFENDANT:  I understand that.

23          THE COURT:  If you did want to discuss the issue with

24     conflict counsel, independent counsel, your communications with

25     that lawyer would be entirely confidential.  I wouldn't learn

1   about them, except to the extent you wanted me to, the Steptoe

2   lawyers wouldn't learn about it, and the government lawyers, it

3   would be entirely independent.

4           Do you understand that?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  And you can discuss any of these issues

7   with them before you make your decision as to how to proceed.

8   You understand that?

9           THE DEFENDANT:  I understand that, your Honor.

10          THE COURT:  So I am prepared to adjourn this

11  proceeding, so that you can have more time to discuss the issue

12  with your lawyers or have as much time as you'd like to discuss

13  with a conflict-free attorney, the independent attorney not

14  associated with Steptoe.

15          Would you like -- first, would you like any additional

16  time now to discuss the issue with your current lawyers?

17          THE DEFENDANT:  Thank you so much, your Honor.  We had

18  these sorts of conversations for a couple of months now, so I

19  think that's been sufficient on that issue.  And I appreciate

20  that, and I don't think that would be necessary to have an

21  independent conflict-free consultation at this point in time.

22          THE COURT:  Have you had sufficient time to consider

23  even that question, whether you'd like to consult with a

24  conflict-free counsel?

25          THE DEFENDANT:  Yes.  I believe that was the first

J99KNEJC

1    thing that Mr. Heberlig brought up to my attention when this

2    issue came up, and I have almost about two months.

3         THE COURT:  And you don't wish to adjourn today's

4    proceeding in order to --

5         THE DEFENDANT:  I don't believe that would be

6    necessary, your Honor.

7         THE COURT:  Mr. Heberlig, before I get to the final

8    questions, anything you'd like to add or address?

9         MR. HEBERLIG:  No, your Honor.  We're satisfied with

10   the Court's inquiry.

11        THE COURT:  Mr. Krouse, anything?

12        MR. KROUSE:  No, no further questions on that.

13        THE COURT:  Mr. Sadr, after considering all that I've

14   said today about the ways in which a conflict of interest could

15   adversely affect your defense, do you wish to continue with

16   Mr. Weingarten and Mr. Heberlig from Steptoe & Johnson as your

17   attorneys?

18        THE DEFENDANT:  Absolutely, your Honor.

19        THE COURT:  You understand that by choosing to

20   continue with your lawyers as your attorneys in this matter,

21   you are waiving your right to be represented by an attorney who

22   has no conflict of interest?

23        THE DEFENDANT:  That's correct, your Honor.

24        THE COURT:  And you're knowingly and voluntarily

25   waiving your right to conflict-free counsel?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Let me just add, by waiving your right to

3     conflict-free counsel, you will also be -- and I will give you

4     an opportunity to address this directly -- you would waive any

5     postconviction argument on appeal or otherwise, that by virtue

6     of Steptoe's representation of JP Morgan Chase or the other

7     alleged victim banks, that you were denied effective assistance

8     of counsel.

9          You understand that will be an implication of waiver?

10          THE DEFENDANT:  That's correct, your Honor.

11          THE COURT:  Do you agree to waive any postconviction

12     argument on appeal or, otherwise, that by virtue of Steptoe's

13     representation of JP Morgan Chase and the other alleged victim

14     banks, that you were denied effective assistance of counsel?

15          THE DEFENDANT:  Yes, your Honor, I'm willing to waive.

16          THE COURT:  Is there anything that I've said to you

17     that you wish to have explained further or any questions

18     related to this proceeding?

19          THE DEFENDANT:  Your Honor, there is nothing more that

20     comes to my mind at this point.  Thank you so much for being

21     patient with me and walking me through the process.  I

22     appreciate that.  Thank you.

23          THE COURT:  Thank you.

24          Counsel, anything further?

25          MR. KROUSE:  No, your Honor.

J99KNEJC

1          MR. HEBERLIG:  No, your Honor.

2          THE COURT:  I do find that Mr. Sadr has knowingly and

3    voluntarily waived his right to conflict-free representation.

4    I thank counsel for their letters and the proposed script on

5    that matter.

6          I should note, also, we did receive a written waiver

7    from JP Morgan Chase dated September 3rd, 2019.

