# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ALI SADR HASHEMI NEJAD,

*Defendant*.

Case No. 18 Cr. 224 (AJN)

ORAL ARGUMENT REQUESTED

**DEFENDANT ALI SADR HASHEMI NEJAD'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HIS MOTIONS FOR SUPPRESSION OF SEARCH WARRANT EVIDENCE AND FOR RETURN OF PROPERTY**
**(Pretrial Motions No. 8 & 9)**

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
Bruce C. Bishop (*Pro Hac Vice*)
David M. Fragale
Nicholas P. Silverman (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant Ali Sadr Hashemi Nejad*

Dated:  October 10, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 2

    A.    The Search Warrants ............................................................. 2

    B.    The Indictment and Discovery ............................................... 4

    C.    The Pretrial Motions ............................................................. 6

    D.    The New Claim of Additional Pertinent Documents ............................ 8

ARGUMENT ...................................................................................................... 9

I.    THE COURT SHOULD SUPPRESS THE RETURNS OF SADR'S PERSONAL
AND BUSINESS EMAIL ACCOUNTS ............................................................ 9

    A.    New Authority Confirms the Warrants Are Overbroad, Lacking in
Particularity, and Function as General Warrants ...................................... 9

    B.    The Executing Agents Treated the Warrants as General Warrants ..................... 11

    C.    The Good-Faith Exception Does Not Save the Blanket Seizures ........................ 16

II.    THE COURT SHOULD ORDER THE NON-PERTINENT DOCUMENTS
RETURNED OR DELETED, OR ORDER THAT THEY BE SEGREGATED
AND NOT SEARCHED OR USED .................................................................. 18

III.    THE COURT SHOULD HOLD A SUPPRESSION HEARING .................................... 20

CONCLUSION .................................................................................................. 21

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*In re 650 Fifth Ave.*,
    830 F.3d 66 (2d Cir. 2016)............................................................7, 10

*In re 650 Fifth Ave.*,
    934 F.3d 147 (2d Cir. 2019)...................................10, 11, 16, 17, 18

*Riley v. California*,
    573 U.S. 373 (2014)......................................................................17

*State v. Thompson*,
    51 Misc. 3d 693 (N.Y. Sup. Ct. 2016) ...........................................7, 18

*United States v. Cioffi*,
    668 F. Supp. 2d 385 (E.D.N.Y. 2009) ..............................................17

*United States v. Ganias*,
    824 F.3d 199 (2d Cir. 2016) (en banc)................................................7

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017).............................................................16

*United States v. Wey*,
    256 F. Supp. 3d 355 (S.D.N.Y. 2017).................................... *passim*

**Other Authorities**

U.S. Const. amend. IV .................................................................. *passim*

Fed. R. Crim. P. 41(e)(2)(B) ...............................................................7

N.Y. Crim. Pro. § 690.05(2)(a) ..........................................................12

N.Y. Crim. Pro. § 690.25 ..................................................................12

N.Y. Crim. Pro. § 690.50(5) ..............................................................13

N.Y. Crim. Pro. § 690.55(1) ..............................................................13

**INTRODUCTION**

The government seized the entire universe of data associated with Sadr's personal and business email accounts, without limitation, going back to the accounts' inception fifteen years ago.[1]  Sadr has moved to suppress this evidence because (among other reasons) the warrants are overbroad, not particularized, and functionally equivalent to general warrants.[2]  Sadr has further moved for return of all seized data not identified as pertinent in the government's initial responsiveness review,[3] or at a minimum an order that the government segregate and not search those materials, which are outside the scope of the warrants.[4]

In July 2018, the government represented to the Court that discovery was substantially complete, and that its trial evidence, or the "vast majority" of it, was contained in the 420 PDF documents that it produced in May 2018 and identified as the "pertinent" documents.  When, in February 2019, Sadr moved for return of all documents other than the May 2018 production—describing those documents as "private documents that have not been identified as non-privileged and pertinent," Return Mem. at 2—the government did not state it had identified any other documents as pertinent, tacitly confirming Sadr's understanding.

More than a year later, in mid-September 2019, the government for the first time identified another 2,397 documents it claimed were pertinent, many of which it had never

---

[1] Memorandum in Support of Motion For Suppression of Search Warrant Evidence and For a Franks Hearing at 1-2, Dkt. No. 96 ("Suppression Mem."); Memorandum in Support of Motion For Return of Property at 1 nn.1-2, Dkt. No. 98 ("Return Mem.").

[2] *See* Suppression Mem. at 1, 17-22; Reply in Support of Suppression Mot. at 11-14, Dkt. No. 116 ("Suppression Reply").  Sadr also seeks to suppress the evidence seized under the warrants, and seeks a *Franks* hearing, because of intentionally and/or recklessly false statements in the warrant affidavits.  *See* Suppression Mem. at 5-13; Suppression Reply at 2-10.  Those requests remain pending but are unaffected by the supplemental information herein.

[3] *See generally* Return Mem.; Reply in Support of Motion for Return of Property at 2-6, Dkt. No. 117 ("Return Reply").

[4] *See* Return Reply at 6-8.

produced to Sadr (in violation of a discovery order).  The government has not provided any meaningful explanation for how this happened.  Despite Sadr's requests, the government has refused to provide critical details about its responsiveness review, including the instructions given to the document reviewers or the search terms used to identify the pertinent documents. Nor have the government's vague statements about the timing of its responsiveness review explained whether that review was conducted promptly after the initial seizure, as the Fourth Amendment requires.

