Jb7WnejO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                           18 Cr. 224 (AJN)

5  ALI SADR HASHEMI NEJAD,

6                Defendant.
                                         Oral Argument
7  ------------------------------x

8                                        New York, N.Y.
                                         November 7, 2019
9                                        11:00 a.m.

10 Before:

11
                      HON. ALISON J. NATHAN,
12
                                         District Judge
13
                           APPEARANCES
14
   GEOFFREY S. BERMAN
15      United States Attorney for the
        Southern District of New York
16 BY:  MICHAEL K. KROUSE
        JANE KIM
17      STEPHANIE L. LAKE
        Assistant United States Attorneys
18      -and-
        GARRETT LYNCH
19      Special Assistant United States Attorney

20
   STEPTOE & JOHNSON LLP
21      Attorneys for Defendant
   BY:  REID H. WEINGARTEN
22      BRIAN M. HELBERIG
        NICHOLAS P. SILVERMAN
23      BRUCE C. BISHOP

24

25

Jb7WnejO

1         (Case called)

2         THE COURT:  Good morning, everyone.  I'll take

3    appearances of counsel, starting with the government.

4         MR. KROUSE:  Good morning, your Honor.  Michael

5    Krouse, Jane Kim, Garrett Lynch, and Stephanie Lake for the

6    United States.

7         THE COURT:  Good morning, counsel.

8         And for the defendant.

9         MR. WEINGARTEN:  Good morning, your Honor.  Reid

10   Weingarten, Brian Heberlig.

11        MR. SILVERMAN:  Nicholas Silverman on behalf of

12   Mr. Sadr.

13        THE COURT:  Good morning to counsel and Mr. Sadr.

14        MR. BISHOP:  Bruce Bishop, also on behalf of Mr. Sadr.

15        THE COURT:  Mr. Bishop, good morning as well.  Thank

16   you.

17        We are here for oral argument on a subset of the

18   defendant's motions -- essentially, the motions to dismiss --

19   and specifically, as I indicated by order yesterday, I will

20   hear argument today on defendant's motions as labeled No. 1,

21   No. 3, No. 4, No. 6, and No. 7.  No argument was requested on

22   motions two or five.  Argument was requested, is requested on

23   essentially eight, nine, and ten.  I don't think ten is labeled

24   "ten," but it's the motion to exclude.

25        As I was preparing, with the supplemental briefs

Jb7WnejO

1    coming in late and also out of concern that there was just

2    insufficient time today to do everything, I indicated yesterday

3    that I would hear argument at a later date on those connected

4    motions, which include the supplemental briefing.  We can talk

5    about scheduling for that in a moment.  Actually, we can talk

6    about it now.

7           What I have available and prefer, but I'll see what

8    the reaction is, is to hear argument on those motions on

9    November 27.  That is the day before Thanksgiving.

10          Does that present an impossible barrier?

11          MR. KROUSE:  That's fine for the government, your

12   Honor.

13          THE COURT:  OK.

14          Mr. Weingarten.

15          MR. WEINGARTEN:  Maybe the day before that?

16          THE COURT:  I don't think I have it available.  No one

17   schedules for the day before Thanksgiving, so it's open.

18          MR. WEINGARTEN:  Yes, but the truth is everybody has

19   family stuff, which I'm sure you would anticipate, and if

20   that's the only time you can do it, we will be here.  We would

21   certainly prefer if there were alternatives.  I mean, any

22   possibility of not next week but the week after that?  Any time

23   at all, as late as you wish for us to be here we'll be here, or

24   as early.

25          THE COURT:  No.  I could do the 25th, which is Monday,

1    at 3:30 p.m.

2              MR. WEINGARTEN:  Yes.

3              THE COURT:  Mr. Krouse.

4              MR. KROUSE:  Yes, your Honor.  That's fine for the

5    government.

6              THE COURT:  All right.  We'll do that, Monday, the

7    25th, at 3:30 p.m.

8              As indicated, today we've got motions that are

9    numbered one, three, four, six, and seven.  I'm going to

10   structure this as follows.  I will give each side an hour.  If

11   with my questions I take you significantly over an hour, I'll

12   make sure that both sides get equal time.  You can make your

13   own decisions about time allocation, but from my perspective,

14   time would be best spent focusing on motions No. 1 and 4.  I

15   also think it would be most beneficial to alternate sides per

16   motion so that I can get responses to positions while I still

17   have them in my head, which is not as long as it used to be.

18             With that, who will argue for Mr. Sadr?

19             Mr. Weingarten, generally, would you like to reserve

20   time for rebuttal?

21             MR. WEINGARTEN:  Yes.

22             THE COURT:  How much total time?

23             MR. WEINGARTEN:  I guess we'll do each argument.  I

24   can't imagine more than five minutes for rebuttal.

25             THE COURT:  All right.  So 55 minutes total -- sorry.

Jb7WnejO

1          MR. WEINGARTEN:  Can I make a suggestion about

2    tweaking the schedule?  Perhaps it would make the most sense if

3    we did four after this one and three, the nondelegation

4    argument, we put to the last?

5          THE COURT:  That's fine.

6          MR. WEINGARTEN:  OK.

7          THE COURT:  Whenever you're ready.

8          MR. WEINGARTEN:  Thank you, your Honor.

9          May it please the Court.

10         I'd like to begin with some prefatory remarks that I

11   think will apply to every word that's uttered on our side

12   today, and they concern sanctions generally and

13   philosophically.  We get why they're important in the world.

14   Obviously, if they're alternative to war, that's a wonderful

15   thing.  We get sanctions relating to nukes.  We get sanctions

16   relating to terror.  We get sanctions relating to human rights

17   violations.  What is also true, the Iranian sanctions in

18   particular cut a huge swath of utterly benign economic activity

19   and criminalize it.  In response to that, every president, I

20   think, except this one, beginning with Jimmy Carter, has said

21   the following:

22         Our only purpose here is to stop the nukes and stop

23   terrorism and stop human rights violations.  We understand that

24   there are economic steps taken here that harm people.  We want

25   the Iranian people to understand, we're not out to hurt them;

we're only out to discourage the bad behavior.  In fact, we

support the Iranian people.  We do not want to hurt the Iranian

people.

That's a critical piece to all this, because what

we're talking about in this case, from start to finish, is

utterly benign activity, the building of low-cost housing in

Venezuela after a disastrous flood that has nothing to do with

nukes, has nothing to do with terrorism, and has nothing to do

with human rights violations and there will never be evidence

adduced that will contradict what I just said.

In addition, there will be absolutely no evidence of

fraud, of rip-off, of cheating, of stealing, none of that

whatsoever.  So the point I'd like to begin with is this is not

a case where we should be stretching and pulling on statutes

and regs to find criminality.  That would be utterly

inconsistent with what every president, what every

administration has said about sanctions, from Jimmy Carter.

Now let's turn specifically to the charges here.

So, what are the charges?

The charges, of course, as we know, relate to reg.

204, and it talks about services going to Iran.  I have found

the sanctions to be surprisingly complex.  When you put up the

regs. with the statutes, with the interpretations, with the

definitions, sometimes you can have brain lock.

THE COURT:  We do our best.

1          MR. WEINGARTEN:  I know.

2          Here, this argument is mercifully simple, because what

3     we're talking about is the most fundamental rule of statutory

4     construction; that is, the plain language.  Read the language.

5     If it's obvious, that's what the law is.

6          So first thing I did, I take out my C.F.R., I look at

7     560.204, and throughout that section, we find over and over

8     again the prohibition has to include, and certainly when it

9     comes to services, "to Iran or the government of Iran."

10         THE COURT:  Right, and the importance for the most

11    direct argument made by the government is the language you've

12    skipped over, which precedes it, which is the word

13    "indirectly."

14         MR. WEINGARTEN:  Of course, but as we articulate in

15    our brief, that does not contradict the requirement of services

16    to Iran.  Something has to go to Iran or the government of

17    Iran.

18         THE COURT:  Does something include benefit of the

19    services?

20         MR. WEINGARTEN:  Well, I mean, obviously, the core

21    argument here is 410.

22         THE COURT:  Right.  So if you're going to give a

23    speech about what matters is the text, then we should spend our

24    time talking about the relevant textual language.

25         MR. WEINGARTEN:  I totally agree.

1    THE COURT:  What does indirectly mean?  And does going

2  to Iran include benefits and services going to Iran as has been

3  interpreted by the agency?

4    MR. WEINGARTEN:  Indirectly could mean reexportation.

5  Let's just say hypothetically that something was shipped to

6  Turkey and it was left there for a day and then went to Iran

7  with the purpose of it getting to Iran, that would be indirect.

8  That's clear, but that doesn't take away from the import and

9  the meaning "of to Iran or the government of Iran."

10    I mean, the real issue in the first argument we make

11  is the contradiction between 410, the interpretive language,

12  and 204.  And 410, the interpretive language, expands the

13  meaning of the prohibition itself.  In such a situation, a

14  first-year law student learns that the law, the prohibition

15  itself has to rule.  If there's an inconsistency, the

16  interpretation cannot prevail.  And if that's the situation,

17  what we have to find, we look to the indictment and see if

18  anything's alleged to have gone to Iran.  I think it is that

19  simple.  And when we look to the indictment, we find the answer

20  is no.

21    Simply stated, the money that we're talking about --

22    THE COURT:  As I understand the allegations, it is

23  that, ultimately, benefit goes to Iranian individuals and

24  Iranian-controlled entities.

25    MR. WEINGARTEN:  And we are saying that is not

1   sufficient.  That doesn't make it.  That is contrary to the

2   explicit, straightforward language of the reg.  I mean, that is

3   the essence of the argument.  Under 410, under the interpretive

4   language, that would be covered, and the interpretive language

5   is way broader than the regulatory language.

