UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



United States of America,

–v–

Ali Sadr Hashemi Nejad,

Defendant.

18-cr-224 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Defendant Ali Sadr Hashemi Nejad is charged in a six-count Indictment. Dkt. No. 2.
The allegations in the Indictment stem from payments allegedly routed from a Venezuelan state-
owned energy company through banks in the United States to the Swiss accounts of entities
owned by Sadr and his family. The Indictment alleges that these transactions violated the
International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and
Sanctions Regulations ("ITSR"). Before the Court are various pretrial motions brought by Sadr.
For the reasons that follow, the Court DENIES Sadr's first, second, third, fourth, fifth, sixth, and
seventh pretrial motions in their entireties. With respect to the fifth and seventh pretrial motions,
these denials are without prejudice.

## I.   BACKGROUND

### A.   Factual Background

Counts One and Two of the six-count Indictment charge Sadr with conspiring to defraud
the United States and to violate the IEEPA respectively. Ind. ¶¶ 14–21. Counts Three and Four
further charge him with bank fraud and conspiracy to commit bank fraud, and Counts Five and
Six charge him with money laundering and conspiracy to commit money laundering. Ind. ¶¶ 22–
33. All of the charges arise out of the same underlying conduct. In December 2005, the
Governments of Iran and Venezuela allegedly entered into agreements that called for their
cooperation to construct housing units in Venezuela. Ind. ¶ 6. The housing construction project

1

was led by Stratus Group, an Iranian conglomerate. Ind. ¶ 7. At all times relevant to the charges in the Indictment, Stratus Group was allegedly controlled and operated by Sadr and his family members. *Id.* Around December 2006, Stratus Group allegedly incorporated the Iranian International Housing Corporation in Tehran to manage the housing construction project. Ind. ¶ 8. The Iranian International Housing Corporation allegedly entered into a contract with a subsidiary of a Venezuelan state-owned energy company in July 2007 to construct housing units in Venezuela. Ind. ¶ 9. In 2009, Stratus Group created the Venezuela Project Executive Committee to oversee the housing construction project. Ind. ¶ 10. Sadr was allegedly a member of this Executive Committee and managed the project's finances. *Id.*

In 2010, Sadr and an unindicted coconspirator allegedly incorporated Clarity Trade and Finance in Switzerland and Stratus International Contracting (also known as Stratus Turkey) in Turkey using St. Kitts and Nevis passports and a United Arab Emirates address. Ind. ¶ 11. At all times relevant to the charges in the Indictment, these entities were allegedly owned and controlled by Sadr and his family members. *Id.* Sadr is accused of conducting international financial transactions using these entities in order to conceal from United States banks that services were being provided to Iran and for the benefit of Iranian individuals and entities in violation of the IEEPA and the ITSR. Ind. ¶ 12. Specifically, he is alleged to have directed the Venezuelan state-owned energy company to make payments to the Iranian International Housing Corporation through Clarity or Stratus Turkey on 15 separate occasions between April 2011 and November 2013. Ind. ¶ 13. These payments, which totaled roughly $115 million, were allegedly routed through United States banks. *Id.* These banks provided processing services, and the funds were ultimately received in Clarity or Stratus Turkey's Swiss bank accounts. *Id.*

### B.   IEEPA and ITSR Framework

The IEEPA confers upon the President "broad authority to issue regulations that restrict or prohibit international trade where he declares a 'national emergency' with respect to an 'unusual and extraordinary' foreign policy or national security threat." *United States v. Banki*, 685 F.3d 99, 105 (2d Cir. 2012); *see also* 50 U.S.C. §§ 1701–1706. Section 1705 provides that

"[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a

violation of any license, order, regulation, or prohibition issued under [the IEEPA]" and

prescribes civil and criminal penalties for violation of the IEEPA.  50 U.S.C. § 1705.

Trade with Iran has been restricted under the IEEPA since 1979, when the President first

issued an Executive Order declaring a national emergency with respect to the unusual and

extraordinary threat posed by Iran.  Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14,

1979).  In 1995, the national emergency was extended by Executive Order, *see* Exec. Order No.

12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995), and a subsequent Executive Order "imposed

comprehensive trade and financial sanctions on Iran," *Banki*, 685 F.3d at 106; *see* Exec. Order

No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995).  These Orders authorized the Secretary of the

Treasury to promulgate rules and regulations to carry out their purposes.  *See* Exec. Order No.

12,957 § 3; Exec. Order No. 12,959 § 3.  The comprehensive trade and financial sanctions are

implemented via the Iranian Transactions Regulations—since renamed the Iranian Transactions

and Sanctions Regulations—promulgated by the Department of Treasury's Office of Foreign

Assets Control.

Section 560.204 of the ITSR provides that

the exportation, reexportation, sale, or supply, directly or indirectly, from the United
States, or by a United States person, wherever located, of any goods, technology, or
services to Iran or the Government of Iran is prohibited, including the exportation,
reexportation, sale, or supply of any goods, technology, or services to a person in a third
country undertaken with knowledge or reason to know that: (a) Such goods, technology,
or services are intended specifically for supply, transshipment, or reexportation, directly
or indirectly, to Iran or the Government of Iran; or (b) Such goods, technology, or
services are intended specifically for use in the production of, for commingling with, or
for incorporation into goods, technology, or services to be directly or indirectly supplied,
transshipped, or reexported exclusively or predominantly to Iran or the Government of
Iran.

31 C.F.R. § 560.204.  Section 560.410, a regulation that falls within the "Interpretations" Subpart

of the ITSR, interprets "[t]he prohibition on the exportation, reexportation, sale or supply of

services contained in § 560.204" to apply "to services performed on behalf of a person in Iran or

3

the Government of Iran or where the benefit of such services is otherwise received in Iran, if

such services are performed . . . [i]n the United States." *Id.* § 560.410.  Section 560.203 further

prohibits any transaction that takes places within the United States "that evades or avoids, has the

purpose of evading or avoiding, causes a violation of, or attempts to violate any of the

prohibitions set forth" in the ITSR.  *Id.* § 560.203.[1]

## II.   MOTION TO DISMISS COUNTS ONE, TWO, FIVE, AND SIX FOR FAILURE TO STATE AN OFFENSE

Sadr moves in his first pretrial motion to dismiss Counts One, Two, Five, and Six of the

Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), on the grounds that

those counts fail to state an offense.  Because "federal crimes are solely creatures of statute, a

federal indictment can be challenged on the ground that it fails to allege a crime within the terms

of the applicable statute."  *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012)

(internal quotation marks and citations omitted).  "A defendant faces a 'high standard' in seeking

to dismiss an indictment."  *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013)

(quoting *United States v. Saliba*, 2010 WL 680986, at *2 (E.D.N.Y. Feb. 24, 2010)).

An indictment must contain "a plain, concise, and definite written statement of the

essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  But in order "to

satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track

the language of the statute charged and state the time and place (in approximate terms) of the

alleged crime."  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation

marks and citation omitted).  Put differently, "the indictment need only allege the 'core of

criminality' the Government intends to prove at trial, since the indictment is 'read . . . to include

facts which are necessarily implied by the specific allegations made.'"  *United States v.*

*Budovsky*, 2015 WL 5602853, at *3 (S.D.N.Y. Sept. 23, 2015) (alteration in original) (quoting

---

[1] For transactions that took place prior to October 22, 2012, an earlier version of Section 560.203 was in effect.  That version provided, "Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited."  31 C.F.R. § 560.203.

*United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007)). In evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Sadr argues that Counts One and Two of the Indictment, which allege conspiracies to violate the IEEPA and ITSR, and the portions of Counts Five and Six of the Indictment that rely on these alleged violations should be dismissed for two reasons. First, he argues that because no services were exported to Iran, the transactions at issue did not violate the ITSR; second, he argues, in the alternative, that the transactions alleged in the Indictment did not violate the ITSR because they were *expressly authorized* by them. He is wrong on both counts.

