JBP5sadA                    argument - Corrected

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            18 Cr. 224 (AJN)

5   ALI SADR HASHEMI NEJAD,

6               Defendant.

7   ------------------------------x

8                                          November 25, 2019
                                           3:30 p.m.
9

10  Before:

11                  HON. ALISON J. NATHAN,

12                                         District Judge

13

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:   MICHAEL K. KROUSE
17        JANE KIM
          STEPHANIE L. LAKE
18        GARRETT LYNCH
          Assistant United States Attorneys
19

    STEPTOE & JOHNSON, LLP
20       Attorneys for Defendant
    BY: BRIAN M. HEBERLIG
21       BRUCE C. BISHOP
         NICHOLAS P. SILVERMAN
22

23

24

25

1          (Case called)

2          THE COURT:  I will take appearances of counsel,

3     starting with the government.

4          MR. KROUSE:  Good afternoon, your Honor.  Michael

5     Krouse, Stephanie Lake, Jane Kim and Garrett Lynch for the

6     United States.

7          THE COURT:  Good afternoon to the three of you.

8          For the defendant?

9          MR. HEBERLIG:  Good afternoon, your Honor.  Brian

10    Heberlig, Bruce Bishop, my client Ali Sadr and Nicholas

11    Silverman here for the defense.  Mr. Weingarten had a medical

12    procedure and was not able to be here today.

13         THE COURT:  Good afternoon, counsel.  And good

14    afternoon Mr. Sadr.  Please, be seated.

15         We are here for oral argument on the suppression

16    motion which I broke off from the other motions to dismiss the

17    indictment that was argued a few weeks ago.  I will tell you I

18    am close to finalizing the opinion for those so that will be

19    out soon this week or next, so you will have that and I will

20    get resolution to this one when I can, but I did want to hear

21    argument on the defendant's motion.  I think we should do 30

22    minutes per side.

23         Mr. Heberlig, would you like to reserve time?

24         MR. HEBERLIG:  I would, your Honor.  10 minutes.

25         THE COURT:  10 minutes.

1          MR. HEBERLIG:  And I don't have a watch, they

2     collected it, so if you cut me off or deliver me a two-minute

3     notice?

4          THE COURT:  We will try to give you a two-minute

5     notice so that will be 18 minutes from when you start.

6          MR. HEBERLIG:  Terrific.

7          May it please the Court, if I can, I would like to

8     start, we have two issues, a Franks issue, an overbreadth lack

9     of particularity issue, in addition to the motion for return of

10    seized property.  I would like to start with the overbreadth

11    and lack of particularity issue, if that's okay with the Court.

12          THE COURT:  That's fine.

13          MR. HEBERLIG:  The search warrants we are talking

14    about here, Judge, were grossly overbroad and they lacked any

15    particularity whatsoever.  They functioned as general warrants.

16    They were treated by the government like general warrants.  The

17    facial deficiency of the warrants combined with the way the

18    government executed them renders the good faith exception

19    inapplicable in this case.  We think suppression is the only

20    outcome justified by the facts here.

21          So, let's start with the face of the warrant because

22    we have to start there.  There were no express terms of

23    incorporation, the government does not argue that point so we

24    are left with just the warrant.  The warrant, I have to say, is

25    inartfully drafted, to say the least, but the way it reads

1    there is an introductory paragraph or series of paragraphs that

2    talk about the probable cause that's been established that

3    essentially says there is probable cause to believe that the

4    e-mail accounts contain evidence of, and then there are three

5    enumerated New York State crimes, money laundering offering a

6    false instrument for filing and falsifying business records.

7         THE COURT:  Isn't the inclusion of knows specific

8    crimes what distinguishes the case from most, if not all of the

9    cases you rely on?

10        MR. HEBERLIG:  I don't think so for two reasons.

11   Number one, that's not the way the warrant reads.  The

12   government would like you to interpret the warrant as if the

13   later paragraph that says and instructs the officers what

14   they're commanded to seize, they want that to be read as if it

15   three enumerated offenses.  That's not what the paragraph says.

16   The officers are demanded, and it is the paragraph about that

17   the begins, you are therefore commanded to seize literally the

18   entirety of the account with no limitation whatsoever.  This is

19   document, it is docket 96-1, the bottom right-hand Bates Number

20   is 488, and it's the "you are therefore commanded" paragraph.

21   The only plausible way to read that is there is no limitation

22   whatsoever that the government agents had on what they could

23   seize but even if, for sake of argument, the inclusion of those

24   three offenses could be read to limit the seizure to only

25   documents that support those three offenses, that's no

1    limitation at all in the context of this warrant.  We cited,

2    it's in our reply brief, page 5, footnote 5, 10 or so cases

3    that involve very broad categories --

4                THE COURT:  Which reply was this?  The briefing got

5    so --

6                MR. HEBERLIG:  Supplemental reply.  The last reply we

7    filed.

8                THE COURT:  Okay.

9                MR. HEBERLIG:  There is a series of cases in which

10   Courts have held that simply including a broad criminal statute

11   but then also having general categories of evidence to be

12   seized that are not tied with any particularity to the statute

13   is not enough.  That's no particularization.  From the Second

14   Circuit it is the *Buck* decision and the *Rosa* decision.  From

15   the District Court it is the *Zemlyansky* decision and we also

16   cited a series of out of Second Circuit opinions that are dead

17   on -- *Maxwell*, *Roche*, and *Leary*, where they did say that this

18   probable cause to believe this has been violated, like in wire

19   fraud or in the case of *Leary*, more on point, violation of the

20   Arms Export Control Act but, the warrants went on to then allow

21   the officers to seize broad categories of documents that were

22   not tied back in any respect to the statute that was cited.

23   And in this case that's, at best, what this warrant allows.  It

24   articulates the three crimes that are at issue but then says

25   you may seize every single e-mail, draft e-mail, and other bit

1   of information about these accounts.  There is no

2   categorization whatsoever that even attempts to tie what the

3   officers can seize to the showing of probable cause in

4   affidavit.

5           THE COURT:  And do those cases, you said it was your

6   supplemental reply page 5 footnote 5?

7           MR. HEBERLIG:  Both page 5 and footnote 5.

8           THE COURT:  And footnote 5.  Were those limited to

9   specific e-mail accounts as opposed to all devices, all

10  electronics, and the like?

11          MR. HEBERLIG:  I think arguably some of those cases

12  were more specific than here.  They at least had

13  categorizations of the types of documents that could be seized

14  like financial records, business records, tax --

15          THE COURT:  Is no the beginning of that answer?

16          MR. HEBERLIG:  I lost the question.

17          THE COURT:  The question was are those -- so this case

18  is tied to specific e-mail accounts, as opposed to what we

19  sometimes see which is the collection of all electronic

20  devices.

21          MR. HEBERLIG:  Well, but I think that's, I would

22  respectfully submit --

23          THE COURT:  Make the argument you want to distinguish

24  it but first question --

25          MR. HEBERLIG:  Yes.  Sure.

1     These warrants were limited to only e-mail accounts.

2     They were sent to the providers like Gmail, Hotmail, not to a

3     particular business or anything.

4          THE COURT:  That's different than the cases you have

5     relied on -- and then you will tell me why it doesn't matter --

6     but is it different.

7          MR. HEBERLIG:  You know, I'm not entirely certain

8     whether there are any of those cases.  I think they're broader,

9     they're businesses plus computers and e-mail whereas these are

10    just e-mail accounts.  I think warrants directed at e-mail

11    accounts are, in many senses broader, because an e-mail account

12    is the equivalent of someone's home office, for instance.

13         THE COURT:  Well, devices usually contain at least one

14    e-mail account if not multiple e-mail accounts.

15         MR. HEBERLIG:  That is true, but what I am saying is

16    those cases had at least limits in what categories could be

17    grabbed.  They didn't allow the seizure of the entire e-mail

18    account, every single e-mail on the phone.  They were limited

19    to things like business records or bank records or other

20    things, whereas our warrant is literally every single e-mail

21    with no restriction whatsoever.

22         THE COURT:  And then those cases also didn't include,

23    on the face of the warrant, specification of relationship to

24    enumerated crimes.

25         MR. HEBERLIG:  They included enumerated crimes but

1     they did not tie what was being searched for and seized to

2     those crimes, just like we have here.  There was no factual

3     information in the warrants that says, for instance in our

4     case, money laundering.  What were the officers supposed to be

5     looking for?  What type of money laundering?  What business at

6     issue?  What underlying criminal activity were the agents

7     directed to seize?  There was nothing in the warrant that gave

8     them any direction whatsoever.  Likewise, with respect to

9     falsifying business records, what business had allegedly false

10    records?  Were they cabined in any way to were we talking about

11    Stratus?  Clarity?  Some of Mr. Sadr's businesses?  Were we

12    talking about banks Citibank?  UBS?  No factual information

13    whatsoever in the warrants, they do seize everything, and

14    that's what gave no direction to the executing officers.

15          Those cases, I submit if the Court goes and reads

16    them, made clear that it's not enough just to articulate a

17    crime in the warrant.  You have to tie, with specificity, what

18    you are searching for to the enumerated crime.  That comes from

19    the *Ulbricht* -- the Dread Pirate decision -- and others.  And

20    that's what's missing here.  We recognize that there were three

21    statutes cited in the warrant.  That is the only way in which

22    these warrants were different than some of the cases like *Wey*

23    and others but that's not a meaningful distinction here.

24    Courts, and I would point to the *Vilar* case which was analyzed

25    in *Zemlyansky*.  They say there are two ways in which you could

1   have a lack of particularity; one can be when there is no crime

2   articulated, that's the way, *650 Fifth Avenue* is another case,

3   but the second way is where there are catch-all seizures of

4   records of some time where that catch-all is not tied with any

5   specificity to the crimes articulated.

6          So, the government would like you to conclude that by

7   saying in the warrants that there was a probable cause to

8   believe money laundering had occurred, that that gave the

9   officers sufficient direction but that is literally the only

10  direction that was given so they were instructed look at the

11  entirety of his e-mail account and look for all evidence of

12  money laundering.  That's what the cases that I am referring to

13  in our reply say is not enough that gives no particularization

14  or direction whatsoever to the officers.

15         So, on its face, our argument is the warrant is

16  facially overbroad and operates as a general warrant.  I think

17  that there is no right answer to that.  I do believe when you

18  look at those cases, simply articulating the statutes is not

19  enough so we are in a situation where, objectively, the face of

20  the warrant is overbroad and that gets us to what is the

21  appropriate remedy and in this case where you have such a

22  facially deficient warrant I think the authorities say fairly

23  clearly that the good faith exception is not applicable.  It is

24  certainly not our burden to show and it is the government's

25  burden but the principal analysis that the Court has to go

1    through is was this warrant facially reasonable or was it

2    facially overbroad and there is literally no direction if you

3    read this warrant.  What is an executing officer supposed to

4    seize?  It's every e-mail in the account with no discretion

5    whatsoever.

