Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

**Steptoe**

December 11, 2019

By ECF

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

  Re: *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

  Defendant Ali Sadr respectfully submits this brief response to the government's December 9, 2019 letter, Dkt. No. 168 (the "December 9 Letter").

  At the November 25 hearing, the Court asked, "did DANY mark as pertinent every one of the 3,135 pages" in the May 2018 Pertinent Documents production "by April 2017?" Tr. 43. The government has now definitively answered: No. The December 9 letter confirms that at least 617 pages of the remaining 3,104 pages at issue (after elimination of spousal privilege documents) were *not* marked pertinent by April 2017. If the Court denies Sadr's motion for full suppression and instead permits the government to use those May 2018 Pertinent Documents marked pertinent by April 2017, the following documents within that production (as categorized in the December 9 Letter) must be suppressed and returned: Categories Four (26 pages), Five (184 pages), Six (188 pages), Seven (46 pages), Eight (6 pages), Nine (1 page), Ten (4 pages), Eleven (36 pages), and the 126 pages the government does not explain but does not seek to use. The government's descriptions make clear that these 617 pages were not marked as pertinent until after April 2017.[1]

---

[1] The government's two-page response letter dated today (Dkt. No. 172) wrongly assumes that the government's assertions in these various categories prove those documents were "seized" and "identified as pertinent" by April 2017. The opposite is true. Those descriptions (including, for example, attachments to *different* and "*related*" emails (Categories 6-8), and documents merely *referred to in work product, but never seized* (Category 11)) concede that those documents were *not* "marked as pertinent" by April 2017 (Nov. 25 Tr. 43); were *not* printed and saved by that date (the government's previously-claimed method of "seizure"); but instead were the products of the government's *conceded* post-April-2017 searches. *See* Dkt. No. 155, at 8-9; Defendants' Letter dated December 9, 2019 (Dkt. No. 166).

The Honorable Alison J. Nathan
December 11, 2019
Page 2

      A hearing would then be necessary to determine which of the remaining 2,487 pages (Categories One, Two, Three, Twelve, and Thirteen) at issue were actually seized by April 2017. A hearing would be necessary because the government's description of the search and search process has shifted yet again in fundamental ways, revealing that the government has not shown that it made a reasonably prompt responsiveness review by April 2017, or that the remaining 2,487 pages were marked as pertinent in such a review. The government has again declined to provide any declarations, contemporaneous documentation, or metadata to support its broad claims and changed explanations. The government has not even provided the Bates numbers of the pages in each of its asserted categories, rendering it impossible to identify the documents in each category, assess the reliability of the government's representations, or identify which documents may be retained and which must be suppressed and returned. *See* Dkt. No. 165-1 (agreed-upon proposed order granting motion for return of property).

      The government's December 9 Letter contains stark discrepancies with core representations in its October Opposition (Dkt. No. 155) concerning the process by which the government claims DANY "seized" pertinent documents. A hearing is necessary for the Court to be able to determine, in an evidentiary setting with adversarial testing, what happened. Here is a side-by-side comparison of some of these discrepancies:

| **OCTOBER OPPOSITION (Dkt. No. 155)** | **DECEMBER 9 LETTER (Dkt. No. 168)** |
|---|---|
| The government initially represented that all seized documents were saved to DANY electronic folders:<br><br>• "The Reviewers created records of the documents they were seizing by printing to PDF and saving the documents, or portions of documents, into electronic folders on the DANY network." (p. 6).<br><br>• "When documents constituted evidence of the subject offenses, the Reviewers saved electronic copies or portions of the documents into the subject-matter Folders." (p. 19). | The government now represents that saving documents to DANY electronic folders was only one of many ways the government purportedly seized documents, and that only a small number of pages in the May 2018 Pertinent Documents production were located in the DANY electronic folders.<br><br>• "During the review, DANY identified the materials to be seized pursuant to the warrants by, *among other methods*, printing the documents, saving the documents as PDFs to folders in the DANY network drive, and identifying the documents in internal emails, timelines, memos, and other work product." (pp. 1-2) (emphasis added).<br><br>• "385 of the pages in the set of 417 Documents are currently located in DANY's electronic folders and have an electronic 'modified' date of April 2017 or earlier." (p. 2). [From Sadr's review, "Date Modified" metadata is not a reliable way to determine the date of seizure |

