UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALI SADR HASHEMI NEJAD,

                    Defendant.

18 Cr. 224 (AJN)

**THE GOVERNMENT'S REPLY TO THE DEFENDANT'S
OPPOSITION TO MOTIONS *IN LIMINE***

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Jane Kim
Michael K. Krouse
Stephanie Lake
   Assistant United States Attorneys
Garrett Lynch
   Special Assistant United States Attorney
        - *Of Counsel* -

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 1

DISCUSSION ............................................................................................................................. 1

I.      Co-Conspirator Statements In Furtherance Of The Charged Conspiracies Should Be
        Admitted ........................................................................................................................ 1

II.     Certain Documents Attached To Emails To And From The Defendant Or To And From
        Co-Conspirators Should Be Admitted As Adoptive Admissions ...................................... 4

III.    Certain Documents Should Be Admitted For The Non-Hearsay Purpose Of Establishing
        The Defendant's Knowledge Of U.S. Sanctions ............................................................. 9

IV.     The Defendant Has Conceded The Admissibility Of Evidence Concerning The Process
        Of Obtaining St. Kitts And Nevis Citizenship ............................................................... 11

V.      Evidence, Cross-Examination, Or Argument About Any Purported Benefits To The
        Public From The Venezuela Project Should Be Precluded ............................................. 12

VI.     Evidence, Cross-Examination, Or Argument That The Defendant Did Not Commit The
        Charged Bank Fraud Offenses Because Of Purported Victim Fault Or Lack Of Harm To
        The Victim Banks Should Be Precluded ........................................................................ 13

VII.    Evidence, Cross-Examination, Or Argument About OFAC's "U-Turn Exemption"
        Should Be Precluded ..................................................................................................... 15

VIII.   The Defendant Has Conceded That Evidence, Cross-Examination, Or Argument
        Regarding The JCPOA Should Be Precluded ................................................................ 17

IX.     Cross-Examination Of Expert Witnesses Affiliated With A Non-Profit Policy Institute
        Concerning The Institute's Donors Should Be Precluded ............................................... 17

CONCLUSION .......................................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Bourjaily v. United States*,
   483 U.S. 171 (1987)..................................................................................................... 3

*In re General Motors Ignition Switch* Litigation,
   14 Civ. 8176, 2015 WL 8578945 (S.D.N.Y. Dec. 9, 2015)...................................... 4

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ................................................................................... 16

*Loughrin v. United States*,
   573 U.S. 351 (2014)................................................................................................. 14

*Luce v. United States*,
   469 U.S. 38 (1984)..................................................................................................... 2

*O'Sullivan v. Deutsch Bank AG*,
   17 Civ. 8709 (LTS), 2019 WL 1409556 (S.D.N.Y. Mar. 28, 2019 ........................ 16

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*,
   262 F. Supp. 2d 251 (S.D.N.Y. 2003)............................................................. 5, 6, 8

*Shaw v. United States*,
   137 S. Ct. 462 (2016) .............................................................................................. 13

*United State v. Nejad*,
   18 Cr. 224 (AJN), 2019 WL 6702361 (S.D.N.Y. Dec. 6, 2019) ............................ 15

*United States v. Barone*,
   09 Cr. 91 (NRB), 2010 WL 2976505 (S.D.N.Y. July 9, 2010) ................................ 3

*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991)..................................................................................... 10

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017)....................................................................................... 15

*United States v. Geaney*,
   417 F.2d 1116 (2d Cir. 1969)................................................................................. 3, 4

*United States v. Kelley*,
   305 F. App'x 705 (2d Cir. 2009) .............................................................................. 7

*United States v. Lebedev*,
   932 F.3d 40 (2d Cir. 2019)....................................................................................... 14

*United States v. Nektalov*,
   03 Cr. 828 (PKL), 2004 WL 1469487 (S.D.N.Y. June 30, 2004) ............................ 2

*United States v. Paredes*,
   176 F. Supp. 2d 183 (S.D.N.Y. 2001)....................................................................... 2

*United States v. Rollins*,
   862 F.2d 1282 (7th Cir. 1988 .................................................................................... 6

