UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 2 8 2020

United States of America,

–v–

Ali Sadr Hashemi Nejad,

Defendant.

18-cr-224 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Defendant Ali Sadr Hashemi Nejad is charged in a six-count Indictment. Dkt. No. 2.

Before the Court are Sadr's motion for a *Franks* hearing and for suppression of search warrant

evidence, motion for return of property, and motion to exclude. For the reasons that follow, the

Court GRANTS in part, DENIES in part, and RESERVES JUDGMENT in part on Sadr's

motion to suppress search warrant evidence, DENIES his corollary requests for a *Franks*

hearing, RESERVES JUDGMENT on his motion for return of property, and DENIES as moot

his motion to exclude.

## I.  BACKGROUND

### A.  Factual Background

The Court assumes familiarity with the factual background in this matter as set forth in its

December 6, 2019 Opinion and Order deciding Sadr's first seven pretrial motions. *See* Dkt. No.

164.  In brief, the Indictment alleges that an Iranian-incorporated entity controlled by Sadr and

his family was involved in a housing construction project in Venezuela. Ind. ¶ 8.  The charges in

the Indictment stem from payments for the construction of low-income housing in Venezuela

that were allegedly routed from a Venezuelan state-owned energy company through banks in the

United States to the Swiss accounts of entities owned by Sadr and his family. *See id.* ¶¶ 11–13.

The Government alleges that this transaction structure violated the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR").[1]

## B. Procedural Background

This case originated as an investigation by the New York County District Attorney's Office. On April 16, 2014, June 16, 2014, and October 21, 2015, the DA's Office obtained search warrants from the Honorable Michael Obus, a justice of the New York County Supreme Court, to search certain of Sadr's email accounts for evidence of involvement in money laundering, offering a false instrument for filing, or falsifying business records. *See* Dkt. 108 at 56–59; *see also* Dkt. 96-1–4. These search warrants generally provide that "there is reasonable and probable cause to believe that certain property, evidence, and records" exists including

> any and all subscriber and account information and history, and retained account data, for [the target] email accounts, any associated or linked accounts, including: payment history, detailed billing information, method of payment, including full debit, credit, or bank account numbers used, Contacts or "Buddy List" content, sent and received email messages that are or were in the account, saved or draft email messages, any files attached to any email messages, Internet Protocol ("IP") log history, connection log data, account creation data, passwords, sign-on codes, account numbers, and any other information maintained by or within the databases of the service provider and related entities regarding the named email account and subscriber and any linked email accounts and subscribers, *which shows or tends to show the following*:
>
> . . .
>
> o *involvement in Money Laundering, Offering a False Instrument for Filing, Falsifying Business Records*, and an attempt and conspiracy to commit said crimes, and/or involvement in the planning of, recruiting for, or commission of those crimes; communication with witnesses to and victims of the above-named crimes; communication with third parties relating to witnesses to and victims of the above-named crimes; and communication with third parties while using aliases or other identities.

*See, e.g.*, Dkt. No. 96-1 at 37 (emphasis added). They further authorize executing agents

---

[1] References to the Government throughout this Opinion and Order refer to the United States Attorney's Office for the Southern District of New York.

> to search, enter, retrieve, examine, copy, and analyze the . . . servers and . . . accounts
> associated with target email address . . . from the time period of the inception of the target
> email account to the date of the warrant, for any and all payment history, detailed billing
> information, method of payment and credit card numbers used, contacts, sent and
> received email messages that are or were in the account, saved or draft email messages,
> any files attached to such email messages, basic subscriber and account information, and
> Internet Protocol ("IP") log history . . .

*Id.* at 38.

In response to these search warrants and others, internet service providers provided the

D.A. with data consisting of over one million documents from various email accounts—

including both Sadr's and others' accounts—which were processed by it on a rolling basis. Dkt.

No. 155 at 4. In order to process this data, D.A. employees began in May 2014 to search it for

material to be seized pursuant to the search warrants. *Id.* at 5. During this responsiveness

review, they seized certain documents identified as responsive to the search warrants. *Id.* at 6.

By April 2017, the responsiveness review was complete. *Id.* at 3–7.

At the conclusion of the responsiveness review, the D.A. referred the case to the United

States Attorney's Office for the Southern District of New York for federal prosecution and

provided the U.S. Attorney's Office with a binder of 420 seized documents at that time. *Id.* at 8.

Between the time the case was referred to the U.S. Attorney's Office and the Indictment was

filed, D.A. employees continued to access the entire set of data—beyond just previously seized

documents—in order to "pull complete versions of [previously] seized documents" and to query

the data "for purposes of preparing materials related to the Indictment." *Id.* These employees

were given instructions to "(1) locate specific documents that were responsive to the search

warrants—which [members of the review team] ha[d] seen when conducting earlier searches, or

(2) query the [entire set of data] regarding topics for which more experienced members of the

investigative team had previously seen responsive documents." *Id.*

On March 19, 2019, the Indictment in this case was returned, and on March 28, 2018,

Sadr arrived in the Southern District of New York following his arrest in Virginia. *Id.* at 9.

From April to May 2018, the U.S. Attorney's Office produced to Sadr, among other things, all of

the data from his own email accounts as well as the 420 seized documents the D.A. provided the U.S. Attorney's Office with when it made the referral. *Id.* During the process of producing these documents, D.A. employees again accessed the entire set of data in some instances to, in its words, pull "complete versions" of the 420 documents. *Id.*

In May 2018, the U.S. Attorney's Office requested that the D.A. provide it with information related to Sadr's travel to or from Iran for the purposes of opposing his bail application. *Id.* In response, the D.A. again accessed the entire set of data and seized some documents that had not previously been seized. *Id.* at 9–10.

In May 2019, the U.S. Attorney's Office learned that the D.A. had seized documents beyond the 420 that were produced to Sadr in May 2018, and that some of these seized materials had not previously been produced to Sadr. *Id.* at 10–11. Ultimately, 622 documents—all from non-Sadr email accounts—were identified that had not previously been provided to Sadr. *Id.* at 11. On September 17, 2019, the Government produced these 622 non-Sadr documents, as well as 1,775 documents seized from Sadr's accounts that had previously been produced to him in April 2018 but were not then identified to him as having been seized. *Id.* at 2, 11.

On February 25, 2019, Sadr filed nine pretrial motions, including the motion for a *Franks* hearing and for suppression of search warrant evidence and the motion for return of property now before the Court. *See* Dkt. Nos. 95, 97. At a conference before the Court on September 9, 2019, the Government revealed to Sadr for the first time the information it had learned back in May: that "there were custodians searched and documents seized that were not Mr. Sadr's accounts, that were not produced in [the] initial Rule 16 discovery"—namely, the 622 documents identified above. Dkt. No. 137 at 35:5–7. Following that revelation, Sadr informed the Court of his intention to supplement his existing motions to suppress and for return of property and to file an additional motion to exclude the 622 late-disclosed documents from the non-Sadr accounts. Dkt. No. 143 at 2.

4

In its supplemental opposition to the motions now before the Court, the Government represents that it will use neither the 622 non-Sadr documents nor the 1,775 Sadr documents identified above in its case-in-chief. Dkt. No. 155 at 11. The Government further clarified, at oral argument on these motions on November 25, 2019, that it will not rely on these documents at *any* point in trial—whether in its case-in-chief, on cross-examination, or in its rebuttal case— and will thus limit itself to only the 420 documents produced to Sadr in May 2018. *See* Dkt. No. 173 at 38:24–39:4.

At that argument, the Court inquired whether the 420 documents the Government now represents it will exclusively rely on at trial were in fact all identified as responsive by the conclusion of the responsiveness review in April 2017. The Government represented that the "vast majority" were and agreed to conduct a "page-by-page" analysis to determine whether each page of the 420 documents was identified as responsive by that time. *See id.* at 42:11–44:22.

The Government ultimately conducted a page-by-page analysis of 417 documents, having "removed from the universe" of 420 documents three documents the parties agree are subject to spousal privilege. *See* Dkt. No. 168 at 1 n.1. These 417 documents comprise 3,104 pages. *Id.* at 1. The Government's analysis indicates that of these 3,104 pages, 2,064 were identified for seizure by April 2017, and 449 pages are from non-Sadr accounts or are part of grand jury subpoena returns. *Id.* at 5. An additional 36 pages were referenced in work product created by April 2017, and 429 pages are part of or related to email threads and attachments that the D.A. identified by April 2017 but for which the Government has not found any indication that the specific pages were identified as responsive by that time. *Id.* at 3–5. The Government was unable to determine whether the remaining 126 pages, or related versions, were identified for seizure by April 2017 and has represented to the Court that it will not rely on those pages as a

result. *Id.* at 5. Thus, the Government now represents to the Court that it will only rely at trial on 2,978 pages of the 3,104 pages constituting the 417 documents. *Id.* at 1.

