Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

March 4, 2020

<u>By ECF</u>

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

   Re: *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

  On behalf of Defendant Ali Sadr Hashemi Nejad, we write to respond to the government's objections to the admissibility of documents for Ted Kim's cross-examination tomorrow.

  To avoid duplication of analysis, we address the exhibits out of the numerical sequence followed in the government's objections letter.

  **Defense Exhibit 1347**  is a joint fact sheet authored by the U.S. Department of the Treasury, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of the Comptroller of the Currency, titled: "U.S. Department of the Treasury and Federal Banking Agencies Joint Fact Sheet on Foreign Correspondent Banking:  Approach to BSA/AML and OFAC Sanctions Supervision and Enforcement."  "This fact sheet summarizes key aspects of federal supervisory and enforcement strategy and practices in the area of correspondent banking," *id.* at 1, including those related to enforcement of "sanctions programs administered by the Treasury Department's Office of Foreign Assets Control (OFAC)," as well as those relating to national anti-money laundering (AML) and countering the financing of terrorism requirements (CFT) set out in the Bank Secrecy Act (BSA).  *Id.*

  Treasury's and the Federal Banking Agencies' (FBAs') joint fact sheet describes facts, policies and practices regarding "Federal Banking Agencies' Expectations for U.S. Depository Institutions," "FBAs' Supervisory Examination Processes," "FBA Enforcement Actions," "FinCEN['s] and OFAC['s]" enforcement of the sanctions and AML regimes, and "Recent Large FBA, FinCEN, and OFAC Enforcement Penalties."  *Id.* at 2-4.  This four-page fact sheet is admissible in its entirety as a statement of the United States and the authoring federal agencies

**Steptoe**

The Honorable Alison J. Nathan
March 3, 2020
Page 2

(including the Treasury Department, the parent of OFAC) under Federal Rule of Evidence 801(d)(2).[1]

"[C]ourts have ... stated on more than one occasion that reports or writings published by a governmental agency constitute admissions of the government under Fed. R. Evid. 801(d)(2)(D)." *Penguin Books U.S.A. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 261 (S.D.N.Y. 2003) (*citing United States v. Van Griffin*, 874 F.2d 634, 638 (9th Cir. 1989) (admitting as a party admission under Fed. R. Evid. 802(d)(2)9D) a manual published by the government.).  The report may be admitted even though it originated from a separate agency.  For instance, in *United States v. Connolly*, No. S1 16 Cr. 370 (CM), 2018 WL 2411760 (S.D.N.Y. May 15, 2018), a bank fraud prosecution, the court allowed the defense to admit statements "by another agency of the United States (the FDIC) that are relevant to positions taken by the Government in this matter." *Id.* at *13.  They were admissible as party admissions by the United States, notwithstanding that the FDIC is a different agency by the Department of Justice.  "While the FDIC and the Department of Justice are separate agencies, the fact that [the FDIC] reached conclusions that may not accord with those of the Department of Justice could prove highly relevant." *Id.*

The government's objections that this document was published after the charged conduct, and is claimed to be outside the scope of Mr. Kim's direct testimony, is no basis for exclusion.  The document is not offered for bearing directly on specific transactions at specific times, but rather to rebut Mr. Kim's testimony regarding OFAC's enforcement against U.S. intermediary banks.  Mr. Kim testified that "U.S. sanctions regulations are enforced under the principle of strict liability," Tr. 501, and that banks could face monetary penalties of up to $250,000 per transaction or twice the value of the transaction—penalties that could range into the tens or hundreds of millions of dollars.  Tr. 508-09.

Sadr is entitled to challenge this testimony on cross examination, by introducing an official statement by the U.S. Treasury Department—OFAC's parent—concerning the precise topic of OFAC's enforcement of these sanctions, including the manner and frequency by which OFAC enforces, the standards that lead to such enforcement--including whether in fact it is strict liability, as Mr. Kim testified, or is imposed only for sustained violations where bank management knew of violations or ignored repeated warnings, after warnings or more

