# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ALI SADR HASHEMI NEJAD,

*Defendant.*

Case No. 18 Cr. 224 (AJN)

ORAL ARGUMENT REQUESTED

## MOTION FOR JUDGMENT OF ACQUITTAL

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  March 9, 2020

# TABLE OF CONTENTS

I.  No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly committed, or knowingly and willfully conspired to commit, bank fraud (Counts Three and Four) ........................................................................ 2

   A.  No reasonable juror could conclude beyond a reasonable doubt that Sadr's conduct would likely harm the bank's property interest, or that Sadr knew it would likely cause such harm ............................................................. 3

   B.  No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly executed a scheme to obtain bank property by means of false and fraudulent pretenses, representations, and promises ..................................... 10

      1.  The wire transfer orders contained no misrepresentations ..................... 10

      2.  There were no misrepresentations by omission, because there was no duty to disclose anything more ......................................................... 11

      3.  The charged scheme was not to obtain bank funds *by means of* false or fraudulent pretenses, representations, or promises ................................... 14

   C.  No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to commit bank fraud .................................. 16

II. No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to defraud the United States (Count One) ................ 16

III. No reasonable juror could conclude beyond a reasonable doubt that Sadr willfully conspired to violate IEEPA and the ITSR (Count Two) .................................... 20

IV. No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly and willfully committed, or conspired to commit, money laundering. (Counts Five and Six) ................................................................. 21

Defendant Ali Sadr Hashemi Nejad respectfully moves for judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure.  With the government now having presented its evidence, it is clear there is insufficient evidence for a reasonable jury to find guilt beyond a reasonable doubt on any of the charges.

## ARGUMENT

"After the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a) (emphasis added); *see, e.g., Burks v. United States*, 437 U.S. 1, 10 n.5 (1978) (reaffirming the mandatory nature of this rule); accord 2A Charles Alan Wright & Peter Henning, *Federal Prac. & Proc. Crim.* §462 (same).  Rule 29(a) "implements 'the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense.'"  *Id.*  (citation omitted).  Although the court must "look at the evidence in the light most favorable to the government," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury," *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) (alteration in original), "[t]his standard does not mean that" the verdict must be sustained "if there is any evidence that arguably could support a verdict."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  "In any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution."  *Id.*

Although a reviewing court defers to jury assessments of credibility, conflicting testimony, and reasonable inferences from the evidence, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."  *Id*. (internal quotations omitted) (emphasis in original); *see also United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("[T]he jury's inferences must be reasonably based on

evidence presented at trial, not on speculation.") (internal quotations omitted). Speculation, even reasonable speculation, is insufficient to establish an element of guilt beyond a reasonable doubt. *United States v. Pauling*, 924 F.3d 649, 655, 659-61 (2d Cir. 2019); *United States v. Leslie*, 103 F.3d 1093, 1102 (2d Cir. 1997).

"If 'reasonable' jurors 'must necessarily have a reasonable doubt' as to guilt, the judge 'must require acquittal, because no other result is permissible within the fixed bounds of jury consideration.'" *Jackson*, 443 U.S. at 318 n.11 (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C. Cir. 1947)) (alteration marks omitted). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 515 (citations omitted); *accord* 2A Wright & Henning § 467 (4th ed. 2009) (noting that the *Curley* test "is universally accepted by the courts").

A pre-verdict judgment of acquittal under Rule 29(a) is final and unappealable. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977) ("[T]he Double Jeopardy Clause bars appeal from an acquittal entered under . . . Rule 29(a) . . . .").[1] In contrast, a post-verdict judgment of acquittal is appealable and may result in a new trial if the judgment is reversed on sufficiency grounds but remanded because of other errors. *See, e.g.*, Fed. R. Crim. P. 29(d)(3).

## I. No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly committed, or knowingly and willfully conspired to commit, bank fraud (Counts Three and Four)

Count Three charges two different forms of bank fraud, under the two respective prongs of 18 U.S.C. § 1344. Under § 1344(1), it charges that Sadr knowingly executed a scheme to

---

[1] *Accord Evans v. Michigan*, 133 S. Ct. 1069, 1074 (2013); *Smith v. Massachusetts*, 543 U.S. 462, 467-68 (2005) (midtrial judgment of acquittal under equivalent state rule was final and unreviewable); *Sanabria v. United States*, 437 U.S. 54, 59, 64, 66-67, 69 (1978).

defraud a bank whose assets were insured by the FDIC.  Under § 1344(2), it charges that Sadr

knowingly executed a scheme to obtain money or property owned by and under the custody and

control of an FDIC-insured bank, by means of false and fraudulent pretenses, representations,

and promises.  Count Four charges, under 18 U.S.C. § 1349, that Sadr knowingly and willfully

conspired to commit the bank fraud offense charged in Count Three.

