K34nsad1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          18 CR 224 (AJN)

 5    ALI SADR HASHEMI NEJAD,

 6                Defendant.

 7    ------------------------------x

 8                                         New York, N.Y.
                                           March 4, 2020
 9                                         9:00 a.m.

10
      Before:
11
                         HON. ALISON J. NATHAN,
12
                                           District Judge
13

14                           APPEARANCES

15    GEOFFREY S. BERMAN
           United States Attorney for the
16         Southern District of New York
      JANE KIM
17    MICHAEL KROUSE
      STEPHANIE LAKE
18         Assistant United States Attorneys

19    STEPTOE & JOHNSON
           Attorneys for Defendant
20    REID WEINGARTEN
      BRIAN HEBERLIG
21    BRUCE BISHOP

22

23

24

25
```

K34nsad1

1          (Trial resumed; jury not present)

2          THE COURT:  As you have likely noted, Ms. Williams is

3    assisting me today while Mr. Scott is away.

4          First let me ask how the witness is doing.

5          MR. KROUSE:  I have not seen him yet this morning,

6    your Honor, but my understanding from his attorney is that he

7    is feeling better.  He had to go to the hospital last night.

8          THE COURT:  Do we know what's going on?

9          MR. KROUSE:  I am not positive.  I haven't had a

10   chance to see him yet, but he is apparently on his way and

11   should be here shortly.

12         THE COURT:  OK.  Given my concern that people are on

13   heightened alert about illness, I would like to just state to

14   the jury he wasn't feeling well, he's been checked out, he's

15   fine whatever.

16         MR. KROUSE:  I think it wasn't related to any sort of

17   virus or any illness.  He just was feeling lightheaded,

18   dehydrated, something to that effect.  He was checked out.

19         THE COURT:  Great, thankfully.  I think just being

20   able to say to the jury he's fine and confirming that he's fine

21   would be helpful.

22         All right.  We have heard from two jurors who are

23   running late.  I think they are both on Metro-North.  One

24   indicated they thought they would be about 30 minutes late.  As

25   I get updates, I will let you know.  But that does give us a

K34nsad1

1    little bit more time for what we need to do this morning.

2              On that, I received briefing on the 560.516 issue and

3    will resolve that now.  Then we can discuss briefly what I

4    received three sets of letters on over the course of last night

5    and this morning related to -- the next witness, Ms. Kim, is

6    that right?

7              MS. KIM:  Yes, that's correct.  We have reached

8    agreement in terms of the parameters of the first area of

9    testimony.

10             THE COURT:  All right.  So for 560.516, I don't think

11   I have any questions at this point.  I just have resolution.

12             I do reject the legal arguments, both novel and well

13   trodden, that Mr. Sadr's counsel makes with respect to Section

14   560.516 in the supplemental briefing, including regarding the

15   request to charge for several reasons:

16             First, the new argument presented in Mr. Sadr's March

17   2, 2019, letter amounts in effect to an additional legal basis

18   for dismissing the indictment in this case.  Indeed, in this

19   letter, Mr. Sadr provides "additional reason" supporting his

20   argument that Section 560.516 provided a license for the

21   charged transactions, and, thus, the sanctions count failed to

22   state an offense for violating the ITSR's prohibitions.

23             Rule 12 of the Federal Rules of Criminal Procedure

24   provides that motions alleging a defect in the indictment must

25   be raised by pretrial motion if the basis for the motion is

K34nsad1

then reasonably available and the motion can be determined

without a trial on the merits.  Moreover, the rule provides

that the Court may set a deadline for pretrial motions and that

a motion is untimely if a party doesn't meet the deadline for

making a 12(b)(3) motion.

          In this case, Judge Carter, who was presiding, set a

pretrial motions deadline of February 25, 2019, and the defense

timely filed nine pretrial motions on that day.  The defense

does not argue that the novel argument he now advances was

unavailable to him in February of 2019, nor do they provide any

good cause for the failure to raise the argument then.  I won't

now entertain the untimely motion to dismiss disguised as a

request to charge.

          Even were the Court to consider the merits of the new

legal theory, I would remain unpersuaded that the license in

560.516 to process transfers arising from underlying

transactions not prohibited by the ITSR is as broad and wide

ranging as the defense suggests.  Moreover, the defense has not

explained how, even accepting his interpretation of this

section, the charged transactions would not still be

"prohibited under this part" by Section 204.

          Second, the defense's urging that the Court reconsider

an argument previously made in his timely filed motion to

dismiss amounts effectively to an untimely filed motion for

reconsideration of this Court's December 6, 2019, opinion and

K34nsad1

1    order.  Pursuant to Local Criminal Rule 49.1, a motion for

2    reconsideration for reargument of a court order determining a

3    motion shall be filed and served within 14 days after the

4    Court's determination of the original motion.  Because Mr. Sadr

5    filed his memorandum of law imploring the Court to reconsider

6    its December 6 opinion and order nearly two months after that

7    decision was issued, and only two days before trial, I decline

8    the untimely 11th hour invitation to reconsider it.

9            That said, even were the memorandum timely filed, it

10   would still fail to meet the standard for granting a motion for

11   reconsideration because the defense has failed to point to

12   controlling decisions or data that the Court overlooked.

13           In light of this conclusion, a sort of related point

14   is that I deny the defense's request to have the jury

15   instructed on Section 560.516, because this request is premised

16   on legal arguments that the Court has rejected.

17           Finally, to the extent that the defense couches this

18   novel legal theory or the one it sought reconsideration as

19   something to put before the jury to suggest an inference about

20   Mr. Sadr's state of mind, first, with respect to the novel

21   legal theory, the one articulated for the first time 48 hours

22   or so ago, I do find it facially incredible that a newfangled

23   argument that Mr. Sadr's counsel himself only fully understood

24   on the first day of trial was plausibly in Mr. Sadr's mind

25   during the relevant time period.  But, in any event, as I've

K34nsad1

1        stated time and again, without evidence that Mr. Sadr was aware

2        of Section 560.516, legal arguments either of the novel or

3        well-trodden variety with respect to whether he could have

4        thought certain conduct was licensed by it are irrelevant and

5        unduly prejudicial based on my full awareness now that I have

6        heard oral arguments and the opening of evidence here.

7                So, again, if there's evidence making the link to

8        Mr. Sadr's knowledge, that's one thing.  In the absence of it,

9        it is both irrelevant and prejudicial.

10               That deals with 560.516.

11               Then I have the parties' letter briefing on

12       Ms. Ebanks.  Let me just pull it up.

13               Then Ms. Kim, if you can tell me again what you have

14       worked out.

15               Ms. Kim, you are drawing off the original letter?

16               MS. KIM:  Yes, your Honor.

17               THE COURT:  OK.  In terms of the categories?

18               MS. KIM:  Yes.

19               THE COURT:  I've got it.

20               OK.  I have the letter in front of me.

21               So with respect to category 1, I think those -- the

22       three are outlined in your response.

23               MS. KIM:  Yes, it's page 3.  And I have a copy if that

24       would be helpful.

25               THE COURT:  That would be great.  Thank you.

K34nsad1

1          MS. KIM:  I do have one note on it.

2          THE COURT:  All right.

3          This is from the government's letter from last night.

4          So category 2 is the one you've worked out?

5          MS. KIM:  Category 1 is the one we've worked out.

6          Category 2 there is no objection.

7          Category 3 there is continuing dispute.

8          THE COURT:  Category 1 you worked out; category 2, no

9    objection; category 3 on derisking.

10          MR. HEBERLIG:  Category 1 can we just put on the

11   record, I think I understand where counsel is going and I don't

12   object, but I would like it to be memorialized, what we've

13   agreed to.

14          THE COURT:  Great.  Go ahead.

15          MS. KIM:  For category 1, your Honor --

16          THE COURT:  I took your notes.  Perhaps you want that

17   back.

18          MS. KIM:  For category 1 the government plans to

19   elicit testimony that Ms. Ebanks would describe the due

20   diligence practices in relation to the SKN CBP application

21   process as lax and not rigorous.

22          Then the second point, that the vast majority of

23   applications were accepted through this program.  We don't plan

24   on going into the risk posed to AML/CFT systems, but I would

25   flag that two of the defense exhibits, which we don't think are

K34nsad1

1    admissible because they are the defendant's statements, refer

2    to financial benefits from SKN in terms of their banking

3    practices and their transparency.  And so, should that type of

4    evidence be admitted, we may potentially consider calling a

5    rebuttal case that would include some of this discussion.  But

6    for purposes of the witness today we don't plan on getting into

7    that.

8                THE COURT:  Go ahead.

9                I'm sorry, Mr. Heberlig.  Go ahead.

10               MR. HEBERLIG:  I was going to suggest, we are in

11   agreement with the way it was framed.  Perhaps the safest way

12   to do this, we wouldn't object to leading questions in those

13   two areas of inquiry, yes answers and move on.

14               THE COURT:  OK.  I think that's good so we don't arch

15   over into the kinds of areas that you've agreed to avoid.  OK.

16   Thank you.

17               Then we'll deal at an appropriate break with the

18   government's hearsay objections to the defendant's documents

19   that may reimplicate the issue, but for now I think we're good.

20               OK.  Go ahead, Ms. Kim.

21               MS. KIM:  The third category is still in dispute.

22   This is the category of derisking.  So we plan to elicit

23   limited testimony from Ms. Ebanks on this issue.

24               First we plan to ask her what derisking is, what her

25   understanding of what derisking is, and we anticipate that she

K34nsad1

```
1    will say that it is a process by which correspondent banking

2    relationships and customer banking relationships may be

3    terminated.  She describes it as loss of banking relationships

4    because they are high risk.

5              We then plan to ask her or propose asking her what she

6    means by high risk, and she would then go into some of the

7    categories or examples of high risk considerations or factors

8    for both correspondent banking relationships and customer

9    banking relationships.

10             The customer banking relationship risks include things

11   like customers are not able to explain business reasons for

12   monetary transactions, access is granted to a certain bank

13   account to multiple individuals, unusual patterns of

14   transactions or instructions.

15             Here the government submits, you know, we didn't view

16   this entire category of evidence as relevant.  The defense has

17   indicated that they're going to elicit expert testimony on this

18   issue and has opened on it.

19             So, from the defense's opening, there are two primary

20   references to derisking.  It's described as to avoid, that the

21   defendant tried to avoid the hassle caused by derisking and

22   because a bank could simply turn him down because he's Persian.

23   We think that that opened the door to this testimony and it's

24   important to clarify what exactly derisking is.

