K35TSAD1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          18 CR 224 (AJN)

ALI SADR HASHEMI NEJAD,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        March 5, 2020
                                        8:50 a.m.

Before:

                    HON. ALISON J. NATHAN,

                                        District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
JANE KIM
MICHAEL KROUSE
STEPHANIE LAKE
GARRETT LYNCH
      Assistant United States Attorneys

STEPTOE & JOHNSON
      Attorneys for Defendant
REID WEINGARTEN
BRIAN HEBERLIG
BRUCE BISHOP

K35TSAD1

1          (Jury not present)

2          THE COURT:  Thank you for the letter briefing on the

3    issues that might develop today that you sent in last night,

4    and I did receive a reply this morning from the government, so

5    I have reviewed those.  It may be necessary to start to go

6    through the documents.  I will work in the order that the

7    government included in its initial letter.

8          So 1333 is the first one, that's the CISADA document.

9          Go ahead, Mr. Krouse.

10         MR. KROUSE:  Your Honor, I'm happy to talk about that

11   exhibit in particular, but the government does want to make an

12   overall objection to all of these documents.

13          As the Court knows, the defense moved to limit

14   Mr. Kim's testimony quite severely.  The government worked with

15   the defense to limit it to the relevant portions of the

16   regulations at issue during the relevant time frame, and now

17   the defense is seeking to introduce all of this confusing

18   evidence to the jury that is outside that time frame, has

19   nothing to do with the charges in this case, and their claim is

20   is that this somehow impeaches Mr. Kim because he didn't talk

21   about it during his direct examination when that was the

22   agreement that the parties came to and that was consistent with

23   the Court's ruling.

24          So just overall this idea that it's somehow

25   impeachment of the witness to bring out all these other laws

K35TSAD1

1    and statutes and regulations having to do with Iran and Iran

2    sanctions, of course there are a lot of sanctions against Iran,

3    Mr. Kim would have been qualified to talk about a lot of

4    different things, but based on the defense motion and based on

5    the Court's rulings and based on the government's, frankly,

6    view of the relevance of that testimony, we limited Mr. Kim to

7    the stuff that was relevant.  So you can't put under the

8    umbrella of impeachment there's a lot of other stuff I didn't

9    mention.

10        THE COURT:  On this one I asked specifically at a

11   certain point, and it was before objections came, was there any

12   surprise as to what Mr. Kim was doing about the law, and was

13   told that in fact the PowerPoint had been provided to the

14   defense and that the testimony would be largely following the

15   PowerPoint demonstrative.  And so to the extent this is being

16   offered to impeach the idea that he focused on the particular

17   statute --

18        So who is taking, this Mr. Heberlig, Mr. Weingarten?

19   You had that in advance, right?

20        MR. WEINGARTEN:  We certainly had the PowerPoint.

21        THE COURT:  And there wasn't a suggestion that it

22   was -- or an objection to it as misleading for failure to

23   reference CISADA, correct?

24        MR. WEINGARTEN:  Agreed.

25        THE COURT:  And I don't have the document, but from

K35TSAD1

1  what has been described we're talking about putting in a

2  substantial document, a statutory provision, for the point that

3  Mr. Kim didn't reference other provisions of law relevant to

4  Iranian sanctions?

5          MR. WEINGARTEN:  In part.

6          THE COURT:  Well, what else?  For what other purpose?

7          MR. WEINGARTEN:  Mr. Kim, in the PowerPoint and in his

8  testimony, talked about the effect of the sanctions in 2008

9  going forward, and CISADA in large measure is a response to

10  that.  Yes, the sanctions were continued, and President Obama

11  did many other things as well, and we want to elicit that.

12          THE COURT:  So the jury doesn't need the text of

13  CISADA to get that point, for example.

14          MR. WEINGARTEN:  But the text contains it directly.

15  Maybe we redact, but --

16          THE COURT:  Well, from what I understand of this

17  document, for very limited relevance and arguable waiver of

18  this point by you, because what's not okay, we have had a lot

19  of discussions about this issue, and the defense -- I checked,

20  and you later objected, and that raised other issues, but at

21  the point that we're doing this, I said no surprises, this is

22  what was anticipated?

23          MR. WEINGARTEN:  Can I respond to that right now?

24          THE COURT:  Of course.

25          MR. WEINGARTEN:  So we go home last night, and in my

K35TSAD1

1    experience as a criminal defense attorney, in the trials I have

2    had, you don't disclose beforehand.  It's your rule, it's a

3    good rule, I'm happy to do it.

4            THE COURT:  Everybody does it.  And to the extent that

5    the concern was that they were going to prep Mr. Kim on it,

6    they wouldn't have if you had taken up your cross-examination

7    and he was under cross.  So you don't get all of the

8    advantages.

9            MR. WEINGARTEN:  Let me continue, if I may.

10           THE COURT:  You may.

11           MR. WEINGARTEN:  So we go back, and anything that's

12    remotely possible to be used in cross we identify, communicate

13    with the prosecutor, send the documents over, and I communicate

14    as well we're going to whittle down, very nice exchange,

15    whittle away, we whittled a little more and we proceed.

16           Now the way it works, the documents are sitting here,

17    maybe I like an answer, maybe I don't, maybe I use the

18    document, maybe I don't.  You will hear when we go through the

19    documents one by one that we're going to withdraw some of them.

20           THE COURT:  Are you withdrawing 1333?

21           MR. WEINGARTEN:  No.  Could I say one more point?

22    This is completely candid, we have a conversation yesterday

23    about how this trial is going to work out.  It may be that we

24    don't put on a defense and it may be that we want to close to

25    the jury with some documents that are in evidence, and maybe I

K35TSAD1

should have said that explicitly to the government.  In my

experience, it's transparently clear how defense attorneys

think.  If CISADA is important to the defense, we get it in.

THE COURT:  Well, you get it in if it's relevant and

non-prejudicial and is not irrelevant and prejudicial, which is

on the grounds I said, in addition to them being the rules,

what I won't allow are -- most specifically I won't allow the

defense to make arguments about the law contrary to the Court's

conclusions unless there is some tie to Mr. Sadr's knowledge.

I don't think that's where we are on this point.  So then the

question is what can you argue -- what do you want to argue

from CISADA?

MR. WEINGARTEN:  The proffer, I said it in the opening

and I said it at sidebar as to where CISADA fits.  And it's a

government exhibit.  They want to introduce it to show the

knowledge of my client about the sanctions.  In fact, he did

know about the sanctions from CISADA.  It was important to him.

If we put him on, he will say just that.

And the important parts are that he thought for the

first time, and I think it's accurate, the President of the

United States imposed sanctions on the Iranian leaders for

doing terrible things to Iranian people.  The document is

filled with wonderful statements about the Iranian people.

There was a feeling that the world had changed, and that's the

point we and want to make.

K35TSAD1

1          THE COURT:  What is the date that the world changes?

2          MR. WEINGARTEN:  The document is 2010.

3          THE COURT:  Go ahead.

4          MR. KROUSE:  Your Honor, on this, I think there's a

5     lot of issues to unpack there.  It's certainly not the case

6     that the defense, because they want to use something, it comes

7     in.  I think the Court gets that.

8          But on the narrow point of what they can cross Mr. Kim

9     on, whether they can introduce CISADA in some other part of the

10    case, including their case in chief, the government would

11    object.  We think it's confusing to introduce a whole other law

12    with legal text and all the language and then have the jury

13    sitting back there reading CISADA.  That doesn't make any

14    sense.  The Court is going to instruct the jury on the law.

15         THE COURT:  Why did you produce the Clinton executive

16    order?  What is the relevance of that to the jury?

17         MR. KROUSE:  Your Honor, that executive order is just

18    the first one that establishes the authority to issue the ITSR,

19    and that everything that Mr. Kim was testifying about flows

20    from that.

21         THE COURT:  Why do they need the text of the EO?

22         MR. KROUSE:  The government is happy to strike that

23    exhibit and withdraw it.  It wasn't necessary to offer it, and

24    so -- but was there was no objection by the defense.  The

25    government is happy to strike that exhibit.

1          But on the point of CISADA, that has no tether at all

2     to this case.  That's a law that was specifically implemented

3     to continue sanctions against certain entities.  It has nothing

4     to do with the ITSR.  It didn't change anything about the ITSR.

5     The law applicable to this case stayed exactly the same.

6          So to have a document back there in evidence with the

7     jury reading another law that doesn't have anything to do with

8     this case, when the defense has made no proffer factually that

9     Mr. Sadr had anything in his mind about CISADA, if he wants to

10    take the stand and say this entire time I was thinking about

11    CISADA, he's welcome to do that, but even then the government

12    would object to putting in the actual law to have the jury sit

13    back there and read the law.

14         But on the narrow issue here of whether they can

15    cross-examine Mr. Kim on CISADA, the defense limited the

16    testimony of Mr. Kim.  It's not impeachment for them to then

17    say:  Aren't there a bunch of other laws that are relevant to

18    the Iran sanctions regime?  It opens up this entire area of

19    inquiry.

20         THE COURT:  With respect to the statutory provisions

21    that he discussed, frankly for reasons unclear to me, I sat

22    here in somewhat of amazement yesterday as it happened, with

23    respect to the relevant provisions of law that the government

24    introduced, how did the defense limit that?

25         MR. KROUSE:  The defense limited -- and both, I will

K35TSAD1

1    say the defense and the government together worked to limit it

2    to what was relevant.

3            Now I understand the Court's point, I think.  Part of

4    this was the defense having noticed an expert on OFAC

5    themselves endeavoring to have this OFAC witness sort of

6    explain the relevant areas in this case that touch directly on

7    this case, and then allow the defense to cross-examine on those

8    relevant areas, thereby making an OFAC witness for the defense

9    unnecessary.

10           Now whether or not that was what the Court was

11   envisioning, it doesn't sound like it was, but that was

12   something that was worked out by the government and the

13   defense.  And I think there is something here to -- the defense

14   can't -- there's a couple times now where the defense has said

15   that's prejudicial to us, and then the Court ruled for them and

16   then they turned around and have done the exact same thing,

17   like saying that terrorism is such a prejudicial word and then

18   opening on it and talking about it constantly.

19           THE COURT:  I said this yesterday, they can't object

20   to documents coming from in from the government and then try to

21   get the documents in.  If they're saying these documents can't

22   come in because they say terrorism but we'll put the documents

23   in, that's a problem, but it's different to --

24           MR. KROUSE:  That's what is happening.

25           THE COURT:  What do you mean that's what is happening?

K35TSAD1

1          MR. KROUSE:  That's what is happening, where the

2     government and the defense worked together to limit a witness'

3     testimony, and then they can get up and say, for impeachment

4     purposes:  Why didn't you mention this law?  Why didn't you

5     mention this law?  Why didn't you talk about these SDN

6     designations?  Why didn't you talk about CISADA?  Why didn't

7     you do this?  Why didn't do you that?  If that is what it is

8     being offered for for this witness, that's highly improper.

9          Now if the defense has some theory why CISADA is

10     admissible in their case, the government opposes it and we

11     object for all the reasons I stated, but it can be taken up on

12     the defense case.  For the purposes of this witness, there is

13     absolutely no relevance to bringing -- even mentioning CISADA

14     with this witness, because it's not impeachment, and so it has

15     no purpose on -- it's outside the scope of direct, and I still

16     have not heard from the defense what their theory is for why

17     this would be admissible on this cross-examination.

18          THE COURT:  Mr. Weingarten?

19          MR. WEINGARTEN:  Can I respond to the initial parts?

20          THE COURT:  You may.

21          MR. WEINGARTEN:  Judge, here's the story here, the

22     government's opening OFAC regulations are crystal clear and

23     simple.

24          THE COURT:  The quote was, "It's not complicated."

25          MR. WEINGARTEN:  We believe anything but.

1              THE COURT:  Which again, I was quite surprised, given

2      where we have been.

3              MR. WEINGARTEN:  I understand.  So that's how they

4      opened.  We understand completely, we have had 10,000

5      conversations about this, that when it comes to how you're

6      going to instruct the jury, we can't introduce evidence, we

7      can't argue to the jury that you're wrong and there's a

8      different interpretation and that's where they should go.

9              THE COURT:  Again, unless it's tied specifically -- I

10     want to be clear, I'm not saying there can't be a suggestion

11     that Mr. Sadr had in his head another interpretation of the

12     law, so long as it's not just made up from thin air and it's

13     connected to him.

14             MR. WEINGARTEN:  And I said to you yesterday and I'll

15     say it again, he didn't sleep with 516, so we're not going to

16     go there.

17             Number two, there's a split in the defense camp about

18     which way is consistent with your ruling.  Can't introduce the

19     regs.  And I wasn't sleeping when they introduced the Clinton

20     order, I wanted a little more room.  Okay.  Others believe

21     can't introduce the orders but you certainly can cross-examine

22     this guy inconsistent with their opening statement, that this

23     is simple, there are a zillion documents, they are

24     inconsistent, they change constantly, they're political.  I

25     don't know whether or not I can do that right now.

K35TSAD1

1          And I would say --

2          THE COURT:  So you are raising a point which you have

3     not previously raised, right, a purpose counter to the

4     government's suggestion of the simplicity of the sanctions,

5     which goes to Mr. Sadr's awareness, is sort of a general theory

6     of complicatedness, which is not making a specific legal

7     argument about legality.

8          MR. WEINGARTEN:  Right.

9          THE COURT:  So I think that might have been fine

10    previously, not raised it before, certainly seems fine in light

11    of the government's opening.  But there's a limit, and 403 is

12    the limit, as to how you can do that.

13         MR. WEINGARTEN:  Since I'm here, can I raise it to the

14    next level?

15         In the PowerPoints they don't quote -- then don't say

16    this is 410, this is 204, but they take language from both

17    those rules.  How can it be if they do that that I can't take

18    204 or 410 and ask him questions about it?

19         MR. KROUSE:  No one is saying he can't ask questions

20    about the relevant regulations, your Honor.  Again, even --

21         THE COURT:  So you're not objecting to asking him

22    questions about regulations that he testified to suggest

23    complications or he that oversimplified or the like.

24         MR. KROUSE:  I think that's right, because that goes

25    to the witness's credibility as an enforcement officer.  So we

1    understand, I think, the limits of what -- we're not saying he

2    can't cross-examine or bring out defense themes, it's just the

3    way in which he's doing it with CISADA in particular that's

4    really outside the scope.

5              THE COURT:  Why?

6              MR. KROUSE:  Your Honor, there's a distinction again

7    about the defense being able to pursue themes, both on

8    cross-examination and in their case in chief, with their

9    expert.  And we can take up what is appropriate at a later

10   time, but what is appropriate with this witness I think is very

11   different, because the parties have agreed to what he was going

12   to testify about.  It's improper cross of the witness to then

13   try to imply that there's some sort of credibility problem with

14   the fact that he didn't mention CISADA when that was agreed

15   that that wouldn't be part of the case, because it's not part

16   of the case.

17             THE COURT:  So your representation is the defense

18   agreed Mr. Kim would not testify about CISADA.

19             MR. KROUSE:  CISADA never came up.  CISADA is not part

20   of this case.  CISADA has to do with blocked entities.

21             THE COURT:  That's the question.  They're obviously

22   trying to introduce it, so just saying it's not part of the

23   case --

24             MR. KROUSE:  It's not part of the law in this case, so

25   it's not going to be anything that your Honor is going to

K35TSAD1

1    instruct the jury on.  So with respect to the law itself --

2              THE COURT:  But to my point a moment ago, neither is

3    the Clinton EO.

4              MR. KROUSE:  The Clinton EO is the fountainhead of the

5    entire --

6              THE COURT:  The jury is not going to get instructed on

7    the Clinton EO.

8              MR. KROUSE:  And government will strike that exhibit.

9    But I think there is a very big difference between the Clinton

10   EO which is tied to the law in this case.  Now maybe the

11   government should not have introduced it, so we're happy to

12   strike it and the jury will never see it.  They saw the first

13   page and it was just cited, it just showed them that President

14   Clinton issued it.  So we're happy to strike the exhibit and

15   happy to strike the testimony referencing it.  But it's not

16   apples to apples to say that CISADA is the same thing.  It's a

17   completely different law.

18             THE COURT:  It's not saying it's the same thing, the

19   question is just --

20             So Mr. Weingarten, one, the representation is you had

21   every opportunity in the negotiations over Mr. Kim's testimony,

22   given concerns that had been discussed, to have him front

23   CISADA as part of the sanctions regime and you didn't, right?

24             MR. WEINGARTEN:  No.  I mean it could be --

25             THE COURT:  Is it right that you were negotiating

1   this, and with respect to the question of what the relevant

2   area of law would be, that you would discuss, those were active

3   discussions?

4           MR. WEINGARTEN:  I want to be perfectly clear:

5   Certainly not with me.  I'm looking at my colleagues and I'm

6   getting a head shake here.

7           There were discussions, and what my primary feeling

8   is, every time I turned around there was a new PowerPoint

9   coming down the road with changes.  I didn't have any sense

10  that I had any ability to influence what was being put in that

11  PowerPoint.

12          MR. KROUSE:  They moved on it, your Honor, we had

13  extensive discussions about it in the motions in limine phase.

14  We sent them multiple versions of the PowerPoint to put them on

15  notice about what we intended to do.  We talked about whether

16  we would will put the language of the regs in front of the jury

17  and we told the defense we did not intend to do that.  They

18  didn't indicate one way or the other what they intended to do,

19  but during all of those conversations it never came up:  We

20  also think Mr. Kim should talk about CISADA.  That's the core

21  of the government's objection.

22          The other objection is CISADA is a completely

23  different rule.  Under 403 it's going to lead to jury confusion

24  to have the document in front of them, so we object very

25  strenuously that the document should come in as a defense

K35TSAD1

1    exhibit for any purpose.  But even on this witness, questioning

2    him about CISADA is unfair and outside the scope of the direct,

3    because to the extent it's being used just to impeach Mr. Kim's

4    knowledge, it's sandbagging the government to limit his

5    testimony to a certain area and then say, well, isn't it true

6    that you don't know what you're talking about because you

7    didn't mention this completely irrelevant statute.

8           THE COURT:  So Mr. Weingarten, is the purpose being

9    offered here for impeachment?

10          MR. WEINGARTEN:  No.

11          THE COURT:  It's not, because he didn't talk about

12   CISADA.

13          MR. WEINGARTEN:  No.

14          THE COURT:  So why do you get it in through this

15   witness?

16          MR. WEINGARTEN:  Because he took the stand and he

17   testified these are the relevant documents.  It's not

18   cross-examination to say:  Isn't it true that there were

19   others, for a variety of reasons, CISADA being one of them.

20          And then number two, he talks about what happened in

21   2008 going forward.  And what I would like to do is say:  It is

22   true, is it not, that CISADA strengthened the regulations

23   against Iran in very important ways and did a number of other

24   things?  And I want to elicit it that way.

25          THE COURT:  And what are you going to argue to the

K35TSAD1

1     jury from that?

2               MR. WEINGARTEN:  It depends entirely on what our case

3     looks like.  It depends entirely.

4               MR. KROUSE:  It's not --

5               THE COURT:  I get that, but that's not a sufficient

6     answer for purposes of this witness.  You don't get to do

7     anything you want with respect to this witness.

8               MR. WEINGARTEN:  Of course, I understand that.

9               THE COURT:  So you're not doing it to impeach him.

10              MR. WEINGARTEN:  Clarification, the mildest of

11    impeachment:  You didn't include this.  Isn't it true that the

12    following is contained in there?

13              THE COURT:  So if the hook for getting it in through

14    him is mild impeachment because you didn't include it, then I

15    think that puts us squarely in what happened in the

16    negotiations with the government over the limit of his

17    testimony.

18              MR. KROUSE:  And the motions in limine --

19              MR. WEINGARTEN:  None is the answer.

20              MR. KROUSE:  The motions in limine sought to limit his

21    testimony, and he testified about the relevant portions.

22              Now it sounds to me like the defense wants CISADA for

23    their own defense purposes.  It's outside the scope of the

24    direct.  They can introduce, or try to --

25              THE COURT:  It is for their own purposes, which

K35TSAD1

1    usually a defense case doesn't exist other than what comes in

2    through cross, so that's not unusual, so long as it's within

3    the scope of direct.  But for the negotiation over the scope of

4    Mr. Kim's testimony, it would be within the scope of direct.

5    There's still the 403 issue, but that's true, so the question

6    is just --

7            MR. WEINGARTEN:  There was no negotiation, Judge.

8            THE COURT:  What do you mean there was no negotiation?

9            MR. WEINGARTEN:  I certainly didn't negotiate with

10   them about anything, and my colleagues are echoing that.  This

11   negotiation, this is fantasy.

12           MR. KROUSE:  Your Honor, once again there was

13   extensive motions in limine practice on Mr. Kim's testimony.

14           THE COURT:  Yes.

15           MR. KROUSE:  The government stated that we would work

16   with the defense to limit his testimony to the relevant

17   portions, we provided the PowerPoint --

18           THE COURT:  I need clarity.  You mean with respect to

19   the references to terrorism and the like?

20           MR. KROUSE:  No, with respect to what he would testify

21   about, what was within the scope of the relevant testimony in

22   this case.

23           THE COURT:  You didn't much fight about Mr. Kim.

24           MR. KROUSE:  There were a lot of behind-the-scenes

25   discussions, so a lot emails sent to the defense, different

K35TSAD1

versions of the PowerPoint in which the government disclosed
well in advance and said this is what we're thinking about
introducing with Mr. Kim, multiple versions.  We did have
discussions about whether the regulation, the text of the
regulations, would go in.  We told the defense we did not
intend to use the text of the regulations.

It turns, I guess, on what the defense considers
negotiation, but in the government's view it was discussing
with the defense in good faith what the proper scope of this
witness's testimony was in light of us calling a witness from
OFAC and them noticing a defense expert from OFAC, and multiple
times the defense said, with respect to the defense OFAC
witness, it kind of depends on what your OFAC witness testifies
to.

So we said we would limit the scope of the testimony
to things that were directly relevant to this case, the ITSR,
which the judge, your Honor, is going to instructed the jury
on, that regime, what it constitutes, what it is.  And CISADA
is a distraction in so many ways because Mr. Weingarten keeps
saying it's part of this, but if you say it's part of this,
there's a lot of Iranian sanctions regulations.  They regulate
the aircraft industry, they regulate the oil industry, there's
a lot of stuff that's part of this, if you want to define
"this" as all of Iran sanctions.

But with respect to this case, it's 203, 204, and 410.

K35TSAD1

1    And it's not all that complicated, your Honor, honestly, and

2    that's how we opened, and I think that's how we're going to

3    close.  It's not that complicated on the law.

4              THE COURT:  This is the state of mind question, and

5    it's a fine blade here for purposes of whether or not Mr. Sadr

6    violated sanctions.  I get the government's argument that it's

7    simple, but because the defense is he didn't know that

8    simplicity because it's buried in a mountain of complexity,

9    that is relevant to state of mind and they get to make those

10   arguments.  I just don't think that answers the question,

11   necessarily.

12             MR. KROUSE:  I think there's room here for some sort

13   of compromise.  One, I will say the defense has noticed an

14   expert, they say their defendant might testify, based on the

15   opening it seems like he's going to testify.

16             THE COURT:  I will say there have been proffers that

17   allowed a lot of stuff in opening that is premised on evidence

18   that the defense is going to get in, and I think it includes

19   the expert, the OFAC expert.

20             You have an OFAC expert?

21             MR. WEINGARTEN:  We do.

22             MR. KROUSE:  Of course they're not bound by that

23   commitment, but based on everything that's happening up to this

24   point and based on the opening and all the personal details

25   that came out in the opening, we're not sure how that is coming

K35TSAD1

1   in without the defendant testifying.  And if the defendant is

2   going to testify then the defense will have more than ample

3   opportunity, through both their OFAC witness and through the

4   defendant, to introduce evidence, competent evidence about his

5   state of mind and whether -- and the fact this is a complicated

6   area.  That is a defense case.  But with respect to this

7   witness, it's excluded under 403, the government believes it's

8   outside the scope, and certainly the defense exhibit, the

9   document itself of CISADA, should be precluded.

10          MR. WEINGARTEN:  Judge, I had a senior moment in that

11  there's another piece to the proffer about what would happen if

12  this comes in, and may I offer it here as well?

13          THE COURT:  Yes.

14          MR. WEINGARTEN:  Another part of CISADA was a change

15  of focus, as the Court knows, and I may or may not have said in

16  opening, Reagan was imports, Clinton was exports, then there's

17  a trade embargo, gross measures.  Obama saw the world

18  differently and he wanted targeted sanctions directed at the

19  wrongdoers, and that was a very significant part of CISADA, not

20  against citizens or private entities operating outside of Iran.

21          THE COURT:  And you're going to argue what to the

22  jury?

23          MR. WEINGARTEN:  That the regime in power at the time

24  of the sanctions in this case was a regime that was not

25  interested in punishing people from Iran who were working

K35TSAD1

1    outside of Iran if there's no connection to Iran.

2              THE COURT:  That's an argument about the law.  That's

3    a nullification argument and an argument about the law.

4              MR. WEINGARTEN:  It's a state of mind.

5              THE COURT:  No, I precisely asked you just now and you

6    didn't make it as a state of mind argument, you made it as a

7    fact in the world argument, a legal fact in the world argument.

8              MR. WEINGARTEN:  But the preface to all this is the

9    government is introducing CISADA for the purposes of imputing

10   knowledge to him.  This is part of the knowledge.

11             MR. KROUSE:  I will correct the record on that, the

12   government is not introducing CISADA.

13             THE COURT:  That's clear.  You're trying to introduce

14   CISADA.

15             MR. WEINGARTEN:  I thought it was a government

16   exhibit.

17             MR. HEBERLIG:  It may be change of heart, it was on a

18   list of exhibits we got last night from the government.

19   Mr. Sadr received an email with CISADA attached to it that he

20   forwarded to another address and:  Says please print out.  So

21   it's a government exhibit that we understand --

22             MR. KROUSE:  I don't believe we said we were going to

23   introduce it.  It's a marked government exhibit in the sense

24   that it's an email that Mr. Sadr received.  I will note also

25   that the attachment on the email is different than the defense

K35TSAD1

1   exhibit.  There are different versions of the reports.  But the

2   government is not introducing it, there's no reason to

3   introduce it, there's no marked exhibit.  To the extent the

4   government said we're intending to use it, it was an error or a

5   typo, but I don't think that we said we were going to use it,

6   but if the defense corrects me, then --

7           MR. HEBERLIG:  Give me 30 seconds, I will find it for

8   you.

9           MR. KROUSE:  But, your Honor, the fact remains we're

10  not introducing it.  It's not relevant with respect to this

11  witness in the least.  Mr. Weingarten has not been able to

12  proffer a legitimate reason to ask this witness about that

13  statute.  I'll just note what CISADA is, because I think

14  there's a little bit of misleading content in what the defense

15  is saying.

16          The comprehensive ban on --

17          THE COURT:  And I think -- am I right in saying I

18  never heard of CISADA until whatever came in right before

19  trial, it wasn't ever part of the in limines.

20          MR. KROUSE:  The government didn't have any idea that

21  the defense was going to try to introduce an entirely different

22  statute.

23          I will say that it's misleading to say that CISADA is

24  relevant to his state of mind because it made things easier.

25  In fact, it was a statute to tighten the sanctions against

Iran.  The comprehensive ban was already in place and had been
in place since 1995, the 2008 U-turn was revoked, all that is
ongoing through the entire time period and still in place
today.

          CISADA was an effort to make it harder for certain
directly -- the most culpable parts of the Iranian government
and industry, the SDNs to make it harder and block their
property.  It has nothing to do with this case, it has nothing
to do with Mr. Sadr.  The comprehensive ban was in place this
entire time period, and that's what your Honor is going to
instruct the jury on.

          We would oppose any introduction of CISADA, period,
but in particular, if we want to use our time on this witness,
it's more confusing than probative by far, it's to be excluded
under 403, any reference to it, and it's outside the scope of
the direct testimony because witness was testifying about the
laws and regulations relevant to this case.

          To the extent the defense wants to draw out an
argument later to the jury that these were complicated
regulations, they can do that with their OFAC witness,
possibly, if they -- but still the government would oppose
introducing CISADA.  They can bring out the idea that this is a
complicated regime both with the defendant when and if he
testifies, and with their OFAC witness or with any other
witness.

1          THE COURT:  They could bring out that it's a

2     complicated regime with this witness, why not?

3          MR. KROUSE:  I think they could ask that question.  Is

4     it fair, Mr. Kim, that the sanctions against -- there are a lot

5     of different regulations against Iran?  I think he will say yes

6     to that.

7          Is it fair to say it can be complicated?  I think

8     that's probably fair, too, but that's, I think, as far as he

9     should go with this witness, because I think it would be unfair

10    and outside the scope to say well, why didn't you testify about

11    all these other things that were irrelevant to this case?

12          There's a lot of stuff that the Iran sanctions regime

13    on whole regulates.  They regulate specific industries, they

14    regulate specific people, specific entities, there's CISADA,

15    there's the ITSR, there's a lot of stuff.  Just allowing a free

16    ranging inquiry on this witness about all the other stuff,

17    Mr. Weingarten hasn't explained how that is impeachment of this

18    witness, and it's clearly confusing to the jury.

19          So I think under 403, outside the scope, relevance,

20    there's a lot of different objections with respect to this

21    witness.

22          THE COURT:  Was the government's understanding of the

23    negotiation over the scope of Mr. Kim in part to eliminate what

24    the defense OFAC witness would have to do?

25          MR. KROUSE:  In our minds, and I can't speak to what

K35TSAD1

1   the defense thought was happening if they say that's not what

2   was happening, but the government, in our minds, was disclosing

3   in a very timely manner, two weeks before trial, a presentation

4   that we were proffering to the defense was going to outline the

5   government's direct testimony with Mr. Kim.

6          We did have discussions, explicit discussions about

7   the defense OFAC witness and what they thought that OFAC

8   witness was adding.  And the response was it depends on what

9   Mr. Kim testifies to, and we pointed to the PowerPoint and we

10  gave them different versions as we refined it and met with the

11  witness, but the discussion was:  What is Mr. Kim going to

12  testify about and what is the defense expert going to add?

13  During those conversations CISADA never came up.  As your Honor

14  pointed out, CISADA was never moved on.  An effort to put an

15  entirely different law that has nothing to do with this case in

16  front of the jury is something that should be flagged I think

17  in advance and wasn't here.

18          So with this witness, asking about --

19          THE COURT:  Okay, you're going in circles.  Let me

20  hear from the defense.

21          MR. HEBERLIG:  Judge, there was motion practice.  They

22  moved to admit the CISADA email we're talking about.  It's

23  relevant to his state of mind and knowledge of the sanctions.

24  It's Government Exhibit 2207, the attachment is 2207A.  In an

25  email from Ms. Lake last night 5:07 they designated it to be

K35TSAD1

1     read through two different paralegal readers.

2             The email in question is Ali Sadr, to a different

3     address, please print, and attached to it is CISADA.  We have

4     always understand that they were going to put it in as evidence

5     of his knowledge that it existed.  So there was no point to be

6     litigating this before.

7             And the idea we negotiated over the PowerPoint is

8     simply not true.  We received it and we evaluated it for

9     whether there were objectionable material in there, but we

10    certainly never understood the government giving us an

11    opportunity to shape the direct examination of their expert

12    witness.  We did not offer suggestions of what we thought

13    should be in their PowerPoint because that's the purpose of

14    cross-examination.  But this document has been a central part

15    of the case.  They moved in limine to admit this document.

16            MR. KROUSE:  It's a different document.

17            MR. HEBERLIG:  It is not a different document.

18            MR. KROUSE:  Our document is 78 pages and defense

19    counsels' is -- ours is 72 and theirs is 48.  The government is

20    not admitting the document and/or the email.  It was marked.

21    We marked all -- just to be clear with the Court, we marked

22    every exhibit -- every piece of documentary evidence from the

23    email accounts that was not suppressed.  So this was one of the

24    emails that was marked as responsive to the search warrant.

25            THE COURT:  The representation is that last night it

K35TSAD1

1    was suggested that --

2              MR. HEBERLIG:  Twice.

3              MR. KROUSE:  Ms. Lake informed me that was a mistake,

4    that was typo.  We are not introducing that exhibit.

5              MR. HEBERLIG:  It's not a typo, it's in here twice.

6              THE COURT:  Mr. Heberlig, as you're well aware, I give

7    everyone an opportunity, but it has to be orderly and calm.

8              MS. LAKE:  I'm happy to speak to this.

9              THE COURT:  Go ahead.

10             MS. LAKE:  It was taken from an old list.  It was a

11   mistake.  We were scrambling to get this to them 30 minutes

12   after we left court.  It was an error.

13             THE COURT:  But the suggestion has been earlier in the

14   litigation that the government was going to move this in?

15             MR. KROUSE:  Well, there was a representation that in

16   the motions in limine we litigated as an example this exhibit

17   as being admissible for a purpose.  That doesn't mean the

18   government, as it understands the case, that we wish to

19   present, as we understand the defense case, that we're going to

20   actually offer it, but I think -- some of this I think is a

21   distraction from the question of whether they can question

22   Mr. Kim on this point.

23             And also --

24             THE COURT:  But here's the thing, so I have 403

25   concerns about the document, but in terms of cross-examination,

1    but for what you represented as the agreement negotiation,

2    which seems in question and probably unresolvable by me, it is

3    within the scope.

4         MR. KROUSE:  I think to draw out this theme of

5    complexity, the government agrees.

6         THE COURT:  Well, that's a relevance question, that's

7    not a scope question.  It's within the scope because you asked

8    him about the relevant sanction laws.  Now you're saying it's

9    not fair to have negotiated that it would be limited testimony

10   and then get up and say you didn't say anything, that's a

11   separate question.  But for that, it's within the scope.  So

12   the scope -- so I can't resolve the negotiation question.  To

13   the extent it's a scope question, overruled.  So then it's a

14   401 -- well, it's really a 403 question.

15        MR. KROUSE:  I think it is a 403 question, your Honor.

16   I will say the Court is saying it's unresolvable whether --

17   "negotiations" might be a loaded term and the defense is

18   objecting to the implication that we sat down at a table and

19   hashed out his testimony.  What I will say is the government in

20   its best efforts tried to limit Mr. Kim's testimony to what was

21   relevant to this case, from a legal standpoint.  So the ITSR,

22   the regulations that the Court is going to instruct on, the

23   overall regime and what his role is as an enforcement officer,

24   what it means to license something, what it means to block

25   property, just these kinds of general outside the ken of the

K35TSAD1

1    average jury definitions.  And that was the testimony.

2              Now to introduce into that after the defense has been

3    on notice about what that overall testimony would be, I do

4    think it's unfair impeachment of the witness to then say well,

5    you didn't bring up all this other stuff, including CISADA when

6    he knows about CISADA, could have easily testified about

7    CISADA, could have easily testified about a bunch of different

8    things.

9              THE COURT:  How about this as a resolution,

10   Mr. Krouse:  Although you finished your direct, you do a final

11   question that sets up there's a lot of other statutory

12   provisions in this field, some question that suggests that you

13   have focused the questions on specific stuff so there's no

14   sting to impeachment.  Then I think we get to the relevance

15   question and why it comes in through this witness and what

16   you're going to do with it and the 403 question with respect to

17   the document.

18             I don't think I'm going to let the document in through

19   this witness.  I still don't have it in front of me, but

20   substantial complicated statutory provisions, which when I

21   asked you a moment ago, Mr. Weingarten, you didn't make a

22   knowledge argument, you made a law argument, and I'm not

23   allowing that.

24             MR. WEINGARTEN:  I missed that.

25             THE COURT:  You didn't make a knowledge argument, you

1     made a law argument, that you will argue to the jury look at

2     this provision of CISADA, it didn't cover this, it narrowed or

3     broadened or whatever you're going to do, that's a legal

4     argument that I won't allow.

5              Again, as I said all along, to the extent we're

6     talking about things being a general argument about

7     complication, about what was in Mr. Sadr's mind, that's one

8     thing.

9              MR. WEINGARTEN:  Can I try one more time?  Perhaps I

10    misspoke or misargued.  The premise -- I start with the idea

11    that everything about CISADA is in my client's mind.  A

12    significant part of CISADA, which is objectively true, is there

13    was a new focus on individual wrongdoers, the government of

14    Iran, SDNs and the IRGC.  That is an objective fact known to my

15    client.  The logical conclusion from that is this

16    administration is not enforcing the sanctions against Iranians

17    who are outside of Iran doing business.  It's an important

18    piece.  It's objectively true.  It was a very important part of

19    the statute.  There are a thousand -- I'm exaggerating, but not

20    by much -- people who touted that, and it was known to my

21    client.

22             MR. KROUSE:  I think that's a defense argument.  I

23    don't know what the evidence is of that.  Mr. Weingarten is

24    asserting that that was within his client's mind that entire

25    time.  It sounds like he will testify and say that.  But with

1    respect to this, there's no prejudice to the defense in being

2    limited on that area with this witness.  It's, I think,

3    precluded under 403, it's not relevant to this witness, and I

4    think this idea of complexity they can bring out with this

5    witness.

6              THE COURT:  I will allow questioning on complexity.

7    I'm not letting the document in through this witness for the

8    reasons we discussed, but at the moment, for 403 reasons, in

9    light of -- the line between a legal argument being made to the

10   jury, which is the province of the Court, and what Mr. Sadr may

11   have thought or concluded is a fine one, and my conclusion is

12   it tips over to 403 prejudice to do what Mr. Weingarten

13   suggested.

14             So I will allow questioning on complexity but not this

15   document through this witness.  We can take up whether it will

16   come up through your OFAC witness.

17             What else do you want to do?

18             MR. WEINGARTEN:  Go home.

19             THE COURT:  Okay.  So we have all our jurors, but

20   unfortunately that's one.  We'll move through these quickly.

21             On 1334 there's a timeframe question, so I want to

22   hear from the defense whether they're seeking 1334 because it

23   has anything to do with the timeframe of the charged

24   transactions.

25             MR. WEINGARTEN:  It's the witness's boss.

K35TSAD1

1          THE COURT:  But it happened in 2016, so please answer

2     what it has to do with proof with respect to time frame of the

3     charged transactions.

4          MR. WEINGARTEN:  That the evidence being offered on

5     page 31 was as applicable during the alleged conspiracy as it

6     was when he said it.  There's no change.

7          He was the director of OFAC throughout the entire

8     period.

9          THE COURT:  Is there any sense of what time frame he's

10    talking about?  You're inferring from the fact there's no

11    change.

12         MR. WEINGARTEN:  Yes.

13         THE COURT:  Mr. Krouse.

14         MR. KROUSE:  Your Honor, it's unclear to me how this

15    is relevant.  It's, first, outside the time frame.  I will add

16    to that that this was a congressional hearing about the JCPOA,

17    which the government moved on and the defense said they had no

18    intention to bring up anything about it.  It's completely

19    confusing to the jury.  It's a 70-page document of a hearing

20    committee.  Having the jury sit back in the jury room and read

21    a 70-page document about the JCPOA I think squarely falls

22    within what the government moved on in limine and the defense

23    said they had no objection to and the Court ruled was out.

24         So to the extent they're seeking to introduce this

25    exhibit, we object on hearsay ground, relevance grounds, 403

K35TSAD1

1    grounds, and to be frank, I still don't understand what the

2    defense is saying why this comes in.

3         THE COURT:  What do you want to do with this,

4    Mr. Weingarten?

5         MR. WEINGARTEN:  Judge, it's page 31.  Obviously we

6    would redact the one page and that would be the exhibit.

7         THE COURT:  You want to use page 31?

8         MR. WEINGARTEN:  Yes.

9         THE COURT:  For what purpose?

10        MR. WEINGARTEN:  I just may read it.  Our sanctions

11   control what U.S. actors can do and what they cannot do.  It

12   governs the conduct of U.S. actors anywhere they reside in the

13   world, blah, blah, blah.  Our sanctions, on the other hand, do

14   not control the actions of non-U.S. persons, whether or not the

15   currency they are using is dollar, Euro, pound or the yen.

16        That paragraph is critically important.  It was

17   inconsistent with what the witness said, and I want to hear

18   what he has to say when he sees what his boss wrote.

19        MR. KROUSE:  It is not inconsistent.  As the Court

20   knows, the government's theory is that the U.S. person in this

21   case is the U.S. banks.  That was briefed extensively in the

22   motions to dismiss, it was briefed extensively in the motions

23   in limine.  This is not inconsistent.

24        It goes on.  Mr. Weingarten didn't read it, but it

25   says it governs the conduct of the U.S. actors anywhere they

1    reside in the world.  So, for example, a branch of a U.S. bank

2    in Europe and East Asia has to behave like a U.S. person here

3    in Washington or here in New York.  JP Morgan, Citibank, those

4    are banks with branches in New York, the payment letters that

5    Mr. Sadr is on asks for payments from DUCOLSA through the JP

6    Morgan Chase and Citibank U.S. banks.  He caused a violation of

7    U.S. sanctions by a U.S. person.  This is not inconsistent in

8    the least, it's well outside the timeframe, it's in 2016, it's

9    not relevant, it's confusing to the jury, and it should be

10   excluded.  It definitely shouldn't come in through this

11   witness.

12           MR. WEINGARTEN:  The magic words:  That means banks in

13   Europe, Japan and China all hold dollars in their vaults.  Our

14   sanctions don't extend to those dollar bills.

15           The clear implication to the opening and the witness's

16   testimony yesterday:  You deal with dollars in Iran, you're

17   cooked.  His boss says directly the opposite.

18           THE COURT:  So therefore, the motion to dismiss should

19   be granted.

20           MR. WEINGARTEN:  No, I want to see, maybe he will

21   changes his testimony.

22           MR. KROUSE:  I still don't understand.  But the

23   payment letters, as your Honor will see today when we introduce

24   them, specifically say JP Morgan, Citibank in different payment

25   letters, the U.S. branches, and all of the payments did in fact

K35TSAD1

1    transit the United States and go through New York.  So it's

2    confusing to the jury.

3              THE COURT:  So there's timeframe issue, there's a 403

4    issue, there's a 401 issue.  I sustain on 1334.

5              1335.  There's an authentication question.  What is

6    1335?

7              MR. WEINGARTEN:  This is another document from a prior

8    OFAC head, it's again --

9              THE COURT:  How will it be authenticated?

10             MR. WEINGARTEN:  My understanding is it's part of

11   their website, and I assumed he could give that to me.

12             MR. KROUSE:  Who could give it to him?

13             MR. WEINGARTEN:  The witness.

14             THE COURT:  You're going to seek to have it

15   authenticated through Mr. Kim?

16             MR. WEINGARTEN:  Yes.

17             THE COURT:  Could I see it?

18             What are you going to with this?

19             MR. WEINGARTEN:  It's a statement of a high-ranking --

20             THE COURT:  This document with text deleted, text

21   teated, text deleted was on the website?  Yes or no.

22             MR. WEINGARTEN:  Yes.

23             MR. BISHOP:  We could send a link.

24             (Continued on next page)

25

K35nsad2

1          THE COURT:  The purpose it's being offered for?

2          MR. WEINGARTEN:  Again, high-ranking OFAC official,

3    offering his view about the extent of 204, which we believe is

4    inconsistent with the testimony that was received yesterday.

5          MR. KROUSE:  What part is inconsistent, your Honor, if

6    we can inquire.

7          THE COURT:  What specifically?

8          MR. WEINGARTEN:  The witness stated over and over

9    again in very broad terms that, in essence, doing business with

10   Iran was verboten under the sanctions.  This a specific

11   instance where the OFAC boss offers a view that is inconsistent

12   with that as it relates to a specific case.

13         MR. KROUSE:  Where does it say that?

14         THE COURT:  What language are you going to pull from

15   here, the letter?

16         MR. WEINGARTEN:  You have to read the entire letter.

17   It is a letter to Newcomb.  Newcomb offers his view, and I was

18   hopeful through interrogation to have the witness adopt the

19   letter.

20         MR. KROUSE:  A letter to whom?

21         THE COURT:  It says, "Dear text deleted."  I don't

22   know.

23         MR. WEINGARTEN:  There's privacy concerns.

24         THE COURT:  You edited the document?

25         MR. WEINGARTEN:  No.

K35nsad2

1          THE COURT:  This is exactly as you pulled it from the
2      website?
3          MR. WEINGARTEN:  Yes.
4          MS. KIM:  Mr. Krouse, do you know if this was on the
5      OFAC website?
6          MR. KROUSE:  We weren't provided the benefit of the
7      link.
8          THE COURT:  That wasn't my question.
9          Do you know?
10         MR. KROUSE:  I don't know.  I haven't seen it so I
11     can't speak to it.  Even if it was on the OFAC website, I am
12     still unclear how any of this inconsistent with Mr. Kim's
13     testimony.
14         THE COURT:  What did Mr. Kim say?  That you want to
15     impeach?
16         MR. WEINGARTEN:  I want -- he would read it and he
17     would agree with it.
18         THE COURT:  What is it inconsistent with what he said?
19         There was very loose language all yesterday afternoon
20     about the reach of OFAC and the sanctions.
21         MR. KROUSE:  If there could just be a proffer of what
22     Mr. Kim said and what this letter shows that's different.  The
23     government could respond.
24         THE COURT:  Can you?
25         MR. WEINGARTEN:  Again, there was loose language about

K35nsad2

1    the extent of the reach of OFAC and the sanctions, and this is

2    a specific instance where there's specific language from the

3    boss of OFAC inconsistent with that loose language.

4              THE COURT:  And the inconsistency is what?

5              MR. WEINGARTEN:  The ruling is that if you are in a

6    third country and you receive material, the only time you are

7    in violation of the sanctions is if there is a specific

8    intention to deliver Iran.  That has obvious references to this

9    case, and it's inconsistent with the general picture that was

10   portrayed by it.

11             MR. KROUSE:  Where is this in the document, your

12   Honor?

13             THE COURT:  I don't know.  I am just getting it for

14   the first time.

15             MR. KROUSE:  Your Honor, defense counsel had all night

16   to decide and this whole trial to decide how they were going to

17   use this the document.  If they were going to use it, I think

18   they're required to point to a specific part of it and tell us

19   why it is inconsistent with Mr. Kim's testimony.

20             THE COURT:  You are telling me how you read this

21   letter, Mr. Weingarten.  I can't say I fully understand, but it

22   is an argument that Mr. Sadr can't appropriately be sanctioned,

23   can't appropriately be violating the sanctions, right?

24             MR. WEINGARTEN:  Here's --

25             THE COURT:  Yes?

K35nsad2

1          MR. WEINGARTEN:  Can I answer it with a slightly

2     different twist.  The twist is this.  This is an OFAC document.

3     It is part of the mix.  He's an OFAC employee.  This is from a

4     guy who used to run OFAC.  His ruling is I believe generally

5     inconsistent with the testimony that the government offered

6     yesterday, and obviously we want this document in as a

7     representation of OFAC's position on the subjects in dispute.

8          MR. KROUSE:  I mean, it's in 2003 for one thing.  I

9     still don't know what specifically from this document is

10    inconsistent.  I need to be pointed to that to have a

11    meaningful response on the merits.

12          But May 9, 2003, is before the U-turn was revoked.

13    It's confusing to the jury.  It's outside the time frame.

14    There's been no proffer that the defendant had this in his mind

15    this letter that --

16          THE COURT:  I'm sustaining on this one, 401, 403.

17          That was 35.

18          1347, what are you going to do with this?  This is the

19    time frame issue again?

20          MR. WEINGARTEN:  I'm sorry.  I couldn't -- what's the

21    number?

22          THE COURT:  1347.

23          MR. WEINGARTEN:  OK.

24          THE COURT:  From 2016.

25          MR. WEINGARTEN:  This is relevant in two places.  One,

K35nsad2

1    it is obviously it is an official document issued by the United

2    States Department of Treasury and federal banking agencies.

3    It's relevant both to the enforcement piece, if you would turn

4    to page 3 and 4, and it's relevant to the correspondent bank

5    piece.

6             On the correspondent bank piece, it basically says

7    correspondent banks, correspondent banks do not have an

8    obligation to investigate the customers of their customers,

9    obviously relevant to this case.

10            And on enforcement it lays out with specificity what

11   the enforcement policies are, that well over -- well, I guess

12   the number is 95 percent of the cases OFAC gets are disposed of

13   with nothing except a letter.

14            Then they describe with particularity what happens

15   when there's very serious violations in the minority of cases.

16   So it's substantive evidence offered from government agencies

17   with responsibility -- it could not be more relevant.

18            THE COURT:  But just to spit it out, what are you

19   arguing to the jury from it?  What is the relevance?

20            MR. WEINGARTEN:  That substantively, the customers,

21   the correspondent banks have no responsibility to investigate

22   the customers of their customers, directly relevant to this

23   case and on punishment and --

24            THE COURT:  You just keep saying relevant.  You have

25   to say -- why is that relevant?

K35nsad2

1          MR. WEINGARTEN:  Because that's what Mr. Sadr was.  He

2     was a customer of Hyposwiss, and what this document says is

3     that Hyposwiss had no -- that J.P. Morgan, the quote victim

4     here, had no responsibility to investigate the customer of

5     their customer Hyposwiss.

6          MR. KROUSE:  I just --

7          THE COURT:  Is that a risk of harm argument?

8          MR. WEINGARTEN:  Yes.

9          MR. KROUSE:  There will be two bank witnesses

10    testifying, your Honor.  One we expect to go on today, maybe

11    both.

12         THE COURT:  Overruled.  Because on risk of harm it is

13    potentially relevant.

14         MR. KROUSE:  Your Honor, the government agrees

15    possibly that the defense could ask the question of Mr. Kim

16    about isn't it true that OFAC resolves most cases, 95 percent

17    of cases, with administrative measures or something like that.

18    I think that is a fair point to draw out.

19         Our objection to the document, though, is, as provided

20    to us, it's a four-page document that as a lot of irrelevant

21    conduct -- or content, excuse me.  I believe what

22    Mr. Weingarten is pointing to is just the bottom of page 3.

23    The question I think is fair.  I think they can ask the

24    question about it.

25         THE COURT:  You didn't make any other objection last

K35nsad2

1    night so overruled.

2              MR. KROUSE:  Your Honor --

3              THE COURT:  Moving on, 1349.

4              MR. KROUSE:  Your Honor, I believe we did make

5    objections in the reply, but in response to -- just having the

6    documents without knowing what they're going to do with them,

7    we objected on the ground that we thought was the strongest.

8              So we did file a reply last night.  This document, we

9    are saying based on Mr. Weingarten's proffer and based on what

10   they told us, just so the Court is aware, all we got was a list

11   of documents, and the documents themselves.  We didn't know

12   what they were using them for other than having to guess.

13             THE COURT:  You need to get to a point because I have

14   a jury waiting and I've already ruled.

15             MR. KROUSE:  Yes.  Your Honor, we are just asking for

16   reconsideration on the document itself.

17             THE COURT:  Overruled.

18             1349, is that withdrawn?

19             It wasn't indicated.

20             MR. WEINGARTEN:  This is an example of a license.  He

21   talked about licenses.

22             THE COURT:  1349?

23             MR. WEINGARTEN:  Yes.

24             MR. KROUSE:  Your Honor, can we ask that 1347 be

25   redacted for purposes of today.  We don't have an objection to

K35nsad2

1      admitting it.

2              THE COURT:  If you want to discuss something after,

3      but I've ruled.

4              MR. KROUSE:  All right.

5              THE COURT:  1349.

6              MR. WEINGARTEN:  It is an example of a license.  It is

7      to support humanitarian activity.  Just again, being completely

8      candid, it relates to the earthquake in Iran.

9              THE COURT:  What is the relevance?

10             MR. WEINGARTEN:  It is a license, and he did talk

11     about licenses.

12             THE COURT:  What are you going to argue to the jury

13     from it?  I don't know how else to ask for relevance.

14             MR. WEINGARTEN:  The only way I would argue to a jury

15     is if there's derisking evidence relating to the earthquake.

16             THE COURT:  If there's derisking --

17             MR. WEINGARTEN:  In my opening I made reference to it.

18             THE COURT:  It doesn't get it in, because that would

19     be cart before the horse.

20             MR. WEINGARTEN:  OK.

21             THE COURT:  I am not hearing a stated relevance -- I

22     am not saying it can't come in, but for this witness and for --

23             MR. WEINGARTEN:  But I mean -- well, never mind.

24             THE COURT:  Sustained.

25             1352 and 121.  The proffered relevance is --

K35nsad2

1          MR. WEINGARTEN:  I don't know why.  I don't have it.

2          THE COURT:  -- risk of harm.  Risk of harm to the

3    banks because they rebut the contention from Mr. Kim that

4    sanction violations are subject to strict liability, and then I

5    think what we're left with is the party admission point, is

6    that right?

7          All right.  I'm overruling the objection --

8          MR. KROUSE:  Can I be heard.

9          THE COURT:  You may.

10          MR. KROUSE:  Your Honor, this implicates a completely

11    different rule than the sanctions.  This is related to SDNs.

12    This is called the 50/50 rule.  It would be confusing to the

13    jury to have this other law -- it's for the same reasons -- it

14    is not relevant for the same reasons that the other laws are.

15    I realize that a jury is waiting, but with respect to this,

16    it's the same confusion concern.  It's 403.  It has nothing to

17    do with this case.  It's not relevant.

18          THE COURT:  So the argument, if you'll take on the

19    specific argument, is it accurate that Mr. Kim argued that

20    sanctions violations are subject to strict liability?

21          MR. HEBERLIG:  Yes.

22          MR. KROUSE:  Yes.

23          THE COURT:  That pertains to risk of harm to the

24    victim banks, correct?

25          MR. KROUSE:  Yes.  But this has to do with blocked

K35nsad2

1   property.  It is a different area.  So it's not actually

2   addressing Mr. Kim's testimony.  It's just introducing a

3   completely different rule and regulation with respect to SDNs.

4   There is no allegation that the violation in this case has

5   anything to do with SDNs.  The allegation is that it violates

6   the --

7            THE COURT:  Why did he testify about SDNs?

8            MR. KROUSE:  Just to give the overall explanation of

9   what SDNs are.  And licensing --

10            THE COURT:  It's very difficult to respond to the

11   government saying X, Y, and Z have nothing to do with this case

12   after X, Y, and Z were admitted through their witness on

13   direct.

14            MR. KROUSE:  That was relevant --

15            THE COURT:  What matters to the government's case is

16   relevant, but not what the matters to the defense.

17            MR. KROUSE:  I don't think that's fair.

18            THE COURT:  You just said that SDNs are irrelevant,

19   but Mr. Kim testified on SDNs.

20            MR. KROUSE:  I am saying this rule with respect to

21   SDNs, this 50/50 rule is irrelevant and confusing to the jury

22   because it has nothing do with the conduct that is alleged in

23   the case.

24            SDNs in general and the publication of what SDNs are

25   is relevant to the defendant's state of mind about the

K35nsad2

1    sanctions regime.  On the point of 50/50 rule, though, this is

2    a completely different area and confusing to the jury.

3              THE COURT:  Did he delineate with respect to risk of

4    harm to the banks between the 50/50 rule and the rules relevant

5    here?  No.

6              MR. KROUSE:  I don't know what's in this document that

7    is contrary to Mr. Kim's argument.  So, 1352, if the defense

8    could point out what is inconsistent about this with Mr. Kim's

9    testimony.

10             THE COURT:  Go ahead, Mr. Heberlig.

11             MR. HEBERLIG:  What Mr. Kim testified is strict

12   liability for banks, and this goes directly to what the banks'

13   obligation are.  OFAC says essentially -- I will boil it town

14   for time purposes.  If the banks were innocent, didn't know of

15   any Iranian connection, then OFAC wouldn't pursue an

16   enforcement action against then.  There is even less of an

17   obligation in our case because there's no allegation of SDN.

18             THE COURT:  All right.  It's arguably impeachment

19   witnesses.  Sometimes there are arguments about -- that's why

20   we have redirect, but in light of the testimony the objection

21   is overruled.

22             Next is 1360.

23             MR. KROUSE:  Your Honor, with respect to -- if the

24   Court's ruling for 1352.

25             THE COURT:  1352 and 121.  Thank you.

K35nsad2

1              MR. KROUSE:  Understood.

2              THE COURT:  I think we can group 1361, 1362.  This I

3    don't understand.

4              MR. WEINGARTEN:  It's simple, and these are the big

5    documents with the SDNs.

6              THE COURT:  Yes.

7              MR. WEINGARTEN:  Those are the numbers.  The

8    government offered evidence that in 2012 EN Bank, my client's

9    father's bank that he founded was put on the SDN list.  We want

10   to show it was not because of specific misconduct by EN Bank,

11   it was because at that time all the financial institutions in

12   Iran were put on the SDN list, and that document reflects that.

13             What's also true is that EN was taken off the SDN list

14   in 2016.  We want to show that.  For the sake of completeness,

15   Trump put them back on in 2018.  They introduced evidence about

16   EN Bank being put on sanctions.  We want to tell the jury.

17             MR. KROUSE:  It goes to the state of mind of Mr. Sadr

18   that his family companies within the Stratus Holding Group were

19   placed in the SDN list so understanding what sanctions are, but

20   the government has no objection to Mr. Weingarten asking the

21   witness are you aware that EN Bank was put on the SDN list

22   because all banks in Iran were on that date.

23             That's not an objectionable question.  The government

24   is fine with that.  Now what happened after the JCPOA I think

25   is out based on the Court's prior ruling.  If the only point is

K35nsad2

1     that the defense is trying to bring out is that EN Bank was

2     designated along with all other Iranian banks the government

3     has no objection to it.  Specifically what they are seeking to

4     introduce are 163-page, 302-page, 360-page documents with

5     irrelevant stuff.

6              THE COURT:  Mr. Weingarten, can you get what you need

7     with the question?

8              MR. WEINGARTEN:  I hope so.  I think there is one more

9     point.  Not just that all the other banks were placed on the

10    list, but there was no specific allegation of wrongdoing by EN

11    Bank.  Maybe he needs the document, maybe he doesn't.  I have

12    no desire for the jury to have 500 pages of SDNs.

13             THE COURT:  You can ask the question.

14             The document is out.

15             Ask to revisit if something happens unexpected.

16             MR. WEINGARTEN:  OK.  Yes.

17             THE COURT:  I will hear that.  OK.

18             1825 is not discussed again.

19             MR. WEINGARTEN:  Which one is that, your Honor.

20             THE COURT:  Correspondent banking services?

21             MR. WEINGARTEN:  Mr. Heberlig.

22             THE COURT:  I don't think you raised it in your --

23             MR. WEINGARTEN:  I don't think that was objected.

24             THE COURT:  It was objected to, but you didn't

25    respond.

K35nsad2

1              MR. WEINGARTEN:  OK.  It is a banking thing.

2    Mr. Heberlig will have the banking witness.

3              THE COURT:  You didn't respond, correct?

4              MR. KROUSE:  There was no response on this.

5              THE COURT:  All right.  So I assume with the lack of

6    response last night that this was withdrawn.

7              So it's withdrawn.

8              MR. WEINGARTEN:  That's fine.

9              THE COURT:  608, 609, 616.

10             MR. WEINGARTEN:  Withdrawn.

11             THE COURT:  OK.  And that's it.  All right.  Get the

12   jury.

13             Just a second, Mr. Krouse, did you want to make a

14   preliminary inquiry of Mr. Kim as discussed?

15             MR. KROUSE:  Yes, your Honor, please.  Thank you.

16             THE COURT:  All right.

17             (Continued on next page)

18

19

20

21

22

23

24

25

K35nsad2                            Kim - Direct

1              (Jury present)

2              THE COURT:  Thank you so much, members of the jury.

3              You were all here completely on time and the lawyers

4    and I tried to get through the issues that would arise now that

5    might cause us to have sidebars, and we couldn't quite get it

6    done by 9:30.

7              I appreciate your patience.  I figured you would be

8    more comfortable waiting for that in the jury room than here.

9    I hate to make you wait and try to avoid that as much as

10   possible.  Thank you for your patience.  I think what we did

11   while you were waiting will expedite the morning, and we are

12   moving well.  I said I will have some updates on timing, but

13   things are moving more quickly than had been anticipated so we

14   are in good shape.  More on that later today.

15             With that, Mr. Krouse, you are going to finish your

16   direct?

17             MR. KROUSE:  Ms. Kim.

18    TED KIM, resumed.

19             THE COURT:  I will ask Mr. Scott to, since it is a new

20   day, readminister the both to Mr. Kim.

21             (Witness sworn)

22   DIRECT EXAMINATION

23   BY MS. KIM:

24             THE COURT:  Thank you.

25             Go ahead, Ms. Kim.

1           MS. KIM:  Thank you, your Honor.

2    Q.  Mr. Kim, you testified yesterday about the U.S.

3    government's comprehensive Iran sanctions program implemented

4    and enforced by OFAC --

5    A.  Yes.

6    Q.  -- is that right?

7    A.  Yes.

8    Q.  And you testified that after 2008 the U.S. government

9    imposed a comprehensive ban on the export of all financial

10   transactions to Iran, is that right?

11   A.  Yes.

12   Q.  Or for the benefit of entities in Iran or for the

13   government of Iran?

14   A.  That's correct.

15   Q.  Is it fair to say that this is the baseline sanctions

16   regime in force today?  Sorry.  Is it fair to say that this is

17   the baseline sanctions regime that has been in force since 1995

18   to the present day?

19   A.  I don't understand your question.

20   Q.  OK.  So, in terms of the comprehensive ban on the export of

21   all financial services, is it fair to say that that has been

22   the baseline of the Iran sanctions program from 1995 forward?

23   A.  That's correct.  From 1995, from the beginning, until to

24   date exportation of financial services to Iran has been

25   prohibited.

1          MR. WEINGARTEN:  I respectfully, object, your Honor.

2     This is not what the instruction was.

3          MS. KIM:  I'm getting to the question.

4          THE COURT:  Next question.

5     BY MS. KIM:

6     Q.  We talked about some of the foundational documents for the

7     Iran sanctions program.  Have additional laws and regulations

8     been added that have targeted specific entities, industries,

9     and economic sectors in Iran?

10    A.  Yes.

11    Q.  And none of these additional laws and regulations have

12    altered the baseline that all?

13         MR. WEINGARTEN:  Objection.

14    Q.  Financial services from the U.S. to Iran --

15         THE COURT:  Sustained.

16    Q.  And none of these additional laws and regulations have

17    altered --

18         THE COURT:  Sustained.

19         I think we've covered what was discussed, unless

20    I'm --

21         MS. KIM:  That's fine, your Honor.

22         THE COURT:  Cross-examination, Mr. Weingarten.

23    CROSS-EXAMINATION

24    BY MR. WEINGARTEN:

25    Q.  Good morning, Mr. Kim.

1    A.  Good morning.

2    Q.  My name is Reid Weingarten.  I represent Mr. Sadr.  We

3    actually met outside yesterday, did we not?

4    A.  Yes, we did.

5    Q.  OK.  So just a little bit about your background.

6    A.  Uh-huh.

7    Q.  So did I understand you correctly to say that you have two

8    law degrees?

9    A.  Yes.

10   Q.  One in the States and one in South Korea?

11   A.  Yes.

12   Q.  You have had a variety of jobs.  Were you actually inside

13   counsel for Daewoo, am I saying that correctly?

14   A.  That's correct.

15   Q.  That is a huge South Korean company?

16   A.  Yes.

17   Q.  That does many different things?

18   A.  Yes.

19   Q.  Including selling things to Iran, correct?

20   A.  I'm --

21           MS. KIM:  Objection, your Honor.

22   A.  All I can say is possibly.

23           THE COURT:  I'm sorry.

24           Let me just read the question.

25   Q.  Probably, correct?

1          THE COURT:  Just a moment.  There's an objection.

2          MR. WEINGARTEN:  I'm sorry.

3          MS. KIM:  Can we have a time frame on the question.

4          THE COURT:  All right.

5    BY MR. WEINGARTEN:

6    Q.  I am just getting a general understanding of the sanctions

7    here.  It is true, is it not, that South Korean companies do a

8    tremendous amount of business with Iran, correct?

9          MS. KIM:  Objection, your Honor.  Relevance.

10          THE COURT:  Sustained.

11   Q.  So you were general counsel, Daewoo, correct?  Inside

12   counsel?

13   A.  Yeah.

14          THE COURT:  What's the time frame?  When were you --

15          THE WITNESS:  From 1994 through 19 -- through 2001.

16          THE COURT:  OK.

17   BY MR. WEINGARTEN:

18   Q.  Then you were in private practice in the States?

19   A.  Yes.

20   Q.  And you have been at OFAC for how long?

21   A.  Six years.

22   Q.  Is there an OFAC section devoted entirely to Iran?

23   A.  In my division, no.

24   Q.  OK.  Are there employees of OFAC who work exclusively on

25   Iran?

K35nsad2                        Kim - Cross

1    A.   There are, yeah.  Yes.

2    Q.   OK.  Are you one of them?

3    A.   Yes and no.  Can I explain?

4    Q.   Sure, of course.

5    A.   Because most of our -- my division is enforcement division

6    so all the --

7    Q.   I missed that.  I'm sorry.

8    A.   My division is called enforcement division.

9    Q.   OK.

10   A.   In my division, most of the work is related to Iran

11   sanctions.  But in my division, everybody is a generalist.

12   Q.   OK.

13   A.   But actually most of our work is related to Iran.

14   Q.   OK.  So what you're --

15   A.   So we had to constantly work with those persons in other

16   divisions whose mostly specialized in the Iran program, so we

17   worked together.  So it is really difficult to say somebody is

18   only devoted to the Iran program.  We are not officially Iran

19   expert enforcement officer --

20   Q.   OK?

21   A.   -- but most of our work is Iran.

22   Q.   OK.  In this case, was there an allegation that came to

23   OFAC's attention relating to Mr. Sadr or this particular case?

24   A.   Could you --

25   Q.   In your work as enforcement --

K35nsad2                          Kim - Cross

1    A.  Uh-huh.

2    Q.  -- relating to Iran --

3    A.  Uh-huh.

4    Q.  -- did it come to your attention that there was an

5    allegation made relating to anything having to do with this

6    case?

7    A.  Not until I got instruction to get involved in this.

8    Q.  So, to your knowledge, this matter was never investigated

9    by OFAC, correct?

10            MS. KIM:  Objection, your Honor.

11            THE COURT:  Overruled.

12   A.  In my knowledge, no.

13   Q.  OK.  To your knowledge, was there ever a referral made by

14   J.P. Morgan to OFAC relating to this case?

15   A.  In my knowledge, no.

16   Q.  OK.  How long have you been involved in this case?

17   A.  Since --

18            MS. KIM:  Objection, your Honor.

19            What does "involved in this case" mean?

20            MR. WEINGARTEN:  Working with the prosecutors.

21            MS. KIM:  Objection, your Honor, "working with the

22   prosecutors."

23            THE COURT:  Overruled.

24   A.  Yes.  I started to work with the prosecutors from end of

25   February, like 12 months.

1   Q.  How many meetings have you had with them?

2   A.  Meetings, six or seven meetings.

3   Q.  OK.  During that period of time, it never came to your

4   attention that OFAC had received a referral from J.P. Morgan

5   that has to do with this case, is that fair?

6   A.  I cannot say that.

7   Q.  Well, is it true or is it not true?

8   A.  I don't know.

9   Q.  So you have no knowledge that that occurred, right?  No one

10  has brought that to your attention?

11  A.  Not my attention.

12  Q.  Well, to OFAC's attention.

13  A.  That I don't know.

14  Q.  So the answer is no?

15  A.  That I don't know.

16  Q.  So just to start with the general contours of the

17  sanctions, you have testified that what is in play is the

18  relationship between the United States and Iran, correct?

19  A.  Yes.

20  Q.  And the reason I asked you about Daewoo, I want to make it

21  clear that other countries, like South Korea can trade with

22  Iran back and forth and that happens, isn't that true?

23          MS. KIM:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.  Well, isn't it true, for example, that the sanctions don't

K35nsad2                              Kim - Cross

1      include Iranians who live in Canada and do business with the

2      United States?

3      A.   That is not true.

4      Q.   The Iranians in Canada can't do business with the United

5      States?

6      A.   It depends.

7      Q.   Well, isn't it true that an Iranian businessman who works

8      outside of Iran and does business with the rest of the world

9      and none of the proceeds make it to Iran, is exempted from

10     these sanctions?

11     A.   I'm sorry.  It's difficult to understand your question.

12     Q.   Well --

13     A.   It's too long.  I need to draw a picture to understand.

14              THE WITNESS:  Can I do that?

15              THE COURT:  Sure.

16     A.   Could you -- because I usually to understand the scenario.

17     I this is my habit.

18     Q.   Fair enough.

19              MR. WEINGARTEN:  With the Court's permission, I will

20     withdraw that question and get to it after I do a few other

21     things.

22              THE COURT:  That's fine.

23     BY MR. WEINGARTEN:

24     Q.   Now, yesterday, you testified that basically these

25     sanctions are a foreign policy tool for the president.  Did I

K35nsad2                        Kim - Cross

1   get that correctly?

2   A.  Yes.

3   Q.  So, in other words, if the president of the United States

4   wants a particular country to conform to certain foreign policy

5   objectives, he can impose sanctions?

6   A.  Yes.

7   Q.  And that happens, correct?

8   A.  Yes.

9   Q.  And the sanctions sometimes change?

10  A.  Yes.

11  Q.  For the same country?

12  A.  Yes.

13  Q.  Sometimes they're harsh and then the country changes its

14  attitude and they become gentle, fair?

15  A.  Yes.

16  Q.  And sometimes they are withdrawn?

17  A.  Yes.

18  Q.  And isn't it true that the sanctions against Iran have been

19  in place in a variety of forms from Jimmy Carter forward?

20  A.  No.

21  Q.  Haven't there been sanctions against Iran for 40 years.

22  A.  No.  Shall I explain?

23  Q.  Sure.

24  A.  There was for a brief period, from 1979 to 1981, and that

25  program was related to another incident, and then it was almost

K35nsad2                        Kim - Cross

1    resolved.  The current Iran program is completely separate from

2    the old one.  So the current one, when we talk about Iran

3    program, we need to think about the program starting from 1995.

4    Q.  I am not talking about the current program.  I'm talking

5    about United States sanction against Iran.  Haven't they been

6    in place in a variety of forums for 40 years?

7    A.  I don't know.  That is not my --

8    Q.  OK.  Fair enough.  Isn't it true that the sanctions against

9    Iran have changed dramatically depending upon who the president

10   is?

11   A.  I wouldn't say so.

12   Q.  You would or would not?

13   A.  Wouldn't.

14   Q.  OK.  Isn't it true that under President Reagan there were

15   sanctions against -- there was a ban on imports, true?

16   A.  Yes.

17   Q.  Isn't it true that Bill Clinton changed those to exports or

18   included imports with exports and made an entire trade embargo?

19   A.  That's true.

20   Q.  Isn't it also true that President Obama changed the focus

21   of the sanctions from these gross weapons against Iran to

22   specific --

23              MS. KIM:  Objection, your Honor.

24   Q.  -- targeted objectives --

25              THE COURT:  Just a moment.

1          Overruled.

2     Q.  Isn't it true that President Obama's focus was on getting

3     the bad guys, getting the government of Iran, the national

4     banks of Iran, the Islamic Revolutionary Guard Corps and the

5     SDNs, isn't it true that that is what he focused on?

6               MS. KIM:  Objection.

7               THE COURT:  Overruled.

8     A.  No.

9     Q.  You disagree with that?

10    A.  I disagree --

11    Q.  OK.

12    A.  -- with what --

13    Q.  I'm sorry.

14    A.  I disagree to what you described.

15    Q.  OK.  That's fine.  Isn't it true that the sanctions law,

16    that sometimes the same language can be used for different

17    countries for different sanctions programs using the same

18    words, and the words can have different meanings depending on

19    the context of the sanctions?

20              MS. KIM:  Objection, your Honor.  Form.

21              THE COURT:  Yes.  I will ask you to rephrase, please.

22              MR. WEINGARTEN:  OK.

23    BY MR. WEINGARTEN:

24    Q.  Isn't it true that there are sanctions programs I think you

25    said yesterday against 30 countries?

1   A.  Uh-huh.

2   Q.  Isn't it true you can find the same language in the

3   different sanctions programs?

4   A.  Uh-huh.

5   Q.  And isn't it true that OFAC has said to the world that

6   using the same words --

7            MS. KIM:  Objection, your Honor.

8   Q.  -- can mean different things depending on the context and

9   the particular sanctions agenda?

10           THE COURT:  One word, grounds?

11           MS. KIM:  Relevance.

12           MR. WEINGARTEN:  Confusion.

13           MS. KIM:  It goes to the law.

14           THE COURT:  Overruled.

15   Q.  Isn't that true, sir?

16   A.  Not exactly.  It's true it can be interpreted differently,

17   but not in a substantial way, yeah.

18   Q.  Can't the same words mean different things depending upon

19   the context?

20           MS. KIM:  Asked and answered, your Honor.

21           THE COURT:  Sustained.

22   Q.  I would like to refresh the --

23           THE COURT:  No time for that.

24           MR. WEINGARTEN:  OK.  I'm sorry.

25           THE COURT:  I thought you were explaining your -- go

1     ahead.

2                Next question.

3                MR. WEINGARTEN:  I would like to put up Government

4     Exhibit 623 just for the witness.

5                THE COURT:  I misunderstood.  Thank you, you may.

6                MS. KIM:  Objection, your Honor.

7                He hasn't said that he doesn't remember something.

8     Q.  Do you know, sir, whether or not there is a reg in OFAC --

9                MS. KIM:  Objection, your Honor.

10               THE COURT:  Move on.  We'll come back to it.

11               MR. WEINGARTEN:  OK.

12    BY MR. WEINGARTEN:

13    Q.  So I believe you testified yesterday and perhaps this

14    morning as well that there are a number of statutes, executive

15    orders and regs applying to the Iranian sanctions, correct?

16    A.  That's correct.

17    Q.  OK.  Just so we're clear laws passed by Congress, correct?

18    A.  Uh-huh.

19    Q.  Would that be what you are talking about?

20    A.  Including the laws passed by Congress.

21    Q.  And the executive order would be when the president of

22    United States declares an emergency and says why, correct?

23    A.  I'm sorry.  Could you --

24    Q.  The executive order would be the president's declaration

25    that there is an emergency and he explains why, correct?

1    A.   Yes.

2    Q.   Then OFAC will issue regulations, correct?

3    A.   Yes.

4    Q.   And often the regulations are abundant, are very

5    complicated and very long, fair?

6    A.   No.

7    Q.   They're not?

8    A.   Not to me.

9    Q.   So they're brief?

10   A.   They're not unusual.

11   Q.   And they're simple to understand?  Anybody who reads them

12   would understand them in two seconds?  Is that what you are

13   saying?

14          MS. KIM:   Objection, your Honor.  Mischaracterizes.

15          THE COURT:   Overruled.

16   A.   Anybody who is involved in international business would

17   understand.

18   Q.   Isn't it true that there is a whole -- you are a lawyer,

19   right?

20   A.   Yeah.

21   Q.   Isn't there a whole branch of the bar of lawyers who do

22   nothing but interpret your regs at OFAC?

23   A.   Yes.

24   Q.   So they're so simple that there just emerged in the world a

25   discipline of lawyers because it was easy to understand, is

K35nsad2                          Kim - Cross

1   that your testimony?

2   A.  Yes.  What I'm saying is it's not unusual.  It is not

3   unusually difficult to understand what the sanctions rules are

4   demanding.

5   Q.  OK.  Isn't it true that the regs change all the time or

6   frequently?

7   A.  No.

8   Q.  No.  OK.  Let's talk about Persian rugs.  Everybody knows

9   what a Persian rug is, right?

10  A.  Yes.

11  Q.  Isn't it true that Persian rugs were legal in terms of

12  coming into the United States until 2010, isn't that true?

13  A.  The carpet case is not really a serious thing to me.  So I

14  know it was allowed, prohibited, allowed, prohibited.  It

15  changed a couple of times.

16  Q.  So let's be clear.  So it was legal until 2010; then it

17  became illegal?

18           MS. KIM:  Objection, your Honor.  Relevance.

19           THE COURT:  Overruled.

20  Q.  Isn't it true that in 2016 it became legal again and then

21  in 2018 it became illegal?  So isn't it true in eight years it

22  changed four times?

23           THE COURT:  You'll calm down and break out the

24  question.

25           MR. WEINGARTEN:  OK.

K35nsad2                          Kim - Cross

1    BY MR. WEINGARTEN:

2    Q.  So let's do it one step at a time.

3    A.  Yes.

4    Q.  Up until 2010, if I'm sitting here in New York City and I

5    want to buy a Persian rug from Tehran, I can do that, right?

6    A.  I'm sorry.  I don't follow the carpet rules because I've

7    never -- I did a couple of cases involving carpets, but it's

8    not -- I don't exactly remember the dates and years, but always

9    I have to go to the regs, if it was not, if it was yes, but it

10   is not, not like important -- very important matter for overall

11   sanctions enforcement.

12   Q.  So you will agree with me that it changed four times in

13   eight years, correct?

14   A.  I'm sorry.  I don't know whether it's four times, but it

15   changed.

16   Q.  OK.  What about the subject of foreign subs of U.S.

17   corporations?

18   A.  Uh-huh.

19   Q.  Isn't it true that that also changed four times in terms of

20   whether or not they were subject to the sanctions?

21   A.  Let me count.

22           THE COURT:  You are asking about foreign --

23           THE WITNESS:  Yeah.

24           THE COURT:  Just a moment.  You are asking about

25   foreign subsidiaries of U.S. companies; is that the question?

1           MR. WEINGARTEN:  Yes.

2           THE COURT:  Go ahead.

3    A.  It was outside of the definition and then put it back, put

4    it in, and then it went out and put it in.  So isn't it two

5    times?  But --

6    Q.  Isn't it true that from '97 until '12 they were outside the

7    program; from '12 to '15, they were inside the program; and

8    then from '18 on -- so just three times, I misspoke, not four,

9    but three.

10   A.  So it was -- I wouldn't describe it as inside the program,

11   outside the program.  I would say U.S. corporations, foreign

12   subsidiaries was not defined as part of U.S. person.

13   Q.  OK.

14   A.  But even if -- it's not -- you know, something could be in

15   the program while they were outside of the U.S. person's

16   definition.

17   Q.  I think we are saying the same thing.  That's fine.  I will

18   move on.  These changes take place at the political whim of the

19   president, isn't that true?

20           MS. KIM:  Objection, your Honor.

21           Lack of foundation.

22           THE COURT:  Sustained.

23   Q.  These programs change because the president says they are

24   changing or the executive branch?

25           MS. KIM:  Objection.

1    A.  Yes.

2             MS. KIM:  Can he explain what he means by "program,"

3    "regulations."

4             MR. WEINGARTEN:  Let's take a simple one, the Persian

5    carpets.  The Persian carpets changed four times because the

6    executive branch wanted them to change four times, correct?

7    A.  Yes.

8    Q.  Was there any say in Congress about any of those changes?

9    A.  I don't know.

10   Q.  Was there any notice given to anybody, or was it just the

11   executive branch said, boom, and it happened?

12   A.  Notice of?  Notice of what?

13   Q.  I'll ask it this way.  Does OFAC have to give notice to

14   anybody when they make these changes, or do they just do it?

15   A.  Oh, are you asking how OFAC's involved in the

16   decision-making process?

17   Q.  Yes.

18   A.  Yes.  We are involved --

19             MS. KIM:  Your Honor, can the defense specify if he's

20   talking about Persian carpets or about the sanctions program.

21             THE COURT:  Sustained.

22   BY MR. WEINGARTEN:

23   Q.  Let me ask this:  Isn't it true that OFAC can change an

24   interpretation of a rule without giving any notice to the

25   public?

1   A.  We do.

2   Q.  I'm sorry?

3   A.  OFAC gives out notice to the public when we change the

4   interpretation.

5   Q.  But you don't have to?

6   A.  I don't know, but what I know is we do.

7           MR. WEINGARTEN:  1339, just for the witness to take a

8   look.

9           MS. KIM:  Objection, your Honor.

10          THE COURT:  Sustained.

11  BY MR. WEINGARTEN:

12  Q.  Isn't it true, sir, that OFAC can change its previously

13  stated nonpublished interpretation or opinion without first

14  giving public notice, isn't that true, sir?

15          MS. KIM:  Objection.  Asked and answered.

16          THE COURT:  Overruled.

17  A.  I'm sorry.  I didn't get the question correctly.  So --

18  Q.  All right.  I'm just ask it again, and if you get it,

19  great; if you don't, I'm fine with that, too.

20  A.  Yes.

21  Q.  Isn't it true that OFAC can change its previously stated

22  nonpublished interpretation or opinion without first giving

23  public notice?

24  A.  Yes.

25  Q.  So the decision to give public notice is up to OFAC?

1    A.  I'm sorry.  If you ask like that, then I don't get it.  Can

2    you repeat that last question?

3    Q.  That's fine.  I'll move on.  We have a lot to cover.

4         You gave some indication yesterday about the process,

5    about how a regulation gets established.  Just a sum, I think,

6    of your testimony, there is a statute in place, there is a law

7    in place that says if the president of the United States sees

8    an emergency, he can declare it, and then he can impose

9    sanctions, correct?

10   A.  That's correct.

11   Q.  OK.  And regs can follow from that executive order from

12   OFAC imposing what is sanctioned and what is not sanctioned,

13   fair?

14   A.  Yes, that's fair.

15   Q.  Then OFAC will also issue guidance to the world as to what

16   these sanctions may or may not mean, correct?

17   A.  That's correct.

18   Q.  Then OFAC also issues something called frequently asked

19   questions so that people who have questions can write in and

20   then you put them on your website so the whole world can see

21   what's going on, correct?

22   A.  That's correct.

23   Q.  That's what the lawyers who work in this area work with,

24   all those documents that we just talked about, correct?

25   A.  Probably.

1            MS. KIM:  Objection, your Honor.

2            MR. WEINGARTEN:  All right.

3            THE COURT:  Just a minute.

4            You withdraw the question?

5            MR. WEINGARTEN:  Yes.  I withdraw the question.

6            THE COURT:  The question is withdrawn.

7    BY MR. WEINGARTEN:

8    Q.  So when it comes to the OFAC regs that you all put out,

9    they have nothing to do with Congress, right?  In fact --

10           MS. KIM:  Objection.

11   Q.  -- Congress doesn't pass on them; there are no hearings

12   about them?

13           THE COURT:  Just a second.

14           MS. KIM:  Objection to form.

15           Compound question.

16           THE COURT:  Let's break them apart.

17           MR. WEINGARTEN:  OK.

18   BY MR. WEINGARTEN:

19   Q.  When OFAC decides what regs to pass, they're not subject to

20   Congressional hearings; OFAC issues those regulations, correct?

21   A.  That's correct.

22   Q.  And there's no vote on the Hill whether or not those

23   regulations are appropriate or not appropriate, correct?

24   A.  Correct.

25   Q.  So if the President of the United States wakes up today and

1   says, you know, I'm angry at Turkey --

2            MS. KIM:  Objection, your Honor.

3            MR. WEINGARTEN:  I am following with the hypothetical.

4            THE COURT:  Sustained.

5   BY MR. WEINGARTEN:

6   Q.  Just so we're sort of grounded in the enforcement work that

7   you do, OK, it is true, is it not, that U.S. dollars are not

8   prohibited from going into Iran?

9   A.  It depends.  But U.S. dollars can go into Iran without --

10  Q.  OK.

11  A.  Yes.

12  Q.  It is also true to your knowledge that virtually every

13  international bank in the world has U.S. dollars?

14  A.  Yes.

15  Q.  And OFAC does not regulate those U.S. dollars that are in

16  foreign banks, isn't that correct?

17  A.  It depends.  As long as that money is not involved in

18  prohibited transaction, it's fine.

19  Q.  OK.  And for example, in Hong Kong --

20  A.  Uh-huh.

21  Q.  -- there are many banks in Hong Kong that clear dollar

22  transactions, aren't there?

23  A.  What do you mean?  The Hong Kong banks clearing as U.S.

24  banks clearing --

25  Q.  Yes.

1   A.  -- dollars?

2   Q.  Yes.

3   A.  They clear, yes.

4   Q.  Yes.  I mean, there are clearing banks in Hong Kong over

5   which you have no responsibility, isn't that true?

6   A.  Yes.  It's true.

7   Q.  OK.  And an American Iranian can walk down the street and

8   open an account in Wells Fargo and that doesn't violate the

9   sanctions, isn't that true?

10  A.  Excuse me.  Could you repeat?

11  Q.  An Iranian American can open an account in Wells Fargo here

12  in New York, and that implicates no sanction, isn't that true?

13  A.  That's true.

14  Q.  Isn't it also true that Iranians who are working outside of

15  Iran --

16  A.  Uh-huh.

17  Q.  -- doing business with Germany or Greece involving no U.S.

18  financial institution are not violating any sanction either?

19  A.  That's not our business.

20  Q.  That's not your position?  That's not your business?

21  A.  No.  What I'm saying is they can do the business you

22  described without getting subject to U.S. sanctions.

23  Q.  OK.  So let's say an Iranian was in Switzerland and he was

24  building houses in Venezuela and no money went back to Iran.

25  That wouldn't be your business, would it?

1           MS. KIM:  Objection.

2           THE COURT:  Sustained.

3           MR. WEINGARTEN:  With the Court's indulgence.  Sorry.

4    BY MR. WEINGARTEN:

5    Q.  Let's look at the PowerPoint that you talked about

6    yesterday?

7    A.  Yes.

8           MR. WEINGARTEN:  Let's turn to GX 601, page 2.  No,

9    let's go back to page 1, if we may.

10   Q.  So this is the front page.  "OFAC administers and enforces

11   economic and trade sanctions based on U.S. foreign policy and

12   national security goals."

13          That's what you've testified before, correct?  And

14   that's true?

15   A.  Yes.

16   Q.  The whole point is to impose foreign policy restrictions on

17   countries that the president wants to punish, fair?

18          MS. KIM:  Objection, your Honor.

19          THE COURT:  Just a moment.  Overruled.

20   A.  Yes.

21   Q.  OK.  No. 2, so we are in agreement that there are many,

22   many more statutes and orders and regs --

23   A.  Uh-huh.

24   Q.  -- involving Iran than are represented on GX 2, correct?

25   A.  That's correct.

1    Q.  OK.  Let's turn to 3.

2         OK.  And now let's turn to 4.

3         So you say, "Prohibits virtually all imports and

4    exports to and from Iran."

5         Again, we are not talking about South Korea; we are

6    talking about the United States, correct?

7    A.  Can you repeat the question.

8    Q.  It prohibits virtually all imports and exports to and from

9    Iran to the United States.  We are not talking about Turkey, we

10   are not talking about Switzerland, we are not talking about

11   Venezuela, we are talking about the United States.  Correct?

12   A.  Not correct.

13   Q.  So are you saying that Iran can't import or export anything

14   to anybody?

15   A.  It depends, because the imports and exports here includes

16   direct or indirect and indirect exportation importation to.  So

17   if the goods go to Turkey and eventually come to the United

18   States, as long as Iran's --

19   Q.  OK.  Let's go the other way.  Let's see --

20        MS. KIM:  Your Honor, can he finish answering the

21   question.

22        THE COURT:  You may.  You were cut off.

23        Go ahead.  Finish your answer.

24   A.  OK.  Importation exportation, if the exportation from U.S.

25   goes to Taiwan, but it was intended to Iran eventually, then

K35nsad2                    Kim - Cross

1   the U.S. exportation to Taiwan matters.

2   Q.  I'm glad you said that.  So thank you.  What you are saying

3   is that if there is a middleman and the middleman's only

4   purpose is to get the end product to Iran, then the sanctions

5   would apply, correct?

6   A.  I lost your description of the middleman.

7   Q.  Let's say hypothetically that someone in the United States

8   or someone -- an American person --

9   A.  Uh-huh.

10  Q.  -- wanted to get something to Iran, and didn't send it

11  directly, but had a middleman in Switzerland, and used that

12  middleman to get the product to Iran, correct?  That would

13  implicate the sanctions?

14  A.  That's correct.

15  Q.  But if nothing went to Iran, then it wouldn't implicate the

16  sanctions?

17  A.  It does.  I'm sorry, but it does.

18  Q.  OK.  So if there is a middleman who receives something and

19  then doesn't send it to Iran and never intended to send it to

20  Iran, that's your business?

21  A.  Yes.

22  Q.  OK.

23  A.  If it eventually landed in Iran, because that's what I said

24  yesterday, because our rules operate under strict liability.

25  It doesn't matter actually what you intended or not.

K35nsad2                        Kim - Cross

1    Q.   Well --

2    A.   What we are prohibiting is not that the person, we are

3    prohibiting the transactions.  So exportation to Iran is

4    prohibited.  So how those parties are involved in this

5    particular transaction is next question.

6    Q.   All right.

7    A.   They are all involved in the violation of sanctions.

8    Q.   You are assuming everybody is involved with everything and

9    everybody is guilty?  Is that what you are saying?

10             MS. KIM:  Objection, your Honor.

11             THE COURT:  Sustained.

12             The jury will regard.

13             MR. WEINGARTEN:  Let's clarify this point.

14             THE COURT:  Excuse me.

15             The jury will disregard the answer and the question.

16   BY MR. WEINGARTEN:

17   Q.   So I just want to be -- directly and indirectly a point I

18   want to clear.  OK?

19   A.   Uh-huh.

20   Q.   So it's your testimony that if someone in the United States

21   wants to send something to Iran --

22   A.   Uh-huh.

23   Q.   -- and uses a middle person in Germany --

24   A.   Uh-huh.

25   Q.   -- that involves the sanctions?

K35nsad2                          Kim - Cross

1   A.  Yes.

2   Q.  OK.  The critical issue is whether or not the intent is for

3   the product to get to Iran, correct?

4   A.  In this -- but the -- that one matters when -- it is not

5   that simple.  I'm sorry.  If the product goes to Iran, it

6   matters, but if not, if it didn't land in Iran, then -- I'm

7   sorry.  The intention is really -- it doesn't really work here.

8   Q.  I missed that.  I'm sorry.  The intention is important?

9   A.  It's important when we consider the nature of the violation

10  but the violation is not related to the intention.

11  Q.  Well, does the violation turn on whether or not the product

12  gets to Iran?

13  A.  That's what I'm confused actually.  So there can be many

14  different scenarios to answer your question.

15  Q.  OK.  Let's move on.  So back to "prohibits virtually all

16  imports and exports to and from Iran."

17          It is true, is it not, that OFAC has established

18  humanitarian exceptions for product going to Iran?

19  A.  That's correct.

20  Q.  And it includes food?

21  A.  Yeah.

22  Q.  All right.  So the United States and U.S. people can export

23  food to Iran, correct?

24  A.  That's correct.

25  Q.  OK.  And medicine?

1    A.   Yes.

2    Q.   There can be the transfer of family remittances?

3    A.   That's correct.

4    Q.   And that means that if there's family on either side, in

5    Iran or in the United States, money can go back and forth to

6    support those family members; that's completely legal.

7    Correct?

8    A.   That's correct.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K35TSAD3                      Kim - Cross

1   BY MR. WEINGARTEN:

2   Q.  And in instances there have been exceptions made for

3   disaster relief, correct?

4            MS. KIM:  Objection, your Honor.

5            THE COURT:  Sustained.

6   Q.  Let's take a look at number 5.  So you testified yesterday

7   that the comprehensive trade embargo against Iran prohibits

8   export of goods and services directly or indirectly to Iran or

9   to the government of Iran, correct?

10  A.  Correct.

11  Q.  So that's the general prohibition, right?

12  A.  The general prohibition includes more than that, but it is

13  fair to say it's the basic in terms of commerce, import and

14  export.

15  Q.  So it seems from that statement that you -- let's break it

16  apart a little bit:  Prohibits goods or services directly or

17  indirectly to two places, to Iran or the government of Iran, is

18  that what that sentence says?

19  A.  Yes.

20  Q.  And "to Iran" means that territory of Iran, doesn't it?

21  A.  Yes.

22  Q.  And the government of Iran is the mullahs and the

23  Ayatollahs and government that runs the country, correct?

24  A.  Yes.

25  Q.  And let's talk about goods and services.  Yesterday you

1   said that services could mean engineers going into Iran and

2   helping projects.  You said that yesterday.

3   A.  Can you repeat?

4   Q.  Well, I'm trying to recall in a simplistic way what you

5   said.  You gave two examples yesterday, you talked about

6   engineers going into Iran and working.  Do you remember that?

7           MS. KIM:  Objection, I think that mischaracterizes the

8   testimony.

9           THE COURT:  Sustained.

10  Q.  You gave two examples.  Tell me what you said yesterday.

11  A.  The engineering services.

12  Q.  Okay.  And the second was financial services, right?

13  A.  Yeah.

14  Q.  Okay.  Is the word "services" defined anywhere in any OFAC

15  law, reg, guidance, anything?  Is there a place we can go to

16  see what "services" mean?

17          Isn't the answer no?

18  A.  Yes, but I don't know.  There is the services defined in

19  the reg, but I don't know whether that description serves as

20  the meaning of service you're looking for.

21  Q.  Isn't it true, sir, that what you're looking at here is a

22  reg from 1995?

23  A.  Mm-hmm.

24  Q.  And in all the documents in your building, the first time

25  services are applied to financial transactions is in 2012.

1          MS. KIM:  Objection.

2     Q.  Isn't that true?

3     A.  No.

4          MS. KIM:  The Court will explain the law to the jury.

5          THE COURT:  It's your exhibit, isn't it, Ms. Kim?

6          MS. KIM:  The meaning of services and the definition

7     of services.

8          THE COURT:  Yes, I will, I certainly will, but this

9     is -- well, actually what we're going to to do, because I hoped

10    we resolved all the issues, but I will give the jury a little

11    bit of a break.  We'll break now so we can discuss this.

12         Members of the jury, thanks for your patience, I will

13    see you in 15 minutes.

14         (Jury not present)

15         MS. KIM:  Your Honor, could the parties have a

16    two-minute bathroom break?

17         THE COURT:  We'll take a couple minutes and come back

18    to discuss this issue.  But first of all, let me say both sides

19    of been guilty of this:  If I haven't been clear going forward,

20    when there are objections, say the word "objection."  If I want

21    a ground, I'll ask for it.  Nothing more, no more commentary

22    feeding witnesses, getting suggestions in front of the jury.

23    So for example, don't say in the courtroom I'll instruct you as

24    to law.

25         Obviously this is an issue we'll have to deal with.  A

K35TSAD3                         Kim - Cross

1    limiting instruction might be appropriate, you should think

2    about a proposal for that, but the government introduced the

3    law yesterday.  So whatever we discussed previously, I think so

4    far, in light of what the government did, we're on appropriate

5    territory, but it can't be a contradiction as to what I have

6    instructed -- to what I will instruct the jury on as to the law

7    and the legal conclusions I reached without ties to Mr. Sadr's

8    knowledge, and that's a fine line, made more complicated by

9    what the government did yesterday, but we'll take that up in a

10   couple of minutes.

11            (Recess taken)

12            THE COURT:  Counsel, I need to raise an issue, which

13   is I have been informed by the District Executive that one of

14   the potential jurors that was here for jury selection on Monday

15   has been contacted by the CDC; not diagnosed with the virus,

16   but is being quarantined because of the exposure -- I want to

17   say, based on what I know, I will get more information from the

18   DE in a moment, this is not anything to be panicked about, not

19   anything to be overly concerned about, but the District

20   Executive's view is we need to take some precautionary measures

21   and hard clean the courtroom.

22            So what I have been told is that this is someone who

23   was at the synagogue where someone has been diagnosed on the

24   same days, and my understanding of state health warnings and

25   the like is this sort of second, third-level exposure, which is

K35TSAD3                      Kim - Cross

1    what the possibility is here, is not leading to quarantine at

2    this point, so even family and the like of folks who are

3    quarantined don't need to be quarantined.  That's the kind of

4    distance we're at.  But the best advice, as we have seen, for

5    example, at New York Law School, is to clean spaces where there

6    has been this level of exposure, or potential exposure I think

7    is the best way to think of it.  I will get more information

8    from the DE, but his suggestion is that he wants to come in and

9    do the deep clean now.

10           So I think what makes sense is to send the jury home

11   for the day and take it from there and indicate simply that

12   there is an issue that needs to be resolved, further

13   information, and therefore we can't proceed today, period.

14   Send them home.

15           MR. KROUSE:  So obviously the District Executive's

16   concern is a legitimate one that we also share and steps that

17   we think should be taken.

18           The only caveat is Mr. Kim has been here for several

19   days.  I don't know how much longer Mr. Weingarten's cross is,

20   but if we could -- the redirect will be extremely short, if

21   any --

22           THE COURT:  I suspect we have some distance to travel.

23   Mr. Weingarten, is that correct?

24           MR. WEINGARTEN:  It is.

25           MR. KROUSE:  Perhaps we could move to a different

1    courtroom for Mr. Kim's cross-examination, which I still don't

2    think will take us past lunch.

3            THE COURT:  110 is available, although I'm not sure

4    that it's immediately available.  I think if it were the lunch

5    break, it would be one thing.  I don't think we could proceed

6    right now, so we would need a break of substantial time to get

7    the courtroom and get the courtroom set up.

8            So the only possibility is to tell the jury we have

9    issues to resolve, we're doing an early lunch, but then tell

10   them we're moving to another courtroom.  But to move to another

11   courtroom, I think that we need to deal with essentially

12   protocols with respect to all of the equipment that's been in

13   the room and the like, and I just don't know if it's practical

14   on the fly right now to do that.

15           MR. KROUSE:  Your Honor, so I think to make the best

16   use of the jury's time, they have been here this morning and

17   they only heard about 50 minutes of testimony.  It would be, I

18   think, efficient to, instead of spreading this witness over

19   three days to finish today, I understand the logistical

20   challenges, but I think the suggestion that we break them early

21   for lunch, tell them they can go eat or get coffee or whatever

22   for an hour and a half or so to see if we can logistically

23   accomplish the move to 110, and if we can, have the jury come

24   there at 11:30 or so or 12:30, and if not, have them come back

25   at 12:30 and say they will be done for the day.  I think it's

K35TSAD3                          Kim - Cross

1       worth a try to see if we could move to a different courtroom.

2                   THE COURT:  Mr. Weingarten?

3                   MR. WEINGARTEN:  I don't know if -- it's astonishing

4       news.  Thinking about 516 and this is a little challenging.

5                   THE COURT:  It's not an issue that any of us have had

6       to deal with before, and I want to emphasize at this point

7       we're talking entirely precautionary measures.  It's just

8       in-the-moment dealing.

9                   MR. WEINGARTEN:  I understand.  Mr. Kim seems like a

10      lovely guy, but he's a public servant, I was a public servant,

11      sometimes we have to stay an extra night.  I think we have to

12      move here.

13                  MS. KIM:  Your Honor, I also note it seems like

14      Mr. Weingarten is planning go about another hour or so.  He

15      indicated he might finish before lunch, so it's possible that

16      Mr. Kim would be finished after an hour and five minutes.

17                  THE COURT:  My judgment -- I'll tell you what, let's

18      break, let me see what I can learn very briefly from the DE

19      about 110.  It will mean telling the jury that we're moving

20      courtrooms.

21                  MR. WEINGARTEN:  That has the potential for arousing

22      all sorts of speculation about this very subject.  I say we be

23      straight with them and fix the problem.

24                  MR. KROUSE:  It's a bigger courtroom.  I don't think

25      the jury is going to speculate.  They see us crammed in here,

K35TSAD3                    Kim - Cross

1    maybe they think we're moving because it's a bigger courtroom.

2    And it would only be a temporary moving for the rest of today,

3    however long we end up sitting.

4                THE COURT:  Give me a moment to speak with the DE.

5                (Recess taken)

6                THE COURT:  We have access to 110 pretty much

7    immediately.  What I think is the right course is to tell the

8    jury that we need to break early for lunch, we are going to

9    move to the larger courtroom, 110, maybe have Mr. Scott show

10   them on their way out where they will come in, and then resume

11   let's say at 12:30, and I think we should be able to continue

12   at that point.

13               The DE emphasized how super-precautionary this is, the

14   cleaning of the courtroom, but it is what he's recommending.

15               So 110 is available now.  I think that makes sense.

16   Until we have any additional information, there's no need to do

17   anything differently.

18               MR. WEINGARTEN:  So we just take everything?

19               THE COURT:  So I've got DE folks coming immediately,

20   they will assist with the transfer of the technology to the

21   other courtroom.  It's only physical contact, so the jurors

22   didn't have access to the technology that we'll be moving, so

23   yes, we'll move everything.

24               MR. WEINGARTEN:  With the likelihood we are coming

25   back or staying there?  Who knows?

1          THE COURT:  I presume we'll stay there since we should

2     be in a bigger courtroom anyway.

3          So just to be clear, what I will tell the jurors is we

4     need to take an early lunch break, unfortunately, and I'm sorry

5     for the start and stop nature.  We are going to resume at

6     12:30.  We will be moving to a different and larger courtroom,

7     Courtroom 110, Mr. Scott will show them how to get there, and

8     that they should move their notebooks and the like.  Mr. Scott

9     will take them down there as well.

10          No need to panic, a lot of places are dealing with

11    this kind of stuff, and it's a matter of needing to clean the

12    courtroom, so that's what we'll do.

13          We'll bring in the jury.

14          Counsel, any objection to me telling the jury that we

15    believe the case will likely get to closing arguments next

16    week?

17          MR. KROUSE:  No objection.  Next week I think --

18          THE COURT:  Not making any promises beyond that, but

19    we think we -- our best estimate at this point is we get to

20    closing arguments next week.

21          MR. KROUSE:  With the caveat we don't know how long

22    the defense case will be, but that is our expectation.  The

23    government's case will certainly be completed.

24          THE COURT:  I know, Mr. Krouse, the question is what

25    we can tell the jury with all of the issues that surround that.

1          Mr. Weingarten?

2          MR. WEINGARTEN:  I'm just nervous that you will make

3    that representation and someone will rely on it and we'll be in

4    the middle of something --

5          THE COURT:  I'm not going to do something that's not

6    clear.  I thought, based on best estimate, even the longest

7    version is we would get to closing arguments next Thursday.

8          MR. WEINGARTEN:  That's right, but --

9          THE COURT:  All right.  I won't say anything.

10         Bring them in.

11         (Jury present)

12         THE COURT:  Members of the jury, unfortunately we need

13   to take an early lunch break so that the process can continue.

14   I apologize for the start and stop.  I do assure you we're

15   doing everything we can to move things through quickly, and as

16   I said, we are making good progress in that regard.

17         So it's 11:30 now, we're going to resume at 12:30.  I

18   apologize for deviating from the schedule.  We are also going

19   to move to a larger courtroom, Courtroom 110.  Mr. Scott is

20   going to show you how you enter there on your way down.  He'll

21   facilitate so that you know where you're going, but we're going

22   to do that move during the lunch break.

23         So it is 11:20 now, 12:30 will be Courtroom 110, which

24   Mr. Scott will show you on the way out.

25         I do apologize, I like to have a predictable schedule,

K35TSAD3                         Kim - Cross

 1    and I apologize for the misinformation with respect to schedule

 2    today, but we'll do our best to rectify it as soon as we can.

 3             With that, I wish you an enjoyable lunch.  We'll see

 4    you in 110 at 12:30.

 5             (Jury not present)

 6             THE COURT:  I think what makes sense is to -- I see

 7    we've got representatives from the DE's Office, so we're going

 8    to move all the materials down to 110 and get set up.  I think

 9    we should plan on meeting as soon as that is done, so I'm going

10    to presume about a half an hour to address the issues that we

11    need to address, either with respect to what the immediate

12    issue around moving the courtroom, but also to take on any of

13    the issues that were developing around questions as to law

14    meaning and the like so that we can, when we resume

15    examination, press forward without any additional interruption.

16             All right?  Any matters to take up before we break?

17             I will see you in 110 as soon we can get going again,

18    and hopefully within a half hour.

19             (Continued on next page)

20

21

22

23

24

25

AFTERNOON SESSION

(12:05 p.m.)

THE COURT:  All right.

I suppose unsurprisingly, and as some of you or all of you know, the press is aware of the issue.  Let me again just give complete clarity.

I haven't learned anything additional, but this is what I know.  So, one of the venire persons got a letter from the health department saying that they were in temple on the same days as someone who has been diagnosed with COVID-19, so everyone in that situation has been contacted by the heath department and told to self-quarantine.  The person who was venire person on Monday has no signs or symptoms and has not tested positive.  So that's the information.

We'll be kept updated if there are any changes so we are in a good situation in that sense.  Because my immediate proposal is communicating to the jury, and I think just the simple explanation that I just gave you, that someone who was in the venire has been asked to self-quarantine; people in contact with that person, including as I understand it, family members, are not being asked to self-quarantine in any way; that we will be kept apprised if anything changes with respect to the health of that person, which puts us in a more informed situation than everyone that person rode the subway with that day; and I'll keep them informed and we are on top of it,

K35TSAD3                         Kim - Cross

1    including the very proactive step of moving to this courtroom

2    which we needed to do anyway since we were cramped.

3            That is my suggestion as to what to tell the jury as

4    soon as they come in so they are informed.

5            Any reactions to that?

6            MS. KIM:  No objection, your Honor.

7            THE COURT:  Can you pull up the mic.

8            It is even harder to hear here.  Thank you.

9            MR. WEINGARTEN:  I think perhaps you should go into

10   the jury room and tell them.  I think there's going to be a

11   dramatic reaction.

12           THE COURT:  That I should talk -- I can't hear you.

13           I want to hear you desperately.

14           MR. WEINGARTEN:  Sorry.

15           THE COURT:  Go ahead.

16           MR. WEINGARTEN:  Better now.  I think in a more

17   intimate setting with you in the jury room, I think that's

18   better.  There's going to be a strong reaction if they're

19   sitting there.  It's not likely to come out, I think you will

20   be more reassuring to them if you do it in the jury room.

21           THE COURT:  That is not a bad suggestion.

22           MR. KROUSE:  No objection, your Honor.

23           THE COURT:  Obviously with the court reporter.  They

24   may have some questions or express concerns and we will deal

25   with that.  I have told you everything I know.  I am not

1    concerned.  What I will make clear to them is we are on top of

2    it, we are in a good position for receiving information.  A lot

3    of organizations and institutions are facing this kind of

4    remote contact, and I'll keep them informed, and we will keep

5    them on top it.  We're taking the extra precaution of simply

6    moving to this courtroom, which we did need to do anyway.

7            All right.

8            So then let's talk about our issues.  There was the

9    immediate objection, Ms. Kim objected to the instruction on the

10   law.

11           So, Mr. Weingarten, I guess the question is how much

12   are you going to do of that?

13           MR. WEINGARTEN:  I will go over there.

14           THE COURT:  That would be great.  Thank you.

15           MR. WEINGARTEN:  So it's GX 601, page 6.  If someone

16   is here to do that and put it up.  I beg your pardon.  It's 5.

17   Where I was is we were talking about services, and it is my

18   understanding that services in all the regs were never tied to

19   the financial services until 2012, and that's 427.

20           Before that there's nothing said about financial

21   services and financial activities being a service.  Obviously,

22   in the normal world I would introduce 427.  No, I shouldn't say

23   that.  That would be my instinct, and I note that I guess I am

24   not supposed to do that, given where we are.

25           THE COURT:  Because you would argue from that that the

1      transactions in issue aren't illegal?

2                  MR. WEINGARTEN:  Of course.

3                  THE COURT:  And you can't make that argument to the

4      jury.

5                  MR. WEINGARTEN:  No.  I would say, slightly different,

6      you could extrapolate.  I would say, how in the world would my

7      client know, objectively speaking, the financial services were

8      services they didn't -- they saw no reason to put it on the

9      books until 2012.  It is a powerful piece.  Then from there I

10     would go to benefit received in Iran, and, you know, fuss with

11     him a little bit about what that means.

12                 THE COURT:  What does that mean?

13                 MR. WEINGARTEN:  Well, you know, it's 410.  I can make

14     all the arguments -- not make all the arguments but try to make

15     the points on 410.  What's the benefit?  Where is it defined?

16     How in the world do you know what a benefit in Iran means?

17                 THE COURT:  I will hear from Ms. Kim.

18                 MR. KROUSE:  I am going to handle this, your Honor.

19                 THE COURT:  Could you pull up the mic.

20                 MR. KROUSE:  Yes.  It sounds to me like, that

21     Mr. Weingarten wants to make a legal argument through this

22     witness when the Court is going to be instructing the jury

23     exactly what the words in the regulation mean.

24                 So, first, as a factual matter it's just incorrect

25     that services was never defined.  In 1995, in the general

K35TSAD3                          Kim - Cross

1    license, what was later called the U-turn, it says that

2    transfer instructions directing the movement of funds or the

3    performance of other banking services that would directly or

4    indirectly benefit persons in Iran or the government of Iran or

5    requests for the exportation of services.

6            So that is 1995.

7            Just as a factual matter, the question asked includes

8    in it a factual piece that's just flatly incorrect.  But even

9    if it was correct, asking this witness to define services or to

10   explain to him the different regulations that define services

11   or when that happened or anything of that nature is irrelevant

12   and confusing to the jury.  It should be excluded under 403.

13           The Court is going to -- and we will have a charge

14   conference over this, and I think there are some contested

15   issues, including 410, but the Court is going to decide how to

16   define services, how to define to Iran, and how to do so

17   consistent with the law and consistent with the Court's ruling

18   on the motion to dismiss.

19           This is, again, the defense trying to relitigate what

20   they lost on motion to dismiss.  If this conduct didn't fall

21   under services as a matter of law, they would have won their

22   motion to dismiss.  If this conduct --

23           THE COURT:  The point that's being made, obviously, to

24   the extent Mr. Weingarten tries to argue that to the jury, it

25   will not be allowed.  He can't make arguments as to what the

K35TSAD3                          Kim - Cross

1       law is consistent or inconsistent with the Court's ruling

2       because that's the Court's province.  The contention being

3       made -- and it's been a boundary I've talked about

4       previously -- is, whatever the meaning of it is, there's

5       difficulty in knowing what's prohibited.  That's the theme.  It

6       changes, it's complicated, things are undefined, etc.  That

7       question, I think that's appropriate.  So it is, generally

8       speaking, an appropriate ground and the question is how to do

9       that.

10             Again, in light of the government putting on evidence

11      of the law, despite the ground we've covered, that allows him

12      to make an argument essentially, well, see, services isn't

13      defined and the laws change and the regs change, etc., to

14      suggest the mens rea piece.  That's the issue.

15             MR. KROUSE:  Yes, I think that is the issue.  It is

16      just factually not true that services wasn't defined.  So as a

17      matter of just fact I think that's misleading to the jury.

18             THE COURT:  That is a redirect point.

19             MR. KROUSE:  Or a 403 point, because it's leading to

20      confusion by the jury.  If he's introducing in his question an

21      incorrect fact and we have advance notice of it or heard it,

22      that should be excluded on 403 grounds, because it is

23      confusing.

24             I agree with the Court that there is a line that -- or

25      one side of the line that the defense can explore, which is the

K35TSAD3                    Kim - Cross

1     law has changed perhaps, the meaning, you know, in his own

2     state of mind was unclear.  There's been no factual proffer of

3     that here.  The plain language of the statute or the regulation

4     will be defined and explained by the Court.  I think that's an

5     important --

6              THE COURT:  How about a limiting instruction?

7              So there's no question in the jury's mind, I will

8     instruct them as to the law, and to the extent there is

9     evidence coming in with respect to this particular piece of

10    evidence or that particular piece of evidence, it's coming in

11    not to inform the jury as to what the law is, because that's

12    the judge's job, but may only be considered for the purpose of

13    the defendant's state of mind or something like that.

14             Then there's a 403 question, because it can't be

15    anything.  It has to be tethered to an available inference or a

16    direct connection as to Mr. Sadr's knowledge.  But I think, as

17    the government says, this was the law and it was public and it

18    hasn't changed that much, and whatever the government's

19    argument is, that it's not complicated, there are these

20    generalized arguments, it is complicated and it changes a lot

21    and meanings aren't totally transparent.

22             So the government did it in its opening.  The

23    government did it yesterday with the witness.  I have to allow

24    it appropriately for the defense in order to make the state of

25    mind argument.

1      I think, if kept at a general level and not too

2   confusing and prejudicial, it can be done, and a limiting

3   instruction would help ensure the jury understands the purpose

4   for which it's coming in.

5      What's your response to that?

6      MR. KROUSE:  Is that directed to the government?

7      THE COURT:  Yes.  I'm sorry, Mr. Krouse.

8      MR. KROUSE:  That's OK, your Honor.

9      I think I understand the Court's ruling.  I think that

10  it is correct that the defense can, on a limited basis or not

11  limited, but in a direct way explore this theme that the regs

12  are complicated, that some of the terms may be ambiguous.  But

13  I think the way the question was phrased before the break it

14  would still be objectionable because it's asking for Mr. Kim to

15  opine on the meaning, and how the meaning of the word services

16  has been defined or when it was defined or how it evolved over

17  time or whatever, when in reality in 1995, it was defined.

18      So I object to the way the question was asked.

19      THE COURT:  OK.

20      MR. KROUSE:  I think a limiting instruction is a good

21  idea.  If, to the extent questions are asked about the meaning

22  of words, the Court is going to instruct you at the end of this

23  trial what the law is in this case, and any argument -- or any

24  questions related to the meaning of words are not to be taken

25  for the truth of what -- or not the truth, but the actual

K35TSAD3                    Kim - Cross

1      meaning of what those words are, but for the defendant's state

2      of mind or something to that effect.

3              THE COURT:  So we will deal with the specific

4      questions at a general level.  You are in agreement to the

5      general proposition and that a limiting instruction would be

6      appropriate.

7              Before we get to the specific instructions,

8      Mr. Weingarten, your response to a limiting instruction?

9              MR. WEINGARTEN:  No objection.

10             MR. KROUSE:  On the limiting instruction -- sorry, my

11     colleagues made a point -- I believe the Court said that it

12     would still have to be tethered to something that could be

13     proffered by the defense that the defendant didn't actually

14     have this state of mind.  I haven't seen anything on that

15     still.

16             THE COURT:  I think, yes.  So any evidence around

17     specific language, around regulations to make an argument that

18     this is what Mr. Sadr thought, I do think what we are talking

19     about are the available inference as to uncertainty of relevant

20     law and changing meaning of relevant law, just as the

21     government is seeking the inference and put on evidence of the

22     existence of the law to go to knowledge.  Right?

23             So I think for purposes of cross-examination questions

24     within the scope of the direct, obviously I am not going to let

25     a misstatement of the law lead a question, so we will have to

1      deal with that, but that would be obviously a sustained

2      objection on 403 grounds.

3              But allowing questions to support the inference in

4      light of the government's opening that it wasn't complicated

5      and what it put on yesterday, it think it is the same

6      inferences being sought.

7              So I would allow the questions on cross that go to

8      complexity, ambiguity, lack of public notice, uncertainty, and

9      the like.  That's where we are.

10             So on the specific question, Mr. Weingarten, can you

11     rephrase the question so that it's not embedding a false

12     premise?

13             MR. WEINGARTEN:  Obviously, I didn't believe it to be

14     a false premise when I said it, so I'm going to check.

15             THE COURT:  OK.  What else do you have in this area?

16             MR. WEINGARTEN:  Well, you know, I am thinking about

17     whether or not I can squeeze benefit in.  It is the 410

18     question, and, you know, what's a benefit that goes to Iran.

19     You know, there are a thousand things that could be said about

20     it, and I will decide whether or not it's general complexity or

21     whether or not I'm too specific to arguing the law.  I may or

22     may not try to do that.

23             MR. KROUSE:  This was directly litigated in the motion

24     to dismiss and rejected by the Court.  So this idea that the

25     defense has set forth in their motion to dismiss and continues

1    to try to argue is that 410 somehow doesn't apply to the

2    conduct in this case.  The Court has rejected that.

3            So I think any questions bearing on the benefit to

4    Iran as it being somehow not part of the regulatory framework

5    here is squarely violating the province of the Court to

6    instruct the jury to the law, and it contravenes the Court's

7    ruling, which was quite clear, that that legal interpretation

8    or legal argument by the defense has been rejected.

9            THE COURT:  Right.  But as I've said all along, even

10   wrong interpretations of the law could be appropriate if

11   tethered to Mr. Sadr's state of mind.  So that's the question.

12           MR. WEINGARTEN:  Can I just try one.

13           We are talking about the coronavirus, how about a

14   hypothetical like this, not asking him his opinion, but asking

15   him where would you find the answer:  I devised the cure to

16   coronavirus, and I used an American bank.  There is an obvious

17   benefit in Iran.  Is that a violation of the sanctions?  This

18   is coming out of the top of my head, but you get the point.

19   The point being there's inherent confusion in the word benefit

20   that's never explicitly explained.

21           MR. KROUSE:  I think money is pretty clearly a

22   benefit.  I don't think there's much ambiguity, and this case

23   is just about money.

24           As creative as that hypothetical may be, it's not

25   tethered to the facts in this case.  It's not tethered to

K35TSAD3                        Kim - Cross

1    anything about Mr. Sadr's state of mind.  The cases about money

2    transfers that were in the government's view for the benefit of

3    Iran or people in Iran, and that's what the government is

4    trying to prove and what we will argue to the jury.

5               THE COURT:  And that he was aware of that of that

6    prohibition?

7               MR. KROUSE:  That he was aware of the prohibition,

8    yes.  So there's nothing in here about Mr. Sadr thinking that

9    he was providing the coronavirus or any or sort of abstract

10   benefit to an Iranian person or to an Iranian entity.  We are

11   talking about money.  I don't think there's much ambiguity in

12   the word benefit.

13              MR. WEINGARTEN:  I think there is a whole line of

14   questioning that could happen that would elucidate just the

15   point.  I mean, where do you draw the line?  It's never clear.

16   There's inherent ambiguity with this concept.

17              MR. KROUSE:  That's --

18              THE COURT:  Excuse me.

19              I think there's two potential problems, and I'm going

20   to preclude either.  One is a nullification problem.  To the

21   extent you start suggesting an inherent ambiguity, you are

22   getting I think toward a nullification argument.  I know you

23   would say to the jury I would never suggest such a thing to

24   you -- that's my best booming voice -- and then say the thing

25   you would never suggest.

1            MR. WEINGARTEN:  Your Honor --

2            THE COURT:  We've spent enough time together.

3            There's the nullification problem.

4            Then there's the infringing on the province of the

5      Court to instruct the jury on what the law is.  Those are

6      related.

7            So I think, you know, the practical reality of how to

8      implement the line that the Court has imposed is still there.

9      I think anything that there's evidence to tie to Mr. Sadr's

10     knowledge, questions about complexity and ambiguity and

11     changing law and the like is appropriate.

12           Framing questions, for example, along the lines of

13     couldn't someone who reads this word think it means X, Y, and

14     Z, wouldn't somebody who doesn't stay on top of the law that

15     changes this frequently have uncertainty about what is in

16     existence at any particular moment, a limiting instruction that

17     makes it clear the purpose for which the evidence is being

18     permitted to go to the jury is appropriate.  But specific

19     arguments with the witness about what the meaning of the law is

20     I won't allow because of the nullification problem and the

21     interfering with the Court's role of the instructor of the law

22     and additional complications around introducing potentially an

23     irrelevant law.

24           So those are all 403 problems.  That's the line.

25           We are still waiting for a couple more jurors.

1     I will ask you to abide by it.  If there are

2     objections, I know what the arguments are, and I'll rule.

3          MR. WEINGARTEN:  Sure.  What I'll do, when we finish,

4     I'll sit down and think it through and decide.

5          THE COURT:  Yes.  I would also like you to confer on a

6     limiting instruction.

7          MR. WEINGARTEN:  Sure.

8          THE COURT:  OK.  Anything else?

9          We are waiting on a few more jurors.  When they're

10    here, I will meet with them with the court reporter and report

11    back.

12          (Recess)

13          (In the jury room; counsel and defendant not present)

14          THE COURT:  I never get to talk to you before the end,

15    but I want to let you know something that is going on.

16          This is a much more comfortable jury room.

17          I learned right before the break that someone who was

18    in our big selection that first day, we call it the venire, is

19    not sick, but they go to synagogue with somebody who has been

20    diagnosed with the coronavirus and were in synagogue the same

21    day as the person who has been diagnosed with the coronavirus.

22          So the person who was in the courtroom with us on

23    Monday again is not sick, but has been informed that they were

24    in synagogue the same day as somebody who has been diagnosed

25    with the coronavirus.  The person that we were in the courtroom

K35TSAD3                         Kim - Cross

with is now self-quarantined.  Their family members don't have

to be self-quarantined.  People who had contact with them, like

us, don't have to be self-quarantined.

          Unlike whoever rode with them on the subway that day,

I will learn if that person gets sick, and therefore you will

all learn if that person get sick.  So that is not an issue.

We are at an advantage because we will have that information if

something develops.

          The district executive, which is the executive office

that runs this courtroom, has been in regular contact with the

health department.  As you can imagine, this is an issue, the

sort of secondary, tertiary contact issues are developing

wherever there are large public gatherings.

          What we're doing is, one, making sure everybody is

informed; two, staying in contact with the local health

department to make sure that we know everything that can be

known; and, three, taking extra precautions, including moving.

The DE's office, the district executive's office wants to do a

cleaning of my courtroom.

          You may have seen, for example, New York Law School

closed yesterday for a cleaning basically for the same reason.

Someone who was in synagogue with the person who was diagnosed

then was in school.  We needed to move to a bigger courtroom

anyway, but because they want to clean my courtroom as an extra

precaution, that was the impetus I needed to say let's go do

1    that now.

2                That's where we are.  I promise you, you will be kept

3    informed.  As soon as I learn anything that affects anyone who

4    was in that room, you will learn it.  I obviously made the

5    lawyers aware of the same situation.

6                That's it.  I just wanted to tell you let you know

7    what is going on, basically as soon as we learned it and I

8    could communicate it to the lawyers and sort of figure out the

9    courtroom change and that sort of thing.

10               That's where we are.  I hope you have comfort in

11   knowing that I will do everything in my power to make sure that

12   you have any relevant information and knowledge.

13               Again, I think because of that we're sort of in a more

14   informed position than, for example, whoever the person who was

15   in the courtroom with us on Monday rode the subway with or went

16   to the movies with and the like.  That is what I have to say to

17   you.

18               JURORS:  Thank you.

19               THE COURT:  I thank you very much.  We will resume in

20   just a few moments.

21               (In open court)

22               THE COURT:  All right.  I think it went fine with the

23   jury.  They seemed accepting of the information, and I tried to

24   do what I could to truthfully explain how everything is fine

25   and we are in a good situation because we will be notified and

1    we are on top of it and taking precautions.  That all seems

2    good.

3              Do you have a proposed limiting instruction?

4              MR. KROUSE:  We drafted one, your Honor.

5              I can read it or hand it up.

6              THE COURT:  I will take it in writing.  Thank you.

7    I'm hoping your handwriting is better than mine, Mr. Krouse.

8              MR. HEBERLIG:  We haven't seen it, Judge.

9              THE COURT:  Oh, I thought you worked on it together.

10   Thank you, Mr. Heberlig.

11             OK.  Let me hear it, please.  I suppose I should have

12   just had him read it, then we would all have it on the

13   LiveNote.  It is a bigger courtroom but no easier to find your

14   way here.

15             MR. HEBERLIG:  I just added a sentence.  So I wanted

16   to --

17             THE COURT:  Yes.  Go ahead.

18             All right.  Any concern with the sentence added?

19             MR. KROUSE:  Yes, your Honor.  It's the government's

20   view that just the general instruction that it's the law, the

21   law will be defined by the Court.  I don't believe that -- or

22   maybe something, this evidence was admitted for a different

23   purpose.

24             THE COURT:  That's what the sentence does.

25             MR. KROUSE:  What it says is to prove the defendant's

K35TSAD3                          Kim - Cross

1    state of mind.

2              THE COURT:  The testimony was admitted as relevant to

3    the defendant's state of mind.  I mean, a limiting instruction

4    usually goes the following evidence was admitted for this

5    limited purpose.  That's the purpose for which you can consider

6    it and no other purpose.

7              So we have to tell them the limited purpose that it's

8    admitted for, and then with the caution that the testimony was

9    admitted for the purpose or -- I think actually the testimony

10   was admitted as relevant to the defendant's state of mind.  You

11   may only consider it for that purpose is the language I propose

12   adding, and then go on, as I mentioned in my initial

13   instructions to you, I as the judge will instruct you on the

14   law and the meaning of the law and you will be required to

15   follow my instructions.

16             OK?

17             MR. KROUSE:  OK, your Honor.  Thank you.

18             THE COURT:  OK?

19             MR. HEBERLIG:  Yes, your Honor.

20             THE COURT:  OK.

21             We will bring out the jury.  Where is Mr. Kim?

22             Please bring him in and on the witness stand.

23             Counsel, I'll give it when I think it is appropriate.

24   I ask you to indicate if either side thinks it should being

25   given if I haven't given it by then.  OK?

1          MR. KROUSE:  OK, your Honor.

2          THE COURT:  Mr. Weingarten, you'll let me know if you

3     think it should be given.

4          I'll make my own judgment as well.

5       (Continued on next page)

1              (Jury present)

2              (Witness resumed)

3              THE COURT:  Thank you, everyone.  A little shorter

4     distance to the jury box this way.

5              Please be seated.

6              Thank you, members of the jury.  We will continue with

7     the cross-examination of Mr. Kim.

8              Mr. Weingarten, you may continue.

9     BY MR. WEINGARTEN:

10    Q.  Mr. Kim, good afternoon.

11    A.  Good afternoon, sir.

12    Q.  Just a little bit more.

13    A.  OK.

14    Q.  So, we were looking at the slides that the government put

15    up.  Why don't we turn to slide 7.  So slide 7 talks about or

16    represents that there was an executive order in 2012 about

17    blocking.

18             Do you see that?

19    A.  Yes.

20             THE COURT:  Let me just check.  Any issues --

21             JUROR:  I can see.

22             THE COURT:  You can't see it?

23             Raise your hand if you can't see.  OK.  We're good.

24    Thank you.

25    BY MR. WEINGARTEN:

1  Q.  I believe, as you testified on direct, blocking is and

2  freezing are essentially the same, and in 2012 there was a new

3  remedy that was given to OFAC for blocking that didn't exist

4  before; is that fairly stated?

5  A.  Yes.

6  Q.  OK.  And it's the freezing of property of the government of

7  Iran and Iran financial institutions, correct?

8  A.  Yes.

9  Q.  OK.  And those were the targets of the blocking provisions,

10 correct?

11 A.  Of this executive order, that's correct.

12         THE COURT:  If you could just speak into the

13 microphone.

14         THE WITNESS:  Sure.

15         THE COURT:  Mr. Kim.  Thank you.

16 BY MR. WEINGARTEN:

17 Q.  Let's turn to slide 9 and Bank Saderat.  This is

18 identification of Iranian government-owned financial

19 institutions where sanctions were imposed.

20         Is that what we have here?

21 A.  Yes.

22 Q.  OK.  And you talked in your testimony about SDNs.  An SDN

23 is what?

24 A.  SDN is whose property is blocked.

25 Q.  Before 2012 were there SDNs?

K35TSAD3                        Kim - Cross

1   A.  Before 2012 there were SDNs, yes.

2   Q.  But there was no blocking before 2012?  Isn't that what you

3   just said?

4   A.  No.

5   Q.  All right.  So there was a statute or a reg passed in 2012

6   for blocking for government property, and -- government of Iran

7   property and Iran financial institutions, blocking and freezing

8   property.  That's the slide we just saw.  That's 7, correct?

9   A.  Yes.  But I need to explain a little bit too to answer

10  correctly.

11          THE COURT:  Go ahead.

12  A.  The Executive Order 13599 we saw before, that's the

13  blocking EO about government of Iran and Iranian financial

14  institutions, but Iranian financial institutions and

15  subdivisions of Iranian government were blocked under other

16  programs.

17  Q.  OK.

18  A.  So Iranian -- the remaining program, the objectives of each

19  of those programs overlapped.

20  Q.  OK.

21  A.  So other banks were blocked too.

22  Q.  So the government of Iran in 2012 in a special program had

23  a new block reg?  Is that what you are saying?

24          MS. KIM:  Objection.

25  A.  What I'm saying --

1              THE COURT:  Just a moment.

2              Overruled to the extent I think it was a clarifying

3    question.

4              Go ahead.

5    A.   What I'm saying is Iranian financial -- some of Iranian

6    financial institutions were blocked before.

7    Q.   OK.  The focus on -- never mind.  I'll move on.

8              On 9, it's Bank Saderat.  Bank Saderat is one of the

9    larger banks, one of the larger I think you testified

10   government-owned banks in Iran?

11   A.   Yes.

12   Q.   And there are many, many local offices of Bank Saderat in

13   Iran and elsewhere?

14   A.   Yes.

15   Q.   Obviously it's not OFAC's business who is the depositor in

16   Iran in Bank Saderat, that's not what you're interested in,

17   correct?

18   A.   Not exactly because -- can I explain?

19   Q.   Sure.

20   A.   Yes.  If Bank Saderat's clients are SDNs, then Bank

21   Saderat, of course, will be under our monitoring, and then Bank

22   Saderat, there's a huge chance to be designated as --

23   Q.   I guess here's the issue.  Obviously OFAC is interested if

24   Bank Saderat is working with the Iranian government building

25   nukes or supporting terror around the world, fair?

1   A.   That's fair.

2   Q.   Of course.  But if mom and pop down the street in Tehran is

3   depositing money or writing checks on a Bank Saderat account

4   you are not interested in?

5   A.   No.

6   Q.   You are not interested in the typical everyday transactions

7   that Bank Saderat engages in with Iranians, correct?

8   A.   That's correct.

9   Q.   And if Bank Saderat had a transaction with someone outside

10  of Iran in euros, that wouldn't be your business either,

11  correct?

12  A.   It could.  That's too generalized a question to me.

13  Q.   OK.  Too general?

14  A.   Yes.

15  Q.   Let's look at 10.  So, October 25, 2007, OFAC designation,

16  and you have Iran Islamic Revolutionary Guard Corps, IRGC,

17  correct?

18  A.   That's correct.

19  Q.   That's the paramilitary or military organization that

20  supports the theocracy, correct?

21  A.   That's correct.

22  Q.   And there are any number of sanctions imposed against them,

23  correct?

24  A.   That's correct.

25  Q.   Because there's a belief on your part in OFAC that they are

1    primarily responsible for any nukes and any activity relating

2    to terrorism, fair?

3    A.   That's fair.

4    Q.   OK.  Now, you also have Oriental Oil Kish in your list

5    here, Iranian oil company owned or controlled by IRGC.  Did you

6    do an investigation as to what is the story what Oriental Oil

7    Kish?

8    A.   OFAC did.

9    Q.   And did you learn that there was a property that we are

10   talking about with Oriental Oil Kish that used to be owned by

11   Halliburton?

12   A.   I cannot say that I knew, but OFAC -- this designation is

13   done by another division in OFAC.  It is not my division.  So I

14   would probably, of course, but I cannot say from my own

15   knowledge.

16   Q.   Well, did you learn that my client's father participated

17   with others in an investment into this property for

18   Halliburton?

19             MS. KIM:  Objection.

20             THE COURT:  Just a minute.

21             Sustained.

22   Q.   Did you learn that Oriental Oil Kish property was stolen by

23   the IRGC?

24             MS. KIM:  Objection.

25             THE COURT:  Sustained.

1           MR. WEINGARTEN:  He said he knew, your Honor.

2           THE COURT:  Sustained.

3   Q.  So you don't know of your personal knowledge what happened

4   to this property?

5   A.  What I know is they are designated, and then what I know is

6   when designation happens we internally provide very brief

7   summary that why it is designated so that the other OFAC

8   internally know, but actual designation and the information in

9   the designation package that belongs to a specific division.

10  Q.  You don't have personal knowledge?

11  A.  I don't.

12  Q.  OK.  Moving on to page 11, so more designations.

13          Were you told to look to see whether or not there were

14  designations for these people?  How did these people appear or

15  how did these institutions on appear on the chart?

16  A.  The prosecution asked.

17  Q.  The prosecution asked you to look for these people?

18  A.  They said, Do you know this bank?  I said, yes.

19  Q.  OK.  Let's look at the bottom one, the EN Bank.

20  A.  Uh-huh.

21  Q.  The EN Bank was designated July 12, 2012.  Do you see that?

22  A.  Yes.

23  Q.  Did you come to learn that on July 12, 2012, all the

24  financial institutions of Iran were designated, not just EN

25  Bank?

K35TSAD3                          Kim - Cross

1    A.  I didn't know all the financial institutions of Iran.

2    Q.  You didn't know?

3    A.  Not this one.  This one was the -- one, 13599, the blocking

4    EO, it designates, it says, All Iranian financial institutions

5    are blocked, right.  That executive order is blocking.  And

6    then in order to make that blocking order into, put into SDN's

7    system, then we need to have OFAC's designation as an SDN so

8    that they go into it.

9    Q.  However you did it, when you hit EN Bank to look in the

10   computer to see if on that day EN was designated, did you see

11   hundreds and hundreds of other banks that were also designated?

12   A.  Yes.  I don't know whether hundreds but --

13   Q.  Many?

14   A.  Yes.

15   Q.  Did you come to learn several years later all the banks

16   were taken off the SDN list in 2016?  Did you come to learn

17   that?

18   A.  I know many of them were.

19              MS. KIM:  Objection.

20              THE COURT:  Overruled.

21   A.  Many of them were delisted temporarily, but that was

22   conditional, and most of the banks were -- remained.  The

23   effect of delisting was not, was not significant because

24   Iranian programs designated stayed there.  But what is lifted

25   temporarily was other programs' designations.  So one bank can

1  be designated multiple times based on many different programs.

2  So, for example, one designation is lifted doesn't mean that

3  this bank is now free to transact with.

4  Q.  Are you suggesting that EN Bank was still listed in 2016?

5  A.  As far as I know, yes.

6  Q.  All right.  To your knowledge, when you looked at EN Bank,

7  did you see any special designation for wrongdoing by EN Bank?

8  A.  That I don't remember.

9  Q.  All right.  You introduced yourself as a person in the

10  enforcement division of OFAC, is that correct?

11  A.  That's correct.

12  Q.  So you handle cases and make a judgment whether or not

13  people dealing in some form or fashion should be punished?

14  A.  Yes.

15  Q.  I believe you testified that about 90 percent of the

16  violations that you find there's no actual punishment, is that

17  what you said?

18  A.  Not exactly.

19  Q.  So there's a letter that you send?

20  A.  Yes.

21  Q.  So you have a hundred cases that come on your desk and the

22  worst you do for 90 of them is you send somebody a letter?

23  A.  Yes.

24          (Continued on next page)

25

K35TSAD5                          Kim - Cross

1   BY MR. WEINGARTEN:

2   Q.  No fine?

3   A.  No, no.

4   Q.  No referral to the prosecutors?

5   A.  In those instances, probably not.

6   Q.  Of the hundred OFAC cases that you handle at a time, how

7   many referrals do you make to the prosecutors, average?

8   A.  Out of hundred, two or three.

9   Q.  Two or three.  Isn't the percent actually 95 percent are

10  occasions when nothing happens to the person dealing with Iran

11  other than, at worst, a letter, as opposed to 90 percent?

12  A.  That description is not exactly correct because receiving

13  the warning letter or cautionary letter has a lot of meaning to

14  it and it has a consequence if you receive that.

15          MR. WEINGARTEN:  Maybe we'll get some help.  DX47 is

16  the document we talked about this morning, your Honor.

17          THE COURT:  Okay.

18          MR. WEINGARTEN:  Put it in front of the witness,

19  please.

20          MS. KIM:  It's not in evidence, your Honor.

21          MR. WEINGARTEN:  I thought you ruled it in.

22          THE COURT:  It hasn't been admitted.

23          MR. WEINGARTEN:  Sorry.

24  Q.  Do you see the document in front of you, sir?

25  A.  Yeah.

K35TSAD5                          Kim - Cross

1    Q.  And is it a document entitled U.S. Department of Treasury

2    and Federal Banking Agency's Joint Fact Sheet on Foreign

3    Correspondent Banking Approach to BSA AML and OFAC Sanctions,

4    Supervision and Enforcement.  Do you see that?

5    A.  Yes.

6    Q.  OFAC is your organization, correct?

7    A.  That's correct.

8    Q.  And this is a summary of two things, basically, is it not,

9    the enforcement procedures that you're talking about and the

10   responsibilities for correspondent bank, fair?

11             MS. KIM:  Objection.

12             THE COURT:  Just a moment.

13             MS. KIM:  Your Honor, we ask that the witness have an

14   opportunity to review the document.

15             THE COURT:  That's fine.  Can you give the witness a

16   full copy?

17             MR. WEINGARTEN:  May I approach?

18             THE COURT:  You may.

19   Q.  Have you seen this document before?

20   A.  No.

21   Q.  So you are familiar with the United States Department of

22   Treasury, correct, you work there?

23   A.  Yes.

24   Q.  And you work at OFAC, correct?

25   A.  That's correct.

1    Q.  And this is a joint fact sheet on foreign correspondent

2    banking, and it also talks about enforcement, is that correct?

3              MS. KIM:  Objection.

4              THE COURT:  Sustained.

5              MR. WEINGARTEN:  I move it into evidence, your Honor.

6              MS. KIM:  The government objects.

7              THE COURT:  Anything different than what we discussed?

8              MR. WEINGARTEN:  It's what we discussed.

9              THE COURT:  For the government, grounds?

10             MS. KIM:  Not for impeachment purposes and all the

11   other reasons we discussed.  He has never seen this document.

12             THE COURT:  Overruled.

13             (Defendant's Exhibit 47 received in evidence)

14   Q.  Let's move to FINCEN and OFAC.

15             What is FINCEN, sir?

16             MS. KIM:  Your Honor, could we make clear what the

17   date is on this document from the first page?

18             MR. WEINGARTEN:  August 30, 2016, document entitled

19   United States Department of Treasury and Federal Banking

20   Agency's Joint Fact Sheet on Foreign Correspondent Banking

21   Approach to BSA, AML and OFAC Sanctions, Supervision and

22   Enforcement.

23   Q.  Let's turn to page 3, and we see FINCEN and OFAC, correct?

24   A.  Yes.

25   Q.  And what is FINCEN?

K35TSAD5                          Kim - Cross

A.   FINCEN is one of the Treasury's -- one of agencies that

belongs to the Treasury, and it collects reports from banks

about suspicious banking activities, and it works as like

information center about what is going on in banks.

Q.   Let's see what this report says.  FINCEN and OFAC are also

essential to the effectiveness of the United States BSA, AML

framework and sanctions regime.  What is BSA and AML?

A.   BSA is the Bank Secrecy Act, and AML is Anti-Money

Laundering.

Q.   So FINCEN has independent enforcement authority to impose

CMPs and may seek equitable relief against financial

institutions for non-compliance with BSA.  What are CMPs?

A.   Civil Monetary Penalties.

Q.   Let's jump down and move from FINCEN to OFAC, fourth line

from the bottom.

         Similarly, in certain circumstances, OFAC -- and

that's you, of course, correct?

A.   Yes.

Q.   -- will consult with relevant FBAs regarding the quality

and effectiveness of an institution's compliance program when

determining the appropriate enforcement response.

         And when talking about an institution's compliance

program, you're talking about a bank, right, or financial

institution?

A.   Yeah.

K35TSAD5                          Kim - Cross

1    Q.  OFAC investigates cases of sanctions violations, many of

2    which, over 95 percent, are closed with administrative measures

3    such as cautionary or no action letters.

4               That's what you said before, correct?

5    A.  Yes.

6    Q.  But you said 90, they're saying 95, right?

7               MS. KIM:  Objection, your Honor, it's a

8    mischaracterization of what he actually said.

9               THE COURT:  Overruled.

10   A.  I said less than ten percent.

11   Q.  Sorry?

12   A.  I said less than ten percent.

13   Q.  I beg your pardon, I believe you said ten.  This means that

14   less than five percent of all cases of sanctions by --

15   sanctions-related violations investigated by OFAC have resulted

16   in a civil monetary penalty or other public enforcement

17   response.  Do you see that?

18   A.  Yes.

19   Q.  So we're clear, for every hundred cases you get, 95 result

20   in something less than a monetary penalty, correct?

21   A.  That's correct.

22               MR. WEINGARTEN:  Can I have one second, please.

23               THE COURT:  Yes.

24               MR. WEINGARTEN:  Could I have DX1352 put up, please?

25               THE COURT:  Sorry, what was the number?

1               MR. WEINGARTEN:  1352, just for the witness.

2    Q.  Now is there such a thing at OFAC as frequently asked

3    questions and answers?

4    A.  Yes.

5    Q.  What is that?

6    A.  That's OFAC's notice to the public saying that this will be

7    our answers if anybody has these types of questions.

8    Q.  So people -- do you make up the questions or do people

9    actually write them in?

10   A.  Both.

11   Q.  And have you ever seen the question on 1352?

12   A.  Yes.

13              MR. WEINGARTEN:  Move it in, your Honor.

14              MS. KIM:  The government objects.

15              THE COURT:  As discussed, overruled.

16              (Defendant's Exhibit 1352 received in evidence)

17   BY MR. WEINGARTEN:

18   Q.  Would you like a paper copy or can you read it up there?

19   A.  It would be all right.

20   Q.  On February 14, 2008, OFAC issued guidance stating that the

21   property and interests in property of an entity are blocked if

22   the entity is owned, directly or indirectly, 50 percent or more

23   by a person whose property and interests in property are

24   blocked pursuant to an executive order or regulations

25   administered by OFAC.

K35TSAD5                         Kim - Cross

1          Does that mean if more than 50 percent of an entity is

2     an SDN, the property is blocked, is that what you're saying?

3          Is that the import of that sentence?

4     A.  Can you repeat?

5     Q.  Maybe if I read the next sentence it will be clear.

6          We act as an intermediary bank in wire transfers

7     between other banks.

8          So that's the correspondent bank that you described

9     yesterday, right?

10    A.  Mm-hmm.

11    Q.  Does OFAC expect banks that are acting as financial

12    intermediaries to research non-account parties that do not

13    appear on the SDN list but are involved with or referenced in

14    transactions that are processed on behalf of correspondents?

15         You got that question?

16    A.  Yeah.

17    Q.  Could you translate that in simple English?

18         Can I help you here, maybe?  Isn't the issue --

19         MS. KIM:  Could you give him a minute to read the

20    document?

21         MR. WEINGARTEN:  That's fine.

22    A.  Yes.  In other words, in plain language, does OFAC expect

23    banks to do due diligence on the bank's client's client.

24    Q.  So is the question:  If the correspondent bank has a

25    transaction, wired funds that go through the correspondent

```
 1   bank, and neither party, not the party presenting the money or
 2   the party receiving the money, is on the SDN list, correct?
 3              Isn't the question --
 4   A.  The question is whether OFAC expects the correspondent
 5   banks to know about not only sender -- not about the bank that
 6   send the transfer order, whether correspondent bank should know
 7   about the parties involved in the transaction.
 8   Q.  And isn't the answer if neither party is on the SDN list,
 9   then the correspondent bank has no responsibilities at all?
10   A.  Answer to question is no.
11   Q.  Well, isn't that what is said on this piece of paper?
12              MS. KIM:  Where, your Honor?
13   Q.  Let's see.
14   A.  This is the question, but I didn't look at the answer part
15   yet.
16   Q.  Okay.  Let's see what is actually written here, second
17   paragraph, last sentence.  Let's highlight it, beginning with
18   "In instances where all three conditions are met," I guess we
19   have to look at the conditions.  Let's go back to the top
20   paragraph 2.  The answer to question 116.
21              A wire transfer in which an entity has an interest is
22   blocked property if the entity is 50 percent or more owned by a
23   person whose property and interests in property are blocked.
24              That's an SDN, right?
25   A.  Yes.
```

K35TSAD5                         Kim - Cross

Q.   Let's continue.  This is true even in instances where such

a transaction is passing through a U.S. bank that, one, is

operating solely as an intermediary.  That's the correspondent

bank, correct?

A.   That's correct.

Q.   And two, does not have any direct relationship with the

entity, for example, the entity is a non-account party, so

that's a standard wire procedure, and three, does not know or

have reason to know the entity's ownership or other information

demonstrating the blocked status of the entity's property, EG,

the entity is located in Cuba.

          That means the correspondent bank has no reason to

believe on either side of a transaction is a SDN, fair?

A.   Not fair because of the third condition, does not know.

Q.   So we're saying the same thing, the correspondent bank

doesn't know, has no reason to believe anybody is an SDN?

A.   Yeah, right.

Q.   Okay.  OFAC would not expect the bank to research the

non-account parties listed in the wire transfer that do not

appear on the SDN list, and accordingly, would not pursue an

enforcement action against the bank for having processed such a

transaction.

A.   That's correct, yeah.

Q.   And you agree with that, right?

A.   Yeah.

1    Q.  So if the correspondent bank has no reason to believe that

2    anybody on either side of the transaction is on the SDN list,

3    that correspondent bank has no issues with you?

4    A.  That is not exactly true.  We have issue, but we will not

5    take like monetary penalties.  Here, will not pursue an

6    enforcement action.  When we say this, this one usually means

7    public enforcement action, if they keep doing this, is that

8    they receive cautionary letter and it goes onto their file.

9    Q.  Is that what is said here?  Is there another sentence that

10    says what you just said?

11          MS. KIM:  Objection.

12          THE COURT:  Sustained.  That wasn't the question.

13    Q.  Is there any further guidance -- is there anywhere that

14    this question is supplemented in the OFAC records where

15    additional information is provided?

16          MS. KIM:  Objection.

17          THE COURT:  Sustained.

18    Q.  So you said in your direct testimony that OFAC is a strict

19    liability organization, is that correct?

20    A.  That's correct.

21    Q.  So of the 100 cases that typically fall on your desk, how

22    many are cases where entities or individuals have been punished

23    in any way, shape or form for conduct where there was

24    absolutely no knowledge on their part that they did anything

25    wrong?

1    A.  It depends how you interpret punishment, but we take

2    enforcement action to -- that includes cautionary letter to

3    party who unwittingly getting involved in the transaction that

4    is in violation of a regulation.

5    Q.  And they got a letter from you?

6    A.  Yep.

7    Q.  So that was the punishment, they got a letter?

8    A.  Yep.

9    Q.  Which cases were they?

10           MS. KIM:  Objection to form.

11           THE COURT:  Sustained.

12           MR. WEINGARTEN:  I have nothing further.

13           THE COURT:  Okay.  Ms. Kim.

14   REDIRECT EXAMINATION

15   BY MS. KIM:

16   Q.  Just a few questions, Mr. Kim.

17           MS. KIM:  Mr. Milione, if we could please pull up

18   Defense Exhibit 1352, which was just on the screen.

19   Q.  And actually, while you're doing that, I'll ask you a

20   little bit about enforcement actions at OFAC.

21           So you testified on direct and also a minute ago when

22   defense counsel asked you about OFAC's enforcement actions,

23   about monetary penalties as well as cautionary letters.  Can

24   you describe for the jury what a cautionary letter is?

25   A.  Yes, the way OFAC operate is we investigate the potential

violation, the transaction, and then when the transaction is in

violation, for example, U.S. food was exported to Iran, then we

look at the transaction and all the parties involved in that

transaction and we see U.S. manufacturer, freight forwarder,

carrier and so on and up to the Iranian recipient.

THE COURT:  I didn't hear you.

THE WITNESS:  Up until the Iranian recipient of the

goods.

THE COURT:  Iranian recipient, okay.

A.   Then we analyze who was the most responsible for this

transaction, and then somebody -- if everybody did it by

mistake, then it's one story, but if somebody hide some key

information there so all other get involved in this without

knowing, then we definitely go after the party who did

something to hide the key information that the other parties'

compliance was not able to catch, then we go after the most

responsible party with monetary penalty as much as we can.

For others, if you look at their compliance program

it's so weak so they are prone to fall into this kind of

problems, then we issue cautionary letter.  If that party

accumulate cautionary letter, it is a different story, it is a

pattern for them, they seriously let something, if something

comes up involving that party, next time that party will be on

the list for monetary penalties.  That's how it goes.

So cautionary letter, we issue can cautionary letter

normally to a party who unwittingly committed the violation,

but yeah, the intentional -- for a party who intentionally

tried to get around or intentionally tried to breach the rule,

then we go after them with monetary penalty as much as we can.

Q.   And so I'm sorry, Mr. Kim, when you speak could you be sure

to speak into the microphone, thank you.

        So earlier I think you started to say that cautionary

letters have meaning?

A.   Yes.

Q.   And fair to say that you just testified that part of that

meaning is because if you receive multiple cautionary letters,

that could impact the decision of OFAC to bring an enforcement

action down the line?

A.   Yes, but that's the second one.  The first one is the party

who received cautionary letter is in violation of the

transaction, that's why they received the cautionary letter; if

they don't, they will receive no action letter.  There's a

special name for that.  But a cautionary letter means you

violated, but we are just giving a pass this time because looks

like you unwittingly fell into this problem.

Q.   And earlier there was some discussion about what

percentage, approximately, of cases where OFAC finds there was

a violation.  What percentage of those cases results in

monetary penalties?

A.   Normally I say less than ten percent, around, but if he

1    shows the other calculation is five percent, that range.

2    Q.  Somewhere around less than ten percent, five percent.

3            And you testified yesterday on direct that the

4    potential penalties could reach hundreds of millions of

5    dollars, is that correct?

6            MR. WEINGARTEN:  Beyond the scope, your Honor,

7    repeating yesterday.

8            THE COURT:  Sorry?

9            MR. WEINGARTEN:  Beyond the scope of my cross and it

10   was repeated yesterday.

11           THE COURT:  Sustained.

12   Q.  So now if we could move to Defense Exhibit 1352.  And do

13   you see this was the exhibit that defense counsel just walked

14   you through.  Are you familiar with something called the 50/50

15   rule or referred to as a 50/50 rule?

16   A.  It is called -- we call it 50 percent rule.

17   Q.  50 percent rule.  Very generally, could you please explain

18   what the 50 percent rule is.

19   A.  Yes, if an entity is owned 50 percent or more by a blocked

20   person, then the first entity's property is also blocked.

21   Q.  So just clarify, does this document refer to the 50 percent

22   rule, does it discuss the 50 percent rule?

23   A.  I think so, yes.

24           MS. KIM:  If we could take this down, Mr. Milione.

25   Q.  And apart from the 50 percent rule, when an entity is not

1  partially owned or controlled by SDN, so is not an SDN, not

2  affiliated with an SDN but is Iranian and headquartered in

3  Iran, do Iran sanctions apply to that entity?

4  A.  Yes.

5  Q.  Defense counsel asked you some questions, I think it was

6  this morning, about the comprehensive ban on exports to Iran,

7  also known as the ITSR.  Do you remember that?

8  A.  Yes.

9  Q.  And you testified on cross-examination that the ITSR can be

10  violated if services are sent directly or indirectly to Iran.

11  Do you remember that?

12  A.  Yes.

13  Q.  Mr. Kim, are you familiar with the term "front company?"

14  A.  Yes.

15  Q.  What does that term mean?

16  A.  Front company is a company used to hide --

17          MR. WEINGARTEN:  Excuse me.  Respectfully, Judge,

18  that's beyond the scope, your Honor, and also subject to all --

19          THE COURT:  I didn't hear you.

20          MR. WEINGARTEN:  This is the subject that was

21  discussed extensively before.

22          THE COURT:  Yes.

23          MR. WEINGARTEN:  I think we were about to --

24          THE COURT:  I think you misremember.  So on that

25  second ground, overruled, the first ground which was scope,

1   overruled.

2   Q.  Mr. Kim, could you please explain to the jury, what does

3   the term "front company" mean?

4   A.  Front company is a company used to hide the true identity

5   of the principal or the true parties of the transaction that is

6   conducted through the front company.

7   Q.  And is the use of a front company, or as you described it,

8   hiding the identity of a principal, that is headquartered in

9   Iran, does that matter to OFAC?

10  A.  Yes.

11  Q.  Why?

12  A.  That matters to OFAC because that makes -- as I said, if

13  one transaction is to be done, then there are so many

14  participants involved.  If one is to go to Iran or one is

15  delivered to Iran, there is so many parties involved.  If front

16  company is used, then the parties' effort to be in compliance

17  with the sanctions program get frustrated, get compromised,

18  because the key information that they're looking for as a red

19  flag is hidden.

20          In comparison, if a transaction is to be done, it was

21  planned to be done or trying to be done without mistake, then

22  normally in those situations, from my experience, there's --

23  the key information is there, because nobody wants to

24  intentionally hide those.  So if front company is used and

25  looks like it is not even related to transaction, then it goes

1    through step by step the transaction process.  And that process

2    made all the parties involved in violation of the regulation,

3    and also it makes U.S. services or goods going to Iran.  That

4    is the ultimate problem of the sanctions program.  That's why I

5    said it defeats the purpose of sanctions program.  That's why,

6    again, the use of front company matters to OFAC.

7              MS. KIM:  Your Honor, just one minute, please.

8              THE COURT:  Okay.

9              (Pause)

10             MS. KIM:  No further questions.

11             THE COURT:  Mr. Weingarten.

12             MR. WEINGARTEN:  Just one.

13             THE COURT:  Go ahead.

14   RECROSS EXAMINATION

15   BY MR. WEINGARTEN:

16   Q.  So it's your understanding the whole point of these front

17   companies in Iran, in your work, is to secretly get the money

18   to the mother ship in Iran, correct?

19             MS. KIM:  Objection.  What is "mother ship?"

20   Q.  Remove mother ship.

21             THE COURT:  I'll sustain.  Reask it, please, for

22   clarity.

23   Q.  So the point of the front company is to secretly get the

24   money into Iran so that you don't see it, correct?

25   A.  That's correct, but I -- I need some explanation for that.

K35TSAD5

1   We call those companies front company.  If the purpose is not

2   to hide, then we use other term.

3   Q.  So if there's no reason to hide, then they're not front

4   companies, right?

5         The front companies are secretly getting that money

6   into Iran, that's their whole point, right?

7   A.  Yes.

8         MR. WEINGARTEN:  Thank you.

9         THE COURT:  Ms. Kim.

10        MS. KIM:  Nothing from the government, your Honor.

11        THE COURT:  Thank you, Mr. Kim, you are excused.

12        Counsel, I'm going to give the limiting instruction

13  now unless there's any objection to timing.

14        MS. KIM:  No objection.

15        THE COURT:  No objection.  Thank you.

16        Members of the jury, I have a limiting instruction:

17  You have heard testimony about the meaning of the words

18  "inapplicable laws and regulations."  That testimony was

19  admitted as relevant to the defendant's state of mind.  That is

20  the sole purpose for which you may consider it.  As I mentioned

21  in my initial instructions to you, I, as the judge, will

22  instruct you on the law and the meaning of the law, and you

23  will be required to follow my instructions.

24        Thank you.  Ms. Kim, you may call your next witness.

25        MR. LYNCH:  Your Honor, the government calls Talya

K35TSAD5

1    Nevins.

2           While we wait for the witness, if I may, the

3    government offers a stipulation.

4           THE COURT:  Go ahead.

5           MR. LYNCH:  Stipulation 104D, as in David.

6           THE COURT:  Counsel, without objection?

7           MR. HEBERLIG:  No objection.

8           THE COURT:  104D.

9           (Government's Exhibit 104D received in evidence)

10          MR. LYNCH:  It is hereby stipulated and agreed by and

11   between the United States of America by Geoffrey S. Berman,

12   United States Attorney for the Southern District of New York --

13   and I realize we read this before in prior stipulations, so I

14   will jump ahead to point one, which is Government

15   Exhibits 1401A-T, 1403T, 1405T, 1501T, 1503T, 1503A-T, 1506A-T.

16   1601T, 2032T, 2034T, 2034B-T, 2034C-T, 2090T, 2090A-T, 2149T,

17   2187T, 2237T, 2269A-T, 2269B-T, 2269C-T, 2269D-T, 2269E-T,

18   2269F-T, 2269G-T, 2269H-T, 2271T, 2271A-T, and 2276T consist of

19   true and accurate English translations of the underlying

20   government exhibits.

21          It is further stipulated and agreed that this

22   stipulation may be received in evidence as Government

23   Exhibit 104D at trial.

24          Your Honor, the Government offers Government

25   Exhibit 104D at this time.

K35TSAD5

1            MR. WEINGARTEN:  No objection.

2            THE COURT:  Thank you, Mr. Lynch, the exhibit and

3    indicated documents are admitted.

4            (Government's Exhibits 104D 1401A-T, 1403T, 1405T,

5    1501T, 1503T, 1503A-T, 1506A-T.  1601T, 2032T, 2034T, 2034B-T,

6    2034C-T, 2090T, 2090A-T, 2149T, 2187T, 2237T, 2269A-T, 2269B-T,

7    2269C-T, 2269D-T, 2269E-T, 2269F-T, 2269G-T, 2269H-T, 2271T,

8    2271A-T, and 2276T received in evidence)

9            MR. LYNCH:  For the purposes of this witness, the

10   government offers the following exhibits, 1103, 2002, 2210,

11   2114 and 2114A, 2210, 2237 and 2237T, 2257, 2265, 2265B, 2271,

12   2271T, 2271A and A-T, 2276 and 2276T, 2277, 2297, 2297A and

13   2298.

14           MR. HEBERLIG:  Can you repeat the one between 2002 and

15   2210?

16           MR. LYNCH:  2114 and 2114A.

17           MR. WEINGARTEN:  And the first one?

18           MR. LYNCH:  1103.

19           MR. HEBERLIG:  Your Honor, we have objections to two

20   of those exhibits.

21           THE COURT:  Which two?

22           MR. HEBERLIG:  1103, and 2271 and 2271A and their

23   related translations.

24           THE COURT:  Could you skip those until we break, or

25   until the end?

1          MR. LYNCH:  Sure.  Can you read those off one more

2    time?

3          MR. HEBERLIG:  Yes, 1103, 2271, 2271A and their

4    related translations.

5          MR. LYNCH:  1103 and 2271?

6          MR. HEBERLIG:  Yes.

7          THE COURT:  2271A.

8          MR. WEINGARTEN:  And the translations.

9          THE COURT:  Ready to proceed?

10          MR. LYNCH:  Yes.

11     TALYA NEVINS,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. LYNCH:

16          MR. LYNCH:  Mr. Milione, please publish 2276 and its

17    corresponding translation, 2276T.

18          THE COURT:  I should say other than 1103 and 2271 and

19    A, the other documents read by Mr. Lynch are admitted.

20          (Government's Exhibits 2002, 2210, 2114 and 2114A,

21    2210, 2237 and 2237T, 2257, 2265, 2265B, 2276 and 2276T, 2277,

22    2297, 2297A and 2298 received in evidence)

23          MR. LYNCH:  If you could highlight the header on

24    2276T, this is an email from ali.sadr@spanrise.com to

25    sadrhashemi@stratusgt.com sent June 21, 2008, forward.

1          If you go to the body, please, and the lower -- please

2     highlight the entire body, and focusing on the lower email

3     which responding to -- that's an email from

4     sadrhashemi@strtusgt to Ali Sadr at that same address that same

5     date.

6     BY MR. LYNCH:

7     Q.   Could you plead read the highlighted text of the first

8     email message, "Hello, Dear Ali."

9     A.   Hello, Dear Ali,

10         Why didn't you email me the name of the bank?

11    Q.   And may you read the response above that that relates

12    "Hello, Dear Father," and highlighting through to the bottom

13    message.

14    A.   Hello, Dear Father,

15         The following bank is on the OFAC list,

16    Europäisch-Iranische Handelsbank DIH, Hamburg, Germany.

17         Sincerely yours, Ali.

18    Q.   Thank you.

19         MR. LYNCH:  Let's go to the next exhibit, 2277, and

20    highlight the header.

21         This is an email from Rob Klingensmith at an

22    anrcapital.com email address to Ali Sadr at a similar email

23    address sent October 4, 2008.

24         If you could highlight the first two paragraphs of the

25    body.

1    Q.   And Ms. Nevins, if you read the first two paragraphs.

2    A.   Late last month the Treasury Department gave special

3    permission to the private American Iranian Council to open an

4    office in Teheran.  The office plans to promote educational and

5    cultural exchanges by hosting round table discussions and

6    conferences.  The Princeton, New Jersey, based council will

7    join a handful of other think tanks and policy institutes that

8    have similar licenses from the Office of Foreign Assets Control

9    to work in Iran, which is under heavy U.S. sanctions over its

10   nuclear program and support for groups the United States labels

11   terrorist organizations.

12             MR. LYNCH:  If you could look to the next document,

13   2002, and highlight the initial header.

14             This is an email thread.  The top email is from Bahram

15   Karimi at stratusgt.com to Ali Sadr sent December 18, 2009.

16             Could you please highlight the top email.

17   Q.   And if you could read that, Ms. Nevins.

18   A.   Salam.  I have not received my account number and password

19   yet.  Maybe such a trifle amount of money is under sanction,

20   too.  I think, at this moment, the information you have sent

21   will be enough.  Otherwise, I will inform you.  Thanks, Karimi.

22   Q.   Thank you.

23             MR. LYNCH:  If we could move to the next Exhibit,

24   2205.  And could you highlight the header, please.

25             Actually, no, we can move on.

1        If we could move on to 2210.  If you highlight the

2   header on the top.  At the top you have an email from Mustafa

3   Cetinel to Ali Sadr sent August 26, 2010.  It appears within

4   the body of this email is another email, and the header

5   information for that is its from metalsac@metalsac.com.tr to

6   M.Cetinel at that address sent on the same day, August 26,

7   2010.

8        If you could highlight the body of that email.

9   Q.  And Ms. Nevins, if you could read the first three

10  paragraphs of that email.

11  A.  Related to yesterday's meeting held in Ankara, headed by

12  state undersecretary, have assessed the continuation of

13  business relation with Iran under U.S. embargo.  However, it is

14  clear that Turkish state owned, and including private banks,

15  have connections with Iranian banks, have been seriously warned

16  to cease money transfers to their Iranian counterparts.

17  Otherwise, United States will enforce sanctions against them.

18  In addition to the sanctions threat, firms that continue

19  relations with Iran risk losing all business connections with

20  the United States.

21       MR. LYNCH:  If you could move to the next exhibit,

22  which is -- we're tabling 1103, which would have been the next

23  exhibit, so we're moving on to 2257.  And highlight the letter.

24       This is from Mustafa Cetinel to Ali Sadr, this time a

25  gmail account.  This email is sent October 1st of 2011.  And

1    the subject is swifts are received with thanks.

2               Can you please go to the body and highlight the body

3    of the email.

4    Q.  And Ms. Nevins, if you could read the middle -- or the

5    second and third paragraphs, starting "regarding."

6    A.  Regarding Mr. Karimi's payment, he checked yesterday and

7    not received yet.  If you can furnish me with swift copy I

8    would let him trace in his bank.  I'm afraid the money might be

9    blocked in U.S. bank, as they are sensitive to Iranian names.

10   Meanwhile, we will expect to receive $4.4 million U.S. in ten

11   days from DUCOLSA.  We received the addendum signed by them.

12   We will further discuss the details in Istanbul when we see

13   each other.

14   Q.  Thank you.

15               MR. LYNCH:  We can move to the next exhibit, 2265.

16   Highlight the header.  This is an email from

17   pegahsadr@gmail.com to undisclosed recipients with a BCC to

18   alisadr@gmail.com, sent Thursday, February 16, 2002.

19               Please highlight the body.  Sorry, 2012.  If you

20   highlight the body.

21   Q.  And Ms. Nevins, could you read that.

22   A.  Please see attached.  This applies to U.S. persons and

23   whomever is present in the U.S., regardless of what visa they

24   hold.

25   Q.  If you could go to 2265A -- excuse me, B, and what is the

1     title of this document?

2     A.   The Impact of the U.S. Sanctions Against Iran on You.

3     Q.   And on the lower right, does it appear to be a publication

4     from a specific organization?

5     A.   Yes, the Asian Law Caucus.

6            MR. LYNCH:   And if you could go to the body of that

7     and turn to page 2, which is the third page of the document, if

8     you look at the upper left corner you will see pagination.

9            If you turn to page 2 and highlight the top first, and

10    that reads Introduction to Iran Sanctions, and then next, if

11    you could highlight -- the next section is What are Iran

12    Sanctions?  Highlight that in the first paragraph, please.

13    Q.   Ms. Nevins, please read that.

14    A.   What are Iran Sanctions?

15           Sanctions are penalties that one country imposes on

16    another country for foreign policy or national security

17    reasons.  For a number of years, the United States has imposed

18    sanctions against Iran, generally on the basis that the Iranian

19    government works against U.S. interests.  The most relevant

20    sanctions affecting your commercial and financial dealings with

21    Iran are the Iranian transaction regulations, Iran sanctions.

22           MR. LYNCH:   If you highlight the next section, says

23    Who Regulates U.S. Sanctions against Iran.

24    Q.   If you read the body of that.

25    A.   OFAC.  OFAC stands for Office of Foreign Assets Control,

1    which is an agency of the United States Department of Treasury.

2    Among other things, OFAC is responsible for administering and

3    enforcing the Iran sanctions.

4            MR. LYNCH:  And if you could highlight the section on

5    the upper right.

6    Q.  And Ms. Nevins, if you could read that whole section.

7    A.  What happens if I don't comply with the Iran sanctions?

8            Failure to comply with the Iran sanctions can result

9    in severe criminal and civil consequences.  Criminal penalties

10   may include a fine up to one million dollars, imprisonment up

11   to 20 years, or both.  Civil penalties may be the greater of up

12   to $250,000 or twice the amount of the transaction.

13           MR. LYNCH:  And now if with go to page 4 within the

14   document, which is Section 3, Money and Investment Matters.  If

15   you could highlight the section, "How do I know?"

16   Q.  Ms. Nevins, if you could read the title and the body of

17   that.

18   A.  How do I know what properties or entities are owned or

19   controlled by the government of Iran?

20           OFAC publishes a list of persons determined to be the

21   government of Iran as part of its specially designated

22   nationals list.  The list, commonly known as the SDN list, is

23   available in a number of formats on OFAC's website.

24           THE WITNESS:  Should I read --

25           MR. LYNCH:  Indicating a web address after that at the

treasury department.

             If you pull out and highlight the following section

below it, "What is generally allowed," and highlight the first

bullet for me.

Q.   If you could read that.

A.   What is generally allowed?

             U.S. banks are allowed to handle funds transfers to

and from Iran through third country banks for the following

transactions:  A non-commercial family remittance.  This means

you are allowed to send and receive money to and from your

family as long it is not for a commercial transaction or

related to a family-owned business.

             MR. LYNCH:  And pull out and highlight the next

paragraph, "In practice."

Q.   And Ms. Nevins, if you could read the first full sentence.

A.   In practice, funds transfers between U.S. and Iran that do

not violate the Iran sanctions are few and far between because

most transactions with Iran are prohibited, and almost all

Iranian banks are on the SDN list.

             MR. LYNCH:  Pull out, and highlight just the next

bullet and point header.

A.   Payment associated with one of the import or export

exceptions.  See Sections 4 and 5 of this publication for a

detailed discussion of these exceptions.

             MR. LYNCH:  And I apologize, if you could highlight

1    that bullet with the bullets below.  Sorry, if you keep the

2    header.

3    Q.  And read the second and third bullets, please.

4    A.  Travel-related payments, such as payment of living

5    expenses, payment for accompanied baggage and goods and

6    services acquired for personal use, and payment for travel

7    arrangements, air and sea, land.

8              Payment for the shipment of donation of articles,

9    food, clothes, medicine, to relieve human suffering.

10             MR. LYNCH:  And if you could pull out and highlight

11   the final two bullets on the page that all fall under, again,

12   the general heading of what is generally allowed.

13   A.  Any transaction authorized by OFAC through a specific or

14   general license.  Payments to Iran associated with the

15   overflight of Iran or emergency landing in Iran.

16   Q.  The heading is fine on that.

17             MR. LYNCH:  If we go to skip ahead a few pages to page

18   10 in the internal document, Section 5, export prohibitions, if

19   you highlight the whole body of the upper half of that page.

20   Q.  If you could read "You are generally," that sentence, and

21   then after that the first bullet below.

22   A.  You are generally prohibited --

23   Q.  If you could read the header above it, please.

24   A.  How do the Iran sanctions affect the export of goods and

25   services to Iran from the United States?

1          You are generally prohibited from the following

2     transactions:  Exporting goods, technology, and services to

3     Iran.

4     Q.  And then if you could read the third and fourth bullets.

5     A.  Exporting goods, technology, or services from the United

6     States to a third country, for example, UAE, if you know or

7     have reason to know that such items are intended for shipment

8     or exportation, directly or indirectly, to Iran.

9          Exporting goods, technology or services from the

10     United States to a third country, for example, Germany, if you

11     know or have reason to know that such items are intended for

12     production, for commingling with, or incorporation into goods,

13     technology or services, which will then be exported directly or

14     indirectly to Iran.

15     Q.  If you could read the final paragraph, please.

16     A.  These export prohibitions include direct exports U.S. to

17     Iran, exports through a third country, U.S. to third country to

18     Iran, and exportations for transshipment U.S. to Iran to third

19     country.  Also note that the prohibition against technology

20     exports generally extends to software.

21          MR. LYNCH:  Let's go to the next page, page 11, if you

22     highlight just maybe the left-hand side.

23     Q.  I will have you read a few things on this side, just the

24     top bold portion, please.

25     A.  Are there any exceptions to the export prohibitions?

Q.   Would you read the bolded bulleted points, but not the

text.

A.   Gifts exception, accompanied baggage and personal use

exception, household goods exception.

          MR. LYNCH:  You could pull out, and same thing on the

second side of the page, right side of the page, highlight all

that.

Q.   If you could read the bulleted bolded lines that again fall

under:  Are there any exceptions to the export prohibitions?

A.   Information exception, humanitarian donation exception,

licensed agricultural and medical commodities exception,

license needed.

          MR. LYNCH:  If we could go to page 17 internally

within the document, which is Section 7, OFAC licensing, and

highlight the top paragraph, please.

Q.   If you could read that.

A.   What is an OFAC license?

          A license is an authorization from OFAC to engage in a

transaction that otherwise would be prohibited.  In other

words, any export, import or transaction involving Iran that is

not covered by an exception is prohibited unless you have a

license from OFAC.  There are two types of licenses, general

licenses and specific licenses.

Q.   And we could go to the next document, 2114.

          MR. WEINGARTEN:  Your Honor, we ask that a limiting

1    instruction be read at this time.

2                THE COURT:  Without objection?

3                MR. KROUSE:  No objection.

4                THE COURT:  I'm going to remind you, ladies and

5    gentlemen, of the limiting instruction as it pertains to this

6    evidence.

7                You've heard testimony and evidence about the meaning

8    of words in the applicable law and regulations, and that

9    evidence is admitted as relevant to the defendant's state of

10   mind, and that is the sole purpose for which you may consider

11   it.  As I mentioned in my initial instructions to you, I, as

12   the judge, I will instruct you on the law and the meaning of

13   the law, and you will be required to follow my instructions.

14               Thank you.

15               MR. LYNCH:  Mr. Milione, please turn back to 2265 and

16   highlight the entire -- this is the email to which the document

17   I just read was attached.  And again, this is an email from

18   February 16, 2012, subject OFAC sanctions on Iran, description

19   from Pegah Sadr to undisclosed recipients with a BCC to

20   alisadr@gmail.com.

21               And go to the next exhibit, 2114, the header, this is

22   an email from Volz Oliver or Oliver Volz, as indicated in the

23   email address, to Ali Sadr at the gmail account, it was sent on

24   Monday, March 12 of 2002, subject return of USD 45,000.  If you

25   please highlight the body of that email.

1    Q.  And Ms. Nevins, if you could read that body.

2    A.  Dear Ali,

3          Unfortunately, we have received the money back,

4    referring to the payment of USD 45,000 to Lafttiz Shipping FZE.

5    After all, UBS Stanford would return us USD 44,980 minus fee.

6    They rejected this payment due to the Iranian transaction

7    regulations.  See attachment.  Up to now, they have also not

8    reacted on our request for receiving their compliance

9    reports/lists.  I'm sorry to provide such bad news.

10         Best regards, Oliver.

11         MR. LYNCH:  If you pull out on the top it indicates

12   the subject is return of $45,000 and indicates there's an

13   attachment.

14         If we go to 2114A, the attached document, and

15   highlight the full text of the message.  Thank you.

16         At the top it indicates incoming message, output from

17   swift, and go down and highlight line 32 across the page, 32A

18   across the page, 58A across the page and below it.  Then the

19   whole section, 72 across and below.

20         If I may, your Honor, take the liberties, this is a

21   little -- the structure is a little different, if I may read

22   this one, 32A: value date currency code, 10 February 2012, USD

23   44,980, 58A beneficiary institution, indicates Hyposwiss

24   private bank, Zurich, 72 sender to sever information, and it

25   reads a few lines down after some coded language:  Rejected by

K35TSAD5                          Nevins - Direct

1    UBSWU33, please reject this payment pursuant to the Iranian

2    transaction regulation less charges.

3            We're tabling 2271 for the time being, so please jump

4    to 2297.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  The header of this is an e-mail of July 3, 2014 from Linet

2   Estiroti to Ali Sadr, forward payment USD 6,000 dollars.

3            This is a document the jury has seen before, but there

4   is an attachment this time.  But to remind the jury I will have

5   you read from -- if you could highlight the body of the e-mail

6   from the top, down to "best."

7            If you could read first the bottom e-mail "Dear

8   Linet."

9   A.  "Dear Linet,

10           "I hope you are well.

11           "I'm writing to inform you that the payment in the

12   amount of USD 6,000 in favor of Farshid Kazerani, apparently

13   the payment has been rejected by the intermediary bank.

14           "Please find enclosed the official swift message we

15   have received from the intermediary bank."

16   Q.  That is it.  If you could just highlight the top e-mail in

17   response.

18   A.  "Mr. Ali.

19           "The intermediary bank has rejected the payment to

20   Mr. Kazerani.  The reason is the U.S. sanctions to pay Iranian

21   institution/individual.

22           "Please advise what to do.

23           "Regards,

24           "Linet Estiroti."

25           MR. LYNCH:  If you could go to 2297A, which is the

1    attached document referenced what is called a swift message.

2    If you could highlight the middle section, No. 2, and on the

3    right-hand side this indicates a date of July 1, 2014, a bank

4    code beneath that and bank name JPMorgan Chase Bank NA, New

5    York, New York.  And above that it indicates this is an

6    incoming message.  If you could then pull out and highlight the

7    text in Section 4.

8    Q.  Ms. Nevins, if you could read what is called the narrative

9    underneath line 79.

10   A.   "Regarding your payment order, dated July 1, 2014 for 6,000

11   U.S. dollars, please be advised that, in accordance with the

12   United States Treasury Department and OFAC regulations,

13   transactions involving Iran are restricted.  Payment involving

14   an Iranian institution, entity and/or individual not conforming

15   to the guidelines established by the Office of Foreign Asset

16   Control will not be executed.

17           "Such payment instructions will be canceled and no

18   action taken on our part.  In compliance with the above, we

19   affirm having canceled your payment instructions.  Your account

20   has not been debited in compliance with OFAC regulations.  We

21   confirm transaction was rejected and reported to the Office of

22   Foreign Asset Control.  We consider this matter resolved and

23   case closed.

24           "Regards, USD wire investigations.

25           "Our reference" --

K36nsad6                        Nevins - Direct

1    Q.  That's fine Ms. Nevins.  Thanks.  There is a code beneath

2    it and J.P. Morgan.

3               MR. LYNCH:  If you could go to 2298?

4               MR. HEBERLIG:  Your Honor, this may have been admitted

5    through Mr. Kazerani.

6               MR. LYNCH:  It is the next e-mail.  It is very quick

7    just in response to that to complete the narrative on the

8    e-mail batch.

9               MR. HEBERLIG:  It came in through a fact witness.

10              THE COURT:  Yes.  Sustained.

11              MR. LYNCH:  We have nothing further for Ms. Nevins.

12   We do have the two documents to --

13              THE COURT:  All right.

14              Members of the jury, since we took lunch earlier and

15   started back earlier, we have been going about the stretch of

16   time before our break, and your snacks are here.  So Mr. Scott

17   will take you back for a 15-minute break.

18              Thank you.

19          (Continued on next page)

20

21

22

23

24

25

K36nsad6                              Nevins - Direct

1           (Jury not present)

2           THE COURT:  You may be seated.

3           OK.  I have now been just handed up 1103 and 2271 and

4     2271A.

5           1103, objection?

6           MR. HEBERLIG:  Relevance and 403, your Honor.  This is

7     appears to be a news story about UN sanctions.  It is not about

8     the U.S. sanctions.  There's been ample evidence that was just

9     read in that these sanctions are actually relevant in this

10    case.  U.S. sanctions are not among them, so it is a relevance

11    issue and 403.

12          THE COURT:  Mr. Lynch.

13          MR. LYNCH:  One moment.

14          MR. KROUSE:  Your Honor, we have been looking at it

15    during Mr. Lynch's direct.  We can address this.  This was

16    covered in our motions *in limine*.  The Court has already ruled

17    that it is admissible, this type of document.

18          The government provided the list yesterday, and heard

19    no indication from defense that they had any objections to this

20    document, but --

21          THE COURT:  I get that, but just --

22          MR. KROUSE:  This area was covered in the motions *in*

23    *limine* and it was admitted.

24          THE COURT:  I don't recall this particular document.

25          What's the relevance?

1           MS. LAKE:  Your Honor, if I may just briefly.

2           THE COURT:  Third lawyer.

3           MS. LAKE:  Sorry.

4           THE COURT:  Always a tell.

5           MS. LAKE:  It is just because I think I prepared this

6     for --

7           THE COURT:  I appreciate it.

8           Go ahead, Ms. Lake.

9           MS. LAKE:  It is my recollection that the Court ruled

10    that e-mails that the defendant received about sanctions, even

11    other than U.S. sanctions, were relevant because they went to

12    his knowledge of sanctions generally, showed that sanctions

13    were a topic that was discussed, that these were things that he

14    received, and it was probative of the argument that the

15    government would make that he was aware of the sanctions at

16    issue in this case.

17          So that was the Court's ruling, that although we

18    didn't include this as one of the specific examples in the

19    motions, it is our view that the Court's ruling on the broader

20    category of documents would encompass a document of this kind.

21          THE COURT:  OK.  Thank you for the refreshing my

22    recollection.

23          So, in that category, Mr. Heberlig --

24          MR. HEBERLIG:  We maintain our objection.  It is a

25    newspaper article about UN sanctions.

1              THE COURT:  That he received?

2              MR. HEBERLIG:  Yes.

3              There has been ample evidence that he received

4    information about the U.S. sanctions.  This imposes a

5    different, confusing concept that the jury has no need to

6    learn.

7              THE COURT:  How much of this type of material are we

8    talking about?

9              MS. LAKE:  This is it.

10             This is the section.  We just went through the

11   documents that in our view go to his knowledge of sanctions, so

12   this is it.

13             THE COURT:  Just 1103?

14             MS. LAKE:  Yes.

15             THE COURT:  From this you are going to argue general

16   knowledge of sanctions.

17             MS. LAKE:  Ware going to argue that sanctions were an

18   issue, right.  Sanctions generally were a problem for the

19   company.  They were talking about sanctions.  He was on e-mails

20   talking about how sanctions got in the way of them doing

21   business, and it's relevant to this broader theme that

22   sanctions are something that, when you are part of an Iranian

23   company and you're doing international business, they're going

24   to come up and you're going to know about them.

25             THE COURT:  All right.  Overruled.

1         2271.  Objection?

2              MR. HEBERLIG:  The objection is what's purported to

3    the attachment to the e-mail was not attached to the e-mail,

4    2271.

5              THE COURT:  That's not good.

6              MR. HEBERLIG:  Pardon me?

7              THE COURT:  That's not good.

8              MR. HEBERLIG:  2271 is responsive message from

9    Mr. Sadr saying, why am I copied on this.  It is possible,

10   although not apparent and certainly not clear that the

11   attachment was attached to the first e-mail, but I don't think

12   we can draw that conclusion clearly from what's here.  The

13   attachment is identified in 2271 by name.

14             THE COURT:  And 2271A is what purports -- what the

15   government believes was attached?

16             MR. HEBERLIG:  I think that's the idea.  That's their

17   nomenclature.  When they number something an A, it's supposed

18   to be an attachment.

19             It is not attached to this e-mail, and it is not clear

20   it is even the attachment to the original e-mail, which has the

21   title on the attachment of document 2013/10/31.  The attachment

22   is a letter dated 10/23/2013.  I don't think there's sufficient

23   evidence that it is part of this document.

24             MR. KROUSE:  This is in evidence, your Honor.  The

25   government moved it in with Mr. Kazerani and went through it

1   with him.

2                THE COURT:  2271A?

3                MR. KROUSE:  Yes, both, along with the translations.

4                MR. HEBERLIG:  Why are we doing it again?

5                MR. KROUSE:  I don't know.  It is in evidence.

6                THE COURT:  It is in evidence, so we don't need to do

7   it with the paralegal, right?

8                MR. KROUSE:  That's correct, your Honor.

9                THE COURT:  Anything else.

10               MR. HEBERLIG:  Just one issue.  I don't know when it's

11  coming up.  We were handed over the lunch break some summary

12  chart exhibits that we have not seen previously.

13               We would like the opportunity overnight to review the

14  voluminous exhibits that are cited in them and check on the

15  accuracy of the document.  We would object to any testimony

16  this afternoon about the exhibits.

17               THE COURT:  Who's doing that?

18               MR. KROUSE:  The summary charts that we handed to the

19  defense pertain to, one, payments, just a summary of all the

20  payments that the government has alleged in this case.  There's

21  around 15 payments.

22               The second summary chart is the travel chart showing

23  the defendant's travel to and from Iran.  I think the travel

24  chart is less of a pressing matter because that's not coming

25  up.

1          The payments section we may get to today.  I actually
2     don't think so.  It's possible we'll start it.
3          But there is a section where we will, with a
4     paralegal, walk through the quite voluminous evidence of wire
5     transfers, payment letters, bank accounts.
6          THE COURT:  Any reason they shouldn't have tonight to
7     review it.
8          MR. KROUSE:  The government has no objection to them
9     having the night to review it.  It's a fairly simple chart in
10    the government's view, but overnight is fine.  Then we can put
11    it in after the payment section is fully shown to the jury.
12         MR. HEBERLIG:  That's fine.
13         THE COURT:  We have plenty of material to fill the
14    rest of the time, but the chart, that will be offered tomorrow?
15         MR. KROUSE:  Yes.
16         THE COURT:  What else?
17         So this paralegal, and then there's another paralegal?
18         MR. KROUSE:  I'm about to call one.
19         Your Honor, if I could maybe read the exhibit, we will
20    check.  I will confer with defense counsel if there are any
21    objections.
22         THE COURT:  That would be great.
23         MR. HEBERLIG:  Can I just address that?
24         We did get a long list of exhibits last night.  The
25    person who was just on was identified as the third paralegal

1    who would be called today.  I guess the order switched.  I

2    anticipated raising this on a break.  At 2 in the morning I

3    didn't seem productive to send a list over.

4              THE COURT:  I appreciate it, and at least this time,

5    Mr. Heberlig, I didn't give you a hard time.

6              MR. HEBERLIG:  Right.

7              THE COURT:  I do appreciate that and recognize the

8    difficulties.  There's only so many hours in the day, but all

9    we can do is try.

10             Anything else?

11             MR. KROUSE:  Your Honor, this doesn't need to happen

12   now, but the government is going to seek to admit Government

13   Exhibit 502 in as a public record.  The government has provided

14   this exhibit to the defense I believe on February 14.  We don't

15   need to introduce it today, but I think with respect to the

16   defense's arguments last night that a Treasury Department

17   federal banking agency fact sheet should be admissible as a

18   public record that sets out that agency's activities under

19   Federal Rule of Evidence 803(8), the government believes that

20   Government Exhibit 502 which is a FinCen U.S. Department of

21   Treasury advisory concerning St. Kitts and Nevis' citizenship

22   by investment program similarly falls under that exception and

23   should be admitted as well.  So the government will offer it,

24   but we don't have to do that today.

25             MR. HEBERLIG:  We object for multiple reasons.

1            Number one, this was discussed in the Jencks  material

2       with the witness who was on the stand a couple of days ago

3       maybe yesterday.  The government decided to withdraw it and not

4       offer it.

5            Had they done so through her, it would have been

6       subject to rigorous cross-examination by us.  They chose not

7       to.  It is highly prejudicial under Rule 403.  It came in, it

8       was published by the agency May 20, 2014.

9            The information in here is completely different than

10      the facts of our case.  A point of the advisory is that someone

11      with an SKN passport could evade sanctions because individuals

12      with whom they were dealing would not know their Iranian

13      identity.

14           The facts of this case are fundamentally different.

15      The face of Mr. Sadr's passport, unlike apparently some other

16      SKN passports, identifies his place of birth as Iran.  So any

17      bank compliance officer or other person who was using his

18      identity document to establish an account or form a business

19      would have full information that he was an Iranian citizen,

20      number one.

21           The evidence has also shown that not only did he

22      provide his SKN passport to his bank, the bank that is at issue

23      in this case, Hyposwiss, but he provided his Iranian passport,

24      which was the e-mail that was kept out for now where the bank

25      officer replied, "Terrific, you made my day."

1             That is highly prejudicial, and it's a sandbag that

2     they didn't put this in through the relevant witness yesterday

3     or a few days ago.

4             MR. KROUSE:  It is not a sandbag.  The government told

5     them.  We marked this three weeks ago and gave it to the

6     defense.  We never intended to introduce it through that

7     witness.  We never showed it to her.  She was testifying about

8     the program in general.

9             THE COURT:  Why was it in their Jencks?

10            MR. HEBERLIG:  It was on our Jencks.

11            MR. KROUSE:  Because she mentioned it in one of her

12    interviews.

13            MR. HEBERLIG:  They wrote in their letter to the Court

14    that they were not going to offer evidence about this when we

15    were fighting about what the Treasury Department witness would

16    testify about.

17            MR. KROUSE:  The defense is more than welcome to call

18    a witness during their case to talk about why this isn't

19    applicable, but that doesn't mean it's not admissible.

20            THE COURT:  Why is it applicable?

21            MR. KROUSE:  It is relevant because it is a same

22    argument the defense was making about why Treasury Department

23    public fact sheets were relevant to show the defendant's state

24    of mind.

25            This is relevant to show that passports obtained using

the St. Kitts and Nevis citizenship by investment program were

known by FinCen to pose a risk of financial crime as relevant

to show --

THE COURT:  What about the point that it is in the

context of where Iran is not identified as the place of origin?

MR. KROUSE:  I don't believe it says that anywhere,

but if defense counsel will show me that.

MR. HEBERLIG:  On page 2, under the guidance, it says

Financial institutions should conduct risk-based customer due

diligence to mitigate the risk that a customer is disguising

his or her identity with an SKN passport in order to evade

sanctions or engage in other financial crime.  This due

diligence may include verifying a customers' identity using a

form of government-issued identification other than or in

addition to the SKN passport, so on and so forth, which is

exactly what this bank did and exactly what he produced.

The SKN passport itself represents on its face that he

is Iranian.  There are other passports apparently that this

addresses where the individual's place of birth is not

represented.

That is not the facts of this case. In any event --

MR. KROUSE:  I don't think --

MR. HEBERLIG:  If I may finish please --

MR. KROUSE:  Sorry.

MR. HEBERLIG:  There was extensive pretrial litigation

1    in connection with the Dubowitz matter about offering evidence

2    that a bunch of other people committed crimes using facts that

3    are somewhat tangentially related to this case to argue to the

4    jury that the defendant did too.  It is highly improper and it

5    should be excluded.

6            THE COURT:  Just on that last point, what I said is

7    there is a line, and I'm concerned about this area, and I would

8    take them as they come.  So in that form you're raising the

9    objection --

10           MR. HEBERLIG:  Absolutely.

11           THE COURT:  OK.  Mr. Krouse.

12           MR. KROUSE:  Your Honor, we distinguished those cases.

13   Those cases are situations where the government is arguing,

14   putting on an expert witness who says this is what people in

15   Washington --

16           THE COURT:  I am aware of the cases.

17           I didn't categorically exclude it, but there is a line

18   and potential for a problem here.  So we'll get to that in a

19   moment.

20           Start with the contention, the significance of Iran

21   being clear on the face of Mr. Sadr's SKN passports.

22           MR. KROUSE:  Thank you, your Honor.

23           I will look again at the passport.  It says he was

24   born in Iran.  I don't think it's clear from the face of the

25   Iranian passport that he remained an Iranian national.

1        Just because someone is born in Iran, listed as the

2   place of birth on the passport doesn't mean that you are

3   disclosing that you are an Iranian national when you show your

4   St. Kitts and Nevis passport.

5        We're about to put in a bunch of documents that show

6   in fact when Mr. Sadr was opening these front companies he was

7   listing himself as a national exclusively of St. Kitts and

8   Nevis.

9        So it's not the case that Mr. Sadr was simply

10   obtaining the St. Kitts and Nevis passport but telling

11   everybody I'm both a St. Kitts and Nevis and Iranian citizen.

12        That is not what was happening.  He was using the St.

13   Kitts and Nevis passport to explicitly represent to these

14   authorities and these banks that he was a St. Kitts and Nevis

15   citizen.

16        Also, I do take issue -- I don't think what defense

17   counsel read there puts what Mr. Sadr did outside of this

18   advisory.  It is not saying that this is only an issue because

19   of people who get St. Kitts and Nevis passport and don't

20   disclose that they are Iranian citizens.  It's saying that this

21   citizenship by investment program is being used to facilitate

22   financial crime.

23        THE COURT:  What will you argue to the jury from this?

24        MR. KROUSE:  Your Honor, in the opening the government

25   laid out the five steps that we allege Mr. Sadr engaged in to

K36nsad6                          Nevins - Direct

1   hide his transactions.

2              THE COURT:  Right.  And you will talk about the

3   passport.

4              MR. KROUSE:  We will talk about the passport.

5              THE COURT:  What will you argue to the jury from this?

6              MR. KROUSE:  We will argue a point that wouldn't be

7   immediately obvious to them, which is that a citizenship by

8   investment program like the St. Kitts and Nevis one is one that

9   can be used to hide a person's nationality.

10             The defense on cross-examination tried to

11   cross-examine the witness by saying doesn't the United States

12   do the exact same thing.  I think it's fair for the government

13   to introduce evidence that this isn't an S1 visa situation,

14   where you have to put in investment, live in the United States

15   for eight years, learn English, take a citizenship test, etc.

16             This is a situation where you pay money to St. Kitts

17   and Nevis, it says $400,000 or $250,000 and you obtain a

18   citizenship essentially a couple of months later.  There's lax

19   oversight.  There's lax information about that citizenship.

20   The defense.

21             MR. HEBERLIG:  All of that is in through Ms. Ebanks.

22   What he just said, every bit of it came in through her

23   testimony.

24             MR. KROUSE:  I don't believe Ms. Ebanks spoke to

25   FinCen's financing.

1              MR. HEBERLIG:  She spoke to controls.

2              THE COURT:  You can't talk on top of each other.

3              Go ahead.

4              MR. KROUSE:  She didn't speak about FinCen's findings.

5     To the extent that this is an exception to the hearsay rule,

6     the same rule that the defense cited to the Court earlier, the

7     government is entitled to utilize that same exception and offer

8     this evidence of a public record from the United States

9     Treasury Department setting forth an advisory on the threat of

10    St. Kitts and Nevis citizenships being used to facilitate

11    financial crimes.

12             MR. HEBERLIG:  Just because it may have a hearsay

13    exception doesn't mean that the other rules of evidence don't

14    apply, 403 and the like.

15             THE COURT:  Maybe you didn't make a hearsay objection.

16             MR. HEBERLIG:  I am not making a hearsay objection.

17             THE COURT:  I didn't think so, but that is not the

18    question.

19             MR. HEBERLIG:  Counsel's said because it is a public

20    record it comes in.

21             THE COURT:  Obviously not.

22             MR. HEBERLIG:  That is not the case.  It's also dated

23    May 20, 2014.  That is after the conspiracy.  All of the

24    payments were done by November of 2013.  I mean, this is

25    completely irrelevant, and the prejudice can't be overstated.

1              It is within the charged -- may I please finish.

2              MR. KROUSE:  I'm sorry.  I thought you were.

3              MR. HEBERLIG:  I wasn't.

4              MR. KROUSE:  That is why I said sorry.

5              THE COURT:  Stop talking on top of each other.  I

6    can't say it enough.  It's unhelpful and frustrating.

7              Go ahead.

8              MR. HEBERLIG:  That other Iranian nationals were

9    abusing this program in other ways is not relevant evidence for

10   this trial, especially when the facts are different from them.

11             THE COURT:  And --

12             MR. HEBERLIG:  I'm sorry.

13             THE COURT:  The testimony you said overlapped with

14   Ebanks was what?

15             MR. HEBERLIG:  She testified to exactly how you obtain

16   a St. Kitts and Nevis passport.  You pay money.  You didn't

17   have to visit, there wasn't an interview, all of those.

18             Then she was also permitted, through leading questions

19   we discussed with the Court, to testify that the controls for

20   obtaining a St. Kitts and Nevis passport were lax.

21             THE COURT:  OK.

22             MR. HEBERLIG:  The only additional thing they want is

23   that FinCen declared that a bunch of other Iranians were

24   misusing the program.

25             MR. KROUSE:  Your Honor --

1        THE COURT:  Last point.

2        MR. KROUSE:  Yes, your Honor.

3        The government, as we said, we are not offering it

4   today.  We are happy to supplement with a letter now that we

5   understand the defense is not making a hearsay objection and

6   directly focus on the relevance and 403 issues.

7        One proposal would be to redact certain parts of the

8   advisory to make the points that are the most relevant and

9   least prejudicial.  For instance, we could redact.

10       THE COURT:  You are going to do it tonight anyway, so

11   I will take a proposal in that regard.  But I've got the

12   defendant's objections firmly in mind.

13       MR. KROUSE:  Understood.

14       Thank you, your Honor.

15       THE COURT:  Anything else?

16       Just quick bathroom break and we will return.  Five

17   minutes, please.

18       (Recess)

19       THE COURT:  All right.  Ready to proceed?

20       MR. KROUSE:  Yes, your Honor.

21       THE COURT:  Bring the witness back up.

22       Mr. Lynch, are you finished with direct?

23       MR. KROUSE:  I believe that witness was finished.  I

24   didn't know if the defense --

25       MR. LYNCH:  There were two more exhibits.  One of the

1    ones the objection was overruled, but I think we will just

2    incorporate them.

3              MR. HEBERLIG:  And cross?

4              THE COURT:  They haven't done cross.

5              MR. LYNCH:  OK.  Then I will finish with these two.

6              THE COURT:  What do you mean two?

7              MR. LYNCH:  I'm sorry.  There are two documents.

8              One I neglected to read.  One we did argument.

9              THE COURT:  One --

10             MR. LYNCH:  It was on the list, 2237.

11             THE COURT:  All right.

12             (Witness resumed)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Thanks, everyone.  You may take your

3      seats.  Everyone may be seated.

4           MR. LYNCH:  May I, your Honor?

5           THE COURT:  Mr. Lynch, you may proceed.

6           MR. LYNCH:  We just have two more documents.

7           If you could please publish 1103.  If you could

8      highlight the header.

9           This is from Mustafa Cetinel to B. Karimi at two

10     addresses and a couple other individuals and copying a series

11     of individuals Zangeneh.

12          THE COURT:  Just a moment.

13          JUROR:  Sorry.  It is on.

14          THE COURT:  Go ahead.

15          MR. LYNCH:  Sorry.

16          This is dated May 4, 2011.  If you could highlight the

17     body of the e-mail but not the attached information just yet.

18     The body of the actual e-mail message.  I'm sorry.  What's

19     above that?  The e-mail content.

20     BY MR. LYNCH:

21     Q.  If you could read that, Ms. Nevins.

22     A.  "Dear All Concerned.

23          "This news is from one year ago.  It is not new.  In

24     spite of this, we exported several goods for Vavan project

25          "Thanks and regards,

1          "Mustafa Cetinel."

2          MR. LYNCH:  If you would highlight the body below to

3    what it's referring to.  If you could highlight from on

4    Wednesday to 10 lines down.  Perfect.

5          This reads, On Wednesday, I believe that's May 4,

6    2011, M. Reza SH Moayed at Stratus GC sent the following

7    information.

8    Q.  If you could read the first roughly ten lines to the

9    sentence that reads "in late June."

10          Once you finish that sentence I'll ask you to stop.

11   Thank you.

12   A.  "Transactions with Iran-based banks and private companies

13   have nearly come to a halt since a delegation from the United

14   States met with Turkish banks and institutions in August to

15   discuss UN sanctions passed in June Daily Milliyet reported

16   Saturday.  The delegation came from the U.S. to Turkey around

17   two weeks ago to warn banks and private companies not to do

18   business with Iranian companies, Milliyet reported.

19          "The visit came in the wake of a fourth round of

20   sanctions approved June 9 by the UN Security Council against

21   Iran for its nuclear programs.  In late June, the U.S. and the

22   EU imposed their own stricter sanctions and asked other

23   countries to do so as well."

24          MR. LYNCH:  Thank you.  And then the final document

25   will be Exhibit 2237.  Can we publish that, please.  Highlight

1    the header.  This is an e-mail from Mustafa Cetinel to

2    sadr@samanehstratus.com sent on December 18, 2010 and copy Ali

3    Sadr.  If you could please highlight the full body of that top

4    e-mail.

5    Q.  If you could read that, please, Ms. Nevins.

6    A.  "Dear Mr. Soltani,

7           "Here below, please find the letter received from

8    Albaraka Bank and its exact translation made by Mr. Celal

9    Tatlikibasi.  It seems that there is no possibility to work

10   with the mentioned bank as I was expecting.

11          "Thanks and regards

12          "Mustafa Cetinel.

13          "Quote.

14          "Dear Mustafa,

15          "Please find below the reply of Albaraka Turk in

16   response to our follow-up inquiry related to a possible

17   cooperation as discussed during the meeting at their offices.

18   Their message is 'We regret to inform you that, because of the

19   present policy of our bank, we are unable to render any

20   services to any direct or indirect transaction originating from

21   or associated with Iran.'

22          "Best regards.

23          "Celal Tatlikibasi."

24          MR. LYNCH:  Tough name.  Thanks.  Nothing further.

25          THE COURT:  Mr. Heberlig, cross-examination.

1           MR. HEBERLIG:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    BY MR. HEBERLIG:

4           MR. HEBERLIG:  May I proceed?

5           THE COURT:  You may.

6    BY MR. HEBERLIG:

7    Q.  I have questions only on one of those documents.  It's

8    Government Exhibit 2265 and 2265A.

9           Do you remember this document?  You were asked some

10   questions about it February 16, 2012 e-mail from Pegah Sadr.

11          Do you know that to be Ali Sadr's sister --

12   A.  No.  I don't know the --

13   Q.  -- to a bunch of undisclosed recipients with a BCC to Ali

14   Sadr and there is an attachment.  It's the attachment I just

15   want to ask you a couple of questions about.

16   A.  Sure.

17          MR. HEBERLIG:  2265B, please.  Can we go to page 2.

18   Highlight the bottom paragraph, please.  Thank you.

19   Q.  Can you just read that for a moment?

20   A.  "Asian Law Caucus is increasingly receiving inquiries from

21   community members regarding the Iran sanctions.  This Know Your

22   Rights publication aims to provide a general discussion of the

23   Iran sanctions, the scope of the prohibited and allowed

24   transactions under the Iran sanctions and the serious impact

25   the Iran sanctions pose on people's lives, especially United

K36nsad6                    Nevins - Cross

1   States citizens and residents of Iranian descent.

2            "This publication should not be regarded as legal

3   advice."

4            MR. HEBERLIG:  All right.  Can we go to page 6,

5   please.  Can you just make the whole text larger, but you don't

6   need the heading.  What's printed on down.

7   Q.  This was the page you were asked some questions about.  Do

8   you remember that?

9   A.  Yes.

10  Q.  Under "what is generally allowed," do you notice that after

11  a number of the sentences there are footnotes, for instance,

12  after noncommercial family remittance there's footnote 10.

13           Do you see that?

14  A.  Yes.

15           MR. LYNCH:  Objection, your Honor, she may be asked to

16  read, but I am not sure what --

17           MR. HEBERLIG:  I am asking her to identify that there

18  are footnotes, your Honor.

19           THE COURT:  Overruled.

20  Q.  On the right-hand side do you see that other sentences, in

21  particular under the payment associated with the with one of

22  the import or export exceptions was 13, 14, 15 and 16.

23           Do you see that?

24  A.  Yes.

25  Q.  Can we turn to page 23, please.  OK.  We just identified

1  10, 13, 14, 15, 16 and 17.  Can we highlight footnote 10,

2  please.  Just 10 first.

3          Can you read that, please?

4  A.  31 C.F.R. Section 560.516(a)(2).

5  Q.  Thank you.  Can we look at footnote 13.  Actually, why

6  don't you highlight on down to 16.

7  A.  31 C.F.R. Section 560.210 --

8  Q.  I'm sorry to interrupt you.  Maybe there is a shortcut.  Do

9  you see on the right-hand side of footnotes 13, 14, 15, and the

10  entirety of footnote 16 that there is a citation to 31 C.F.R.

11  560.516(a)(3) and (a)(1)?

12  A.  Yes.

13  Q.  Can we go to page 22, please.  Can I ask you, I don't need

14  the whole thing, just the first sentence, please.

15  A.  "Whether U.S. economic sanctions such as the Iran

16  sanctions, are an effective tool of American foreign policy

17  remains a matter of longstanding debate and is outside the

18  scope of this publication."

19  Q.  Just one more.

20  A.  "However, there is little dispute that the Iran sanctions

21  can have both intended and collateral effects."

22          MR. HEBERLIG:  Thank you.

23          THE COURT:  Mr. Lynch.

24          Anything further?

25          MR. LYNCH:  No.  Thank you.

1          THE COURT:  Thank you, Ms. Nevins.

2          You are excused.

3          (Witness excused)

4          THE COURT:  The government may call its next witness.

5          MR. KROUSE:  Thank you, your Honor, Matthew Nelson.

6          THE COURT:  Mr. Nelson may come up.

7          MR. KROUSE:  Your Honor, the government at this time

8   can offer, while the witness is going to the stand, Government

9   Exhibits 2005, 2005A, 2016, 2016A, 2016C, 2016F, 2065, 2065A,

10  2071, 2071A, 2071B, 2187, 2187-T, 2188, 2190, 2198, 2199, 2201,

11  2201A, 2215, 2215A, 2215A-T, 2215B, 2215B-T, 2215C, 2215C-T,

12  2217, 2219, 2219A through M.

13         MR. HEBERLIG:  No objection.

14         THE COURT:  Thank you.  Let's swear the witness, and I

15  will admit those at that point.

16   MATTHEW NELSON,

17      recalled as a witness by the Government,

18      having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. KROUSE:

21  Q.  Good afternoon, Mr. Nelson.

22  A.  Good afternoon.

23         THE COURT:  And the exhibits read by Mr. Krouse are

24  admitted.

25         (Government Exhibits 2005, 2005A, 2016, 2016A, 2016C,

1    2016F, 2065, 2065A, 2071, 2071A, 2071B, 2187, 2187-T, 2188,

2    2190, 2198, 2199, 2201, 2201A, 2215, 2215A, 2215A-T, 2215B,

3    2215B-T, 2215C, 2215C-T, 2217, 2219, 2219A through M received

4    in evidence)

5              THE COURT:  You may proceed.

6              MR. KROUSE:  Mr. Milione, Government Exhibit 2187,

7    please.  If you could zoom into the header.

8              This is an e-mail sent February 25, 2010, subject

9    forward, forward, Clarity Trade & Finance SA.  (In formation)

10   from Mo Sadrha, sadrhas@gmail.com to Ali Sadr, with two

11   attachments, one Clarity Trade & Finance SAOFRC confirmation

12   and another Clarity Trade & Finance SA UBS fax.

13             You can zoom out of that, please.

14             If you could zoom into the bottom e-mail.  This is an

15   e-mail chain.  The bottom e-mail, thank you, including the

16   header.

17             Thank you.

18             This is from Reza Ebadi to Mo Sadrha, Clarity Trade &

19   Finance SA (in formation).

20             "Dear Mr. Sadr,

21             "Good morning."

22             If you go to the second page.  Zoom in to the top of

23   that.  No, sorry to the first half.  Excuse me.

24             "I have the pleasure to inform you that the name your

25   Swiss company approved by central commercial registrar of

1    Switzerland in Bern.  Please refer to the attachmant.  Based on

2    the above confirmation, I hoped a temporary account with UBS

3    for Clarity Trade & Finance SA."

4              The details are "Bank UBS SA Geneva, Switzerland.

5    Various information.

6              "Reference Clarity Trade.

7              "I would very much appreciate if you kindly have the

8    capital of your company be transferred to the above account.

9              As I already informed you, the minimum capital for

10   creation of this type of company is CFH 100,000.  However, it

11   is advisable to create and register the company with more

12   capital.  The creation and registration costs" -- and the costs

13   are listed.

14             "I would like to suggest to you to add this amount to

15   the amount of capital of your choice that you will be

16   transferring to the above account."

17             And then if you could zoom out of that.

18             And for 6, if you could highlight that which has some

19   bolded language.

20             "As the purpose of the company I would suggest,

21   portfolio management, research and advising on investment

22   projects, participation in projects, also commercial,

23   financial, banking and real estates operations, purchase and

24   sales of all sorts of products, management consultancy as well

25   as execution of the mandates received from clients according to

K36nsad6                       Nelson - Direct

1      all of the prevailing rules and regulations related to above

2      activities."

3                You can zoom out of that.

4                Go back to page 1, please.

5                And then zoom into the middle e-mail, including the

6      header.

7                Thank you.

8                All the way down through the signature.

9                This is from Reza Ebadi to Mo Sadr.

10               "Dear Mr. Sadr,

11               "Good afternoon.

12               "Further to my e-mail of this morning below, I have

13     the pleasure of sending you the fax of UBS concerning Clarity's

14     temporary account."

15               You can zoom out of that.

16               The top e-mail is in a foreign language.

17               If you could pull up Government Exhibit 2187-T, which

18     is the translation and zoom into the from the top through that

19     top e-mail.

20               Thank you.

21               It says,

22               "From Mo Sadrha to Ali Sadr, February 25, 2010.

23               "Hi, Ali.

24               "Read carefully.

25               "Just now, we want to wire money for the registration

 1    of the company in Switzerland.  We have to do it very fast.

 2    Tell me what you to do so that no one can withdraw the money

 3    and that it will be used only for deposit of the company's

 4    capital and no one can withdraw except for ourselves."

 5             Mr. Milione, Government Exhibit 914, which is in

 6    evidence, please.  If you could zoom into the name and the

 7    e-mail address.

 8             And the Google subscriber information part.  Sorry.

 9    Where it says above -- no, where it says above Google

10    subscriber information.

11             Thank you.

12             Google subscriber information, name Mo Sadrha, e-mail

13    sadrhas@gmail.com, SMS No. 989122160999.

14             You can zoom out of that.

15             If you could now pull up Government Exhibit 2187.

16             If you could zoom into the header, please.

17             Sorry, wrong one.  2188.

18             Now, if you could zoom into the bottom e-mail first.

19             This is another e-mail chain.

20             This is from Ali Sadr, on behalf of Ali Sadr sent

21    dimanche to Mo Sadrha, CC Reza Ebadi, re Clarity Trade &

22    Finance AS.

23             Mr. Nelson could you read the e-mail here, the text.

24    A.  "Dear Mr. Ebadi.

25             "It was nice talking to you on the phone.  I'll be

1   sending a copy of my passport shortly.  I'll being also looking

2   forward to receiving your e-mail to Mr. Federik Zumbach from

3   UBS to introduce me as one of the beneficiaries of the company

4   and tell him to be expecting a call from me in order to make

5   the process more transparent.

6           "Best regards,

7           "Ali Sadr."

8           MR. KROUSE:  Thank you.  If you could zoom into the

9   top e-mail from the header down to the name, to kindest

10  regards.  Thank you.  This is a response from Reza Ebadi to Ali

11  Sadr, the same date.

12  Q.  And Mr. Nelson if you could read the body e-mail, please.

13  A.  "Dear Mr. Sadr.

14          "Good morning.  I was pleased talking with you today.

15          "As agreed, I have the pleasure of sending you:

16          "1.  Business card Mr. Federik Zumbach, our account

17  executive at business banking department of UBS - Geneva.

18          "2.  UBS fax concerning the details of Clarity Trade &

19  Finance SA information, temporary AC and 3.

20          "Domain names that I have reserved so far"

21          "CTF-SA.com.

22          "Clarity trade.com.

23          "Clarity Trade-finance.com.

24          "Clarity-TF.com.

25          "Clarity TF.com.

1            "I will send Mr. Zumbach an e-mail, copy to you,

2    informing him that you will be contacting him to discuss about

3    Clarity's temporary account."

4            MR. KROUSE:  That is fine there.

5            Mr. Milione, could you zoom in to the bottom e-mail

6    which starts the way at the bottom.

7            It says, "Dear Mr. Ebadi.

8            If you go to the second page.

9            This is from the sadrhas@gmail.com.

10   Q.  Could you read that e-mail?

11   A.  "Thank you for the progress.

12           "I've discussed the matter with my son, Ali, who is

13   also copied on this e-mail, and he'll contact you to further

14   instruct for transferring of the required funds accordingly.

15   You can also reach him via his mobile at 1-301-254-0455.

16           "Regards."

17           MR. KROUSE:  Government Exhibit 2190.

18           If you could zoom into the header and the full e-mail,

19   please.  Thank you.

20           This is an e-mail Tuesday, March 2, 2010, re follow-up

21   from Ali Sadr to frederick.zumbach@ubs.com.

22           If you could read the e-mail, Mr. Nelson?

23   A.  "Dear Mr. Zumbach.

24           "It was a pleasure talking to you the other day on the

25   phone.  As mentioned on the phone, I would like to make sure

1    that the funds transferred to the temporary account are well

2    protected and are nonaccessible by any third party, including

3    the registered agents or existing directors, and these funds

4    are not moved to any permanent account without my or my father

5    consents with written authorizations and signatory form

6    approvals.

7         "Once we are personally present and are identified by

8    the bank, then we could move forward in releasing the funds

9    into a permanent account with well-defined protections and

10   limitations on each signatory person.

11        "Thus, as we agreed on the phone, I would very much

12   like to receive an e-mail from you stating these protective

13   steps and procedures.

14        "On the service fees that we talked about, please

15   provide me with two fee structures:

16        "1.  Based on an initial capital of $500,000.

17        "2.  Based on an initial capital of $1 million.

18        "Best regards,

19        "Ali Sadr."

20        MR. KROUSE:  Government Exhibit 2065, please.

21        This is an e-mail chain.  If you could just zoom into

22   the whole document.

23        The bottom e-mail of this is from Ali Sadr to

24   nassarhomapour@yahoo.com, July 31, 2011 Clarity Trade &

25   Finance.

1          "Dear Mr. Homapour,

2          "Hope all's well.  It was pleasure seeing you again

3     yesterday.  Please find attached the requested information on

4     Clarity.  Should you need more information, please let me know.

5          "Best regards.

6          "Ali Sadr."

7          And then that e-mail is sent and says, "Print the

8     attached files."

9          It's sent from Ali Sadr to

10    internal@samanehstratus.com.

11         And there are two attachments there.  Government

12    Exhibit 2065A is an attachment to that e-mail.

13         Put that up.  Thank you.

14         If you could zoom into the first half of this

15    document.  Thank you.

16         This is Clarity Trade & Finance SA.

17    Q.  Mr. Nelson, could you read the first line company name.

18    A.  Clarity Trade & Finance SA.

19    Q.  Registered office?

20    A.  Geneva.

21    Q.  Date of memorandum and articles of association?

22    A.  March 16, 2010.

23    Q.  And then the purpose, please.

24    A.  "Wealth management; research and advice on investments; the

25    acquisition of interests in companies and all commercial and

K36nsad6                        Nelson - Direct

1    financial operations and operations involving real and moveable

2    property within the limits permitted by the relevant

3    legislation, notably the LFAIE, law on the acquisition of real

4    estate by persons abroad; trading in all products; all types of

5    management consultancy and execution of all instruction on

6    behalf of its clients.

7              MR. KROUSE:  Government Exhibit 2198.

8              This is another e-mail chain.  If you could go to page

9    2 to get the first e-mail.  Zoom in from the middle of the

10   page.  There.  Just capture that e-mail, please.

11             Thank you.

12             On July 15, 2010, HBM funds, Alwin de Jongh,

13   alwyndejongh@hbmgroup.com writes.

14   Q.  Mr. Nelson can you read it.

15   A.  "Dear Ali.

16             "As we are still awaiting to receive the three

17   below-mentioned documents, Mr. Marynberg from MV has requested

18   us to supply him with details about your real estate project in

19   Venezuela which is being financed with the bolivars exchanged.

20   Mr. Marynberg would like to know the name of the project, the

21   name of your company running and financing the project, and the

22   names of the principals (company directors and shareholders).

23   I assume Pinnacle Investments SA is the company running the

24   project -- is it not?

25             "Looking forward to hearing from you.

1             "Kind regards.

2             "Alwin F. De Jhong."

3             (Continued on next page)

1          MR. KROUSE:  And Mr. Milione, if you go to page 1 to

2    capture the response, which is goes across two pages starting

3    the middle to the bottom, please.

4          This is the response from Ali Sadr to Alwin De Jhong

5    from HBM Funds, and Herman Oosten, July 16, 2010, subject

6    conference call with Mercantil Valores Uruguay.

7    Q.  Mr. Nelson, could you read the response.

8    A.  Dear Alwin,

9          It is the government of Venezuela that pays and

10   finances the project.  We are only acting as the construction

11   company who is performing the job, so we USD/EUR outside in a

12   Swiss bank, then through the process of exchange we would have

13   to pay for the day-to-day operations of the project in

14   bolivars, such as salaries, payrolls, materials, local heavy

15   machines and equipment, et cetera.

16         If MV is concerned about the source of the funds, I

17   can provide him with an IPC from the government of Venezuela

18   which shows:  1, the name and location of the project; 2, the

19   total dollar/bolivar amount of the project; 3, the company

20   performing the construction, which is IIHC, and IIHC has six

21   shareholders who then are some of our international companies,

22   and the ultimate shareholder of those entities is my family.  I

23   have no intention of disclosing/providing all such

24   documentations to MV or anyone else for that matter.

25         More importantly, based on our contract with the

1  government of the Venezuela, we cannot share that information

2  with the third parties unless with banks and financial

3  institutions for which we would have to disclose their names to

4  the government and seek their approval in advance.  I'm sure MV

5  wouldn't like to be reported to the government of Venezuela and

6  seek their approval for such exchange process.

7           This is why we have created a second company in

8  Venezuela by the name of Pinnacle that has a contract/mandate

9  with IIHC to run its financing and take care of its financial

10  management since we can't disclose much about IIHC and its

11  contract with the government of Venezuela.

12           All MV needs to be concerned about is that it's

13  dealing with two legitimate and established entities, 1,

14  Clarity Trade & Finance SA of Switzerland; and 2, Pinnacle

15  Investments SA of Venezuela with cleared shareholders; and 3,

16  the source of funds USD/EUR, which is the government of the

17  Venezuela.

18           The questions that relate to who's performing the

19  construction, who owns those contractor/subcontractor

20  companies, what's the progress of the project, where's the

21  project, and such should not be anyone's business since it

22  shall create significant problem for that company since it's

23  under strict rules set forth by the Venezuela government.

24  However, due to the confidence I have in your organization,

25  Herman and yourself, I attached our latest IPC to this email.

1          This IPC is not to be disclosed to any MV for any

2     reason, that it's only for use to verify and report the finding

3     to MV if needed.  Please use your highest level of discretion

4     regarding this information.  This is well beyond what we should

5     disclose on the matter.  Let me know if you would like to have

6     a phone call on this.

7          Thanks, as always.

8     Q.  Then back to page 1, this is the last email on this

9     particular chain, from the header down, the response from Alwin

10    De Jhong, also dated July 16, 2010.

11         If you could read the text.

12    A.  Dear Ali,

13         Thank you for your detailed explanation on the matter.

14    We will inform Mr. Marynberg.  Please note the IPC document

15    provided will not be communicated to anyone.  Awaiting to

16    receive from you the outstanding account opening documentation.

17    Awaiting to receive from MV/Mr. Marynberg opinion letter on the

18    legality of the exchange process promised next week.  Feedback

19    and confirmation of how to go about the two companies involved.

20         Enjoy your weekend, Ali.  Alwin F. De Jhong.

21    Q.  Government Exhibit 2199, same date, email chain July 16,

22    2010, if you could do the middle email first, same date from

23    the same person, Alwin De Jhong to Ali Sadr.

24         If you could read that.

25    A.  Dear Ali,

1          We have provided MV with your explanation of the

2     project and parties involved, and apparently there are still

3     some concerns in these initial stages of the process.

4          Herman just informed me that he has a company document

5     for IIHC on file which we can forward to MV with your

6     permission.  However, how would you like to respond to the

7     concerns raised below?  You are probably the best person to do

8     so.  Please note that these are normal type of compliance and

9     KYC issues that a financial institution like MV needs to

10    address.  Looking forward to hearing from you.

11         Kind regards, Alwin F. De Jhong.

12         MR. KROUSE:  This references concerns below.  If you

13    go to page 2 and zoom in for the Alwin -- that email right

14    there.

15    Q.  Mr. Nelson, could you read that.

16    A.  Alwin, thank you for your detailed response.  The issue not

17    that the government of Venezuela is the source of funds, it is

18    that we are dealing with an Iranian-owned entity which may or

19    not be subject to certain sanctions around the world.  What is

20    the jurisdiction of formation/domicile of IIHC?  Please confirm

21    where Mr. Sadr himself is based.

22    Q.  Back to page 1, Ali Sadr's response from the top to the

23    middle, same day, Ali Sadr to the same people from HVN group.

24    If you could read the email.

25    A.  Dear Alwin,

1         No one is dealing with Iranian entity.  The clients

2    are 1, Clarity Trade and Finance, which is domiciled in

3    Switzerland with a non-Iranian shareholder, 2, Pinnacle

4    Investments SA, domiciled in Venezuela with non-Iranian

5    shareholders.

6         The issue of Iranian concern should be completely out

7    of the picture.  Why do you think all these entities are set up

8    in different countries with no Iranian connections?  I'm sure

9    it's now clear that MV's client/customer is no shape or form an

10   Iranian entity or shareholder.

11        Finally, IIHC is completely irrelevant to this whole

12   process.  A legitimate Swiss company wants to exchange USDs to

13   Bs to a Venezuelan entity.  I only brought up IIHC to prove the

14   source of funds and nothing else.

15        Hope this helps, thanks.

16        MR. KROUSE:  Government Exhibit 2201.  July 30, 2010,

17   Calarity account from Ali Sadr to Mo Sadr.

18   Q.  Mr. Nelson, could you read that email.

19   A.  Salam, Papa,

20        Please find attached a copy of Calarity's USD and EUR

21   accounts in order to ship our deposit routes, so please arrange

22   for the letter.

23        Love, Ali.

24        MR. KROUSE:  There's an attachment, 2201A.  If you

25   could zoom into the top half down through the name of the bank.

K35TSAD7                    Nelson - Direct

1   Q.   If you could read from the top.

2   A.   Instructions for fund transfer in USD in favor of client at

3   Hyposwiss Private Bank Limited, Zurich.

4        MR. KROUSE:   Below it says to via JP Morgan Chase

5   Bank, New York, it has a few codes, for the account of bank of

6   beneficiary, it says Hyposwiss Private Bank in Zurich,

7   Switzerland and has a few codes.

8        If you could zoom out of that and then go zoom into

9   the bottom part in favor of beneficiary, name Clarity Trade and

10  Finance, again there's an account number there.

11       2215.   This is an email is sent October 28, 2010,

12  Stratus documents, from Ali Sadr to Urs Schneider.   There's

13  some attachments.

14  Q.   Mr. Nelson, if you could read the email.

15  A.   Dear Urs,

16       Regarding our company in Turkey, please find attached

17  update of all the registration and incorporation documents.

18  Also, you might need the below information as well, the name on

19  the bank account, Stratus International JS joint stock,

20  registration number of Stratus is 751671, office address is

21  Gardenya Plaza 5, K3, D3, Atasehir, Istanbul, Turkey.   I shall

22  be the sole signatory on the account for now until I add my

23  father and sister later on.   I've promised them that we shall

24  have the account numbers sometime mid next week.   I would very

25  much appreciate it if we could live up to my promise.

1          Thanks, as always, Ali.

2     Q.   Thank you.   There's three attachments, Government

3     Exhibit 2215A, which is in Turkish, then 2215A-T, which is the

4     translation.

5          MR. KROUSE:   Could you put them side by side, page 1,

6     if you zoom on the article section one, incorporation, where it

7     says "Founders," all the way down.

8     Q.   If you could just read the names and nationalities -- name,

9     nationality and address?

10    A.   1.   Sayed Mohammad Sadr Hashemi Nejad, St. Kitts & Nevis,

11    Caribbean Isles, 2705 Dubai Marina Heights Tower, Dubai, UAE.

12         2.   Sayed Ali Sadr Hashemi Nejad, St. Kitts & Nevis,

13    Caribbean Isles, 2705 Dubai Marina Heights Tower, Dubai, UAE.

14         3.   Abbas Taheri Gharagozlou, St. Kitts & Nevis,

15    Caribbean Isles, 2705 Dubai Marina Heights Tower, Dubai, UAE.

16         4.   Negarin Ali Sadr Hashemi Nejad, St. Kitts & Nevis,

17    Caribbean Isles, 2705 Dubai Marina Heights Tower, Dubai, UAE.

18         MR. KROUSE:   The last two you don't have to read the

19    address, it's Mustafa Cetinel in Turkey and Ekrem Cinar in

20    Turkey.

21         Page 4, please.   If you could zoom into before it says

22    the division of the shares among the company's shareholders.

23         It says Sayed Mohammad Sadr Hashemi Nejad, number of

24    shares, 150,000 shares, 30 percent; Sayed Ali Sadr Hashemi

25    Nejad, 150,000 shares, 30 percent; Negarin Sadat Sadr Hashemi

Nejad, 150,000 shares, 30 percent; Abbas Taheri Gharagozlou,

25,000 shares, 5 percent; Mustafa Cetinel, 20,000 shares, 4

percent; Ekrem Cinar 5,000 shares, one percent.

          Page 6, please.  If you could zoom into where it says

the following persons are chosen to the members of the board of

directors:  Sayed Mohammad Sadr Hashemi Nejad, the Dubai

address, nationality St. Kitts & Nevis, Caribbean Isles; Abbas

Taheri Gharagozlou, same address in Dubai, St. Kitts & Nevis,

Caribbean Isles; Mustafa Cetinel, an address in Turkey,

nationality Turkey; Sayed Ali Sadr Hashemi Nejad, same address

in Dubai, St. Kitts & Nevis, Caribbean Isles; Ekrem Cinar, an

address in Turkey, Turkey.

          Number 9, please.  And this indicates shareholders,

the six named earlier, and the signatures in the original.

          Government Exhibit 2215B, which is the second

attachment, also in Turkish.  Sorry, 2215B and BT next to each

other.  If you could zoom in to the top half.

          Chamber of Commerce Certificate of Activity, registry

number.

Q.  Could you read the company name there?

A.  Stratus International Contracting.

Q.  And then it has -- (reading Turkish)

          THE COURT:  You have got it, it says on the page.

Sorry to the court reporter, but it's in Turkish.  It's

document number 2215B.  We'll move on.

K35TSAD7                        Nelson - Direct

1          MR. KROUSE:  And then the last exhibit, 2215C and CT,

2     which is in, and this states the registry certificate and the

3     date of registration, October 22nd, 2010, for that same company

4     name.

5          2217, please.  And this is an email chain, if you zoom

6     in from the top, through the blue email.

7          This from Urs Schneider, the middle email, to Ali

8     Sadr.

9          Dear Ali,

10         I have received the information from our compliance

11    partners and it needed to have the company documents in the

12    home language and a translation version in English.

13         And then there's the top email from Ali Sadr to Leyla

14    Estir and Uri Schneider.

15    Q.   Could you read that email.

16    A.   Dear Linet,

17         Please find below the requested information and

18    apostled and translated documents that need to be prepared

19    ASAP.  This has the highest priority in our schedule right now.

20    Please keep me posted on the progress and get this started now.

21         Best regards.

22    Q.   Government Exhibit 2219, the top portion.  And this is

23    November 2nd, 2010, an email from Leyla Estir to Tevs Nevin

24    copying Ali Sadr.  If you could read that.

25    A.   Mrs. Nevin,

K35TSAD7                        Nelson - Direct

1          Please find attached copies of the necessary documents

2     for opening an account for Stratus in English and apostled.

3     The DHLAWB is attached.  I guess you'll receive them tomorrow.

4     For any questions, please do not hesitate to contact me.

5          Best regards, Linet Estiroti.

6          MR. KROUSE:  Attached are several documents.

7          2219B.  This is the trade registry certificate for

8     that company.

9          2219M.  The names of the shareholders.

10         2219J.  This is the distribution of the shares.

11         2219H.  These are the members of the board of

12    directors, including their addresses and stated nationalities,

13         2219E.  These are, again, the legal provisions and the

14    names of the shareholders.

15         Government Exhibit 2005.  This is an email, if you

16    zoom in.  It's from February 18, 2010, it says from Ali Sadr to

17    Luis Rivera, the body says:  Thanks, and there's an attachment.

18         If you open the attachment to 2005A, please.

19         This is a share certificate which states capital

20    $10,000 Stratus Global Investments LTV, St. Christopher &

21    Nevis, 5,000 shares.  This is to certify that Sayed Mohammad

22    Sadr Hashemi Nejad at an address in St. Kitts, is a registered

23    proprietor of 5,000 shares, and signed it's by Sayed Mohammad

24    Sadr Hashemi Nejad and Luis Rivera.  So that's the first page

25    of that exhibit.

1              Second page, same certificate, St. Christopher &
2      Nevis, this one is to certify Sayed Ali Sadr Hashemi Nejad at
3      St. Kitts address, 5,000 shares, signed by Sayed Ali Sadr
4      Hashemi Nejad and Luis Rivera.
5              And then the last page, third page.
6              THE COURT:  Mr. Krouse, how much longer?
7              MR. KROUSE:  About ten minutes, your Honor.
8              THE COURT:  Okay.
9              MR. KROUSE:  This is a certificate of notary public.
10     Q.  Can you read what was included in this package that the
11     notary public verified to be true?
12     A.  Certificate of incorporation, statutory statement,
13     memorandum and articles of association, appointment of the
14     directors, transfer of subscription rights, general power of
15     attorney, share certificate in the name of Ali Sadr.
16     Q.  So the last one is share certificate in the name of Ali
17     Sadr, correct?
18     A.  Yes.
19     Q.  If you go back to the email, 2005, what is the title of the
20     subject of the email?
21     A.  Please take the first page off.
22     Q.  And then 2005A, what is the first page of that exhibit?
23     A.  Certificate of shares.
24     Q.  For which person?
25     A.  Sayed Mohammad Sadr Hashemi Nejad.

1          MR. KROUSE:  Government Exhibit 2271.  This is an

2     email, if you could zoom into the whole thing.  Wednesday,

3     September 28, 2011, subject finance management contract between

4     Stratus International JS and Stratus Global, and the dividends

5     distribution from Stratus Global to Mr. Mohammad from Linet

6     Estiroti to Urs Schneider CC Sayed Ali Sadr Hashemi Nejad.

7     Q.  Can you read the e-mail?

8     A.  Dear Mr. Schneider,

9          Please find attached the contract of Stratus

10    International versus Stratus Global and the dividend

11    distribution from Stratus Global to Mr. Mohammad Sadr.

12         Best regards, Linet Estiroti.

13         MR. KROUSE:  There's two attachments there, Government

14    Exhibit 2071A.  There's a longish financial contract here.

15    I'll just point out the top portion, please, the date, 14th day

16    of January 2010, it's between Stratus International Contracting

17    JS and Stratus Global Investments LTD represented by Mr. Ali

18    Sadr Hashemi Nejad, and he's referred to as the administrator.

19         The bottom of the page.  The administrator is a legal

20    person constituted under the private laws of the Federation of

21    St. Christopher & Nevis under the regime of legal liability

22    company that is dedicated to providing wealth and financial

23    investment services and general consulting to the company and

24    its hereafter announced subsidiaries and partners.

25         You can go to the third page of that exhibit, please.

K35TSAD7                        Nelson - Direct

Q.   Could you read the first sentence of that?

A.   The parties agree that, as compensation for the services

rendered, the administrator shall receive a service fee of

equivalent of USD $1,000,000 payable annually starting from

July 31, 2011 from the account of the company managed by the

administrator.

          MR. KROUSE:  If you go to the last page, 4, and that's

signed at the bottom by two people, one says the company

Stratus International Contracting JS, one is Stratus Global

Investments LTD, one has a Turkish name, one is Ali Sadr

Hashemi Nejad.

          2071B, which is the second attachment, I'll read the

date, September 1st, 2011, subject chairman Mr. SM Sadr Hashemi

Nejad, compensation payout 2010 to 2011 to the treasury of

Stratus Global Investments LTD.

          Could you zoom in to "Dear sir."

Q.   And read that.

A.   Dear sir,

          Please find below the declaration of Mr. S. Mohammad

Sadr Hashemi's full compensation package until the end of

fiscal year 2011 ending on December 31, 2011.  The amounts

cited below are payable and due upon availability of the

relevant funds:  Board member chairman signing bonus, GBP

1,000,000 million.  2010 chairmanship option dividend payout,

March through December, GBP 300,000.  2011 chairmanship option

1  dividends payout, January through December, GBP 400,000.  2010

2  performance bonus, GBP zero.  2011 performance bonus GBP

3  300,000.  Total, 2 million GBP.

4        Please note that by any partial payments the total

5  above amount shall be closed out before the fiscal year 2011.

6  Q.  That's signed by Ali Sadr, correct?

7  A.  Yes.

8  Q.  2016.

9        THE COURT:  Wrapping up, Mr. Krouse?

10       MR. KROUSE:  This is the last email, then a couple of

11  attachments.

12       THE COURT:  Quickly.

13       MR. KROUSE:  Yes, your Honor.

14       Zoom into to the bottom email of this chain, please.

15       Ali Sadr, Urs Schneider, Tevs Nevin, transfer request

16  and Nevin's passport copy.

17       Dear Urs, Nevin,

18       Please find attached another wire transfer request for

19  today's value date, please also find a copy of Tev Nevin's

20  passport.  Best regards, Ali.

21       There are several attachments, the top emails from Ali

22  Sadr attaching a bunch of things which we won't all go through.

23  Please print all the attached files in colors.

24       2016A, and zoom into the top half.  This is Hyposwiss

25  Private Bank, authorized signature for legal entities Stratus

K35TSAD7

1   Global Investments LTD, country St. Kitts & Nevis, signatory

2   one, Sayed Ali Sadr Hashemi Nejad, date of birth there,

3   St. Kitts & Nevis nationality.  Negarin Sadat Sadr Hashemi

4   Nejad, date of birth there, nationality St. Kitts & Nevis.

5          2016C.  First half.  Hyposwiss Private Bank and

6   authorized signatures for different legal entity, Clarity Trade

7   and Finance SA.  Signatory one, Sayed Ali Sadr Hashemi Nejad,

8   nationality St. Kitts & Nevis.  Negarin Sadat Sadr Hashemi

9   Nejad, nationality St. Kitts & Nevis.

10          Last one, 2016F.  First half.  Hyposwiss Private Bank,

11   Stratus International Contracting JS, which has an Istanbul,

12   Turkey address.  Signatory one, Sayed Ali Sadr Hashemi Nejad,

13   nationality St. Kitts & Nevis.  Negarin Sadat Sadr Hashemi

14   Nejad, also nationality St. Kitts & Nevis.

15          No further questions, your Honor.

16          THE COURT:  All right.  Mr. Heberlig?

17          MR. HEBERLIG:  No cross, your Honor.

18          THE COURT:  Thank you, you may step down.

19          Next witness.

20          MS. LAKE:  Your Honor, the government calls Matthew

21   Blair.

22          THE COURT:  Ms. Lake, do you want to read the

23   documents?

24          MS. LAKE:  This is not a document, but I have a

25   stipulation.

K35TSAD7

1                THE COURT:  Counsel, without objection, 103?

2                MR. HEBERLIG:  No objection.

3                THE COURT:  Thank you.

4                (Government's Exhibit 103 received in evidence)

5                MS. LAKE:  It is hereby stipulated and agreed by the

6        parties that Government Exhibits 401 through 406 are true and

7        accurate copies of business records maintained by JP Morgan

8        Chase Bank.

9                Government Exhibit 410 is a true and accurate copy of

10       a business record maintained by Commerzbank.

11               Government Exhibits 421 through 431 are true and

12       accurate copies of business records maintained by Citibank.

13               Government Exhibits 440 and 441 are true and accurate

14       copies of business records maintained by UBS.

15               Government Exhibit 450 through 455 and their subparts

16       are true and accurate copies of business records maintained by

17       Wells Fargo.

18               Government Exhibit 460 and its subparts are true and

19       accurate copies of business records maintained by Equity Title

20       Company.

21               Government Exhibit 470 and its subparts are true and

22       accurate copies of business records maintained by the United

23       States Federal Reserve.

24               Government Exhibit 480 and its subparts and true and

25       accurate copies of business records maintained by Fidelity

K35TSAD7

1    National Title Company.

2              Government Exhibit 409 and its subparts are true and

3    accurate copies of business records maintained by Malibu Escrow

4    Corporation.

5              The original records for Government Exhibits 401

6    through 490 and their subparts were made at or near the time by

7    or from information transmitted by a person with knowledge of

8    the matters set forth in the records.  They were kept in the

9    course of regularly conducted business activity, and it was the

10   regular practice of that business activity to make the records.

11             It is further stipulated and agreed that this

12   stipulation may be received in evidence as Government

13   Exhibit 103 at trial.

14             At this time the government offers Government

15   Exhibit 103 and Government Exhibits 401 through 406.

16             THE COURT:  Thank you.  Without objection.

17             MR. HEBERLIG:  No objection.

18             THE COURT:  They're admitted.

19             (Government's Exhibits 103, 401 through 406 received

20   in evidence)

21             (Continued on next page)

22

23

24

25

1    MATTHEW JORDAN BLAIR,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. LAKE:

6    Q.  Good afternoon.  Where do you work?

7    A.  I work at JP Morgan Chase.

8    Q.  When did you join JP Morgan Chase?

9    A.  In 2011.

10   Q.  What your current title?

11   A.  I'm a vice president.

12   Q.  How long have you been a vice president at JP Morgan?

13   A.  About three years.

14   Q.  At a very high level, what kind of work do you do at JP

15   Morgan?

16   A.  I'm operations manager in the transactions sanctions

17   screening utility.

18   Q.  Is the transaction screening sanctions utility part of a

19   broader group within the bank?

20   A.  It is.

21   Q.  What is that broader group?

22   A.  It falls within the global sanctions compliance teams.

23   Q.  How long have you worked in sanctions compliance at JP

24   Morgan?

25   A.  Since 2011.

1   Q.  Can you provide an overview of what kind of bank JP Morgan

2   is?

3   A.  JP Morgan is an investment bank, is it's a commercial bank,

4   it's a retail bank, provides services to domestic clients in

5   the United States and international clients across the world.

6   Q.  What country is JP Morgan based in?

7   A.  The United States.

8   Q.  Are the deposits of JP Morgan insured?

9   A.  They are.

10  Q.  Who insures the deposits of JP Morgan?

11  A.  The Federal Deposit Insurance Corporation.

12  Q.  Do you have an estimate of how many U.S. dollar

13  transactions JP Morgan processes on a daily basis?

14  A.  Approximately 2 million.

15  Q.  Are you familiar with wire transfers?

16  A.  I am familiar with wire transfers.

17  Q.  What is a wire transfer?

18  A.  A wire transfer is a means of transferring -- making a U.S.

19  dollar payment.

20  Q.  And can people in different countries wire money to one

21  another?

22  A.  They can.

23  Q.  Are you familiar with the term "correspondent banking?"

24  A.  I am familiar with the term "correspondent banking."

25  Q.  What is correspondent banking?

1    A.   Correspondent banking refers to the relationship that banks

2    have with each other making them able to service clients in

3    other domiciles.

4    Q.   What are some of the services that correspondent banks

5    provide?

6    A.   So if a U.S. business has supplier in Mexico, their bank

7    could make payments to the supplier in Mexico even if they

8    don't have the presence in Mexico if they have a correspondent

9    bank relationship with the Mexican bank.  Individually

10   speaking, if a person were to go on a vacation to another

11   county and they needed some banking services, they would be

12   able to get them even if their bank didn't have a presence in

13   that country through a correspondent bank relationship with

14   their bank.

15   Q.   Do correspondent banks provide dollar clearing services for

16   banks in foreign countries?

17   A.   They may.

18   Q.   Does JP Morgan have are correspondent banking relationships

19   with non-U.S. banks?

20   A.   It does.

21   Q.   What kinds of banks generally clear U.S. dollars?

22   A.   U.S. banks or banks with presence in the United States, or

23   non-U.S. banks with correspondent bank relationships with U.S.

24   banks.

25   Q.   Can you provide an example of how the money could move if a

 1   bank in Venezuela sent U.S. dollars to a bank it Switzerland?

 2   A.  If the bank in Venezuela had a correspondent bank

 3   relationship with the U.S. bank, and if the bank in Switzerland

 4   also had a correspondent bank relationship with the U.S. bank,

 5   that U.S. bank could process that payment from Venezuela to

 6   Switzerland.

 7   Q.  Are you familiar with swift messages?

 8   A.  I am familiar with swift messages.

 9   Q.  What is a swift message?

10   A.  Swift messages are a means of banks communicating with each

11   other.  They are used to make payments, to settle commodity

12   trades, security trades, statements, free format messages.

13   There's a number of different types of swift messages.

14   Q.  And can you describe just a couple of the different types

15   of swift messages?

16   A.  There's an MT103, which is a type of payment; MT202, which

17   is a payment cover letter; an MT545, which is a securities

18   statement; there's an MT346, which is a bullion statement.

19   Q.  So the first that you mentioned, the 103 and 202, what do

20   those swift messages do?  What are they used for?

21   A.  They're used to communicate banks to process a payment.

22   Q.  Are you familiar with the term "know your customer?"

23   A.  I am familiar with the term "know your customer."

24   Q.  What is know your customer?

25   A.  Know your customer, known by the acronym KYC, is the

1    expectation of banks to have information about their clients.

2    Q.  Does JP Morgan Chase have a know-your-customer requirement?

3    A.  Yes, it does.

4    Q.  Why does it have that requirement?

5    A.  Because it's a U.S. bank and U.S. banks have a

6    know-your-customer requirement.

7    Q.  Does JP Morgan have a know-your-customer requirement when

8    it is serving as the correspondent bank?

9    A.  It does not.

10   Q.  How does JP Morgan learn information about the parties to a

11   transaction when its acting as the correspondent bank?

12   A.  It relies on the information provided by its correspondent

13   banking partner.

14   Q.  Is it fair to say that JP Morgan relies on the

15   correspondent bank to do its own KYC?

16   A.  Yes.

17   Q.  So changing gears, you testified that you're part of the

18   sanctions compliance group at JP Morgan.  Generally speaking,

19   what are sanctions?

20   A.  Sanctions are legislative and executive actions that carry

21   the force of law that are used to force behavioral change.

22   Q.  What obligations does JP Morgan have with respect to

23   sanctions?

24   A.  Well, as a U.S. entity, it's obligated to be following the

25   sanctions themselves, and as a U.S. bank payment provider it's

K35TSAD7                         Blair - Direct

1    obligated to be ensuring it's not party to any potential

2    sanctions violations.

3    Q.  What can happen to JP Morgan if does not adequately screen

4    for sanctions violations?

5    A.  It could be subject to regulatory action.  It can receive

6    fines from the U.S. regulator, which is OFAC, the Office of

7    Foreign Assets Control.  It could be subject to market

8    restrictions by the U.S. regulator.  It also can be subject to

9    reputational risk.

10   Q.  So you mentioned the Office of Foreign Assets Control.  Is

11   that also known as OFAC?

12   A.  Yes.

13   Q.  What are the types of things that OFAC can do to JP Morgan

14   if it determines that JP Morgan violated sanctions?

15   A.  They could impose fines upon JP Morgan.  They could

16   restrict their ability to act in a specific market.

17   Q.  And are you aware of whether JP Morgan needs to know that

18   it violated sanctions to face regulatory action from OFAC?

19   A.  No, JP Morgan does not need to know that it violated

20   sanctions.

21   Q.  And are you aware of instances in which OFAC has

22   investigated transactions that JP Morgan approved but which

23   were later flagged for sanctions violations?

24   A.  Yes, I am.

25   Q.  Can you just describe the circumstances in which that might

1   happen?

2   A.  So if a payment moves to a second bank or a third bank,

3   moves to a downstream party in the sanctions program, if the

4   transaction is found to be in violation of the sanctions, that

5   entity would cease it and block it.  JP Morgan would then be

6   notified and would need to explain why it processed payment if

7   there's a potential sanctions violation.

8   Q.  How often does that sort of thing happen?

9   A.  Couple of times a month.

10  Q.  And what exactly does JP Morgan need to do internally when

11  that happens?

12  A.  They would need to investigate why the payment was

13  processed.  They would need to see was the payment held for

14  sanction review at JP Morgan; if it was, what was the position?

15  If it wasn't held, why wasn't it held, and should it have been?

16  Q.  Approximately how many work hours go to each review of this

17  nature?

18  A.  At least 20 work hours.

19  Q.  For each review?

20  A.  For each review.

21  Q.  How many people generally work on that sort of review?

22  A.  At least one to two people.

23  Q.  And when you testified that JP Morgan can face reputational

24  risk if it process transactions that violate sanctions, what

25  did you mean?

1    A.   Reputational risk is the damage to the firm's reputation.

2    If JP Morgan become known as an entity that violates sanctions

3    or does business with entities that violates sanctions, it runs

4    of risk of losing clients or not being able to establish

5    relationships with clients.

6    Q.   Are there different kinds of sanctions that affect your

7    work at JP Morgan?

8    A.   There are different kinds of sanctions.

9    Q.   Are you familiar with country-based sanctions?

10   A.   I am.

11   Q.   Is that one of the types of sanctions that affects your

12   work?

13   A.   Yes, it is.

14   Q.   What is a country-based sanction?

15   A.   Country-based sanctions enacted by OFAC are comprehensive

16   sanctions programs on a specific country.

17   Q.   And what countries are on the country sanctions list?

18   A.   Cuba, Iran, Syria, North Korea and Crimea.

19   Q.   And what does it mean if a country is subject to country-

20   based sanctions for JP Morgan?

21   A.   It's a complete and total restriction on economic activity

22   with them.

23   Q.   And has Iran been on this country's sanctions list during

24   your entire time at JP Morgan since 2011?

25   A.   It has.

K35TSAD7                        Blair - Direct

1    Q.  Are you familiar with list-based sanctions?

2    A.  I am familiar with list-based sanctions.

3    Q.  What is list-based sanction?

4    A.  List-based sanctions are sanctions on individuals,

5    companies and vessels and other organizations which are

6    generally somewhat less prohibitive than country sanctions.

7    Q.  Is there a name for the individuals or entities subject to

8    sanctions through a list-based program?

9    A.  They are known as specially-designated nationals.

10   Q.  So you testified earlier that you work in the central

11   sanctions utility, is that right?

12   A.  Correct.

13   Q.  So what does the central screening -- sorry, the central

14   screening utility, what does the central screening utility do?

15   A.  The central screening utility maintains the filter

16   environment that transactions are screened through at JP

17   Morgan.  It also performs initial review for payments held in

18   sanctions review.  It then escalates those reviews to a senior

19   level for potentially true matches.

20   Q.  We'll break down that sanctions screening process, but

21   first, how many people work in the central screening utility?

22   A.  About 240.

23   Q.  And are there subdivisions within the central screening

24   utility?

25   A.  There are subdivisions.

1   Q.  And generally speaking, what is your specific role within

2   the central screening utility?

3   A.  I'm the manager of the hit rate management team, which is

4   responsible for the quality of the alerts that are being

5   presented for review, responsible for the sanction list testing

6   team, and I'm responsible for the quality assurance team.

7   Q.  So now let's walk through how what I'm going to call the

8   CSU screens for potential sanctions violations.  What is the

9   first step in the sanctions screening process?

10  A.  So the first step would be with the payment itself, either

11  received at JP Morgan or initiated at JP Morgan.  All of the

12  parties and details of the transaction would be sent to the

13  Fircosoft filter, which is the name of the fuzzy piece of

14  artificial intelligence used for sanctions screening.  The

15  content of the sanctions list, the names and entities and

16  account numbers that are present on it are then screened for

17  within the transaction data.  If there is no alerts found, the

18  transaction continues to be processed.  If there is a potential

19  alert found, it falls to sanctions review where it is then

20  reviewed by an operator, it can be released if it's found to be

21  a false positive, or it can be escalated for further

22  investigation for potential matches.

23  Q.  So if something is caught in the Fircosoft filter as a

24  potential match, what does that mean?  Why would it be a

25  potential match?

1    A.  Because it contained data within it that looked like a

2    sanctioned entity.

3    Q.  And if it's flagged as a potential match, what happens

4    next?

5    A.  An operator would review it, a person would review it.  If

6    it appears to be a false positive, which would be a

7    coincidental match or a match to invalid data or something, it

8    would be released.  If it was potentially true, it would then

9    be escalated to a senior team where it would potentially be

10   investigated.

11   Q.  And what does that investigation entail?

12   A.  It would involve acquiring with remitter of the payment the

13   initiating party of the payment for any information that could

14   be used to clarify the association, which could be a date of

15   birth for an individual, it could be an address, it could be

16   ownership of a company or vessel.

17   Q.  And if after the investigation it's determined that there

18   is a true match to something that is in the Fircosoft filter

19   which contains the sanctions list, what happens to the payment?

20   A.  The transaction would customarily by blocked, which is the

21   seizing of the funds of the transaction, depositing it into an

22   interest-bearing account, and reporting it to OFAC.

23   Q.  And is it also possible for a transaction to be rejected?

24   A.  Yes, it is.

25   Q.  And what does it mean if a transaction is rejected?

1    A.   Rejected transactions are seized and funds are returned to

2    the remitter, and they are still reported to OFAC.

3    Q.   Are you familiar with the term "stripping?"

4    A.   I am familiar with the term "stripping."

5    Q.   What is stripping?

6    A.   Stripping is the removing of sanctioned information or

7    potential references to sanctioned information from a payment

8    with the intention of bypassing a sanctions screening program.

9    Q.   Can you provide an example of stripping?

10   A.   If I'm trying to send funds to a North Korean general who I

11   know happens to be subject to sanctions, if I remove that name

12   from the transaction and enter a different name that I don't

13   believe is related to sanctions, I then stripped the payment.

14   Q.   Does JP Morgan have an anti-money laundering program?

15   A.   It does.

16   Q.   Are you familiar with that program?

17   A.   I am.

18   Q.   How are you familiar with it?

19   A.   In addition to screening for sanctions, we also screen for

20   the anti-money laundering program in our utility.

21   Q.   And is Fircosoft part of that screening as well?

22   A.   It is.

23   Q.   How does Fircosoft screen for money laundering?

24   A.   The same way it screens for sanctions, it screens for and

25   identifies the content of the AML program or the AML list, and

1    it screens for those names and references within transaction

2    data.

3    Q.  And what happens if Fircosoft catches a transaction in its

4    money laundering filter?

5    A.  The transaction would be held for review, it would be

6    reviewed by an operator, potentially true matches would be

7    escalated for further investigation.  If it was identified as a

8    true match, it would be rejected.

9    Q.  And are you aware of whether Iran is one of the terms in

10   the money laundering filter within Fircosoft?

11   A.  It is.

12       MS. LAKE:  Let's turn to some documents.  Can we

13   please publish Government Exhibit 401.

14   Q.  Are you familiar with type of document?

15   A.  I am.

16   Q.  What kind of document is this?

17   A.  This is a representation of a swift message.

18   Q.  And do you know where the swift message came from?  Is it

19   from JP Morgan?

20   A.  It is.

21   Q.  Can you just briefly remind the jury what a swift message

22   is.

23   A.  A swift message is a means of communication between banks.

24   Q.  Let's go through some of the fields on here.  What is the

25   amount listed at the top?

1    A.  $20,692,579.48.

2    Q.  And what is the date?

3    A.  July 5, 2011.

4    Q.  And what is the meaning of the data in field 20?  What does

5    that correspond to?

6    A.  That would qualify as an identifier with the transaction.

7    It would be unique to the specifics transaction.

8    Q.  And what does the swift type mean?

9    A.  That refers to this being an MT202.

10   Q.  What is an MT202 again?

11   A.  That's a type of payment, cover letter.

12   Q.  And what does sender BIC mean?

13   A.  BIC is the Bank Identification Code.  It's a unique

14   identifier that banks utilize.  The sender BIC in this instance

15   is BESCPTPL.

16   Q.  Does that correspond with some other bank that's not JP

17   Morgan?

18   A.  Yes.

19   Q.  What is the receiver BIC?

20   A.  The receiver here is CHASUS33, which corresponds to JP

21   Morgan's New York XP.

22   Q.  Does that mean this wire went through JP Morgan's New York

23   bank?

24   A.  It does.

25   Q.  Is that a bank here in Manhattan?

1   A.  It is.

2   Q.  Does this mean JP Morgan received this swift message?

3   A.  Yes, it does.

4          MS. LAKE:  Let's look at field 50, which is in the

5   text, and highlight down from there.

6   Q.  What is field 50?

7   A.  That is the ordering party.

8   Q.  Who was the ordering party here?

9   A.  Petroleos de Venezuela.

10  Q.  And where are they based?

11  A.  Venezuela.

12         MS. LAKE:  Let's highlight field 59.

13  Q.  And what kind of information is found in field 59?

14  A.  Field 59 is the beneficiary.

15  Q.  Who is the beneficiary here?

16  A.  Clarity Trade and Finance SA.

17  Q.  Which of these fields does Fircosoft query for sanctions

18  compliance purposes?

19  A.  All of them.

20  Q.  What would have happened in the sanctions screening process

21  if instead of Clarity Trade and Finance SA, field 59 read

22  Iranian International Housing Company?

23  A.  The payment would have stopped for review, it would have

24  been escalated, it would have been investigated, and if it was

25  found to be related to Iranian company it would have been

1    blocked.

2    Q.  So what if the investigation revealed that the Iranian

3    International Housing Company was incorporated in Teheran,

4    Iran?

5    A.  The payment would have been blocked.

6    Q.  And who, if anyone, would JP Morgan report the payment to?

7    A.  OFAC.

8    Q.  Do you have an understanding of why JP Morgan reports

9    transactions like this to OFAC?

10   A.  Because it is legally required to.

11   Q.  And what would JP Morgan do if it learned that this payment

12   to Clarity Trade and Finance was for the benefit of an Iranian

13   company?

14   A.   It would have held the payment, it would have reviewed it,

15   it would have investigated it and blocked it.

16           MS. LAKE:  Turning to page 2, let's expand the text

17   there.

18   Q.  So what is this type of document?

19   A.  So this is from JP Morgan's U.S. dollar processor.  It's a

20   clarification and expansion on the information from the

21   previous message.

22   Q.  So is it fair to say that this is essentially a

23   reformatting of the information contained in the swift message?

24   A.  Yes.

25   Q.  And based on your review of these documents, is this a

1    reformatting of the data contained in page 1 of Government

2    Exhibit 401?

3    A.  Yes.

4    Q.  Is that the case for all of the government exhibits that

5    you expect to go through?

6    A.  Yes.

7    Q.  Let's turn -- let's turn to the next exhibit, 402.

8           We'll turn to page 2.  Let's walk through some of the

9    fields here.  What is the instruction date?

10   A.  August 11, 2011.

11   Q.  And what does that mean?

12   A.  That's the date the payment instructions would have been

13   received.

14   Q.  And what's the payment date?

15   A.  August 11, 2011.

16   Q.  And what does that mean?

17   A.  That's the date the payment is valued.

18   Q.  And what's the transaction amount here?

19   A.  $5,418,765.49.

20   Q.  What's the transaction type?

21   A.  The transaction type here is BT, which means it's a book

22   transfer, which means it's funds going from one account on JP

23   Morgan's books to another account on JP Morgan's books.

24   Q.  Is it possible when it's a book transfer that it means that

25   JP Morgan served as the correspondent bank for both of the

 1  foreign banks involved in the transaction?

 2  A.  Yes, it does.

 3  Q.  What is the customer swift ID?

 4  A.  The customer swift ID here is SHHBCHZZ, which is a

 5  reference to the credit party Hyposwiss Private Bank AG.

 6  Q.  And the sender's ID?

 7  A.  The sender's ID is a reference to the debit party BIC,

 8  which is BESCPTPL.

 9  Q.  And who is the order party?

10  A.  Petroleos de Venezuela.

11  Q.  Where is that based?

12  A.  Venezuela.

13  Q.  Who is the debit party?

14  A.  BESSFE.

15  Q.  Where is that?

16  A.  That's in Lisbon, Portugal.

17  Q.  Who is the credit party?

18  A.  Hyposwiss Private Bank AG.

19  Q.  And the BENE?

20  A.  BENE is reference to beneficiary, which is Clarity Trade

21  and Finance SA.

22  Q.  So based on this information, who originated the payment?

23  A.  Petroleos de Venzuela would have originated the payment.

24  The funds moved from the debit party account 11728748 to the

25  credit party account 11835873.

K35TSAD7                          Blair - Direct

1   Q.  And on its way is it right that it passed through JP Morgan

2   Chase here in Manhattan?

3   A.  Correct.

4   Q.  Let's turn to Government Exhibit 403.  We'll look at the

5   second page.  For this one, what is the payment date?

6   A.  October 12, 2011.

7   Q.  And the transaction amount?

8   A.  $5,874,779.37.

9   Q.  And who is the ordering party?

10  A.  TDVSA, Petroleosa.

11  Q.  And who is the beneficiary?

12  A.  Clarity Trade and Finance.

13  Q.  And what's the bank for Clarity Trade and Finance under

14  credit party?

15  A.  Hyposwiss Private Bank AG.

16  Q.  Let turn to Government Exhibit 404, and look at the second

17  page here as well.

18          What's the date of this payment?

19  A.  November 9, 2011.

20  Q.  And what is the amount of the transfer request?

21  A.  $12,904,173.50.

22  Q.  Who was the order party?

23  A.  Petroleos de Venzuela.

24  Q.  And who was the beneficiary?

25  A.  Clarity Trade and Finance SA.

1    Q.  And what's the credit party's bank information here?

2    A.  Hyposwiss Private Bank AG.

3    Q.  So where did this transaction originate?

4    A.  With Petroleos de Venezuela.

5    Q.  Where did it end up?

6    A.  Through Hyposwiss Private Bank AG to Clarity Trading.

7    Q.  Where did it go on the way?

8    A.  It was processed by JP Morgan.

9    Q.  Let's publish Government Exhibit 405.  We'll stay on the

10   first page this time.  What kind of document is this?

11   A.  This is also a reference to a swift message.

12   Q.  Is this a swift message or a different kind of message?

13   A.  So this came through a payment system called CHIPS.

14   Q.  What is CHIPS?

15   A.  It's another U.S. dollar type of payment system which has a

16   slightly different format.

17   Q.  Does it basically do the same thing as swift?

18   A.  It does.

19   Q.  Looking at the page, who is -- sorry, what is the date of

20   the transaction?

21   A.  December 27, 2011.

22   Q.  And what's the dollar amount?

23   A.  $4,243,372.66.

24   Q.  And who is the originating party?

25   A.  PDVSA, Petroleos.

K35TSAD7                          Blair - Direct

1   Q.   Who is the beneficiary?

2   A.   Clarity Trade Finance.

3   Q.   Let's turn to page 2.  Expand the text.  Is this JP

4   Morgan's data that corresponds to the CHIPS message on page 1?

5   A.   It does.

6   Q.   So who is the debit party listed here?

7   A.   Citibank NA.

8   Q.   And where is Citibank located?

9   A.   111 Wall Street, New York, New York.

10  Q.   And what does it mean that Citibank is the debit party?

11  A.   It means that these funds originated outside of JP Morgan.

12  They moved from Citibank as a party to Hyposwiss Private Bank

13  AG.

14  Q.   Looking at this information, can you explain the path that

15  the money took from beginning to end?

16  A.   So here the order party, BESSFE, initiated the payment from

17  their account held at Citibank, crediting the Hyposwiss Private

18  Bank AG and JP Morgan.

19  Q.   Turning back to page 6 of this exhibit, was the original

20  originator of the payment PDVSA in Venezuela, based on the

21  information or page one?

22  A.   It is.

23  Q.   Let's turn to Government Exhibit 406.  And what kind of

24  document is this one?

25  A.   This is also a CHIPS payment.

1              MS. LAKE:  So for this payment, can you highlight the

2       text next to number one?

3       Q.   Who originated the payment?

4       A.   PDVSA, Petroleosa.

5              MS. LAKE:  Let's turn to page 2 to look at the rest of

6       the information.  Expand that, please.

7       Q.   What's the payment date?

8       A.   December 30, 2011.

9       Q.   What's the transaction amount?

10      A.   $6,704,753.09.

11      Q.   Who is the debit party?

12      A.   Citibank NA.

13      Q.   And who is the credit party?

14      A.   Hyposwiss Private Bank AG.

15      Q.   So is it correct that this transaction began with PDVSA,

16      transited through Citibank in Manhattan to JP Morgan in

17      Manhattan, ultimately to Clarity Trade and Finance and

18      Hyposwiss based on what we just looked at?

19      A.   Yes.

20      Q.   Do you know whether each of the six transactions that we

21      just reviewed were ultimately processed and paid by JP Morgan?

22      A.   Yes, they were.

23             MS. LAKE:  And then I would like to show briefly

24      what's in evidence as Government Exhibit 2297A to have the

25      witness explain it.

1  Q.  What is this document?

2  A.  So this is a swift message, an MT199.

3  Q.  What kind of swift message is that?

4  A.  It is a free format message.

5  Q.  And when is a free format message used?

6  A.  It's used by banks to communicate when one of the other

7  message types doesn't reflect what you're communicating.

8  Q.  And what's the date on this?

9  A.  1st of July, 2014.

10  Q.  And who is the sender?

11  A.  JP Morgan Chase Bank NA in New York.

12  Q.  And what is the purpose of this message?

13  A.  This is a communication to a bank with a swift BECHZZ

14  identifying a transaction that was found to be in association

15  with sanctions against Iran.

16  Q.  So what happened to that transaction?

17  A.  This transaction was rejected and reported to OFAC.

18          MS. LAKE:  No further questions at this time.

19          THE COURT:  Mr. Heberlig.

20          It's been a long stretch, let's take a restroom break

21  and finish out the day.

22          Members of the jury, about a five to ten-minute break.

23  Thank you.

24          (Continued on next page)

25

1              (Jury not present)

2              THE COURT:  Any matters to take up?

3              MS. KIM:  No, your Honor.

4              THE COURT:  We'll take a break for five minutes.  I

5    still have a desire to give the jury a little bit of sense of

6    timing, so maybe you could think about and discuss what would

7    be an appropriate way to do it that doesn't feel like it's

8    jamming up the defense in any way.

9              MR. WEINGARTEN:  Maybe say something like we're

10   optimistic.

11             THE COURT:  Optimistic of what?

12             MR. WEINGARTEN:  The end of the week.

13             THE COURT:  That we'll get to closing arguments by

14   next week?

15             MR. WEINGARTEN:  By the end of the week.

16             THE COURT:  Before the end of next week.

17             MR. WEINGARTEN:  Yes.

18             THE COURT:  Is that comfortable?

19             MR. WEINGARTEN:  Somewhat.

20             THE COURT:  The other way to do it is say that we

21   anticipate the government will finish its presentation of

22   evidence by Monday, which is sooner than we expected, so we're

23   moving.  Is that comfortable?

24             MR. KROUSE:  Yes, your Honor.  We're still planning to

25   sit until 5:00 today and all day tomorrow?

1           THE COURT:  Yeah, I guess one question is whether we

2     have enough to fill all day tomorrow.  I recognize I said

3     Dubowitz on Monday in light of health issues.

4           MS. LAKE:  Could we evaluate over the break?

5           THE COURT:  Yeah, and I think also I do -- just with

6     everything that is going on I think -- I know it's exhausting,

7     but just getting it done as soon as reasonably can be makes

8     sense, and continue to desire to use tomorrow fully.  But

9     depending where we are, I do want to think about the charging

10    conference Tuesday morning.  If we're not going to use all of

11    Monday, there's the possibility moving it to Monday, depending

12    on where we are.  But I know the defense won't be able to say

13    yet what they're going to do, but just if the government rests

14    Monday, if there's a very short defense case we should use the

15    time.

16          Anyway, I will gather the information, then you'll

17    tell me when we come back.  And take five minutes.  Thank you.

18          (Recess taken)

19          (Continued on next page)

20

21

22

23

24

25

K35nsad8

1           THE COURT:  All right.  Where are we?

2           Ms. Lake, in terms of the length of what we have to do

3    tomorrow, and what we can get through today I suppose?

4           MS. LAKE:  Speaking to Mr. Heberlig, I think it sounds

5    like hopefully we'll finish with Mr. Blair today and then

6    tomorrow we will have sort of a longer section of documents

7    with the summary chart that we provided to defense, another

8    bank witness, some more documents and a very brief witness.

9           So I don't expect that it will take the entire day

10   tomorrow, but a fair chunk, probably past lunch.  I don't

11   expect with this that we would go all the way until 5 tomorrow.

12          THE COURT:  So how about I tell the jury that we will

13   do a half day tomorrow?

14          MS. LAKE:  OK.

15          THE COURT:  Some of them indicated to Mr. Scott they

16   would love to have time off tomorrow, as you all would too.  So

17   I think if we can tell them that we'll do a half day tomorrow

18   and that the government anticipates that it will finish

19   presenting evidence on Monday, which is several days ahead of

20   where we thought we would be, how is that?

21          MS. LAKE:  That sounds great.

22          MR. HEBERLIG:  Yes.

23          THE COURT:  All right.

24          MR. HEBERLIG:  One thing we also discussed, it sounds

25   like there may be a possibility that Monday would be quite

K35nsad8

1     limited for the government if they decided for instance not to

2     call Mr. Dubowitz.

3              If that is the case, we will be prepared to go if we

4     know on Saturday.  You know, if we find out on Sunday night it

5     is going to be a little tricky.  I think we have an

6     understanding in that regard.

7              MR. KROUSE:  We do have an understanding.  The issue

8     is what I mentioned yesterday to the Court about his heath.  We

9     will know by Saturday if he's going to be able to travel here

10    to appear on Monday.

11             MR. WEINGARTEN:  I am hearing this for the first time.

12    There is a chance Dubowitz won't testify?

13             MR. KROUSE:  I think I mentioned yesterday -- you

14    might have been out of the courtroom or didn't hear -- he is

15    having some health issues.  Nothing too serious I don't think,

16    but it could impact his ability to travel here.

17             THE COURT:  If he can't, then the government is not

18    going to sub?

19             MR. KROUSE:  We may try, your Honor, that is sort of

20    on the docket for tonight.  If we don't have anyone and don't

21    give notice, then we'll rest.

22             THE COURT:  OK.  And if Dubowitz does testify, what's

23    the length of time we think?

24             MR. KROUSE:  For his direct testimony, he would

25    probably be a half hour to an hour conservatively.

K35nsad8

1          THE COURT:  I guess I am just -- I am starting to

2     wonder whether we should give the jury the day off tomorrow.

3     It sounds like either way, you all will finish on Monday.

4          Is that fair to say?

5          MR. HEBERLIG:  I think that would be sensible, your

6     Honor.

7          MR. KROUSE:  The only hesitation from the government

8     is that, based on yesterday, we had a witness travel here --

9          THE COURT:  OK.

10         MR. KROUSE:  -- who now looks like he's definitely not

11    going to be getting on today.

12         THE COURT:  How long of a cross do you have,

13    Mr. Heberlig?

14         He's here, Mr. Krouse?

15         MS. LAKE:  He is in New York.  He is not at the

16    courthouse because we thought there was no way he would get on

17    today.

18         MR. HEBERLIG:  I think I'm going to get to the end of

19    the day.  I hope to finish, but it's going to be close.

20         THE COURT:  All right.

21         MS. LAKE:  If we could just do the half day, he'll get

22    on and off the stand and we'll do some documents.

23         THE COURT:  All right.  I'll tell them we'll do that.

24    I'll tell them we will do a half day tomorrow and that the

25    government anticipates that it will complete its presentation

K35nsad8

1    of evidence by Monday, which is several days ahead of where we

2    thought we would be.

3              OK.  We will bring the witness back, please.

4              You may take your seat.  Thank you.

5              THE WITNESS:  Thank you.

6              (Witness resumed)

7         (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you, everyone.

3              You may take your seats.

4              Thank you, members of the jury.

5              Just a quick note on schedule.  I know some of you had

6     indicated a desire for some amount of tomorrow off, and we can

7     accommodate that.  We are going to do a half day tomorrow.  So

8     you can plan on that.  We'll start at our normal time and we'll

9     end by lunch.

10             So thank you for that.  I hope knowing that helps you

11    plan.  With today and with that half day tomorrow, we do

12    anticipate that the government will finish its presentation of

13    evidence by Monday.  That's several days ahead of where we

14    thought we would be.

15             I'll keep you apprised as soon as we know more

16    information about the schedule and any planning ahead we can

17    do.  Half day tomorrow, and that's where we are, which is

18    several days ahead of where we anticipated.

19             With that, cross-examination.

20             Mr. Heberlig, you may proceed.

21    CROSS-EXAMINATION

22    BY MR. HEBERLIG:

23    Q.  Good afternoon, Mr. Blair.

24    A.  Good afternoon.

25    Q.  I am Brian Heberlig.  I represent the defendant, Ali Sadr.

1    Just a couple of questions about your background.  I am not

2    sure I caught your educational background.

3              Where did you go college.

4    A.   I went to SUNY Binghamton.

5    Q.   Do you have any postgraduate degrees?

6    A.   I do not.

7    Q.   You are not a lawyer, I take it?

8    A.   I am not.

9    Q.   How long have you been at J.P. Morgan?

10   A.   Since 2011, so about nine years.

11   Q.   That whole time you have been in the compliance enforcement

12   function one way or another?

13   A.   Yes.

14   Q.   Are you familiar with J.P. Morgan's compliance program in

15   the years prior to your arrival?

16   A.   Not directly.

17   Q.   A few questions about the types of correspondent banking

18   transactions we have been discussing.  Am I correct those types

19   of transactions are sometimes referred to as clearing

20   transactions, U.S. dollar clearing?

21   A.   Yes.

22   Q.   OK.  And my questions in particular are focused on U.S.

23   dollar transactions from one foreign bank to another foreign

24   bank.

25              OK.  A wire transfer originates at the bank of the

1    party that is sending the money, correct?

2    A.   Yes.

3    Q.   And that party is sometimes referred to as the sender or

4    the payor?

5    A.   Yes.

6    Q.   And the wire transfer is received at the person who's owed

7    the money or who's receiving the money, correct?

8    A.   Correct.

9    Q.   That party is sometimes referred to as the recipient or the

10   payee, is that correct?

11   A.   Yes.

12   Q.   And in the transactions you have testified about in this

13   case, both the sender's bank and the recipient's bank were

14   foreign banks, correct?

15   A.   That's correct.

16   Q.   And they weren't U.S. banks?

17   A.   Not to my knowledge.

18   Q.   All right.  I think you testified about the process, but

19   for one foreign bank to send a U.S. dollar transfer to another

20   foreign bank, am I right that typically the foreign bank needs

21   to use a U.S. intermediary bank?

22   A.   Unless they have a physical presence in the United States,

23   right, the ability to bank in the United States, yes, they

24   would need a U.S. intermediary.

25   Q.   You are saying if a foreign bank had, say, a U.S. branch,

1   it could do it itself?

2   A.  Correct.

3   Q.  But in an instance in which the two foreign banks don't

4   have a U.S. branch, generally speaking they would need the

5   U.S. -- excuse me, need to use the U.S. intermediary bank?

6   A.  Correct.

7   Q.  Is there any way for a foreign bank to send U.S. dollars to

8   another foreign bank without using a U.S. intermediary bank?

9   A.  Unless they have that physical presence in the United

10  States, no.

11  Q.  How about are there systems in other countries, for

12  instance, Hong Kong, where one party might transfer U.S.

13  dollars to another party without clearing it through the United

14  States?

15  A.  They would need to be connected to the U.S. financial

16  system.

17  Q.  OK.  What do you mean by connected?

18  A.  Have a correspondent bank relationship or have a presence

19  in the United States to be part of the Federal Reserve system.

20  Q.  OK.  How about if a foreign bank had its own store of U.S.

21  dollars or its own reserves of U.S. dollars and two parties

22  both had accounts at that foreign bank.

23       Could a transfer be made within the bank that did not

24  involve the U.S. financial system?

25  A.  I don't know.  I guess if they're literally moving their

1    physical cash around, potentially.

2    Q.  Say the foreign bank had 100 million U.S. dollars in

3    reserves, and two of its customers wanted to move $1 million

4    from one customer to another.  That type of transfer would not

5    require the involvement of a U.S. intermediary bank, correct?

6    A.  I guess not.

7    Q.  OK.  Focusing on these transactions, J.P. Morgan was the

8    intermediary bank, correct?

9    A.  Correct.

10   Q.  Sometimes the term has been used as correspondent bank.  Am

11   I right that the correspondent banks are also known sometimes

12   as the two foreign banks?  Those are the correspondents of the

13   intermediary bank?  The terminology gets confusing.

14   A.  Agreed, it does.

15   Q.  I am going to refer to J.P. Morgan as the intermediary

16   bank.  Is that a term you're comfortable with?

17   A.  It is.

18   Q.  All right.  J.P. Morgan is one of the top intermediary

19   banks in the world, correct?

20   A.  Yes.

21   Q.  How many foreign banks does J.P. Morgan have correspondent

22   relationships with?

23   A.  I couldn't say.

24   Q.  Is it more than a hundred?

25   A.  Potentially.

1   Q.   As many as a thousand?

2   A.   Potentially.

3   Q.   And I think you testified on direct that J.P. Morgan clears

4   somewhere around 2 million of these U.S. dollar wire transfers

5   a day?

6   A.   Yes.

7   Q.   Do you have a sense of how much money clears every day in

8   J.P. Morgan in terms of the amount of dollars?

9   A.   It's probably somewhere between two and three trillion

10  dollars.

11  Q.   That clearing process is automated, correct?

12  A.   Yes.

13  Q.   It's run by computers?

14          Is that a yes?

15  A.   Yes.

16  Q.   OK.  A bank that submits a wire transfer request does so

17  electronically typically, correct?

18  A.   Correct.

19  Q.   And J.P. Morgan processes those wire transfer requests

20  electronically?

21  A.   Correct.

22  Q.   And a wire transfer request is processed in a nanosecond,

23  correct?

24  A.   Not quite, but, yes, it happens very quickly.

25  Q.   Seconds?  Is that fair?

1    A.   Sure.  Around 60 seconds on average if there's no concerns.

2    Q.   All right.  Unless, of course, a wire hits on one of the

3    screening terms you testified about, correct?  And we'll come

4    back to that topic.

5                 THE COURT:   You shook your head.  Could you just --

6    A.   Yes.

7                 THE COURT:   Thank you.

8    Q.   Does J.P. Morgan charge a fee for its correspondent banks

9    to process these wire transfers?

10   A.   I believe so.

11   Q.   And is the fee charged on a per-wire basis?

12   A.   I believe so.

13   Q.   Does it depend on the amount of money that's being wired?

14   A.   No.

15   Q.   How much is the fee typically?

16   A.   I believe each wire is about $20.

17   Q.   OK.  So whether you are a transferring a hundred dollars or

18   a hundred million dollars, you pay J.P. Morgan 20 bucks?

19   A.   If you are wiring it, yes.

20   Q.   Now, in the transactions you have been testifying about,

21   J.P. Morgan's customer relationship is with the foreign

22   correspondent banks, correct?

23   A.   Correct.

24   Q.   And the sender and the recipient of the money are customers

25   of those foreign banks, right?

K35nsad8                    Blair - Cross

1   A.  Yes.

2   Q.  They are not J.P. Morgan's customers, correct?

3   A.  Correct.

4   Q.  So you've testified about some transactions involving a

5   company named Clarity Trade & Finance.  That company had an

6   account with the Hyposwiss Bank, correct?

7   A.  Yes.

8   Q.  And it was the Hyposwiss bank that had an account with J.P.

9   Morgan?

10  A.  Correct.

11  Q.  Clarity did not?

12  A.  Not to my knowledge.

13  Q.  I think you testified about this concept of KYC on direct,

14  is that correct?

15  A.  Yes.

16  Q.  And that stands for know your customer?

17  A.  Yes.

18  Q.  That is a process that the bank must go through to do

19  what's known as due diligence to find out certain information

20  about its customer, correct?

21  A.  Correct.

22  Q.  In this context, the KYC that J.P. Morgan performed was on

23  the foreign correspondent banks, correct?

24  A.  Yes.

25  Q.  Like Hyposwiss in the transactions we have been talking

1    about?

2    A.   Yes.

3    Q.   J.P. Morgan did not perform due diligence on the individual

4    sender or receiver of the transactions, correct?

5    A.   Correct.

6    Q.   So in our instance, in our case, PDVSA on the one side

7    sending the money, Clarity on the other side receiving the

8    money, it was not J.P. Morgan's responsibility to do KYC on

9    those two parties?

10   A.   Correct.

11   Q.   And J.P. Morgan didn't do so?

12   A.   Not to my knowledge.

13   Q.   And that's in part because were that responsibility to fall

14   to the intermediary bank for each of these two million

15   transfers a day, it would be a time-consuming and expensive

16   process, correct?

17   A.   No, I don't believe that's why.

18   Q.   So, for the 2 million transfers a day, if you were

19   obligated to do individual KYC due diligence on each sender and

20   receiver sending money through the bank, it wouldn't be a

21   time-consuming process?

22   A.   I'm sure that it would be time consuming, but KYC is done

23   on accounts when they're opened and then periodically

24   thereafter.  They are not done at the time of transaction

25   processing.

1    Q.  So there would be an initial obligation; once you completed

2    your KYC, you would sort of have it in the file.  Is that

3    right?

4    A.  Correct.

5    Q.  OK.  What we're talking about, the fact that J.P. Morgan

6    didn't conduct due diligence or KYC on its customer's customer,

7    do you know that term sometimes to be referred to as KYCC, know

8    your customer's customer?

9    A.  No, I'm not familiar with that.

10   Q.  OK.  Well, regardless of the terminology, am I right that

11   the bank's decision not to perform that kind of due diligence

12   was because banking regulators didn't expect it to do so,

13   correct?

14   A.  Yes.  That's the nature of a correspondent bank

15   relationship.

16   Q.  Had you been obligated to do so by law or regulation, of

17   course, J.P. Morgan would have done so?

18   A.  Yes.

19   Q.  OK.  Your regulators, your banking authorities, OFAC, did

20   not put that responsibility on an intermediary bank like J.P.

21   Morgan to do diligence about its customers' customers, correct?

22   A.  Correct.

23   Q.  I want to talk a little bit about the due diligence process

24   that you did perform on your customer in this case, Hyposwiss.

25          It is correct that J.P. Morgan conducted

1    know-your-customer due diligence on Hyposwiss, right?

2    A.  I would expect it to.

3    Q.  And you know that J.P. Morgan's due diligence and screening

4    process for its customers is rigorous, is it not?

5    A.  Yes.

6    Q.  You follow all of best practices in banking standards that

7    are required under the law?

8    A.  I would hope so.

9    Q.  In this instance, for Hyposwiss to be able to have a

10   correspondent banking relationship with J.P. Morgan that

11   allowed it to process wire transfers, it had to pass the due

12   diligence requirements of J.P. Morgan, correct?

13   A.  Yes.

14   Q.  Had J.P. Morgan flunked Hyposwiss, it wouldn't have done

15   business with you, right?

16   A.  Corrects.

17           MR. HEBERLIG:  Can you pull up Defense Exhibit 1905

18   for the witness only, please.

19   Q.  I have a paper copy if you could be more comfortable.  You

20   are welcome to use the screen.

21   A.  This is fine.

22   Q.  OK.  Sir, do you recognize the document in front of you to

23   reflect a due diligence report of Hyposwiss Bank conducted by

24   J.P. Morgan?

25   A.  Yes.

1        MR. HEBERLIG:  I move its admission, your Honor.

2        MS. LAKE:  No objection.

3        THE COURT:  Thank you.  Defendant's Exhibit 1905 is

4   admitted.

5        (Defendant's Exhibit 1905 received in evidence)

6        MR. HEBERLIG:  Thank you.

7        Can we publish your Honor?

8        THE COURT:  You may.

9        MR. HEBERLIG:  Can you focus us on the dates in the

10  lower right-hand corner, please, last renewed date.

11  BY MR. HEBERLIG:

12  Q.  The report appears to be dated January 29, 2013, correct?

13  A.  Unless that is a reference to the last renewed date of the

14  secondary renewal owner.

15  Q.  OK.  Well, in any event, the risk assessment date you see

16  there is October -- down at the very, very bottom -- October

17  23, 2012?

18  A.  Yes.

19  Q.  Does that generally reflect when the bank makes its

20  decision on the customer's risk assessment?

21  A.  I believe so.

22        MR. HEBERLIG:  All right.  Let's zoom back out,

23  please.  I just want to highlight a few things from the report.

24  Can you just highlight the very top of the report down through

25  the customer legal address.

1          OK.  That's fine.

2     BY MR. HEBERLIG:

3     Q.  Is the parent name of the bank reflected on this page down

4     toward the bottom?

5     A.  It appears that it is.

6     Q.  All right.  Do you see the name St. Galler Kantonal bank

7     AG?

8     A.  I do.

9     Q.  Are you familiar with that bank?

10    A.  I am not.

11    Q.  Are you familiar with the concept of a cantonal bank in

12    Switzerland?

13    A.  I am not.

14         MR. HEBERLIG:  Let's zoom back out for a moment.

15    Highlight the paragraph under the renewal status, not the

16    paragraph, but the section.  All right.

17    BY MR. HEBERLIG:

18    Q.  Does this indicate under renewal incremental status that

19    the KYC had been completed?

20    A.  Yes, it does.

21         MR. HEBERLIG:  All right.  Let's turn to page 3 of

22    this document, please.  If you could just highlight the KYC

23    type table there.

24    Q.  Can you just give us a sense in looking at this, what is

25    the nature of the KYC screening that J.P. Morgan would conduct

1     on a correspondent bank like Hyposwiss, what these things mean,

2     what it looked for?

3     A.  So it would look at -- so standard due diligence, the third

4     item down on the left, it refers to a standard level of KYC

5     review.  Enhanced due diligence refers to an enhanced form of

6     KYC review, a more complex form that's done.

7             I am not sure what MIFID nonsecurities lending refers

8     to.

9     Q.  OK.

10    A.  TSS products would refer to Chase Treasury Services.

11    Q.  How about the term EMEA?  Does that the commonly stand for

12    Europe, Middle East, and Africa?

13    A.  It does.

14    Q.  What sort of screening would J.P. Morgan do with respect to

15    the Europe, Middle East, and Africa?

16    A.  It would meet local requirements of both Switzerland and

17    the EU.

18    Q.  OK.  And the bank was approved in that category, correct?

19    A.  Yes.

20            MR. HEBERLIG:  Let's go to page 7, please.

21            Can you highlight just where it says in red there

22    "negative media search is required," down about 10 lines or so.

23    You have to scroll over to the right a little bit, please.  OK.

24    Q.  Fair to say J.P. Morgan would also conduct a search of

25    media to see if there had been any negative stories about the

1    bank?

2    A.  Yes.  That's negative media.

3    Q.  This reflects the fact that a search was conducted and

4    there had been no negative media in the past five years about

5    Hyposwiss, correct?

6    A.  I believe so.

7    Q.  And likewise in the next question, the client --

8           That's Hyposwiss, correct?

9    A.  Yes.

10   Q.  -- had not been subject to any fines, penalties, sanctions

11   or other similar negative actions associated with money

12   laundering or terrorist financing in the past five years,

13   correct?

14   A.  It appears so.

15          MR. HEBERLIG:  Let's go a little further down the

16   page, please.  If we can zoom out.  Thank you.  All right.

17   Q.  This indicates five or more years is the period of time

18   that Hyposwiss had maintained a relationship with J.P. Morgan,

19   is that correct?

20   A.  Yes.

21   Q.  And there's information presented here about -- the

22   question posed is, what is the money laundering supervisory

23   regime of the client?

24          And there's information here about Switzerland,

25   significant AML legislation in place, and some other

1    information.

2            Do you see that?

3    A.  Yes.

4    Q.  It also says Switzerland is a member ever the FATF.

5            Do you know what the FATF is?

6    A.  I don't.

7    Q.  Do you know that it stands for the financial action task

8    force?  Have you ever heard of that?

9    A.  No.

10   Q.  OK.  All right.  As a result --

11           MR. HEBERLIG:  We can take that down.

12   Q.  I think you said as a result of the review Hyposwiss was

13   renewed again and allowed to continue transacting, correct?

14   A.  I would assume so.

15   Q.  OK.  A few more questions about the mechanics of how these

16   payments worked.  I just want to understand mechanically.

17           So we've talked about there are two foreign banks on

18   each side of the transaction, correct?

19   A.  Correct.

20   Q.  J.P. Morgan's in the middle as the intermediary.  So if we

21   are talking about one of these PDVSA transfers to Clarity on

22   the sender's site, we have PDVSA as the sender, correct?

23   A.  Yes.

24   Q.  And PDVSA has a relationship with its own foreign bank,

25   correct?

1   A.  Yes.

2   Q.  That's the customer relationship there?

3   A.  Yes.

4   Q.  That foreign bank has a relationship with J.P. Morgan,

5   correct?

6   A.  Correct.

7   Q.  On the other side of the transaction, J.P. Morgan has a

8   relationship with Hyposwiss?

9   A.  Correct.

10  Q.  And Clarity has the customer relationship with Hyposwiss?

11  A.  Correct.

12  Q.  When PDVSA would transfer money to Clarity, and let's just

13  assume -- we'll use a million dollars as a round number.  PDVSA

14  needed to have at least a million dollars in its account with

15  its own foreign bank, correct, to do that?

16  A.  I should think so.

17  Q.  And when PDVSA would initiate the wire transfer, its

18  foreign bank would debit PDVSA's account and be credited that

19  $1 million, correct?

20  A.  Yes.

21  Q.  OK.  And the bank wouldn't literally go collect the

22  physical $1 million from PDVSA, correct?  These are book

23  entries?

24  A.  Yes.  If the account is held on their books, yes, they

25  wouldn't.

1    Q.  We've established that PDVSA had an account with J.P.

2    Morgan, right?  Excuse me, PDVSA's foreign bank had an account

3    with J.P. Morgan, right?

4    A.  Correct.

5    Q.  And likewise Hyposwiss did as well.

6         So when PDVSA was credited that $1 million from its

7    customer, J.P. Morgan would debit its account, correct?

8    A.  Yes.

9    Q.  And simultaneously credit Hyposwiss' account?

10    A.  Correct.

11    Q.  OK.  And then Hyposwiss would credit its customer, Clarity,

12    is that correct?

13    A.  Yes.

14    Q.  OK.  And those accounting entries, when that would occur,

15    would they be as instantaneous as the wire transfer processing

16    time you reflected, 60 seconds or less?

17    A.  Essentially, yes.

18    Q.  And no physical U.S. dollars are changing hands in that

19    type of transaction, these are book entries within J.P. Morgan

20    for PDVSA's foreign bank account to Hyposwiss' foreign bank

21    account, correct?

22    A.  Yes.

23    Q.  And if PDVSA's foreign bank account with J.P. Morgan didn't

24    have $1 million in it, you would not have processed the

25    transfer, correct?

1   A.  Correct.

2   Q.  So is it fair to say that in none of the transactions we

3   have been talking about J.P. Morgan was transferring its own

4   money to Hyposwiss?

5   A.  Yes, that's fair to say.

6   Q.  And J.P. Morgan did not lose any money on any of the

7   transactions we have been talking about in this trial?

8   A.  No.

9   Q.  In fact, it gained $20 times eight transactions?  160

10  bucks?

11  A.  Sure.

12  Q.  All right.  Let me switch gears and talk a bit about the

13  bank's compliance program that you testified about on direct.

14          I want to be clear.  My questions are focused on J.P.

15  Morgan's policies, OK?  I am not asking for your legal opinion

16  on what the law required.

17          You talked about the compliance program in place at

18  J.P. Morgan to screen for potential Iran sanctions violations,

19  correct?

20  A.  Yes.

21  Q.  And the first line of defense was the vendor tool you

22  described and I think you called it Fircosoft?

23  A.  Yes, that's correct.

24  Q.  And that's the tool that automatically screens information

25  that's in the wire transfer request, correct?

1   A.  Yes.

2   Q.  Those electronic payment instructions?

3   A.  Correct.

4   Q.  So when the electronic payment instruction is made, the

5   computer searches the fields in those instructions for keywords

6   or terms, correct?

7   A.  Yes.

8   Q.  Some of the fields are the originator of the transaction,

9   correct?

10  A.  Yes.

11  Q.  Another field would be the beneficiary or recipient?

12  A.  Yes.

13  Q.  You would also screen things like address, correct?

14  A.  Correct.

15  Q.  OK.  In the context of the Iran sanctions regime, one of

16  the principal things you were screening for was what either the

17  sender or the recipient of the money was especially designated

18  a national, correct?

19  A.  Correct.

20  Q.  That is a list that's maintained by OFAC, correct?

21  A.  Correct.

22  Q.  It's made publicly available to all the banks?

23  A.  Yes.

24  Q.  So if there are a hundred names, I know there are well more

25  than 100 names, but all those names get fed into that vendor

1    program that you described, correct?

2    A.  Yes.

3    Q.  So if the Acme Company is a specially designated national

4    and you received a payment that is either from or to the Acme

5    Company, it would hit your software?

6    A.  I would expect it to.

7    Q.  How about the address field that you checked?  If there was

8    an Iranian address in the payment instruction, would the tool

9    automatically flag the payment?

10   A.  Yes.

11   Q.  And I think you testified that one of the key terms you

12   screened for was actually the word Iran, correct?

13   A.  Yes.

14   Q.  So if the tool was operating correctly, if the word Iran

15   was anywhere in the payment instructions, the transaction would

16   be screened for further scrutiny, further review, correct?

17   A.  Yes.

18   Q.  And how about did you screen for Iranian sounding names?

19   A.  No.  Only names that are on the SDN list.

20   Q.  So two popular surnames, excuse me, popular first names in

21   Iran, Mohammad and Ali, would you screen for names like that?

22   A.  If they are on the sanction list, yes.

23   Q.  So if there is a person on the sanctions list whose name is

24   Mohammad something or Ali something, then you would search for

25   it?

1  A.  It would only generate if both of them are present, but

2  yes.

3  Q.  OK.  How about variations of the name, like Iranian, would

4  you search for that as well?

5  A.  Yes.

6  Q.  How about Persian?

7  A.  Yes.

8  Q.  And if either of those terms were in the instructions, the

9  transaction would be pulled aside, correct?

10  A.  Yes.

11  Q.  Popular Iranian cities, would you search for those as well?

12  A.  Yes.

13  Q.  All right.  So any business with the name Iranian in its

14  business name would be flagged by your system, correct?

15  A.  Yes.

16  Q.  It would be impossible to automatically clear a wire

17  through J.P. Morgan if the name Iranian was part of the

18  business of either the sender or recipient, correct?

19  A.  I would hope so.

20  Q.  You said once a flag is hit there is a secondary process of

21  review, correct?

22  A.  Yes.

23  Q.  And that process takes some time, fair?

24  A.  Correct.

25  Q.  But some of the transactions that are hit initially are

1    ultimately cleared through by J.P. Morgan, correct?

2    A.  Yes.

3    Q.  I think you described those as false positive?

4    A.  Correct.

5    Q.  All right.  So, again, focusing on the bank's policies, not

6    on what you understand the law to be, I have a few questions

7    about that.

8           If upon further review the bank determined that a wire

9    transfer was being received by an Iranian citizen who is living

10   outside of Iran, say in a place like Europe, would the bank put

11   that transaction through?

12   A.  Would it put it through?

13   Q.  Would it allow it to clear after you've done your second

14   review, determined that there was Iranian citizen receiving the

15   payment, but he or she was living outside of Iran, would the

16   bank allow the transaction to clear after the secondary review?

17   A.  Yes.

18   Q.  OK.  How about if it was a business located in France named

19   the Iranian Ice Cream Company and after doing your due

20   diligence you determined that that company was not incorporated

21   or located in Iran, it was in France?  Would you clear the

22   money through?

23   A.  If it was found to have no associations to Iran, yes, it

24   would be cleared.

25   Q.  And likewise for the Tehran Cafe in London?

1    A.  Yes.

2    Q.  But in each of those instances the transaction would need

3    to go through your secondary screening?

4    A.  Correct.

5    Q.  How long would a process like that take?

6    A.  So the investigation process can take anywhere from a day

7    to about two and a half weeks.

8    Q.  And during that time period the money that one party was

9    trying to send to, say, the owner of the Iranian Ice Cream

10   Company in France would be held within J.P. Morgan and not sent

11   on through, correct?

12   A.  Correct.

13   Q.  Now, one last hypothetical.

14          What if the banks' investigation revealed that the

15   company receiving the wire transfer was located outside of Iran

16   but it had a minority owner who lived in Iran?  Would that kind

17   of transaction clear through?

18   A.  It may clear through.  It may -- they may take a risk-based

19   approach and determine to not be associated to the transaction.

20   Q.  One possibility, when you say risk-based approach, would

21   be, if the bank couldn't get definitive information one way or

22   another whether there was a sanctions issue, it might just say

23   we're canceling this transaction?

24   A.  Correct.

25   Q.  Because it wasn't worth the risk for the 20 bucks to

1  process that kind of transaction, fair?

2  A.  Correct.

3  Q.  Are you familiar with a concept in banking known as

4  derisking?

5  A.  Derisking?

6  Q.  Derisking.

7  A.  No, I'm not.

8  Q.  OK.  What happens if a foreign correspondent bank sends too

9  many wire transfers that wind up being rejected or blocked by

10 J.P. Morgan for sanctions issues?  Would you ultimately cease

11 relations with that bank?

12 A.  The relationship would be reconsidered, certainly.

13 Q.  And how about a scenario where there were repeated and

14 multiple flags that turn out to be false positives?  Would that

15 also be something you would take into consideration when

16 determining whether to maintain a business relationship with a

17 bank?

18 A.  No, that would not be taken into account.

19 Q.  Not a factor at all if there were multiple false positives?

20 It's only if there is an actual issue?

21 A.  Correct.

22 Q.  You testified a little bit about steps that would be taken

23 after the sort of secondary review you've just been describing.

24 I want to ask you some questions about that.

25         One action I think you said would be for the bank to

1   block the transaction, correct?

2   A.  Yes.

3   Q.  In that case the bank would actually freeze the money in

4   its account?

5   A.  It would be moved to its own account, yes.

6   Q.  To the bank's own account?

7   A.  No, to an account for that transaction.

8   Q.  OK.  But the money would be maintained within the bank?

9   A.  Correct.

10  Q.  It wouldn't go to the customer, correct?

11  A.  Correct.

12  Q.  OK.  That sort of blocking under the bank's policies would

13  occur -- focused still on the Iranian context here -- if the

14  transaction involved an SDN, is that fair?

15  A.  Yes.

16  Q.  Meaning the government of Iran or other specially

17  designated nationals?

18  A.  Yes.

19  Q.  And when did that blocking obligation become policy at J.P.

20  Morgan?  Do you recall?

21  A.  No, I don't.

22  Q.  All right.  Was it in place when you got there, or was it

23  something that occurred within the first year or two after you

24  arrived?

25  A.  I guess, to my knowledge, it was in place when I got there.

1   Q.  OK.  So a second type of resolution I think you described

2   would be a rejection, correct?

3   A.  Correct.

4   Q.  And a rejection might occur if you determined under the

5   bank's policies that there could be a sanctions issue, but it

6   didn't involve an SDN, you would just reject the payment,

7   correct?

8   A.  Correct.

9   Q.  And the difference between rejecting and blocking is that

10  when there is a rejection the money would go back to the

11  originating party, correct?

12  A.  Correct.  It would be going to the remitter.

13  Q.  In both instances the bank would report the information to

14  OFAC, correct?

15  A.  Correct.

16  Q.  And that's required by law?

17  A.  Yes.

18  Q.  A third option -- I think you described this, but, if not,

19  let me just ask.  Would a third option be for J.P. Morgan to

20  just cancel the transaction?

21  A.  It is.  Canceling is not usually an action taken with

22  sanctions.

23  Q.  Well, in the instance we described before or you described

24  before, where you just couldn't figure out the facts but you

25  decided it's too risky, we are not going to put it through,

1  would that be an instance that would be accurately described as

2  canceling a transaction?

3  A.  Potentially, yes.

4  Q.  When transactions are canceled, there's not the same

5  obligation to report to OFAC, is that correct?

6  A.  Not -- to my knowledge, yes.

7  Q.  You were asked a couple of questions about this concept of

8  stripping.  Do you recall those questions?

9  A.  I do.

10  Q.  I think you gave an example of a North Korean general, is

11  that right, who was under sanctions?

12  A.  I did.

13  Q.  If someone wanted to send money to that person, they might

14  take out his name.  That's the example you gave of wire

15  stripping, is that correct?

16  A.  Yes.

17  Q.  I think you had said it was to conceal information if the

18  party knows that the transaction would violate the sanctions,

19  correct?

20  A.  I believe I said that.

21  Q.  And that's your understanding of what the concept of

22  stripping is?  Someone who believes they are engaged in a

23  transaction that would violate the sanctions does something to

24  conceal that fact, right?

25  A.  Yes.

1   Q.  I want to talk a little bit, still focused on J.P. Morgan's

2   policies, about indirect parties to wire transfers.

3           Am I correct that as a matter of J.P. Morgan's

4   policies, you did not require foreign correspondent banks to

5   identify information beyond the sender and the recipient of the

6   funds?

7   A.  Correct.

8   Q.  OK.  Again entirely consistent with the guidance you had

9   been given by banking regulators, correct?

10  A.  I believe so, yes.

11  Q.  And those same banking regulators and J.P. Morgan pursuant

12  to its policy did not require intermediary banks to demand

13  anything more than that information about the sender and the

14  recipient of the funds, correct?

15  A.  To my knowledge.

16  Q.  And in J.P. Morgan's instance your additional obligation --

17  let me back up.  You had two obligations.  You had to make sure

18  those fields were filled out in a wire transfer, correct,

19  sender and recipient?

20  A.  Correct.

21  Q.  And you had to have an adequate compliance program to

22  screen those names against the SDN list and country

23  information, correct?

24  A.  Correct.

25  Q.  If you had both of those things, you fully satisfied your

1  obligations under what you understand to be applicable law?

2  A.  As I understand them.

3         MR. HEBERLIG:  Bear with me just one second.  I'm

4  trying to make this shorter.

5         THE WITNESS:  I appreciate that.

6  Q.  As a matter of policy, J.P. Morgan did not require either

7  the sender or the recipient of a wire transfer to tell the bank

8  whether it intended to transfer the money to someone else,

9  correct?

10 A.  I'm sorry.  Can you repeat the question.

11 Q.  Maybe I'll ask it a different way.  As a matter of J.P.

12 Morgan's policy, you did not ask your foreign correspondent

13 banks to demand from their customers information about whether

14 the transaction was being performed on behalf of somebody else,

15 correct?

16 A.  Correct.

17 Q.  You could have done so, correct?

18 A.  I guess we could have, yes.

19 Q.  You could have asked your foreign correspondent banks to

20 demand from every sender of a wire transfer a certification

21 that the payment didn't violate any sanctions regime.  That was

22 within your ability to request, was it not?

23 A.  I guess.

24 Q.  But that was not bank policy, correct?

25 A.  To my knowledge, no, it was not.

K35nsad8                          Blair - Cross

1    Q.  And to your knowledge, that was not required under the

2    applicable regulations that apply to intermediary banks?

3    A.  Correct.

4    Q.  Because if it was, J.P. Morgan would have done it?

5    A.  I would hope so.

6    Q.  Now, am I right that as a result of the wire transfers in

7    this case that you've testified about J.P. Morgan has not been

8    criminally prosecuted?

9    A.  To the my knowledge.

10   Q.  OFAC has not pursued any enforcement action against the

11   bank for violating the Iran sanctions as a result of those wire

12   transfers?

13   A.  Not to my knowledge.

14   Q.  And J.P. Morgan has not been fined by OFAC for violations

15   of the Iran sanctions regime as a result of wire transfers you

16   testified about in this case?

17   A.  Not to my knowledge.

18   Q.  And you're not aware of even the bank having received a

19   cautionary letter or any other sanctions from OFAC as a result

20   of your behavior, correct?

21   A.  In these instances, no, I'm not.

22   Q.  OK.  You understand that the allegations in this case are

23   that the bank, J.P. Morgan, did not know of any information in

24   these wire transfers that potentially violated the sanctions,

25   correct?

A.  Well, I don't really know those allegations, but that's
what I determined from those transactions.

Q.  Do you understand that the government maintains that J.P.
Morgan is the alleged victim of the crime?

A.  No, I don't know that.

Q.  Do you have any reason to believe anyone at J.P. Morgan
knew that these wire transfers in this case related in any way
to Iran?

A.  No.

            MS. LAKE:  Objection.  Lack of foundation.

            THE COURT:  Overruled.

Q.  All right.  Even assuming for present purposes that the
wire transfers in this case violated the sanctions, and I don't
concede that, but I will assume it for purposes of these
questions, am I correct that because J.P. Morgan didn't know
about that potential violation, the risk of any penalty to the
bank was low?

A.  No.  That's not necessarily true.

Q.  Isn't it true that the risk to the bank for being
sanctioned as a result of these payments was virtually
nonexistent?

            MS. LAKE:  Objection.  Asked and answered.

            THE COURT:  Sustained.

Q.  The only way that J.P. Morgan could have been in trouble
with OFAC or the regulators for these transactions is if your

K35nsad8                        Blair - Cross

1    compliance program was deemed deficient, correct?

2    A.  No, that's not true.

3    Q.  J.P. Morgan's compliance program you've testified about was

4    one of the more robust programs in banking practice, correct?

5    A.  I hope so.

6    Q.  And your testimony is that, despite complying with all of

7    the rules and regs as we just talked about and not having any

8    knowledge that anyone at J.P. Morgan knew of any connection to

9    Iran with these wire transfers, the bank was at risk of

10   enforcement action?

11   A.  If OFAC found it so, yes.

12   Q.  If OFAC found it so?  You are aware of the fact that OFAC

13   knows of this case?

14            MS. LAKE:  Objection.

15            THE COURT:  Sustained.

16   Q.  There was an OFAC witness to testified in court --

17            MS. LAKE:  OK.

18            THE COURT:  Sustained.

19   Q.  Would you agree that a bank that transacts millions of

20   transactions a day, as J.P. Morgan does, inevitably, despite

21   all best practices, might allow some transactions through that

22   could violate the sanctions?

23            MS. LAKE:  Objection.

24            THE COURT:  Overruled.

25   A.  Potentially, yes.

K35nsad8                          Blair - Cross

1    Q.   If you wanted to eliminate any possibility of that

2    happening, you would have to do individual

3    transaction-by-transaction due diligence, would you not?

4    A.   Well, you could not process transactions.

5    Q.   It would grind the financial system to a halt, would it

6    not?

7    A.   It would.

8    Q.   The fact is the bank in your instance did everything it was

9    expected to do here, correct?

10   A.   As far as I can tell.

11   Q.   You testified a little bit about reputational risk.  Do you

12   recall those questions?

13   A.   I do.

14   Q.   In this instance, J.P. Morgan processed seven wire

15   transfers over a roughly 18-month period that relate to this

16   case, correct?

17              MS. LAKE:  Objection.

18              THE COURT:  Overruled.

19   A.   I don't memorize the dates, but potentially.

20   Q.   OK.  Over a more than one-year period in the neighborhood

21   of seven or eight wire transfers I think were shown to you on

22   your direct examination, correct?

23   A.   I believe six wire transfers, but, yes.

24   Q.   Six wire transfers during a period in which J.P. Morgan was

25   clearing 2 million wires a day, correct?

1   A.  Yes.

2   Q.  And in an instance in which you believed that the bank had

3   no knowledge of any connection to Iran in these payments,

4   correct?

5   A.  Yes.

6   Q.  Do you believe that the bank has suffered reputational harm

7   as a result of this case?

8   A.  Not to my knowledge.

9   Q.  Do you believe the bank has lost any business as a result

10  of this case?

11  A.  Not to my knowledge.

12  Q.  No customers are leaving J.P. Morgan in protest as a result

13  of clearing those six wire transfers?

14  A.  Not to my knowledge.

15  Q.  And it's true, is it not, that OFAC has provided guidance

16  that makes clear that OFAC would not pursue an enforcement

17  action against J.P. Morgan under circumstances like those in

18  this case?

19  A.  No, I don't know that to be true.

20          MR. HEBERLIG:  Can we please pull up Defense Exhibit

21  1347 in evidence.  Actually, strike that.  Can we pull up 1352.

22          Just enlarge that whole section, please.

23  BY MR. HEBERLIG:

24  Q.  This is a document that's been admitted in evidence in this

25  case.  It is an OFAC Q and A.

1            The question posed -- these are publicly available --

2    is being posed by an intermediate bank.

3            It says:  We act as an intermediary bank in wire

4    transfers between other banks.

5            That's the scenario that we have been describing.

6    That's what J.P. Morgan did with respect to the wires in this

7    case, correct?

8    A.  Yes.

9    Q.  It asks:  Does OFAC expects banks that are acting as

10   financial intermediaries to research nonaccount parties that do

11   not appear in the SDN list?

12           Let me stop there.  A bank acting as a financial

13   intermediary, that's J.P. Morgan in this case, correct?

14   A.  Yes.

15   Q.  It's asking whether the bank is expected to research

16   nonaccount parties that do not appear on the SDN list.

17           In this instance the nonaccount parties we are talking

18   about would be PDVSA and Clarity, correct?

19   A.  Presumably.

20   Q.  OK.  It goes on to answer.  It gives three conditions about

21   a transaction involving an intermediary bank:

22           1.  If the bank is operating solely as an

23   intermediary.

24           In this case in the transactions we are talking about,

25   that was the role that JP played, correct?

1   A.   Yes.

2   Q.   2.   The bank does not have any direct relationship with the

3   entity, the entity being the nonaccount party.

4           That is also true of transactions we are talking

5   about, correct?

6   A.   Correct.

7   Q.   3.   The bank does not know or have reason to know the

8   entity's ownership or other information demonstrating the

9   blocked status of the entity's property.

10          Interpreting that, that means no reason to know there

11  is an SDN involved, correct?

12  A.   Presumably.

13  Q.   OK.   OFAC goes on to say:   In instances where all three

14  conditions are met, notwithstanding the blocked status, the SDN

15  status of the wire transfer, OFAC would not expect the bank to

16  research the nonaccount parties listed in the wire transfers

17  that do not appear in on the SDN list.

18          We've already talked about that.   J.P. Morgan didn't

19  do that, correct?

20  A.   Not to my knowledge.

21  Q.   OK.   Accordingly, if all three conditions are met, as we

22  just established that they were in this case, OFAC would not

23  pursue an enforcement action against the bank for having

24  processed such a transaction.

25          Is that correct?

K35nsad8                          Blair - Cross

1    A.  That's the way I read it.

2              MR. HEBERLIG:  We can take that down.

3              THE COURT:  Mr. Heberlig, how long?

4              MR. HEBERLIG:  Five to ten minutes.

5              THE COURT:  All right.

6              MR. HEBERLIG:  Do you want me to continue?

7              THE COURT:  Yes.

8              MR. HEBERLIG:  OK.

9              THE COURT:  Let's shoot for five.

10             MR. HEBERLIG:  I will do my best.

11             I am flipping ahead.

12             MS. LAKE:  Your Honor, we will have at least 15

13   minutes of redirect, just in terms of the timing for this

14   witness.  So we would expect to do that tomorrow based on the

15   time.

16             THE COURT:  All right.

17             Why don't you finish, Mr. Heberlig.

18             MR. HEBERLIG:  I will do my best.

19             THE COURT:  I told the jury half day tomorrow, so we

20   can go a little bit longer to enable that.

21             MR. HEBERLIG:  No problem.

22   BY MR. HEBERLIG:

23   Q.  I think you testified on direct that one of the -- actually

24   I don't remember.  Did you testify on direct about the

25   possibility of the bank being fined as a result of sanctions

K35nsad8                          Blair - Cross

1    violations?

2    A.  Yes, I did.

3    Q.  That was a potential sanction that you described in your

4    direct testimony, correct?

5    A.  It is a potential result of violating the sanctions, yes.

6    Q.  I didn't mean sanction in the sanction sense.  A potential

7    penalty --

8    A.  Yes.

9    Q.  -- that could be imposed on a bank for violating the

10   sanctions regime, correct?

11   A.  Yes.

12   Q.  But, again, in the circumstances present here, where the

13   bank had no reason to know of any underlying issue related to

14   Iran, there was no meaningful risk of financial penalty imposed

15   on the bank, isn't that correct?

16   A.  From the questionnaire you just showed, I wouldn't think

17   so.

18   Q.  That's not the only questionnaire.  OFAC has published

19   explicit guidance, am I correct, that foreign correspondent

20   banking transactions involving essentially innocent mistakes

21   will not subject banks to prosecution?

22              MS. LAKE:  Objection.

23              THE COURT:  Sustained.

24              MR. HEBERLIG:  Can we please pull up Defense Exhibit

25   1347 in evidence.

1    BY MR. HEBERLIG:

2    Q.   This is a fact sheet published by the essentially the

3    regulators in the banking community.

4         Do you recognize the names that are listed there?

5    A.   I do.

6    Q.   The Board of Governors of the Federal Reserve, that's a

7    body that regulates banks like J.P. Morgan?

8    A.   Yes, it is.

9    Q.   Likewise for the FDIC, correct?

10   A.   That insures deposits of retail banks.

11   Q.   OK.  A few others listed there, including the U.S.

12   Department of Treasury, correct?

13   A.   Yes, it is.

14   Q.   And that's the agency under which OFAC is housed?

15   A.   Correct.

16   Q.   All right.  This is a fact sheet on foreign correspondent

17   banking.  Do you see that?

18   A.   I do.

19   Q.   That's what we have been talking about, right, foreign

20   correspondent banking?

21   A.   Yes, it has been.

22        MR. HEBERLIG:  OK.  If we take that down and just call

23   out that box on page 1.

24   Q.   That indicates that the vast majority, about 95 percent, of

25   BSA and OFAC compliance deficiencies identified by the FBA --

K35nsad8                          Blair - Cross

1    you know those to be the federal, I think it stands for federal

2    banking authorities?

3    A.   I don't, but I believe it.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HEBERLIG:

2    Q.   Federal bank agency.  It's defined earlier in the page.

3              Do you see it states there that the vast majority,

4    about 95 percent of compliance deficiencies identified by these

5    agencies and OFAC, are corrected by the institution's

6    management without the need for any enforcement action or

7    penalty.

8              Do you see that?

9    A.   I do.

10   Q.   And if we go to the bottom of page 3, please.  The very

11   bottom, carried over to the next page.

12             OFAC's guidance, treasury's guidance says that OFAC

13   investigates cases of sanctions violations, many of which, over

14   95 percent, are closed with administrative measures such as

15   cautionary or no action letters.  This means that less than

16   five percent of all cases of sanctions-related violations

17   investigated by OFAC have resulted in civil monetary penalty or

18   other public enforcement response.

19             Is that your understanding?

20   A.   No, it wasn't.

21   Q.   You had a different view than OFAC and the banking

22   regulators about the number of cases that lead to financial

23   penalty?

24             MS. LAKE:  Objection.

25             THE COURT:  Sustained.

1   Q.  You do know that the risk of criminal enforcement of the

2   bank in this case was non-existent?

3   A.  I don't know that.

4   Q.  Sorry?

5   A.  I don't know that.

6   Q.  Let's go to page 3.

7        Sitting here, you believe that there was a meaningful

8   possibility of criminal enforcement of the bank?

9        MS. LAKE:  Objection.

10        MR. HEBERLIG:  He said he didn't know.

11        MS. LAKE:  Mischaracterizes the testimony.

12        THE COURT:  Sustained.

13   Q.  Do you believe that JP Morgan was at meaningful risk of

14   criminal prosecution for its conduct in this case?

15        MS. LAKE:  Objection, foundation.

16        THE COURT:  Sustained.

17   Q.  Page 3, please, the guidance about criminal enforcement.

18        Financial institutions may also be subject to criminal

19   enforcement by the U.S. Department of Justice.  However, it

20   goes on to state, those cases are typically brought against

21   financial institutions only when there is sufficient evidence

22   of willful wrongdoing.

23        Did I read that accurately?

24   A.  Yes.

25   Q.  Are you aware of any conduct in this case involving willful

1   wrongdoing by JP Morgan?

2             MS. LAKE:  Objection.

3             THE COURT:  Sustained.

4             MR. HEBERLIG:  You can take that down.

5   Q.  You did talk -- last question.  You talked about I think

6   the process that you went through when there are these reviews

7   of blocked transactions and the manpower involved.

8   A.  Yes.

9   Q.  Just briefly state again what that process entailed.

10  A.  So if a transaction is blocked by a downstream institution,

11  JP Morgan would be notified of the transaction, what action is

12  being taken, JP Morgan would investigate what happened at JP

13  Morgan to that transaction.

14  Q.  That would involve manhours and cost and resources,

15  correct?

16  A.  Correct.

17  Q.  And that would be the case when there was a blocked

18  transaction downstream, correct?

19  A.  Yes.

20  Q.  And a blocked transaction is one involving an SDN or

21  government of Iran, correct?

22  A.  Yes.

23  Q.  So a transaction that did not involve the government of

24  Iran or an SDN and was just rejected and returned to the

25  banking party, there would be no such review with the hours,

K35TSAD9

1    correct?

2    A.   Well, if it was returned to JP Morgan they would have been

3    notified.

4    Q.   Not returned to JP Morgan, JP Morgan just returned the

5    payment to its customer; no need for that extended manpower

6    review, correct?

7    A.   Well, if JP Morgan is doing it itself, they wouldn't need

8    to investigate it.

9    Q.   What do you mean by doing it itself?

10   A.   If JP Morgan rejects a payment because of lack of response

11   on an investigation, then JP Morgan wouldn't further

12   investigate it because they know it happened.

13   Q.   Fair enough.  If one of your downstream banking partners

14   decided to reject a payment as opposed to block it, you might

15   not even know about that, correct?

16   A.   We may not.

17   Q.   And you certainly wouldn't have to incur those manhours and

18   time to do an investigation because that downstream bank would

19   send the money bank to the party, right?

20   A.   Yes.

21           MR. HEBERLIG:  Nothing further.

22           THE COURT:  Thank you.

23           Ms. Lake, you need more than five minutes?

24           MS. LAKE:  Yes, your Honor.

25           THE COURT:  We will stop for the night.

K35TSAD9

1          Members of the jury, we have more space.  It was an

2     eventful day, and I thank you for your diligence and patience

3     and staying a little later today to enable us to do the half

4     day tomorrow.  See you ready to go at 9:30.  I remind you all

5     of the rules I gave in the beginning of the case, and I ask you

6     to continue to comply with them, as I know you are.

7          Have a good night.

8          (Jury not present)

9          THE COURT:  Matters to take up.

10          MR. KROUSE:  Your Honor, we will, as always, tell the

11     defense who we're planning to call tomorrow and the exhibits we

12     plan to put in.

13          THE COURT:  Just so I understand, obviously the list

14     may narrow, but the plan is everyone but Mr. Dubowitz, correct?

15          MR. KROUSE:  Yes.  So we'll finish with Mr. Blair,

16     we'll have a paralegal on the stand to go through a lot of just

17     the nuts and bolts payment evidence, payment letters and things

18     of that nature.  We'll offer the payment chart after consulting

19     with the defense.  And once they're assured that the chart is

20     an accurate summary of the evidence, then we have Mr. Peri, who

21     is from Citibank.  He will be providing similar testimony but

22     with respect to the Citibank transactions at issue in this

23     case.

24          With Mr. Blair, defense counsel provided a few

25     exhibits that they thought they might use.  They ended up only

K35TSAD9

1   using the two that were admitted during Mr. Kim's

2   cross-examination that your Honor allowed, but we don't know if

3   there are other exhibits they may try to use with Mr. Peri, so

4   if we set a schedule just for the defense to provide us any

5   defense exhibits beyond what has already been admitted that

6   they make seek to use with Mr. Peri.

7        MR. HEBERLIG:  I will double-check, but I believe what

8   produced last night was for both.  If there's anything more, I

9   will provide it by 7 o'clock.

10        THE COURT:  Okay.

11        MR. KROUSE:  So my colleague says that we may have

12   objections to some of the ones that were provided last night

13   that weren't admitted or offered by the defense, so we'll

14   consult with defense counsel if they still intend to use those

15   with Mr. Peri, and we may have some objections to flag for the

16   Court.

17        THE COURT:  All right.

18        MR. HEBERLIG:  I had some ready to go today but he

19   gave me the answers I wanted.  I don't know that I will seek to

20   admit them.  They're more for refreshing and getting him to

21   focus on certain standards, but I will reevaluate tonight and

22   let them know if it's still an issue.

23        THE COURT:  So let's say the same basic schedule, so

24   for everything that we're talking about, disclosures by 7:00,

25   objections by 9:00, responses by 11:00.  And let's put the

1    summary chart on the same schedule.

2              What else?

3              MR. HEBERLIG:  Does the government intend to admit the

4    chart or is it a demonstrative?

5              MR. KROUSE:  We're seeking to admit it through Rule

6    1006.

7              THE COURT:  The person traveling, Mr. Krouse, the

8    person --

9              MR. KROUSE:  That's Mr. Peri.  He's here in New York,

10   my understanding.

11             THE COURT:  I was thinking to ensure he gets done by

12   the end of the half day, maybe he should go second.

13             MR. KROUSE:  That's fine, your Honor.

14             THE COURT:  So it will be Blair, finishing Blair,

15   Peri, the paralegal, and I've encouraged it and I really do try

16   to get out of the way, but reading Turkish into the record,

17   Mr. Krouse, is a good example of when I'm going to start

18   bringing down the hammer.

19             MR. KROUSE:  I understand, your Honor, and that was

20   inadvertent.

21             THE COURT:  Really, really, it's in the record, use it

22   in closing, flash it on the screen, you don't have to go

23   through everything.

24             MR. KROUSE:  Understood, your Honor.  It is a

25   document-heavy case, but I think the government has tried to

K35TSAD9

1    trim down significantly, and I think we're moving at a good

2    pace.

3              THE COURT:  But you did try to read Turkish.

4              MR. KROUSE:  Yeah, and I won't do it again.

5              MS. LAKE:  It was just to show off his excellent

6    pronunciation.

7              THE COURT:  Showing off is not the impression.

8              So Peri, the paralegal, who you will do everything

9    within your power to cut down so I don't have to keep inquiring

10   as to how long.

11             And then after the paralegal?

12             MR. KROUSE:  I think that will take us through the

13   half day.

14             THE COURT:  There was a Ms. Conte mentioned yesterday.

15             MR. KROUSE:  She's another fact witness who need to

16   travel not super far, but she's a lay witness.  I think if we

17   try to bring her, I doubt she would go on tomorrow, so I think

18   our view is that we could -- she's very short.  We could put

19   her on first thing in the morning on Monday even before

20   Mr. Dubowitz, if he appears, and then probably show a few

21   documents and rest.

22             So I'm very confident that with what we have on the

23   list we can fill the day.  We also do have another set of

24   final -- second to final set of documents to put in through the

25   paralegal, and if need arises we will fill the day without

K35TSAD9

1    Ms. Conte.

2              THE COURT:  You'll fill the half day.

3              MR. KROUSE:  Yes, we'll fill the half day.

4              THE COURT:  All right.  What else?

5         So to be safe, I actually think we should -- I don't

6    know what is going to come in tonight.  We didn't leave

7    ourselves enough time this morning to resolve the issues, so

8    8:30 tomorrow.  And if nothing comes in, I'll put out an order

9    and let the court reporters and everyone know that we won't

10   start until 9:00, but let's assume 8:30 since something could

11   come in, and if you could communicate and work it out we'll

12   switch to 9:00.

13             Anything else?

14             MR. KROUSE:  No, your Honor.

15             THE COURT:  Okay, we'll be here.  I think we've kept

16   control of this courtroom throughout the duration, so we'll be

17   here.  Thank you.

18             (Adjourned to March 6, 2020 at 8:30 a.m.)

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                           Page

 3     TED KIM

 4    Direct By Ms. Kim . . . . . . . . . . . . 574

 5    Cross By Mr. Weingarten . . . . . . . . . 576

 6    Redirect By Ms. Kim . . . . . . . . . . . 653

 7    Recross By Mr. Weingarten . . . . . . . . 659

 8    TALYA NEVINS

 9    Direct By Mr. Lynch . . . . . . . . . . . 663

10    Cross By Mr. Heberlig . . . . . . . . . . 700

11     MATTHEW NELSON

12    Direct By Mr. Krouse . . . . . . . . . . . 703

13    MATTHEW JORDAN BLAIR

14    Direct By Ms. Lake . . . . . . . . . . . . 731

15    Cross By Mr. Heberlig . . . . . . . . . . 760

16                     GOVERNMENT EXHIBITS

17    Exhibit No.                           Received

18     104D    . . . . . . . . . . . . . . . . 661

19     104D 1401A-T, 1403T, 1405T, 1501T,  . . . . . 662

20              1503T, 1503A-T, 1506A-T.

21              1601T, 2032T, 2034T, 2034B-T,

22              2034C-T, 2090T, 2090A-T,

23              2149T, 2187T, 2237T, 2269A-T,

24              2269B-T, 2269C-T, 2269D-T,

25              2269E-T, 2269F-T, 2269G-T,
```

```
 1                    2269H-T, 2271T, 2271A-T, and

 2                    2276T

 3     2002, 2210, 2114 and 2114A, 2210, 2237  . . . 663

 4               and 2237T, 2257, 2265, 2265B,

 5               2276 and 2276T, 2277, 2297,

 6               2297A and 2298

 7     2005, 2005A, 2016, 2016A, 2016C, 2016F, . . . 703

 8               2065, 2065A, 2071, 2071A,

 9               2071B, 2187, 2187-T, 2188,

10               2190, 2198, 2199, 2201, 2201A,

11               2215, 2215A, 2215A-T, 2215B,

12               2215B-T, 2215C, 2215C-T, 2217,

13               2219, 2219A through M

14     103  . . . . . . . . . . . . . . . . . . 729

15     103, 401 through 406  . . . . . . . . . . 730
```

16                     DEFENDANT EXHIBITS

17     Exhibit No.                          Received

```
18     47   . . . . . . . . . . . . . . . . . . 645

19     1352   . . . . . . . . . . . . . . . . . 648

20     1905   . . . . . . . . . . . . . . . . . 771
```

21

22

23

24

25