K39TSAD1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                          18 CR 224 (AJN)

ALI SADR HASHEMI NEJAD,

                  Defendant.

------------------------------x

                                         New York, N.Y.
                                         March 9, 2020
                                         8:45 a.m.

Before:

                  HON. ALISON J. NATHAN,

                                         District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
JANE KIM
MICHAEL KROUSE
GARRETT LYNCH
     Assistant United States Attorneys

STEPTOE & JOHNSON
     Attorneys for Defendant
REID WEINGARTEN
BRIAN HEBERLIG
NICHOLAS SILVERMAN

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

K39TSAD1

1        (Case called)

2        THE COURT:  Good morning, counsel, good morning,

3    Mr. Sadr.

4        We're getting started earlier in light of what

5    developed over the weekend, but here we are.  We have some

6    amount of time we'll take.  I think the immediate need is to

7    deal with the late disclosure of GX411.

8        Who wants to begin?

9        MR. KROUSE:  Your Honor, the government filed letters,

10   the defense filed letters.  I want to stress from the outset

11   the government takes this very seriously.  We made a mistake,

12   we own that mistake, and it's an unfortunate situation.  We

13   acknowledge that, and it's our fault.  So I want to put that

14   out first.

15       I also want to stress that -- and I don't think the

16   defense is saying otherwise, I think the Court understands that

17   mistake was inadvertent entirely.  Nothing was purposely

18   withheld from the defense.  There was no conversation about

19   withholding anything from the defense.  That's not what

20   happened here.  It was a mistake.  And like I said, we're not

21   minimizing anything, but that was an oversight, and we're very

22   sorry to the Court and the defense for that oversight.

23       I also want to stress for the Court, each member of

24   the prosecution team has gone through its files one more time

25   to make sure there's nothing else like this, that this is the

K39TSAD1

1    only document that relates to the case that hasn't been turned

2    over to defense, and we can make that affirmation to the Court.

3          This really was sort of an anomalous situation where

4    DANY had a separate investigation into Commerzbank.  That

5    investigation into Commerzbank was for conduct that well

6    preceded this case, but in the course of that investigation,

7    Commerzbank turned over a number of documents to DANY, and in

8    the course of that one of the documents that was found was this

9    document, GX411, that did relate to this case.

10         The government had never seen that document before

11   January of this year.  It was sent to us by a member of our

12   team, by Garrett Lynch, that was during the time that the

13   government was going through a lot of evidence, was going

14   through and figuring out --

15         THE COURT:  Clarification, so I understand, because I

16   understand Mr. Lynch is a special assistant --

17         MR. KROUSE:  Yes, your Honor.

18         THE COURT:  -- when you say we weren't aware of it

19   before January, and it was sent to the team by Mr. Lynch, at

20   what point is Mr. Lynch part of the team so that his awareness

21   of it is relevant to what the team is aware of?

22         MR. KROUSE:  Mr. Lynch is a SAUSA appointed to this

23   team.

24         THE COURT:  As of?

25         MR. KROUSE:  I'm not sure, but before the case was

K39TSAD1

1      charged, so for the entire relevant period he has been.

2                THE COURT:  When you say we were not aware of it

3      before January, is that a representation that Mr. Lynch was not

4      aware of it before -- what was the date, January '20?

5                MR. KROUSE:  That is not a representation, that

6      Mr. Lynch was not aware of it.

7                THE COURT:  And when did Mr. Lynch become aware of it?

8                MR. KROUSE:  If I may have just a moment.

9                Mr. Lynch -- this is my understanding from prior

10     conversations -- had seen the document before in the context of

11     the Commerzbank investigation, later recalled that he had seen

12     that document in the unrelated investigation, went and found

13     the document, and sent it to the rest of the team in January of

14     2020.

15                THE COURT:  Okay.  And is the representation that

16     you've checked and there's nothing else dependent on

17     Mr. Lynch's recall after the fact as to what may be relevant,

18     or there's been an independent analysis of the Commerzbank

19     documents?

20                MR. KROUSE:  Mr. Lynch went back over the weekend to

21     his office and to the DANY offices and went through the file of

22     the Commerzbank investigation.  Most of that investigation, as

23     I said, relates to conduct that well preceded this case, I

24     believe it was 2002 to 2007 conduct, and so I think in an

25     abundance of caution we have reviewed that.  Commerzbank, also

K39TSAD1

1      in an abundance of caution, was producing a lot of documents to

2      DANY.

3              I will say Commerzbank, in relation to conduct in this

4      case, related to the single payment, so the payment that this

5      GX411 relates to.  So it's not a situation where Commerzbank

6      had a large role in the conduct of this case and we would have

7      an expectation that there would be a lot of other documents

8      related to this case.  It was just this single transaction.

9      But we had made an independent review to make sure there's

10     nothing else that needs to be turned over to the defense.

11             THE COURT:  So for purposes -- there's the question of

12     the timeframe with respect to this document and all of the

13     issues that now are encompassed in its failed disclosure and

14     then disclosure and representations about the disclosure.  We

15     need to deal with those.

16             We also need -- I need assurance, defense needs

17     assurance, as to the certainty and the carefulness and the

18     process by which the government has reviewed the potential

19     relevant documents, because this has a bit of a tip-of-the-

20     iceberg feeling to it, not only because of what appears to may

21     be a lack of candor about it.

22             And so for timeline purposes with respect to this

23     document, the team, including Mr. Lynch, has been part of the

24     prosecution team for a period of time, was aware of this

25     document from before the case was charged, but thought of it at

K39TSAD1

1    some point in January.

2              MR. KROUSE:  Yes, your Honor.

3              THE COURT:  Of 2020.

4              MR. KROUSE:  Yes, your Honor.

5              THE COURT:  In thinking of it and realizing its

6    potential relevance, that's the process that's been described

7    so far for assessment at that point, emailed it to the other

8    members of the team, and the team -- the other members of the

9    team, although Mr. Lynch is part of the team and remembers this

10   document --

11             MR. KROUSE:  Yes.

12             THE COURT:     -- and emails it, but somehow at that

13   point the whole team says, oh, we don't need to worry about it

14   because it's already been turned over.

15             MR. KROUSE:  I wouldn't take that last step as that

16   was an affirmative decision by the team.

17             THE COURT:  Mr. Lynch flagged it as something

18   potentially new, right, from what you're saying?

19             MR. KROUSE:  He hasn't flagged it as something new, he

20   flagged it as this is another piece of evidence for -- as we're

21   going through all the evidence, this is another good piece of

22   evidence for the government.

23             Now again, the government made a mistake, we should

24   have --

25             THE COURT:  On its face, it's not a good piece of

K39TSAD1

1    evidence for the government.

2              MR. KROUSE:  Your Honor, we could address that.

3              THE COURT:  We'll get to that.

4              MR. KROUSE:  We can get to that.

5              THE COURT:  I sat through trial for a week.  I

6    understand the defense case, I think I understand the

7    government's case.  So that's in the background here, because

8    part of the representation --

9              We'll get to it.  Let's do it a step at a time because

10   it's important, and precision is important.

11             MR. KROUSE:  Yes, your Honor.

12             THE COURT:  So I'm responding to what you said.

13             Mr. Lynch remembered the document, something about the

14   document -- something caused him to say oh, this might be

15   helpful to us, send it over.  And the understanding at that

16   point, "Hey, this might be helpful to us, do we need to

17   disclose it," that thought doesn't happen?

18             MR. KROUSE:  No, and let me address that directly and

19   explain why.  This was during a time when a lot of emails were

20   going around; this is a good piece of evidence, this is a good

21   piece of evidence, in the context of everything that had

22   already been disclosed in discovery.

23             THE COURT:  Boy, have I heard this song before.

24             MR. KROUSE:  Your Honor --

25             THE COURT:  I'm just --

K39TSAD1

1          MR. KROUSE:  If I may.

2          THE COURT:  Fool me once.  Go ahead.

3          MR. KROUSE:  Your Honor, again, I don't think anyone

4    is saying that this wasn't a mistake or that we shouldn't

5    have --

6          THE COURT:  I need to understand what happened.

7          MR. KROUSE:  That's what I'm trying to do.  We were

8    going through the evidence, it was a painstaking process, there

9    were a lot of documents, a lot of emails going around, this is

10   a nice piece of evidence, this is a nice piece of evidence.

11         Mr. Lynch sent the email about what was later marked

12   Government Exhibit 411:  This is a nice piece of evidence.

13         In the course of those discussions, it didn't occur to

14   the rest of the team that this particular piece of evidence

15   wasn't like every other piece of evidence that was being

16   discussed and had already been produced in the Rule 16

17   discovery.

18         We should have at that time --

19         THE COURT:  How is that point consistent with the

20   notion that Mr. Lynch remembered something that triggered him

21   to retrieve this document and send it along?

22         Maybe I don't understand the process or the piece of

23   that that you described, but they don't appear to be consistent

24   statements.

25         MR. KROUSE:  Respectfully, your Honor, if I could just

K39TSAD1

1   explain.

2            THE COURT:  Please.

3            MR. KROUSE:  Mr. Lynch had been on the case for longer

4   than the rest of the team.  He had the institutional knowledge

5   about the evidence.  So it was frequent that Mr. Lynch would

6   say, in the context of preparing for trial, this is a nice

7   piece of evidence, this is a nice piece of evidence.

8            The government -- the rest of the team hadn't charged

9   the case, wasn't involved in the discovery, didn't realize on

10   its face when we got that email that it wasn't clear that this

11   was somehow new, it was:  This is a nice piece of evidence that

12   we could use in our case.

13            I believe there was a short conversation between

14   Mr. Lynch and Ms. Lake about the evidence.  This kind of goes a

15   little bit to why the government at the time, and even as

16   recently as yesterday --

17            THE COURT:  Sorry, I want to pause on that

18   conversation.  Is that by email?

19            MR. KROUSE:  I believe it was a phone call

20   conversation or in-person conversation --

21            Phone call conversation between Mr. Lynch and

22   Ms. Lake.

23            THE COURT:  And the nature of that conversation?

24            MR. KROUSE:  About the document and how it fits in the

25   rest of the case.

K39TSAD1

1          So on that point --

2          THE COURT:  And if this is a question for Mr. Lynch,

3     that's fine, but it's helpful to have one person providing the

4     information.

5          The representation is that at that point Mr. Lynch's

6     understanding was that this document had been produced to the

7     defense?

8          Take your time if you need it, because I think that's

9     important.

10          (Pause)

11          MR. KROUSE:  The representation is that Mr. Lynch did

12     not know at the time that it had not been produced to defense,

13     that his understanding at that time in sending it, when he sent

14     it to the government -- or I don't mean to use "government" as

15     somehow excluding Mr. Lynch, he's parts of the team, but

16     sending it to the three AUSAs who were on the case with him,

17     his understanding was it had been produced in discovery.  It

18     wasn't represented to us -- and nobody realized at that time in

19     January -- that it hadn't been produced in discovery.

20          In the context of the exhibit fitting into the rest of

21     the government's case, I think part of it is that those other

22     documents haven't yet been introduced.  Those will be

23     introduced today.  But the reason why the government viewed it

24     as a wholly inculpatory document on its face was that there are

25     emails between Commerzbank that find their way to Mr. Sadr

K39TSAD1

1    where Commerzbank is asking very pointed questions about the

2    ownership structure and the beneficial owners of Stratus

3    Turkey.  And Mr. Sadr then responds to those questions with

4    what the government views as misrepresentations or omissions

5    about those owners.

6         And so in the government's view, the emails were

7    always going to come in as part of the government's case as

8    part of the story of misrepresentations by Ms. Sadr, and we're

9    still intending to introduce those emails today and to argue

10   them to the jury.

11        So this document, Government Exhibit 411, closes the

12   loop on that story but isn't a document that the government

13   necessarily needed for its case in chief because it has the

14   emails from Commerzbank to Mr. Sadr.

15        So on the face of the document -- and maybe this was

16   just blinders, but from the government's perspective, this was

17   an inculpatory document, it's Commerzbank asking questions

18   about a payment that they processed and looking back and saying

19   maybe that payment was to an Iranian entity, and going forward

20   Commerzbank saying we'll put that entity on our list and filter

21   for it.

22        And this sort of dovetails into the next part of what

23   happened.  Ms. Lake, over the weekend, went back into her

24   emails and was looking through various documents and stumbled

25   across this January email from Mr. Lynch, opened the document,

K39TSAD1

1     and in the context of how the trial developed, thought it would

2     be helpful for the government to close the loop on that story

3     of why Commerzbank was asking the questions of Mr. Sadr after

4     having processed the transactions.  And seeing that document,

5     Ms. Lake proposed to the team that we produce it -- that we

6     introduce it at trial, mark it as a new exhibit.

7              THE COURT:  In the course of this discussion was there

8     any notion as to its potential use to the defense case, having

9     yourselves sat through a week of trial, heard rulings on

10    objections, heard the defendant's opening, in any of that

11    discussion, right at the moment you're talking about, is there

12    the thought:  Whether we want to use this or not, it needs to

13    be turned over?

14             MR. KROUSE:  Candidly, your Honor, no, there was not

15    that discussion.  The discussion was solely about how

16    inculpatory the government viewed the document.

17             Now in conversations -- and the defense has been very

18    available to talk about this, and the government does

19    appreciate that, we had conversations about the document, and

20    we now understand much better what the -- how the defense would

21    seek to use this document.  And I think the correspondence that

22    was sent to the Court reflects that the government was

23    genuinely confused or unsure about how the document would be

24    used -- how it would be helpful to defense.

25             It's, in many, many ways, a very inculpatory document.

K39TSAD1

1   I'm sure the defense would concede that.  It's also, in the

2   defense's theory, there is -- it does support aspects of the

3   defense theory.  We addressed this a little bit in our letter,

4   and I'm happy to address it further if the Court has questions

5   about it.

6              THE COURT:  We'll get to it.  Continue on the

7   timeline.  So you have this moment of finding it in the

8   emails --

9              MR. KROUSE:  Yes.

10             THE COURT:  -- thinking it's helpful to the

11  government's case.

12             MR. KROUSE:  Yes.

13             THE COURT:  And then what, in terms of the realization

14  of the failure to disclose it previously?

15             MR. KROUSE:  Ms. Lake then, in an abundance of

16  caution, reviewed and realized it hadn't been produced to the

17  defense.

18             THE COURT:  Did anything trigger that, or that was her

19  normal process:  I got to make sure, even though, boy, I know

20  we turned over everything, I got to make sure this document was

21  turned over.

22             That's normal standard process, or something triggered

23  the second look?

24             MR. KROUSE:  It wasn't anything in particular that

25  triggered that other than what your Honor is saying, the fact

K39TSAD1

1    that it was a newly marked exhibit, that it hadn't been marked

2    before, it wasn't in our stipulation.

3              THE COURT:  Step back.  Newly marked because Ms. Lake

4    asked -- you asked the paralegal to newly mark it?

5              MR. KROUSE:  Ms. Lake asked the paralegal.

6              THE COURT:  Not previously marked.

7              MR. KROUSE:  Not a previously marked trial exhibit.

8              THE COURT:  In the context of the discussions about --

9    the many discussions about the scope of the trial exhibits, and

10   the government was, out of an abundance of caution, going to

11   overmark --

12             MR. KROUSE:  In the email context, yes, entirely, and

13   we have done that.

14             THE COURT:  So this is a different context because you

15   thought a subpoena -- well, because it's a subpoena return?

16             MR. KROUSE:  Because it's a bank record, which we

17   understood to have been all obtained by subpoena.

18             And so --

19             THE COURT:  And the other subpoena returns, the

20   emails, for example, those had been premarked as trial exhibits

21   and disclosed to the defense?

22             MR. KROUSE:  Yes, and all of those banking documents,

23   those financial documents that had been marked had been put

24   into a stipulation as to their authenticity.  And your Honor

25   has seen a bunch of those banking exhibits introduced.

K39TSAD1

1          So this is a bank exhibit that Ms. Lake came across

2     and thought had we marked this before, realized we hadn't.  She

3     looked back and realized that it hadn't.  She went into the

4     Commerzbank folder in the shared drive for the documents that

5     had been produced and realized those weren't among the

6     documents.

7          THE COURT:  This is Friday?

8          MR. KROUSE:  Friday night is when she found it -- I

9     don't know if it was Friday or Saturday morning that she

10    realized it hadn't been.

11         THE COURT:  But by Saturday morning, and before it was

12    sent to the defense, the government is aware that it's not been

13    premarked as a trial exhibit and never been previously

14    disclosed to defense.

15         MR. KROUSE:  Yes.

16         THE COURT:  That gets us to communications.  At that

17    point it's sent via email from Ms. Lake to the defense.

18         MR. KROUSE:  Yes.

19         THE COURT:  In an email that says that we don't think

20    Mr. Dubowitz will be able to testify.

21         MR. KROUSE:  Yes.

22         THE COURT:  Attached are the following, and there's 12

23    bullet points, includes 3500 unmaterial, exhibits, summary

24    charts, and the like.

25         MR. KROUSE:  Yes.

K39TSAD1

1           THE COURT:  It's number 3 in the bullet points --

2           MR. KROUSE:  Yes.

3           THE COURT:  -- out of those 12 bullet points.

4           Bullet point 3:  GX411, we intend to use this on

5    Monday.  Will you stipulate to its authenticity?

6           MR. KROUSE:  Yes.

7           THE COURT:  You do not identify -- as far as I can

8    tell, I'm happy to hear -- that this has not previously been

9    disclosed.

10          MR. KROUSE:  That's correct.  And that is a mistake, a

11   hundred percent.

12          The reason for that mistake, and not making excuses in

13   the least, we should have flagged in that email this is a new

14   document, period.

15          THE COURT:  At a minimum you should have flagged in

16   the email this is a new document.  Responsibly, you should have

17   said this is a new email, here's what happened, we thought it

18   had been disclosed, we realized it, and here's why we made our

19   mistake.

20          MR. KROUSE:  Agreed.

21          THE COURT:  I felt enormous relief, though you should

22   have done that, that you did the minimum.  And that's what you

23   told me you did expressly last night, correct?

24          MR. KROUSE:  Yes, your Honor.

25          THE COURT:  And I felt that relief because the letter

K39TSAD1

1    to me asking precisely this question assured me you had done

2    the minimum.  I won't quote it, but you know what it says.

3          MR. KROUSE:  I understand, your Honor.

4          THE COURT:  That was false.

5          MR. KROUSE:  I think it was imprecise, and here's why:

6    The government has had -- this is in the context of many, many

7    discussions with the defense.  And again, we were disclosing

8    this is a newly marked exhibit, that we need an authenticity

9    stipulation to it, and we were intending to offer it.

10          Of course in the benefit of hindsight we should have

11   done a lot more, but part of it was, at least in the

12   government's mind -- this goes back to what we talked about

13   earlier, in the government's mind at the time -- it had not

14   entered the government's mind that this was potentially Brady

15   material or that this was helpful to the defense.

16          It was solely in our mind, and maybe this was just

17   trial blinders --

18          THE COURT:  It is.

19          MR. KROUSE:  I think that's fair, but in the

20   government's mind, I can affirm as an officer of the Court that

21   what we were thinking was:  This is a good piece of evidence

22   for the government.  It's Commerzbank asking the questions that

23   the defense has been crossing the other bank witnesses on.  Why

24   didn't they do these things?  It's Commerzbank actually doing

25   those things.  It's Commerzbank then saying, based on that

investigation, we're no longer going to process transactions

for this entity, and in the overall context of the evidence, no

other transaction is processed by Commerzbank going forward.

So it is inculpatory, just to be clear, and it's a

mistake.  With the benefit of hindsight, if we had thought

there was Brady material in this, if that had been in our

heads, we would have structured that correspondence with the

defense much, much differently.  And for that, that's on us, we

apologize for that.

The document was produced to the defense.  They

realized almost immediately, based on the chronology of events,

that because this was a newly-marked exhibit, we're asking for

authenticity, they went back and looked, I'm assuming, at the

discovery productions and realized that it hadn't been

produced.  And they asked the question, and immediately the

government responded with the truth.

We weren't trying to hide anything.  We could have

been more proactive in communicating that information, a

hundred percent.

THE COURT:  When you say -- and you're saying it

again -- that you identified it as a newly-marked exhibit when

you produced it in the email on Saturday around 4:00, what do

you mean?

MR. KROUSE:  That it's an exhibit that we're asking

for a new stipulation of authenticity for.  And government's

1  view, wrongly or rightly, was that the defense would realize

2  that this was a new exhibit because we had never produced it

3  and never marked it and never asked for the authenticity for

4  it.

5          THE COURT:  So bullet number 4, GX456, exact same

6  sentence.  GX456, we intend to offer this on Monday.  Let us

7  know if you're willing to stipulate to authenticity.

8          That, too, had never been produced to the defense?

9          MR. KROUSE:  No.

10         THE COURT:  Same for GX495A and B?

11         MR. KROUSE:  No, this was the only document, your

12  Honor.

13         THE COURT:  I'm sorry, then I misunderstood your

14  answer on GX456, which is structured -- GX456 had been produced

15  to the defense before this weekend or no?

16         MR. KROUSE:  Yes, it had.

17         THE COURT:  Mr. Krouse --

18         MR. KROUSE:  Your Honor, I am not saying that that was

19  a good way to communicate the information.

20         THE COURT:  I'm talking about what you said to the

21  Court last night and what you are continuing to maintain in the

22  face of evidence that it's false.

23         MR. KROUSE:  Let me step back then.

24         THE COURT:  Because -- well, yes, let me ask you

25  again:  When this was disclosed to the defense Saturday around

1    4:00, did you identify it as a newly-marked document?

2                 MR. KROUSE:  No.

3                 THE COURT:  Okay.  So when you said to me -- aside

4    from what you said a moment ago, when you said to me in

5    response to an order asking precisely this timeline -- because

6    the vagueness with which it was described in the government's

7    original letter was a blinking red light to me:  They're

8    intentionally not telling me what was happening in this

9    process.

10                So I asked specifically, and you said the members of

11   the team -- Ms. Lake found it in her emails, the members of the

12   team discussed the document the next morning and confirmed it

13   likely had not been produced to the defense previously.  The

14   government promptly had a paralegal mark it as an exhibit and

15   produced it to defense along with other exhibits of 3500

16   material.  The government made clear this is -- I'm bolding in

17   my tone -- the government made clear that GX411 was a newly

18   marked exhibit, and that we intend to offer it, and asked the

19   defense if they would stipulate to its authenticity.  End of

20   bolding, in my head.

21                MR. KROUSE:  Yes, your Honor.

22                THE COURT:  Defense counsel responded shortly after

23   the government provided GX411 and asked how long the government

24   had GX411 and why they never previously received it.

25                Sure, competent counsel saw a document that they

K39TSAD1

1    thought helpful to them that the government slipped in on this

2    list without identifying it, as a government told me last

3    night, that it was a newly marked exhibit, never previously

4    disclosed, and asked what the heck it was.  And you're acting

5    like you identified it as such, and you misrepresented to Court

6    last night.

7         MR. KROUSE:  I apologize for the imprecision of the

8    language.  I'm not acting like this had never been produced to

9    the defense, I believe the Court asked -- and I apologize if

10   the language was imprecise in court or in the letter --

11        THE COURT:  Mr. Krouse, you understood my order last

12   night, the supplemental order was asking precisely this

13   question, did you not?

14        MR. KROUSE:  Yes.

15        THE COURT:  And yet I will be frank, I don't

16   understand how this is not an OPR referral.

17        MR. KROUSE:  Your Honor --

18        THE COURT:  Is your unit chief here?

19        MR. KROUSE:  He is and she is, they're both here.

20        THE COURT:  Have them come forward, please.

21        Would you enter your names.

22        MS. CROWLEY:  Shawn Crowley.

23        MR. BOVE:  Emil Bove.

24        THE COURT:  Mr. Bove, have you looked at the course of

25   conduct that happened last night?

K39TSAD1

1          MR. BOVE:  We have, Judge.

2          THE COURT:  What do you intend to do about this?

3          MR. BOVE:  So far we asked the team -- and you heard

4    this part this morning -- to go back to the files and make sure

5    there are no similar issues in this case.

6          Following the conclusion of this case -- this has also

7    been discussed and briefed up to the level of the U.S.

8    Attorney, there have been conversations with the chief of the

9    criminal division as recently as this morning.  So everyone is

10   taking this extremely seriously.

11         At the conclusion of the trial we'll look back on this

12   and see if there are any other similar issues in this trial or

13   any other trials in the unit, sit down with the unit to discuss

14   how this was handled.

15         So I don't think it mitigates -- I'm not intending it

16   to mitigate what is discussed here now, but this is being taken

17   extremely seriously.

18         THE COURT:  As it should be and as it needs to be.

19   And as Mr. Berman, who I have an enormous respect for, has

20   promised me with respect to, as you well know, the last trial I

21   had with the office, a Brady issue that was not the day before

22   the government rested, that was at the final pretrial

23   conference, and we delayed it as a result.

24         The disclosure issue is a problem, and what would

25   allow me to get to a comfortable place on it is the

K39TSAD1

representations from the lawyers from the office that they have
served that they're confident that there's nothing else.  And
it is hard, in light of the misrepresentation to the Court last
night, to accept that.  That's the problem.

MR. BOVE:  I understand your point, Judge.  We
apologize.  We take this seriously.

I do think that this arises from a lack of precision,
as Mr. Krouse said, this morning as opposed to an intentional
issue.  I'm not sure that that -- that is not going to address
the concerns that you have, nor should it, but I think the
inadvertence is relevant as you analyze the situation, and that
is what you have here.

I think the point being discussed now about the
language in that letter last night -- Ms. Crowley and I
reviewed that letter in realtime before it was filed -- our
understanding in submitting that language to your Honor was
that this clearly marked language that has been addressed here
this morning related to the fact that the document had been
marked as a government exhibit with a yellow government
sticker.  That is what we intended to convey with that.  Again,
the language should have been more precise, and it has been --
and you pointed out exactly why, and it was an error.  I think
that was the intent of the language, we're correcting it now,
and I don't think there's much more for us to do on that point
other than to apologize for that error.

K39TSAD1

```
 1            THE COURT:  I think that's right.  In light of the
 2    order I put out seeking information on this precise timeline,
 3    in light of the fact that there were other exhibits that had
 4    been previously disclosed, that were indicated in precisely the
 5    same way in the transmittal email, it's very difficult to see
 6    this as anything other than maybe "blinders" is the right word,
 7    but it's blinders to the point of misrepresentation, and it's
 8    deeply concerning.  And we will, aside from the what's
 9    happening in this trial, address it.
10            My concern is the tip-of-the-iceberg concern.  What
11    else is there?  And I'm sure that's the defense's concern as
12    well.  For me to be able to have confidence, credibility with
13    respect to this is important, and you don't have it right now.
14            So Mr. Bove, Ms. Crowley, this will be addressed no
15    matter what the resolution is with respect to case.  I don't
16    think I'm having blinders on about this, I'm not coming to any
17    determinative conclusions yet, but it's hard to understand this
18    to be anything other than a misrepresentation.
19            Thank you.
20            And with respect to how to handle this document, I'm
21    going to hear from the defense.
22            MR. KROUSE:  Thank you, your Honor.
23            THE COURT:  Mr. Weingarten.  The request is for a
24    curative instruction, that you will seek to admit, that is your
25    desire?
```

K39TSAD1

1          MR. WEINGARTEN:  Could I make a preliminary

2     observation?

3          THE COURT:  Sure.

4          MR. WEINGARTEN:  I think the most useful way is to do

5     the chronology as you did.  So we get it at 4:00 on Saturday.

6     Yes, we're shocked.  We allow for the possibility of mistakes

7     were made.  That happens.

8          We get the government's response saying it's not

9     exculpatory.  We think that's ridiculous, but we say fine, and

10    we sort of continue along.  It is a hundred percent clear to me

11    that if I had that document, and I should have, my opening

12    would have been different and my cross-examination of the OFAC

13    guy would have been very, very different.  Just to emphasize

14    that, the government's opening was:  We tricked OFAC.  OFAC

15    couldn't stop this until $115 million passed, an elaborate

16    scheme to trick OFAC.  Obviously, if I had that document and

17    OFAC knew the first dollar payment of $29 million, that's a

18    huge point for us.

19         But here's the part that you've not yet addressed that

20    really troubles us, the issue is:  Did the government, in the

21    course of this investigation, ask OFAC what they did?  We never

22    received information about that.  It is against human nature

23    for prosecutors like the prosecutors to my left not going to a

24    sister government agency and asking them if they investigated

25    the case, particularly when they have Government Exhibit 411.

K39TSAD1

 1   Obviously, the first dollar payment, $29 million, was sent.

 2   What did they do with it?

 3            THE COURT:  Count One charges conspiracy to defraud

 4   the United States by interfering and obstructing OFAC.

 5            MR. WEINGARTEN:  That's exactly right.

 6            So Mr. Kim is on the stand and I'm crossing him, and I

 7   asked him those question.  And you may recall -- I didn't have

 8   411, so I had no idea about this, but I did know about the

 9   $6,000 payment to the Persian guy who testified, Mr. Kazerani.

10   You may recall a $6,000 check or payment was stopped, and in

11   the government exhibit it makes reference to the fact this went

12   to OFAC.

13            So when Kim was on the stand I asked him about that,

14   and I had a funny feeling when I was standing here, and then I

15   read the testimony, and if I may just make reference to it

16   briefly, so I say to Kim:

17            Did it come to your attention that there was an

18   allegation made relating to anything having to do with this

19   case?

20            And he said:  Not until I got instruction to get

21   involved with this.

22            So to your knowledge, this matter was never

23   investigated by OFAC, correct?

24            Objection, your Honor.

25            Overruled.

K39TSAD1

 1          In my knowledge, no.

 2          And I go:  To your knowledge, was there ever a

 3     referral made by JP Morgan to OFAC relating to this case?

 4          In my knowledge, no.

 5          Then I ask him:  How long have you been working on

 6     this case?

 7          He goes:  I started to work with the prosecutors from

 8     the end of February, like twelve months, six or seven meetings.

 9          I submit it's impossible for me to believe that the

10     subject of what OFAC did when they received information

11     relating to my client did not come up in conversations between

12     competent prosecutors and OFAC.

13          But it continues.  During that period of time, it

14     never came to your attention that OFAC had received a referral

15     from JP Morgan that has to do with this case, is that fair?

16          And he goes:  I cannot say that.

17          I go:  Well, is it true or is it not true?

18          He goes:  I don't know.

19          Question:  So you have no knowledge that that

20     occurred, right, no one has brought that to your attention?

21          Not to my attention.

22          Well, to OFAC's attention.

23          That I don't know.

24          So the answer is no?

25          That I don't know.

1   The point is I had a gut at the time that there had

2   been relationships on this particular subject between OFAC and

3   the U.S. Attorney's Office that I didn't know.

4   Okay.  So now we have the correspondence from the

5   government about this issue.  And, of course, we read it with

6   great attention, and they say -- and I think the language is

7   important, so heaven knows I don't want to misquote, this is on

8   page 2 of their letter to you on March 8:  The government is

9   currently seeking to confirm whether OFAC took any action based

10   on Bank 1's disclosure, and is willing to stipulate that OFAC

11   did not take action against Bank 1, the Stratus entities, or

12   the defendant.

13   I'm not saying that's a cute answer, but that's not an

14   answer saying we never had any business with OFAC, we had no

15   idea.

16   If in fact -- I think here's the deal, here's the real

17   deal on this matter:  If in fact they dealt with OFAC and they

18   learned that there was a declamation where OFAC did nothing and

19   they didn't share with us that point, and then they opened the

20   way they did and they elicited the information from Mr. Kim

21   that they elicited, we are in mistrial with prejudice

22   territory.

23   THE COURT:  What's the application?

24   MR. WEINGARTEN:  That's my application.  I would like

25   to know -- I would like for them to stand up and say -- if they

K39TSAD1

1    say, "Look, maybe we're not as great as everybody thinks we

2    are, we just missed that, we didn't care whether or not OFAC

3    actually did anything even after they got a letter from

4    Commerzbank saying $29 million went to this potentially Iranian

5    company, maybe we just weren't interested," and that's just the

6    truth, then we have an application for a stipulation that I

7    will submit to Court.

8              But if they actually knew that OFAC did nothing,

9    behaved the way they behaved in this Court, we are in mistrial

10   with prejudice territory.

11             THE COURT:  All right.  Mr. Krouse.

12             MR. KROUSE:  Yes, your Honor, I can address that

13   point.  Mr. Kim -- just factually, Mr. Kim, his answer was

14   February of this year when the government started preparing him

15   as an expert witness.  He wasn't the OFAC person, to the extent

16   there was an OFAC person dealing with this case, he was called

17   as an expert witness to testify about OFAC general processes

18   and procedures.

19             The government's understanding has always been that

20   OFAC did do nothing in this case for the conduct that's being

21   charged.  There was no OFAC finding, there was no is

22   investigation.

23             Now, of course, with this letter we are asking that

24   question, but again, there is nothing willful about what

25   happened here.  The government learned about this, or members

K39TSAD1

1    of the team were informed about -- I can only speak for myself

2    and the rest of the team here -- about this letter to OFAC from

3    Commerzbank in January of 2020.

4                THE COURT:  No, that's not true, because the team

5    includes Mr. Lynch.

6                MR. KROUSE:  Yes, so Mr. Lynch also.  But my

7    understanding is there's never been any disclosure from OFAC --

8    and we're running this down, we're talking to them -- that they

9    did anything with this letter, that there is any investigation

10   open or anything like that.

11               And so we are happy, once we confirm that, to

12   stipulate to that point.  And if the defense introduces this

13   letter along with the stipulation, they can -- they are in a

14   position, I think powerfully, to argue that you heard that

15   Commerzbank sent this referral or sent this letter to OFAC and

16   they did nothing, you can infer from that that this was conduct

17   that OFAC didn't care about.

18               But there isn't any --

19               THE COURT:  And that does appear to be information the

20   team has had in its possession for a date unspecified but for a

21   long period of time.

22               MR. KROUSE:  The letter, yes, and the fact that OFAC

23   did nothing I think the defense has known for a period of time

24   as well.

25               MR. WEINGARTEN:  That's just not true.

K39TSAD1

1      MR. KROUSE:  There's nothing in the discovery that

2   indicates that they did anything.

3      THE COURT:  Did the government, anyone on the team,

4   inquire of OFAC as to what they did upon learning?

5      MR. KROUSE:  No.  We have now.  Now that we understand

6   the potentially exculpatory aspect of this letter from

7   Commerzbank, we have asked that question.  We haven't received

8   an answer yet since it occurred over the weekend, but our

9   strong suspicion is, as OFAC has -- that OFAC did nothing with

10  this letter.  So once we confirm that, we will be in a position

11  to stipulate to that fact.

12      THE COURT:  Mr. Weingarten.

13      MR. WEINGARTEN:  That's not enough.  There are other

14  prosecutors on this case.  It is inconceivable to us that there

15  was never occasions in the years of this investigation that

16  OFAC wasn't inquired about what they did and didn't do in

17  reference to my client and the companies that you are familiar

18  with.  We want declarations from every prosecutor who worked on

19  this case.  If they're incompetent enough to not make those

20  inquiries, I will live with that, but I don't believe it.

21      THE COURT:  I will grant that application.

22      So we have to proceed now.  I have all my jurors.

23  This is not resolved.  I think the question is:  Can we proceed

24  with Peri and the documents and continue to deal with this?

25      MR. WEINGARTEN:  We're capable of finishing the

K39TSAD1

1    government's case, if that's the Court's wish.  We had

2    resolved, before this nightmare, that we were going to put the

3    client on, and we're prepared to do that.  We think this is a

4    huge issue, and we think this really has the potential to end

5    this trial.

6              I think when all the prosecutors are quizzed about

7    this, including members of the district attorney's office and

8    the prosecutors who worked on this case before, there is no

9    chance that there's not going to be a positive response to the

10   Court that they made inquiry.  There is no chance in the world.

11   If they told us, it would have been profoundly exculpatory

12   information.  They opened completely inconsistent with that and

13   elicited information from the OFAC guy completely inconsistent

14   with that.

15             This case should be dismissed with prejudice.  And

16   that's where we're going to end up.  We would respectfully

17   request that the prosecutors are required to make presentations

18   to you by the end of the day, and if they pass muster, we'll be

19   prepared to put the client on tomorrow.

20             THE COURT:  There are many ways to cure problems, and

21   we'll get to curing the problem when we have all of the

22   information.  We don't have all the information yet, but we'll

23   get it, and then the question of cure, which may include things

24   like recalling Kim or otherwise, there are possibilities that

25   we have not yet explored, so we're not anywhere close to there

K39TSAD1

1    yet.

2              As I said, a problem in this is the Court's specific

3    concern as to the credibility in light of what additionally

4    occurred last night and in the nature in which this late

5    disclosure was noticed.  So it concerns me, clearly.

6              The immediate question is:  Can we proceed with the

7    remainder of the government's case in light of lack of

8    resolution, and then before requiring the defense to proceed

9    with its case, continue to explore this?

10             MR. WEINGARTEN:  Okay, that's fine, your Honor.

11             THE COURT:  Okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K398SAD2

```
 1                THE COURT:  All of our jurors are here.  I have a
 2     juror whose child is sick, and so unsurprisingly sent home from
 3     school, in light of being sick and the state of the world.  He
 4     or she is here, but there will be child care issues tomorrow
 5     because the school requires the child to be away for a certain
 6     amount of time in light of illness.  So we are going to have to
 7     deal with that, and I suspect these types of issues may
 8     continue to appear.  But all jurors are here and are prepared
 9     to proceed.
10                Mr. Krouse.
11                MR. KROUSE:  Should we put Mr. Peri on the stand?
12                THE COURT:  Yes.  And we will bring in the jury.
13                (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

K398SAD2                         Peri - Cross

1            (Jury present)

2            THE COURT:  Good morning, everyone.  Please take your

3   seats as you come in.  Everyone may be seated.

4            Thank you so much, members of the jury, again for your

5   diligence and punctuality.  It's greatly appreciated.  I hope

6   you had a nice half day off on Friday and weekend.

7            We will continue with the cross-examination of

8   Mr. Peri.  We will have Mr. Peri sworn in again.  Thank you.

9    ROBERT PERI,

10       called as a witness by the government,

11       having been duly sworn, testified as follows:

12           THE COURT:  Mr. Heberlig, you may proceed.

13  CROSS EXAMINATION (Cont'd)

14  BY MR. HEBERLIG:

15  Q.  Good morning, Mr. Peri.

16  A.  Good morning.

17  Q.  Do you recall when we left off on Friday afternoon we were

18  about to get into a topic known as de-risking?

19  A.  I do.

20           MR. HEBERLIG:  Your Honor, at this time we would move

21  to admit Defense Exhibit 96-R subject to our prior discussions.

22           THE COURT:  Without objection?

23           MR. HEBERLIG:  Thank you.

24           THE COURT:  There was a question.

25           MR. LYNCH:  No.

1           THE COURT:  96-R is admitted.

2           DX.

3           MR. HEBERLIG:  Defense Exhibit 96-R.

4           (Defendant's Exhibit 96-R received in evidence)

5    BY MR. HEBERLIG:

6    Q.  Mr. Peri, can you see it on your screen?

7    A.  Yes.

8    Q.  This is a document published by the FATF.  What does that

9    stand for again?

10   A.  Financial Action Task Force.

11   Q.  We discussed that a little bit on Friday as well, correct?

12   A.  Correct.

13   Q.  You're familiar with that agency?

14   A.  I am.

15   Q.  This a document entitled "FATF Guidance for Correspondent

16   Banking Services."  Do you see that?

17   A.  I do.

18   Q.  And the date of the document is October 2016, correct?

19   A.  Correct.

20           MR. HEBERLIG:  Let me ask to turn to page DX 96-R,

21   page 3.  Can we just highlight the headings in paragraph 1.

22   Q.  Sir, this is under the heading "introduction," and then a

23   subheading "Background:  FATF action to address de-risking in

24   the correspondent banking context."

25           If I may, sir, would you please read that first

K398SAD2                          Peri - Cross

1  paragraph of the document?

2  A.  Yes, sir.

3        "In the wake of the global financial crisis and

4  countries' response to it, the international community has been

5  increasingly concerned about de-risking.  The FATF understands

6  this term to mean situations where financial institutions

7  terminate or restrict business relationships with entire

8  countries or classes of customer in order to avoid rather than

9  manage risks in line with the FATF's risk-based approach.  This

10  is a serious concern for the FATF and the FATF style regional

11  bodies, to the extent that de-risking may drive financial

12  transactions into less or non-regulated channels reducing

13  transparency of financial flows and creating financial

14  exclusion, thereby increasing exposure to money laundering and

15  terrorist financing risks."

16        MR. HEBERLIG:  May we take that down and highlight the

17  next paragraph.

18  Q.  Perhaps I will read that one and ask you if I have done so

19  accurately.  This is paragraph 2 of the same document.

20        "Analytical work undertaken so far by different

21  bodies, including the FATF, shows that de-risking is a complex

22  issue driven by various considerations, including

23  profitability; reputational and liability risks; changes in

24  banks' financial risk appetites; the amount of financial

25  penalties imposed by supervisory and law enforcement

K398SAD2                          Peri - Cross

1   authorities, increased compliance costs associated with

2   implementing conflicting regulatory requirements, including

3   anti-money laundering and counterterrorist financing (AML/CFT),

4   and confusion caused by the term 'know your customer's customer

5   (KYCC)'.  A recent survey also shows that in some cases banks

6   will exit the relationship solely on the basis of profits

7   (de-marketing) irrespective of the risk context and of the

8   market circumstances."

9           Did I read that correctly, sir?

10  A.  Yes.

11  Q.  I promise we are not going to read the entire thing, but I

12  would like to look at the third paragraph.

13          MR. HEBERLIG:  Marco, can you highlight the first and

14  last sentences.

15  Q.  When he is done, I would ask you to read those two, sir.

16  A.  "The term KYCC has created a lot of confusion.  To clarify,

17  the FATF recommendations do not require financial institutions

18  to conduct customer due diligence on the customers of their

19  customer (i.e., each individual customer).

20          "There is no expectation, intention or requirement for

21  the correspondent institution to conduct customer due diligence

22  on its respondent institution customers."

23  Q.  Those views, sir, are consistent with your own views, that

24  Citibank does not have an obligation to conduct KYC due

25  diligence on the clients of its correspondent banks; is that

K398SAD2                         Peri - Cross

1   correct?

2   A.  Yes, that's correct.

3   Q.  Just a little more from this document.

4           MR. HEBERLIG:  Can we please highlight paragraph 4.

5   Q.  I would ask you to read that, sir.

6   A.  "In June 2015, the FATF issued a public statement to

7   clarify that, when establishing correspondent banking

8   relationships, correspondent institutions are required to

9   perform customer due diligence (CDD) on the respondent

10  institution, and gather sufficient information about the

11  respondent institution to understand its business, reputation,

12  and the quality of its supervision, including whether it has

13  been subject to an ML/TF investigation or regulatory action,

14  and to assess the respondent institution's AML/CFT controls.

15  It was clarified that the FATF recommendations do not require

16  correspondent institutions to perform CDD on the customers of

17  their respondent institutions when establishing correspondent

18  banking relationships or in the course of the relationship."

19  Q.  Thank you.

20          Sir, do you agree that the complexity and the number

21  and the changes in various sanctions regimes have led to

22  uncertainty causing banks to de-risk?

23  A.  I think that's a complicated question and probably hard to

24  answer with a yes or a no.

25          THE COURT:  You may explain.

A.  I think that that's one of a number of factors, some of
which seem like they have been listed in this document.  There
are a whole slew of factors, one may be sanctions.
Q.  So just to be clear, one of the factors that have led banks
to de-risk has been the complexity and the number and the
changes in various sanctions regimes.  Would you agree with
that statement?
A.  De-risking in my view is largely a business decision that's
based on number of factors, and in my role I am not responsible
for any of those business decisions.  So I don't fully
understand what drives a bank to make those types of decisions,
but certainly sanctions could be a factor, yes.
Q.  Could be or are?
        You know them to be a factor, don't you, sir?
A.  It depends where you're talking about.  A lot of
countries -- in my view, de-risking is focused on a lot of
countries where there are little to no sanctions.
Q.  My question was, have the complexity and the number and
changes to the sanctions regimes led banks to engage in
de-risking?
A.  If you mean away from countries subject to comprehensive
sanctions, yes.
Q.  How about with respect to the Iran sanctions.  Have the
complexity and the various sanctions regimes, and the changes
to those Iran sanctions regimes, led banks to engage in

K398SAD2                         Peri - Cross

1   de-risking?

2   A.  I would argue not U.S. banks, no.

3   Q.  Let's take a look at paragraph 6.

4           MR. HEBERLIG:  Can you highlight just the first

5   sentence, please.

6   Q.  Can you read that one?

7   A.  "Prudential and other regulatory requirements, as well as

8   the complexity, number and changes in sanctions regimes, and

9   also the uncertainty related to the interplay of different

10  sanctions regimes and their applicability to financial

11  institutions, were also mentioned as drivers of de-risking."

12  Q.  Thank you.

13          MR. HEBERLIG:  Can we go to just the last paragraph of

14  this document, paragraph 8.

15          Can you enlarge that, please.

16  Q.  I will read that one and then ask you a question about it.

17          Paragraph 8.  "Correspondent banking is an activity

18  that has been negatively impacted by de-risking in certain

19  regions and sectors."

20          Let me stop right there.  Is Iran one of the certain

21  regions and sectors that has been impacted by negative

22  de-risking?

23  A.  Possibly globally.  I just want to draw the distinction,

24  U.S. banks have been subject to sanctions on Iran for decades.

25  Q.  I understand that.  My question is, is Iran one of the

1    countries indicated here as a certain region that's led to

2    correspondent banking being negatively impacted by de-risking?

3    A.   Probably.

4    Q.   Let me go on.

5              "This is of concern to the international community, as

6    correspondent banking is an important means of facilitating

7    cross-border movements of funds, and enabling financial

8    institutions to access financial services in different

9    currencies and foreign jurisdictions, thereby supporting

10   international trade, charitable giving, commerce and

11   remittances flows, all of which contributing to promoting

12   financial inclusion."

13             Did I read that accurately?

14   A.   Yes.

15   Q.   Do you agree as a general matter that correspondent banking

16   has been negatively impacted by de-risking in certain regions

17   and sectors?

18   A.   Sure.

19   Q.   Isn't it true that some banks have decided to terminate

20   business relationships with all Iranians to avoid risks

21   associated with possible sanctions violations?

22   A.   Again, I can speak to Citi.  I don't know that there is a

23   calculation that goes into other banks, but certainly there are

24   not a lot of banking relationships left with Iran.

25   Q.   I didn't hear that answer.

K398SAD2                      Peri - Cross

1   A.   There are not a lot of banking relationships left with

2   Iran.

3   Q.   So is Citi among the banks that have decided to de-risk by

4   not doing business with any Iranians?

5   A.   No.

6   Q.   Maybe I didn't understand your answer.

7           Are you aware of the fact that some banks have decided

8   to terminate business relationships with all Iranians to avoid

9   risks associated with potential sanctions violations?

10          MR. LYNCH:  Objection, your Honor.  Foundation.

11          THE COURT:  Sustained.

12  Q.   As a head of sanctions compliance for a large U.S.

13  financial institution, are you generally aware of the state of

14  the correspondent banking industry in the United States?

15  A.   No, I am not responsible for correspondent banking.

16          THE COURT:  I'm sorry.  I couldn't hear your answer.

17  A.   I am responsible for sanctions and only where there is

18  intersecting correspondent banking, but we have a whole line of

19  business of correspondent banking.  I don't know the state of

20  play.

21  Q.   My questions that we have been addressing over the last few

22  questions have been about correspondent banking, the effects on

23  correspondent banking of de-risking as a result of the

24  sanctions.  So that's what I am focused on, not the finer

25  details of correspondent banking in some other capacity.  OK?

1   A.  OK.

2   Q.  In your capacity as head of U.S. sanctions for the entirety

3   of Citigroup, are you aware of other financial institutions

4   de-risking by eliminating business with all Iranians?

5           MR. LYNCH:  Same objection.

6           THE COURT:  Overruled.

7   A.  Can I clarify?  The first time you asked the question you

8   said U.S. institutions.  Are you asking about U.S.

9   institutions?

10  Q.  Let's start there.  In particular, U.S. intermediary

11  financial institutions.

12  A.  There I am not because those prohibitions have existed for

13  decades.

14  Q.  Where are you aware?  It sounds as if you are aware of some

15  banks engaging in de-risking with respect to Iranians.

16  A.  There were global sanctions on Iran in the early 2000s,

17  which is a period when I believe, although I was not at

18  Citibank, that many international banks followed those global

19  sanctions which forced them to, if you want to call it

20  de-risking, but forced them legally to not do business with

21  Iran.

22  Q.  To terminate business with all Iranians, correct?

23  A.  Can you define Iranians?

24  Q.  Anyone with a nexus to Iran; someone who was born there,

25  someone who may have relatives there.

1    A.  I mean, there I can only speak for Citigroup, but that's

2    not accurate.  We deal with Iranian Americans all the time, and

3    we do some permissible transactions with Iran.

4    Q.  So you're focused on the government of Iran and people in

5    Iran, is that correct?

6    A.  We are focused on implementing the sanctions which are

7    targeting the government of Iran and individuals who are

8    ordinarily resident in Iran.

9    Q.  Let me ask you this.  Would you agree that refusing to do

10   business with any Iranians is one way to eliminate the risk of

11   violating the U.S. sanctions against Iran?

12   A.  Sorry.  I am just trying to think that through.  It's a

13   complicated question.

14        I suppose that could eliminate the risk, but it's not

15   how we would address the problem.

16   Q.  OK.

17        MR. HEBERLIG:  We can take that document down.

18   Q.  Let's change topics slightly.

19        Am I right that as a result of the wire transfers you

20   have testified about in this case, that Citi has not been

21   criminally prosecuted for violating the U.S. sanctions against

22   Iran?

23   A.  Yes.  To my knowledge, that's correct.

24   Q.  Am I also correct that -- and all of these questions are

25   directed at the wire transfers that you have testified about on

K398SAD2                         Peri - Cross

1   direct.  OK?

2   A.  OK.

3   Q.  Am I correct, with respect to those wire transfers, OFAC

4   has not brought any enforcement action against Citi?

5   A.  To my knowledge, that's correct.

6   Q.  Am I also correct that, with respect to the those same wire

7   transfers, OFAC has not fined Citi?

8   A.  On those wire transfers, it has not.

9   Q.  In fact, OFAC has imposed no sanctions or punishments

10  whatsoever to include cautionary or no-action administrative

11  remedies, is that correct?

12  A.  Well, I haven't gone back to look in our database of

13  cautionary letters, but in my time at Citi, I am not aware of

14  one, that's correct.

15  Q.  Are you holding out the possibility that Citi has been

16  sanctioned by OFAC related to the conduct at issue in this

17  case?

18  A.  No.  I am speaking to the best of my knowledge.

19  Q.  Were you asked to investigate that issue before testifying

20  today?

21  A.  No, I wasn't.

22  Q.  And you don't know that --

23  A.  I am comfortable saying I don't believe that we have been.

24  I am just trying to be honest.

25  Q.  Thank you.

1           Just to put a bow on this and move on, you have no

2     knowledge of OFAC having sanctioned Citi or imposed any of its

3     various remedies that you described in direct examination as a

4     result of the conduct in this case, is that correct?

5     A.  Yeah.  That's what I said, I have no knowledge of that.

6     Q.  Thank you.

7           Now, in fact, you understand that the theory in this

8     case is that Citi was unaware of any Iranian nexus to the wire

9     transactions in this case, right?

10    A.  I don't know -- I haven't studied this case.

11    Q.  Do you understand that the government maintains Citi was

12    one of the victims --

13          MR. LYNCH:  Objection.

14    Q.  -- of the alleged bank fraud charges?

15          THE COURT:  Sustained.

16    Q.  Are you aware factually of any information suggesting that

17    Citi knew of the Iranian nexus with respect to the wire

18    transfers in this case?

19          MR. LYNCH:  Same objection, your Honor.

20          THE COURT:  Overruled.

21    A.  Can you repeat the question?

22    Q.  As a factual matter, are you aware of any information that

23    Citi knew about an Iranian nexus to any of the wire

24    transactions we have discussed in this case?  And I will

25    eliminate from that question the one we spoke about on Friday.

K398SAD2                         Peri - Cross

1   A.  That says Iran in it?

2   Q.  Correct.  Putting that one aside.

3   A.  Putting that one aside, I don't believe Citi had any

4   knowledge.

5   Q.  In light of that fact, am I correct that the risk of OFAC

6   enforcement upon Citi was low?

7   A.  I think there is that gamut of OFAC enforcement and it's a

8   strict liability regime, so that risk always exists.  But where

9   there is no knowledge, I would argue that the risk is somewhat

10  limited.

11  Q.  Isn't it fair to say that the risk was virtually

12  nonexistent?

13  A.  I don't think it is.

14  Q.  Let's get into this topic.  You have said now, both on

15  direct and in response to my question, that you believe this is

16  a strict liability regime.  Is that what you said?

17  A.  Yeah.

18  Q.  Is that your own personal view?

19  A.  I think --

20              MR. LYNCH:  Objection.

21              THE COURT:  Sustained.

22  Q.  I am correct, am I not, that that's not what the Treasury

23  Department has told the banking community?

24              MR. LYNCH:  Objection, your Honor.

25              THE COURT:  Overruled.

K398SAD2                        Peri - Cross

1    A.  I don't know what the Treasury Department has told the

2    banking community.  That's how the banking community

3    understands it.

4    Q.  Isn't it true that the Treasury Department has told the

5    banking community the exact opposite, that it does not use a

6    zero tolerance philosophy to sanctions enforcement?

7    A.  I am not a lawyer, but I would say --

8    Q.  I am not asking for a legal opinion.

9    A.  I am just trying to answer your question.  You could have

10   strict liability in conjunction with less than zero tolerance.

11   That's to say we could be liable, but OFAC has discretion.

12   Q.  My question a moment ago was on whether there was a

13   realistic likelihood of sanctions enforcement against Citi.

14   That's the issue I am focused on.

15           Am I correct that there really was no risk to Citi in

16   this case?

17           MR. LYNCH:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  It's a complicated question and a complicated answer.

20   There is risk to Citi, and the reason being that OFAC could

21   find that systems aren't applied appropriately, other things

22   aren't working effectively, and then it can be much stricter in

23   any given case.

24   Q.  But in this case, you don't believe that Citi's systems

25   fell down on the job with respect to these wire transfers, do

1    you?

2    A.  I don't believe they did.

3    Q.  So in light of that fact, given that that is the type of

4    issue that could create liability for the bank, having poor

5    systems in place, you weren't exposed to meaningful risk,

6    correct?

7              MR. LYNCH:  Objection.

8              THE COURT:  Overruled.

9    A.  It's very hard to judge.  Even as a sanctions officer of

10   the bank, OFAC has a lot of discretion and at times they have

11   applied it more strictly than others.

12   Q.  Let me see if I can address this.

13             MR. HEBERLIG:  Can we look at Exhibit 1347 in

14   evidence.

15             THE COURT:  Go ahead.

16             MR. HEBERLIG:  Can you highlight just the top heading.

17   Q.  First of all, what is the date of this document, sir?

18   A.  August 30, 2016.

19   Q.  Let's go through who these folks are in the upper left-hand

20   corner.

21             It's fair to say, other Department of Treasury, the

22   other four agencies are known as federal banking agencies?

23   A.  Yes.

24   Q.  Do they regulate banks, such as Citibank?

25   A.  I believe so.  I only come in contact with two of them, but

K398SAD2                          Peri - Cross

1    yes.

2    Q.  Which two do you come in contact with?

3    A.  The fed and OCC.

4    Q.  The fed being the Federal Reserve system?

5    A.  The Federal Reserve, not this particular --

6    Q.  You have to speak up.

7    A.  Not the board of governors.  I take that back.  But the

8    Office of the Comptroller of the Currency.

9    Q.  Just in brief, what are those two agencies and what are

10   their responsibilities?

11   A.  They are regulators of the bank.  So they are supervisors.

12   So they supervise the practices of the bank.

13   Q.  Of course, we have heard a lot of testimony about the U.S.

14   Department of Treasury.  You're familiar with that, correct?

15   A.  Of course, yes.

16   Q.  That is the federal agency within which OFAC resides?

17   A.  Yes.

18   Q.  The title of this document is "U.S. Department of Treasury

19   and Federal Banking Agencies Joint Fact Sheet on Foreign

20   Correspondent Banking:  Approach to BSA/AML and OFAC sanctions

21   supervision and enforcement."

22           Did I read that correctly?

23   A.  Yes.

24   Q.  We have been discussing OFAC sanctions supervision and

25   enforcement, correct?

K398SAD2                        Peri - Cross

1   A.  Correct.

2   Q.  Can you read the last sentence on page 1 of this document.

3           MR. HEBERLIG:  Let's just enlarge it for a moment.

4   A.  "This fact sheet summarizes key aspects of federal

5   supervisory and enforcement strategy and practices in the area

6   of correspondent banking."

7           MR. HEBERLIG:  Can we turn to page 3.

8           Enlarge the final sentences at the bottom of 3 and the

9   top of page 4.

10  Q.  I will ask you to take a look at those, sir.

11          All right, sir.  The bottom of page 3 carried over to

12  page 4 says, "OFAC investigates cases of sanctions violations,

13  many of which (over 95 percent) are closed with administrative

14  measures, such as cautionary or no-action letters."

15          I am correct that Citi has not received even an

16  administrative measure, such as a cautionary or no-action

17  letter in this case, correct?

18  A.  Yeah.  I think you asked me and I said, to the best of my

19  knowledge, that's correct.

20  Q.  It goes on to say, "This means that less than five percent

21  of all cases of sanctions-related violations investigated by

22  OFAC have resulted in a civil monetary penalty or other public

23  enforcement response."

24          Would you agree that that's an accurate statement?

25  A.  I have no way of verifying that, but based on this

K398SAD2                          Peri - Cross

1    document, I don't doubt it either.

2    Q.   How about from your experience, as a head of U.S. sanctions

3    for one of the largest global intermediary banks in the world,

4    would you agree with that statement based on everything you

5    know in the world?

6              MR. LYNCH:  Objection, your Honor.

7              THE COURT:  Overruled.

8    A.   The problem is you're asking me to speculate about how many

9    nonpublic enforcement responses other banks face, and the truth

10   is I don't know.

11   Q.   Do you see anything in what we just read distinguishing

12   between public and nonpublic?

13   A.   Well, yeah.  One can infer from the final sentence, "other

14   public enforcement response," that cautionary letters and

15   no-action letters are not a public response.

16   Q.   My question was, do you agree that less than five percent

17   of all sanctions-related violations have resulted in a civil

18   monetary penalty or other public enforcement response?

19   A.   I just have to take OFAC at their word on that.

20             MR. HEBERLIG:  Let's go to the next -- take that

21   enlargement down and bear with me one moment.

22   Q.   This next section of the document talks about recent large

23   FBA, FinCEN and OFAC enforcement penalties.

24             Now, before we read this, sir, you testified in your

25   direct examination that -- correct me if I am wrong -- that

1  penalties for sanctions violations add up very quickly; they

2  are often in the billions of dollars.  Is that a fair

3  characterization?

4  A.  Yes.

5  Q.  You were not trying to suggest, sir, that the bank's

6  actions in this case exposed the bank to billions of dollars of

7  potential fine exposure, were you?

8  A.  No.  I wasn't speaking to this case specifically at all.

9  Q.  I am correct, am I not, that those billion dollar cases

10  have involved intentional evasion of the U.S. sanctions by

11  banks over periods of years?

12  A.  I am not going to speak with a hundred percent certainty,

13  but certainly the most of the high profile ones have.

14  Q.  Why don't we read this paragraph, sir, and I will do that

15  for you.

16          Under the heading it says, "Over the past several

17  years, certain major enforcement cases involved large

18  enforcement penalties related to BSA/AML and OFAC sanctions.

19  It is important to note that the largest and most prominent

20  monetary penalties for BSA/AML and sanctions violations in

21  recent years generally involved a sustained pattern of serious

22  violations on the part of depository institutions."

23          Let me pause there.  You understand that's a reference

24  to banks, correct?

25  A.  I do.

K398SAD2                          Peri - Cross

1   Q.  Like intermediary banks that we have been discussing in

2   this case?

3   A.  Yes.

4   Q.  It goes on to say, "With regard to the sanctions

5   violations, these cases did not involve unintentional mistakes,

6   but generally involved intentional evasion of U.S. sanctions

7   over a period of years and/or the failure of the institutions'

8   officers and/or senior management to respond to warning signs

9   that their actions were illegal.  Many of these cases also

10  involved criminal conduct that was prosecuted separately by the

11  Department of Justice."

12          Sir, am I correct that the types of cases that are

13  being described here involving large monetary sanctions by

14  OFAC, and even potential criminal conduct, are very different,

15  involve very different conduct than the conduct you have

16  described in this case?  Is that a fair statement?

17  A.  What I am familiar with of this case, yeah, I would say.

18  Q.  I am focused on the bank's conduct in clearing or

19  processing the eight transactions you testified about on direct

20  examination, correct?

21  A.  Sure.

22  Q.  In a factual context, in which I think you have

23  acknowledged, putting aside that one payment, you're unaware of

24  Citi knowing of any Iranian nexus, correct?

25  A.  Right.

K398SAD2                    Peri - Cross

1   Q.  So that would be a situation involving what is described in

2   this document as unintentional mistakes, correct?

3   A.  Probably, yes.

4   Q.  And in that setting, there was no possibility that Citi

5   would be exposed to these significant monetary penalties, isn't

6   that fair?

7   A.  Yes, that's fair.  I don't think Citi would have faced a

8   billion dollar penalty for something like this.  But this

9   speaks to those types of penalties.  There are internal costs

10  even to nonpublic enforcement actions that are not

11  insignificant to a financial institution.

12  Q.  Let's read just at the very end here, the conclusion,

13  please.  This is the end of the document.  I will read it

14  briefly.

15          "Conclusion.  The goal of BSA compliance programs and

16  OFAC sanctions programs is to ensure a well-functioning,

17  transparent, resilient, and safe and sound financial system.

18  While the Treasury and the FBAs do not utilize a zero tolerance

19  philosophy that mandates the strict imposition of formal

20  enforcement action, regardless of the facts and circumstances

21  of the situation, Treasury and the FBAs take the threats posed

22  by criminals, money launderers, and terrorist financiers very

23  seriously and continue to use their authorities in a

24  proportionate and appropriate manner to safeguard our financial

25  system against abuse."

1           Did I read that accurately?

2    A.  Yes.

3    Q.  And it is fair that what Treasury is saying here is that it

4    does not employ a zero tolerance or strict liability approach

5    to its enforcement decisions; isn't that correct?

6    A.  I'm not a lawyer, but it seems to me there is a distinction

7    between zero tolerance and strict liability.

8    Q.  In your mind there is a distinction between zero tolerance

9    and strict liability?

10   A.  Yes.

11   Q.  So enforcement policy that does not utilize a zero

12   tolerance philosophy squares with your understanding of the

13   strict liability regime, is that your testimony?

14   A.  My understanding of strict liability regime is a bank is

15   liable for any transaction that was potentially prohibited, but

16   zero tolerance is a philosophy whereby OFAC may choose to apply

17   a less and different degree of enforcement or not take an

18   enforcement action.

19   Q.  So I think I understand.  So liable in the hypothetical

20   sense.  But OFAC has made it clear in this document that

21   whatever hypothetical liability may exist, the bank faced no

22   real-world exposure for enforcement, isn't that fair?

23           MR. LYNCH:  Objection, your Honor.

24           THE COURT:  Overruled.

25   A.  I think it's making clear that --

K398SAD2                           Peri - Cross

1           MR. HEBERLIG:  That's a direct question, your Honor, a

2    yes or no.

3           MR. LYNCH:  Your Honor, I object.

4           THE COURT:  Go ahead and explain.

5    A.  I can't answer it as a yes or no because I think that what

6    it's making clear is that they are not likely to impose a major

7    penalty, but they reserve the right, as I understand it, to

8    issue cautionary letters and other things that are an

9    enforcement action and do have a cost within the bank.

10   Q.  Of course, that's not stated in here.  There is not an

11   exception, zero tolerance does apply if we are talking about

12   cautionary letters or administrative actions.  Does it say that

13   here?  It talks about all enforcement actions, does it not?

14   A.  Then it goes on to say that they take it really seriously.

15   Q.  In a proportionate and appropriate manner, correct?

16   A.  So proportionate could be a cautionary letter and something

17   else.

18   Q.  Fair enough.

19           Last couple of questions.

20           I think you just touched on this.  You described the

21   concept of reputational risk in your direct and maybe just a

22   moment ago in response to my questions, correct?

23   A.  I don't remember right now, but I do remember it in the

24   direct.

25   Q.  I believe we have established, putting aside that one

K398SAD2                              Peri - Cross

1    transaction that we talked about on Friday, that you believe

2    the bank did everything it was supposed to do here, correct?

3    A.  That's a broad statement, but yes, I don't see -- they were

4    a straight-through process; they weren't even stopped in our

5    system.

6    Q.  The bank, to your knowledge, did nothing wrong with respect

7    to those transactions, correct?

8    A.  That's correct.

9    Q.  And do you feel that as a result of that, Citigroup has

10   suffered reputational harm as a result of this case?

11   A.  I don't know what is going to happen based on this trial,

12   but no, I don't think there has been reputational harm to Citi

13   to this date.

14   Q.  So while there is a potential for some sanctions violations

15   to cause reputational harm, you don't maintain that the conduct

16   at issue in this case has caused any reputational harm to

17   Citibank?

18   A.  No.  We do what we do to avoid potential reputational harm.

19   Q.  Is that a no?

20   A.  I am not asserting that there is any reputational harm in

21   this case.

22           MR. HEBERLIG:  That's all I have, your Honor.

23           THE COURT:  Mr. Lynch.

24           (Continued on next page)

25   REDIRECT EXAMINATION

K398SAD2                          Peri - Redirect

1    BY MR. LYNCH:

2    Q.  All right.  I have got some ground to cover.  Defense

3    counsel asked you a lot of questions about a variety of topics.

4    We can work backwards a little bit.

5         That last document that counsel was asking you about,

6    if we can pull that up.  That's Defense Exhibit 1357.

7              THE COURT:  96-R.

8              MR. LYNCH:  DX 1347.

9              If you can zero in on the date.

10   Q.  What is the date of this publication?

11   A.  August 30, 2016.

12   Q.  What is the date range of the transactions that we were

13   discussing on Friday, approximately?

14   A.  2011 and 2012, for the most part.

15   Q.  So this is some form of publication that happens several

16   years after the conduct in question, correct?

17   A.  Correct.

18   Q.  Defense counsel asked you a question about this 95 percent

19   number.  I am not sure if you were able to fully answer the

20   question when it says that five percent or fewer resulted in a

21   monetary penalty or public action.

22        Are there costs associated with nonpublic actions

23   taken by OFAC?

24   A.  Sure.  Yeah.  Absolutely.

25   Q.  Some of those we discussed on Friday?

K398SAD2                           Peri - Redirect

1    A.  I am trying to recall what we discussed on Friday.

2    Q.  What are some of the costs imposed on a bank for nonpublic

3    actions that OFAC may take?

4    A.  Well, for one thing, nonpublic actions are still reported

5    to the supervisors.  So the Office of the Comptroller of the

6    Currency and Federal Reserve for two.  There can be internal

7    investigations that can be quite resource intensive.  So there

8    are a number of sort of internal costs.  There may be remedial

9    efforts that need to be made, even in a cautionary letter, that

10   can often be quite costly in terms of systems fixes.

11   Q.  This again was published in 2016.  Do you know if all of

12   these various agencies had made this type of information as

13   clear prior to 2016?

14   A.  I don't know the answer to that.

15   Q.  Counsel asked you about a series of very large penalties

16   imposed on banks, in the billions of dollars for the worst

17   conduct.  And you were asked questions about that not being a

18   possible risk in this case.

19       Are there other types of penalties that can be imposed

20   proportionately for different types of conduct?

21   A.  Sure.  The big penalties are in the billions and that's why

22   banks do what they do, but there are plenty of penalties in the

23   millions and hundreds of thousands of dollars.  And typically,

24   when we look at penalties, that's sort of the tip of the

25   iceberg because the legal costs of negotiating with OFAC over

K398SAD2                          Peri - Redirect

1    years before settling, the remedial actions that need to be

2    taken within a bank, you may have a monitor that is placed in

3    the bank, there may be compliance requirements to increase

4    spending or resources, and all of that is considered part of

5    the costs and the possible penalty within the bank.

6    Q.  Are there potential costs even if it's ultimately

7    determined that the bank did not act intentionally?

8    A.  Yes, certainly.  The most massive cases seem to generally

9    involve intense -- a lot of very significant cases involve

10   simply sort of systems that needed to be updated or other

11   actions that needed to be taken to get in line with sanctions.

12   Q.  Working backwards to discuss some of the issues freshest in

13   the mind.

14          You were asked questions about Defense Exhibit 96-R.

15   Do you recall that?

16   A.  Not by number.

17   Q.  The FAFT publication.

18   A.  The guidance on de-risking, sure.

19          MR. LYNCH:  If you could pull up the cover page on

20   that.

21   Q.  What is the date on this?

22   A.  October 2016.

23   Q.  Is this well after the period of the payments in discussion

24   in this case?

25   A.  Right.

K398SAD2                        Peri - Redirect

1   Q.  Is de-risking a formal or informal term, as far as you're

2   aware?

3   A.  It appears in FATF documents to have a somewhat formal

4   definition, but it's obviously something that's been debated a

5   lot.  The fact that they feel the need to provide guidance

6   means it's a term that gets used very generically and in a

7   variety of different matters.

8   Q.  As indicated on cover of this document, what types of

9   de-risking is this document referring to?

10   A.  Correspondent banking.

11   Q.  Again, we discussed correspondent banking.  What is

12   correspondent banking?

13   A.  Those relationships between banks that allow transactions

14   to move from one financial institution or one country to

15   another.

16   Q.  Is this providing guidance on banks when handling

17   relationships with other banks?

18   A.  Yeah.  Again, I haven't read the document, other than the

19   parts that were highlighted, though we read a fair bit, but

20   guidance, generally speaking, directed at governments and at

21   supervisors and regulators, but obviously that flows down

22   ultimately to banks.

23   Q.  And you were asked in one of your answers -- withdrawn.

24           How many countries does Citibank operate in?

25   A.  We have a physical presence in 98 countries, and we operate

K398SAD2                          Peri - Redirect

1    in over 160.

2    Q.  In your experience as the head of global sanctions at

3    Citibank, are you aware, whether as a response to any U.S.

4    sanctions laws or regulations, Citi has refused to deal with

5    any class of customers?

6    A.  No.  Class of customer is something that doesn't resonate

7    with me.  We wouldn't think of it that way.

8    Q.  You were asked a lot of questions about whether, in this

9    context of de-risking, either Citibank or banks you know of or

10   otherwise have refused to deal with Iranians, and you tried to

11   clarify your answer.  Why was that confusing to you?

12   A.  Because the sanctions on Iran target essentially two

13   things.  They target the government of Iran, and then they

14   target the country of Iran, the jurisdiction of Iran.  And they

15   target individuals and companies, entities, that are in Iran,

16   but they don't target any Iranian passport holder, they don't

17   target Iranian Americans, and Citi doesn't discriminate in that

18   manner.  We have to enforce a sanction that targets individuals

19   who are ordinarily resident in Iran, and we do, it's our

20   obligation, but we don't carry it beyond that to other people

21   who have some familial ties to Iran.

22   Q.  In your experience, are you aware of Citi not opening bank

23   accounts or terminating bank account relationships with

24   individuals of the type you describe, simple passport holders

25   or Iranian Americans?

K398SAD2                        Peri - Redirect

1    A.  No.

2    Q.  And this document talks about de-risking in the context of

3    high-risk jurisdictions.  In your experience, what is a

4    high-risk jurisdiction?

5    A.  They could high risk for a number of reasons.  It could be

6    high risk because it is a jurisdiction subject to sanctions, to

7    comprehensive sanctions, and I don't think anyone would argue

8    that Iran is high risk in that sense.  It could also be a

9    country that has a lot of corruption or money laundering

10   issues, or a lack of regulatory regime to help enforce money

11   laundering.

12   Q.  FATF is a global organization, correct?

13   A.  That's correct.  Not every country is a member of the FATF,

14   but most are a member of the either the FATF or one of the FATF

15   regional bodies.

16   Q.  Do you recall counsel asking you about language and their

17   referencing the complexity of sanctions?

18   A.  Yes, I do.

19   Q.  Is that referring to just a U.S. sanctions regime?  Would

20   FATF only be referring to U.S. sanctions?

21   A.  No.  In fact, FATF generally refrains from opining on U.S.

22   sanctions and focuses on United Nations sanctions, because

23   those are the ones that all of its -- that all UN member states

24   have an obligation to impose.

25   Q.  And your bank, where you are the head of U.S. global

K398SAD2                        Peri - Redirect

1    sanctions compliance, is the Iranian comprehensive sanctions

2    regime that you enforce, do you consider that to be one that is

3    complex?

4    A.  Yes and no.  Yes, there are a lot of layers to the Iranian

5    sanctions regime, that's true.  But as I also discussed, for a

6    U.S. bank, it's a regime that has been in place for the most

7    part for a long time, and so we generally have a good sense of

8    how to handle it.

9    Q.  What about the general prohibition you have described about

10   providing banking services to entities or individuals in Iran,

11   is that one that you consider to be one that adds that

12   complexity or no?

13   A.  There's always complexity; there can be complexity.

14   Q.  Such as?

15   A.  Well, the sanctions say that you have to apply sanctions to

16   anyone who is ordinarily resident in Iran, but there isn't a

17   lot of clear guidance about the definition of ordinarily

18   resident.  So a bank is left to try to determine what is

19   ordinarily resident versus outside the country for a limited

20   period, or something like that.

21   Q.  What if the payment is for the benefit of an entity located

22   in Iran?

23             MR. HEBERLIG:  Objection.  Leading.

24             THE COURT:  Sustained.

25   Q.  What types of issues don't raise complexity with respect to

1   Iranian sanctions?

2   A.   Any clear nexus to the country of Iran, a payment that's

3   connected by a person or entity who is in the country of Iran,

4   or to the government of Iran, that is pretty straightforward.

5   Q.   I want to go back to Government Exhibit 432, which we

6   discussed on Friday and counsel asked you a number of questions

7   about on Friday.

8   A.   OK.

9   Q.   If we can go to the beginning of the thread, the last page

10  of the e-mail.

11          This is, if I may refresh your memory, referring to

12  the 87,000, roughly $87,000 payment originally initiated in

13  November of 2012 and ultimately consummated in February of

14  2013.

15  A.   Yes.

16          MR. LYNCH:   If you could highlight above, please.

17  Q.   This is the beginning -- just to pull out again to the

18  front page of the thread, in what time frame are these e-mails

19  in this thread?

20  A.   2013.

21  Q.   So the last e-mail in the thread is Monday, January 14th of

22  2013?

23  A.   Right.

24  Q.   If we then go to the last page, which is the first e-mail

25  in the chain, what is the year or date -- actually, one page

K398SAD2                          Peri - Redirect

1   before, the bottom there.

2   A.  November 29, 2012.

3   Q.  So is it fair to say this reflects efforts made at that

4   time to get answers to these questions?

5   A.  Right.

6   Q.  If we can go to that last page.

7          If you recall on Friday you were asked by counsel why

8   this payment originally was flagged and stopped, and you

9   confirmed that it was most likely because of the beneficiary

10  entity Iranian International Housing Company.  Do you recall

11  that?

12  A.  Yes, I do.

13  Q.  If you pull out and go above, you will see a series of

14  questions, right?

15  A.  Right.

16  Q.  Did Citi receive a response to any of those questions

17  about the Iranian International Housing Company?

18          You can take time to go through the e-mail.  You can

19  read those questions.

20  A.  No.  I don't think it got any of this related to the

21  Iranian International Housing.

22  Q.  What was Citibank told in response to all of these

23  questions about the Iranian International Housing?

24  A.  That was the wrong beneficiary; it was a mistake.

25  Q.  What would have happened if Citi had been told that it was,

K398SAD2                          Peri - Redirect

1    in fact, the beneficiary?

2    A.   Then we would have sought answers to these questions, which

3    gets to the fact that it's not -- we would need to make a

4    determination that it's subject to the sanctions.  Just because

5    it says Iran in it doesn't mean we are going to block it, but

6    we would ask to get answers to these questions, and if we

7    determined that there was a nexus to the Iran sanctions, that

8    it was subject to the sanctions, then we would either reject it

9    or block it, depending on the obligation that we had.

10   Q.   And based upon the outcome, if you had actually gotten

11   answers to those questions, what would have happened if Citi

12   had learned that this was an entity incorporated and

13   headquartered in Tehran, Iran?

14   A.   If it was a government entity, then those funds would have

15   been blocked and held at Citibank and reported to OFAC.  If it

16   was a private entity in Iran, the transaction would have been

17   rejected back and reported to OFAC.

18   Q.   Based on what?

19   A.   Based on the our obligations under the Iran sanctions.

20   Q.   What would have happened if you had learned that it was not

21   located in Iran or have any connection to Iran?

22   A.   If it had no connection to Iran, to the government or to

23   the country of Iran, then most likely it would have been

24   processed.

25   Q.   You recall a moment ago you testified that the bank was

K398SAD2                          Nelson – Direct

1    told it was a mistake to include that name and that another

2    entity's name should have been included, is that right?

3    A.  Right.

4             MR. LYNCH:  If we can flip to a page where it

5    identifies what that entity is.

6             Let's go back a page.

7             Here is a response.  If you could highlight the bottom

8    section.

9    Q.  It indicates that the name of the client with the account

10   in the original message is, in fact, Stratus International

11   Contracting JS (a Turkish company), right?

12   A.  Right.

13   Q.  What would have happened if Citi had learned that that

14   entity was owned or controlled by a person or individuals

15   located in Iran?

16   A.  Well, then the same thing.  If it's an entity that's under

17   control by a person in Iran, then we have to apply the

18   sanctions the same way.

19   Q.  Meaning?

20   A.  It may mean we have blocked or rejected the transaction; we

21   would not have allowed it to go through.

22            MR. LYNCH:  One moment.

23            Nothing further.

24            THE COURT:  Thank you, Mr. Peri.  You are excused and

25   may step down.

1           (Witness excused)

2                THE COURT:  The government may call its next witness.

3                MR. LYNCH:  The government calls Matt Nelson again.

4                THE COURT:  You may come forward.

5                MR. LYNCH:  With this witness, the government offers

6      the following government exhibits.

7                THE COURT:  For a clean record, let me swear the

8      witness and then go ahead.

9       MATTHEW NELSON,

10          called as a witness by the government,

11          having been duly sworn, testified as follows:

12               THE DEPUTY CLERK:  State and spell your name for the

13     record.

14               THE WITNESS:  Matthew Nelson, N-E-L-S-O-N.

15               THE COURT:  Mr. Lynch, you may proceed.

16               MR. LYNCH:  Thank you, your Honor.

17               As an initial matter, for housekeeping, the government

18     offers Government Exhibits 401, 402, 403, 404, 405, 406, 410,

19     420, 421, 422, 423, 424, all the way through 429, 1403, 1403T,

20     1403A, 1405, 1405T, 1405A, 1501, 1501T, 1501A, 1502, 1502A,

21     1503, 1503T, 1503A, 1503AT, 1504, 1504A, 1506, 1506A, 1506AT,

22     1601, 1601T, 1601A, 2009, 2011, 2011A, 2018, 2018A, 2019, 2020,

23     2022, 2023, 2023A, 2032, 2032T, 2032A, 2034, 2034T, 2034A,

24     2034B, 2034BT, 2034C, 2034CT, 2043, 2043A, 2047, 2047A, 2048,

25     2048A, 2051, 2051A, 2052, 2052B, 2082, 2094, 2117, 2117A, 2119,

K398SAD2                          Nelson - Direct

1    2119A, 2147, 2149, 2149T, 2149A, 2182, 2240, 2240A, 2241,

2    2241A, 2248, 2252, 2252A, 2267, 2267A, 2268, 2268A, a series of

3    exhibits related to the number 2269, so it's 2269 and then E,

4    F, G, H, A, B, C, D, 2280, 2280A, 2303, 2303A, and 2303B.

5               Thank you.

6               THE COURT:  Mr. Silverman.

7               MR. SILVERMAN:  Approximately 25 of them are already

8    in evidence, but there is no objection.

9               THE COURT:  Without objection, the previously not

10   admitted documents indicated by Mr. Lynch are hereby admitted.

11              (Government's Exhibits 401, 402, 403, 404, 405, 406,

12   410, 420, 421, 422, 423, 424 through 429, 1403, 1403T, 1403A,

13   1405, 1405T, 1405A, 1501, 1501T, 1501A, 1502, 1502A, 1503,

14   1503T, 1503A, 1503AT, 1504, 1504A, 1506, 1506A, 1506AT, 1601,

15   1601T, 1601A, 2009, 2011, 2011A, 2018, 2018A, 2019, 2020, 2022,

16   2023, 2023A, 2032, 2032T, 2032A, 2034, 2034T, 2034A, 2034B,

17   2034BT, 2034C, 2034CT, 2043, 2043A, 2047, 2047A, 2048, 2048A,

18   2051, 2051A, 2052, 2052B, 2082, 2094, 2117, 2117A, 2119, 2119A,

19   2147, 2149, 2149T, 2149A, 2182, 2240, 2240A, 2241, 2241A, 2248,

20   2252, 2252A, 2267, 2267A, 2268, 2268A, 2269A, 2269B, 2269C,

21   2269D, 2269E, 2269F, 2269G, 2269H, 2280, 2280A, 2303, 2303A,

22   and 2303B received in evidence)

23              MR. LYNCH:  If we can show to the witness only

24   Government Exhibit 702.

25   DIRECT EXAMINATION

K398SAD2                         Nelson - Direct

```
 1    BY MR. LYNCH:
 2    Q.  I will ask you, Mr. Nelson, to take a look at this.  Do you
 3    recognize this?
 4    A.  I do.
 5    Q.  What is it?
 6    A.  This is a chart that I made summarizing 15 U.S. dollar
 7    payments for the Venezuela project.
 8    Q.  On what information or types of information did you base
 9    this chart?
10    A.  I based this summary chart based on my analysis of
11    documents, bank records, and other official documents provided
12    to me by the prosecution team.
13    Q.  Does this summary chart fairly and accurately summarize the
14    information contained in the documents you reviewed?
15    A.  Yes.
16            MR. LYNCH:  The government offers Government Exhibit
17    702.
18            MR. SILVERMAN:  We had no notice of this particular
19    exhibit on the list of approximately 200 exhibits that we got
20    from the government.
21            THE COURT:  Then --
22            MR. LYNCH:  We provided this document to --
23            THE COURT:  Excuse me.  I will accept counsel's
24    representation at this point.  I won't admit it.  If that is an
25    incorrect statement, we can address it at the break.
```

1              Move on.

2              MR. LYNCH:  OK.

3    BY MR. LYNCH:

4    Q.  Let's go through 15 payments and the documents related to

5    them.

6              MR. LYNCH:  If you could please publish Government

7    Exhibit 2241.

8              If you could highlight the header and the very brief

9    body beneath it and who it is from.

10   Q.  This is an e-mail, dated December 30, 2010, from B. Karimi

11   to Ali Sadr.  The subject is account USD.

12             Can you just read that quick body of the e-mail?

13   A.  "Salam, please check the account information.  Thanks."

14             MR. LYNCH:  If we could go to Government Exhibit 2240.

15             Highlight the full document since it's a brief one.

16   Q.  This is an e-mail on the same date, December 30, 2010, the

17   same subject, USD account, from Ali Sadr to B. Karimi.

18             Can you please read the body of that?

19   A.  "Salam, please find attached the USD account information as

20   requested.  Best regards, Ali."

21             MR. LYNCH:  If we can go to 2240A, the attachment, if

22   we can highlight the information contained in that document.

23   Q.  This has a series of information, as indicated in the

24   e-mail, including intermediary bank JPMorgan Chase Bank, New

25   York, New York, with a SWIFT code beneath it and a banking code

K398SAD2                       Nelson - Direct

1    beneath it.  It provides information related to a beneficiary

2    bank, Hyposwiss, a private bank, also with a SWIFT code and

3    account number beneath it.  Finally, a beneficiary, Stratus

4    International Contracting JS, and an address for that entity.

5             MR. LYNCH:  If we can move on to the next exhibit

6    2009.  If we can highlight the full text of the document.

7    Q.  This is an e-mail from Ali Sadr at Stratus Global, sent on

8    February 2, 2011, to Urs Schneider at Hyposwiss.

9             Can you please read the e-mail, the body through the

10   first full paragraph.

11   A.  "Dear Urs, hope all's well and you're back with good

12   results from the Middle East.  We are expecting 29m in the

13   coming couple of weeks from Venezuela, so please have your

14   watchful eye on them.  Other funds from Dubai are waiting the

15   account opening for our St. Kitts company."

16            MR. LYNCH:  We can go to the next document, which is

17   2011.  Again, just highlight the full document, or pull out the

18   full document.

19   Q.  This is an e-mail on February 11, 2011, from B. Karimi to

20   Ali Sadr.

21            Can you read the contents of that e-mail?

22   A.  "Hi, Ali.  Please reconfirm the information of account in

23   USD.  Regards."

24            MR. LYNCH:  We can go to the attachment 2011A.

25            On this one, if you could quickly pull out

K398SAD2                        Nelson - Direct

1    the -- focus on the left-hand side, the English side, from

2    Iranian International Housing Company logo at the top through

3    the paragraph beginning "therefore."

4           Actually, I will pull that out for a moment.  If you

5    could highlight the address on the bottom.

6           Indicating an address on Mina Boulevard, Africa

7    street, Tehran, Iran, as well as a telephone number beginning

8    with a 98 area code, as well as a website www.iihco.ir, e-mail

9    info at iihco.ir.

10          Now highlight from the logo through the paragraph

11   beginning "therefore."

12   Q.  If you could read that, Mr. Nelson.

13   A.  "To:  Eng Jose Luis Parada Sanchez, Chairman of the Board

14   of DUCOLSA.

15          "Dear Sir, I hereby write you with my cordial and

16   revolutionary greetings.  In the view of the current

17   difficulties for transfer and movement of funds and to

18   facilitate the process, we have decided to appoint a company in

19   Istanbul, Turkey, Stratus International Contracting Insaat ve

20   Taahhut, to act as our agent and propose to make the payment of

21   IPCs through this agent.  Therefore, we hereby request you to

22   order to make the payment of IPCs to the account of the

23   aforementioned company with the below details."

24          MR. LYNCH:  If you can pull out and highlight from

25   "for USD" to the bottom of the page.

1          This indicates "for USD" and indicates below that some

2     of the information we just saw.  Correspondent bank JPMorgan

3     Chase, New York, New York, with a SWIFT code CHASU.S.33.  A

4     beneficiary bank is Hyposwiss.  The beneficiary is Stratus

5     International Contracting.  And it's signed by Behrooz

6     Zangeneh, managing director.

7          If you can pull out and highlight the date on the

8     upper right-hand corner.  The date on this letter is December

9     30, 2010.

10         If we can go to the next document 2018 and highlight

11    the full first e-mail.

12         It's just a header.  There is no real body.  It's an

13    e-mail dated March 16, 2011, from Karimi to Ali Sadr, forward

14    bank account letter.

15         If you can go to the next document 2018A, the

16    attachment.

17         You see on the upper right-hand corner this is dated

18    February 12, 2011.

19         Highlight the full left side.

20    BY MR. LYNCH:

21    Q.  If you can read that, please, from "to."

22    A.  "To:  Eng Jose Luis Parada Sanchez, Chairman of the Board

23    of DUCOLSA.

24              "Project:  Fabricio Ojeda New City Urban Project.

25              "Dear Sir, I hereby write you with my cordial and

1    revolutionary greetings.  In view of the current difficulties

2    for transfer and movements of funds and to facilitate the

3    process, we already appointed Stratus International Contracting

4    Insaat ve Taahut to act as our agent for receiving the payment

5    of IPCs.  Therefore, we hereby request you to order to make the

6    payment of IPCs 7, 8, 9, and 10 to the account of the

7    aforementioned company with the below details."

8            MR. LYNCH:  If you can pull out and just highlight the

9    details once again.

10           Same correspondent bank and beneficiary bank

11   information and beneficiary information.

12           We can move on to the next document, 2019.

13           If you can pull out the header through Bahram Karimi.

14   Q.  This is an e-mail thread.  The first e-mail in the thread

15   is from Thursday, March 17 of 2011, from Karimi.

16           If you could read the contents of that, please.

17   A.  "Salam, I'll get the bank letter as soon as possible --"

18   Q.  I'm sorry.  The first e-mail.

19   A.  "Salam, Fondo Chino has asked a bank confirmation that

20   verifies the characters of the account's owner.  Thanks."

21   Q.  Read the first sentence of the response.

22   A.  "I'll get the bank letter as soon as possible today."

23   Q.  The letter relating to verifying the account's owner.

24           MR. LYNCH:  If we can go to 2020.  If you would

25   highlight that full document.

K398SAD2                         Nelson - Direct

1    Q.  This is an e-mail from May 17 of 2011, from Ali Sadr to Urs

2    Schneider of Hyposwiss, subject reference letter.

3              If you could read the first sentence of the letter.

4    A.  "Based on our phone conversation, please find below the

5    items that would have to be mentioned in this reference

6    letter."

7              MR. LYNCH:  If you can highlight from subject through

8    number 4.

9    Q.  If you could read that, please.

10   A.  "Subject:  Bank verification and reference letter.

11             "Reference:  Fabricio Ojeda New City Urban Project's

12   IPC payments.

13             "To:  To whom it may concern.

14             "Items:

15             "1.  Name of the company, Stratus International

16   Contracting JS, and company's address in Turkey."

17   Q.  You don't need to read the address.

18   A.  "2.  Date of its bank account opening.

19             "3.  Its good standing and character with the bank.

20             "4.  Verification of its USD account information

21   below."

22             MR. LYNCH:  If we can move on to the next exhibit,

23   2248.

24             Highlight that full e-mail.

25   Q.  This is an e-mail, March 26 of 2011, from Ali Sadr to B.

1    Karimi.  And it's in response to an e-mail below from March 25
2    of 2011.
3              If you could highlight the e-mail below the March 26
4    e-mail and read the content of that.
5    A.  "Salam, I tried to call you several time but could not
6    reach you.  Please call me urgently.  Client asked if the owner
7    of the account in the intermediate bank is Iranian."
8              MR. LYNCH:  If you could highlight Ali Sadr's response
9    above that.
10   A.  "There is no Iranian behind any of the accounts provided.
11   This is a simple answer."
12             MR. LYNCH:  If we can go to the next document 2022 and
13   highlight the header through Karimi.
14   Q.  This is an e-mail, March 25, 2011, from Karimi to Sadr.
15             If you could read that e-mail, please.
16   A.  "Salam, the net amount of IPCs is $29,442,967.60.
17   Regards."
18             MR. LYNCH:  If we can go to the next document, which
19   is Government Exhibit 410.
20   Q.  Mr. Nelson, is this one of the documents, among others,
21   that you relied on in making the summary chart I asked you
22   about a moment ago?
23   A.  Yes.
24             MR. LYNCH:  I will just indicate that this is a
25   payment message.

K398SAD2                        Nelson - Direct

1          If you can highlight line 32 across.  It's a payment

2     message from April 4 of 2011, the USD amount is $29,442,967.57.

3          The ordering customer in line 50 is Fondo Chino, and

4     the beneficiary customer in line 59, Stratus International

5     Contracting.  And then indicating some banking information in

6     between the various banks involved in the transaction.

7     BY MR. LYNCH:

8     Q.  If we can go to the next document 2023, which is from that

9     same day, April 4, 2011.  It's forwarding a SWIFT and it's from

10    Ali Sadr to individuals at Hyposwiss.

11         If you could read the body of that e-mail, please.

12    A.  "Dear Susanne, per our phone conversation, I'd appreciate

13    your follow-up on the attached SWIFT.  I've made a mistake in

14    my previous e-mail since the value date on the SWIFT is April 4

15    (today).  Thanks and best regards."

16         MR. LYNCH:  Go to the attached document 2023A.  And

17    highlight from line 32 through line 59.

18         This is a payment message, with the date April 11,

19    2011, for that U.S. dollar amount, with the ordering customer

20    Fondo Chino in line 50, beneficiary customer Stratus

21    International in line 59.

22         If we can go to the next document 2032.  This is a

23    document with some Farsi on it.  So we will go to 2032T, which

24    is a translation.

25         If you could highlight the header in the first e-mail,

K398SAD2                         Nelson - Direct

1    please.  The header and the body of the first e-mail on the

2    top.

3    Q.  This is an e-mail from B. Karimi to Ali Sadr, on Wednesday,

4    27 April 2011.

5            If you could read the text of that e-mail, please.

6    A.  "Greetings.  Due to the urgency of the letter, it was

7    forwarded to you immediately.  Please follow the below texts to

8    the end.  Additional information will be sent upon receipt of

9    the letter.  Regards, Bahram Karimi."

10           MR. LYNCH:  If we could work back through this chain

11   that was been translated to the last page of 2032T.

12           Highlight from, "Please ask your customer to provide

13   the following information."

14   Q.  If you could read that text, please, through there is a

15   concluding sentence in there.

16   A.  "Please ask your customer to provide the following

17   information:

18           "1.  Please provide the full address of the

19   beneficiary, Stratus International Contracting.

20           "2.  Please provide the country of registration for

21   Stratus International Contracting.

22           "3.  Please provide the beneficial owners and

23   citizenship of the owners of Stratus International Contracting.

24           "4.  Please provide a detailed purpose of the payment.

25           "5.  Was this payment for services provided?  If so,

K398SAD2                          Nelson - Direct

1    what type of services, and please provide a copy of the

2    invoices.

3              "6.  Please provide the countries in which Stratus

4    does business.

5              "Waiting for your prompt response."

6              MR. LYNCH:  If we can go to the prior page.  And

7    highlight the bottom.

8              This is a request for information, an alert number and

9    alert name.  And it says Commerzbank branch, and then

10   references another bank, Banco del Tesoro.

11             If you could go to the prior page, please.

12             One more page before that.

13             Highlight the header in the middle.

14             This is subject Commerzbank with some other

15   information.  It's from an individual at bt.gob.ve to another

16   individual.  And if you could highlight the "good day" portion

17   of that, please.

18   Q.  Read that, Mr. Nelson.

19   A.  "Good day.  Please find enclosed the information requested

20   by the Commerzbank regarding the payment made to Stratus Co. in

21   order to provide an answer as soon as possible."

22             MR. LYNCH:  If we can go to the next page so we can

23   see the continuation.

24             1805.  The next page.  Highlight the upper portion,

25   please.

K398SAD2                        Nelson - Direct

1              This reads, "We only have time until May 2nd of 2011."

2              "Good morning, I am attaching the information

3      requested by Commerzbank AG in relation to the payment made to

4      Stratus International Contracting, with the purpose of

5      responding as soon as possible given that we only have until

6      May 2nd of 2011."  And it has some more information of the

7      same.

8              "Please submit the information by May 2, 2011."

9              Now, go to 1803 is the Bates number.  If you could

10     highlight the upper header through "regards."

11             This is an e-mail, dated April 27th of 2011, from

12     fccd@fccv.org.ve, to a series of individuals at PDVSA.

13             If you could please highlight the body of that e-mail.

14     BY MR. LYNCH:

15     Q.  If you could read that, Mr. Nelson.

16     A.  "Good afternoon.  In response to the request made to the

17     operations management of the managing director by Banco del

18     Tesoro, we hereby re-send this e-mail to you in order to

19     receive the following requested information promptly and in

20     connection with the disbursement in favor of Stratus

21     International Co.  In this regard, it is reiterated that the

22     above information is really urgent, as otherwise the above

23     funds will be blocked.  If you require any further information,

24     contact us.  Regards, Janice Peneloza, relationship coordinator

25     with the executive agencies."

1  Q.  If we can go to page 1802, the e-mail after that, which is

2  also April 27, 2011, this time from S. Gabriela at a Gmail

3  account to ttorabi@hot mail.com.

4       If you could please read the body of that e-mail.

5  A.  "Good afternoon.  With due respect, I would like to request

6  the information required by the China fund for Banco del

7  Tesoro.  The above request is really urgent and the details

8  thereof are attached.  Regards, Gabriela Sanchez.

9       "Good afternoon.  I hope this message finds you well.

10  We would like to request information that is urgently required

11  by the Chinese fund for Banco del Tesoro and which is detailed

12  in the attached e-mail.  Regards, Ms. Gabriela Sanchez."

13  Q.  Then the initial page where we started.  You will that this

14  begins with Torabi forwarding this e-mail, and then that being

15  forwarded to, a copy to Bahram Karimi.

16       Then ending where we began with the e-mail from Karimi

17  to Sadr saying, "Due to the urgency of the letter, it was

18  forwarded to you immediately.  Please follow the below texts to

19  the end.  Additional information will be sent upon receipt of

20  the letter."

21       MR. LYNCH:  Now, if we can go to 2034, please.

22       If we could highlight the header.

23  Q.  This is on May 2nd of 2011, what appears to be the next

24  e-mail in the chain, from Ali Sadr to Karimi.

25       Please read "dear sir."

K398SAD2                         Nelson - Direct

1    A.   "Dear sir, please see below our response to their request."

2              MR. LYNCH:  If you can highlight the questions below

3    and the information provided in response to each.

4              Actually, pull out because that obscures the

5    distinction between the question and answer.

6    Q.   Can you please read from 1 through 4, both the black and

7    the blue portions.

8    A.   "1.  Please provide the full address of the beneficiary,

9    Stratus International Contracting.

10             "Stratus International Contracting, Gardenya Plaza,

11   5K3D3, floor 3, seat 3, 34758, Atasehir, Istanbul.

12             "2.  Please provide the country of registration for

13   Stratus International Contracting.

14             "Istanbul Turkey.

15             "3.  Please provide beneficiary owners and citizenship

16   of the owners of Stratus International Contracting.

17             "See attached the operating certificate and

18   registration confirmation.

19             "4.  Please provide a detailed purpose of the payment.

20   Was this payment for services provided?  If so, what type of

21   services, and please provide a copy of the invoices.  Please

22   provide the countries in which Stratus does business.

23             "Please see attached as a suggested sample since this

24   will be provided by the employer with their letterhead.

25   Stratus provides construction services in Turkey, Dubai, and

K398SAD2                      Nelson - Direct

1  Venezuela."

2  Q.  Now, if you can go to 2034T.  As you will see below, there

3  is some Farsi and some other languages in this document.  This

4  is a translation.

5       You will note that the body on the top, which you just

6  read in English, is the same in English.  And below that, this

7  is a response to the prior e-mail from Karimi to Sadr saying

8  "due to the urgency of the letter, it was forwarded to you

9  immediately."

10      If you can go to the attachments to Sadr's e-mail to

11 Mr. Karimi, you will note on the top there are attachments

12 noted in the e-mail from Sadr to Karimi.

13      If you could go to 2034B and place next to it 2034BT.

14      (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           MR. LYNCH:  234A, it's an English document, it's the

2   first attachment.

3           If you highlight the date and the first paragraph.

4   A.  May 2nd, 2011.  To whom it may concern.

5           The order for payment on April 1st, 2011 and value

6   date of April 4th, 2011 in the amount of USD $29,442,967.57 to

7   Stratus International Contracting JS is made for the interim

8   progress payments of the construction of 7,000 apartment unit

9   project.

10  Q.  You don't need to read the Spanish language portion.

11          MR. LYNCH:  If we go to 2034B now and pull up 2034BT

12  simultaneously.

13          And if you could note the type of document, the one on

14  the right is at the top Istanbul Chamber of Commerce Operating

15  Certificate, Copy of the Commercial Registry.  Beneath

16  highlight the company and address information, Stratus

17  International Contracting with an address.

18          Beneath that it lists activity, if you highlight the

19  first paragraph, and indicates that the company has adopted a

20  multipurpose main objective in our country primarily focusing

21  on construction services with the goal of providing and

22  conducting the most advanced technology and organization

23  services in the Turkish contracting sector, creating

24  opportunities and conditions that can easily compete with

25  international companies in the construction sector, both at

K39TSAD3                        Nelson - Direct

1    home and abroad.

2              Beneath it there's a paragraph, if you pull out

3    momentarily, which indicates the types of activities that

4    company's business participates in.

5              And if you go to 2034C and 2034C-T --

6              THE COURT:  Let's take our mid-morning break at this

7    point.

8              MR. LYNCH:  Your Honor, this is the last document.

9              THE COURT:  All right.

10             MR. LYNCH:  Let's finish this document, if you don't

11   mind.

12             THE COURT:  That's fine.

13             MR. LYNCH:  On the right it indicates the document is

14   headed Certificate of Registry, the first box, trade name,

15   Stratus International Contracting, it has a registry number

16   beneath that, and registry date of October 22nd, 2010, it gives

17   an address, work that the business is involved in and then

18   identity of the business owner for legal entities, the nature

19   of the legal entity, and the English translation says

20   anonymous.

21             Again if you pull back to 2034 and highlight line 3.

22   Q.  Read that, Mr. Nelson.

23   A.  Please provide the beneficial owners and citizenship of the

24   owners of Stratus International Contracting.  See attached the

25   operating certificate and registration confirmation.

1          MR. LYNCH:  Thank you, your Honor, for your patience.

2     Now is a natural breaking point.

3          THE COURT:  We'll take our mid-morning break.  Members

4     of the jury, it's about five after 11:00.  We'll resume in

5     about 15 minutes.  Enjoy your break.  Thank you.

6          (Jury not present)

7          THE COURT:  I propose that we take a short break and

8     then let me know what matters -- the chart had not previously

9     been disclosed?

10          MR. SILVERMAN:  It wasn't on the list for this

11     witness, your Honor.

12          MR. KROUSE:  This is the same chart that we discussed

13     on Friday, and over the weekend there was some correspondence

14     about the payment chart.  This is a summary chart that

15     summarizes the exhibits that we just introduced.

16          THE COURT:  I understand what it is, my only question

17     is whether the chart you're seeking to use, which is 701 --

18          MR. KROUSE:  702.

19          THE COURT:  -- 702 is the precise chart has been shown

20     to defense so they could review it for any inaccuracies.

21          MR. LYNCH:  Yes, your Honor, I handed it to counsel on

22     Friday morning with the anticipation of Mr. Nelson testifying

23     on Friday.  Obviously the cross of Mr. Peri went longer than

24     expected on Friday.  We thought Mr. Nelson was testifying on

25     Friday.  We had the chart in the courtroom the whole time, the

1   blown up one, and I handed earlier today this same copy to

2   counsel.  We discussed over the weekend about whether they had

3   any changes to it and they said no.

4            MR. SILVERMAN:  Your Honor, we switched who was

5   handling it, and we have no objection.  We didn't have notice

6   because it wasn't on the list, so we didn't hand it up.  We

7   apologize.

8            THE COURT:  You did have notice?

9            MR. SILVERMAN:  We didn't have notice it was coming

10  through this witness, so I had not seen the chart.  We have no

11  objection to the chart.

12           THE COURT:  All right.  Anything else in the

13  immediate?

14           MR. KROUSE:  Not from the government, your Honor.

15           THE COURT:  Mr. Lynch, you may move the chart when the

16  witness reassumes.

17           MR. LYNCH:  Thank you.  And Mr. Scott is not in court.

18  There's an easel up there, may I set up the easel on the break?

19           THE COURT:  You may.  See you in a few.  Thank you.

20           (Recess taken)

21           THE COURT:  Matters to take up?

22           MR. KROUSE:  Your Honor, I believe the defense -- we

23  may not get to it before the lunch break, but the defense has

24  objections to three documents with the next paralegal reader.

25           THE COURT:  Okay.

K39TSAD3                         Nelson - Direct

1          MR. KROUSE:  I'll let the defense state its
2     objections.
3          MR. SILVERMAN:  Your Honor, it depends which documents
4     the government intends to put in.  I don't know whether they
5     intend to put all of them, but from paralegal one, definitely
6     all of them cannot come in from the list.
7          MR. KROUSE:  I guess to take up the ones that I know
8     about objections to, there's 2142 and 2143, which are related
9     documents.
10          Mr. Milione, can you put on the screen 2142?
11          THE COURT:  What do you think is the likelihood that
12     we get to this before the break?
13          MR. KROUSE:  I think it's unlikely, your Honor.
14          THE COURT:  It's been 15 minutes and you can proceed
15     and clarify what is at issue.  Sounds like you identified
16     three, but I'll take it at the lunch break.
17          MR. KROUSE:  Thank you, your Honor.
18          THE COURT:  Let's get the jury and the witness.
19          (Witness and jury present)
20          THE COURT:  Thank you, members of the jury.
21          Mr. Lynch, you may continue with your direct
22     examination of Mr. Nelson.
23          MR. LYNCH:  At this time the government is offering
24     Government Exhibit 702, the summary chart that Mr. Nelson
25     testified to.

K39TSAD3                          Nelson - Direct

 1              MR. SILVERMAN:  No objection.

 2              THE COURT:  Without objection, 702 is admitted.

 3              (Government's Exhibit 702 received in evidence)

 4              MR. LYNCH:  Government Exhibit 702, if we may display

 5      on the easel.

 6              THE COURT:  You may.

 7              What the jury sees on their screen is the same as

 8      what's on the easel, Mr. Lynch?

 9              MR. LYNCH:  Correct, Government Exhibit 702.

10              If I may inquire if that's visible to the jury?

11              You have it on your screen, but as we go -- I can only

12      get it so close, but as we go through, each specific document

13      will be pulled up on the screen, which is why we have the aid

14      here.

15      BY MR. LYNCH:

16      Q.  Mr. Nelson, again, just to refresh our memories, what's

17      depicted on the chart?

18      A.  This is a chart summarizing 15 U.S. dollar payments for the

19      Venezuela project.

20      Q.  And if you could run us through what each of the columns

21      and the information in those columns indicate.

22      A.  Okay, from left to right, number being the number of the

23      payment, one to 15, the next, IPC number, the next, the date of

24      the transaction, the next is the U.S. dollar amount, the next

25      is the sender, followed by the beneficiary followed by the U.S.

K39TSAD3                        Nelson - Direct

1     dollar clearing bank, and the following is the underlying

2     government exhibit.

3     Q.  Does that indicate some of the exhibits you relied on

4     entering the information contained in each row?

5     A.  Yes.

6     Q.  And IPC numbers, is that information that is reflected in

7     some of the documents that you reviewed linking certain

8     payments to what are called IPC numbers?

9     A.  Yes.

10          MR. LYNCH:  And if we could highlight the first bold

11    row, please.

12    Q.  Is that the payment we just been referring to in the

13    preceding documents that we discussed before the break?

14    A.  Yes.

15          MR. LYNCH:  And this is payment number one referencing

16    IPC seven through ten, payment date April 4th, 2011,

17    $29,442,967.57, from Fondo Chino Venzelano (ph) to Stratus

18    International Contracting with two intermediary banks and a

19    couple of exhibits referenced that we have read through prior

20    to the break.

21          We'll out focus on the second payment, if you

22    highlight payment number two.

23          I will give the jurors a moment to look at that and

24    read it.

25          If we now display on the screen Government

1    Exhibit 2043, this is an email thread with two emails in it.

2              Highlight the bottom email first, an email from Ekrem

3    Cinar to Mustafa Cetinel, the date is June 14, 2011, says

4    forward letter.

5              If you could please highlight the body.

6    Q.  And Mr. Nelson, read through to the first sentence of the

7    second paragraph.

8    A.  Dear Mustafa Bey,

9              Please find attached the letter in the format ready

10   for submission.  Upon your confirmation, Mr. Zangeneh's

11   signature will be required for submission to the employer.

12   Q.  Again, the first sentence.

13   A.  Today an Indian representatives and workers went to DUCOLSA

14   and asked for a rapid solution for payments to IIHCO.  DUCOLSA

15   tallied them that they are awaiting answer to Mr. Parada's

16   letter from the contractor.

17             MR. LYNCH:  Go to the email above, which is an email

18   from Cetinel to Ali Sadr dated June 14 of 2011, subject

19   forward -- sorry, from Cetinel to Ali Sadr copying Behrooz

20   Zangeneh and referencing an attachment employer revisions to

21   IPC 11, 12, 13, PDF.

22   Q.  Read the body of that email.

23   A.  Dear Ali Jan,

24             Further to our last conversation, I attach the final

25   letter ready for signing and submission.  Since it is too late

K39TSAD3                         Nelson - Direct

in Teheran, it is very important to submit the letter today.  I
would like to get your agreement to produce Mr. Zangeneh's
signature as it has been tested a few times in the past with
success.

          Thanks with regard, Mustafa Cetinel

          MR. LYNCH:  Let's bring up 2043A, the letter that is
referenced in this email.  June 14, 2011, and highlight the
left-hand side, please, the upper portion.

          And again I want to ask you, as we go through, to read
the header information.  This is a letter from Behrooz Zangeneh
to Parada at DUCOLSA and the subject is employer's revisions to
IPC 11, 12 and 13, and if you could pull out below, and if you
could pull up about halfway down that first paragraph that
notes that it is stipulated that the employer shall pay the
agreed parts of the statements submitted by the contractor
within 15 days working day after its submission date, and gives
some numbers.  And then below it indicates the delay to payment
caused to the project to enter into suspension with resulting
costs and time impact damage.  Therefore, so as not to have
such further damage to the project, the contractor requests
that the employer pays the amounts agreed by the employer as
soon as possible.

          Go to the next document, please, 2047, and pull up the
full email this is July 1 of 2011, from Ali Sadr to Mustafa
Cetinel subject USD account info with an attachment, USD

K39TSAD3                          Nelson - Direct

1    account info.

2    Q.  And if you could read the body of that email, please.

3    A.  Dear Mustafa Bey,

4            Per our phone conversation earlier, please find

5    attached the USD account info for clarity for the expected

6    payment.

7            Best regards, Ali.

8            MR. LYNCH:  If we go to the attachment 2047A, it

9    indicates at the top Clarity Trade and Finance, the date is

10   July 1, 2011, please be advised of the USD account information

11   of Clarity Trade and Finance, and includes the beneficiary bank

12   is Clarity Trade and Finance, an address in Switzerland, a

13   beneficiary bank of Hyposwiss and an account number, and

14   intermediary bank JP Morgan Chase Bank, New York, New York and

15   gives a swift code CHA SU 33, and signed by Ali Sadr,

16   president.

17           If you go to the next document, please, 2048.  This is

18   an email from Mustafa Cetinel to Behrooz Zangeneh dated

19   July 2nd, 2011 forwarding bank account information copying Ali

20   Sadr.

21   Q.  Please read the body of that email.

22   A.  Dear Mr. Zangeneh,

23           Please accept my apologies, first of all, for being

24   used your signature for the attached letter due to the urgent

25   request of the employer during last Thursday, June 30, 2011

K39TSAD3                         Nelson - Direct

1    evening.  Hopefully we are awaiting the employer starts the

2    process of payment shortly.  As soon as I receive the news from

3    Mr. Cinar regarding finalization of minister confirmation on

4    related payment, I will inform you.

5            Thanks and regards, Mustafa Cetinel.

6    Q.  Go to 2048A, noting that it's a letter dated July 1st of

7    2011, again on the same Iranian International Housing Company

8    letterhead, it's to engineer Jose Luis Parada Sanchez, the

9    chairman of the board of DUCOLSA.

10           If you read the body of that.

11   A.  Dear sir,

12           I hereby write to you with my cordial and

13   revolutionary greetings.  In view of the current difficulties

14   for transfer and movement of fund, and to facilitate the

15   process, we already appointed Clarity Trade and Finance SA to

16   act was our agent for receiving the payment of IPCs.

17   Therefore, we hereby request you to order to make the payment

18   of IPCs 11, 12 and 13 to the account of the aforementioned

19   company with the below details for USD.

20           MR. LYNCH:  If you pull up below, this indicates the

21   information contained in that prior email of beneficiary

22   Clarity Trade and Finance with the bank account Hyposwiss, and

23   with intermediary bank request of JP Morgan Chase Bank, New

24   York, New York.  And if you could pull out, has a signature at

25   the bottom above the name Behrooz Zangeneh, managing director.

K39TSAD3                        Nelson - Direct

1            If we go to the next document, 401, this is a payment

2    transaction message, highlight at the top, it's dated July 5,

3    2011, received by Chase US 33, the amount of the transaction in

4    the upper left is $20,692,579.48, below indicated in the field

5    50, the sender is Petroleos de Venezuela and recipient is

6    Clarity Trade.

7            If you highlight fields 50 and 59, please.  Petroleos

8    is the sender and Clarity Trade and Finance is the beneficiary

9    of this $20.6 million payment.

10           If we go to the next page, just the following page in

11   the JPMC record that indicates the same information in the

12   message.

13           If we go to Government Exhibit 2051 and highlight the

14   header through the body.  This is an email the next day July 6,

15   2011, from Ali Sadr to Mustafa Cetinel, and the subject is

16   payment from Venezuela and attachment of July 6 swift

17   confirmation.

18   Q.  Please read the body of that.

19   A.  Dear Mustafa Jan,

20           Please find attached the swift confirmation for the

21   incoming funds from Venezuela for the amount of $20,692,579.48.

22   It seems like our strategy has worked so far.  Please keep the

23   news confidential to yourself and Ekrem until we decide tonight

24   on when's best to go public with it.  Please call with any

25   questions or concerns.

1          Best regards, Ali.

2          MR. LYNCH:  And we go to the attachment, the next

3    document, 2051A.  If you highlight the upper left corner, this

4    is a record from Hyposwiss Private Bank in Switzerland, the

5    upper right-hand corner referencing the Clarity Trade and

6    Finance account, account number, below.  If you highlight the

7    credit advice to the bottom, indicating that a payment ordered

8    by Petroleos de Venezuela with a reference number for any

9    amount that we have seen on the actual payment was credited to

10   the Clarity account at Hyposwiss.

11         If we go to the next document, please, 2052.  And if

12   you could pull out through the bottom of that, this is an email

13   from Mustafa Cetinel to sadr@samanehstratus.com sent July 10,

14   2011, the subject is report for the committee, and it copies a

15   number of individuals, Behrooz Zangeneh, Ali Sadr and Ekrem

16   Cinar, indicates there's an attachment.

17   Q.  If you read the body of that, please.

18   A.  Dear Mr. Hashemi Sadr,

19         Enclosed please find our report regarding the recent

20   development from Venezuela.  I appreciate your earliest comment

21   and approval for our further actions on Monday, July 11, 2011.

22         Thanks and regards, Mustafa Cetinel.

23         MR. LYNCH:  Again indicating, much like the header,

24   copying Zangeneh and Ali Sadr.

25         Please go to 2052B.

K39TSAD3                          Nelson - Direct

1           Document headed report, if you highlight the first

2     paragraph, please, and highlight from the total amount to the

3     end of the sentence.

4     Q.  If you could read number one -- from the top of the letter

5     through number one.

6     A.  The recent developments on the housing project in Venezuela

7     are as follows:

8           1.  Further to the letter of Mr. Parada dated June 2,

9     2011, and following negotiation discussions held by Mr. Ekrem

10    Cinar with DUCOLSA authorities, the total amount USD

11    $20,692,579.48 has been transferred to the company account.

12    The amount is exactly the same as indicated in Mr. Parada's

13    letter.

14          MR. LYNCH:  Pull out and pull up Exhibit 702 again,

15    and highlight row 3.

16          This indicates the third payment relates to IPC number

17    14, the date of the payment is August 11, 2011, and this

18    payment is $5,418,765.49 from Petroleos de Venezuela to Clarity

19    Trade and Finance, there's a clearing bank of JP Morgan Chase

20    New York and some underlying exhibits.

21          Please go to Exhibit 1501 and 1501T.

22          The upper document is simply a email from Gabriela

23    Sanchez to three individuals, one of which has a PEDVSA email

24    account, the others have Gmail and Hot Mail accounts, forward

25    bank account.  Good afternoon, I'm forwarding you the letter

K39TSAD3                        Nelson - Direct

1   with the details.

2           If you go to the next document, 1501A, see here this

3   is a letter dated July 22nd of 2011, the same header

4   information we have seen before, Iranian International Housing

5   Company, the same addressee, Mr. Parada Sanchez, and includes

6   some of the common language we have seen before about in view

7   of the current difficulties for transfer and movement of fund

8   and to facilitate the process, we already appointed Clarity

9   Trade and Finance to act as our agent receiving the payment of

10  IPCs.

11  Q.  Which IPC is this referencing in the document?

12  A.  IPC 14.

13          MR. LYNCH:  Pull out.  Below indicated is the Clarity

14  bank account at Hyposwiss, the account number, same

15  intermediary bank reference of JP Morgan Chase in New York, New

16  York, with the bank swift code, and with signed under Behrooz

17  Zangeneh, managing director.

18          If we pull out go to the next document 402, this is

19  the payment message August 11, 2011, and there's an amount in

20  the upper left-hand corner, roughly $5.4 million, go to the

21  body of that swift message and see that in field 50 the sender

22  is the same Petroleos de Venezuela and the recipient is Clarity

23  Trade and Finance.

24          The next page is the clearer more digestible form of

25  that.

K39TSAD3                         Nelson - Direct

1              If we go to the next Exhibit 2252, this is an email

2    thread, and start at the bottom email from Tev Nevin or Nevin

3    Tev at Hyposwiss dated August 15, 2011 to Ali Sadr.

4    Q.  And please read the body of that.

5    A.  Dear Ali,

6              Please find attached the credit advice from August 11,

7    2011.

8              Best regards, Nevin.

9              MR. LYNCH:  And above that we have an email from Sadr

10   to Cetinel and Zangeneh.  Please find attached the confirmation

11   for IPC 14 payments.  The amount is fully credited to our

12   account.  Best regards.

13             And above that you see a final email in the thread

14   where this email and various attachments are being sent on

15   August 21, 2011 from Ali Sadr to Faramarz Shadloo.

16             If we go to 2252A, please.  Attached is again a

17   Hyposwiss Private Bank record in Switzerland for the Clarity

18   Trade and Finance U.S. dollar account indicated on the upper

19   right, and this is another credit advice indicating that on

20   August 11, 2011, we booked the following payment from Petroleos

21   de Venezuela to the Clarity account in that amount.

22             If we could pull out and go back to chart 702.

23             We just reviewed payment number three and the

24   documents related to that, and now we'll move onto payment

25   number four, if you highlight that the row.

1          Indicating payment four related to IPCs 15 and 16, a

2     date of October 12, 2011 in an amount of roughly $5.8 million

3     from PDVSA to Clarity through JP Morgan Chase in New York.

4          Go to the next exhibit, 1502.  This is another Spanish

5     language -- sorry, withdrawn.  This is an email from

6     torastorabi@hotmail (ph) to gabrielasanchez@pdvsa and says:

7     Dear, best regard, and indicates there's an attachment for IPC

8     15 to 16.

9          Go to that that attachment, which is 1502A.

10          This is yet another payment request letter with the

11     same header information from Iranian International Housing

12     Company dated September 27, 2011.  And pull out and zero in on

13     the top half.  Again it's to parada@ducolsa again extending

14     cordial revolutionary greetings and referencing the difficulty

15     for the transfer of funds and requesting payment to Clarity in

16     relation to IPCs 15 and 16.

17          If you pull out, and again bank account information --

18          MR. SILVERMAN:  Objection, your Honor.  At this point

19     counsel is testifying.

20          THE COURT:  Sustained.

21   Q.  Is the beneficiary and beneficiary bank referenced below?

22   A.  Yes.

23   Q.  Who is this signed by?

24   A.  Bahram Karimi.

25   Q.  If we move on to the next document, 403.  And can you

1    indicate the transaction date and amount of this transaction

2    represented in this document?

3    A.  October 12, 2011, amount, $5,874,779.37 USD.

4            MR. LYNCH:  And if you highlight the body.

5    Q.  And read what is contained in field 50F, the sender of the

6    payment, and field 19, the recipient of the payment.

7    A.  50F is PDVSA and 59 is Clarity Trade and Finance SA.

8            MR. LYNCH:  Go back to the summary chart 702.  That

9    was just payment 4, so we're on to payment 5 for IPCs 17 and

10   18, payment on November 9, 2011 for roughly almost $13 million

11   from PDVSA to Clarity through JP Morgan.

12           If we go to the first the first document underlying

13   that payment, 1503, and 1503T, a translation, this is the email

14   from Torabi (ph) to Gabriela Sanchez and to an individual at

15   PDVSA.

16   Q.  And read the top email.

17   A.  Good morning, I'm forwarding you the communication for

18   processing payment of the Iranian IPCs.

19           MR. LYNCH:  If we go to 1503A and highlight the bar

20   across the top.  Same type of document we keep seeing.  The

21   date on this one is October 24 of 2011.

22   Q.  Who is this to?

23   A.  Jose Luis Parada Sanchez.

24   Q.  And if you could read the middle paragraph.

25   A.  In view of the current difficulties for transfer and

1    movement of funds and to facilitate the process, we already

2    appointed Clarity Trade and Finance SA to act as our agent for

3    receiving the payment of IPCs.

4    Q.  Beneath that is bank account information indicated for

5    Clarity?

6    A.  Yes.

7    Q.  And the signatory at the bottom?

8    A.  Bahram Karimi.

9    Q.  If we could move on to Exhibit 404, is this a payment

10   message that you relied on in entering the data on your chart?

11   A.  Yes.

12   Q.  And beginning 11/9/11, roughly $12.9 million was

13   transferred?

14   A.  Yes.

15   Q.  If you go to the next page of that document, it makes it a

16   little clearer, lists ordering party and beneficiary at the

17   bottom.  Could you read those?

18   A.  Ordering party is PDVSA and the beneficiary is Clarity

19   Trade and Finance SA.

20   Q.  If we go to the next document, 2082, and highlight at the

21   top, this is an email on November 24, 2011, from Ali Sadr to

22   Faramarz Shadloo and Linet Estiroti.  Could you read that.

23   A.  Mr. Shadloo, please see below the swifts for your files.

24   Regards.

25            MR. LYNCH:  Pull out and highlight the rest of that

K39TSAD3                    Nelson - Direct

1    first page.

2    Q.  And what's the dollar amount swift message at the upper

3    right-hand corner?

4    A.  $5,874,779.37.

5    Q.  Is that the amount in payment four?

6    A.  Yes.

7    Q.  If we go to the next page of the exhibit, the second swift

8    message that's attached, and the amount in the upper right,

9    does that correspond with payment number five?

10   A.  Yes.

11          MR. LYNCH:  If we pull out and look at the chart

12   again, 702, and move on to payment number six.

13          THE COURT:  May I speak to counsel, please?

14          (At sidebar)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K39TSAD3                         Nelson - Direct

1            THE COURT:  The chart is in under 1006, the underlying

2     documents are in.  It's in under 1006 because I concluded that

3     it cannot be -- or the other side did not object and cannot be

4     conveniently examined in court.  So you can't do both.  So the

5     chart is in, you've done the exemplars, we're not going through

6     all the documents.

7            MR. LYNCH:  Maybe I'll focus on specific emails that

8     have more than simply communicating the payment message.  There

9     are some documents that do give some flavor as to --

10           THE COURT:  Have you done any of those yet?

11           MR. KROUSE:  Just the first set.

12           THE COURT:  Look, you can highlight emails that are in

13    if you want, but we're not going through every document on the

14    chart.  That's the whole idea.

15           MR. LYNCH:  Sure.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MR. LYNCH:

2    Q.  We're on Exhibit 702, looking at the chart, we were on

3    payment number five we just completed, correct?

4    A.  Yes.

5    Q.  And this goes through payment number 15, correct?

6    A.  Yes.

7           MR. LYNCH:  And if you could highlight payment 6

8    through 15.

9    Q.  And is it fair to say for each of these payments there are

10   documents of a similar type, reviewing for each one a payment

11   request letter typically?

12   A.  Yes.

13   Q.  Followed by an actual payment document demonstrating the

14   pavement was in fact made?

15   A.  Yes.

16   Q.  And some other documents?

17   A.  Yes.

18   Q.  Why don't we quickly go through the payment chart to tell

19   us -- why don't you go through the number, the IPC number, the

20   date and the amount and so forth for each of the remaining

21   payments.

22   A.  Sure.  Payment number six, IPC number 19, date 12/27/2011,

23   amount $4,243,372.66, sender was Petroleos de Venezuela,

24   beneficiary Clarity Trade and Finance SA, the U.S. dollar

25   clearing bank was JP Morgan Chase, New York, New York and

1  Citibank, New York, New York, and the underlying exhibits were

2  Governments 405 --

3  Q.  You don't need to read the underlying.

4           THE COURT:  The chart is in.  You could leave it up

5  for a minute if you would like the jury to look at it for a

6  minute.

7           MR. LYNCH:  Let me see if there are other documents

8  related to pure data.

9           I'm going to highlight a few documents related to

10 these payments, not the technical documents underlying the

11 actual fact of the payment.

12          If we pull up 2267.  Underneath it indicates it's an

13 email from the Mustafa Cetinel to Ali Sadr on February 17,

14 2012, indicating attached is the letter given to the employer,

15 and above that is another email from Mustafa Cetinel to Ali

16 Sadr, the same date and including an attachment.

17          Pull out and show what 2267A is.

18          If we move on to 2268, and highlight down to the

19 bottom.  Initial email on this thread is from Cetinel to Ali

20 Sadr and the subject is forward the IPC 21 payment letter,

21 attached is the letter given to the employer.

22 Q.  If you could read the email response back from Ali Sadr.

23 A.  Dear Mustafa Jan,

24          After a lot of back and forth with the bank, I think

25 at this point it's safe to announce the attached account to the

K39TSAD3                          Nelson - Direct

1    employer.  However, if such information cannot be passed on to

2    the employer during the weekend, I might give you a different

3    account number for Clarity on Monday morning.  I've tried to

4    keep it simple and didn't pass on three different confusing

5    accounts on this email.

6          Best regards.

7          MR. LYNCH:  Quickly show the substance of 2268A, the

8    attachment.  It's Clarity Trade and Finance SA bank

9    information.

10         If we move on to 2117, and highlight the top email,

11   please.  This is an email from Linet Estiroti to

12   shadloo@newoffice43@yahoo, subject update of funds received

13   from Venezuela.

14   Q.  Read the body of that, please.

15   A.  Dear Mr. Shadloo,

16         As per our telephone conversation with Mr. Mustafa of

17   yesterday, please find attached the credit advices on the

18   payments for your records.  For any questions, please do not

19   hesitate to contact me.

20         Best regards, Linet Estiroti.

21         MR. LYNCH:  If you flip through the attachment,

22   please, 2117A, the first page is a Hyposwiss record with

23   handwriting at the top that relates to IPCs 2, 3, 4, 5.

24         The next page is another record related to IPC 78910

25   with the dollar amount of roughly $29 million.

1          The next page relates to the IPCs 11, 12, 13 with the

2     dollar amount of roughly $2.6 million.

3          The next page is IPC 14, roughly $5.4 million.

4          And so on through the final page is IPC 21 for $7.4

5     million roughly.

6          If we move on to 2119A and the full body of both

7     emails, the one beginning from Cetinel to New Office

8     indicating --

9     Q.  If you read the body of that.

10    A.  Dear Mr. Shadloo,

11         Attached please find the approved copies IPC 22 and 23

12    for your file.  IPC 22 has been paid already.  23 is on the

13    process of payment.  Linet will provide you with a copy of the

14    swift and the receipt of IPC 22 shortly

15         Thanks and regards, Mustafa Cetinel.

16         MR. LYNCH:  And if we could move on to 2147, which

17    relates to payment number 10, and highlight that email.  This

18    is from Linet Estiroti to Cetinel copying Sadr, the subject is

19    a U.S. dollar amount.

20    Q.  Can you read the body?

21    A.  Mr. Mustafa, we received USD $1,894,333.40 into our Stratus

22    International account from Venezuela.

23         Best regards, Linet Estiroti.

24         MR. LYNCH:  If we could quickly go to 1061, 1061T.  If

25    you could look at that attached letter 1601A, this one is

1    different than some of the others, and I will highlight the

2    difference.  This is from the Iranian International Housing

3    Company dated October 15, 2012, it's again addressed to

4    Sanchez, Parada Sanchez, related to IPCs 26 through 29.  If you

5    could highlight the USD account information at the bottom.

6    Q.  For the request for U.S. dollars, who is the beneficiary

7    entity?

8    A.  Stratus International Contracting, JS.

9    Q.  With an account where?

10   A.  Istanbul, Turkey.

11   Q.  For the BSF account, who is the beneficiary party

12   indicated?

13   A.  Iranian International Housing CA.

14              MR. LYNCH:  And for the final payment, payment number

15   15, if you go to Exhibit 2182, this is an email thread.  We

16   start at the bottom, this is an email from Linet Estiroti on

17   July 2nd, 2013 to email address hsn.teh218@gmail as well as Ali

18   Sadr?

19   Q.  Could you read that.

20   A.  Dear Mr. Hossein Tehrani,

21              Please find attached the USD account details, Straturk

22   INS AAVT TAAH AS.

23              Best regards, Linet Estiroti.

24              MR. LYNCH:  If you could please display 2090 and

25   2090T.  And this is -- if you highlight the bottom email from

K39TSAD3                         Nelson - Direct

1  Linet Estiroti to alisadr@gmail.

2  Q.  And please read that.

3  A.  Mr. Ali,

4          Please find attached the wires from 314 to 365.

5          Best regards, Linet Estiroti.

6          MR. LYNCH:  If you could pull out, please, and go to

7  2090A, and you could move -- this is a multiple page document

8  with a number of payment instructions of the type indicated on

9  this page.

10 Q.  Mr. Nelson, can you please read the body of this letter

11 from Stratus Global Investments Limited signed by Ali Sadr,

12 Director.

13 A.  Date, December 6, 2011.

14         Dear Mr. Schneider,

15         Please transfer USD $60,000 from the USD account of

16 Clarity Trade and Finance SA to Stratus Global Investments,

17 Ltd. and then make the below transfers to Ali beneficiary

18 through the below instructions.  Amount, USD $60,000.

19 Q.  And is there a name below?

20 A.  Who is it signed by?

21 Q.  No, the recipient of the funds.

22 A.  Vincento y Alessandra Conte.

23         MR. LYNCH:  Nothing further for this witness.

24         THE COURT:  Thank you.

25         Mr. Silverman.

K39TSAD3                     Nelson - Cross

1    CROSS-EXAMINATION

2    BY MR. SILVERMAN:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  I will try to keep this blissfully brief.  I just want to

6    clear up two points, GX2011 and go to the attachment, 2011A.

7            You read from this document on direct examination and

8    zoomed in on the text in the bottom left-hand corner, is it

9    that correct?

10   A.  Yes.

11   Q.  And can you tell me, is the document signed?

12   A.  Yes.

13           Oh, it does not appear to be stamped, but there is a

14   signature line.

15   Q.  And is there any signature there?

16   A.  No.

17   Q.  And do you know whether this document was ever signed?

18   A.  No, I don't know.

19   Q.  And do you know whether this document with an Iranian

20   address was ever used?

21   A.  No, I don't know that.

22   Q.  Is it fair to say that every other letter that you read

23   from that was signed contained a Venezuela address?

24   A.  I don't recall.

25           MR. SILVERMAN:  Can we pull up GX2048.  And I promise

K39TSAD3                          Nelson - Cross

1        I won't go through all them.

2        Q.  2048A.  And this letter is signed, correct?

3        A.  Yes.

4        Q.  And what is the country or what is the address on the

5        bottom right corner, please?

6        A.  Appears to be an address in Venezuela.

7        Q.  And then if we could just go up to the date up at the top,

8        what is the date of this letter?

9        A.  Appears to be July 1, 2011.

10              MR. SILVERMAN:  And if we could pull up GX1601,

11       please.

12       Q.  And what's the date on this email?

13       A.  October 15, 2012.

14              MR. SILVERMAN:  If we go to the attachment, please,

15       1601A.

16       Q.  And if we could look at the address.  First of all, this is

17       signed as well, correct?

18       A.  Yes.

19       Q.  If we look at the address on the bottom right, is it also

20       an address in Venezuela?

21       A.  Yes.

22              MR. SILVERMAN:  Now moving on to one other point from

23       a few documents you read from.  If we pull up GX2267, please,

24       and 2267A, specifically.

25       Q.  Now this is one of the letters you read on direct

K39TSAD3                         Nelson - Cross

1    examination?

2    A.  Yes.

3    Q.  And if you could read the city and country of intermediary

4    bank, please?

5    A.  Zurich, Switzerland.

6    Q.  And what currency is this payment in?

7    A.  Does not -- I don't believe it says.

8    Q.  The line above beneficiary or the paragraph?

9    A.  USD currency.

10   Q.  And if we could go to GX2268A, and if you could tell me the

11   name and city of intermediary bank, please.

12   A.  Zurich, Switzerland UBS AG.

13              MR. SILVERMAN:  No further questions.

14              THE COURT:  Thank you.

15              MR. LYNCH:  No redirect.

16              THE COURT:  Thank you, Mr. Nelson, you are excused.

17   You may step down.

18              The government may call its next witness.

19              MS. KIM:  Your Honor, the government calls Alessandra

20   Conte.

21              THE COURT:  Ms. Conte may come forward.

22    ALESSANDRA CONTE-PETROZZINO,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

K39TSAD3                          Conte-Petrozzino - Direct

 1  BY MS. KIM:

 2  Q.  Good afternoon, Ms. Conte.

 3  A.  Good afternoon.

 4  Q.  What city do you live in?

 5  A.  I live in Staten Island.

 6  Q.  And how long have you lived in Staten Island?

 7  A.  Since 2000, the year 2000.

 8  Q.  Where did you grow up?

 9  A.  In Venezuela, Caracas.

10  Q.  When did you move to United States?

11  A.  In the year 2000.

12  Q.  Directing your attention to August 2011, did you sell an

13  apartment in Venezuela?

14  A.  Yes, I did.

15  Q.  Who did you sell it to?

16  A.  Cesar Gudino, G-U-D-I-N-O.

17  Q.  And what was the purchase price?

18  A.  $170,000.

19  Q.  Where were you living when you sold the apartment?

20  A.  In Staten Island, New York.

21  Q.  Was the buyer having trouble paying you the full purchase

22  price in U.S. dollars?

23  A.  Yes.

24  Q.  Did there come a time when he arranged to have a third

25  party send you the $60,000 he owed you for the apartment in

K39TSAD3                              Conte-Petrozzino - Direct

1  U.S.?

2  A.  Yes, he did.

3  Q.  Excuse me, apartment to the U.S.

4          What was the name of the third party?

5  A.  Stratus.

6  Q.  Do you recall --

7          MS. KIM:  So let's pull up, Mr. Milione, pull up for

8  the witness what has been marked for identification as

9  Government Exhibit 810.

10          MR. HEBERLIG:  No objection.

11  Q.  Do you recognize this document?

12  A.  Yes, this is a sheet with the money he owe me.

13          MS. KIM:  Your Honor, the government offers Government

14  Exhibit 810.

15          MR. HEBERLIG:  No objection.

16          THE COURT:  Thank you, 810 is admitted.

17          (Government's Exhibit 810 received in evidence)

18          MS. KIM:  May we publish this for the jury?

19          THE COURT:  You may.

20          MS. KIM:  Thank you.

21  BY MS. KIM:

22  Q.  So I think a minute ago you said this was a swift, it's the

23  wire confirmation that you received?

24  A.  Correct.

25  Q.  And how much money did you receive?

K39TSAD3                    Conte–Petrozzino – Direct

1    A.   $60,000.

2    Q.   Where did you receive the money?

3    A.   Into my bank account.

4    Q.   What was your understanding of what the money was for?

5    A.   To finish paying my apartment.

6    Q.   What company sent the wire?

7    A.   On the bottom says Stratus Global Investment.

8    Q.   Had you ever heard of Stratus Global Investments before

9    this?

10   A.   No, never.

11   Q.   Have you ever heard of Clarity Trade and Finance?

12   A.   No.

13   Q.   Have you ever heard of Stratus Turkey?

14   A.   No.

15   Q.   Do you know someone by the name Ali Sadr, Ali Sadr Hashemi

16   Nejad?

17   A.   No.

18   Q.   Do you recognize anyone in the courtroom today?

19   A.   No.

20   Q.   Directing your attention to the bottom of this page where

21   it says details of payment, legal fees, claims management IPC

22   40.  Do you know what this means?

23   A.   For me, it doesn't mean anything.  It was a payment, so

24   legal fees, I guess is a fee for legal work, but for me it was

25   just for payment.

K39TSAD3                      Conte-Petrozzino - Direct

1    Q.  So just to clarify, was this payment for legal fees?

2    A.  No, it was for the price of my apartment, the final

3    payment.

4    Q.  And Ms. Conte, what kind of work do you do?

5    A.  Now I own a hardware store.

6    Q.  How long have you been in the hardware business?

7    A.  Five years.

8    Q.  Have you ever done legal work?

9    A.  Not in U.S.

10   Q.  Have you ever done legal work outside of the U.S.?

11   A.  In Venezuela.

12   Q.  Have you ever done legal work for Stratus Global

13   Investments?

14   A.  No.

15   Q.  Have you ever done legal work for Clarity Trade and

16   Finance?

17   A.  No.

18   Q.  Have you ever done legal work for Ali Sadr Hashemi Nejad?

19   A.  No.

20   Q.  Did you do any legal work in 2011?

21   A.  No.

22   Q.  When is the last time you did any legal work?

23   A.  1999.

24   Q.  Were you the sole signatory on the account the $60,000 was

25   transferred to?

K39TSAD3                         Conte-Petrozzino - Direct

1   A.  It was my account and my father's account.

2   Q.  And what is your father's name?

3   A.  Vincento Conte.

4   Q.  What kind of work does your father do?

5   A.  He's retired.

6   Q.  When did retire?

7   A.  30 years ago.

8   Q.  Before he retired, what kind of work did he do?

9   A.  He used to have kitchen cabinet factory.

10  Q.  And where was the kitchen cabinet factory?

11  A.  In Caracas.

12  Q.  Is your father a lawyer?

13  A.  Is my father what?

14  Q.  Is your father a lawyer?

15  A.  No, he's not.

16  Q.  Has he ever been a lawyer?

17  A.  No.

18  Q.  To your knowledge, has he ever done legal work?

19  A.  No.

20          MS. KIM:  Your Honor, just one minute, please.

21          No further questions for the government.

22          THE COURT:  Thank you.

23          Mr. Heberlig.

24          MR. HEBERLIG:  Thank you, your Honor.

25          (Continued on next page)

K39TSAD3                        Conte-Petrozzino - Cross

1   CROSS-EXAMINATION

2   BY MR. HEBERLIG:

3   Q.  Good afternoon, Ms. Conte.

4   A.  Good afternoon.

5   Q.  You said that you grew up in Venezuela, correct?

6   A.  Correct.

7   Q.  Was it in the city of Caracas?

8   A.  Correct.

9   Q.  Is that the capital of Venezuela?

10  A.  Yes, sir, it's the capital.

11  Q.  Did you live there your entire childhood until you moved to

12  the U.S. as an adult?

13  A.  Most of it, but I lived before in Italy, too.

14  Q.  I didn't understand the last part.

15  A.  I lived for a few years in Italy, too.

16  Q.  And you said you came to the U.S. in the year 2000?

17  A.  Correct.

18  Q.  Back when you were in Venezuela, you studied to become a

19  lawyer, is that correct?

20  A.  That's correct.

21  Q.  And did you obtain a law degree?

22  A.  That's correct.

23  Q.  And did you practice as a lawyer in Venezuela?

24  A.  In Venezuela, as an attorney, when you are already an

25  attorney you can practice free, you don't have to belong to a

1    attorney's office.  Like many of them, I work using my

2    specialization for a nonprofit organization, not directly as an

3    attorney but because of my profession --

4    Q.  I understand.

5    A.  -- and my master's degree.

6    Q.  Thank you.  And then you moved to United States in 2000, is

7    that right?

8    A.  Correct.

9    Q.  And you have lived, since you've been here, in Staten

10   Island?

11   A.  Correct.

12   Q.  And you no longer practice law, is that correct?

13   A.  That's correct.

14   Q.  Are you today a U.S. citizen?

15   A.  I am.

16   Q.  And you have your own business today, is that correct?

17   A.  Correct.

18   Q.  So just a few questions about Venezuela currency.  Am I

19   correct that the official currency in Venezuela is the bolivar?

20   A.  Correct.

21   Q.  And is that the money that is generally spent locally in

22   Venezuela?

23   A.  Yes, until maybe a few years ago, because we don't have

24   currency available on the streets for the daily expenses, many

25   people accept now dollars or Euros in the local stores.

K39TSAD3                          Conte-Petrozzino - Cross

1    Q.   Thank you.  Are you familiar with the concept of currency

2    exchange rate?

3    A.   Yes.

4    Q.   And just generally speaking, is that you take one form of

5    currency, like the U.S. dollar, and you exchange it for another

6    form of currency, like the bolivar, is that correct?

7    A.   Correct.

8    Q.   And there's a rate that determines how many bolivars you

9    can obtain for one U.S. dollar, is that fair?

10   A.   That's correct.

11   Q.   And the U.S. dollar was always worth more than the bolivar,

12   correct?

13   A.   Correct.

14   Q.   And in Venezuela, am I correct that the government

15   maintained an exchange rate?

16   A.   It's very fluctuating, but yes.

17   Q.   And do you recall around the time of the transaction you

18   described in 2011 what that government-mandated bolivar

19   exchange rate was with respect to U.S. dollars?

20   A.   Yeah, by the time I sold the apartment it was between 8.5

21   to 9 bolivars per dollar.

22   Q.   Now is it also the case that in Venezuela there exists what

23   is known as a parallel market exchange rate?

24   A.   Yes, that's something that I hear and read about it, but

25   when I left Venezuela it was still not happening as strong as I

1    hear and read now.

2    Q.  Was that you, said eight or nine bolivar exchange rate,

3    what you could obtain in the parallel market and sort of the

4    free market?

5            MS. KIM:  Objection, your Honor.

6            THE COURT:  Sustained.

7    Q.  What market were you able to obtain that eight or nine --

8    A.  By the time I sold my house it was still only one exchange

9    rate, so for me I don't know if it's -- I consider it regular

10   market, it was an exchange rate that was considered for the

11   mass at the moment.

12   Q.  When did that change?

13   A.  It was changing in that period.  We were selling our

14   properties because we were afraid of exactly what was saying on

15   the voice that was possible to happen, so we all were afraid to

16   lose our properties or the value of it and tried to sell right

17   away.

18   Q.  And am I correct that the issue was that Venezuela was

19   experiencing hyperinflation?

20           MS. KIM:  Objection, your Honor.

21           THE COURT:  Sustained.  Next question.

22   Q.  What led you to sell your property in 2011?

23   A.  Well, I was living in U.S., so I don't need a house there,

24   my mother passed away.  There was not really a reason to keep

25   the apartment, and we were afraid of what the politics -- the

1    rumors of a losing our private properties.  So for me it was

2    better to sell.  I need the money here in U.S., I live in U.S.

3    Q.  The last past I'm unclear.  What was the concern, the rumor

4    that you were concerned about?

5    A.  Well, we --

6              MS. KIM:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.  So let's talk a little bit about the transaction.  You sold

9    a piece of property in Venezuela, correct?

10   A.  Correct.

11   Q.  Was the purchase price contract valued in bolivars or in

12   U.S. dollars?

13   A.  Bolivars.

14   Q.  And you were living in the U.S. at the time?

15   A.  Yes.

16   Q.  So how much in bolivars was the purchase price for?

17   A.  It was 1.5 million.

18   Q.  1.5 million?

19   A.  Bolivars.

20   Q.  When was the sale again, roughly?

21   A.  The sale was in bolivars.

22   Q.  The date.

23   A.  The date, it was sold in -- we signed the agreement to sell

24   in August, the closing was in October.

25   Q.  And why was it that at the time of the closing -- well, let

K39TSAD3                          Conte-Petrozzino - Cross

1    me step back.

2              Were you unable to obtain the full purchase price at

3    the time of the closing?

4    A.  No, I received just half in U.S. dollars and half in

5    bolivars.

6    Q.  Okay.  And am I correct that you wanted to obtain the

7    second half also in U.S. dollars?

8    A.  Yes, I was interested to receive it in dollars.

9    Q.  Why couldn't you obtain that half in U.S. dollars at the

10   time you sold the property?

11   A.  The gentleman that purchased the house have only half in

12   U.S. dollars and the other half he obtained mortgage for the

13   difference, promising me to help me to find the rest -- that

14   money in bolivars in dollars.

15   Q.  Why couldn't he just go to the bank and change the bolivars

16   for U.S. dollars?

17             MS. KIM:  Objection, your Honor.

18             THE COURT:  Overruled.

19   Q.  Do you want me to repeat the question?

20   A.  Please.

21   Q.  For that second half that was in bolivars and you wanted

22   U.S. dollars, why couldn't he just go to the bank and change

23   the bolivars for U.S. dollars and give it to you?

24             THE COURT:  Actually foundation, sustained.  You may

25   inquire.

K39TSAD3                          Conte-Petrozzino - Cross

1   Q.  Did you ask that gentleman if you could obtain that second

2   half of the purchase price in U.S. dollars at the time of sale?

3   A.  At that moment it was not possible anymore to purchase

4   dollars, U.S. dollars in a bank.

5   Q.  Why is that?

6   A.  I guess they say that they were having something called

7   control -- or they control the exchange rate.  It was taken

8   from the government, it was not anymore possible to do it for

9   regular citizens at the bank anymore.

10  Q.  When you say "they," that's the government of Venezuela

11  that imposed that?

12  A.  I guess so, yes.

13  Q.  So as a factual matter, at the time of the sale you

14  couldn't get that second half in U.S. dollars, is it that

15  correct?

16  A.  Correct.

17  Q.  And so at some later point in time you reached this

18  arrangement that you've testified about in this trial, correct?

19  A.  I just reached the point that the buyer find a way to make

20  me get the money in U.S. dollars.

21  Q.  And I just want to make sure we're clear on the mechanics

22  of how the transaction worked.  Am I right that the buyer went

23  to a bank and deposited the amount in bolivars?

24  A.  I really don't know how he did it.

25  Q.  How did you understand this transaction was going to work

K39TSAD3                        Conte-Petrozzino - Cross

 1   where you were going to obtain U.S. dollars that you had been
 2   waiting on for the second half of the transaction?
 3   A.  Well, he sent the first half from his own account in U.S.,
 4   so I guess the second part it was -- he would find in somebody
 5   that he would trust enough to make me get half of the money in
 6   dollars.
 7   Q.  And what would he do?  That's what I just want to make sure
 8   is clear, so that he found somebody --
 9           MS. KIM:  Objection, your Honor.
10           THE COURT:  Overruled.
11   Q.  I think you testified he would find somebody he trusted,
12   correct?
13   A.  He would find somebody he trusted to do the transaction.
14   Q.  And then what would he do?  What was the transaction that
15   would enable you to receive U.S. dollars?
16   A.  He would take the bolivars and send me the dollars, U.S.
17   dollars.
18   Q.  And am I right that he personally was not going to be
19   sending you the U.S. dollars?
20   A.  He didn't have it, so I guess he was -- he need to buy it
21   or use someone else to transfer that money here.
22   Q.  Okay.  And is it your understanding that after he provided
23   the bolivars to that person he trusted, some third party wired
24   you an equivalent amount of U.S. dollars?
25   A.  Yeah, third party did.

K39TSAD3

1    Q.   Okay.  And am I right that you did not believe there was

2    anything whatsoever wrong with this transaction?

3    A.   No.

4    Q.   Not for one second did you think this was an illegal

5    transfer of money, did you?

6              MS. KIM:  Objection.

7              THE COURT:  Sustained.

8    Q.   Did you believe the transaction was illegal?

9    A.   No.

10   Q.   You wouldn't have engaged in it, I take it, were that the

11   case?

12   A.   Absolutely not.

13   Q.   Have you engaged in any other similar transactions in

14   which, in order to obtain U.S. dollars in the United States,

15   you had to facilitate a trade to bolivars in Venezuela?

16   A.   No.

17   Q.   Are you aware that this was a common practice at the time

18   Venezuela was encountering these currency difficulties?

19             MS. KIM:  Objection.

20             THE COURT:  Sustained.

21   Q.   Did your father engage in any similar transactions?

22             MS. KIM:  Objection.

23             THE COURT:  Sustained.

24             MR. HEBERLIG:  Nothing further.

25             THE COURT:  All right.

K39TSAD3

1           MS. KIM:  Nothing from the government, your Honor.

2           THE COURT:  Thank you, Ms. Conte, you are excused.

3    You may step down.

4           It's 12:30, counsel, so we'll take our lunch break.

5           Members of the jury, we'll break for an hour, so we'll

6    resume at 1:30.  Please bear in mind, as I'm confident you

7    will, my instructions:  No communications with each other about

8    the case or anyone involved in the case, no research about

9    anything in the case or anyone involved in the case, and of

10   course, continue to keep an open mind until all of the evidence

11   is completed, until the lawyers have had an opportunity to make

12   their closing arguments, and until I have instructed you on the

13   law.

14          Enjoy your lunch, we'll see you at 1:30.

15          (Jury not present)

16          THE COURT:  I noted earlier Mr. Scott said there was a

17   juror who raised a child care issue.  I asked him to inquire

18   what the contours of it is, the representation that the person

19   needs to be out tomorrow or what, so we'll -- I'll get that

20   information and we could figure out how to proceed.  He also

21   indicated, and I asked him to get the specific information,

22   there's a juror who has some appointment on Thursday.  I don't

23   recall that from selection, but we'll get the information and

24   then I'll discuss with you how to deal with those issues.

25          Matters to take up, Mr. Krouse.

K39TSAD3

1          MR. KROUSE:  Yes.  Your Honor.  After the lunch break

2     the government is going to be introducing several summary

3     charts that we have been discussing with the defense, as well

4     as the underlying exhibits.  We're not intending to go through

5     in detail each of those exhibits, we're hoping to rely on the

6     summary charts, so I believe that there may be some objections

7     to underlying documents or to the charts themselves that we

8     haven't worked out.  So we'll use the lunch break to resolve on

9     that, but we're still on track, I believe.  So after the three

10    charts are admitted, we have one last set of about ten

11    documents, mainly emails that we'll put on with the reader, and

12    then we're on track to rest, your Honor.

13          THE COURT:  So not much time after the lunch break?

14          MR. KROUSE:  I don't anticipate it being much time.

15          THE COURT:  An hour or so?

16          MR. KROUSE:  Hour to hour and a half.

17          (Continued on next page)

18

19

20

21

22

23

24

25

K398SAD4

1          MS. KIM:  Just with respect to, in addition to the

2     summary charts and underlying documents, which we will

3     hopefully resolve during lunch break, defense has noted

4     objections to some of this afternoon's exhibits and we are

5     happy to go through those now or later before we come back.

6          THE COURT:  It sounds like we should take a short

7     break and then meet to deal with these issues.  I think that

8     will probably make sense.

9          Let me note I have completed a draft of the charge for

10    the charging conference tomorrow, and we will send it out

11    during the lunch break so you will have that.

12         With respect to our GX 411 issue, I want to make sure

13    you have clarity on the defense's request, which I am

14    authorizing.

15         The specific information, Mr. Weingarten, that you're

16    seeking from the lawyers, let's hear that.

17         MR. WEINGARTEN:  We respectfully request that you

18    direct that every prosecutor who worked on this case from its

19    inception submit a declaration to you indicating whether or not

20    they had any contact with anyone at OFAC and/or received any

21    information directly or indirectly about the status of any

22    investigation involving my client and any of the companies

23    mentioned in the document -- we can get it to you; there are

24    seven entities mentioned in the document mentioned by the

25    government -- and report to the Court whether there was any

K398SAD4

1    such contact or any such information received.

2              THE COURT:  I can't tell whether that's grammatically

3    a full sentence.  Any information received by the government,

4    broadly defined, relevant for Brady and Rule 16 purposes, the

5    prosecution team, any contact -- I don't know what contact

6    means, but any information that the government received with

7    respect to information OFAC received or had regarding Mr. Sadr

8    or any of the relevant entities.  Basically, anything OFAC had

9    that was provided to the government about OFAC's information

10   regarding Mr. Sadr and these entities.

11             MR. WEINGARTEN:  Or didn't have.  Obviously, if they

12   called back and they said we didn't do anything, that's

13   relevant too.

14             THE COURT:  To the extent that had been represented to

15   the government that they didn't -- see, that's different.

16   That's why I am trying to be precise here.  Now you're asking

17   for, I think, not just the information that OFAC had, but also

18   what investigatory steps that OFAC took in light of any

19   information that it had.

20             MR. WEINGARTEN:  Exactly.  I tried to inartfully

21   divide it into two parts.

22             THE COURT:  Mr. Krouse, any ambiguity with respect to

23   that request?

24             MR. KROUSE:  I think it's clear enough, your Honor,

25   and we will come back to the Court if there is any ambiguity.

K398SAD4

1          THE COURT:  I suppose embedded in that as well, Mr.

2     Weingarten, just thinking through this, is what was conveyed to

3     the government and what OFAC had regarding its awareness of

4     connections to Iran with respect to Mr. Sadr or any of the

5     entities.

6          MR. WEINGARTEN:  That was point two that I tried to

7     convey.

8          MR. KROUSE:  Awareness of Mr. Sadr or the entities,

9     OFAC's.

10          THE COURT:  And connections to Iran.

11          MR. WEINGARTEN:  Obviously, we would draw the

12     government's team broadly, including agents.

13          THE COURT:  Mr. Krouse, any ambiguity with respect to

14     that?

15          MR. KROUSE:  No, your Honor.

16          THE COURT:  Then I have a question for the defense,

17     which I didn't get to ask in the colloquy this morning about

18     the government's late disclosure and information conveyed via

19     the transmittal letter.

20          Is that for you or Mr. Heberlig?  I know Mr. Heberlig

21     responded.

22          MR. HEBERLIG:  I had the direct conversations.

23          THE COURT:  I think about an hour between when the

24     government received the e-mail from Ms. Lake, laying out the

25     dozen bullet points, and within an hour says, What the heck is

K398SAD4

GX 411 and why haven't we seen it before?  I am paraphrasing.

Upon seeing GX 411 identified in that list, did you understand the government to be conveying that this had not previously been disclosed?

MR. HEBERLIG:  No.  The only reason why my e-mail wasn't five minutes after we received it from the government is I was meeting with a witness.  The very moment it was brought to my attention, I went to my desk and wrote the e-mail that you saw, and there was no mistake in the urgency.  We know this case.  That letter would not have escaped our attention.  We had never seen it before.  As soon as it was brought to my attention by my colleagues who reviewed the various documents, I asked about it.

THE COURT:  So in the content of the document, you recognized that you did not see it before?

MR. HEBERLIG:  Yes.

THE COURT:  In the government's transmittal letter, by disclosing it at that time, identifying it as GX 411, indicating that they intended to seek its admission today and would you stip to its authenticity, is there anything in that communication, in light of how you have been practicing and my requirement that issues are being raised so that we can deal with objections without interrupting trial, is there anything in the nature of that communication that would have identified that document to you -- not would have, did identify that

1    document to you, not based on the content of the document but

2    based on the transmittal e-mail, as something that had not been

3    previously disclosed?

4            MR. HEBERLIG:  No.  And I had a brief moment of panic

5    that somehow we overlooked the document in the voluminous

6    discovery production that we received.  We knew we had received

7    a Commerzbank third-party subpoena production, and for a brief

8    moment I was worried that somehow I had fallen down on the job

9    and missed this.  So we immediately went to that folder of the

10   Commerzbank third-party subpoena production.  It was not in

11   there.  All that was in there were three or four documents of

12   no real consequence.  So nothing in the transmittal alerted me

13   whatsoever that this was an undisclosed document.

14           THE COURT:  I think in that same e-mail response, you

15   said something like, this has happened before and there are a

16   number of documents that we think are Brady that hadn't been

17   disclosed.  Were those documents that at some point during the

18   trial the government had provided that in fact had not

19   previously been disclosed?

20           MR. HEBERLIG:  Yes.

21           THE COURT:  Had they, in belatedly disclosing them,

22   identified them as documents that had not been previously

23   disclosed?

24           MR. HEBERLIG:  Not to my recollection.  We can get the

25   transmittals, but I believe they were delivered in the exact

K398SAD4

same manner.  Here are GX 430, 431, and we got 432 even a few

days after that.  Would you stipulate to their authenticity?

If it's relevant, we can easily find the e-mail.  I suspect the

exact same.

THE COURT:  I will give you an opportunity,

Mr. Krouse.

I think this is the last question.  I had noted to

understand the context that the next bullet point, I think it

was GX 456, exactly the same language, that was not a document

that had not been previously disclosed.

MR. HEBERLIG:  I think that's correct.  We pulled it

up, it didn't have the same surprise, and then we found it.

THE COURT:  But was that a newly marked government

exhibit?

MR. HEBERLIG:  I think it was.  And there have a few

occasions during the trial where there have been newly marked

exhibits that weren't on the pretrial exhibit list, and we

haven't raised a stink about that.  But this one was in an

entirely different category.

THE COURT:  Because of its content, but not how it was

communicated.  But maybe in a similar category of what you

noted in the letter, that is to say, there have been other

documents that have been disclosed mid-trial that were not

previously disclosed.

MR. HEBERLIG:  That is correct.  There is another

K398SAD4

1    issue here that we would like to write to the Court about this

2    evening.  It has not surfaced because the government ultimately

3    did not call the witness that the issue pertains to.  But on

4    the eve of trial, with the Jencks disclosure from the

5    government, we received a bombshell of Brady information about

6    one of the government's witnesses, who was a paid informant for

7    the district attorney's office, received $20,000 in living

8    expenses from the U.S. Attorney's Office, received $20,000 from

9    FBI for a monthly stipend, and had an extraordinary

10   whistleblower agreement in which he stood to gain 30 percent of

11   any recovery in this case.

12          When the government chose not to call the witness,

13   there was not a whole lot to do.  But I have to say when we saw

14   that a week before trial, we were stunned, and had serious

15   questions about what we may not have received from the district

16   attorney's office investigation.  And now that this issue has

17   come front and center, I think it bears on the Court's

18   consideration of these issues, and I would ask that you give us

19   an opportunity, by 5 or 6 or 7 tonight, to submit a letter on

20   this because it goes to the mentality of what is Brady and what

21   is not.  We were stunned when we got the disclosure.  I do

22   think it does bear on this issue.

23          THE COURT:  OK.  Let me ask you one more question that

24   occurs to me not related to that.  When the government

25   transmitted this, without indicating that it hadn't been

K398SAD4

1    previously disclosed, but you identified it as such and you

2    demanded information, the government's response was that they

3    had known about it since January 2020.  I know that's the time

4    frame, but I wanted to see the nature of the information.  They

5    said, in any event, We have been aware of the letter since

6    mid-January.  We thought it was part of the Commerzbank

7    subpoena return.  We now understand it came from an unrelated

8    investigation and therefore was not in the subpoena return.

9           When they said, We have been aware of the letter since

10   mid-January, what was your understanding of "we" in that

11   communication?

12          MR. HEBERLIG:  I haven't been distinguishing

13   between -- Mr. Lynch is obviously a member of their team and

14   the rest of the prosecutors.  I assumed the entire prosecution

15   team was aware of this issue in January and chose not to tell

16   us about it.

17          THE COURT:  Mr. Krouse.

18          MR. KROUSE:  Just on that point, it's not that we

19   chose not to tell the defense about it.  I just want to make

20   that clear.  It was an inadvertent oversight that the

21   government is apologetic about and sorry that it happened.

22          THE COURT:  I understand that's the government's

23   position.

24          MR. KROUSE:  I don't know which order the Court wants

25   me to take these in, but I guess --

K398SAD4

1          THE COURT:  I wanted clarity from the defense of

2     questions that I had.  You are welcome to respond to any of the

3     points, but I don't have a question from the government since I

4     spent most of my time this morning inquiring of the

5     government's state of mind.

6          MR. KROUSE:  With respect to the other government

7     exhibits that were produced during the trial, those were the

8     exhibits that were explored with the bank witness, and I think

9     it came out on the cross-examination that those were provided

10    to the government shortly before or during trial, and they were

11    disclosed to defense the moment the government had it.

12         THE COURT:  In a different category.

13         MR. KROUSE:  In a different category.  As preparing

14    our case, we had a question about one particular payment.  We

15    inquired of the bank and they provided us those documents, and

16    we produced those immediately to the defense, knowing full well

17    that they had never received them because we had just received

18    them.

19         THE COURT:  It would have been clear in that context

20    that they had never received them before.

21         MR. KROUSE:  Yes.

22         THE COURT:  Which is different than here.

23         MR. KROUSE:  Yes, entirely.  So I just want to make

24    that clear.  I am not saying it helps us.

25         THE COURT:  It doesn't help you, but I appreciate what

K398SAD4

1    is expected, which is honesty.

2            MR. KROUSE:  With respect to the other witness, just

3    on that point, I don't think it's really related to this

4    inquiry.

5            THE COURT:  The other witness?

6            MR. KROUSE:  The other witness that Mr. Heberlig

7    referred to as having Jencks material that the government

8    turned over.  All of that material that Mr. Heberlig referenced

9    that was in the witness's Jencks, we weren't certain whether we

10   would call the witness.  We produced all of that information.

11   Ultimately we decided not to call the witness.  I will say that

12   he doesn't know the defendant or anything about really the

13   Iranian side of this case.  He is a Venezuelan who was working

14   on the project down in Venezuela.  So to the extent the

15   government was going to call him, his testimony was going to be

16   about what he observed in Venezuela, the Venezuelan side of

17   things, which we ultimately decided was not a relevant portion

18   of the government's presentation.  So we are not calling him as

19   a witness.

20           I would just say we fully disclosed all of his Giglio,

21   Jencks materials, and the defense has had it.  They have asked

22   us questions about it.  We have responded in a timely manner.

23   So that's what I will say about that witness until defense

24   possibly writes something about it.

25           THE COURT:  Thank you.

K398SAD4

1           Then I think this may be for Mr. Weingarten.

2    Obviously, there is a bit more fact investigation, and you have

3    asked and I have granted that application, and the government

4    is endeavoring, as has been represented to me by the assistants

5    as well as the unit chiefs, to ensure that this is not an

6    iceberg tip and that there is not more out there, and I will

7    get from them the information that you have asked.

8           So I think if this is the end of the disclosure

9    failure, the question of remedy occurs.  What you had asked for

10   last night, and I don't think anything has changed since then,

11   except the potential credibility of the government in its

12   representations as to what else might be out there, but again,

13   for purposes of this question, we are going to assume that we

14   have determined there is not more, you had asked for a curative

15   instruction, and in the e-mail exchanges there is some

16   suggestion of what you would have done with it, namely,

17   cross-examine the OFAC witness, Mr. Kim, with it.  So it seems

18   to me that suggests the cure to be a curative instruction

19   and/or recall of Mr. Kim with an opportunity for you to cross

20   him on the material.

21           MR. WEINGARTEN:  I appreciate that.  My only

22   hesitation there is he was here and he said, I know nothing.

23   When he comes back, he is not going to know anything either.

24   So maybe when we see how the government responds, we have

25   different suggestions as to an alternative for evidence.

K398SAD4

1          I did note the government offered stips, and maybe a

2    combination of a curative instruction and stips, if there is no

3    more, is what we would seek.  I would request an opportunity to

4    see what comes in, have conversations with my friends here, and

5    then make a request of you.

6          THE COURT:  Fair enough.

7          Anything else?

8          MR. KROUSE:  No, your Honor.

9          MR. WEINGARTEN:  We talked about Rule 29.  We have Mr.

10   Bishop typing away right now.  We would request the opportunity

11   to present something to you in writing by the end of the day.

12         THE COURT:  That's fine.  We will see where we are.

13   As I said this morning, I understood the need for resolution of

14   this issue with respect to remedying the late disclosure; there

15   are other issues, but we need to determine whether there are

16   any other materials that need to be disclosed.  You will be

17   given the representations from the prosecutors that you are

18   seeking.  And then the remedy question, I won't require the

19   defense to proceed to its case until we know whether recall of

20   Mr. Kim or some other remedy is appropriate.  So I think what

21   that means is we will probably end before 5 today, and in any

22   event, there will be an opportunity for dealing with this issue

23   as well as argument on Rule 29, or at least preservation and

24   then a submission of a writing.

25         MR. WEINGARTEN:  My only thing there is, on the 29, if

K398SAD4

1    we get you something by midnight tonight, and we are coming in

2    tomorrow to argue about instructions, if we could carve out 30

3    minutes for the 29.

4              THE COURT:  Maybe.  I have told the jury they are

5    coming in at 12:30.  We need to deal with the juror who may

6    need to be out for child care.  So what that means we don't

7    know.  I have told the jury to be here at 12:30.  We need to

8    know by the end of the day if we are in a position to stick to

9    that.  And if the government has rested, what the jury is going

10   to do at that point is either hear a defense case or hear

11   closings.

12             MR. WEINGARTEN:  Would you say that last part again?

13             THE COURT:  That was not clear.

14             The jury is coming in at 12:30.

15             MR. WEINGARTEN:  I have got it.

16             THE COURT:  Tomorrow.  So at that point they are

17   either going to hear a defense case, if there will be a defense

18   case, or they are going to hear closings.

19             MR. WEINGARTEN:  Right.

20             THE COURT:  So I don't know how long the charging

21   conference is going to take.  I am letting you put in a

22   writing.  I am happy to hear some argument today after the jury

23   goes and tomorrow with time.  But that's the schedule.  I don't

24   want to delay.  I normally don't delay and don't want to delay,

25   but I particularly don't want to delay when we are starting to

K398SAD4

1    have issues around child care and other things in light of the

2    state of the world.

3                MR. WEINGARTEN:  OK.

4                THE COURT:  Anything else?

5                I am afraid we will have about 20 minutes for lunch,

6    and then we will meet to take up the objections.

7                Thank you.

8                (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K398SAD4

AFTERNOON SESSION

1:20 p.m.

1    THE COURT:  Let's take up what we need to take up.

2    MR. KROUSE:  Yes, your Honor.  So we split it up into

3  two different paralegals so I will handle the first.

4         We are going to seek to admit three summary charts,

5  one has two subsets, 703, 704, 705A and 705B.

6         Our understanding, 704 is the travel chart that the

7  Court has already ruled on.  The defense has a standing

8  objection, but that's coming in.

9    THE COURT:  The title has been taken off?

10    MR. KROUSE:  Yes, your Honor.

11    THE COURT:  Anything additional there, Mr. Silverman?

12    MR. SILVERMAN:  No, your Honor.

13    MR. KROUSE:  Then 703 our understanding is there is no

14  objection to the chart, assuming the foundation is laid.

15         Then 705A and B, I believe there is an objection.

16    THE COURT:  All right.

17    MR. SILVERMAN:  Yes, your Honor.  705A and B summarize

18  one exhibit that was put into evidence during the last ten

19  minutes.  It's a 50- or 52-page exhibit, but it was put into

20  evidence and it's no more voluminous than any other large

21  exhibit.

22    MR. KROUSE:  Your Honor, it's on your screen now.

23  This is 52 pages that look like this.  So these are wire

K398SAD4

1    transfers between two different dates over a range of about 12

2    days or so, and each one is an individual wire.

3          So the government has a summary chart, which is just

4    an Excel table that lays out the beneficiaries, the amounts,

5    etc. for those 52 pages.  It summarizes an extensive exhibit

6    where every page might as well be its own exhibit, but it's

7    just that that's the way it was e-mailed to Mr. Sadr.  My

8    understanding is the defense has no objection to the accuracy

9    of the chart itself.

10          Then part B of it -- part A is just the table that

11    summarizes the information, but part B sort of adds up which

12    countries the transactions went to, the beneficiaries the

13    transactions went to, and sums up the amounts that went to

14    those countries and beneficiaries.

15          MR. SILVERMAN:  To put it differently, part B argues

16    from the summary in part A and would be appropriate as a

17    demonstrative for closings.

18          THE COURT:  You trailed off, Mr. Silverman, and

19    Mr. Krouse started speaking in the background.

20          MR. SILVERMAN:  Part B would be appropriate as an

21    demonstrative in closing.  We would have no objection.  But we

22    don't believe it should be entered into evidence.

23          THE COURT:  No objection to A.

24          MR. SILVERMAN:  We don't believe A is necessary.

25          THE COURT:  You want them to go through each of the 52

K398SAD4

1    documents?

2          MR. SILVERMAN:  They certainly have access to each of

3    the 52.

4          THE COURT:  That's always the case with 1006.  That's

5    always the case.  In my experience, the underlying documents

6    themselves come in.  We don't do what the government was doing,

7    and you didn't object to it, but I did under my authority to

8    control the presentation of evidence, which is it makes zero

9    sense to do a summary chart and go through each document.  So

10   that won't happen here.

11         So the question here is, do we go through each

12   document or does the summary chart allow for convenient

13   examination of otherwise inconvenient evidence?

14         MR. SILVERMAN:  We withdraw our objection on 705A,

15   your Honor.

16         THE COURT:  So 705A can come in.

17         The government is not going to do what it did this

18   morning, because you have represented to the Court that it

19   cannot be conveniently examined in court so you're not going to

20   examine the underlying documents in court.

21         MR. KROUSE:  705B is similarly a summary.  It's adding

22   which country.  So if the money is going to, for instance,

23   China, or the United States, or Venezuela, or wherever the

24   money is going according to the wire exhibit, it just adds it

25   up and says this much went -- basically, underlying exhibits,

K398SAD4

        1    this much went to China, this much went to the United States,

        2    etc.

        3             THE COURT:  I think that is more akin to argument,

        4    summarizing argument of what is contained in 705A, and it

        5    sounds more appropriately as a demonstrative for closing.

        6             MR. KROUSE:  Understood.

        7             THE COURT:  What else?

        8             MR. KROUSE:  I understand there is an objection to

        9    2076A, but I think the parties have resolved it.  The second

       10    and third page is fully redacted and the government will just

       11    cut those redacted pages, but will offer it for now.  We are

       12    not going to show it to the jury.  But the version that will go

       13    back to the jury will have just the one page without the

       14    redacted two pages.

       15             THE COURT:  Any concern?

       16             MR. SILVERMAN:  No, your Honor.

       17             THE COURT:  Thank you.

       18             Next.

       19             MR. KROUSE:  There is an objection to 205AT and 206AT,

       20    which are translations of the stamps that are within the

       21    defendant's passports.

       22             THE COURT:  Can I see them while Mr. Silverman is

       23    talking?

       24             Go ahead, Mr. Silverman.

       25             MR. SILVERMAN:  The translations don't appear to be

K398SAD4

1    translations of what is in the passports; they appear to be

2    selective pulling from the passports, and then actually adding

3    things that aren't in the passports.  So one of the passports

4    that was issued in 2012, you have dates from 2010.  That would

5    be 205AT.

6              THE COURT:  So it's an inaccuracy of the summary, both

7    inaccurate and additional information?

8              MR. SILVERMAN:  Yes, your Honor.

9              MR. KROUSE:  I believe it's a straight translation.

10             THE COURT:  Let's just take a specific example, Mr.

11   Silverman.

12             MR. SILVERMAN:  The top two examples would be fine.

13   Those are both 2010.

14             If we go to GX 205, you will see it's an Iranian

15   passport issued in, I think 2012 in my notes.  I hope that is

16   correct.

17             MR. KROUSE:  This is 205.

18             MR. SILVERMAN:  Date of issue would be, I don't know

19   if that's April 2 or February 4 of 2012.

20             THE COURT:  Then back to 205AT.  Which entry line?

21             MR. SILVERMAN:  The top two lines are both from 2010.

22             THE COURT:  The top line has in parentheses 204.  I

23   think we are just looking at 205.

24             MR. SILVERMAN:  The second line has 268-324.  So I

25   don't think that's a reference to the government's exhibit

K398SAD4

1   number.

2           MR. KROUSE:  Your Honor, we are not going to show

3   these exhibits to the jury.  My understanding is that there is

4   no accuracy issue with respect to the travel chart.

5           THE COURT:  What document is the travel chart?

6           MR. KROUSE:  The travel chart is 704.

7           THE COURT:  That's not objected to.

8           MR. SILVERMAN:  No further objection, and subject to

9   our continuing overruled objection.

10           MR. KROUSE:  We will rely on the travel chart.

11           THE COURT:  So 205AT and 206AT are not going to be

12   used.

13           MR. KROUSE:  Correct, your Honor.

14           THE COURT:  What else?

15           MR. KROUSE:  Mr. Silverman has an objection to the

16   exhibit that's on your Honor's screen.

17           THE COURT:  2027.

18           MR. SILVERMAN:  The primary area is in the second

19   paragraph.  I think that's what the government wants it for.

20   This has nothing to do with the sanctions, your Honor.  My

21   understanding is it has to do with securities licensing,

22   although I don't pretend to be an expert.

23           MR. KROUSE:  Your Honor, I think that's an argument

24   that the defense could make from the record.

25           THE COURT:  What argument are you going to make from

K398SAD4

1    the record in good faith?

2              MR. KROUSE:  In good faith, it appears to us that it's

3    Mr. Sadr talking to the other person who is on the

4    account -- the two account signatories for all three companies

5    that the government alleges are fronts are Ali Sadr and Negarin

6    Sadr.  So it appears to be a co-conspirator conversation about

7    their Swiss banker, Urs Schneider, who is also present on a lot

8    of different e-mails.  So one co-conspirator advising the other

9    not to speak to the Swiss banker from the United States by

10   phone and instead to say let's talk in person.

11             MR. SILVERMAN:  Your Honor, there is no reference

12   whatsoever to Venezuelan project, payments in U.S. dollars.  If

13   it was relevant for that purpose, it would be pure 404(b).

14             MR. KROUSE:  It's within the time frame.  It's between

15   the only two named signatories on all the relevant Swiss bank

16   accounts.  It's referencing a person named Urs.

17             THE COURT:  The government's understanding of this

18   document, from the broad context of it, is that it relates to

19   the transactions in issue and sanctions?

20             MR. KROUSE:  Yes, your Honor.  Urs Schneider is the

21   Hyposwiss banker that Mr. Sadr has multiple e-mails with

22   regarding the Clarity account, the Stratus Global Investments

23   account, and the Stratus Turkey account.  We have put in all of

24   the account signatory documents for each of those three

25   accounts, and the two signatories are Ali Sadr and Negarin

K398SAD4

Sadr.  Urs Schneider is the banker for all three accounts.  In
good faith, this appears to be within the time frame, Mr. Sadr
sending a message to Negarin Sadr, advising her not to speak to
the Swiss banker on the phone.  This is a party admission from
the defendant.

      MR. SILVERMAN:  We are not arguing about hearsay.
This is a conversation between a brother and sister that has
nothing to do with the charged transactions here.

      THE COURT:  I recognize that's your position, but the
government has made a representation to the Court that there is
an available argument that it does, in light of the time frame
and the parties involved and the content.  Why is that not an
available argument?

      MR. SILVERMAN:  Because the inference that the
government is seeking to draw is so incredibly weak, it would
be substantially outweighed by the unfair prejudice here.

      At this time, Negarin Sadr is attempting to get her UK
resident permit, and that's why she might be getting advice
from Urs Schneider.  She and Ali are working together to set up
a clothing company that would operate out of the UK, and that's
why she might be getting advice from Urs Schneider.  She was
not involved in the charged payments in this case.  There is no
foundation that the government has laid to put this in, and
certainly no foundation that would allow for an inference
strong enough to override the statement, Not to mention that

K398SAD4

1   you're in America, even if you are, say, in Canada, when he is

2   talking about something completely unrelated to the sanctions.

3            MR. KROUSE:  It's not true that the government hasn't

4   laid any foundation.  There are three bank records in evidence

5   that show that the signatories on the accounts, where all of

6   the payments at issue were flowing into, were these two people,

7   Ali Sadr and Negarin Sadr.  And then you have Ali Sadr, as the

8   speaker, advising the only other signatory on those accounts,

9   within the time frame of the charged conspiracy, within the

10  time when these transactions were all going into those accounts

11  with those two signatories, about how she should conduct

12  herself in speaking to Urs Schneider who is the banker.

13           So the defense is more than free to argue and explain

14  why this transaction is completely -- or this interaction is

15  completely innocuous, but on the face of it, the government has

16  a good faith basis to argue that Ali Sadr is advising Negarin

17  Sadr essentially to lie to their Swiss banker.

18           THE COURT:  But what does that have to do with the

19  sanctions?

20           MR. KROUSE:  Because the Swiss banker is the bank that

21  they are putting all the money that the government alleges is

22  the violation of the sanctions into those accounts.  So the

23  government's argument could be that Urs Schneider was also lied

24  to by Ali Sadr and by Negarin Sadr about the beneficial owners

25  of the various accounts.

K398SAD4

1          Your Honor will recall that when we admitted evidence

2     about the front companies and the front companies' Swiss bank

3     accounts, there was a document that showed Stratus Turkey was

4     owned 30 percent by Mohammad Sadr, 30 percent by Ali Sadr, and

5     30 percent by Negarin Sadr, but the bank account itself for

6     that entity only had two signatories, Ali Sadr and Negarin

7     Sadr, and left off Mohammad Sadr.

8          THE COURT:  The structure of the government's argument

9     is, here is Mr. Sadr directing someone to make a fabrication

10    with respect to something related to the bank account.

11    Therefore, from this you can conclude that Mr. Sadr made

12    misrepresentations with respect to the bank account.  Is that

13    the structure of the argument?

14         MR. KROUSE:  No, your Honor.  It's a co-conspirator

15    statement in the classic sense.

16         THE COURT:  It's not a hearsay objection.

17         MR. KROUSE:  As far as the relevance of it, it's a

18    co-conspirator statement in the classic sense of, here is one

19    co-conspirator speaking to the other person on the same account

20    about their shared banker, for the bank accounts that all the

21    sanctions violations proceeds are flowing into, and he is

22    advising her to hide information from that banker.  I expect

23    that one of the arguments --

24         THE COURT:  The question is, what in furtherance of

25    the charged conspiracy?

K398SAD4

         MR. KROUSE:  I expect that the defense is going to try

to argue, and they have already with different banking

witnesses, that the KYC, the know-your-customer requirement,

lies with the recipient bank, and the recipient bank is

Hyposwiss.  So the argument the defense is going to make is

that Ali Sadr told Urs Schneider from Hyposwiss everything he

needed to know.  So why would there be any violation?  The

correspondent bank isn't required to know its customer.

         So I think it is relevant to the charged conspiracy --

         THE COURT:  Because?

         MR. KROUSE:  -- that there are instances where Ali

Sadr is advising his co-conspirator to not disclose all the

information about relevant information to their Hyposwiss

banker.  It's not for propensity.

         THE COURT:  I just can't tell from what you're saying.

It does seem like propensity.

         MR. KROUSE:  It's not propensity, in the sense it's

not us arguing he is a liar and therefore you can infer that he

lied.  It's a specific instance where he is advising a

co-conspirator to hide information from the banker, and from

that we could argue that the banker isn't being provided all

the information that the banker would want to know about these

customers.  Because the defense is going to argue that

Hyposwiss had know-your-customer requirements and would have

known everything that was relevant to this case.

K398SAD4

1    It is relevant that there is an instance, a nonhearsay

2    instance, where Mr. Sadr is advising the other person on the

3    account in the same time frame to hide something from the

4    banker.  It's not about his character, it's about the action of

5    hiding information from the banker, for the government to then

6    argue that the banker wasn't fully aware, or wouldn't have been

7    fully aware, because the customers he was dealing with were

8    hiding information from him.

9    THE COURT:  My inability to understand the relevance

10   argument you are making suggests that it is, at best, very

11   tenuous 401 and outweighed by 403, because it sure sounds like

12   it's gesturing, if not there at propensity.  So I will sustain

13   the objection.

14   Can we proceed with the jury at this point?

15   MR. KROUSE:  I think Ms. Kim has a few with her

16   paralegal reader.

17   THE COURT:  Why don't we take them between the

18   paralegals so that I can get the jury out and give them an

19   additional break if they need it.

20   MR. KROUSE:  Can I just assure that the witnesses are

21   here?

22   THE COURT:  While he is doing that, go ahead, Ms. Kim.

23   MS. KIM:  Thank you.

24   The first one is 2261.  This is an e-mail that's

25   forwarded to Ali Sadr.  It's about --

K398SAD4

1          THE COURT:  I'm sorry.  Since we haven't made any

2    progress, you have your witnesses?

3          MR. KROUSE:  Yes, your Honor.

4          THE COURT:  Sorry, Ms. Kim.  We will take it up

5    between witnesses, and we will get the jury.

6          MR. KROUSE:  There are some very minor cleanup, by way

7    of cleaning up the transcript, where the government offered

8    things and it wasn't necessarily admitted.  We don't need to

9    take that up in front of the jury.  We can offer to make those

10   corrections through the Court.

11         THE COURT:  It's been admitted, you're saying?

12         MR. KROUSE:  Yes.  It's not reflected in the

13   transcript.

14         THE COURT:  Is it on Mr. Scott's chart?

15         MR. KROUSE:  I haven't seen Mr. Scott's chart.

16         THE COURT:  Run it by the defense.  If they have any

17   concern about whether it's been admitted, we can take it up.

18         MR. KROUSE:  Thank you, your Honor.

19         (Continued on next page)

20

21

22

23

24

25

K398SAD4                          Nevins - Direct

1              (Jury present)

2              THE COURT:  Thank you.  Everyone may be seated.

3              Members of the jury, I hope you enjoyed your lunch.

4              Mr. Krouse, the government may call its next witness.

5              MR. KROUSE:  The government calls Talya Nevins.

6              THE COURT:  Ms. Nevins may come forward.

7     TALYA NEVINS,

8          called as a witness by the government,

9          having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  State and spell your name for the

11    record.

12             THE WITNESS:  Talya Nevins, T-A-L-Y-A, N-E-V-I-N-S.

13    DIRECT EXAMINATION

14    BY MR. KROUSE:

15    Q.  Good afternoon, Ms. Nevins.

16    A.  Good afternoon.

17             THE COURT:  You may proceed.

18             MR. KROUSE:  The government at this time would read a

19    stipulation between the parties, Government Exhibit 106.

20             The parties stipulate that:

21             1.  From at least January 10 through at least October

22    13, the defendant maintained bank accounts at HSBC.

23             2.  Government Exhibit 411 is a true and accurate copy

24    of a business record maintained by Commerzbank.

25             3.  Government Exhibit 456 is a true and accurate copy

1    of business records maintained by Wells Fargo.

2           The original records for Government Exhibits 411 and

3    456 were made at or near the time by or from the information

4    transmitted by a person with knowledge of the matters set forth

5    in the records.  They were kept in the course of a regularly

6    conducted business activity and it was a regular practice of

7    that business activity to make the records.

8           The government offers the stipulation, Government

9    Exhibit 106, and Government Exhibit 456.

10          MR. SILVERMAN:  No objection.

11          THE COURT:  We are dealing with a screen of one of the

12   jurors.  Thank you.

13          MR. KROUSE:  While Mr. Scott is doing that, I can read

14   the other exhibits that the government is admitting.

15          The government offers 2214 and 2214A, 2216 and 2216A,

16   2218, 2220, 2220A, 2222, 2245 and 2245A.  We offer 452, 480E,

17   480D, 480K, 480J, 480F, 452, 454C, 456, 490A, 2175 and 2175A,

18   1212 and 1212A, 1213 and 1213A, 1222 and 1222A and B, 1214,

19   1214A and B, 1215, 1215A, 2293, 2293A, 1216, 1216A and B, 1217,

20   1217A and B, 2183, 2183A, 2090, 2090T, 2090A, 2090AT, 2076,

21   2076A and B, 2164, 2164A, 2284, 2284A, 2284D, 2304 and 2304A.

22          MR. SILVERMAN:  Only about half of those were on the

23   government's list.

24          MR. KROUSE:  I don't believe that's accurate.

25          THE COURT:  The question, Mr. Silverman, is, do you

K398SAD4                         Nevins - Direct

1    have an objection?  If you need time, you may ask for that.

2              MR. SILVERMAN:  I need a written list and a moment.

3              MR. KROUSE:  I believe that's been provided, your

4    Honor.

5              May we have a moment to confer?

6              THE COURT:  You may.

7              MR. KROUSE:  Your Honor, we are going to put the

8    charts in now that have the underlying, and then allow the

9    defense to make possible objections to the underlying exhibits

10   at a later time.

11             THE COURT:  Understood.  Thank you.

12             MR. KROUSE:  Thank you, your Honor.

13             THE COURT:  The chart numbers?

14             MR. KROUSE:  We will go through them one by one with

15   the witness.

16             THE COURT:  They are not in yet.

17             MR. KROUSE:  703, 704, and 705A.

18             MR. SILVERMAN:  Subject to our previous discussions.

19             THE COURT:  703, 704 and 705A are admitted.

20             (Government's Exhibits 703, 704 and 705A received in

21   evidence)

22             MR. KROUSE:  Mr. Milione, can you put on the screen

23   2090A.

24   BY MR. KROUSE:

25   Q.  Ms. Nevins, do you recognize this document?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's --

4   Q.  How do you recognize it?

5   A.  It's one record that I reviewed in the process of making a

6   summary chart of 52 similar pages.

7   Q.  Does this exhibit contain about 52 pages of documents that

8   look just like this?

9   A.  Yes.

10  Q.  When you say you created a summary chart, can you describe

11  how you created it?

12  A.  I reviewed all 52 pages, and then of those 52 pages, there

13  were 49 that had to do with U.S. dollar wire transfers, and I

14  made a chart, an Excel, that summarizes those 49 U.S. dollar

15  payments, including the beneficiary bank, the intermediary

16  bank, the originating entity, and the dollar amount, and the

17  date.

18          MR. KROUSE:  Mr. Milione, Government Exhibit 705A,

19  please.

20  Q.  You just testified about a summary chart that you created.

21  Is that what this chart is?

22  A.  Yes.

23  Q.  Could you describe, starting from the left, moving to the

24  right, what each column signifies?

25  A.  The very first column is, they are in chronological order

1    so this is the first of three pages of the chart.

2             The second column is the date.  Then the originating

3    party.  Then the intermediary party.  The beneficiary party.

4    The city where the beneficiary party is located.  The country

5    where the beneficiary party is located.  The stated purpose

6    that appeared on the record for that payment.  And then the

7    dollar amount for that payment.

8    Q.  To be clear, for each row, that's one of those sheets in

9    Government Exhibit 2090A, correct?

10   A.  Correct.

11   Q.  All of that information you just went through is on the

12   face of that document, correct?

13   A.  Yes.

14             MR. KROUSE:  Mr. Milione, could you go to the second

15   page?

16   Q.  This is just a continuation.  So we are at the bottom,

17   number 39 of those transactions, right?

18   A.  Yes.

19   Q.  And then the third page?

20             All the way, as you said, to 49 payments, correct?

21   A.  Correct.

22   Q.  Then there is a total there?

23   A.  Yes.

24   Q.  That's a total of what?

25   A.  All 49 U.S. dollar payments added together, the dollar

K398SAD4                          Nevins - Direct

1    amounts added together.

2    Q.  So around about 1.17 million, approximately?

3    A.  No.

4    Q.  8.17.

5    A.  8.17, yes.

6    Q.  Ms. Nevins, did you create another summary chart having to

7    do with financial records?

8    A.  Yes.

9    Q.  What was the nature of that summary chart?

10   A.  It's a flow of funds chart.

11   Q.  Can you describe what you mean by flow of funds chart?

12   A.  So it is in the style of a flow chart.  It is more of a

13   visual flow chart where you can see starting payments going

14   from entity to entity to entity.

15        The originating entity on this flow chart is PDVSA.

16   Money flows from an entity called PDVSA to an entity called

17   Clarity Trade & Finance.  Then from Clarity Trade & Finance, it

18   flows to four ultimate beneficiaries, sometimes directly from

19   Clarity to those beneficiaries and sometimes through an entity

20   called Stratus International.

21   Q.  What kind of records did you use to follow the funds and

22   construct this chart?

23   A.  I used some wire transfer detail from banks, provided by

24   banks, specifically, Wells Fargo.  I don't have them all

25   memorized, but I will tell you the ones I remember.

1        Some that were Hyposwiss bank statements that belonged
2    to two separate accounts in the name of Clarity Trade & Finance
3    that were held at Hyposwiss.  Some operating agreements for the
4    beneficiaries represented on the charts.  And perhaps some
5    other documents.  I would need a visual.
6    Q.  Financial documents, is that fair?
7    A.  Yes.
8        MR. KROUSE:  Mr. Milione, Government Exhibit 703,
9    which is in evidence.
10   Q.  Ms. Nevins, is this the chart you have just been testifying
11   about?
12   A.  Yes.
13   Q.  Could you describe to the jury, starting at the left and
14   moving to the right, what this chart depicts?
15   A.  So all the way on the left there is a red box that
16   represents the entity called PDVSA.  And the chart shows four
17   separate payments, which are just a selection of payments that
18   I have seen evidence of, that are payments from an entity
19   called PDVSA to the entity called Clarity Trade & Finance.
20   Q.  Just on this, the arrows have dates.  Are those the dates
21   of the transactions?
22   A.  Yes.
23   Q.  Then within the arrows, there are dollar sums.  Those are
24   the amounts?
25   A.  Yes.

K398SAD4                         Nevins - Direct

1    Q.  Then underneath there is a GX number, a couple of GX

2    numbers, sometimes one, sometimes two under the arrows.  Does

3    that stand for government exhibit?

4    A.  Yes.

5    Q.  So those are the documents you used to construct this

6    chart, is that fair?

7    A.  Right.  So each payment has an italicized GX number, those

8    are the records where I saw evidence of that payment.

9          MR. KROUSE:  Mr. Milione, you can zoom out of that and

10   go to the next half, to Stratus Global Investments.

11   Q.  Can you explain to the jury this phase of the chart?

12   A.  I will start on the top left because the ones that are on

13   the bottom are not going to Stratus Global Investments.

14         So there is one arrow that is going from Clarity Trade

15   & Finance to an entity called Stratus Global Investments.  That

16   arrow is labeled with five separate payments.  Those payments

17   all occurred between January 5, 2012 and May 7, 2012.  And

18   those are all payments that I saw reflected in GX 2284A and

19   2284D, which are both Hyposwiss bank statements that belonged

20   to -- A belongs to one Clarity Trade & Finance account at

21   Hyposwiss and D belongs to a different Clarity Trade & Finance

22   account at Hyposwiss.

23         MR. KROUSE:  Mr. Milione, can you zoom out of that and

24   go from Clarity Finance to the -- from the top of that all the

25   way across.

K398SAD4                          Nevins - Direct

1  Q.  So we covered the top portion of this.  What about the

2  middle part?

3  A.  Would you like me to do the arrows going from Stratus or

4  the three other arrows going from Clarity?

5  Q.  First the three others from Clarity.

6  A.  So from Clarity, we have an April 30, 2012 payment for

7  $1,088,960 that is going to an entity called Sapene LLC.

8  Q.  And the next?

9  A.  A payment dated February 1, 2012, for $2,225,950, going

10 from Clarity Trade & Finance to an entity called Fidelity

11 National Title Company.

12          Purchase number 2 is not the name of an entity.  It's

13 just that there were two separate transactions going to

14 Fidelity National Title Company, and we noted them separately

15 on the chart.

16 Q.  Then the one on the bottom.

17 A.  A payment dated April 11, 2012, for $919,960, from Clarity

18 Trade & Finance to Malibu Escrow Corporation.

19 Q.  All of that money that you just mentioned was coming from

20 Clarity Trade & Finance to these three other entities?

21 A.  Correct.

22 Q.  Then at the top, the Stratus Global Investments, you

23 covered the money that came from Clarity to Stratus Global

24 Investments.  Could you now cover what left from Stratus Global

25 Investments to various other entities?

K398SAD4                          Nevins - Direct

1   A.  Sure.  So we have an October 24, 2011 payment for

2   $1,299,973 to Fidelity National Title Company.

3   Q.  You mentioned before there is a purchase 2 and a purchase

4   1.  This is the first one to that?

5   A.  Yes.  I labeled it purchase 1, but it's to the same title

6   company that the earlier mentioned payment was to.

7   Q.  Then to Setoma LLC?

8   A.  So there are four payments, dated September 23, 2012, for

9   $199,973; January 5, 2012, $1,055,960; April 13, 2012,

10  $499,960; February 6, 2013, $901,782.  And those are all going

11  from Stratus Global Investments to an entity called Setoma LLC.

12  Q.  Now, there are four entities, five different boxes here on

13  the far right.  Did you total how much money went into each of

14  these five entities in total?

15  A.  I did.  And there is one more payment that I haven't read

16  yet, which is that April 30, 2012 payment from Stratus Global

17  Investments to Sapene LLC, which I mentioned earlier.  The

18  payment is for $499,960.

19  Q.  So here it shows two different payments going from two

20  different entities into this Sapene entity?

21  A.  Right.  They are on the same date, April 30, 2012.  Sapene

22  LLC received one payment from Clarity Trade & Finance, which I

23  read earlier, for $1,088,960, and another payment from Stratus

24  Global Investments, which I just read, for $499,960.

25  Q.  What was the total?

1   A.  The total is $8,642,478.

2   Q.  Is it fair to say you don't know what any of these entities

3   do, right?

4   A.  I don't.  I have seen some records connected to these

5   entities, but I don't know these entities.

6   Q.  You don't have personal knowledge about these entities,

7   correct?

8   A.  Correct.

9          MR. KROUSE:  Mr. Milione, you can zoom out of that,

10  please, and go to page 2 of this exhibit.

11  Q.  What do the next few pages reflect of this exhibit?

12  A.  So the next five pages of this exhibit are explanations of

13  the records I reviewed related to those five -- those four

14  beneficiary entities, but those five separate transactions, or

15  what I came to understand as purchases, those five separate

16  purchases that are represented as beneficiaries on the flow

17  chart.

18  Q.  So taking Malibu Escrow Corp., which is one of the

19  beneficiaries of the transactions from the earlier page, what

20  does it reflect here that $919,960 was used for?

21  A.  The purchase of a vacant lot in Malibu, California.

22  Q.  That's California, as in the United States?

23  A.  United States.

24  Q.  Moving to page 3.

25  A.  So this is one of the payments, which on the chart was

1    property purchase number 2, to Fidelity National Title Company.

2    And this was for the purchase of land in California through an

3    entity called Pistache LLC, that was 50 percent owned by Sapene

4    LLC, which is also one of the beneficiaries that we saw on the

5    flow chart.

6    Q.  If you could go to page 4.

7             What does this page reflect?

8    A.  This page is a summary of records that I reviewed related

9    to Sapene LLC, which is one of the beneficiaries represented on

10   the flow chart, and was also just mentioned on the previous

11   slide as a 50 percent owner of the entity Pistache LLC.  This

12   page shows that the Pistache LLC bank account was opened at

13   Wells Fargo on January 23, 2012.

14   Q.  Who were the account signatories on Sapene LLC's bank

15   account?

16   A.  The original account signatory was Pegah Sadr, and then on

17   October 1, 2013 Ali Sadr was added as a second account

18   signatory.

19             MR. KROUSE:  If you could go to the next page.

20   Q.  What does this reflect?

21   A.  This is a summary of records I reviewed related to Setoma

22   LLC, which was one of the five beneficiaries represented on the

23   flow chart.  And this shows that I reviewed an operating

24   agreement for Setoma LLC, dated September 19, 2011, that is

25   signed by Pegah Sadr Hashemi Nejad, and she is represented as a

K398SAD4                        Nevins - Direct

1   50 percent owner of Setoma LLC.

2   Q.  Can I have the name again?

3   A.  Pegah Sadr Hashemi Nejad.

4            MR. KROUSE:  Your Honor, related to the travel chart,

5   which is in evidence, the government offers the underlying

6   exhibits reflected in the travel chart just for the record.

7            THE COURT:  OK.  Mr. Silverman, you're not ready to --

8            MR. SILVERMAN:  Which exhibit numbers?

9            MR. KROUSE:  I can read them.

10           1104, 1105, 1106, and actually continue through 1110,

11  2010, 2012, 2029, 2035, 2039, 2045, 2053, 2067, 2079, 2085,

12  2202, 2209, 2222, 2227, 2235, and that's it, your Honor.

13           MR. SILVERMAN:  No objection to the admission of those

14  documents.

15           THE COURT:  Thank you.  The exhibits just indicated by

16  Mr. Krouse are admitted.

17           (Government's Exhibits 1104, 1105, 1106, 1107, 1108,

18  1109, 1110, 2010, 2012, 2029, 2035, 2039, 2045, 2053, 2067,

19  2079, 2085, 2202, 2209, 2222, 2227, 2235 received in evidence)

20           MR. KROUSE:  Mr. Milione, Government Exhibit 704,

21  which is a summary chart.

22  BY MR. KROUSE:

23  Q.  Is this another chart that you created, Ms. Nevins?

24  A.  Yes, it is.

25  Q.  What does this chart show?

K398SAD4                        Nevins - Direct

 1   A.  This chart is a summary of evidence that I reviewed, but

 2   evidence of travel to or from Tehran, between the years 2010

 3   and 2014.

 4   Q.  By who?

 5   A.  By Ali Sadr.

 6   Q.  When you say travel, does this chart include travel

 7   reservations as well as passport entry stamps?

 8   A.  Yes.

 9   Q.  Do you have any personal knowledge of whether Ali Sadr took

10   the trips that he had reservations for?

11   A.  No.

12   Q.  So to be clear, this summarizes both reservations and

13   instances where there were actually stamps in the passport,

14   correct?

15   A.  Correct.

16   Q.  Is it reflected in the chart whether the trip indicated is

17   from a reservation or from a stamp?

18   A.  Yes.

19   Q.  Where is it indicated?

20   A.  It's indicated in the fourth column headed "source."  So

21   for those that are labeled e-mail electronic ticket with an

22   exhibit number, those were evidence of reservations, and the

23   majority of the chart is based on those.  And then on the

24   second page of the chart, there are some that the source is

25   listed as passport stamp, and then it says which passport that

1    stamp was found in.

2              MR. KROUSE:  Before we go there, Mr. Milione, stay

3    here and zoom in on the top part through the heading and the

4    columns.

5    Q.  If you could just describe what the jury is looking at from

6    the left to the right.

7    A.  There are four columns on this chart.  The first column is

8    date; the second column is the city from which the reservation

9    was departing; the third column is the to column, so the

10   destination city for that reservation; and the source is, as I

11   explained, the document that I sourced this information from.

12             MR. KROUSE:  If we could just briefly put on the

13   screen Government Exhibit 2202, which is the first source

14   there.

15   Q.  What are we looking at here?

16   A.  So the bottom half of the page shows a flight reservation

17   that was e-mailed to Mr. Ali Sadr.

18   Q.  Is this the sort of reservation document that you used in

19   constructing the chart that you just testified about?

20   A.  Yes.

21   Q.  Did they mainly all look this way?

22   A.  Most did not have e-mails at the top.  This one was one

23   that was unique to the others, in that most of them were just

24   the reservation and this one includes some correspondence about

25   that reservation, in which Mr. Sadr indicates that he can't

1    actually take the flight that is in this ticket reservation and

2    asks for a flight that is a few hours later.  The chart

3    reflects the later flight, not the one in this ticket, but most

4    of them are just the reservation.

5    Q.  By the reservation, you mean the bottom half, is this what

6    you mean by the reservation?

7    A.  Yes.

8           MR. KROUSE:  You can zoom out of that and go back to

9    Government Exhibit 704, please.

10          Mr. Milione, are you able to go to page 2?

11          It appears we are having some technical difficulties

12   so I will move on, your Honor.

13   Q.  Just if you can testify from your memory, page 2 and 3,

14   what is reflected on those pages?

15   A.  I believe there's only two pages to the document, but I'm

16   not sure, and it's just more such flights.  I believe there are

17   40-something total flights.  I don't remember the exact number.

18   And most are from e-mailed reservations like the one we just

19   looked at.  And then the final five to ten are from passport

20   stamps.

21   Q.  You testified you don't ultimately know if the defendant

22   took all the trips that he had reservations for in the e-mail

23   evidence?

24   A.  No, I don't.

25   Q.  Do you know whether the defendant took additional trips

1    other than what is in the e-mail evidence?

2    A.  I don't know.

3            MR. KROUSE:  May I have a moment, your Honor?

4            THE COURT:  You may.

5    Q.  So this is the last page on the chart.  And just for the

6    jury's reference, what are the last series of entries in the

7    chart, what does that reflect?

8    A.  So the bottom -- I haven't counted, but it appears to be

9    approximately ten entries -- reflect passport stamps as opposed

10   to tickets that I reviewed.  So these were actual stamps in the

11   passports.

12           If it states Tehran, Iran in the "from" column, it was

13   an exit from Tehran stamp.  If it reflects Tehran, Iran in the

14   "to" column, it was an entry to Tehran stamp.  And then the

15   fourth column, the source column, states which passport that

16   stamp was found in.

17   Q.  And the two different passports were Government Exhibit

18   205A and 206A?

19   A.  Yes.

20   Q.  For instance, in the first one, the April 10, 2012, you

21   know it was an entry stamp to Iran, but you don't know where

22   the defendant came from on that trip, correct?

23   A.  Correct.

24   Q.  That's why that column is blank?

25   A.  Yes.

K398SAD4                          Nevins – Cross

1          MR. KROUSE:  Nothing further.

2          THE COURT:  Mr. Silverman.

3   CROSS-EXAMINATION

4   BY MR. SILVERMAN:

5   Q.  Good afternoon.

6          I would like to start by asking you about GX 703.  You

7   described this as a flow of funds chart, I believe.

8   A.  Yes.

9   Q.  So your goal was to show how money flowed from the left of

10  the chart to the right side of the chart, correct?

11  A.  Correct.

12  Q.  And in your opinion, does this chart show money flowing

13  from the left side of the chart to the right side?

14  A.  Yes.

15  Q.  So the money that went from Clarity to Stratus Global then

16  flowed on to Fidelity National Title Company Purchase Number 1,

17  right?

18  A.  No.  Each arrow represents its own transaction.  I cannot

19  verify that the money in one arrow is directly sourced from the

20  money in another arrow.  It is merely listing transactions that

21  flowed in this direction.

22  Q.  In fact, there is evidence that the money didn't flow in

23  that way, right?

24  A.  Can you repeat the question?

25          MR. KROUSE:  Objection to form, your Honor.

K398SAD4                        Nevins - Cross

1            THE COURT:  Sustained.

2    Q.  In fact, you can see that the transfer from Stratus, if we

3    can look at the transfer from Stratus Global Investments to

4    Fidelity National Title Company Purchase Number 1?

5    A.  Yes.

6    Q.  That occurred on October 24, 2011, right?

7    A.  Correct.

8    Q.  And if we can go back over to the left slightly and look at

9    the five transfers in the Stratus Global.  Those all occurred

10   several months after, right?

11   A.  Correct.

12   Q.  So the money that was transferred from Clarity to Stratus

13   Global was not transferred to Fidelity National Title Company

14   Purchase Number 1, was it?

15   A.  I only reviewed records from Clarity's bank accounts for

16   the period of January 2012.  I did not have access to earlier

17   records.  So as far as what is reflected on the chart, that's

18   correct.

19   Q.  Fair enough.  These five transfers of money, though, they

20   didn't flow to Stratus Global and then through to Fidelity,

21   right?

22   A.  Correct.

23   Q.  If we can look at the -- if we zoom out and look at the

24   September 23, 2011 transfer to Setoma.  That wasn't sourced in

25   those five transfers either, right?

1    A.  Correct.

2    Q.  So you're not sure whether or not the money that is flowing

3    into these five companies on the far right actually came from

4    the transfers on the left, are you?

5    A.  I can't be sure of that.

6    Q.  On this chart, you didn't include foreign currency

7    transactions, right?

8    A.  Right.

9    Q.  It was just the U.S. dollar accounts?

10   A.  Correct.

11   Q.  So if Clarity had received $8.6 million worth of euros,

12   that wouldn't be on this chart?

13   A.  No.

14   Q.  And if Clarity exchanged those euros into U.S. dollars,

15   that exchange wouldn't be on this chart?

16   A.  I was only reviewing records that I was given related to

17   these specific payments.  So if it's not on the chart, I did

18   not review it.

19   Q.  Essentially, what I am trying to get at is, the money on

20   the far right, that could have come from other sources instead

21   of Clarity, correct?

22   A.  It could have.

23   Q.  Now, I just want to ask a few questions about the five

24   companies on the far right.

25               Two of them are the same, right, Fidelity National

1   Title Company?

2   A.   Yes.

3   Q.   Those are transfers to purchase land in California, right?

4   A.   Correct.

5   Q.   And Setoma, that's a California LLC?

6   A.   Yes.

7   Q.   And Sapene, that's a California LLC?

8   A.   Yes.

9   Q.   And Malibu Escrow Corporation, that received money to

10  purchase land in California as well, right?

11  A.   Correct.

12  Q.   So all five of these are the money ending up in California?

13  A.   Right.

14  Q.   Does the money end up in Iran anywhere on this chart?

15  A.   I only reviewed records showing money going to California.

16  Q.   Just one further question about a couple of these.

17          Are you aware whether or not Ali Sadr has any interest

18  in Setoma LLC?

19  A.   I am not aware.

20  Q.   Are you aware whether or not he had any interest in the

21  land purchased from Malibu Escrow Corporation?

22  A.   I am not aware.

23          MR. SILVERMAN:   If we can pull up GX 704, please.

24  Q.   Now, this is the travel chart that you prepared in

25  conjunction with the prosecutors, correct?

K398SAD4                          Nevins - Cross

1    A.  Correct.

2    Q.  Specifically, you took a chart that had been prepared by

3    Jane Kim, is that right?

4    A.  Yes.  Partially.  I supplemented a chart that I received.

5    I verified all of the entries independently, and then I added

6    to it.

7               MR. KROUSE:  Objection.  Relevance.  There is no claim

8    that it's inaccurate, your Honor.

9               THE COURT:  As to what has been asked already,

10   overruled.  But I have the objection in mind.

11              MR. SILVERMAN:  Understood, your Honor.

12   Q.  I would like to ask you about a few rows on this.

13              You were very clear that you were not sure that all of

14   these trips took place, but I would like to focus on a few rows

15   and ask whether you believe they took place.

16              MR. SILVERMAN:  If you could zoom in on February of

17   2011.

18   Q.  There is a February 17 trip from Dubai to Tehran, correct?

19   A.  Correct.

20   Q.  And then a February 19 trip from Dubai to Tehran, correct?

21   A.  Correct.

22   Q.  And a February 21 trip from Frankfurt to Tehran, right?

23   A.  Right.

24   Q.  Does it seem likely that all three of those trips occurred?

25   A.  I don't know.

1           MR. SILVERMAN:  If we can zoom out and go back to

2     December 2010.

3     Q.  Within four days, there are two trips from Istanbul, Turkey

4     to Tehran, correct?

5     A.  Correct.

6     Q.  The next trip is similarly from outside of Iran into Iran?

7     A.  Correct.

8     Q.  So you don't know whether either of those Istanbul trips

9     actually occurred, right?

10    A.  Correct.

11    Q.  There may be records showing that Ali Sadr was in Zurich,

12    right?

13    A.  I don't know.

14          MR. KROUSE:  Objection.

15          THE COURT:  Overruled.

16          MR. SILVERMAN:  If we can just scroll down to April

17    and May of 2011.

18    Q.  Specifically, April 30, May 4, May 14, a similar pattern

19    emerges, multiple trips to Tehran in a row?

20    A.  Sure.  Yes.

21    Q.  And it's fair to say you don't know which of these actually

22    represents a trip to Tehran in Iran in which never happened?

23    A.  I don't know.

24          MR. SILVERMAN:  If we can go to page 2 of the chart,

25    please.

K398SAD4                         Nevins - Redirect

1    Q.  I want to focus on the rows that are from the passports.

2              Now, there actually is evidence that these trips

3    occurred, is that right?

4    A.  In that a passport stamp is reliable evidence that that

5    passport was used to enter or exit the country from where the

6    stamp is from, then yes.

7    Q.  Each of these trips is less than a week, right?

8    A.  I haven't memorized the dates, but that appears to be

9    correct.

10   Q.  We have got two trips of one day and five days in 2012?

11   A.  Yes, I see that.

12   Q.  Then there is no travel to Iran from May 2012 until

13   February 2014, correct?

14   A.  Not in the records I reviewed.

15              MR. SILVERMAN:  No further questions, your Honor.

16              THE COURT:  Mr. Krouse.

17              MR. KROUSE:  Just briefly, your Honor.

18   REDIRECT EXAMINATION

19   BY MR. KROUSE:

20   Q.  Just on the travel charts 704, which we were just looking

21   at, again, you have no idea whether those reservations were

22   actually used by Ali Sadr, correct?

23   A.  Correct.

24   Q.  You just reviewed the evidence that the reservations were

25   made?

K398SAD4                      Nevins - Redirect

1    A.  Yes.

2            MR. KROUSE:  Mr. Milione, Government Exhibit 703.

3    Q.  Mr. Silverman asked a few questions about this and the

4    tracing of the funds.

5            Again, this summarizes evidence that you reviewed,

6    correct?

7    A.  Correct.

8    Q.  You don't know anything about these entities, is that

9    right?

10   A.  That's right.

11   Q.  Other than what you have testified about, correct?

12   A.  Correct.

13           MR. KROUSE:  If you could zoom in, Mr. Milione, at the

14   top, the flow from Stratus Global Investments to the

15   three -- no, from Clarity through Global Investments to the

16   other entities, just the top half.

17   Q.  Do you see a transaction here from Clarity Trade & Finance,

18   on April 13, 2012, for $500,020 to Stratus Global Investments?

19   A.  Yes.

20   Q.  And then do you see a transaction from Stratus Global

21   Investments in the sort of middle, April 13, 2012, for $499,960

22   to Setoma LLC?

23   A.  Yes, I do.

24   Q.  That's the exact same day, correct?

25   A.  Correct.

1    Q.  It's $500,020 and then approximately $500,000 to this other

2    entity, correct?

3    A.  Correct.

4    Q.  Do you see on April 27, 2012, a $600,000 transfer from

5    Clarity Trade & Finance to Stratus Global Investments?  Do you

6    see that?

7    A.  Yes, I do.

8    Q.  Then three days later, from Stratus Global Investments,

9    April 30, 2012, for approximately $500,000 to Sapene LLC?

10   A.  Yes.

11          MR. KROUSE:  Mr. Milione, you can zoom out of that.

12   Q.  Then do you see from PDVSA to Clarity Trade & Finance, on

13   April 13, 2012, a transaction for $15.6 million?

14          MR. SILVERMAN:  Objection.  Going beyond the scope.

15          MR. KROUSE:  This is directly --

16          THE COURT:  I understand.

17          Overruled.

18   A.  I do.

19   Q.  That reflects a $15.6 million transaction from PDVSA to

20   Clarity Trade & Finance, correct?

21   A.  Correct.

22   Q.  That's the same date as those other transfers that we just

23   covered, the April 13 ones?

24   A.  Yes.

25   Q.  Going from Clarity Trade & Finance to Stratus Global

K398SAD4

1   Investments, and then down to Setoma LLC.  Do you see that?

2   A.  Yes, I do.

3          MR. KROUSE:  No further questions, your Honor.

4          THE COURT:  All right.  Nothing further.

5          Thank you, Ms. Nevins.  You may step down.  You are

6   excused.

7          The government may call --

8          MR. KROUSE:  I think there is an issue to take up.

9          THE COURT:  Mr. Scott is checking to see if the snacks

10  are here.

11         Members of the jury, we have one more legal issue to

12  take up between the witnesses.  So he will be back in a second.

13  If the snacks are here, we will take a slightly early

14  mid-afternoon break so that you're not sitting here.  Just a

15  moment, please.

16         We will take our mid-afternoon break for about 15

17  minutes.  Thanks, members of the jury.

18              (Jury exits courtroom)

19              (Continued on next page)

20

21

22

23

24

25

K398SAD4

1           MR. KROUSE:  Just for the record, the government

2    offered a bunch of exhibits at the beginning of Ms. Nevins's

3    testimony.  Then in the middle we offered more and those were

4    admitted.  We still do want the ones admitted that we offered

5    even though we aren't going to go over them with the paralegal

6    reader.  We do need them in evidence and argue from them.  So

7    to the extent defense has any objections to them.

8           THE COURT:  I think the request was just clarity as to

9    what that list was so that they can make that assessment.  Mr.

10   Silverman indicated -- I am not sure what happened, but he

11   didn't have in mind the list that you were reading.

12          MR. KROUSE:  So I will show him the list again and see

13   if there are any issues.

14          THE COURT:  Ms. Kim, try this again.

15          MS. KIM:  So there are defense objections to four

16   exhibits, I believe on relevance grounds.  The first one is

17   Government Exhibit 2261.

18          THE COURT:  Pull it up, if possible.

19          MS. KIM:  I can describe the exhibit.  And it goes on

20   to the second page.  It is an e-mail chain that is forwarded to

21   the defendant.  The subject is domains availability and it

22   discusses changing websites and domains for the Stratus Holding

23   websites.

24          On the second page, there is a statement that says,

25   from Aghajani, "With regard to sanction issues, I wish our

K398SAD4

domains are being registered for the entity.  I don't know who

is responsible here.  Otherwise we may miss them sooner or

later."

          And on the first page, there is a discussion also

about sanctions, where it says, "This is too risky and we might

lose our domains at any time with regard to U.S. sanctions

issues."

          Your Honor, this e-mail chain is from January 2013,

and in 2013 there's also evidence, which we will seek to offer

this afternoon, that in August 2012, the defendant instructed

his employees to take down a website for the Iranian

International Housing Company, as well as he reached out to a

reporter of the Business Year and stated that the news article

should be taken off the Business Year's website because it was

creating sanctions problems.

          So we believe that this e-mail is directly relevant to

the fact that during this time period the defendant is

scrubbing and aware of the online presence of the company, and

the fact that others, for example, banks and regulators, could

Google him, members of his family, his father, as well as the

Stratus entities to determine where they are located.

          (Continued on next page)

K39TSAD5

1          MR. SILVERMAN:  Your Honor, we haven't objected to the

2   two exhibits that Ms. Kim mentioned that do directly --

3          THE COURT:  So no objection to 2261?

4          MR. SILVERMAN:  We do object to 2261, which is not

5   related to the sanctions in the way Ms. Kim is making it out to

6   be.  The sanctions have a complex relationship with the

7   internet that I frankly don't understand the exemptions, but

8   what they were talking about here is not violating the

9   sanctions in terms of services for the benefit of Iran.  There

10  is an internet exemption.

11         THE COURT:  That wasn't the proffer of relevance just

12  made, the proffer of relevance was that it goes to scrubbing

13  and awareness of IIHC.

14         MR. SILVERMAN:  I apologize, your Honor, I did not

15  address that directly.  There is no scrubbing involved in this

16  email.

17         THE COURT:  That sounds like weight, not relevance, so

18  I overrule on 2261.

19         MS. KIM:  Your Honor, the next Exhibit 2143, if we

20  could pull this up.

21         It's a communication, there's two pages and there's

22  discussion about paying a subcontractor Sandvick for two jumbo

23  drills at the top, and then there's discussion about putting

24  together an invoice because the payment for the drills has not

25  been processed, it's been rejected.  So as they're putting

K39TSAD5

together the invoices, the defendant states:  Linet, make sure

no communication has any mention of Iran and it is only Stratus

Turkey that has been behind everything.

        So for this document, your Honor, we believe it's

directly relevant to the defendant's state of mind, his

awareness both of sanctions and taking out Iran and replacing

Iranian International Housing Company with Stratus Turkey.

        MR. SILVERMAN:  Your Honor, this is a Euro payment

that has to do with a project that is not involved in the

Venezuela project whatsoever.  It's purely an entity to remove

the name Iran at this point, it's not knowledge of U.S.

sanctions in any way, and Mr. Sadr's knowledge of the sanctions

is no longer in reasonable dispute in terms of whether or not

he knows they exist.

        MS. KIM:  Your Honor, it also goes to scrubbing and

taking out when he says no trace or mention of Iran, it goes to

the fact he is making sure all the documents, the invoices

related to the project don't have the name Iran in them.  And

that's something that happens from the start of his involvement

in the Venezuela project but particularly in 2011 and 2012.

        THE COURT:  How do you argue to the jury what this has

to do with -- it's the same structured argument with the

document Mr. Krouse and I had an extended exchange on prior.

It's the same time period as the relevant transactions, but is

it just an argument that he's removing the name Iran from other

1   matters from which the government will argue that he therefore

2   did that here?

3           MS. KIM:  Your Honor, this is sort of a different

4   situation than the other document.  Here, this is directly

5   related to the project, and so it is about Sandvick Company,

6   and we have -- there's other evidence that Sandvick was a

7   subcontractor for this particular project.

8           MR. SILVERMAN:  Your Honor, may I be heard?

9           THE COURT:  You may, but not yet.  We take turns.  We

10  try, anyway.

11          MS. KIM:  So when he's referring to Stratus Turkey,

12  what we argue from that is, A, he's directing his employees to

13  replace IIHC with Stratus Turkey on these invoices.

14          THE COURT:  Invoices related to the Venezuela project?

15          MS. KIM:  Yes, your Honor.

16          THE COURT:  Go ahead.

17          MR. SILVERMAN:  Your Honor, that is factually

18  incorrect.  This is related to a shipment of a jumbo drill

19  planned to go into Iran for a completely unrelated project, and

20  it was -- I don't know how to respond to that, it's not

21  accurate.

22          THE COURT:  You don't think there's a basis for the

23  government to suggest that this pertains to a subcontractor for

24  the Venezuela project?

25          MR. SILVERMAN:  No, I don't think there is a basis.  I

K39TSAD5

1       think I know the email that Ms. Kim is suggesting in which they

2       discuss an invoice to IIHCO versus Stratus Turkey, and we have

3       not objected to that email's admission, but that email does not

4       deal with Sandvick, it deals with Alper Insaat.

5               MS. KIM:  Your Honor, the response there is that

6       Alpert and Sandvick, our understanding is they were both

7       subcontractors used in connection with the Venezuela project,

8       and --

9               THE COURT:  What's the basis for the understanding

10      that Alpert Ansaat was related to the Venezuela project?

11              MS. KIM:  I believe there's another document already

12      in evidence that relates to -- that discusses Alpert as a

13      subcontractor.

14              THE COURT:  What document?

15              MS. KIM:  I can find that.

16              MR. SILVERMAN:  Your Honor, Sandvick is the

17      subcontractor in this.  We agree Sandvick may be a

18      subcontractor, but it's not in this payment.  This deals with

19      an Iranian project.

20              THE COURT:  Well, you're telling me this deals with an

21      Iranian project, and the government is telling me this deals

22      with a Venezuela project.  To the extent either of you can back

23      up your assertions, I'm able to assess relevance, otherwise it

24      seems to me these are things you will argue to the jury.

25              Clearly if it is connected -- not clearly, I think,

K39TSAD5

 1  Mr. Silverman, you agree if it is -- if the inference is
 2  available it's connected to the Venezuela project, it's
 3  relevant.  So help me make the assessment, and if there are
 4  different things to argue about it to the jury, so be it, but
 5  the government is proffering -- and Ms. Kim will back it up
 6  with the document she's looking for -- that the subcontractor
 7  here with respect to 2143 is for the Venezuela project.
 8          MR. SILVERMAN:  Your Honor, if you look at 2143A, the
 9  attachment to this email, you will see that the delivery was to
10  the Bandar Abbas customs, and Bandar Abbas is in Iran.
11          THE COURT:  What's being shown to me has no bearing on
12  the words you're saying.
13          MR. SILVERMAN:  2143A-T, the translation.
14          Your Honor, co-counsel is pointing out to me this is
15  for jumbo drills to build a tunnel in Kyrgyzstan, Iran, and
16  there were no tunnels involved in the Venezuela project that
17  would require a jumbo drill.
18          MS. KIM:  Your Honor, so I go have the document about
19  Alpert, which is 2136BT.
20          THE COURT:  So that now the representation is this
21  doesn't pertain to Alpert, 2143, it pertains -- the relevant
22  subcontractor is Sandvick.
23          MS. KIM:  Yeah, so this was in response to the Court's
24  question, but this document shows that Alpert is a
25  subcontractor.

K39TSAD5

1            THE COURT:  Which document?

2            MS. KIM:  2136BT.

3            MR. SILVERMAN:  We don't dispute that, your Honor.

4            THE COURT:  What about Sandvick?

5            MS. KIM:  For Sandvick I don't have the specific

6    document.  I'm happy to look for it.

7            THE COURT:  If you can proffer a connection to

8    Sandvick in light of the tunnel argument -- shorthanded is that

9    it's for tunnel digging equipment and there are no tunnels in

10   the Venezuela project.  I have no idea, but if you can find the

11   comparable document with respect to Sandvick that shows how

12   this is -- how you could argue to the jury that 2143 is tied to

13   Venezuela project; if you can, it can go in, I just need to

14   know what the basis is for that.

15           MS. KIM:  We will look for that.

16           THE COURT:  In the absence of the government

17   affirmatively making that proffer, this is out.

18           MS. KIM:  And then there's one other document which is

19   2142 -- and maybe we can start with 2037, sorry.

20           So 2037 is a May 9, 2011 email, it's about

21   restructuring Stratus Turkey, and it's from Cetinel to the

22   defendant.  And the large paragraph explains that they're

23   trying to restructure Stratus Turkey and there's a requirement

24   that five actual persons or legal entities or some combination

25   is required.  It goes on to say one Austrian company is not

K39TSAD5

1    sufficient, and so they're trying to reorganize Stratus Turkey.

2             I am urged to move forward to explain that this

3    document also is:  None of us want our individual names shown

4    on the structure due to the reasons in Venezuela and Iran.

5             Now if we could move to 2142.

6             THE COURT:  Which is the document in issue.

7             MS. KIM:  Yes.  My understanding is that that there's

8    no objection to 2037, so at the bottom of 2142 there's

9    discussion between Linet Estiroti and the defendant, number one

10   is establishing one Austrian company, shareholder structure as

11   Spanrise, and then also a list of things to do, the last is

12   catalogs, booklets, business cards.

13            And so if you go to the top and then down in the

14   middle, the defendant's assistant writes back and asks:  What

15   official address should we use?  Should we use Mr. Schneider's?

16   And then the defendant responds and says no one should mention

17   any ties to from me or Iran.

18            The government's position is this refers not just

19   to -- this refers to all of the entities and all of the action

20   items on this list including the setting up the Austrian

21   company.

22            THE COURT:  Okay.

23            MR. SILVERMAN:  Your Honor, there are two key points

24   about this email and why it doesn't relate to the Venezuela

25   project.  First of all, it's a year and a half after Ms. Kim

K39TSAD5

1    mentioned that they were restructuring Stratus Turkey, an email

2    that we have not objected to.  We understand the connection

3    there.  The connection is not here where they're no longer

4    restructuring Stratus Turkey.  And the next sentence that no

5    one is to mention ties to me and Iran, this is only to Pilatus

6    and the Bank of Malta.  There's no relationship to the

7    Venezuela project, it's just for the propensity inference that

8    he says no one should mention any ties of me to Iran.

9            MS. KIM:  What I would say in response to that, and

10   also the argument for 2143 with respect to Sandvick, is those

11   are weight arguments and the defense can make those arguments

12   in summation about these documents.

13           THE COURT:  Well, with respect to 2143, we have some

14   proffer as to tie, as you said.  The objection is sustained,

15   although I'm happy to hear the proffer, but in the absence of

16   that which you're making now, it can't come in.

17           Here could you address the time frame issue?  The tie

18   that you made to the earlier email, for which there's no

19   objection, relates to the establishing of the Austrian company.

20   I'm told that this email, 2142, is not relevant to that earlier

21   email because it occurred after the structuring of the Austrian

22   company.  Is that accurate?

23           MS. KIM:  I can't speak to that.  I haven't seen any

24   evidence of that.  What I can say is based on this document and

25   the two combined, they both refer to the establishing and

K39TSAD5

1    structuring of an Austrian company.  And so that, in our minds,

2    links this document to the Venezuela project.

3          MR. SILVERMAN:  Your Honor, Mr. Sadr had multiple

4    Austrian companies.  This Austrian company was to be the

5    holding company for Pilatus, which was then the holding company

6    for Pilatus Bank in Malta.

7          MS. KIM:  Again, defense can argue that goes to the

8    weight of the document, but this document also goes to the

9    defendant's state of mind and the fact that he's aware that

10   Iran should not be included in any of these business documents.

11         THE COURT:  So long as it's tied to the Venezuela

12   project, fine, if it's not, then you are running into the

13   propensity problem, so I'm sustaining.

14         MR. KROUSE:  If I may be heard on that, your Honor?

15         THE COURT:  No.  I have a one-lawyer rule, and I

16   ruled, so to allow a second lawyer to argue it after I ruled

17   means we'll never get back to trial.

18         MR. KROUSE:  Understood.

19         THE COURT:  You get your chance.  As with 2143, if you

20   can proffer a tie other than the use of the words "Austria

21   company," given the representation, no reason to discount it,

22   by defense counsel, and in light of the argument Ms. Kim just

23   made, which sounded like a propensity argument to establish

24   essentially what the government wants to establish, Mr. Sadr

25   did here hide the connection to Iran.  It's 404(b), 403 and

K39TSAD5

1    minimally 401.

2              What else?

3              MS. KIM:  I just want to confirm that there are no

4    objections anymore to 1213.

5              THE COURT:  Ms. Kim, what's your best estimate as to

6    this witness?

7              MS. KIM:  45 minutes.

8              THE COURT:  All right.  We'll take a two-minute

9    bathroom break.

10              (Recess taken)

11              THE COURT:  One more, I'm told.

12              MR. KROUSE:  Yes, your Honor.  Before we get to that,

13    the parties have conferred on what the government offered with

14    the witness, there's now no objection to admitting all of it,

15    except for 1213, so that's the one pending objection.

16              THE COURT:  So the --

17              MR. KROUSE:  I think it's 1213 and 1213A, the

18    attachment.

19              THE COURT:  Otherwise, the documents that Mr. Krouse

20    offered didn't come in, Mr. Silverman, other than the 1213 and

21    attachment, no objection?

22              MR. SILVERMAN:  No objection, your Honor, and I

23    apologize for taking everybody's time on that.

24              THE COURT:  So those will be admitted.

25              For clarity of the record, Mr. Krouse, when we're done

K39TSAD5

1    at the end of the day I will have you say them again.

2            MR. KROUSE:  Yes, understood, your Honor.

3            THE COURT:  1213.

4            MR. SILVERMAN:  Yes, your Honor, we object on hearsay

5    and relevance grounds similar to the email attaching the letter

6    from the Iranian ambassador to Venezuela that your Honor ruled

7    on several days ago.

8            And counsel advised me I should clarify Mr. Sadr is

9    not copied on this email.

10           THE COURT:  All right.  Mr. Krouse?

11           MR. KROUSE:  Yes, your Honor, this is squarely within

12   the project.  It's not offered for the truth of what's

13   contained in the letter that was sent by the Iranian Minister

14   of Industry to the Minister of Petroleum and Energy of

15   Venezuela, it's offered for the fact that the Minister of

16   Industry for Iran was brought in by the company to send this

17   letter to the Venezuela counterpart.  It's not offered for what

18   is within it, the truth of the statements within it are not

19   relevant in the government's view, it's offered for the

20   involvement of the Iranian government.

21           THE COURT:  Which is derived from the content of the

22   text.  It does sound parallel.  It would drive a truck-sized

23   hole through the hearsay rule if every time someone wanted to

24   argue some truth value purpose they said simply we're not

25   offering it for the truth, we're just offering it for the fact

K39TSAD5

1     that it was said, which is the structure of this argument, that

2     what is said, the accuracy of what was said, involvement of the

3     minister, those are things that derive from the truthfulness of

4     the letter.  And so for the same reasons -- we had the same

5     argument with respect to the prior ambassador letter, if

6     there's a different argument to make, I will hear it, but we're

7     not going to retread that ground.

8          MR. KROUSE:  I have an alternate suggestion, with the

9     Court's permission I could suggest, is to redact the letter

10    itself and just leave the to/from heading and the subject line

11    for the fact that there is a letter being sent on this date by

12    this party.

13         THE COURT:  It's the subject line that's the problem.

14    It's a truth value purpose, it's a truth purpose.

15         MR. KROUSE:  It's not --

16         THE COURT:  Let's say it's -- this is the same

17    argument.  If you were saying just the to and the from and the

18    date, I suppose there's a different argument, but that's not

19    what you're seeking.

20         MR. KROUSE:  We can seek that, your Honor, along with

21    the email.

22         THE COURT:  What will you argue from it?

23         MR. KROUSE:  Because this letter, 1213A, is attached

24    to an email from a co-conspirator.  So Mr. Karimi I believe his

25    statement in that email is a co-conspirator statement.  The

1   minister's letter has been translated and we'll await for your

2   decision for further actions.

3          I think the email is admissible for a co-conspirator

4   statement, and we would only introduce the attachment to extent

5   that it shows the header, to, from, and we don't need the

6   subject.

7          MR. SILVERMAN:  Your Honor, in connection with a

8   project between the Venezuela government and what opposing

9   counsel characterizes as an Iranian company, I think that

10  including the header of a message from the Minister of Mines

11  and Commerce to the Honorable Minister of Venezuela would cause

12  all sorts of 403 problems.

13         THE COURT:  You don't -- do you have a basis to

14  objecting to 1213 absent the attachment?

15         MR. SILVERMAN:  Just relevance, because Mr. Sadr is

16  not on it.

17         MR. KROUSE:  This is a co-conspirator statement in the

18  same way other co-conspirator statements have been admitted.

19         THE COURT:  That's a hearsay response.  I guess the

20  question is -- and they have not asserted a hearsay objection,

21  so from the email, what would you argue to the jury?

22         MR. KROUSE:  Your Honor, it's not a proper relevance

23  objection to say that just because Mr. Sadr is not on --

24         THE COURT:  I didn't say it was, I'm asking you what

25  would you argue to the jury from 1213 itself.

1          MR. KROUSE:  That on this date, July 3, 2014,

2    Mr. Karimi, along with other conspirators named Zangeneh,

3    Safavardi, sent those other individuals, in furtherance of this

4    effort to get paid for the project itself, an email attaching a

5    letter from an Iranian government official and asked to --

6          THE COURT:  You've imported the content of the letter.

7          MR. KROUSE:  Taking out the letter itself.

8          THE COURT:  But you have imported it by saying seeking

9    to get paid.  There's nothing about that in the email, so I'm

10   sustaining the objection.

11         Let's get our jury.

12         MR. KROUSE:  Your Honor, so I -- just to be clear,

13   should I read those now or after we rest?

14         THE COURT:  You did read them, so I will just say to

15   the jury that the earlier documents that went to the chart for

16   the prior witness I'm admitting, and then at the end of the day

17   outside of the jury, for clarity of the record, you will repeat

18   what the exhibit numbers were, please.

19         MR. KROUSE:  Understood.

20         THE COURT:  So my plan is close this witness,

21   Mr. Krouse.  The government has nothing further at this time,

22   correct.

23         MR. KROUSE:  That's correct.

24         THE COURT:  So what I suggest is you say that, and

25   then I send the jury home to return at 12:30 tomorrow.

K39TSAD5

1          The juror who had the potential child care issue tells

2     me they're okay for tomorrow, and so we could proceed at 12:30.

3     So I will send them to return at 12:30 for the remainder of the

4     day, and we'll be dealing with the non-disclosure issue.  And

5     to the extent that the defense wants to orally go into the Rule

6     29 motion and its briefing, it can do so with additional time

7     tomorrow if the charge is done.

8          Everybody agree with that schedule suggestion?

9          MR. KROUSE:  Yes, your Honor.

10          THE COURT:  Mr. Weingarten?

11          You're shaking your head yes.  Please bring in the

12     jury.

13          (Jury present)

14          THE COURT:  Ms. Kim, the government may call its next

15     witness.

16          MS. KIM:  Your Honor, the government recalls Talya

17     Nevins.

18          THE COURT:  Ms. Nevins may return.

19          MS. KIM:  While she's coming to the courtroom the

20     government would like to offer the following exhibits:  2015,

21     2015B, 2015D, 2015DT, 2077, 2074, 1503, 1503T, 1503A, 1503A-T,

22     2087, 2087A, 2087B, 2116, 2116A, 2126, 2126A, 2153-1, 2153-2,

23     2154-1, 2154-2, 2139, 2261, 2229, 2229A, 2234, 2234A, 2282,

24     2282A, 2156, 2238, 2145, 2037, as well as 910 through 917,

25     2021A-T, 2104T, and 1103.

K39TSAD5

1         MR. SILVERMAN:  After 2282 were not on the list for

2    this witness.

3         MS. KIM:  That's the list that I gave you during the

4    break on that Post-it.

5         THE COURT:  Why don't you confer, counsel.

6         (Pause)

7         MS. KIM:  So there are three, 2021A-T, 2104T and 1103

8    that defense counsel is checking, and the remainder the

9    government offers.

10         THE COURT:  With the exception of those?

11         MR. SILVERMAN:  No objection.

12         THE COURT:  Those documents are admitted.

13         (Government's Exhibits 2015, 2015B, 2015D, 2015DT,

14    2077, 2074, 1503, 1503T, 1503A, 1503A-T, 2087, 2087A, 2087B,

15    2116, 2116A, 2126, 2126A, 2153-1, 2153-2, 2154-1, 2154-2, 2139,

16    2261, 2229, 2229A, 2234, 2234A, 2282, 2282A, 2156, 2238, 2145,

17    2037, 910 through 917 received in evidence)

18         THE COURT:  Note also that during the prior

19    examination Mr. Nevins, Mr. Krouse had offered a number of

20    exhibits, and we bracketed those.  With the exception of 1213,

21    those exhibits have been admitted.

22         And with that, we will swear in Ms. Nevins.

23         (Continued on next page)

24

25

K39TSAD5                        Nevins - Direct

1    TALYA NEVINS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. KIM:

6    Q.  Ms. Nevins, could we please first turn to Government

7    Exhibit 2015.

8         MS. KIM:  And if we could zoom in on the bottom header

9    on the email, this is an email dated February 28, 2011, from MQ

10   Sardush (ph) to Mohammad Zaira D (ph), and the subject is

11   changing business name.  And if we zoom in on the top header

12   and message.

13        This is a forward of that email to the defendant --

14   and sorry, this is a forward dated March 7, 2011, the same

15   subject, changing business name, it's from the defendant to

16   Zangeneh with four attachments.

17   Q.  Could you please read after "Dear Mr. Zangeneh" the last

18   two paragraphs of that email.

19   A.  Please see attached the documents forwarded by Mr. Karimi

20   in order to make some necessary changes to our trade name in

21   Venezuela so we can make our transactions a bit easier.

22        Let me know when we can conclude on this, as we

23   requested for our last invoice to be paid in U.S. dollars,

24   which makes this name change a bit more crucial.

25        MS. KIM:  And if we could turn to 2015B, and zoom in

on the first half with the letterhead down through the date.

Q.  What company's letterhead is listed on the top of this

document?

A.  Iranian International Housing Company CA.

Q.  And what is the title of the document?

A.  Minutes from extraordinary general meeting in Iranian

International Housing Company.

Q.  And what's the registration number listed?

A.  286445.

        MS. KIM:  And if we could zoom out of this and zoom in

to "The chairman then declared," down through that next

paragraph.

Q.  If you could read from "The chairman then declared."

A.  The chairman then declared the meeting duly convened to

consider the agenda as follows:  Using company's abbreviation

name instead of its full business name.  Mister, stating

project manager points of view in respect of using company's

abbreviation name, i.e., IIHC, instead of company's full name,

i.e. Iranian International Housing Company, CA SHERKA-TE BI --

Iranian on all documents and correspondence of the company, as

well as formal notification of the subject Venezuela legal

authorities emphasizing on using full legal capacities to make

Venezuela project as convenient and smooth as possible, taking

due account of the local circumstances of the project's

location and required shareholders' consideration and opinions

K39TSAD5                          Nevins - Direct

1    of general meeting members.

2                 MS. KIM:  Thank you.  And go to 2077 and focus on the

3    bottom half of the page.  This is an email dated October 24,

4    2011 from Mustafa Cetinel to the defendant, and the subject is

5    name change of IIHC company.

6    Q.  If you could read the message that follows.

7    A.  Dear Ali Jan,

8                 Further to our conversation in Istanbul, I suggest two

9    names for the change as follows:  1.  International Industrial

10   Housing Company.  2.  International Iron Housing Company.

11                Could you please check with the availability of the

12   above names in the registry office of Iran so we can proceed

13   with notification process at this end.

14                MS. KIM:  Thank you.  If we zoom out and zoom in on

15   the top half of the document.  This is an email from the

16   defendant dated October 24, 2011 to Cetinel, and the subject is

17   the same, name change of IIHCO.

18   Q.  If you could please read the first sentence.

19   A.  Hope all's well in Venezuela.  I think the first choice is

20   a good one, but to keep it in the right order I think it should

21   read Industrial International Housing Company.

22                MS. KIM:  Okay.  If we could move down to Government

23   Exhibit 2074 and zoom in on the bottom email.  This is an email

24   chain, and this particular portion is dated October 17, 2011

25   from Mustafa Cetinel to Ekrem Cinar.  The subject is change of

1  the name of company.

2  Q.  If you could please read the first two paragraphs.

3  A.  Due to developing circumstances, it is decided that name of

4  company will be changed from Iranian International Housing

5  Company, IIHC, to International Housing Company, IHCO.

6       As I consulted with our legal and contract departments

7  before in this regard, is this is a major change in the company

8  and should be advised to employer and obtain their agreement

9  through amendment.  We should reach to agreement very quickly

10  in this regard.  Accordingly, board of the company will gather

11  and make the resolution to change the name of company with an

12  immediate effect.

13       MS. KIM:  Thank you.  If we could zoom in on the top

14  of the email chain, the email is forwarded to the defendant on

15  October 17, 2011, from Mustafa Cetinel, the subject is the

16  same, change of the name of the company.

17  Q.  If you could read the first line.

18  A.  I commenced the procedure.  As soon as response from

19  employer, I will inform you back.

20       MS. KIM:  Thank you.  If we could turn now to

21  Government Exhibit 1503T, this is a translation of Government

22  Exhibit 1503, the subject is forward IPC 17 and 18 bank account

23  from Gabriela Sanchez dated October 24, 2011.

24  Q.  If you read the first sentence.

25  A.  Good morning.  I'm forwarding you the communication for

1    processing payment of the Iranian IPCs.

2            MS. KIM:  So we're going to sort of put a pin on this

3    document and come back to the attachments, but for now if we

4    could turn to Government Exhibit 2087.

5            This is an email from Ali Sadr to Urs Schneider at

6    Hyposwiss with two attachments dated December 9, 2011, the

7    subject is IPC 17 and 18.  And the message says:  Dear Urs,

8    please find attached IPCs related to the recent incoming funds.

9            So if we could please compare 1503A at page 2, those

10   are the attachments to the first email we just read, and 2087A

11   at 1.

12           If you could please zoom in for both of them just the

13   top through the date, so before the demonstration, if you could

14   zoom in on the same content on the other document.

15   Q.  So looking at the top, this is zooming in to Government

16   Exhibit 2087A, what is the company letterhead on the top of

17   this IPC?

18   A.  DUCOLSA.

19   Q.  What is on the right?

20   A.  IIHCO.

21   Q.  What is the valuation number?

22   A.  17.

23   Q.  What's the date, or the date that's reflected in the bottom

24   right-hand corner?

25   A.  August 31, 2011.

K39TSAD5                        Nevins - Direct

1    Q.  Turning to the bottom, which is zooming in to 1503A, what

2    is the company letterhead on the top right of this document?

3    A.  Iranian International Housing Company.

4    Q.  What's the valuation number?

5    A.  17.

6    Q.  And what's the date on the bottom right corner?

7    A.  August 31, 2011.

8           MS. KIM:  Now if we could please compare Government

9    Exhibit 1503A at 3 and 2087B at 1.  And if you could zoom in on

10   the same content.  Thank you.

11   Q.  So starting with the top, that zooming in on Government

12   Exhibit 2087B at 1, what is the letterhead on the top right

13   corner?

14   A.  IIHCO.

15   Q.  What's the valuation number?

16   A.  18.

17   Q.  What's the date on the bottom right corner?

18   A.  September 30, 2011.

19   Q.  What about for the bottom, zooming in on Government

20   Exhibit 1503A?

21   A.  The letterhead is Iranian International Housing Company,

22   the valuation is 18, and the date is September 30, 2011.

23          MS. KIM:  If we could turn now to Government

24   Exhibit 2126 and zoom in onto that message.  This is an email

25   dated May 28, 2012, the subject is invoices from Stratus,

1  Stratus to IIH Co. from the defendant to Linet Estiroti and

2  Seda Turin (ph) at Stratus International with one attachment.

3  Q.  Could you please read the body of this message.

4  A.  See attached and prepare the invoices based on the IPC

5  dates.  Would need to have as many invoices as the number of

6  IPC numbers.  The invoices are from Stratus International to

7  IIH Co.  Needs to be done today.

8         MS. KIM:  Turn to the attachment, 2126A, and if you

9  could zoom in on the chart.

10 Q.  Ms. Nevins, if you could focus on the column entitled date

11 of payment received, what are the dates -- what is the first

12 date and what's the last date?

13 A.  The first date is July 5th, 2011, the last date is

14 April 16, 2012.

15        MS. KIM:  If we could turn now to Government

16 Exhibit 2153-1, zoom in on the bottom portion.  This is an

17 email from Linet Estiroti from December 19, 2012.

18 Q.  If you could please read the body of the email.

19 A.  Please see attached the subcontract agreement between

20 Stratus International and IIH Co.  It is 43 pages.  I can't

21 send you all, I will send the first three pages.

22        MS. KIM:  If we could zoom in on the response, which

23 is from the defendant to Linet Estiroti.

24 Q.  Could you please read this message.

25 A.  Must be February 2nd, 2010, both on top and on the bottom.

K39TSAD5                        Nevins - Direct

We give the one 2010 to Alex and use 2012 for our own purposes.

Only send Alex the first three pages and nothing more, and tell

him the remaining is protected by the confidentiality Stratus

has signed with IIH Co.

          MS. KIM:  So again, we'll put a pin in this document

and move to 2154-1.  If we could zoom in on the bottom portion,

which is an email from Linet Estiroti dated December 21, 2012

to the defendant, the subject is IIH Co. documents.

Q.  Could you please read the body starting with the

"yesterday."

A.  Yesterday, while reviewing the Gazette, I saw the date 2009

in many places of the text.  That's why I requested Deniz to

make the changes accordingly.  July 2nd, 2007, contract between

DUCOLSA and IIH Co., August 28, 2009, Gazette, April 26, 2010,

letter to Clarity, November 1st, 2010, subcontract between IIH

Co. and Stratus International.  Mr. Mustafa wants to keep it as

2012.

          MS. KIM:  Then zoom in on the top half of the email.

Q.  So on the bottom of this chain, this is an email from the

defendant to Linet, same subject, it's dated December 21, 2012.

Could you please read the text of this message.

A.  Mustafa Bey doesn't know the use of that contract.  Yes,

our actual contract is 2012 and that's what Evrim and others

will see.  But the contract you show Alex should be 2010.

          MS. KIM:  If we could compare Government

K39TSAD5                          Nevins - Direct

1  Exhibit 2153-2 at page 1 with 2154-2 at page 7.  If you zoom in

2  for both on the top portion.

3  Q.  Ms. Nevins, for the top portion of the document that's

4  zoomed in, what is the date on that first line?

5  A.  February 2nd, 2012.

6  Q.  And can you just name the entities that are in bold?

7  A.  IIH Co. CA Venezuela and Stratus International Contracting

8  Insaat Ve Taahhut.

9  Q.  Zooming in on the other contract at the bottom, what the

10  date on that contract?

11  A.  November 1st, 2010.

12  Q.  And the two entities?

13  A.  IIH Co. CA Venezuela and Stratus International contracting

14  Insaat Ve Taahhut.

15        MS. KIM:  Now zoom in and compare 2153-2 at page 2 and

16  2154-2 at 8.  So these are the respective subsequent pages of

17  the contract.  If we zoom in on both sides to just the

18  paragraph price and down to the stamp.

19  Q.  And who is listed as the signatory for the top document

20  that we're zooming in on?

21  A.  On which side?

22  Q.  On the subcontractor side.

23  A.  Mr. Mustafa Cetinel.

24  Q.  Whose name is below that?

25  A.  Mr. Sayed Ali Sadr Hashemi Nejad.

K39TSAD5                        Nevins - Direct

1    Q.  And the name for the bottom document?

2    A.  Also Mr. Mustafa Cetinel and Mr. Sayed Ali Sadr Hashemi

3    Nejad.

4           MS. KIM:  Now if we could please compare Government

5    Exhibit 2203A at page 1 with 2154-2 at page 2.  And if we could

6    zoom in on the top title of each contract.

7    Q.  Ms. Nevins, so the top portion is -- zooming in to 2154-2,

8    who are the parties to this contract agreement?

9    A.  Desarrollos Urbanos SA, DUCOLSA, and International

10   Industrial Compania de Housing CA, IIH Co.

11   Q.  The bottom of 2203A, who are the parties to this contract?

12   A.  Desarrollos Urbanos SA, DUCOLSA, and the Iranian

13   International Housing Company CA.

14          MS. KIM:  So one more comparison, if we could compare

15   2203A at 3 and 2154T at 4, these are the respective last pages

16   of the contract we were just looking at.  If you could just

17   zoom in the paragraph six through the date and the signatories.

18   Q.  Do you see the date for both contracts is July 2nd, 2007?

19   A.  Yes.

20          MS. KIM:  So let's turn now to Government

21   Exhibit 2139.  If we could zoom in on the text of both emails,

22   the bottom email is dated August 12, 2012 from the defendant at

23   Stratus Global.

24   Q.  Could you please read the body of this email.

25   A.  Please order to bring the website wwwiihco.com.ve

K39TSAD5                        Nevins - Direct

1    immediately down.  I can't believe with all that we go through

2    something as dangerous like this gets uploaded.  I've several

3    times reminded Bahram that such website shall never be

4    constructed for any reason.

5    Q.  And the response from Mustafa Cetinel to the defendant, and

6    the subject is IIH Co. website, if you could read the body of

7    that email.

8    A.  I instructed now to shut this website down.  I did not know

9    when it has been constructed and why.  Thank you for your

10   reminder.

11   Q.  Let's turn now to Government Exhibit 2261, and we're going

12   to start at the bottom and go onto the second page.  The bottom

13   email is from Z. Aghajani, and it's dated January 17, 2012, the

14   subject is domain's availability, the important is high.

15        If you could read the body of this email.

16   A.  Dear Dr. Soltani,

17        Considering in investing or upgrading our website

18   under the name of Stratus Group, I verified that definitely all

19   convictions of the verdict, the outcomes as follows.

20   Q.  Then there's a table with domain names and domains taken,

21   and if you read the paragraph under that on the second page

22   that starts "With regard to Iran sanction issues."

23   A.  With regard to the Iran sanction issues, I wish our domains

24   are being registered with a trustworthy entity.  I don't know

25   who is responsible here.  Otherwise, we may miss them sooner or

K39TSAD5                        Nevins - Direct

1   later.  Our first priority is selecting name of the domain for

2   the website, then apply for host service, and finally take

3   further steps for upgrading the site and other advertising

4   campaign.

5           MS. KIM:  Thank you.  And now if we zoom out, go back

6   to the first page and zoom in on the first message down through

7   the first two paragraphs.

8           This is an email that is sent to the defendant, the

9   subject is the domain registration dated January 28, 2012.

10  Just to make good use of time let's not read the whole thing,

11  but if you could start with the middle of the third line with

12  "All details trace" to the end of that paragraph.

13  A.  All details trace as name of Iran where there is no direct

14  definite site revealing that this domain is part of Stratus

15  properties, leave alone an invoice this Iranian company issues

16  us for the related costs.  This is too risky, and we might lose

17  our domains at any time with regard to the U.S. sanction

18  issues, replacement of involved people, and indirect

19  registration with the companies who undertake no commitments.

20  Q.  Please read on to the next paragraph.

21  A.  As you are aware, the domains are the most important

22  properties of the company.  If they are missed due to whatever

23  reason, sanction, not being renewed in due time or dissolving

24  the Iranian registers, changing of staff, et cetera, the

25  business of the company might undergo serious loss.  So my

1    suggestion --

2              MS. KIM:   Thank you.  Let's turn now to Government

3    Exhibit 2229.  And this is an email from

4    sadr@samanehstratus.com to the defendant at Spanrise and at

5    Spangroup dated November 23, 2010 with attachment, and the

6    message is:  Dear Ali, would you please transfer 45,000 Euro to

7    one of the followings accounts.  This is for advertisement and

8    interview of Stratus Group which we published in the business

9    year 2011.

10             And then if we could turn to Government Exhibit 2282A,

11   if we could zoom in the top of this page with the title and the

12   subheading.

13   Q.  What is the title of this article?

14   A.  Interview Mohammad Ali Sadr Hashemi Nejad.  Nothing too

15   difficult.

16   Q.  And what's the subheading two lines below?

17   A.  TBY talks to Mohammad Sadr Hashemi Nejad, Chairman Stratus

18   Group Holding, Iran.

19             MS. KIM:   Zoom out and zoom into the text under the

20   photograph from the CV down through the quote.

21   Q.  So here the CV includes born 1950, education, career.

22   Please read the quote in blue there.

23   A.  Stratus is the only private conglomerate in Iran.  We are

24   involved in banking, general contracting, real estate

25   development, and trading.

K39TSAD5                        Nevins - Direct

1            MS. KIM:  Thank you.  And we're not going to go

2    through the whole article, just some specific portions.  The

3    full article is in evidence.  So turn to page 2.  And if you

4    could zoom in on the bottom of this middle column, you work

5    very closely with the ministry.  It's probably hard to see

6    that.

7    Q.   Could you please read that heading?

8    A.   You work very closely with the Ministry of Transportation.

9    Does the Iranian government place a greater emphasis on roads

10   or railways?

11           MS. KIM:  Thank you.  And then if we could turn to

12   page 3, and if you could zoom in on the top half.

13   Q.   So year of foundation 1978, employees, 10,000.  What is

14   listed as the annual turnover for construction, real estate

15   development and trade?

16   A.   $2.5 billion.

17   Q.   And annual turnover for banking?

18   A.   $15 billion.

19   Q.   And then if we could turn to the last column, what are your

20   activities -- on the right -- other than construction, and

21   could you read the first half of this paragraph.

22   A.   What are your activities other than construction?

23           In construction we have Stratus International

24   Contracting.  Stratus Group also owns the first private bank in

25   Iran, Eghtesad Novin Bank, better known as EN bank.  It was

1  only ten years ago that the law was passed legalizing private

2  banks, and we established EN Bank right after that.

3        MS. KIM:   Thank you.  And then last portion of this

4  article, so if you could zoom in on the first paragraph on this

5  page -- sorry the one above that.  So the question this

6  responds to is from the page before, which is:  Where do you

7  see the biggest investment opportunities for Stratus

8  International Contractors in the near future?

9  Q.  If you could please read the sentence that starts the end

10  of the second line, "On top of that."

11  A.  On top of that, we are currently constructing more than

12  10,000 houses in Iran and abroad.  We have projects in Djibouti

13  where we are building the parliament, and in Venezuela where we

14  are constructing 7,000 residential units as a rate of 500 units

15  per month.  Besides these, we also have a project to build 20

16  14-story high-rises in Teheran in a single year.  That means

17  two buildings a month.

18        MS. KIM:   Turn now to Government Exhibit 2156.  And

19  we're going to start on the second page.  If you could zoom in

20  on the email on that page, it's an email from the defendant to

21  Peggy Rosiak dated January 7, 2013, the subject is website take

22  down.

23  Q.  If you could please read the body of that email.

24  A.  Dear Peggy,

25        Hope all is well and you've enjoyed your short

holiday.  Please take down our page from the website since this

has created so many problems due to sanctions, and this might

damage us further if this is not done urgently.  We are under

the following link.

            And there's a link.

Q.  And then if we could turn to the first page, and the email

on the bottom, which is a response from Peggy Rosiak to the

defendant, if you could read the second sentence.

A.  I wish you all the best for 2013.  I have forwarded your

request to our website directors.  It will be removed shortly.

Q.  And then if we could move to the response, which is from

the defendant dated January 8, 2013 to Peggy Rosiak, the same

subject, and if you could read the first sentence of the email.

A.  Thanks for your prompt action in this regard.  Could you

please also delete the link off the server, as it seems that

the link comes up when I Google Sayed Mohammad Sadr Hashemi

Nejad.

            MS. KIM:  If you zoom in on the top message,

January 28, 2013, from Peggy Rosiak to the defendant.

Q.  And if you could please read the body of that message.

A.  I have transferred your request to the website department.

They inform me it might take more time to be removed as of

Google policies we don't manage.  However, the request has been

sent to Google.

            MS. KIM:  Let's turn to Government Exhibit 2238.  If

K39TSAD5                    Nevins – Direct

1    we start on the third page.  And at the top here, this is an

2    email from the defendant, and it reads:  Please find attaches

3    two wire transfers for today's value date.  You can find me on

4    my mobile in case of concern.

5            Turning to page 2, this is an email from Urs Schneider

6    to the defendant, and he says:  Can you provide me with a

7    contract for the amount of USD 305,448, which we had to pay

8    beginning of the month.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K398SAD6                          Nevins - Direct

1   Q.  Then if you could move to the next message, which is a

2   response from the defendant.  And if you could please read the

3   body of this e-mail.

4   A.  "Good morning.  Please see below the request for an

5   invoice/contract from Alper about the payments the receive from

6   me.  Please tell them to issue their formal invoice to Stratus

7   Turkey for their work in Venezuela.  I would like this be

8   sorted out ASAP as I can't make their upcoming payments till

9   this is sorted out.  Please also make sure that we will receive

10  another new invoice for their new payments.  This is only to

11  satisfy the bank's regulations and has nothing to do with our

12  accounting."

13  Q.  Then the message in response is to the defendant from

14  Cetinel.  Can you just read the second paragraph, the last line

15  of the e-mail.

16  A.  "If agreed, I will ask Alper Co. to issue a dummy invoice."

17  Q.  Then turning to the bottom of page 1.

18          This is a response from the defendant, dated December

19  20, 2010.  If you could please read the body of this e-mail.

20  A.  "This is only a formality that the bank asks me to do for

21  their compliance filings and nothing more.  Even if you have an

22  invoice that only mentions IIHC, then we are still fine.  But

23  if that invoice shows the name Iranian anywhere, then we will

24  have serious problems."

25  Q.  Let's turn now to our final document, Government Exhibit

K398SAD6                         Nevins - Cross

1    2145.

2              This is an e-mail, dated September 10, 2012.  The

3    subject is Cirrus and Perse, and it's from the defendant to

4    Linet Estiroti and Victoria Reed.

5              Could you please read the full e-mail?

6    A.  "How the hell did you two people from the same organization

7    cooperate/coordinate on Cirrus's package?  I can tell from what

8    you have sent to me as the initial draft of Cirrus you did not

9    cooperate together at all.  Why the hell do I see the name of

10   Iran in there?  Why wasn't the same format of Clarity followed?

11   Cirrus needs to be fully done by tomorrow with pictures even if

12   no one sleeps tonight.  Such a waste of time for me to even

13   read that.  Why still after a week we don't have the monthly

14   cost breakdown of Perse?  Meeting a deadline doesn't mean

15   sending shitty work by a certain date.  Coordinate and ask

16   questions."

17             MS. KIM:  Your Honor, can I have one moment?

18             No further questions of the government.

19             THE COURT:  Mr. Silverman.

20   CROSS-EXAMINATION

21   BY MR. SILVERMAN:

22   Q.  Good afternoon.

23             MR. SILVERMAN:  If I could have Government Exhibit

24   2282A.

25   Q.  This is one of the documents that you read from and there

1    are just a few portions that I would like to hear you read a

2    few other parts from.

3          The first paragraph beginning with "Mohammad Sadr."

4    And then if you can read down to "Stratus is a purely private

5    holding."

6    A.  "We are the only conglomerate holding in Iran.  There are

7    other holding companies in Iran, but they are mostly public or

8    government holdings.  A lot of them are investment companies

9    that belong to national banks, such as Bank Melli and Bank

10   Saderat.  There are a lot of investment companies that are

11   called holdings but Stratus is a purely private holding."

12   Q.  Does it say that Stratus first started its operations in

13   the construction sector in 1975?

14   A.  Yes.

15   Q.  And it started from scratch in a very small construction

16   company and built it all the way up from there?

17   A.  Yes.

18         MR. SILVERMAN:  If we can turn to the next page,

19   please.

20         Could you please blow up and highlight the paragraph

21   beginning "your expertise seems to lie in undertaking."

22   Q.  Could you read the bolded question, please?

23   A.  "Your expertise seems to lie in undertaking difficult

24   projects such as the Karun 3 dam.  What other complex projects

25   are you involved with?"

K398SAD6                          Nevins - Cross

1    Q.  Can you read the response?

2    A.  "That's true.  We have a certain degree of expertise and

3    experience with difficult and large scale projects, such as the

4    bridges over the Karun 3 dam.  There is no project like this in

5    the Middle East.  We are building tunnels.  We are constructing

6    massive dams, roads and freeways."

7              MR. SILVERMAN:  Marco, if you can go out for one

8    moment and zoom in on the caption of that photo and the photo.

9    Q.  Is this the Karun 3 dam that he mentioned in the interview?

10   A.  Yes.

11             MR. SILVERMAN:  If we can flip to the next page,

12   please.

13             If we can zoom in on the photo and the caption,

14   please.

15   Q.  What is this a photo of?

16   A.  "The design and construction of the parliament building and

17   a commercial center in Djibouti City was undertaken by

18   Stratus."

19   Q.  Now, you read a document about potentially changing a name.

20   I just want to have you follow up on one portion of that.

21             If we go to 2015DT, if you can read the sentence

22   beginning "additionally."

23   A.  "Additionally, please be advised that based on negotiations

24   with the employer and the related Venezuelan legal entities,

25   such as the office for the registration of local companies and

K398SAD6

1    consultations with local attorneys, there are no legal

2    restrictions for the change and the use of the new name in

3    Venezuela."

4            MR. SILVERMAN:  No further questions, your Honor.

5            MS. KIM:  Nothing from the government, your Honor.

6            THE COURT:  Thank you.  Ms. Nevins, you may step down.

7    You are excused.

8            (Witness excused)

9            MR. KROUSE:  May we have a brief sidebar?

10           THE COURT:  You may.

11           (Continued on next page)

K398SAD6

1             (At the sidebar)

2             MR. KROUSE:  We are done with our presentation of

3     evidence.  There are three exhibits that, from our review of

4     the transcript, it appears they haven't been admitted, even

5     though they have been offered previously, and I think with no

6     objection.  But we are ready to rest and then conditional that

7     will can put those in.

8             THE COURT:  I just as soon have you say it in front of

9     the jury and admit it if there is no objection to these.

10            MR. HEBERLIG:  No objection.

11            MR. KROUSE:  I can stand up, offer these, and then

12    rest.

13            THE COURT:  I think we also had bracketed a few

14    exhibits from that last witness.  Is that it?  With that,

15    that's it?

16            MR. KROUSE:  I believe so, yes.

17            THE COURT:  I am going to tell the jury 1 p.m.

18    tomorrow.  We can get the charge conference done and take a

19    brief lunch break before whatever comes next, either defense

20    case or closings.  Let's let the jury go and then we will deal

21    with the rest of the day.

22            (In open court)

23            THE COURT:  Mr. Krouse.

24            MR. KROUSE:  The government offers Government Exhibit

25    20, 21A, 2104T, and 1103.

```
 1              MR. HEBERLIG:  No objection.

 2              THE COURT:  They are admitted.

 3              (Government's Exhibits 20, 21A, 2104T and 1103

 4    received in evidence)

 5              MR. KROUSE:  The government rests.

 6              THE COURT:  Members of the jury, we finished a little

 7    bit earlier than we thought today, but as indicated, the

 8    government has rested at this point.  As I mentioned, we are

 9    going to start late tomorrow so that the lawyers and I can work

10    out some legal matters before we move to the next stage of the

11    trial.  So you're done for the day early, and I had said come

12    in at 12:30 tomorrow.  I am going to edit that slightly to

13    1:00.  I just want to make sure we are ready for you and that

14    we had our own chance for a brief lunch break.

15              So please be ready to go at 1 tomorrow, post lunch

16    afternoon schedule.  And again, as soon as I have any

17    additional information about the schedule, we will let you

18    know, but as I said, we are ahead of where we thought we would

19    be and a little bit ahead today since we are finishing early.

20              I do think it's important to remind you of my

21    instructions at this stage, and my practice is to do it just as

22    we get to these different stages of trial.

23              Just as important, although the government has rested,

24    to have no communications with each other or anyone else about

25    the case, no research through any means, in any way, having
```

K398SAD6

1    anything to do with the case or anyone involved in the case,

2    and continue to keep an open mind until we get through the

3    remaining portions, including my instructions as to the law,

4    and the lawyers' closing arguments as to how you should

5    understand the evidence, and any additional evidence to be

6    presented.

7              And also, as a general matter, be healthy, wash your

8    hands and the like, and of course do let us know if you aren't

9    feeling well or the like before coming in.  Thank you.

10             Have a great night.

11             (Jury exits courtroom).

12             THE COURT:  All right.  Mr. Krouse, where are we with

13   the additional representations as to what else might or might

14   not be out there and what was in the government's possession

15   but not disclosed, if anything, up to this point?

16             MR. KROUSE:  Your Honor, I do need to probably check

17   back with the office to see what other people have communicated

18   to the chiefs.  Just for the Court's background, a different

19   team of prosecutors charged the case and were on the case

20   before Judge Carter.  AUSA Kim, AUSA Lake, and I joined the

21   case later, as the case was going to trial and being litigated

22   in the pretrial phase.

23             So there are a series of prosecutors who were

24   previously on the case, and we have tasked them with going

25   through all of their materials and figure out a declaration to

K398SAD6

1    the Court regarding any contacts they may or may not have had

2    with OFAC and any information they might have learned from

3    that.  So that's happening as far as I last heard at the last

4    break.

5              THE COURT:  What kind of time frame are we talking?

6    Because I don't know how to proceed to the next steps

7    necessarily.  I need to think about it, and I am open to

8    proposals, but what is the time frame?

9              MR. KROUSE:  My understanding is we were working very

10   hard and diligently to get that done by today.  It may be done

11   already.  It may take more time into the night.  Your Honor may

12   have noticed that SAUSA Lynch was not present at the table

13   after the lunch break.  He went back to the DA's office to do

14   the same thing.  I think our effort will be to get a

15   representation to the Court by tonight about the questions

16   posed by the Court and suggested by defense counsel.

17             THE COURT:  Mr. Weingarten.

18             MR. WEINGARTEN:  I guess I am where I was before.  We

19   hear what they have to say and then we make a suggestion.

20             THE COURT:  We need the information and then we can go

21   forward.

22             So that we are preparing for eventualities in order to

23   proceed tomorrow, if the representation is that there is

24   nothing else, are you interested in recalling Mr. Kim?

25             MR. WEINGARTEN:  I think there are two issues.  One,

K398SAD6

1    what did OFAC do?  And number two, what did the prosecutors

2    know?  I think it's unlikely that we will seek to recall Mr.

3    Kim.  I think it's conceivable that we can hear something

4    extraordinary and think differently.  If that happens, we would

5    obviously contact the Court.

6         When I was up there before, I said some combination of

7    an instruction by you and a stipulation, perhaps, if it's not

8    more exaggerated than we think, would meet our demands.

9         THE COURT:  OK.

10        MR. KROUSE:  And the Court may have noticed, we did

11   together sign a stipulation about the exhibit itself,

12   Government Exhibit 411, as to the authenticity, and that's in.

13   The government didn't offer it pursuant to our agreement not to

14   offer it in our case in chief and leave it to the defense if

15   they wished to offer it on their case.  So obviously the

16   government has no objection if the defense wishes to offer 411

17   in their case.

18        THE COURT:  Do you mean 411 is in?

19        MR. KROUSE:  No.  We didn't offer 411, but it's within

20   a stipulation.

21        THE COURT:  I see.

22        MR. KROUSE:  There is going to be no issue of

23   authenticity or admissibility if the defense seeks to admit it.

24        The government also offered previously a stipulation

25   regarding what OFAC did.  Once we have that firmly in hand

K398SAD6

1    factually, that offer still stands, and the parties will confer

2    on that.

3              THE COURT:  So working out a stip on what did OFAC do

4    question and continuing to chase down in order to be presented

5    in declarations what did the prosecutors know with respect to

6    that.

7              MR. KROUSE:  Yes, your Honor.

8              THE COURT:  All right.  Anything else to do on that

9    now?

10             MR. WEINGARTEN:  I don't think so, your Honor.

11             THE COURT:  Mr. Krouse.

12             MR. KROUSE:  No, your Honor.

13             THE COURT:  Rule 29 motions.  You got what you kept

14   trying for.

15             To just close the record, Mr. Krouse, the referenced

16   exhibits that we had to bracket, could you just read those so

17   we know full well exactly what has been admitted.

18             MR. KROUSE:  Yes, your Honor.

19             Government Exhibits 2214 and 2214A, 2216, 2216A, 2218,

20   2220, 2220A, 2222, 2245, 2245A, 452, 480D, E, F, K, J, 490A

21   454C, 2175, 2175A, 1212, 1212A, 1222, 1222A and B, 1214, 1214A

22   and B, 1215, 1215A, 2293, 2293A, 1216, 1216A and B, 1217, 1217A

23   and B, 2183, 2183A, 2090, 2090T, 2090A, 2090AT, 2076, 2076A and

24   B, 2164, 2164A, 2284, 2284A and D, 2304 and 2304A.

25             THE COURT:  As I indicated when the jurors were

K398SAD6

1    present, those were admitted, and you correctly didn't include

2    1213, which I sustained the objection.

3           (Plaintiff's Exhibits 2214 and 2214A, 2216, 2216A,

4    2218, 2220, 2220A, 2222, 2245, 2245A, 452, 480D, E, F, K, J,

5    490A 454C, 2175, 2175A, 1212, 1212A, 1222, 1222A and B, 1214,

6    1214A and B, 1215, 1215A, 2293, 2293A, 1216, 1216A and B, 1217,

7    1217A and B, 2183, 2183A, 2090, 2090T, 2090A, 2090AT, 2076,

8    2076A and B, 2164, 2164A, 2284, 2284A and D, 2304 and 2304A

9    received in evidence)

10          Mr. Weingarten.

11          MR. WEINGARTEN:  I am not reconsidering.  We are going

12   to file a brief.  Give me two minutes, if I may.  Obviously,

13   the Court will read our brief carefully.  There may be some

14   subsequent follow-up, some questions the Court might have.  If

15   I could just make some preliminary comments right now, I would

16   be grateful.

17          THE COURT:  To be clear, this is the time for oral

18   argument.  As best as I can, unless the charging conference

19   goes really quickly tomorrow, which I have some doubt it will.

20          MR. WEINGARTEN:  Count One is we obstructed the OFAC

21   investigator.  The OFAC investigator took the stand and said

22   how important it was to get all the information, and he would

23   be all over any reference to Iran.  Well, just based upon the

24   conversations we have had all day, he did have information that

25   there was a $29 million transaction with Iran on it and they

K398SAD6

didn't do anything.  I don't know how, given what you know is
coming, how a reasonable jury could find beyond a reasonable
doubt that we are guilty of obstructing OFAC.  That's just
obvious.

         Number two is the sanctions issue.  I am sure my
colleague Bruce is going to write about 516.  We have argued
516 until we were blue in the face.  I am not going to take up
another second on 516.

         The real bugaboo for us is the bank fraud charges.  I
know 1344.  I have worked with my statute much of my life.
Whatever this is in this courtroom, it's not a bank fraud.
There are two parts of it, obviously.  The first part is right
to control, and the second part is false statements that induce
a bank to give money.  They are different.  I don't think the
government has come close to making either.

         Any reasonable being knows for sure that those banks
in this instance, those banks in the middle, face no
conceivable exposure for the conduct in this case.  They had no
duty to do anything more than they did.  There is no evidence
whatsoever that they misbehaved.  It is basically a
preposterous argument to say they were exposed, and it's their
only argument for the first part of 1344.  And I know the
bankers said strict liability.  There is no corresponding
reality to that and the overwhelming evidence --

         THE COURT:  The testimony should not be believed?

K398SAD6

1          MR. WEINGARTEN:  In face of the official documents

2     that we submitted, that 95 percent of the time the worst that

3     happens is a letter, and five percent of the time, when the

4     conduct is egregious, the banks get wild.  Nothing even

5     remotely close to what happened here.

6          The second element of 1344(1).

7          THE COURT:  So you're talking prong 1.

8          MR. WEINGARTEN:  Yes.  1344(1) requires the government

9     to prove beyond a reasonable doubt that Sadr knew that it was

10    likely that the alleged fraudulent scheme would cause the

11    victim banks tangible economic harm under a right-to-control

12    theory of bank fraud.  There wasn't a hint of that.  Where do

13    they get that from?  That's an element.  That my client knew

14    that JP Morgan, in the position that JP Morgan worked, was at

15    risk?  There is not a hint of that.  And if there is not a hint

16    of that, that goes.

17         And the second part of 1344 is that somehow, some way,

18    false statements made by my client caused money to flow from

19    the bank.  The wire transfers contained no misinformation

20    whatsoever.  There were no false statements, certainly no false

21    statements by my client, but there were no false statements

22    whatsoever.  There is no proof of that.  So that falls.

23         Then were there omissions?  There were no

24    misrepresentations or omissions by my client because there was

25    absolutely no duty to disclose.  What this case really boils

K398SAD6

1    down to, what the bank fraud counts really boil down to is that

2    Ali Sadr, doing what he was doing from Europe, running the

3    finances of this project, had some responsibility, that the

4    government is trying to impose on him, to call JP Morgan and

5    say, I just want to make sure you know that my dad is Iranian

6    and he has some connection to this project.  He had no duty to

7    disclose and those correspondent banks had no duty to do any

8    more than they what they did.

9          There is no bank fraud in this case.  You should kick

10   it.  The money laundering count should go too.  Really, to me,

11   the only count that makes any sense whatsoever is whether or

12   not there was any technical sanctions violation.  That's the

13   only thing they come close to proving, and that's because of

14   your legal interpretation of 516.  Otherwise the rest of this

15   case should go.

16         THE COURT:  Do you want to say anything in substance

17   on money laundering?

18         MR. WEINGARTEN:  Money laundering is hooked into the

19   substantive counts.  If the substantive counts go, the money

20   laundering goes.

21         THE COURT:  Thank you.

22         Mr. Krouse.

23         MR. KROUSE:  Your Honor, I can focus on bank fraud,

24   just because the bulk of the defense argument seems to be on

25   that.  I will just say for the OFAC –– for the substantive or

K398SAD6

1  the Count Two violation of the ITSR, conspiracy to violate the

2  ITSR, the government has more than introduced enough evidence

3  that a reasonable jury could find the defendant's guilt on

4  that.  It doesn't sound like the defense is moving on that

5  count so I won't belabor that point.  But based on this Court's

6  legal rulings about 560-410, and what I anticipate will be the

7  charge on that count, I don't believe there is a valid Rule 29

8  for that count and so I will move on from there.

9          As to bank fraud, your Honor, as your Honor knows, and

10 consistent with your ruling, there are two different prongs of

11 bank fraud.  I can address the first prong first.  And based on

12 the Court's ruling, the elements essentially are that Mr. Sadr

13 interfered with the victim banks' right to control, and that

14 interference was likely to cause them economic harm.  And those

15 are the two prongs.

16         The first element, that they interfered with the

17 victim banks' right to control their money or property, Mr.

18 Sadr sent payment letters to DUCOLSA, which listed the

19 intermediary banks, JP Morgan and Citibank, the named victim

20 banks in this case.  He sent those payment letters with the

21 intent that DUCOLSA, through their bank, would send a request

22 for U.S. dollars to be sent from the correspondent banks to Mr.

23 Sadr's bank in Switzerland, Hyposwiss, which was the banker for

24 who the government alleged were front companies.

25         There is substantial evidence in the record where a

reasonable jury could conclude that Mr. Sadr, by setting those

transactions in motion, by constructing this elaborate scheme

to have front companies domiciled in other jurisdictions with

Swiss bank accounts, for the purpose of receiving money that

was directly tied to the Venezuela project, was an effort to

violate sanctions and to, by extension, trick the banks into

paying those funds.  And that's the theory of bank fraud here.

So I think fundamentally the argument is that you

can't divorce, and under 410 you can't for sure divorce, the

source of the funds and the ultimate beneficiaries of those

funds from the case such that you set up front companies and

say, no money is going to Iran, this has nothing to do with

Iran, because our front company is in Turkey or our front

company is in Switzerland.  Fundamentally, all the money being

paid, and the government has proven this, and will argue it to

the jury, all the money that is being paid comes from the Iran

project in Venezuela.  These are all payments for that project.

The government has introduced multiple e-mails,

multiple documents, financial documents, to show that Mr. Sadr,

in obtaining those funds, was setting forth a fraudulent scheme

to obscure the fact that all of that money was for the benefit

of Iranian entities and Iranian people.  And so that conduct,

which violates the sanctions regime, also violates bank fraud

when a misrepresentation of that sort is sent to the bank.

So the government's argument is that under that first

K398SAD6

element, Mr. Sadr interfered with the bank's ability to control

their funds by misleading them about the ultimate Iranian nexus

to those payments.  And there is ample evidence in the record

from the bank witnesses that, had they known that the payments

were ultimately going to the benefit of Iranian entities and

people, they would have stopped or at least investigated those

payments.  So that's the misleading fraud that the government

alleges Mr. Sadr engaged in.  So that's as to element one of

prong one.

Element two, which Mr. Weingarten also argued on, was

that Mr. Sadr knew that such an interference was likely to

cause them economic harm.  There is testimony in the record

sufficient that a reasonable jury could conclude that, one, the

banks did face a risk of economic harm.  Both bank witnesses

effectively testified to that, that this is a strict liability

regime, that any sanctions violations, even unwitting ones, can

result in penalties.  That could be financial, it could be

letters which do have consequences, it can be reputational

harm, it can be the economic harm of having to pay for an

investigation, the human cost of devoting personnel and

resources to finding out what happened.  All of that is

potential economic harm.

All these arguments about the likelihood of that harm,

or the fact that unwitting banks are frequently not penalized

by OFAC, those are arguments to the jury, but a reasonable jury

1    could conclude, based on the testimony of the OFAC witness, Mr.

2    Kim, both bank witnesses, that there was at least this risk of

3    economic harm to the banks.

4            With respect to Mr. Sadr's knowledge of that, the jury

5    is able to make reasonable inferences, and at the Rule 29

6    stage, those reasonable inferences are sufficient to defeat a

7    Rule 29 motion.  So the fact that Mr. Sadr engaged in this

8    elaborate scheme, setting up companies, setting up fronts, all

9    goes to his knowledge of the sanctions and his knowledge of the

10   consequences of a violation of those sanctions, namely, blocked

11   payments and rejected payments.  And it was well-known in the

12   sanctions area and among international business people that

13   banks had been penalized in many other contexts for

14   facilitating Iranian sanctions violations.  So the inference is

15   there that Mr. Sadr would have known and took all these

16   affirmative steps in order to induce the banks to provide him

17   money that were the fraud proceeds, and that the banks faced a

18   risk at least of economic harm as a result of that conduct.

19           Now, with respect to the second prong of bank fraud.

20           THE COURT:  Just to make sure I understand what you

21   would argue.  The specific evidence that you would argue,

22   knowledge of risk of harm consists of inferences from

23   misrepresentations?

24           MR. KROUSE:  Inferences from misrepresentations.  We

25   would also argue that there is a lot of evidence about Mr.

Sadr's overall knowledge of sanctions -- e-mails that he sent,

conversations with others via e-mail about sanctions,

references to sanctions.

THE COURT:  What would connect knowledge of sanctions

to knowledge of potential harm to the banks?

MR. KROUSE:  There is testimony in the record from, I

believe, both bank witnesses, but certainly the Citibank

witness, that there were instances, several instances where

banks were penalized heavily for facilitating Iranian sanctions

violations.  That was general knowledge.  The government can

argue and the jury could infer that somebody who is closely

tracking the sanctions regime, aware of what was happening with

respect to sanctions, would also have been aware of these

penalties and the enforcement surrounding bank transactions

that violate sanctions.

So that is a reasonable inference that the jury could

draw based on the ample evidence, and I haven't touched on all

of it, but there is a lot, as your Honor is aware, that the

defendant was closely tracking the sanctions regime, was

talking about it frequently, was taking steps to avoid the

sanctions, in the government's view.  And all of that I think

in combination goes to the defendant's knowledge of the overall

sanctions regime, and that links up I think with the testimony

from the bank witnesses and the OFAC witness, I believe, about

penalties that banks face, could face, and did face in the

K398SAD6

public domain.

THE COURT:  Anything else in that category?

MR. KROUSE:  With respect to?

THE COURT:  Knowledge of risk.

MR. KROUSE:  Those are the main arguments, your Honor.
Just the overall knowledge of sanctions linked up with the fact
that banks were frequently sort of the pressure point on the
sanctions, banks frequently faced enforcement with respect to
sanctions.

THE COURT:  OK.

MR. KROUSE:  As to the prong two, I believe under the
Court's ruling, the only elements are that Mr. Sadr caused a
false representation to be sent to the banks with the intent to
obtain funds under the bank's custody or control.  I think this
one is quite straightforward.  For all the reasons that I just
went through, I don't want to repeat myself, but as to prong
one, the false representation that Mr. Sadr is causing to be
sent to the bank is that these funds have nothing to do with
Iran.  The truth couldn't be more different.  The funds
themselves are all earned by an Iranian company, owned by an
Iranian person living in Iran.

So the fact that Mr. Sadr -- and there's e-mails where
he says Iran has nothing to do with this money.  That's a false
statement for all the reasons we just went through.  So I think
on that element, causing a false representation to be sent to

K398SAD6

1    the banks, it's not just that Mr. -- it's not only an

2    affirmative duty to provide information; he is affirmatively

3    deciding to withhold information, to hide information, and to

4    lie to the banks who are asking him questions, because he knows

5    that if he is truthful about the actual source of the funds,

6    those transactions will be blocked or rejected.

7           So there is definitely enough evidence in this record

8    for the jury to conclude that the first element of that prong

9    of bank fraud is satisfied.

10          Now, with the intent to obtain funds under the bank's

11   custody or control, I think that's pretty straightforward.  I

12   don't think Mr. Weingarten has argued that element.  Every

13   payment was sent with the intent to obtain dollar deposits

14   under the custody and control of the intermediary banks.  The

15   payment letters all list the intermediary banks.  The

16   intermediary banks are how Mr. Sadr is getting access to the

17   dollar funds that he is trying to get.  And that's in through

18   the bank witnesses, that's in through the financial documents.

19   That element has been more than satisfied here.

20          THE COURT:  You were going to speak to money

21   laundering.

22          MR. KROUSE:  It doesn't appear that the defense is

23   moving on money laundering itself, just moving that if the

24   predicate, the specially designated unlawful activity is not

25   satisfied, then money laundering would also fall.  For all

K398SAD6

these reasons, and in the indictment it's charged as money

laundering, both for the sanctions violations and also for the

bank fraud violations.  So so long as both of those counts or

even one of those counts survives, the only argument the

defense is making is that money laundering should fall along

with the substantive counts, and the government's argument is

those substantive counts should not be -- the Rule 29 should

not be granted as to those counts.  And so for that same

reason, the money laundering counts should also survive Rule

29.

           THE COURT:  Thank you.

           MR. WEINGARTEN:  May I?

           THE COURT:  Yes.

           MR. WEINGARTEN:  My colleagues back in my office may

well be writing arguments about money laundering, and I hope

the Court will consider them.

           Number two, the representation made by counsel that

there is evidence in the record that Mr. Sadr was tracking the

sanctions, that's just not accurate.  There are some e-mails

that show that a Persian has to deal with the sanctions in

life.  Of course that's true.  But the idea that he is a

sanctions scholar, whether he was tracking the sanctions, there

is nothing even remotely like that.  The only substantive

document that I recall that was entered was the Asian Law

Society's version of what Persians in the United States go

K398SAD6

1    through with the sanctions.  That's not tracking the sanctions.

2    So his knowledge about the specific potential harm to JP Morgan

3    as a result of this conduct is completely absent from the

4    record.

5         I also go back to this idea, they have two fundamental

6    problems here.  There were no misrepresentations made by my

7    client to these correspondent banks.  The information that the

8    correspondent banks received, the information that was relevant

9    to them -- who is sending the money, who is receiving the

10   money -- was exactly accurate.  And there were times for sure

11   when Hyposwiss would additionally report where the money was

12   going to.  And where the money was going to were the two

13   companies that in fact were set up:  Stratus Turkey, a real

14   company; and Clarity, a real company.  The information was

15   accurate.  There were no misrepresentations in this case to

16   these banks.

17        THE COURT:  OK.

18        MR. KROUSE:  I could make a small point on that last

19   statement by Mr. Weingarten, but I could also save it, your

20   Honor.

21        THE COURT:  You can save it.

22        Mr. Weingarten, you have indicated a number of times

23   you have outlined the arguments, but you want to do a written

24   brief.

25        MR. WEINGARTEN:  Yes.

K398SAD6

1          THE COURT:  When will that be filed?

2          MR. WEINGARTEN:  As soon as we get back and read it.

3          THE COURT:  So by?

4          MR. WEINGARTEN:  I am not certain where they are, your

5     Honor.  Obviously, we know it's in our interest to get it to

6     you as quickly as possible.

7          MR. KROUSE:  Just as a resource standpoint from the

8     government's side, we don't have somebody who is diligently

9     working on a response.  We think that we would rest on an oral

10    response to the Rule 29.  We think for all the various reasons

11    just stated it's premature; it shouldn't be granted at this

12    time.  We are obviously happy to brief a full Rule 29 in the

13    event there is a guilty verdict in this case, but as far as

14    tonight, because of the possibility that we will be closing

15    tomorrow and wanting to stay on track for that and being

16    prepared for it, we would ask not to -- we are happy to waive a

17    written response and can be heard tomorrow orally.

18         THE COURT:  Mr. Weingarten, by 8?

19         Then I think we need to plan the contingencies again.

20         Mr. Krouse, I will ask before we break for the night

21    if you're in a position to make any of the representations

22    regarding the disclosure issue so that we can try to come to

23    some resolution tonight so we know how we are proceeding.  If

24    you can't, you can't, and we will break.  But to the extent you

25    can, I want to know before we leave.

K398SAD6

1          MR. KROUSE:  Yes, your Honor.  We want to be as

2    precise as possible and as accurate as we can be.  So that's

3    the hesitation in committing to a particular time, just because

4    I haven't had --

5          THE COURT:  I do see your supervisors creeping up on

6    you.  So take a moment.

7          While they are conferring, Mr. Weingarten, you can

8    think about the question I am going to ask in a moment, which

9    is, assuming the Rule 29s are denied or reserved, what do you

10   anticipate in terms of a defense case, so that we can plan

11   going forward and I want to allocute Mr. Sadr on the

12   defendant's right to testify and right not to testify.  So

13   that's coming next.

14         While you're all conferring, I am going to take a

15   two-minute break.

16         (Recess)

17         THE COURT:  Mr. Krouse.

18         MR. KROUSE:  AUSA Kim and I have conferred with our

19   unit chiefs.  We are up-to-date on what has been happening

20   since we have been in court.  I again want to stress the

21   importance we are placing on this and the efforts we are

22   undertaking to find out all the information that is relevant to

23   this issue and just to find out what happened here.

24         So my understanding is the moment the chiefs left the

25   courtroom, they went and spoke to the other AUSAs who were

K398SAD6

1    previously assigned to this case, the five AUSAs who have not

2    been in court, and those five AUSAs have reviewed in detail all

3    of their files, their e-mails and any other materials they

4    have, as well as their memories in order to answer the

5    questions posed by the Court.

6         Just for precision, what we asked those AUSAs to look

7    for is whether any substantive conversations were had between

8    the AUSAs and OFAC, either in writing or orally, that related

9    to decisions or actions taken or not taken by OFAC related to

10   the entities in this case, including the defendant, all of the

11   named corporate entities, and the processing banks.  So that is

12   what those AUSAs have been looking for.

13        As of right now, and I believe it's still ongoing,

14   although a lot of progress has been made, as of right now we

15   can confirm for the Court what we represented before, which was

16   that none of those AUSAs had any such substantive conversations

17   with OFAC, and nothing has been found related to any

18   conversations with OFAC, other than the license check, which is

19   a piece of evidence that the government admitted in its case in

20   chief, so just asking OFAC to conduct a license check on the

21   named entities.

22        So that's where we are with the AUSAs.  I mentioned, I

23   think, to the Court earlier that SAUSA Lynch went back to the

24   DA's office.  He is reviewing all of his e-mails.  He is going

25   to prepare a detailed chronology of any substantive

K398SAD6

1   conversations he has had with OFAC during the entirety of this

2   case.  He is going to represent to the Court where the

3   document, Government Exhibit 411, came from, when it was

4   transmitted to the rest of the team, and any other substantive

5   discussions, to the extent there are any, that Mr. Lynch had on

6   OFAC, and the nature of those conversations.

7              (Continued on next page)

K39TSAD7

1          THE COURT:  I think on that one, just because it

2     doesn't -- it didn't quite gel, make sense when represented,

3     this process by which he had a memory of this document, and I

4     think the representation was and then he went and looked for

5     it, found it, transmitted it to the other government lawyers on

6     the team in January of this year.

7          MR. KROUSE:  Yes, your Honor.

8          THE COURT:  Because it is -- that grayness I think

9     could bear on the process.

10          MR. KROUSE:  Yes, your Honor.  Understood.  And I was

11     going to say, I think for SAUSA Lynch, I think for his

12     declaration to be a fully written, very precise accounting of

13     what happened.

14          My understanding from the other AUSAs who were

15     previously on the case is because Mr. Lynch had been on the

16     case for a much longer period of time, helped investigate the

17     case, all OFAC related discussions, to the extent there were

18     any, would have been conducted by him, and that's sort of been

19     borne out at this point by the review of the emails and the

20     files.  So as far as the meat around what the other AUSAs would

21     say, I think most of the relevant information about what

22     happened I think will come from Mr. Lynch's declaration.

23          So I just have sort of a question, and we have a

24     question about the form that the Court wishes this -- the

25     factual information to be presented to the Court, whether there

K39TSAD7

1    should be formal declarations or representations by the

2    government in a letter, what form should that take, just

3    because that will affect sort of how quickly the government can

4    pull that together and submit it to the Court, and we want to

5    plan for that.

6           THE COURT:  Well, the request had been declarations.

7           MR. KROUSE:  I don't know if the defense wants to be

8    heard on that, if they have a different view having heard this

9    explanation.

10          MR. WEINGARTEN:  With enormous respect for this

11   office, if the supervisor comes in and said I have done an

12   extensive investigation and talked to my people and makes a

13   direct representation to you, I buy that.  But if there are any

14   indications that there's substance there, then of course it has

15   to be written out.

16          THE COURT:  Yeah, I think that is right.

17          So if ultimately what everyone is going to say is that

18   there's nothing, I'll take the representation for purposes of

19   what we're doing now.  I mean obviously, declaration or not,

20   there's implications to any misrepresentation, that everyone is

21   well aware of that, whether it's in a letter or declaration or

22   orally.

23          MR. KROUSE:  Yes, your Honor.

24          THE COURT:  So I think for purposes of being able to

25   pass this and go forward in the case, Mr. Weingarten, you

K39TSAD7

1    agree, based on what the government has indicated it's doing,

2    that a representation from Mr. Krouse's supervision by the

3    chiefs would be sufficient to go forward.

4            MR. WEINGARTEN:  I think, because the consequences are

5    so serious here, a letter -- an oral letter from the office

6    would be fine with us.

7            THE COURT:  So that we have precision, it has no

8    bearing on the effects of -- the consequences of

9    misrepresentations, omissions, falsity, if you like, a letter

10   rather than a declaration will be sufficient, and that way we

11   have precision as to what was searched for and what was found.

12           Then the question is if there's more information

13   there, we need to understand what it is and why it hadn't been

14   produced.

15           MR. KROUSE:  Yes, your Honor.  Should we put SAUSA

16   Lynch's in that same letter, a single letter representing the

17   entire prosecution team?

18           THE COURT:  Mr. Weingarten?

19           MR. WEINGARTEN:  It depends what it says.  If there's

20   a separate thing to consider, submit it separately; if there's

21   no difference between the DA and the U.S. Attorney's people,

22   fine, one letter.

23           THE COURT:  All right.  So we can proceed with a

24   letter.  If there's more that we learn that was in the

25   possession of the team, whether assistant -- either assistants

1    or folks in DANY, then we're going to need -- I think it

2    doesn't need to be a declaration necessarily at this point, but

3    we need specific -- very specific information as to what it is,

4    what was known, why it wasn't disclosed.

5            MR. KROUSE:  Yes, your Honor.

6            MR. WEINGARTEN:  Your Honor, as events have been

7    moving so quickly, we put together a potential stip with the

8    government.  Obviously events could overturn this, but I would

9    like to hand it to the government.  This is a stip that we

10   might suggest either in addition to or instead of the proposed

11   curative instructions, and I would like to give the Court a

12   copy.

13           THE COURT:  So if I'm understanding this right,

14   Mr. Weingarten, if what we learn is clear representation that

15   there is nothing further, so we have no new information beyond

16   what we have now, you anticipate that this is what your request

17   will be with respect to GX4011.

18           MR. WEINGARTEN:  I would say if there's not a real

19   world mistrial prejudice motion, I think either this or

20   something very close to this will be what we want.

21           THE COURT:  Okay.

22           MR. KROUSE:  I just want to mention one other fact

23   that I learned from the chiefs, and that has to do with our

24   communications with OFAC after getting out of court just to

25   find out what, if anything, OFAC did with respect to this

K39TSAD7

1    letter.  And this may bear on the stipulation.  We can say that

2    we will be in a position to stipulate that the letter was sent

3    to OFAC, and as of right now, our understanding is nothing was

4    done.  So unless we hear otherwise from OFAC, we are prepared

5    to stipulate to that, and I will have conversations with

6    Mr. Weingarten.  I haven't read this yet, but I just want the

7    Court to be aware that other piece, aside from just looking

8    internally, also speaking to OFAC and seeing what effect within

9    OFAC this letter had or did not have.

10            MR. WEINGARTEN:  I neglected to say one thing.  The

11   contemplation of this stip is it would be in addition to the

12   curative instruction that we requested.

13            THE COURT:  Yeah.  Okay.  And I gather that it is

14   along the lines of what Mr. Krouse just said.

15            MR. WEINGARTEN:  Yes.

16            THE COURT:  We'll take a look at that.  Any other

17   requests from the defense with respect to this?

18            MR. WEINGARTEN:  No.

19            THE COURT:  Mr. Krouse, anything further?

20            MR. KROUSE:  No, your Honor.

21            THE COURT:  Mr. Weingarten, what do you anticipate?

22            MR. WEINGARTEN:  We are prepared to put the client on,

23   and there are issues relating to exhibits that the government

24   objects to.  Mr. Heberlig is prepared to handle those.

25            Obviously we're living in a crazy fluid situation.

K39TSAD7

1    Things could happen.  We could change our mind.  We could come

2    to court prepared to put him on or it goes to the jury.

3          THE COURT:  And just to be clear, no expert, because

4    that has been --

5          MR. WEINGARTEN:  Sorry.  So we have two experts, and

6    our thinking there -- again being completely candid, is if we

7    put the client on, we're not going to put the experts on

8    tomorrow.  Either we put the client on or we're going to the

9    jury.  But if the client testifies and comes to certain

10   conclusions at the end of his testimony, it's conceivable we

11   would put on one or both experts.

12         THE COURT:  And you talked about a document reader.

13         MR. WEINGARTEN:  Yes, brief, very brief.

14         THE COURT:  So that's happening no matter what?

15         MR. WEINGARTEN:  Yes.

16         MR. HEBERLIG:  Yes.

17         THE COURT:  So for sure things could change, but for

18   sure you anticipate a document reader.

19         MR. WEINGARTEN:  Yes.

20         THE COURT:  And as you sit here, you do anticipate

21   Mr. Sadr, but a final decision has to be made.

22         MR. WEINGARTEN:  We're ready to go.

23         THE COURT:  And you understand it's that or closings.

24         MR. WEINGARTEN:  Yes.

25         THE COURT:  Okay.  So let me do the allocution and

1    then we'll talk about the objections.

2          So Mr. Sadr, I do want to make sure that you

3    understand that you have the right to testify in when your own

4    defense, and you also have the right not to testify.  If you do

5    decide not to testify, I will instruct the jury that they may

6    not draw any inference against you based on that decision, and

7    that fact may not enter into their deliberations.

8          I want to make sure that you know that the decision

9    whether to testify or not is your decision.  You're entitled to

10   the best advice of your attorneys in making that decision, but

11   the decision is yours.  Do you understand that?

12          THE DEFENDANT:  Yes, I do.

13          THE COURT:  And I think, Mr. Weingarten, you have

14   discussed these issues with your client?

15          MR. WEINGARTEN:  We have, your Honor.

16          THE COURT:  And you've advised him that it is his

17   decision.

18          MR. WEINGARTEN:  Yes, of course, your Honor.

19          THE COURT:  With that, tomorrow, you'll let us know

20   what the decision is.

21          MR. WEINGARTEN:  Yes.

22          THE DEFENDANT:  Thank you, your Honor.

23          THE COURT:  And also, Mr. Sadr, you should indicate --

24   when I ask you about that decision, you should indicate if you

25   feel that you haven't had sufficient time to discuss it with

K39TSAD7

your attorneys.

          THE DEFENDANT:  That's correct.

          THE COURT:  All right.  Thank you.

          MR. HEBERLIG:  Judge, pursuant to rules we have been
following in this trial, I sent a list of our witnesses and
exhibits yesterday evening, and the government has filed a
letter motion.  Somewhat to my chagrin, I think every or close
to every document that we put on the list they objected to.  I
don't think it would be a wise use of our time to go through
all of them.  I frankly think many of the objections are
borderline frivolous.  I don't know how the Court wants to go
through it.

          THE COURT:  Maybe the government is in a position to
withdraw at least the hearsay objections, which I agree border
on frivolous, so long as there's no ambiguity, no question that
it is being offered not for the truth but for the issue that --
if I have to say it again, I might lose my mind, but the state
of mind of Mr. Sadr, which is important to his knowledge.

          Now maybe, government, there are some that you don't
think go to that, and there are some that don't go to that, so
bracket that, maybe you want a limiting instruction.  But to
the extent anything is being offered not for the truth but what
it shows about Mr. Sadr's state of mind and specifically would
be available for the defense to argue in contrast to the
government's opening "This is not complicated," that it's

K39TSAD7

1    complicated, that the sanctions regime is complicated, that

2    there's ambiguity, that it changes frequently.  To the extent

3    that's part of the defense's core rebuttal to some of the mens

4    rea, all of the mens rea arguments, Ms. Kim, is there --

5         MS. KIM:  Yes, your Honor, to the extent that those

6    documents do go to the defendant's state of mind, and that's

7    plain on the face of those documents, we withdraw those

8    objections.  There's a list of those documents on page 2 of our

9    letter.  But we ask for the opportunity to just go through and

10   we can flag for defense an hour or two after court today which

11   ones do not plainly on the face of the document go to the

12   defendant's state of mind.

13        THE COURT:  Okay.  Let me see if there's anything else

14   that I want to ask now.

15        MR. HEBERLIG:  There were a couple of categories.

16        THE COURT:  I have got my notes from late last night,

17   early this morning, with respect to the videos.  I think this

18   goes directly to that point, but I suppose one question is how

19   much is necessary for that point?  Because it could tip over

20   into 403.

21        MR. HEBERLIG:  I will tell you exactly.  There are two

22   types of videos, a couple that relate to the Venezuela project,

23   I think that's a different category.  I assume the Court is

24   asking about the two Obama videos.

25        THE COURT:  Yes.

K39TSAD7

1         MR. HEBERLIG:  There are two, one of them is three and

2    a half minutes long, the other is about nine minutes long.  The

3    first one is a message that Mr. Sadr received by email from his

4    then wife.  The link is an email.  He will testify that he

5    opened it and viewed it, so he could authenticate it.  And it's

6    President Obama giving a Persian New Year message to the

7    Iranian people.  It bears directly on his state of mind and

8    belief that the U.S. was sort of turning a new page with

9    respect to relations with Iran, and was focusing in this

10   context on the quote, unquote bad guys in the government, the

11   SDN, IRTC, but opened this to private Iranians to encourage

12   private Iranians to thrive.  The government can argue from it

13   that maybe he shouldn't have drawn a comfort from that

14   statement, but we think it does bear directly on his state of

15   mind.  That one is less sanctions per se.

16        THE COURT:  Do you have the number?

17        MR. HEBERLIG:  I do, 11A, that one.  And we can submit

18   that, if the Court wants to review that tonight, whatever is

19   easiest or we could play them now.  But that's one.

20        And the second one --

21        THE COURT:  That's the shorter one?

22        MR. HEBERLIG:  That's the shorter one.

23        The second one comes down to the issue that there will

24   be testimony from Mr. Sadr that in the summer of 2010,

25   precisely in August of 2010, he was sent some media articles

from a colleague, and they flagged a new sanctions law.  And
this was around the time of the key events in this case when
banking relationships were being established, when structure
for the Venezuela project was being contemplated.  And there
will be testimony that when he received the article it said
there's new comprehensive sanctions legislation, he searched
for it, and he found the video that we would seek to play,
which is Exhibit 31.

It was President Obama's signing ceremony.  There are
statements about what the law was targeting.  Most of President
Obama's speech focuses on the government, the IRTC human rights
violators, and in particular about the seven-minute mark of the
speech there's a message for the Iranian people, and he says:
To be clear, I want the Iranian people to understand -- I'm
paraphrasing -- but this is not directed at you.  We have warm
feelings for you.  We want you to thrive.  This is focused at
the wrongdoers, essentially and in a broad brush way.

And after that what happens is Mr. Sadr searches
through the internet and he locates the law.  It's actually a
committee report, but it contains the legislation, and there's
an email which he prints for review.  This was an email in
government's motion in limine pretrial, and the Court
conditionally admitted it as relevant to Mr. Sadr's state of
mind.  I think the government changed course and obviously
didn't admit it in its case, but in pretrial their position was

1    it bears on his state of mind and understanding of the

2    sanctions, and we maintain:  Of course it does.

3           He reviewed it and he drew certain conclusions from

4    it, and there are relevant provisions of the law that bear

5    directly on this issue of sort of what was targeted and what

6    wasn't.  We are not going to argue to the jury that this is the

7    law.  Obviously the Court can read the instruction before or

8    after this portion of the testimony, but it does go directly to

9    his state of mind.

10          And there's been numerous times during this trial when

11   this has come up, and we attempted to, without the client on

12   the stand, suggest some evidence might come in.  Frankly, if he

13   wasn't testifying I think we would have a very good argument

14   about this document even without him on the stand, but he will

15   be on the stand and he will be subject to cross-examination.

16          So the relevance to his state of mind far outweighs

17   any risk of prejudice to the government.  The risk of prejudice

18   could be easily cured by a limiting instruction.  And frankly,

19   the government got to read an Asian Law Caucus article at

20   length where there was the thinnest of reeds that Mr. Sadr saw

21   that document.  He was BCC'd on a stamped email from his

22   sister.  There was no evidence that he opened up the document

23   or read it, but nonetheless we had a reader go throuhn about

24   ten pages of it, and all about what the Asian Law Caucus said

25   the sanctions do and do not prohibit.

1          This was something that was in his head.  He printed

2     it out and he read it, and it has to go to the jury for

3     consideration with whatever limiting instruction is

4     appropriate.  So that's the state of the CISADA evidence.

5          THE COURT:  So there's the question that you just

6     finished on, which is the text of the law, which is not

7     relevant to the jury's charge here but relevant, you argue, to

8     Mr. Sadr's state of mind.  There's that question and the video

9     question.

10         MR. HEBERLIG:  Yes.

11         THE COURT:  So let me --

12         MR. HEBERLIG:  Let me add one -- the reason why we

13    think the document should be admitted is so that when he's

14    testifying --

15         THE COURT:  Not the document, the statute you mean.

16         MR. HEBERLIG:  The committee report, but yes.

17         So when he's testifying it can be displayed.  He can

18    talk about what it is that he saw and why it was important to

19    him.  And to do that sort of in the abstract without the jury

20    being able to look at the document and see that what he's

21    saying is right there in black and white, we think would give

22    them only half the story.  And again, it can be resolved by

23    curative instruction.  We're never going to argue in closing

24    that forget what Judge Nathan says, this is the law.  That's

25    not the purpose for this evidence, but it does bear on whether

1    Mr. Sadr understood at the time he was violating the law, even

2    if the law may be instructive in a different manner to the jury

3    through your Honor's instructions.

4              MS. KIM:  So I will start off with the videos --

5              THE COURT:  Actually I think logically the first

6    question is the subject area, and then if I allow that in the

7    text of the committee report then we can address what

8    additionally could come in through the video.

9              MS. KIM:  Sure.  So the government -- of course if the

10   defendant takes the stand and he testifies that he learned

11   about CISADA and started researching it, no objection.  We

12   don't have an objection to that first email where he sends an

13   attachment which includes CISADA.  We don't object to that

14   cover email where he sends it to someone else to print.

15             We do object to admitting the 70-page document.  It's

16   a comprehensive report that includes a lot of text and draft

17   language for the ultimate regulation.  And for all of the

18   reasons that we discussed earlier in this case, I think neither

19   party is submitting any regulations for the jury to take back

20   to the jury room.  And here this is a 70-page document that

21   includes a lot of regulations that are completely irrelevant to

22   this case, and so we think that --

23             THE COURT:  Here's I think the difference in the

24   relevance that's being offered, and if you could address that:

25   The government didn't submit regulations that I'm going to

K39TSAD7

1    instruct the jury on because I'm going to instruct the jury on

2    the relevant law.  That makes sense.

3         The defense wants to argue here was Mr. Sadr's

4    understanding and misunderstanding of the complicated sets of

5    provisions, here's why he might have thought what he was doing

6    was not prohibited by the sanctions, which is relevant to his

7    mens rea, in light of -- that's a different piece of relevance

8    to be drawn from the committee report itself, and with the

9    curative instruction doesn't interfere with the Court's task of

10   instructing the jury as to the law.  So I don't think the two

11   are parallel.

12        MS. KIM:  Your Honor, what may make sense is -- it is

13   a 70-page document, if there are certain excerpts that the

14   defendant plans to talk about, perhaps we could confer with

15   defense counsel and discuss those specific excerpts, but I

16   think for the full 70-page document, which includes -- the

17   majority of that document I imagine is irrelevant, and the

18   defendant will not testify about every page, we think that

19   sending that back with the jury would be confusing for them to

20   have that document and flipping through it would be confusing

21   for them.

22        MR. HEBERLIG:  That's not a bad solution.  Certainly

23   the jury won't be getting the document right away.  I haven't

24   resolved exactly which pieces we're going to be going through,

25   but it certainly won't be all 70 pages.  As long as we can

K39TSAD7

1    display the relevant portions while he's testifying, we would

2    have no objection to redacting the remainder.  So the

3    conditional admission subject to his testimony, and then

4    redaction, if anything we didn't discuss with him on the stand,

5    and of course the cross-examination, we're happy to do that.

6              THE COURT:  So you will make a proposal of a pared

7    down --

8              MR. HEBERLIG:  My preference is we do that after he

9    testifies.

10             THE COURT:  As to what gets redacted out of the

11   document?

12             MR. HEBERLIG:  Yes.  To do it in advance gives them a

13   road map to my examination.

14             THE COURT:  I'll accept that.

15             MR. HEBERLIG:  Thank you.

16             THE COURT:  And my plan would be to do -- maybe think

17   about when the limiting instruction should come in so I'm not

18   repeating it over and over again, so at the beginning of the

19   testimony or the end, I'm happy to hear requests with respect

20   to that, and whether we're talking about the same limiting

21   instruction or if there's any reason to deviate from it.

22             With respect to the videos, the second video, can that

23   be cut down?

24             MR. HEBERLIG:  So the part we care most about is where

25   he's communicating to the Iranian people.  If the government

K39TSAD7

1    doesn't want the first part in, which has references to the

2    government of Iran, and we could talk about that, I don't care

3    as much about that.  I sort of assume for balance that they

4    would want the entirety of the video because there are -- the

5    President does make some strong statements about Iran, and

6    we're not running from those.  But if it's just a matter of

7    time, I think we could probably cut some of it.

8              There has to be a bit of a balance, because the point

9    is Mr. Sadr heard both, but I think it's the first seven

10   minutes that's kind of focused on the Iranian government side

11   and some of the parts of the new law, and then the message to

12   the Iranian people at the end.  We could try to shrink the

13   first seven minutes, but it's about a nine-minute video.

14             MS. KIM:  Your Honor, so I have a proposal, and so I

15   think first off we have no objection, of course, to the

16   defendant testifying about these videos or having watched these

17   videos.  It's completely proper.

18             I think the videos themselves are highly prejudicial

19   in that, for example, the first video, which is three minutes,

20   and my understanding is that in this video President Obama

21   doesn't mention sanctions, he wishes Iranians and Iranian

22   Americans a happy new year, and then there is a discussion

23   about sort of celebrating the contributions of Iranian

24   Americans to the United States.

25             It's a three-minute video.  I think the defendant can

K39TSAD7

1   testify about it, or an alternative to portraying President

2   Obama via video would be to have a transcript of the excerpts

3   that defense counsel would like to discuss with the defendant.

4   And that would remove the prejudice of having a video of a

5   former President which, first, politicizes the Iran sanctions

6   program and U.S. foreign policy with Iran, and second is

7   prejudicial given that it's -- he's speaking out and not

8   speaking about sanctions specifically.

9           With respect to the second video, which is a

10  nine-minute video, and in this video -- I should say we

11  attached both of these a little over a week ago in our filing,

12  which is Docket 248, so I think the Court should have all

13  these.  That nine-minute video includes President Obama but

14  also the full Democratic leadership behind him.  So we think

15  that this video as well is extremely prejudicial, it

16  politicizes U.S. foreign policy.  And we think that the way to

17  work around that and perhaps a compromise is that if the

18  defense wants to submit a transcript of what I understand is

19  about seven minutes into the video and read from that

20  transcript and have the defendant testify about what he thought

21  those words meant, that would be appropriate and reasonable.

22          MR. HEBERLIG:  It's a little difficult to understand.

23  This is the chief executive who is in charge of sanctions

24  enforcement ultimately.  It's not prejudicial.  I mean this is

25  the President announcing --

K39TSAD7

```
 1              THE COURT:  Well, there's a line, and the points that
 2     you want to make it seems to me can be conveyed without the
 3     possibility of some suggestion that President or other leaders
 4     are kind of on your side.  And that's the concern, all of the
 5     content, because that's what matters, and certainly Mr. Sadr,
 6     if he does testify, could describe its impact on him.  It seems
 7     to me that the video, beyond the transcript, beyond the
 8     testimony, is pushing into 403 for no reason.  You're not
 9     getting any more of it then you get through the transcript and
10     the anticipated testimony.
11              MR. HEBERLIG:  But what is relevant is that it's the
12     President saying these words.  I assume the transcript will say
13     it's the President saying these words, so we're going to read a
14     transcript?
15              THE COURT:  It doesn't matter.  That would matter if
16     it were for the truth because you want to persuade the jury to
17     accept -- and that's the concern, to accept what's being said
18     as opposed to the impact on the listener, which you can get
19     from the transcript and you can get from the testimony.  The
20     political nature that comes unnecessarily through I think the
21     visual of the video strikes me as heading over into 403
22     territory.
23              MR. HEBERLIG:  May I try one other option?  I think
24     it's the weight of the President that goes to his state of
25     mind, that this is the leader of the United States.  And again
```

1    the first video is in 2009, right at the very outset of this

2    alleged conspiracy.  The second is in mid 2010, before all of

3    the transactions have occurred in this case.  I think it goes

4    directly to weight and why he would take it so significantly

5    that it was the President of the United States.

6              THE COURT:  That's just the fact that will be known to

7    the jury.

8              MR. HEBERLIG:  If it's just the imagery of the video,

9    what about playing the audio?  They you will know who President

10   Obama is and recognize the voice.  We don't care about the pomp

11   and circumstance of the video, but it won't be as effective

12   just reading it, kind of a dry transcript.  Can we play the

13   audio at least for them to hear?

14             I don't understand -- I don't understand the prejudice

15   in that.  They will know it's President Obama.  So the fact

16   that the Democratic leadership is behind it, that's not why

17   we're asking for it.

18             THE COURT:  So now we're at audio versus transcript.

19             MR. HEBERLIG:  Our strong preference is video, but if

20   the Court's concern is that somehow the imagery of him

21   announcing a new law will be prejudicial, I disagree, but I

22   think what is important is it would be time consuming and

23   boring for the jury, frankly, to have me read a transcript when

24   they know it's President Obama.  It seems a little silly to not

25   let them at least hear the audio.

K39TSAD7

1          MS. KIM:  Your Honor, may I respond?

2          THE COURT:  Yes.

3          MS. KIM:  So as the Court has said, I don't think that

4     anything additional is -- there's nothing relevant in terms of

5     hearing the President's voice versus seeing a transcript or

6     hearing a transcript that says President Obama.  This, to me,

7     seems like it is entirely irrelevant, the difference between

8     the audio and the transcript.  If Mr. Heberlig is concerned

9     about not having a charismatic reader, he could ask

10    Mr. Weingarten to read that part of the transcript.

11          THE COURT:  To be sure.

12          MS. KIM:  And I think that reading from the transcript

13    it's going to be clear these are the word of President Obama.

14    I think going further than that is prejudicial, it politicizes

15    this.  The President has a very distinct voice.  There are

16    certain reactions that could come from that, and I think this

17    is sort of an appeal to say this was the position of a former

18    President and the Democratic party, and there's prejudice to

19    that, and I think it is an appeal to the jury's sympathy.

20          MR. HEBERLIG:  I disagree.  We've had testimony from

21    Mr. Kim that sanctions are in part political and depend on who

22    is the leader of the country.  They change from one

23    administration to another.  President Obama was the leader of

24    the country and the Treasury Department at the time of the

25    conduct in this case.  It's not about the Democrats, it's about

K39TSAD7

1     he was one who was promoting what the U.S. policy was with

2     respect to Iran, and his words gave our client reason to

3     believe there may be a thawing in terms of how the U.S. would

4     impose sanctions against private Iranians.

5            THE COURT:  But the words can come through the

6     transcript.

7            MR. HEBERLIG:  There's a practical problem, I don't

8     have a transcript.  I guess I could have someone type one

9     tonight.  I guess I will if that's what we need to do.

10           THE COURT:  Somebody would have to type it tomorrow.

11    It's three minutes and nine minutes.  Let's produce the

12    transcript.  It allows you what you've indicated you need

13    without the danger of unfair prejudice that comes I think from

14    the emotive reaction people have to political speeches in their

15    oral presentation and visual presentation.

16           All right.

17           MR. HEBERLIG:  May I clarify, the transcript will say

18    it's President Obama, it's not me reading an anonymous

19    transcript.

20           THE COURT:  It's not to be anonymous, it should

21    indicate that it's President Obama.

22           MR. HEBERLIG:  Thank you.

23           THE COURT:  DX45 I think is also not in the category

24    of state of mind.  These are the emails that indicate

25    Mr. Sadr's father's cancer, and the defense has indicated that

K39TSAD7

1    it's --

2              MR. HEBERLIG:  That was the not purpose of the email.

3    I did not realize that was in there.

4              THE COURT:  So that can get redacted.

5              MR. HEBERLIG:  We can redact that information.  But

6    there is a relevant purpose for Mr. Sadr to testify about the

7    fact that his father got sick, and we won't belabor it or go

8    into the diagnosis, but it explains why he, during the period

9    of illness, was in Iran more, he was helping his dad more.  And

10   I think we will describe it as cancer but not get into the gory

11   details in any respect.  It's not prejudicial, it's relevant

12   evidence.

13             THE COURT:  Okay, I agree with that, but it won't be

14   belabored for sympathy purposes.

15             MR. HEBERLIG:  No, your Honor.

16             THE COURT:  Next, in the non-state of mind category, 1

17   and 137, which seems like extensive information about the

18   Venezuela project.

19             MR. HEBERLIG:  I'm happy to pull it up.  Here's what

20   we did:  There's been virtually no information presented to

21   this jury about what the Venezuela project was.  The only fact

22   witness that testified is Mr. Kazerani, who planned it from

23   afar but I'm not sure -- maybe he went there once, and I think

24   there's one photograph admitted at the groundbreaking ceremony

25   for a couple of the buildings.  It's relevant for any number of

1    reasons, and the jury should be allowed to understand what was

2    being constructed here.

3         THE COURT:  Why?

4         MR. HEBERLIG:  Because the government's opening

5    statement suggested this scheme allowed Mr. Sadr to pocket $115

6    million in U.S. currency.  It is our theory that the vast

7    majority of that money was poured back into the project and

8    used to buy things to construct the city that was being built.

9         I'm not trying to belabor it and there's nothing

10   prejudicial in what I put together.  For ease of going through

11   this quickly, I assembled a handful of photographs into a

12   PowerPoint that we could click through.  I think the whole

13   thing takes about two minutes.  The video, there are two,

14   they're both about a minute and 30 each.

15        One of them explains the technology that has come up

16   in this trial, the tunnel form technology that built these

17   buildings that Stratus Turkey was known for.  Mr. Sadr will

18   testify about that, why the company Stratus Turkey was

19   subcontracted to do the work in Venezuela.  It did do the work

20   in Venezuela.  It wasn't a shell company or a front.  And the

21   video, which is a minute 30 seconds long, is sort of a

22   time-lapse video showing one of these buildings being built.  I

23   don't think there's any prejudice at all with respect to this.

24   The government moved in limine pretrial for the Court to

25   exclude the purposes of the housing prong, the Court denied

K39TSAD7

1    that.  It's relevant for them to know.

2         THE COURT:  I denied it with this caveat:  I said you

3    could call it low-income housing, but at some point it could

4    tip over.

5         MR. HEBERLIG:  I assure these are not prejudicial.  We

6    could pull up the PowerPoint right now and flip through it.  I

7    think it would take two minutes.

8         THE COURT:  How long will it take with the jury?

9         MR. WEINGARTEN:  The two videos are a minute and 30

10   each, and I think there are 25 photos.  And if the Court thinks

11   it's too many, I will cut it down.  I think the testimony is

12   about five minutes.  It's background explaining what this

13   project was and what you were doing.  It's the kind of stuff

14   juries should hear, not the sort of cold details of swift

15   messages, but this was a real world project they were building

16   in Venezuela.

17        THE COURT:  And therefore something to be proud of and

18   admirable and the like.

19        MR. HEBERLIG:  Goes to a couple of different things:

20        One, Stratus Turkey that we heard so much about was

21   not a shell company.  It built a significant portion of this

22   city in Venezuela.  The video we will display was Stratus

23   Turkey that was putting the these tunnel form concrete

24   buildings, number one.

25        Number two, the size and scope of the project goes

1    directly to rebutting the suggestion by the government that

2    this scheme was to get Mr. Sadr and his family $115 million

3    that they could walk away with.  That's not what happened.

4            THE COURT:  So those are two relevant proffers, and I

5    am inclined -- I think it needs to be cut down.  You don't need

6    to see the same thing over and over again to make the point.

7    We don't need the photos and videos showing the same thing, so

8    you will cut it down.

9            MS. KIM:  Could I make a suggestion?

10           THE COURT:  Yes.

11           MS. KIM:  So I don't think the fact that this was a

12   conduction project, I don't think that's in dispute.

13           THE COURT:  That's not what was proffered as relevant.

14           MS. KIM:  I think maybe showing the jury two to five

15   photographs of the project would be reasonable.  I think a

16   30-something, 40-page slide deck as well as a 1.5 minute video

17   which is, setting aside sort of the lack of relevance, but it

18   is very fancy and impressive, but I don't think that having the

19   jury sit through there for ten minutes --

20           THE COURT:  Well, you will cut it down, but fancy and

21   impressive goes to the relevance proffer as to rebuttal to what

22   the government argued, that the money was going to Mr. Sadr and

23   his family.  So cut it down.  I don't want it to be duplicative

24   I don't want it to take longer than it needs to.  So we'll take

25   it up tomorrow in its specifics.

K39TSAD7

1          MR. HEBERLIG:  Understood.

2          THE COURT:  But I will give you -- please cut it down.

3          MR. WEINGARTEN:  No problem.

4          THE COURT:  The childhood photograph I think we need

5     to hear.  I don't know what it is.  I think it turns on what

6     it's going to be proffered for the.

7          MR. HEBERLIG:  Our preference would be to do that at

8     the bench before his testimony.

9          THE COURT:  Okay.  You want to make an ex parte

10    proffer?

11         MR. HEBERLIG:  Our request was to do so because it

12    goes to sort of a key and sensitive part of his direct that --

13         THE COURT:  So it would reveal strategy?

14         MR. HEBERLIG:  It would reveal.

15         THE COURT:  That's why you would do it ex parte.

16         MR. HEBERLIG:  Yes.

17         MS. KIM:  Your Honor, the photograph I believe should

18    be on our screen.

19         THE COURT:  I will look at the photograph.  I will

20    take the ex parte proffer.

21              (Continued on next page)

22              (Pages 1252 through 1255 SEALED by Order of the Court)

23

24

25

K39TSAD7

1    THE COURT:  I have asked Mr. Heberlig if he could make

2    a generalized proffer as to the areas so that I could hear the

3    government's reaction to it.  He indicated there's a way that

4    he could do that without tipping into the reasons for the ex

5    parte conference.

6    MR. HEBERLIG:  Thank you, your Honor, there are two

7    issues we discussed.  The general topic that we intend to get

8    into during Mr. Sadr's examination, in the background

9    discussion of his upbringing in Iran and his relationship with

10   his father, we intend to elicit that his father was mistreated

11   at the hands of the Iranian government in terms of arrest and

12   imprisonment.  I will sort of leave the details there.  And

13   that our client, Mr. Sadr, also was mistreated in various

14   episodes by elements of the IRTC, and those events contributed

15   in a couple of ways to relevant facts in this case:

16   Number one, with respect to Mr. Sadr personally, the

17   defendant, they led him to leave Iran as a young man.

18   Number two, they go directly to rebutting an issue

19   that has been central in this trial, and that is whether the

20   contract and conduct at issue was for benefit of the government

21   of Iran.  And the proffer is that through the testimony and

22   describing some of the events that took place during his

23   upbringing and his understanding of his father, the last thing

24   in the world Mr. Sadr ever would have done is to work to

25   benefit the government of Iran.  He has disdain for the

1    government of Iran.  The government of Iran mistreated his

2    family in any number of ways that go directly to this issue.

3         We do not intend to belabor the details, but

4    Mr. Weingarten did open on it.  There's been evidence through

5    Mr. Kazerani, evidence about the senior Mr. Sadr's arrest.  We

6    think it's plainly relevant to his state of mind, and the

7    notion that he, in doing what he did during this project, was

8    not doing it for the benefit of the government of Iran.  In

9    fact, it was the exactly the opposite:  To keep all resources

10   and revenue outside of the territory of Iran and away from the

11   government.

12        THE COURT:  Ms. Kim.

13        MS. KIM:  Your Honor, I'm sorry, maybe I'm missing

14   something, but we're talking about Defense Exhibit 112?

15        THE COURT:  The specifics of that exhibit aside, it

16   implicated this issue -- the broader discussion ex parte

17   implicated this issue because the government objected during

18   opening to the subject area.

19        I asked if we could -- so there was an adversarial

20   process, I wanted to make sure the government had an

21   opportunity to be heard on the general topic, which, based on

22   what I heard from the government's opening, I allowed it in the

23   defense's opening.  I don't think anything has changed that,

24   but I wanted to give the government an opportunity to be heard

25   on it before heading into the specific rulings on evidence that

K39TSAD7

1     touched on these general topics.

2          MS. KIM:  Sure.  Could I have one minute?

3          THE COURT:  You may.

4          (Pause)

5          MS. KIM:  Your Honor, so we think generally that there

6     is some potential relevant testimony here.  We think that it

7     could very quickly move into 403 territory.  And I think the

8     more graphic or more sort of charged terms used by defense

9     counsel or the defendant, I think that's where we would draw

10    the line.  So I think some limited testimony on this topic

11    would be appropriate or would be reasonable, but if we're sort

12    of sitting on this topic for too long or if there are certain

13    terms like torture or certain graphic descriptions, I think

14    that would go too far and it would be a call for sympathy to

15    the jury.

16         MR. HEBERLIG:  Your Honor, I agree there has to be a

17    balance, but --

18         THE COURT:  Graphic descriptions.

19         MR. HEBERLIG:  But for the information --

20         THE COURT:  Graphic descriptions.  I think that's fair

21    grounds, or no?

22         MR. HEBERLIG:  Not in detail, but in concept at a high

23    level.  The fact that certain things happened, not described

24    with precision, but I think it gives weight to the evidence.

25    It's not an abstract:  We got a lot of parking tickets.

K39TSAD7

1          THE COURT:  Maybe taking the two things government

2    said, they object to to use of the word "torture" then they

3    object to graphic descriptions of torture.

4          MR. HEBERLIG:  There won't be graphic descriptions,

5    but we intend to use the word, and it's relevant.

6          MS. KIM:  Maybe we could narrow that so the parties

7    have some guidance.  Based on Mr. Heberlig's proffer, he said

8    that the defendant's father was mistreated by the Iranian

9    government, the defendant was also mistreated.  I think using

10   that word and describing whether or not that mistreatment was

11   physical, psychological, financial, I think that would be

12   appropriate.  I think going into -- I think using the word

13   "torture" and going beyond that is sort of a bit too much and

14   goes into 403.

15         THE COURT:  I disagree.  I think that still maintains

16   the general level and explains and verifies the rebuttal point

17   that Mr. Sadr is not tied to the government of Iran, was

18   seeking to leave Iran and the like.  I would allow -- I

19   wouldn't allow specific descriptions, I wouldn't allow

20   duplicative information in this regard, I won't allow

21   belaboring it, but to provide the general information I will

22   allow it.

23         MR. HEBERLIG:  And for a little clarification, with

24   respect to his father, I do not intend to do anything more than

25   that.

K39TSAD7

1    I do think with respect to Mr. Sadr and his own

2    personal treatment, a little bit of leeway.  I do not intend to

3    go into great detail, but I believe a little leeway beyond just

4    generalities is appropriate because it gives weight and

5    credibility to his feelings.  There are I think four specific

6    episodes.  Mr. Weingarten opened on at least two of them.

7    They're going to be tight and 30-second-type descriptions of

8    what happened, but they're important to his state of mind and

9    why he chose the life that he did and left, and would not have

10   worked to support this regime.

11   THE COURT:  Four 30-second descriptions of specific

12   instances of mistreatment I think patently are seeking sympathy

13   and not to make the point that you have described.

14   MR. HEBERLIG:  I think I need to understand the line

15   then, because there are concepts like torture, arrest both at

16   issue, physical mistreatment.  I can be general, but they all

17   happened.  And I don't -- it's not elicited for sympathy, it's

18   elicited for a core central issue in this case about the fact

19   that he was a private secular Iranian working to keep things

20   away from this awful regime that he's never ever supported.

21   THE COURT:  I just find it -- there's clearly the

22   potential for 403 sympathy.  So I will allow you to ask -- to

23   probe at a somewhat general level, allow it to have indicia of

24   credibility with respect to it, allow it to have indicia of its

25   impact on Mr. Sadr for the purposes that you've described, but

K39TSAD7

1    specific, graphic descriptions of mistreatment would tip over

2    into being done for the purpose of eliciting sympathy

3    inappropriately and would be 403.

4         Now that's my general guidance, you'll work with that.

5         MR. HEBERLIG:  Yes.

6         THE COURT:  And I think it's -- either on the

7    government's objection or on my own, I'll stop it if you're

8    going too far.

9         MR. HEBERLIG:  Understood.  Thank you.

10        MS. KIM:  Your Honor, with respect to the other

11   objections, some of them I think can be resolved quickly, so

12   I'm happy to walk through them.

13        THE COURT:  Yeah, I think that is largely what I had.

14        MS. KIM:  So the hearsay ones we'll pick out ones that

15   don't go to state of mind, Defense Exhibits 52, 52A and 53 and

16   53A, we withdraw the objection to those.

17        With respect to Defense Exhibit 73, defense counsel

18   has represented they will also admit the attachment, the

19   passport, so that's not an issue.

20        The last objection is to Defense Exhibits 82 and 82A.

21   In our view, these would be prior consistent statements of the

22   defendant, and under the rules, it doesn't seem like unless he

23   is attacked in terms of truthfulness or that specific

24   statement, that his prior consistent statement on that issue

25   won't be admissible.

K39TSAD7

1          THE COURT:  I have 82 and 82A as the Hyposwiss

2    contract.

3          MS. KIM:  And it comes with a cover email from the

4    defendant, and yes, attaches the Hyposwiss contract.

5          THE COURT:  Maybe I'm fading, Ms. Kim, I don't

6    understand, I didn't understand it to be a relevance objection.

7    And maybe you're adding to it, but is there a relevance

8    objection here?

9          MS. KIM:  Yes, there is, your Honor.

10         THE COURT:  So Mr. Heberlig, what's the relevance?

11         MR. HEBERLIG:  This relates to a business that will

12   come up in testimony that Mr. Sadr formed toward the back

13   portion of the alleged conspiracy period.  It was an asset

14   management business in Switzerland.  Part of his general

15   background of his business activities, what he was doing during

16   the time of the alleged conspiracy, he opened an asset

17   management business with Hyposwiss and he invested both his own

18   money and attracted investors.

19         The contract is an approval by Hyposwiss for him to

20   engage in this business after they obviously put him through

21   significant due diligence.  And an asset manager obviously

22   manages and conducts transactions in U.S. dollars.  And it goes

23   to the fact of Mr. Sadr's state of mind and good faith that if

24   a reputable bank like Hyposwiss -- and if we go to the last

25   page of this document, I believe that the director of the bank

1    or the head of compliance signed the contract.

2            In any event, the fact that they approved him to do so

3    at the end of this vetting process, the head of compliance and

4    the head of private banking, authorized him to serve in this

5    position as an asset manager of funds in Switzerland where he

6    would be obviously transacting in U.S. dollars every day and

7    managing clients' money.  And it goes to the fact that he

8    didn't believe that he was violating the sanctions, his bankers

9    who knew all of the information there is to know about him

10   approved him to engage in this capacity.

11           It's not for the truth, it's for a non-hearsay state

12   of mind that he wouldn't have been approved for business

13   activity like this if it was illegal for someone like him to

14   engage in U.S. dollar transactions outside of Iran.

15           THE COURT:  So it's not being offered for the truth.

16           MR. HEBERLIG:  No.

17           THE COURT:  It's being offered to show his state of

18   mind.

19           MR. HEBERLIG:  Yes.

20           THE COURT:  Because if he -- say it again?

21           MR. HEBERLIG:  Two ways.  One, if he believed that he

22   was violating the law by engaging in U.S. dollar transactions

23   outside of Iran, the notion he would have gone to his bank and

24   asked to get approval for an asset management company for which

25   he would be engaged in those transactions is inconsistent with

K39TSAD7

1    that.  It proves circumstantially he had a good faith state of

2    mind and believed he was able to engage in U.S. dollar

3    transactions outside of Iran.  The fact that the bank approved

4    him to do so also bears on his state of mind.  Had they

5    objected to him being in that trusted capacity in managing

6    other people's U.S. dollars, they would have told him, instead

7    of approving his business.  That's what it goes to.

8              THE COURT:  Ms. Kim.

9              MS. KIM:  Your Honor, I think with respect to

10   relevance, the allegation here is that the criminal conduct

11   here isn't transacting in U.S. dollars.  So the fact that this

12   bank approved of those types of transactions or managing other

13   people's money in Europe, we don't see the relevance.

14             (Continued on next page)

K398SAD8

1      THE COURT:  I do think that's a weight argument.  So

2   the 401 objection is overruled.

3      I will allow it with a limiting instruction, Mr.

4   Heberlig.  So you will propose to the government a limiting

5   instruction to deal with the nonhearsay.

6      MR. HEBERLIG:  I think that's it.

7      THE COURT:  Anything else?

8      MS. KIM:  Just one last thing.  Can we just make sure

9   that the transcripts of the videos and any updates to the

10  exhibits are sent to the government this evening?

11     THE COURT:  Yes.

12     MR. HEBERLIG:  Yes.

13     MS. KIM:  In a relatively timely manner.

14     THE COURT:  We will do that.

15     MR. HEBERLIG:  They have the video.

16     MR. KROUSE:  Just as a point of clarification, is the

17  intent to use the whole video, the whole transcript, or just

18  portions?

19     MR. HEBERLIG:  I can probably scale it down to

20  portions of the second one.

21     THE COURT:  You will let the government know what you

22  want to do with respect to that.

23     MR. HEBERLIG:  I have got work to do tonight.

24     THE COURT:  This is part of it.

25     MR. HEBERLIG:  If you want it shorter, then I will

K398SAD8

1    make it shorter.

2              MR. KROUSE:  Shorter will be met with approval I

3    think.

4              THE COURT:  And not the government on cross trying to

5    get other parts in.

6              MR. KROUSE:  I doubt it very highly.

7              MS. KIM:  I apologize, your Honor.  This is one other

8    exhibit.  I just want to make a note on the record.  This is

9    Defense Exhibit 1920.  It's the page that --

10             THE COURT:  He said he is not going to introduce it,

11   but use as a demonstrative.

12             MS. KIM:  It's part of larger document, and we just

13   ask that the actual image is excerpted for the demonstrative.

14             MR. HEBERLIG:  I am not sure I understand.

15             MS. KIM:  Just the image rather than the text above

16   and below it.

17             MR. HEBERLIG:  It says Department of Treasury or

18   FinCEN at the bottom.  I don't know that that's irrelevant.

19             THE COURT:  It's relevant as a demonstrative?

20             MR. HEBERLIG:  I really just want the picture.

21             THE COURT:  Then take out everything else.

22             Do we need to set any schedule on what is coming in

23   tonight?

24             No.

25             MR. KROUSE:  I don't think so, your Honor.

K398SAD8

1           MR. HEBERLIG:  One request.  May I be excused with Mr.

2    Sadr tomorrow morning from the jury charge conference?

3           THE COURT:  Yes.

4           Mr. Sadr, you understand that the jury charge

5    conference will be discussing the substance of what

6    instructions will be provided to the jury?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Mr. Heberlig has indicated that you wish

9    to waive your presence at that conference?

10          THE DEFENDANT:  That's correct, your Honor.

11          THE COURT:  You understand that you have the right to

12   be at that conference if you want to?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And you do wish to waive it?

15          THE DEFENDANT:  That's fine.  Yes.

16          MR. KROUSE:  Not every member of the government team

17   will be present for the charge conference.

18          THE COURT:  With respect to the charge again, if you

19   have objections, obviously, if it's well-tread, you can just

20   preserve it.  If you have specific requests for language

21   change, please have in hand what you're requesting and any

22   relevant authority I need to consider.

23          OK.  I am going to say 8:30 tomorrow to make sure we

24   get it done, if issues develop overnight.  So 8:30 tomorrow,

25   please.  Again, as specific as you can be with respect to any

K398SAD8

1    requests to change the charge.

2            Anything else?

3            MR. KROUSE:  No, your Honor.

4            MR. WEINGARTEN:  No.

5            THE COURT:  See you tomorrow.

6            (Adjourned to March 10, 2020, at 8:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    ROBERT PERI

 4    Cross By Mr. Heberlig . . . . . . . . . . .1009

 5    Redirect By Mr. Lynch . . . . . . . . . . .1034

 6    MATTHEW NELSON

 7    Direct By Mr. Lynch . . . . . . . . . . . .1047

 8    Cross By Mr. Silverman . . . . . . . . . .1089

 9    ALESSANDRA CONTE-PETROZZINO

10    Direct By Ms. Kim . . . . . . . . . . . . .1092

11    Cross By Mr. Heberlig . . . . . . . . . . .1097

12    TALYA NEVINS

13    Direct By Mr. Krouse . . . . . . . . . . .1135

14    Cross By Mr. Silverman . . . . . . . . . .1152

15    Redirect By Mr. Krouse . . . . . . . . . .1158

16    TALYA NEVINS

17    Direct By Ms. Kim  . . . . . . . . . . . .1180

18    Cross By Mr. Silverman . . . . . . . . . .1198

19                        GOVERNMENT EXHIBITS

20    Exhibit No.                              Received

21     401, 402, 403, 404, 405, 406, 410, 420, . . .1046

22              421, 422, 423, 424 through

23              429, 1403, 1403T, 1403A, 1405,

24              1405T, 1405A, 1501, 1501T,

25              1501A, 1502, 1502A, 1503,
```

```
1                    1503T, 1503A, 1503AT, 1504,

2                    1504A, 1506, 1506A, 1506AT,

3                    1601, 1601T, 1601A, 2009,

4                    2011, 2011A, 2018, 2018A,

5                    2019, 2020, 2022, 2023, 2023A,

6                    2032, 2032T, 2032A, 2034,

7                    2034T, 2034A, 2034B, 2034BT,

8                    2034C, 2034CT, 2043, 2043A,

9                    2047, 2047A, 2048, 2048A,

10                   2051, 2051A, 2052, 2052B,

11                   2082, 2094, 2117, 2117A, 2119,

12                   2119A, 2147, 2149, 2149T,

13                   2149A, 2182, 2240, 2240A,

14                   2241, 2241A, 2248, 2252,

15                   2252A, 2267, 2267A, 2268,

16                   2268A, 2269A, 2269B, 2269C,

17                   2269D, 2269E, 2269F, 2269G,

18                   2269H, 2280, 2280A, 2303,

19                   2303A, and 2303B
```

```
20   702   . . . . . . . . . . . . . . . . . .1067

21   810   . . . . . . . . . . . . . . . . . .1093

22   703, 704 and 705A   . . . . . . . . . . .1137

23   1104, 1105, 1106, 1107, 1108, 1109, . . . .1147

24             1110, 2010, 2012, 2029, 2035,

25             2039, 2045, 2053, 2067, 2079,
```

```
 1                        2085, 2202, 2209, 2222, 2227,

 2                        2235

 3        2015, 2015B, 2015D, 2015DT, 2077, 2074, . . .1179

 4                        1503, 1503T, 1503A, 1503A-T,

 5                        2087, 2087A, 2087B, 2116,

 6                        2116A, 2126, 2126A, 2153-1,

 7                        2153-2, 2154-1, 2154-2, 2139,

 8                        2261, 2229, 2229A, 2234,

 9                        2234A, 2282, 2282A, 2156,

10                        2238, 2145, 2037, 910 through

11                        917

12        20, 21A, 2104T and 1103   . . . . . . . . .1203

13                             PLAINTIFF EXHIBITS

14        Exhibit No.                              Received

15         2214 and 2214A, 2216, 2216A, 2218,  . . . . .1208

16                        2220, 2220A, 2222, 2245,

17                        2245A, 452, 480D, E, F, K, J,

18                        490A 454C, 2175, 2175A, 1212,

19                        1212A, 1222, 1222A and B,

20                        1214, 1214A and B, 1215,

21                        1215A, 2293, 2293A, 1216,

22                        1216A and B, 1217, 1217A and

23                        B, 2183, 2183A, 2090, 2090T,

24                        2090A, 2090AT, 2076, 2076A and

25                        B, 2164, 2164A, 2284, 2284A
```

```
 1              and D, 2304 and 2304A

 2                    DEFENDANT EXHIBITS

 3    Exhibit No.                          Received

 4     96-R    . . . . . . . . . . . . . . . . .1010

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```