8          Mr. Sadr, you did see that as well?

9          THE DEFENDANT:  Yes.  Yes, your Honor.

10          THE COURT:  The waiver is expressly conditioned on the

11    firm's attorneys not using any confidential information

12    obtained in the course of their representation of the bank and

13    lawyers in Steptoe who normally work on JP Morgan Chase matters

14    will not participate in the representation of you.

15          You understand that?

16          THE DEFENDANT:  That's my understanding.

17          THE COURT:  That's consistent with what we've

18    discussed throughout today's proceeding.  You understand that?

19          THE DEFENDANT:  That's correct, your Honor, yes.

20          THE COURT:  All right.

21          Counsel, anything else with respect to the conflicts

22    issues?

23          MR. KROUSE:  No, your Honor.

24          MR. HEBERLIG:  No, your Honor.

25          THE COURT:  So we'll turn to scheduling.

J99KNEJC

1    I have reviewed the September 3rd letter.

2 Mr. Heberlig, anything you want to add to that?

3    MR. HEBERLIG:  Just a brief update, your Honor.  I

4 anticipated correctly there has been a continuance in the other

5 matter.  That trial is now set for October 19th of 2020.  So

6 the decks are here for the date we proposed or any other date

7 consistent with the Court's schedule.

8    THE COURT:  Mr. Krouse?

9    MR. KROUSE:  Yes, your Honor.  The government is

10 available whenever the Court is.  I think Mr. Heberlig proposed

11 March 2nd.  I don't know if that works for the Court, but we

12 could also do it later in March or any other date after that.

13    THE COURT:  I can make that work.  I have a slight

14 preference for April, but I couldn't start until April 20th --

15 no, we'll go with March 2nd.  That's fine.

16    There's also something, right, Mr. Weingarten?

17    So let me say this:  I will put it on the calendar,

18 trial to commence on March 2nd, if we are proceeding to trial.

19 I do set firm trial dates, so I do that for good reason.  In

20 part, I think I've already said here, that my chambers' motto

21 is the human heart works on deadlines, so knowing that that

22 date is not going to move will enable all of us to set other

23 matters, set expectations, and do the work that we need to do

24 with a clear understanding that we will proceed to trial on

25 that date.

1    I have my work cut out for me because I've got the set

2  of motions fully briefed from you to resolve, including the

3  request for a Franks Hearing and the other now fully briefed

4  motions.  I will give you resolution to those as soon as I can

5  and let you know if I seek oral argument on any of them.

6    Once we get past the resolution of those motions, I

7  will set a schedule for the remainder of the case.  That is to

8  say -- well, I will set a schedule for in limine motions,

9  404(b) motions, and other pretrial submissions once we get past

10  these motions.

11    And as I think about it, when I go back to chambers, I

12  may put something out sooner than that, but we have some time.

13  But I'll set that schedule, so that there's sufficient time,

14  following full briefing, to allow me to dig into them and give

15  you as much resolution as I possibly can, with as much time in

16  advance of trial as I can, so that you can plan accordingly.

17    With that, Mr. Krouse, any matters to update the Court

18  with respect to any ongoing discovery or other issues?

19    MR. KROUSE:  Yes, your Honor, just briefly.  I think

20  we raised at the last conference that there was some dispute

21  over which documents were marked as responsive in the initial

22  review of those documents by the Manhattan DA's office.  The

23  government will, I think, very shortly confer with defense

24  counsel.  It's not really a discovery matter.  All the

25  documents pertaining to emails with Mr. Sadr's accounts were

1    produced in discovery.  The only question is which of those

2    emails were marked as responsive in the initial review of those

3    documents by the Manhattan DA's office.  So, the government

4    will be prepared very shortly to inform defense counsel --

5    there's already been certain documents that have been marked as

6    responsive, have been identified by the government as so-called

7    hot documents, and I think there's been some miscommunication

8    or some cross-signals about whether that was the entire

9    universe of documents that the Manhattan DA's office initially

10   marked as responsive.  Part of it is the manner in which they

11   were marked responsive, they didn't operate under the same

12   relativity database and things that the U.S. Attorney's Office

13   would have been using; rather, they went through the emails and

14   pulled them into folders as PDF documents and identified them

15   as responsive to the search warrant in that manner.