More important, the circumstances surrounding this late-breaking production reveal that, rather than limiting review of Sadr's seized electronic data to material initially determined responsive to the warrants, government agents in fact have likely continued, on at least some occasions, to search the *entirety* of Sadr's seized emails.  Such continued searches of the unbounded initial seizures show the warrants in fact have functioned as electronic general warrants.  Sadr is entitled to suppression of the unconstitutionally seized material (Mot. No. 8), and to the return (or, at a minimum, prohibition on further access or use) of all information not initially determined responsive to the warrants (Mot. No. 9).

## FACTUAL BACKGROUND

### A.     The Search Warrants

This case originated as an investigation by the Manhattan District Attorney's Office ("DANY"),  not into the state-law crimes referenced in the search warrants, but rather into allegedly "illicit U.S. dollar payments made through banks in Manhattan in furtherance of a scheme to evade [federal] U.S. sanctions against Iran."  Gov't Omnibus Opp'n at 56, Dkt. No. 108 ("Opp'n") (noting that the Supervising Investigator who swore out the warrants was experienced in investigating "the illicit movement of U.S. currency in violation of United States Office of Foreign Assets Control ('OFAC') sanctions against Iran").

Even though it was investigating potential federal sanctions violations, DANY obtained warrants purporting to search for and seize evidence of state-law offenses of offering a false instrument for filing, falsifying business records, and money laundering.  *See* Dkt. Nos. 96-1, 96-2.  The DANY made no attempt to link the allegations in the supporting affidavits to these crimes.  Instead, the supporting affidavits alleged what the government understood to be violations of federal sanctions.[5]

Relying on these allegations of federal sanctions violations, the government obtained warrants to search every Sadr email address referenced in its affidavits, including several for which DANY had no evidence at all.[6]  Through these warrants, DANY seized more than 100,000 of Sadr's emails, many of which concerned personal relationships, family, medical information, and unrelated business dealings.  There was no attempt to cabin the seizure by date range (despite express knowledge of when the alleged Venezuela project occurred), subject matter, or any other limiting principle.  The seizure captured every email from the inception of the accounts to the day of seizure—spanning more than fifteen years of Sadr's life.

A filter team of staff and attorneys at DANY removed approximately 8,615 potentially privileged documents, but sent the remaining 365,140 documents through to the DANY prosecution team.[7]

---

[5] Sadr disputes the government's reading of the relevant sanctions and has moved to dismiss on that basis.  *See* Motion to Dismiss the Sanctions Counts (One & Two) and Derivative Money Laundering Counts (Five & Six) For Failure to State an Offense, Dkt. No. 81.

[6] *See, e.g.*, Apr. 16, 2014 Search Warrant for ali.sadr.h@gmail.com and others, Dkt. No. 96-1 at 000490 (seizing all accounts "associated or linked" to the email address for which the government claimed probable cause).

[7] Letter from Andrew DeFilippis et al. to Hon. Andrew L. Carter Jr. (Oct. 1, 2018), Dkt. No. 64.  (DANY's data processing resulted in many duplicate documents.  This number was reduced to approximately 100,000 when the U.S. Attorney's Office processed the same data in November 2018.)

**B.**      **The Indictment and Discovery**

The Indictment was returned on March 19, 2018.  Sadr promptly requested discovery,

and the government responded on April 5, 2018, by producing "the defendant's electronic

accounts" along with certain documents referenced in or used in support of the Indictment.[8]  The

"defendant's electronic accounts" were raw, unprocessed data[9] consisting of the entire contents

of Sadr's email accounts.  The government said it would "produce an additional copy of the data

from the defendant's and other individual[s'] electronic accounts excluding any potentially

privileged materials, which will represent the documents available to the prosecution team."  *Id.*

Thus, the government appears to have contemplated that after removing privileged documents,

all of Sadr's and third-parties' seized electronic accounts would be "available to the prosecution

team."

On April 11, 2018, Judge Carter ordered the government to complete discovery within

sixty days—by June 10, 2018.[10]  The government subsequently explained that the discovery

productions required "compiling large amounts of e-mail data from multiple accounts on drives

and making decisions about what's discoverable and what's not."[11]  On May 15, 2018, the

government made its only additional production within the sixty-day period.  It produced 420

PDF files, many of which contain multiple emails or email attachments.

The government later described the May 15, 2018 production as "a subset of [the entirety

of Sadr's email accounts] (as well as emails from other accounts) that were identified as non-

---

[8] Letter from Matthew Laroche et al. to Baruch Weiss & Andrew Bauer (Apr. 5, 2018)
(Ex. A).

[9] Data must be processed before it can be reviewed through document review software
like Relativity or Concordance.  The raw nature of the data produced April 5, 2018, lacking any
information or metadata from the government, suggests it likely was the data received directly
from the e-mail hosting companies.

[10] Apr. 11, 2018 Tr. at 13, Dkt. No. 21 (noting that this would include data from other e-
mail accounts).