6          Hypothetically, if a U.S. person, using U.S. banks to

7   move money, built a hospital in Germany, because he was

8   concerned -- let's say he was of Iranian descent -- that the

9   people in Iran were not receiving adequate health care and

10  people from Iran went to that hospital in Germany and received

11  treatment, that certainly would be for the benefit of Iranian

12  people.  That couldn't possibly be violative of the sanctions

13  and that would be inconsistent with the language of the reg.,

14  point being the interpretive language is inconsistent.

15         It's broader.  It includes, but is broader, than the

16  statutory language -- the prohibitions included in the regs.,

17  the prohibitions have to rule.

18         THE COURT:  You made a point about first-year law

19  students.  So the first-year law student who wrote the Second

20  Circuit *per curiam* in *Homa* you want me to just treat as dicta.

21         MR. WEINGARTEN:  Oh, no.  I think you should.

22         My son is actually a first-year law student.  I asked

23  him if he'd learned this yet; he hadn't.  *Homa* is fine.  I'm

24  not suggesting, in a million years, you look at the

25  interpretive language and say:  This is garbage; this

Jb7WnejO

1    irrelevant; this doesn't count.  No.  Obviously, it can be

2    helpful in certain instances, but in this instance, it doesn't

3    cover the question whether or not interpretive language can

4    expand the meaning, the straight meaning of the reg. itself.

5         THE COURT:  We start, then, with what is the meaning

6    of "indirectly" and "to Iran."  Those are the key phrases, and

7    you said something hypothetically.  I guess let's just ask

8    this.  If the service is to the Swiss entity and the next day

9    the money is transferred to an Iranian entity within the

10   geographic location of Iran, is that within the --

11        MR. WEINGARTEN:  It could well be, your Honor.  I

12   would think we'd need a little more evidence to figure out

13   what's going on, and there is a real issue about services.

14        I mean, the service provided by J.P. Morgan is the

15   service.  It's the clearing function.  And if there was another

16   action taken, somebody carried the money across the border,

17   we'd have to make an evaluation, but obviously, you're in the

18   ballpark.

19        The point here, and I don't think it's going to be

20   contradicted by my friends seated to my right, nothing went to

21   Iran.  The money never went to Iran.  That was the whole

22   purpose of the structure.  The money didn't go there.  If it

23   didn't go there, there's no consistent with the prohibition in

24   204.

25        THE COURT:  If the government wants to argue how the

Jb7WnejO

1    benefits of the services end up in Iran, you would say that's

2    not alleged, that's not in the indictment, but you wouldn't

3    preclude that as an argument under the regulatory language.

4              MR. WEINGARTEN:  They do allege that.  They do allege

5    it in paragraph 12, and we're saying that's not the crime.

6    That's a statement inconsistent with the crime charged.  That's

7    why the count has to be dismissed.

8              THE COURT:  OK.

9              Do you want to shift to the evading, structuring,

10   alternative argument?

11             MR. WEINGARTEN:  Sure.  The evading argument?  Is that

12   what you're asking me to do, your Honor?

13             THE COURT:  Right.  They say even if I'm not persuaded

14   by that sort of direct argument via indirect to Iran and the

15   reliance on 410, then they can still establish a violation

16   pursuant to the prohibition against evading under 203.

17             MR. WEINGARTEN:  I think this is exhibit A as to why

18   bureaucrats in the Treasury department shouldn't be drafting

19   our criminal laws.  I don't say that in sarcasm or scorn, but

20   that's who did draft this, and here's why it's ridiculous in

21   the extreme.

22             Let's say hypothetically -- and it's not hypothetical;

23   it's this case -- the whole point of the financial structure

24   that was set up was to see to it that money did not go to Iran.

25   Basically, under their theory, that would be evading the

Jb7WnejO

sanctions.  That shouldn't be a felony commensurate with

obstruction.  Somebody should get a medal for that, but more

important, the issue is there has to be an evasion of a

prohibition.  The prohibition is 204.  The prohibition of 204

carries with it an obligation that the service relates to the

territory of Iran.  It does not.  So the evasion argument is

not successful either.

THE COURT:  So under that theory, 203 just doesn't do

anything broader than the prohibition in 204.

MR. WEINGARTEN:  Well, I mean, it's conceivable.

There has to be the violation.  There has to be the services to

Iran, but, I mean, you raised a hypothetical where the evasion

piece could actually apply.

THE COURT:  Could you spin that out.

MR. WEINGARTEN:  The instance where the money goes to

Turkey, sits there for a day and a half and, then through some

other means, goes into Iran and the government could actually

prove an intent to accomplish something, meaning evaded

sanctions, but it's hypothetically.

Let's say there's a factory in Iran and if the factory

needs appliances to function properly and the appliances go to

Turkey, if the appliances sat there for three days and then

went to Iran, you may have an evasion.  You may have a

violation of the sanctions.  But let's say the individuals

involved say:  No.  Because of the difficulty of doing business

1  in Iran, we're going to leave the appliances in Turkey or

2  actually manufacture the products there and nothing goes to

3  Iran, there's no violation, there's no evasion, there's no

4  avoidance, there's no obstruction.  There's no crime.

5          THE COURT:  OK.  Any other points you want to make?

6          MR. WEINGARTEN:  There are two arguments for the first

7  one.  There's the 516 argument, so why don't we let the

8  government answer this one, and then I'll do 516.

9          THE COURT:  OK.

10          MR. KROUSE:  Your Honor, just a couple of points on

11  the facts, and of course, on a motion to dismiss, all the facts

12  alleged in the indictment are assumed to be true.  I think it's

13  important here to sort of take a step back and consider the

14  factual circumstances just a little bit.

15          The money that was paid into these shell companies

16  located in Switzerland and Turkey was payment for the

17  construction of housing that was entered into between an

18  Iranian company and a Venezuelan entity, and the payments were

19  made to that Iranian company.  So it can't be divorced entirely

20  from the factual circumstances that are alleged in the

21  indictment.

22          You can't just look narrowly at the regulation, and

23  I'll get to how the defense is trying to look past certain

24  language that doesn't support their argument, but just from a

25  factual standpoint, looking at the allegations in the

1  indictment, the government alleges that an Iranian entity,

2  owned by Iranian people, entered into a contract with

3  Venezuela.

4        THE COURT:  By Iranian entity, do you mean owned by

5  Iranian nationals, or what exactly do you mean?

6        MR. KROUSE:  Incorporated in Iran and owned by Iranian

7  nationals.

8        THE COURT:  So its corporate existence is within the

9  territory of Iran.

10        MR. KROUSE:  Yes, and that is Stratus.  Stratus is an

11  Iranian company.  It's owned by Iranian people.  The contract

12  for the project was entered into with Stratus and the

13  Venezuelan entity, which is a governmental entity, to build

14  these housing developments.  And all of the payments that the

15  government alleges were sent through U.S. banks, in violation

16  of sanctions against Iran, were sent as payments for the

17  construction of that housing.  So it's not as though those

18  payments are completely divorced from activities conducted by

19  an Iranian company.  They're part and parcel of an Iranian

20  company's activities in Venezuela.

21        With that background, the government's position is

22  that all of those payments, which were structured in a way to

23  go through U.S. banks in order for Stratus to receive payment

24  in U.S. dollars, and then were sent to shell companies, located

25  in Switzerland and Turkey, are violations of the ITSR.

1      It can't be that under that, under these regulations,

2  the only thing you have to do to evade or avoid a violation of

3  sanctions is that you create a third-party shell company in

4  another country, incorporate that, and then receive payments

5  into that shell company for activities that were performed by

6  an Iranian company.  That would just be an absurd result.

7      THE COURT:  Unless someone rightly looks at the

8  regulatory language and says, You know what, it only prohibits

9  services to the geographic region of Iran, so if we set up a

10  company, an entity that isn't that, then the line between

11  evasion and compliance is there, and we've figured out a way to

12  comply by not having the services enter into, as the language

13  of the regs. requires, the geographic area of Iran or to the

14  government of Iran.

15      MR. KROUSE:  And your Honor, I think there is a

16  statutory canon of construction that's relevant to that point,

17  which is the statute or the regulation shouldn't be interpreted

18  in a way that would lead to absurd results.  And I think that

19  in this situation, allowing an entity to just create a

20  third-party shell company in another country and then receive

21  payments for activities that are performed by an Iranian

22  company in order to get around the sanctions regime would

23  clearly be an absurd result.

24      THE COURT:  Let's just talk specifically.  Your sort

25  of primary argument, direct argument, 204 argument, is what,

Jb7WnejO

1    that it is indirectly going to the geographic region of Iran?

2            MR. KROUSE:  It's an indirect payment for an entity

3    located in Iran.  That's correct, your Honor.

4            THE COURT:  And do you have to show, then, to

5    establish it, that ultimately the benefit of the services goes

6    to the entity located in Iran as opposed to the shell company

7    it set up?  I mean, would trial follow the money beyond the

8    shell company?

9            MR. KROUSE:  No, your Honor.

10           As alleged in the indictment, the money then was

11   transferred to another shell company in the Virgin Islands, and

12   I believe that's where the trail evidentiarily sort of ends.

13   But the government's position is that we do not need to show

14   that the money physically went into an account located in Iran.

15   All the government has to show is that these payments were for

16   economic activity performed by a company located in Iran, owned

17   by Iranian people, and that those payments were made to the

18   benefit of that company or those people, no matter where the

19   money was actually housed in an account.  It's possible for

20   companies, as your honor knows, to have accounts in multiple

21   different countries.