### A. The Indictment Alleges That Services Were Exported to Iran in Violation of Section 560.204

As discussed above, Section 560.204 prohibits the "exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204. As an initial matter, it is well established in the Second Circuit that the processing by U.S. banks of international financial transactions at issue here constitutes a "service" for purposes of the ITSR. See *Banki*, 685 F.3d at 106 ("[T]he execution on behalf of others of money transfers from the United States to Iran is a service under the ITR.") (internal quotation marks omitted) (quoting *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004)). Sadr, however, argues that the Indictment does not—and cannot—allege that these services were exported *to Iran*. For the reasons stated below, the Court disagrees.

### 1. Services are Indirectly Exported to Iran Because their Benefit is Received in Iran

The Indictment nowhere alleges that the processing services were *directly exported* to Iran, as defined by the ITSR to include the territory of Iran and other areas over which Iran

claims sovereignty or jurisdiction.  *See* 31 C.F.R. § 560.303 (defining "Iran").  Accordingly,

whether the processing services the U.S. banks are alleged to have provided were exported to

Iran depends on whether they were *indirectly exported* within the meaning of Section 560.204.

"In interpreting an administrative regulation, as in interpreting a statute, we must begin by

examining the language of the provision at issue." *Banki*, 685 F.3d at 107 (quoting *Resnik v.*

*Swartz*, 303 F.3d 147, 151–52 (2d Cir. 2002)).

      Section 560.204 of the ITSR prohibits "the exportation . . . , directly or indirectly, from

the United States . . . of any goods, technology, or services to Iran or the Government of Iran."

31 C.F.R. § 560.204.  A service is "useful labor that does not produce a tangible commodity" or

"[a]n intangible commodity in the form of human effort."  *See Banki*, 685 F.3d at 107 (collecting

definitions of "service").  As an intangible commodity, a service's value derives from the benefit

the useful labor or human effort produces.

      The intangible nature of services informs the meaning of indirect exportation in Section

560.204.  Indirectly means "deviating from a direct line or course," "roundabout," or "not going

straight to the point." *Indirect*, Miriam-Webster Online Dictionary (November 8, 2019),

https://www.merriam-webster.com/dictionary/indirectly.  Tangible goods are indirectly exported

when shipped to Iran "through a middleman in a third country." *See United States v. Quinn*, 403

F. Supp. 2d 57, 64 (D.D.C. 2005); *see also* 31 C.F.R. § 560.204 (prohibiting the indirect

exportation of goods to Iran through a person in a third country).  While an intangible service

cannot be shipped through a "middleman" in the same way, it can be performed on behalf of a

"middleman" such that its benefit is ultimately received by others beyond the individual for

whom it was performed.  Thus, pursuant to the text of Section 560.204, a *service* is *indirectly*

exported to Iran if it is performed outside Iran but the benefit of it is ultimately received by persons or entities in Iran.

With this meaning of indirect exportation in mind, the Court concludes that the Indictment alleges that the processing services the U.S. banks provided were indirectly exported to Iran in violation of Section 560.204, because it alleges that these banks provided services that processed payments due to the Iranian International Housing Corporation but transferred through U.S. banks to alleged "middleman" shell companies, Clarity and Stratus Turkey.  Ind. ¶¶ 11–13, 16.  In other words, it alleges that the Iranian-incorporated entity to whom the funds were owed ultimately stood to benefit, in a roundabout way, from the processing of these fund transfers on behalf of the "middleman" shell companies.

Sadr argues, to the contrary, that the processing services "were exported to Switzerland and nowhere else" because they were of a "one-time, instantaneous nature and ended when the funds were credited to the U.S. correspondent bank account of Clarity's and Stratus Turkey's Swiss bank." Mot. 1 at 11.[2]  However, this argument is unmoored from the regulation's text.  By arguing that these services were exported only to Switzerland, he ignores the text of Section 560.204's prohibition—which proscribes both *direct and indirect* exportation—and in effect reads the modifier "indirectly" out of the regulation entirely.  Indeed, while the processing services may have allegedly been *directly* exported only to Switzerland because they were performed on behalf of accounts located there, they were allegedly *indirectly* exported to Iran because the Iranian International Housing Corporation allegedly received the benefit of those services in Iran, the place of its incorporation.  The alternate interpretation Sadr offers denies the

_____

[2] This opinion resolves seven of Sadr's pretrial motions, all of which have been numbered by him.  The Court will cite to Sadr's memoranda of law in support of his motions as "Mot." followed by the motion number and his replies in further support of his motions as "Reply" followed by the motion number.  It will cite to the Government's omnibus memorandum of law in opposition to Sadr's pretrial motions as "Opp."

regulatory prohibition its full effect, and, as such, runs contrary to cardinal canons of regulatory interpretation. *See Associates Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) (Courts "must attempt to give effect to the plain meaning of each word in the [regulation].") (quoting *United States v. Pacheco*, 225 F.3d 148, 156 (2d Cir.2000)).

In sum, because the Indictment alleges that the processing services were performed in the United States for "middleman" shell companies and their benefit was received by the Iranian-incorporated entity to which the processed payments were due, it sufficiently alleges that the services were indirectly exported to Iran in violation of the prohibition in Section 560.204.

### a. The Court's Conclusion is Bolstered by the Agency's Interpretation and Second Circuit Precedent

This conclusion is in accord with the Office of Foreign Assets Control's interpretation of Section 560.204, which appears in Section 560.410. That interpretive regulation provides that "[t]he prohibition on the exportation, reexportation, sale or supply of services contained in § 560.204 applies to services performed on behalf of a person in Iran or the Government of Iran *or where the benefit of such services is otherwise received in Iran*, if such services are performed . . . [i]n the United States." 31 C.F.R. § 560.410 (emphasis added). This regulation necessarily distinguishes, as the Court does, between the direct exportation of services, which are performed on behalf of a person in Iran or the Government of Iran, and the indirect exportation of services, *the benefit of which is received in Iran*.[3] Furthermore, the Second Circuit has relied on Section 560.410 in interpreting the prohibition in Section 560.204, finding that "[t]he Embargo's prohibition on the exportation of services applies 'where the benefit of such services is . . . received in Iran, if such services are performed . . . [i]n the United States.'" *Homa*, 387 F.3d at

---

[3] The Court does not defer to the Office of Foreign Assets Control's interpretation but rather notes the consistency between that interpretation and the Court's.

146 (alteration in original) (quoting 31 C.F.R. § 560.410(a)). Even were this authority dicta, as Sadr argues, the Court would still find it highly persuasive and relevant to resolving the issues in the motion now before it.

These interpretations of Section 560.204 bolster the Court's conclusion that the prohibition in that section reaches the exportation of services *the benefit of which* is received in Iran. Indeed, Section 560.204 proscribes such indirect exportation by its terms. Accordingly, for these reasons and others stated above, the Indictment sufficiently alleges that Sadr indirectly exported services to Iran in violation of Section 560.204.

### B.   The Indictment Alleges Evasion or Avoidance of the ITSR's Prohibitions in Section 560.204

Even were the Court to find that the Indictment *failed* to allege that any services were exported to Iran within the meaning of Section 560.204, such a conclusion would not be fatal to the sanctions counts because the Indictment clearly states an offense for evading or avoiding the ITSR's prohibitions, which is equally proscribed by Section 560.203 of the ITSR.

Section 560.203 provides that a "transaction . . . that evades or avoids [or] has the purpose of evading or avoiding . . . any of the prohibitions set forth in [the ITSR] is prohibited." 31 C.F.R. § 560.203. The Indictment sufficiently alleges transactions that evaded or avoided or had the purpose of evading or avoiding Section 560.204's prohibition on such exportation because it "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *See Stringer*, 730 F.3d at 124 (internal quotation marks and citation omitted); *see also* Ind. ¶ 12. Indeed, it explicitly alleges that Sadr "conspired to evade U.S. sanctions by conducting international financial transactions using Clarity and Stratus Turkey" and states when and where the 15 alleged transactions took place. Ind. ¶ 13.