6         If that weren't enough, if there was some doubt about

7    the facial overbreadth and lack of particularity, we have the

8    information that's now been disclosed in the government's

9    supplemental briefing about the manner in which the search was

10   executed and there are all sorts of problems with the manner in

11   which the search was executed.  There, frankly, wasn't a true

12   responsiveness review ever conducted by the government.  They

13   simply put all of the million plus, 2 million plus -- depending

14   on what number is in a different brief -- into one big pool,

15   they call it the provider data, and there was never any attempt

16   to separate that data into two piles; responsive and

17   non-responsive.  It was all mixed together.  And a roving team

18   of constantly changing dozen or so district attorney's office

19   personnel went in using a program that was not designed to

20   review documents, there was no tagging capability, it was no

21   different than Outlook.  And they went in and sort of

22   periodically reviewed, with no overall set of search terms, no

23   directions as to who is looking at what year, what sort of

24   information in the e-mail, and when they would come across

25   something they found interesting they would print it to pdf and

1    apparently file it away in an electronic folder all the way

2    never ruling out any documents as unresponsive.

3            This process went on for, at a minimum, three years.

4    They say that the search for responsive documents concluded as

5    of April 2017 --

6            THE COURT:  That's the process that produced the 420,

7    so-called, pertinent documents?

8            MR. HEBERLIG:  Well, it's the 420 plus the other

9    1,775 -- they're the May set and the September set, May 2018

10   September 2019 they say they were all identified as pertinent

11   in this review.  They have voluntarily decided they're not

12   going to rely on the September set but, as we understand it,

13   the September set is the pertinent set and the May set is some

14   subset of that, that the district attorney's office determined

15   may have been a hot document set.

16           The point of it, though, is it took three years, at a

17   minimum, for them to do this review and then when they

18   represented a month before the supplemental briefing that as of

19   April -- well, they said early 2017 no one from DANY, the U.S.

20   Attorney's office, or the FBI, has reviewed the e-mail, raw

21   returns to identify any responsive material.  That turned out

22   not to have been true as they indicated in their supplemental

23   opposition.  There are actually three major ways in which,

24   after April of 2017, which is already three years after the

25   execution of the warrant but after that point in time in fact

1    government agents were seizing documents from the full returns

2    right up until the close of discovery post-indictment and there

3    are three categories in which they did that and this is from

4    their brief.  Number one, this is explained in their opposition

5    at page 8.  After April 2017, when supposedly the

6    responsiveness review ended, the District Attorney's office

7    directed its reviewers to go to the raw returns, to the

8    provider data, and locate documents that they had seen before

9    but apparently not seized.  So, these at least are ones that

10   reviewers had apparently remembered seeing during the

11   responsiveness review but hadn't collected at the time and they

12   went back after April of 2017, all the way until the time of

13   indictment, and collected those documents.  That's one

14   category.

15           Number two, this is also explained on page 8 of their

16   brief.  They were -- the reviewers were instructed by more

17   experienced law enforcement personnel to query new topics --

18   they say that's their words -- query new topics that were

19   related to responsive documents they had seized earlier.  Under

20   any interpretation of what they're saying these were new

21   searches and they seized entirely new documents and this,

22   again, is after April 2017, right up until the time of

23   indictment.  And we know from just limited metadata we have

24   seen -- frankly, the metadata is a complete mess and we have no

25   real reason to believe it is reliable -- but what we have seen,

1   they're seizing documents in the week and two weeks before

2   indictment.  There are a good 20, 25 documents that directly

3   relate to the forfeiture allegations in the indictment and they

4   seem to have been frantically searching right up until the time

5   of indictment so that's now a full four years after these

6   warrants were executed.

7          The final category occurred post-indictment and this

8   is explained at page 9 of their brief.  Post-indictment, they

9   apparently went to find complete documents, they say.  The most

10  charitable interpretation of what went on at this point in time

11  was that they had seized the document earlier in time that was

12  missing a page and they decided they had to go back and find

13  the complete document.  Well, we looked closely at what they

14  might be talking about.  The 420 documents are 420 pdfs but

15  each pdf often has more than one document in it.  It may have

16  four or five e-mails.  And what appears to have happened, and

17  again we don't know for sure because their metadata is

18  unreliable and the government has refused to answer our

19  questions about what happened, but it appears that back in the

20  day closer in time to the execution of the warrants, they

21  seized one e-mail and later in time, even after indictment,

22  they realized in reading that e-mail that -- you know how the

23  e-mails read, the top e-mail is the most recent and you go back

24  in time, say, the third e-mail down in the chain had some

25  attachments.  Well, the attachments obviously wouldn't be part

1    of the top e-mail, that's how e-mails work; if you respond to

2    an e-mail the attachments are gone, they went back and they

3    looked for the attachments, or in some instances we believe the

4    e-mail chain stopped at an interesting point in time, they

5    instructed the agents, *go find what happened. How did that*

6    *conversation end? What else occurred in that discussion?* And

7    we think it's beyond doubt that they seized wholly new

8    documents post-indictment. From a statistical perspective they

9    say that 852 additional pages were obtained post-indictment.

10   That's more than one quarter of those pertinent documents.

11   There is no way in the world that can be attributed to sloppy,

12   inadvertent, missing pages.

13        We think, with a full opportunity to explore this

14   issue, we are going to be able to prove, without a doubt, that

15   these were entirely new documents being seized right up until

16   two weeks before the close of discovery. The metadata we have

17   seen suggests that their last discovery production was on May

18   15, 2018, two weeks before Judge Carter said discovery had to

19   end, and they're still searching the full returns in the week

20   or two weeks leading up to that production to find new

21   documents that were produced in discovery.

22        THE COURT: Do you have -- maybe this is for the

23   government -- but an exemplar document where this is the page

24   that was originally marked as pertinent, put in that file of

25   the 420, and now here is where the government is calling the

1    complete document?

2            MR. HEBERLIG:  I can very easily come up with one.

3            We didn't file one, there is nothing currently in the

4    record.  I have some Bates numbers but they won't mean anything

5    because they're not in the record but this afternoon, tomorrow,

6    we can easily file a handful of very clear examples and explain

7    what we think is going on, but again, we don't know because we

8    have asked for when all the documents were seized and we have

9    been rebuffed in those requests.

10           THE COURT:  But the representation is, as an example,

11   one of the original 420 marked as pertinent is like a single

12   page of an e-mail chain and now it violates -- two minutes

13   remaining -- now in the post-indictment phase the government

14   went, and to complete that document, 15 pages of other

15   communications and attachments have been added and the

16   government indicates that that's just sort of, to be thought of

17   as the original of the original 420 marked pertinent.

18           MR. HEBERLIG:  Yes.  That's absolutely what happened.

19           And, this is not simple authentication.  If you think

20   about it in terms of paper documents, three or four years after

21   the fact the government has seized the document in paper from a

22   house and they realize all of a sudden, oh my goodness, we

23   missed the attachment or the relevant communication that must

24   have been in the relevant file.  They couldn't go under the

25   guise of the original warrant back to the house, bust down the

1  door, and grab what they missed.

2         There is no practical difference there and that's

3  exactly what they did.

4         I have limited time.  If the Court is willing to

5  extend my time I would like to address Franks.  The one thing I

6  didn't address about this issue, though I want to in 30 seconds

7  because they don't defend it at all in their brief, is it is

8  undisputed that in May of 2018, three months or two months

9  after indictment during the bond proceedings, the government

10  went back to the raw returns and they searched willy-nilly,

11  didn't limit themselves to things that had been marked

12  previously as responsive -- they searched for evidence of

13  travel to Iran and beyond.  They searched for entire categories

14  of document like citizenship, certain bank records, assets,

15  communications with his father.  Absolutely no justification

16  for doing that.  It reveals, without a doubt, that these were

17  general warrants and they believed they had free opportunity to

18  go back to the well time and time again, and they did.

19         THE COURT:  Thank you.

20         MR. HEBERLIG:  Can I take a few minutes or can we add

21  10 minutes?

22         THE COURT:  You have more time you have reserved.  Why

23  don't you take five more minutes of your time and then we will

24  see how it goes.

25         MR. HEBERLIG:  Very quickly then Franks.

1          We understand there is a high hurdle to meet in a

2    Franks motion.  We think we have met it here.  There are

3    obviously two ways a Franks argument can be sustained --

4    showing of intentional misrepresentations in an affidavit and

5    reckless misrepresentations.  Without a hearing we don't think

6    we can establish intentional misrepresentations, we will

7    acknowledge that, with the exception of one allegation in the

8    search warrant affidavit:  The allegation that the money being

9    transferred for this project, the construction project in

10   Venezuela was used to fund covert projects between the

11   government of Iran and Venezuela.  That's complete -- I won't

12   use the word I want to use -- that's nonsense.  There is

13   absolutely no basis for the allegation.  When we called them

14   out on it in their briefs they say, well, the affiant only said

15   there is reason to believe that but yet articulated no reason

16   to believe.  This was a private business contract between a

17   private company and Venezuela and the thrust of --

18          THE COURT:  What would I look to, in this record for

19   which you bear the burden, to know that that was intentional?

20   You said that you can't show intentionality with this

21   exception.  What would I look at other than the fact that you

22   called them out and they say reason to believe?

23          MR. HEBERLIG:  It is such a stark, like, were it true

24   shocking allegation that this was, you know, this commercial

25   project was in fact used to fund covert government projects

JBP5sadA                    argument - Corrected

1    that an affiant wouldn't make such an allegation without some

2    reason to believe it's true, and yet when we called them out on

3    it in the brief they don't defend, in any respect, they don't

4    give any reason in which it was included, don't defend it at

5    all.

6            THE COURT:  That's just flipping the burden to them.

7    Right?

8            MR. HEBERLIG:  Okay.  Well, you know, perhaps then you

9    could say it is reckless.  I don't think there is an

10   explanation for it and had there been one they would have given

11   it to you in the opposition.  But even if it is reckless I

12   think it clearly happened in -- two minutes, your Honor, and I

13   will sit down -- that was the gist of all of the

14   misrepresentations.  You just need look no further than

15   paragraph 5 of the affidavit.  This is the first affidavit, the

16   April 2014 affidavit, basically the entire paragraph is false

17   and what it conveys is that Mr. Sadr and his family -- conveys

18   falsely I should say -- are national security risks, they were

19   aligned with if not part of the Iranian government and they

20   were engaged in activity hostile to the United States.  This

21   took a razor thin theory of probable cause and made it into a

22   national security issue when none of those statements were

23   true.  They don't have substantial ties to the government of

24   Iran.

25           THE COURT:  And what do I look at to note that -- just

1    take that, let's isolate that.  What do I look at to know that?

2           MR. HEBERLIG:  Well, you know, I think there is no

3    record evidence that they are.

4           THE COURT:  Right.  But we agree that the law puts the

5    burden on you.

6           MR. HEBERLIG:  It puts the burden on us to make a

7    preliminary showing.

8           THE COURT:  All you have done is pointed to the

9    language and said they don't have a response to what supports

10   it.  Maybe that's right.  I will ask, obviously, you.  But that

11   clearly is just putting the burden on them.

12          MR. HEBERLIG:  My view of what it takes to establish a

13   preliminary showing is to point out falsehoods if they're not

14   rebutted in any respect.  I think that that's enough to get a

15   preliminary showing and there is case law we cited that says

16   you don't have to submit affidavits or declarations.

17          THE COURT:  I am asking specifically for an affidavit

18   or declaration other than you saying it's not true and I have

19   no reason to disagree with you other than you saying it's not

20   true and noting that they have provided nothing in response to

21   that which is saying you have pointed to language, burden on

22   them.  What would I look to in this record to know that

23   that's -- to see that you have made a showing and that it is

24   not true?