The Honorable Alison J. Nathan
December 11, 2019
Page 3

**Steptoe**

| | |
|---|---|
| | because documents are not necessarily "Modified" when they are printed or saved. For example, more than 200 documents in the September 2019 Pertinent Documents have a "Date Modified" preceding the first warrant's execution in April 2014.] |
| The government initially represented that the May 2018 Pertinent Documents production contained the entirety of the "hot documents" binders provided by DANY in April 2017 (roughly three quarters of the production), plus pages that were obtained to "complete" the hot documents (roughly a quarter of the production).<br><br>• "In or about April 2017, . . . DANY provided SDNY with hard-copy binders containing 420 documents—or in some cases, excerpts of documents—that were seized pursuant to the Search Warrants and subsequently produced to the defense as complete documents (*i.e.*, the May 2018 Pertinent Documents)."  (p. 8).<br><br>• "The May 2018 Pertinent Documents total 3,134 pages. The hard-copy binders that DANY gave SDNY in or about April 2017 total approximately 2,283 pages (a difference of approximately 852 pages)." (p. 9 n.6). | The government now represents that the May 2018 Pertinent Documents production *did not* contain the entirety of the "hot documents" binders, and that only roughly half of the production documents were in the "hot documents" binders while roughly half of the production documents were obtained in other ways.<br><br>• "When DANY created the May 2018 discovery production for the defense, it included *many* of the documents that it had already provided to the USAO in the USAO Binders, as well as other documents that DANY had identified as responsive but had not previously provided to the USAO."  (p. 2 n.2) (emphasis added).<br><br>• Only "1,590 of the pages in the [May 2018 Pertinent Documents] were also located in the current versions of the USAO Binders, which DANY provided to the USAO in April 2017."  (p. 2).<br><br>• [It is not clear why there are "current versions" of the hot documents binders and how they differ from the binders DANY provided in April 2017.] |
| The government initially strongly suggested that its post-April 2017 searches of the Provider Data were solely to locate "complete" versions—*i.e.*, missing pages or attachments—of documents seized in a timely manner.<br><br>• "Some of the documents DANY provided to SDNY were incomplete or lacked attachments because of the manner in which they were saved by the Reviewers | The government has now made clear that many new documents were obtained in its post-April 2017 searches that were *not* simply missing pages or attachments from documents already seized. For example,<br><br>• 188 pages "are from email attachments where a *related* version of the parent email was identified for seizure by April 2017." |

| | |
|---|---|
| during the course of the review. Accordingly, after April 2017, DANY accessed the Provider Data to retrieve complete versions of these documents (*i.e.*, the May 2018 Pertinent Documents) in order to produce them to the defendant. . . . Portions of the May 2018 Pertinent Documents had previously been identified by DANY as pertinent and saved in the Folders during the course of the review between 2014 and 2017. After the Indictment was returned, DANY simply collected complete, authenticated versions of the May 2018 Pertinent Documents from the Provider Data to provide them to the defendant." (pp. 19-20). | (p. 3, Category 6) (emphasis added).<br><br>• 46 pages are "from emails for which a *related* version of the email was identified for seizure by April 2017." (p. 3, Category 7) (emphasis added).<br><br>• 6 pages are "from four parent emails for which a version of the parent email with fewer messages" was seized by April 2017. (p. 3, Category 8).<br><br>• 36 pages are from documents not seized previously, but were "identified in DANY work product that was created prior to April 2017." (p. 4, Category 11). |

The government's new description—that "DANY identified the materials to be seized pursuant to the warrants by, *among other methods*, printing the documents, saving the documents as PDFs to folders in the DANY network drive, and identifying the documents in internal emails, timelines, memos, and other work product," Dkt. No. 168, at 1-2—is far more haphazard than even the informal "print to PDF" system the government previously represented to be its means of seizing documents from the Provider Data. It strongly suggests that there was no true responsiveness review at all, and that DANY believed it was free to go back to the Provider Data whenever it wished to keep searching. The Court should hold a suppression hearing and require the government to back up its shifting claims with competent evidence that can be seen and tested.

The government's reliance on *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2017), is completely misplaced. In *Lumiere*, the government supported its positions with a declaration from the executing FBI agent, and Judge Rakoff held an evidentiary hearing to obtain a full fact record. *Id.* at *1. The executing agent began his responsiveness review the night the warrant was executed, completed it roughly one month later, and never went back to the source material to conduct additional searches. *Id.* at *2. The Court's determination that the government need not "segregate" responsive material located on digital storage devices relied on the Second Circuit's discussion in *United States v. Ganias*, 824 F.3d 199, 211-21 (2d Cir. 2016) (en banc) that "meaningful digital segregation [on such devices, *i.e.*, hard drives] may well be impossible," and on Lumiere's failure to file a motion for return as *Ganias* suggested. 2016 WL 7188149, at *4. Here, Sadr has moved for return of seized property and, unlike a digital storage device, the responsive files within email accounts in this case can easily be segregated from the non-responsive files. Most importantly, in *Lumiere*, the pertinent documents were identified within a month of the warrant's execution. Nothing in that decision authorizes the government to return to raw search warrant returns years after execution to obtain additional pertinent files after the completion of a responsiveness review.



The Honorable Alison J. Nathan
December 11, 2019
Page 5

      Finally, Sadr has focused his post-November 25, 2019 hearing submissions on the narrow issue identified by the Court—whether the government seized all pages of the May 2018 Pertinent Documents by April 2017—and has not attempted to further litigate issues related to lack of particularity and execution of the warrants.  Nonetheless, the government's entirely new descriptions of multiple categories of documents seized after its claimed responsiveness review ended prove Sadr is correct: the government repeatedly went "back to the well" of the Provider Data, for multiple purposes, feeling free to do so as it developed its case.  Indeed, the government's reference in work product to documents it had not printed and saved (Category 11) demonstrates that DANY's printing/saving procedure was not a responsiveness cull, but that the government instead believed the entire set of Provider Data was fair game regardless of what it had printed and saved by April 2017.  This was a general search under a general warrant, and justifies full suppression.

      Thank you for your consideration.

      Respectfully submitted,

       /s/  Brian M. Heberlig
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
Bruce C. Bishop (*Pro Hac Vice*)
David M. Fragale
Nicholas P. Silverman (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com
*Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:    Counsel of Record (via ECF)