*United States v. Rowland*,
   14 Cr. 79 (JBA), 2014 WL 3908115 (D. Conn. Aug. 11, 2014) .............................. 3

*United States v. Saneaux*,
   365 F. Supp. 2d 493 (S.D.N.Y. 2005)................................................................... 3, 4

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992)..................................................................................... 13

**Statutes**

18 U.S.C. § 1344 ................................................................................................... 13

**Rules**

Federal Rule of Evidence 801 ................................................................................. 4
Federal Rule of Evidence 402 ............................................................................... 10
Federal Rule of Evidence 403 ............................................................................... 10

**Federal Regulations**

31 C.F.R. § 560.516 .............................................................................................. 16

## INTRODUCTION

The Government respectfully submits this memorandum of law in support of its motions *in limine* in connection with the trial scheduled to begin in this matter on March 2, 2020. For the reasons set forth in the Government's opening brief and below, the Court should grant each of the Government's nine motions *in limine*.

## BACKGROUND

The Government respectfully refers the Court to the factual background set forth in its opening brief. (Gov. Br. at 3-10.)[1]

## DISCUSSION

### I. Co-Conspirator Statements In Furtherance Of The Charged Conspiracies Should Be Admitted

The Court should admit co-conspirator statements made in furtherance of the charged conspiracies, including the statements contained in the approximately twenty examples the Government provided in its opening brief. (Gov. Br. at 17-21.) Rather than engage with the detailed summary the Government provided of evidence it expects to introduce at trial, or address the examples of documents the Government summarized, the defendant simply encourages the Court to defer ruling on the Government's motion to admit co-conspirator statements "because trial has not yet begun." Such deferral is not necessary, and departs from the well-established practice in this Circuit for courts to make "ruling[s] regarding a motion *in limine*" in advance of trial, even where they are "'subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the . . . proffer.'" *United States v. Nektalov*, 03 Cr.

---

[1] "Gov. Br." refers to the Government's memorandum in support of its motions *in limine*, which was filed at docket number 186. "Def. Br." refers to the defendant's opposition to the Government's motions *in limine*, which was filed at docket number 191.

828 (PKL), 2004 WL 1469487, at *1 (S.D.N.Y. June 30, 2004) (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)) (ellipses in original).  Such rulings will increase efficiency at trial and conserve the jury's time.

Where, as here, the Government has provided a detailed proffer to support a finding by a preponderance of the evidence that the co-conspirators ("CCs") referenced in the Government's opening brief conspired with the defendant to commit the offenses charged in the Indictment, (Gov. Br. at 14-17), it is proper—and indeed efficient—for the Court to make a preliminary ruling on the admissibility of co-conspirator statements made in furtherance of those conspiracies.  *See, e.g.*, *United States v. Paredes*, 176 F. Supp. 2d 183, 188 (S.D.N.Y. 2001).

The defendant's sole factual challenge to the Government's detailed proffer relates to CC-9.  The defendant claims that the "government proffer[ed] no information even remotely suggesting that Sadr and any banker conspired to violate the sanctions or commit any other crime." (Def. Br. at 6.)   This assertion ignores an entire paragraph of the Government's brief, which includes proffered facts regarding CC-9's role in the conspiracy.  (Gov. Br. at 16.)  It also ignores the many emails the Government intends to offer at trial that CC-9 and the defendant exchanged demonstrating that CC-9 knew about sanctions against Iran and that the defendant was Iranian (UVN_000164315, Bates 001721), knew that the defendant opened U.S. dollar accounts for Clarity and Stratus Turkey at a Swiss Bank (the "CC-9 Bank") using a St. Kitts and Nevis passport and claiming residency in Dubai (UVN_000164334, Bates 001745), and that the defendant was the signatory to Stratus Turkey (UVN_000164119, Bates 001536).   In addition, in an email instructing his sister on how to talk to CC-9, the defendant wrote "you can't talk to [CC-9] from the States on the phone. As soon as you feel that his answers are going around the bush, and he's not comfortable, just say: 'do you rather discuss this in person.'"   (UVN_000164378, Bates

001789.)  This proffered evidence is sufficient to show that CC-9 was a participant in the defendant's scheme to evade U.S. sanctions, and that CC-9's statements in furtherance of that scheme—including statements regarding the establishment and use of foreign bank accounts to execute U.S. dollar transactions—are admissible co-conspirator statements.