## II.    A *FRANKS* HEARING IS NOT WARRANTED

Sadr argues that the Government "obtained multiple search warrants for [his] email accounts under false and misleading pretenses," and that, in doing so, it "deliberately misled the reviewing court . . . or, at the very least, acted with reckless disregard for the truth." Dkt. No. 96 at 1. As a result, he argues that these warrants are invalid and a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is necessary to establish their invalidity. *See generally* Dkt. No. 96 at 5–17. For the reasons stated below, the Court concludes that a *Franks* hearing is not warranted.

Because the probable cause standard underpins much of the discussion that follows in this and subsequent sections, the Court begins with a description of it. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).

"The Supreme Court has explained that 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "In evaluating probable cause in any given case, a judge must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a

6

crime will be found in a particular place." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (internal quotation marks and ellipsis omitted) (quoting *Falso*, 544 F.3d at 117). "Due to this subjective standard, a reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting [the] inquiry to whether the officer 'had a substantial basis' for his determination." *Id.* at 113 (quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)). "Nevertheless, under this standard, [courts] 'may properly conclude that . . . a warrant was invalid because the [judge's] probable-cause determination reflected an improper analysis of the totality of circumstances.'" *Falso*, 544 F.3d at 117 (internal brackets omitted) (quoting *United States v. Leon*, 468 U.S. 897, 915 (1984)).

Although "a search or seizure pursuant to a warrant is presumed valid," a defendant may, "[i]n certain circumstances, . . . challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164–72). To obtain a *Franks* hearing on a motion to suppress on the basis of alleged misstatements or omissions in a warrant affidavit, a defendant must make a *substantial* preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth"; and (2) those misrepresentations or omissions were material, or "necessary to the issuing judge's probable cause finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (alterations omitted) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)); *see also Franks*, 438 U.S. at 155–56. To satisfy this test, "a defendant must 'point out *specifically* the portion of the warrant affidavit that is claimed to be false.'" *United States v. Levy*, 2012 WL

5830631, at *5 (S.D.N.Y. Nov. 16, 2012), *aff'd*, 626 F. App'x 319 (2d Cir. 2015) (emphasis added) (quoting *Franks*, 438 U.S. at 171).

With respect to the intentionality prong, "the reviewing court must be presented with credible and probative evidence" that a misstatement or omission "in a [warrant] application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (second alteration in original) (quoting *Awadallah*, 349 F.3d at 68). Reckless disregard for the truth may be established by demonstrating that an affiant made "statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." *Rivera v. United States*, 728 F. Supp. 250, 258 (S.D.N.Y. 1990), *aff'd in relevant part*, 928 F.2d 592 (2d Cir. 1991). Where omissions are concerned, recklessness may be inferred "where the omitted information was 'clearly critical' to the probable cause determination." *Rivera*, 928 F.2d at 604. However, such an inference is "not to be automatically drawn simply because a reasonable person would have included the omitted information, and the inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the [warrant] application." *Rajaratnam*, 719 F.3d at 154–55 (citation omitted).

With respect to the materiality prong, courts "gauge materiality by a process of subtraction" or addition depending on whether misstatements or omissions are at issue. *Awadallah*, 349 F.3d at 65. In other words, to determine materiality, courts should "disregard the allegedly false statements," *Awadallah*, 349 F.3d at 65 (citation omitted), "insert the omitted truths," *Rajaratnam*, 719 F.3d at 146 (citation omitted), and determine whether "there remains a residue of independent and lawful information sufficient to support probable cause," *Awadallah*,

349 F.3d at 65 (citation omitted). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

The *Franks* standard is "a high one." *Rivera*, 928 F.2d at 604. As discussed above, to be entitled to a hearing under this standard, "a defendant 'must make a substantial preliminary showing' of each of the prongs." *Levy*, 2012 WL 5830631, at *5 (quoting *Salameh*, 152 F.3d at 113). This substantial preliminary showing must consist of "specific allegations accompanied by an offer of proof"; "[u]nsupported conclusory allegations of falsehood or material omission cannot support a *Franks* challenge." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994).

### A. Sadr Has Not Made a Substantial Showing of Deliberate Falsehood or Reckless Disregard for Truth

As an initial matter, Sadr's offer of proof consists only of his memorandum of law submitted in support of this motion, unaccompanied by any "[a]ffidavits or sworn or otherwise reliable statements of witnesses," or even any satisfactory explanation for their absence. *Franks*, 438 U.S. at 171. Even were such an offer of proof sufficient to make the required substantial preliminary showing—which the Court does not and need not decide here—the memorandum of law fails to make a substantial showing of "credible and probative evidence" of deliberate falsehood or reckless disregard for the truth. *See Rajaratnam*, 719 F.3d at 154.

In his memorandum of law, Sadr points out what he alleges are numerous misstatements, omissions, and what he calls "misleading claims" that, he argues, derive from "stringing together unrelated facts" to create false implications. *See* Dkt. No. 96 at 7–13. However, he fails to make the requisite *substantial* showing of credible and probative evidence demonstrating that any of

these alleged misstatements, omissions, or "misleading claims" were deliberately false or made with reckless disregard for the truth.

### 1. Misstatements

With respect to alleged misstatements, Sadr claims that the warrant applications contain five "demonstrably false and unsupported statements." These include (1) statements in the April 2014 and June 2014 warrant affidavits that the Sadr family has "substantial ties to the Government of Iran," Dkt. No. 96-1 ¶ 5; Dkt. No. 96-2 ¶ 6; (2) a statement in the April 2014 affidavit that Sadr, his company, and his father's company have "links" to "entities that have been sanctioned by OFAC . . . for supporting Iran's nuclear weapons program, proliferation activities, and support of terrorism," Dkt. No. 96-1 ¶ 29; (3) statements in the April 2014, June 2014, and October 2015 affidavits that "there is reason to believe that some of the funds transferred are for covert projects between the [Government of Iran] and Venezuela outside the scope of the Project," Dkt. No. 96-1 ¶ 5; Dkt. No. 96-2 ¶ 6; Dkt. No. 96-3 ¶ 10; (4) statements in the April and June 2014 affidavits that "entities involved in the Project engage in large, U.S.-dollar transactions between Venezuela and Iran . . . involv[ing] a variety of non-transparent entities, banks in high-risk jurisdictions, and . . . Swiss bank accounts . . . ," Dkt. No. 96-1 ¶ 5; Dkt. No. 96-2 ¶ 6; and (5) various alleged inaccuracies and inconsistencies that Sadr admits are "not material on their own," Dkt. No. 96 at 10.

Setting aside the fact that he has offered little evidence that these statements are in fact *mis*statements, Sadr offers even less credible and probative evidence that these alleged misstatements were deliberately false or made with reckless disregard for the truth. The evidence that he does offer falls primarily into two categories. First, he points to the fact that the affidavits do not provide additional "support" or "evidence" for these alleged misstatements. *See* Dkt. No. 96 at 7–8 (citing a lack of support or evidence for statements in categories (1), (2), and

(3)). Second, he argues that the fact that certain statements appeared in earlier warrant affidavits but were excised from later warrant affidavits is an acknowledgement, on the Government's part, of their falsity. *See id.* at 7–9 (noting that statements in categories (1) and (4) were removed from or revised in later warrant affidavits).

With respect to Sadr's first category of evidence, he argues that the lack of further "support" or "evidence" for various allegations in the affidavit evinces a "reckless disregard" for the truth. However, reckless disregard for the truth cannot be inferred unless circumstances evince "*obvious* reasons to doubt the veracity" of the allegedly misstated information. *Rajaratnam,* 719 F.3d at 154 (emphasis added) (quoting *United States v. Whitley,* 249 F.3d 614, 621 (7th Cir. 2001)). The alleged lack of further support or evidence for an allegation does not constitute an *obvious* reason to doubt the veracity of that allegation, and, in any event, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Awadallah,* 349 F.3d at 67–68 (quoting *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990)). Any further suggestion that the falsity of the allegation *itself* constitutes obvious reason to doubt its veracity is obviously circular. *See, e.g.,* Dkt. No. 96 at 8 (arguing that the "affidavit cites no evidence to support this significant claim [that Sadr had links with entities sanctioned by OFAC for supporting Iran's nuclear weapons program and support of terrorism], and in fact, neither Sadr nor any of the individuals or entities described in this paragraph have any connections whatsoever to nuclear weapons or terrorism").