---

[1] Such an official pronouncement satisfies all four of prongs 801(d)(2)(A) through (D): (A) statements of the party; (B) statements the party has adopted; (C) statements the party authorized; and (D) statements by the party's agent or employee (who issued the statement).  Because the admissibility of party statements are based principally on the adversary system rather than hearsay considerations, "[n]o guarantee of trustworthiness is required." Rule 801, adv. comm. notes, 1972 Proposed Rules, Note to subdivision (d)(2).  The rule "calls for generous treatment of this avenue of admissibility," free "from technical demands of searching for an assurance of tru[st]worthiness in some against-interest circumstance, [or] from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge." *Id.*

incremental enforcement resulting from supervisory banking examinations, DX 1347 at 2-3. Sadr is also entitled to challenge Mr. Kim's testimony about the likelihood and amount of monetary penalties in light of the Treasury Department's statements that over 95 percent of OFAC's sanctions violations "are closed with administrative measures," meaning "less than five percent of all cases of sanctions-related violations investigated by OFAC have resulted in a civil monetary penalty or other public enforcement response." Indeed, the Treasury Department stated, "[i]t is important to note that the largest and most prominent monetary penalties for [anti-money laundering] and sanctions violations in recent years generally involved a sustained pattern of serious violations on the part of [banks] ... [and] did not involve unintentional mistakes, but generally involved intentional evasion of U.S. sanctions over a period of years and/or the failure of the institutions' officers and/or senior management to respond to warning signs that their actions were illegal." *Id.* at 4.

This is square rebuttal of Mr. Kim's testimony on direct, on an issue that this Court has repeatedly recognized is central to the government's assertion of the right-to-control theory of bank fraud. *See, e.g.*, Dkt. No. 164, at 30 (noting "a question of fact to be resolved at trial" is "how and to what etent the alleged scheme did or would have harmed the banks," through the risk of "regulatory investigations, fines, and civil penalties"). Exclusion would deny Sadr his constitutional right to Confront Mr. Kim's testimony against him. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (Confrontation Clause entitles defendant to "delve into the witness' story" "to impeach, i.e., discredit" him). Excluding official statements of the Treasury Department that do not square with the OFAC representative's testimony would "keep[] from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *United States v. Treacy*, 639 F.3d 32, 44 (2d Cir. 2011) (quoting *United States v. Pedroza*, 750 F.2d 187, 196 (2d Cir. 1984), and *Gordon v. United States*, 344 U.S. 414, 423 (1953)).

Alternatively, the Treasury Department/Federal Banking Agencies' fact sheet may be admissible as a public record that sets out those agencies' activities, Fed. R. Evid 803(8), or it may be used as a reliable authority for cross-examination of Mr. Kim as an expert, under Fed. R. Evid. 803(18). Because the fact sheet is an official pronouncement of the Treasury Department—the parent of OFAC, charged with the promulgation and enforcement of the sanctions, which has worked closely with the prosecution team in this criminal action to enforce the sanctions, *see* DX 1347, at 3, 4—it is admissible in its entirety as an admission of the Treasury Department, OFAC, and the United States under Rule 801(d)(2). In addition, Mr. Kim's testimony regarding strict-liability enforcement and the possibility of multi-million-dollar monetary penalties opened the door to this Treasury Department statement.

**Defense Exhibits 0121 and 1352:** These exhibits are versions of OFAC's "FAQ 116," issued on its website as public guidance. (DX 1352, dated 02-24-09, was in effect at the time of the charged wire transfers; DX 121, dated 01-15-2015, is the current version.) These public FAQ statements by OFAC address OFAC's view of the obligations of U.S. intermediary banks, and state in relevant part that where the U.S. bank "(1) is operating solely as an intermediary, (2) does not have any direct relationship with the [suspect or blocked] entity (e.g., the entity is a non-account party), and (3) does not know or have reason to know the entity's ownership or

**Steptoe**

other information demonstrating the blocked status ...," then "notwithstanding the blocked status of the wire transfer, *OFAC would not expect the bank to research the non-account parties listed in the wire transfer that do not appear on the SDN List and, accordingly, would not pursue an enforcement action against the bank for having processed such a transaction.*" DX 121 and DX 1352, second paragraph (emphasis added).