A.   **No reasonable juror could conclude beyond a reasonable doubt that Sadr's conduct would likely harm the bank's property interest, or that Sadr knew it would likely cause such harm**

Bank fraud under § 1344(1) requires proof beyond a reasonable doubt that Sadr

knowingly executed a scheme to defraud an FDIC-insured bank.  A "scheme to defraud" is a

pattern or course of conduct concerning a material matter designed to deceive a federally insured

bank into releasing property with the knowledge that that course of conduct would likely harm

the bank's property interest.  *See* Order at 1, 2 (Dkt. No. 227).

In this case, the government asserts such fraud under the "right to control" theory of

property fraud.  The loss of the right to control money or property constitutes deprivation of

money or property only when the scheme, if it were to succeed, would likely result in tangible

economic harm to the victim, and the defendant knew such tangible economic harm was likely.

*See, e.g.*, *United States v. Lebedev*, No. 15-cr-769, Instr. No. 32 (at 50:3-9), Dkt. No. 439; *United*

*States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) ("The common thread of [the Second

Circuit's] decisions is that misrepresentations or non-disclosure of information cannot support a

conviction under the 'right to control' theory unless those misrepresentations or non-disclosures

can or do result in tangible economic harm.") (citations omitted); Order at 4 (Dkt. No. 227)

(citing *United States v. Binday*, 804 F.3d 558, 578 (2d Cir. 2015)).  This Court, seeing "little

daylight between 'contemplating exposing the victim banks to a risk of economic harm," as the

government concedes is required under the right-to-control theory, and "the fraudulent intent

3

generally required by § 1344(1)—that is, *knowing* that such harm is likely to result," Dkt. No. 227 at 4, has ruled that conviction under the first prong of § 1344 requires the government to prove beyond a reasonable doubt "that Sadr knew that it was likely that the alleged fraudulent scheme would cause the victim banks tangible economic harm under a right to control theory of bank fraud under § 1344(1)." *Id.* at 4-5.

Here, the government's evidence does not allow a reasonable jury to conclude beyond a reasonable doubt that Sadr's course of conduct would likely have caused the banks tangible economic harm, or that Sadr knew it would likely cause the banks such harm. The government's theory is that Sadr's conduct knowingly exposed the banks to the risk of enforcement by OFAC, which posed the risk of fines (potentially into the tens or hundreds of millions, the government has argued), as well as reputational harms or costs of investigation associated with enforcement. The government's evidence, however, has shown that such risk was far from likely, and instead was remote or non-existent. *See, e.g.*, Dkt. No. 164, at 29 (acknowledging this risk as an issue for trial). Both the likelihood of harm to the banks, and Sadr's knowledge of the likelihood of such harm, are insufficient to allow conviction for bank fraud.

OFAC senior enforcement officer Ted Kim, the government's OFAC expert, testified that 95 percent of OFAC's enforcement cases result in no monetary penalty. Tr. 647 ("Q: So we're clear, for every hundred cases you get, 95 result in something less than a monetary penalty, correct? A: That's correct."). This was confirmed by a Joint Fact Sheet on Foreign Correspondent Banking, issued by the U.S. Department of the Treasury and four federal banking enforcement agencies,[2] which highlighted that "[t]he vast majority (about 95%) of [Bank Secrecy Act]/OFAC compliance deficiencies identified by the [Federal Banking Agencies],

---

[2] The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of the Comptroller of the Currency (the "Federal Banking Agencies," or "FBAs"). *See* DX 1347, at 1.

FinCEN, and OFAC are corrected by the institution's management without the need for any enforcement action or penalty." DX 1347, at 1 (received Tr. 645). The Treasury Department repeated this statistic both for anti-money-laundering deficiencies, DX 1347 at 3,[3] and for OFAC investigations of suspected sanctions violations:

> OFAC investigates cases of sanctions violations, many of which (over 95 percent) are closed with administrative measures, such as cautionary or no action letters. This means that less than five percent of all cases of sanctions-related violations investigated by OFAC have resulted in a civil monetary penalty or other public enforcement response.

*Id.* at 3-4; *accord* Tr. 647:1-5 (Kim).

Moreover, financial penalties are reserved for the most serious violations, where banks have failed to remediate deficiencies identified by federal regulators and instead have persisted in a sustained pattern of serious violations. The Treasury Department explained that "in the vast majority of instances, deficiencies identified during the [bank] examination process are resolved promptly after they are brought to the attention of a depository institution's management through the issuance of confidential reports of examination and supervisory letters." DX 1347 at 2. Where deficiencies are more serious, or "have not been corrected in the course of the supervisory process," Federal Banking Agencies can initiate enforcement actions to "reinforce awareness of senior management and boards of directors" of the deficiencies and required corrective actions. *Id.* at 3. "Enforcement tools may vary and can include informal memoranda of understanding, or formal, public, written agreements, and cease-and-desist orders." *Id.* The Federal Banking Agencies have authority to assess civil money penalties "[i]n very limited instances, when corrective action has not been achieved within a reasonable amount of time or serious violations or unsafe or unsound practices or breaches of fiduciary duty have been identified." *Id.*