25             THE COURT:  Go ahead, Mr. Heberlig.
```

K34nsad1

1          MR. HEBERLIG:  While we don't dispute the relevance of
2    the topic, this is an area of expert testimony.  She is not a
3    fact witness.  She had no interactions with Mr. Sadr which
4    she's going to be describing.  It does not relate to his
5    banking practices.  We've not been provided notice of what her
6    opinions are or her qualifications.  We don't even have a
7    résumé for her.  It is not appropriate on the eve of testimony
8    to be provided with expert testimony and notice that that's
9    what the government intends to go into.

10         What she will be testifying to is based entirely on
11   hearsay, the work that she's done in the Treasury Department
12   speaking with other people, learning about other programs.  We
13   don't think it is appropriate for fact testimony from this
14   witness.

15         If they want to identify a rebuttal expert, by all
16   means that would be appropriate.  They could identify the
17   bases, the witness's qualifications, but they haven't done so
18   with respect to Ms. Ebanks.  If the Court is even going to
19   consider this, we are going to have to ask her what her
20   opinions are on the stand and voir dire her qualifications and
21   we need some more information about her background.

22         Obviously until last night we believed mistakenly she
23   was coming from the State Department based on what the
24   government said.  I can understand now that the notes had a
25   reference to a job title.  It wasn't apparent to us.  So I mean

K34nsad1

1    this is truly 11th hour, and we don't believe it is appropriate

2    for the reasons we've stated in our letter.

3            MS. KIM:  Your Honor, may I just respond briefly?

4            THE COURT:  Yes.

5            It's rebuttal to what the defendant's have raised over

6    your objection and I am allowing them to do on derisking.

7            As Mr. Heberlig said, he doesn't dispute the relevance

8    of it.  The question is whether it is expert testimony and

9    whether it's appropriate through this witness.

10           MS. KIM:  So we don't believe that this is a

11   particularly difficult concept or that this is expert

12   testimony.  Ms. Ebanks works with -- and the defense is free to

13   voir dire her if necessary -- but the concept itself and her

14   proposed testimony is fairly simple.  It will be short,

15   probably about five minutes.  She works with these types of

16   compliance issues on a regular basis.  That's part of her job.

17   So she has personal knowledge about what derisking is and what

18   conversations are about derisking in the banking community.  I

19   think she could testify to a lot more, but we are really

20   proposing a narrow scope of testimony for her in response to

21   what the defense opened on.

22           I just also want to clarify for the record, because

23   defense's letter has stated that we did not disclose her title.

24   The first piece of 3500, at the top of the page it says, Crina

25   Ebanks policy adviser, financial crimes, Treasury, terrorist

K34nsad1

1    financing and financial crimes and anti-money laundering.  That

2    was produced to the defendant on February 14, 2020.

3              I would also say on the issue of due diligence there

4    was also an allegation that we hadn't disclosed that topic

5    until the eve of trial.  Based on our productions, the fact

6    that SKN lacks due diligence procedures with respect to the CBI

7    program, that was disclosed on February 14 as well as prior to

8    trial through 3500 material.  So I just want to clarify that

9    for the record.

10             But, again, with respect to Ms. Ebanks and her very

11   limited testimony, we don't think that this is expert

12   testimony.  She is defining this concept and providing very

13   little factual testimony about it, and it is very likely that

14   she won't be available, given her health situation on rebuttal.

15             THE COURT:  I guess, Mr. Heberlig, it does seem

16   parallel to the kind of testimony of Mr. Kim from OFAC, in the

17   nature of the testimony which you specifically requested not be

18   deemed expert testimony.  It's information derived from the

19   job.

20             MR. HEBERLIG:  There are a couple of significant

21   differences.  He's testifying because OFAC is alleged to be the

22   agency that was defrauded by the conduct.  He's going to be

23   testifying about what they do, what their enforcement regime

24   is, and limited information about the regs that are at issue.

25   That's factual information that is in play with the charges.

1          What was just described, she said that Ms. Ebanks

2     knows about this concept from conversations she'd had about

3     derisking in the business community.  She is not a banker.

4     What she knows is pure hearsay from talking with bankers.

5     That's the subject of expert testimony.

6          There's limited ways in which the government can offer

7     opinion testimony through a witness that's based on hearsay,

8     but it's through the rules regarding expert testimony.  She

9     can't come in and say generally I know that derisking is this

10    and such and such based on communications she's had with

11    bankers in the industry.

12         We will have some bankers on the stand, and if the

13    government can elicit from them, that, no, we J.P. Morgan or

14    Citibank are not engaged in derisking, that is not a concept we

15    are aware of, that would be fact testimony with respect to the

16    relevant banks here.  This is opinion and it's expert and it

17    hasn't been noticed.

18         MS. KIM:  Your Honor, if that's the case, we propose

19    that defense counsel voir dire the witness, and we can qualify

20    her as an expert.  We don't have an opposition to that.  We do

21    think that the substance of her testimony is very limited and

22    fact based.  As the Court has pointed out, Mr. Kim and the bank

23    witnesses in this case are not testifying as expert witnesses.

24    They're testifying as fact witnesses.  But we do think that it

25    would be inefficient to have her come back to testify for five

K34nsad1

 1    minutes.  That would be, quite frankly, an inefficient use of

 2    the jury's time as well.

 3         THE COURT:  Well, I mean, I guess it depends a little

 4    on when we do the voir dire.

 5         MR. HEBERLIG:  I mean, just to be clear, I haven't had

 6    an opportunity to interview this witness.  From the one-line of

 7    information in the letter, I expect a full examination of what

 8    are your opinions and what are they based on and what are your

 9    qualifications.  I think that's going to take at least a half

10    hour, possibly 45 minutes.  I mean, I have no idea what she's

11    going to say about these topics.  I literally received a half

12    page of notes, your Honor.

13         THE COURT:  Here's what I'm going to do:  I think it

14    may be an inefficiency, but I will allow the government to

15    notice and provide information for purposes of a rebuttal

16    witness, and I imagine that the government has access to people

17    other than Ms. Ebanks.

18         Recognizing her medical condition, we won't do this

19    with Ms. Ebanks, but the government is perfectly able to

20    provide notice and relevant information for rebuttal witness so

21    that we can take care of any qualification issues and provide

22    relevant opinions in advance of any rebuttal case.

23         All right.  What else?

24         So you don't need any additional guidance with respect

25    to Ms. Ebanks?

K34nsad1

1          MS. KIM:  That's correct, your Honor.  I think there's

2     one sort of additional issue that we would appreciate guidance

3     on.

4          THE COURT:  Sure.

5          MS. KIM:  That is, again, the use of the word

6     "terrorism."

7          THE COURT:  Yes.

8          MS. KIM:  So defense counsel in his first letter

9     continued to state that we should be precluded from using that

10    term.  To be clear, we have directed our witnesses not to use

11    that term, and that has been sort of a painstaking process for

12    the OFAC witness because it's interrelated to sort of the way

13    that he describes some of the sanctions programs.

14         We're fine sticking with that, but we do think that,

15    given that the defense opened and used the terms terrorism,

16    nukes, multiple times, and I believe yesterday or the day

17    before said that it's not a secret that terrorism is a part of

18    the sanctions program and didn't object to certain exhibits

19    using that word that we should be able to use that word in

20    certain limited contexts.  We plan to be conservative with its

21    use, but we think it would not be fair for the defense to be

22    able to use it when they would like but for the government to

23    be precluded.

24         THE COURT:  Mr. Weingarten?

25         MR. WEINGARTEN:  Yes.

K34nsad1

1          THE COURT:  I think when you last spoke on this, you

2     said --

3          MR. WEINGARTEN:  I talked about the orgies.

4          THE COURT:  Right.

5          MR. WEINGARTEN:  No orgies this morning.  There's no

6     blinking reality.  The sanctions are about nukes and terror.

7     We've never objected to the jury generally understanding that.

8     There's 40 years of this.

9          THE COURT:  In light of what Ms. Kim described, their

10    being conservative, their using it in limited ways to the

11    extent it is part of a title or an office name or a job

12    responsibility, as long as it's cautiously --

13         MR. WEINGARTEN:  Yes.

14         THE COURT:  -- done, it's OK?

15         MR. WEINGARTEN:  Fine.

16         THE COURT:  Fine.

17         OK.  Ms. Kim?

18         MS. KIM:  Thank you, your Honor.  That's it from the

19    government.

20         THE COURT:  OK.  Mr. Heberlig?

21         MR. HEBERLIG:  I am not trying to violate the

22    one-lawyer rule.  This relates to the witness.  I assume that

23    means with respect to someone like Ms. Ebanks, she can be

24    introduced by her title, but there won't be background

25    information about what she does in that capacity to investigate

K34nsad1

1   counterterrorism financing.  That's not relevant to this case,

2   and there is a distinction between what Mr. Weingarten did,

3   just talking about the history of the bases for the sanctions,

4   then trying to suggest from a witness who wasn't part of the

5   investigation even that her job is rooting out terrorist

6   financing.  That has nothing to do with this case.

7          THE COURT:  You are violating the rule, and you are

8   not even trying not to, and you have demonstrated precisely why

9   I have it.  But I'm happy to see if Ms. Kim agrees.

10         MS. KIM:  Your Honor, what we anticipate Ms. Ebanks

11  will say about some of her responsibilities, so she will

12  describe what her office does, and that includes combating

13  money laundering, financing of national security threats, and

14  managing AML/CFT programs, anti-money laundering, combating

15  financial terrorism programs.  That is part of her job, and

16  that is where she works.

17         We also expect that she will describe some of her

18  responsibilities as a policy officer.  Again, we don't plan to

19  harp on this.  These are the basic background questions that we

20  ask of any witness.

21         So we expect that if she were to testify with respect

22  to some of her duties and responsibilities she would talk about

23  ensuring that other countries are strengthening their AML/CFT

24  programs, advising other countries on these programs, engaging

25  in bilateral discussions about these programs.

K34nsad1

1          We also expect that she will describe that the reason

2     why she's familiar with and works with CBI programs is because

3     through these programs an individual is able to obtain a

4     passport or an identity document that they can then use to gain

5     access to the financial system, so, for example, open a bank

6     account and that's it.

7          We are not planning on going into the wealth of other

8     information that she has on that topic, but we think that that

9     establishes her basis of knowledge for her testimony.

10          MR. HEBERLIG:  We object to that, that windup.  To ask

11     the question what is the CBI passport program and how quickly

12     can you get approved is not relevant to the charges and none of

13     that should come in.  It's to suggest to the jury that somehow

14     she was looking at the program or Mr. Sadr for those reasons.

15     She wasn't.  She didn't investigate the case.  All that is

16     relevant from her testimony is what the requirements are to

17     apply for a passport and how quickly it can be approved.

18     That's what we understood to be that she would say.  We said

19     fine.  We'll stipulate to that.

20          MS. KIM:  Your Honor, I think this goes to both the

21     credibility of the witness, but we are also entitled to

22     introduce who this witness is that the jury is hearing from.  I

23     will also say that we did try to work with defense counsel on a

24     stipulation about the St. Kitts and Nevis CBI program.  It

25     appears, based what the defense wanted to include in that, that

K34nsad1

1    they may present evidence that this was sort of a legitimate

2    application process.  So that's why we're asking the questions

3    about due diligence.

4              MR. HEBERLIG:  I am not sure what counsel means by not

5    a legitimate application process.  He applied, they approved.

6    I mean, the program is what it is.  But any suggestion that he

7    fraudulently obtained the citizenship is just not true.

8              MS. KIM:  We are not saying that he fraudulently

9    obtained it.  We would also just point out that the defense is

10   welcome to, of course, cross her on the fact that she wasn't

11   involved in this investigation.  My understanding is that she

12   does not investigate these types of cases.  She works on --

13             THE COURT:  I mean, given that, then you don't need it

14   to set up her background.  So just limit the question, and

15   leading is fine, but with respect to permissible areas tell us

16   about your background.  Just lead her through that.  The risk

17   of prejudice is there, and it's not a parallel to the defense's

18   invocation of terrorism to say that essentially this isn't what

19   it was about or this is Mr. Sadr's understanding, was that

20   sanctions were about that.  That then doesn't open the door in

21   the way that you suggested.

22             Let's be cautious here.  I think in light of what you

23   just said there's room for limiting her credentials and

24   background and experience to avoid discussion of

25   terrorism-related investigations.

K34nsad1

1          Thank you.  Go ahead.

2          MR. HEBERLIG:  Two other.

3          One is a housekeeping matter.  One we can take it up

4    now or later.

5          THE COURT:  Let me just check on our jury number.

6          MR. HEBERLIG:  Sure.

7          THE COURT:  Go ahead.

8          MR. HEBERLIG:  One is an exhibit issue.  Yesterday in

9    Ms. Kim's examination I think she offered Government Exhibits

10   2148 and 2148A through D.  But the transcript reflects only

11   that 2148A through D were received in evidence.  I think that

12   is an oversight.  Government Exhibit 2148 should have been

13   admitted as well.  We would like it to be admitted, so if there

14   is a way to clarify the record.

15         THE COURT:  Just confirmation that 2148 was admitted?

16         MR. HEBERLIG:  Correct.  Which is the e-mail attaching

17   A through D.

18         THE COURT:  OK.  Ms. Kim?

19         MS. KIM:  That's correct, your Honor.

20         THE COURT:  All right.  Fine.  If I didn't say it

21   previously, 2148, the e-mail attaching -- what was it, A

22   through D, Mr. Heberlig?

23         MR. HEBERLIG:  Yes.

24         THE COURT:  2148 itself is also received in evidence.

25         (Government Exhibit 2148 received in evidence)

K34nsad1

1          MR. HEBERLIG:  The last issue, maybe it is not the

2     right time.  This may be Ms. Lake's issue.  With the document

3     reader that's coming I think after Mr. Kazerani, maybe even

4     after Ms. Ebanks, there are probably five exhibits out of the

5     20 or so that the government intends to use over which we have

6     some objections, and at any point can address those.

7          THE COURT:  OK.  I think we should break and see if

8     Mr. Kazerani is here, Mr. Krouse.

9          MR. KROUSE:  Yes, your Honor.

10          THE COURT:  And see if we have clarity as to his

11     healthiness to testify.

12          MR. KROUSE:  Yes, your Honor.

13          THE COURT:  We'll check on our jurors.  I'll come back

14     in five, and if we're still waiting for jurors I can take those

15     up.

16          MR. KROUSE:  Sure.

17          (Recess)

18          THE COURT:  All right.  We are still waiting for one

19     juror who had diligently called quite early this morning to say

20     that they would likely be about 30 to 45 minutes late, but I

21     wanted to check in on Mr. Kazerani.

22          How is the witness?

23          MR. KROUSE:  He seems fine, your Honor.  Pursuant to

24     the Court's ruling, I didn't speak extensively with him.  I

25     just checked on his health.  He seems in good spirits and OK.

K34nsad1

1    He did go to the hospital last night, but it apparently is not

2    anything serious, so he should be fine.

3            THE COURT:  OK.  All right.

4            I guess I propose just saying to him with the jury I'm

5    sorry you didn't feel well last night, I'm glad you're feeling

6    better.  We'll proceed.

7            OK.  Anything else?

8            The defense has an issue with the -- you are working

9    on it.  OK.  You're good?

10            THE TECHNICIAN:  For now.

11            THE COURT:  OK.

12            Anything else?  No.  All right.

13            Then we will just wait for the juror.

14            (Recess)

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Good morning everyone.  I know that a

3     couple people had transportation issues and the like today.  I

4     thank you for your efforts to get here on time and your

5     communication with the Court as to issues, and just to ask to

6     keep pushing, as I know that you are, for timeliness.

7            Because are starting a little bit late, I will see how

8     we're doing.  We will either take a short morning break or try

9     to get through the morning break and hit lunch a little earlier

10    to keep being efficient.

11           We're going to continue with the conclusion of the

12    direct testimony of Mr. Kazerani.  And Mr. Kazerani, I'm glad

13    that you're feeling better.

14           MR. KROUSE:  Thank you, your Honor.

15     FARSHID KAZERANI,

16        having been previously sworn, testified as follows:

17    DIRECT EXAMINATION

18    BY MR. KROUSE:

19    Q.  Good morning, Mr. Kazerani.

20           THE COURT:  And Mr. Kazerani, I do remind you, sir,

21    that you are under oath.

22           THE WITNESS:  Yes.

23    Q.  Mr. Kazerani, you testified yesterday that you did not see

24    Stratus Contracting mistreated by the government during the

25    time that you worked with them.  Do you remember that

1   testimony?

2   A.   Yes.

3   Q.   And that, in fact, Stratus Contracting did multiple

4   projects for the Iranian government, correct?

5   A.   Yes.

6   Q.   During your time at Stratus from 1992 to 2013, did you ever

7   see Mohammad Sadr mistreated by the government in any way?

8   A.   I did not see that.

9             MR. KROUSE:  Mr. Milione, Government Exhibit 2195,

10  please.

11            This is an email chain from Ali Sadr on Sunday,

12  May 23rd, 2010, the subject is Stratus catalogue, it's to an

13  individual indicated Ojian.  It says:  Please send me the

14  complete catalog as is as soon as possible.  Best, A. Sadr.

15            Zoom out of that, please, and zoom in to the top half.

16            Ojian responds to Ali Sadr, May 23, 2010 with an

17  attachment titled Stratus Catalog, 23.05.2010.PDF.

18            Dear Mr. Ali Sadr, please find attached catalog

19  including Venezuela project for your kind attention.  With

20  regards, Stratus International Contracting Company, manager

21  business development department, Peyman Ojian, then there's a

22  series of phone numbers and an email and a website.

23  Q.   Do you know who Peyman Ojian is, Mr. Kazerani?

24  A.   The marketing director of Stratus Contracting Company.

25            MR. KROUSE:  And Mr. Milione, could you put on the

K34TSAD2                         Kazerani - Direct

1   screen the attachment 2195A, please.

2   Q.  Mr. Kazerani, do you recognize the cover of this document?

3   A.  Yes.

4   Q.  What is it?

5   A.  This is a photo of projects done by Stratus Contracting

6   company.

7            MR. KROUSE:  And if I could approach the witness, your

8   Honor?

9            THE COURT:  To show what?

10           MR. KROUSE:  The full document.

11           THE COURT:  Of 21 --

12           MR. KROUSE:  2195A.

13           THE COURT:  Go ahead.

14           MR. KROUSE:  Thank you, your Honor.

15  BY MR. KROUSE:

16  Q.  Mr. Kazerani, do you recognize the overall document?

17  A.  Yes.

18  Q.  What is this?

19  A.  This is promotional or commercial brochure or marketing

20  brochure.

21  Q.  For which company?

22  A.  International Contracting Company.

23  Q.  Stratus, correct?

24  A.  Stratus, yes.

25  Q.  This is the one that -- the company that you worked for?

K34TSAD2                          Kazerani - Direct

1   A.  Yes.

2   Q.  What was the purpose of this marketing brochure?

3   A.  It was an advertisement for the employer from whom we were

4   to get contracts.

5           MR. KROUSE:  Mr. Milione, page 2, please and I will

6   scroll through this.

7           States at the top Stratus International Contracting

8   Company has been established in 1978 in Teheran, Iran.  There

9   are various other items on that page.  I will skip that to page

10  3, please.

11          Here it states Stratus group of companies, included in

12  the list under finance, credit, investment and insurance is

13  the -- the third one is Eghtesad Novin Bank, and then under oil

14  and gas and general contract, Kish Oriental Oil, private joint

15  stock.

16  Q.  When it says here Stratus group of companies, what's that

17  mean?

18  A.  It's the same as the holding company.

19  Q.  So these are all the other companies under the holding

20  group?

21  A.  Yes.

22          MR. KROUSE:  Next page, please.

23  Q.  Do you recognize this project?

24  A.  Yes.

25  Q.  Who is the employer for the project, meaning who paid for

K34TSAD2                        Kazerani - Direct

1    it?

2    A.  Ministry of energy or ministry of power.

3    Q.  The ministry of energy for which government?

4    A.  Iranian government.

5    Q.  Is this project in Iran?

6    A.  Yes.

7           MR. KROUSE:  Next page, please.  Skip this page.

8           This page lists various ongoing projects and completed

9    projects.

10   Q.  Mr. Kazerani, do you recognize the names of these various

11   projects?

12   A.  Yes.

13   Q.  Which country were the majority of these projects completed

14   in?

15   A.  Iran.

16          MR. KROUSE:  Next page, please.

17   Q.  Do you recognize this project?

18   A.  Yes.

19   Q.  And the employer listed there is ministry of road and

20   transportation, correct?

21   A.  Yes.

22   Q.  And that's the ministry of road and transportation for

23   which country?

24   A.  Iran.

25          MR. KROUSE:  Next page, please.

1   Q.  Do you recognize this tunnel project?

2   A.  Yes.

3   Q.  Same employer, correct, ministry of roads and

4   transportation for Iran?

5   A.  Yes.

6          MR. KROUSE:  Next page.

7   Q.  Another project ministry of roads and transportation for

8   Iran?

9   A.  Yes.

10          MR. KROUSE:  Next page.

11   Q.  Another project for the ministry of roads and

12   transportation for Iran?

13   A.  Yes.

14          MR. KROUSE:  Next page.

15   Q.  This says the employer is the Iran Water and Power

16   Resources Development for Azad Storage Dam.

17          MR. KROUSE:  Next page.

18   A.  Yes.

19   Q.  Another dam for the Zanjan Province water organization.

20   A.  Yes.

21   Q.  Also in Iran?

22   A.  Yes.

23          MR. KROUSE:  Next page, same project.  Next page.

24   Q.  And here's a project that was in Djibouti, which is a

25   separate country from Iran, correct?

1    A.  Outside of Iran.

2              MR. KROUSE:  Next page.

3    Q.  Now this states 7,000 units new Ojeda housing development

4    project, and this is the Venezuela project you were testifying

5    about yesterday, correct?

6    A.  Yes.

7    Q.  And here the employer is listed as Ducolsa Urban

8    Development SA, correct?

9    A.  Yes.

10             MR. KROUSE:  Next page, please.

11   Q.  Another project in Khuzestan Province.  Is that located in

12   Iran as well?

13   A.  Yes.

14             MR. KROUSE:  Next page.

15   Q.  Another project in Lorestan Province, is that in Iran?

16   A.  Yes, in Iran.

17             MR. KROUSE:  Next page.  Ministry of road and

18   transportation.

19             You can go to the next page.

20   Q.  This is in Azerbaijan, correct?

21   A.  Yes, in Iran.

22             MR. KROUSE:  Next page.

23   Q.  This is in Yemen, correct?

24   A.  Yes.

25             MR. KROUSE:  Next page.

K34TSAD2                         Kazerani - Direct

1    Q.  This is in the Republic of Pakistan, correct?

2    A.  Yes.

3    Q.  Is this the Pakistan project that you referenced a couple

4    of times in your testimony?

5    A.  Yes.

6           MR. KROUSE:  Next page.  This is a highway project

7    ministry of roads and transportation for Iran.

8           Again, another road project for the ministry of roads

9    and transportation in Iran.

10          Another project, same employer, ministry of roads and

11   transportation in Iran.

12          Again, ministry of roads and transportation in Iran.

13          And this is a page we don't need to spend time on.

14          Next page.  And then here at the -- this is the last

15   page of the document, there's an address listed, Number 35

16   Bolstand Street, Iran Zamin Avenue, Shahrake Ghods, Teheran,

17   Iran with the country code 98.

18          You can take that down.

19          Government Exhibit 1001T and 1001.  Looking at the

20   translation, if you could zoom in to the header and the text,

21   please, thank you.

22          This is from internal or international@

23   stratusholding.com, an email sent November 3, 2013, sent to

24   asafaverdi@yahoo.com, asafaverdi@gmail.com copying

25   hsn1957@yahoo.com.

1           It says:  Dear Mr. Safaverdi, greetings.  Please find

2    attached a PowerPoint for the introduction to the Stratus Group

3    in English, which was sent to you.  Best regards, Stratus

4    Holdings Office.

5           There's an attachment to this called Stratus Holding

6    profile equals English, Government Exhibit 1001A, which is the

7    attachment, please.

8    Q.  Do you recognize this exhibit?

9    A.  This is in regard to Stratus Holding.

10          MR. KROUSE:  It says Stratus Holding Group at the top,

11   history of achievements, September 2013 International Affairs

12   Department.

13          Second page, please.

14   Q.  Who is this a photograph of?

15   A.  Mohammad Sadr Hashemi Nejad.

16          MR. KROUSE:  It says:  By his previous business

17   client, Mohammad Sadr Hashemi Nejad, chairman of the group, has

18   been conducting one of the most leading companies in the

19   contracting industry in the Middle East region.  He is one the

20   most successful entrepreneurs and pioneer in the export of

21   technoengineering services.  Mr. Sadr established the first

22   private building group in Iran consisting of more than 80

23   private and public companies in different countries.

24          Just at the top it says Stratus Holding Group is the

25   first, biggest, and most diversified private economic group in

1    Iran, extensively active in different fields such as banking

2    affairs, finance, investment, stock exchange, leasing,

3    insurance, technical engineering projects, EG design and

4    construction of road, railway, airport, tunnel, bridge, dam,

5    water transmission, sewage, residential, commercial,

6    recreational, tourism, educational and office buildings,

7    industrial structures, pipelines, et cetera, import/export of

8    essential goods and commodities and other areas.

9            If you could flip through the rest.

10           This slide mentioned EN Bank, which was referenced in

11   the earlier slide.

12           If I could stop you.

13   Q.  This says Iranian International Housing Company.  You

14   testified this was the general contractor on the Venezuela

15   project, correct?

16   A.  Yes.

17           MR. KROUSE:  It states:  Establishment date 2007, main

18   projects, construction of 12,000 residential units in Ojeda new

19   city in Venezuela.

20           And then the next page.  Here's the same company,

21   Iranian International Housing Company.  This mass housing

22   production project is constructed for 60,000 inhabitants in an

23   area of 318 hectares on the outskirts of Ojeda in Solia

24   Province.

25           Next page.

1   Q.  This is the company that you worked for, correct?

2   A.  Yes.

3   Q.  Which was within this overall holding group.

4   A.  Yes.

5          MR. KROUSE:  You can keep going, Mr. Milione.

6          THE COURT:  Next document, Mr. Krouse.

7          MR. KROUSE:  Yes, your Honor.

8   Q.  After you left Stratus, Mr. Kazerani, did you continue to

9   join phone calls and meetings regarding the Venezuela project?

10  A.  On a limited basis.

11  Q.  And just to remind the jury, you left Stratus in August of

12  2013, correct?

13  A.  Yes.

14  Q.  Why did you continue to join calls and meetings on a

15  limited basis for the Venezuela project?

16  A.  I worked with Mr. Cetinel.  If he had any questions, I

17  would answer.

18  Q.  When you worked for Stratus, did you travel for work?

19  A.  Yes.

20  Q.  Where would you go for work to travel internationally?

21  A.  Yemen, Pakistan, Germany, Switzerland, Turkey.

22  Q.  So those various international locations you traveled to

23  for work, correct?

24  A.  Yes.

25  Q.  What country's passport would you use to take those

1   international trips?

2   A.  Iran.

3   Q.  Did you have any other passport other than an Iranian

4   passport?

5   A.  No.

6   Q.  How about now, do you have any other passport other than an

7   Iranian passport?

8   A.  No.

9   Q.  And you still travel on that passport, correct?

10  A.  Yes.

11  Q.  You first met with the government in response to a

12  subpoena, is that right?

13  A.  Yes.

14  Q.  That first meeting with the government was on December 16,

15  2019, correct?

16  A.  Yes.

17  Q.  And you were later served with a trial subpoena that

18  compelled your testimony in court today, is that right?

19  A.  Yes.

20  Q.  Have you received any benefits from the government in

21  exchange for your testimony?

22  A.  No.

23  Q.  Would you rather be doing something other than testifying

24  here today in court?

25  A.  Yes.

K34TSAD2                          Kazerani - Cross

1    Q.  You are required by the subpoena that was issued to testify

2    today, is that right?

3    A.  Yes.

4              MR. KROUSE:  No further questions, your Honor.

5              THE COURT:  Thank you.

6              Mr. Weingarten, your cross-examination.

7    CROSS-EXAMINATION

8    BY MR. WEINGARTEN:

9    Q.  Mr. Kazerani, my name is Reid Weingarten, and I represent

10   Ali Sadr.  Good morning.

11             So let me just get the basics.  You were born in Iran,

12   correct?

13   A.  Yes.

14   Q.  And you went to university and got a degree in engineering?

15   A.  Yes.

16   Q.  And after graduating you went to work for Stratus, the

17   Stratus Construction Company, correct?

18   A.  After my military service.

19   Q.  After your military service.

20             And you worked there for over 20 years, correct?

21   A.  Yes.

22   Q.  And you rose from a bottom level engineer to the CEO of the

23   company, correct?

24   A.  Yes.

25   Q.  And you are very proud of your work and very proud of the

K34TSAD2                         Kazerani - Cross

1    company, correct?

2    A.  Yes.

3    Q.  And the company was built by Mohammad Sadr, the father of

4    Ali Sadr, correct?

5    A.  Yes.

6    Q.  And he started with a very small construction company at or

7    around the time of the revolution and built one of the great

8    conglomerates in the Middle East, fair?

9    A.  Yes.

10   Q.  And the Stratus family, including the construction company,

11   has done a great number of projects, fair?

12   A.  Yes.

13   Q.  And the projects in Iran are largely infrastructure

14   projects, correct?

15   A.  Yes.

16   Q.  Dams, roads, tunnels, bridges?

17   A.  Yes.

18   Q.  And this work began after the Iraq/Iran war where Iran was

19   devastated, true?

20   A.  Yes.

21   Q.  And Iran desperately needed these projects to build the

22   company back, correct?

23            THE INTERPRETER:  Iran wanted?

24            MR. WEINGARTEN:  Iran.

25   A.  Yes.

K34TSAD2                     Kazerani - Cross

1    Q.  It's true for some of the Iranian projects, the Stratus

2    group had a great deal of difficulty getting paid by the

3    government, correct?

4    A.  Yes.

5    Q.  And sometimes the delays were years, correct?

6    A.  Yes.

7    Q.  And did I understand you to testify that you never knew

8    that the government of Iran mistreated Mohammad Sadr

9    personally?

10            MR. KROUSE:  Misstates the testimony, your Honor.

11            THE COURT:  I'll allow it.

12   A.  Yes.

13   Q.  Have you ever heard of Evin Prison?

14   A.  Yes.

15            MR. KROUSE:  Objection, relevance.

16            THE COURT:  Overruled.

17   Q.  What is it?

18   A.  In Teheran, Iran.

19   Q.  Is it a notorious prison where political prisoners go and

20   get tortured, is that your understanding?

21            MR. KROUSE:  Relevance, your Honor.

22            THE COURT:  Overruled.

23   A.  For anyone with conviction going to jail.

24   Q.  Isn't it true that Mohammad Sadr spent years in that

25   prison?

1        MR. KROUSE:  Objection, lack of foundation, hearsay.

2        THE COURT:  Overruled.

3        MR. KROUSE:  How would the witness know?

4        THE COURT:  Overruled.

5   A.  Yes.

6   Q.  And isn't it true that just recently Mohammad Sadr's home

7   was raided by the government of Iran?

8        MR. KROUSE:  Objection.

9        THE COURT:  Sustained.

10  Q.  Do you know whether or not Mohammad Sadr's home was raided

11  by the government of Iran?

12       MR. KROUSE:  Objection, calls for hearsay, relevance.

13  It's not within the time frame of this case.

14       THE COURT:  Overruled.

15  A.  Recently?  You mean recently?

16  Q.  Do you know whether or not his home was raided?

17       I'll ask the question generally.  Do you know whether

18  or not Mohammad Sadr's home was raided by the government of

19  Iran?

20       MR. KROUSE:  How would he know other than hearsay?

21       THE COURT:  It's a question, "do you know."

22       MR. KROUSE:  Could he lay a foundation for him to

23  know?

24       THE COURT:  Overruled.

25  A.  No.

K34TSAD2                         Kazerani - Cross

1    Q.  You don't know that.

2              Do you know whether or not Mohammad Sadr was recently

3    incarcerated within the last year?

4              MR. KROUSE:  Again relevance, well outside the time

5    frame of the charges in this case.

6              THE COURT:  We'll move to the time frame.

7              MR. WEINGARTEN:  I missed that, your Honor.

8              THE COURT:  I'm sustaining.  We'll move back to the

9    time frame.

10             MR. WEINGARTEN:  There was a -- may we --

11             THE COURT:  No, go ahead.  Go ahead.  Next question.

12   Q.  Do you know whether or not Mohammad Sadr in the period 2008

13   to 2015 was arrested and detained by the government of Iran?

14   A.  I have heard that he was arrested recently.

15   Q.  Let me understand your work at Stratus.  So you rose to the

16   level of CEO and you were assigned that title in 2011, correct?

17   A.  Yes.

18   Q.  And is it your testimony that you ceased being the CEO in

19   2013?

20   A.  The end of 2013.

21   Q.  You received a green card, correct?

22   A.  Yes.

23   Q.  Your family lives in Seattle, Washington, correct?

24   A.  Yes.

25   Q.  And you wanted to join them, correct?

K34TSAD2                         Kazerani - Cross

1    A.   Yes.

2    Q.   But isn't it true you remained as CEO of Stratus and

3    commuted for the next three or four years between Teheran and

4    Seattle?

5    A.   Yes.

6    Q.   And isn't it true, contrary to the testimony you gave on

7    direct, you remained as CEO and the great majority of your time

8    was spent in Teheran working for the Stratus group?

9    A.   No.

10   Q.   What's the truth?

11   A.   They asked me to remain on the job until a proper

12   substitution was found.  In order to maintain their grade --

13   they asked me to remain on the list until there's a

14   substitution found so that the company could keep its grade or

15   grading.

16   Q.   So if we looked at your passport and looked at your travel

17   records between 2013 and 2018, where would you be?

18   A.   I traveled between Teheran and Seattle.

19   Q.   Where were you most of the time?

20   A.   I would stay in Teheran or visit my mother and set up my

21   belongings.

22   Q.   Isn't it also true, sir, that Mohammad Sadr, Ali Sadr's

23   father, made you his special assistant for the holding company

24   after you were done being the CEO?

25   A.   Yes.

1    Q.  And when did that happen?

2    A.  When they found a substitution for my position, they asked

3    me to stay so that the proper transfer would be made so that I