16          So, the Manhattan DA's office has been working with

17   our conflict counsel, and the trial counsel have been walled

18   off from this process because there still hasn't been a final

19   determination of which of those documents are attorney-client

20   privileged.  So, where we are in the process is the Manhattan

21   DA's office, working with paralegals in our office who are part

22   of the conflict side of the case, have been endeavoring to mark

23   within the relativity databases those documents that have been

24   previously identified by the Manhattan DA's office as

25   responsive, so that we're all operating from the same platform

1    and the same understanding of what was identified as responsive

2    in that initial review.

3              As I said, from a discovery perspective, all of

4    Mr. Sadr's emails, of which he was a custodian, were provided

5    in the initial Rule 16 discovery, so it's more a question of

6    the responsiveness review that was performed by the Manhattan

7    DA's office and the back story on that, which I think the Court

8    is aware of based on the prior filings in the case, there was

9    some difficulty in transitioning the documents from the

10   Manhattan DA's electronic databases and platforms to the U.S.

11   Attorney's Office electronic database and platforms, and that's

12   something we're working very hard to resolve promptly.

13             The other point I'll make is that the government did

14   obtain email communications from several other custodians that

15   were not controlled directly by Mr. Sadr and, therefore,

16   weren't his accounts.  The government's present understanding

17   is that those emails that were part of the hot docs subset

18   included some emails that were from those other custodians,

19   that were not from Mr. Sadr's accounts, and that other than

20   those documents, those other custodians were not fully produced

21   to the defense, and that's something that we just realized

22   happened.  There is a subset of documents from those other

23   custodians that were marked as responsive in the initial review

24   of those documents by the Manhattan DA's office, and we're

25   working on getting those documents together to produce to the

1    defense.

2           So, all of that's to say, there are still ongoing

3    technical issues with the email productions that the government

4    counsel are working hard to wrap our heads around and resolve,

5    and in doing so, I don't anticipate that it would be a

6    tremendous amount of additional information that would be

7    produced in the defense, because, as I said, all the email

8    traffic on Mr. Sadr's accounts were produced in the initial

9    Rule 16 discovery.  But there may be an additional production,

10   and I just want the Court to be aware of that.

11          THE COURT:  With respect to the materials that

12   Mr. Sadr was the custodian for, defense has all of those, and

13   you're working to complete identification of the subset of

14   those that the DA's office had identified as responsive?

15          MR. KROUSE:  Yes, your Honor.

16          THE COURT:  So, that's one category of information to

17   be provided by the government, and we'll come to time frame.

18          MR. KROUSE:  Yes, your Honor.

19          THE COURT:  The second is that there is Rule 16

20   discovery material from custodians other than Mr. Sadr that

21   have not been turned over yet?

22          MR. KROUSE:  That is --

23          THE COURT:  The material itself as opposed to

24   indications -- information about whether the DA marked it as

25   responsive?

J99KNEJC

1    MR. KROUSE:  Yes, your Honor.  That's my
2    understanding.

3         And whether it would constitute Rule 16 or not, I
4    think is a question, because it's possible that only the
5    responsive documents from those other custodians, since
6    Mr. Sadr is not the -- he is not the custodian of that account,
7    it is possible that, from the government's perspective, the
8    Rule 16 would only consist of the responsive documents to the
9    warrant since that is what the government will be seizing.

10        THE COURT:  But there is a subset of that material
11   that has not been turned over?

12        MR. KROUSE:  That's my understanding, yes, your Honor.
13   And that is what we're most urgently attempting to resolve,
14   with the assistance of the Manhattan DA's office and with our
15   conflict counsel, who are walled off from the trial counsel.

16        THE COURT:  And why wasn't that part of the initial
17   discovery production effort?

18        MR. KROUSE:  I don't have a direct answer to that
19   question.  We are trying to find out why it wasn't initially
20   produced.  I think I'd be speculating, but the view, I think,
21   was that the accounts that were controlled by Mr. Sadr were
22   plainly Rule 16 materials and were produced in their entirety.
23   And I think there was some miscommunication or confusion about
24   whether all of the custodians were produced or only the subset
25   as to Mr. Sadr, and that within the hot documents, there were

1   documents included that were from the other custodians.  But my

2   understanding now, after spending a lot of time with both the

3   Manhattan DA's office and the conflict counsel that's sort of

4   running this program, running this issue for us, is that we've

5   now discovered that there were custodians searched and

6   documents seized that were not Mr. Sadr's accounts, that were

7   not produced in that initial Rule 16 discovery.