[11] Apr. 18, 2018 Tr. at 70, Dkt. No. 24.

privileged and pertinent."[12]  Prior defense counsel sought confirmation that the May 15
production consisted of the pertinent documents:

> [T]he cover letter [to the April 5 production] stated that you would 'produce an
> additional copy of the data from the defendant's and other individual's
> electronic accounts excluding any potentially privileged materials, which will
> represent the documents available to the prosecution team.' Was the
> production on May 15th that subset? *It sounds like the May 15th subset
> removed both privileged and non-pertinent documents*, which is a little
> different. As such, I think Tal's email was asking for what you had said you
> would provide, *i.e. the 'documents available to the prosecution team' before
> the non-pertinent materials were removed.*[13]

Despite this specific request, the government did not identify any other pertinent documents.

The government recently represented that "DANY completed its responsiveness review
of all email evidence in early 2017."[14]  Thus, by the time of the May 15, 2018 production, the
government's responsiveness determinations had been made more than a year earlier.  Yet in
2018, the government, describing its May 15 production as the "subset of those emails (as well
as emails from other accounts) that were identified as non-privileged and pertinent," said nothing
about any other pertinent documents.

In July and August 2018, defense counsel periodically confirmed their understanding that
the May 15, 2018 production constituted "what you [the government] [have] characterized as the
relevant documents.  Those were all cleared by the taint team and reviewed by the prosecution
team."[15]  The government did not dispute this understanding.  To the contrary, when defense

---

[12] Email from Matthew Laroche to Tal Machnes et al. (July 10, 2018 9:02 AM) (Ex. B at
5) (emphasis added).

[13] Email from Andrew Bauer to Matthew Laroche et al. (July 10, 2018 3:26 PM) (Ex. B
at 4) (emphasis added).

[14] Letter from Michael Krouse et al. to Brian Heberlig (Sept. 26, 2019) (Ex. C) ("Gov.
Sept. 26 Letter").

[15] Email from Tal Machnes to Matthew Laroche et al. (July 26, 2018 4:52 PM) (Ex. B at
2); *see also* Email from Tal Machnes to Matthew Laroche et al. (Aug. 2, 2018 7:43 AM) (Ex. B
at 8) ("the discovery we have so far in this case has consisted primarily of (1) a thumb drive of

counsel asked for more time to review the raw search warrant returns, the government resisted, arguing it had "identified a very discrete, very limited set of documents that we expect would be what we would introduce at trial or the vast majority of what we would offer at trial,"[16] which "set out a very detailed roadmap for the defense of the documents that we intend to rely upon at trial," and that "the relevant materials are really a small fraction of what was produced to the defense." *Id.* at 7.[17]

### C.    The Pretrial Motions

On September 25, 2018, after substituting for Arnold & Porter, undersigned counsel explicitly adopted all outstanding discovery requests and specifically requested all "data and documents from all [non-Sadr] accounts obtained by the government pursuant to search warrants."[18]  If the government refused to provide documents other than those in the May 2018 pertinent document production, counsel asked the government to explain what keywords were used to search for pertinent documents in the non-Sadr accounts.[19]  The government responded on November 2, 2018 that DANY had searched the Non-Sadr Accounts for unspecified categories of documents and seized only those documents it identified as responsive to those

---

Mr. Sadr's accounts, produced on April 5; and (2) material from Mr. Sadr's accounts and other sources, which the prosecution deemed was pertinent and produced on May 15.").

[16] July 17, 2018 Tr. at 14, Dkt. No. 45.  The government's "vast majority" qualification could not have meant that another 2,397 pertinent documents—nearly six times the May 15, 2018 production—existed and might yet be produced.

[17] The government later informed Sadr that the prosecution team had only had access to the documents produced on May 15, 2018 and those referenced in the indictment.  The remaining documents seized from Sadr "were not, and have never been made available to prosecutors in this Office (that is, SDNY prosecutors), except [Garrett Lynch]."  Letter from Andrew DeFilippis et al. to Brian Heberlig (Oct. 15, 2018), Dkt. No. 66-2.

[18] Letter from Brian Heberlig to Andrew DeFilippis et al. at 2-3 (Sept. 25, 2018), Dkt. No. 92-1.

[19] *See id.* at 3.

categories.[20]  The government further represented that it was confirming with the filter team its

understanding that "the responsive documents *were all produced to the defendant in the prior*

*discovery productions*."[21]  The government declined to produce any additional documents from

the Non-Sadr Accounts, stating the "remaining portions" were not considered part of the seizure

under the warrants:

> We do not believe we are currently authorized to provide to the defendant the
> remaining portions of the Non-Sadr Accounts. As noted above, the search
> warrants did not permit DANY to seize the entirety of the Non-Sadr Accounts
> and, thus, providing the defendant with the remaining portions of those
> accounts would potentially run afoul of the search warrants and the Fourth
> Amendment.[22]

After this representation that it would confirm the prior discovery productions were complete,

the government disclosed no further pertinent documents seized from Sadr or anyone else.

While preparing Sadr's pretrial motions (filed February 25, 2019), Sadr (through counsel)

focused on the relevant law that permits the government to copy and temporarily overseize

electronic data to determine what falls within the warrant,[23] but permits such overseizure for only

as long as it takes to perform a responsiveness review.  *See United States v. Wey*, 256 F. Supp. 3d

355, 383-84 (S.D.N.Y. 2017); *State v. Thompson*, 51 Misc. 3d 693, 719-20 (N.Y. Sup. Ct. 2016).

Accordingly, Sadr moved for the suppression and return of all documents except those that had

---

[20] Letter from Andrew DeFilippis et al. to Brian Heberlig at 1 (Nov. 2, 2018), Dkt. No.
92-2.