22           But if the company that's performing the economic

23   activity is then getting paid through U.S. dollar transactions

24   in violation of the sanctions regime, it doesn't matter if it

25   directly goes into Stratus's bank account in Tehran or if it

Jb7WnejO

1     indirectly goes into a shell company incorporated by members of

2     Stratus in order to evade U.S. sanctions.

3               THE COURT:  Before we get to the evading of sanctions,

4     just trying to keep clean the lines between the 204 and 203

5     argument --

6               MR. KROUSE:  Yes, your Honor.

7               THE COURT:  -- under 204, it sounds like you want the

8     reg. to read not "to Iran," as defined by geographic location,

9     but "to Iranians."  Do I have that right?

10              MR. KROUSE:  Your Honor, on that point, "to Iran" I

11    don't believe is explicitly defined.  But to Iran, there's no

12    definition that says it's limited to the geographic location.

13              THE COURT:  So 560.303, subheading Iran/Iranian, "The

14    term "Iran" means the territory of Iran and any other territory

15    or marine area, including the exclusive economic zone and

16    continental shelf, over which the government of Iran claims

17    sovereignty, sovereignty rights, or jurisdiction."

18              Doesn't that have a physical territorial meaning?

19              MR. KROUSE:  The term "Iran" does have a physical --

20              THE COURT:  Right.  That's the term, and that's the

21    term.

22              MR. KROUSE:  But "to Iran," as interpreted by the

23    Second Circuit in *Homa*, says that that provision, 204, should

24    be interpreted to cover services received in Iran or for the

25    benefit of people in Iran.

1    Clearly, it's the government's position, just focusing

2    on the 204 argument, we have the two parts of the regulation

3    that we argue, indirectly and directly; and then also, under

4    410, the fact that these payments were clearly to the benefit

5    of individuals located in Iran, because they were payments for

6    activities that those individuals or the corporate entity that

7    they owned were performing in Venezuela.

8         THE COURT:  Would your argument be that this would fit

9    under the language "directly," or are you relying on

10   "indirectly"?

11        MR. KROUSE:  Your Honor, we're not relying necessarily

12   on "indirectly," because I believe, under the word "directly,"

13   as interpreted by 410 and as interpreted by the Second Circuit

14   in *Homa*, this payment was a direct payment to the benefit of

15   individuals in Iran.  But alternatively, an argument would be

16   that it's indirectly going to Iran or individuals in Iran,

17   because it's going to a third country.  So those are, in a

18   sense, alternative arguments.

19        THE COURT:  And just analytically, is your primary

20   contention that I'm bound by *Homa*'s reliance on 410 to

21   interpret this to include where the benefit of such services is

22   received in Iran?

23        MR. KROUSE:  Your Honor, 410 is part of the regulatory

24   framework.  It's an interpretive provision.  It's also duly

25   authorized by the Treasury department.  It's part of the

Jb7WnejO

1  regulatory framework.

2          THE COURT:  It's an agency interpretation of 203.

3          MR. KROUSE:  Yes, your Honor.

4          THE COURT:  Sorry.  204.

5          MR. KROUSE:  204, yes, your Honor.

6          As you know, in *Homa*, the Second Circuit relied on it,

7  so the government's position is that that is part of the

8  regulatory framework, it makes sense to rely on it in

9  interpreting 204 to the extent that there's ambiguity.

10         THE COURT:  And what about the rule of lenity, if I

11 think that there is ambiguity?

12         MR. KROUSE:  The first argument is that we don't

13 believe there's ambiguity here.  It's clearly within the

14 heartland of what the Iranian sanctions were meant to prevent.

15         To the extent that there is some ambiguity, the agency

16 interpretation of the language, we believe, would control as

17 well as the Second Circuit's reliance on that language.

18         THE COURT:  And just so I understand, how would you

19 define "to Iran" in 204, since you seem not to have the

20 territorial definition I read to you in mind?

21         MR. KROUSE:  Your Honor, for the word "Iran," that's

22 obviously a territorial definition, but under 410, where it

23 says that it's also for the benefit of individuals residing in

24 that territory, the government's view, in response to your

25 Honor's question about whether we need to trace the money

Jb7WnejO

1  directly to an account in Iran, is that we don't have to do

2  that, because a corporate entity that is incorporated in Iran

3  or an individual living in Iran can obviously have bank

4  accounts outside of Iran that are for that person or that

5  entity's benefit.  And so under the overall regulatory

6  framework, under the plain language of 410 and 204, there's no

7  requirement that the government trace the money physically to

8  the geographic entity of Iran.

9          THE COURT:  You would have to trace the benefit to an

10  entity in the geographic territory of Iran.

11          MR. KROUSE:  Yes, your Honor.

12          THE COURT:  All right.  Do you want to move to the

13  evading argument?

14          MR. KROUSE:  Yes, your Honor.

15          An alternative argument, and it's charged in the

16  indictment, is that, under 203, the regulatory framework also

17  criminalizes efforts to avoid or evade Iranian sanctions under

18  the ITSR.  There's another statutory construction or rule of

19  construction that you're not to assume that different words are

20  redundant or read out of the regulation.  Here, that regulation

21  says that it's a violation to directly violate U.S. sanctions

22  against Iran.  It's also a violation to avoid or evade those

23  sanctions.  And here, the government's indictment alleges very

24  sophisticated efforts on the part of the defendant and others

25  to structure these transactions in a way that would evade U.S.

1    sanctions.

2          I'll give a couple of examples.

3          There are emails showing that the defendant purposely

4    and knowingly took the word "Iran" out of the entity that was

5    operating in Venezuela, or tried to; made sure that none of the

6    correspondence with the correspondent banks in New York

7    referenced Iran, all of which shows, in the government's view,

8    knowledge that these transactions were violations of the

9    sanctions laws, and by taking out that language, the parties

10   were attempting to evade U.S. sanctions.  It's plain reading of

11   the regulation.

12         Furthermore, the creation of these shell companies in

13   Switzerland and Turkey are also efforts to evade U.S. sanctions

14   or as part of that same effort to hide who really is receiving

15   the benefit of those funds.  Those funds are clearly payments

16   for construction activities performed by an Iranian company.

17   They're going into bank accounts that are controlled by those

18   same people that just happened to be in a different geographic

19   country, and they're going through the U.S. correspondent banks

20   on the false pretense that those payments have nothing to do

21   with Iranian activity, when they clearly did.

22         So even if the 204 argument wasn't sufficient, which

23   the government's position is it is, 203's broader conception of

24   liability to include evasion and avoidance would clearly cover

25   this activity.

1    THE COURT:  If I agree with you on 203, do you still

2    need resolution of 204 for trial?

3    MR. KROUSE:  Your Honor, we would want resolution on

4    both grounds to be able to argue both grounds to the jury.  So

5    I guess the answer is yes, we would like resolution on both.

6    THE COURT:  All right.  Thank you.

7    Should we pick up 516?

8    MR. KROUSE:  Thank you, your Honor.

9    THE COURT:  I dream in C.F.R. numbers now.

10   MR. WEINGARTEN:  Just 30 seconds to respond to two

11   points, if I may?

12   THE COURT:  Yes.

13   MR. WEINGARTEN:  In 2012, there was a big change, and

14   the whole regimen was altered, and that's why we believe that

15   our conduct under 516 was completely legal from inception until

16   2012.  Also, some changes since 2012, but what does not change

17   is the language about "to Iran or the government of Iran."

18   560.427, "exportation, reexportation, sale or supply

19   of financial services to Iran or the government of Iran," not

20   to the benefit of people.  They know how to write.  They're

21   smart people in the Treasury.  When they want to talk about

22   nationals, they know how to do that.  They did it with Cuba.

23   This language could not be clearer, and the definition in 203

24   could not be clearer.  And it survives the change in 2012.

25   In terms of, quote, shell companies, there's a

Jb7WnejO

pejorative sense to that.  The suggestion is they were only in

existence to receive the money in connection with construction.

That is not true.  Clarity was a trading company and did a

great number of things in addition to being involved in the

Venezuela project.

    THE COURT:  Why aren't those arguments to be made to

the jury?

    MR. WEINGARTEN:  I just wanted to clear the record.

That's all.

    THE COURT:  OK.

    MR. WEINGARTEN:  And Stratus Turkey also did projects

above and beyond Venezuela.

    OK.  516.

    We argued that, under 516, what we did in Venezuela

was perfectly legitimate, authorized by the sanctions *ab

initio*, since 2006, and one way of being comfortable with that

is to look at 516.  And in the beginning years of the life of

this alleged conspiracy, 516 talked about clearing services and

talked about four categories and said the U.S. depository

institutions are --

    THE COURT:  Slow down.

    MR. WEINGARTEN:  You know the language.

    THE COURT:  I've got it right here.

    MR. WEINGARTEN:  OK.  So four separate categories of

conduct, and one, of course, being the U-turns, and No. 3,

1    underlying transaction is not prohibited.

2         We believe, for sure, that the conduct in Venezuela

3    was authorized by both.  Interesting thing, by the way, 2006 --

4    no dispute from the government -- that when this illegal

5    conspiracy began, the conduct was completely legal.  As I was

6    taking the Acela up here, it occurred to me, I wonder if the

7    grand jury heard, were they instructed, that at the beginning

8    of this conspiracy, when this illegal agreement was launched,

9    that the conduct contemplated was 100 percent authorized under

10   U.S. law?  And I would suggest -- I would be eager to hear from

11   the podium today whether or not the grand jury was so

12   instructed -- they should have been.

13        Moving to 2008.

14        For whatever reason, and we'll get to that reason in

15   two seconds, the first category's taken out.

16        Why?

17        Well, we have an answer from the Treasury, and the

18   answer from the Treasury is in the briefs of the parties, and

19   it is clear that the emphasis was there was a belief in U.S.

20   law enforcement that Iranian banks were misbehaving.  Iranian

21   banks weren't checking money laundering.  Iranian banks were

22   engaged in SWAPs, meaning exchanging Iranian currency for

23   dollars with no underlying transactions.  From the words of

24   OFAC, from the words of the United States Treasury, it seems

25   clear, beyond peradventure, what motivated the change in 2008

1    was not a desire to criminalize everything and anything having

2    to do with any Iranian anywhere but to get hold of the conduct

3    of the Iranian banks.