Specifically, it alleges that from April 2011 to November 2013, Sadr directed the Venezuelan state-owned energy company to make payments to the Iranian International Housing Corporation, an Iranian corporation incorporated in Tehran, through Clarity and Stratus Turkey,

non-Iranian entities, rather than directly to the Iranian International Housing Corporation.  Ind. ¶ 13.  These transactions were processed by U.S. banks in U.S. dollars.  The Indictment contains numerous additional allegations that this transaction structure evaded or avoided or had the purpose of evading or avoiding the ITSR's prohibition on exporting these services to Iran.  For example, Sadr allegedly emailed an unindicted coconspirator in March 2011 to express that the Iranian International Housing Corporation would begin using IIHC, an abbreviated version of its name, to make its "transactions a bit easier," and noted that because it "requested [the] last invoice to be paid in USD . . . [,] this name change [was] a bit more crucial."  Ind. ¶ 16.o. Around the same time, he allegedly sent an email to a different unindicted coconspirator instructing him to inform the "client" that "[t]here's no Iranian behind any accounts" related to the housing construction project.  Ind. ¶ 16.p.  In several subsequent transactions, Sadr allegedly caused letters to be sent to the Venezuelan subsidiary noting that Clarity had been appointed to act as the Iranian International Housing Corporation's agent for receiving payments in light of the "current difficulties for transfer and movements of funds."  *See, e.g.*, Ind. ¶ 16.t, x, z, cc, ff, gg, kk.  Taking all the facts alleged in the Indictment as true, the Indictment adequately alleges an offense for the evasion or avoidance of the ITSR's prohibitions in violation of Section 560.203.

The Court does not find either of Sadr's arguments to the contrary persuasive.  Sadr argues that allegations of evading or avoiding the ITSR's prohibitions cannot stand on their own because an evading or avoiding violation requires a predicate violation that the Indictment fails to allege.  Mot. 1 at 8.  However, this argument is foreclosed by the Court's conclusion that the Indictment *does* allege exportation of services to Iran in violation of Section 560.204 and accordingly *does* supply a predicate for an evading or avoiding violation.

Even if Sadr's first argument were not foreclosed by the Court's interpretation of Section 560.204, it would still reject his additional argument that one cannot "evade or avoid" sanctions by "*complying* with them."  Reply 1 at 9.  This argument implies that potential liability for evading or avoiding the ITSR's prohibitions lies only where an *actual violation* of them is

alleged and thereby reduces the "evading or avoiding" language to mere surplusage. However, as common sense suggests and the 2012 amendment to this Section—which distinguishes between "evading or avoiding" the ITSR's prohibitions and "caus[ing] a violation of" them—confirms, the "evading or avoiding" language is intended to *broaden* liability beyond actual violations of the ITSR's prohibitions. 31 C.F.R. § 560.203. In other words, the very purpose of this Section is to capture transactions that were intentionally structured to evade or avoid application of them. Sadr's argument fails because it collapses the distinction between proving evading or avoiding liability and proving liability for actual violations of the ITSR's prohibitions and, in doing so, reads the "evading or avoiding" language out of the regulation.

### C.   The Transactions Were Not Authorized by the ITSR

Sadr argues, in the alternative, that Counts One and Two, and the derivative portions of Counts Five and Six, fail to state an offense because the transactions alleged in the Indictment were expressly authorized by the ITSR. Mot. 1 at 18. He argues, in particular, that the transactions at issue were explicitly allowed by Section 560.516, which authorized transfers of funds that "[arose] from an underlying transaction that is not prohibited by" the ITSR. 31 C.F.R. 560.516. The Court's conclusion that the Indictment sufficiently alleges a violation of Section 560.204 may preclude Sadr from arguing that the underlying transactions at issue were not prohibited by the ITSR. However, even were this not the case, the Court would reject Sadr's alternative argument.

Section 560.516 appears in Subpart E of the ITSR, which is entitled "Licenses, Authorizations, and Statements of Licensing Policy." This Section authorizes certain transfers of funds to Iran, but none of the versions in effect when the transactions charged in the Indictment were processed by U.S. banks authorized those transactions. Because this Section has been amended several times and multiple versions were in effect during the events alleged in the Indictment, a review of its history is necessary to resolving the issue now before the Court.

The version of this section in effect from April 26, 1999 until March 27, 2005 authorized U.S. banks to process the transfer of funds to or from Iran or for the direct or indirect benefit of

Iranian individuals or the Iranian Government where any of four different conditions were met,

so long as the transfer did not involve the debiting or crediting of an Iranian account.  Section

560.516(a)(1) explicitly allowed so-called "U-Turn" transactions such as those at issue here,

where "[t]he transfer is by order of a foreign bank which is not an Iranian entity from its own

account in a domestic bank (directly or through a foreign branch or subsidiary of a domestic

bank) to an account held by a domestic bank (directly or through a foreign branch or subsidiary

of a domestic bank) for a second foreign bank which is not an Iranian entity."  31 C.F.R. 560.516

(1999).[4]  Section 560.516(a)(2) allowed transfers "aris[ing] from an underlying transaction that

has been authorized by a specific or general license issued pursuant to this part."  *Id.*  Section

560.516(a)(3) allowed transfers "aris[ing] from an underlying transaction that is not prohibited

by this part, such as a non-commercial remittance to or from Iran (e.g., a family remittance not

related to a family-owned enterprise); a U.S.– related commercial transfer not prohibited by this

part (see, e.g., § 560.515(b)); or a third-country transaction not prohibited by this part."  *Id.*  And

Section 560.516(a)(4) allowed transfers "aris[ing] from an underlying transaction that is

exempted from regulation pursuant to § 203(b) of the International Emergency Economic Powers

Act (50 U.S.C. 1702(b)), such as an exportation to Iran or importation from Iran of information

and informational materials, a travel-related remittance, or payment for the shipment of a

donation of articles to relieve human suffering."  *Id.*  In the versions of Section 560.516 in effect

from March 28, 2005 to September 11, 2006 and September 12, 2006 to November 9, 2008,

these four subsections remained intact.  *See* 31 C.F.R. 560.516 (2005); *id.* (2006).

　　The version of Section 560.516 effective from November 10, 2008 to October 21, 2012

departed from the prior versions in two important ways.  First, the "U-Turn" authorization

provided in Section 560.516(a)(1) of prior versions was eliminated.  *See* 31 C.F.R. 560.516

(2008).  Second, Section 560.516(a)(2)—renumbered from 560.516(a)(3) following the

elimination of Section 560.516(a)(1)—was shortened, providing fewer exemplars of underlying

---

[4] In simpler terms, "U-Turn" transactions are those that originate and end in foreign countries and involve U.S. banks in the middle solely for the purpose of processing funds.

transactions "not prohibited by this part." *See id.* While prior versions included "a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise)," "a U.S.– related commercial transfer not prohibited by this part," and "a third-country transaction not prohibited by this part" as examples of underlying transactions not prohibited by the ITSR, the version in effect from 2008 to 2012 listed only one example: "a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise)." *Compare* 31 C.F.R. 560.516(a)(3) (2006) *with* 31 C.F.R. 560.516(a)(2) (2008).

In 2012, Section 560.516 was overhauled, and nearly all of the specific authorizations previously provided were eliminated. The current version of this Section, which has been in effect since October 22, 2012, provides as follows:

> (a) United States depository institutions are authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer arises from, and is ordinarily incident and necessary to give effect to, an underlying transaction that has been authorized by a specific or general license issued pursuant to, or set forth in, this part and does not involve debiting or crediting an Iranian account.

> (b) United States registered brokers or dealers in securities are authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer arises from, and is ordinarily incident and necessary to give effect to, an underlying transaction that has been authorized by a specific or general license issued pursuant to, or set forth in, this part and does not involve debiting or crediting an Iranian account.