25          MR. HEBERLIG:  Stratus is a company, for instance,

1   that has a website, it is clearly a private company.  There is

2   nothing that suggests it is a government company.  We have

3   argued that but we didn't submit declarations.

4           I think I will reserve the rest of my time.  Thank

5   you.

6           THE COURT:  Thank you.

7           MR. KROUSE:  So, your Honor, just to structure this a

8   little bit.  In the government's view, there are four

9   sequential questions for the Court.  First, were the warrants

10  facially valid, and embedded in that question is the question

11  of whether a Franks hearing is appropriate, whether there were

12  material misrepresentations that the defense has made out that

13  would justify such a hearing, and whether the warrant itself

14  was facially invalid, overbroad, and not particular enough.

15  And the government's position on that question is that the

16  warrants were valid, there were no material misrepresentations

17  in the affidavit, the warrants were particular and not

18  overbroad, and therefore that aspect of the defense motion

19  should be denied.

20          Second, even if the warrants were not valid, did the

21  government execute the warrants in good faith such that

22  suppression would be inappropriate?  And this is the good faith

23  argument and the answer, in the government's view to this

24  question, is clearly yes.  Law enforcement's reliance on those

25  signed warrants by the magistrate judge was not unreasonable,

1    there wasn't any facial invalidity that was so obvious to the

2    law enforcement agents executing the warrants that the good

3    faith exception should not apply.  So, on that ground also, the

4    defense motion with respect to the warrants themselves should

5    also be denied.

6           Third, the defense makes arguments about the manner in

7    which the search was executed.  As to these documents, as to

8    this argument there is sort of two arguments the defense is

9    making.  They're making argument about duration and they're

10   conflating a lot of these arguments together but they're making

11   argument, at base, about the duration of whether the duration

12   was reasonable and also whether the results of the search were

13   reasonable and it is the government's position there is no

14   bright line rule on duration.  This search was conducted over

15   a million documents and it's now down really to 420 documents

16   that the defense has never, in any instance, stated that any of

17   those documents were not responsive to the warrant.  And so,

18   for those reasons, the bad aspect of the defense motion should

19   also be denied as to the manner in which the search was

20   executed.

21          And finally, even if the manner in which the search

22   was executed was found to be unreasonable, the Court would have

23   to determine whether suppression carries meaningful deterrence

24   benefits that would outweigh the price to be paid by the

25   justice system.  The government is not saying that if these

1    e-mails are suppressed the government won't be able to go

2    forward with its case but it would be, we haven't undertaken

3    that analysis yet but it would be very difficult to go forward

4    in this case so there would be a real cost to the justice

5    system and here there is no real meaningful deterrence benefits

6    to be gained.  The reviewers did not engage in this review in a

7    deliberately reckless or unlawful manner, they did not

8    disregard the Fourth Amendment.  In fact, the way in which the

9    search was conducted which defense counsel raises some of those

10   issues, those actions taken by law enforcement have been

11   endorsed in other Court decisions.  It is not clearly stated

12   law either on the duration point or the point that defense

13   counsel raises about going back to retained data from an e-mail

14   account and determining whether, on the same offense, there is

15   additional evidence to support the government's theory and

16   that's what happened here.  The reviewers in this case were not

17   going back to the prior set in order to find evidence of an

18   entirely different crime.

19          The government's theory of the crime in this case has

20   been entirely consistent from the first affidavit in 2014 all

21   the way through the indictment in this case and even today and

22   up to trial.  That theory is that the defendant engaged in a

23   conspiracy to conceal the fact that dollar payments were being

24   routed through New York banks in order to benefit an Iranian

25   entity and Iranian people and that is the government's theory

1    and it has been from the beginning.

2              So, on all of those four points, it is the

3    government's position that the defense motion should be denied.

4              If I could pick up just on the Franks point quickly

5    because that's where the defense ended?  The defendant has not

6    adduced any evidence -- as the Court noted it is the defense's

7    burden -- to show that there were material misstatements that

8    the affiant knew were false at the time.  The government

9    addressed this in detail in its initial response from April but

10   there are no misstatements, much less material misstatements,

11   that would justify a Franks hearing here.  So, that aspect of

12   the defense motion should be denied.

13             As to the overbreadth and particularity arguments,

14   looking again at the warrant which the defense highlighted, the

15   defense would have the Court ignore the entire first page and a

16   half of the warrant and just start at the "you are therefore

17   commanded" section on page 2 but that --

18             THE COURT:  So, he began with that argument but then

19   quickly shifted to even if you accept the reference in the

20   preliminary language that references the three enumerated

21   crimes, the argument is that it doesn't limit the search to

22   those enumerated crimes.  Right?  Not just that it -- so,

23   accepting I think Mr. Heberlig quickly said, accepting that it

24   references those crimes, he went on to make the further

25   argument.

1          MR. KROUSE:  Yes, your Honor; and drafting of the

2    warrant is not entirely clear but I do think there are aspects

3    of it that make it obvious that the probable cause finding by

4    the Judge and the statement about the crimes themselves and

5    what the evidence that's expected to be found in that e-mail

6    address make clear that law enforcement is only authorized to

7    search that target e-mail address for these items of data that

8    are connected to the crimes that are enumerated and I think

9    that's pretty obvious reading of the warrant.

10          So, if you look at page 1, right in that first

11    paragraph, it says that --

12          THE COURT:  Page 487 is the Bates.

13          MR. KROUSE:  Yes; exactly, your Honor, 487 Bates.  In

14    that first paragraph it states a finding by the Judge that

15    there is reasonable and probable cause to believe that certain

16    property, evidence, and records, to wit; and the to wit there,

17    then enumerates multiple categories of information including

18    subscriber account information, e-mails, draft e-mails, IP

19    addresses, things of that nature.  And then at the end of that

20    first bullet point it says which shows or tends to show the

21    following and then links it directly in the second sub-bullet

22    point to involvement in money laundering, offering a false

23    instrument for filing, falsifying business records, or attempt

24    or conspiracy to do the same.

25          So, in that way, the warrants -- this is on the face

1   of the warrant.  It's saying that there is probable cause that

2   within this e-mail address there are these categories of data

3   that will serve as evidence of these offenses.  It's saying

4   that pretty plainly.  And then it goes on to say that there is

5   reasonable and probable cause to believe that this above

6   described property, which is the categories of information

7   linked to the offenses, constitutes evidence and tends to

8   demonstrate that an offense was committed -- now I am on page

9   488 sort of at the top of the page -- and that a particular

10  person participated in the commission of the offense and that

11  the target e-mail account has been used or was possessed for

12  purposes of being used to commit or conceal the commission of

13  an offense.

14          So, all of that is in the warrant, it's plain to the

15  law enforcement officers who were executing it that this

16  warrant, the probable cause has been found by the judge is

17  directly linked to these subject offenses, these three state

18  subject offenses.

19          The "you are therefore commanded" paragraph that

20  immediately follows that is directed to Microsoft.  The

21  e-mail -- this warrant is directed to the service provider and

22  they're commanding the service provider to provide is all of

23  the e-mail, everything contained in that account, and there is

24  nothing unusual about that in the context of an electronic

25  warrant.  The service provider is to provide everything and

1     then the law enforcement officers are supposed to go through

2     and determine what in that e-mail return actually constitutes a

3     return consistent with the warrant.  And that, even though it's

4     not described as clearly as it could be in the paragraphs

5     after, the second to last paragraph towards the bottom of 488

6     where it says, This Court hereby authorizes members of New York

7     County District Attorney's office to seize, search, retrieve

8     and view, and then at the end of that paragraph says:

9     Subsequent review is deemed analysis.

10              Now, if this really was a warrant --

11              THE COURT:  Sorry.  Where is that language?

12              MR. KROUSE:  On 489 at the end of the paragraph that I

13    started reading it says, it describes notwithstanding warrant,

14    an order is deemed executed when it is served upon the e-mail

15    provider and subsequent review is deemed analysis.

16              So that's a plain statement that --

17              THE COURT:  What does that mean?

18              MR. KROUSE:  That it's not -- it's not that law

19    enforcement is able to keep and retain every single thing

20    that's given to them and use that in their case.  There has to

21    be analysis conducted and the analysis is plainly referring

22    back to what's earlier in the warrant describing what the

23    property that can be seized by law enforcement is.  And that

24    property is those categories of data that are linked to the

25    subject offenses.

1          So that's the only logical reading of this warrant.

2     In the government's view it is particular to the offenses

3     charged, it is particular to the location to be served which is

4     the e-mail account and it is particular in the sense that it

5     links the items that can be seized to the specific offenses

6     that are listed in the warrant.  That distinguishes this

7     warrant from nearly every case.

8          THE COURT:  So, in particular, if you would

9     distinguish it from *Buck*, *Rosa*, and *Zemlyansky* are the cases

10    that Mr. Heberlig focused on today.

11         MR. KROUSE:  Yes, your Honor.  Those cases concerned

12    searches of homes where there is large categories of

13    information that can be seized.  This is a search, a stored

14    communication search for a particular e-mail address and

15    probable cause has been shown that that e-mail account is being

16    used to further a crime and so authorizes the government to

17    seize that data and to search it for evidence of that, those

18    enumerated offenses.  The government relies on *Washington*,

19    which is a Second Circuit decision, to distinguish the defense

20    arguments on those other cases where the Second Circuit

21    approved of a warrant that stated that search categories of

22    information could be seized that showed drug trafficking and so

23    linked what could be seized to a particular crime.  And that's

24    all that the warrant needs to do.  It needs to be particular in

25    those three ways and here this warrant is.  The warrant lists

1    the offenses, it lists where, the location that needs to be

2    searched, and it links the items to be seized to those

3    particular offenses.

4         So, that's the government's view on the overbreadth

5    argument that the warrant is not facially invalid.  But, even

6    if it was, the good faith exception would plainly apply here.

7    These are very fine distinctions that the lawyers are making

8    over what the warrant says and reading the warrant, what the

9    most reasonable interpretation of the warrant is.  Law

10   enforcement isn't expected to receive a facial -- what appears

11   to be a valid warrant signed by a magistrate judge based on a

12   detailed 19-page affidavit and examine it so closely that

13   they're able to draw out these fine distinctions.  They

14   operated on good faith that this authorized search warrant was

15   valid and that was not so unreasonable that the good faith

16   exception should not apply.

17        So, even if the Court were to find that perhaps this

18   warrant could have been more clearly drafted, it's not a

19   situation where it's so plainly invalid, for instance a

20   situation where the offenses aren't even stated on the warrant.

21   It is not that situation where Courts have found good faith

22   doesn't apply so even if the warrant --

23        THE COURT:  So, Mr. Heberlig has -- and I need to look

24   at the cases, but suggested that those cases I just mentioned

25   did involve the enumerated crimes being on the face of the

1  warrant and articulated that there was still insufficiency

2  because catch-all seizures weren't tied to the articulated

3  crimes.  I presume there was a good faith analysis in those

4  cases as well?

5          MR. KROUSE:  Yes, your Honor.  I believe so.

6          THE COURT:  And so, how then would you distinguish

7  that presumably ultimate conclusion that it's invalid?