The defendant next implores the Court to prolong the trial and risk juror confusion by refusing to admit co-conspirator statements subject to connection.  (Def. Br. at 8-9.)  It is "standard protocol for addressing proffered coconspirator statements at trial" to admit those statements "subject to connection."  *United States v. Barone*, 09 Cr. 91 (NRB), 2010 WL 2976505, at *1 (S.D.N.Y. July 9, 2010).  This has been the established rule in this Circuit for decades.  Once a court conditionally admits a co-conspirator statement:

> [It] must determine, when all the evidence is in, whether in [its] view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence. . . . If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt.  If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility . . . declare a mistrial if the defendant asks for it.

*United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969);[2] *see also United States v. Rowland*, 14 Cr. 79 (JBA), 2014 WL 3908115, *2 (D. Conn. Aug. 11, 2014) (declining defendant's request that it depart from the *Geaney* procedure).  The defendant relies on the district court's decision in *United States v. Saneaux*, 365 F. Supp. 2d 493 (S.D.N.Y. 2005), in urging the Court to depart from

---

[2] As the Supreme Court made clear in *Bourjaily v. United States*, 483 U.S. 171 (1987), the statement must also have been "made during the course and in furtherance of the conspiracy."  *Id.* at 175.

this well-established Circuit practice of admitting co-conspirator statements subject to connection. But *Saneaux* does not sweep nearly as broadly as the defendant suggests. In that case, Judge Haight allowed the Government to introduce a portion of the co-conspirator statements it sought to admit subject to connection. *Id.* at 505 ("These non-recorded declarations will accordingly be subjected to the traditional *Geaney* protocol."). The court "departed from" the "traditional *Geaney* protocol" in only "one respect." *Id.* at 504. It did "not allow the jury to hear [certain] recorded [] declarations 'subject to connection' through the medium of subsequently offered evidence" only because the Court harbored material doubt that the Government would be able to establish that declarations were made in furtherance of the conspiracy. *Id.* There is simply no basis for departing from *Geaney* in this case, where the Government has provided detailed proffers regarding the types of co-conspirator statements it will seek to introduce, and the defendant has done nothing to call into question the accuracy of the Government's proffer.

## II. Certain Documents Attached To Emails To And From The Defendant Or To And From Co-Conspirators Should Be Admitted As Adoptive Admissions

The defendant presents a cramped and inaccurate reading of the standards for admitting adoptive admissions.[3] As the Advisory Committee Notes to Federal Rule of Evidence

---

[3] Perhaps most egregiously, he incorrectly characterizes the Advisory Committee Notes to Rule 801(d)(2) and claims that Judge Furman misstated the rule in *In re General Motors Ignition Switch Litigation*, 14 Civ. 8176, 2015 WL 8578945 (S.D.N.Y. Dec. 9, 2015). Rule 801(d)(2) governs all statements of a party opponent including, among others, those where "the party manifested that it adopted or believed it to be true." Fed. R. Evid. 801(d)(2)(B). The Advisory Committee Note regarding *all* of Rule 801(d)(2)—which includes subsection (B)—states that "this avenue to admissibility" should receive "generous treatment." It goes on to explain that there are "five categories of statements for which the responsibility of a party is considered sufficient to justify reception in evidence against him," describing each subsection to Rule 801(d)(2), including subsection (B). The defendant's assertion that the "generous treatment" language applies only to Rule 801(d)(2)(A) is inconsistent with the text of the Advisory Committee Note itself and the case law that has interpreted that Note.

801(d)(2)(B) plainly state, "[a]doption or acquiescence may be manifested in any appropriate manner." *Id.* This can include "language, conduct[,] [] silence" or "by using it or taking action in response to or in compliance with it." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003). For each of the examples of documents the Government provided, and for each document it will seek to introduce at trial under this theory, there is sufficient evidence for the Court to conclude by a preponderance of the evidence that the statements were adopted by the defendant or a co-conspirator.