With respect to the alleged misstatements that appeared in earlier warrant affidavits but were excised from later warrant affidavits, he argues that these subsequent omissions were due to the Government's realizations through further investigation that such deliberately "false allegation[s]" were "untenable." *Id.* at 7. However, the fact that some allegations were omitted

from subsequent affidavits does not necessarily suggest that the "affiant in fact entertained serious doubts as to the truth of his allegations" *when he initially made them*, and, in fact, may suggest just the opposite. *Rajaratnam*, 719 F.3d at 154 (quoting *Whitley*, 249 F.3d at 621). Indeed, Sadr's argument demonstrates the willingness of the affiant to *strike* allegations where unsupported, suggesting that the allegations he initially put forth *were* "believed or appropriately accepted by [him] as true" for the simple reason that he would not have otherwise included them. *Franks*, 438 U.S. at 165. While Sadr's contrary inference may fall within the realm of possibility, this conjecture, unsupported by any additional offer of proof, certainly does not amount to a substantial showing of "credible and probative evidence" that the alleged misstatements were "designed to mislead." *Rajaratnam*, 719 F.3d at 154.

### 2. Omissions

Sadr's arguments with respect to omissions that he alleges intentionally or recklessly misled the issuing court fare no better. He alleges that the affidavits: (1) do not allege that the transactions involved the proceeds of criminal conduct, such that they fail to establish probable cause for money laundering, Dkt. No. 96 at 11; (2) fail to acknowledge that the ITRS authorized the charged transactions, *id.*; and (3) "contain no evidence" that Sadr used any of the email accounts searched to conduct any allegedly unlawful business related to the housing construction project, *id.* at 11–12. However, Sadr fails to make *any* showing—let alone a substantial showing—that these alleged omissions were designed to mislead or were made with reckless disregard for whether they would mislead the issuing court, and, in any event, his arguments with respect to these alleged omissions are rejected elsewhere in this Opinion and Order, *see infra* Section II.B (addressing probable cause for money laundering); Section III.B (addressing probable cause that evidence of crimes would be found within the specific target email accounts), or in the Court's December 6, 2019 Opinion and Order resolving Sadr's first seven

pretrial motions, *see* Dkt. No. 164 at II.C (rejecting the argument that the ITSR authorized the charged transactions).

### 3. "Misleading Claims"

Finally, Sadr argues that the affidavits contain "misleading claims" that derive from "stringing together unrelated"—but true—"facts" to create false implications. Dkt. No. 96 at 12–13. This argument is meritless because it fails to even identify any false statements or omitted truths, prerequisites to the application of the *Franks* doctrine. *See Awadallah*, 349 F.3d at 64 ("In order to invoke the *Franks* doctrine, [a defendant] must show that there were intentional and material misrepresentations or omissions in [the agent's] warrant affidavit.").

In sum, in each instance Sadr fails to support his argument that alleged misstatements, omissions, or "misleading claims" in the warrant applications—to the extent there are any—were designed to mislead or made with reckless disregard for whether they would mislead the issuing court. Indeed, these arguments are, at bottom, premised on nothing more than speculation and conjecture. Such "[u]nsupported conclusory allegations of falsehood or material omission cannot support a *Franks* challenge." *Velardi*, 40 F.3d at 573. Because he has failed to make a substantial showing that alleged misstatements or omissions were designed to mislead or made with reckless disregard for whether they would mislead the issuing court, a *Franks* hearing is not warranted.

### B. Sadr Has Not Made a Substantial Showing of Materiality

Though Sadr's failure to make a substantial showing of "credible and probative evidence" of deliberate falsehood or reckless disregard for the truth in the warrant affidavits is on its own fatal to his motion for a *Franks* hearing, *see Levy*, 2012 WL 5830631, at *5, this motion also fails for the additional reason that Sadr has not made a substantial showing of materiality.

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013); *see also Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017) ("To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information."). Even assuming these affidavits contain errors that require correcting, excising the alleged errors from them only demonstrates the overwhelming strength of the probable cause showing. Indeed, as the Government points out, the hypothetical corrected April 2014 affidavit contains numerous allegations unchallenged by Sadr, including:

- There was a multi-million dollar infrastructure project in Venezuela involving a Venezuelan state-owned energy company and the Iranian International Housing Corporation—an entity that is part of Stratus Group, an Iranian conglomerate controlled by Sadr's family. Dkt. No. 96-1 ¶ 5.

- A contract involving this housing construction project was signed by a subsidiary of the Venezuelan state-owned energy company and the Iranian International Housing Corporation and was entered into pursuant to an agreement between Venezuela and the Government of Iran. *Id.* ¶ 9.

- An addendum to the contract provided that payments for project-related transactions would be made in U.S. dollars. *Id.* ¶ 10.

- The housing construction project was suspended over a payment issue during May and June 2011. The chairman of the Venezuelan subsidiary told an informant that sanctions regimes against Iran made it difficult to pay for the project in U.S. dollars, and he repeatedly asked that the Iranians accept payment in Bolivars. *Id.* ¶ 14.

- After work on the project resumed, the Iranian International Housing Corporation provided the chairman of the Venezuelan subsidiary with a letter instructing that payment be made through a bank located in New York to the Swiss bank account of Clarity Trade and Finance S.A. "[i]n view of the current difficulties for transfer and movement of funds." *Id.* ¶ 15.

14

- Subsequent letters signed by the chairman of the Venezuelan subsidiary instructed that payments in favor of the Iranian International Housing Corporation be made through a New York bank to Clarity's Swiss bank account. *Id.* ¶ 17.

- On several occasions, the Venezuelan state-owned energy company sent payments in U.S. dollars through a New York bank to Clarity's Swiss bank account. *Id.* ¶ 27.

- According to the Stratus Holdings website, Stratus Global Investments held a controlling interest in Clarity. *Id.* ¶ 30.

- Sadr was the Director of Clarity, *id.* ¶ 32, and had signatory authority or a controlling interest in its Swiss bank accounts, *id.* ¶ 37.

*See also* Dkt. No. 108 at 75–77.[2]

These allegations and others unchallenged by Sadr establish probable cause to believe that he was engaged in a complex scheme designed to evade U.S. sanctions. Under the totality of the circumstances, there remains, even based only on the allegations of the corrected affidavit, a "fair probability" that business records were falsified or false instruments were offered for filing as part of this complex scheme. *See Raymonda*, 780 F.3d at 113 (2d Cir. 2015). Moreover, in light of the fact that these allegations establish probable cause that Sadr committed these other state offenses, it follows that there is a high probability that this scheme also violated state money laundering statutes.

Sadr's argument that he does not accept as true the unchallenged allegations in the affidavit but rather culled the affidavit's misrepresentations to "only the most egregious and clear-cut," which on their own "are sufficient to obtain a *Franks* hearing" fundamentally misapprehends the materiality showing required to obtain such a hearing. *See* Dkt. No. 116 at 5 n.2; *id.* at 10. Indeed, a defendant must "point out specifically" *all* portions of the warrant

---

[2] Sadr notes that the affidavits in support of the June 2014 and October 2015 warrants contain "largely the same recycled allegations from the April 2014 warrant affidavit." Dkt. No. 96 at 4. Accordingly, the Court focuses on the April 2014 affidavit here.

affidavit he claims to be false. *See Levy*, 2012 WL 5830631, at *5. This is necessary to allow the Court to gauge materiality, which involves "deleting any alleged misstatements from the original warrant affidavit," "adding to it any relevant omitted information," and determining whether probable cause still exists "after such a correction." *Ganek*, 874 F.3d at 82. After correcting the errors *specifically* identified by Sadr, the Court finds that the hypothetical corrected affidavit still establishes probable cause. Accordingly, Sadr has not made a substantial showing of materiality to warrant a *Franks* hearing on the basis of the misstatements, omissions, and "misleading claims" specifically identified in his memorandum of law. Nor is he entitled to one to determine whether the "truth or falsity of these and *other* misrepresentations" *not specifically identified and not now before the Court* were necessary to the probable cause showing. Dkt. No. 116 at 5 n.2.

## III.    SUPPRESSION IS NOT WARRANTED ON PARTICULARITY OR OVERBREADTH GROUNDS

Sadr also argues that the search warrants are invalid because they lack the requisite particularity and are overbroad. *See* Dkt. No. 96 at 17–22. Ultimately, for the reasons stated below, the Court finds that neither of these arguments provide grounds for suppressing the search warrant evidence.

As discussed above, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A warrant, therefore, can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries." *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009).