The exhibits further state that OFAC will hold banks responsible for processing blocked wire transfers if the bank "currently has information in its possession leading the bank to know or have reason to know that a particular individual or entity involved with or referenced in the wire transfer is subject to blocking," and that "OFAC expects banks to conduct due diligence on their own direct customers." *Id.* (third and fourth paragraphs). For "other types of transactions where a bank is acting solely as an intermediary and fails to block transactions involving a sanctions target, OFAC will consider the totality of the circumstances ... to determine what, if any enforcement action to take against the bank." *Id.* (fourth paragraph).

These official statements by OFAC are admissible to rebut Mr. Kim's testimony that OFAC engages in strict-liability enforcement, Tr. 501, and can impose multi-million dolar monetary penalties, Tr. 508-09. They are official statements by the agency on whose behalf Mr. Kim is testifying—an agency of the United States, a party. Thus, they are admissible as statements of a party under Rule 801(d)(2). Moreover, Mr. Kim's testimony opened the door to these statements.

**Defense Exhibit 1334:** This document is offered for a statement on page 27, by Adam Szubin, the former director of OFAC:

> Mr. Szubin. ... Our sanctions, our primary sanctions in the U.S., control what U.S. actors can do and what they cannot do. It governs the conduct of U.S. actors anywhere they reside in the world....
>
> Our sanctions, on the other hand, do not control the actions of non-U.S. persons, whether the currency they are using is the dollar, euro, pound, or the yen. To be very specific, every foreign bank in the world has U.S. dollars in their possession. It is, thankfully, the international currency of choice for international trade .... Our sanctions don't extend to those dollar bills. And foreign actors aren't under our jurisdiction if they chose to give those to any actor, including an Iranian actor.

The government has made or elicited repeated statements, in opening and witness examinations, to the effect that the sanctions prohibit, and are intended to prohibit, Iranian access to U.S. dollars and to the ability to transact in dollars. This statement, by the former director of OFAC, is offered to rebut those statements. Those statements opened the door to this testimony by the former director of OFAC who was testifying because of that position.

**Defense Exhibit 1335:** This letter from Richard Newcomb, the then-director of OFAC, is a letter responding to a request for guidance from OFAC. It addresses the scope and effect of

**Steptoe**

The Honorable Alison J. Nathan
March 3, 2020
Page 5

Section 560.204's prohibition on exportation, and Section 560.205's prohibition on reexportation. It addresses a situation where no U.S.-origin goods, technology or services would be exported to Iran or the Government of Iran, or be incorporated into goods intended f0or reexportation there, and stated that in such a situation no OFAC license would be required in order to export the [systems that were the topic of the request letter] to a third country. This official pronouncement by the then-director of OFAC is offered to rebut Mr. Kim's testimony that the sanctions broadly prohibit all exportation or reexportation of goods, services, and technology from the U.S. or by a person to Iran or the Iranian government. Tr. 482. (The deletions do not reflect draft status; they reflect redactions of the requesting party's details.).

**Defense Exhibits 614, 608, 609, and 616**: These exhibits—EO 13599, a press release and fact sheet concerning the U-Turn license, and a Treasury fact sheet, are statements by a party under Rule 8012(d)(2). They have been the subject of extensive discussion already, including whether the government opened the door to public statements that affect Sadr's state of mind. *See*, *e.g.*, Tr. 491-493. The Court expressed openness to the idea that the government's use of the Treasury press release, to show an inference of Sadr's knowledge from generally available public statements, would open the door to similar use by the defense of generally available public statements to show Sadr's state of mind. In Sadr's view, that would notably include use even of the post-2008 version of § 560.516, which was publicized in the Federal Register just as earlier versions of the Executive Orders and the ITR were (to which Mr. Kim testified). Although the Court has ruled regarding what the post-2008 version of § 560.516 actually meant, it acknowledged that if there were an evidentiary connection to Sadr's awareness, it could be relevant to his state of mind even if his understanding did not accord with the Court's ruling. And the Court suggested that inferential link would be available here for the defense as well as the government based on the use the government made of the press release. Tr. 492.

Although the government tried to move on without opening that door, Tr. 493, it had already put that use of the press release before the jury, Tr. 486-487, and had already elicited testimony from Mr. Kim about the U-Turn revocation, Tr. 484-85 (to which the Court sustained an objection). The door is already open.

More generally, Mr. Sadr offers these exhibits in response to Mr. Kim's testimony concerning U-turns and SDNs.