---

[3] "The vast majority of BSA/AML compliance deficiences identified by the FBAs—approximately 95%--are resolved through the supervisory process without the need for an enforcement action." *Id.*

Though the government elicited testimony that some U.S. banks have been assessed monetary penalties in the "millions, tens of millions, or sometimes it could be hundreds of millions," Tr. 508-09, the Treasury Department found it "important to note" that:

> the largest and most prominent monetary penalties for BSA/AML and sanctions violations in recent years generally involved a sustained pattern of serious violations on the part of depository institutions. With regard to the sanctions violations, *these cases did not involve unintentional mistakes*, but generally involved *intentional evasion of U.S. sanctions over a period of years* and/or the *failure of the institutions' officers and/or senior management to respond to warning signs that their actions were illegal.*

DX 1347, at 4 (emphasis added). Thus, the large monetary penalties touted by the government were imposed in cases of *sustained, intentional wrongdoing by the banks*.

Here, the government contends that Sadr's concealment of Iranian connections to the charged wire transfers prevented the banks from learning of and investigating those charged connections. Even if the government's contentions are proved, the most they could show on the banks' part would be unwitting and unintentional violations at worst. The Treasury Department's fact sheet, and Mr. Kim's testimony, confirm that in such cases, the banks would face *no* realistic risk of monetary harm—at worst, they would fall into the 95% of cases that resulted in *no* monetary penalty to the banks.

An OFAC document, "Frequently Asked Questions and Answers," Number 116, confirms the negligible risk of enforcement in this circumstance. Mr. Kim testified that such "FAQs" are "OFAC's notice to the public" regarding the answers to those questions. Tr. 648. FAQ 116 (DX 1352, received Tr. 648), which was in effect in February 2009, during the time of the charged conduct, addressed situations like that here: where the U.S. bank "(1) is operating solely as an intermediary, (2) does not have any direct relationship with the entity" suspected to be blocked, *i.e.*, an SDN, "(e.g., the entity is a non-account party), and (3) [the bank] does not know or have reason to know the entity's ownership or other information demonstrating" that the

party may be blocked. DX 1352, second paragraph. OFAC's FAQ 116 confirms that "[i]n instances where all three conditions are met," even if the transfer should have been blocked, "OFAC would not expect the bank to research the non-account parties listed in the wire transfer that do not appear on the SDN List and, accordingly, *would not pursue an enforcement action against the bank for having processed such a transaction.*" *Id.* Thus, *even if* any of the charged transactions here involved a blocked entity—which they do not—OFAC's own public notice document confirms that "OFAC would not pursue an enforcement action against the bank" in this instance. *Id.* Mr. Kim agreed with that statement. Tr. 651. In such an instance, the bank might receive a non-public cautionary letter that "goes into their file," but would not be subject to an enforcement action or to monetary penalties. Tr. 652.

The lack of risk of any harm in this case is driven home by the fact that OFAC did not open an investigation into the transfers charged in this matter, *even after it learned that payments that Stratus Turkey originated and received had been rejected or flagged* as part of the banks' screening process. During his direct testimony, Mr. Kim testified that if a bank reported a rejected or blocked transaction involving Iranian entities, OFAC would open an investigation that could lead to an enforcement action:

> Q. What does OFAC do with the information from banks about transactions involving Iranian entities?
>
> A. Those are one of the important source for us that lead to open an investigation, because the banks collects other information and other country's information involved in rejected and blocked transaction. That means those entities' management teams are blocking and report a lot of other information about other parties other than the bank, the other parties that has potential to be in violation of sanctions regulation.
>
> Q. So would the information -- OFAC takes that information and it leads to investigations?
>
> A. That's correct.
>
> Q. And in some instances, those investigations lead to enforcement actions?

A. Yes, that's correct.

Tr. 510:1-16 (Kim).

Yet when banks reported two of the charged transfers in this case as possibly involving Iranian entities, OFAC apparently did nothing. The government has shown two examples in this case. *First*, it introduced a SWIFT message in which J.P. Morgan stated that it had rejected a payment from Stratus Turkey to Farshid Kazerani because the payment allegedly involved "an Iranian institution," and the bank had reported the rejected transaction to OFAC. *See* GX 2297A (received Tr. 663); *see also* Tr. 286-87 (Kazerani). *Second*, the government produced GX 411 – the June 16, 2011 letter from Commerzbank to OFAC in which the bank flagged a payment from Venezuela to Hyposwiss for which Stratus International Contracting Company was listed as the beneficiary, "since Stratus may be an Iranian Company." *Id.*[4] Despite these two notices to OFAC in this case, Mr. Kim testified that he was unaware of any investigation by OFAC into the payments involved in this matter. *See* Tr. 579:22-581:15 (Kim). (The government further represented out of court that it is not "aware of any such OFAC investigation or enforcement action." Gov. Suppl. MIL, at 16 (Dkt. No. 248).)