4    would stay during that time period.

5    Q.  Isn't it true, sir, that you wanted to join your family in

6    Seattle, correct?

7    A.  Yes.

8    Q.  And you also wanted to maintain a connection with the

9    Stratus group because you were very proud of working for them,

10   correct?

11   A.  Yes.

12   Q.  And they were happy to do that, correct?

13   A.  Yes.

14   Q.  And they tried to ease your way into the United States by

15   employing you as, first, an assistant to Mohammad Sadr and then

16   as a consultant, isn't that true?

17   A.  Yes.

18   Q.  And you knew that the Stratus group was an international

19   company that did projects all over the world, isn't that true?

20   A.  Yes.

21   Q.  And you wanted to participate in those projects and the

22   Stratus group was encouraging you to do so, correct?

23   A.  Yes.

24   Q.  Let's talk about the $50,000 that you received.

25           MR. WEINGARTEN:  Government Exhibit 2177B, it's

K34TSAD2                          Kazerani - Cross

1    already in evidence, can we put it up.

2    Q.  It is true, is it not, July 18, 2013 you received $50,000

3    in U.S. dollars from Mohammad Sadr, Ali Sadr's dad, correct?

4    A.  Yes.

5    Q.  And this is his personal check to you from his Swiss bank

6    account at Hyposwiss, correct?

7    A.  Now I see this letter, I realize it.  I didn't know it

8    before.

9    Q.  Well, now that you see it, you know that Mohammad Sadr gave

10   you $50,000, you now an American person with a green card,

11   correct?

12   A.  Yes.

13   Q.  Did you ever in your wildest imagination believe that this

14   $50,000 gift to you violated U.S. sanctions?

15          MR. KROUSE:  Objection as to the form of the question.

16   I believe the testimony was this was payment for work, not a

17   gift.

18          THE COURT:  Overruled.

19   A.  This was not a gift, this is what I was owed.

20   Q.  This personal check from Mohammad Sadr to you for $50,000,

21   that was not a gift to you, you believe that was money earned?

22   A.  Yes.

23   Q.  Did you ever believe that whatever this $50,000 was, that

24   you were violating U.S. sanctions by receiving that money?

25   A.  No.

1    Q.  Did you take that check?  Did you deposit that check in

2    your personal account?

3    A.  No, I did not receive a check, it was wired to my account.

4    Q.  I beg your pardon.  When you received the wire, was it an

5    American bank that you received the wire?

6    A.  Yes.

7    Q.  And when you received the wire, did you run to the bank and

8    say I want to volunteer to you that Mohammad Sadr in Teheran

9    has given me this money?

10   A.  No.

11   Q.  Now let's talk about the consulting agreements that you

12   reached.  Did I understand correctly the first one was with

13   Stratus Turkey?

14   A.  No, with Straturk.

15   Q.  Okay.  Is there a company in Istanbul where there are

16   Turkish engineers that do work with Stratus Iran?

17   A.  Yes.

18   Q.  What is the name of that company?

19   A.  Straturk.

20   Q.  And in fact, they played a significant role in the

21   Venezuelan project, did they not?

22   A.  I don't know that.

23   Q.  Well, isn't it true that the Turkish engineers developed a

24   procedure that was innovative and it helped build low income

25   housing quickly?

K34TSAD2                        Kazerani - Cross

1    A.  Yes.

2    Q.  And isn't it true that was the process that was used in

3    Venezuela?

4    A.  Yes.

5    Q.  And isn't it true that's the process that Stratus Iran

6    Construction Company and Stratus Turkey Construction Company

7    used together in other places?

8    A.  Stratus in Iran and Straturk in Turkey were together.

9    Q.  And isn't it true that Stratus Turkey and Stratus Iran,

10   working together, were looking to do projects all over the

11   world?

12           MR. KROUSE:  Could we have a time frame on that

13   question, your Honor?

14   Q.  At or around 2012, 2013 and 2014.

15           THE INTERPRETER:  2011?

16           MR. WEINGARTEN:  Fine.

17   A.  I don't know that.

18   Q.  Isn't it true that when you became a consultant for the

19   Turkish entity, part of what you wanted to do was to work on

20   some of these international projects?

21   A.  Yes.

22   Q.  Then you had consulting contracts with other entities, some

23   connected to Ali Sadr, correct?

24   A.  The father, Ali Sadr?

25   Q.  No, Ali Sadr.

K34TSAD2                        Kazerani - Cross

1    A.  Yes.

2    Q.  And you saw Ali Sadr as a promising young international

3    businessman, did you not?

4    A.  Yes.

5    Q.  And you wanted him to find interesting projects that you

6    could work on once you left Iran, correct?

7    A.  No.

8    Q.  You didn't want to work on international projects that he

9    may find?

10   A.  I just wanted to evaluate the projects, I didn't want to

11   work on the projects.

12   Q.  So you wanted to assume the role of consultant, the project

13   was found, you assess their viability, is that what you're

14   saying?

15           THE INTERPRETER:  Could you read that question.

16           (Record read)

17   A.  Yes.

18   Q.  And you got paid 6,000 a month for a period of three or

19   four years doing that, correct?

20   A.  Yes.

21   Q.  Isn't it true you saw that as the Stratus group trying to

22   ease your way into a life in Seattle, Washington while

23   maintaining a connection with them?

24   A.  I don't think so.

25           (Continued on next page)

K34nsad3                          Kazerani - Cross

1    Q.  What do you think?

2    A.  They would sign contracts with me because of my familiarity

3    and also because of my expertise.

4    Q.  I am not suggesting that you didn't earn the money.  OK.  I

5    will move along.

6           It is true, is it not, that for every one of those

7    $6,000 payments the money came either from a Turkish company or

8    an American company?

9    A.  It would come from the Turkish company into my account.

10   Q.  Then it changed to an American company?

11   A.  My account was in the United States.

12   Q.  Did you ever believe that any of those $6,000 payments that

13   were made to you as a consultant violated U.S. sanctions law?

14   A.  No.

15   Q.  Let's take a look at Government Exhibit 2298.  So, this is

16   the $6,000 payment from the Turkish entity that was blocked,

17   that was stopped.  Do you remember this?

18   A.  Yes.

19   Q.  Just so we're perfectly clear, this is money coming from a

20   Turkish entity to you in the United States, correct?

21   A.  Yes.

22   Q.  What happened once the payment was stopped?  What happened

23   after that?

24   A.  I signed an agreement with the Altitude Capital for the

25   same job.

K34nsad3                        Kazerani - Cross

1    Q.  Is it fair to say that what my client Ali Sadr said to you

2    is:  No worries, we'll switch over so there won't be problems

3    going forward, don't worry about it?

4    A.  Yes.

5    Q.  Isn't it true you viewed this not as a violation of U.S.

6    sanctions, but as an annoyance because you are Iranian?

7    A.  I don't know why this, the fund was blocked.

8               MR. WEINGARTEN:  Can I consult with my client for one

9    second?

10              THE COURT:  You may.

11              (Defense counsel and the defendant conferred)

12              MR. WEINGARTEN:  May I continue?

13              THE COURT:  Please.

14   BY MR. WEINGARTEN:

15   Q.  Let me just be clear on one thing:  You never believed the

16   $6,000 payment that was stopped was a violation of the U.S.

17   sanctions, did you?

18   A.  No.

19              MR. WEINGARTEN:  Excuse me one second.

20              I am a little sniffly.  Sorry.

21   Q.  The government showed you some pictures of projects.  I

22   would like to just take a look at that document briefly.  It's

23   Government Exhibit 101.  If we could put it up.

24              MR. KROUSE:  Just for the record, defense counsel said

25   it's 101, but this is 1001.

K34nsad3                         Kazerani - Cross

1              MR. WEINGARTEN:  I'm sorry.  I beg your pardon.

2              THE COURT:  You meant 1001 or is this the wrong

3    exhibit?  Mr. Weingarten, this is the correct exhibit?

4              MR. WEINGARTEN:  Yes.

5              THE COURT:  OK.  1001.  Go ahead.

6    BY MR. WEINGARTEN:

7    Q.  If you could turn to page 1 of that.  You talked about it

8    with Mr. Krouse briefly, page 1 of that exhibit.  It is on the

9    bottom.  It is actually GX 1001A, page 1.  Sorry.  I'll get it.

10             So this is the Stratus Group history of achievements,

11   and it's September 2013.  Is this a marketing document?

12   A.  Yes.

13   Q.  Let's just turn to page 2.  Again, the man on the right,

14   that's Mohammad Sadr, correct?

15   A.  Yes.

16   Q.  This is a document that celebrates his accomplishments,

17   correct?

18   A.  Yes.

19   Q.  He was a very well-known man in Iran, correct?

20   A.  Yes.

21   Q.  And these projects were not secret in any way, were they?

22   A.  No.

23   Q.  In particular, the Venezuela project was highly publicized,

24   correct?

25   A.  Yes.

K34nsad3                    Kazerani - Cross

1    Q.  There was no effort to keep it a secret from anybody?

2    A.  No.

3    Q.  Let's turn to page 5 -- excuse me, page 6.  I'm sorry.

4            So page 6 are these branch offices of Stratus?

5    A.  Yes.

6    Q.  OK.  So they are branch offices in at least six other

7    countries:  Kazakhstan, Turkey, Venezuela, Iraq, Djibouti, and

8    Kyrgyzstan, correct?

9    A.  Yes.

10   Q.  You personally were involved in some of the projects

11   internationally, correct?

12   A.  Yes.

13   Q.  You were involved in a project in Pakistan, correct?

14   A.  Yes.

15   Q.  And do you recall approximately what year that project in

16   Pakistan was?

17   A.  1994.

18   Q.  Do you remember how the Stratus Group was paid?  Paid in

19   dollars?  Paid in some other currency?  Do you remember?

20   A.  I don't remember that.

21   Q.  Do you remember on international projects the Stratus

22   Company getting paid in dollars?

23   A.  Yes.

24   Q.  Were you also involved in a project in Bangladesh?

25   A.  No.

K34nsad3                         Kazerani - Cross

1    Q.   You personally were not?

2    A.   No.

3    Q.   Was Stratus involved in a project in Bangladesh, to your

4    knowledge?

5    A.   Yes.

6    Q.   What did they build?

7    A.   Roads.

8    Q.   OK.  Turn to page 8, if we could.  This is the EN Bank,

9    establishment date 2001.

10             Cutting right to the chase, is it fair to say that

11   Mohammad Sadr started the first private bank in Iran?

12   A.   Yes.

13   Q.   And this is the EN Bank that we see on slide 8?

14   A.   Yes.

15   Q.   Let's see what it says:

16             "Establishment date:  2001.

17             "Field of activity:  Banking and financial services.

18             "Main shareholders:  A consortium of industrial,

19   construction, and investment companies.

20             "Main branch:  Tehran.  Over 240 branches in Iran and

21   some representative offices in other countries.

22             "First private bank established."

23             Let's take a look quickly at page 9.

24             Bank of the year of Iran for three successive years,

25   '7, '8 and '9 by Bankers' Magazine, best Iranian bank by

1    Euromoney 2000, member board of Asian Banking Association.

2            Isn't it true that around the time he was getting

3    these awards the government of Iran relentlessly harassed

4    Mohammad Sadr in connection with his bank work?

5    A.  For EN Bank, yes.

6    Q.  So, in connection with your construction company where you

7    were CEO, the government of Iran backed off and let you do your

8    work.  Fair?

9    A.  Yes.  They had nothing to do with it.

10   Q.  When it came to the bank and the 240 offices, they

11   relentlessly pursued Mohammad Sadr, is that your experience?

12   A.  Yes.

13   Q.  Let's take a look at slide 13, if I may.  This is the

14   Iranian International Housing Company, correct?

15           Do you see that?

16   A.  Yes.

17   Q.  This company was a one-off.  This company was devoted

18   entirely to the project in Venezuela, correct?

19   A.  Yes.

20   Q.  It was involved in no other projects, correct?

21   A.  No.

22   Q.  The Iran International Housing Company had a sister entity

23   in Venezuela that was incorporated in Caracas, isn't that true?

24   A.  Yes.

25   Q.  Here it says the capital is $4.1 million.  Do you see that?

K34nsad3                          Kazerani - Cross

1    A.   That's what it says here.

2    Q.   Isn't it true that the project in Venezuela was a half a

3    billion dollar project?

4             THE INTERPRETER:   What was the last part?

5             MR. WEINGARTEN:   Half a billion.   500 million.

6    A.   Yes.

7    Q.   Isn't it true, sir, for the Venezuela project there were

8    certainly decision makers in Tehran in your Venezuela group but

9    the project was run for all intents and purposes in Venezuela?

10   A.   Yes.

11   Q.   Isn't it true that the Iranian International Housing

12   Company in Tehran had a skeleton crew of individuals that were

13   borrowed from the Stratus family?

14   A.   Yes.

15   Q.   Now, the prosecutor showed you a different exhibit that

16   touched upon a company called Kish.   Do you remember that

17   testimony?

18             THE INTERPRETER:   What was the company name?

19   Q.   Why don't I get it.   2195.   If we could turn to GX 2195A,

20   page 4.   I have to ask you, sir, what is that?

21   A.   This is a road construction project.

22   Q.   How in the world did you build that?

23   A.   Very hard, with difficulty.

24   Q.   OK.   Let's turn to page 3 of this document.   So look at the

25   third grouping, "Oil and gas and general contract, Kish

K34nsad3                           Kazerani - Cross

1    Oriental Oil (private joint stock)."

2              Now that's within the holding company, correct?

3    A.   That's what it says here.

4    Q.   So it wasn't under your responsibility when you were the

5    CEO of the construction company, correct?

6    A.   No.

7    Q.   Do you have any idea what business was conducted with Kish

8    Oriental Oil?

9    A.   No.

10   Q.   Do you have any idea if there were employees from the

11   Stratus Group that worked there, if there was money received,

12   if there were loans made?  Do you have any idea at all what

13   happened in connection with Kish Oil?

14   A.   No.

15   Q.   Do you know if there was any business activity at all

16   involving Mohammad Sadr?

17   A.   I don't know that.

18   Q.   Do you know of any involvement with Kish Oil from Ali Sadr?

19             MR. KROUSE:  Your Honor, I believe the testimony is he

20   doesn't know anything about this company.

21             THE COURT:  Last question.

22             MR. WEINGARTEN:  I agree.

23             THE COURT:  Go ahead.

24   A.   I don't know that.

25   Q.   Now I want to talk a little bit about the Venezuela

K34nsad3                           Kazerani - Cross

1   project.  Just, again, what was your role in the project?  A

2   supervisor?

3   A.  I was a member of the consulting committee.

4   Q.  So you got involved on a regular basis with the substantive

5   issues of the project?

6   A.  Yes.

7   Q.  Is it fair to say the project got started when there was a

8   treaty between Iran and Venezuela and then a contract where a

9   bunch of companies that identified themselves as II -- IIHCO,

10   had a contract for --

11           THE COURT:  Let's break it down for the interpreter.

12           MR. WEINGARTEN:  Yes, I just want to --

13           THE COURT:  Could you break that question down.

14           MR. WEINGARTEN:  Yes.

15   BY MR. WEINGARTEN:

16   Q.  Isn't it true the project got started with a contract

17   between six -- or involving six construction companies in Iran

18   and Venezuela to build a new city?

19   A.  I don't know that.

20   Q.  OK.  But isn't it true that you do know that the at some

21   point Mohammad Sadr bought out all the companies and then the

22   project was Mohammad Sadr's alone?

23   A.  Yes.

24   Q.  And this was a private undertaking by Mohammad Sadr not

25   involving the Iranian government?

K34nsad3                         Kazerani - Cross

1    A.  Yes.

2    Q.  And the government of Iran didn't tell you what to do on

3    the project?

4    A.  No, it didn't.

5    Q.  OK.  Now, you talked about with the government meetings

6    that the group would have and the fact that minutes were kept.

7    Just remind me, how often were these meetings?

8    A.  In the early stage of the project, it was every two weeks.

9    Q.  OK.

10   A.  And after the completion of the design or planning, it was

11   once a month.

12   Q.  OK.  And the project went on for several years, correct?

13   A.  Yes.

14   Q.  And so there were many meetings?

15   A.  Yes.

16   Q.  And every aspect of the project was discussed at the

17   meetings, correct?

18   A.  Yes.

19   Q.  Technical issues?

20   A.  Yes.

21   Q.  Financial issues?

22   A.  Yes.

23   Q.  Political issues?

24   A.  Yes.

25   Q.  Legal issues?

1    A.  Yes.

2    Q.  Isn't it true -- and Ali Sadr attended those meetings,

3    correct -- no.  Ali Sadr either participated personally or was

4    involved from a distance with those meetings, correct?

5              THE INTERPRETER:  Was or was not?  I'm sorry.

6              MR. KROUSE:  OK.  Let me clarify it.

7    Q.  Did I hear you correctly yesterday say that Ali Sadr was

8    part of this group?

9    A.  Yes.

10   Q.  And that he would attend the meetings when he was visiting

11   his father?

12   A.  Yes.

13   Q.  And you estimated that was about 20 percent of the time,

14   correct?

15   A.  Yes.

16   Q.  Was there ever an occasion at any of these meetings when

17   anyone expressed a concern that the Stratus Group was violating

18   U.S. sanctions?

19   A.  No.

20   Q.  Was there ever even a concern articulated by anyone at

21   those meetings over those years that there might be the

22   possibility of a violation of U.S. sanctions?

23   A.  Yes.

24   Q.  OK.  What?

25   A.  They said because the name Iran was involved in this

K34nsad3                    Kazerani - Cross

1    project there might be some problems.

2    Q.  OK.  We'll get to that.  I'm glad you raised that.  Thank

3    you.  Let's look at the minutes and see exactly what is said.

4              Let's look at GX 2113B-T, page 7.

5              Let's look at --

6              THE COURT:  These were the minutes admitted yesterday,

7    correct?

8              MR. WEINGARTEN:  Yes.

9    Q.  Let's look at paragraph 8, "Specialized Committees."

10             "Regarding the discussions on job description, the

11   need to form specialized committees, (including the following)

12   was discussed:

13             "A risk committee, considering the numerous political,

14   social, safety and labor risks,

15             "Audit committee," and

16             "Procurement committee."

17             Were those committees formed?

18   A.  I am aware of an audit committee and a procurement

19   committee.  The rest I don't know.

20   Q.  OK.  Fine.  Let's take a look at page 8 of that document.

21   It talks about the legal department of the Stratus Group.  Was

22   there a legal department of the Stratus Group?  Were actually

23   lawyers hired?

24   A.  Yes.

25   Q.  Were there typically lawyers involved in the projects

1    internationally as well?

2    A.  Yes.

3    Q.  Then let's look at what it says under "Legal Department."

4            "According to Mr. Sadr Hashemi Nejad" -- that's Ali,

5    or is that his father?

6    A.  His father.

7    Q.  OK.  "Given that the project is being implemented in

8    Venezuela, greater knowledge of Venezuela's legal principles

9    should be put on the agenda, and the set of legal issues, laws,

10   and trade union and labor regulations and issues should be

11   monitored by the legal department of the Stratus Group."

12           So Ali's dad was concerned about legal issues

13   associated with this project, fair?

14           THE INTERPRETER:  Could you read the portion where Ali

15   Sadr was or was not.

16           MR. WEINGARTEN:  Can you see it right there.

17           THE COURT:  Do you have the Farsi?

18           MR. WEINGARTEN:  I'm sorry.

19           THE COURT:  That's the translation.

20           Can we show the witness the original.

21           MR. WEINGARTEN:  OK.  Do we have it, the Farsi,

22   please?

23           MR. KROUSE:  Your Honor, can we be heard just quickly

24   at the sidebar on this point?

25           THE COURT:  No.

K34nsad3                         Kazerani - Cross

1               MR. KROUSE:  Well, the government objects.

2               THE COURT:  It's in.  He's reading from the document

3     you admitted.

4               MR. KROUSE:  Yes, OK.

5     A.  OK, I see it.

6               This is concerning the specialized committee, not

7     legal committee.

8     Q.  I understand.  OK.  So Ali's father is expressing concern

9     about a variety of legal issues here, correct?

10    A.  No, but you are reading it incorrectly.

11    Q.  I'm sorry?

12    A.  You are reading it incorrectly.  What you showed me before

13    was about the legal department, legal committee.  No.  OK.

14    It's here.

15              MR. WEINGARTEN:  We have the wrong page.

16    A.  No. 11.

17              MR. WEINGARTEN:  I will move along.  We're belaboring

18    this.  We'll move along.

19              Let's take a look at Defense Exhibit 27A-T.

20              THE COURT:  Marked for identification?

21              MR. WEINGARTEN:  I think there is an agreement.

22              THE COURT:  OK.

23              MR. WEINGARTEN:  Could we put it up at least for the

24    witness first, Defense Exhibit 27, and 27A alongside.

25    BY MR. WEINGARTEN:

K34nsad3                    Kazerani - Cross

1   Q.  Is it fair to say, sir, these are notes from another

2   meeting of the Venezuela group?

3   A.  Yes.

4          MR. WEINGARTEN:  I move it in, your Honor.

5          THE COURT:  Mr. Krouse?

6          MR. KROUSE:  No objection, your Honor.

7          THE COURT:  Defendant's 27 and 27A is received.

8          (Defendant's Exhibits 27 and 27A received in evidence)

9   BY MR. WEINGARTEN:

10  Q.  So is it fair to say --

11         MR. WEINGARTEN:  Why don't we turn to 27A-T.  No.

12  Excuse me.  Yeah, that's fine.  27A-T.

13         MR. KROUSE:  The government has no objection to that

14  also being admitted if it's being offered.

15         THE COURT:  Thank you.  So the translation is coming

16  in as well as 27A-T.

17         MR. WEINGARTEN:  Yes.

18         (Defendant's Exhibit 27A-T received in evidence)

19  BY MR. WEINGARTEN:

20  Q.  Let's turn to page 2 of 27A-2.

21         THE COURT:  But we'll show the witness the original.

22         MR. WEINGARTEN:  OK.  Can we do that.

23         can I approach, your Honor?

24         THE COURT:  Yes.

25         OK.  So the witness has the original in the paper, and

1    the translation is on the screen.

2              Go ahead.

3              MR. WEINGARTEN:  Yes.

4    BY MR. WEINGARTEN:

5    Q.  Now what we're looking at is another meeting, this one

6    taking place on December 12, 2009, correct?

7    A.  Yes.

8    Q.  Is it fair to say -- and you can take a minute to look at

9    the document -- that a fair number of legal issues were

10   discussed at this meeting?

11   A.  Yes.

12   Q.  One of the issues discussed was changing the name of the

13   company, correct?

14   A.  Yes.

15   Q.  And the issue was taking the name Iran out of IIHCO, isn't

16   that true?

17   A.  Yes.

18   Q.  Isn't it the reason you considered that was you did not

19   want your private company to be confused with an Iranian

20   government company?

21   A.  Yes.

22   Q.  And isn't that because when a company has the name Iran in

23   it, there's often a very negative reaction around the world?

24   A.  Yes.

25   Q.  Isn't it true that negative reaction can cause banks to

1    refuse to do business with you even when the business is

2    entirely legitimate?

3    A.  That's possible.

4    Q.  Yes.  Let's look at paragraph 5, changing the name of the

5    company.

6            "The points of view the legal experts about the change

7    of the name of the company for solving problems and

8    difficulties that have come up in registration of the company's

9    branch with the several organizations in Venezuela and sea

10   transportation of the equipment and materials were put forth."

11           So you had lawyers -- excuse me.

12           Translate.

13           THE INTERPRETER:  He's reading it from the Farsi, your

14   Honor.

15           MR. WEINGARTEN:  OK.

16           THE COURT:  Next question.

17           MR. WEINGARTEN:  I'm sorry.

18   BY MR. WEINGARTEN:

19   Q.  So, in fact, at the very time you're discussing this, there

20   are lawyers offering their opinion as to how to do it, correct?

21   A.  Yes.

22   Q.  The conversation was triggered by the fact that in

23   connection with the Venezuela projects you all had had trouble

24   based upon the Iranian name in your entity?

25   A.  Yes.

1    Q.  I will continue reading.

2              "It was noted that a few alternatives will be

3    suggested to the board of directors of Iranian International

4    Housing Company for their decision making."

5              So it's fair to say this discussion wasn't being had

6    behind closed doors or in secret?  You were discussing the name

7    change with lawyers, everybody on the committee and the entire

8    board, fair?

9    A.  Yes.

10             THE COURT:  My plan is to go to noon and break for

11   lunch.

12             MR. WEINGARTEN:  Straight to lunch?

13             THE COURT:  Yes.  Unless anybody is desperate for a

14   bathroom break.  Raise your hand if you are.

15             Do you need a quick break?

16             MR. WEINGARTEN:  I could use five minutes.

17             THE COURT:  Why don't we do five, everybody.  It will

18   be short, but we'll come right back.

19             MR. WEINGARTEN:  Thank you.

20             THE COURT:  Thank you.  Five minutes for the jury.

21             Thank you.

22          (Continued on next page)

23

24

25

1              (Jury not present)

2              THE COURT:  Five-minute break.  See you very briefly.

3     Thank you.  The witness may step down.

4              (Recess)

5              THE COURT:  Anything before we bring in the jury?

6              Mr. Krouse, was there an issue you needed to raise?

7              MR. KROUSE:  No, your Honor.

8              THE COURT:  OK.  We will bring in the jury.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you.

3          Everyone may be seated.

4          THE COURT:  Mr. Weingarten, you may continue.

5          MR. WEINGARTEN:  Thank you.

6  BY MR. WEINGARTEN:

7  Q.  Just a couple more questions.  So yesterday you talked

8  about dollars and it's the strongest currency and it's the most

9  desired currency.  It is also true, is it not, that in the

10 Venezuela project euros were used?

11 A.  I don't know.

12 Q.  Do you not know that the initial down payment, about 95

13 million euros, was how the project got started?

14 A.  I had heard things like that.  I think the prepayment was

15 in euros.

16 Q.  Isn't it also true that the first two bills were paid in

17 euros?

18          THE INTERPRETER:  The first two payments?

19          MR. WEINGARTEN:  Yes, the first two payments?

20 A.  That I don't know.

21 Q.  Isn't it true that the transition from euro to dollar was

22 just a matter of convenience, having nothing to do with the

23 sanctions?

24 A.  Probably.

25 Q.  There were some discussions yesterday about a business card

K34nsad3                        Kazerani - Cross

1    for Mr. Ali Sadr.  Do you recall those conversations with the

2    prosecutor?  Why don't we bring up 2033A.  It is already in

3    evidence.

4              THE COURT:  I don't think we got an answer from the

5    witness.  The last question?

6    Q.  Do you recall the conversations about Ali's business card?

7    A.  Yes.

8    Q.  Do you know whether or not these cards were ever printed?

9              THE INTERPRETER:  I'm sorry?

10   Q.  Do you know whether or not these cards were actually

11   printed and used?

12   A.  I don't, no.

13   Q.  Well, let's look and see what it says.

14             "Samaneh Stratus Investment Company."

15             That's the holding company, correct?

16   A.  Yes.

17   Q.  It says, "Ali Sadr Hashemi Nejad, vice chairman - finance."

18             Isn't it true that Ali Sadr was never the vice

19   chairman of the holding company?

20   A.  He was not.

21   Q.  OK.  So, whatever purpose these cards have, they don't

22   signify that he -- they don't accurately represent that he was

23   employed by the holding company, correct?

24   A.  Yes.

25   Q.  And you did say that Ali frequently visited his dad,

K34nsad3                          Kazerani - Redirect

1    correct?

2    A.   Yes.

3    Q.   Isn't it true that those visits took place around 2010,

4    2011 and 2012?

5    A.   Yes.

6    Q.   And isn't it true that at that time Mohammad Sadr was

7    diagnosed with bladder cancer and needed a lot of help?

8    A.   I don't know.  I know he was sick, but I don't know if he

9    had cancer.

10   Q.   All right.  Well, isn't it true you do know that Ali

11   visited him to help him with his medical issues?

12            MR. KROUSE:  Calls for speculation, Ali Sadr's reasons

13   for visiting.

14            THE COURT:  Sustained.

15            MR. WEINGARTEN:  All right.

16            No further questions, your Honor.

17            THE COURT:  Thank you.

18            Mr. Krouse, redirect.

19            MR. KROUSE:  Thank you, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. KROUSE:

22   Q.   Mr. Kazerani, defense counsel asked you a lot of questions

23   about your relationship with Mohammad Sadr and the Sadr family

24   more generally.

25            Do you remember those questions?

K34nsad3                        Kazerani - Redirect

1    A.  Yes.

2    Q.  He asked you about whether you were proud of having worked

3    for 21 years for the Stratus Company.

4            Do you remember that?

5    A.  Yes.

6    Q.  To be clear, you have no ill will towards Mohammad Sadr,

7    right?

8    A.  No.

9    Q.  And no ill will towards Ali Sadr either?

10   A.  No.

11   Q.  You're here to testify because you were served with a

12   subpoena, is that right?

13   A.  Yes.

14   Q.  And you took an oath to tell the truth?

15   A.  Yes.

16   Q.  Do you remember Mr. Weingarten asking you some questions

17   about Turkish subcontractors on the Venezuela project?

18   A.  Yes.

19           MR. KROUSE:  Mr. Milione, Government Exhibit 2042,

20   please, which is in evidence.

21   Q.  You went over this during your direct testimony, that this

22   was an IPC a bill from a Turkish company called Tekyen.

23           Do you remember that?

24   A.  Yes.

25   Q.  And this bill was in June 2011, IPC No. 2, correct?

 1    A.  Yes.

 2    Q.  And you knew Tekyen was a subcontractor on the Venezuela

 3    project, correct?

 4    A.  Yes.

 5    Q.  And if Straturk had been a subcontractor on this project,

 6    they also would have sent bills to IIHC, correct?

 7    A.  I am not sure about Straturk.  I know Cetinel worked there

 8    with -- it was for himself or his company.  I am not sure.

 9    Q.  So that's not my question.  My question was, if Straturk

10    had been a subcontractor on the Venezuela project, they would

11    also have sent IPCs to IIHC, correct?

12    A.  Yes.

13    Q.  Because that's how it works, the subcontractor bills the

14    general contractor, right?

15    A.  Yes.

16    Q.  And then the general contractor bills the employer?

17    A.  Yes.

18    Q.  And then the employer pays the general contractor, right?

19    A.  Yes.

20    Q.  And then the general contractor pays the subcontractor?

21    A.  Yes.

22    Q.  And here Tekyen is a Turkish subcontractor on this project,

23    right?

24    A.  Yes.

25    Q.  And when you signed your contract with Straturk in

1    September of 2013, had you ever heard of Straturk before that?

2    A.  Straturk worked with us on the Vovon project.

3    Q.  So they worked with you on a completely separate project

4    called Vovon, right?

5    A.  Yes, in Iran.

6    Q.  But, to your knowledge, the entity Straturk, you never saw

7    their name on anything related to the Venezuela project, isn't

8    that right?

9    A.  I have not heard about it.

10   Q.  You mentioned Cetinel, and we saw his photograph at one

11   point during your direct testimony.  Cetinel was Turkish

12   himself, right?

13   A.  Yes.

14   Q.  And he was appointed as the project director by Mohammad

15   Sadr?

16   A.  Yes.

17   Q.  In that letter that Mohammad Sadr signed, that order that

18   we showed you?

19   A.  Yes.

20   Q.  Now, the defense counsel asked you some questions about the

21   project itself.  Do you remember that?

22   A.  Yes.

23   Q.  Now the project was in Venezuela, right?

24   A.  Yes.

25   Q.  Bahram Karimi the project manager.  He was located in

1   Venezuela, right?

2   A.  Yes.

3   Q.  And he originally came from Stratus, and he was an Iranian?

4   A.  Yes.

5   Q.  There were a lot of Iranians who went from Iran to

6   Venezuela to work on this project; you testified about that on

7   direct.

8   A.  Yes.

9   Q.  But the project was managed from Iran, correct?

10  A.  Yes.

11  Q.  The CEO of IIHC was Behrooz Zangeneh?

12          MR. WEINGARTEN:  The last part?  I'm sorry.

13  Q.  The CEO of IIHC was Behrooz Zangeneh?

14  A.  Yes.

15  Q.  And Behrooz Zangeneh was based in Tehran?

16  A.  Yes.

17  Q.  He had an office there?

18  A.  Yes.

19  Q.  The Venezuela project committee that managed the project

20  met in Tehran, right?

21  A.  Yes.

22  Q.  All of those meetings were in Mohammad Sadr's office,

23  right?

24  A.  Yes.

25  Q.  Mohammad Sadr was in charge of those meetings?

K34nsad3                        Kazerani - Redirect

1    A.   Yes.

2    Q.   Audits were sent from Tehran to Venezuela by Mohammad Sadr,

3    right?

4    A.   Yes.

5    Q.   Procurement policy was set in Tehran by Mohammad Sadr?

6    A.   Yes.

7    Q.   Now, at one point in the cross-examination, Mr. Weingarten

8    asked you, did the issue of sanctions ever come up in project

9    committee meetings, and you said yes.  Do you remember that?

10   A.   Yes.

11   Q.   And then defense counsel sort of changed the subject to

12   something else?

13              MR. WEINGARTEN:  Objection.

14              That is not what defense counsel did.

15              THE COURT:  Sustained.

16              MR. KROUSE:  I will withdraw it.

17   BY MR. KROUSE:

18   Q.   On the sanctions that you recall the committee discussing,

19   tell the jury what was discussed in those committee meetings.

20   A.   I only know that there was a suggestion that the company

21   changes its name.

22   Q.   Because of sanctions?

23   A.   Probably for the reason that the name Iran would create

24   problems.

25   Q.   With getting paid in U.S. dollars?

K34nsad3                        Kazerani – Redirect

1   A.   Probably.

2   Q.   In violation of U.S. sanctions?

3            MR. WEINGARTEN:  Leading, your Honor.  Objection.

4            THE COURT:  Just a moment.

5            You can translate, but no answer.

6            I sustain the objection.  Rephrase.

7            MR. KROUSE:  Thank you, your Honor.

8   BY MR. KROUSE:

9   Q.   What was your understanding of why the name needed to be

10  changed?

11  A.   It was a suggestion by the legal team to change the name or

12  change the name Iran, if possible.

13  Q.   For what reason?

14  A.   I believe he guessed or surmised that there would be

15  problems for the company.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

(212) 805-0300

K34TSAD4                          Kazerani - Redirect

1    BY MR. KROUSE:

2    Q.  Problems in what way?

3    A.  Banking problems.

4    Q.  So payments?

5    A.  Yes.

6    Q.  Mr. Weingarten asked you some questions about some meetings

7    that were held, Government Exhibit 2113BT for translation, page

8    8, where it says I believe row 11 is what was discussed.

9         And it says:  Given that the project is being

10   implemented in Venezuela, greater knowledge of Venezuela's

11   legal principles should be put on the agenda, and the set of

12   legal issues, laws, trade union and labor regulations and

13   issues should be monitored by the legal department of Stratus

14   Group.

15        In these meetings, these were lawyers employed by

16   Stratus, correct?

17   A.  Stratus Group.

18   Q.  So they were internal Stratus Group lawyers that were

19   talking in these meetings, correct?

20   A.  Yes.

21   Q.  And the issues talked about here are legal principles

22   having to do with Venezuela, correct?

23   A.  Yes.

24   Q.  There is nothing in this meeting talking about the

25   sanctions regime, correct?

K34TSAD4                        Kazerani - Redirect

1   A.  No, I don't recall that.

2   Q.  Mr. Weingarten asked you some questions about Ali Sadr's

3   role with the holding group.  Do you remember those questions?

4   A.  Yes.

5   Q.  Do you actually know what Ali Sadr or whether Ali Sadr was

6   employed by the holding group or not?

7   A.  Because he was not in Iran, I don't think he worked for the

8   group.

9   Q.  But do you know if Ali Sadr was employed by the holding

10  group or not?

11  A.  I don't know that.

12  Q.  And do you know what his role was if he was employed?

13  A.  I don't know.

14          MR. WEINGARTEN:  May we approach?

15          I guess we're almost done, never mind.

16  Q.  Do you recall Mr. Weingarten asking you some questions

17  about --

18          THE COURT:  Just a moment, is there a request for

19  retranslation?

20          Let's get the question again.  I think there was a

21  question to whether the translation was accurate.

22          MR. KROUSE:  A request from whom, your Honor?

23          THE COURT:  From defense counsel.

24          MR. KROUSE:  This is a court-certified interpreter.