8           THE COURT:  Well, that does sound like a problem.

9           MR. KROUSE:  Yes, your Honor.

10          And so I wanted to alert the Court of that.

11          THE COURT:  What's your time frame for -- you said --

12   I think you used the word now we've discovered now that this

13   issue.  When did you discover this?

14          MR. KROUSE:  We discovered it in the lead-up to the

15   reassignment of the case, and it's obviously not an excuse in

16   the least.  The government counsel have changed over, so there

17   are new government counsel, and I think in the process of

18   attempting to understand the case, and what had been produced

19   and everything that came before, we did ask some questions

20   about the discovery and dug into that, and that's when we

21   discovered the issue.  So I don't know the exact date, but it

22   was sometime in mid-August.

23          THE COURT:  Okay.  And what's your time frame here?  I

24   have to give them -- they might have motions related to that

25   material.

1           MR. KROUSE:  Understood, your Honor.

2           The time frame, I think, is within two weeks, we

3   should be able to have all of those issues worked out and

4   documents produced to the defense.

5           THE COURT:  What happens, on a daily basis, between

6   now and two weeks from now?  Why does it take two weeks?

7           MR. KROUSE:  My understanding, from the Manhattan DA's

8   office and from our conflict counsel, is that it is fairly

9   time-intensive for them to take a PDF document and determine

10  where it is within the relativity database, to then mark that

11  exhibit, and that's all being done sort of by hand by the

12  paralegals in the Manhattan DA's office.

13          THE COURT:  What's the volume of material we're

14  talking about?

15          MR. KROUSE:  So, I'm not positive about the volume

16  with respect to -- I can give some numbers.  There were 420,

17  approximately, hot documents that were produced.

18          THE COURT:  The hot doc marking, that came from the

19  Manhattan DA's office or that came from your office?

20          MR. KROUSE:  That came, my understanding, from our

21  office in the process of drafting the complaint and charging

22  the case.

23          THE COURT:  And that consisted of both materials for

24  which Mr. Sadr was the custodian and materials for which other

25  folks other than Mr. Sadr was the custodian, and it consisted

1  of some materials that had been marked responsive by the

2  Manhattan DA's office and materials which had not been marked

3  as responsive by the Manhattan DA's office?  Do I have that

4  right?

5          MR. KROUSE:  I think, yes, except for that last part.

6  I think all of those had been responsive is my understanding.

7  So that's --

8          THE COURT:  So do you know, approximately, what is the

9  volume of material that has been turned over up to this point?

10         MR. KROUSE:  All of the documents where Mr. Sadr was

11 the custodian, and that's in the many, many thousands of

12 emails.  I don't have an exact number, but it's substantial.

13 And I will say I think that's the majority of the hot docs are

14 from Mr. Sadr's, as one might expect.  The emails that he's

15 directly on are the most pertinent in the case.  And so a lot

16 of the 420 are from Sadr custodian accounts.  There was also a

17 separate folder that was provided to the defense called

18 indictment documents, and those were -- I said complaint

19 earlier, but I meant indictment, those are the documents that

20 were directly referenced in the indictment, and so those, I

21 think, were separately produced in a folder.  And then all of

22 Sadr's documents were produced in Rule 16.

23         My understanding, my present understanding, which I

24 think is a moving target somewhat because I think there is some

25 duplicate documents, and until all of those are marked in the

relativity database, and we can just run the program to know
how many total documents there are, I was told 2200 documents
were marked responsive and were not in the hot docs.

THE COURT:  Okay.

And were not materials that Mr. Sadr was the custodian
for or could be?

MR. KROUSE:  Or could be.  Or could be.  Some subset
of that 2200 would be non-Sadr custodial documents, but the
majority of -- what I am being told is the majority of the 2200
are from Sadr accounts, so would have already been produced in
Rule 16.  But my understanding is there are some subset, and I
don't have an exact number for that subset, would have been
from noncustodial accounts.

THE COURT:  So, some subset of 2200?

MR. KROUSE:  And I think it would be on the smaller
end of the subset, but I don't have an exact number.

THE COURT:  So, you're thinking it's within that
hundreds or less of materials that have not been turned over at
all yet that will be turned over and within the next two weeks?

MR. KROUSE:  Yes, your Honor.

THE COURT:  And those are essentially email from
people other than Mr. Sadr?

MR. KROUSE:  Yes, your Honor.

THE COURT:  What else are you learning?