[21] *Id.* (emphasis added).

[22] *Id.*

[23] Fed. R. Crim. P. 41(e)(2)(B); *United States v. Ganias*, 824 F.3d 199, 210 n.3 (2d Cir.
2016) (en banc) (explaining that, "because 'computers and other electronic storage media
commonly contain such large amounts of information that it is often impractical for law
enforcement to review all of the information during execution of the warrant at the search
location, this rule acknowledges the need for a two-step process: officers may seize or copy the
entire storage medium and review it later to determine what electronically stored information
falls within the scope of the warrant") (quoting Fed. R. Crim. P. 41, advisory committee's note to
2009 amendments); *accord In re 650 Fifth Ave.*, 830 F.3d 66, 100 n.31 (2d Cir. 2016) ("*650
Fifth Ave. I*") (acknowledging that Rule 41(e)(2)(B) "authorize[s] warrants of this nature").

already been marked as "non-privileged and pertinent."  Sadr's Return Motion clearly identified the May 15, 2018 production by date, page count, and description, Return Mem. at 2, and sought return of all other documents seized from his accounts on the grounds that they were "private documents that have not been identified as non-privileged and pertinent[] during the almost five years the government has had to review them [and] are no longer subject to reasonable search or seizure."  *Id.*

In response, the government did *not* claim that Sadr had misunderstood the scope of the May 15, 2018 production, or that other responsive documents existed.  Instead, it stated only that "the prosecution team has been permitted to access and review only the far narrower universe of emails that have been deemed pertinent and have been reviewed and cleared by the government's privilege review wall team and defense counsel."  Opp'n at 94.

In Sadr's Reply, he reiterated his understanding:

> Over three years later, in May 2018, the government notified Sadr's counsel that it had identified the documents that it believed were 'pertinent,' *i.e.*, responsive to the warrants, which amount to less than 5% of the seized files. Nonetheless, the government has retained copies of the nearly 100,000 non-pertinent files seized from Sadr despite the lack of any warrant justifying the ongoing retention of those files.[24]

In the four months following that reply, the government again did not correct this understanding.

### D.    The New Claim of Additional Pertinent Documents

It was not until the September 9, 2019 hearing that the government claimed it possessed other documents, not yet disclosed or identified, that were responsive to the search warrants.[25]  In its September 16, 2019 letter, the government stated it would be producing an additional 1,775 pertinent documents from the Sadr accounts, which had been included among the raw disclosure of all material seized from the Sadr accounts, but had not previously been identified as pertinent.

---

[24] Return Reply at 1.

[25] *See* Sept. 9, 2019 Tr. at 31-32, Dkt. No. 137.

The government further stated it would be producing an additional 622 documents from the non-Sadr Accounts that had never before been produced.[26]

The government states DANY identified these documents as responsive during reviews that concluded by early 2017, and that since that time, "*no one from DANY, the U.S. Attorney's Office, or the FBI has reviewed the email evidence to identify any additional responsive material.*"[27]  The government had previously represented that it "ceased accessing and conducting searches of Sadr's non-pertinent communications at least as early as May 2018."[28]

## ARGUMENT

**I.     THE COURT SHOULD SUPPRESS THE RETURNS OF SADR'S PERSONAL AND BUSINESS EMAIL ACCOUNTS**

**A.     New Authority Confirms the Warrants Are Overbroad, Lacking in Particularity, and Function as General Warrants**

The warrants here authorized seizure of the entirety of Sadr's personal and business email accounts, back to their inception.[29]  Though they purported to state probable cause to believe the email accounts will contain evidence of violations of three broad New York State criminal statutes, they "COMMANDED" the executing officers to seize *all* of Sadr's email messages, and other information associated with his accounts, with no limitations whatsoever.[30]  Sadr's suppression motion explained that the warrants were overbroad, completely lacking in particularity, and functioned as prohibited general warrants.[31]

---

[26] Letter from Michael Krouse et al. to Hon. Alison J. Nathan (Sept. 16, 2009), Dkt. No. 134.

[27] Gov. Sept. 26 Letter at 2 (Ex. C) (emphasis added).

[28] Opp'n at 95-96, Dkt. No. 108.

[29] *See* Suppression Mem. at 2, 18-19; Apr. 16, 2014 Affidavit & Search Warrants, Dkt. No. 96-1.

[30] *See* Apr. 16, 2014 Search Warrant for ali.sadr.h@gmail.com and others, Dkt. No. 96-1, at 000490 (paragraph beginning, "YOU ARE THEREFORE COMMANDED"); Suppression Mem. at 19-20 n.14; Suppression Reply at 13-14.

[31] Suppression Mem. at 18-21; Suppression Reply at 11-14.

*In re 650 Fifth Avenue*, 934 F.3d 147 (2d Cir. 2019) ("*650 Fifth Ave. II*"), decided after

pretrial motion briefing was complete, confirms these warrants were constitutionally deficient.