4              So what did they do?

5              They eliminated U-turns.  And I should add U-turns and

6    the clearance function of United States banks is important to

7    the United States.  The U-turns and the clearance process

8    wasn't put in place for Iran.  There's a benefit to the United

9    States for the dollar and U.S. depository institutions being

10   the center of the universe.  So the point of all this, there

11   was an intelligent decision made in 2008:  U-turn gone.  But

12   the other three categories remained, pure and simple.  So if it

13   was illegal under the third category in 2006, it was legal in

14   2008 as well.  And the only argument they have is that:  Oh,

15   no, no.  The Treasury meant the only thing that survived, after

16   we took away the U-turn exception, No. 1, charitable

17   institutions, like remittances.

18             Well, remittances are important.  It's not surprising

19   that that was on the mind of the Treasury.  There are a bunch

20   of Iranian kids in the United States who go to school, and they

21   rely heavily on remittances.  And why in the world would you

22   want to punish them?  So it's not unusual that that would be

23   highlighted in the regs.  But what kills the government's

24   argument is language, the plain language of the reg.  And the

25   plain language of the reg. that kills them, "such as."  Such as

1    doesn't mean only this, and *"e.g.,"* for example, doesn't mean

2    only this.

3            So again, we're at pure English language.  We're just

4    reading English language here.

5            THE COURT:  Let me ask.  On your theory, looking at

6    that same provision, what does noncommercial add?  Am I right

7    under your theory, whether it's commercial or noncommercial

8    remittance, it wouldn't change the meaning.  Right?  You're

9    saying this just highlights one example.

10           MR. WEINGARTEN:  I think there are different kinds of

11   remittances.

12           THE COURT:  Right.

13           MR. WEINGARTEN:  I think that's what they're referring

14   specifically to remittances here, and I think there was a big

15   controversy here.  I may have to check this.  I may supplement

16   what I'm saying here.  I'm understanding that from family, it's

17   one thing.  If it's not family, if it's a business, it's

18   another thing.

19           THE COURT:  OK.

20           MR. WEINGARTEN:  But it's specific to remittances.  It

21   has nothing to do with building low-income housing in

22   Venezuela.  It doesn't change.  That language cannot possibly

23   change the third paragraph of the original 516.

24           THE COURT:  OK.  But you're saying the only question

25   is whether the transfer arises from an underlying transaction

1    that is not prohibited by this part.

2              MR. WEINGARTEN:  Yes.

3              THE COURT:  OK, so it wouldn't matter.  And are

4    commercial remittances prohibited?

5              MR. WEINGARTEN:  I'm not an expert on remittances, so

6    I'm not sure.

7              THE COURT:  All right.

8              MR. WEINGARTEN:  I'm sure I have people here who are.

9              THE COURT:  Move on.

10             MR. WEINGARTEN:  Again, it sort of goes, I think,

11   right to Judge Chin's words.  I think the government's 516

12   argument was stronger in Judge Chin's case than this one.  It

13   was a closer call, and he found ambiguity.  This is 100 percent

14   clear to us.  This is the plain reading, "such as" and "for

15   example."

16             THE COURT:  Which case are you talking about?

17             MR. WEINGARTEN:  The *Banki* case.

18             THE COURT:  Oh, in *Banki.*

19             MR. WEINGARTEN:  I think Judge Chin wrote the opinion.

20             THE COURT:  Thank you.

21             MR. KROUSE:  Your Honor, on this point the defense

22   doesn't cite any authority, and I don't think there is any, for

23   this reading of that one part, where it says, "arose from an

24   underlying transaction not prohibited by this part," to mean

25   that because it was a housing project in Venezuela, it was not

1   prohibited by this part.  It's sort of a very circular argument

2   that the defense is trying to make.  They're saying because

3   these transactions didn't violate the sanctions regime, 516

4   authorizes them.  But as we just went through, in the

5   government's view, under 203 and 204, these transactions did

6   violate the sanctions regime, so they were not authorized by

7   this part.

8           It's clear from the context of 516 that when the

9   U-turn license provision was revoked in 2008, the intent was to

10  leave behind certain types of transactions that relate to

11  noncommercial remittances from family members, humanitarian

12  aid, things of that nature, not these kinds of commercial

13  transactions.

14          THE COURT:  How do we know what was carved out?

15          MR. KROUSE:  Well, we know, your Honor, from just

16  looking at what it was before 2008, what it was between 2008

17  and 2012, and then what it became afterwards.

18          Also, we know from the statement of what Treasury was

19  doing when they made that revocation of the U-turn.  So the

20  government's view is, and we've conceded this, that under the

21  U-turn provision, these kinds of transactions were allowed.  In

22  2008, that was revoked.

23          THE COURT:  What's the relevance of the fact that the

24  conspiracy begins in 2006, as alleged in the indictment, when

25  it, by everybody's concession, was permissible?

Jb7WnejO

1     MR. KROUSE:  The overall conspiracy began in 2006.

2     There is no significance, in the government's view.

3          First, every transaction that the government goes

4     through, the 15 transactions that amount to $115 million, all

5     of those transactions well postdate the revocation of the

6     U-turn license.  They also are well after *Homa* and all the

7     other interpretive decisions that we've been talking about

8     today.

9          As for the start date of the conspiracy, that start

10    date is when the memorandum of understanding was entered into

11    between Stratus and Venezuela, so it's a logical starting point

12    for the conduct.  It's when the agreement was made.

13         THE COURT:  But at that time they're conspiring to

14    comply with the U-turn license.

15         MR. KROUSE:  Possibly, your Honor, but the conspiracy,

16    the overall conspiracy to evade U.S. sanctions began, then,

17    when that agreement was made to start the construction project,

18    and then the manner in which the payments were made --

19         THE COURT:  So in 2006, they were conspiring to evade?

20         MR. KROUSE:  Your Honor, the government doesn't have

21    to prove that at the moment of the date that's alleged in the

22    indictment the full understanding of how the illegal activity

23    would be conducted had to be agreed to.  The conspiracy can

24    evolve over time, and it's the government's view that, here,

25    where we're alleging all of the transactions postdating the

Jb7WnejO

1    revocation of the U-turn provision, that while this conspiracy

2    was in effect and the majority of the time it was in effect,

3    was after the U-turn provision was revoked, Mr. Sadr and other

4    members of the conspiracy worked together to structure these

5    transactions in a way that would either evade U.S. sanctions or

6    violate the sanctions directly or indirectly.

7         The government's view is that there's no significance

8    from a legal perspective on the fact that in 2006, that the

9    start date of the conspiracy is before the revocation of the

10   U-turn provision, especially here, where all of the

11   transactions that make up the bulk of or the entirety of the

12   illegal activity postdated that.

13        Just with respect to Mr. Weingarten's arguments about

14   516 itself --

15        THE COURT:  Yes.

16        MR. KROUSE:  -- there's no authority at all cited in

17   the defendant's brief for this very novel reading of 516, where

18   it appears that there be some circularity to the interpretation

19   of the regulation, where you're saying that there's no

20   violation because these transactions were not prohibited.

21        THE COURT:  The language is the transfer arises from

22   an underlying transaction that is not prohibited.

23        MR. KROUSE:  Yes.

24        THE COURT:  You could see why they'd make the

25   argument.  If you stopped the sentence there, that argument

Jb7WnejO

1    prevails.

2            MR. KROUSE:  But the transaction was prohibited under

3    all the other provisions that we've been discussing here today.

4            THE COURT:  Right.  If you persuade me on that, that's

5    the end of this argument.

6            MR. KROUSE:  Yes, your Honor.

7            THE COURT:  OK.

8            MR. KROUSE:  Thank you, your Honor.

9            THE COURT:  Thank you.

10           MR. WEINGARTEN:  We'll go to four, your Honor?

11           THE COURT:  Sure.

12           MR. WEINGARTEN:  Four, obviously, relates to bank

13   fraud, 1344.

14           Fundamentally, there are three questions that need to

15   be addressed here:

16           One, was there a misrepresentation made by the

17   defendant?

18           Two, did the defendant get or seek to get any of the

19   bank's money either that it owned or had custody of?

20           And then three, did the defendant defraud the bank by

21   exposing it to a risk of tangible economic harm?

22           I'm sure at this point the Court is well aware of the

23   facts.  We're talking about routine, automated, and

24   instantaneous clearing transactions to process the transfer of

25   U.S. dollars from one foreign bank to another.  There are a

1    zillion a day at each of these banks.  I'm exaggerating, but

2    not by much.  I think they get about $9 a pop when they're done

3    in seconds.  We included an exhibit of the Treasury department

4    that describes these transactions, and Judge Chin describes the

5    transactions well in the *Grain Traders* case that we cite in our

6    brief.

7         Let's start with the first question.  Was there

8    misrepresentation?

9         I think it's useful to start with the words of Judge

10   Blackmun in the *Williams* case from the early '80s, which I

11   actually remember.  He basically said a check cannot be a false

12   statement for a simple reason.  Technically speaking, a check

13   is not a factual assertion under the law, and therefore, it

14   cannot be characterized as true or false.  1344 was amended as

15   a result, and there are about a zillion -- again, I'm

16   exaggerating, but not by much -- cases about whether or not in

17   check-kiting cases or bad-check cases it's a false statement to

18   a bank.

19        But the point here, and all of those cases involved

20   defendants doing very bad things but claiming it's not 1344

21   stuff; it should be state stuff.  We're saying nothing of the

22   sort here.  There are no statements made by the defendant, much

23   less false statements, in this.  They're wire transfers, and

24   there's not a false statement, not a false word in those wire

25   transfers.