31 C.F.R. § 560.516.

In accord with the foregoing, both parties agree that "there is no dispute that transactions of the type charged in the Indictment would have been permitted before November 10, 2008" under the authorization for "U-Turn" transactions that Section 560.516(a)(1) provided prior to that time. Opp. at 19; Reply 1 at 2–3; *see also* 31 C.F.R. § 560.516 (1999); *id.* (2005); *id.* (2006). However, the transactions charged in the Indictment were processed between *2011* and *2013*, well after the "U-Turn" authorization was eliminated from Section 560.516. Whether the transactions at issue remained authorized by this Section following the elimination of the "U-

13

Turn" authorization depends on whether the subsequent 2008 and 2012 versions of Section 560.516 elsewhere include an authorization for the charged transactions.[5]

### 1. 2008 Version

Sadr argues that the 2008 version of Section 560.516(a)(2) preserved an independent authorization for the transactions at issue that existed in prior versions of the regulation. Specifically, he argues that this section "expressly authorize[d]" U.S. banks to perform the processing services at issue because the "underlying transactions"—i.e. payments for the "construction of low-income housing by IIHC in Venezuela"—were not prohibited by the ITSR. *See* Mot. 1 at 21–23. The Court disagrees.

In interpreting regulations, courts apply all the "'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Accordingly, the Court must "carefully consider" Section 560.516(a)(2)'s "text, structure, history, and purpose" to determine whether that Section independently authorizes the transactions at issue here. *Id.* The Court begins with its text, which provides that U.S. banks may process transfers "to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . arises from *an underlying transaction that is not prohibited by this part*, such as a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise)." 31 C.F.R. § 560.516(a)(2) (2008) (emphasis added). Whether the processing services alleged in the Indictment were expressly authorized by this subsection hinges on what underlying transactions were "not prohibited by this part."

In interpreting this phrase, the Court is guided by the maxim that "the meaning of doubtful terms or phrases may be determined by reference to their relationship with other associated words or phrases (*noscitur a sociis*)." *United States v. Dauray*, 215 F.3d 257, 262 (2d Cir. 2000). Courts rely on this canon of construction "to avoid ascribing to one word [or phrase]

---

[5] Sadr argues that the conspiracies charged in Counts One, Two, and Six allegedly began in 2006, prior to the elimination of the "U-Turn" authorization, and thus prior versions of this section should apply. *See* Mot. 1 at 19–22. However, all of the alleged overt acts, including the charged transactions, date to 2009 or later, and thus post-date the elimination of the "U-Turn" license. *See* Ind. ¶ 16.

a meaning so broad that it is inconsistent with its accompanying words." *United States v. Rowland*, 826 F.3d 100, 109 (2d Cir. 2016) (quoting *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015)).   Mindful that a statutory or regulatory phrase "gathers meaning from the words around it," the Court finds that to the extent 560.516(a)(2) authorizes the processing of fund transfers, it only does so where the transfer arises from a transaction similar to the example given in that subsection.   *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).   Because commercial payments for housing construction are different in kind from the non-commercial remittances—such as family remittances—identified in that subsection, the Court concludes that the 2008 version of Section 560.516 does *not* expressly authorize U.S. banks to perform the processing services alleged in the Indictment.   An alternate interpretation would ascribe to the phrase "not prohibited by this part" a meaning so broad that it would be inconsistent with the example that followed.

This interpretation is confirmed by the history of amendment of this Section discussed above.   Sadr himself argues that the prior version of this subsection—Section 560.516(a)(3)—expressly authorized U.S. banks to process the transfers at issue because it authorized transfers arising

> *from an underlying transaction that is not prohibited by this part, such as* a non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise); a U.S.– related commercial transfer not prohibited by this part (see, e.g., § 560.515(b)); or *a third-country transaction not prohibited by this part*.

31 C.F.R. § 560.516 (2006); *see also* Mot. 1 at 21.   However, in the subsequently amended version of this subsection relevant here, only the example of non-commercial remittances remains; both "U.S.– related commercial transfer[s]" and "third-country transaction[s]" were eliminated as examples of underlying transactions "not prohibited by" the ITSR.   *See* 31 C.F.R. § 560.516 (2008).   This "significant change in language is presumed to entail a change in meaning."   *Arangure v. Whitaker*, 911 F.3d 333, 341 (6th Cir. 2018) (citing the so-called "reenactment canon").   Accordingly, even if U.S. banks were expressly authorized to process the

15

transfers at issue here under the prior version of Section 560.516, that express authorization was eliminated in the 2008 amendment of the ITSR. Indeed, the Second Circuit has described the 2008 version of Section 560.516(a)(2) as "expressly provid[ing] that *non-commercial* remissions are not prohibited." *Banki*, 685 F.3d at 111. Accordingly, commercial transactions like those alleged here are prohibited.

This interpretation is further confirmed by the overall purpose of the ITSR, as well as the specific purpose served by the 2008 amendment of this Section. As the Second Circuit has noted on multiple occasions, the Iranian "embargo is deliberately overinclusive." *Banki*, 685 F.3d at 108. In other words, "to reform the actions of the government of Iran, Executive Order 12,959 and the IT[S]R adopt a blunt instrument: broad economic sanctions intended to *isolate* Iran." *Id.* (emphasis added); *see also Homa*, 387 F.3d at 146 ("The obvious purpose of [Executive Order 12,959] is to isolate Iran from trade with the United States.") (quoting *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir.1998)). Given the deliberate breadth of the ITSR, the Court declines to adopt the expansive reading of Section 560.516(a)(2) advanced by Sadr. Indeed, as the Department of Treasury noted at the time, the 2008 amendment of this Section, which eliminated the "U-Turn" authorization, did

> not affect funds transfers by U.S. financial institutions arising from several types of underlying transactions, including:
>
> - Payment for the shipment of a donation of articles to relieve human suffering;
> - A non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise);
> - The exportation to Iran or importation from Iran of information and informational materials;
> - Travel-related remittances; and
> - An underlying transaction authorized by Treasury's Office of Foreign Assets Control (OFAC) through a specific or general license.

*See* U.S. Dep't of Treas., *Treasury Revokes Iran's U-Turn License* (Nov. 6, 2008),

https://www.treasury.gov/press-center/press-releases/Pages/hp1257.aspx.  The limited universe

of underlying transactions reflected in this statement—which mirrors those explicitly enumerated

in the 2008 version of the Section—further underscores that Section 560.516(a)(2) is not, as Sadr

contends, a broad authorization of transfers arising from *all* underlying transactions not

prohibited by the ITSR, but rather is a limited authorization of transfers arising from underlying

transactions akin to those expressly listed in the regulation.  Because commercial payments for

housing construction are unlike anything expressly authorized by the 2008 version of Section

560.516(a)(2), the Court concludes that the processing of those payments was not authorized by

it.

### 2.  2012 Version

Sadr cannot—and indeed does not—argue that the 2012 version of Section 560.516

authorizes the transactions at issue here.  *See* Mot. 1 at 24–25.  As discussed above, that version

of Section 560.516 only authorizes the processing of fund transfers where the transfer arises

from an underlying transaction authorized *elsewhere* in the ITSR by a specific or general license.

*See* 31 C.F.R. § 560.516 (2012).  Because no such specific or general license exists, the Court

concludes that the charged transactions were authorized by neither the 2008 nor the 2012 version

of the ITSR.

Accordingly, Sadr's first pretrial motion to dismiss Counts One and Two and the

derivative portions of Counts Five and Six for failure to state an offense is DENIED in its

entirety.

### III.   MOTION TO DISMISS COUNT ONE FOR FAILURE TO STATE A CONSPIRACY TO DEFRAUD THE UNITED STATES AND UNCONSTITUTIONAL VAGUENESS

Sadr argues in his second pretrial motion that Count One of the Indictment, which charges him with conspiring to defraud the United States in violation of 18 U.S.C. § 371 by impairing or impeding the Office of Foreign Assets Control's enforcement of economic sanctions against Iran, should be dismissed for two additional reasons.  First, he argues that Count One fails to state a conspiracy because it does not allege that Sadr's conduct deprived the United States of money or property.  Mot. 2 at 1–2.  Second, he argues, in the alternative, that Count One should be dismissed as an unconstitutionally vague application of 18 U.S.C. § 371 that failed to provide Sadr with fair notice that his conduct was criminal.  *Id.* at 2.  Both of these arguments are, as Sadr concedes, *see* Mot. 2 at 2, foreclosed by the Second Circuit's decision in *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012), which reaffirmed the validity of the so-called *Klein* theory of conspiracy charged in Count One.  *See* 703 F.3d at 59–62.  Accordingly, Sadr's second pretrial motion is DENIED.