8          MR. KROUSE:  It is case by case, your Honor.  The

9  standard for good faith is that it applies unless -- unless

10  there are a few things that don't matter here.  I believe the

11  defense is relying on the warrant was so facially deficient

12  that reliance was unreasonable and I think in this case that's

13  plainly not the situation.

14          THE COURT:  Where does the absence of any temporal

15  restriction fit into that part of the analysis?

16          MR. KROUSE:  Your Honor, the Courts have uniformly

17  held that a temporal restriction is not required in a warrant,

18  especially in complex investigations where the temporal scope

19  of the conspiracy isn't entirely clear or how long the account

20  was being used.  Here the conspiracy alleged is 2006 to 2014 so

21  it is a fairly large scale conspiracy from the perspective of

22  the time frame.

23          THE COURT:  Right, but that would suggest that there

24  is not probable cause with respect to pre-2006, right?

25          MR. KROUSE:  Not necessarily, your Honor.  That's

1   ultimately what the government decided to charge but at the

2   stage in which the affidavit was drafted when the search

3   warrants were executed, that was the investigative stage and

4   there is nothing facially invalid about a warrant that doesn't

5   contain a specific time frame.

6          So, the government -- DANY in this case, which I will

7   call the government in this case, interchangeably, with an

8   affiant with a 19-page affidavit describing the full scope of

9   the scheme, how the e-mail addresses were being used in that

10  scheme and requesting warrants to search those locations and a

11  magistrate judge approved the warrants without a specific time

12  frame.  There is nothing invalid about that and I believe there

13  is deference shown to the magistrate judge's determination.

14         THE COURT:  Is that just a good faith argument?  That

15  is to say that the absence of a, in light of the

16  magistrate's -- well, you get it.  To the extent that there is

17  something problematic in the failure to have any temporal

18  restrictions you would make a good faith argument.

19         MR. KROUSE:  To the extent there is, your Honor.  I

20  don't think it is settled or I think actually the law is clear

21  that a time frame is not a per se requirement in a warrant --

22         THE COURT:  It is not a per se requirement but does

23  that mean that the absence of a temporal restriction can never

24  be grounds for concluding that it's unconstitutional?

25         MR. KROUSE:  No, your Honor.  No, your Honor.  I think

1   in totality that could be one factor that the Court could

2   consider.  I think in a case like this with where there is a

3   long-standing conspiracy that the government is investigating

4   that has a lot of complexity with a lot of different people and

5   a lot of different entities operating over a long period of

6   time, it's not unreasonable to not include a time frame.

7           THE COURT:  I think the defendant even says in his

8   briefing -- at one point in the barrage of briefing -- that he

9   is not relying on the absence of temporal restriction alone as

10  a basis but in conjunction with the other factors.

11          MR. KROUSE:  Yes.  And I think that's where the

12  government comes out.  It is possible that it could be a factor

13  in certain cases, we don't think it is here under these facts

14  and that, in any event, it wouldn't be so obviously facially

15  invalid that a law enforcement officer could not rely on it in

16  good faith and so it does then bleed into a good faith

17  argument.  But, on either ground, the government's view is

18  that --

19          THE COURT:  So it is not really a good faith argument

20  that the law is uncertain as to the necessity or lack of

21  necessity of inclusion of a temporal restriction but just that

22  in light of what is contained in the warrant it's not facially

23  invalid in a way that would be necessary to overcome the

24  government's good faith.

25          Is that the point?

1          MR. KROUSE:  Yes, your Honor.

2          So, for all of those reasons, your Honor, the

3     defense's initial set of motions, the February motions

4     regarding the affidavit, the Franks hearing, and the facial

5     validity of the warrant, all of those should be denied in the

6     government's view.

7          Just from a timeline perspective, your Honor, it might

8     be helpful to take a step back and note that in February of

9     2019, the defense filed their motions to suppress all the

10    e-mail evidence on the Franks basis and on the overbreadth

11    basis.  They never specifically challenged the 420.  In fact --

12         THE COURT:  Right, but so now I do have a question

13    because I have thought of it in the briefing as the government

14    saying it's going to only rely on this 420 and then it went

15    back and printed out the complete pdfs.  Mr. Heberlig has now

16    painted a different picture of what that looks like, that it's

17    not -- it's not in fact the government just relying on the same

18    420 documents with a few additional pages printed for

19    completion but that now the 420 documents with 800 and some

20    additional pages includes, presumably, e-mail chains,

21    conversations from over the course of time and different dates,

22    attachments to exhibits and the like and I don't -- it is hard

23    for the Court, without specific examples, to really get my head

24    around that but I have shifted -- and you tell me why this is

25    wrong -- I have shifted from thinking from, well, the

1   government said it is going to rely on the original 420

2   complete pdfs to something quite different.

3           MR. KROUSE:  And I think that's based on, perhaps, a

4   misunderstanding of what Mr. Heberlig is saying.  I mean, I

5   will let him -- Mr. Heberlig -- I will let him explain, but the

6   420 documents were all produced to the defense in May 2018.

7   Those are what we referred to as the May pertinent documents.

8           THE COURT:  And how many pages did that include?

9           MR. KROUSE:  That was 3,145 pages.  That was the full

10  discovery production and that's what the government is stating

11  that it will rely on at trial.

12          THE COURT:  So it is the May 2018 production.

13          MR. KROUSE:  Yes, your Honor.

14          THE COURT:  May 2018?

15          MR. KROUSE:  The May 2018 production.  So, these are

16  the documents that the defense has had for over a year and a

17  half.  It was described to the defense as pertinent documents

18  from the e-mail search warrants so --

19          THE COURT:  This is after you have gone back and

20  looked for, printed the full pdfs as you have described it in

21  your papers?  That's what you are talking about?

22          MR. KROUSE:  That's that intervening period I believe

23  that Mr. Heberlig is talking about from April 2017 to May 2018.

24          THE COURT:  Well, what did DANY -- DANY identified 420

25  pertinent documents, correct?

1      MR. KROUSE:  Yes, although I will put a pin in that

2   and they found more later, but the 420 were turned over in May.

3      THE COURT:  May of?

4      MR. KROUSE:  Of 2018.

5      THE COURT:  Of 2018.  So that's 420 docs and it

6   consists of 3,145 pages and you have gone back now and

7   printed -- and you are only going to rely on those 420

8   documents?

9      MR. KROUSE:  Yes, your Honor.

10      THE COURT:  But you are going to rely on something

11   more than 3,145 pages.

12      MR. KROUSE:  No, your Honor.  That's it.

13      THE COURT:  Okay.  So, when you did go back and print

14   the full pdfs?  Just so I know.  And to make sure we are not

15   talking about something different, that produced how many

16   pages?

17      MR. KROUSE:  It wasn't that we went back and printed

18   pdfs, it is that we looked back at the binders that were

19   provided to the U.S. Attorney's office in April of 2017 because

20   we were endeavoring to figure out when we, as now I will say

21   the government as the U.S. Attorney's office, received those

22   documents from DANY and that was the page number that I believe

23   was 2,397 which is in our a footnote in our brief.

24      THE COURT:  So that was --

25      MR. KROUSE:  That binder or set of binders that was

JBP5sadA                    argument - Corrected

1    provided to the government.

2            THE COURT:  You have to be more specific.  You told me

3    a few moments ago that you were going to equate DANY with the

4    government.

5            MR. KROUSE:  Yes, your Honor.

6            THE COURT:  So, I presume when you say, so give me the

7    time frame that you are talking about.  For the DANY's original

8    identification of what has been referred to as 420 documents,

9    that was when?

10           MR. KROUSE:  That was produced in May of 2018; the 420

11   documents of 3,145.  That was provided to the defense in May

12   2018 and that's what the government is going to rely on at

13   trial.

14           THE COURT:  Okay.

15           MR. KROUSE:  I think the confusion stems from the

16   government's footnote on page 9 of its response brief document

17   155 and that's footnote no. 6, your Honor.

18           THE COURT:  Yes.

19           MR. KROUSE:  So, that's -- I misspoke earlier -- 3,135

20   pages which was produced to the defense May 2018 and that's

21   synonymous with the 420 documents.

22           Now, the hard copy binders, which is just for full

23   disclosure to the Court of the facts, the hard copy binders

24   that were provided to the government in April 2017, when DANY

25   brought the case to the U.S. Attorney's office, we did a page

1   count on that and it had 2,283 pages.  And there is a way to

2   explain --

3           THE COURT:  Why aren't you -- why isn't it that that

4   you are limiting yourself to?

5           MR. KROUSE:  Your Honor, because it doesn't contain

6   everything that DANY identified as pertinent during its review

7   and it doesn't identify -- and it doesn't contain everything

8   that the government disclosed to the defense as the pertinent

9   documents that the government would be relying on at trial in

10  May 2018.

11          THE COURT:  So, take the first part of that.  How is

12  that the case -- just to get the language you used -- it

13  doesn't contain everything that DANY identified as pertinent

14  during its review?

15          MR. KROUSE:  Yes, your Honor.

16          THE COURT:  Explain that.

17          MR. KROUSE:  So, DANY provided those binders to the

18  U.S. Attorney's office as a way of saying here are some very

19  probative pieces of evidence that you should look at in

20  reviewing whether you want to take this case and charge it

21  federally.  It did not contain every document that DANY had

22  identified as pertinent up to that point.  So, as we detailed a

23  little bit in our motion, DANY conducted a wide-ranging review

24  of over a million documents and narrowed that down to these

25  420.  The 1,775 Sadr documents that we identified for the

JBP5sadA                    argument - Corrected

1    defense in September of 2019 and the 622 non-Sadr documents we

2    identified --

3                THE COURT:  None of which you are going to rely on.

4                MR. KROUSE:  None of which we are going to rely on.

5                THE COURT:  Sorry.  I did want to get clarity on this

6    point before I move on.

7                You are not going to rely on, you said at certain

8    points in the briefing, in your case-in-chief.  You are not

9    going to rely on at all no matter what?

10               MR. KROUSE:  Your Honor, the reason why we say

11   case-in-chief is because the government, if the defense

12   chooses -- because they have all of these documents, we have

13   disclosed them to them, they now have them, they may rely on

14   them during their case or during cross-examination of witnesses

15   and I think at that point the government would argue that to

16   put the government on equal footing with the defense who is now

17   relying on these documents, there may be other documents within

18   that same set which we are not relying on in our case-in-chief

19   but that we may want to -- we reserve the right to bring to the

20   Court as documents that we want to introduce in light of the

21   defense action.

22               THE COURT:  So it would seem for purposes of the

23   suppression analysis I have to consider it.  In other words,

24   you are saying we are only going to rely on 420.  That gets me

25   nothing because you might use one page knowing that the defense

1    will use another page and then you will use something else.

2            MR. KROUSE:  I don't think that's -- practically

3    speaking, I don't think that's what's going to happen, your

4    Honor.

5            THE COURT:  You are forced to forego using them, in

6    which case using anything other than the 420 -- and we will

7    deal with the 852-page discrepancy -- but for shorthand we will

8    call the 420 documents --

9            MR. KROUSE:  Right.

10           THE COURT:  -- either you say we are limiting

11   ourselves to that, in which case I won't consider the matter in

12   which the other documents were seized and produced, or you

13   don't in which case I do.  And I think for purposes --

14           MR. KROUSE:  And I think for purposes of suppression

15   we can say we will forego using any of the other documents.