First, documents the defendant or a co-conspirator modified or declined to modify constitute adoptive admissions. Indeed, with respect to several of the examples provided in the Government's opening brief, the defendant expressly noted that he had made revisions to the documents and transmitted the documents himself. (Gov Br. at 26-27.) For example, in UVN_000164190 (Bates 001604), the defendant emailed attachments regarding several of Stratus's subsidiaries and projects—including the Venezuela Project—noting that they had all been "revised." (*See also* UVN_000165421, Bates 002835 (responding to an email regarding Stratus Turkey's sub-contract with IIHC, noting that "the latest files Yasemin had sent were not consistent and had to be revised" and "attach[ing] the right ones")). The content of the messages demonstrates the defendant's knowledge of the contents of the attached documents and his adoption of the statements contained therein. The defendant incorrectly argues that the Court should apply the standards for "adoption by silence" to any portion of the attachments the defendant did not correct. (Def. Br. at 15.) But the defendant was not "silent" with respect to attachments he himself reviewed, modified, and transmitted. By reviewing them and sending them to others, he "manifest[ed] [his] intent to adopt another's statements" as well as his "belief in the

truth of the statements"—exactly what is required for admission.  *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988).

That the defendant routinely corrected or commented on documents regarding the Venezuela Project is relevant to the Court's evaluation of documents the defendant received about the Venezuela Project but did not comment on.  Similarly relevant is the role the defendant played with respect to Stratus Group and IIHC.  The defendant was the Vice Chair of finance for the Stratus Group (UVN_000164427, Bates 001838), and also the head of finance for IIHC (UVN_000163493, Bates 000904).  In the context of his role at Stratus and IIHC, it is natural that the defendant would have responded if information he received about the Venezuela Project were inaccurate.  In UVN_000163510 (Bates 000921), for example, the defendant received three attachments about the Venezuela Project from a Stratus employee.[4]  Those attachments contain information about the defendant's area of expertise, including that "[t]he total amount of the agreement is USD 475 million," that the "[p]ayments are in USD," and "[o]ne of the important problems is to transfer money from Iran to Venezuela and vice versa and exchange the USD to Bolivar for local expenses."  Certainly if any of this basic information about the Venezuela Project were incorrect, the defendant would have corrected it, as he did with respect to the content of UVN_000165421 (Bates 002835), discussed above.  That he did not respond "when natural to do so" if the documents had been inaccurate demonstrates his adoption of the statements contained therein.  *Penguin Books*, 262 F. Supp. 2d at 259.

---

[4] One of the attachments is independently admissible as a co-conspirator statement.  It is a letter to the defendant from CC-6 summarizing certain information regarding the conspiracy, including that the "contract is signed between an Iranian company," that "Stratus will be in charge of execution of the project due to the majority of Stratus's subsidiary companies share in Iranian International Housing Co." and that the "project is Million USD 475."

Second, with respect to documents the defendant or his co-conspirators forwarded, the Government has proffered a sufficient basis from which to conclude that he adopted the statements within the documents. For example, with respect to UVN_000164334 (Bates 001745),[5] the defendant wrote to a banker at the CC-9 Bank (the "Banker"), attaching a scan of the defendant's sister's passport and a wire transfer. The Banker responded to the defendant "please find attached the forms 'Authorized Signatures' as requested." The forms attached to that email are standard bank forms with spaces to fill in the company name and the name, date of birth, nationality, and signature of the signatories to the account. The defendant's banker sent the defendant these signature forms for Clarity Trade and Finance and Stratus International Contracting, with the defendant's name, date of birth, and nationality as well as the defendant's sister's name, date of birth, and nationality pre-filled. The defendant had specifically provided his sister's name, date of birth, and nationality to the Banker for use on the forms,[6] and the defendant specifically requested that the Banker send him the forms, which the Banker had filled out. All that remained for the defendant to do was print and sign the forms. Naturally, the defendant then forwarded the signature forms to have them printed. That the defendant requested these forms that required his signature, received them, did not make any corrections to them, and asked that they be printed—a prerequisite to signing them—all evince his adoption of the contents of the forms.