The Fourth Amendment's particularity requirement targets "the specific evil [of] the 'general warrant' abhorred by the colonists," and is thus meant to prevent the "general, exploratory rummaging in a person's belongings" that such general warrants allowed. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). A sufficiently particular warrant is one that "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). Under Second Circuit law,

> [t]o be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements. First, "a warrant must identify the specific offense for which the police have established probable cause." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). Second, "a warrant must describe the place to be searched." *Id.* at 445–46. Finally, the "warrant must specify the items to be seized by their relation to designated crimes." *Id.* at 446 (internal quotation marks omitted).

*United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017). The Fourth Amendment "requires particularity in the warrant, not in the supporting documents," and, accordingly, "[t]he fact that the [warrant] *application* adequately described the 'things to be seized' does not save the *warrant*" from failure to satisfy the particularity requirement. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).[3]

In addition to these requirements, courts in this Circuit have identified certain "circumstance-specific considerations" that may bear on whether a given warrant lacks particularity, even if they do not constitute formal, universal requirements. *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 454 (S.D.N.Y. 2013). Many courts, for example, "have found warrants for the seizure of [business] records constitutionally deficient where they imposed too wide a time frame or failed to include one altogether." *Id.* (quoting *Cohan*, 628 F. Supp. 2d at

---

[3] Notably, the Government does not argue that the Court should consider the warrant affidavits in its particularity analysis, and the Court does not do so.

365–66 (citing "general agreement that a time frame is *relevant*" even if not necessarily "required")); *see also United States v. Levy*, 2013 WL 664712, at *11 n.7 (S.D.N.Y. Feb. 25, 2013) ("Several courts in this Circuit have recognized the constitutional questions that are raised by the lack of a specific date range in a warrant for documentary records and warned the Government to include one when possible."); *cf. United States v. Hernandez*, 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010) ("A failure to indicate a time frame could render a warrant constitutionally overbroad because it could allow the seizure of records dating back arbitrarily far and untethered to the scope of the affidavit which ostensibly provided probable cause." (internal quotation marks, citation, and alterations omitted)).

"[A] warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (alteration in original) (quoting *Galpin*, 720 F.3d at 446). Breadth and particularity are thus "related but distinct concepts." *Ulbricht*, 858 F.3d at 102. The two are related in that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause. However, they are distinct in that a broad warrant does not necessarily lack particularity: a "warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material," without necessarily "violating the particularity requirement." *Id.* "In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'" *Zemlyansky*, 945 F. Supp. 2d at 464 (quoting *Hernandez*, 2010 WL 26544, at *8).

## A. Particularity

The warrants are sufficiently particular because they identify the specific offenses for which the police established probable cause, describe the place to be searched, and specify the

items to be seized by their relation to designated crimes as required under Second Circuit law. *See Ulbricht*, 858 F.3d at 99. Indeed, they identify specific New York State Penal Law offenses—money laundering, offering a false instrument for filing, and falsifying business records—for which law enforcement established probable cause. *See, e.g.*, Dkt. No. 96-1 at 37; Dkt. No. 96-2 at 20. In addition, they describe the places to be searched—specific target email accounts. *See, e.g., id.* Finally, they specify that the items seized—including payment history, billing information, contacts, sent and received messages, saved or draft messages, attachments, IP log history, connection log data, account creation data, passwords, sign-on codes, and account numbers—should be those that tend to demonstrate commission of the aforementioned offenses, including evidence of involvement in money laundering, offering a false instrument for filing, and falsifying business records; an attempt or conspiracy to commit those crimes; involvement in the planning of, recruiting for, or commission of those crimes; communication with witnesses to and victims of those crimes; communication with third parties relating to witnesses to and victims of those crimes; and communication with third parties while using aliases or other identities. *See, e.g., id.*

Sadr, however, argues that the warrants at issue are lacking in particularity for three reasons.[4] First, he argues that the warrants functioned as general warrants because "identifying broad state law offenses in the warrants did not render them sufficiently particularized, [especially] where the scope of the authorized seizure was not linked to the probable cause

---

[4] Sadr also argues in his supplemental briefing that the executing agents' identification of allegedly irrelevant documents as responsive "confirms" the warrants' lack of particularity. *See* Dkt. No. 156 at 12–14. However, for reasons the Court explains below, to the extent there are any particularity problems with the warrants, they pertain only to their lack of temporal limitations. That some number of the fewer than 3,000 documents the Government ultimately seized from the over one million documents it reviewed may be irrelevant does not affect the Court's conclusion with respect to the *validity* of the warrants. Nonetheless, this argument is relevant to whether the *execution* of the warrants conformed with the Fourth Amendment, and thus the Court addresses it in more detail below.

showing for those offenses." Dkt. No. 156 at 4. Second, he argues that the warrants "were not limited to certain . . . email recipients/users, domains, subjects, or any other particularized places to look for evidence of the alleged offenses." Dkt. No. 96 at 19. Finally, he argues that the "lack of any temporal restrictions on the seizure and search also supports a finding of insufficient particularity." *Id.* at 20. For the reasons stated below, the Court finds that the warrants did not function as general warrants and need not have set out specific email recipients, domains, or subjects to comply with the Fourth Amendment. The Court need not decide whether the lack of any temporal limitations rendered the otherwise particular warrants insufficiently particular, because the agents acted in good-faith reliance on them.

### 1. Limitations by Crimes

Sadr concedes that the warrants here "state that evidence of three broad criminal violations may be found in the target email accounts," Dkt. No. 116 at 14, but argues that they nonetheless were insufficiently particular—and, in effect, functioned as general warrants—because the paragraphs authorizing seizure do not refer to these crimes. He cites only one case, *United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), for this argument. However, the warrant at issue in *Zemlyansky* is readily distinguishable from those at issue here. Indeed, in *Zemlyanksy*, the warrant only referenced the crimes for which the search was being undertaken in a *single* subsection of the *ninth* item enumerated in the warrant. *See id.* at 454. The court noted that at "no point prior to or during the enumeration of [the first] eight items does the warrant offer any indication of the relevant criminal allegations," and, as a result, "officers are thus directed to these categories without a single word of guidance regarding the type of criminal offense under investigation." *Id.* In light of the fact that reference to the suspected crimes was buried deep within the warrant in a sole subsection of the ninth item, the court concluded that the

warrant, "on any reasonable interpretation, [was] silent as to the federal criminal offenses for which evidence [was] sought." *Id.* at 457. *Zemlyanksy* is thus more akin to the line of cases finding warrants insufficiently particular where they completely "fail[] to reference the suspected crimes." *United States v. Wey*, 256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017); *see also George*, 975 F.2d at 75–76 (finding a warrant permitting search for evidence "relating to the commission of a crime" lacked particularity because "[n]othing on the face of the warrant tells the searching officer for what crime the search is being undertaken").

The warrants at issue here, however, neither completely fail to reference the suspected crimes nor bury them deep within the warrant. Rather, each warrant is only three pages long and references the suspected crimes within the first page, if not the first paragraph. *See* Dkt. No. 96-1 at 37; *id.* at 40; *id.* at 43; *id.* at 46; Dkt. No. 96-2 at 17; *id.* at 20; *id.* at 23. Indeed, each warrant notes, *prior* to the search and seizure authorization, that there is probable cause to believe that the target email accounts contain evidence of involvement in money laundering, offering a false instrument for filing, and falsifying business records. *See id.* Unlike in *Zemlyansky*, they "offer an[] indication of the relevant criminal allegations" up front and provide "guidance regarding the type of criminal offense[s] under investigation" prior to authorizing the search and seizure of any evidence. 945 F. Supp. 2d at 454.

The Court concludes that the fact that these brief warrants do not reference the suspected crimes within the paragraphs authorizing seizure does not render them insufficiently particular. "[T]here is no settled formula" in the Second Circuit "for determining whether a warrant lacks particularity," *id.* at 453; rather a warrant must be sufficiently specific "to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize," *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (alteration in original) (citation omitted). In

other words, a warrant is lacking in particularity if it "leave[s] to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990). In contrast to the warrants at issue in *Zemlyansky*, these warrants did not leave the decision as to what items may be seized to the unguided discretion of the executing officers, but rather informed them within the first page that the target email accounts were believed to contain evidence of certain specified crimes. Viewed as a whole, the failure of these search warrants to repeat the suspected crimes in the paragraphs authorizing seizure does not render them lacking in particularity. *See United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("A warrant need not . . . survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement.").