With respect to U-turn transactions, Mr. Sadr seeks to respond to Mr. Kim's repeated testimony that the license was revoked because of the Government of Iran and Iranian entities were abusing the license to engage generally in unlawful conduct. As this evidence shows, the revocation was specifically in response to the Government of Iran using Government of Iran-owned companies to facility terrorist funding and its nuclear weapons program. Moreover, before Mr. Sadr had the opportunity to object, Mr. Kim testified that the revocation was publicized in press releases and news coverage. Mr. Sadr intends to introduce these documents to establish the focus of the Treasury's own statements at the time of the revocation.

The Honorable Alison J. Nathan
March 3, 2020
Page 6

**Steptoe**

   Moreover, Mr. Kim testified about SDNs, generally, and specific companies, including two the government alleges are connected to this case. Mr. Sadr seeks to use these exhibits for three relevant purposes. First, to correct Mr. Kim's misleading testimony that did not distinguish the reasons why certain entities were placed on the SDN list—*e.g.*, En Bank was not designated for engaging in any illicit behavior. Second, Treasury's announcements with respect to the designations confirms that the Obama administration was targeting certain behavior that was aiding or had the potential to aid the Government of Iran's illicit conduct, which the sanctions were designed to change. Third, Mr. Kim's testimony that OFAC required U.S. financial institutions to block the property interest of all entities placed on the SDN list. That is simply false and the documents will establish that.  as evidence that there is a significant differ

   **Defense Exhibit 1333:** The government is correct that Mr. Kim did not testify about CISADA, which is precisely why the testimony that the government elicited is misleading and prejudicial.

   First, referring to Government Exhibit 601 at slide two—a list containing three Executive Orders and two iterations of ITSR, Mr. Kim testified that "[t]hese five documents are in fact the most important documents that formulate the framework of the Iran sanctions program." Tr. at 169:16-21. Not only did Mr. Kim's testimony ignore several significant amendments to ITSR, it misled the jury into believing that the entire Unites States sanctions program against Iran is contained in ITSR. Among other parts of the Iran sanctions program are the Iranian Assets Control Regulations (31 CFR 535); the Iranian Financial Sanctions Regulations (31 CFR 561); Iranian Human Rights Abuses Sanctions Regulations (31 CFR 562); the various terrorist sanctions regulations; and CISADA.

Second, Mr. Kim repeatedly testified about correspondent banking relationships, the risk posed by "stripping," and the liability faced by U.S. intermediary banks involved in international transactions under ITSR. Mr. Kim's testimony implied that the only regulation that safeguards the U.S. financial system from the abuse of correspondent banking relationships, which is not the case. Unlike ITSR's prohibition on the export of services, CISADA directly addresses correspondent relationships between U.S. and foreign banks. For example, section 104 of CISADA prohibits U.S. banks from maintaining or opening correspondent accounts for foreign banks that, among other things, "facilitates a significant transaction or transactions or provides significant financial services for" the IRGC or the Government of Iran.

   **Defense Exhibits 1360, 1361, and 1362:** Mr. Kim's testimony left the impression that the entities involved in this case were SDNs, both by the lengthy testimony concerning entities that were designated as SDNs, the blocking provisions added to ITSR in 2012, and the responsibility of banks to block SDN transactions. These documents will establish that none of Mr. Sadr's entities were or are SDNs.

Steptoe

The Honorable Alison J. Nathan
March 3, 2020
Page 7

        Respectfully submitted,

        */s/ Brian M. Heberlig*
        Reid H. Weingarten
        STEPTOE & JOHNSON LLP
        1114 Avenue of the Americas
        New York, NY 10036
        Tel: (212) 506-3900
        Fax: (212) 506-3950
        rweingarten@steptoe.com

**Steptoe**

> Brian M. Heberlig (*Pro Hac Vice*)
> Bruce C. Bishop (*Pro Hac Vice*)
> David M. Fragale
> Nicholas P. Silverman (*Pro Hac Vice*)
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue, N.W.
> Washington, DC 20036
> Tel: (202) 429-3000Bishop
> Fax: (202) 429-3902
> bheberlig@steptoe.com
>
> *Counsel for Defendant Ali Sadr Hashemi Nejad*

cc: Counsel of Record (via ECF)