Mr. Kim's testimony as an OFAC enforcement officer confirms that the banks faced *no* realistic risk of *any* monetary harm through OFAC enforcement. JP Morgan Chase witness Matthew Blair's testimony that he nonetheless believed JPMC was at risk of enforcement action (Tr. 792) was unfounded, being squarely contradicted by Mr. Kim, as well as by official public guidance from OFAC (DX 1352) and the Treasury Department (DX 1347).[5] Because the banks faced no realistic risk of any harm to their property interest, the evidence is insufficient as a

---

[4] Sadr will submit a separate letter addressing the improper late disclosure of this obviously exculpatory evidence.

[5] Mr. Blair did confirm that JPMC was not suffer any enforcement by OFAC, any fine, or any reputational harm or lost business as a result of the wire transfers JPMC processed in this case. Tr.778, 790, 794.

matter of law to allow conviction on the right-to-control theory of bank fraud.  *See Finazzo*, 850

F.3d at 111 ("The common thread of [the Second Circuit's] decisions is that misrepresentations

or nondisclosure of information cannot support a conviction under the 'right to control' theory

unless those misrepresentations or non-disclosures *can or do* result in tangible economic harm.")

(emphasis added) (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994));

*accord Binday*, 804 F.3d at 570-71.

The evidence is also insufficient as a matter of law to allow any reasonable jury to

conclude beyond a reasonable doubt that Sadr *knew* the charged concealments would likely harm

the banks' property interest.  The government has introduced only one piece of evidence to show

Sadr's specific knowledge of the sanctions – an Asian Law Caucus publication called "The

Impact of U.S. Sanctions Against Iran On You."  *See* GX2265B (English translation of GX

2265A).[6]  But that publication's section on enforcement was directed at enforcement against

individuals, and said nothing about enforcement against banks.  *See id.* at page 17 of 24.  Any

inference the jury might reach in the complete absence of evidence about Sadr's knowledge of

OFAC/bank enforcement would at most be speculation.  Such speculation cannot form the basis

for conviction beyond a reasonable doubt.  *See Pauling*, 924 F.3d at 655, 659-61.  Thus, the

evidence of Sadr's knowledge on the first prong of bank fraud is also insufficient to permit a

---

[6] Though the government stated in opening that it would show the sanctions were "widely
publicized," Tr. 79, it has not introduced such evidence.  Its OFAC expert gave limited,
conclusory testimony about some sanctions provisions, but did not discuss their publication
(other than the executive order by President Clinton that declared a national emergency
regarding Iran).   Much less did the government actually admit the published regulations or their
notices in the Federal Register.  Though Mr. Kim stated that monetary penalties are publicly
announced, Tr. 508, he did not say where, when, how, how often, or give any other detail that
would show beyond a reasonable doubt that Sadr would have been aware of such penalties
against the banks.  *See Pauling*, 924 F.3d at 655, 659-61.  Much less did the government adduce
evidence sufficient to prove beyond a reasonable doubt Sadr's knowledge of the circumstances
in which they are actually imposed, as described in GX 1347.  Had he known that information, of
course, it would have confirmed his knowledge of how *unlikely* harm to the banks' property
interest was.

reasonable jury to convict beyond a reasonable doubt.  Acquittal of bank fraud under §1344(1) is required.

**B.    No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly executed a scheme to obtain bank property by means of false and fraudulent pretenses, representations, and promises**

Bank fraud under the second prong of § 1344 requires proof beyond a reasonable doubt that Sadr knowingly executed a scheme to obtain money or property owned by and under the custody or control of an FDIC-insured bank, by means of false and fraudulent pretenses, representations, and promises.  § 1344(2); *Loughrin v. United States*, 573 U.S. 351, 355-56, 362-63 (2014); Order at 5-6 (Dkt. No.227) (citing *Loughrin* and *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019)).[7]

The government's evidence, even viewed favorably to the government, does not allow a reasonable jury to conclude beyond a reasonable doubt that Sadr schemed to obtain bank property by means of false and fraudulent pretenses, representations, and promises, for three reasons:  (1) the wire transfer orders in this case contained no misrepresentations; (2) they contained no fraudulent omissions because there was no duty to disclose anything more; and (3) because the banks did not and were not required to obtain any more information about parties other than the senders and recipients of the transfers, the charged scheme did not obtain money *by means of* such alleged concealment, *see Loughrin*, 573 U.S. at 362-63.