25          MR. HEBERLIG:  We're asking for a readback.

K34TSAD4                         Kazerani - Redirect

1          THE COURT:  Frequently with court-certified

2   translators sometimes there are issues raised, and I'm always

3   happy to make sure we got it right.

4          (Record read)

5   A.  I don't know.

6          THE COURT:  Mr. Weingarten, does that cover it?

7          MR. WEINGARTEN:  Yes.

8          THE COURT:  All right.  Go ahead.

9          MR. KROUSE:  Thank you, your Honor.

10  Q.  Mr. Kazerani, did you have any involvement -- well, first,

11  do you recall Mr. Weingarten asking you about the payments in

12  this case for the Venezuela project?

13  A.  Yes.

14  Q.  Did you have any involvement whatsoever in the payments

15  made from Venezuela for this project?

16  A.  No.

17  Q.  Did you obtain a citizenship for St. Kitts & Nevis?

18         MR. HEBERLIG:  Objection, your Honor.

19         THE COURT:  Just a moment.

20         MR. KROUSE:  Basis?

21         THE COURT:  Sustained.

22  Q.  Do you have any other citizenships other than an Iranian

23  citizenship?

24         MR. WEINGARTEN:  Objection, your Honor, this has

25  nothing to do with my cross.

1              THE COURT:  I will let you know if I want argument.

2              MR. WEINGARTEN:  Sorry.

3              THE COURT:  Overruled.

4   Q.  Did you have any other citizenships other than your Iranian

5   citizenship?

6   A.  No.

7   Q.  Did you set up companies to act as fronts to receive

8   payments?

9              MR. WEINGARTEN:  Objection.

10             THE COURT:  Sustained.

11             MR. KROUSE:  I'm asking what he did, your Honor.

12             THE COURT:  Sustained.  Also you will ask non-leading

13  questions, it's redirect.

14  Q.  With respect to the payments in this project, did you have

15  any involvement whatsoever?

16             MR. WEINGARTEN:  Asked and answered.

17             THE COURT:  Overruled.

18  A.  No.

19             MR. KROUSE:  No further questions, your Honor.

20             THE COURT:  Thank you.  Done?

21             MR. WEINGARTEN:  Done.

22             THE COURT:  Okay.  You may step down, thank you.

23             And members of the jury, it's about 10 after 12:00, so

24  we'll take our lunch break a little early.  Please be ready to

25  go -- it's seven after, so let's start again at 1:05.  We

K34TSAD4

1    earned back a little time this morning with the short

2    mid-morning break, and we'll earn back a little bit with the

3    shorter lunch break.

4            Please be back around 1:00 or shortly thereafter and

5    we'll start at 1:05.

6            Enjoy your break.  Thank you.

7            (Jury not present)

8            THE COURT:  Matters to take up?

9            MS. LAKE:  Your Honor, I believe defense has

10   objections to four of the emails and their attachments that we

11   intend to offer this afternoon with the paralegal.

12           THE COURT:  Let's take them up.

13           MS. LAKE:  Would you like to hear from me or them?

14           THE COURT:  Let me hear the objections.

15           MR. HEBERLIG:  First is Government Exhibit 1030, and

16   the attachment 1030A.

17           The objection is Ali Sadr is not happy on this email,

18   and these two individuals, Mr. Zargoush and Mr. Safaverdi, are

19   not proper co-conspirators.  There is no foundation made that

20   any of one of them participated in a conspiracy.  And the

21   attachment, which Ali Sadr didn't receive, it's not

22   attributable to him, there's no adopted position or anything,

23   it's a hearsay objection.

24           THE COURT:  Go ahead, Ms. Lake.

25           MS. LAKE:  Your Honor, this attachment from Safaverdi

K34TSAD4

1    in our view should come in for fact that he's making the

2    request.  It doesn't need to come in for the truth of what he's

3    saying, but the truth is that he is writing with regard to the

4    original document, he's making a request for the return of the

5    guarantee promptly, and the fact that he's making this request

6    is relevant to issues in this trial.

7              THE COURT:  Like what?

8              MS. LAKE:  The Export Development Bank of Iran, it

9    makes it more likely that the Export Development Bank of Iran

10   guaranteed the project.  We heard testimony from Mr. Kazerani

11   about what a guarantee bond is.  So he testified that for

12   construction projects run out of Iran, generally speaking, the

13   Export Development Bank of Iran issues a guarantee.  If the

14   contractor doesn't get paid, the Export Development Bank of

15   Iran would likely be out money, and that it's Iranian owned

16   bank.

17             So this goes to one of the government's arguments that

18   the government of Iran does have an interest in this project,

19   is benefiting from the payments made for this project, because

20   if IIHC doesn't get paid by Venezuela, the Export Development

21   Bank of Iran, an Iranian-owned bank is out money.

22             THE COURT:  Let me read -- I will admit to having

23   trouble tracking.  Let me read the document.

24             (Pause)

25             THE COURT:  So the fact of the request for return is

K34TSAD4

1  what you're seeking this to be admitted for.

2          MS. LAKE:  Yes, and the fact that he's requesting the

3  return of the guarantee makes more likely a fact that is

4  relevant to case, which was there was a guarantee, that the

5  Export Development Bank of Iran did guarantee this project,

6  which is a government entity in Iran.

7          MR. HEBERLIG:  I think that's for the truth of the

8  matter asserted.

9          THE COURT:  That's what it sounds like.  I know you're

10  saying it's about the fact that it was asked, but the inference

11  you're seeking to be drawn is the truth of the guarantee.  So

12  it sounds to me like at base is a truth purpose.

13          Is there an exception?

14          MS. LAKE:  Your Honor, our view of the case -- and

15  we'll talk about this with some of the emails that follow -- is

16  that anyone who was involved in trying to get the company paid

17  and knew that the payments were in U.S. dollars a

18  co-conspirator.  By that logic, Safaverdi is a co-conspirator.

19  He's involved in trying to get the company paid here, and he's

20  involved in working out the finances and the logistics of the

21  finances in terms of the guarantee of the project.

22          MR. HEBERLIG:  The person who wrote the email is a

23  lawyer.  This is a draft.  There's no indication from any other

24  evidence that it was finalized or these facts actually

25  happened.  And the notion that every single person associated

K34TSAD4

1    with this project is a co-conspirator does not meet the laugh

2    test.

3                MS. LAKE:  We're not asserting that every single

4    person associated with the project is a co-conspirator, but all

5    of the people who were involved in trying to get IIHC paid U.S.

6    dollars were part of the conspiracy.

7                THE COURT:  So the speaker here and the author of this

8    email?

9                MS. LAKE:  The author of the letter.

10               THE COURT:  The letter, it's not an email.

11               MR. HEBERLIG:  It's sent to him, no indication that he

12    adopted it, no indication that it happened.

13               THE COURT:  Just a second.  So the email is to

14    Mr. Safaverdi and from Mr. Zargoush.

15               MR. HEBERLIG:  Yes.

16               THE COURT:  And Zargoush is the lawyer.

17               MR. HEBERLIG:  Is the lawyer.

18               THE COURT:  Is the lawyer, in the government's view, a

19    co-conspirator?

20               MS. LAKE:  I don't think that we have the facts to

21    bear that out.

22               THE COURT:  And it's the lawyer sending a draft letter

23    that he's proposing to Safaverdi to send under Safaverdi's

24    name.

25               MS. LAKE:  Correct.

K34TSAD4

1          THE COURT:  I will sustain the hearsay objection.

2          Any other proffer?

3          MS. LAKE:  No, your Honor.

4          THE COURT:  Next one?

5          MR. HEBERLIG:  Yes, Government Exhibit 1209 and

6    family, which is 1209A.

7          This is another email that Mr. Sadr did not receive.

8    And the attachment relates to this advance payment bond, the

9    attachment -- can we go to 1209A, page 2.  The English is on

10   the left.

11         This appears to be a letter referencing the advance

12   payment.  Our objection is again hearsay based that the

13   individuals on the email.  One, the author is unclear, it's

14   iihco@yahoo.com, no indication of who that is, and the advance

15   payment discussed in the attachment, frankly, I was a little

16   befuddled by the government's argument, but there's no U.S.

17   wire here.  The advance payment was paid in Euros.  There's no

18   suggestion there's been a default on the contract, so this

19   notion that the Iranian government benefited from this contract

20   is literally the first we heard about it and strains credulity.

21         THE COURT:  So a strains credulity argument sounds

22   like weight.  You made a hearsay objection.

23         MR. HEBERLIG:  No, that goes to relevance.  I should

24   have been clear.  Hearsay as to the email, and the attachment

25   also hearsay and irrelevant.

K34TSAD4

1              THE COURT:  Ms. Lake?

2              MS. LAKE:  Your Honor, this is relevant for the same

3      reason as the exhibit we looked at previously.  The fact that

4      the defense may not have anticipated this argument, they had

5      these exhibits, they have been on notice that there was an

6      advance payment bond issued by the Export Development Bank of

7      Iran.

8              Ahmad Farshchian, who signed this letter, he is also

9      the signatory on the contract between IIHC and Venezuela.  He

10     is instrumental in setting up the entire project.  And the fact

11     that it's a project in U.S. dollars, we think that this is

12     fairly a co-conspirator statement from him.  This is also sort

13     of background to the project that is very similar to the

14     contract itself.  This falls into the same category as the

15     contract, the MOU, it's laying out the way that this project

16     was set up.

17             THE COURT:  So it's not a statement in furtherance of

18     the conspiracy?

19             MS. LAKE:  One moment.

20             (Pause)

21             THE COURT:  I wasn't sure what you meant by

22     background.

23             MS. LAKE:  It is, because statements of

24     co-conspirators like Farshchian about setting up the project

25     and setting up the finances of the project are all designed,

K34TSAD4

1    again, to get IIHC, an Iranian company, paid in U.S. dollars.

2    So this furthers the conspiracy, because in order for the

3    project to go forward, in order for the project to succeed,

4    they have got to get the U.S. dollars.

5              THE COURT:  And the point about Euros?

6              MR. HEBERLIG:  The advance payment was paid in Euros.

7    The reference to U.S. dollars here is a valuation currency.

8    The payment of the advanced payment was in Euros to a bank, it

9    had no -- did not violate the sanctions, did not implicate the

10   sanctions.  It was valued at $142 million but it was paid in

11   roughly 95 million Euros.

12             MS. LAKE:  The bond was in dollars.

13             MR. HEBERLIG:  Never paid out, no indication of any

14   U.S. wire involvement.

15             MS. LAKE:  The argument here is not that the bond in

16   and of itself is a sanctions violation, but this is part of how

17   the finances for the project were set up.  And it's relevant,

18   again, to the government of Iran's interest in IIHC getting

19   paid the U.S. dollars that they were trying to get paid by

20   Venezuela.

21             THE COURT:  So the government's view is that

22   Farshchian is a co-conspirator.  You have to give me -- he's a

23   co-conspirator the government is alleging, and you have to

24   evidentiarily support that.  It's not just a proffer at this

25   point.

K34TSAD4

1          MS. LAKE:  As it states here, he's the managing

2     director of the Iranian International Housing Company at this

3     time.  He is the person who signed the contract between IIHC

4     and Ducolsa that laid out that IIHC was going to be paid $475

5     million U.S.

6          This is an email sent to --

7          THE COURT:  But -- go ahead.  I interrupted, Ms. Lake,

8     you can continue.

9          MS. LAKE:  I was going to note, in addition, the email

10    was sent to a charged co-conspirator, Bahram Karimi, as well as

11    to Zangeneh, and there's been a lot of testimony about his

12    role, that he essentially was involved in the project back in

13    Iran.

14          THE COURT:  Go ahead.

15          MR. HEBERLIG:  None of whom responded or adopted the

16    attachment, and in our view neither of whom the government has

17    provided sufficient evidence to this point to prove that he's a

18    co-conspirator.  We have received Jencks material related to

19    Mr. Karimi, and he flat denied any knowledge of any sanctions

20    violations.  In fact, the Court knows the government charged

21    him in connection with that activity.  There has not been any

22    evidence by a preponderance of the evidence that Mr. Karimi

23    participated in that.  But if it had been made, he didn't

24    respond to the email, he didn't adopt the attachment.  And the

25    notion that the person signed the contract -- and there is no

K34TSAD4

1    other information or evidence before you about Mr. Farshchian

2    was a co-conspirator -- is not enough.

3          MS. LAKE:  Your Honor, two things.  First of all, a

4    grand jury indicted Bahram Karimi.  The fact that he lied and

5    said that he didn't know about sanctions, which was belied by

6    the emails that are in this case, is completely irrelevant to

7    whether he was a co-conspirator.

8          THE COURT:  And he's the recipient of this, so what

9    about the speaker?

10         MS. LAKE:  In terms of speaking, I don't -- I'm not

11   encouraging tabling this, but the first page of the attachment

12   1209A, which is the Farsi version of this, is initialed and

13   commented on by Zangeneh.  We didn't originally get that first

14   page translated from Farsi to English because it's in English

15   on the second page, but this is Zangeneh essentially saying, as

16   far as I understand, yes, do what this says in the letter.

17         So we can get an official translation of those notes,

18   and --

19         THE COURT:  We'll start with that and I will look at

20   it and make an assessment.

21         Next.

22         MS. LAKE:  We'll table that for today then since we

23   won't be able to get the translation.

24         THE COURT:  Correct.

25         MR. HEBERLIG:  Government Exhibit 1401 and family.

K34TSAD4

1   And I guess we need to put up 1401T next to 1401 because it's

2   in Spanish.

3          THE COURT:  Can I just -- so I'm thinking, Ms. Lake on

4   the prior one, do you have a paper copy of what you have

5   translated already?

6          MS. LAKE:  Of the translation of the hand notes?

7          THE COURT:  No, that's what you need to get?

8          MS. LAKE:  Yes, we got a rough translation.

9          THE COURT:  I'm asking about the document, the

10  existing translation --

11         MS. LAKE:  Yes.

12         THE COURT:  -- of the letter.

13         MS. LAKE:  Do you want it now or could we move onto

14  the next document?

15         THE COURT:  Yeah, that's fine.

16         MR. HEBERLIG:  This is on the left the Spanish

17  version, on the right the English.  This is the cover email.  I

18  will show you the attachment in a minute.

19         The salient point here, this is a hearsay objection as

20  well.  Again, Mr. Sadr not copied on the email.  All of these

21  individuals we understand are associated with PDVSA, the

22  employer of the company that paid the contract.  We don't

23  believe any sufficient predicate has been established that

24  PDVSA is a co-conspirator in connection with this case.  I

25  haven't heard the government articulate that.  It's a hearsay

K34TSAD4

1    document not relevant for Mr. Sadr's state of mind or knowledge

2    because he's not copied on it.

3          And the attachment just says you can consider the

4    whole thing.  Pull up 1401A, please.

5          This is a letter from IIHCO to DUCOLSA, Mr. Karimi

6    signs it, about a form, an unidentified form required by IIHCO

7    auditors.  The form is not attached, we don't know what the

8    content of the form is, and our position is there's no

9    relevance to that as well.  So it's hearsay as to the cover

10   email and relevance as to the attachment.

11         MS. LAKE:  Your Honor, this doesn't pass the laugh

12   test.  First of all, the cover email doesn't have an assertion,

13   it just says regarding the attached request, please proceed in

14   obtaining the information required by the Iranian

15   International --

16         THE COURT:  Can I see it?  I don't have the cover of

17   it.

18         MR. HEBERLIG:  1401T, please.

19         MS. LAKE:  It's a request.  Please proceed in

20   obtaining the information required by the Iranian International

21   Housing Company.  The cover email isn't particularly important

22   other than just for context and completeness, it's the

23   attachment.

24         THE COURT:  So it's the attachment that you're seeking

25   to get in?  The cover email for context, but substance-wise for

K34TSAD4

1    the truth of what is contained, you're seeking to get in the

2    attachment.

3              MS. LAKE:  Yes.

4              THE COURT:  So can we go back to the attachment,

5    please.

6              MS. LAKE:  The attachment is authored by Bahram

7    Karimi, again an indicted co-conspirator.

8              THE COURT:  Not again.  I mean again that's who he is,

9    but this is the first out-of-court statement from him that

10   we're seeing, correct?

11             MR. HEBERLIG:  Yes.

12             MS. LAKE:  I believe so.

13             THE COURT:  Go ahead.

14             MS. LAKE:  Anyway, so it's signed by him.  He's also

15   one of the co-conspirators who we briefed, and the judge made

16   an initial ruling -- you made an initial ruling that statements

17   from him in furtherance of the conspiracy would come in.  So

18   that was --

19             THE COURT:  Under *Geaney*, so long as there's

20   sufficient evidence.

21             MS. LAKE:  So the email is, again, about a step that

22   is necessary for -- sorry, the letter is about a step that's

23   necessary to be taken for the project to succeed and for the

24   project to get payment.  IIHC needs a form filled out for the

25   auditors in Iran.  It's plainly relevant because it refers to

K34TSAD4

1    there being auditors in Iran who need to audit this project.

2    It goes to fact that this is being controlled by an Iranian

3    entity and that the project and the payments are for the

4    benefit of an Iranian entity.

5              THE COURT:  So that's relevant.

6              MS. LAKE:  The hearsay is that it's a statement of a

7    co-conspirator that is related to the success of the project,

8    which is necessary for the project to get paid, and the form is

9    the next page of the attachment.

10             THE COURT:  Sorry, "the form," meaning the form

11   discussed in the cover letter?

12             MS. LAKE:  Yes.  Defense counsel said there's no form,

13   but it's the very next page.

14             MR. HEBERLIG:  I do see it now, your Honor.

15             MS. LAKE:  Again Karimi --

16             THE COURT:  All right.  So Mr. Heberlig?

17             MR. HEBERLIG:  The missing attachment has been cured,

18   but the issue of relevance, and the proffer was that without

19   this being approved the payments wouldn't get made, there's a

20   disconnect there.

21             THE COURT:  No, the relevance argument is that it

22   shows a point which is clearly an issue in trial, which is the

23   extent to which the government of Iran is involved.

24             MR. HEBERLIG:  There's no government of Iran involved

25   here, this is a private company.  The auditor request is coming

K34TSAD4

1    from, to be clear, from IIHCO, the private company.  The

2    government doesn't maintain that IIHCO is a government company.

3         THE COURT:  But it's talking about four Iranian

4    auditors under Iran law.

5         MR. HEBERLIG:  IIHCO auditors.

6         THE COURT:  Read the sentence.

7         MR. HEBERLIG:  We are sending a form that is required

8    by IIHCO auditors in Iran in compliance with Iranian law.  Not

9    for the government of Iran.

10        THE COURT:  That's a weight argument, so I overrule

11   the relevance objection.

12        MR. HEBERLIG:  Thank you.

13        THE COURT:  And it sounds like it fits within my

14   pretrial rulings on co-conspirator statements, so I overrule

15   the hearsay objection.

16        Just to be clear, that was document number --

17        MS. LAKE:  1401.

18        THE COURT:  So of the ones we discussed, 1401 appears

19   to be likely to be admitted.

20        MR. HEBERLIG:  Okay.  This is blissfully the last one.

21   2159, which is Farsi.  2159T.  It's an email and then an

22   attachment.

23        THE COURT:  All I know how to say in Farsi is "yes."

24        MR. HEBERLIG:  We heard that one a lot.

25        So this is an email from Mr. Tehrani to I believe

K34TSAD4

1    Mohammad Sadr with a copy to Ali Sadr.  It's not the email that

2    is the issue, it's the attachment.  He attaches a -- maybe we

3    could jump to the attachment, 2159A-T.

4            Essentially the attachment, as I understand the

5    translation, is a letter that the Iranian ambassador wrote and

6    signed and sent to his counterpart in Venezuela about the

7    business dispute between the parties.  And our objection is

8    that it's hearsay.  That individual obviously won't be

9    testifying, and no indication of any sort of adoptive admission

10   was forwarded, commented on, so it can't come in for the truth

11   of the matter asserted.

12           THE COURT:  Ms. Lake.

13           MS. LAKE:  Your Honor, Soltani is a co-conspirator.

14   He's all over the documents trying to help IIHC get paid U.S.

15   dollars.

16           THE COURT:  To be clear, you're talking about the

17   ambassador.

18           MS. LAKE:  Yes.  He's intervening because there are

19   payments disputes between Venezuela and IIHC.  Venezuela wants

20   to pay more bolivars, fewer U.S. dollars.  So clearly he knows

21   that the company is getting paid some amount in U.S. dollars

22   because that's the subject of the dispute he's getting involved

23   with.  And he's writing this letter to advocate on behalf of

24   the project to try to smooth over relations between Venezuela

25   and IIHC, and he specifically references the possibility of

K34TSAD4

1    changes to the contract to change the dollar/bolivar

2    proportions.  This is designed to get the company paid.

3            MR. HEBERLIG:  I want to make sure I heard correctly,

4    the Iranian ambassador, the government official is a

5    co-conspirator in the case, that's the government's position?

6            MS. LAKE:  Yes, he's helping the company get paid U.S.

7    dollars in violation of U.S. sanctions against Iran.

8            MR. HEBERLIG:  There's not been sufficient evidence

9    proffered to establish that the Iranian ambassador to Iran is a

10   co-conspirator in this case.

11           MS. LAKE:  We need to prove this by a preponderance of

12   the evidence.  We don't need to convict the Iranian ambassador

13   of sanctions violations, we need to establish by a

14   preponderance of the evidence that he was a member of this

15   conspiracy.  The emails and letters that he writes trying to

16   get IIHC paid U.S. dollars show that he's part of this

17   conspiracy.  Those emails and letters trying to get IIHC paid

18   in U.S. dollars, an Iranian company paid U.S. dollars, show

19   that he is a co-conspirator, and those are letters and emails

20   that are in furtherance of the conspiracy.

21           MR. HEBERLIG:  It's an astonishing position that the

22   Iranian government is co-conspiring in this case.  This is the

23   first evidence that we have seen and the first time we heard

24   from the government that that is their position.  And this

25   alone certainly does not establish by a preponderance of the

K34TSAD4

1    evidence that the Iranian government was conspiring in this

2    case to get IIHCO paid.

3            You know our position, that payments outside of Iran

4    are not prohibited by the sanctions, but the notion that

5    obviously if this Iranian ambassador is a co-conspirator, he's

6    engaged in bilateral negotiations with the Venezuelan

7    ambassador, who I guess by the same token also co-conspired to

8    get his comrades paid in Iran.  It doesn't pass muster.  It's

9    not enough.

10           Is that the government's position, that the Venezuelan

11   diplomatic minister who is involved in these bilateral

12   negotiations is a co-conspirator as well?

13           MS. LAKE:  First of all, we're not trying to seek

14   admission of his statements, but it is our position that people

15   who are involved in trying to get an Iranian company paid in

16   U.S. dollars are co-conspirators.  Especially people who are

17   higher up in the government, they certainly can't disclaim

18   knowledge of the sanctions.  They know about the sanctions,

19   they're trying to get an Iranian company paid dollars.

20           THE COURT:  In terms of awareness of

21   misrepresentations, awareness of the setting up of the alleged

22   front companies, what is there with respect to that?  I guess I

23   need to see the substance of this.

24           MR. HEBERLIG:  I could hand it up.

25           THE COURT:  That would be helpful.

K34TSAD4

1           MR. HEBERLIG:  This is Government Exhibit 2159A-T.

2           THE COURT:  And Ms. Lake, remind me, Soltani wasn't

3      briefed in the co-conspirator statements in limines, was he?

4           MS. LAKE:  I don't believe that he was.

5           THE COURT:  Let's take our lunch break.  I will read

6      this full document.

7           MR. HEBERLIG:  The last thing I add, your Honor, is

8      just paying an Iranian company in U.S. dollars is not a crime

9      or a violation of the sanctions.  And frankly, the fact that

10     the two governments are involved in these negotiations is

11     pretty good corroborative evidence of that fact.

12          MS. LAKE:  Your Honor, these are governments that hate

13     America.  I don't see why the fact that they are involved in

14     these negotiations means that everybody must be trying to

15     comply with U.S. law.

16          THE COURT:  Is it the government's position that any

17     payment in U.S. dollars is a violation of sanctions?

18          MS. LAKE:  A payment in U.S. dollars that transits

19     through the United States, which basically all payments in U.S.

20     dollars --

21          THE COURT:  Basically?

22          MS. LAKE:  Functionally all.  I mean it's very

23     difficult to do a U.S. dollar payment that does not get routed

24     through the U.S., and --

25          THE COURT:  I assume this is an ignorant question:

K34TSAD4

1   You can't go through a Japanese bank --

2            MS. LAKE:  No.

3            THE COURT:  -- yens to dollars?

4            MR. HEBERLIG:  Hong Kong actually.  Somewhere around

5   20 percent or more of worldwide U.S. dollar transactions are

6   cleared outside the United States, which we'll learn when the

7   banker is on the stand.

8            THE COURT:  I think without more than just he's trying

9   to get them paid in U.S. dollars, I don't think that's a

10  preponderance of the evidence that the ambassador to Iran is a

11  co-conspirator here.

12           MS. LAKE:  Even if it's not for purposes of this

13  document, this is relevant for the fact that --

14           THE COURT:  It's not a relevance question.

15           MS. LAKE:  Sorry, this is also relevant for a

16  non-hearsay purpose.

17           THE COURT:  Okay.

18           MS. LAKE:  So it's relevant for the fact that the

19  Islamic Republic of Iran Ambassador Hojatollah Soltani is

20  getting involved in trying to get IIHC paid.  This goes to fact

21  that this is all for the benefit of an Iranian company.  We

22  opened on this.  The ambassador to Iran doesn't get involved

23  for a company in Switzerland or a company in Turkey, they're

24  involved because this is for an Iranian company.  So even if

25  this doesn't come in for its truth, I think it certainly comes

K34TSAD4

1    in for the fact that the ambassador is writing this letter

2    advocating on behalf of IIHC.

3           And it rebuts the defense's argument in opening that

4    there was all this sort of antipathy and animosity between the

5    Sadrs and the government of Iran.  They're getting involved.

6    Here it's the ambassador, we have other documents where it's

7    the minister of industry.

8           MR. HEBERLIG:  It's an argument about the truth.

9           THE COURT:  Well, the fact of involvement is not the

10   same as the truth of what's contained in this document, which I

11   still want to read.

12          I will look at this over our short lunch.  It's 12:40,

13   we'll come back at 1:00.  Thank you.

14          (Luncheon recess taken)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K34nsad5

                        AFTERNOON SESSION

                            (1:00 p.m.)

1          THE COURT:  I think we're waiting for one more juror.

2     As soon as they are here, we'll start.  I think,

3     Ms. Lake, you don't need resolution before the lunch break,

4     correct?  Or we don't know?

5          MS. LAKE:  We can do the documents, those documents --

6          THE COURT:  At the end.  I didn't have much time to

7     look at this.  So if we can table both until at least the lunch

8     break.  So we've got Ebanks.

9          MR. KROUSE:  Your Honor, you mean the afternoon break?

10         THE COURT:  I'm sorry.  Yes.

11         MS. LAKE:  We're happy to take another lunch break if

12    you want.

13         THE COURT:  It was short.

14         You are not going to finish with your paralegal before

15    the afternoon break?

16         MS. LAKE:  No.

17         THE COURT:  No.  All right.

18         MS. KIM:  Your Honor, just one thing to note for the

19    Court.  The next witness just might ask for a restroom break --

20         THE COURT:  Yes.

21         MS. KIM:  -- if she's on for a while.

22         THE COURT:  That's fine.

23         Anything else?  Still waiting on one.

K34nsad5

1              MR. HEBERLIG:  Your Honor --

2              THE COURT:  Yes.

3              MR. HEBERLIG:  Excuse me.

4              THE COURT:  Just a second.  All right.

5         We're waiting on one.

6              MR. HEBERLIG:  If we're waiting, one thing to

7    supplement the discussion earlier.  It goes to whether a

8    conspiracy has been established for purposes of the

9    coconspirator exception.  I think it is relevant that there's

10   no information in the letter we are talking about that any of

11   the participants thought they were doing something wrong.

12             Normally to establish that a conspiracy existed you

13   need some indicia that the people participating in the

14   activities were aware of the wrongdoing, they were trying to

15   conceal information, there was something amiss, dirty talk

16   between them.  Just participating in meetings in which U.S.

17   dollar payments were discussed in our view is not enough to

18   establish that those individuals were participants in a

19   conspiracy.

20             THE COURT:  Yes.

21             MS. LAKE:  Your Honor, we are not saying they just

22   participated in the meeting.  We are saying they were helping

23   or trying to help the company get paid in U.S. dollars.  It's

24   not just that they sat in a meeting where other people talked

25   about it.

K34nsad5

1          THE COURT:  In front of me at the moment is the one

2     from the ambassador.  I don't think the government has shown by

3     a preponderance of the evidence that he is a coconspirator.  So

4     what I want to consider is the question of whether the

5     government may offer it for essentially the fact that the

6     ambassador was involved at all, which I think is what the

7     government wants it for.

8          Where did this come from?  Authenticity is stipulated

9     to and the like?

10          MS. LAKE:  Yes, your Honor.  It's from the defendant's

11     e-mail.  He did receive this.

12          THE COURT:  OK.  We're ready.  We'll bring in the

13     jury.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2              THE COURT:  Thank you very much, members of the jury,

3    for your diligence and attention.  It seems from the window

4    that it is nice outside.  I hope that you have had a few

5    moments to experience that.  So thank you again.

6              Ms. Kim, the government may call the next witness.

7              MS. KIM:  Your Honor, the government calls Crina

8    Ebanks.

9              THE COURT:  Ms. Ebanks may come forward.

10    CRINA EBANKS,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MS. KIM:

15              THE COURT:  All right.  Ms. Kim, you may proceed.

16    Q.  Good afternoon, Ms. Ebanks.

17    A.  Good afternoon.

18    Q.  Where do you work?

19    A.  I work in the Office of Terrorist Financing and Financial

20    Crimes at the United States Department of the Treasury.

21    Q.  Is that office also called TFFC?

22    A.  Yes, it is.

23    Q.  In terms of TFFC's responsibilities, is one of those

24    responsibilities to combat threats posed by illicit financial

25    activities?

1    A.  Yes.

2    Q.  What is your title at TFFC?

3    A.  Policy adviser.

4    Q.  How long have you been a TFFC policy adviser?

5    A.  Two years and seven months.

6    Q.  Where did you work prior to the Department of Treasury?

7    A.  I worked at the Drug Enforcement Administration.

8    Q.  What was your role there?

9    A.  I was an intelligence research specialist.

10   Q.  And for approximately how long were you an intelligence

11   specialist at the DEA?

12   A.  Eight years.

13   Q.  As a TFFC policy adviser, do you cover a geographic

14   portfolio?

15   A.  Yes, I do.

16   Q.  What areas are included in that portfolio?

17   A.  Mexico, Central America, the Caribbean, and Canada.

18   Q.  As a TFFC policy adviser, do you engage with and advise

19   other countries as to how they can strengthen their anti-money

20   laundering programs?

21   A.  Yes, I do.

22   Q.  So I would like to talk a little bit about citizenship by

23   investment programs generally.

24          Are you familiar with citizenship by investment

25   programs?

1    A.  Yes.

2    Q.  Are these programs also called CBI programs?

3    A.  Yes.

4    Q.  How are you familiar with citizenship by investment

5    programs?

6    A.  As part of my responsibility as a policy adviser in my

7    office, we focus on any access to the financial system.  One of

8    the ways that you access the financial system is through

9    identity documentation, which is a part of a citizenship by

10   investment program.  Most citizenship by investment programs

11   result in the issuance of a passport, which is a form of an ID.

12           As I previously mentioned, identity documents allow

13   you to open bank accounts to receive financial services, so you

14   gain access to the financial system.

15   Q.  When you say "financial system," what do you mean by that?

16   A.  I'm referring to financial institutions, to include banks,

17   credit unions, money services businesses, wire remitters.

18   Q.  Could you please explain for the jury generally what a

19   citizenship by investment program is.

20   A.  Yes.  A citizenship by investment program is where a

21   country allows a foreign-born national who was not born in that

22   specific country to gain citizenship through investing or

23   providing a monetary contribution to particular funds in that

24   country.

25   Q.  Approximately how many citizenship by investment programs

1   are there in the world, if you know?

2   A.   Approximately nine, at least nine.

3   Q.   What are some examples of countries with these programs?

4   A.   There are approximately five in the Caribbean, St. Lucia,

5   St. Kitts and Nevis, Antigua and Barbuda, Grenada, Dominica.

6   In Europe, there are several, including Cyprus, Malta, Latvia.

7   Another that I'm familiar with is in the Seychelles in Africa.

8   Q.   So let's turn to St. Kitts and Nevis' citizenship by

9   investment program.  Is St. Kitts and Nevis also called SKN?

10  A.   Yes.

11  Q.   Are you familiar with SKN's citizenship by investment

12  program?

13  A.   Yes, I am.

14  Q.   When was it established?

15  A.   In the 1983.

16  Q.   Are you generally familiar how the CBI program was

17  implemented before in or about 2014?

18  A.   Yes.

19  Q.   At a very high level, could you please describe SKN's CBI

20  program as of that time.

21  A.   SKN granted citizenship by investment through contributions

22  to two funds that existed at that time.  It was a sugar

23  diversification investment foundation fund as well as a real

24  estate investment fund.

25  Q.   And what was the sugar diversification fund?

A.   The sugar diversification investment fund was a fund that
the government established in order to diversify their economy,
which up until the early 1980s had been predominantly dependent
on sugar exports around the world.

As I understand it, market forces and globalization
significantly weakened their sugar exports, and so they
established the sugar diversification investment fund to be an
alternative source to those exports.

Q.   And very generally, at a high level, what was the real
estate fund?

A.   The real estate fund was an alternative option for gaining
citizenship by investment through monetary contributions or an
investment in real estate, which would ultimately result in
applicants who were granted citizenship also having land titles