MR. KROUSE:  That's the only update we have, your

1    Honor.  Obviously, our attention is very focused on this

2    particular issue, and we are -- by "we," I mean mainly conflict

3    counsel and the Manhattan DA's office, they're working very

4    diligently at our request to resolve this as quickly as

5    possible, but I'm confident within two weeks, it will be

6    resolved.

7              THE COURT:  All right.  I'd certainly like a letter in

8    two weeks' time -- actually, let me hear from you in one week

9    with an update on where you are and two weeks confirming it's

10   been completed.

11             MR. KROUSE:  Yes, your Honor.

12             MR. HEBERLIG:  May I be heard on this?

13             THE COURT:  You may.

14             MR. HEBERLIG:  I have to say I'm quite surprised by

15   what we just heard, and I'd like to take the issues in reverse

16   order.

17             The documents from other custodians, we did

18   understand, both our predecessor counsel at Arnold & Porter and

19   then us, when we got on the scene, that other email accounts

20   were searched that didn't belong to Mr. Sadr.  His entire

21   family and friends were searched.  From the very outset, we

22   asked -- "we" meaning Arnold & Porter first and then we, when

23   we came on the case, asked for complete disclosure of all of

24   those emails that were seized, and we were advised explicitly

25   that we could not be provided any of the emails that were not

deemed pertinent pursuant to the search warrants, that we had

already received the pertinent documents in that what's now

being described as hot documents production, but what up until

this point has been described as the pertinent documents.

So --

THE COURT:  You understood the 420 to not just be hot,

but the only pertinent material?

MR. HEBERLIG:  Absolutely.  And we have written

representations from the government that these were the

pertinent, nonprivileged documents.  So that's a term of art in

this context, obviously.  So, with respect to those

noncustodian emails, we also have the situation that back in

July of last year, maybe prior to July, Judge Carter ordered

the government to complete discovery by mid-July.  And the

government came into court at a status conference and

represented, discovery is now complete.  That's 17 or 18 months

ago.  They were pushing for a fall of 2018 trial date back

then.  So, I'm, frankly, astonished that we're hearing there

are some other subset of material we didn't receive.

As to Mr. Sadr's emails, we have been advised that

those 420 documents, which consist of about 4,000 pages,

reflected the pertinent documents.  We understood that to mean

those that the agents who executed the search warrant deemed

pertinent.  This issue is completely wrapped up in our motion

to suppress the search warrant and our motion for return of

1    seized property.  I think when the Court digs into those, you

2    will see that these warrants were facially deficient.  I mean,

3    the argument we heard today, frankly, makes our case, at an

4    absolute minimum, an evidentiary hearing is warranted here.

5    The U.S. Attorney's Office can't even keep straight what

6    happened here.

7          We're told now that the Manhattan DA's office is still

8    involved?  I'd like to know, is Gary lynch, who's a special

9    Assistant U.S. Attorney, involved in that process?  Because the

10    current state of play is the trial team, the prosecution team,

11    is not permitted to access anything other than these pertinent

12    documents because there were a host of privilege issues, as

13    well, with the material seized by the search warrant.

14          Now, those privilege issues and the filter review, we

15    understood, were essentially obviated because the only

16    documents that were relevant, the only pertinent documents

17    we've had a back-and-forth with the filter team about, and they

18    don't have attorney-client privileged material in them.  There

19    were a few marital communications we advised the filter team we

20    object to going over to the trial team, and we don't understand

21    there to be any dispute there.  But if we're now reopening this

22    process to, I just heard, another 2200 documents that might

23    have been deemed responsive to the search warrants, there quite

24    likely is going to be a whole host of privilege issues because

25    the people who executed the search warrant had no regard for

1   the attorney-client privilege or marital communications.  We

2   have not been provided, at any stage of this case, any

3   instructions given to the executing officers.  We know, from

4   what was provided to us in a series of sort of botched

5   discovery productions that I won't bore the Court with all of

6   the technical problems we've had over nine months, but

7   privileged communications were widespread to the point that

8   Judge Carter ordered the government, the prosecution team,

9   cease accessing the discovery, you are no longer allowed to

10  look at those materials.  I believe that order is still in

11  effect, with the exception of this small universe of the

12  pertinent documents.