There, as here, the affidavit "was neither attached to the warrant nor incorporated by deliberate

and unequivocal language," but instead was merely referenced in "'boilerplate language' in

[their] statement[s] of probable cause." *Id.* at 161 (quoting *650 Fifth Ave. I*, 830 F.3d at 84); *see,*

*e.g.*, Dkt. No. 96-1, at 000487-88.  This is insufficient.  "[T]he Fourth Amendment's particularity

requirements must be satisfied 'in the warrant, not in the supporting documents.'" *650 Fifth Ave.*

*I*, 830 F.3d at 99 (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).  For a warrant affidavit to

be considered in support of the warrant's particularity, "the warrant must contain 'deliberate and

unequivocal language of incorporation." *Id.* at 100 (quoting *United States v. Waker*, 534 F.3d

168, 172-73 & n.2 (2d Cir. 2008) (per curiam), and citing *Groh*, 540 U.S. at 557-58).[32]

Here, the warrants referred to the investigator's affidavit, but did not contain "deliberate

and unequivocal language of incorporation" (such as stating the affidavit "is incorporated by

reference," 830 F.3d at 100), nor is there evidence the affidavits were attached.[33]  The warrants

thus must be evaluated on their face, without the affidavits.  Although the warrants here are

marginally better than those in *650 Fifth Ave.* in that they list the (non-federal) offenses

alleged,[34] they share the same particularity flaw, in that they authorize seizure of the *entirety* of

---

Sadr also seeks suppression under *Franks v. Delaware*.  *See* Suppression Mem. at 5-17;
Suppression Reply at 1-11.  That argument is unaffected by this supplement.

[32] "Language in a warrant that simply references an underlying affidavit does not
incorporate the affidavit so as to allow the documents together to satisfy the particularity
requirement." *Id.* (citing *Groh*, 540 U.S. at 554-55, and *United States v. George*, 975 F.2d 72, 76
(2d Cir. 1992)).

[33] *See* Suppression Mem. at 19 & n.14; Dkt. No. 96-1, at 000487-488; Suppression Reply
at 14.

[34] *See, e.g.*, Apr. 16, 2014 Search Warrant for ali_sadr@hotmail.com, Dkt. No. 96-1, at
000487 (alleging state-law offenses, *but see* Suppression Mem. at 14-17; Suppression Reply at
10-11; *supra* at 2-3).

10

the data held in or associated with the accounts, with no effort to particularize what among all of

that data should be seized, searched, or may contain evidence of the offenses alleged, and "no

temporal scope of the materials that could be seized."  934 F.3d at 161.[35]

Worse, the warrants gave the executing officers no guidance whatsoever as to what

within that vast trove of data could be searched or retained as evidence of the crimes alleged.[36]

Instead, the warrants amounted to licenses for the agents to ransack the entirety of Sadr's digital

life for fifteen years in search of evidence of crime.[37]  "Lacking . . . any practical tool to guide

the searching agents in distinguishing meaningfully between materials of potential evidentiary

value and those obviously devoid of it; the Warrants are—in function if not form—general

warrants."  *Wey*, 256 F. Supp. 3d at 386.  "This deficiency, while concerning under any

circumstances, is only exacerbated by the fact that the Warrants target . . . the contents of

electronic devices."  *Id.* (citing *United States v. Ulbricht*, 858 F.3d 71, 99-100 (2d Cir. 2017)).

### B.    The Executing Agents Treated the Warrants as General Warrants

Given the lack of any limitation (either temporal or subject-matter) on agents' searches of

the entire email accounts, it is impossible to tell how or when the executing agents made

pertinence determinations.  Despite Sadr's repeated requests, the government has repeatedly

refused to explain how such determinations were made, and has provided very limited

---

[35] *Compare id.* at 161 n.13 (warrant covering "any and all . . . documents or records concerning or relating to the ownership of . . . [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran]"; "any and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran] . . ." and, "most broadly," "'any and all computers, central processing units, external and internal hard drives . . . and related or connected computer or data storage equipment' located on the premises"), *with, e.g.*, Dkt. No. 96-1 (directing seizure and search of entire email account, all associated subscriber and payment information, and all content, including drafts and attachments, sent and unsent, and all log history, "from the time period of the inception of the target email account to the date of the warrant").

[36] *See* Suppression Mem. at 20-21; Suppression Reply at 14.

[37] *See* Suppression Mem. at 19, 21; Suppression Reply at 14.

explanations of the timing of the review.  Moreover, it appears that the government has

improperly searched the warrant returns outside the scope of even its own pertinence

determinations.

After the government's late disclosure in September 2019 regarding the existence of

additional pertinent documents, Sadr requested the instructions provided to the executing agents

and a summary of how the pertinent documents were selected.[38]  Although the government

claimed the DANY attorneys and support staff who reviewed the search warrant returns "had

several meetings and discussions about reviewing the returns, and discussed and used search

terms to identify responsive materials," it declined to disclose the instructions or the search terms

used by DANY.[39]  The government also stated that during the responsiveness review, the DANY

"made binders of responsive documents" and "saved responsive documents in electronic

folders."[40]  Yet when Sadr requested copies of those binders and folders, the government stated

only that it is "in the process of determining whether the Folders and Binders remain in the same

form as they were when the DANY Reviewed created them, and whether they can be produced

to the defense as such."[41]  Two weeks later, the government has yet to produce the folders and

binders, or even confirm whether they still exist.

The government's description calls into question whether DANY's review was a true

responsiveness review, or simply part of its case development.  New York law requires that the

police officer execute the warrant.  *See* N.Y. Crim. Pro. §§ 690.05(2)(a), 690.25.  Similarly, in

federal investigations, FBI (or other law enforcement) agents generally execute federal warrants

and undertake the responsiveness review.  *See, e.g.*, *Wey*, 256 F. Supp. 3d at 376 (explaining that

---

[38] Letter from Brian Heberlig to Michael Krouse et al. at 2 (Sept. 23, 2019) (Ex. D).