1          THE COURT:  The argument is it's an implied

2     misrepresentation to a non-Iranian entity.

3          MR. WEINGARTEN:  OK.  I get that.

4          And there, I think we go to the duty to disclose.  Is

5     there a duty on the part of the defendant to do more than he

6     did?  And there we turn to the cases that we cite -- the

7     *Autuori* case, a Second Circuit case, and obviously, you start

8     with, Well, is he a fiduciary?  Does he have some obligation

9     under the law to provide information to the recipient of

10    whatever statements he's making even if he's making statements?

11    And of course, he's not even a customer, so there's no

12    fiduciary responsibility there.

13         The inquiry doesn't stop.  I recognize that.  We have

14    to turn to *Pirro*, another Second Circuit case, which I think is

15    really important.  And *Pirro* basically says in a situation like

16    this, when we're talking about an omission, there must be a

17    known duty to disclose.  Even more important than that, *Pirro*

18    says you have to include in the charge what that known duty is.

19    And of course, there is no such inclusion in the indictment in

20    this case.

21         Now, the government will say, and they're correct, of

22    course, that *Pirro* is a tax case.  And we go back to *Cheeks* and

23    *RadLAX* from the Supreme Court, and what are the obligations

24    there?  And not just tax cases, where there must be a known

25    duty to disclose for there to be an omission.  In an extremely

1  complex statutory or regulatory regimen, that duty applies, and

2  there can't be a more complicated statutory or regulatory

3  regimen than here.

4  THE COURT:  And what about *Morgenstern*; was there a

5  fiduciary duty there?

6  MR. WEINGARTEN:  No.  He was a customer who was

7  ripping off -- I mean, he's just one of the many cases, where a

8  fraudster is trying to rip off someone else, but not the bank.

9  So the argument there is --

10  THE COURT:  -- that he's just handing checks.

11  MR. WEINGARTEN:  Yes.

12  THE COURT:  And he's put the bad checks in with good

13  checks.

14  MR. WEINGARTEN:  Well, as I recall the decision, the

15  Second Circuit said there were affirmative misleading steps

16  taken by *Morgenstern*, which certainly don't exist here.

17  In all of the cases -- and we cite a lot and they cite

18  a lot -- there is underlying fraud.  There's underlying theft.

19  Somebody's trying to rip off somebody, and that's just not

20  happening in this case, which goes to element two.

21  Is there any evidence of our client seeking to obtain

22  property from the bank that's not his own?  And the answer is

23  no.

24  And here, we think that *Shaw* and Justice Kagan's

25  effort to separate 1344(1) and 1344(2) -- it's complicated.  I

Jb7WnejO

1    think I've always assumed that the two parts of 1344 overlap.

2    Maybe they do, maybe they don't.

3              THE COURT:  They're separated by an "or."

4              MR. WEINGARTEN:  Yes.

5              But I don't think that matters in this context.  The

6    point with Justice Kagan's answer is, for purposes of 1344(2),

7    there may or may not be a need to prove an intent to rip off

8    the bank, but you need misrepresentations.  You need to deceive

9    somebody.  This is a fraud statute, after all.  And there will

10   never be evidence in this case that our client sought to rip

11   off anyone, much less the bank or the bank's customer.  We're

12   talking about money that he was entitled to.  That separates

13   this case from all the other cases that we and they cite.

14             What this really comes down to is the right to

15   control.  I mean, at the bottom, on this 1344 charge, the

16   government will have to say -- the only place for them to go --

17   that somehow, some way, the information that was not provided

18   to them put them at risk.

19             THE COURT:  Yes.

20             MR. WEINGARTEN:  And we obviously go back to what

21   obligation did our client have to provide information to the

22   bank?  Was he supposed to pick up the phone and call Jamie

23   Dimon and say:  Jamie, by the way, my dad's in Iran.  He has a

24   complicated relationship with the government, and I just wanted

25   to let you know?

1      I'm being silly, but the point is well-taken.  What,

2  beyond the wire transfer, was called upon either by the law or

3  any other reason for our client to do with J.P. Morgan?

4      So in terms of the right to control, I think the

5  *Binday* and *Finazzo* cases sort of lay it out.  I think it is

6  palpably clear, and Judge Droney, I think, lays it out and

7  gives the history of the 20 years of right-to-control cases and

8  concludes the common thread of these decisions is that

9  misrepresentation or nondisclosure of information cannot

10  support a conviction under the right-to-control theory, unless

11  those misrepresentations or nondisclosures can or do result in

12  tangible economic harm.

13      And by the way, we followed *Lebedev*.  We know that was

14  your case and we read Judge Droney's opinion in *Lebedev*.  I

15  don't think Judge Droney moved an inch.

16      THE COURT:  I don't think *Lebedev* was cited in the

17  papers.

18      MR. WEINGARTEN:  I read it on the Acela.

19      THE COURT:  I was surprised, since it has bearing on

20  both the risk issue --

21      MR. WEINGARTEN:  I agree, I agree, but I don't think

22  Judge Droney's opinion moved an inch in terms of the

23  requirement for tangible economic harm.

24      So what does that mean for purposes of this case?  And

25  then we have to turn to Judge Winters's words.

1      THE COURT:  Are you going to say why *Lebedev* doesn't?

2      MR. WEINGARTEN:  Sure.  We're talking about Bitcoin.

3   We're talking about fundamentally illegal conduct.  We're

4   talking about real potential harm to the bank.  We're talking

5   about the bank advancing funds, and we're talking about actual

6   misrepresentations that were found in the middle of the trial,

7   actual misrepresentations by the defendant to the bank.  I

8   think those would be just the start.

9      THE COURT:  That's on the misrepresentation point, but

10  in terms of the right to control, the disguised transactions

11  had a higher risk of being fraudulent.  Right?  I'm just

12  looking at the language of the opinion.  The institutions

13  processing those transactions would be more likely to process

14  and approve them because they weren't aware of the risk.

15     MR. WEINGARTEN:  I think they were far more likely to

16  be out money than J.P. Morgan, and I think they were also far

17  more likely to be in trouble because of their dealings with an

18  inherently illegal entity, which is nothing even remotely like

19  what's here.

20     I think in all of these cases we have to go to Judge

21  Winters's words in *Nkansah*.  They're oft repeated.  The actual

22  exposure of a bank to losses can't be unclear, remote, or

23  nonexistent.  And here, the potential risk to the banks -- in

24  fact, with all due respect to my friends on the right, I don't

25  think that argument passes the laugh test.  They cite the

French bank *BNP Paribas* and *HSBC*. You know from personal

experience about the French bank participating and admitting to

participating in the massacre in Darfur.

THE COURT: You spend your time following all of my

cases.

MR. WEINGARTEN: Seems to be a wise thing to do.

THE COURT: It's getting harder and harder to keep

track.

MR. WEINGARTEN: *HSBC* -- I know from my own personal

experience what their travails have been -- not even within

light years of the situation facing these banks in this cases.

The government is holding them out as potential victims here.

In the history of man -- and again, I'm being

facetious, but in the history of OFAC work, no bank situated

the way they're situated, dealing with someone who is not a

customer or a client, dealing with a transaction like the ones

in this case, faced exposure.

They cite the MasterCard situation. MasterCard was

dealing with SDNs, entities that had been designated as people

you shouldn't be dealing with. There's nothing even remotely

like this. And what happened to MasterCard? I don't know.

Maybe someone will tell me that they've been sanctioned or

they've been indicted.

THE COURT: That point that you just made, isn't that

the government's argument, that the bank would know they can't

1    deal with Iranian entities, and that's the fraud?

2             MR. WEINGARTEN:  In MasterCard, they were dealing with

3    people who were on a list.  All you have to do is check the

4    list with your customer and you'll find out you shouldn't be

5    dealing with them.  That's the potential risk to MasterCard.

6    There's nothing even remotely like that in this case.  They're

7    wire transfers.

8             What was he supposed to do?  And what's the bank

9    supposed to do?

10            The answer's nothing.  And there's a section we quote

11   in 516, where there's a distinction between financial

12   institutions and their responsibilities with clients and

13   customers, where they have an obligation to see whether or not

14   they are being consistent with the law and with sanctions.  And

15   here, we're talking about financial institutions not dealing

16   with customers.  Completely different situation than the ones

17   cited by the government.

18            So the point is under any analysis of the situation,

19   we don't have any chance whatsoever of these banks getting in

20   trouble under known law, and as a result, there can't be a

21   right-to-control theory here.

22            One more thing I would like to mention is the *Davis*

23   case -- I also read that on the Acela -- Judge Preska's

24   opinion.  That's a recent case, 2017.  It's one where she

25   reversed the conviction in a matter before her, and I think the

Jb7WnejO

1   point here is she talks extensively about the right to control,

2   goes through the entire history, and the benefit-of-the-bargain

3   piece is important here.  I don't think that's terribly

4   relevant to this case, but what she also points out is that the

5   government did not charge the right-to-control theory in *Davis*

6   that they pursued.  She found that to be wanting, and that was

7   part of the reason she reversed the conviction.  The

8   no-right-to-control allegation or theory is articulated in the

9   indictment.  So under *Davis*, that is not kosher.

10          THE COURT:  OK.  Thank you.

11          MR. KROUSE:  Your Honor, at the outset, I'll note that

12  most of these arguments that defense counsel is making are

13  arguments that they can make to the jury.  The question here is

14  whether the government has alleged sufficient facts to support

15  the charge in the indictment and the elements of those

16  offenses, and I think the answer to that question is plainly

17  yes.

18          This is a bank fraud charge and a conspiracy to commit

19  bank fraud charge.  I'll divide up the categories the same way

20  defense counsel did, in the same order.

21          He, first, talked about misrepresentations.  The

22  misrepresentations here are alleged that the defendant

23  misrepresented to the bank that these payments were not for the

24  benefit of an Iranian entity, and that is a misrepresentation.