## IV. MOTION TO DISMISS ALL IEEPA-BASED COUNTS BECAUSE THE IRAN SANCTIONS REGIME EXCEEDS THE AUTHORITY IN THE IEEPA AND THE IEEPA IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY

Sadr moves in his third pretrial motion to dismiss Counts One and Two of the Indictment—and the portions of the money laundering charges in Counts Five and Six derived from Count Two—on the grounds that the IEEPA is an unconstitutional delegation of legislative authority to the Executive Branch and the Iran sanctions regime, as implemented, exceeds the authority granted under the IEEPA.  *See* Mot. 3 at 1.  Sadr's first argument is foreclosed by Second Circuit precedent.  In *United States v. Dhafir*, 461 F.3d 211 (2d Cir. 2006), the Second Circuit considered and rejected the very nondelegation doctrine argument made by Sadr here, concluding that the IEEPA is *not* an unconstitutional delegation to the Executive of the Congressional authority to create criminal offenses.  *See* 461 F.3d at 215–17.

Sadr's second argument is two-fold.  He argues that his prosecution is an *ultra vires* act because (1) the IEEPA was intended to reign in abuse of the sanctions power and, as such, does not authorize the "perpetual state of emergency" ongoing since first declared against Iran in 1979, *see* Mot. 3 at 3–5; and (2) neither the President nor Congress has followed the IEEPA's procedural requirements, and, as such, the regulations promulgated pursuant to it are unauthorized, *see* Mot. 3 at 5–8; Reply 3 at 1–4.  The Court disagrees on both counts.

## A.    The IEEPA's Statutory History

To adequately address Sadr's second argument, which "implicates interrelated issues of foreign policy, congressional authorization, and statutorily mandated oversight," *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011), a review of the statutory history is in order.  The IEEPA "traces its provenance" to § 5(b) of the Trading with the Enemy Act ("TWEA") of 1917. *Id.* at 572; *see also Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).  The TWEA granted the President broad authority to regulate international trade in wartime and times of "national emergency," but it "lacked a countervailing mechanism to divest the President of such authority once the emergency had ebbed." *Amirnazmi*, 645 F.3d at 572.  As the Supreme Court has noted, there was concern at the time that the TWEA "operated as a one-way ratchet to enhance greatly the President's discretionary authority over foreign policy" because Presidents tended to allow emergency declarations to remain in effect "even after the circumstances or tensions that had led to the declaration could no longer be said to pose a threat of emergency proportion to the Nation." *Regan v. Wald*, 468 U.S. 222, 245 (1984).

As a result, the TWEA was amended to apply exclusively in times of war, and the IEEPA was enacted "to serve as the locus of executive economic authority during national-emergency situations." *Amirnazmi*, 645 F.3d at 572.  As relevant here, the IEEPA also placed several

19

procedural limitations on the President's authority in times of national emergency that were "designed to ensure Congress would retain its essential legislative superiority in the formulation of sanctions regimes erected under the Act's delegation of emergency power." *Id.* These procedural limitations include requirements that "in every possible instance" the President "consult with the Congress before exercising any of the authorities granted by [the IEEPA] and . . . consult regularly with the Congress so long as such authorities are exercised"; that the President immediately transmit to Congress a report whenever she exercises any of the authorities granted by the IEEPA; and that the President submit follow-up reports every six months after transmitting an initial report to Congress. 50 U.S.C. § 1703. Congress must also meet every six months "to consider a vote on a joint resolution to determine whether [the national] emergency shall be terminated." *Id.* § 1622(b); *see also id.* § 1706(b) ("The authorities described [in the IEEPA] may not continue to be exercised under this section if the national emergency is terminated by the Congress by concurrent resolution pursuant to section 202 of the National Emergencies Act [50 U.S.C. § 1622] and if the Congress specifies in such concurrent resolution that such authorities may not continue to be exercised under this section."). Against the backdrop of this statutory framework, the Court rejects Sadr's second argument for the reasons stated below.

### B.    Sadr's Prosecution is not *Ultra Vires*

#### 1.    The IEEPA Authorizes Congress to Terminate National Emergencies and It Has Not Exercised That Power Here

First, Sadr argues that his prosecution is an *ultra vires* act because the IEEPA was intended to reign in abuse of the sanctions power and, as such, does not authorize the "perpetual state of emergency" ongoing since first declared against Iran in 1979. As an initial matter, the Court proceeds with caution when reviewing a declaration of national emergency, "a

20

determination so peculiarly within the province of the chief executive." *Sardino v. Fed. Reserve Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) (stating that the court would not review a declaration of national emergency under the TWEA because such a determination was "so peculiarly within the province of the chief executive"); *see also Amirnazmi*, 645 F.3d at 581 ("The Supreme Court has held that '[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention,' [*Haig v. Agee*, 453 U.S. 280, 292 (1981)], and federal courts have historically declined to review 'the essentially political questions surrounding the declaration or continuance of a national emergency,' *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (internal quotation marks omitted).").

While Sadr rightly points out that the IEEPA was enacted to "limit the President's emergency power in peacetime," *Dames & Moore*, 453 U.S. at 673, he ignores the fact that the IEEPA itself is "designed to ensure *Congress* would retain its essential legislative superiority in the formulation of sanctions regimes erected under the Act's delegation of emergency power," *Amirnazmi*, 645 F.3d at 572 (emphasis added). Indeed, Congress built into the IEEPA a check on the emergency economic powers the statute endows the President with: Congress may vote to terminate the national emergency, thereby extinguishing the emergency economic powers authorized pursuant to it. 50 U.S.C. § 1622(b); *id.* § 1706(b). The statutory scheme itself thus "places the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms." *Amirnazmi*, 645 F.3d at 581. And though Congress could have voted to end the national emergency declared against Iran at any point over the last four decades, it has not done so. Mindful of the "interrelated issues of foreign policy, congressional authorization, and statutorily mandated oversight" implicated by this argument, *Amirnazmi*, 645

F.3d at 577, the Court declines Sadr's invitation to second-guess Congress' *and* the Executive's judgment.

### 2. There is Evidence the President Has Complied with the IEEPA'S Procedural Requirements and Congress' Alleged Failure to Do So Does Not Render the ITSR Unauthorized

Sadr also argues that the President's and Congress' failure to comply with the IEEPA's procedural requirements renders the regulations promulgated pursuant to it unauthorized—and thus this prosecution *ultra vires*. This argument fails for two reasons.

First, with respect to the President's obligation to regularly consult Congress, Sadr argues that "[t]here is no evidence in the record that the President fulfilled his statutory duties to meaningfully consult with Congress and to periodically report and explain his actions." Mot. 3 at 6. However, Sadr concedes that the Government *does not bear the burden* "to prove compliance with [the] statute's requirements." Reply 3 at 3 (quoting *Dhafir*, 461 F.3d at 218). Moreover, the Government *has* pointed to some evidence that the President has satisfied his reporting requirements under the IEEPA and the National Emergencies Act by consistently renewing the national emergency with respect to Iran. Opp. at 27 (citing 83 Fed. Reg. 56,251 (Nov. 8, 2018)). Sadr's argument is further undermined by the fact that he himself points out that "[s]ix successive Presidents have renewed [the Iran] emergency annually for nearly forty years." *See* Reply 3 at 2 n.1 (quoting Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* at 18 (Mar. 20, 2019), https://www.everycrsreport.com/files/20190320_R45618_e985c38bdba3d48769a70bd27efdeb95 390c9216.pdf. Because he wrongly reverses the burden to prove compliance—or lack thereof— with the IEEPA, and himself introduces evidence that the President has *in fact* complied with reporting requirements for the last four decades, the Court finds unavailing Sadr's argument that

the President's failure to comply with the IEEPA's procedural requirements renders his prosecution *ultra vires*.