16           THE COURT:  Okay.

17           MR. KROUSE:  The only caveat being the defense has

18   those documents including the non-Sadr documents and there may

19   be a time in which they seek to introduce it and then the

20   government would oppose.

21           THE COURT:  Would oppose.

22           MR. KROUSE:  If they sought to use those.  We are

23   dealing in hypotheticals here, your Honor.

24           THE COURT:  No.  I want to know, because I have to do

25   the analysis, whether the government is foregoing using

1    anything other than what we are now calling the 420 documents

2    no matter what.

3           MR. KROUSE:  We are foregoing using those documents.

4    Yes, your Honor.

5           THE COURT:  So then the question is what we mean by

6    the 420 documents and whether it's appropriate for the 852

7    original additional pages to be used.  I think we have narrowed

8    the question to that.

9           MR. KROUSE:  Yes.  And on that they're not additional

10   pages in any real sense.  The 420, which are 3,135 pages,

11   that's what was turned over to the defense and identified as

12   responsive in May 2018 so, from the government's perspective,

13   this footnote is informative for the Court just to show that we

14   have -- that the government hadn't received a lot of these

15   pages in binders from the defense as early as April 2017, but

16   for purposes of the Court's analysis as to what should be

17   suppressed, if anything, and nothing from the government's

18   perspective, those 420 documents, that's the full 3,135 pages,

19   were provided the to the defense in May 2018 and up until the

20   point --

21          THE COURT:  And those were all identified by DANY

22   during the time frame that we think of as the responsiveness

23   review as pertinent?  That's the representation?  Or a portion

24   of them were identified as pertinent and then later DANY went

25   back and included more documents within -- more pages including

1    additional e-mail communications in a chain, attachments to

2    e-mail and the like.  Which is that?

3          MR. KROUSE:  I think it depends on what the Court

4    means by the responsiveness review.  So, the duration --

5          THE COURT:  Well, you have talked to me about three

6    years.

7          MR. KROUSE:  So 2014 is when the first -- April 2014

8    is when the first warrant was executed.  DANY brought the case

9    to the U.S. Attorney's office in April 2017 previously -- and

10   the government has explained this in its motion -- previously

11   made representations that that was the point when all reviews

12   stopped.  Further inquiry by the government has revealed that

13   there were additional searches conducted between April 2017 and

14   the time of this document as well as for the bail issue.

15         So, there isn't -- I can say that the vast majority,

16   and DANY has represented to the government, that all of the 420

17   documents were identified as responsive as early as April 2017.

18   In any event, in May 2018 all 420 documents clearly had been

19   identified and had been disclosed to the defense.  Many of

20   those documents have print dates on them on the bottom of the

21   page, it will say something like the date it was printed which

22   are in 2014, 2015, 2016, further indicia that they had been

23   seized well in advance of the indictment and the discovery in

24   this case.  But, in May 2018 the government provided this full

25   set of 420 documents, 3,145 pages and told the defense these

1    are the documents that were responsive to the warrant and that

2    the government will rely on at trial.  The defense didn't seek

3    to suppress those 420 specifically in their initial motions in

4    February.  They made these general motions about the facial

5    validity of the warrant in the Franks hearing but at least at

6    that time the government and the defense were on the same page

7    that the 420 documents was the universe out of this million

8    documents that had been seized that would be at issue at trial.

9           After the briefing in May 2019, the government learned

10   from DANY -- the U.S. Attorney's office learned from DANY for

11   first time that there was in fact other documents that had been

12   identified as responsive and because the government was

13   concerned that that impacted our disclosure obligations to the

14   defense, especially with respect to the non-Sadr documents

15   whose discovery had been limited to the 420, the government

16   asked DANY to get a filter team to review -- to pull together

17   all of the documents that they had identified as responsive in

18   these various platforms, to deduplicate them, and to tell us

19   whether there were more.  We didn't know at that time whether

20   there in fact were more.  It turned out there was 1,775 Sadr

21   documents and 622 non-Sadr documents and we promptly, as soon

22   as we learned of them, learned about the existence of these

23   additional documents, mentioned it in Court, your Honor will

24   recall, and then made a promise production to the defense of

25   those documents.  The defense then filed their motion seeking

1   to suppress those documents and our response is that we do not

2   intend to rely on them at trial.

3          And so, we are back now to the 420 that for over a

4   year and a half everyone in this case had understood to be the

5   evidence seized from the search warrants and the posture in

6   February and April was that if the defense failed in their

7   motions to suppress all the e-mail evidence from the Franks

8   perspective or from the overbreadth perspective, then those 420

9   documents would be admissible.

10         So, that's sort of the factual perspective.

11         THE COURT:  That's helpful, and I want to get clarity

12  on it.

13         So, your representation is none of the 3,135 pages

14  that was turned over to the defendant in May of 2018, all of

15  those documents, all of those pages were identified by DANY as

16  pertinent by April 2017?

17         MR. KROUSE:  Your Honor, that was our understanding

18  from DANY and --

19         THE COURT:  I am asking now.

20         MR. KROUSE:  Yes, your Honor.  And the vast majority

21  the answer is yes.  So, this is why.  The government has been a

22  little bit hamstrung by the fact that we are not able to go

23  back and look at other -- like the file structure.  If you

24  recall at the last hearing, the defense asked the government to

25  cease any review of any other documents or to look at anything

1    else so we ceased that and told DANY to stop as well.  If it

2    would be helpful to the Court if it is dispositive to the

3    Court, the government can undertake a document-by-document

4    analysis for those 420.

5            THE COURT:  Page by page, just to be clear.

6            MR. KROUSE:  Page by page.

7            THE COURT:  And very specifically the question I am

8    looking for an answer to is did DANY mark as pertinent every

9    one of the 3,135 pages that were turned over to the defendant

10   in May 2018.  Did DANY mark each of those pages as pertinent by

11   April 2017?  And you believe yes but the caveat is that you

12   have been a little bit restricted in your ability to assess

13   that.

14           MR. KROUSE:  Yes, your Honor.  We believe yes.  But I

15   don't want to represent to the Court unless I am entirely sure,

16   and there has been some difficulty with getting access to the

17   file structure and as well as accessing internal e-mails within

18   DANY.

19           So just on this point and then the government will

20   take that step, there is some distinctions to be drawn between

21   the 420 -- first, it is actually 417 because the defense

22   asserts spousal privilege over three and the government is not

23   fighting that so it will be down to 417.

24           THE COURT:  Does that reduce our page number by some

25   amount?

1            MR. KROUSE:  That will.  It will, but we will look at

2      that.  I don't believe by much.

3            And then there is the fact that some of those e-mails

4      amongst the 417 were non-Sadr e-mails of which he does not have

5      standing to suppress and that's an additional 62.

6            THE COURT:  Docs?

7            MR. KROUSE:  Documents.

8            THE COURT:  Not pages.

9            MR. KROUSE:  Not pages, documents.  So, the actual

10     documents that Sadr has standing to contest is more like 353, I

11     believe.

12            THE COURT:  And I am just interested if there is any

13     delta between what remains after you have carved that out, what

14     was turned over in May of 2018 and what was identified by DANY

15     as pertinent by April 2017.

16            MR. KROUSE:  Yes, your Honor.  And in order to conduct

17     that analysis with the Court's permission, we will access --

18     not we as in the trial team but some other personnel at DANY,

19     will have full ability to access all the e-mail platforms and

20     file folders in which those documents were saved, as well as

21     the binders that those documents were contained in.

22            THE COURT:  Okay.  I think you are out of time.  You

23     are over and I will give Mr. Heberlig additional time, 10

24     minutes over.

25            Any final points, Mr. Krouse, since I kept you over?

1    And I will make sure you get equal time.

2         MR. KROUSE:  Just, your Honor, that aside from the

3    challenge to the warrants themselves which the government

4    believes lack merit and should be denied, this search by DANY

5    consisted of a large provider set of data, there were lots of

6    challenges involved in identifying these documents, there was

7    no blatant disregard of constitutional principles during the

8    period of that review with respect to duration it was

9    reasonable.

10         With respect to the amount of documents that were

11   identified as pertinent and seized, that was also reasonable

12   and for all of those reasons the manner in which the search was

13   conducted was not unconstitutional, it was reasonable.  There

14   is also a good faith argument that the government asserts in

15   its papers on that point so separate from the point about the

16   warrant.

17         Suppression here, in the government's view, would not

18   further any real deterrence interest and there would be an

19   actual harm to the administration of justice by suppressing

20   these documents.  This was not a situation where there was

21   blatant disregard where the agents were acting in a manner that

22   ignored the Fourth Amendment entirely and for that reason, with

23   respect to the execution of the warrant, there is a good faith

24   argument that the government believes should be considered by

25   the Court as well.

1          THE COURT:  Thank you.

2          MR. KROUSE:  Thank you.

3          THE COURT:  I think that gives you 12 minutes plus

4    what you had earlier so let's call it 17.

5          MR. HEBERLIG:  Okay.  Thank you, your Honor.

6          I want to just start back with the facial invalidity

7    of the warrant because that's a critical part of the good faith

8    analysis.

9          THE COURT:  Actually, let me ask so I can clear it, we

10   have narrowed what we are talking about with respect to the

11   documents.  At the very least we know the government has

12   foresworn using anything other than what we will call the 420

13   documents and there is some question remaining as to what,

14   exactly, that consists of.

15         MR. HEBERLIG:  Yes, but I think there is a

16   misconception of how they got to the 420.  There was one

17   responsiveness review that they have now represented seized all

18   of these documents.  The 420 was the district attorney's office

19   culling them down to hot documents but it sounded like there is

20   a suggestion that the 420 were seized first and they were the

21   good seizures and then the rest of them that they are

22   foreswearing or foregoing were seized later after April 2017.

23   That is not the case.  They were all seized as part of this

24   roving review and in April of 2017 they culled them down into a

25   hot documents binder.  The Court can't ignore the other

1    documents.  When you are looking at how this warrant was

2    executed, was it reasonably executed, were the executing agents

3    given sufficient guidance on what to seize, it is the entirety

4    of what they deemed pertinent and, as we put in our reply

5    brief, there is document after document that is wildly

6    irrelevant to anything in this case.

7           So, I don't think it's correct to say, well, we no

8    longer have to worry about those documents.  They were part of

9    their pertinence review.  In our view they're Exhibit A for why

10   this warrant, on its face, gave no guidance to the executing

11   officers.  They're seizing e-mails about poetry, wedding

12   invitations, wildly irrelevant stuff.  So, the fact that at

13   some later point in time they came up with a hot docs binder

14   doesn't mean that this was a valid search.  That's a small

15   portion of this bigger seizure.

16          I would also say it seems beyond dispute that the

17   entirety of the May 2018 production was not identified as

18   pertinent by April 2017.  I mean, what else could the 852 pages

19   be but the searches and seizures that they say were done after

20   indictment to complete the documents?

21          So, unless -- I really don't know any other

22   explanation.  We will see what their explanation is but those

23   852 documents were seized after April 2017.

24          THE COURT:  Pages -- but it is the case that you

25   received the 3,145 pages indicated as what DANY indicated as

1    pertinent by May 2018, right?