---

[5] This particular document is also admissible under Rule 801(d)(2)(D), as a statement of the party's agent on a matter within the scope of the agency relationship. *See, e.g.*, *United States v. Kelley*, 305 F. App'x 705, 708 (2d Cir. 2009) (tax form prepared by defendant's tax preparer admissible under Rule 801(d)(2)(D)).

[6] The defendant sent the CC-9 Bank his passport information months earlier. (UVN_000163655, Bates 001066.)

The next document the defendant challenges is admissible for similar reasons. UVN_000164223 (Bates 001634) reflects that the defendant requested information about Stratus's "heavy inventory" from a Stratus employee ("Employee-1"). Employee-1 responded by sending the defendant the material he had requested, explaining that the attachment is Stratus International Contracting Company's "Prequalification Document," which is "submit[ed] to the clients" and includes the company's "resources such as Experience, Certificates, Manpower, Equipments, Key Personnel and Standards," adding that he "hope[s] it will meet your requirements." The defendant then forwarded the entire attachment to a third person (the "Stratus Turkey Representative"). Where, as here, "a party forwards a document to another in response to some request for information contained in the document," it is "an adoptive admission." *Penguin Books*, 262 F. Supp. 2d at 259. The defendant's contention that only the summary of "Equipment" is admissible is incorrect. He had an opportunity to send only a portion of the document, to differentiate the "Equipment" summary from the rest of the document, or to request that Employee-1 make changes to the document before sending it. That the defendant declined to do so evinces his adoption of that document, which contains details regarding companies—including IIHC—with which he was deeply familiar.

Third, the defendant's objection that the email attachments in UVN_000164223 (Bates 001634), UVN_000163680 (Bates 001074), and UVN_000163510 (Bates 000921) contain inadmissible "hearsay within hearsay" is misplaced. The email attachments the Government seeks to admit are reports that principally contain basic, factual information about Stratus entities, including IIHC. The defendant does not identify what second-level hearsay these reports purportedly contain. To the extent they do contain second-level hearsay that the defendant did not

adopt through his adoption of the overall document, the Government may be amenable to redacting those portions of the attachments.

Finally, for the reasons set forth above in Section I, the Court need not defer ruling on the admissibility of the defendant's adoptive admissions. Instead, it should issue preliminary rulings admitting these documents based on the detailed factual proffers the Government has provided.

## III. Certain Documents Should Be Admitted For The Non-Hearsay Purpose Of Establishing The Defendant's Knowledge Of U.S. Sanctions

The defendant concedes that "evidence of Sadr's understanding of the U.S. sanctions against Iran is relevant non-hearsay." Nonetheless, he objects to six of the documents the Government provided as examples of documents that prove Sadr's knowledge of U.S. sanctions. His objections, however, go to the weight of the evidence the Government intends to offer, not its admissibility. He incorrectly contends, without support, that the Government must prove that Sadr read each email that he received in order to establish a foundation for its admission. (Def. Br. at 18-19.) That is not the law. The defendant will be free to argue to the jury that he did not read any emails he received regarding the U.S. sanctions against Iran, and that it therefore should not give the emails any weight. The Government should similarly be free to argue to the jury that it should use its common sense in concluding that the defendant did read the emails he received in accounts that he regularly used, and which were in his name.

Nor is it the case that the Government can only introduce emails the defendant received at the outset of the charged conspiracy. (Def. Br. at 20.) Any information the defendant received with information about the U.S. sanctions against Iran during the period of the conspiracies, which the Indictment alleges continued until in or about May 2014, is relevant to proving his knowledge. The jury will be instructed that the defendant is guilty if he was a member of the charged

conspiracies at any time during their existence.  In other words, even if the jury were to conclude that the defendant was unaware of U.S. sanctions against Iran until February 2012, when he received an email from his sister with detailed information about the U.S. sanctions regime,[7] the jury could still find the defendant guilty of the charged crimes.  In support of his spurious argument that his knowledge is relevant only at the outset of the conspiracy, the defendant cites to an inapposite Second Circuit case.  (Def. Br. at 20 (citing *United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991)).  *Cardascia* addressed whether a statement the defendant made several months after a particular event was evidence of his mental state at the time of that event, not whether information the defendant received part of the way through an ongoing conspiracy was relevant proof of his criminal intent.  *Cardascia*, 951 F.2d at 486-87.