Sadr further argues that even if the warrants could be interpreted as limiting seizure to all evidence of the specified crimes—which, the Court concludes, they can—"identifying broad state law offenses . . . did not render them sufficiently particularized." Dkt. No. 156 at 4. However, nearly all the cases he cites to support this argument are over three decades old and do not involve electronic searches, the nature of which, as discussed below, affects the context-dependent particularity inquiry. *See United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987); *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990); *United States v. Leary*, 846 F.2d 592, 594 (10th Cir. 1988); *Rickert v. Sweeney*, 813 F.2d 907, 908 (8th Cir. 1987); *United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980); *United States v. Abrams*, 615 F.2d 541, 542 (1st Cir. 1980). These dated and largely out-of-circuit cases are accordingly of little value to the Court in deciding the issue now before it.[5]

---

[5] Moreover, the warrants in the two cases he cites that do involve electronic information were ultimately found to be lacking particularity because they failed to identify *any* specific suspected crimes and are thus inapposite. *See United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010); *Wey*, 256 F. Supp. 3d at 384.

Moreover, Sadr mischaracterizes the warrants, which are more particularized than he admits. Indeed, as discussed above, they include illustrative lists of the kinds of data sought, including payment history, sent and received emails, and IP log history, and specify that such data should show involvement in the suspected crimes, an attempt or conspiracy to commit such crimes, involvement in the planning of, recruiting for, or commission of those crimes, communication with witnesses to and victims of those crimes, and communication with related third parties. *See, e.g.*, Dkt. No. 96-1 at 37. In cases of more recent vintage, courts in this District have upheld similar warrants for email account data. *See, e.g., United States v. Dupree*, 781 F. Supp. 2d 115, 152 (E.D.N.Y. 2011) (upholding warrant for electronically stored information that "authorize[d] seizure of evidence of violations of 18 U.S.C. §§ 1341, 1343, 1344 and 1349, specifically '[a]ll documents relating to the conspirators', or any of their principals', employees', or agents' calendar, contact, or personal planner data or files including, but not limited to, data contained in Outlook, Lotus Notes, or Eureka, created or maintained by the user(s) of any computer located at the SUBJECT PREMISES'"); *see also, e.g., United States v. Mathieu*, 2018 WL 5869642, at *2 (S.D.N.Y. Nov. 9, 2018); *United States v. Patel*, 2017 WL 3394607, at *4 (S.D.N.Y. Aug. 8, 2017); *see also Lustyik*, 57 F. Supp. 3d at 227 (finding that "[t]he inclusion of an illustrative list of seizable items" brought the email warrants "within the Fourth Amendment's particularity parameters"). Indeed, where, as here, warrants call for the seizure of records relating to the suspected crime or crimes and include a list "providing examples of the items to be seized," they have been found to "offer[] sufficient guidance to law enforcement officers to pass constitutional muster." *Lustyik*, 57 F. Supp. 3d at 228; *see also Riley*, 906 F.2d at 843 (upholding a warrant calling for the seizure of "records of the distribution of cocaine . . . including but not limited to, bank records, brokerage house records, business

23

records, [and] safety deposit box keys or records"). The Court agrees with this precedent and its applicability here.

## 2. Additional Particularization Relating to the Scope of Search and Seizure

Sadr further argues that the warrants lack particularly because they authorize the executing agents to search the entireties of the target email accounts and seize "all email messages in the account" without placing any further limitations with respect to email recipients, domains, or subjects. Dkt. No. 96 at 19; *see also* Dkt. No. 156 at 6 (arguing that the warrants do not "particularize the evidence sought to specific categories of evidence . . . [and thus] the agents had unfettered discretion to seize the entirety of Sadr's email accounts").

As an initial matter, Sadr's objection to the seizure of the entireties of his email accounts misapprehends the case law related to electronic searches and seizures. Indeed, due to the unique challenges that electronic searches pose, "it is frequently the case with computers that the normal sequence of 'search' and then selective 'seizure' is turned on its head, as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time." *United States v. Vilar*, 2007 WL 1075041, at *35 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks and citation omitted); *see also* Fed. R. Crim. P. 41(e)(2)(B) ("A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."). This rationale applies with equal force to email accounts, and, based on this rationale, courts in this District have "upheld the Government's ability to obtain the entire contents of [an] email account to [later] determine which particular emails come within the search warrant." *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at*

*Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014); *see Patel*, 2017 WL 3394607, at *4; *see also United States v. Chalavoutis*, 2019 WL 6467722, at *4 (E.D.N.Y. Dec. 2, 2019) (finding that a "warrant command[ing] the email provider to turn over 'the contents of all emails associated with the account' . . . 'is consistent with the well-established law of this Circuit'" (citation omitted)). Thus, the Court concludes that the search warrants' authorization of the initial seizure of all email messages in the target accounts does not render them insufficiently particular.

Sadr's argument that the search warrants lack particularity because they fail to further limit the scope of the search and ultimate seizure to certain types or categories of evidence also fails for many of the same reasons already articulated above. As discussed above, district courts in this Circuit have found warrants that reference the suspected crimes and "provid[e] an illustrative, but not exhaustive, list of items to be seized," sufficiently particular. *See Lustyik*, 57 F. Supp. 3d at 228. Indeed, "[g]eneric terms," such as those employed here to describe the items to be seized, "may be used . . . so long as the warrant identifies a specific illegal activity to which the item [sought] related." *Patel*, 2017 WL 3394607, at *5. Thus, the Government's use of "generic, catch-all phrases in its [w]arrant[s] instead of the case-specific information it had at its disposal" to describe the information to be seized here is not fatal to these warrants, which are nonetheless "sufficiently specific to permit the rational exercise of judgment [by the executing officers]." *Dupree*, 781 F. Supp. 2d at 150 (alternation in original) (citation omitted).

Moreover, the type of evidence sought is relevant to the level of specificity the Fourth Amendment requires, *see id.* at 149, and courts typically tolerate less specificity where electronic documentary evidence is involved. *See United States v. DiScala*, 2018 WL 1187394, at *15 (E.D.N.Y. Mar. 6, 2018) ("A broad warrant does not necessarily lack particularity, especially

where electronic records are concerned."); *Dupree*, 781 F. Supp. 2d at 149. This is due to the

fact that "documentary evidence may be difficult to describe *ex ante* with the same particularity

as a murder weapon or stolen property," *Dupree*, 781 F. Supp. 2d at 149 (quoting *United States

v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009)), and, when electronic information is

involved, "there is no way for law enforcement or the courts to know in advance how a criminal

may label or code his computer files and/or documents which contain evidence of criminal

activities," *United States v. Graziano*, 558 F. Supp. 2d 304, 315 (E.D.N.Y. 2008). Accordingly,

the Court concludes that the email warrants at issue were not lacking in particularity on the

ground that they failed to "particularize the evidence sought to specific categories of evidence."

### 3. Temporal Limitations

Sadr finally argues that the warrants' "lack of any temporal restrictions on the seizure and

search . . . supports a finding of insufficient particularity." Dkt. No. 96 at 20. While a temporal

limitation is "*one indicia* of particularity," *United States v. Triumph Capital Grp., Inc.*, 211

F.R.D. 31, 58 (D. Conn. 2002) (emphasis added), courts in this Circuit have recognized that

"[t]he complexity and duration of the alleged criminal activities" may "render a time frame less

significant than in a case that required a search for a small set of discrete items related to one or

only a few dates," *see, e.g., Hernandez*, 2010 WL 26544, at *11. On the other hand, at least one

court in this Circuit has observed that "a warrant's failure to include a temporal limitation on the

things to be seized" alone "may, in certain circumstances, render a warrant insufficiently

particular." *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014). The Court need

not decide whether the lack of temporal limitations renders the otherwise sufficiently particular

warrants at issue here insufficiently particular, because, as discussed below, *see infra* Section

III.C, the executing agents acted in good-faith reliance on them. *See United States v. Ganias*,

824 F.3d 199, 209 (2d Cir. 2016) (en banc) ("Because we conclude that the agents acted in good faith, we need not decide whether a Fourth Amendment violation occurred.").

## B. Overbreadth

A warrant "is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *Lustyik*, 57 F. Supp. 3d at 228 (alteration in original) (quoting *Galpin*, 720 F.3d at 446). In this case, the warrant affidavits established probable cause for New York state crimes, *see supra* Section II.B, and the warrants limit the descriptions of the information to be seized to evidence of those crimes, *see supra* Section III.A.