**1.    The wire transfer orders contained no misrepresentations**

The evidence in this case concerning the charged wire transfers orders—the SWIFT forms and payment instructions that caused the transfer payments—shows that they contained no

---

[7] Sadr also respectfully preserves for further review his contention that, even after *Loughrin*, § 1344(2) requires intent to defraud *someone*, *i.e.*, to cheat someone of money, as four other circuits' pattern jury instructions provide (contrary to *Lebedev*).  There is no evidence here that Sadr's course of conduct was intended to cheat anyone of money: the transfers arose from the Venezuelan project owner's willing payments of valid debts.

misrepresentations. For each transfer, the form asked for the sender and the recipient of the transfer. And for each transfer, the completed form, and the accompanying payment instructions, furnished that information. *See, e.g.*, GX 1405A (account information letters listing recipients for USD and BsF transfers); GX 2220 (account information letter for EUR transfer); GX 401-406 (SWIFTs listing correct sender and recipient for each transfer).

These statements were all true. They correctly identified the sender of each payment, and the recipient of each payment. The payment instructions to the banks contained no misrepresentations.

### 2. There were no misrepresentations by omission, because there was no duty to disclose anything more

On their face, the wire transfer orders and payment instructions contained everything the banks asked about the identity of the sender and recipient of each transfer. They contained no false statements. Nor was there any misrepresentation by omission, because neither the senders nor recipients of the transfers, nor Sadr, had any duty to disclose anything more than the banks asked.

JPMC witness Matthew Blair confirmed that JPMC did not ask for any information beyond the sender and recipient, and that such information was not required by OFAC or banking regulators:

> Q. I want to talk a little bit, still focused on J.P. Morgan's policies, about indirect parties to wire transfers. Am I correct that as a matter of J.P. Morgan's policies, you did not require foreign correspondent banks to identify information beyond the sender and the recipient of the funds?
>
> A. Correct.
>
> Q. OK. Again entirely consistent with the guidance you had been given by banking regulators, correct?
>
> A. I believe so, yes.

Q. And those same banking regulators and J.P. Morgan pursuant to its policy did not require intermediary banks to demand anything more than that information about the sender and the recipient of the funds, correct?

A. To my knowledge.

Q. And in J.P. Morgan's instance your additional obligation—let me back up. You had two obligations. You had to make sure those fields were filled out in a wire transfer, correct, sender and recipient?

A. Correct.

Q. And you had to have an adequate compliance program to screen those names against the SDN list and country information, correct?

A. Correct.

Q. If you had both of those things, you fully satisfied your obligations under what you understand to be applicable law?

A. As I understand them.

....

Q. ... As a matter of J.P. Morgan's policy, you did not ask your foreign correspondent banks to demand from their customers information about whether the transaction was being performed on behalf of somebody else, correct?

A. Correct.

Q. You could have done so, correct?

A. I guess we could have, yes.

Q. You could have asked your foreign correspondent banks to demand from every sender of a wire transfer a certification that the payment didn't violate any sanctions regime. That was within your ability to request, was it not?

A. I guess.

Q. But that was not bank policy, correct?

A. To my knowledge, no, it was not.

Q. And to your knowledge, that was not required under the applicable regulations that apply to intermediary banks?

A. Correct.

Tr. 788-90.

OFAC's and Treasury's public notice documents confirmed that U.S. intermediary banks had no duty to look into the identities of entities other than the parties listed in the wire transfer. The Treasury Department's Joint Fact Sheet describes the obligations of U.S. banks that maintain correspondent accounts for foreign financial institutions (FFI), DX 1347 at 1, and states that "[u]nder existing U.S. regulations, there is no general requirement for U.S. depository institutions to conduct due diligence on an FFI's customers." DX 1347 at 2. In other words, where a U.S. bank is acting as an intermediary in a transfer between foreign correspondent banks, it does not have an obligation to conduct due diligence on those correspondent banks' customers—*i.e.*, the sender and the payor at either end of the transfer. *See id.* Consistent with that lack of requirement from OFAC, the banks did not ask for information beyond the sender and recipient of each wire transfer. Tr. 788-90 (Blair) (quoted *supra*); Mar. 9, 2020 rough transcript (unpaginated) ("Q: So under these circumstances [no SDN involvement], am I right Citibank did not have know your customer responsibilities over those two parties? A: That's correct.").

It is black-letter law that an omission is not fraudulent where there is no duty to disclose. *See, e.g.*, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Bank of Am. N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 351 (S.D.N.Y. 2013). Because banks did not ask for information beyond the sender and recipient of each wire transfer, Tr. 788-90, and the government has not shown any provision requiring U.S. intermediary banks to ask for, or senders and recipients of correspondent-banking transfers to provide, information on entities other than the sender and recipient of the transfer (such as related corporate parties, or contemplated recipients of subsequent downstream fund transfers), there was nothing fraudulent about Clarity,

13

Stratus Turkey, or Sadr not volunteering information beyond the identity of the fund transfer recipients—Clarity or Stratus Turkey.

### 3. The charged scheme was not to obtain bank funds *by means of* false or fraudulent pretenses, representations, or promises

The Supreme Court explained in *Loughrin* that § 1344(2) has a third requirement, beyond (1) obtaining property from bank ownership, custody, or control, and (2) misrepresentation. There is also a proximate cause requirement—the defendant "must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation." *Loughrin*, 573 U.S. at 362-63. "Section 1344(2)'s 'by means of' language is satisfied when ... the defendant's false statement is the mechanism naturally inducing a bank ... to part with money in its control." *Id.* at 363.