or real estate in SKN.

Q.   When you say monetary contributions or investments, what
was the approximate range of monetary contributions?

A.   Between 200,000 U.S. dollars and 400,000 US dollars.

Q.   And were there different packages in place whereby an
applicant could apply for citizenship or an applicant and his
dependents could apply for citizenship?

A.   Yes.

Q.   To apply for citizenship by investment in St. Kitts and
Nevis, did an applicant have to submit some information about
themselves?

K34nsad5                          Ebanks - Direct

1   A.   Yes.

2   Q.   And has the application process substantially changed since

3   in or about 2009 with respect to requirements for applicants?

4   A.   With respect to requirements for?

5   Q.   Applicants.

6   A.   For applicants, not to my knowledge.

7   Q.   Did the SKN citizenship by investment application have a

8   residency requirement prior to 2014?

9   A.   Not to my knowledge.

10  Q.   Did it have a language requirement?

11  A.   Not to my knowledge.

12  Q.   Did it have a citizenship examination requirement?

13  A.   Not to my knowledge.

14  Q.   Did it have a tax requirement?

15  A.   Not to my knowledge.

16  Q.   To apply for citizenship through the CBI program, are you

17  familiar with the types of information that applicants had to

18  submit about themselves?

19  A.   I'm sorry.  Can you repeat the question.

20  Q.   Yes.  Sure.

21        So to apply -- are you generally familiar with the

22  kind of information that applicants submitted in connection

23  with their CBI applications?

24  A.   Generally familiar.

25  Q.   Are you familiar with what kinds of due diligence, if any,

K34nsad5                          Ebanks – Cross

1    St. Kitts and Nevis conducted on CBI applications?

2    A.  In that time frame?

3    Q.  Yes.

4    A.  My understanding is that the controls were laxer than they

5    are now.

6    Q.  So, prior to 2014, would you describe SKN's due diligence

7    practices as lax and not rigorous?

8    A.  Yes.

9    Q.  As a general matter, fair to say that St. Kitts and Nevis

10   approves the vast majority of CBI applications?

11   A.  Yes.

12            MS. KIM:  Your Honor, can I have one moment?

13            THE COURT:  You may.

14            MS. KIM:  Nothing further from the government.

15            THE COURT:  All right.

16            Mr. Heberlig.

17            MR. HEBERLIG:  Thank you, your Honor.

18   CROSS-EXAMINATION

19   BY MR. HEBERLIG:

20   Q.  Good afternoon, Ms. Ebanks.

21   A.  Good afternoon.

22   Q.  You and I have not met before, correct?

23   A.  That's correct.

24   Q.  You are an official at the Treasury Department, is that

25   right?

1    A.  Yes.

2    Q.  And am I correct that you did not personally participate in

3    the investigation of Mr. Sadr?

4    A.  That is correct.

5    Q.  Nor did your office?

6    A.  That's correct.

7    Q.  And you haven't done any independent investigation of the

8    facts of this case?

9    A.  No, sir.

10   Q.  OK.  You testified about citizenship by investment programs

11   generally.  I have a few questions about that.  I think you

12   said there are roughly nine countries that have such programs,

13   is that right?

14   A.  Yes.

15   Q.  And you mentioned -- is that the current roster of

16   companies -- countries, excuse me.

17   A.  Yes.

18   Q.  Were there more programs in earlier time periods than say

19   the 2009 to 2014 time period?

20   A.  I don't know.

21   Q.  You mentioned some countries.  I want to see if you are

22   aware of any other countries that had such programs.

23          Did Canada have such a program, or does it have such a

24   program?

25   A.  I'm not aware.

1  Q.  How about the United States?

2  A.  As I understand it, we do not have a citizenship by

3  investment program.

4  Q.  We do have something called the EB5 program, is that

5  correct?

6  A.  I couldn't speak to that.

7  Q.  You are not aware of that?

8  A.  I'm not aware of that.

9  Q.  OK.  So then let's turn to the St. Kitts program.  I think

10  you said it has been around since 1983, is that correct?

11  A.  That's my understanding, yes.

12  Q.  Is that one of the more well established or longest tenured

13  programs?

14  A.  Yes.

15  Q.  OK.  You said something about applicant and dependents

16  could apply.  Can you elaborate what you meant by that?

17  A.  Yes.  So St. Kitts offers -- can I ask you to specify the

18  time frame that you are speaking to.  Currently or in the past?

19  Q.  2009 -- 2008 to 2012.

20  A.  I can speak to prior to 2014.

21  Q.  OK.

22  A.  My understanding is that St. Kitts offered citizenship by

23  investment to an applicant as well as dependents.

24  Q.  OK.  A couple of questions about -- at the end of the day,

25  one who applies and is approved through a citizenship by

K34nsad5                        Ebanks - Cross

1    investment program typically obtains a passport, is that

2    correct?

3    A.   Yes.

4    Q.   And in this instance the passport was issued by St. Kitts

5    and Nevis?

6    A.   In what instance?

7    Q.   Mr. Sadr's instance.

8    A.   I'm not aware of --

9    Q.   The facts of his case.  OK.  Fair enough.

10           One who applies for acceptance to the St. Kitts and

11   Nevis program, if they are admitted, receives a St. Kitts and

12   Nevis passport, correct?

13   A.   If approved, yes.

14   Q.   All right.  Are you familiar generally with restrictions on

15   ability to travel with different countries' passports?

16   A.   I'm generally familiar, but my focus is not on visa and

17   travel authorizations.

18   Q.   So just generally speaking -- and if you don't know, you

19   don't know -- but would you agree with me that it is difficult

20   to travel internationally on an Iranian passport?

21   A.   I don't know.

22   Q.   Do you know whether Iranian passport holders are unable to

23   obtain visas in many countries around the world?

24   A.   I'm not sure.

25   Q.   Are you aware of the comparative ease with which one can

1    travel on an Iranian passport versus a St. Kitts and Nevis

2    passport?

3    A.  I'm not.

4    Q.  So you are unaware of the fact that it is easier to travel

5    internationally without a visa on a St. Kitts and Nevis

6    passport than it is on an Iranian passport?

7    A.  That's correct.

8    Q.  A couple of questions about Iranian citizenship, and again,

9    only if you know.  People who are born in Iran are

10   automatically Iranian citizens, correct?

11   A.  I'm not sure.

12   Q.  I take it, then, you are unaware of whether people or

13   Iranian citizens can renounce their citizenship?

14   A.  I don't know.

15   Q.  So then just a few more questions about the St. Kitts and

16   Nevis program.  I think you indicated that one -- bear with me

17   one second.

18          MR. HEBERLIG:  I have nothing further, your Honor.

19          THE COURT:  Ms. Kim?

20          MS. KIM:  Nothing from the government, your Honor.

21          THE COURT:  Ms. Ebanks, thank you.  You are excused.

22          THE WITNESS:  Thank you.

23          (Witness excused)

24          THE COURT:  The government may call its next witness.

25          MS. LAKE:  Your Honor, the government calls Matthew

1   Nelson.

2           THE COURT:  OK.  Mr. Nelson may come forward.

3           MS. LAKE:  While we are waiting, may I read a

4   stipulation.

5           THE COURT:  What's the number?

6           MS. LAKE:  It is 104C.

7           THE COURT:  Without objection.

8           MR. HEBERLIG:  Without objection.

9           THE COURT:  Thank you.

10          MS. LAKE:  The parties stipulate that Government

11  Exhibits 2159T, 2159A-T, 2171-T, 1003-T and 1003A consist of

12  true and accurate translations of Government Exhibits 2159,

13  2159A, 2171, 1003 and 1003A.  It is further stipulated and

14  agreed that this stipulation may be received in evidence as

15  Government Exhibit 104C at trial.

16          The government offers Government Exhibit 104C at this

17  time.

18          THE COURT:  Without objection, 104C is admitted.

19          MR. HEBERLIG:  No objection.

20          (Government Exhibit 104C received in evidence)

21          MR. HEBERLIG:  Your Honor, we are experiencing

22  difficulty with our screens here.  We're trying to fix it but

23  nothing is appearing.

24          THE COURT:  Well, we're still waiting for our witness,

25  so we will get IT to look at it.

1          MS. LAKE:  I can also offer the documents now.

2          THE COURT:  Go ahead.

3          MS. LAKE:  The government offers the following

4    government exhibits, 2278, 2278A, 2278B, 2049, 2049B, 2218,

5    1401, 1401A, 1401T, 1401A-T, 2026, 2050, 2070, 2072, 2072A,

6    2078, 2078A, 2084, 2088, 2088A, 2135, 2171, 2171-T, 1003,

7    1003A, 1003T, 1003A-T, 2103, 2103A, 2104, 2104A, 2296, and

8    2296A.

9          MR. HEBERLIG:  Can I have the Court's indulgence.

10         THE COURT:  By that you just mean time?

11         MR. HEBERLIG:  Yes, please.

12         THE COURT:  OK.

13         MS. LAKE:  I would be happy to read another

14   stipulation.

15         THE COURT:  Well, Mr. Heberlig is going to take the

16   time he needs to indicate if there are any objections.

17         MS. LAKE:  Thank you, your Honor.

18         MR. HEBERLIG:  May I consult with counsel for a

19   moment?

20         THE COURT:  You may.

21         (Counsel conferred)

22         MR. HEBERLIG:  Thank you, your Honor.

23         No objection other than with respect to 1401, which is

24   the subject of the prior discussion.

25         THE COURT:  OK.  So with the exception -- I admitted

K34nsad5                    Nelson – Direct

1    1401.  Yes.

2              So, without the objection waived, of course, the

3    documents read by Ms. Lake are admitted.  I think we now have

4    our witness.

5              Mr. Nelson, you may come forward.

6              (Government Exhibits  2278, 2278A, 2278B, 2049, 2049B,

7    2218, 1401, 1401A, 1401T, 1401A-T, 2026, 2050, 2070, 2072,

8    2072A, 2078, 2078A, 2084, 2088, 2088A, 2135, 2171, 2171-T,

9    1003, 1003A, 1003T, 1003A-T, 2103, 2103A, 2104, 2104A, 2296,

10   and 2296A received in evidence)

11    MATTHEW NELSON,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. LAKE:

16             THE COURT:  You may proceed.

17             MS. LAKE:  Thank you, your Honor.

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  Where do you work?

21   A.  I work at the New York County District Attorney's Office.

22   Q.  What is your title?

23   A.  Paralegal.

24             MS. LAKE:  All right.  Mr. Milione, please publish

25   Government Exhibit 2278.  Can you zoom in on the top of the

K34nsad5                          Nelson - Direct

1    page.  This is an e-mail from Stratus head office to Ali Sadr,

2    CC Reza Moayed, subject Venezuela project, sent on June 7,

3    2009.

4    Q.  Could you please read the text of the e-mail?

5    A.  "Dear Mr. Ali Sadr.

6              "Please find attached 3 filed regarding the Venezuela

7    project."

8              MS. LAKE:  Let's please publish Government Exhibit

9    2278A, which is an attachment.

10             Could you please zoom in on the top half of the page.

11   Q.  Can you read the title of this document, please?

12   A.  "Subject, general information -- dated July 2007,

13   7,000-unit housing project in Venezuela."

14   Q.  Can you read the line under that.

15   A.  "The general information of the Venezuela housing project

16   is presented as follows."

17   Q.  Can you read the text under 2 - contractor?

18   A.  "A new company with the name of 'Iranian International

19   Housing Company' has been established in Tehran and a branch of

20   it has been registered in Venezuela and signed the agreement.

21   The shareholders of this company are six big Iranian

22   construction companies, including sister companies of Stratus

23   Group."

24             MS. LAKE:  Let's please turn to page 2.  Can you

25   expand No. 7, payments.

1   Q.  Can you read the text under 7, payments?

2   A.  "Payments are in USD, according to percentage of progress

3   (the price breakdown differed by weight percentage of each

4   activity).  Advance payment is 30 percent of the contract

5   amount against bank guarantee and is already paid on October

6   2008."

7        MS. LAKE:  OK.  Can we please expand 14, money

8   transferring.

9   Q.  Please read that text.

10  A.  "One of the important problems is to transfer money from

11  Iran to Venezuela and vice versa and exchange the USD to

12  bolivar for local expenses."

13       MS. LAKE:  Let's please publish Government Exhibit

14  2278B, which is another attachment.  Can you just expand the

15  text.

16  Q.  Mr. Nelson, please read this entire memo.

17  A.  "Dear Mr. Ali Sadr,

18       "Salam.

19       "1.  The contract is signed between an Iranian

20  company, in the name of Iranian International Housing Co. and

21  Venezuela employer DUCOLSA Co. affiliated to oil ministry.

22       "2.  The amount of the project is million USD 475 and

23  contract period is 51 months.

24       "3.  Performance guarantee, 5 percent, and advance

25  payments guarantee, 30 percent, are submitted to the employer

1    and advance payment has been paid to contractor.

2              "4.  The project land has not been handed over to the

3    contractor due to lack of environmental permission and

4    occupation of land by some owners, 92 families.

5              "5.  Stratus will be in charge of execution of the

6    property due to the majority of the Stratus' subsidiary

7    companies share in Iranian International Housing Company, whose

8    shareholders are six Iranian big housing investment and

9    contractor companies.

10             "6.  Mr. Eng Zangeneh is the managing director of

11   Iranian International Housing Company and Mr. Eng Karimi will

12   be the project manager.

13             "7.  The design of units is in process by an Iranian

14   consulting/designer company.

15             "8.  We are in the stage of planning, preparing the

16   cash flow requirements and logistic affairs.

17             "Thanks.

18             "Reza Moayed."

19             MS. LAKE:  Thank you.  Can we please turn to

20   Government Exhibit 2049.  Can you just expand the top message

21   in this chain.  This is from Mustafa Cetinel to Behrooz

22   Zangeneh, sent July 2, 2011.  The subject, forward label table

23   and organization chart.

24   Q.  Mr. Nelson, can you please read the e-mail.

25   A.  "Dear Mr. Zangeneh.

1          "As agreed in the last committee meeting, the

2     following dismissal and annual leave program has been executed

3     at the job site.  The annual leave schedule were deviated due

4     the transit visa process delays.  Therefore, 107 Venezuelan

5     workers and six white collar Venezuelan staff were dismissed

6     and five Iranian staff were sent for their annual leave.

7          "Thanks and regards,

8          "Mustafa Cetinel."

9          MS. LAKE:  Let's turn to 2049B which is an attachment

10    to this e-mail.  Can you please expand just the top quarter of

11    the page.

12    Q.  Who is listed as project manager?

13    A.  B. Karimi.

14    Q.  Who is listed as vice project manager?

15    A.  E. Cinar.

16    Q.  If you look to the top left, what is the name of this

17    document?

18    A.  IIHCO organization chart.

19          MS. LAKE:  Can we please expand the table in the

20    bottom right.

21    Q.  Can you please read the rows under nationality and

22    quantity?

23    A.  "Venezuelan, 83; Iranian, 65; Turkish, 2; British, 1.

24          "Total 151."

25          MS. LAKE:  All right.  Let's please turn to Government

K34nsad5                         Nelson - Direct

Exhibit 2218.  Can you expand from where it says 2010, 10/29

Ali Sadr.  All right.  This is an e-mail from Ali Sadr dated

10/29/2010.

Q.  Can you please read the text of this message.

A.  "Hey, don't forget to send me one of your pics.  I also

need a final yes from you with regards to your job, and a

summary of what we agreed on with regards to your compensation

and everything else.  So, as soon as I receive that from you, I

can send a proper introductory e-mail and introduce your to the

rest of our team in Venezuela.

          "I will he available on plus 989128086338 in case you

wanted to get in touch with me; also, save this number along

with my other numbers.  This is my mobile number in Tehran.

Here the weekends are only on Fridays, so Saturdays and Sundays

are working days, so it's important to keep that in mind for

your communications with the Tehran office in the future.

          "Have a great weekend and don't do anything crazy.

          "Take care.

          "Ali."

          MS. LAKE:  Can we please turn to Government Exhibit

1401.  I'm sorry, can you also pull up 1401-T alongside this

document.  1401-T is a translation of 1401.  Can we expand the

top half of 1401-T.  This is from Yusmila de Nicolo to Emelia

Ruza, with a variety of CCs, dated January 25, 2011, with the

subject IIHCO auditing company.

1              Can you please zoom in on the text of the e-mail now.

2

3    Q.   Mr. Nelson, can you please read the e-mail?

4    A.   "Good afternoon, Emelia.

5              "Regarding the attached request, please proceed in

6    obtaining the information required for the Iranian

7    International Housing Company.  To that end, prepare a memo for

8    the regional management of DUCOLSA West to sign.

9              "Sincerely,

10             "Yusmila de Nicolo, engineer, extension 0412-1709803."

11             MS. LAKE:  Can we please publish Government Exhibit

12   1401A which is an attachment to 1401.  Can you just expand the

13   top half of the page from the very top.  Yes.  That's great.

14   Q.   What does it say in the top left corner of the page?

15   A.   Iranian International Housing Co.

16   Q.   What is the date on the top right?

17   A.   January 19, 2011.

18   Q.   Can you read the English text which is on the left side of

19   the page?

20   A.   "To DUCOLSA, Christobal Colon Ave., arterial 7, Subeca

21   Mall, DUCOLSA building western region.

22             "Attention, Ms. Virginia Mares, manager, western

23   region, employer's representative.

24             "Project, Fabricio Ojeda New City, urban project.

25             "Subject, confirmation of information for auditors.

1             "Dear Madam" --

2    Q.   Can we please expand the bottom part of the page.

3             Please continue reading.

4    A.   "Dear Madam.

5             "Receive respectful greetings.  We are sending a form

6    that is required by IIHCO auditors in Iran in compliance with

7    Iranian law.

8             "We will appreciate if you can complete the attached

9    form and send it directly to the auditors all as explained in

10   the form.

11            "Yours sincerely,

12            "Bahram Karimi, contractor's representative."

13            MS. LAKE:  Now, can we please publish Government

14   Exhibit 1401A-T, which is a translation of Government Exhibit

15   1401A.  Can you please turn to the second page.  Expand the top

16   half of the page.

17   Q.   Can you please read starting with, "Dear Sirs."

18   A.   "Dear Sirs,

19            "At the request of the Osulpaye Faragir Institute of

20   Audit and Management Services, which is performing an audit of

21   this company, please indicate the balance of credits/debits and

22   the balance of accounts payable/receivable as of September 22,

23   2010 in the corresponding spaces on this letter.  Please sign

24   and affix your seal to the original, then send same direct to

25   the following address:  Iran, Tehran, Vanak, Square, Codemi Av,

K34nsad5                          Nelson - Direct

1    Aftap Av, Ararat Gharbi Av. No. 24 first floor, and a copy to

2    this company.  Please report any other issue regarding the

3    aforementioned accounts that have not been requested.

4               "Cordially, Bahram Karimi, executive director."

5               MS. LAKE:  Can you please expand the second half of

6    the page.

7    Q.  Mr. Nelson would you mind reading that?

8    A.  "Below you will find the balance of credits/debits and the

9    balances of accounts receivable payable for the Iranian

10   International Housing Company Iranian of September 22, 2010.

11              "Amount in USD.

12              "Credits.

13              "Documents receivable.

14              "Debits.

15              "Documents payable.

16              "Total observations.

17              "Seal and signature.

18              "Date."

19              MS. LAKE:  Thank you.  Let's turn to government 2026.

20              Can you expand the header of the e-mail, please.

21              This is an e-mail from Mustafa Cetinel to Ali Sadr

22   dated April 7, 2011 re IPC 11 and 12.  Can you please expand

23   the text under the line that reads July 4, 2011, from Ali Sadr.

24   Yes.

25   Q.  Would you mind reading that.

1    A.   "Dear Mustafa Bey,

2                "Thanks for your e-mail.  My strong suggestion is to

3    submit the letters and notices as soon as possible.  This

4    matter has already been prolonged.  Once we've set our strategy

5    and have set a plan accordingly, the best is to follow our plan

6    as set previously.

7                "Consequently, please submit the letters as soon as

8    possible, since everyone in Tehran, including myself, has been

9    under the impression that these letters have already been

10   submitted.

11               "We can review our strategy once we have a stronger

12   feedback from their side after our letters and actions.  They

13   have to understand that Tehran is sending notices and doesn't

14   waste a minute from this point forward and to follow what it

15   says without wasting a second.

16               "And, most importantly, there's a contract, and

17   everyone has to abide by it.  If they don't, they won't get

18   what's promised on the contract.  We have to make it very

19   simple for them.  The simplest way is to follow the contract by

20   second from this point forward.

21               "Thanks again for your efforts and best regards.

22               MS. LAKE:  Can you just expand the bottom of the page

23   that shows who sent the e-mail.

24   Q.   What is the name at the bottom there, the second line from

25   the bottom?

1    A.  Ali.

2            MS. LAKE:  Let's turn to Government Exhibit 2050.

3            Can you please expand the top half of the page.  I'm

4    sorry, can you expand actually a little farther down.  That's

5    great.

6    Q.  All right.  This is from Ali Sadr to HReza, underscore,

7    gh@hotmail.com, re Geneva trip, dated July 3, 2011.

8            Can you read that e-mail.

9    A.  "Hamidreza Jan.

10           "I won't be able to make it on those days since I will

11   be very tied up with our general assembly meeting of EN Bank in

12   Tehran from the 16th until Thursday, the 21st.  However, I can

13   certainly join her and you from Friday, the 22nd, and can

14   discuss all matters accordingly.

15           "On the other hand, we can meet in Dubai or Tehran as

16   well.  Please let me know what suits you best.  For your info,

17   I will be in Switzerland until the 12th.  Call me if you want

18   to coordinate further.  You should be expecting my business

19   plan numbers shortly as some matters have evolved rapidly.

20           "Thanks and best.

21           MS. LAKE:  All right.  Can you read -- can you

22   reexpand on that same section.

23   Q.  Can you read the e-mail one above that in the chain, which

24   is the response from H. Reza underscore GH.

25   A.  "I'm coming to Tehran on the 25th for a week.  Will you be

1    there?

2           "Regards, Hamidreza."

3    Q.  And then can you please read the response from Ali Sadr?

4    A.  "Yes.  I should be there.  I'll call you tonight.  Best."

5           MS. LAKE:  All right.  Please turn to Government

6    Exhibit 2070.  This is an e-mail exchange between Ali Sadr and

7    m.Cetinel@superonline.com.  Let's start with the e-mail that is

8    in the middle of the page from Ali Sadr.  The one below that.

9    Expand from that point down.

10   Q.  All right.  Can you please read that top e-mail from Ali

11   Sadr?

12   A.  "Dear Mr. Mustafa Jan.

13          "Thank you for the information and it shall be kept in

14   full confidence.  I will be arriving in Caracas on Wednesday

15   with Lufthansa.  I would appreciate it if a pickup could be

16   arranged.

17          "Thanks and best regards."

18          MS. LAKE:  OK.  Now can we expand to the top half of

19   the page.  Down -- yeah, perfect.

20   Q.   Can you read the next e-mail in the chain, which is the

21   response from Mustafa Cetinel?

22   A.  "Dr. Ali Jan.

23          "I will arrange with Mr. Karimi and Mr. Turabi to meet

24   you at the airport on Wednesday and book a hotel room for the

25   same night, as they are in Caracas for meeting Iranian

K34nsad5                         Nelson - Direct

1    delegation.

2              "As I know there is a plan of Iranian minister of

3    housing will be visiting our site and Karimi trying to arrange

4    a charter flight to Cabimas for Thursday morning.  I think you

5    will be joining them in the same plane, and I will ask them to

6    include you in the same organization if you do not have

7    separate plan.

8              "See you here in Ojeda.

9              "Thanks and regards,

10             "Mustafa Cetinel."

11   Q.  Now can you please read the top e-mail which is the

12   response from Ali Sadr.

13   A.  "Dear Mustafa Jan,

14             "I will have a meeting in Caracas on Wednesday late

15   evening with Leonel.  Then I can come to Cabimas with the

16   Iranian delegation as well.

17             "Best regards.

18             MS. LAKE:  Can we please turn to Government Exhibit

19   2072.  Expand the header information.  You can go actually just

20   down to the next one.  Perfect.

21             This is an e-mail from Ali Sadr to internal, subject

22   forward addendum, dated October 4, 2011 -- sorry from Ali Sadr

23   to internal@samanehstratus.com.

24   Q.  Can you read the text of that e-mail.

25   A.  "Print and put on my desk."

1      MS. LAKE:  Can you please publish Government Exhibit

2  2072A, which is an attachment to Government Exhibit 2072.

3  Q.  Can you just read the name of this document?

4  A.  "Addendum No. 1.  IPC contract New Ojeda Housing

5  Development for the construction of 7,000 single-family housing

6  units and apartments with infrastructure and public buildings."

7      MS. LAKE:  All right.  Let's turn to Government

8  Exhibit 2078.  Can we please expand the top portion.

9      This is an e-mail from sadr@samanehstratus.com to Ali

10  Sadr, subject forward this is Shadloo, representative of

11  Mr. Sadr, dated November 2, 2011.

12      And below that is an e-mail from New Office at the

13  e-mail address newoffice43@yahoo.com, to

14  vcgfinanzas@hotmail.com copying sadr@samanehstratus.com.

15  Q.  Can you read the text of the e-mail from New Office.

16  A.  "Dear Leon, please find attachment."

17      MS. LAKE:  And can we please publish Government

18  Exhibit 2078A, which is the attachment to this e-mail, and

19  expand just the top portion of the page until the table.

20  Q.  Can you please read this e-mail.

21  A.  "Dear Mr. Leon,

22      "Respectfully, this is Faramarz Shadloo,

23  representative of Mr. Ali Sadr in Tehran.  In this case you can

24  informed by Mr. Sadr then I pleased if you send me a duplicate

25  the version of payment receipt transfer report, which you send

1    to Mr. Sadr.  The last report you had sent to Mr. Sadr is till

2    to 10/19/2011, with the balance of 151823-26 dollars.

3    Moreover, check the following if these are correct.  Correct

4    your report.  This is our new e-mail address,

5    newoffice43@yahoo.com."

6              MS. LAKE:  Can we please publish Government Exhibit

7    911, which is in evidence.  This is the registration data from

8    the e-mail account newoffice43@yahoo.com.

9    Q.  Mr. Nelson, what is listed next to country?

10   A.  Iran.

11             MS. LAKE:  All right.  Can we please publish

12   Government Exhibit 2084.  Please expand the top e-mail on the

13   page.  This is an e-mail from Ali Sadr to

14   faramarzshadloo@vcgfinanzas dated November 30, 2011, subject,

15   forward statement.

16   Q.  Can you please read that e-mail?

17   A.  "Dr. Leonel.

18             "Please copy Mr. Shadloo on your future statements, as

19   he is in charge of the accounting of our operations and he may

20   also contact you from time to time for related matters.

21             "Thanks and best regards."

22             MS. LAKE:  All right.  Let's turn to Government

23   Exhibit 916.  This is the registration data from

24   shadloo.faramarz@yahoo.com.

25   Q.  What is the full name listed on this e-mail.

K34nsad5                          Nelson - Direct

1   A.  "Shadloo.faramarz@yahoo.com."

2   Q.  And what is the country listed for this e-mail address?

3   A.  Iran.

4            MS. LAKE:  Let's publish Government Exhibit 2088.

5            Can you expand the first e-mail on the page.

6            This is from Ali Sadr to sadr@samanehstratus.com,

7   subject forward meeting report, sent December 18, 2011.

8   Q.  Can you please read the text of this e-mail?

9   A.  "Please print the attached file and give it to Mr. Sadr as

10  soon as possible.

11           MS. LAKE:  Can you please expand the next e-mail down

12  the page.  This is from Mustafa Cetinel to Ali Sadr dated

13  December 18, 2011, subject forward meeting report.

14  Q.  Can you please read that e-mail?

15  A.  "Dear Ali Jan.

16           "Attached is the report prepared by Mr. Karimi, whom I

17  instructed to have a meeting with our ambassador to seek for

18  his support to our position.

19           "Thanks and regards,

20           "Mustafa Cetinel.

21           MS. LAKE:  Can we please publish Government Exhibit

22  2088A, which is the attachment to this e-mail.

23           Expand the top half of the page.

24  Q.  All right.  Can you please read from the tom through the

25  first full paragraph?

K34nsad5                         Nelson - Direct

1    A.  Date, December 17, 2011.

2               "Dear Mr. Cetinel,

3               "According to your instructions with the purpose of

4    presenting a report about the situation in the project on

5    December 12 and considering the relations between

6    Mr. Ambassador Mesri and Mr. Ramirez, minister of petroleum,

7    and availing opportunity this clarify the mentality of the

8    Venezuelan party in relation to the project, a meeting was held

9    with the Iranian ambassador in the embassy of Iran."

10          MS. LAKE:  And let's then zoom in on the bottom half

11   of the page.

12   Q.  Can you read from the top through bullet 2.

13   A.  "After the presentation of the report and the information

14   offered to Mr. Mesri about the impossibility of the completion

15   of such housing units during this period, the most important

16   observations by Mr. Ambassador is as follows:

17              "1.  Mr. Ambassador did not accept any reason of the

18   delay of the project presented to us.

19              "2.  He replied that IIHCO has violated its

20   commitments related to the completion of such housing units and

21   has caused disgrace of the Islamic Republican of Iran."

22          MS. LAKE:  All right.  Let's turn to page 2 and expand

23   from No. 5 to the bottom.

24   Q.  Can you please read No. 5.

25   A.  "5. Before the suspension, I defended your positions

1   seriously in front of Iranian Bank of Development and minister

2   of industry, and also I sent a very strongly worded letter to

3   Mr. Ahmadinejad against the BID's president.  Such defenses

4   were caused that you received your advanced payment completely.

5   Also, I agreed a payment of a loan to IIHCO by the BID.

6          "6.   In joint commission between Iran and Venezuela

7   your positions were admired in all sessions.

8          "7.   Considering what you have done and your

9   nonfulfillment about termination of 1,760 units up to December

10  2011, I have regretted all I have done up to now, and I will

11  write a letter to Iranian president in which I will inform that

12  I was wrong with all my positive positions about IIHCO.

13         "Further, I threatened that if IIHCO does not fulfill

14  its commitments, I will do anything to deny the departure of

15  managers of this company from Iran.

16         MS. LAKE:  All right.  Can we turn to the last page.

17  Just expand the very bottom two lines.  Just the name of the

18  person who sent this.

19  Q.  Can you just read that?

20  A.  "Bahram Karimi, project manager."

21         MS. LAKE:  All right.  Let's turn to Government

22  Exhibit 2135.  Can you expand the top half of the page.  This

23  is an e-mail from Mustafa Cetinel to Ali Sadr dated July 2,

24  2012, subject addendum related report.

25  Q.  Can you read from the top through No. 2?

1  A.  "Dear Ali Jan.

2          "I tried to repair my office programs in the weekend

3  but failed.  Therefore, I would like write a short summary of

4  our last week's meetings and events here in this e-mail message

5  in order to complete final negotiation for the addendum file.

6          "1.  On 22 June 2012, with the live TV participation

7  of both presidents of Venezuela and Iran, we made a handover

8  ceremony for 384 apartment units.  This has a very positive

9  effect on all sides.

10         "2.  During the preparation of this ceremony, before

11 Coronado has received an order from the Minister Ramirez to act

12 as the mediator between DUCOLSA and IIHCO, as he is the final

13 user of these apartments on behalf of PDVSA."

14         MS. LAKE:  Then can we please expand from following

15 this meeting through No. 2 below it.

16 Q.  All right.  Can you just read those lines?

17 A.  "Following this meeting we have been invited to a meeting

18 at PDVSA on 25/06/2012.

19         "In this meeting:

20         "1.  We clarified our position by making a brief

21 introduction of what has happened in the last eight to nine

22 months.

23         "2.  Mr. Parada clarified their position, and he

24 emphasized that the requirement of BS - USD payment is not his

25 personal caprice but a requirement of a new law which was

K34nsad5                           Nelson - Direct

1    introduced by the president of Venezuela on 2010.  In spite of

2    this law, he explained that they treated this contract on

3    special way, and they once again reminded the president that

4    this contract was signed on USD and with the initiatives of

5    both presidents."

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K34TSAD6                          Nelson - Direct

 1   BY MS. LAKE:
 2   Q.  Can you read paragraph four, just the last four lines.
 3   A.  Company.  However, it is impossible to leave the equipment
 4   and plants at the end of the project due to strict laws of Iran
 5   as IIHCO made commitments and provided guarantees to
 6   authorities to return the machinery and plants after that
 7   project completed.  But we can offer to you other kind of
 8   services or whatever it is as a good will and a brotherly
 9   gesture of IIHCO to DUCOLSA.  He said that he would expect our
10   offer in this regard.
11          MS. LAKE:  Please turn to the last page, just expand
12   the text on that page.
13   Q.  Please read the first paragraph.
14   A.  We explained that we needed all the said IPCs in USD
15   because of our previous commitments.  However, we thanked him
16   that he was speaking very openly and brotherly with us, and
17   encouraged him to speak with us everything open in case he
18   feels any mistaken action made by us.
19          6.  Last week we prepared all these required tables
20   and shared the information with DUCOLSA, and expecting this
21   week a second meeting in order to finalize addendum matter.
22          7.  My overall opinion is that Venezuelan side is also
23   eager and obliged to finalize this matter.  If we follow the
24   steps that I propose in my action plan, we might be able to
25   sign a fair addendum.  Please note that there no way out to

K34TSAD6                          Nelson - Direct

1    sign an addendum without involving BS portion of paper.

2    Expecting your firm order in order to continue with this

3    negotiation.  Thanks and regards, Mustafa Cetinel.

4              MS. LAKE:  Please publish two documents side by side,

5    Government Exhibit 2171 and 2171T, which is the translation.  I

6    apologize for the technical difficulties with the Farsi.

7              Please expand just the header information on the

8    2171T.  This is an email from hosseintehranihsn.

9    pdh218@gmail.com, sadr@samanehstratus.com, BCC Ali Sadr, June

10   13, 2018, subject preparation for amendment meeting comparing

11   and reviewing different options and preparing appropriate

12   offers.

13             Can you expand the top portion of the document.

14   Please read from the top through point one?

15   A.  Dear Mr. Sayed Mohammad Sadr Hashemi Nejad,

16             Greetings.  Considering the previous telephone

17   conversation, the copy of the letter I sent to Mr. Cetinel

18   asking for some options to discuss with Mr. Parada, my previous

19   reading, ultimately leading and defining red lines by you will

20   be summarized for decision making and potential agreement in

21   the meeting.  Below is the brief of the follow ups:

22             1.  Following a telephone conversation with the

23   Honorable Ambassador Soltani, a detailed confidential letter

24   was sent as well as an email from 6/6/2013 stating that the

25   official note is likely to be sent to the Venezuelan foreign

1    ministry along with a Spanish translation of the company letter

2    and an effective follow up.  The meeting has not yet been held

3    due to negotiations and coordination over the phone, busy work

4    schedule and election issues.  Due to the organization that has

5    been done, sending a letter with a lot of insistence at this

6    point is unnecessary and not very pleasant.

7    Q.   Expand the bottom of the page and read 3 and 4, please.

8    A.   3.   Your guidance and decisions at this critical juncture

9    are needed for the strategy of the company for participating in