13          So, this is a mess.  And you're absolutely right,

14  there will be a motion from the defense.  We'll wait and see

15  what the government has to say, but we will be moving to

16  exclude any use of these late discovery documents more than a

17  year after the government was ordered to complete discovery,

18  and we're obviously vigorously pursuing an evidentiary hearing

19  because we think all this stuff should be suppressed.

20          THE COURT:  Mr. Krouse?

21          MR. KROUSE:  Yes, your Honor.

22          THE COURT:  It does overlap with the suppression

23  issue, doesn't it?

24          MR. KROUSE:  It does to some extent, but not entirely.

25  I mean, I think not to excuse what I think is a real issue, the

J99KNEJC

1    production -- the late production of these other custodians --

2              THE COURT:  The basics of this, you have a discovery

3    deadline.  We're talking about material within the government's

4    possession that was not turned over within that deadline,

5    correct?

6              MR. KROUSE:  Yes, your Honor, as with respect to

7    the --

8              THE COURT:  And material that the existence of which

9    is contrary to express representations made by the government?

10             MR. KROUSE:  That, I'm not positive about.  That's how

11   Mr. Heberlig is representing it, and I'm not saying he's

12   misrepresenting.  I just don't have any direct knowledge about

13   that point.  I will say that with respect to discovery, the

14   vast majority of the documents that would be useful to the

15   government or to the defense were produced a very long time

16   ago, and that's all the emails with Mr. Sadr as the custodian,

17   and that is the heart of the case.

18             So, the question of whether that was produced -- that,

19   I think, both sides agree, there is no issue with respect to

20   the discovery as to those accounts.  There is this limited --

21             THE COURT:  I'm sorry, is that what you've just

22   described limited to the 420 so-called hot docs, or do you mean

23   to indicate that as long as it was Mr. Sadr's emails and had

24   been turned over, even if outside that hot doc marking, you

25   mean to include that or you mean the 420?

1          MR. KROUSE:  I mean to include beyond the 420, if they

2      were, in fact, identified as pertinent and relevant by the

3      Manhattan DA's office in the initial review of those documents.

4          I'll say on just the point of Mr. Lynch, who is a

5      special Assistant U.S. Attorney assigned to this matter, he is

6      similarly walled off from the ongoing review of documents based

7      on Judge Carter's order.  So, the order applies both to him and

8      to us.  The people working on the Manhattan DA's side with our

9      filter team are paralegals who are merely going into the

10     folders where pertinent and responsive documents were pulled in

11     and attempted to dedupe -- deduplicate those and identify where

12     they fall in the relativity database for the full production of

13     Mr. Sadr's emails.

14         So, that's more of a pertinent and responsive issue,

15     which I can anticipate having litigation over, and that is a

16     universe beyond the 420.  So I think if we're thinking about

17     the issues, Mr. Sadr's emails were all produced.  Some subset

18     of the 420 include Mr. Sadr's emails.  I think --

19         THE COURT:  Do you, as you stand here, know what the

20     representation was with respect to the hot docs?

21         MR. KROUSE:  With respect to the hot docs, if I --

22         THE COURT:  It's one thing for the government to say,

23     look, here's all his emails, here's what we're identifying as

24     hot docs, it's another thing to say these 420 documents, most

25     of which were Mr. Sadr's emails, are the pertinent documents

1    and nothing beyond that will be pertinent, right?

2              MR. KROUSE:  Yes.

3              THE COURT:  Those are very different representations.

4              MR. KROUSE:  I agree in that that would be the

5    government's position, that they are very different.

6              I don't believe, standing here, the government ever

7    said these 420 documents are the sole and exclusive pertinent

8    documents in the case.  I don't think that representation was

9    made.  If defense counsel was able to point to a transcript or

10   a letter, I can stand corrected, but my understanding is --

11             THE COURT:  Go ahead, Mr. Heberlig.

12             MR. HEBERLIG:  I have an email, not a transcript, but

13   it was from prior AUSA in the case, Matthew La Roche, to

14   Arnold & Porter in an exchange about discovery on July 10,

15   2018, and Mr. La Roche said:  "We previously produced the

16   entirety of your client's account on April 5; that is, all

17   material obtained pursuant to our search warrants.  On May 15,

18   we produced a subset of those emails (as well as emails from

19   other accounts) that were identified as nonprivileged and

20   pertinent."