[39] Gov. Sept. 26 Letter at 2 (Ex. C).

[40] Letter from Michael Krouse et al. to Hon. Alison J. Nathan (Sept. 16, 2019), Dkt. No. 134.

[41] Gov. Sept. 26 Letter at 2 (Ex. C).

after a privilege review, an FBI agent was tasked with locating and tagging as "pertinent" any documents that were "covered by the search warrant"). Here, by contrast, Sadr's email returns were reviewed by "Assistant District Attorneys, paralegals, and analysts from DANY."[42] This departure from New York warrant execution procedure suggests the review was not a valid responsiveness review. Instead, it appears the DANY investigative team may have skipped the responsiveness step of execution and simply reviewed the entirety of Sadr's emails as part of its case investigation.[43]

The government's response regarding the timing of the responsiveness review is equally deficient. Under the Fourth Amendment, the government must complete its responsiveness review "within a 'reasonable' period of time." *Wey*, 256 F. Supp. 3d at 383. Here, the government disclosed that DANY executed 18 search warrants over 33 email and iCloud accounts, with the first warrant issued in April 2014 and the last issued in April 2016. The government stated that the responsiveness review "was conducted on a rolling and continuous basis," "as returns were received, from approximately May 2014 to early 2017."[44] That response does not specify whether the returns of each particular warrant were reviewed promptly, leaving open the possibility that DANY agents continued to rummage through the returns of warrants executed in 2014 well into 2016 or even 2017. The government's response does not establish compliance with the Fourth Amendment's requirement of a reasonably prompt responsiveness review.

---

[42] Gov. Sept. 26 Letter at 2 (Ex. C).

[43] New York law also requires that "[u]pon seizing property pursuant to a search warrant, a police officer must without unnecessary delay return to the court the warrant and the property, and must file therewith a written inventory of such property, subscribed and sworn to by such officer." N.Y. Crim. Pro. § 690.50(5). This inventory enables the court to either retain the property or direct that it be held by the applicant or the officer who executed the warrant. N.Y. Crim. Pro. § 690.55(1). The government has not produced such an inventory.

[44] Gov. Sept. 26 Letter at 2 (Ex. C).

In fact, there is reason to believe government agents continued to access and search the raw email returns long after any responsiveness review was completed.  The government represented to the defense that "DANY completed its responsiveness review of all email evidence in early 2017," and that since that time "no one from DANY, the U.S. Attorney's Office, or the FBI has reviewed the email evidence to identify any additional responsive material."[45]  But in its Opposition, the government gave a different date for ending its searches— stating "the Government's prosecution team ceased accessing and conducting searches of Sadr's non-pertinent communications at least as early as May 2018."  Opp'n at 95-96.

There is a reason for this year-long discrepancy.  In spring 2018, Sadr was being detained pretrial, and the parties were intensely litigating whether he would be released on bail.  At Sadr's March 28, 2018 arraignment, prosecutors claimed Sadr's passport showed recent travel to the United Arab Emirates,[46] and that '[t]here's talk of him going back and forth to Iran."  Mar. 28, 2018 Tr. at 16, Dkt. No. 12; *see also id.* at 17 ("He's traveled to Turkey, he's traveled to the UAE, and he can travel to Iran.").  To support its argument of flight risk, it appears the government went into the database of *all* seized documents, and ran searches for any travel to or from Iran.[47]  The government's April 2018 briefs regarding bail cited multiple boarding passes and emails about travel that have never been included in the pertinent documents demonstrating that the government conducted unrestricted (and unconstitutional) searches of the entirety of Sadr's emails between March 28 and April 17, 2018.  Indeed, the government's Opposition

---

[45] *Id.*

[46] The government was wrong.  It mistook a reference to Sadr's travel to Dublin, Ireland as a reference to Dubai, UAE.  Sadr had not been to Dubai during the preceding two years. Appl. For Pretrial Release at 3, 15, Dkt. No. 14.

[47] *See, e.g.*, Opp'n to Def.'s Mot. For Bail at 3, Dkt. No. 15.

*admits* "the Government's prosecution team" was "accessing and conducting searches of Sadr's *non-pertinent communications*" through "May 2018." Opp'n at 95-96 (emphasis added).[48]

Thus, despite having concluded its responsiveness review a year earlier—and later acknowledging that it would be improper "to retain 100,000 of the defendant's emails *and continue to search them for responsive material* for a period [of] more than four years," Opp'n at 95 (citing *State v. Thompson*, 51 Misc. 693, 716 (N.Y. Sup. Ct. 2016))—the government had no problem searching *all* of Sadr's emails when it served the government's purpose of trying to keep Sadr in jail through trial. The government's apparent distinction—that it was not searching "*for responsive material,*" Ex. C at 2; Opp'n at 95—slices exceedingly thin, to the point of being misleading. Sadr's constitutionally protected privacy interest in not having his digital life combed through under a general warrant is violated equally whether the government's search is for responsive evidence, non-responsive evidence useful in keeping him detained, or indeed *any* governmental search for *any* reason not supported by probable cause.