25          THE COURT:  Well, which allegations make that

Jb7WnejO

misrepresentation?  Where in the indictment are the allegations

that he misrepresented to the bank that there would be no

benefit to an Iranian entity?

MR. KROUSE:  Your Honor, I'll take a step back.

It's throughout the indictment that those steps were

taken by the defendant, so various steps that I outlined

earlier -- changing the name of the entity, taking Iran off of

certain transmittal letters.  Things of that nature were

intended by the defendant and his coconspirators to

misrepresent the nature of the payments that were being made

through these U.S. correspondent banks.

The indictment itself, the charge for bank fraud and

conspiracy to commit bank fraud, alleges all of the elements of

that offense; incorporates in the conspiracy the overt acts

that were previously listed with respect to the IEEPA counts.

And then in Count Three of the bank fraud, which is paragraph

22, it incorporates paragraphs 1 through 13 and 16 of the

indictment, which outlined a lot of the conduct that I'm

referring to.  And then within paragraph 23, there's, toward

the end, a "to wit" clause, "inducing U.S. financial

institutions to conduct financial transactions on behalf of and

for the benefit of the government of Iran and Iranian entities

and persons using money and property owned by and under the

custody and control of such financial institutions, by

deceptive means."

1            That's a clear statement of what the government's

2    charge in this case is.  It's explained in a very detailed

3    fashion in all of the overt acts that were under Count One --

4    Count Two, excuse me -- yes, Count One, the IEEPA conspiracy.

5    And those misrepresentations regarding the nature of those

6    payments and where those payments were destined to were

7    material representations.

8            The government will prove at trial, through a witness

9    from the bank, that had the bank known that these payments were

10   for a construction project run by an Iranian entity and for the

11   benefit of that entity and for the owners of that entity, it

12   would not have approved those transactions.

13           THE COURT:  But how is that different than the

14   check-kiting schemes, where, presumably, someone from the bank

15   would testify had I known there wouldn't have been sufficient

16   funds from this check coming in, I wouldn't have allowed the

17   withdrawal of the funds?

18           MR. KROUSE:  Under *Morgenstern*, your Honor, it's clear

19   that the request for funds can be a material misrepresentation

20   if certain facts are --

21           THE COURT:  The request for funds alone can't be, but

22   you need misrepresentation in addition.

23           MR. KROUSE:  Yes, your Honor, and the government will

24   prove that at trial, that there were these additional

25   misrepresentations by the defendant, the transmittal letters,

1    the changing of the name, the incorporation of these shell

2    accounts, or whatever you want to call them, accounts in other

3    countries, were all part of this overall scheme to trick these

4    U.S. banks into providing the defendant with U.S. dollars in

5    violation of the sanctions regime and also in violation of the

6    bank fraud statute.

7         The point of whether it's a misrepresentation or a

8    material misrepresentation, the government will prove that at

9    trial, and we've adequately alleged, in very great detail, that

10   element of the offense in the indictment.

11        As to the defendant's point about the money, and I

12   guess the statement was that there's nothing that's going to

13   show that the defendant wasn't entitled to the money, the money

14   is the dollars.  The banks are parting with U.S. dollars that

15   they have in their possession, and the defendant is not

16   entitled to those U.S. dollars under the government's view of

17   the case.  He purposely misled the banks in order to obtain

18   those U.S. dollars, which is what he and his coconspirators

19   wanted, and that's property of the bank they're turning over.

20        No matter how the defendant wants to define how a

21   correspondent banking relationship works, it's pretty clear.

22   It's pretty obvious and not that complicated.  A request for

23   payment is made from Venezuela up to the U.S. into these shell

24   accounts in Switzerland and Turkey, and the U.S. banks are

25   parting with U.S. dollars and sending them to those accounts.

Jb7WnejO

And that, in the government's view, would clearly satisfy the element of the bank actually providing property to the defendant.

On the point of risk of economic harm, this, again, I believe, is an issue for trial. It's a factual issue. The Second Circuit has said in another case, *Rossomando*, 144 F.3d 197, pin cite 201, n. 5 (2d Cir. 1998) that the harm was the denial of the bank's right to control their assets by depriving them of information necessary to make discretionary economic decisions. And here, this kind of bleeds a little bit into the material misrepresentation, but the bank's witness will testify that had they known what this money was for and where it was going, they would not have approved the transactions.

There is risk -- real risk -- to the bank in approving transactions that violate Iranian sanctions. There are reputational risks. There are risks to the business. There are risks that the bank is going to have to retain counsel, be investigated whether they were knowingly facilitating these violations of U.S. sanctions. All of that will be proved up at trial. It's alleged in the indictment, and the government's view is that's enough.

THE COURT: Mr. Weingarten makes an argument that you don't, in the indictment, lay out a right-to-control theory. What's your response to that?

MR. KROUSE: Your Honor, it's not necessary in the

Jb7WnejO

indictment to lay that out.  It's only necessary in the

indictment that the government allege a violation of each of

the elements of the offense, and here, we've done so with great

detail and a lot of particularity, and there's no requirement

that the government describe in the indictment every theory

under which the government would be able to prove those

elements at trial.

THE COURT:  Thank you.

MR. KROUSE:  Thank you, your Honor.

THE COURT:  Mr. Weingarten.

MR. WEINGARTEN:  I'm prepared to do nondelegation.  I

would just request a ten-second response?

THE COURT:  Sure.  You get rebuttal too.

MR. WEINGARTEN:  I know.  I'm looking at my watch.  I

don't want to overstay the visit.

I listened closely to what my friend had to say, and I

said there are three issues here.  One, was there a

misrepresentation?  Two, did my client try to get any of the

bank's money he wasn't entitled to?  And three, did he put any

of the banks at risk, and the answers couldn't be more obvious

to all three.  There was no misrepresentation by him to the

bank.  We're talking about information that the bank had.  All

true.

In terms of him getting money that he was not entitled

to, that's what bank fraud charges are all about.  No scintilla

1    of evidence.

2              Finally, there's no response to the point in the world

3    that we live in these banks were not put at risk at all.

4              Nondelegation.

5              Obviously, I understand what the Second Circuit has

6    ruled here, but they left us a little room, and I would just

7    like to touch --

8              THE COURT:  I never read footnotes.

9              MR. WEINGARTEN:  All right.  Boy, did you cut my legs

10   off.

11             THE COURT:  Go ahead.

12             MR. WEINGARTEN:  Emergency.

13             THE COURT:  It's there.  The issue is there.

14             MR. WEINGARTEN:  OK.

15             Emergency.  How in the world can it be that we have a

16   40-year emergency, under any definition of emergency with Iran?

17   It's just silly.  It's silly to argue it.  Iran is a

18   misbehaving country for sure.

19             THE COURT:  The contention is that I should conclude

20   it's silly regardless of what Congress and successive

21   administrations have done.

22             MR. WEINGARTEN:  If the sanctions regime is not

23   authorized by law, the prosecution goes.  And if there's no

24   emergency, the prosecution goes.

25             And every president, Jimmy Carter didn't like the

hostage-taking.  Ronald Reagan had his beef.  Bill Clinton was

crazy about Salman Rushdie, who was not as great a writer as

everyone seems to think, and that, of course, is beside the

point.  W., or at least his vice president, was accusing the

Iranians of 9/11.  Are you kidding?

Actually President Obama had a different view.  He

lifted many of the sanctions, and he was the primary person in

the life of this conspiracy to say the whole point of these

sanctions is not to punish innocent Iranians who are doing

benign things.  And of course, now we have President Trump,

who's taken the opposite.

Shifting justifications.  Emergency has a clear

definition.  Under the law and also in common parlance.

There's no emergency here.

And the constraints.  The Second Circuit, in *Dhafir*,

said one of the reasons we'll save this and we won't find

constitutional violations, are there real constraints on the

Executive?  Yes, of course Congress passes law.  Yes, we

understand that the world is complicated when sometimes the

Executive branch has to do things, but you can't just dump

law-making responsibility on the Executive branch.  And we feel

pretty good about this one because the Executive has

constraints.  Are you kidding?

The Executive reporting meticulously and carefully to

Congress?  No, that's not happened.  And Congress has been even

Jb7WnejO

1    more derelict.  The point to that, the law's not been followed.

2    We're not talking about an emergency, as defined by law, and

3    we're talking about constraints that have been completely

4    ignored.

5           About the delegation, obviously, what is the

6    intelligible principle here?  That the Iranians are bad and

7    that GS-15s on Fifteenth and Pennsylvania can take out their

8    pencils and write whatever they want and that becomes federal

9    criminal law?  That just can't be.  It just doesn't feel right.

10          Obviously we want you to toss the indictment because

11    of this.  What's our second choice?  I'm not sure.  I mean, I

12    think it's so obvious.  I think 50 years from now, when legal

13    scholars look back at the prosecutions of these completely

14    benign economic activities by Iranians, they're going to say

15    how did we let this happen?  Again, I'm not sure what to do

16    about it other than to make this argument.

17          THE COURT:  Thank you.

18          Mr. Krouse.

19          MR. KROUSE:  Your Honor, I'm not going to necessarily

20    engage on the argument that the other branches of government

21    have wrongly decided that there's an emergency.  I'll just note

22    that both Congress and the President have made that conclusion,

23    but the Second Circuit has stated that IEEPA is not an

24    unconstitutional delegation of authority to the President under

25    the case *Dhafir*.

Jb7WnejO

1          Accordingly, the defendant's motion on this point

2     should be denied.

3          THE COURT:  It seems like the one space where I have

4     to particularly opine is the question that was left expressly

5     open in the footnote in *Dhafir*, whether Congress's failure to

6     consider and vote on a joint resolution as to whether the

7     emergency declared should be terminated, I'm not sure I see in

8     your papers a response to that argument.