Second, with respect to Congress' obligation to meet and consider a vote on a joint resolution to determine whether the emergency declared against Iran should be terminated, Sadr argues that Congress' failure to do so—which the Government does not contest—has terminated the national emergency and extinguished the emergency economic powers authorized pursuant to it. While the Second Circuit in *Dhafir* did not reach the question of whether Congress' failure to satisfy this obligation affects the validity of sanctions regulations promulgated pursuant to the IEEPA, *see Dhafir*, 461 F.3d at 217 n.3, several other Courts have reached that question and answered it in the negative.

For example, in *United States v. Amirnazmi*, the Third Circuit considered "whether a national emergency properly declared . . . terminates automatically when Congress fails to meet in conformance with the language of § 1622(b)." 645 F.3d at 578. As discussed above, Section 1622(b) requires that "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated." 50 U.S.C. § 1622(b). The Third Circuit found, relying heavily on the First Circuit's decision in *Beacon Products Corp. v. Reagan*, 814 F.2d 1 (1st Cir. 1987) (Breyer, J.), that Congress' failure to fulfill this requirement "did not effectively terminate the emergency against Iran." *Amirnazmi*, 645 F.3d at 578. In reaching this conclusion, it noted that Section 1622(d), "explicitly provides for the automatic termination of a national emergency should the President fail to extend it," and found that Section 1622(b)'s lack of a parallel Congressional provision "suggests Congress deliberately withheld automatic termination as a

remedy for violation of the 'periodic meeting' clause." *Id.* at 578.  It further noted that "Congress eliminated a sunset provision from an earlier draft" of the statute, "reserving for itself 'the burden of acting affirmatively' by substituting in that provision's place the requirement that it pass a resolution to end an emergency." *Id.* (quoting *Beacon Products*, 814 F.2d at 4).

The Third Circuit's analysis is persuasive, and the Court agrees that "[e]quating inaction with a withdrawal of authorization would be particularly improper with a statute that concerns foreign affairs, 'a sphere in which delegation is afforded even broader deference.'" *Id.* (quoting *Dhafir*, 461 F.3d at 215).  Accordingly, the Court adopts the reasoning of the Third Circuit, and the First Circuit before it, and concludes that Congress' failure to periodically meet pursuant to Section 1622(b) does not terminate the state of emergency against Iran. *See Amirnazmi*, 645 F.3d at 577–81; *Beacon Products*, 814 F.2d at 4–5; *see also United States v. Saboonchi*, 2014 WL 1831149, at *3–4 (D. Md. May 7, 2014) (adopting the reasoning of the Third and First Circuits and reaching the same conclusion the Court reaches here).  Sadr's argument that his prosecution is *ultra vires* because criminal penalties cannot be imposed under extinguished emergency powers is foreclosed by this conclusion.

Because the Court does not find any of Sadr's arguments availing, his third pretrial motion is DENIED in its entirety.

## V.   MOTION TO DISMISS COUNTS THREE THROUGH SIX FOR FAILURE TO STATE AN OFFENSE

Sadr moves in his fourth pretrial motion to dismiss Counts Three and Four, the bank fraud and bank fraud conspiracy counts, for failure to state an offense.  Specifically, he argues that these counts fail to allege that he made any misrepresentation to any U.S. bank or anyone else, that he obtained money belonging to a U.S. bank or its accountholders, or that he intended to defraud a U.S. bank by exposing it to a risk of tangible economic harm.  Mot. 4 at 1.  He also

argues that, because these counts fail, the portions of the money laundering charges in Counts

Five and Six that rely on the bank fraud charges should be dismiss. Mot. 4 at 3. For the reasons

stated below, the Court DENIES Sadr's fourth pretrial motion to dismiss Counts Three and Four

and the portions of Counts Five and Six that rely on the bank fraud charges.

Counts Three and Four of the Indictment charge Sadr with bank fraud and conspiracy to

commit bank fraud. The federal bank fraud statute criminalizes

> knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice—
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned
> by, or under the custody or control of, a financial institution, by means of false or
> fraudulent pretenses, representations, or promises . . . .

18 U.S.C. § 1344. The Indictment charges Sadr with violating both subsections of Section 1344.

Accordingly, the Court considers whether the Indictment states an offense with respect to each

subsection under the standard articulated above in Section II and concludes that it does.

### A.      The Indictment States an Offense with Respect to Section 1344(1) and (2)

Because the Indictment tracks the language of the bank fraud statute and states the time

and place of the alleged crimes, Ind. ¶¶ 22–26; *see also Stringer*, 730 F.3d at 124, it states an

offense with respect to Section 1344(1) and (2). The Court considers and rejects each of Sadr's

arguments to the contrary below.

### 1.  The Indictment Alleges Misrepresentations

Sadr first argues that the bank fraud counts should be dismissed because the Indictment

does not allege the requisite misrepresentation. As an initial matter, "the two subsections of

§ 1344 are written in the disjunctive, [and] courts have required proof of misrepresentation only

when the defendant is charged with violating § 1344(2)." *United States v. Ragosta*, 970 F.2d

1085, 1089 (2d Cir. 1992). Accordingly, Sadr's first contention is properly leveled only at the

portions of the counts of the Indictment that allege or rely on violations of Section 1344(2).

Sadr's argument is premised on the Supreme Court's statement that a check—and by the same logic a wire transfer order—"is not a factual assertion" and thus "cannot be characterized as 'true' or 'false.'" *Williams v. United States*, 458 U.S. 279, 284 (1982).  Sadr thus argues that an indictment alleging a bank fraud scheme "in which the *only* falsehoods or misrepresentations are the . . . checks" or wire transfer orders themselves fails to allege a violation of Section 1344(2).  *United States v. Burnett*, 10 F.3d 74, 78 (2d Cir. 1993) (emphasis added).  However, an indictment *may* sufficiently allege a violation of Section 1344(2) where the check or wire transfer order is accompanied by additional circumstances from which an *implied* misrepresentation may arise.  *See, e.g.*, *id.* at 78–79 (finding additional deceptive practices were sufficient to bring check depositing scheme within parameters of Section 1344(2)); *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (finding substantial evidence that defendant "deliberately engaged in a pattern of deceptive conduct" that "amounted to a false representation" that he was acting within the scope of his legitimate authority); *see also United States v. Briggs*, 965 F.2d 10, 12 (5th Cir. 1992) (affirming lower court's finding that "implicit misrepresentation by [defendant] that she was acting under her employer's authority [was] sufficient to establish the misrepresentation element of section 1344(a)(2)").

In this case, the Indictment sufficiently alleges a series of wire transfer orders accompanied by additional circumstances from which an implied misrepresentation may arise.  As detailed above, it specifically alleges that Sadr and an unindicted co-conspirator "incorporated two entities [in Switzerland and Turkey], using St. Kitts and Nevis passports and a Dubai, United Arab Emirates address," Ind. ¶ 11; that these entities were "owned and controlled by Sadr and his family members," *id.*; that these entities received payments due to the Iranian International Housing Corporation, Ind. ¶ 12; and that these payments, totaling approximately

$115,000,000, were routed from the Venezuelan state-owned energy company through banks in the United States to the Swiss and Turkish entities' accounts at a Swiss bank, Ind. ¶ 13; *see also id.* ¶ 16.  In order to make these "transactions a bit easier," Sadr allegedly communicated to an unindicted coconspirator that the Iranian International Housing Corporation would begin using IIHC, an abbreviated version of its name, and noted that because the Swiss and Turkish entities were requesting payment in U.S. dollars "this name change [was] a bit more crucial."  Ind. ¶ 16.o.  Under these circumstances, the Indictment alleges that the wire transfer orders themselves impliedly misrepresented that the beneficiaries of the fund transfers were Turkish and Swiss— and, importantly, not Iranian—entities.  *See United States v. Zarrab*, 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016) (finding, in a case bearing close factual resemblance to this one, that the indictment alleged "false and misleading statements through the use of multiple layered entities and by stripping material information from wire transfer instructions" to conceal Iranian beneficiaries and thereby influence the decision-making of U.S. banks).  Accordingly, the Court rejects Sadr's argument that the Indictment fails to allege a misrepresentation, as required by Section 1344(2).