2                MR. HEBERLIG:  Correct.  But I'm not really sure of

3    the point of the argument.  First of all, we did move to

4    suppress the entire 420.  We couldn't make arguments we weren't

5    aware of.  This stunning factual record that came out after

6    their disclosure that there were additional pertinent documents

7    gave us more to work with.  We are not mind readers.  We didn't

8    know the grossly deficient way in which the search warrant was

9    executed so we had a lot more to say when we learned that, but

10   that doesn't mean we ever suggested the 420 were seized

11   appropriately.  They were seized pursuant to a facially invalid

12   warrant and that's really the critical point here.

13               The Court said it in *Wey*, what is the point of the

14   particularity analysis?  It is to ensure that the warrant

15   doesn't leave it to the unguided discretion of the executing

16   officers.  What on earth would an executing officer who was

17   given this warrant that gives authority to seize all e-mails, I

18   will just assume for the sake of argument now, all e-mails

19   reflecting involvement in money laundering -- what on earth

20   guidance does that give to the executing officer?  Money

21   laundering is an extremely broad offense, just like falsifying

22   business records.  Was this narcotics money laundering?

23               THE COURT:  Just to be clear, so all e-mails in a

24   particular e-mail account that the affidavit offers probable

25   cause to suggest as being used during the commission of the

1    alleged crime, so again not -- every document in the house, not

2    every document in every electronic device but tied to a

3    specific e-mail account, tied to a specific e-mail account

4    documents used in furtherance of or to cover up money

5    laundering.

6           MR. HEBERLIG:  Right, but certainly not by reference

7    to the facts described in the affidavit because we know you are

8    constrained to the face of this warrant.  There is zero factual

9    information.

10          THE COURT:  Well, probable cause is in the affidavit.

11          MR. HEBERLIG:  Understood.

12          THE COURT:  Probable cause doesn't have to be in the

13   warrant.  The warrant is a judge saying I have found probable

14   cause for the search of these particular documents tied to

15   particular crimes in this particular place.

16          MR. HEBERLIG:  Right, and the documents that the

17   agents are directed to seize must be tied to the probable cause

18   showing.  That is square Second Circuit law, that's *Ulbricht*.

19   How is that the case here?  How is an agent supposed to come

20   upon an e-mail and say, oh, that's evidence of money

21   laundering?  There is literally no facts, no indication of the

22   type of identification of the companies that are involved in

23   money laundering.

24          THE COURT:  So, can you cite me the cases you rely on,

25   a case which says something like direction -- I mean a

1    comparable case where you have got direction to search

2    particular e-mail accounts, particular e-mail accounts for

3    documents related to X crime and a Court has held that as

4    unconstitutionally overbroad?

5          MR. HEBERLIG:  *Zemlyansky* is the most directly

6    relevant.  The *Zemlyansky* warrant was a mix of paper documents

7    and electronic documents but the clause seeking electronic

8    documents articulated three offenses, I believe it was

9    healthcare fraud, bank fraud, and mail fraud, and the Court

10   said that was no limitation at all.  That's the most directly

11   on point but I think the other cases, I don't know that it --

12   respectfully, I think it may be a distinction without a

13   difference where there is a broad statute cited, violation of,

14   say, money laundering or mail fraud or wire fraud, and then the

15   rest of the warrant says you may seize all documents which is

16   what this warrant says.  That's what all of those decisions we

17   cite say is inappropriate.  But *Zemlyansky* is one that

18   immediately comes to mind that has that information.

19          The whole point of the cases like *650 Fifth Avenue*,

20   *Groh*, all the decisions that say it has to be articulated on

21   the face of the warrant is because we can't assume that the

22   executing officers have read the affidavit.  Here there is no

23   record evidence that they did.  I assume if they had, we would

24   know about it, the government would have represented they did.

25   That's why it has to be in the warrant.  And respectfully --

1          THE COURT:  The probable cause doesn't have to be in

2     the warrant.

3          MR. HEBERLIG:  No.  Categorization of what the agents

4     are authorized to seize based on the showing of probable cause.

5          So, in this instance there should have been some

6     categorization of, okay, I find that there is probable cause to

7     believe money laundering occurred therefore you are permitted

8     to seize e-mails that show and then some categorization,

9     whatever the government's theory of money laundering is.  Maybe

10    in this instance it was wire transfers showing payment routed

11    through correspondence banks in the U.S. from one foreign bank

12    to another.  But, there is nothing here.  There is nothing that

13    would prevent an officer from seizing an e-mail related to

14    narcotics trafficking or any other kind of money laundering and

15    that's just, frankly, not sufficient cabining of the officer's

16    discretion.

17         So, I do think, upon a close analysis of the cases we

18    are dealing with an objectively deficient, a facially deficient

19    warrant, and that gets us to the good faith exception is the

20    government's principal argument here.

21         The good faith exception, which again it is their

22    burden, turns principally on an objective look of the warrant.

23    We carefully analyzed what the Court did in *Wey*, what the Court

24    did in *Zemlyansky* about first being an objective determination

25    and then if you get beyond that to this narrow gap of the

1   factors in *Rosa*, I frankly am not sure, given the more recent

2   Second Circuit decision in *650 Fifth Avenue* where the Court in

3   *Rosa* meant to articulate those facts as specific factors that

4   district court judges must go through when trying to evaluate

5   that narrow gap after you get past the objective determination.

6   But, even assuming for the sake of the argument that that is

7   still the valid analysis under *Rosa*, every single one of those

8   factors cut in our favor.  Okay?

9           The first factor is was there any exigency here?  Was

10  there a need, like in *Rosa* in the middle of the night, to

11  execute the warrant?  No.  Obviously, no.

12          Number two, was there a single reviewer, the affiant,

13  was the affiant also present during the execution of the search

14  so that you could assume he was familiar with the contents of

15  affidavit as was the case in *Rosa*?  No.  The affiant in our

16  case didn't even participate in the review time.

17          Were the searches cabined based on the factual

18  information in the affidavit?  We have absolutely no assurance

19  from the government that that's the case.  They can't

20  articulate a list of search terms beyond what few haphazard

21  recollections -- they have no search history, they have

22  presented you with no specific information that there were

23  cabined searches.

24          Was there an over-seizure?  That's the fourth factor.

25  Here, obviously yes.  We articulate in our reply brief

1    over-seizure doesn't mean how many documents were seized, it

2    means were there irrelevant documents seized that do not

3    relate, in any respect, to the probable cause showing and we

4    catalogue in our reply brief the many irrelevant documents that

5    were seized.

6         Beyond that, those are the *Rosa* factors that all cut

7    in our favor.  Beyond that, we also have the factors present in

8    our case that the Court found significant in *Wey*.  We have the

9    government going back to the well, well after the

10   responsiveness review to search and seize more documents.

11        So, every factor cuts in our favor here and shows the

12   good faith exception certainly does not apply and at an

13   absolute minimum.

14        THE COURT:  The distinguishing point Mr. Krouse made

15   that strikes me as distinguishing from that is there you had

16   evolving theory of the case, new crimes being suspected, the

17   kind of thing you would expect the agents to go and get a new

18   warrant in order to conduct a new kind of search.  That's not

19   what we have here.

20        MR. HEBERLIG:  I actually respectfully think that's

21   not at all clear.  From the stuff that they now say they're not

22   going to rely upon but that was part of their pertinence

23   review, it looks like they're searching for things like IRS,

24   tax evasion issues, things that don't bear on the probable

25   cause showing warrant.  We don't have proof from them what the

1    agents searched for, search histories, very little.  No

2    declarations support their brief, no contemporaneous documents.

3    We have conflicting representations about what they did and

4    reviewers did.  I don't think it is clear at all that they

5    weren't roving in search of theory of prosecution and just

6    because they're now foregoing the broader universe that this

7    pertinent review identified, that doesn't -- that's just them

8    trying to sort of get past the fact that the original search

9    was problematic.

10          THE COURT:  It is a question of whether it was the

11   original search or going back to the well because there is

12   always the question of what remedy, if there is a Fourth

13   Amendment violation, and suppression of everything is not

14   typically the remedy and if, for example, you are relying on a,

15   going back to the well where much later after they're altering

16   their theory of the case and looking for new things, then it

17   would be perfectly appropriate to say I would suppress those

18   later documents but not the original pertinent search.

19          MR. HEBERLIG:  I think what you may be getting at is

20   is it possible to sever, is there some severance.  They haven't

21   argued that and I don't think so based on, if we are correct

22   that the face of the warrant is unconstitutionally overbroad

23   then you can't seize, let's just say for the sake of argument,

24   10,000 documents and at a later point it is only 500 that were

25   actually directly responsive to the probable cause showing.

1    That's all we are going to rely on, we will forget about the

2    other 9,500.  That's not how it works.  That would encourage

3    overbroad fishing expeditions, overbroad warrants, and

4    essentially be no harm no foul to the government.

5         So, I don't see any way to sever here.  I believe the

6    facts are far from clear that this 420 document set was seized

7    appropriately, at a minimum it was seized pursuant to this

8    facially overbroad warrant.

9         So, I guess the last thing which we didn't address in

10   the opening but I do think was --

11        THE COURT:  Just as an example, on *Zemlyansky* I think

12   this never came about but after Judge Oetken concluded that

13   suppression was warranted, he said the Court will determine the

14   appropriate scope of the suppression remedy following further

15   submissions by the parties in a subsequent hearing.  So, to the

16   extent that you are relying on that case, I don't know that it

17   answers the question of what an appropriate remedy would be and

18   to the extent an appropriate remedy would be to limit the

19   government to the original set of documents, it is relevant

20   that they're foregoing use of those documents.

21        MR. HEBERLIG:  But I don't think they're the original

22   set of documents in terms of the original seizure.  They're

23   just now called our greatest hits from an overbroad seizure and

24   I don't think they can voluntarily cleanse a bad search by

25   saying we are both going to use the good docs, the ones that

1    are tied to the warrant when the factual allegations in the

2    affidavit were not part of this warrant.  The officers had no

3    way to identify that, that's why they seize so many irrelevant

4    and overbroad documents.

5         So, in our view, they can't now say, well, we will

6    take the ones that were clearly covered by the probable cause

7    showing.  That's not how it should work.

8         THE COURT:  Just so I understand, you reject the

9    characterization that there was this initial pertinent review

10   and then sometime passed and they, the ADAs or folks working

11   for them went back and started to do additional searches.

12        MR. HEBERLIG:  It's not that I reject it.  This is

13   what they represented in their brief.  They say that the 420

14   were hot documents that were selected by I think Mr. Lynch,

15   maybe someone else, from the broader pertinent set that were in

16   these locked electronic folders that we have heard about.  So,

17   someone at the DA's office right before they transferred it

18   over to the U.S. Attorney's office looked at everything they

19   had seized and came up with a smaller binder of the greatest

20   hits but sequentially it wasn't those 420 were seized first

21   pursuant to sort of a narrowly tailored search and then

22   thereafter they went out and seized 2,000 more get more

23   creative with their search terms.  That's not what happened.

24   There was one responsiveness reviewed and this doesn't even

25   account for what went on after April 2017, I think we have

1    already gone through that but this had to, at least a quarter

2    of it was seized as a result of these later searches

3    post-indictment or leading up to --

4              THE COURT:  That's not the representation currently of

5    the government, although the government has caveated that

6    they're going to make the final determination but we don't, as

7    we sit here, know that that's the case.