The defendant next complains that two of the emails the Government provided as examples refer to other countries' sanctions programs, not U.S. sanctions, and therefore are irrelevant.  These emails are both relevant and admissible.  Evidence that the defendant received information about global sanctions against Iran is probative of the impact of the worldwide sanctions against Iran on the defendant, his work, and his companies, and his knowledge of sanctions broadly.  It shows that the defendant was on notice of these topics and supports the inference that Iranian businesspeople transacting in the global economy, like the defendant, regularly encountered issues relating to

---

[7] This document is not, as the defendant characterizes it, a "spam" email.  (Def. Br. at 19.)  There is no indication on the email that it is spam.  It is an email from the defendant's own sister to the defendant, titled "OFAC sanctions on Iran description; English & Farsi," which states in the body of the email "Please see attached.  This applies to US persons and whomever is present in the US, regardless of what visa they hold."  The attachments contain detailed descriptions of the U.S.-Iran sanctions regime.

sanctions.  This evidence will aid in countering any argument that the defendant was unaware of the sanctions constraining his business' ability to operate in the global marketplace.

Finally, the defendant's challenge to UVN_000163492 (Bates 000903) as irrelevant and unduly prejudicial based on its reference to the American-Iranian council as the defendant's "homies" can easily be mooted by redacting the title of the email.  In the October 2008 email, one of the defendant's business partners wrote to the defendant that Iran "is under heavy U.S. sanctions over its nuclear program and support for groups the United States labels terrorist organizations." This email bears directly on the defendant's knowledge of the U.S. sanctions against Iran, which is a core issue in the case.  In light of its considerable probative value, and the ease with which any prejudice that the title of the email might cause can be mitigated, exclusion under Rule 402 or 403 is unwarranted.

## IV. The Defendant Has Conceded The Admissibility Of Evidence Concerning The Process Of Obtaining St. Kitts And Nevis Citizenship

The defendant concedes that evidence about the process by which individuals can purchase St. Kitts and Nevis citizenship and passports without any residency, language, or interview requirements is relevant and admissible.  (Def. Br. at 21.)   The Government reserves its right to call a witness to testify as to these topics, but will consider the defendant's proposal that the parties enter into a stipulation regarding the process required to obtain citizenship in St. Kitts and Nevis.

The Government should be permitted to argue, over the defendant's objection, that the defendant obtained citizenship in St. Kitts and Nevis in order to perpetrate the fraudulent schemes charged in the indictment.  This argument is precisely what makes the proffered evidence relevant at trial.  As set forth in the Government's opening brief (Gov. Br. at 30-31), the defendant's acquisition of St. Kitts and Nevis citizenship, without ties to that country and shortly before

establishing front companies to receive payments on behalf of IIHC, is probative of his intent to violate the law. The email evidence the Government intends to introduce at trial further demonstrates the importance to the defendant of obscuring the Iranian nationality of anyone connected to Clarity and Stratus Turkey to perpetrate his scheme. For example, in emails about establishing Clarity's bank account at the CC-9 Bank, the defendant agreed to provide his own St. Kitts and Nevis passport, but refused to provide his Iranian father's passport to open the account.[8] (UVN_000163655, Bates 001066.)

## V. Evidence, Cross-Examination, Or Argument About Any Purported Benefits To The Public From The Venezuela Project Should Be Precluded

The defendant appears to have misunderstood the Government's motion regarding evidence about the nature of the Venezuela Project. The Government does not oppose the introduction of evidence that the Venezuela Project was a construction project that involved building homes and other related structures. The Government seeks only to preclude the defendant from adducing evidence or arguing that the Venezuela Project was a "low income" housing project, or otherwise designed to assist impoverished residents of Venezuela. As set forth in the Government's opening brief (Gov. Br. at 31-32), evidence regarding the intended beneficiaries of the Venezuela Project is irrelevant to the issues the jury will be asked to consider.