Nonetheless, the warrants' failure to include temporal limitations implicates overbreadth as well as particularity concerns. As courts in this District have recognized, a "failure to indicate a time frame could render a warrant constitutionally overbroad because it could 'allow[ ] the seizure of records dating back arbitrarily far' and untethered to the scope of the affidavit which ostensibly provided probable cause." *Hernandez*, 2010 WL 26544, at *9 (alteration in original) (quoting *Cohan*, 628 F. Supp. 2d at 365). However, as above, the Court need not definitively decide whether the lack of temporal limitations renders the warrants unconstitutionally overbroad, because the Court concludes below, *see infra* Section III.C, that the executing agents acted in good-faith reliance on them. *See Ganias*, 824 F.3d at 209.

Sadr's other overbreadth arguments are completely without merit. He first argues that the warrant affidavits offered no reason to believe that evidence of the suspected crimes would be found within the specific target email accounts. Dkt. No. 96 at 18–19. However, contrary to his arguments, "the affidavits for search of a device or account do not have to provide specific evidence that every category of evidence sought will be present in that device or account, but can rely on the affiant['s] training, experience, and the totality of the circumstances to support a

'common-sense' probability that the evidence may be found there sufficient for probable cause."
*See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306 (S.D.N.Y. 2018).

In this case, the affiant's training, experience, and the totality of the circumstances clearly supported a "common-sense" probability that evidence may be found in the specific target email accounts sufficient to establish probable cause to search them. For example, the April 2014 affidavit supporting the warrant applications specifically notes that "email is a preferred means of communication" within the Venezuelan state-owned energy company from which entities owned by Sadr and his family allegedly received payments for the construction of low-income housing. Dkt. No. 96-1 ¶ 7. It further notes that "personal emails are frequently used to transmit messages and documents amongst individuals involved in . . . projects" with the state-owned energy company. *Id.* The affidavit also alleges that Sadr was the director of Clarity Trade and Finance S.A. and that money owed to the Iranian International Housing Corporation was remitted from the Venezuelan state-owned energy company, processed by New York banks, and received by Clarity's Swiss bank account. *Id.* ¶¶ 15–17, 27, 32. As discussed above, these and other allegations were sufficient to establish probable cause that crimes were committed under New York State law in an attempt to evade Iranian sanctions and further suggest a common-sense probability that evidence of these crimes may be found in Sadr's email accounts. *See United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (noting that the nexus between the evidence sought and the location to be searched "may be based on 'reasonable inference' from the facts presented based on common sense and experience" (citation omitted)).

Sadr's second overbreadth argument—that the warrants are overbroad because they fail to identify the sanctions laws allegedly violated—is likewise unavailing. Dkt. No. 96 at 20. In support of this argument, he cites *United States v. Cioffi* for the proposition that "[r]eferences to

28

broad statutes realistically constitute no limitation at all on the scope of an otherwise overbroad warrant." 668 F. Supp. 2d at 392 (citation omitted). However, that quote is merely a reformulation of the particularity principle, discussed above, that warrants must confine searches to evidence of particular crimes. Because the warrants here confine any search to evidence of the particular crimes— money laundering, offering a false instrument for filing, and falsifying business records—for which the warrant affidavits established probable cause, it is irrelevant to the overbreadth inquiry that they did not also specifically identify the sanctions laws alleged to have been violated but that did not form the basis of an independent showing of probable cause.

### C.  Good-Faith Exception

As discussed above, Sadr argues that the lack of temporal limitations renders the warrants invalid. Even if the Court were to agree, such a conclusion would not compel suppression of search warrant evidence. "A violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *Rosa*, 626 F.3d at 64. Indeed, the exclusionary rule is not a "personal constitutional right of the party aggrieved," *United States v. Calandra*, 414 U.S. 338, 348 (1974), but rather is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect,'" *Herring v. United States*, 555 U.S. 135, 139–40 (2009) (quoting *Calandra*, 414 U.S. at 348). Thus, in order for the exclusionary rule to apply, "the benefits of deterrence" must "outweigh" the often "substantial social costs" of "letting guilty and possibly dangerous defendants go free." *Id.* at 141 (citations omitted).

These principles are reflected in the good-faith exception to the exclusionary rule, which allows the Government to "introduce evidence obtained in violation of the Fourth Amendment unless the 'police conduct [was] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Zemlyansky*, 945 F. Supp. 2d at 465 (alteration in original) (quoting *Herring*, 555 U.S. at 144).

The deterrence benefits of exclusion will naturally "vary with the culpability of the law enforcement conduct at issue," *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 162 (2d Cir. 2019) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)):

> "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Conversely, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force."

*Id.* (citations omitted). "The pertinent analysis of deterrence and culpability is objective and [the Court's] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Rosa*, 626 F.3d at 64 (internal quotation marks and citation omitted).

Thus, as a general matter, the good-faith exception applies "when the government acts in 'objectively reasonable reliance on a subsequently invalidated search warrant.'" *In re 650 Fifth Ave.*, 934 F.3d at 162 (quoting *Leon*, 468 U.S. at 922). However, this is not so "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Id.* (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).

The good-faith exception applies here because, even assuming the search warrants are invalid, the Government acted in objectively reasonable reliance on them, and none of the four above-noted exceptions to this exception apply here. Indeed, the Court has already considered and rejected arguments that the issuing judge was knowingly misled, *see* Section II.A, and that the warrant applications were lacking in probable cause, *see* Section II.B. Moreover, Sadr does not even suggest that Justice Obus, a justice of the New York County Supreme Court who had no

prior involvement in the investigation of this case, wholly abandoned his judicial role in granting the search warrant applications.

The only remaining exception to the application of the good-faith exception likewise does not apply because—even assuming the lack of temporal limitations renders them invalid—the warrants are not so facially deficient that reliance on them was unreasonable. The standard of reasonableness in the context of suppression mirrors that in the context of qualified immunity. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 n.1 ("[T]he same standard of objective reasonableness that [applies] in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer who obtained or relied on an allegedly invalid warrant." (internal quotation marks and citations omitted)). Thus, "where denial of qualified immunity would be appropriate in the civil context because clearly established law establishes a warrant's invalidity, so too must a court conclude that an officer's conduct was objectively unreasonable for purposes of the good faith inquiry." *Zemlyansky*, 945 F. Supp. 2d at 472. Conversely, where there is no clearly established law establishing a warrant's invalidity, reliance on it cannot be said to be objectively unreasonable for purposes of the good-faith inquiry.

Because there is no consensus in this Circuit as to when temporal limitations are required, *Jacobson*, 4 F. Supp. 3d at 526—or when the lack thereof alone may invalidate an otherwise valid search warrant—the Court cannot here say that "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also Levy*, 2013 WL 664712, at *11 ("For overbreadth and particularity purposes, no controlling authority requires a specific time frame. In these circumstances, it cannot be said that executing officers should have realized a lack of date limitation constituted a facial deficiency in the Search Warrant such that reliance on it would be unreasonable."); *Cohan*, 628

31

F. Supp. 2d at 367 (finding the good-faith exception applied under similar circumstances because "the Second Circuit has never addressed when, if at all, time-frames are a constitutional requirement in business-record search warrants, and district courts in this circuit have not converged upon a clear rule"). Thus, the Court concludes that, under these circumstances, the warrants were not so facially deficient that reliance upon them was unreasonable, and the good-faith exception applies. Accordingly, even were the Court to find the warrants constitutionally deficient—on particularity or overbreadth grounds—due to their lack of temporal limitations, suppression of search warrant evidence would be unwarranted.

## IV.   CHALLENGES TO THE EXECUTION OF THE SEARCH WARRANTS

Sadr also argues that the search warrant evidence should be suppressed because the *execution* of the search warrants violated the Fourth Amendment. Specifically, he argues that the responsiveness review the D.A. undertook was unreasonable, and thus unconstitutional, and that the D.A. continued to search the entire set of data long after the responsiveness review was completed in April 2017. Dkt. No. 147 at 11–16; Dkt. No. 156 at 6–12. The Government concedes that "some aspects" of the D.A.'s handling of the entire set of data after April 2017 "were problematic." Dkt. No. 155 at 17. For the reasons stated below, the Court finds that the responsiveness review was reasonable but agrees with Sadr that the D.A.'s handling of the entire set of data after April 2017 was not only problematic but unconstitutional. It concludes that the remedy for this Fourth Amendment violation is, at a minimum, suppression of the 429 pages of the 417 documents that were seized *after* the conclusion of the responsiveness review.

"The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted); *see also Graziano*, 558 F. Supp. 2d at 316 ("[U]nder the Fourth

Amendment, the manner of the execution of the warrant in searching the computer also will be subject to judicial review under a 'reasonableness' standard.").