Here, this "relational component" (*id.* at 362) is missing. The proximate cause of the U.S. intermediary banks' processing the transfers was not the omission from the wire transfer orders of information regarding non-parties. The banks were not required to inquire into such non-parties, DX 1347 at 2; DX 1352 (second paragraph), and they did not do so, Tr. 788-90 (Blair); Unpaginated Mar. 9, 2020 Tr. (Peri). Instead, what caused the U.S. intermediary banks to process the transfers was the wire transfer orders, which were only required to disclose the sender and recipient of payment, and accurately did so. *See* Sec. I.B.1, *supra*; Tr. 788-90 (Blair). That alone was sufficient to cause the transfer; no more was required.

Nor should it have been. The idea of wire funds transfers, even those conducted through foreign correspondent banks, is speed and volume: "Most often, funds transfers are used as an inexpensive and efficient method of discharging an 'underlying payment obligation which arose through earlier commercial dealings between the originator ... and the beneficiary.'" *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 788 (S.D.N.Y. 1997). They are high-speed, mechanistic transactions—processed via the "SWIFT" system, for, in this case, $20 each. Tr. 766 (Blair). JP Morgan Chase processed two million of them—totaling some two to three

trillion dollars—every day.  Tr. 765 (Blair).  A U.S. intermediary bank is not expected to, and does not, conduct due diligence beyond the disclosed sender and recipient of each transfer.  *See* Subsec. I.B.2, *supra*.  If it did, it would grind the system to a halt.  Tr. 793 (Blair).

Indeed, the first wire transfer charged in this case removes any doubt.  The bank that processed that $29.4M transfer notified OFAC of the payment, informing OFAC that it had obtained from the remitting bank the information that the payment's beneficiary, Stratus International Contracting Company (registered in Turkey), appeared on its website to be associated with the Stratus International that was founded in Tehran, Iran and had a Tehran address.  GX 411, at 1, 5.  The bank attached to its notice pages of printouts from Stratus International Contracting Company's website, *id.* at 4-11, and noted it had "added Stratus into our sanctions filter to monitor any future payments."  *Id.* at 2.

In response, OFAC appears to have done nothing.  It did not initiate an investigation, impose fines, or issue either public or non-public cautionary letters.  It did not impose "strict liability" for having processed the transfer.  As far as this trial record shows, it took no action at all.  Mr. Kim knew of no action taken by OFAC in this case, Tr. 579-81, and the government knows of no such action either.  Dkt. No. 248, at 16.

In sum, it was the wire transfer order and the payment instructions—issued by a willing sender, to transfer its own funds to pay a legitimate debt—that was the "means" by which Clarity and Stratus Turkey obtained funds from the custody of the U.S. intermediary banks.  The fact that no one volunteered the identity of other parties affiliated with Clarity and Stratus Turkey was not the "means by" which Clarity and Stratus obtained the transferred funds.  *Loughrin*,  573 U.S. at 359.

*     *     *

Because the evidence is not sufficient for a reasonable jury to conclude beyond a reasonable doubt (a) that there was any misrepresentation; (b) that there was any omission in light of a duty to disclose; or (c) that any such omission was the "means" by which the wire fund transfers were caused here, the evidence is insufficient as a matter of law to allow conviction beyond a reasonable doubt of bank fraud under the second prong of the statute, § 1344(2).

### C. No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to commit bank fraud

Finally, to convict Sadr of conspiracy to commit bank fraud (Count Four), the government must prove beyond a reasonable doubt that a conspiracy to commit bank fraud existed, and that Sadr knowingly and willfully became a member of that conspiracy, with knowledge of its criminal objective. *See* Parties' Request No. 24, Dkt. No. 185, at 106; *cf.* Parties' Request No. 4, *id.* at 20; Def. Request No. 7, *id.* at 35 (adapted from *United States v. Ramirez*, No. 12-cr-927-AJN (Dkt. 48), Instr. 25).

Because, as explained above, the evidence is not sufficient for a reasonable jury to conclude beyond a reasonable doubt that a scheme to defraud a bank or to obtain money or property from a bank by means of misrepresentation has been proven, the evidence is insufficient as well to prove beyond a reasonable doubt either a conspiracy to commit such offenses, or the criminal intent required to join such a conspiracy. Accordingly, Sadr is entitled to judgment of acquittal on the conspiracy to commit bank fraud count as well as the substantive bank fraud count.