10   the potential negotiations of the contingency mentioned during

11   the previously mentioned meeting, as well as maximum

12   flexibility that may be taken, if necessary, to resolve this

13   chronic dilemma to be then coordinated with you, given all the

14   dimensions of the situation and position of our company and

15   Stratus Group in and out of our country, which you are aware

16   of.

17           4.   Since the ambassador is fully supportive of the

18   company and recent actions taken under current circumstances,

19   as well as the overall vision of the employer body, which has

20   slightly improved in light of the company's goodwill despite

21   recent social and cultural problems, the extended work is in no

22   way beneficial to the company.  In addition to the company's

23   policies and international reputation, financial and labor

24   issues, termination of personnel would be extremely

25   problematic.  Therefore, the company, and above all, you,

K34TSAD6                         Nelson - Direct

1    should ultimately make your final and historic decision by

2    evaluating the high costs of continuing work rather than

3    suspending, acting, et cetera, and identify the red lines to

4    design a strategy for achieving that goal.

5            MS. LAKE:  All right.  Let's turn to government

6    exhibits, two of them, 1003 and 1003T, which is a translation

7    of 1003.

8            And please expand the portion of 1003T below the black

9    line.  This is an email from iihco@yahoo.com to

10   asafavardi@gmail, asafavardi@yahoo, soltani@stratus.ir,

11   HSN1954@yahoo, CC Zangeneh, dated November 21, 2013.

12           Please read the text.

13   A.  Dear Mr. Safaverdi,

14           Greetings.  Respectfully enclosed please find twelve

15   pages of information pertaining to the company and the project.

16   I will try to send the rest on Saturday.  Please inform me of

17   your probable attendance on November 28 at the celebration

18   party for the delivery of 1,760 units, which will be a special

19   opportunity to meet and make the acquaintance of the officials.

20           Respectfully, Behrooz Zangeneh.

21           MS. LAKE:  Before we go to the attachment let's pull

22   up some registration information.

23           Could we publish Government Exhibit 902.

24   Q.  This is for asafavardi@gmail.com, what is the name?

25   A.  Ahmad Safaverdi.

K34TSAD6                        Nelson - Direct

1   Q.  Let's go to 912.  This is the registration for

2   IICO@yahoo.com.  Can you read the country?

3   A.  Iran.

4           MS. LAKE:  Now let's go back to the email attachments.

5   Can you publish both 1003A and 1003A-T.  This is an eleven page

6   letter, we will not read all of it.

7           Could you expand the top of 1003AT.

8   Q.  Can you read that portion?

9   A.  From Behrooz Zangeneh to respectful Mr. Safaverdi.

10          Greetings.  Let me express my pleasure for being able

11  to collect information on the goal country, Venezuela, which

12  will be beneficial to the company and the project.  And I would

13  like to take this opportunity to inform you, in this first

14  correspondence, of the sections that help with illegible.

15          MS. LAKE:  Let's turn to page 2.  Can you just expand

16  the bottom part of the first bullet to the bottom.

17  Q.  Can you read the first paragraph starting with "Anyway."

18  A.  Anyway, so far the support of Iranian officials has been a

19  valuable help in resolving disputes.  Officials such as senior

20  administrators of the Specialized Venezuelan Ministry of

21  Transportation and Urban Development and the Iranian Embassy in

22  Venezuela, particular Messrs. Dr. Soltani and Ambassador Mayor

23  Alian, the second official, who present during the

24  negotiations, and also the trade attaché.  We are expecting the

25  new minister of specialized ministry, a previous board member

K34TSAD6                        Nelson - Direct

of Iranian company that has detailed information about the

problems of project will help with future problems of the

project.

            MS. LAKE:  Let's turn to the next page.  Can you

expand B.

Q.  We'll do the top five lines through "On an oral promise."

A.  B.  The project's financial and technical situation.  Even

though the project, according to first timeline that was

approved by both parties was 65 percent complete, it is now

considered 57 percent complete because of the increase in the

amount of the agreement from $475 million to $574 million,

according to most recent appendix.  Both parties have agreed to

the deadline of end of July 2014 to complete the 7,000

residential units, plus six months extension, which is based on

an oral promise.

            MS. LAKE:  Let's turn to the next page, page 4.

Expand the top paragraph.

Q.  Starting with "Even though," through the line about 6 or 7

down that says "American dollars."

A.  Even though the American dollar is the agreement's

currency, after the pressure from the employer and the

recommendations of the Iranian officials, we agree to pay the

Bolivarian expenses with the Bolivarian currency and other

foreign currency expenses with American dollars.  After

extensive calculations, the coefficient is determined to be

K34TSAD6                          Nelson - Direct

1    55 percent of the amount of the statements with the official

2    Bolivarian rate, currently one dollar equals 6.3 bolivar and

3    45 percent in American dollars.

4              MS. LAKE:   Let's turn to page 9, and expand the first

5    paragraph.

6    Q.   Can you read the first six lines through "his companies."

7    A.   Other members of the board of directors include Mr. Sadr,

8    engineer, who has a bachelor's degree in civil engineering from

9    Tabriz, born 1950 with over 40 years of experience in

10   construction contracting and has gained valuable experience in

11   banking over the last twelve years.   He is also a high level

12   economic consultant for one of most important organizations of

13   the Islamic Republic of Iran.   May God give him the ability to

14   complete this last job of his career and to serve the almost

15   20,000 Iranians working in his companies.

16             MS. LAKE:   Turn to Government Exhibit 2103.   Can you

17   expand the text on this page.   This is from M. Cetinel to

18   Zangeneh, Ali Sadr, Farshid Kazerani, B. Karimi, BC

19   sadr@samanehstatus.com, dated February 15, 2014, subject

20   minutes of meeting, dated 13.2.2012.

21   Q.   Can you please read that email.

22   A.   Dear Committee Members,

23             After receiving the final comments, I revised the MOM

24   as enclosed.   Please note that 20.02.2014, 8 o'clock Venezuela

25   time, 14:30 Istanbul, 1600 Teheran time, another committee

1    meeting will be held.  It is highly appreciated all members

2    makes their prearrangements with the go-to meeting system and

3    their wifi and laptop adjustments to have an effective meeting.

4    The meeting ID will be provided to members on day prior to the

5    meeting.

6            Thanks and regards, Mustafa Cetinel.

7            MS. LAKE:  Let's 2103A, which is an attachment the

8    email, and expand the top half of the page.

9    Q.  What is this document titled?

10   A.  Minutes of meeting.

11   Q.  Can you read the participants?

12   A.  Committee members Ali Sadr, Behrooz Zangeneh, Farshid

13   Kazerani, Mustafa Cetinel, Bahram Karimi.

14   Q.  Expertise?

15   A.  Mr. Safaverdi, Mr. Cinar.

16   Q.  Can you read the line under that?

17   A.  Venezuela committee held an extraordinary meeting on

18   Thursday, February 13, 2014, to discuss and finalize the issues

19   listed in the enclosed agenda.

20           MS. LAKE:  Then let's expand paragraph one.

21   Q.  And just read starting at "The original budget," which is

22   about eight lines or so from the bottom, starting at "The

23   original budget."

24   A.  The original budget was assumed to provide manpower from

25   Straturk for the finishing works based on the problems of

1   extensive robbery and damaging by the local subcontractor teams

2   during the finishing work stage.  Due to high workmanship costs

3   of Turkish ex-pat workers, project management decided to

4   continue with local subcontractors for the basic finishing

5   works and hire Iranian ex-pat worker groups specialized for the

6   final tuning finishing works --

7   Q.  Can you finish reading that sentence.

8   A.  At the stage of delivery of the apartments.

9   Q.  And the next sentence?

10  A.  This caused a cut on USD cost while an increase in Bs cost.

11          MS. LAKE:  Turn to the next page, please, and just

12  expand the first four lines next to number 3.

13  Q.  Can you read that?

14  A.  Project management stated that IPC43, covering the period

15  up to December 2013, is under the review of the employer site

16  organization.  The 20 million USD part of this IPC is the

17  infrastructure material delivered to site.

18          MS. LAKE:  Finally let's turn to the next page, and

19  expand under 7 from committee member down.

20  Q.  Can you please read that.

21  A.  Committee member responsible for finance stated that USD

22  provided by project management already spent for various

23  expenses of the project and USD payments are far beyond the

24  approved budget cash flow.  However, it is decided that within

25  a two-weeks period, rial funds equivalent to $240,000 will be

K34TSAD6                      Nelson - Direct

1    provided to IIHCO Iran in order to make the salaries for Mehr

2    difference, Aban, and partial completion bonus payment.

3          MS. LAKE:  Let's turn to Government Exhibit 2104.  Can

4    you also publish 2104T.  Can you expand the header information

5    on 2104, it's from IIHCO to Ali Sadr, February 18, 2014.  Now

6    can you expand the text on the translation.

7    Q.  Can you please read the message.

8    A.  Dear Mr. Ali Sadr Hashemi,

9          Greetings.  Attached copy of Mr. Engineer Sadr Hashemi

10   is attached for your information.  Kindly refer to the

11   attached.

12         MS. LAKE:  Please pull up both 2104A and 2104A-T,

13   which is the translation.

14         Can you just expand the bottom left of 2104A.

15   Q.  First can you read the English text in that footer?

16   A.  Intl@stratusholding.com, www.stratusholding.com.

17         MS. LAKE:  Then let's expand the text on 2104A-T.  All

18   of it.

19   Q.  Would you please read that.

20   A.  Date, February 17, 2014.  Number, 92-126M/S.  Attachment

21   none.  Stratus Group Holding.

22         Dear Mr. Doctor Ahmad Safaverdi,

23         Whereas the successful execution of the 7,000 unit

24   project in Venezuela, as well as expansion of Iranian

25   International Housing Company construction activities are of

K34TSAD6                         Nelson - Direct

1    special significance, and in order to maximally utilize your

2    expertise and experience, you are hereby appointed to the

3    Venezuela committee membership.  I pray to Almighty God for

4    your success in performance of your duties.

5           Sayed Mohammad Sadr Hashemi Nejad, executive director

6    and Venezuela committee president, signed.

7           MS. LAKE:  Let's turn to Government Exhibit 2296.  Can

8    you please expand all of the text on the page.

9           This is from M. Cetinel to sadr@samanehstratus.com, CC

10   Zangeneh, Ali Sadr, A. Safavardi, Farshid Kazerani, dated

11   June 27, 2014, the subject IPC report for chairman.

12   Q.  Can you please read that message.

13   A.  Dear Chairman Engineer Sadr and esteemed members of

14   Venezuelan committee,

15          Attached please find update of IPC report for your

16   information.  Thanks and regards, Mustafa Cetinel.

17          MS. LAKE:  Can you please publish Government

18   Exhibit 2296A, and expand the top half of the page.

19   Q.  Can you just read the first two lines?

20   A.  Dear Chairman Engineer Sadr,

21          Here below, we would like to brief you with the last

22   update of IPC situation.

23          MS. LAKE:  And then can you zoom out and expand the

24   bottom half of the page.  Actually, zoom out and then expand

25   from "So far as of today."

K34TSAD6                    Nelson - Direct

1    Q.  Can you just read the first two lines?

2    A.  So far as of today, we have a total approved payment in the

3    amount of USD 2,776,955, and Bs, 22,881,892.

4    Q.  The expected IPC?

5    A.  Expected IPC approval for payment in the next week amounts

6    to USD $1,748,333.86.

7              MS. LAKE:  May I have one minute, your Honor?

8              THE COURT:  You may.

9              (Pause)

10             MS. LAKE:  No further questions for this witness at

11   this time.

12             THE COURT:  Let me see you briefly.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  I want to make sure we're dealing with the

3     two tabled documents before I move on.

4          MS. LAKE:  We can do it tomorrow with a different

5     witness.

6          MR. WEINGARTEN:  Could I raise one issue?

7          THE COURT:  Yes.

8          MR. WEINGARTEN:  So the next witness is the OFAC guy.

9     I badly underestimated when we would get to him, so I will

10    cross him today, but I have not given them notice of the

11    cross-examination documents, which we're committed to do.  So I

12    would request that if it's like 4:45 or something like that, we

13    go to tomorrow so I could get the documents prepared.

14         THE COURT:  How long is the cross here?

15         MR. HEBERLIG:  This witness, not long, four documents.

16         THE COURT:  Then how long is the direct on the next?

17         MS. KIM:  Around two hours.

18         THE COURT:  That's fine.

19         MS. LAKE:  If you're prepared to rule.

20         THE COURT:  Well, we're still waiting on the

21    translation for this one, but I'm sustaining the objection to

22    2195A and 2195A-T.

23         (Continued on next page)

24

25

K34TSAD6                        Nelson - Cross

1          (In open court)

2          THE COURT:  Mr. Heberlig, your cross-examination.

3          MR. HEBERLIG:  Thank you, your Honor.  Fortunately I

4    only have questions on four of the documents.

5          Could we please pull up Government Exhibit 2278.  And

6    just to reorient us to this document, this is a July 7, 20009

7    email from the Stratus head office to Ali Sadr at Spanrise.com

8    and another individual, stating:  Dear Mr. Sadr, please find

9    attached three -- probably should be files regarding the

10   Venezuela project.

11         Let's turn to the attachment 2278A.  And this is one

12   of the attachments to that email, subject general information,

13   July 2007, about the housing project in Venezuela.

14   CROSS-EXAMINATION

15   BY MR. HEBERLIG:

16   Q.  And I wanted to highlight two paragraphs that the

17   government did not have you read on direct.

18         MR. HEBERLIG:  Could we go to paragraph 9, please, on

19   page 2.

20         Could you read that paragraph, please.

21   A.  The local currency of Venezuela is bolivar.  The exchange

22   rate in the bank is 2,150 in the new open market is 4,000.  In

23   2009 it is around 6,000, and the Venezuela government omitted

24   three zeros, 000, from the local currency.

25         MR. HEBERLIG:  Can we go to the next page, page 3,

K34TSAD6                         Nelson - Cross

1   paragraph 15.

2   Q.  If you read that one as well, sir.

3   A.  Security.  Due to the Colombia neighborhood, the safety and

4   security is a considerable factor.  An Iranian construction

5   company, Cayson, working now in four provinces of Venezuela in

6   10,000 unit housing project faced to some armed attach.

7   Robbing the properties and hostage taking exists in the area.

8   It is needed to employ military forces for protecting the site

9   with contractor budget.

10          MR. HEBERLIG:  Thank you, we can take that one down.

11          Government Exhibit 2088, please.  If you could

12  highlight the top half of this just to reorient us.

13          This was a December 18, 2011 email, subject forward

14  meeting report from Ali Sadr to sadr@samenehstratus.  And

15  again, the email message says:  Please print the attached file.

16          Let's take a look at the attachment, please, 2088A.

17          And let's go to page 3 quickly.

18  Q.  This is signed by Bahram Karimi, correct?

19  A.  Yes.

20  Q.  And his title is what?

21  A.  Project manager.

22  Q.  If we could go back to page 1, please, and just the first

23  paragraph.  And this is just -- I know you read this.  Just to

24  reorient the jury, I will ask you about a different portion of

25  this, but I won't have you read it again.

1          This is reflecting relations between Mr. Ambassador

2   Mesri and Mr. Ramirez, Minister of Petroleum.  Do you see that?

3   A.  Yes.

4   Q.  And down lower on the page, paragraph 2, again this is one

5   you read during direct examination, correct?

6   A.  Yes.

7   Q.  Let's turn to paragraph 8, which is the one I wanted to

8   have you read.  Can you read that paragraph, please.

9   A.  8.  Mr. Mesri also explained that considering the above-

10  mentioned points, he cannot defend under any condition IIHCO in

11  front of Mr. Ramirez.

12          MR. HEBERLIG:  We can take that one down.

13          Government Exhibit 1003, please.  Can you just make it

14  a little larger, the email, sorry, 1003T, please.

15          This is the translation.  Can you make it larger?

16  Q.  This is an email from Mr. Zangeneh to Mr. Safaverdi,

17  correct?

18  A.  Yes.

19  Q.  And it's dated November 21, 2013, right?

20  A.  Yes.

21  Q.  And just summarizing he's sending him twelve pages of

22  information pertaining to the company and the project, correct?

23  A.  Yes.

24          MR. HEBERLIG:  Let's go to the attachment, please, the

25  twelve pages and the translated version, Government

K34TSAD6                        Nelson - Cross

1    Exhibit 1003A-T.  Can you highlight under part one down to

2    right before the last bullet point.

3    Q.  Can you please read that portion.

4    A.  Part one, A, project analysis.  The fundamental and

5    political history of the project.

6            During Dr. Khatami's presidency, an agreement was

7    signed between the two governments, and subsequently an

8    international company was formed that was comprised of six

9    shareholder companies, two of which were public, owned by the

10   government, and four private.  This company was formed and

11   registered in Iran, and its sole purpose was the execution of a

12   part of the agreement, meaning the design and construction of a

13   7,000 unit project for the new city of Ojeda, local

14   pronunciation Okheda.  It is necessary to note that all shares

15   held by government companies were bought out by Stratus Holding

16   companies and have been officially registered, and Iranian

17   International Housing Company is operated by and owned by

18   private sector shareholders.

19   Q.  Thank you.

20           MR. HEBERLIG:  Can we please turn to page 4, and can

21   you enlarge the paragraph that starts "The quality," in the

22   middle of the page.

23   Q.  And can you read that paragraph for us as well, sir?

24   A.  The quality of this project is unsurpassed in Venezuela.

25   It is named best project in Venezuela according to comments

1    made by the employer, Mr. Parada, and General Cardenas,

2    Governor of Zulia State, which is the location of the project.

3    Q.  Last with this document, page 10, please.

4            And the paragraph that begins "Note that Mr. Mustafa,"

5    and can you plead read that paragraph, sir.

6    A.  Note that Mr. Mustafa Cetinel, who had been the manager of

7    Kyrgyzstan branch of the Stratus Company, and used to be the

8    project director for the Alarko, a large company with branches

9    in many different countries, is also currently the manager of

10   the international Straturk company that affiliated with the

11   Stratus Holding companies and has its headquarters in Turkey.

12   Mr. Cetinel has a senior position, along with Mr. Ali Sadr,

13   engineer in the Straturk company, and this company will soon be

14   in charge of the construction of school buildings as part of

15   the general buildings of the 7,000 unit project as the second

16   contractor.

17   Q.  Thank you.  Final document, Government Exhibit 2103.

18           And this, to reorient us, February 15, 2014 email,

19   subject minutes of meeting, and it's from a Mr. Cetinel to

20   several individuals including Ali Sadr, is that correct?

21   A.  Yes.

22   Q.  And he's attaching final comments, I revised the MOM as

23   enclosed, correct?

24   A.  Yes.

25           MR. HEBERLIG:  Let's turn to the attachment, it's

minutes of meeting Government Exhibit 2103A.  And can you

enlarge starting with paragraph one down about six or seven

lines.

Q.  Can you begin reading paragraph one, and I will tell you

when to stop.

A.  1.  Revised budget presented by the project management

enclosed to this MOM.

         Although the end line of the budget is positive in

compared with the previous budget made and approved on

September 2013, there are big deviations in bolivar costs due

to unpredictably rapid growing inflation rate greater than

50 percent, a drastic increase of market currency exchange

rates from one dollar equals 50Bs to approximately 85Bs today

in the country.

Q.  Thank you, that's good, sir.

         MR. HEBERLIG:  Could we turn to the next page, page 2,

and highlight the is sentence beginning "The immediate

procurement."

Q.  Can you read that first sentence, sir.

A.  The immediate procurement of material with the available

bolivar funds will be the first priority since the

unpredictable inflation rate reduces purchase value of the

bolivar every day.

         MR. HEBERLIG:  Thank you very much, no further

questions, your Honor.

K34TSAD6

| | |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | Ms. Lake? |
| 3 | MS. LAKE:  Nothing further, your Honor. |
| 4 | THE COURT:  Thank you, Mr. Nelson, you may step down. |
| 5 | Government may call its next witness. |
| 6 | MS. LAKE:  Your Honor, I will read another |
| 7 | stipulation.  Shall we call the witness and read it? |
| 8 | THE COURT:  Yes, thank you, I think that's a good use |
| 9 | of time. |
| 10 | MS. KIM:  Your Honor, the government calls Ted Kim. |
| 11 | THE COURT:  Mr. Kim may come forward. |
| 12 | In the meantime, Ms. Lake, the stip number is? |
| 13 | MS. LAKE:  105.  Without objection? |
| 14 | MR. HEBERLIG:  No objection. |
| 15 | THE COURT:  Thank you.  You may read, Ms. Lake. |
| 16 | MS. LAKE:  The parties agree that from 1995 to |
| 17 | November 10, 2008, the Iranian Transactions Regulations, the |
| 18 | ITR, later referred to as the Iranian Transactions Sanctions |
| 19 | Regulations, contained in general license 31CFR Section 560.516 |
| 20 | titled Payment and United States Dollar Clearing Transactions |
| 21 | Involving Iran.  Under Section 560.516(a)(1) of that general |
| 22 | license, U.S. banks were authorized to process transfers of |
| 23 | funds to or from Iran or for the direct or indirect benefit of |
| 24 | persons in Iran or the government of Iran, provided that such |
| 25 | transactions were initiated by non-Iranian foreign bank and |

K34TSAD6                        Kim - Direct

1      sent to another non-Iranian foreign bank.  This general license

2      was referred to as the U-turn license.

3              On November 10, 2008 U.S. Department of Treasury

4      revoked the U-turn license.  The parties do not dispute that

5      prior to November 10, 2008, transactions of the type charged in

6      the indictment, that is international wire fund transfers from

7      one non-Iranian foreign bank to another non-Iranian foreign

8      bank processed by a U.S. intermediary bank, would not have

9      violated the ITR.

10             It is further stipulated and agreed that this

11     stipulation may be received in evidence as Government Exhibit

12     105 at trial, and government offers Government Exhibit 105.

13             MR. HEBERLIG:  No objection.

14             THE COURT:  Thank you, 105 is admitted.

15             (Government's Exhibit 105 received in evidence)

16             THE COURT:  And Mr. Kim may come forward.

17      TED KIM,

18          called as a witness by the Government,

19          having been duly sworn, testified as follows:

20     DIRECT EXAMINATION

21     BY MS. KIM:

22             THE COURT:  You may inquire.

23             MS. KIM:  Thank you, your Honor.

24     Q.  Good afternoon, Mr. Kim.

25     A.  Good afternoon.

K34TSAD6                          Kim - Direct

1    Q.  Where do you work?

2    A.  I work in Washington, DC.

3    Q.  Who do you work for?

4    A.  I work for U.S. Department of the Treasuries, Office of

5    Foreign Asset Control.

6    Q.  Does the Office of Foreign Assets Control also go by OFAC?

7    A.  Yes, by acronym, it is usually called OFAC.

8    Q.  What is your current title?

9    A.  My current title is senior enforcement officer.

10   Q.  How long have you been an enforcement officer at OFAC?

11   A.  Six years.

12   Q.  What did you do before you joined OFAC?

13   A.  I worked as an intelligence analyst at the Federal Bureau

14   of Investigation.

15   Q.  For how long were you an intelligence analyst at the FBI?

16   A.  Five years.

17   Q.  Do you have a law degree?

18   A.  Yes, I do.

19   Q.  When did you obtain your law degree?

20   A.  I have two law degrees, one is bachelor's and the other one

21   is master's.  I obtained bachelor's degree in 1992 and master's

22   in 2002.

23   Q.  Could you please explain for the jury what OFAC's primary

24   responsibilities are.

25   A.  OFAC's primary responsibility is to implement and enforce

K34TSAD6                          Kim – Direct

1   economic sanctions rules established by U.S. president.

2   Q.  And at a very basic level, what are economic sanctions?

3   A.  Economic sanctions is one of foreign policy tools U.S.

4   government employs to change foreign countries or governments'

5   actions and policies that pose a threat to U.S. national

6   security.  So economic sanctions usually cut off and exclude

7   target country or government from U.S. and international

8   finance and economic system, thereby creating economic pressure

9   on the targeted country or government so that they can change

10  their behavior.

11  Q.  Approximately how many sanctions programs does OFAC

12  administer?

13  A.  About 30.

14  Q.  Is there a sanctions program in place for Iran?

15  A.  Yes.

16  Q.  And as an enforcement officer at OFAC, what are your

17  primary responsibilities?

18  A.  As an enforcement officer I investigate sanctions

19  violations and take enforcement actions to sanctions violators

20  according to U.S. sanctions rules and regulations.

21  Q.  Have you worked on cases involving the Iran sanctions

22  program?

23  A.  Yes, I have.

24  Q.  Approximately how many?

25  A.  Hundreds of cases involving Iran.

K34TSAD6                        Kim - Direct

1    Q.   In your position as an enforcement officer at OFAC, have

2    you led trainings about the Iran sanctions program?

3    A.   Yes, I have.

4    Q.   Have you advised others with respect to the Iran sanctions

5    program?

6    A.   Yes, I have.

7    Q.   And again, at a very basic level, we'll go into it in more

8    detail, but could you please describe what you mean when you

9    say the Iran sanctions program?

10   A.   The Iran sanctions program -- among 30-something sanctions

11   programs we administer of OFAC, the Iran sanctions program is

12   one of the most comprehensive trade embargoes put in place

13   against Iranian banks, individuals, government, companies.  So

14   it is one of the comprehensive sanctions programs.

15   Q.   And what do you mean when you say "comprehensive?"

16   A.   Comprehensive means the sanctions program like Iran

17   sanctions program prohibits virtually all of Iranian entities

18   having transactions from U.S. persons' engagement.  So when

19   comprehensive trade embargo was put in place, then U.S. persons

20   cannot import or export, cannot deal with any transaction

21   related to Iran.  So virtually all or most of all the

22   transactions are cut off and excluded from U.S. finance and

23   economy.

24   Q.   When you say "U.S. persons," what do you mean?

25   A.   U.S. persons is defined in the economic sanctions rules.

K34TSAD6                         Kim - Direct

1    U.S. persons include U.S. citizens and green card holders and

2    U.S. companies organized under U.S. jurisdiction and its

3    branches overseas and any personal entity present within the

4    United States.  So U.S. persons includes those entities and

5    persons I mentioned.

6    Q.  I would like to start just by talking a little bit about

7    sanctions programs generally before we move to the Iran

8    program.  How are U.S. sanctions typically established?

9    A.  U.S. sanctions are typically established when the President

10   of the United States declares national emergency with regard to

11   a threat posed by foreign country or government.  And at the

12   same time the President exercise his authority to regulate U.S.

13   international commerce to deal with the threat against what is

14   declared national emergency.  The way that the President wants

15   to deal with the threat becomes the content of the economic

16   sanctions program.

17   Q.  And under what authority is the President able to declare a

18   national emergency?

19   A.  U.S. Presidents, such authorities are granted by a law, it

20   is called International Emergency Economic Powers Act.  By the

21   law the Congress granted U.S. President to declare national

22   emergency and regulate international commerce and establish

23   economic sanctions program.

24   Q.  Is the declaration of a national emergency typically issued

25   through an executive order?

K34TSAD6                        Kim - Direct

1   A.  That's correct.

2   Q.  And are executive orders also called EOs for short?

3   A.  Yeah.

4   Q.  And what types of actions, if any, are typically taken

5   after a President declared a national emergency?

6   A.  As I said, when President declares national emergency, then

7   he also issues order in the executive order how to deal with

8   the threat that caused him to declare national emergency.  So

9   in the typical -- typically when President issues an executive

10  order, he declares national emergency and the actions he wants

11  to take to handle this national emergency.  And in here he

12  lists the prohibitions and then he also mandates U.S.

13  government agencies like the Treasury and OFAC to implement the

14  orders he listed in the executive order.  That is how it goes

15  from declaration under IEEPA and then the issuance of the

16  executive order to deal with the threat, the foreign threat

17  U.S. national security, and then in the EO mandates his own

18  administration to deal with those national emergency.

19  Q.  And at a very basic level, what kinds of prohibitions are

20  typically included in a sanctions program?

21  A.  As I said, it could be comprehensive and it could be

22  partial, there are multiple, many options.  So importation from

23  Iran can be prohibited, and also exportation to Iran, any

24  dealing with Iran, for solicitation, as I said, and so on.  So

25  there are many options.

1    Q.  And to what kinds of entities do these prohibitions

2    typically apply?

3    A.  Prohibitions apply to any person or any entity, can be

4    applied to individual, can be applied to companies,

5    associations, government.

6    Q.  So I would like to talk about two concepts before we turn

7    to the Iran sanctions program.  Are you familiar with licensing

8    in the sanctions context?

9    A.  Yes.

10   Q.  What is licensing generally?

11   A.  Licensing is permission issued by the agency I work for,

12   OFAC's permission given to the licensee, normally U.S.

13   companies, to conduct a transaction that is prohibited without

14   the license.

15   Q.  Can a person apply for a license?

16   A.  Yes.

17   Q.  Can companies apply for a license?

18   A.  Yes.

19   Q.  And who grants a license, the license?

20   A.  OFAC does.  After reviewing the license application filed

21   by those applicants, the individuals or companies, we review,

22   and OFAC makes a determination and issues an answer.

23   Q.  So the second term I want to talk about is SDNs.  In the

24   context of sanctions, are you familiar with OFAC's Specially

25   Designated Nationals and blocked persons list?

1    A.  Yes.

2    Q.  And is this list also called the SDN list?

3    A.  Yes.

4    Q.  What is the SDN list?

5    A.  The SDN list is a collection of names of individuals,

6    persons or cooperations and government units, that are

7    designated by OFAC as a person to be blocked, a person U.S.

8    people should be very careful when they deal with.  So SDN list

9    is, again, let me rephrase, is a list of designated entities

10   and individuals.

11   Q.  And when you say "blocked," what do you mean by blocked?

12   A.  Blocked means when an entity or person becomes an SDN and

13   their name is listed on the SDN list then their property or any

14   interest related to this property has to be blocked when that

15   property and property interest comes under U.S. person's

16   position or control.  So then when it's blocked, then it cannot

17   be transferred, it cannot be sold or leased, it cannot be lent.

18   So no action can be taken to this blocked property.

19   Q.  Who administers the designation of SDNs?

20   A.  OFAC does.

21   Q.  And when you say that dealings with SDNs are prohibited,

22   can you give us an example of what kinds of dealings we're

23   talking about?

24   A.  Yes.  As I talked a little bit before, when SDN's property

25   is blocked, for example, SDN's money is blocked, then that

1  money should be put into a blocked account.  And then you

2  cannot do anything with it, just have to report to OFAC what is

3  blocked, when it is blocked, how it is blocked now.  And then

4  also, if a blocked person's property is blocked, like a diamond

5  ring, for example, is blocked, then the diamond ring has to be

6  placed in blocked property storage and then maintained there.

7  It cannot be lent, it cannot be used, it cannot be displayed

8  for anything, it just be -- it has to be stayed there.

9  Q.  So what happens if an SDN tries to transact with a U.S.

10 bank, what, if anything, would happen?

11 A.  When an SDN wants to transact with U.S. bank, then the

12 transaction, whatever it is, the property that is subject to

13 the transaction must be blocked when it touch U.S.

14 jurisdiction.

15 Q.  By property, is money or a financial transaction a form of

16 property?

17 A.  Yeah, if it is a financial transaction, like sending money,

18 receiving money, then that money is subject to -- that money

19 that is an object to financial transaction must be blocked.

20 Q.  And is there a time when OFAC learns about blocked

21 transactions?

22 A.  Yes, within I believe it's ten days, U.S. bank, when they

23 block those SDN's property, they have to report to OFAC the

24 blocking they exercised.

25 Q.  What kinds of information do banks report to OFAC when a

K34TSAD6                          Kim - Direct

1    transaction is blocked?

2    A.   Banks are required to provide OFAC as much information as

3    possible, and those information include the sender's identity

4    and address, recipient of the money, the funds, and the

5    recipient's address and how much was it, when blocking was

6    done.  And if there's any additional information it's recorded

7    in the money transfer instruction, and all those information

8    should be selected and reported to OFAC in the form of blocking

9    report.

10   Q.   Is it important for OFAC to receive this blocking report?

11   A.   Yes.

12   Q.   Why?

13   A.   This is how we -- this is why we exist, the Office of

14   Foreign Asset Control.  It's blocked assets.  We administer how

15   many blocks -- what assets, what properties are blocked, and we

16   manage -- we regulate these blocked properties so that these

17   are staying as blocked, so unless -- we have to know, we have

18   to know to implement the sanctions program.  So it's the core,

19   one of the core of the sanctions program.

20            MS. KIM:  Your Honor, may I approach?

21            THE COURT:  Showing?

22            MS. KIM:  Government Exhibit 601, or what's marked as

23   Government Exhibit 601, I'll start with this one.

24            THE COURT:  Okay.

25   Q.   So I handed you what is marked as Government Exhibit 601.

K34TSAD6                         Kim – Direct

1    Could you please take a look at this document.

2                MS. KIM:  And Mr. Milione, if you could pull up 601

3    and publish it just for the witness.

4    Q.  Do you recognize this document?

5    A.  Yes, I do.

6    Q.  Did you review it before your testimony today?

7    A.  Yes.

8    Q.  Did you participate in its creation?

9    A.  Yes.

10   Q.  Would displaying this document assist you as you testify

11   today about the Iran sanctions program?

12   A.  Yes.

13               MS. KIM:  Your Honor, the government would like to

14   publish this as a demonstrative.

15               MR. WEINGARTEN:  No objection.

16               THE COURT:  601 may be published as a demonstrative.

17               MR. WEINGARTEN:  One second.

18               (Pause)

19               MR. BISHOP:  There's a question about this document.

20               THE COURT:  We're about to take our afternoon break.

21   Why don't we do this now as we're sorting this out.

22               Members of the jury, we'll resume in 15 minutes.

23               (Jury not present)

24               THE COURT:  Mr. Kim, you may step down.

25               (Witness not present)

K34TSAD6                          Kim - Direct

1                THE COURT:  Do you need me?

2                MR. BISHOP:  I think we can work it out, it's

3      confusing on the different versions.

4                (Recess taken)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  Matters to take up?

2                The document issue is resolved?

3                MR. KROUSE:  Yes.