21             It's not a subset or small portion.  Did he say these

22   are the only pertinent documents?  No, he did not.  But was

23   that a fair implication from what he said?  Yes, it was.  And

24   the reason why is it's not just a matter of disclosure.  They

25   did disclose all of the emails they seized to us, but they

1   seized 15 years' worth of his emails that consist of over

2   100,000 messages.  So we've understood for the last 17 months

3   that this case is about the 420 pertinent documents, not some

4   broader universe, and we have been on notice, but we've been on

5   notice of his entire life for 15 years.  This is not a small

6   issue.  Our preparation has focused on the pertinent documents,

7   and they're changing the game at this late stage.

8           THE COURT:  Can I see what you read from?

9           MR. HEBERLIG:  You know, it's my --

10          THE COURT:  Never mind.

11          MR. HEBERLIG:  I can provide you with the email, but

12  this is just an excerpt of it.  It's typed --

13          THE COURT:  Okay.

14          MR. HEBERLIG:  Pardon?

15          THE COURT:  I suppose I'll learn more -- this will be

16  litigated.

17          Okay.  Well, I suppose, defense counsel, your

18  application at this point is simply to be able to file a motion

19  related to this, right?

20          MR. HEBERLIG:  Yes, your Honor.  And for the status

21  quo to remain, which is that the prosecution team is only

22  permitted to access those pertinent documents, or what are now

23  described as hot documents, but I think if they go beyond that

24  on their own, they're running a risk that they're reviewing and

25  tainting themselves over materials that we say weren't deemed

1    pertinent pursuant to the warrant and, therefore, should not be

2    reviewed by the government because it would be the product of a

3    Fourth Amendment violation.

4              MR. KROUSE:  And I will represent that no one from the

5    prosecution team is reviewing any of those documents beyond the

6    hot -- that is part of the difficulty, frankly, is that all of

7    this is happening and not being directed or we can't really

8    provide input on substance.  So, it is, my understanding, a

9    very mechanical process that's happening, which is pulling

10   documents from folders in which they were dragged into in order

11   to identify documents that were marked as pertinent back in

12   that review and then have it migrated to our system, so that we

13   can provide it to the defense counsel as the overall universe

14   of pertinent documents, some of which is beyond the 420 hot

15   docs.

16             So, that is sort of the mechanical nuts and bolts of

17   what's happening.  And as to Mr. Heberlig's concern that the

18   government is -- and by "government," I mean trial counsel --

19   is involved in any way, I can assure the Court and defense

20   counsel that the trial team, which includes Mr. Lynch, remains

21   walled off from that process.

22             THE COURT:  And that's because of Judge Carter's order

23   and the necessity of the privilege review?

24             MR. KROUSE:  Yes, your Honor.

25             THE COURT:  Okay.

1        Well, given where we are now, I think the best we can

2   do is, Mr. Krouse, obviously, in light of the recent

3   realization as to the additional potential materials, you've

4   got to have your foot on the gas with respect to that.  I'll

5   hear from you in a week.  It will be done within two weeks.

6        Mr. Heberlig, do you want to set a schedule now for

7   filing with respect to this or after you see what comes

8   through?

9        MR. HEBERLIG:  Why don't we see what comes, your

10  Honor.  And, again, it's sort of tied in with the other pending

11  motions.

12       THE COURT:  So, why don't we say three weeks from

13  today, we'll hear from you, if you either want to supplement

14  the existing motions or file any additional motions.

15       MR. HEBERLIG:  Just to be clear, that three weeks is

16  for us to give you notice of that, not to file --

17       THE COURT:  Notice and a proposed schedule.

18       MR. HEBERLIG:  Thank you, your Honor.

19       THE COURT:  Anything else I can address at this time?

20       MR. WEINGARTEN:  Just --

21       THE COURT:  Go ahead, Mr. Weingarten.

22       MR. WEINGARTEN:  A few small points, your Honor.

23       I heard the Court say that you will take into

24  consideration whether or not there will be argument on the

25  motions.  And I'm certainly not pressing it, but everybody's

J99KNEJC

1    schedule is filling in the fall.  Is there any possibility we

2    could reserve some time in case there will be argument?  And

3    I'm guessing whatever I thought about the likelihood of

4    argument was increased with what I just heard from the

5    government.

6           THE COURT:  Well, I haven't -- I've been gone for two

7    weeks, and I'm just back, so I need to dig in and figure out

8    what my --

9           MR. WEINGARTEN:  Okay.

10          THE COURT:  -- time frame for being able to actually

11   get to them is, and from that, I'll know when I would likely

12   want argument.  So, as soon as I can, I'll put out an order

13   holding a date for argument, but I don't, as I sit here, know

14   what I want that to be.