The government's searches might well have continued but for Judge Carter's Order stopping government review of the seized documents pending resolution of privilege review issues. The government points to that September 2018 Order to argue that "Sadr's primary concern that the government should not be able to 'continue to *hold and search*'" non-pertinent documents is "misplaced." Opp'n at 96. The government does not say what may have happened had Judge Carter not entered that order. Its searches of the seized documents during the bail litigation—and its failure to acknowledge such searching other than through the artful "for responsive material" distinction—suggest the government believed that once it possessed the

---

[48] It appears the government may have covered some of this searching with a May 2018 "pertinence" determination: the "pertinent documents" it produced in May 2018 included a separate folder, labeled "Travel to Tehran," containing boarding passes and other documents referring to Iran travel that often bore no connection at all to the Venezuelan project at the heart of this case.

entirety of Sadr's email accounts, it could do with them what it wished.  Certainly, the warrants

said nothing to the contrary.[49]  These were general warrants.  *See Wey*, 256 F. Supp. 3d at 386-

87; *Ulbricht*, 858 F. 3d at 99-100 (quoting *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir.

2013)).

> ###       C.       The Good-Faith Exception Does Not Save the Blanket Seizures

Sadr's suppression briefs also explained that the good-faith exception does not save the

unconstitutional warrants here.[50]  The Second Circuit's August 2019 decision in *650 Fifth Ave. II*

confirms this analysis.

The good-faith exception does not apply "where the warrant is so facially deficient that

reliance upon it is unreasonable."  *650 Fifth Ave. II*, 934 F.3d at 162 (quoting *United States v.

Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).[51]  This scenario "applies, for example, when a warrant

'fails to particularize the place to be searched or the things to be seized.'  The animating concern

is whether the 'warrant is so facially deficient . . . that the executing officers cannot reasonably

presume it to be valid.'"  *Id.* (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

"That language fits this case like a glove.  This warrant is facially deficient."  *Id.*

Although the warrants here at least recite the state-law offenses alleged in the affidavits (though

no probable cause is shown for those offenses, Suppression Mem. at 14-17; Suppression Reply at

10, 12), they "plainly lacked particularity" as to the "place to be searched or the things to be

seized," and did "not even arguably include . . . a temporal scope for the items to be seized. . . .

---

[49] *See, e.g.*, Dkt. No. 96-1 at 000487-488.

[50] *See* Suppression Mem. at 22-24 (citing *Wey*, 236 F. Supp. 3d at 398-99; *United States
v. Rutherford*, 71 F. Supp. 3d 386, 393 (S.D.N.Y. 2014); and *George*, 975 F.2d at 78);
Suppression Reply at 14-15.

[51] The exception also does not apply "where the issuing magistrate has been knowingly
misled," or "where the application is so lacking in indicia of probable cause as to render reliance
upon it unreasonable."  *Id.*   Those circumstances are still applicable to the remainder of Sadr's
suppression/*Franks* motion, *see* Supp. Mem. at 5-17, 22-23; Supp. Reply at 1-11, 14, but are not
affected by this supplement.

No reasonable officer could have presumed that th[ese] glaringly deficient warrant[s were] valid." *650 Fifth Ave. II*, 934 F.3d at 162.

Defending its claim of the good-faith exception, the government argues the warrants specified the location to be searched—"specific target email addresses"—and "plainly stated the electronic data and communications to be seized and searched."  Opp'n at 93.  But what they directed to be seized and searched was *everything* contained in, or associated with, each of Sadr's email accounts, from the inception of the accounts forward—some fifteen years of Sadr's life.  That is not particularity.  It is a digital ransacking of Sadr's life.  Suppression Mem. at 19; *Riley v. California*, 573 U.S. 373, 396, 402 (2014); *United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009); *see also Wey*, 256 F. Supp. 3d at 385 (rejecting reliance on warrant containing no "meaningful content-based parameter or other limiting principle").  The information seized was not inherently suspect, *cf. Wey*, 256 F. Supp. 3d at 385, but instead was the cornucopia of information reflecting Sadr's everyday life.

Moreover, after directing the seizure of *everything* contained in or associated with the accounts, the warrants gave *no direction whatsoever* in how that information could be searched or retained, or what within it would be considered responsive.  Once the entirety of Sadr's accounts was delivered to the government, law enforcement agents had free rein to search as widely as they pleased, and to retain the information as long as they pleased, no matter how far afield it was from the offenses recited in boilerplate fashion in the warrants.  *See* Search Warrant for ali_sadr@hotmail.com, Dkt. No. 96-1, at 000487.  They had no direction or limitation whatsoever—comparable to the lack of guidance in *Wey*, 256 F. Supp. 3d at 386-87, and even less than the agent direction found insufficient in *650 Fifth Ave. II*, 934 F.3d at 163.  "Under all these circumstances, the Government's reliance on this warrant was not 'objectively reasonable.'"  *650 Fifth Ave. II*, 934 F.3d at 164.