9          MR. KROUSE:  It's possible we didn't expressly respond

10     to that, your Honor.  I read the footnote.  It seems that

11     Congress, under the statute itself, has the power to terminate

12     the national emergency by a concurrent resolution.  They

13     haven't done so.  Different administrations have periodically

14     updated the executive order for the emergency to account for

15     new facts, and so on this record and on this motion from the

16     defense, there's not enough for the Court to decide that

17     Congress has been somehow derelict in their responsibility to

18     check the President's authority in this area.

19          THE COURT:  Just structurally, the statute requires

20     not later than six months, and the end of each six-month period

21     that the house of Congress shall meet to consider a vote on a

22     joint resolution to determine whether the emergency should be

23     terminated.

24          Congress legislated that, right?  That's 1622(b).  And

25     they haven't, right?

Jb7WnejO

1          MR. KROUSE:  I believe not, your Honor.

2          THE COURT:  It was just a question.  What is the

3     government's argument as to the meaning of that agreed-upon

4     failure?

5          MR. KROUSE:  The meaning of it --

6          THE COURT:  Or remedy for it.

7          MR. KROUSE:  No, I don't believe there would be any

8     individual remedy to that decision by Congress not to follow

9     its reporting obligation.  It's, as you said, structural within

10    the statute and it's within the statute.  Congress has the

11    authority to terminate the President's authority here.  They've

12    chosen not to do so, and so under that framework, the law is in

13    effect and there's no individual remedy to challenge it.

14         THE COURT:  Thank you.

15         Anything further?

16         MR. SILVERMAN:  Yes, your Honor.

17         THE COURT:  Go ahead.

18         MR. SILVERMAN:  I'll address pretrial motions 6 and 7

19    very briefly, your Honor.  I think they go best together, so

20    I'll try not to take up too much of the Court's time with this.

21         Mr. Krouse was talking about bank fraud when he

22    mentioned it, but the question here is whether the government

23    has alleged sufficient facts to support the charge in the

24    indictment, and at the core of motions 6 and 7 is really the

25    fact that it's not what the government has alleged.  It is

1    about what the grand jury has alleged and whether they have

2    alleged sufficient facts to make out the charge against

3    Mr. Sadr so that he can prepare for trial.

4         At this point, your Honor, we would ask that the Court

5    dismiss certain counts, and then, in the alternative, we

6    request striking a surplusage and a bill of particulars.

7    That's why I'm going to try to address these quickly and

8    together and just hit the primary areas where we have something

9    to add to our briefs.

10        The first would be the law of Count Two.

11        Count Two alleges, and I have it on page 24, that

12   Mr. Sadr conspired to violate the entirety of the ITSR, the

13   entirety of the IFSR, and seven different statutes in IEEPA.

14        Now, originally, I had the idea that I'm sure every

15   first-year law student or junior associate has to print out

16   those statutes.  It's over 200 regulations, so suffice it to

17   say that this gives the government incredible ability to roam

18   about at trial, to try to save charges beyond the charges that

19   the grand jury actually intended to bring.

20        THE COURT:  In the alternative to dismissal, you want

21   to know specifically what regulatory violations will be proved.

22        MR. SILVERMAN:  That's correct, your Honor, and it

23   would be consistent with your order in the *Murgio* case, which I

24   understand is another name for the *Lebedev* case; or consistent

25   with, to cite a different case, the Northern District of New

Jb7WnejO

York's order in *Mango*, where they required specific regulations under the Clean Water Act.

No. 2 is something that we've spent most of today talking about, which is the export recipient.  Who received an export that Mr. Sadr either exported himself or caused to be exported?

Today, almost all of the discussion -- in fact, all of the discussion, and I've listened carefully to both the Court and the government -- has been about Iranian individuals receiving an export and about Stratus Iran receiving an export. If you look to the indictment, most of it does say that, but paragraphs 19 and 23 allege with no specificity whatsoever that the government of Iran received exports, and that is an entirely different case; that if Sadr had been accused of that, he does have a right to know what the specific acts underlying that offense are.  That's from both Rule 7 and the Supreme Court, in *Russell v. United States*, and, frankly, the Sixth Amendment, which says that he has the right to know the nature and cause of the allegations against him.

Now, the third essential fact is misrepresentations defense, but we have spent quite a bit of time talking about that, so I will skip right along to the fact that the government, in its response, in the omnibus opposition, doesn't address a lot of these arguments.  But what it does do four times in those three pages is say that we're looking for

1    evidence in our motion for a bill of particulars and to dismiss

2    for lack of specificity.

3              I want to be very clear.  We are not looking for the

4    evidence the government will use to prove these charges.  We

5    are just looking for the charges Mr. Sadr is facing at trial

6    and to dismiss where the grand jury failed to allege those

7    charges with sufficient specificity.

8              THE COURT:  I'm sorry.  This final point that you're

9    making, is that just a summary point?  It's eluding me how it's

10   different.

11             MR. SILVERMAN:  It is just a summary point that

12   applies to all three, your Honor.  I think there are only two

13   places where we are moving to strike surplusage that I haven't

14   already touched upon.

15             First is the use of "among others," and I'd like to

16   clarify our reply brief.  We mistakenly misread the indictment.

17   It does not incorporate all of the uses of "among others."  It

18   incorporates the use of among others in paragraph 16.  So while

19   we do think that "among others" should be struck from the

20   indictment in general, because they're words that don't have

21   any actual function other than to expand the charges beyond

22   what the grand jury returned.  If the Court chooses to apply

23   the distinction between charging paragraphs and means

24   paragraphs, it would be just the "among others" in paragraph 16

25   that we seek to strike.

1          The more important issue in terms of striking and from

2     my perspective is paragraphs 1 through 5 that give the

3     government's history of the ITSR and the legal prohibitions

4     that it opposes, and I think there are a number of reasons to

5     strike this, a few of which we've already touched upon.  But

6     the one thing I wanted to address is how the government defends

7     it.

8          They say that because IEEPA requires willfulness,

9     these introductory paragraphs will provide the jury with

10    information and evidence as to when, through what means, and

11    why prohibitions on exports to Iran --

12         THE COURT:  Let me just ask you about timing.  A lot

13    of courts defer on this.  The jury, if they get the indictment

14    at all, will get it at the point of deliberations.  Why not

15    deem this premature, see what plays out at trial and then

16    address the question then.

17         MR. SILVERMAN:  Because, your Honor, regardless of

18    what evidence is offered at trial, your Honor, those five

19    paragraphs serve no purpose other than to be evidence and

20    information for the jury.  And it's one of the first-year law

21    student points, that an indictment is not evidence.  And if

22    that is the purpose, then it should be struck, just like it was

23    in *Groos* and *Fishenko*.

24         The one thing that I wanted to touch on in those two

25    cases, the government's distinction is that those talk about

Jb7WnejO

1    terrorism and this does not.  It talks about an unusual and

2    extraordinary threat that Iran poses to United States national

3    security.  If that is not an oblique reference to terrorism,

4    I'm not entirely certain what it is.  But *Groos* dealt with four

5    pages of allegations being struck.  There was one sentence that

6    talked about terrorism, so that case was not talking about

7    terrorism either.

8            THE COURT:  The government's papers noted an openness

9    to discussions on these issues and attempting to resolve some

10   of them.  Has that process happened?

11           MR. SILVERMAN:  No, your Honor.  We have not engaged

12   in any sort of conference since the motions were filed.

13           THE COURT:  All right.  Thank you.

14           MR. SILVERMAN:  Thank you.

15           THE COURT:  Mr. Krouse.

16           MR. KROUSE:  Yes, your Honor.  Maybe I'll take them

17   out of order and do surplusage first, your Honor.

18           The government's position is, as the Court noted,

19   this, in our view, is premature.  There's no reason at this

20   point to decide whether certain phrases should be struck from

21   the indictment.  In the event the jury does get the indictment,

22   the Court would have the benefit of all the evidence having

23   been presented and then both parties and the Court could engage

24   meaningfully on whether there were certain phrases that should

25   be in the indictment that goes back to the jury.

Jb7WnejO

1          Just on the specific points, "among others" is a

2     pretty standard phrase that indicates it's not an exhaustive

3     list, and that's been endorsed by various courts, including the

4     *Kassir* decision in this district.

5          The paragraphs-1-through-5 background regarding IEEPA,

6     there's no inflammatory language in there, in the government's

7     view.  It's just a pretty pedestrian description of what led to

8     these various statutes and regulations being put into effect.

9          THE COURT:  It does sound in emergency and threat,

10    doesn't it?

11         MR. KROUSE:  That's the background of these charges.

12    And the arguments will be made at trial, because otherwise the

13    question will be, Well, who cares about these transactions?

14    The transactions are relevant because they're a violation of

15    the law.

16         THE COURT:  What arguments will be made at trial?

17         MR. KROUSE:  That these transactions were part of a

18    scheme to evade Iranian sanctions, so the fact that the word

19    "Iran" comes up --

20         THE COURT:  Right.  But are you going to go into the

21    sort of legislative history or any of the political history

22    around Iran sanctions?

23         MR. KROUSE:  Your Honor, it's a little premature for

24    us to know exactly how the government's going to present the

25    case.

Jb7WnejO

1          I will note that there are going to be certain expert

2    witnesses that the government will propose that could be the

3    subject of some motions *in limine* briefing, but with respect to

4    this motion that's before the Court now, whether to strike

5    surplusage, A, I think it's premature to make that decision; B,

6    there's nothing unusual about a speaking indictment in this

7    district that lays out the history of how certain statutes and

8    regulations were put into effect.

9          THE COURT:  "The situation in Iran constitutes an

10   unusual and extraordinary threat to the national security,

11   foreign policy and economy of the United States and declared a

12   national emergency," etc., etc.