### 2.  The Indictment Alleges a Scheme to Obtain Bank Property

Sadr also argues that the Indictment fails to allege a scheme to obtain money from a U.S. bank.  The Court disagrees.  Sadr's primary argument is that because the Venezuelan subsidiary *willingly* transferred its *own* funds, the Indictment cannot allege a scheme to obtain property from a U.S. bank.  *See* Reply 4 at 5.  However, this argument was squarely rejected by the Second Circuit in *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).  In that case, Lebedev argued that because the customers of his unregistered Bitcoin exchange willingly purchased Bitcoin, the banks that processed these bitcoin purchase transactions were not deprived of any

property interest in the customers' accounts. *Id.* at 49. The Second Circuit, however, found that the scheme was one to "obtain funds under [the banks'] custody and control," namely, "funds in the customers' accounts." *Id.* Likewise, though the Venezuelan subsidiary allegedly willingly transferred its own funds to Clarity and Stratus Turkey, the Indictment still states a scheme to obtain funds in the Venezuelan subsidiary's account. This satisfies the requirement that a Section 1344(1) or 1344(2) scheme be one to obtain money from a bank. *See Shaw v. United States*, 137 S. Ct. 462, 466 (2016) ("[F]or purposes of [Section 1344(1) of] the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution.'"); *Loughrin v. United States*, 573 U.S. 351, 355 (2014) (Section 1344(2) "requires that the defendant intend 'to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution.'").

This argument also fails for the additional reason that these transactions were allegedly routed through and processed by U.S. banks in order to convert the funds to dollars, and thus the Indictment also alleges a scheme to obtain U.S. dollars from U.S. banks. Accordingly, Sadr's argument that the Indictment fails to allege a scheme to obtain money from a U.S. bank is unavailing.

### 3. The Indictment Alleges a Scheme to Defraud Involving an Intent to Cause Tangible Economic Harm

Sadr finally argues that the Indictment fails to allege a scheme to defraud involving an intent to cause tangible economic harm. The Court again disagrees. A scheme to defraud under Section 1344(1) "must be one to deceive the bank and deprive it of something of value." *Shaw*, 137 S. Ct. at 469. In this case, the Government alleges that the banks were deprived of the right to control their assets. Opp. at 38–39. A bank fraud charge "under a right-to-control theory can

be predicated on a showing that the defendant, through the 'withholding or inaccurate reporting of information that could impact on economic decisions,' deprived 'some person or entity . . . of potentially *valuable* economic information.'" *Lebedev*, 932 F.3d at 48 (emphasis added) (alteration in original) (quoting *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017)). Accordingly, a loss of the right to control assets may only constitute a deprivation of money or property for the purposes of Section 1344(1) where the scheme, if it were to succeed, "would result in economic harm to the victim." *Finazzo*, 850 F.3d at 110.  However, the statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss," but rather requires simply "knowledge that [the defendant] would likely harm the bank's property interest." *Shaw*, 137 S. Ct. at 467–68.

Reading the Indictment "to include facts which are necessarily implied by the specific allegations made," it sufficiently alleges a scheme to defraud involving an intent to cause tangible economic harm under a right to control theory. *Rigas*, 490 F.3d at 229 (quoting *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir.2002)).  Specifically, the Indictment alleges that Sadr conspired "to evade U.S. sanctions by conducting international financial transactions using Clarity and Stratus Turkey on behalf of and for the benefit of Iranian individuals and entities . . . in order to conceal from U.S. banks and others that services were being provided to Iran in violation of the IEEPA and the ITSR." Ind. ¶ 12; *see also id.* ¶¶ 11, 13, 16.  Thus, the Indictment alleges that Sadr deprived U.S. banks of information with respect to the true beneficiaries of the services these banks were providing.  This information would have been economically valuable to these banks because they were allegedly lured—by the concealment of this information—into providing these services in violation of the law.  Indeed, the Second Circuit has upheld convictions under a right to control theory where, as alleged here, the defendant disguised

transactions that had "a higher risk" of being fraudulent through "front entities . . . so the institutions processing those transactions would be more likely to process and approve them." *Lebedev*, 932 F.3d at 49. Because information relating to the disguised nature of the transactions was potentially economically valuable to the U.S. banks, *see id.*, the Indictment adequately alleges a scheme to defraud involving an intent to cause tangible economic harm. *See also Zarrab*, 2016 WL 6820737, at *13–14. Sadr's argument that the Indictment nonetheless fails to state an offense because the *risk* of such harm—from, for example, regulatory investigations, fines, and civil penalties—is "unclear, remote, or non-existent," Reply 4 at 7 (quoting *United States v. Nkansah*, 699 F.3d 743, 750 (2d Cir. 2012)), is misplaced. That argument bears on a question of fact to be resolved at trial—namely how and to what extent the alleged scheme did or would have harmed the banks—*not* on the sufficiency of the allegations in the Indictment.

Because the Indictment states an offense with respect to Section 1344, and because the Court finds Sadr's arguments to the contrary unavailing, Sadr's fourth pretrial motion to dismiss the portions of Counts Three through Six that allege or rely on violations of Section 1344 is DENIED in its entirety.

## VI.   MOTION TO DISMISS MULTIPLICITOUS COUNTS

Sadr moves in his fifth pretrial motion to dismiss a number of counts in the Indictment as multiplicitous. Specifically, he argues that Counts One, Two, and Six all charge the same conspiracy based on the same underlying conduct under different statutory provisions. *See* Mot. 5 at 1. A motion to dismiss multiplicitous counts derives from the Fifth Amendment's prohibition against double jeopardy. *See United States v. Mostafa*, 965 F. Supp. 2d 451, 463 (S.D.N.Y. 2013); *see also* U.S. Const. Amend. V. However, it is well established "that the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it

prohibits duplicative *punishment*." *Id.* at 464; *see also United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) ("Where two statutory sections operate independently of one another, 'there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes.'") (quoting *Ball v. United States*, 470 U.S. 856, 860 (1985)).  Accordingly, the Court DENIES without prejudice Sadr's fifth pretrial motion as premature.  *See United States v. Medina*, 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014) (collecting post-*Josephberg* cases in which "courts in this Circuit . . . denied pre-trial motions to dismiss potentially multiplicitous counts as premature").

## VII. MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE AND LACK OF SPECIFICTY, OR IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

In Sadr's sixth pretrial motion, he moves to dismiss all counts of the Indictment for failure to state an offense and lack of specificity.  In the alternative, he moves the Court to order the Government to submit a bill of particulars specifying and clarifying the Indictment's "vague and conclusory assertions."  Mot. 6 at 1.  For the reasons stated below, Sadr's motion to dismiss all counts of the Indictment and for a bill of particulars is DENIED.

### A. Sadr's Motion to Dismiss All Counts of the Indictment is Denied

An indictment can be challenged on the grounds that it lacks the required specificity. Fed. R. Crim. P. 12(b)(3)(B)(iii).  According to Rule 7(c)(1) of the Federal Rules of Criminal Procedure, an indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7.  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *Stringer*, 730 F.3d at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  As discussed above, to satisfy Rule 7(c)(1), an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Id.* (internal quotation

marks and citation omitted).  Indeed, an indictment "need not be perfect, and common sense and reason are more important than technicalities." *Id.* (quoting *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001)).  Courts have repeatedly refused, in the absence of prejudice, to dismiss counts of indictments for lack of specificity "[w]hen the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy." *Id.*

Sadr's motion to dismiss all counts of the Indictment for failure to state an offense and lack of specificity is denied.  Each count of the Indictment "track[s] the language of the statute charged" and "state[s] the time and place" of the alleged crimes.  *Id.*; *see* Ind. ¶¶ 14–16 (Count One), 17–21 (Count Two), 22–23 (Count Three), 24–27 (Count Four), 28–29 (Count Five), 30–33 (Count Six).  Indeed, the 34-page Indictment sets out 54 overt acts allegedly committed in furtherance of the conspiracies alleged in Counts One, Two, Four, and Six.  This lengthy and detailed Indictment provides the requisite "minimal protection against double jeopardy" to survive dismissal.  *Stringer*, 730 F.3d at 124.