8              MR. HEBERLIG:  I know you have asked the government.

9    I would re-submit to you the three, four five good examples

10   that we think show that conclusively.

11             THE COURT:  I appreciate that.

12             MR. HEBERLIG:  The last thing I want to say, I may be

13   getting close to my time.

14             THE COURT:  Two minutes, but you want to go to the

15   facial validity?  Or maybe you have done that.

16             MR. HEBERLIG:  I have already done that.

17             What I didn't address the first time around but I

18   think is highlighted by this discussion the Court had with

19   Mr. Krouse about, well, could you use some of these documents

20   depending on what the defense does, do I really need to rule

21   upon them.  This sort of goes to our motion for return of

22   seized property.  Their argument is you don't need to decide

23   that, we get to hang on to that, we need to authenticate the

24   documents.  In our view, no matter what happens on our ultimate

25   motion, unless there is full suppression, it probably moots the

1    whole thing but we are entitled to return of the non-responsive

2    documents.  We know from their factual showing that they are

3    spread throughout the DA's office, the U.S. Attorney's office,

4    at least four different document platforms, a filter team --

5    actually, two filter teams, public network folders, the

6    electronic folders.  They're all over the government.  They

7    have conceded they have no reason to use those documents

8    anymore, they won't use them anymore, they should be returned

9    to us and purged from the government's system.

10           The only argument they've made as to why that should

11   not occur is authentication.  That the government needs to have

12   a full set for authentication.  Frankly, I don't think that

13   issue is present here like it was in *Ganias* where the Court was

14   talking about a hard drive and very different set of data

15   because you need the hard drive because of the way documents

16   are stored on the hard drives.  But, even assuming

17   authentication is a legitimate issue, these days there are

18   thumb drives, 2-terabyte thumb drives, all of this provider

19   data could be put on one thumb drive, given to the Court, put

20   it in your desk drawer.  If there are any authentication

21   issues, the government can use that material to their heart's

22   content.  What we don't believe is appropriate is that the raw

23   returns that they have admitted various government agents went

24   back to time and time and time again including during the bond

25   proceedings to come up with documents that they used to try to

1   lock him up, that should not be allowed to continue.  There is

2   no basis for it to continue and it is a simple matter for this

3   material to be purged from all government systems.

4   Authentication is a non-issue.

5             THE COURT:  And so I understand that point, return of

6   the non-responsive material.  To the extent authentication

7   presents as an issue, the non-responsive material could be

8   revisited for dealing with that?

9             MR. HEBERLIG:  Correct, by --

10            THE COURT:  You submitted a proposed order for

11  alternative relief originally, a long time ago now.

12            MR. HEBERLIG:  I think the alternative was an order

13  barring them from accessing it, frankly, based on the --

14            THE COURT:  Is sounds like a version of that which you

15  are suggesting which is it is turned over, but to the extent

16  there are authentication issues, access can be revisited.

17            MR. HEBERLIG:  We don't literally need it back because

18  we have a copy of it.

19            THE COURT:  You need it gone from them.

20            MR. HEBERLIG:  We need it gone from them.  We need

21  agents within the bowels of the government unable to search the

22  raw returns at any point in time during the trial.  There is no

23  basis to do so.

24            THE COURT:  Unless there is an authentication issue.

25            MR. HEBERLIG:  Unless there is an authentication issue

1    and that can be easily softened by one of two ways.

2              THE COURT:  Stip.

3              MR. HEBERLIG:  We can stip and that may well happen,

4    that's what we often do during trials, but the Court can hang

5    on to the raw returns or you could order that we hang on to the

6    raw returns.  We already have them.  What clearly doesn't need

7    to happen, these dozen or so government agents continue to hang

8    on to them.

9              And if I could ask for indulgence for one more minute?

10             THE COURT:  Yes, but Mr. Krouse, do you agree to that?

11             MR. KROUSE:  Your Honor, just on this point, the

12   review that the Court and the government has agreed to do and

13   Court has directed us to do is to look at the 420 documents and

14   identify when each page was identified as responsive.  The only

15   way we are able to reconstruct that is because we retained

16   those documents and the final structure and that stuff.  So, I

17   think this issue is not ripe for decision because the

18   government does need, and I mentioned this, an opportunity to

19   go through the e-mail returns which would -- the e-mails,

20   excuse me, internal e-mails within DANY that contain some of

21   that data, the file structure which contains some of that data.

22   Because what I understand the defense to be saying is that the

23   government should purge from its systems -- and by government

24   here I am saying the U.S. Attorney's office and DANY -- purge

25   from its systems everything that the defendant -- that relates

1   to the defendant's e-mail accounts except for the 358 documents

2   that belong to the defendant and we can't do that right now

3   because we need to address this issue for the Court.

4              THE COURT:  How long will it take to address this

5   issue?

6              MR. KROUSE:  Would the week of December 9th be

7   acceptable, your Honor?  Which I think is not next week but the

8   following week.

9              THE COURT:  Right.  So two weeks with the

10  understanding -- and I will get your response, Mr. Heberlig --

11  with the understanding that the government is looking at and a

12  taint team or whatever it is that is going to do this is

13  looking at the nonresponsive -- to the extent you need to look

14  at the non-responsive material it is only to make this

15  assessment of the question that I have asked.

16             MR. KROUSE:  Yes, your Honor.

17             THE COURT:  Once that's done then would you consent to

18  return, for lack of a better word, of the non-responsive

19  documents with the available caveat that if there is an

20  authentication, which I think is the only argument you have

21  offered?

22             MR. KROUSE:  That's the only argument; yes, your

23  Honor.

24             THE COURT:  If that emerges then it can be revisited.

25             MR. KROUSE:  Yes, your Honor.

1          THE COURT:  Mr. Heberlig, is that acceptable?

2          MR. HEBERLIG:  You know, we are frustrated because

3   they identified this problem in May of 2019.

4          THE COURT:  Mr. Heberlig, here we are.

5          MR. HEBERLIG:  Here we are.  So, two weeks I guess it

6   is.  What can we say.

7          The last point I guess I wanted to address --

8          THE COURT:  So what I just said is agreed to.  That

9   will resolve the motion for return of property issue on consent

10  and, again, with the caveat that if an authentication issue

11  does arise, it can be revisited that the government may be able

12  to have access to non-responsive material for purposes of

13  authentication but only from you or from the Court.

14         MR. HEBERLIG:  I believe that's correct.  You would

15  effectively be granting the motion, correct.

16         THE COURT:  Yes.

17         MR. HEBERLIG:  I think there is a difference between

18  denying a motion as moot and granting a motion and we briefed

19  that issue.  I don't need to get into it but there should be

20  some teeth, not just sort of okay, government, we accept that

21  you won't do this.  We have established a basis for return,

22  they say they don't object to it, you should grant the motion.

23         THE COURT:  If you will draft maybe a version of the

24  alternative order which includes the specific caveat for

25  authentication and how maybe the practical way in which you

1  would like to accomplish it, propose it to the government and

2  submit that to me -- I don't think that you need to wait until

3  December 9th, you could do that now.  So, a week from now?  Is

4  that a Happy Thanksgiving?

5        MR. HEBERLIG:  How about the Wednesday after

6  Thanksgiving.

7        THE COURT:  Okay.

8        MR. HEBERLIG:  And my last just one minute here, I do

9  want to respond to, there was an argument made about the face

10  of the warrant.

11        THE COURT:  Yes.

12        MR. HEBERLIG:  Beyond the last paragraph, I think it

13  was the paragraph that carries over from 488 to 489 and I think

14  the suggestion was the discussion of subsequent review as

15  deemed analysis was an indication that the Court contemplated

16  that there would be a connection back to the enumerated

17  offenses.  I would say that is not at all clear that that's

18  what that means.  If you go back to the first part of that

19  paragraph, the "further, this Court hereby authorizes," it

20  authorizes members of the DA's office to seize all of the data

21  provided to them by the e-mail service provider.  So, I still

22  think we have the better of the arguments that the government

23  is asking for you to interpret the warrant as saying they're

24  only permitted to seize e-mails that reflect the enumerated

25  offenses but that's not what the plain language of the warrant

1    says.  Right here in this paragraph alone the DA's office is

2    authorized to seize all data and images provided to them by the

3    e-mail service provider which is everything, is the entire

4    contents of the warrant and I think that last clause is just to

5    satisfy -- I think there is a 10-day requirement that the

6    warrant has to be executed within 10 days under New York Law

7    and it is indicating that the warrant and order is deemed

8    executed when it is searched upon the e-mail provider.  That's

9    all that means.  Subsequent review isn't the execution of the

10   warrant for purposes of that 10-day requirement.

11          So, I do think the better reading of the warrant on

12   the face of it is that it was a general warrant authorizing the

13   seizure of everything.

14          THE COURT:  And that would be by excluding

15   consideration of the earlier language.

16          MR. HEBERLIG:  I think if you read the plain language

17   the earlier paragraphs say there is probable cause to believe

18   that there was a violation of those three statutes and that

19   e-mails may be found in the account reflecting that fact.  And

20   you go down, go on to the subsequent paragraphs and say

21   therefore -- if they don't say therefore you are authorized to

22   seize e-mails showing money laundering and those offenses you

23   are authorized to receive e-mails and every bit of information

24   about that account, and they are asking you to interpret as

25   reference back to the earlier language but that is not what it

1  says.  And, again, we have already articulated the reasons why,

2  even if it did incorporate that earlier language that that's

3  not enough, that is no particularization at all.

4          THE COURT:  Thank you.

5          MR. HEBERLIG:  Thank you.

6          MR. KROUSE:  Your Honor, if I may have a moment to

7  address a couple of small points?

8          THE COURT:  Small points.  And then, Mr. Heberlig, you

9  will have final opportunity, and then at some point we go home.

10          MR. KROUSE:  Yes, your Honor.

11          So, just on the point that Mr. Heberlig raised about

12  what else could be in the eight-hundred-and-some-odd pages.

13  The government isn't representing that the binders that contain

14  those two thousand some pages constitute the entirety of the

15  420 documents or the entirety of what DANY seized.  DANY had

16  several different types of binders that contained evidence sort

17  of on a thematic and on a defendant basis so there were

18  payments binders, there were binders directed toward certain

19  defendants, binders of e-mails linking the defendant to Iran

20  and to Iranian companies and so from those binders DANY created

21  this hot docs binder and gave it to the U.S. Attorney's office.

22  So, the page difference may be explained by multiple other

23  documents that were in other binders that were seized prior to

24  April 2017 by DANY but just weren't in those binders that were

25  given to the U.S. Attorney's office in April 2017 which is why

1    the government is agreeing with the Court's request to go back

2    and go page by page.  But, on this point of what else could

3    there be, there is many different explanations for what it

4    could be and this exercise, I think, will clarify things quite

5    a bit.

6              THE COURT:  Could you respond to the point that it is

7    inappropriate to, for the Court to fail to consider all the

8    other documents simply because you have narrowed -- so, to the

9    extent that they're irrelevant as to the arguments as to

10   overbreadth of the search, even though you have now -- I mean,

11   any overbroad search could then be narrowed to hot documents

12   and that can't be that that excuses the overbreadth, or at

13   least put it this way, shouldn't be considered in thinking

14   about the manner of the execution of the search.