---

[8] The Government does not intend to argue, as the defendant suggests, that the relevant sanctions "prohibit Iranian citizens residing outside Iran from opening U.S. dollar bank accounts and receiving U.S. dollar payments." The Government will argue, however, that the relevant sanctions prohibit Iranian citizens residing outside Iran from opening U.S. dollar bank accounts and receiving U.S. dollar payments on behalf and for the benefit of Iranian companies, such as IIHC. It will further argue that banks are more likely to scrutinize transactions if they know the transactions are in any way linked to Iran.

**VI.** **Evidence, Cross-Examination, Or Argument That The Defendant Did Not Commit The Charged Bank Fraud Offenses Because Of Purported Victim Fault Or Lack Of Harm To The Victim Banks Should Be Precluded**

The defendant has agreed not to elicit testimony or make arguments that the U.S. financial institutions the defendant used to clear his U.S. dollar payments knowingly or negligently participated in evading U.S. sanctions against Iran and that such participation is a defense to the bank fraud charges in the Indictment, or that the lack of any ultimate financial losses to the banks is a defense. (Def. Br. at 26-27.) The defendant contends, however, that he should be permitted to pursue the theory that he should be acquitted of the bank fraud charges because he did not intend to harm the banks. This is not so.

The defendant first concedes that the Supreme Court in *Shaw v. United States*, 137 S. Ct. 462 (2016), held that the first prong of bank fraud "statute, while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." (Def. Br. at 27 (quoting *Shaw*, 137 S. Ct. at 467)). He nevertheless argues, citing a Second Circuit case that pre-dates *Shaw*, that the Government must demonstrate that the defendant "inten[ded] to victimize the institution by exposing it to actual or potential loss," and that cross-examination about his intent to cause financial harm therefore is relevant. *United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992). This is no longer an accurate statement of the law. *Shaw* makes abundantly clear that, for purposes of the first prong of the bank fraud statute, the Government does not need to prove that it was the defendant's "purpose" to take money from the financial institution. *Shaw*, 137 S. Ct. at 468. The defendant need only have intended to defraud the bank.

With respect to the second prong of bank fraud, the Government need only prove that the defendant used a scheme "to obtain any of the moneys, funds, credits, assets, securities, or other

property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). Intent to obtain money is distinct from intent to cause harm. For example, where a bank is fully insured, obtaining money from the bank would not necessarily cause it harm. So long as a defendant intends to obtain the bank's money, it is immaterial whether the defendant specifically intended, or thought he would, cause any particular harm to the bank. *See Loughrin v. United States*, 573 U.S. 351, 355-56 (2014) (holding that the elements of the second prong of bank fraud are (1) "obtain[ing] any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution," (2) "by means of false or fraudulent pretenses, representations, or promises."). Indeed, in *Loughrin*, there was no proof at all that the defendant intended to or likely would have caused harm to the bank.

It is also not the case, as the defendant claims, that "the defendant must have intended to defraud *someone*" to be guilty of bank fraud He cites only an Eleventh Circuit pattern jury instruction in support of this claim, which has no weight in this Circuit and is inconsistent with the reasoning of the Supreme Court's decision in *Loughrin*. (Def. Br. at 29.) The Second Circuit recently rejected this very argument, upholding the defendant's bank fraud conviction in *United States v. Lebedev* against the defendant's argument that "he did not intend to defraud either the bank or the customers who purchased Bitcoin." 932 F.3d 40, 49 (2d Cir. 2019). As *Loughrin* states and *Lebedev* confirms, the only two elements of bank fraud are obtaining some property under the custody or control of a bank, and doing so by false or fraudulent pretenses. Here, the Government will prove that the defendant obtained money from banks by falsely representing that the ultimate beneficiary of the funds was not an Iranian entity. Whether he intended to cause the banks, or anyone else, harm is simply immaterial to the jury's analysis.