"A search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). "[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items." *Id.* The "retention of items outside the scope of the warrant can be justified only if the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement." *Lustyik*, 57 F. Supp. 3d at 230 (citation omitted); *see also Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 590 (S.D.N.Y. 2015) ("Seizure of items outside the scope of a search warrant is unconstitutional, absent an exception to the Fourth Amendment's warrant requirement").

"[T]he drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted in 'flagrant disregard' of the warrant's terms." *Matias*, 836 F.2d at 747. "Executing agents are considered to have 'flagrantly disregarded' the warrant's terms where '(1) they effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in good faith.'" *Pinto-Thomaz*, 352 F. Supp. 3d at 309 (quoting *Shi Yan Liu*, 239 F.3d at 140). The "extreme remedy of blanket suppression should only be imposed in the most extraordinary of cases." *Id.*

## A.    Responsiveness Review

Under Federal Rule of Criminal Procedure 41(e)(2)(B), a warrant may—as the warrants at issue here did—"authorize the seizure of electronic storage media or the seizure or copying of electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). The Rule further provides that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." *Id.* The objective of such a responsiveness review is "to determine

whether the evidence that the government seized . . . fell within the scope of the categories of information sought in the search warrants." *United States v. Metter*, 860 F. Supp. 2d 205, 214–15 (E.D.N.Y. 2012); *see also* Fed. R. Civ. P. 41 Advisory Committee's Note (2009) ("[Rule 41] acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.").

Sadr argues that the responsiveness review the D.A. conducted to determine what documents fell within the scope of the search warrants—and thus were properly seized—was unreasonable for three reasons. Specifically, he argues that the D.A. did not use a comprehensive set of search terms in its search and never sorted returns into responsive and non-responsive sets, walling itself off from the latter documents, but rather maintained *all* documents in one continuously-updating database and continued to search all returns over the course of at least three years. Dkt. No. 156 at 10–11. He also argues that the review—and thus the execution of the search warrants—was not performed in a reasonable amount of time. *Id.* Finally, he argues that the seizure of irrelevant documents "confirms that the search warrants imposed no limits." *Id.* at 12–14.

### 1. Search Terms and Sorting

With respect to the methodology the D.A. employed in conducting its responsiveness review, the Court finds that though the practices Sadr suggests may have been preferable, the D.A.'s failure to follow them did not render the review unreasonable under the circumstances. The Government asserts that the review was conducted by D.A. employees who in many instances were quite familiar with the investigation; these reviewers met and discussed the review of the search warrant returns, including the use of certain search terms, on several occasions; and documents tagged as responsive were typically segregated into responsiveness

folders organized by subject matter. *See* Dkt. No. 155 at 19–21. Though it may have been more desirable for the reviewers to have agreed upon a comprehensive set of search terms and consistently removed documents tagged as responsive from the review population over the course of the review, the review methodology was nonetheless reasonable under the circumstances. Indeed, at least one other court in this District has concluded under similar circumstances that the Government's failure to use a search protocol or segregate evidence within the scope of a warrant from evidence outside the scope of a warrant does not violate the Fourth Amendment, because "no authorities hold[] that the Fourth Amendment requires anything along those lines for electronic evidence." *United States v. Lumiere*, 2016 WL 7188149, at *4 (S.D.N.Y. Nov. 29, 2016) (finding an electronic search reasonable where no formal document review protocol was followed, documents were not marked "responsive" and "not responsive," responsive documents were not segregated from non-responsive documents, and the "findings" of the search were not "memorialized"). The Court agrees with this authority and concludes that the Fourth Amendment does not require the practices Sadr argues the D.A. should have employed in its responsiveness review.

### 2. Duration of Review

As both parties recognize, the review must also have been completed in a reasonable amount of time to comply with the Fourth Amendment and Rule 41's requirements governing the execution of search warrants. *See Metter*, 860 F. Supp. 2d at 215 (collecting cases) ("[T]here is no established upper limit as to when the government must review seized electronic data to determine whether the evidence falls within the scope of a warrant," but courts have recognized that "the Fourth Amendment requires the government to complete its review, *i.e.*, execute the warrant, within a 'reasonable' period of time."); *see also United States v. Alston*, 2016 WL

2609521, at *3 (S.D.N.Y. Apr. 29, 2016) ("[T]he time needed to complete off-site copying or review is subject to the rule of reasonableness.").

The Court concludes that the duration of the responsiveness review was reasonable under the circumstances. The responsiveness review in this case concluded around April 2017, roughly three years after issuance of the first search warrant in April 2014 and only one year after issuance of the last warrant in 2016. *See* Dkt. No. 155 at 4. In total, the search warrant returns comprised over one million documents in at least three different languages, *id.* at 18, and the D.A. toggled between review platforms throughout the duration of the review in an attempt to more efficiently process this large volume of documents, *id.* at 4. As the Advisory Committee's Note to Rule 41 explains, "the practical reality is that there is no basis for a 'one size fits all' presumptive period [for the time in which a review must take place]. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs." Fed. R. Crim. P. 41 Advisory Committee's Note (2009). Given the volume of documents, the various obstacles to review, and the resource constraints under which the D.A. was operating, the Court concludes that the three years it took the D.A. to complete the search was reasonable under the circumstances.

### 3. Seizure of Irrelevant Documents

Sadr further argues that the fact that allegedly irrelevant documents were marked responsive "confirms that the search warrants imposed no limits." Dkt. No. 156 at 12–14. As discussed above, though he frames this argument as supporting the invalidity of the warrants themselves due to a lack of particularity, the argument actually bears on whether the search warrants were executed in a reasonable manner. Indeed, Sadr admitted as much at the November 25, 2019 oral argument on this motion. *See* Dkt. No. 173 at 46:25–47:6.

The Court considers the entirety of the universe of documents deemed responsive in determining whether the responsiveness review was conducted reasonably. In doing so, it does not find the allegedly irrelevant documents Sadr cites as compelling the conclusion that the review was unreasonable. The fact that the Government ultimately tagged as responsive fewer than 3,000 documents from a review population of over one million documents indicates that the review was reasonable, and the reviewers were careful to cull from the review population only those documents that fell within the scope of the warrants. *See* Dkt. No. 155 at 21. Indeed, the relatively small number of documents the Government ultimately seized stands in marked contrast to the seizure at issue in *Wey*—which Sadr cites in support of his "overseizure" argument, Dkt. No. 156 at 12–14—in which the Government seized more than 100,000 electronic documents. *Wey*, 256 F. Supp. 3d at 404. That some much smaller number of the 3,000 documents the Government seized may be irrelevant is not, on its own, sufficient to establish that the responsiveness review was unreasonable.

## B.     Subsequent Searches

Though the Court finds that the responsiveness review was conducted reasonably and thus within the confines of the Fourth Amendment until its completion in April 2017, searches conducted subsequent to the completion of the responsiveness review violated the Fourth Amendment. As an initial matter, Sadr's motion to suppress evidence from subsequent searches is moot with respect to all but the 2,978 pages of the 417 documents that the Government represents it will rely on at trial. *See Mathieu*, 2018 WL 5869642, at *1 (finding that "[d]efendant's motion to suppress is moot as to drmathieu@hotmail.com because the Government does not intend to use information produced from this account at trial"). For the reasons stated below, the Court concludes that 429 of these 2,978 pages must be suppressed because their seizure was in violation of the Fourth Amendment. The Court reserves judgment

with respect to the additional 449 pages that constitute the so-called non-Sadr documents and grand jury subpoena returns.

At the conclusion of its responsiveness review in April 2017, the D.A. had identified all of the documents from the entire data set properly seized under the warrants, and the execution of those warrants was thus complete. *See* Dkt. No. 168 at 2 ("[The D.A.'s] review pursuant to the warrants was completed by April 2017."). Documents not identified as responsive at the conclusion of this review "f[e]ll with[out] the scope of the warrant[s]" and thus were not seized pursuant to them. *See* Fed. R. Civ. P. 41 Advisory Committee's Note (2009). Nonetheless, the Government represents that on at least two separate occasions after the conclusion of the responsiveness review, the D.A. conducted searches of the entire set of data. *See* Dkt. No. 155 at 8–10 (describing searches of the entire set of data from April 2017 to March 2018 and in May 2018); *see also* Dkt. No. 168 at 2 ("At times between April 2017 and when the Government produced discovery in May 2018, [D.A.] paralegals were instructed to query the data obtained by [the D.A.] from providers pursuant to the search warrants to retrieve complete versions of documents that previously had been identified for seizure pursuant to the warrants, or to query the database to retrieve documents that members of the [D.A.] team had previously identified for seizure but had not yet segregated. The [D.A.] team also conducted some limited, new searches in the database, including to retrieve documents responsive to Sadr's bail motion."). Because these searches were conducted following the conclusion of the responsiveness review—and thus the execution of the warrants—they exceeded the scope of the warrants' authority. Accordingly, documents first identified as responsive during these searches were seized outside the scope of the search warrants.