### II. No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to defraud the United States (Count One)

Count One charges Sadr with conspiracy to defraud the United States, "to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of OFAC in the enforcement of economic sanctions laws and regulations administered by that agency." To

convict on Count One, the government must prove beyond a reasonable doubt (1) that the object of the conspiracy was to make it more difficult for OFAC to carry out its lawful and legitimate functions in the enforcement of the U.S.-Iran sanctions laws and regulations as charged, (2) that the scheme depended on fraudulent and dishonest means, and (3) that Sadr knowingly and willingly entered into the conspiracy knowing of that unlawful aim and with the specific intent of furthering that unlawful purpose. *See* Ind. Count One; Parties' Request No. 6 (Dkt. No. 185, at 26); *United States v. Shellef*, 507 F.3d 82, 104 (2d Cir. 2007); Defendant's Request No. 7 (Dkt. No. 185, at 35) (adapted from *United States v. Ramirez*, No. 12-cr-927-AJN, Dkt. 48, Instr. 25)..

No reasonable jury could reasonably conclude beyond a reasonable doubt that the object of the conduct here was to make it more difficult for OFAC to carry out its legitimate and lawful functions in enforcing the sanctions laws and regulations, for the same reason explained in part I.A, *supra*. The qualifiers, "lawful and legitimate governmental functions" in the "enforcement of economic sanctions laws" are important. The law does not criminalize every action that hinders or impedes any action by any government agency—indeed, some actions of withholding information from government agencies are "not inherently malign," despite the fact that withholding the information might make the agency's job more difficult. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005) (discussing examples of withholding different types of privileged information). Such non-malign actions are not merely outside the prohibition of the obstruction statute in *Arthur Andersen*—they are lawful, because they are done without the consciousness of wrongdoing necessary to be punishable. *See id.* at 705-08 (discussing *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *see also United States v. X-Citement Video*, 13 U.S. 64 (1994); *Liparota v. United States*, 471 U.S. 419 (1985). It would be quite a surprise if

the actions held to be non-malign and non-criminal in those cases were nonetheless prosecutable as *Klein* conspiracies because they made the functions of governmental agencies more difficult.[8]

Thus, whether the charged conduct impaired, impeded or obstructed OFAC's lawful and legitimate functions in enforcing the sanctions laws must be read in light of what those sanctions laws do and do not prohibit. Here, because OFAC did not require U.S. intermediary banks in correspondent banking transactions to conduct due diligence on foreign correspondent banks' customers, *see* DX 1347 at 2; DX 1352 (second paragraph); or to conduct any research beyond determining that the sender and recipient of a wire transfer are not on the SDN list, Tr. 648, 651-52 (Kim) (discussed *supra* at 6-7), Sadr's failure to disclose such additional information, or his charged concealment of it, even if proven, did not unlawfully impair, impede or obstruct OFAC's legitimate and lawful sanctions-enforcement function.

To the extent the government contends that the broader scope of Sadr's charged conduct—allegedly setting up European affiliate companies and European bank accounts to accept payments outside Iran in connection with the project—constituted an effort to obstruct OFAC's enforcement of the sanctions laws, the government has failed to adduce proof sufficient for a reasonable jury to conclude beyond a reasonable doubt that Sadr was not acting in good faith, but instead was willfully conspiring to obstruct OFAC's enforcement of the sanctions laws.

An agreement to achieve a lawful goal is not the same as a criminal conspiracy—two or more individuals must have agreed to commit a crime. *United States v. Lebedev*, No. 15-cr-769, Dkt. 442, at 29. Moreover, the "[s]anctions are drawn not only to bar what they prohibit but to allow what they permit." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000). Most important, Sadr's good faith is a full defense to all charges. *See* Defendant's Request No.

---

[8] Sadr respectfully preserves for further review his objection, raised by pretrial motion, that the *Klein* theory of Section 371 conspiracies to defraud the United States is unconstitutional under vagueness and fair notice principles. *See* Dkt. No. 83.

36 (Dkt. No. 185 at 120); *United States v. Lebedev*, No. 15-cr-769, Dkt. No. 442, Instr. 40. That is particularly true with respect to OFAC's enforcement of the sanctions enacted under IEEPA. That statute provides:

> No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

50 U.S.C. § 1702(3). Thus, if Sadr believed he was acting in compliance with the regulations, he may not be held liable in any court for his actions done in such good faith. That is as true for the Count One charged *Klein* conspiracy as it is for the Count Two charged IEEPA conspiracy. The *Klein* conspiracy is not so broad that it may criminalize conduct that complies with, or is done in good faith in connection with, IEEPA and its regulations.

Sadr respectfully acknowledges this Court's conclusion in the related context of 31 C.F.R. § 560.203 that one need not independently violate an IEEPA provision to unlawfully attempt to evade or avoid those provisions. Opinion and Order at 10-11 (Dkt. No. 164). But to the extent that interpretation allows conviction for conduct that complies with regulations under IEEPA, it conflicts with Section 1702(3)'s provision that compliance, or action taken in good faith in connection with IEEPA and its regulations, is "a full acquittance and discharge for all purposes." Where a regulation (or an interpretation of one) conflicts with its authorizing statute, the statute controls. *See, e.g.*, *Chevron U.S.A. v. Natural Resources Def. Council,* 467 U.S. 837, 842-43 (1984); *Wachovia Bank v. Burke*, 414 F.3d 305, 315 (2d Cir. 2005). Moreover, if the regulation is ambiguous, in a criminal case, the Court resolves the ambiguity by the rule of lenity. *United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012).