4                MR. WEINGARTEN:  Yes.

5                THE COURT:  I do just want to confirm that Mr. Kim's

6     testimony, the scope of it, is what the parties agreed to, no

7     surprises.

8                Obviously, the defense isn't objecting, but no

9     surprises in terms of what's coming out regarding the level of

10    generality as to the sanctions and the like.

11               MS. KIM:  I think that's correct, your Honor.

12               THE COURT:  I know you're not surprised.  You wrote

13    your outline.  I suppose most specifically it was a question

14    for Mr. Weingarten.

15               MR. WEINGARTEN:  I am at the edge of my seat, your

16    Honor.

17               THE COURT:  So that means it's what you expected, no

18    surprises?

19               MR. WEINGARTEN:  So far.

20               THE COURT:  All right.

21               Ms. Kim, you were saying you conferred?

22               MS. KIM:  Well, we produced, there were multiple

23    iterations what's marked as Government Exhibit 601, and so the

24    scope of his testimony is largely based on that document.

25               THE COURT:  All right.  Thank you.

K34nsad7                          Kim - Direct

1            We can bring Mr. Kim back in and to the stand, please.

2            Thank you.  I was going to make a joke that maybe when

3    we took the break the construction noise would stop and --

4            MS. KIM:  It did.

5            THE COURT:  Now that I've said that, we're about to

6    hit traffic.

7            You may come forward, Mr. Kim.  Thank you.

8            (Witness resumed)

9            THE COURT:  Ms. Kim, your time estimate?

10           MS. KIM:  Time estimate, your Honor?

11           THE COURT:  Yes.

12           MS. KIM:  I think around two hours total, so probably

13   around an hour and a half more.

14           THE COURT:  OK.  That will work well.

15           It is good to stand and stretch.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you.  Everyone may be seated.

3              Thank you, members the jury.  I know I can't say you

4      enjoyed the outdoors, but I hope the cookies were at least a

5      small compromise.

6              We will continue with the direct testimony of Mr. Kim.

7              Ms. Kim, you may proceed.

8              MS. KIM:  Thank you, your Honor.

9              If we could please publish what's marked as Government

10     Exhibit 601, turning to page 2.

11             THE COURT:  Again, so we have agreement on this

12     document, Mr. Weingarten, as a demonstrative?

13             MR. WEINGARTEN:  No objection as a demonstrative.

14             THE COURT:  Thank you.

15     BY MS. KIM:

16     Q.  Mr. Kim, could you please explain to the jury generally

17     what is depicted on this slide.

18     A.  Yes.  These are the executive orders issued by the

19     president and sanctions regulations issued by OFAC.  These five

20     documents are in fact the most important documents that

21     formulate the framework of the Iran sanctions program.

22     Q.  Let's start with the first one.

23             MS. KIM:  If we could turn to the next slide.

24     Q.  This is executive order 12957.  When was this executive

25     order issued?

K34nsad7                       Kim - Direct

1    A.   It was issued March 15, 1995.

2    Q.   Could you please describe this executive order generally

3    for the jury.

4    A.   This executive order is the executive order where the

5    president issued a national emergency with regard to the threat

6    posed by Iran, Iranian government policy and actions.  This

7    executive order has certain prohibitions, and also like, this

8    executive order includes prohibition against evasion, and this

9    prohibition against evasion clause is one of the prohibitions

10   in the executive orders.

11           MS. KIM:  Your Honor, may I approach with what's

12   marked as government Exhibit 603.

13           THE COURT:  Yes.

14   Q.   I just handed you what's marked as Government Exhibit 603.

15           Are you familiar with this document?

16   A.   Yes.

17   Q.   Is this a copy of the executive order issued on March 15,

18   1995?

19   A.   Yes.

20   Q.   Do you work with this executive order on a regular basis?

21   A.   Yes.

22           MS. KIM:  Your Honor, the government offers Government

23   Exhibit 603.

24           MR. WEINGARTEN:  No objection.

25           THE COURT:  603 is admitted.

K34nsad7                          Kim - Direct

1              MS. KIM:  Permission to publish for the jury.

2              THE COURT:  OK.

3              MS. KIM:  If we could zoom on in on the second

4     paragraph starting I William J. Clinton.

5     BY MS. KIM:

6     Q.  Mr. Kim, could you please read this paragraph for the jury.

7     A.  Yes.  "I, William J. Clinton, President of the United

8     States of America, find that the actions and policies of the

9     government of Iran constitute an unusual and extraordinary

10    threat to the national security, foreign policy, and economy of

11    the United States, and hereby declare a national emergency to

12    deal with that threat."

13    Q.  Thank you.  Was this the first time that a U.S. president

14    declared a national emergency with respect to Iran?

15    A.  Not the first time.  There was a time a U.S. president

16    declared a national emergency to Iran before.

17    Q.  And was this the first time that the U.S. had imposed

18    sanctions on Iran?

19    A.  There was a time before.  No, this is not.

20    Q.  Is there a national emergency with respect to Iran still in

21    effect today?

22    A.  Yes.

23    Q.  Just so we can better understand this process, after a

24    national emergency is declared by a U.S. president, how does

25    that emergency continue to be in effect?

1    A.   In order to -- in order for the national emergency declared

2    initially to continue in effect, the U.S. president has to

3    confirm or redeclare the emergency, national emergency

4    annually.  So here the national emergency was declared to a

5    threat from Iran, and this emergency was confirmed every year

6    and announced to the public.

7    Q.   So has the national emergency with respect to Iran

8    continued to be in effect since March 15, 1995?

9    A.   Yes.

10   Q.   So if we can turn back to what's marked as Government

11   Exhibit 601, and if we could turn to page 4.  Let's talk about

12   the executive order that was issued on May 6, 1995.

13             Executive Order 12959, could you please describe this

14   executive order generally for the jury.

15   A.   Yes.  This executive order is significant in terms of the

16   Iran sanctions program because this executive order created the

17   comprehensive trade embargo against Iran and prohibited

18   virtually all imports and exports, and all Iranian commerce and

19   business were prohibited under this executive order.

20             As a safety measure, again, there is a prohibition

21   against any evasive actions for the purpose of going around the

22   primary prohibition on Iranian commerce and business.

23   Q.   So let's turn to the next slide, to the Iranian

24   transactions regulations, or the ITR.  What is the ITR?

25   A.   The ITR is the obligation of the Iranian sanctions

1    regulations that was issued by OFAC in here, September 11,

2    1995.

3    Q.   And did the ITR include prohibitions?

4    A.   Yes.  Actually, ITR incorporates all the prohibitions

5    issued in the EO issued by the president.  The prohibitions

6    ordered by the president is included here, and what OFAC added

7    is defining some words and some interpretation by which OFAC

8    applies and interprets the executive orders issued by the

9    executive order.

10   Q.   What kinds of prohibitions in terms of exports are

11   included?

12   A.   In terms of exports, the prohibition is the prohibition of

13   exportation or reexportation of goods, services, and technology

14   from the United States or by a U.S. person to Iran or the

15   Iranian government.

16   Q.   What are some examples of services?

17   A.   The typical examples of the services is like engineering

18   consulting services given to an Iranian construction company,

19   or another typical example is the services provided by U.S.

20   banks and financial institutions to Iran when U.S. banks

21   process money transfers that involve Iran, whether directly or

22   indirectly.  When Iran is involved in a money transfer

23   transaction, that goes through United States banks, if U.S.

24   banks process that, that typical financial service is

25   prohibited.

1    Q.  Let's turn to the next slide.  Are you familiar with an

2    amendment to the ITR that was implemented on November 10, 2008?

3    A.  Yes.

4    Q.  So, taking a step back, in the context of the Iran

5    sanctions program, are you familiar with something called the

6    U-turn license?

7    A.  Yes.

8    Q.  What is the U-turn license?

9    A.  U-turn license, before explaining the U-turn license, I

10   would like to describe what U-turn transfer is first.

11          U-turn transfer is a U.S. dollar transfer between two

12   foreign banks which is going through United States banks.  So

13   it starts outside of the United States and ends outside of the

14   United States.  This type of U-turn transfer in itself is

15   commonly used by any foreign business entities, but when Iran

16   gets involved in any U-turn transfers, then under the Iran

17   sanctions program, the EO and ITR, U.S. banks are not allowed

18   to process those Iran-related U-turn transfers, because if U.S.

19   banks do it, then it will be considered as an exportation or

20   provision of services for the benefit of Iran.

21          So it was the foundation, but OFAC created an

22   exception to this overall ban on Iran-related U-turn transfer

23   prohibition.  So by issuing U-turn license, OFAC give

24   permission to United States financial institutions to process

25   U-turn transfers even if Iran is involved on the condition that

K34nsad7                         Kim - Direct

1    U.S. banks are not dealing with Iran directly.  So money can

2    flow from Iran to a third country bank, U.S. bank, third

3    country bank and Iran, like this.

4    Q.  Did there come a time when the U-turn license was revoked?

5    A.  Yes.

6    Q.  When was the U-turn license revoked?

7    A.  The U-turn license was revoked effective November 10, 2008.

8    Q.  What were some of the reasons why the U turn license was

9    revoked?

10   A.  OFAC revoked the U-turn license because Iranian banks and

11   companies used the U-turn license for their unlawful purposes.

12   Because Iranian banks and companies abused and misused the

13   U-turn license, OFAC revoked this license at the time.

14   Q.  And what do you mean by abused?

15   A.  Abused means like Iranian banks and companies were using

16   the U-turn license, were sending money, U.S. dollars to

17   entities that are conducting illicit, illegal, unlawful

18   activities, and Iranian banks and companies were using

19   deception so that U.S. banks wouldn't know what's going on.

20   So, using these deceptive practices, Iranian banks and

21   companies were using the U-turn license to send money to

22   entities to conduct unlawful acts.  So if OFAC let it go, then

23   we couldn't do that, because then U.S. banks will end up --

24            MR. WEINGARTEN:  I respectfully object, your Honor.

25   This is running far afield from the original understanding we

1    had.

2              THE COURT:  Sustained.

3    Q.  Mr. Kim, when you say that transactions were passing

4    through U.S. banks, what you do mean by that?

5    A.  When an international transaction is conducted in U.S.

6    dollars and the international transaction is settled in U.S.

7    dollars, in order to settle in U.S. dollars, then buyers, the

8    purchaser's, buyer's bank should send money to seller's bank

9    through the United States.  Because it's a dollar transaction

10   between foreign bank and foreign bank, the dollar transaction

11   is settled, usually, in most of the cases, it is settled

12   through its buyer's bank, correspondent bank in the United

13   States, and seller's bank, correspondent bank in the United

14   States.  These correspondent banks settle the money transfer

15   between these two foreign banks in the United States.

16              So it doesn't look like U.S. is involved from outside,

17   but whenever foreign --

18              MR. WEINGARTEN:  Respectfully, your Honor, this is

19   coming --

20              THE COURT:  Sustained.

21   Q.  Mr. Kim, I would appreciate it if you could just listen to

22   the question --

23   A.  OK.

24   Q.  -- and make sure you're responding to the question.  Thank

25   you.  You testified a minute ago that the U-turn license was

1   revoked on November 10, 2008.

2   A.  Yes.

3   Q.  Was this a substantial sanction against Iran?

4   A.  Yes.

5   Q.  Why?

6   A.  Because when the U-turn license is revoked, Iranian access

7   to U.S. financial services is cut off.  So Iranians will be

8   difficult to conduct international business in U.S. dollars

9   when they deal with third country business entities.

10  Q.  And what is the significance of U.S. dollars?

11  A.  In international business, the U.S. dollar is the most

12  reliable and most widely used currency, so most of the

13  international business people want to buy and sell in U.S.

14  dollars.  So if you cannot buy and sell in U.S. dollars, then

15  it will be difficult for Iranian banks and companies to find

16  business partners.

17  Q.  What about the euro?

18  A.  Euros can be used as transaction currency, but the euro is

19  not popular as much as the U.S. dollar is.

20  Q.  Was the U-turn revocation made public in 2008?

21  A.  Yes.

22  Q.  Do you know if the U.S. Department of Treasury issued a

23  press release about the U-turn revocation?

24  A.  Yes.

25  Q.  Did it issue a press release?

K34nsad7                          Kim - Direct

1    A.  Yes.

2    Q.  Do you know if there was news coverage about the U-turn

3    revocation?

4    A.  Yes.

5          MS. KIM:  Your Honor, may I approach with what's been

6    marked as Government Exhibits 607 through 611?

7          THE COURT:  OK.

8    Q.  I just handed you what's been marked as Government Exhibit

9    607 through 611.  If you could please focus on the first three

10   exhibits, Government Exhibits 607, 608 and 609.

11         MS. KIM:  Mr. Milione, if you could just publish 607

12   for the witness.

13   BY MS. KIM:

14   Q.  So I would like to walk through these documents with you.

15   Are you familiar with this document, Government Exhibit 607?

16   A.  Yes.

17   Q.  Is this a document that you reference as an enforcement

18   officer at OFAC?

19   A.  Yes.

20   Q.  Is this a press release issued by the U.S. Department of

21   Treasury on November 6, 2008, in connection with the U-turn

22   revocation?

23   A.  That's correct.

24         MS. KIM:  Your Honor, the government offers Government

25   Exhibit 607.

K34nsad7                        Kim - Direct

1          MR. WEINGARTEN:  Respectfully, I ask for a proffer,

2   your Honor, as to why, just the purpose.

3          THE COURT:  You can confer.

4          (Counsel conferred)

5          MR. WEINGARTEN:  Can we have one minute at sidebar.

6          THE COURT:  OK.

7       (Continued on next page)

1          (At sidebar)

2          MR. WEINGARTEN:  I guess this is being offered as a

3     display of how this was publicized, with the suggestion that my

4     client must have known about it.  It is a goose and a gander

5     thing.  I have never been entirely clear on what legal

6     documents we can use and what public documents we can use.  I

7     guess I can't ask for an anticipatory ruling, but I am offering

8     my views about this that I hope we get equal treatment from the

9     government if we agree to this.

10          THE COURT:  Well, let's be clear.  The suggestion is

11     that this somehow opens the door to something that you want to

12     get in that you have concerns otherwise wouldn't?

13          MR. WEINGARTEN:  Obviously.

14          THE COURT:  So, for example, what?

15          MR. WEINGARTEN:  I don't have a specific thing in my

16     head.  These are public statements offered by officials of the

17     Department of the Treasury.  We have only had a thousand of

18     those, so we'll go through them tonight.  I mean, I guess I

19     would -- I don't know what I am asking for.  I apologize for

20     wasting your time.

21          THE COURT:  It is not a waste of time because I think

22     it's important in light of all that we have discussed.

23          MR. WEINGARTEN:  Yes.

24          THE COURT:  If there is going to be an argument about

25     opening the door that somehow contradicts that, it should be

1    raised before the door is opened.

2              MR. WEINGARTEN:  I agree.  The general sense that

3    these documents were being offered for notice to the world that

4    the U-turn has been revoked, we're fine with that.

5              THE COURT:  No objection?

6              MR. WEINGARTEN:  No objection.

7              THE COURT:  OK.  Any questions from the government?

8              MR. LYNCH:  Opening the door to what.

9              MS. KIM:  Opening the door to any press about the

10   sanctions program.

11             MR. KROUSE:  This is mainly just responsive to the

12   defendants' argument that the existence of the U-turn

13   previously was somehow relevant to the defendant's state of

14   mind because he thought that the U-turn was still in effect or

15   something like that.  This is addressing that as widely

16   publicized.  It's relevant in the context of what the defense

17   has argued.  The government moved *in limine* to keep the U-turn

18   out entirely and the defense opposed that on the state of mind

19   theory.  The government would introduce this to show that state

20   of mind was unreasonable.

21             MR. WEINGARTEN:  I think what is the most interesting

22   legal issue in this entire case is what evidence can be

23   introduced on either side to show state of mind that the

24   defendant hasn't seen.

25             MR. KROUSE:  This is directly tied to something that

1    the defendant is arguing.  It is with a competent witness.  I

2    don't think it's opening up the door to anything.

3              MR. WEINGARTEN:  OK.  We're fine with this.

4              MR. KROUSE:  We can take up the defense's exhibits

5    when they offer them.

6              MS. KIM:  If you think this opens the door to any

7    press release by the Treasury Department, we don't need to

8    offer it.

9              MR. KROUSE:  We don't believe that.  We are offering

10   it.  It doesn't open the door to anything I don't think.

11             THE COURT:  I suppose they can try to elicit, for

12   example, a thousands press releases, who reads those?  You can

13   call into question the inference you are seeking to draw.  It

14   opens the door to that, to rebutting that.  To be clear, I have

15   said for evidence of sort of state of the law to be relevant to

16   Mr. Sadr's state of mind he has to show evidentiary his

17   awareness of it, his knowledge of it.  You are seeking an

18   inference of general availability of a press release to infer

19   Mr. Sadr's knowledge.

20             MS. KIM:  I think it's also connected to some evidence

21   in the case where, for example, there is an e-mail where Sadr

22   checks the OFAC website for whether or not his particular

23   entity has been designated.  That shows that he is familiar

24   with the Treasury OFAC, with OFAC website, and has access to

25   its press.

1          MR. KROUSE:  Your Honor, to your point, if the defense

2     is going to argue it opens the door for certain things, it

3     would be helpful to know before the door was opened.  We don't

4     want the horse running out of the barn.  If the view from the

5     Court is that introducing this document somehow opens the door

6     to a wide ranging introduction of press articles about various

7     topics, we are making what we think is a pretty narrow point to

8     rebut the defense argument that --

9          THE COURT:  There was some press release on the same

10     website that Ms. Kim just proffered there's evidence of

11     Mr. Sadr checked.  They wanted to use it to counter the

12     inference that you are making or to suggest a different

13     understanding of the law.  The same inference will be available

14     for the defense as the inference that you are seeking to be

15     made here.

16          MR. KROUSE:  Yes.  If there exists anything like that,

17     that would be open to the defense.

18          THE COURT:  I am always the last to know.  I just want

19     to make sure because we have spent a lot of time talking about

20     the state of mind piece.

21          MR. WEINGARTEN:  Yes.

22          THE COURT:  What I have said to the defense is for it

23     to be relevant and nonprejudicial there has to be an

24     evidentiary link to Mr. Sadr's knowledge.  I think that link,

25     there is an inferential link available here.  By what the

1    government is doing, that certainly opens the door to a

2    comparable inferential link for the defense.

3              MR. KROUSE:  What we will do is not actually offer the

4    documents into evidence, the press release and the articles,

5    and just ask Mr. Kim was the revocation of the OFAC license or

6    was --

7              THE COURT:  It's the same inference, but OK.

8              MR. KROUSE:  May we have a moment to confer?

9              THE COURT:  You may.

10             (Counsel conferred)

11             THE COURT:  You are going to move on?

12             MS. KIM:  We are going to move on.

13             THE COURT:  You are not going to offer the document?

14             MS. KIM:  We are not.

15             THE COURT:  OK.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MS. KIM:  All right.

3    BY MS. KIM:

4    Q.  The last point on the U-turn, you had stated that this was

5    a substantial sanction against Iran.

6          What was the impact of this, of the U-turn revocation?

7    A.  Do you mean impact on each side?

8    Q.  What was the impact of the U-turn revocation on

9    transactions, financial transactions involving Iran?

10   A.  Because the U-turn license is -- when the U-turn license is

11   revoked, then Iran's access to U.S. financial services

12   regarding U-turn transfer is cut off.  So it means Iran will

13   have a difficult time in conducting international transactions

14   based on U.S. dollars.

15   Q.  At the time that the U-turn was revoked in 2008, was the

16   European Union also imposing sanctions on Iran?

17   A.  Yeah.

18   Q.  At the time the U-turn was revoked in 2008, was the United

19   Nations Security Council also imposing sanctions on Iran?

20   A.  Yes.

21   Q.  And from 2008 forward, were there any trends in

22   international sanctions against Iran?

23   A.  The sanctions on Iran was getting more serious and more

24   restrictive since the revocation.

25   Q.  If we can turn to the next slide, this is a slide on the

1    Executive Order 13599 that was issued on February 5, 2012.
2    Could you please describe briefly for the jury this executive
3    order.
4    A.   Yes.  This executive order is unique in the Iranian
5    sanctions program history because this executive order blocked
6    the property of the government of Iran and Iranian financial
7    institutions.  All previous executive orders were about issuing
8    orders to prohibit this act and that act, but this executive
9    order was announced to block Iranian government property and
10   the property of Iranian, all Iranian financial institutions.
11   Q.   Are you familiar with the term rejected transaction or that
12   concept?
13   A.   Yes.
14   Q.   What does that mean, when a transaction is rejected?
15   A.   Rejected is when a U.S. financial institution finds out the
16   money transfer going through that bank is a prohibited
17   transaction, then it rejects, returns the money to the sender.
18   That is different when it is blocked.  As I explained
19   previously, when it's blocked the money will not be sent back
20   to the sender.  The blocked property will stay with the bank
21   that froze the property.
22           MS. KIM:  Mr. Milione, if we could turn to the next
23   slide, please.
24   Q.   Are you familiar with the Iranian transactions sanctions
25   regulations, or the ITSR?

K34nsad7                       Kim - Direct

1    A.  Yes.  ITSR is a restatement of ITR made October 22, 2012.

2    The ITSR included the executive order we previously have seen,

3    the blocking executive other.  The ITSR included that blocking

4    provision in the Iran sanctions regulations.

5              MS. KIM:  Your Honor, may I approach with what's

6    marked as Government Exhibit 602?

7              THE COURT:  OK.

8    Q.  Directing your attention to what's been marked as

9    Government Exhibit 602, do you recognize this document?

10   A.  Yes.

11   Q.  Is this a license history check?

12   A.  Yes.

13   Q.  Is this a license history checking that you ran on or about

14   February 11, 2012?

15   A.  That is correct.

16             MS. KIM:  Your Honor, the government offers Government

17   Exhibit 602 into evidence.

18             MR. WEINGARTEN:  No objection.

19             THE COURT:  Thank you.  602 is admitted.

20             (Government Exhibit 602 received in evidence)

21             MS. KIM:  If we could publish this exhibit.

22   BY MS. KIM:

23   Q.  Could you please explain for the jury briefly what a

24   license history check is.

25   A.  A license history check is to our record search, OFAC's

K34nsad7                        Kim - Direct

1    record search to find out whether a specific individual or

2    company have ever applied for license or whether they received

3    a license, so this is the history check of certain entities'

4    license applications.

5    Q.  Based on OFAC's records has Ali Sadr Hashemi Nejad ever

6    applied for a license to provide goods or services to Iran?

7    A.  No.

8    Q.  Did he ever obtain a license to provide goods or services

9    to Iran?

10   A.  No.

11   Q.  I'm just going to read the other individuals and entities

12   on this license check:  Mohammad Sadr Hashemi Nejad, Iranian

13   International Housing Company, Stratus International

14   Contracting Company, Stratus Group, clarity Trade and Finance,

15   and Stratus International Contracting, J.S.

16          So looking at all these entities, did any of these

17   entities ever apply for a license to provide goods or services

18   to Iran?

19   A.  According to OFAC's records, no.

20   Q.  Based on OFAC's records, did any of these entities ever

21   obtain a license to provide goods or services to Iran?

22   A.  No.

23   Q.  So I would like to talk now a bit more about SDNs.  You

24   explained the concept of SDNs and designations earlier.  So,

25   just to be clear, even if you are not an SDN, can Iran

K34nsad7                            Kim - Direct

1  sanctions prohibitions apply to you?

2  A.  Yes.

3  Q.  And OFAC is the primary agency that administers the SDN

4  list, correct?

5  A.  That's correct.

6  Q.  So if we can turn to the next slide in what's marked as

7  Government Exhibit 601.  This side reflects identifications

8  from August 10, 1995, of Iranian government-owned financial

9  institutions.

10         Mr. Kim are you familiar with a bank called Bank

11  Saderat?

12  A.  Yes.

13  Q.  What is Bank Saderat?

14  A.  Bank Saderat is one of the Iranian government-owned banks.

15  Q.  Does Bank Saderat have branches in the UAE?

16  A.  Yes.

17  Q.  And was Bank Saderat later designated by OFAC as an SDN on

18  October 25, 2007?

19  A.  That's correct.

20  Q.  Are you familiar with an entity called Europaïsch-Iranische

21  Handelsbank, or EIH?

22  A.  Yes.

23  Q.  What is EIH?

24  A.  This is a bank in located in Europe, but it is also owned

25  by the Iranian government.

1    Q.  Was EIH also later designated by on OFAC as an SDN on

2    September 7, 2010?

3    A.  That's correct.

4           MS. KIM:  If we could turn to the next slide please.

5    Q.  Are you familiar with an entity called the Revolutionary

6    Guard Corporation or IRGC?

7    A.  Yes.

8    Q.  What is IRGC?

9    A.  IRGC is Iran's special military force that, its goal is to

10   protect Iran's Islamic revolution.

11   Q.  Was the IRGC designated by OFAC as an SDN in 2007?

12   A.  That's correct.

13   Q.  Are you familiar with an entity called Oriental Oil Kish?

14   A.  Yes.

15   Q.  Was Oriental Oil Kish designated as an SDN by OFAC also on

16   September 25, 2007?

17   A.  Yes.

18           MS. KIM:  If we could go to the next slide please.

19   Q.  Are you familiar with an entity called Export Development

20   Bank of Iran or EBDI?

21   A.  Yes.

22   Q.  What is EBDI?

23   A.  This is another Iranian government-owned bank, and it is

24   known to -- yeah, it is a government-owned bank.

25   Q.  Is it a bank that is known to provide financial services to

K34nsad7                         Kim - Direct

1    Iran's ministry of defense and armed forces?

2    A.   Yes, it was the reason why it was designated.

3    Q.   And was EBDI designated by OFAC as an SDN on October 22,

4    2008?

5    A.   Yes.

6    Q.   So moving on to Eghtesad Novin Bank, or EN Bank, are you

7    familiar with EN Bank?

8    A.   Yes.

9    Q.   What is EN Bank?

10   A.   EN Bank is, unlike the other banks we talked about, it is a

11   private bank in Iran, but it was designated as an SDN by OFAC

12   in 2012.

13   Q.   And are SDN designations made public by OFAC?

14   A.   Yes.

15   Q.   How are they made public?

16   A.   The list of designated entities, the SDN list, is always

17   posted on OFAC's website, and it is -- whenever the list

18   changes, then we announced the changes on the website regularly

19   to the public.  It stays there, so anybody can check the name

20   on the list through OFAC's website.

21            MS. KIM:  Mr. Milione, I think you can take the slide

22   down.  Thank you.

23   Q.   So I just have some questions now about banks.  Under the

24   ITR and the ITSR, can U.S. banks be held liable for sanctions

25   violations?

1    A.  Yes.

2    Q.  And are you familiar with the term U.S. correspondent bank?

3    A.  Yes.

4    Q.  What is a U.S. correspondent bank?

5    A.  Correspondent bank is a foreign bank's -- a bank for a

6    foreign bank's U.S. dollar transactions.

7    Q.  OK.  Sorry.  Could you say that one more time?

8    A.  The correspondent bank -- I don't know how much detail I

9    should explain, but correspondent banks is foreign bank's U.S.

10   bank.

11   Q.  A foreign bank's U.S. bank?

12   A.  U.S. bank, and then when the foreign bank wants to transact

13   in U.S. dollars, then U.S. correspondent bank follows the

14   foreign bank's request and process the money transfer order.

15   Q.  Under the ITSR, can U.S. correspondent banks also be held

16   liable for sanctions violations?

17   A.  Yes.

18   Q.  Can U.S. banks be held liable for sanctions violations even

19   if they didn't know about the Iranian connection to the

20   transaction?

21   A.  Yes.

22   Q.  And why is that?

23   A.  Because U.S. sanctions regulations are enforced under the

24   principle of strict liability.  So no matter whether you know

25   it or not, once you are involved in the transaction that is

prohibited, then you are in violation of sanctions violation, a

sanctions prohibition.

Q.  Are you familiar with the term called stripping in the

context of bank transactions?

A.  Yes.  Stripping is one of the deceptive practices used by

problematic banks and companies.  Stripping means removing the

true identity of the parties involved in a transaction.  So

when foreign banks send money transfer orders to the United

States, they may strip, meaning remove their client's identity

so that U.S. bank wouldn't know who are they acting for.

Q.  So I just have a few concluding questions.  You stated

earlier that the Iran sanctions program involves a

comprehensive trade embargo that was implemented in 1995 and

that that trade embargo prohibits virtually all imports and

exports.

        From 1995 forward, was there ever a time when the

comprehensive trade embargo was lifted?

A.  No.

Q.  You also stated that, you testified that in 2008 the U-turn

was revoked and after that revocation, U.S. banks were

prohibited from transacting with Iran.

        From 2008 forward was there ever a time when that

prohibition was lifted?

A.  No.

Q.  We talked earlier about OFAC's responsibility to administer

K34nsad7                         Kim - Direct

1    and enforce the Iran sanctions program.

2            When Iranian involvement in a transaction is

3    concealed, does that matter to OFAC?

4    A.  Yes, it matters a lot.

5    Q.  Why?

6            MR. WEINGARTEN:  I am going to respectfully object.  I

7    think this transgresses the line.

8            THE COURT:  I understand the objection.  Just a

9    moment.

10           MS. KIM:  Your Honor, could we have a sidebar.

11           THE COURT:  Yes, I need to get a proffer.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2               MS. KIM:  This is important for the 371.

3               MR. KROUSE:  It is an element, Judge.

4               MR. WEINGARTEN:  Materiality with him is not an

5     element.

6               MR. KROUSE:  It is an element of what it obstructed.

7               MS. KIM:  Conspiracy to defraud the U.S.

8               MR. KROUSE:  Obstructed OFAC's ability to do its job.

9               THE COURT:  I want to hear what the answer is going to

10    be because I want to make sure we are not crossing over into

11    the -- the objection is based on?  State the objection.

12              MR. WEINGARTEN:  It is a materiality question.  He has

13    no materiality obligations.  Giving his opinion about whether

14    or not conduct is fraudulent or obstructive is wildly beyond

15    what the proffer was.

16              MR. KROUSE:  I think Mr. Weingarten is

17    misunderstanding, though.  This goes directly to Count One, the

18    Klein conspiracy under Section 371, which charges the defendant

19    with the conspiracy to defraud the United States, meaning

20    defraud OFAC and obstruct OFAC's ability to enforce the laws

21    against sanctions.

22              We can ask the OFAC witness whether conduct like this

23    would have obstructed the ability of him as an enforcement

24    officer to do his job.  How else can the government prove that

25    the conduct that we're going to prove beyond a reasonable doubt

1    meets the element of the offense?

2              MR. WEINGARTEN:  Through objective evidence consistent

3    with your instructions, how you traditionally do it, not

4    offering the opinion of a law enforcement agent that a

5    particular kind of conduct --

6              MR. KROUSE:  You can ask him why would it obstruct

7    your ability to do your function as an enforcement officer.

8              THE COURT:  That question is OK.

9              What's the next question?

10             MS. KIM:  That's the last question.

11             THE COURT:  All right.  I will allow that question.  I

12   am just curious whether I should tell --

13             MR. KROUSE:  Our proposal would be for the defense to

14   conduct its cross.  Mr. Kim --

15             THE COURT:  We are not at 4:45 yet.

16             MR. WEINGARTEN:  I don't have much stuff.

17             THE COURT:  You can do some, right?

18             MR. WEINGARTEN:  I listened to you.  My person left.

19   I don't have my stuff here.

20             THE COURT:  What do you mean listened to me?  You said

21   4:45.

22             MR. WEINGARTEN:  She told me -- I don't have anything

23   here right now.  I'm sorry.  I relied on the conversation we

24   had.  I apologize.

25             MR. KROUSE:  Just for the record, we did put this

K34nsad7                          Kim - Direct

1   witness on our list for the witnesses we expected to go today.

2               MR. WEINGARTEN:  Judge, I relied on -- I don't have my

3   stuff.  The person who was helping me is gone.

4               MS. KIM:  Is it on Trial Director?

5               MR. WEINGARTEN:  No.

6               THE COURT:  Let's finish.

7               MR. WEINGARTEN:  I have not disclosed to them --

8               THE COURT:  Let me be clear.  We are not doing this

9   again.  I forgave 15 minutes.  I didn't forgive an hour.

10  Things moved faster, so prepare for it next time --

11              MR. WEINGARTEN:  Yes.

12              THE COURT:  -- if they're on the list.  Let's finish.

13              (Continued on next page)

1           (In open court)

2                MS. KIM:  Your Honor, may I proceed?

3                THE COURT:  Yes, you may.

4      BY MS. KIM:

5      Q.  So I asked before we broke when Iranian involvement in a

6      transaction is concealed, I asked whether or not that matters

7      to OFAC and you said yes.  And my next question is:  Why does

8      that matter?

9      A.  Because the concealment, it is the core purpose of the

10     sanctions program, and the concealment -- this is all

11     enforcement action it wants to take, that's the reason.  If the

12     entities are not transparent, then U.S. financial institutions

13     and other U.S. persons wouldn't know what kind of transition

14     they are going into.  So making all the transactions

15     transparent is one of the goals we want to achieve.

16     Q.  And when you say "transparent," transparent about what?

17     A.  Iranian sanctions program context, whether the Iranian

18     entity or interest is involved in the transaction.  So when

19     that information is concealed, then that concealment will make

20     every party involved in the transaction a sanctions violator.

21     Q.  And just a few more questions about banks.  You had said

22     earlier that U.S. correspondent banks and U.S. banks can be

23     held liable for sanctions violations.  What are some

24     consequences that U.S. banks could face for sanctions

25     violations?