15          MR. WEINGARTEN:  Okay.  That's fine.

16          And there are two conditions of bond I'd like the

17   Court to consider.  One is a curfew.  As we get closer to

18   court, it would certainly convenience counsel if we could have

19   access to our client in the evenings.

20          THE COURT:  What's the curfew?

21          MR. WEINGARTEN:  7:00.  And we understand that the

22   probation officer in Washington has no objection.

23          THE COURT:  You're seeking complete relief from the

24   curfew or --

25          MR. WEINGARTEN:  Midnights.  Just the way my schedule

1    works, it would be nice to have access to the client in the

2    evening.

3         THE COURT:  Mr. Krouse?

4         MR. KROUSE:  Your Honor, I don't fully understand what

5    the request is.

6         THE COURT:  To change the curfew.  Right now, it runs

7    from, what, 7:00 p.m. to 7:00 a.m., something like that?

8         MR. WEINGARTEN:  Yes.

9         THE COURT:  And so the request is to change it from

10   midnight -- he's got to be home from midnight to 7:00 a.m.

11        MR. WEINGARTEN:  Just so he can come to our office.

12        MR. KROUSE:  Your Honor, I haven't had a chance to

13   consider this or to speak to the pretrial officer about it.  I

14   certainly would have no objection to him being released from

15   the curfew for purposes of meetings with his counsel, but it

16   seems to me that a wholesale revision of the curfew, especially

17   to make it as late as midnight, doesn't seem appropriate

18   without having given it much thought.  If the only reason is

19   that he needs time to meet with his attorneys, it seems like a

20   more narrowly crafted remedy is possible.

21        MR. WEINGARTEN:  I'm not sure who I pose this to, but

22   I have spoken to prosecutors about this in the past.  In

23   addition, his ankle bracelet.  And our understanding is the

24   probation officer in D.C. has absolutely no objection to

25   lifting that obligation as well, and, obviously, we would like

1    that, too, and would respectfully request the Court to consider

2    that.

3            THE COURT:  That doesn't have anything to do with

4    meeting with counsel?

5            MR. WEINGARTEN:  No.

6            MR. KROUSE:  So we object to that, your Honor.  Based

7    on the previous litigation over the defendant's bail, as the

8    Court is aware, he was detained, and the government's position

9    was, and remains, that he poses a risk of flight.  I think the

10   only reason he was released on bail was that it was under

11   strict pretrial supervision with electronic monitoring.

12           THE COURT:  I don't see any reason to revisit that

13   decision.

14           MR. WEINGARTEN:  The only thing I would request is the

15   probation officer who deals with him constantly has very

16   decided views on the subject, and I would respectfully request

17   the Court to consider that.

18           MR. KROUSE:  None of those have been communicated to

19   us, your Honor, but the government's position is unchanged,

20   that that condition --

21           THE COURT:  So, Mr. Krouse, you'll communicate with

22   the probation officer, see what he or she recommends.  If the

23   government consents to the requested alteration for the ankle

24   bracelet, you'll let me know within a week's time.

25           MR. KROUSE:  If we consent, your Honor?

1          THE COURT:  Yes.

2          MR. KROUSE:  And then if we do not consent?

3          THE COURT:  You'll let me know that.

4          MR. KROUSE:  Okay.

5          THE COURT:  And, Mr. Weingarten, if the government

6   doesn't consent, I'll welcome a letter briefing indicating what

7   the probation officer's views are.

8          We'll do the same with respect to -- I'm inclined to

9   change the curfew for purposes of meeting with counsel, if the

10  representation is you need more time later in the evening.

11  That strikes me as a reasonable request.  But I'll hear from

12  the government on that and the ankle bracelet within a week,

13  and, Mr. Weingarten, if there's a dispute on either of the

14  issues, I'll hear from you the week after that.

15         MR. WEINGARTEN:  Thank you.

16         THE COURT:  All right.

17         Anything else I can address at this time?

18         MR. KROUSE:  No, your Honor.  Thank you.

19         THE COURT:  Counsel?

20         MR. WEINGARTEN:  No.

21         THE COURT:  Thank you.  We are adjourned.

22                         *  *  *

23

24

25