## II.    THE COURT SHOULD ORDER THE NON-PERTINENT DOCUMENTS RETURNED OR DELETED, OR ORDER THAT THEY BE SEGREGATED AND NOT SEARCHED OR USED

The government's omnibus opposition acknowledged that the government cannot, consistent with the Fourth Amendment, continue to search data that was seized from Sadr but not responsive to the warrants.  The government contends that Sadr's reliance on *State v. Thompson*, 51 Misc. 693, 716 (N.Y. Sup. Ct. 2016), is misplaced, because there  the government "continue[d] to search" even the non-responsive material for more than four years, whereas here, it "ceased accessing and conducting searches of Sadr's non-pertinent communications at least as early as May 2018" (Opp'n at 95-96).  The government thus acknowledges the impropriety of continuing to retain and search non-responsive documents (while neglecting to mention its searches of those emails up to a year after it completed its responsiveness review in early 2017, to find non-pertinent travel documents it could use to argue flight risk).  Similarly, when Sadr requested production of the files seized from third parties in September 2018, the government responded that DANY had "searched the Non-Sadr Accounts pursuant to search warrants that identified specific categories of documents that were subject to seizure," and as a result "seized only those documents it identified as responsive to the search warrants."  Dkt. No. 92-2 at 1.  The government stated it was not "currently authorized to provide to the defendant the remaining portions of the Non-Sadr Accounts," because "the search warrants did not permit DANY to seize the entirety of the Non-Sadr Accounts and, thus, providing the defendant with the remaining portions of those accounts would potentially run afoul of the search warrants and the Fourth Amendment."  *Id.*

Significantly, the language of the search warrants for the Non-Sadr Accounts was *identical* to the language in the search warrant for Sadr's email accounts.  *See, e.g.*, Dkt. No. 96-1 at 000487-89, 000493-95.  Indeed, in the case of Sadr's personal Gmail account (the source of the most important seized emails), *the same search warrant* authorized seizure of the *same*

*evidence* from both Sadr and third parties.  *See id.* at 40.  The government thus acknowledges that its continued seizure of non-responsive documents from third parties is at odds with the Fourth Amendment, Dkt. 92-2 at 1, but denies any such problem for non-responsive documents seized from Sadr.  *See* Opp'n at 94, 96 (arguing that purging the government's files of such non-responsive seized materials would be "overly" and "particularly burdensome").

Because the government concedes the Fourth Amendment does not allow continued searches of material not deemed responsive in its initial review, this Court should order the government to delete, or at a minimum not to access or search, that material.  *See* Return Reply at 6-8.

The government's actions have demonstrated the necessity of such relief.  Despite having completed its responsiveness review in early 2017, the government continued to search the entirety of Sadr's emails when it suited its purpose in the 2018 bail litigation.  When Sadr squarely asked the government whether any DANY, U.S. Attorney's Office, or FBI personnel have searched or accessed any document database that included documents obtained from Sadr that were not included in the May 2018 pertinent documents or the recently identified additional pertinent documents, the government avoided full acknowledgment of its searches by artfully limiting its answer to searches "for responsive documents," without mentioning it had engaged in searches for other purposes.  The Court should end such minute parsing, by making clear that continued searching of nonresponsive documents for *any* purpose violates the Fourth Amendment.

Any retention and use of seized documents should be limited at a maximum to documents that the government determined were pertinent in its initial responsiveness review, completed in early 2017.  That is the only responsiveness review the government claims to have done, *id.*, and

the only one performed within a reasonable time.  *See Wey*, 256 F. Supp. 3d at 383; Return Mem. at 4-5.

There is reason to doubt whether the large cache of new documents the government recently identified as "pertinent" falls within that requirement.  Despite repeated opportunities and sustained discussion over what documents had been deemed pertinent and disclosed to the prosecution team, the government never identified these documents as "pertinent" in 2018 when that question was at the fore (and discovery was required to be completed).  Instead, the government repeatedly represented its May 2018 production as the "subset of [Sadr's] emails (as well as emails from other accounts) that were identified as non-privileged and pertinent."  Dkt. No. 98-1; *see also* July 17, 2018 Tr. at 2-3.  That position—set out when discovery was required to be completed, and held up to this Court as a representation that discovery in fact was substantively complete—should end the matter.

## III.   THE COURT SHOULD HOLD A SUPPRESSION HEARING

To resolve these disputed issues, the Court should hold a suppression hearing.  Sadr has already sought a *Franks* hearing (*see* Suppression Mem. Part I).  The Court should also resolve at a hearing any other disputed issues regarding: the government's execution of the warrants; its responsiveness determinations; any subsequent searches and their scope; the government's disclosures or nondisclosures to the defense and the reasons therefor; and clarification of the government's representations to the defense and the Court regarding its disclosures.  Such inquiry should include, at a minimum, whether in fact the new documents that have surfaced in the past month were determined to be responsive by early 2017, as the government contends, and if so, how and why they have never surfaced until now.  Unless the government can satisfactorily show (a) that these documents in fact were reviewed and determined responsive reasonably

promptly after the seizures in 2014 through 2017, and (b) why they were never disclosed before the discovery deadline, or at any time before now, the new documents should be excluded.

## CONCLUSION

For the reasons stated above and in Sadr's opening and reply briefs on his motions to suppress evidence and return property, the Court should suppress Sadr's seized emails, should order that any non-responsive documents be returned or destroyed.  At a minimum, the Court should prohibit the government from accessing, searching, or using such documents in any way through the conclusion of this case.  The Court should conduct a suppression hearing to resolve all disputed issues.

Respectfully submitted,


*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
Bruce C. Bishop (*Pro Hac Vice*)
David M. Fragale
Nicholas P. Silverman (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant Ali Sadr Hashemi Nejad*

Dated:  October 10, 2019