13         I guess I had assumed, when you indicated in the

14   briefing that you'd have some meet-and-confer, what might be

15   agreed upon.

16         MR. KROUSE:  We're happy to have those conversations,

17   your Honor.  I think it's, like I said, premature to fully

18   commit.  We haven't had any conversations with the defense, but

19   we're open to those conversations.  I don't think it's clear

20   that the indictment's even going to the jury, so it's sort of a

21   moot point or not a ripe issue at this point.  That's the

22   government's position.  We are open to having conversations.

23         THE COURT:  Why don't you have a conferral, see if you

24   can narrow the issues on the motion to strike, and put in a

25   letter in a week's time.  I want to give you quick resolution,

1    and I've been working to get myself in a position to do that,

2    but within a week's time, let me know if this has been narrowed

3    at all.

4            MR. KROUSE:  Yes.  The only hesitation, your Honor, is

5    that part of this will require more understanding of what

6    evidence we'll be presenting to the trial.

7            THE COURT:  It's not going to be that hard to think

8    through whether you're going to put on evidence that the

9    situation in Iran constitutes an unusual and extraordinary

10   threat to national security, foreign policy, etc.

11           MR. KROUSE:  But they're seeking to strike all five

12   paragraphs.

13           THE COURT:  That's why I'm saying confer and see if

14   you can narrow it.

15           MR. KROUSE:  OK.

16           THE COURT:  If you can't, you can't, but you'll try.

17           MR. KROUSE:  OK.  Sounds good, your Honor.  When would

18   you like that letter?

19           THE COURT:  A week's time.

20           What about the specific regulatory violations?

21           MR. KROUSE:  Those are in the indictments, your Honor,

22   page 26.

23           THE COURT:  Nothing beyond that?

24           MR. KROUSE:  Those are the regulations and statutes

25   that we're alleging were violated here.  That's on page 26 in

1    the parenthetical after the charge in Count Two.

2              THE COURT:  Paragraph 21?

3              MR. KROUSE:  21, yes, your Honor.  The parenthetical

4    under that.

5              THE COURT:  So limited to, for regulatory violations,

6    203, 204, 205.

7              MR. KROUSE:  Within Count Two, yes, your Honor, the

8    IEEPA conspiracy count.

9              THE COURT:  OK.

10             MR. KROUSE:  Just on the broader point of the

11   specificity, this is a very detailed indictment, much more

12   detailed than the vast majority of indictments that are before

13   the Court.  I think the legal framework is that the grand jury

14   need only allege in the indictment the elements of the crime,

15   and that, combined with the discovery produced to the

16   defendant, puts them on adequate notice of how to defend the

17   charges in this case.

18             I don't think there's any real argument that the

19   defense is in the dark about what the government is alleging.

20   It's in a very detailed, 34-page indictment with 50-some overt

21   acts that go into quite a bit of detail about what Mr. Sadr and

22   his coconspirators specifically did.  And then detailed

23   discovery has been provided to the defense.  They're well on

24   notice of what the government's charges are in this case and

25   are adequately informed in order to prepare their defense.

1        Under that framework, that motion, motion No. 6,

2    should be denied.

3        THE COURT:  Let me hear from counsel on this point.

4        The government has, as I understand it, represented

5    that with respect to Count Two, the regulatory violations are

6    limited to 203, 204, and 205.  That's what you're looking for,

7    right?

8        MR. SILVERMAN:  Your Honor, that is most of the relief

9    that we are looking for.  We would like the remaining sections

10   to be struck, and in addition to striking those from the

11   indictment, there are no specific facts underlying the alleged

12   violation or the purportedly alleged violation of 205, which is

13   about reexports to Iran, I believe.

14       And the one response that I would put in is that

15   nobody in this room has examined more discovery than me.  I am

16   still very much in the dark as to how the government of Iran

17   received an export from Mr. Sadr.

18       THE COURT:  All right.  Let me ask about that point.

19       Mr. Krouse, 205 and the allegations with respect to

20   the government of Iran as opposed to "to Iran."

21       MR. KROUSE:  Your Honor, the indictment alleges the

22   specific involvement of the government of Iran with respect to

23   the agreement to have this project happen in Venezuela, so

24   those are specific allegations -- that the government of Iran

25   engaged in a foreign-policy relationship with Venezuela;

Jb7WnejO

entered into a memorandum of understanding -- and then Stratus

was charged with building those houses.  So the government of

Iran is involved in the facts alleged in the indictment.

All that's required in an indictment, again, I'll say,

is a statement of the elements of the offense.  There's a lot

of detail here.  The motion to strike surplusage is not ripe.

THE COURT:  I'm focused on the bill-of-particulars

question, although I suppose we've dealt with that with respect

to the specific regulatory violations.  You've represented they

won't go beyond 203, 204 --

MR. KROUSE:  Your Honor, 410, there's an interpretive

provision, but as far as what the defendant violated, yes,

those are set forth in the indictment.  As every indictment

from our office usually is, it will say what statute and

regulation we believe is violated in that charge, and we did

that here.

THE COURT:  OK.  With respect to reexportation for the

government of Iran, what allegations go to that?  I understand

that the government of Iran is involved in the underlying

construction project and MOU, but I'm not sure if the

government is alleging that there is reexportation for the

government of Iran.

MR. KROUSE:  Your Honor, it's in the indictment.  It

was returned by the grand jury as written.  The government

hasn't fully decided what its evidence will be and what its

1    presentation will be.  That's why we keep saying it's not ripe

2    at this point.  The motion that the defense is filing goes to

3    the face of the indictment and whether it's alleged, with

4    particularity, the offenses charged.  The government's position

5    is yes, it has.  If, after the presentation of the evidence,

6    there's a renewed motion to strike certain portions of the

7    indictment, if the indictment is going to the jury, I feel that

8    it can be addressed at that point.  But to ask the government

9    to lay out its entire -- not to exaggerate and say entire, but

10   any trial strategy having to do with what the government's

11   going to present at trial, at this stage, with this motion, I

12   don't think is required in order to oppose the motion.

13            THE COURT:  OK.

14            Anything further?

15            MR. KROUSE:  Not from the government.

16            MR. HEBERLIG:  There's one more issue for us, your

17   Honor.

18            THE COURT:  Go ahead.

19            MR. HEBERLIG:  This relates to the search warrant

20   issue, which I understand we're going to argue in a couple of

21   weeks, but it's sort of a preserving-the-status-quo issue.

22            We've learned a lot from the government's most recent

23   brief, and as we now understand their position, they only

24   intend to use at trial the 420 pertinent documents.  But we

25   also know that there are potentially as many as a dozen people

Jb7WnejO

1    within the District Attorney's Office and the U.S. Attorney's

2    Office who have access to the full returns.  There are three to

3    four to five databases and document-review platforms that have

4    the entirety of the search warrant returns in them.

5           We would like an order or at least a representation

6    from the government that until the Court resolves our motion,

7    no member of the District Attorney's Office or the U.S.

8    Attorney's Office will access the raw returns for any reason.

9    I believe based on the position there's absolutely no reason

10   for anyone to be looking at anything beyond the 420 documents.

11   We will argue in two weeks that those should be suppressed as

12   well, but in the meantime, we don't want anyone else rummaging

13   through Mr. Sadr's plainly irrelevant personal emails.

14           MR. KROUSE:  The government will make that

15   representation, your Honor.

16           MR. HEBERLIG:  Thank you.

17           THE COURT:  Glad I could be of help.  And just so you

18   know, you're allowed to speak to each other without me in the

19   room.

20           MR. KROUSE:  Your Honor, it occurs to me that there is

21   one other issue outstanding that may be premature in light of

22   the motion to suppress the documents, but our understanding

23   from the privilege/filter team is that the defense is asserting

24   privilege over certain of the 420 documents.  So in the event,

25   just thinking ahead, if the Court decides not to suppress the

Jb7WnejO

1  420 and then the case is going to proceed to trial with those

2  documents still in evidence, I take it it would be prudent to

3  sort of set a schedule for resolving any privilege disputes,

4  which this team is walled off from, but I think the order in

5  which it would happen is the defense would file a motion or

6  something asserting a privilege over certain documents and then

7  our privilege review team would respond.

8          THE COURT:  And the request is to set that schedule

9  now.

10         MR. KROUSE:  Yes, your Honor.

11         THE COURT:  Fine with me.

12         MR. HEBERLIG:  I think we can do it expeditiously

13 after the motions here.  We're talking about a very small

14 universe of the 420 documents.

15         MR. KROUSE:  How many, your Honor, if we could

16 inquire?

17         MR. HEBERLIG:  I will inquire.  Hang on one moment.

18         There are three documents that are spousal

19 communications.  I'd be surprised if the government's filter

20 team tries to argue that they're not.

21         MR. KROUSE:  And there's no attorney-client privilege

22 being asserted?

23         MR. HEBERLIG:  No.

24         THE COURT:  All right.  Maybe you can work this out

25 too.  I'd be delighted.  And you don't need to wait for me to

Jb7WnejO

1    try and do that.  I don't think we need a schedule for that at

2    this point.

3              You'll confer on whether you can narrow on the

4    surplusage issue at all.  I'll hear from you on that in a week.

5              Include in that discussion, Mr. Krouse, whether

6    there's any narrowing on the government of Iran-related

7    allegation, and I'll hear from you in a week and then I'll

8    resolve what remains of that.

9              I have my briefing on the suppression and related

10   motions.  We have our time for oral argument, and you'll try to

11   work out the limited spousal privilege issues, I presume, in

12   advance of that oral argument so you can let me know if we need

13   any briefing schedule on the theory that suppression is denied.

14             MR. KROUSE:  Thank you, your Honor.

15             Anything else?

16             Thank you, counsel.  Motions are submitted.

17             We're adjourned.

18             (Adjourned)

19

20

21

22

23

24

25