Furthermore, several of Sadr's specific arguments challenging individual counts of the Indictment have been rendered moot by the Court's disposition of other of his pretrial motions.  He argues, for example, that the Indictment "does not specify how Sadr allegedly exported services *to Iran or the Government of Iran*." Mot. 6 at 5 (emphasis added).  However, as discussed above, the Indictment need not allege that services were exported *directly to* Iran or the Government of Iran where the benefit of such services allegedly inured to persons or entities in Iran or where the defendant is also charged with conspiring to evade or avoid the ITSR's prohibitions.  *See supra* Section II.A–B.  Likewise, Sadr's argument, Mot. 6 at 10–11, that Counts Three and Four—the bank fraud counts—should be dismissed for failure to specify any false representations is obviated by the Court's resolution of his fourth pretrial motion.  *See supra* Section V.

Because it "contains the elements of the offense charged," fairly informs Sadr of the charges against which he must defend, and "enables him to plead an acquittal or conviction in

bar of future prosecutions for the same offense," the Indictment is sufficient under the

Constitution and the Federal Rules of Criminal Procedure. *Stringer*, 730 F.3d at 124 (quoting

*Hamling*, 418 U.S. at 117). Accordingly, Sadr's motion to dismiss all counts of the Indictment is

DENIED.

### B.      Sadr's Motion For a Bill of Particulars is Denied

Because the Court denies Sadr's motion to dismiss all counts of the Indictment, it now

considers his motion for a bill of particulars. Pursuant to Federal Rule of Criminal Procedure

7(f), a defendant may move for a bill of particulars "to identify with sufficient particularity the

nature of the charge pending against him." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d

Cir. 1987) (per curiam). A bill of particulars is intended to "enable[] a defendant to prepare for

trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a

second time for the same offense." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552

F.3d 93, 150 (2d Cir. 2008) (internal quotation marks and citation omitted). But a bill of

particulars "is required only where the charges of the indictment are so general that they do not

advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378

F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted). And the decision

whether to order a bill of particulars "rests within the sound discretion of the district court."

*United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

In deciding whether to exercise that discretion, a court must "examine the totality of the

information available to the defendant—through the indictment, affirmations, and general pre-

trial discovery—and determine whether, in light of the charges that the defendant is required to

answer, the filing of a bill of particulars is warranted." *Id.* A bill of particulars is not necessary

when "the government has made sufficient disclosures concerning its evidence and witnesses by

other means." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). "A bill of particulars is

not a general investigative tool, a discovery device or a means to compel the government to

disclose evidence or witnesses to be offered prior to trial." *United States v. D'Amico*, 734 F.

Supp. 2d 321, 335 (S.D.N.Y. 2010) (internal quotation marks and citation omitted).

Accordingly, "the proper test in deciding whether a bill of particulars should be required of the

Government is whether the bill of particulars is *necessary* for the defense, not whether it would

aid the defendant in his preparation." *United States v. Trippe*, 171 F. Supp. 2d 230, 240

(S.D.N.Y. 2001) (emphasis added).

Sadr seeks a bill of particulars to identify (1) the alleged co-conspirators and other actors

involved in the alleged criminal conduct and (2) the alleged transactions and false statements at

issue. Mot. 6 at 14–19. The Court considers each category of particulars in turn.

First, the Court denies Sadr's request to identify unindicted co-conspirators and other

actors involved in the alleged criminal conduct. Courts in this Circuit frequently exercise their

discretion to deny requests to identify co-conspirators through a bill of particulars. *See, e.g.*,

*United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006). That is particularly true

where, as here, the allegations in the indictment are specific and the Government has provided

discovery that will enable a defendant to adequately prepare his defense. *See id.*

The Court also denies Sadr's general request to identify the alleged transactions and false

statements at issue. Indeed, the Government *has already* identified these transactions with some

particularity—it details 15 separate transactions, with related allegations comprising over 17

pages of the Indictment. Ind. ¶¶ 13, 16. Sadr concedes that "[i]t is conceivable that these are the

only financial transactions and monetary transfers at issue in the case," but argues that "the

Indictment does not specify whether this is the case." Mot. 6 at 17. However, even if other

transactions are at issue in the case, "the law does not require that an indictment set forth every

act committed by the conspirators in furtherance of the conspiracy." *Mostafa*, 965 F. Supp. 2d at

467. Indeed, though such information, if it exists, may "aid [Sadr] in his preparation," it is not

*necessary* for his defense. *Trippe*, 171 F. Supp. 2d at 240. Furthermore, "the most frequent case

in which particulars are warranted is where discovery is overwhelmingly extensive *and* the

government fails to designate which documents it intends to introduce and which documents are

merely relevant to the defense." *Mahaffy*, 446 F. Supp. 2d at 119. Because the Government has

represented that it intends to rely at trial on only the 420 documents produced to Sadr on May 15, 2018, Dkt. No. 155 at 11, this is not a case in which particulars are particularly warranted. Accordingly, Sadr's motion for a bill of particulars is DENIED, and thus his sixth pretrial motion is DENIED in its entirety.

Though the Court denies Sadr's motion for a bill of particulars in full, it notes in doing so that the Government has already provided him with some of the relief he seeks in the motion now before the Court. Sadr seeks a bill of particulars, in part, out of a legitimate concern that the Government's failure to specify with precision which regulations he allegedly conspired to violate leaves it "free to roam at trial" and "rely on any theory of liability it may find viable." *See* Mot. 6 at 8. However, at oral argument on this motion on November 7, 2019, the Government represented to the Court that it alleges in the sanctions counts that Sadr conspired to violate only Sections 560.203, 560.204, and 560.205 of the ITSR. *See* Dkt. No. 160 at 58:20–59:8. Thus, though this information may be necessary to enable Sadr "to prepare for trial [and] to prevent surprise," *In re Terrorist Bombings*, 552 F.3d at 150, the Government has already provided it.

## VIII.   MOTION TO STRIKE SURPLUSAGE

Pursuant to Federal Rule of Criminal Procedure 7(d), Sadr moves in his seventh pretrial motion to strike as surplusage allegedly irrelevant and prejudicial language in the Indictment. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks and citation omitted). Accordingly, so long as the "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (internal quotation marks and citation omitted). This standard "is an 'exacting' one," and "only rarely is alleged surplusage stricken from an indictment." *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

Sadr argues that five categories of surplusage should be stricken from the Indictment: (1) references to the Government of Iran; (2) references to unrelated or overbroad provisions of the U.S. Code and Code of Federal Regulations; (3) open-ended references, such as "among others," suggesting Sadr is responsible for uncharged misconduct; (4) references to threats to national security and foreign policy; and (5) conclusory statements of law and policy contained in the Indictment's first five paragraphs. *See generally* Mot. 7; Reply 7.

Since the time of the filing of this motion, the parties have resolved the issues with respect to categories (3), (4), and (5). *See* Dkt. No. 162 (representing to the Court that the parties were able to resolve all but Sadr's requests with respect to references to the Government of Iran and references to unrelated or overbroad provisions of the U.S. Code and Code of Federal Regulations). Accordingly, this motion is now moot with respect to those categories of surplusage.

The Court is skeptical that Sadr has satisfied the exacting standard for striking surplusage with respect to either of the remaining categories. However, the Court will follow the routine practice in this District of "await[ing] presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (collecting cases). Indeed, the Court will be better positioned to decide these issues then, as "[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges." *United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004) (Lynch, J.). Moreover, Sadr will not be prejudiced by this delay because the jury will not see the Indictment, if at all, until it begins deliberations.

Accordingly, Sadr's seventh pretrial motion to strike surplusage is DENIED without prejudice to renew.

## XII.   CONCLUSION

For the foregoing reasons, the Court DENIES Sadr's first, second, third, fourth, fifth, sixth, and seventh pretrial motions in their entireties. With respect to the fifth and seventh pretrial motions, these denials are without prejudice.

This resolves Docket Nos. 81, 83, 85, 87, 89, 91, and 93.

SO ORDERED.

Dated: December ___6___, 2019
New York, New York

ALISON J. NATHAN
United States District Judge