15             MR. KROUSE:  Just on that point, the government

16   doesn't necessarily disagree that the other documents that were

17   identified as responsive may have some relevance to the Court's

18   determination on whether the search was actually overbroad but

19   on that point, we are not talking about hundreds of thousands

20   of documents that were identified as material or as responsive

21   by DANY.  In addition to the 420 we are talking about 1,175

22   from the defendant's own account.

23             THE COURT:  And 620.

24             MR. KROUSE:  And 620, too, from the non-Sadr accounts

25   and Mr. Heberlig characterizes this as some hugely overbroad

1    search that has identified all of these irrelevant documents

2    yet in their motion they cite seven documents out of that many,

3    almost 3,000 documents that they object to and there are

4    explanations for why those receive documents would be

5    responsive to the warrant.  For instance, wedding invitations

6    and thank you notes; these can go to the identity of the person

7    who is using the account.  The fact that an invitation to

8    Sadr's mother is found in his account is relevant to showing

9    that that account belongs to Sadr.  The e-mails, spam e-mails

10   from companies wishing Sadr holiday greetings, small things,

11   but the broader point is first there are possible explanations

12   for why those would be identified as responsive but, more

13   importantly, that's seven e-mails or seven categories of

14   e-mails from a search that yielded nearly 3,000 documents.

15          So, to characterize DANY's search as grossly deficient

16   or identifying all of these non-responsive documents I think is

17   overstating it quite a bit.  And, as to the 420, the defense

18   has never identified a single document from the 420 that they

19   view as non-responsive to the warrant which I think further

20   evidences the fact that this was a targeted search conducted by

21   DANY, a review that took a long time with a lot of documents

22   for a complex scheme and out of that large provider set DANY

23   did find the most pertinent and inculpatory e-mails.

24          Other than that, your Honor, one point, just one

25   clarification to make, is that Mr. Heberlig seems to conflate

JBP5sadA                     argument - Corrected

 1   incorporation of the of affidavit for purposes of determining

 2   whether the warrant was facially deficient and the relevance of

 3   the affidavit for guiding law enforcement in determining what

 4   documents are responsive to the warrant.  All that is required

 5   in the warrant itself is particularization as to the crimes

 6   committed, the place to be searched, and linking the documents

 7   to be seized to those crimes.  The affidavit is still relevant

 8   and the detail contained in the affidavit is still relevant in

 9   guiding officers.  It is not that law enforcement can only be

10   guided by what's on the face of the warrant.  That's not the

11   analysis.  The analysis is is the warrant facially deficient.

12   The government's position is no for all the reasons we went

13   through and, moreover, you can look to the affidavit in how the

14   government agents would have been able to execute the warrant

15   consistent with what the magistrate judge found and here there

16   is a detailed 19-page affidavit supporting probable cause,

17   there is a warrant where the judge found probable cause as to

18   three offenses and detailed the items of property that were

19   being responsive to the warrant with respect to those offenses

20   and so there is no facial deficiency.

21            THE COURT:  How would you distinguish *Zemlyansky* where

22   there was specific relevance to crimes on the face of the

23   warrant?

24            MR. KROUSE:  There were references to specific

25   enumerated crimes but I believe Judge Oetken found that the

1    warrant itself didn't link the property to be seized to those

2    enumerated offenses.  And here, that's not the case.  Here it's

3    directly linked that within this one e-mail account the

4    government is authorized to seize categories of data that would

5    be expected to be found in an e-mail account that are linked to

6    those three offenses.

7            THE COURT:  Categories of data on the face of the

8    warrant?

9            MR. KROUSE:  Categories; so subscriber information,

10   draft e-mails, sent e-mails, things of that nature.  And the

11   government again, Zemlyansky is a case going back to *Washington*

12   which is a Second Circuit case in *Washington* the warrant said

13   any and all papers records, receipts, documentation, telephone

14   lists and records which may be related to illicit drug

15   activities and found that that was sufficient particularity.

16   This warrant is more, much more particular than that and lists

17   the offenses that are being investigated and how the data

18   contained in the e-mail account may be expected to support

19   evidence of those crimes.

20           THE COURT:  Okay.

21           MR. KROUSE:  Finally, Judge, just on the severance

22   point, the government has effectively self-severed the 1,775

23   and 622 by agreeing not to proceed with them.  If the

24   government is able to and the government expects the 420

25   documents which the defense has had since May 2018 and has been

1    on notice that those were the items marked as responsive in the

2    search warrant, the government believes that those 420 should

3    not be suppressed for all the reasons that we have stated.

4                    THE COURT:  Thank you.

5                    MR. KROUSE:  Thank you.

6                    THE COURT:  Mr. Heberlig, I will give you two minutes,

7    if you need it.

8                    MR. HEBERLIG:  Just very briefly.

9                    We did not, in the limited time, if the Court

10   remembers we had about 48 hours to come up with our reply

11   brief.  We did not attempt to catalogue every irrelevant

12   document that is in the search returns.  I can hand up two of

13   the most.  Obviously they're e-mails involving Mr. Sadr's

14   mother and a friend and they have no substance to them and they

15   reflect another individual out in the snow.  Nothing of

16   substance.  I would be happy to hand them up.  These are not

17   isolated examples.

18                    THE COURT:  Those are within the seven that you

19   included in the briefing?

20                    MR. HEBERLIG:  I don't think so.  I don't remember if

21   they're in the seven or not.  There are way more than seven

22   that -- we highlighted the seven most egregious in the briefing

23   but there are far more irrelevant documents and it stands to

24   reason there would be fewer irrelevant document in their

25   greatest hits collection but that's not the relevant analysis.

1    They don't get, after executing a warrant unconstitutionally in

2    a defective manner, to say we screwed up on three quarters of

3    them but this one quarter was really good.  It doesn't work

4    that way.

5         The last thing I will say, they rely on the *Washington*

6    case as articulated, at least that warrant says documents which

7    may be related to narcotics activity.  That's not in our

8    warrant.  It says seize all e-mails.  They're asking you to

9    imply that what the Court meant was e-mails related to money

10   laundering and, frankly, I would submit there is a dramatic

11   difference between narcotics-related documents that are very

12   specific and documents that relate to falsifying business

13   records or money laundering.  The types of offenses that are

14   much more akin to mail fraud or general fraud statutes that

15   case after case we cited say can't be -- the warrant can't be

16   sufficiently specific by saying all records related to --

17        THE COURT:  Just on the first point, again, I get that

18   you say at the command language but you have also said, even if

19   you take into account it does say which tends to show the

20   following:  The categories of things and involvement in money

21   laundering, false instrument filing, or falsifying business

22   records.  So, it does tie it, each of those, and means that

23   each of the things in the top bullet points are tied to the

24   enumerated crimes.

25        MR. HEBERLIG:  Well, that's the probable cause

JBP5sadA                    argument - Corrected

1   showing.  That's the judge saying I find the probable cause to

2   be X but then he goes on to say here is what you are authorized

3   to receive.

4           THE COURT:  You want me to ignore that for purposes of

5   what the warrant --

6           MR. HEBERLIG:  I am looking at the plain language of

7   the warrant:  You are therefore commanded to seize and it

8   articulates what.

9           THE COURT:  Therefore you want me to ignore the

10  earlier language which does tie the enumerated categories of

11  items to the enumerated crimes.

12          MR. HEBERLIG:  I think we may be saying different

13  things.  I think the earlier part of the warrant is what are

14  the crimes for which probable cause has been established but

15  that's not the same as --

16          THE COURT:  And you want me to ignore that when I look

17  at the later language which commands seizure of all documents.

18          MR. HEBERLIG:  I want you to focus on the plain

19  language of what the officers were authorized to seize and it

20  is not cabined.

21          THE COURT:  So I can take into account the earlier

22  language.

23          MR. HEBERLIG:  They're just apples and oranges in my

24  view but even if you do read it --

25          THE COURT:  If I am counting how much fruit there is I

 1    would count both, right, apples and oranges.  So, the question

 2    is I'm not comparing them.  I'm asking from you, is your

 3    argument that I can consider it but it creates too much

 4    confusion?  Or that I can't consider it because of the

 5    distinction between the two parts?

 6            MR. HEBERLIG:  My argument is the more natural reading

 7    is that's not what the warrant authorizes seizure of but even

 8    if you do interpret it that way, there is not sufficient

 9    linkage under what the Second Circuit says needs to be in a

10    warrant.  There has to be an articulated link between what the

11    officers are authorized to seize and the probable cause showing

12    and there is none here.  They're authorized to seize all

13    e-mails and they're given no guidance as to an e-mail

14    reflecting money laundering or falsifying business records or

15    filing a false instrument.

16            THE COURT:  No guidance; if I don't consider that

17    they're guided in part by what the warrant on its face says

18    there is probable cause to search.

19            MR. HEBERLIG:  What I am saying is on its face there

20    is not sufficient guidance.  Even if you read it the way you

21    read it.  You can't look at it to have the --

22            THE COURT:  I am not --

23            MR. HEBERLIG:  *650 Fifth Avenue*, *Groh*, and frankly *Wey*

24    say if it is not in the warrant, the affidavit doesn't cure the

25    deficiency.

1          THE COURT:  That's not true.  What *Wey* says is if the

2     enumerated crimes are not there and there is not language

3     specifically incorporating it, you can't look to the affidavit

4     and so on its face on those terms you can look to the affidavit

5     if there is language incorporated, if that language itself is

6     incorporated into the warrant or some subset of it you can look

7     to that.

8          MR. HEBERLIG:  Look to the affidavit.

9          THE COURT:  Look to the language included in the

10    earlier portion of the warrant.

11         MR. HEBERLIG:  So, I suppose where we are left is the

12    direction given to the executing officers is you are authorized

13    to seize all e-mails showing involvement in money laundering,

14    offering a false instrument for filing or falsifying business

15    records.  Was that constitutionally specific enough guidance to

16    the officers?  Respectfully, under the cases, we have submitted

17    it is not even close.

18         THE COURT:  You do look to the affidavit, right, just

19    for clarity?  Not on the question of facial validity of the

20    warrant but on the question of if I think under good faith it's

21    facially valid, there is the question of manner of execution.

22         MR. HEBERLIG:  That's not what the Court just said in

23    *650 Fifth Avenue*.  The government made that argument.  They

24    said that reviewers were well familiar with the case and the

25    Court said that is irrelevant and clearly erroneous.  You have

1    to look at the face of the warrant.  It's direct out of *650*

2    *Fifth Avenue*.

3              THE COURT:  Okay.  Thank you.

4              MR. HEBERLIG:  Thank you very much.

5              THE COURT:  The motion -- well, I guess it is motions

6    are submitted.  I will research and put out a written order.

7    We have a time frame -- we have two time frames, it is

8    approximately two weeks for the government to answer the

9    Court's question and we have a week and a half for the

10   defendant to put in renewed proposed order on the return of

11   property in light of what we have discussed and, Mr. Heberlig,

12   you are welcome to put in, within the, shall we say a week and

13   a half time frame, the exemplar documents that go to the

14   additional pages of the 420 documents?

15             MR. HEBERLIG:  If we could have the two weeks I think

16   that would be better.  Our expert on the documents is on some

17   extended foreign travel.

18             THE COURT:  So two weeks for that as well.

19             MR. HEBERLIG:  Yes.

20             THE COURT:  All right.  We are adjourned.

21                                o0o

22

23

24

25