The defendant correctly identifies that the "right to control" theory of fraud does require that the misrepresentations to the bank "can . . . result in tangible economic harm"—in other words, financial loss. *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). But it is not necessary that the defendant have *intended* the misrepresentations to have resulted in tangible economic harm, or that the misrepresentations actually have resulted in tangible economic harm. *See id.* (approving of a jury instruction that the "'right to control' one's assets is injured 'when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets,'" with no reference to the defendant's intent). Thus, while testimony and argument regarding whether the defendant's misrepresentations robbed the victim banks of "potentially valuable economic information" are relevant, whether the banks in fact were harmed and the defendant's intent to harm them are irrelevant. The defendant therefore should not be permitted to confuse and distract the jury by injecting questions about actual harm to the banks or his intent to harm the banks into the trial.

## VII. Evidence, Cross-Examination, Or Argument About OFAC's "U-Turn Exemption" Should Be Precluded

The defendant fails to explain how or why introducing evidence of OFAC's "U-Turn Exemption," which was repealed before the defendant executed the U.S. dollar transactions that underlie the allegations in this case, is necessary to his defense. He claims only that the existence of the U-Turn "is central to whether Sadr had criminal intent as charged at the outset of the alleged criminal activity." (Def. Br. at 33.) As the Court has already held, the existence of the U-Turn Exemption is not a defense to the allegations in this case because the U-Turn was not in effect when the defendant executed the U.S. dollar transactions charged in the indictment. *United State v. Nejad*, 18 Cr. 224 (AJN), 2019 WL 6702361, at *7 (S.D.N.Y. Dec. 6, 2019). Even if the

defendant could demonstrate that he did not have the requisite criminal intent from 2006 until the U-Turn was repealed in 2008, he would still be guilty of the charged offenses as long as he developed that criminal intent at some point in the conspiracy. Moreover, the Government does not intend to introduce evidence that the defendant developed his scheme to evade the sanctions until after the U-Turn was repealed. Defense evidence regarding the defendant's intent during that time period therefore would be irrelevant.

The Court should also preclude discussion of the U-Turn Exemption at trial because the defendant's scheme, as executed, would have violated the U-Turn Exemption's transparency requirement. The defendant incorrectly argues that there is no transparency requirement in the U-Turn. (Def. Br. at 36-37.) To the contrary, as reflected in *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) and *O'Sullivan v. Deutsch Bank AG*, 17 Civ. 8709 (LTS), 2019 WL 1409556 (S.D.N.Y. Mar. 28, 2019), the versions of 31 C.F.R. § 560.516 in effect from the beginning of 2006 through the revocation of the U-Turn required that "[b]efore a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part." The only way for a United States bank to determine that the underlying transaction was not prohibited under the sanctions would be for the parties to the transaction to transparently disclose their identities and locations. The use of front companies to conceal the true identities of the counterparties therefore would frustrate the banks' ability to comply with the sanctions regulations, and violate the sanctions themselves.

**VIII. The Defendant Has Conceded That Evidence, Cross-Examination, Or Argument Regarding The JCPOA Should Be Precluded**

Because the defendant has agreed not to argue or introduce evidence to support an argument that the JCPOA is a defense to the charged conduct, the Government agrees that this motion is moot.

**IX. Cross-Examination Of Expert Witnesses Affiliated With A Non-Profit Policy Institute Concerning The Institute's Donors Should Be Precluded**

The defendant's opposition fails to explain why or how it is that the identity of the Foundation for Defense of Democracy's ("FDD") donors is relevant to Mark Dubowitz's credibility. The defendant will be free to challenge Dubowitz's credibility based on each of the points he raises in his brief—that Dubowitz has testified for the U.S. government before, that he has been described as a "top Iran 'financial warrior,'" and that FDD has donors who may have particular interests. But the specific identity of those donors has no bearing whatsoever on Dubowitz's credibility. Prohibiting cross examination on their identities would be well within the Court's discretion, as such cross examination would have marginal relevance, if any, and risk undue confusion of issues and delay.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court grant the Government's

motions *in limine*.

Dated: New York, New York
       January 24, 2020

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                            By:    __/s/_____
                                        Jane Kim
                                        Michael K. Krouse
                                        Stephanie Lake
                                        Assistant United States Attorneys
                                        (212) 637-2038/2279/1066
                                        Garrett Lynch
                                        Special Assistant United States Attorney


cc:    Defense Counsel (via ECF)