Because documents seized following the conclusion of the responsiveness review were seized outside the scope of the search warrants, they are subject to suppression unless "the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement." *Lustyik*, 57 F. Supp. 3d at 230 (citation omitted). The Government has not identified any exception that would justify the retention of documents seized after the conclusion of the responsiveness review, and the Court is aware of none. Accordingly, the proper remedy is suppression.

The Court concludes that 429 pages of the 2,978 the Government intends to rely on at trial were first identified as responsive after the conclusion of the responsiveness review and thus must be suppressed. *See* Dkt. No. 155 at 8–10; *see also* Dkt. No. 168 at 2. Though other portions of these documents or related documents *were* identified as responsive at the conclusion of the responsiveness review, the Government concedes that these 429 pages "were [not] identified for seizure by April 2017 in connection with reasonable searches conducted pursuant to the warrants." Dkt. No. 168 at 5. These pages include attachments for which the parent email or a related parent email was identified by April 2017 (Government categories 5 and 6); pages for which a related version or related version and attachment were identified by April 2017 (Government categories 7 and 8); a parent email for which the attachment was identified by April 2017 (Government category 9); and other portions of documents identified by April 2017 (Government category 10).[6]

The Government's argument that it is nonetheless entitled to rely on these documents is unavailing. It cites to *Lumiere* for the proposition that responsive, identified evidence need not be segregated from documents outside the scope of the warrant during the responsiveness

---

[6] The category numbers the Court references correspond to those used by the Government in its December 9, 2019 letter. *See generally* Dkt. No. 168.

review. *See Lumiere*, 2016 WL 7188149, at *4–5. However, the issue here is not one of segregation of documents within the scope of the warrants from those without but rather one of whether these pages were identified as falling within the scope of the warrants during the responsiveness review to begin with. Because the Government cannot demonstrate that these 429 individual pages were identified as responsive at the conclusion of the responsiveness review, their subsequent identification exceeded the scope of the warrants and they must be suppressed.

The Government may rely on 2,100 of the 2,978 pages it represents it intends to rely on at trial. *See* Dkt. No. 168 at 1. These pages include those located in binders provided by the D.A. to the U.S. Attorney's Office in April 2017 (Government category 1); those with a PDF modified date of April 2017 or earlier (Government category 2); those with a print date of April 2017 or earlier (Government category 3); those identical to content identified by April 2017 (Government category 4); and those referenced in documents created by April 2017 but not specifically segregated by that time (Government category 11). Pages in categories 1, 2, and 3 were clearly seized during the responsiveness review. Furthermore, there is no basis to suppress pages in category 4, as they are identical to content seized during the responsiveness review. Though the pages comprising category 11 may not have been *segregated* from the non-responsive documents by the conclusion of the responsiveness review, the Government's analysis demonstrates that they were identified as responsive—and thus seized—by that time. Indeed, they were included in work product that was created prior to April 2017 "based on their evidentiary value in the ongoing investigation." Dkt. No. 168 at 4; *see also Lumiere*, 2016 WL 7188149, at *4 (rejecting defendant's argument "that the Government violated the Fourth Amendment by failing to 'segregate' evidence within the scope of the warrant from evidence

outside the scope of the warrant"). In this way, these pages are distinct from the 429 pages subject to suppression, which were neither seized *nor* segregated by the conclusion of the responsiveness review.

The Court reserves judgment with respect to the final two categories of pages—Government category 12, pages from the so-called non-Sadr documents, and Government category 13, pages from grand jury subpoena returns. The Government argues that Sadr does not have standing to seek the suppression of non-Sadr documents, but Sadr disagrees, at least with respect to email accounts that belonged to his companies. *Compare* Dkt. No. 168 at 5 ("[An] additional 449 pages are not subject to challenge by Sadr because they are confirmed Non-Sadr documents (440 pages) . . . .") *with* Dkt. No. 176 at 2–3 (arguing that Sadr has Fourth Amendment standing with respect to email accounts that belonged to single-member LLCs of which he was the sole owner). The Government also argues that Sadr does not have standing to seek the suppression of grand jury subpoena returns because they "were obtained pursuant to a grand jury subpoena rather than a search warrant." Dkt. No. 168 at 4. However, a grand jury subpoena may constitute a search, *see United States v. Meregildo*, 876 F. Supp. 2d 445, 450 (S.D.N.Y. 2012), and Sadr implies that the grand jury subpoena returns here are the product of a potentially unconstitutional Fourth Amendment search. *See* Dkt. No. 175 at 2 (requesting a suppression hearing to determine which pages of the grand jury subpoena returns were actually seized by April 2017). In the absence of the parties resolving their disputes with respect to these categories of pages, the Court requires further briefing on them. Accordingly, the parties shall meet and confer and propose an expedited briefing schedule, if necessary, within seven days of the date of this Opinion and Order.

In sum, the Court suppresses 429 pages of the 2,978 the Government intends to rely on at trial. The Government may rely at trial on the 2,100 pages identified above,[7] and the Court reserves judgment with respect to the remaining 449 pages. With respect to the categories of pages the Court is able to rule on at this juncture, the Court concludes that it need not hold an evidentiary hearing and decides Sadr's suppression motion on the papers. *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) ("[A]n evidentiary hearing on a motion to suppress ordinarily is [not] required [unless] 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" (citation omitted)).

## V. MOTION FOR RETURN OF PROPERTY

At the November 25, 2019 oral argument on this motion, the Government consented to the return of the non-responsive documents, *see* Dkt. No. 173 at 61:17–23, and on December 9, 2019, Sadr submitted a proposed order for their return with which the Government agreed as to form. *See* Dkt. No. 165; Dkt. No. 165-1. Subsequent to his submission of this proposed order, however, the Government submitted a letter objecting to the proposed order's inclusion of two email accounts "that do not belong to" Sadr. *See* Dkt. No. 171 at 1. This dispute also centers on Sadr's standing to seek the suppression of some subset of so-called non-Sadr documents. Accordingly, to the extent the parties are unable to resolve this dispute on their own, they shall

---

[7] Contrary to Sadr's contentions, there is no basis for blanket suppression of any documents seized *prior* to the conclusion of the responsiveness review. The 2,100 pages identified above were properly seized during the course of a reasonable responsiveness review, and blanket seizure is not justified in this case. Indeed, "the drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." *Matias*, 836 F.2d at 747. As discussed above, there is scant evidence that the D.A. "effect[ed] a *widespread* seizure of items that were not within the scope of the warrant" and no evidence that it "d[id] not act in good faith." *Pinto-Thomaz*, 352 F. Supp. 3d at 309 (emphasis added) (quoting *Shi Yan Liu*, 239 F.3d at 140). The record is thus devoid of any suggestion that this is one of "the most extraordinary of cases" in which the "extreme remedy of blanket suppression should . . . be imposed." *Id.*

42

brief it in conjunction with the supplemental suppression briefing discussed above, and the Court will resolve this issue in due course upon receiving the parties' supplemental briefing. If the parties are able to resolve this dispute on their own, they shall submit a revised proposed order for the return of property within seven days of the date of this Opinion and Order.

## VI. MOTION TO EXCLUDE

In light of the Government's representation that it will not rely on the 622 untimely produced non-Sadr documents at trial, Sadr's motion to exclude those documents is moot.

## VII. CONCLUSION

For the foregoing reasons, the Court GRANTS in part, DENIES in part, and RESERVES JUDGMENT in part on Sadr's motion to suppress search warrant evidence, DENIES his corollary requests for a *Franks* hearing, RESERVES JUDGMENT on his return of property motion, and DENIES as moot his motion to exclude.

Within seven days of the date of this Opinion and Order, the parties shall either submit an expedited briefing schedule for supplemental briefing or inform the Court that no such briefing is necessary and submit a proposed order for the return of property. Should a briefing schedule be necessary, within fourteen days of the date of this Opinion and Order, the Government shall provide the Court with a page-by-page analysis of when each page of the subset of so-called non-Sadr documents that Sadr claims he has Fourth Amendment standing to seek the suppression of was first identified as responsive. It shall do the same with respect to each page of the grand jury subpoena return documents if Sadr also continues to seek their suppression.

This resolves Docket Nos. 95, 97 and 148.

SO ORDERED.

Dated: January ___, 2020
       New York, New York

_____
ALISON J. NATHAN
United States District Judge