For these reasons, the government has not adduced evidence sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr is guilty of the conspiracy to defraud the United States charged in Count One.

**III.**    **No reasonable juror could conclude beyond a reasonable doubt that Sadr willfully conspired to violate IEEPA and the ITSR (Count Two)**

Count Two, conspiracy to violate IEEPA, requires proof beyond a reasonable doubt that there was an agreement to violate regulations § 560.204 and § 560.203 of the ITSR, as charged in Count Two, and that Sadr knowingly and willfully became a member of that conspiracy, with knowledge of its unlawful objective and the purpose of furthering that aim.

Respectfully cognizant of this Court's rulings on the issue, Sadr must respectfully preserve for further review his contentions that:

(1) the conduct charged to have been contemplated here – the charged wire transfers to Clarity and Stratus Turkey in Europe, cleared by U.S. intermediary banks, were expressly authorized by 31 C.F.R. § 560.516 from the beginning of the charged conspiracy in 2006 through November 10, 2008, *see, e.g.*, GX 105; Order, Dkt. 224, at 1 (Feb. 24, 2020), so Sadr could not have had criminal conspiratorial intent during that time period;

(2) the conduct charged to have been actually undertaken from 2009 through November 10, 2008—specifically, the wire transfers charged during that period—were expressly authorized by 31 C.F.R. § 560.516(a)(2) as in effect during that period, *see* Dkt. No. 82; Dkt. No. 110; Dkt. No. 245, at 7-21;[9]

(3) although the § 560.516(c) general license was amended and ceased to authorize such conduct in October 2012, there was nothing at that time period that would prove beyond a reasonable doubt that Sadr's intent, which had been to engage in conduct that was specifically authorized through October 2012, suddenly became criminally conspiratorial with the October 2012 regulatory change, *see* Dkt. No. 82; Dkt. No. 110; and

---

[9] Sadr further respectfully preserves his arguments that (a) this was true notwithstanding the existence of § 560.516(c) during that time period, Dkt. 245, at 21-22, and (b) his arguments in response to this Court's reasoning in its ruling denying Sadr's pretrial motion to dismiss, *see id.* at 7-21, and Dkt. No. 252, were not barred by this Court's Local Rule 49.1 regarding motions for reconsideration, *see* Dkt. No. 259.

(4) Sadr did not cause the export of U.S. clearing transaction services to the territory of Iran or the Government of Iran, or for the benefit of anyone in the territory of Iran or the Government of Iran, as argued in his pretrial motion to dismiss (Dkt. No. 82; Dkt. No. 110).

In addition to these preserved arguments, Sadr submits that the government has not Hebadduced proof sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that he willfully conspired to violate the sanctions, or that he did not act in good faith, for the same reasons argued for Count One, *supra,* at 18-19. Sadr respectfully submits that the sanctions regulations are complicated, and ambiguous, and that the government has not adduced sufficient proof for a reasonable jury to conclude beyond a reasonable doubt that he understood and willfully intended to engage in conduct that was unlawful under them. He further submits that to the extent the regulations were ambiguous, they must be construed in his favor under the rule of lenity. *See Banki*, 685 F.3d at 109.

## IV. No reasonable juror could conclude beyond a reasonable doubt that Sadr knowingly and willfully committed, or conspired to commit, money laundering. (Counts Five and Six)

Count Five (money laundering) and Count Six (conspiracy to commit money laundering) are predicated on, and thus derivative of, the specified unlawful activity charged in Count Two (violation of IEEPA) and Counts Three and Four (bank fraud). Because, for the reasons explained above, the evidence is insufficient as a matter of law to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr is guilty of that underlying specified unlawful activity, it is likewise insufficient as a matter of law to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr had the requisite intent to promote the specified unlawful activity as charged in Counts Five and Six.

In addition, Sadr submits that to the extent the government has proven transfers of funds from outside the United States to places inside the United States as charged in the Indictment, it

has not adduced proof sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that such fund transfers were for the purpose of promoting the specified unlawful activity charged (*i.e.*, violation of IEEPA as charged in Count Two and bank fraud as charged in Counts Three and Four). The money transfer charged in the Indictment, the wiring of approximately $2 million into the United States to purchase property in Malibu, California, Ind. ¶ 13, was not logically connected to and not part of the charged scheme to violate IEEPA by causing the export of financial transactions, *i.e.*, U.S. bank clearing transactions, for wire transfers of funds from Venezuela to Switzerland in connection with the Venezuelan Project.

## CONCLUSION

For all of the foregoing reasons, this Court should grant a judgment of acquittal under Federal Rule of Criminal Procedure 29(a).

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated:  March 9, 2020