```
 1    A.  When they are found to be in violation of sanctions

 2    regulation, then they are subject to OFAC's enforcement's

 3    actions.  It can be like non-public action or it can be public

 4    OFAC action, like imposition of penalty, and if not, if not

 5    that serious, then you will receive cautionary letter by us.

 6    Q.  And is a cautionary letter public or non-public?

 7    A.  Not public.

 8    Q.  Is a monetary penalty public or not public?

 9    A.  It's publicly announced.

10    Q.  And how often, if at all, are monetary penalties imposed?

11    A.  Among the transactions we found in violation of the

12    regulation less than ten percent.

13    Q.  And how are monetary penalties calculated?

14    A.  Monetary penalties are calculated based on the regulation

15    that sets forth the calculation method, but basically what it

16    is is like every transaction -- for every transaction that led

17    to a violation, the maximum penalty is about $250,000 for

18    transaction or twice of the value of the transaction that led

19    to a violation.  So if the transaction has big amount, like a

20    million, then two million will be a maximum penalty amount to

21    that transaction that led to the violation.

22    Q.  And generally, what is the range of monetary penalties that

23    have been imposed on U.S. banks for sanctions violations?

24    A.  For banks, the penalty amount was quite bigger than

25    compared to other trading companies.  It could be like
```

1    millions, tens of millions, or sometimes it could be hundreds

2    of millions dollars were imposed as a penalty to U.S. banks,

3    and other foreign banks, too.

4    Q.  We talked a little bit about banks reporting to OFAC when

5    transactions are blocked.  What does OFAC do with the

6    information that it gets from banks -- sorry, take a step back.

7         Does OFAC receive information from banks about

8    transactions involving Iranian entities?

9    A.  Yes.

10   Q.  And what kinds of information does OFAC get from banks

11   about transactions involving Iranian entities?

12   A.  Those information -- sorry, what kind of?

13   Q.  What kinds of information does OFAC get from banks about

14   transactions involving Iranian entities?

15   A.  What kind of information.

16        Any information bank collected from the rejected or

17   blocked transaction comes to OFAC, and those include the

18   parties involved in the transaction and the transaction amount,

19   if there is any -- about any the information what are the

20   transaction for and when the transaction rejected or blocked

21   and address and the name, if it is a corporation, company name

22   of the sender or recipient of the money transfer if it is a

23   money transfer.  If it's just a simple transaction, then the

24   money -- if it is money received from somebody who wants to

25   just deposit, then the depositor's information is obtained.

K34TSAD8                          Kim - Direct

1    Q.  What does OFAC do with the information from banks about

2    transactions involving Iranian entities?

3    A.  Those are one of the important source for us that lead to

4    open an investigation, because the banks collects other

5    information and other country's information involved in

6    rejected and blocked transaction.  That means those entities'

7    management teams are blocking and report a lot of other

8    information about other parties other than the bank, the other

9    parties that has potential to be in violation of sanctions

10   regulation.

11   Q.  So would the information -- OFAC takes that information and

12   it leads to investigations?

13   A.  That's correct.

14   Q.  And in some instances, those investigations lead to

15   enforcement actions?

16   A.  Yes, that's correct.

17   Q.  As an enforcement officer with OFAC, are you able to do

18   your job if the Iranian connections to a transaction are

19   stripped or hidden?

20   A.  It would make it very difficult for me to do my job, but

21   that's why we have -- we are trying to set up tools and network

22   to find out those deceptive practices.

23   Q.  Why does it make it difficult for you to do your job?

24   A.  It's hiding, so I don't know.  I don't know how to explain.

25   The hiding of money is difficult to catch.

K34TSAD8

1          MS. KIM:  Your Honor, may I have a minute?

2          THE COURT:  You may.

3          (Pause)

4          MS. KIM:  No further questions, your Honor.

5          THE COURT:  All right.  Thank you.

6          Members of the jury, although we have the

7    cross-examination and redirect of Mr. Kim, we're actually

8    making pretty good time, and we'll break a little early today.

9          It's about ten after 4:00.  I will try to provide an

10   update on the schedule tomorrow after I meet with the lawyers

11   this afternoon, but same schedule tomorrow.  Please be ready to

12   go at 9:30 in the morning, and bear all my instructions in

13   mind.  Very grateful for your continued diligence and

14   attention.  Have a good night.

15          (Jury not present)

16          THE COURT:  Mr. Kim may step down.  We'll resume at

17   9:30 tomorrow.

18          (Witness not present)

19          THE COURT:  Matters to take up?

20          MR. KROUSE:  Just on the scheduling point, your Honor,

21   just first with respect to this witness, the government does

22   feel a little bit sandbagged with the defense.  They came to us

23   and said we haven't given you any of the exhibits we said we

24   would give you because we didn't think we would get to Mr. Kim.

25          THE COURT:  I will set a schedule if that's where

1    you're going.

2              MR. KROUSE:  We would appreciate that, because we

3    expected Mr. Kim to testify today.  The witness is now being

4    inconvenienced an additional day when I think it would have

5    been reasonable for him to finish his cross-examination and

6    redirect within the time period set by the Court, which was a

7    5:00 p.m. end date or end time.  So now the witness has to stay

8    an extra night and come back for cross-examination.  So for

9    future I think efficiencies, both for the Court's time, the

10   jury's time --

11             THE COURT:  I already said I'm not doing it again.

12             MR. KROUSE:  Second point on the schedule, your Honor,

13   is as you noted to the jury, we're moving quicker than we

14   expected we would, so there's the issue of whether sitting

15   Friday is necessary.  We spoke to the defense about this.

16             THE COURT:  Well, the question is:  How much longer on

17   the government's case?

18             MR. KROUSE:  So I think tomorrow there's a chance

19   we'll get through nearly all of the case except for three

20   witnesses and maybe one more paralegal session with the

21   exhibits.

22             THE COURT:  So you need two days?

23             MR. KROUSE:  I think two paralegal sessions.  So I

24   think we're looking at two to two and a half days remaining.

25   So say we got through what we expected to get through tomorrow,

K34TSAD8

1    we won't -- and did sit Friday, there would be a chance we

2    would rest Friday.  If we didn't sit Friday, then we would have

3    a chance to rest Monday or early Tuesday.  So there has been

4    some discussion amongst the parties about whether it makes

5    sense to not bring the jury in on Friday, but we wanted to see

6    what the Court's view was on that.

7              THE COURT:  Seems like an important view.  I

8    appreciate your interest and my thoughts on the matter.

9              MR. KROUSE:  Over to you, Judge.

10             THE COURT:  Yeah.  How long, to the extent you can

11   predict at this point, Mr. Weingarten or Mr. Heberlig, how long

12   of a defense case?

13             MR. WEINGARTEN:  I'm not pressing, I did think the

14   case would move quickly, and it has, and I am hearing them say

15   that are likely to rest on Monday.

16             THE COURT:  Or Friday.

17             MR. WEINGARTEN:  Or Friday.  Then it's the classic

18   dilemma or issue for the defense, and --

19             THE COURT:  So just spin out A and B.

20             MR. WEINGARTEN:  I can be completely transparent here.

21   If we put the client on, I'm guessing if they rest Monday we'll

22   have a verdict Friday.

23             THE COURT:  So that seems right.  And to the jury

24   sooner if Mr. Sadr doesn't.

25             MR. WEINGARTEN:  Of course.

K34TSAD8

1          THE COURT:  All right.  So obviously I'm not pressing

2     on the question, and we'll make whatever room is needed, but

3     other than the possibility of Mr. Sadr's testimony, it's not a

4     lengthy defense case?

5          MR. WEINGARTEN:  Again I will be completely

6     transparent, the most interesting witness on their list is

7     Dubowitz, and I don't think there's a clear -- certainly the

8     Court ruled, I think there's some difference in how they view

9     it and how we view it.  I think it could be a short cross or it

10    could be a very long cross.  I think he could inspire us to

11    respond with the experts in a way more aggressively than we're

12    presently thinking.  But we're thinking two experts that would

13    require some cross-examination, and a substantive witness.  I

14    don't see anything else coming out of the government's case

15    that is causing us to see the world differently.

16         THE COURT:  I think what I may do for Friday is a

17    contracted schedule so that the jurors could have the afternoon

18    off, something like that.

19         I don't want forego the whole day, I just don't.

20         MR. KROUSE:  So with that in mind, your Honor,

21    Mr. Dubowitz has had a bit of a health issue this week.  We

22    think we could put him on Friday, but if we are going to sit

23    the contracted day, I think we would allow him time to recover,

24    call him on Monday.  So if we finish the rest of our case by

25    Friday, we would have the one holdover witness on Monday.

K34TSAD8

```
 1          Although speaking to my colleagues, I don't think if
 2   we sit a contracted day on Friday we will be in a position to
 3   rest anyway, I think there would be a few other things to
 4   occupy the time.  So we would anticipate then resting on
 5   Monday.
 6          THE COURT:  Tell me the witnesses we have got coming
 7   up.
 8          MR. KROUSE:  Your Honor, after Mr. Kim is finished
 9   tomorrow we'll call a paralegal to go through a set of
10   documents.  Mr. Lynch will handle that.  I will then call --
11          THE COURT:  Let me say, Ms. Lake, I appreciated -- it
12   still is painful, but I appreciated what was no doubt effort to
13   contract.
14          MS. LAKE:  Sorry, your Honor, I really did try very
15   hard.
16          THE COURT:  It wasn't sarcasm.
17          MS. LAKE:  I know everyone was bored, I was bored,
18   too.
19          THE COURT:  I want to encourage continued effort with
20   that.
21          Mr. Kim finishes, the paralegal --
22          MR. KROUSE:  Two paralegals doing documents on
23   different types of areas.  We'll have a bank witness from JP
24   Morgan tomorrow, and then there will be another -- if we get to
25   it, another paralegal going through payment -- a series of
```

K34TSAD8

1    payment documents.

2              THE COURT:  And then it's Dubowitz?

3              MR. KROUSE:  No, after that we have another bank

4    witness from Citibank, we have another paralegal going through

5    another set of documents, we have Ms. Conte, and then we have

6    another paralegal as well.  So is there is still a fair amount.

7              THE COURT:  Yeah, I'm actually leaning back toward

8    Friday full day.

9              MS. LAKE:  One thing to note, your Honor, the set of

10   documents today was I think the longest set.  The payments may

11   take a little while because there are a lot of documents to put

12   it all together, but in terms of the number, today's was the

13   biggest.

14             THE COURT:  Okay.  We'll sit Friday full day.

15             MR. KROUSE:  With respect --

16             THE COURT:  The Dubowitz health issue, you want to be

17   able to plan for him for Monday?

18             MR. KROUSE:  Yes, your Honor.

19             THE COURT:  All right.  This will incentivize you,

20   because I will allow you to do Dubowitz on Monday, no objection

21   from defense counsel, but what I'm proposing is we'll plan for

22   Dubowitz for Monday and we'll keep going until everything else

23   is done and in the government's case on Friday.

24             MR. KROUSE:  Yes, your Honor.  And we can't --

25             THE COURT:  Unless you're not finished, in which case

K34TSAD8

1   it will move over to Monday, but sounds like no matter what

2   we'll finish Monday.

3           Any concerns with that?  Because he started by making

4   a speech how we shouldn't waste any time and we should use the

5   time, and here we are.

6           Okay.  So that's our schedule.  We'll still plan for

7   Friday as we had, we anticipate the government resting Monday.

8   So we should talk about timing of the charge conference.  It

9   sounds like we should do Tuesday morning, because we may, as

10  soon as possible, get to closings or a day or two later.

11          So we'll plan for, so that I can tell the jury, that I

12  won't start them -- I'll tell them this on Friday when we have

13  a clearer sense, hopefully, but the idea would be that we

14  wouldn't start them until midday on Tuesday so we have the

15  morning for the conference.

16          Thank you.  Tonight for the schedule.  So

17  Mr. Weingarten, the expectation is, since you have worked your

18  way to get the night to prepare your cross, is that it will be

19  efficient.

20          MR. WEINGARTEN:  Very efficient.

21          THE COURT:  Very efficient.  So we'll move quickly

22  through that.

23          So we're going to set a schedule by which the defense

24  will disclose documents it intends to use in the cross and then

25  a letter scheduled for what I hope aren't but somehow I suspect

K34TSAD8

1    might be government objections.  So Mr. Weingarten, you will be

2    out of here by 4:30, by 6:30 you'll disclose.

3              MR. WEINGARTEN:  As soon as I know.

4              THE COURT:  As soon as you know, but no later than

5    6:30.

6              MR. WEINGARTEN:  And if I supplement because I have a

7    brainstorm at 10:30 --

8              THE COURT:  Have it sooner.  I appreciate that

9    deadlines have lost all meaning, but at some point, because

10   there are going to be objections -- you could have been doing

11   this right now.

12             MR. WEINGARTEN:  I understand.

13             THE COURT:  You want 7 o'clock, is that the request?

14             MR. WEINGARTEN:  We're serious people.  If it's too

15   early, I will get more documents, so I will err on being

16   over-inclusive.  As soon as I know, they will get it.

17             THE COURT:  By 7:00 you will disclose the documents

18   you intend to use.  Sooner would be perfectly fine.

19             Ms. Kim, when would you like to put in a letter with

20   objections?

21             MS. KIM:  As late as possible, your Honor.

22             THE COURT:  9 o'clock.

23             And 11 o'clock for the defense to respond.

24             We'll meet at 9:00.  If this turns into a big thing, I

25   will put out an order that I want you to come in sooner to make

K34TSAD8

1    sure it's resolved.

2           Other matters to take up?

3           Ms. Lake, the one thing left open was you're going to

4    supply a translation.

5           MS. LAKE:  Yes, to Government Exhibit 1209A.  We had a

6    translator -- we had Mr. Irani do it, so we need to go look at

7    it.

8           THE COURT:  Okay. so I can look at it tonight or early

9    in the morning, what I ask is that the government put in a

10   letter with the full document and translation attached and the

11   government's proffer as to admissibility.

12          MS. LAKE:  Yes, your Honor.

13          MR. KROUSE:  Your Honor, one other thing is a schedule

14   for defense to disclose any exhibits they intend to use with

15   the bank witnesses, since we may get to them tomorrow as well.

16          THE COURT:  Right.  You've disclosed the bank witness

17   exhibits?

18          MR. HEBERLIG:  No.

19          THE COURT:  Let's start with that.

20          MS. LAKE:  You're asking if we have?

21          THE COURT:  Yeah.

22          MS. LAKE:  No, but it will be very obvious.  They're

23   grouped by bank.

24          MR. KROUSE:  JP Morgan is first.

25          THE COURT:  So you disclose to them what exhibits and

K34TSAD8

```
1     then they will disclose to you their cross exhibits.

2                 Do you want to set a schedule?

3                 MR. KROUSE:  Sure, your Honor.

4                 THE COURT:  When will you make the disclosure?

5                 MR. KROUSE:  30 minutes.

6                 THE COURT:  Mr. Heberlig?

7                 MR. HEBERLIG:  7:30.

8                 THE COURT:  Okay.

9                 MS. KIM:  Your Honor --

10                THE COURT:  Let me know, let me hear if there are

11    issues.

12                MR. HEBERLIG:  Could we assume, your Honor, by giving

13    the government our cross exhibits they're not going to be

14    prepping the witness on them?  It defeats the purpose of

15    cross-examination.  It's fair to make sure they're authentic,

16    but there's an element of surprise to cross-examination.

17                THE COURT:  If you anticipate objections to exhibits

18    then you will disclose them so we can deal with them.

19                MR. HEBERLIG:  I have no problem disclosing exhibits.

20    I don't want them to spend all night prepping their witnesses

21    on cross-examination exhibits.

22                MR. KROUSE:  We can prep our witnesses until they take

23    the stand, your Honor.

24                MR. HEBERLIG:  I didn't hear that.

25                MR. KROUSE:  Our view is we can prep our witnesses
```

K34TSAD8

1    until they take the stand.

2              MR. HEBERLIG:   No surprises, no translations, but

3    we'll think it over.

4              THE COURT:   So only if there are -- yeah, look, if

5    there are things that are going to require discussion about

6    admissibility, then it's got to happen.   Okay?

7              See you at 9:00.

8              (Adjourned to March 5, 2020 at 9:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                          INDEX OF EXAMINATION
2    Examination of:                          Page
3    FARSHID KAZERANI
4    Direct By Mr. Krouse . . . . . . . . . . . . . 333
5    Cross By Mr. Weingarten  . . . . . . . . . . 345
6    Redirect By Mr. Krouse . . . . . . . . . . . 377
7     CRINA EBANKS
8    Direct By Ms. Kim  . . . . . . . . . . . . . 411
9    Cross By Mr. Heberlig  . . . . . . . . . . . 417
10    MATTHEW NELSON
11   Direct By Ms. Lake . . . . . . . . . . . . . 424
12   Cross By Mr. Heberlig  . . . . . . . . . . . 457
13   TED KIM
14   Direct By Ms. Kim  . . . . . . . . . . . . . 464
15
16
17
18
19
20
21
22
23
24
25
</pre>

```
 1                        GOVERNMENT EXHIBITS
 2    Exhibit No.                                    Received
 3    2148    . . . . . . . . . . . . . . . . . . 330
 4    104C    . . . . . . . . . . . . . . . . . . 422
 5     2278, 2278A, 2278B, 2049, 2049B, 2218, . . . 424
 6             1401, 1401A, 1401T, 1401A-T,
 7             2026, 2050, 2070, 2072, 2072A,
 8             2078, 2078A, 2084, 2088,
 9             2088A, 2135, 2171, 2171-T,
10             1003, 1003A, 1003T, 1003A-T,
11             2103, 2103A, 2104, 2104A,
12             2296, and 2296A
13    105     . . . . . . . . . . . . . . . . . . 464
14    602     . . . . . . . . . . . . . . . . . . 496
15                        DEFENDANT EXHIBITS
16    Exhibit No.                                    Received
17    27 and 27A . . . . . . . . . . . . . . . . 370
18    27A-T   . . . . . . . . . . . . . . . . . . 370
19
20
21
22
23
24
25
```