# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ALI SADR HASHEMI NEJAD,

*Defendant*.

Case No. 18 Cr. 224 (AJN)

ORAL ARGUMENT REQUESTED

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL
## OR IN THE ALTERNATIVE FOR A NEW TRIAL

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated: May 1, 2020

## <u>TABLE OF CONTENTS</u>

I.  SADR IS ENTITLED TO JUDGMENT OF ACQUITTAL ON EVERY COUNT .......... 4

    A.  Governing Legal Principles ................................................................................. 4

    B.  Sadr is Entitled to Acquittal on the Bank Fraud Counts (Counts Three and Four)...................................................................................................................... 6

        1.  Under 18 U.S.C. § 1344(1), no reasonable jury could conclude beyond a reasonable doubt that Sadr's conduct would likely cause the banks economic harm, or that Sadr knew it would likely cause such harm .......... 6

        2.  Under 18 U.S.C. § 1344(2), no reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly executed a scheme to obtain property from the banks' custody by means of false and fraudulent pretenses, representations, or promises..................................................... 14

            a.  The wire transfer orders contained no misrepresentations ............. 15

            b.  There were no misrepresentations by omission, because there was no duty to disclose anything more................................................... 20

                i.  Evidence from Treasury and OFAC showed no duty to disclose parties other than the transfer recipients (i.e., "ultimate beneficiaries")............................................................................ 21

                ii.  The Financial Action Task Force's standards for cross-border wire transfers confirm there was no duty to disclose downstream recipients or related parties ........................................................... 24

            c.  Sadr did not obtain bank funds *by means of* false or fraudulent pretenses, representations, or promises .......................................... 26

        3.  No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to commit bank fraud ....................... 29

    C.  Sadr is Entitled to Acquittal for Conspiracy to Defraud the United States (Count One) and Conspiracy to Violate the Sanctions (Count Two) .................. 30

        1.  OFAC's complete inaction after being apprised of the prosecution's entire case shows OFAC itself did not believe Sadr's conduct interfered with OFAC's enforcement of the sanctions (Count One)................................ 32

        2.  No reasonable jury could conclude beyond a reasonable doubt that failure to voluntarily identify affiliated parties not required to be disclosed could interfere, or was intended to interfere, with OFAC's legitimate and lawful sanctions enforcement (Count One)........................................................ 35

ii

3.     Sadr's charged conduct—to cause U.S. intermediary banks to process clearing transactions for payments for an underlying construction project not prohibited by the Iranian Trade Sanctions Regulations—was specifically authorized by the regulations (Counts One and Two) .......... 36

4.     No reasonable jury could conclude beyond a reasonable doubt that Sadr was not acting in good faith (Counts One and Two) ................................ 40

5.     The *Klein* conspiracy theory is not viable after *Marinello v. United States* (Count One) ........................................................................................... 43

D.     Sadr Is Entitled to Acquittal for Money Laundering (Count Five) ....................... 46

II.     THE GOVERNMENT'S REPEATED, EGREGIOUS *BRADY* VIOLATIONS REQUIRE A NEW TRIAL ............................................................................................... 48

A.     Governing Legal Principles ................................................................................. 52

B.     From the 2018 Indictment through April 21, 2020, the Government Suppressed Plainly Exculpatory Evidence That It Possessed As Far Back As April 2016 ....................................................................................................... 54

1.     Sadr diligently requested all *Brady* information ....................................... 54

2.     The government's rote representations of compliance ............................. 56

3.     The government suppressed a wealth of exculpatory information ........... 56

a.     GX 411 ......................................................................................... 56

b.     SAUSA Lynch's presentation of the entire case to OFAC ............ 57

c.     The Karimi Recording ................................................................. 58

i.     The substance of the Karimi Recording ............................. 58

ii.    The government's suppression of the Karimi Recording .... 60

d.     Statements by PDVSA Chief Financial Officer Victor Aular ........ 65

e.     Commerzbank's internal documents regarding its investigation of the first charged payment ............................................................. 66

C.     The Suppressed Evidence Is Material:  There Is A Reasonable Likelihood That The Trial Outcome Would Have Been Different Had It Been Disclosed .......................................................................................................... 70

1.  The government's suppression of GX 411, and the fact that OFAC did nothing after the government disclosed the entire case and urged it to enforce, undermine confidence in the verdict ............................................ 72

2.  Suppressed evidence from key IIHCO and PDVSA witnesses and Commerzbank supported Sadr's understanding of the sanctions and de-risking ................................................................................................ 77

    a.  Project Manager Bahram Karimi ....................................................... 79

        i.   The government suppressed critical content of Karimi's recorded interview ........................................................ 79

        ii.  Sadr would have used Karimi's suppressed interview statements at trial .......................................................... 85

    b.  PDVSA Chief Financial Officer Victor Aular .............................. 92

    c.  Suppressed documents from Commerzbank's compliance department ........................................................................ 95

3.  The suppressed Commerzbank documents supported Sadr's defense against the bank fraud charges ................................................................. 98

    a.  The additional Commerzbank documents refute the government's claim that Sadr lied to obtain $29 million ..................................... 98

    b.  The suppressed Commerzbank documents provide additional evidence that the banks were not at risk of violating the Iran sanctions .................................................................. 100

4.  The number and cumulative effect of the government's violations likely would have affected the judgment of the jury ......................... 101

5.  The government's suppressions kept Sadr from obtaining a mistrial ..... 104

III.   THE GOVERNMENT'S RECKLESS PRESENTATION OF A FALSE NARRATIVE REGARDING OFAC ALSO ENTITLES SADR TO A NEW TRIAL .................................................................................................... 105

IV.   THE GOVERNMENT'S BLINDERED VIEW OF ITS *BRADY* OBLIGATIONS REQUIRE SIGNIFICANT POST-TRIAL DISCLOSURES TO ENSURE COMPLIANCE WITH *BRADY* .................................................. 107

    A.   The Government Continues to Misconstrue Its *Brady* Obligations ................... 108

        1.   GX 411 ...................................................................... 108

iv

2. Other midtrial and post-trial disclosures ................................................. 111

B. The Court Should Compel the Government to Disclose Information and Documentation to Ensure that Sadr's Rights Are Protected .............................. 112

1. The Court Should Compel Disclosure of Information and Documentation Regarding Witness Statements ............................................. 112

2. The Court Should Compel Disclosure of Documents Obtained from Third Parties ...................................................................................... 114

3. The Court Should Compel Disclosure of Information and Documentation Obtained From Commerzbank and Other Banks .................................... 115

4. The Court Should Compel Disclosure of Information and Documentation From OFAC .................................................................................... 116

5. The Court Should Compel Disclosure of Information and Documentation Regarding the Karimi Recording .......................................................... 118

V. BECAUSE THE GOVERNMENT'S REPEATED MISSTATEMENTS TO THE COURT SHOW ITS REPRESENTATIONS CANNOT BE RELIED UPON, THE COURT SHOULD REOPEN AND RECONSIDER ITS SUPPRESSION RULING ....................................................................................................... 119

A. The Government's Shifting Account of the Number of Documents On Which It Would Rely at Trial ............................................................ 120

B. The Government's Shifting Accounts of Its Search and Seizure of Documents From Sadr's Email Accounts ........................................... 121

C. The Court's Suppression Ruling Turns Entirely On the Government's Now-Discredited Word ..................................................................... 128

D. The Government's Many Changed and Shifting Stories Since the Suppression Ruling ........................................................................... 128

E. This Court Should Reopen Suppression to Ensure That the Case Was Not Based on an Unconstitutional General Search ..................................... 130

VI. SHOULD ANY COUNTS SURVIVE, THE COURT SHOULD DISMISS ANY THAT ARE MULTIPLICITOUS ................................................................. 132

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005)...............................................................................................45, 46

*Brady v. Maryland,*
    373 U.S. 83 (1963).................................................................................... *passim*

*Carriger v. Stewart,*
    132 F.3d 463 (9th Cir. 1997) ..................................................................53, 118

*Chevron U.S.A. v. Nat. Resources Def. Council,*
    467 U.S. 837 (1984)...............................................................................................39

*Chiarella v. United States,*
    445 U.S. 222 (1980)...............................................................................................21

*City of Almaty, Kazakhstan v. Ablyazov,*
    No. 15-CV-5345 (AJN), 2019 WL 1430155 (S.D.N.Y. Mar. 29, 2019)................................38

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)...............................................................................................36, 46

*Grain Traders, Inc. v. Citibank, N.A.,*
    960 F. Supp. 784 (S.D.N.Y. 1997), *aff'd*, 160 F.3d 97 (2d Cir. 1998) ............................26, 27

*Jackson v. Virginia,*
    443 U.S. 307 (1979)........................................................................................ *passim*

*Kyles v. Whitley,*
    514 U.S. 419 (1995)........................................................................................ *passim*

*Leka v. Portuondo,*
    257 F.3d 89 (2d Cir. 2001).....................................................................................74, 75, 99

*Loughrin v. United States,*
    573 U.S 351 (2014)........................................................................................ *passim*

*Marinello v. United States,*
    138 S. Ct. 1101 (2018)................................................................................... *passim*

*McBoyle v. United States,*
    283 U.S. 25 (1931).................................................................................................40, 45

*Napue v. Illinois,*
    360 U.S. 264 (1959)...............................................................................................54, 106

*Russell v. United States,*
    369 U.S. 749 (1962)..................................................................................................48

*Shih Wei Su v. Filion,*
    335 F.3d 119 (2d Cir. 2003)..................................................................................106

*Skilling v. United States,*
    561 U.S. 358 (2010)............................................................................................36, 43

*Strickler v. Greene,*
    527 U.S. 263 (1999)..................................................................................................54

*United States v. Aguilar,*
    515 U.S. 593 (1995)......................................................................................40, 45, 46

*United States v. Autori,*
    212 F.3d 105 (2d Cir. 2000)....................................................................................20

*United States v. Banki,*
    685 F.3d 99 (2d Cir. 2012)......................................................................................39

*United States v. Burr,*
    25 F. Cas. 55 (C.C. Va. 1807)................................................................................48

*United States v. Calderon,*
    944 F.3d 72 (2d Cir. 2019)................................................................................27, 28

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012).............................................................................. *passim*

*United States v. Coppa,*
    267 F.3d 132 (2d Cir. 2001)............................................................................ *passim*

*United States v. Cote,*
    544 F.3d 88 (2d Cir. 2008)........................................................................................5

*United States v. Finazzo,*
    850 F.3d 94 (2d Cir. 2017)........................................................................................7

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999)......................................................................................86

*United States v. Gil,*
    297 F.3d 93 (2d Cir. 2002)..........................................................................54, 74, 86

*United States v. Grant,*
    256 F.3d 1146 (11th Cir. 2001) ..............................................................................92

*United States v. Int'l Bhd. of Teamsters*,
  964 F.2d 1308 (2d Cir. 1992) ................................................................ 91

*United States v. Jimenez Recio*,
  537 U.S. 270 (2003) ............................................................................ 36

*United States v. Josephberg*,
  459 F.3d 350 (2d Cir. 2006) ....................................................... 134, 135

*United States v. Kassouf*,
  144 F.3d 952 (6th Cir. 1998) .............................................................. 46

*United States v. Korogodsky*,
  4 F. Supp. 2d 262 (S.D.N.Y. 1998) .................................................... 95

*United States v. Lanier*,
  520 U.S. 259 (1997) ............................................................................ 40

*United States v. Lebedev*,
  932 F.3d 40 (2d Cir. 2019) ................................................................. 15

*United States v. Leslie*,
  103 F.3d 1093 (2d Cir. 1997) ............................................................... 5

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012) .......................................................... *passim*

*United States v. Nkansah*,
  699 F.3d 743 (2d Cir. 2012), ............................................................. 13

*United States v. Pauling*,
  924 F.3d 649 (2d Cir. 2019) ........................................................... 5, 14

*United States v. Perez*,
  No. 01 CR 848 (SWK), 2002 WL 31368108 (S.D.N.Y. Oct. 21, 2002) ..................... 133, 135

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ................................................................. 20

*United States v. Pizarro*,
  No. 17-cr-151-AJN, Dkt. 135 (S.D.N.Y. May 22, 2018) ............................... 49, 132

*United States v. Premises Known as 281 Syosset Woodbury Rd.*,
  71 F.3d 1067 (2d Cir. 1995) .............................................................. 114

*United States v. Rivas*,
  377 F.3d 195 (2d Cir. 2004) ......................................................... 54, 112

*United States v. Rodriguez*,
    582 F. Supp. 2d 486 (S.D.N.Y. 2008)...................................................................135

*United States v. Rosengarten*,
    857 F.2d 76 (2d Cir. 1988)................................................................................46

*United States v. Salim*,
    855 F.2d 944 (2d Cir. 1988)..............................................................................95

*United States v. Santos*,
    553 U.S. 507 (2008).........................................................................................39

*United States v. Stewart*,
    907 F.3d 677 (2d Cir. 2018).............................................................................92

*United States v. Thomas*,
    981 F. Supp. 2d 229 (S.D.N.Y. 2013)........................................................ *passim*

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010).................................................................................5

*United States v. Universita*,
    298 F.2d 365 (2d Cir. 1962)...........................................................................106

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015)....................................................................5, 6, 36

*United States v. Walker*,
    289 F. Supp. 3d 560 (S.D.N.Y. 2018).......................................................53, 107

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991............................................................................107

*United States v. Willner*,
    No. 07 Cr. 183 (GEL), 2007 WL 2963711 (S.D.N.Y. Oct. 11, 2007)....................46

*United States v. Wood*,
    57 F.3d 733 (9th Cir. 1995) ...........................................................................117

*Wachovia Bank v. Burke*,
    414 F.3d 305 (2d Cir. 2005)..............................................................................39

*Washington v. Texas*,
    388 U.S. 14 (1967)...........................................................................................75

*Wearry v. Cain*,
    136 S. Ct. 1002 (2016) ................................................................... *passim*

*Williamson v. United States*,
   512 U.S. 594 (1994)................................................................................91

*In re Witness Before Grand Jury*,
   791 F.2d 234 (2d Cir. 1986)............................................................114

*Yates v. United States*,
   135 S. Ct. 1074 (2015)...........................................................45, 46

**Statutes**

18 U.S.C. § 1344(1) ...........................................................................1, 6, 14

18 U.S.C. § 1344(2) .................................................................... *passim*

18 U.S.C. § 1349 ..................................................................................6

18 U.S.C. § 1503(a) ...........................................................................45

18 U.S.C. § 1512(b)(2) ......................................................................45

18 U.S.C. § 1519 ................................................................................45

26 U.S.C. § 7212(a) ......................................................................44, 46

28 U.S.C. § 530B(a) .........................................................................107

50 U.S.C. § 1702(3) ...............................................................37, 40, 46

50 U.S.C.§ 1702(a)(3) .......................................................................37

CISADA ......................................................................................41, 42, 43

Jencks Act .........................................................................................133

Mandatory Victims Restitution Act ..............................................27

**Other Authorities**

31 C.F.R. § 560.203 .................................................................30, 31, 39

31 C.F.R. § 560.516 ...........................................................................37

60 Fed. Reg. 47061-01, 47062 (Sept. 11, 1995) .............................39

Fourth Amendment .................................................................. *passim*

Fifth and Sixth Amendments ..........................................................75

Fed. R. Crim. P. 12(b)(3)(B)(ii) ....................................................................................134

Fed. R. Crim. P. 15 ..............................................................................................86, 90, 95

Fed. R. Crim. P. 16 ...............................................................................110, 111, 122, 126

Fed. R. Crim. P. 17 ....................................................................................................99

Fed. R. Crim. P. 23(b)(3) ..........................................................................................105

Fed. R. Crim. P. 29 ........................................................................................... *passim*

Fed. R. Crim. P. 33 ......................................................................................................1

Fed. R. Crim.P. 41(e)(2)(B) ........................................................................................122

Fed. R. Evid. 806 ..............................................................................................92, 93

Fed. R. Evid. 807 ........................................................................................90, 91, 92

Local Rule 49.1 ..........................................................................................................37

N.Y. R. Prof. Cond. 3.3(a)(3) ....................................................................................107

Preparation of Letters Rogatory, Travel.State.Gov, https://travel.state.gov/content/
    travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-
    evidence/Preparation-Letters-Rogatory.html ..........................................................95

Defendant Ali Sadr Hashemi Nejad respectfully moves for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), and in the alternative for a new trial under Federal Rule of Criminal Procedure 33 and the requirements of *Brady v. Maryland* and progeny.  In addition, because the government's consistently blindered views of what falls within *Brady* are plainly no longer sufficient to assure *Brady* compliance, Sadr moves to compel additional disclosures to ensure that all potentially exculpatory information in the government's possession has been produced under *Brady*.  Further, because the government's repeated misstatements to the Court have proven its representations can no longer be relied upon, Sadr moves the Court to reopen and reconsider its earlier ruling on suppression.

To the extent any part of the verdict survives, Sadr's pretrial motion to dismiss multiplicitous counts (Pretrial Motion No. 5, Dkt. 89, 90) is now ripe for decision.

## PRELIMINARY STATEMENT

This case suffers three fundamental flaws.  *First*, the evidence on every count is insufficient to support conviction.  Counts Three and Four fail on both prongs of bank fraud. With respect to the "right to control" theory of § 1344(1), the Court should acquit Sadr because no reasonable jury could have concluded that the unwitting intermediary banks faced any risk of tangible economic harm from OFAC enforcement.  The government's "strict liability" theory was completely unfounded—not to mention flatly inconsistent with evidence the government suppressed until mid- and post-trial disclosures—and insufficient to sustain the convictions. Likewise, the Court should acquit Sadr on the "scheme to defraud" theory of § 1344(2) because no reasonable jury could have concluded that the wire transfer forms contained misrepresentations, that Sadr had a duty to disclose supposedly omitted information about indirect beneficiaries, or that Sadr obtained bank property "by means of" fraudulent concealment.  The evidence was insufficient to sustain Count One because OFAC took no

1

enforcement action against the banks or Sadr after receiving the prosecution theory, and there was no proof of any duty to disclose indirect parties to wire transfers. Moreover, no reasonable jury could have concluded that Sadr did not act in good faith, requiring acquittal on Counts One and Two. Acquittal is required on the derivative money laundering charge in Count Five for the same reasons, and because the evidence was insufficient to prove that fund transfers from outside to inside the United States promoted the charged specified unlawful activity. No reasonable jury, considering all of the evidence even in the light most favorable to the government, could have concluded beyond a reasonable doubt that Sadr committed the charged offenses.

*Second*, the government has committed multiple, egregious *Brady* violations that require a new trial if any count survives. These violations began near the end of trial, with the stunning revelations that OFAC took no action after Commerzbank flagged the Iranian connection to the first charged payment, or even after the prosecutors presented their case theory and encouraged enforcement action. This Court granted substantial mid-trial relief, but it was not enough to cure the prejudice or put Sadr in the position he would have been in with timely disclosure. But these mid-trial violations pale in comparison to the exculpatory evidence disclosed by the government after trial, including: (a) the missing interview recording (really in the government's possession well before trial) of the Venezuela Project Manager containing powerful exculpatory evidence that the government failed to memorialize in previously-disclosed notes, (b) FBI 302s of 2016 interviews in which PDVSA's Chief Financial Officer stated that legal counsel vetted the charged payments for sanctions compliance and he had done nothing wrong, and (c) additional Commerzbank documents that exculpate Sadr in multiple ways but somehow were not previously uncovered despite the prosecutors' mid-trial promises that they searched their files on precisely this issue (among others) and that no relevant evidence remained undisclosed. There is more than a reasonable likelihood that the evidence suppressed by these shocking *Brady*

2

violations would have affected the outcome of the trial. Among many other reasons, the government's violations prevented Sadr from obtaining a mistrial when two jurors failed to report on the last day of deliberations due to COVID-19 issues. Had Sadr known of the trove of undisclosed exculpatory evidence in the government's possession, he would have agreed with the government's motion—thereby guaranteeing a mistrial—and used that evidence on retrial to undermine the government's already razor-thin case.

*Third*, the government's repeated misrepresentations and misconceptions of its duties require significant action from the Court. The government has lost the benefit of the doubt. Neither the Court nor Sadr can take at face value any of the government's representations. As a result, the Court should re-open and reconsider its ruling denying Sadr's motion to suppress the email search warrant returns. The Court's ruling that the government had conducted a bona fide responsiveness review—which saved the search from being an unconstitutional general warrant—depended entirely on unsworn representations, unaccompanied by contemporaneous documentation, of actions taken by the DANY team led by SAUSA Lynch. On the current record, those representations can no longer be trusted. Since they were outcome determinative, the Court should vacate its ruling and re-open the search warrant proceedings to require the government to support its claims with competent evidence. The Court should also order substantial post-trial disclosures to ensure *Brady* compliance, including the production of all witness statements, notes and FBI 302s of any witness interviewed during the investigation. The government's blindered view of its *Brady* obligations demands removing all discretion from the prosecutors to determine what is exculpatory and compelling production of the objective categories of information specified below.

3

## ARGUMENT

### I.    SADR IS ENTITLED TO JUDGMENT OF ACQUITTAL ON EVERY COUNT

#### A.    Governing Legal Principles

"After the government closes its evidence ... , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Because "[t]he rule provides that the court 'must enter a judgment of acquittal" if the evidence is insufficient, 2A Charles Alan Wright & Peter Henning, *Federal Prac. & Proc. (Crim.)* § 462 (4th ed. 2009) ("Wright & Henning"), and because it is required by Due Process, *Jackson v. Virginia*, 443 U.S. 307, 314-19 (1979), "its requirements are mandatory."  Wright & Henning § 462; *accord Jackson*, 443 U.S. at 317 (holding that a conviction based on insufficient evidence "cannot constitutionally stand").

The defendant may also move for judgment of acquittal, or renew such a motion, after a guilty verdict or after the court discharges the jury.  Fed. R. Crim. P. 29(c)(1).  No earlier motion is required as a prerequisite.  Fed. R. Crim. P. 29(c)(3).  The Court may enter a judgment of acquittal on any count for which the evidence is insufficient, whether the jury returned a guilty verdict (in which case that verdict is set aside), or failed to return a verdict.  Fed. R. Crim. P. 29(c)(2).

If the Court reserves decision on a midtrial Rule 29 motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Rule 29(b); *accord* 2A Wright & Henning, § 462.  Because Sadr has moved for judgment of acquittal both at the close of the government's evidence under Rule 29(a) (Tr. 1208; Dkt. 282), which was reserved, Tr. 1475, at the close of the defense case, Tr. 1821, 1823, and again after verdict under Rule 29(c)(1), the Court must decide the motion twice: once to determine whether the evidence was sufficient at the close of the government's case-in-chief (as of March 9), under Rule 29(a) and (b), and again

4

to determine whether all of the evidence was sufficient at the close of the case, under Sadr's
renewed motion (Tr. 1208, 1821, 1823; Dkt. 282) and the current motion under Rule 29(c).

"The standard ... is the same regardless of whether the motion is at the close of the
government's evidence, at the close of all the evidence, or after discharge of the jury.  The judge
is to direct acquittal if 'the evidence is insufficient to sustain a conviction.'"  2A Wright &
Henning § 467 & n.1 (noting single standard under Rule 29(a)).  Although the court must "look
at the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, and
may not "substitute its own determination of ... the weight of the evidence and the reasonable
inferences to be drawn for that of the jury," *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008)
(alteration in original), "[t]his standard does not mean that" the verdict must be sustained "if
there is any evidence that arguably could support a verdict." *United States v. Valle*, 807 F.3d
508, 515 (2d Cir. 2015).  "In any criminal trial there is always some evidence of guilt, otherwise
there could not have been a prosecution." *Id.*  Nonetheless, "it would not satisfy the Constitution
to have a jury determine that the defendant is *probably* guilty." *Id.* (internal quotations omitted)
(emphasis in original).  Thus, "specious inferences are not indulged," *id.*; instead, "[t]he jury's
inferences must be reasonably based on evidence presented at trial, not on speculation." *United
States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (internal quotations omitted).  Speculation, even
reasonable speculation, is insufficient to establish an element of guilt beyond a reasonable doubt.
*United States v. Pauling*, 924 F.3d 649, 655, 659-61 (2d Cir. 2019); *United States v. Leslie*, 103
F.3d 1093, 1102 (2d Cir. 1997).

The standard instead is whether "any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  If "no rational
trier of fact could find guilt beyond a reasonable doubt," the conviction cannot stand. *Id.* at 317.
Moreover, "[i]f 'reasonable' jurors 'must necessarily have a reasonable doubt' as to guilt, the

5

judge 'must require acquittal.'"  *Id.* at 318 n.11; *accord United States v. Coplan*, 703 F.3d 46, 72, 76 (2d Cir. 2012) (reversing convictions for insufficient evidence where "a reasonable jury must necessarily entertain a reasonable doubt").  "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," and acquittal is required.  *Coplan*, 703 F.3d at 69 (citations omitted); *accord Valle*, 807 F.3d at 515.

> **B.      Sadr is Entitled to Acquittal on the Bank Fraud Counts (Counts Three and Four)**

Count Three charges two different forms of bank fraud.  Under 18 U.S.C. § 1344(1), it charges that Sadr knowingly executed a scheme to defraud FDIC-insured banks.  Under 18 U.S.C. § 1344(2), it charges that Sadr knowingly executed a scheme to obtain money or property owned by and under the custody and control of FDIC-insured banks, by means of false and fraudulent pretenses, representations, and promises.  Dkt. 308, at 36-37 (Instr. 24).  Count Four charges, under 18 U.S.C. § 1349, that Sadr knowingly and willfully conspired to commit the bank fraud offenses charged in Count Three.  *Id.* at 47 (Instr. 28).

> **1.      Under 18 U.S.C. § 1344(1), no reasonable jury could conclude beyond a reasonable doubt that Sadr's conduct would likely cause the banks economic harm, or that Sadr knew it would likely cause such harm**

The jury returned no verdict under prong one of the bank fraud statute, § 1344(1), and the Court declared a mistrial on the corresponding first prong of Counts Three and Four.  Dkt. 310, at 2, 3 (verdict form); Tr. 2121.  The Court may enter an acquittal even though the jury did not return a verdict, Rule 29(c)(2), and must do so where the evidence is insufficient to allow a reasonable jury to find guilt of those charges beyond a reasonable doubt, *see* Sec. I.A, *supra*.

Bank fraud under § 1344(1) requires proof that Sadr knowingly executed a scheme to defraud an FDIC-insured bank.  Dkt. 308, at 38 (Instr. 25).  A "scheme to defraud" is a "pattern or course of conduct concerning a material matter designed to deceive a federally-insured bank

into releasing property with the knowledge that that course of conduct would likely harm the bank's property interest." *Id.* at 38-39.

Here, there has never been an allegation that any bank lost or could have lost money processing these transactions. (Instead, they gained money—the transaction fees.) Thus, the only even potentially viable theory of prong-one bank fraud was the charged "right to control" theory. *See id.* But that theory still required proof that the scheme would likely result in tangible economic harm to the victim, and that Sadr knew such tangible economic harm was likely. *See id.* at 39; *accord* Dkt. 227, at 3; *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).

The government's theory of possible economic harm to the banks was the supposed risk of fines that allegedly could reach into the tens or hundreds of millions, as well as reputational harms or investigation costs, that could result from OFAC enforcement proceedings. But though the government pointed to OFAC witness Ted Kim's testimony to argue such risk was likely, Tr. 1980 (summation); Tr. 508-09 (Kim), Kim's testimony in fact showed the opposite.

The Court put this question to the government mid-trial:

> Can you argue, knowing what you know now, from Mr. Kim's testimony, that there was a likelihood of OFAC enforcement, even a risk of OFAC enforcement, under the facts of this case?

Tr. 1290. Though the government tried to answer yes, *id.*, the answer was plainly no. Kim's testimony showed no realistic risk—much less any likelihood—of economic risk due to OFAC enforcement on the facts of this case, where the banks allegedly knew nothing of any sanctions violations in connection with the charged transfers. That reality was only confirmed by the wealth of evidence that followed: official Treasury Department policy documents confirming that OFAC does not impose monetary penalties in such circumstances; revelation that Commerzbank told OFAC of the first charged payment's connection to Stratus in Iran and OFAC did nothing; and that even after the prosecution informed OFAC of all the facts of this

7

case through a prosecution memo, OFAC still did nothing.  These facts show conclusively that there was *no* risk of any OFAC enforcement against the intermediary banks, and thus no likelihood of tangible economic harm.

This is particularly true for cases like this one, where the banks knew nothing of any alleged sanctions violations.  The government argued from start to finish that the U.S. banks had no reason to suspect any violations or wrongdoing, telling the jury in opening that Sadr "hid the truth from U.S. banks" through "smoke and mirrors," Tr. 77-78, 84, and in closing rebuttal that "[t]he banks couldn't do their jobs" because Sadr "hid[] the truth from them," and thus they "were tricked into processing his payments."  Tr. 2059, 2060-61.

Official guidance from the Treasury Department and OFAC confirmed that such unwitting banks face no risk of OFAC enforcement action.  In a Joint Fact Sheet on Foreign Correspondent Banking, the Treasury Department highlighted:

> The vast majority (about 95%) of [Bank Secrecy Act]/OFAC compliance deficiencies identified by the [Federal Banking Agencies], FinCEN, and OFAC are corrected by the institution's management without the need for any enforcement action or penalty.

DX 1347 (front-page drop quotation).  Treasury further explained:

> OFAC investigates cases of sanctions violations, many of which (over 95 percent) are closed with administrative measures, such as cautionary or no action letters.  This means that less than five percent of all cases of sanctions-related violations investigated by OFAC have resulted in a civil monetary penalty or other public enforcement response.

*Id.* at 3-4.  OFAC witness Ted Kim agreed that 95 percent of OFAC's enforcement investigations result in no monetary penalty or other public enforcement action.  Tr. 647, 651.

Monetary penalties against banks are reserved for the most serious violations—where banks have failed to remediate deficiencies identified by federal regulators, and instead have persisted in a sustained pattern of serious violations even after repeated warnings.  *See* DX 1347, at 3.  Though the government elicited testimony from Kim about monetary penalties against

8

some banks in the "millions, tens of millions, or sometimes it could be hundreds of millions,"

Tr. 508-09, the Treasury Department found it "important to note" that:

> *these cases did not involve unintentional mistakes*, but generally involved
> *intentional evasion of U.S. sanctions over a period of years* and/or the *failure
> of the institutions' officers and/or senior management to respond to warning
> signs that their actions were illegal*.

DX 1347, at 4 (emphasis added).  Thus, the large monetary penalties touted by the government

were imposed in cases of *sustained, intentional wrongdoing by the banks*.

Despite Kim's later-stricken testimony regarding "strict liability" enforcement,

Tr. 501:22 to 502:2, 600:23-25, and 652:18-20 (subsequently stricken, Dkt. 299; Tr. 1822), the

Treasury Department also explained in the Joint Fact Sheet that "the Treasury and the [Federal

Banking Authorities] do not utilize a zero tolerance philosophy that mandates the strict

imposition of formal enforcement action regardless of the facts and circumstances of the

situation." DX 1347, at 4.  All of the facts of this case—no knowledge of wrongdoing by the

banks; no compliance program failures; the banks did everything they were supposed to do—

show that OFAC would not have brought any enforcement action at all.

Even in cases involving transfers to entities majority-owned by Specially Designated

Nationals—nowhere near the facts tried here—if the bank had no reason to know of a potential

sanctions violation, OFAC would not pursue *any enforcement action at all*.  An OFAC guidance

document, "Frequently Asked Questions and Answers" Number 116 (DX 1352), confirms the

non-existent risk of enforcement in this circumstance.  Such "FAQs" are "OFAC's notice to the

public" about the matters discussed therein.  Tr. 648 (Kim).  FAQ 116, which was in effect

during the charged conduct, addressed enforcement risks in cases like this, where the U.S. bank

"(1) is operating solely as an intermediary, (2) does not have any direct relationship with the

entity" suspected to be receiving a transfer in violation of the sanctions, and (3) the bank "does

not know or have reason to know the entity's ownership or other information demonstrating" that

9

it may be a sanctioned entity.  DX 1352 (second paragraph).  FAQ 116 confirms that in such a situation, "OFAC would not expect the bank to research the non-account parties listed in the wire transfer that do not appear on the SDN List and, accordingly, *would not pursue an enforcement action against the bank for having processed such a transaction.*"  *Id.* (emphasis added).  Kim agreed that OFAC would not pursue an enforcement action against such a bank; at most, such a bank would receive either a no-action letter or a non-public cautionary letter.  Tr. 651-53; *see also* Tr. 508, 655.[1]

The lack of any risk of economic harm to the banks is only driven home by the mid-trial revelations that OFAC took no investigatory or enforcement action even after it learned that the very first payment to Stratus Turkey had been flagged for a possible connection to Iran (GX 411; DX 150), or indeed *even after this prosecution team gave OFAC its entire prosecution theory and urged enforcement*.  *See* DX 150 (stipulation); Tr. 1822 (curative instruction).

Before the government belatedly revealed these facts, it elicited testimony from Kim that if a bank reported a transaction involving Iranian entities, that would lead to investigation and enforcement by OFAC:

> Q. What does OFAC do with the information from banks about transactions involving Iranian entities?
>
> A. Those are one of the important source for us that lead to open an investigation, because the banks collects other information and other country's information involved in rejected and blocked transaction. That means those entities' management teams are blocking and report a lot of other information

---

[1] The government unpersuasively tried to discredit FAQ 116 by eliciting testimony that it involved the "50 percent rule"—i.e., the rule that if an entity is owned 50 percent or more by a blocked person, then the first entity's property is also blocked.  *See* Tr. 656, 838-39.  That no blocked entity is at issue here only makes FAQ 116 more damning to the government's claim of enforcement risk.  If OFAC would not pursue enforcement against an intermediary bank that unwittingly processed a transaction for an SDN-owned entity—as Kim agreed it would not, Tr. 651—there was no conceivable risk that it would pursue enforcement against such a bank that processed a transaction for a purely private, non-SDN party.

about other parties other than the bank, the other parties that has potential to be
in violation of sanctions regulation.

Q. So would the information -- OFAC takes that information and it leads to
investigations?

A. That's correct.

Q. And in some instances, those investigations lead to enforcement actions?

A. Yes, that's correct.

Tr. 510.

Yet when banks reported two of the transfers in this case as possibly involving Iranian

entities, OFAC did nothing.  The government showed two examples: *first*, a SWIFT message in

which JP Morgan said it had rejected a payment from Stratus Turkey to Farshid Kazerani

because the payment allegedly involved "an Iranian institution," and the bank had reported the

transaction to OFAC, GX 2297A; Tr. 286-87 (Kazerani), and *second*, the June 16, 2011 letter

from Commerzbank to OFAC flagging the first payment charged in this case, "since Stratus may

be an Iranian Company."  GX 411.[2]  Despite these two express notices to OFAC, OFAC initiated

no investigation or enforcement.  DX 150 ¶¶ 3, 4; Tr. 1822.  Indeed, OFAC did nothing even

after "Mr. Lynch ... laid out every single fact of the case to OFAC" (Tr. 1288; *see also* Sec.

II.C.1, *infra*)—confirming beyond any doubt that the banks faced *no* risk of *any* enforcement,

much less a likelihood of economic harm proven beyond a reasonable doubt.  Acquittal is thus

required.  *See* Dkt. 308, at 39.

The bank compliance witnesses' subjective concerns about the possibility of enforcement

do not change that result.  JP Morgan witness Matthew Blair conceded that OFAC would not

---

[2] Further documentation about Commerzbank's internal investigation of that payment,
and its communication with OFAC, was suppressed by the government until April 21, 2020.
This newly revealed *Brady* evidence shows Commerzbank's error in conflating Stratus Turkey
with Stratus International Contracting Company (in Iran), and reveals that Sadr's response to
Commerzbank's resulting request for information (RFI) was truthful and accurate, not fraudulent
as the government argued to the jury.  *See* Section II.C.3, *infra*.

11

pursue an enforcement action against the bank for having unwittingly processed a transaction in the circumstances present here (described in FAQ 116, DX 1352).  Tr. 795-96.  He further conceded there was "no meaningful risk of financial penalty" to JP Morgan under the circumstances of this case, Tr. 798, and that JP Morgan suffered no reputational harm or loss of customers as a result.  Tr. 794.  Blair's testimony that he nonetheless believed JPMC was at risk of OFAC enforcement action was squarely contradicted by those concessions, Kim's testimony, and Treasury and OFAC's official public guidance.  *See supra* at 8.  Moreover, Blair based his opinion entirely on the potential investigation costs of responding to an OFAC inquiry if a downstream bank blocked a transaction and OFAC demanded an explanation from an unwitting upstream bank like JP Morgan.  Tr. 737.  Blair conceded that type of inquiry could materialize only if a transaction were *blocked* because it involved an SDN or the Government of Iran.  No such transfers were charged or tried here.  For transactions that were merely *rejected*, not blocked, by a downstream bank—*i.e.*, returned to the originating party and reported to OFAC based on a potential sanctions violation—Blair conceded that JP Morgan "might not even know about that," and "certainly wouldn't have to incur those manhours and time to do an investigation."  Tr. 804.  Thus, for transactions like those charged here, there was no economic risk to JP Morgan from OFAC enforcement of any kind.

Citi witness Robert Peri's subjective concern about a "strict liability" OFAC regime, Tr. 867-68, was similarly contradicted by Kim's testimony, *see supra*, and rendered moot by this Court's striking of Kim's testimony about "strict liability" enforcement.  Tr. 1822.[3]  Peri admitted that his testimony about "billions" of dollars in potential fine exposure had no tie to this

---

[3] When the Court struck Kim's testimony as a remedy for the government's suppression of OFAC's inaction in response to the facts of this case, that remedy logically should have applied to Peri's corresponding testimony as well.  In the heat of the trial moment, the defense overlooked that piece of Peri's testimony.  The Court should strike that testimony retroactively for the same reasons Kim's testimony was stricken.

12

case, Tr. 1028, and he acknowledged that large OFAC fines against banks "involve very different conduct than the conduct you have described in this case." Tr. 1029. Confronted with Treasury's public guidance that OFAC does not apply a "zero tolerance" policy of enforcement, DX 1347, Peri conceded OFAC was "not likely to impose a major penalty" here. Tr. 1032. Although Peri claimed that potential nonpublic cautionary letters from OFAC could still impose "not insignificant" internal costs, Tr. 1030, 1032, that testimony did not establish that such costs were *likely* in the circumstances of this case. Indeed, the overwhelming weight of the evidence—Kim's testimony, the Treasury's and OFAC's public guidance (DX 1347 and 1352), and especially the fact that OFAC, fully apprised by the prosecutors, took *no* enforcement action of *any* kind—shows conclusively that there was *no* risk, much less a likelihood, of any OFAC investigation or enforcement that would result in likely economic harm to the banks. Significantly, such nonpublic action could not result in reputational harm, and Peri acknowledged Citi suffered no reputational harm in this case. Tr. 1033. Peri's concern about theoretical exposure to internal costs based on an unlikely nonpublic cautionary letter is too speculative, remote, and fanciful to constitute a likelihood of economic harm.[4]

Finally, even if the evidence were somehow sufficient to show likely economic harm to the banks, it is insufficient to show Sadr *knew* such harm to them was likely.[5] The government introduced only one piece of evidence to show Sadr's specific knowledge of the sanctions—an Asian Law Caucus publication called "The Impact of U.S. Sanctions Against Iran On You." GX 2265B (English translation of GX 2265A). But that publication's section on enforcement was

---

[4] *See United States v. Nkansah*, 699 F.3d 743, 750 (2d Cir. 2012) (holding a bank fraud charge cannot survive if "the actual exposure of a bank to losses is unclear, remote or non-existent"), *abrogated on other grounds by United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016).

[5] *See* Dkt. 308, at 39, 40 (requiring proof that Sadr "knew the scheme would likely harm the bank's property interest") (emphasis added).

13

directed at enforcement against individuals, not banks.  *See id.* at 17.  There was no evidence that

Sadr knew of any likelihood that the intermediary banks could face OFAC enforcement or fines

for unwittingly processing clearing transactions in violation of the sanctions.  Indeed, Treasury's

and OFAC's guidance documents (DX 1347, DX 1352) showed the opposite: that enforcement

in the circumstances of this case was extremely *unlikely*.  *See supra* at 8.  Any contrary

conclusion the jury might have reached about Sadr's knowledge would at most be speculation,

insufficient for conviction beyond a reasonable doubt.  *See Pauling*, 924 F.3d at 655, 659-61.

Sadr testified that despite a general awareness of OFAC enforcement actions, he was

unaware of any OFAC enforcement actions against "correspondent banks for wire transfers on

business outside Iran."  Tr. 1548.  He further testified that he was generally aware from

newspapers that some big banks had been fined, but for their own deliberate misconduct.

Tr. 1547.  Neither his testimony nor the government's evidence showed that Sadr had reason to

know of a likelihood of OFAC enforcement against the banks.  Much less was there any

evidence that would allow a reasonable jury to find beyond a reasonable doubt that Sadr knew of

such likely enforcement.  Acquittal of bank fraud under §1344(1) is required.

### 2. Under 18 U.S.C. § 1344(2), no reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly executed a scheme to obtain property from the banks' custody by means of false and fraudulent pretenses, representations, or promises

Bank fraud under the second prong of § 1344 requires proof beyond a reasonable doubt

that Sadr knowingly executed a scheme to obtain money or property owned by and under the

custody or control of an FDIC-insured bank, by means of false and fraudulent pretenses,

representations, and promises.[6]  Even viewed favorably to the government, the evidence was

---

[6] Dkt. 308, at 42 (Instr. No. 26); *see* § 1344(2); *Loughrin v. United States*, 573 U.S 351, 355-56, 362-63 (2014); Dkt. 227, at 5-6 (Order, Feb. 24, 2020) (citing *Loughrin* and *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019)).

14

insufficient for a reasonable jury to conclude beyond a reasonable doubt that Sadr schemed to obtain bank property by means of false and fraudulent representations, for three reasons: (1) the wire transfer orders contained no misrepresentations; (2) they contained no fraudulent omissions because there was no duty to disclose anything more; and (3) because the banks did not and were not required to obtain any more information to process the transfers, the charged scheme did not obtain money *by means of* such alleged concealment, *see Loughrin*, 573 U.S. at 362-63.

Sadr further respectfully preserves for review a fourth contention: that even after *Loughrin*, § 1344(2) still requires intent to defraud *someone*, *i.e.*, to cheat someone of money, as four other circuits' pattern jury instructions provide, *see* Dkt. 185, at 88 n.69, and that he cannot be convicted of bank fraud without proof that he tried to fraudulently obtain someone else's money. This Court, following *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019), ruled otherwise. *See* Dkt. 227, at 5-6. There is no evidence here that Sadr's conduct cheated or was intended to cheat anyone of money: the transfers arose from the Venezuelan project owner's willing payments of valid commercial debts.

### a. The wire transfer orders contained no misrepresentations

The evidence shows that the charged wire transfers orders—the forms and payment instructions that caused the transfers—contained no misrepresentations. For each transfer, the SWIFT or CHIPS form directing the transfer stated the correct Order Party (PDVSA or its funds Fondon or Fondo Chino), Debit Party (PDVSA's bank, Banco del Tesoro or Banco Espirito Santo), Credit Party (Hyposwiss), Account Party (the Hyposwiss account to receive the payment), and Beneficiary (the owner of that account, Clarity or Stratus Turkey).[7] *See* GX 401-

---

[7] With respect to the $87,141.67 payment from PDVSA to Stratus Turkey, Hyposwiss credited Stratus Turkey's account on November 28, 2012, even though PDVSA mistakenly listed the Iranian International Housing Company as the beneficiary account holder. *See* GX 432, at 4. On February 7, 2013, a new Swift message that correctly listed Stratus International Contracting J.S. as the beneficiary account holder caused Hyposwiss to receive its cover payment. *See*

406, 410, 420-427, 429, 431-432 (SWIFT or CHIPS messages).  The payment instruction letters to DUCOLSA likewise accurately identified the Beneficiary to be paid—by name, address, bank (Hyposwiss), and account number.  *See* GX 1405A, 1501A-1504A, 1506A, 1601A, 2018A, 2048A, 2267A.  These statements—fully and accurately providing all information required— were all true.  The payment instructions to the banks contained no misrepresentations.

Moreover, those instructions were based on transparent communications between IIHC and DUCOLSA, the contract parties, appointing Clarity and Stratus Turkey to receive payments due.  For example, the evidence related to the $12,904,173.50 wire transfer to Clarity on November 9, 2011, illustrates this transparent process:

- By letter dated October 24, 2011, Bahram Karimi notified the Chairman of the Board of DUCOLSA using letterhead of the Venezuelan branch of the "Iranian Int. Housing Co.," that IIHC has "appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPCs," and requested that the payments for IPCs 17 and 18 be made to a Hyposwiss bank account in which Clarity is the beneficiary.  *See* GX 1503A.

- The same day, a DUCOLSA representative forwarded Karimi's letter to a PDVSA official, with the message: "I'm forwarding you the communication for processing payment of the Iranian IPCs."  *See* GX 1503 and 1503-T.

- By SWIFT message dated November 9, 2011, PDVSA instructed its bank to transfer $12,904,173.50 (the combined payment for IPCs 17 and 18) to Clarity's account at Hyposwiss.  *See* GX 404.

The process for each of the charged wire transfers was similar and involved no misrepresentations to the banks.

Though the government relied heavily on statements in emails lifted from context (context that Sadr described in his testimony, *see, e.g.*, Tr. 1652-56), none of those statements— even viewed favorably to the government—were made to the U.S. intermediary banks, or to obtain money from them.

---

GX 428.  Stratus Turkey did not receive any funds as a result of the February 7, 2013 transaction.

For example, the government introduced an email in which Sadr explained to individuals at HBM Group that proposed currency exchange transactions involving Clarity and Pinnacle Investments would not involve "an Iranian entity." GX 2199.  The prosecution argued that Sadr's statement to HBM was evidence that he lied to banks "to make sure that he and his father got paid." Tr. 1956-57.  Even assuming that Sadr's statement to HBM was untruthful, however—and it was not—neither HBM nor its client was a bank, let alone an FDIC-insured financial institution, nor was Sadr charged with obtaining money from HBM by means of fraudulent representations.[8]  Indeed, the government introduced no evidence showing that either HBM or its clients were banks at all.  *See* Tr. 1652.  Moreover, contrary to the government's assertion, HBM was not involved in ensuring that Sadr (or his father) "got paid," Tr. 1956-57.  HBM's only role was finding opportunities in which Sadr could exchange U.S. dollars or Euros for Bolivars.  Tr. 1652.  Likewise, the government introduced allegedly backdated contracts (GX 2154-2), which it used to argue that Sadr had lied to someone named Alex Frei, whom it claimed was "associated with banks."  *See* Tr. 1970.  But there is no evidence that Frei, who in fact was Clarity's accounting administrator, had any relationship with any banks (he did not), let alone with the U.S. banks that cleared the transactions charged in the Indictment.

The only email statement that went to a U.S. bank was made after the fact and was not a misrepresentation.  On April 27, 2011, Sadr was forwarded a strange email chain in which PDVSA officials claimed that Commerzbank needed certain information about the beneficiary of the April 4, 2011 payment (Stratus Turkey), "otherwise the above funds will be blocked."  *See* GX 2032-T at 3.  Although Sadr knew that Commerzbank was not threatening to block the

---

[8] *See* Ind. ¶ 23 (Count Three, charging Sadr with "inducing *U.S. financial institutions* to conduct financial transactions," *i.e.*, the clearing transactions charged in Ind. ¶¶ 12, 13 & 16, "using money and property owned by and under the custody and control of such financial institutions, by deceptive means").

17

funds—Stratus Turkey's account had already been credited weeks earlier on April 4, 2011 (*see* GX 702)—he nonetheless provided accurate information about Stratus International Contracting J.S. ("Stratus Turkey"), the beneficiary bank's customer, which was precisely the information that Commerzbank was seeking.[9]  Sadr explained the purpose of the April 4, 2011 payment (itemizing the individual IPCs that the payment covered), provided Stratus Turkey's address, and confirmed that the company was a Turkish business by providing a copy of Stratus Turkey's registration statement—all of which was truthful, and beyond the information that banks are required to obtain before processing a wire transfer.  *See* GX 2034-T, 2034A, 2034B-T, and 2034C-T.  Moreover, the information to Commerzbank was not provided in order to obtain the April 4, 2011 payment, which had already been paid.

Sadr's testimony confirmed that he fully disclosed to his own banks that his companies were receiving payments due to IIHCO under the Venezuela contract.  *First*, he testified that the initial company that received payments—Cirrus General Trading—fully disclosed to its bank that it was appointed to received payments on behalf of IIHCO.  Tr. 1480-84.  This was confirmed by several exhibits.  *See* DX 23 (banker asking for the letter in which the Iranian International Housing Co. nominated Cirrus to receive the proceeds of the Venezuela Project on its behalf); DX 24, DX 24A (Cirrus provided bank with a letter indicating that the Fondo Chino fund would be making the payments on behalf of DUCOLSA for the benefit of the Iranian International Housing Co.).

*Second*, Sadr never concealed from his own bank Hyposwiss that he and his father were Iranian citizens.  Tr. 1585.  Numerous exhibits showed that Hyposwiss's CEO and banker Urs

---

[9] According to the exculpatory Commerzbank records the government failed to produce until after trial, Commerzbank wanted to determine the location of the beneficiary bank's customer (Stratus International Contracting J.S.) whose address did not appear on the Swift message.  *See* Section II.C.3, *infra*.

Schneider knew Sadr and his father were citizens of Iran.  DX 50, 51, 55.  Sadr sent Hyposwiss copies of his father's St. Kitts passport showing his place of birth as Iran (DX 73, DX 73A), and his father's and his own Iranian passports (GX 2148, GX2148C & GX 2148D).

*Third*, Sadr testified that he told Hyposwiss that Stratus Turkey and Clarity would be receiving payments on behalf of the Iranian International Housing Co. under the Venezuela project contract.  *See* Tr. 1498 (in first meeting with Urs Schneider, Ali Sadr explained the Venezuela project and that Venezuela would be the source of the funds coming to Hyposwiss[10]); *id.* at 1513-14 (during the Know-Your-Customer ("KYC") meeting with Hyposwiss, Sadr discussed the Iranian International Housing Company and the source of funds); *see also id.* at 1582 (Mohammad Sadr discussed the Venezuela project with Hyposwiss's CEO in a meeting also attended by Ali and Urs Schneider).

*Fourth*, other evidence confirmed that Hyposwiss knew that Stratus Turkey and Clarity were receiving payments on behalf of the Iranian International Housing Co.  Government Exhibits 430, 431, and 432 showed that in response to an inquiry from Citi, Hyposwiss was asked directly whether the correct beneficiary of an $87k payment was the Iranian International Housing Co. or Stratus Turkey.  Hyposwiss responded by clarifying that Stratus Turkey was the correct beneficiary.  It did not express surprise or concern that the payments might have a nexus to the Iranian International Housing Co., nor did it report matters to OFAC.  The only logical conclusion is that it was fully aware of the role played by the Iranian International Housing Co., and did not feel the need even to question Sadr about it.  Sadr's testimony confirms this point.  Tr. 1678 ("Q.  Did anyone from Hyposwiss call up and say, What the heck is the Iranian

---

[10] This information is further corroborated by the recently disclosed Commerzbank internal emails, in which Commerzbank compliance officers confirmed the source of funds, and deemed the anti-money-laundering issues cleared.  *See* Sec. II.C.3, *infra*.

International Housing Company?  A.  They already knew who the Iranian International Housing Company was.").

*Fifth*, the same exhibits confirm that DUCOLSA and PDVSA were aware of the full circumstances behind the payments to Clarity and Stratus Turkey.  When Citi made inquiry to PDVSA's bank, Banco Espirito Santo ("BES"), BES provided Citi with contemporaneous correspondence from within PDVSA showing that the most senior managers of PDVSA—including Victor Aular—were aware that payments under the Venezuela project contract were being made to Stratus Turkey.  GX 432.  (After trial, the government disclosed that PDVSA's CFO Aular maintained in 2016 interviews with the FBI and SAUSA Lynch that all of these payments were vetted by PDVSA's counsel and Aular did not believe they had done anything wrong.  *See* Sec. II.C.2, *infra*.)

### b.    There were no misrepresentations by omission, because there was no duty to disclose anything more

On their face, the wire transfer orders and payment instructions contained everything the banks required about the identity of the sender and recipient of each transfer.  They contained no false statements.  Nor was there any misrepresentation by omission, because neither the senders nor recipients, nor Sadr, had any duty to disclose anything more to the banks.

It is black-letter law that an omission is not fraudulent where there is no duty to disclose. "The fraud statutes are violated" only "by omissions of material information that the defendant has a duty to disclose."  *United States v. Autori*, 212 F.3d 105, 118 (2d Cir. 2000); *accord United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) ("An omission cannot amount to a false statement" without a "duty to disclose the fact that was omitted.  Only the omission of facts required to be reported constitutes a material falsehood.").[11]  Here, the intermediary banks did

---

[11] *See also Chiarella v. United States*, 445 U.S. 222, 228 (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only

not ask for information beyond the sender and recipient of each wire transfer, Tr. 788-90, and the

government introduced no evidence of any duty to identify non-parties to the wire transfers, such

as related corporate parties, or "ultimate beneficiaries."  Indeed, the government's evidence

showed the opposite—that the banks had no duty to make any inquiry about the end recipients of

correspondent banking transfers.  In these circumstances, there was nothing fraudulent about not

volunteering information beyond the identity of the transfer recipients, Clarity or Stratus Turkey.

> i.     *Evidence from Treasury and OFAC showed no duty to disclose parties other than the transfer recipients (i.e., "ultimate beneficiaries")*

The evidence in the government's case—both the testimony of the bank compliance

witnesses, and Treasury's and OFAC's guidance documents—showed that the banks had no duty

to look into, and the parties to a wire transfer had no duty to disclose, any parties other than the

sender and recipient of a wire transfer.

As Citi witness Robert Peri testified, intermediary banks like Citi have no obligation to

conduct "Know Your Customer" diligence ("KYC") on the customers of its correspondent

banks: "Citi does not have the same obligation to know the clients of its correspondent bank."

Tr. 863; *see also* Tr. 951 (Citi did not have KYC responsibilities over PDVSA or Stratus

Turkey); *id.* at 1012-13 (Peri agreed with the FATF's view in its published "FATF Guidance for

Correspondent Banking Services" (DX 96R) that Citi had no obligation to conduct KYC due

diligence on the clients of its correspondent banks).  Similarly, JP Morgan witness Matthew Blair

testified that JP Morgan does not have a KYC requirement when it is serving as the intermediary

bank.  Tr. 735; *see also id.* at 768 (acknowledging JP Morgan had no KYC responsibilities over

Clarity or PDVSA and did not engage in such due diligence).

---

when he is under a duty to do so."); *id.* at 232 ("[T]he element required to make silence
fraudulent—a duty to disclose—is absent in this case.").

Treasury's published Joint Fact Sheet confirmed that U.S. intermediary banks had no duty to look into the identities of entities other than the parties listed in the wire transfer. The Treasury Department's Joint Fact Sheet describes the obligations of U.S. banks that maintain correspondent accounts for foreign financial institutions ("FFI"), DX 1347, at 1, and states that "[u]nder existing U.S. regulations, there is no general requirement for U.S. depository institutions to conduct due diligence on an FFI's customers." *Id.* at 2. That means where a U.S. bank is acting as an intermediary in a transfer between foreign correspondent banks, it has no obligation to conduct due diligence on those correspondent banks' *customers*—that is, the sender and the payor at either end of the transfer. *See id.*; *see also* DX 1352 ("OFAC would not expect the [intermediary] bank to research the non-account parties listed in the wire transfer."). Consistent with that lack of any due diligence or know-your-customer requirement, the banks did not ask for information beyond the sender and recipient of each wire transfer:

> Q. I want to talk a little bit, still focused on J.P. Morgan's policies, about indirect parties to wire transfers. Am I correct that as a matter of J.P. Morgan's policies, you did not require foreign correspondent banks to identify information beyond the sender and the recipient of the funds?
>
> A. Correct.
>
> Q. OK. Again entirely consistent with the guidance you had been given by banking regulators, correct?
>
> A. I believe so, yes.
>
> Q. And those same banking regulators and J.P. Morgan pursuant to its policy did not require intermediary banks to demand anything more than that information about the sender and the recipient of the funds, correct?
>
> A. To my knowledge.
>
> ....
>
> Q. ... As a matter of J.P. Morgan's policy, you did not ask your foreign correspondent banks to demand from their customers information about whether the transaction was being performed on behalf of somebody else, correct?

22

A. Correct.

....

Q. And to your knowledge, that was not required under the applicable regulations that apply to intermediary banks?

A. Correct.

Tr. 788-90 (Blair cross); *accord* Tr. 843 (Blair re-cross) (JP Morgan did not require foreign banks "to identify the ultimate beneficiary, whoever that may be").

None of the bank witnesses identified any other duty to do more. The closest the government elicited was generic statements about "transparency." For instance, Peri testified that transparency from "[e]veryone involved" was "essential" to implementing the sanctions compliance programs at Citi. Tr. 864. Likewise, Peri testified that it was important that the sender and beneficiary fields in payment instruction documents be "truthful and accurate"—"[i]t gets to the trust-based system." Tr. 874. But here, the sender and beneficiary were truthful and accurate. PDVSA really sent the money, and Stratus Turkey or Clarity really received the money. The government elicited no evidence that any party was required to disclose anything more (or, if so, what more was required to have been disclosed).

But whatever the intermediary banks might have wanted parties to voluntarily disclose to achieve some vague notion of "transparency," the evidence established that the banks did not implement any policies or procedures *requiring* parties to disclose any information about indirect parties to wire transfers. JP Morgan required foreign correspondent banks to identify only the sender and recipient of the funds; it did not require them "to demand from their customers information about whether the transaction was being performed on behalf of somebody else," or to demand from each sender "a certification that the payment didn't violate any sanctions regime." Tr. 788-89. As long as JP Morgan ensured that the sender and recipient fields in a wire transfer were completed and maintained an adequate compliance program to screen names

23

against the SDN list and country sanctions programs, JP Morgan "fully satisfied" its obligations
to comply with applicable law.  Tr. 788-89.  The government put on no evidence that the
payments' senders, or Sadr, had any duty to disclose anything more.

> ii.    *The Financial Action Task Force's standards for cross-
>         border wire transfers confirm there was no duty to disclose
>         downstream recipients or related parties*

The only documentary evidence admitted at trial about the obligations of all parties to a
cross-border wire transfer—arguably the only trial evidence of a governing standard at all—was
the "International Standards on Combating Money Laundering and the Financing of Terrorism
and Proliferation, The FATF Recommendations" (Updated June 2019), promulgated by the
Financial Action Task Force (FATF).  DX 1901-R.  FATF Recommendation 16 (DX 1901-R, at
2-3) and its interpretive note governing cross-border wire transfers (*id.* at 5) make clear that the
only required information for a transfer payment's beneficiary—defined as the party designated
by the originator to receive the transfer (*id.* at 7)—is the beneficiary's name and account number.
*See id.* at 5, paragraph 6(d) and (e).  The FATF standard does *not* require the payment originator
or beneficiary to identify any indirect recipients, or any entities related to the beneficiary.

The interpretive note describing the "Responsibilities" of "Ordering financial
institutions" states that the originating bank should include the above information, including the
name and account number of the originator and the beneficiary, and should maintain a record of
that information.  DX 1901-R, at 6 ¶¶ 11-14.  Thus, PDVSA's financial institution, the
originator, was obligated only to identify the recipient of the wire transfer—i.e., Stratus Turkey
or Clarity.  The interpretive note regarding "intermediary financial institutions" recommends
only that "financial institutions processing an intermediary element of such chains of wire
transfers should ensure that all originator and beneficiary information that accompanies a wire
transfer is retained with it," *id.* ¶ 15, and "should take reasonable measures to identify cross-

border wire transfers that lack required originator information or required beneficiary information.  Such measures should be consistent with straight-through processing." *Id.* ¶ 17. "'Straight-through processing' refers to payment transactions that are conducted electronically without the need for manual intervention." *Id.* at 9 (Glossary).  Thus, recognizing that intermediary banks conduct cross-border wire transfers electronically and automatically, FATF Recommendation 16 merely requires that the intermediary banks' systems be set up to identify transfers that lack "required originator [or] beneficiary information," which for the beneficiary means only the name and account number of the recipient.  *See id.* ¶ 6(d), (e).  Intermediary financial institutions should also "have effective risk-based policies and procedures for determining: (i) when to execute, reject, or suspend a wire transfer lacking required originator or required beneficiary information; and (ii) the appropriate follow-up action."  *Id.* at 6 ¶ 18.

Thus, under FATF recommended standards, intermediary financial institutions simply had to ensure that the wire transfer instructions contained originator and beneficiary information, and maintain a risk-based compliance program.  They had no obligation to investigate the originator or beneficiary information.  This was consistent with the U.S. Treasury Department's guidance that "[u]nder existing U.S. regulations, there is no general requirement for U.S. depository institutions to conduct due diligence on [a foreign financial institution's] customers," DX 1347, at 2, and with the bank witnesses' testimony that intermediary banks had no KYC obligations for their foreign correspondent banks' customers, *see supra* at 21.

No standards or duties shown at trial required any party to an international wire transfer to provide information about "ultimate beneficiaries," "affiliated parties," or any other indirect or affected parties other than the transfer's sender and recipient.  Without such a duty to disclose, failure to volunteer information cannot have been a fraudulent omission.

> c.   **Sadr did not obtain bank funds** *by means of* **false or fraudulent pretenses, representations, or promises**

Acquittal is also required on Counts Three and Four because Sadr did not obtain bank funds "by means of" the alleged omissions. Beyond (1) obtaining property from a bank, and (2) misrepresentation, § 1344(2) requires proximate causation: the defendant "must acquire (or attempt to acquire) bank property '*by means of*' the misrepresentation." *Loughrin*, 573 U.S. at 362-63 (emphasis added). This requirement "is satisfied when ... the defendant's false statement is the mechanism naturally inducing a bank ... to part with money in its control." *Id.* at 363; *see* Dkt. 308, at 42-43 (Instr. 26) (instructing that "a false statement must be the thing that causes the bank to part with money in its control. If a false statement is not the reason the bank parts with money in its control, this element is not satisfied.").

Here, this "relational component" (*Loughrin*, 573 U.S. at 362) is missing. The proximate cause of the U.S. intermediary banks' processing the transfers was not the omission from the wire transfer orders of information regarding non-parties. The banks were not required to inquire into such non-parties, DX 1347, at 2; DX 1352 (second paragraph), and they did not do so, Tr. 788-90 (Blair); Tr. 951 (Peri); Sec. I.B.2.b, *supra*. Instead, what caused the U.S. intermediary banks to process the transfers was the wire transfer orders, which were only required to disclose the sender and recipient of payment, and accurately did so. *See* Sec. I.B.1, *supra*; Tr. 788-90 (Blair). That alone was sufficient to cause the transfer; no more was required.

Nor should it have been. The idea of wire funds transfers, even those conducted through foreign correspondent banks, is speed and volume: "Most often, funds transfers are used as an inexpensive and efficient method of discharging an 'underlying payment obligation which arose through earlier commercial dealings between the originator ... and the beneficiary.'" *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 788 (S.D.N.Y. 1997), *aff'd*, 160 F.3d 97 (2d Cir. 1998). They are high-speed automated transactions, processed for $20 each. Tr. 766

(Blair).  JP Morgan Chase processed two million of them—totaling some two to three trillion dollars—every day.  Tr. 765 (Blair).  A U.S. intermediary bank is not expected to, and does not, conduct due diligence beyond the disclosed sender and recipient of each transfer.  *See* Subsec. I.B.2, *supra*.  If it did, the system would grind to a halt.  Tr. 793 (Blair).

The government argued that if the banks had known Clarity and Stratus Turkey were affiliated with the Iranian International Housing Company or Stratus in Iran (which the banks had no obligation to investigate, and IIHCO and Sadr had no obligation to disclose), they would not have processed the payments.  Even if that were true, this argument conflates but-for causation with proximate causation—it does not satisfy § 1344(2)'s "by means of" element, which is in effect a proximate-cause requirement.  *See Loughrin*, 573 U.S. at 363 (explaining the phrase "by means of" "typically indicates that the given result (the 'end') is achieved, at least in part, *through* the specified action, instrument or method (the 'means') (citing dictionaries).  The "by means of" element is satisfied where "the defendant's false statement is the mechanism naturally inducing"—*i.e.*, proximately causing—the bank "to part with money in its control."  *Id.* "In other words, not every but-for cause will do."  *Id.*

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019), is illustrative.  Though the defendants there were guilty of prong 1 ("scheme to defraud") bank fraud in far different circumstances than here (because they blatantly and fraudulently altered shipping documents required for certain guaranteed letters of credit), the Second Circuit held the banks were not "victims" entitled to mandatory restitution because the alteration did not proximately cause the banks' losses, as required by the Mandatory Victims Restitution Act.  *See id.* at 95.  The government advanced there the same argument it does here: that "the banks would not have gone through with the transactions without the Defendants' involvement, and therefore that the Defendants proximately caused the banks' losses on those transactions."  *Id.* at 96.  The Second

27

Circuit rejected the argument, for the same reason highlighted in *Loughrin*: it "confuses 'but-for' causation with proximate causation." *Id.*; *compare Loughrin*, 573 U.S. at 363.  In *Calderon*, "the Defendants' misrepresentations were not even arguably related" to the banks' creditworthiness determination, which the court could "say ... with complete certainty because *before* the Defendants presented the fraudulent documents ..., the USDA and the banks had *pre-approved* the relevant foreign banks for participation in these transactions," based on a "rigorous," months-long independent analysis and three years of audited financial statements.  *Id.* at 96.  Because "the Defendants presented fraudulent documents to the confirming banks *after* those Banks had *already* decided to offer loans to the relevant foreign banks pursuant to comprehensive financial analyses," the banks' decision "was not influenced by," much less proximately caused by, "the Defendants' misconduct."  *Id.* at 97.  So here: the banks had no obligation to inquire beyond the sender and recipient information in the wire transfer instructions; Sadr had no obligation to disclose information beyond that, and those instructions were the "means" that induced the banks to process the transfers.  Any failure to disclose more, even if it could qualify as a fraudulent omission, was not the "means" by which the bank was induced to process the transfers.

The evidence regarding the first charged wire transfer removes any doubt.  Sometime after Commerzbank processed that $29.4M transfer to Stratus International Contracting J.S., it concluded from Internet research that the beneficiary might be affiliated with Stratus International Contracting Company in Tehran.  That did not stop Commerzbank from making the wire transfer—the transfer had already been processed.  *Compare Calderon*, 944 F.3d at 96-97.  Nor did it cause the bank to try to reject or unwind the transaction.  Even after the bank notified OFAC of the payment and its apparent Iranian connection, OFAC took no action to investigate or to require any unwinding.  *See* DX 150.  The bank transferred the funds based on ("by means of") the instructions given, not any failure to disclose information that even when found resulted

in no action taken.  Indeed, contrary to the government's arguments to the jury, the bank did not

even state it would not process such payments in the future—only that it would "monitor any

future payments."  GX 411, at 2.[12]

In sum, it was the wire transfer orders and payment instructions—issued by a willing

sender, to transfer its own funds to pay a legitimate contract obligation—that was the "means" by

which Clarity and Stratus Turkey obtained funds from the intermediary banks' custody.  The fact

that no one volunteered the identity of other, non-recipient parties affiliated with Clarity and

Stratus Turkey was not the "means by" which Clarity and Stratus obtained the transferred funds.

*Loughrin*, 573 U.S. at 359.

\*       \*       \*

Because the evidence does not allow a reasonable jury to conclude beyond a reasonable

doubt (a) that there was any misrepresentation; (b) that there was any omission in light of a duty

to disclose; or (c) that any such omission was the "means" by which the wire fund transfers were

caused here, the evidence is insufficient to support conviction of bank fraud under § 1344(2).

### 3.    No reasonable jury could conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to commit bank fraud

Finally, to convict Sadr of conspiracy to commit bank fraud (Count Four), the

government must prove beyond a reasonable doubt that a conspiracy to commit bank fraud

existed, and that Sadr knowingly and willfully joined it with knowledge of its criminal

objective.[13]  Because, as explained above, the evidence is not sufficient for a reasonable jury to

conclude beyond a reasonable doubt that a scheme to defraud a bank or to obtain money or

---

[12] Indeed, the government's post-trial disclosures of Commerzbank internal documents reveal that unlike for some parties on its manual screening list, Commerzbank did not require all transactions involving Stratus International Contracting Company to be returned or cancelled. Email from Vinay Jepal to Stefan Hofmann et al. (June 16, 2011) (Ex. O).

[13] Dkt. 308, at 48-50 (Instrs. 29-31); *see id.* at 20-25 (corresponding instructions on the Count One conspiracy, incorporated by reference).

property from a bank by means of misrepresentation has been proven, the evidence is insufficient as well to prove beyond a reasonable doubt either a conspiracy to commit such offenses, or the criminal intent required to join such a conspiracy. Accordingly, Sadr is entitled to judgment of acquittal on Count Four.

### C. Sadr is Entitled to Acquittal for Conspiracy to Defraud the United States (Count One) and Conspiracy to Violate the Sanctions (Count Two)

Count One charges Sadr with conspiracy to defraud the United States, "to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of OFAC in the enforcement of economic sanctions laws and regulations administered by that agency."[14] To convict on Count One, the government must prove beyond a reasonable doubt (1) a conspiracy to make it more difficult for OFAC to carry out its lawful and legitimate functions in the administration and enforcement of the U.S.-Iran sanctions laws and regulations as charged, (2) that the scheme depended on fraudulent and dishonest means, and (3) that Sadr knowingly and willingly entered into the conspiracy knowing of that unlawful aim and with the specific intent of furthering that unlawful purpose.[15]

Count Two, conspiracy to violate IEEPA, requires proof beyond a reasonable doubt that there was an agreement to violate regulations § 560.204 and § 560.203 of the ITSR, as charged in Count Two, and that Sadr knowingly and willfully became a member of that conspiracy, with knowledge of its unlawful objective and the purpose of furthering that aim.[16]

---

[14] Dkt. 308, at 17 (Instr. 12) (quoting Indictment).

[15] *See id.* at 19-25 (Instrs. 13-16), particularly *id.* at 22:6-9 (Instr. 15, Object of the Conspiracy) and 23:9-11 (Instr. 16, Knowing and Willful Participation). A Section 371 *Klein* conspiracy also requires proof of an overt act, *see id.* at 19, 26 (Instrs. 13, 17), but the parties did not seriously dispute that element separately from intent.

[16] Dkt. 308, at 30-34 (Instrs. 19-22).

OFAC administers and enforces the regulations Sadr is charged with having conspired to violate, and the two charges are based on identical conduct. Because the elements and charged conduct overlapped heavily, the reasons that the government's proof was insufficient to allow a reasonable jury to find the offenses proven beyond a reasonable doubt overlap heavily as well.

The evidence was insufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr knowingly and willfully conspired to impair, impede and obstruct OFAC's lawful and legitimate functions and operations in administering and enforcing the U.S.-Iran sanctions (Count One), or to violate regulations § 560.204 and § 560.203 of the ITSR (Count Two), for a number of reasons: (1) the revelation that OFAC, fully apprised by the prosecutors of the facts and theory of this prosecution, took *no action whatsoever* would have given any reasonable factfinder reasonable doubt as to whether the conduct here interfered at all with OFAC's legitimate and lawful enforcement of the sanctions (Count One); (2) the evidence was insufficient to show that failure to voluntarily identify affiliated parties not required to be disclosed could or was intended to interfere with OFAC's legitimate and lawful sanctions enforcement (Count One); (3) Sadr's charged conduct—to cause U.S. intermediary banks to process clearing transactions for payments for an underlying lawful construction project in Venezuela (not Iran)—was specifically authorized, not prohibited, by the regulations (Counts One and Two); and (4) the evidence was insufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that Sadr was not acting in good faith (Counts One and Two).

In addition, Sadr respectfully preserves his challenge to the viability of the *Klein* conspiracy theory, because it is a common-law crime not defined by congressionally enacted statute, and because it is not consistent with constitutional vagueness and fair notice standards, as explained in Sadr's pretrial motion (Dkt. 83), and *Coplan*, 703 F.3d at 61-62. *Marinello v. United States*, 138 S. Ct. 1101 (2018), confirms the non-viability of the *Klein* theory.

1.  **OFAC's complete inaction after being apprised of the prosecution's entire case shows OFAC itself did not believe Sadr's conduct interfered with OFAC's enforcement of the sanctions (Count One)**

Whether Sadr's conduct interfered with OFAC's "lawful and legitimate governmental functions" in enforcing the U.S.-Iran sanctions begins with the view of OFAC itself, the enforcing agency.  A reasonable factfinder would not confine review to testimony of the OFAC witness carefully selected and prepared by the prosecutors, who did not know any of the facts of this case or whether OFAC had taken any action based on them.  Instead, the reasonable factfinder's view would be guided by what OFAC, the agency, *did* or *did not do* based on these facts.  After all, as the Court charged the jury on this very conspiracy count, "actions speak louder than words."  Dkt. 308, at 20 (Instr. 14).

Here, OFAC's actions (or inaction) spoke loud and clear.  The prosecution in this case thoroughly apprised OFAC of the facts that were charged and tried, the prosecution's view that that conduct violated the sanctions, and its theories of how and why that was so.  *See* Dkt. 283, at 3-5; Dkt. 283-1.  From August 2016 through September 2017, one of the prosecutors contacted OFAC repeatedly to urge OFAC to consider enforcement.  Over the course of that year:

- Then-DANY prosecutor Garrett Lynch, a member of this trial team, reached out to OFAC by email on August 1, 2016, to "coordinate with OFAC for two reasons," the first of which was "to provide you with information so you can take action on your own [*i.e.*, initiate OFAC enforcement] if so desired," Dkt. 283-1, Page 8 of 48;

- Lynch told OFAC in that initial email that "[o]ur evidence is pretty strong that our targets were aware of US sanctions and structured the USD payments to evade them and to disguise the Iranian connection to the payments," *id.*;

- OFAC responded on August 3, 2016 that "we (OFAC Enforcement) would be the right shop/unit" to be in touch with; that OFAC's Enforcement unit would "discuss internally"; and that the matter had the attention of that unit's management team: three Section Chiefs, and a Senior Advisor for Enforcement, *id.* Page 9 of 48;

- The prosecutor and OFAC had a call on August 5, 2016 that included two additional OFAC Enforcement Officers, *id.* Page 11 of 48;

32

- By-then SAUSA Lynch renewed contact with OFAC by email on July 12, 2017, letting OFAC know that the USAO/SDNY intended to present to the grand jury in the near future, *id.* Page 15 of 48;

- After numerous emails over Summer 2017, the USAO had a call with OFAC Enforcement on September 1, 2017, in which SAUSA Lynch and AUSA Matthew LaRoche participated, *id.* Page 12 of 48;

- During that call, the AUSAs discussed with OFAC Enforcement a PowerPoint giving "a rough sketch of the case, the players, and the evidence," which Lynch forwarded the next day, *id.*;

- The PowerPoint was effectively a prosecution memo that comprehensively reviewed the facts and theory of the case the government tried here, *id.* Pages 29-48 of 48;

- OFAC's Enforcement Unit responded to SAUSA Lynch and AUSA LaRoche: "thanks for passing along the information below/attached.  We'll take a look and will get back to you."  *Id.* Page 12 of 48.

- A year and a half later, "after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC-Officer 1 sent SAUSA Lynch an email," attaching two documents related to an OFAC public enforcement action that OFAC-Officer 1 thought had a similar fact pattern to this case.  Dkt. 283, at 4; *see* Dkt. 283-1, Pages 17-26 of 48.

In response to this information, OFAC did *nothing*.  Despite the attention of OFAC's Enforcement Unit—including its Section Chiefs, a Senior Advisor for Enforcement, and at least two other Enforcement Officers (*id.* Pages 9, 11, 12 of 48)—OFAC, after full consideration, took *no action whatsoever*.  *See* Dkt. 283, at 4 ("SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions."); Tr. 1288 ("THE COURT: Mr. Lynch knew that he laid out every single fact of the case to OFAC, and they did nothing. MR. KROUSE: Yes, your Honor.").  A reasonable factfinder, judging OFAC's actions, not its words, would easily conclude that these facts, communicated in full to OFAC's Enforcement Unit including its leadership, simply *did not matter* to OFAC.[17]

---

[17] OFAC's inaction was consistent with its contemporaneous failure to initiate any investigation or enforcement action in response to GX 411—Commerzbank's June 2011 information letter about the first wire transfer charged in the Indictment containing many of the

33

Case 1:18-cr-00224-AJN   Document 336   Filed 05/01/20   Page 45 of 145

These facts were communicated to the jury—not in the detail relayed to the Court a week into trial, Dkt. 283, 283-1, but in a stipulation (DX 150) and a curative instruction to the jury (Tr. 1822). The jury thus knew that "in September 2016, the prosecutors in this case informed OFAC about the conduct in this case including the allegedly wrongful actions," DX 150 ¶ 6, "so that OFAC might consider initiating enforcement proceedings," Tr. 1822, and that "OFAC chose not to take any enforcement action," DX 150 ¶ 6; *see also* Tr. 1822 (OFAC "did not initiate an enforcement proceeding involving the transactions charged in this case"). On that basis, this Court struck "the portions of Mr. Kim's testimony describing OFAC as having a strict liability enforcement policy from the record of this trial," and instructed the jury, "You are not to consider those portions of Mr. Kim's testimony." Tr. 1822.

Though the jury learned these facts in summary fashion, it may have overlooked their full significance. Despite the faith our system places in juries, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 317. For that reason, the jury's verdict is not the end of the matter—the Court reviews the evidence independently, to determine whether the evidence would cause a reasonable factfinder to have a reasonable doubt—if so, the conviction "cannot constitutionally stand." *Id.* at 318; *see id.* at 317-19; *Coplan*, 703 F.3d at 72, 76.

This Court said it best: this is "no small thing." Tr. 1288. The lack of any likelihood of OFAC enforcement, *see id.*; *see also supra* at 8, has significance beyond right-to-control bank fraud. It also encompasses the larger question of whether the facts here mattered to OFAC at

---

same facts contained in the prosecution's PowerPoint. Although the government stipulated that upon receiving Commerzbank's letter OFAC did not initiate investigation or enforcement against any of the parties to that wire transfer, DX 150 ¶¶ 3-4, in fact, Sadr learned five weeks after trial that an OFAC compliance officer affirmatively responded to Commerzbank's letter, stating: "We'll be in touch if further action is required." Dkt. 334-1 at 2 (Gov. Apr. 21, 2020 Ltr. to Defense); Email from OFAC Compliance to Vinay Jepal (June 22, 2011) (Ex. N) (discussed in Sec. II.C.3, *infra*).

all—whether they constituted a sanctions violation in OFAC's view, or interfered with OFAC's administration or enforcement of the sanctions in any meaningful way.  A reasonable factfinder, knowing OFAC's Enforcement Unit was apprised of these facts repeatedly, considered them thoroughly, and did nothing, would have had a reasonable doubt whether they mattered, or hindered OFAC at all.  Acquittal on Count One is required.  *See Jackson*, 443 U.S. at 317-19; *Coplan*, 703 F.3d at 702, 706.

> ### 2.     No reasonable jury could conclude beyond a reasonable doubt that failure to voluntarily identify affiliated parties not required to be disclosed could interfere, or was intended to interfere, with OFAC's legitimate and lawful sanctions enforcement (Count One)

The evidence is further insufficient to sustain conviction on Count One because, for the same reasons explained in Part I.B.2, *supra*, no reasonable jury could conclude beyond a reasonable doubt that failure to volunteer affiliated parties who were not recipients of the charged wire fund transfers impaired or impeded OFAC's lawful and legitimate functions in enforcing the sanctions, given the lack of any duty to disclose them.

Whether the charged conduct was intended to impair, impede, or obstruct OFAC's lawful and legitimate functions in enforcing the sanctions laws must be determined in light of what those sanctions laws do and do not prohibit.  As explained above, OFAC did not require U.S. intermediary banks in correspondent banking transactions to conduct due diligence on foreign correspondent banks' customers, *see* DX 1347, at 2; DX 1352 (second paragraph); or to conduct any research beyond determining that the sender and recipient of a wire transfer are not on the SDN list, Tr. 648, 651-52 (Kim).  *See* Sec. I.B.2, *supra*.  On the evidence here, a reasonable factfinder would necessarily have at least a reasonable doubt whether Sadr's failure to volunteer such additional information, or his charged concealment of it, even if proven, unlawfully impaired, impeded, or obstructed OFAC's legitimate and lawful enforcement of the sanctions, or was intended to do so.  *See* Sec. I.B.2, *supra* (detailing reasons to doubt whether disclosure was

required); Sec. I.C.1, *supra* (detailing reasons to doubt whether government's evidence was truthful or sufficient regarding scope and nature of OFAC's enforcement).  Acquittal on Count One is thus required.

> **3.    Sadr's charged conduct—to cause U.S. intermediary banks to process clearing transactions for payments for an underlying construction project not prohibited by the Iranian Trade Sanctions Regulations— was specifically authorized by the regulations (Counts One and Two)**

With respect to Count One: the *Klein* theory of conspiracy to defraud the United States does not criminalize *all* conduct that may make a government agency's work more difficult; it reaches only conduct that impairs or impedes the agency's *lawful and legitimate* enforcement functions through fraudulent or dishonest means.  Dkt. 308, at 19, 20, 22.  Sanctions, of course, "are drawn not only to bar what they prohibit but to allow what they permit."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000).  An agency's "legitimate and lawful" enforcement functions do not include punishing what the sanctions permit.  A rational factfinder's consideration of whether Sadr conspired to impede OFAC's "legitimate and lawful" enforcement of the sanctions must thus take into account whether the sanctions prohibited or allowed Sadr's charged conduct.

With respect to Count Two: "the essence of conspiracy is 'an agreement to commit an unlawful act.'"  *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (citation omitted).  Where the underlying conduct is lawful, acquittal of conspiracy is required.  *See Skilling v. United States*, 561 U.S. 358, 408-09 (2010); *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015).  That is particularly true under 50 U.S.C. § 1702(3), which provides that compliance or good faith action in connection with or in reliance on the regulations is a "full acquittance and discharge" of any liability, 50 U.S.C.§ 1702(a)(3), but it is true in any event as a general matter that agreement to do that which is lawful is not a crime.

In briefing on pretrial motions and in support of jury instructions, Sadr argued that:

(1) the conduct charged to have been contemplated here – the charged wire transfers to Clarity and Stratus Turkey in Europe, cleared by U.S. intermediary banks, were expressly authorized by 31 C.F.R. § 560.516 from the beginning of the charged conspiracy in 2006 through November 10, 2008, *see, e.g.*, GX 105; Order, Dkt. 224, at 1 (Feb. 24, 2020), so Sadr could not have had criminal conspiratorial intent during that time period;

(2) the conduct charged to have been actually undertaken from 2009 through October 2012—specifically, the wire transfers charged during that period—were expressly authorized by 31 C.F.R. § 560.516(a)(2) as in effect during that period, *see* Dkt. 82, at 18-25; Dkt. 110, at 2-6; Dkt. 245, at 7-21; Dkt. 252.[18]

(3) although the § 560.516(c) general license was amended and ceased to authorize such conduct in October 2012, there was nothing at that time period that would prove beyond a reasonable doubt that Sadr's intent, which had been to engage in conduct that was specifically authorized through October 2012, suddenly became criminally conspiratorial with the October 2012 regulatory change, *see* Dkt. 82, at 24-25; Dkt. 110, at 6; and

(4) Sadr did not conspire to cause the export of U.S. clearing transaction services to the territory of Iran or the Government of Iran, or for the benefit of anyone in the territory of Iran or the Government of Iran. (Dkt. 82, at 6-18; Dkt. 110, at 6-10).

Without reproducing or belaboring those arguments here, Sadr renews them and incorporates them by reference.[19]  In addition, while it was undisputed that the charged conduct

---

[18] Sadr further respectfully preserves his arguments that (a) this was true notwithstanding the existence of § 560.516(c) during that time period, Dkt. 245, at 21-22, and (b) his arguments in response to this Court's reasoning in its ruling denying Sadr's pretrial motion to dismiss, *see id.* at 7-21, and Dkt. 252, were not barred by this Court's Local Rule 49.1 regarding motions for reconsideration, *see* Dkt. 259.

[19] Because this motion now concerns not whether to dismiss the indictment as a matter of law for failure to state an offense, but instead whether the government met its burden to prove every element of the charged offenses by evidence sufficient to sustain conviction beyond a reasonable doubt, Sadr's failure to seek reconsideration of this Court's denial of his pretrial

would have been expressly legal under the U-Turn license in effect through November 2008, GX 105, the government did not elicit any evidence that Sadr knew the U-Turn license had been revoked.  It did not even ask him about the revocation when he was on the stand.

Because Sadr's conduct was not prohibited by the sanctions but instead was expressly authorized by them, his agreeing to engage in that lawful conduct cannot have constituted either a willful conspiracy to violate the sanctions (Count Two), nor a criminal effort to impede OFAC's lawful and legitimate efforts to enforce them (Count One).

Sadr respectfully acknowledges this Court's conclusion in the related context of 31 C.F.R. § 560.203 that one need not independently violate an IEEPA provision to unlawfully attempt to evade or avoid those provisions.  Dkt. 164 at 10-11.  But to illegally "evad[e] or avoid[]" the sanctions in violation of § 560.203, an action must evade or avoid a "*prohibition*" under them.  If transactions are expressly authorized, they are not prohibited, *see* 60 Fed. Reg. 47061-01, 47062 (Sept. 11, 1995) ("Transactions otherwise prohibited by this part may be authorized by a general license contained in subpart E"), and they are not evading or avoiding

---

motion to dismiss does not waive or bar his argument that the government has not proved every element of its case by sufficient evidence.  "That a party 'could have raised an argument years earlier than it did' or that a party 'focused on a different set of arguments at the motion-to-dismiss stage' does not amount to waiver or forfeiture of issues later raised in a" timely-filed motion seeking different relief. *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2019 WL 1430155, at *3 (S.D.N.Y. Mar. 29, 2019) (citation omitted); see also Dkt. 259 (Sadr's reply to the government's pretrial argument that Sadr waived by not moving for reconsideration).  Sadr's motions for judgment of acquittal under Rule 29 have been timely filed or renewed, at the close of the government's evidence, Tr. 1208-11; Dkt. 282; the close of all evidence, Tr. 1821, 1823, and after verdict (the instant motion).  Just as no earlier motion for judgment of acquittal is necessary as a prerequisite for making this motion, Rule 29(c)(3), so too no earlier motion was required.  Even if there were, this motion is not untimely under Rule 12(c)(3), as these arguments were raised by the pretrial motions deadline, in Dkt. 82 and Dkt. 110.  Even the one argument not set out in those pretrial motions briefs—the argument that supplemental argument submitted in Sadr's letter of March 2, 2020 (Dkt. 252) is now properly submitted in support of this timely motion for different relief (post-verdict judgment of acquittal under Rule 29(c)).  *See City of Almaty*, 2019 WL 1430155, at *3.

anything.  But even absent express authorization, one cannot logically (much less illegally) "evade or avoid" sanctions by *complying* with them.

Indeed, an interpretation that allows conviction for conduct that complies with the sanctions would conflict with Section 1702(a)(3)'s provision that compliance, or action taken in good faith in connection with IEEPA and its regulations, is "a full acquittance and discharge for all purposes."[20]  Where a regulation (or an interpretation of one) conflicts with its authorizing statute, the statute controls.  *See, e.g.*, *Chevron U.S.A. v. Nat. Resources Def. Council,* 467 U.S. 837, 842-43 (1984); *Wachovia Bank v. Burke*, 414 F.3d 305, 315 (2d Cir. 2005).  Moreover, if the regulation is ambiguous, in a criminal case, the Court resolves the ambiguity by the rule of lenity.  *United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012); *see also United States v. Santos*, 553 U.S. 507, 514 (2008).  Finally, an interpretation of § 560.203 (for Count Two) or of what it means to criminally impede OFAC's administration and enforcement of the sanctions in a *Klein* conspiracy (Count One), that would allow conviction for conduct that is expressly allowed under the sanctions regulations runs so far afield of fair notice that it violates due process.  *See, e.g.*, *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (before punishment may be imposed, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed"); *accord United States v. Lanier*, 520 U.S. 259, 266 (1997); *United States v. Aguilar*, 515 U.S. 593, 600 (1995).

---

[20] Sadr respectfully acknowledges this Court's ruling that the above language addresses civil or contract liability, but respectfully maintains and preserves his contention that the international law journals and a Maine district court case analyzing legislative history on which the Court relied cannot trump the plain meaning of the text Congress enacted: "No person shall be held liable in any court" for any actions or omissions in good faith pursuant to or in reliance on the regulations.  *See* Tr. 1295-1310 (charge conference).

### 4. No reasonable jury could conclude beyond a reasonable doubt that Sadr was not acting in good faith (Counts One and Two)

Finally, the evidence was insufficient for any reasonable jury to conclude beyond a reasonable doubt that Sadr was not acting in good faith. Good faith belief that the defendant's conduct was proper, even if mistaken, is a defense to all charges, "because a defendant who acted in good faith cannot be found to have acted knowingly, willfully, and with ... unlawful intent." Dkt. 308, at 23 (Count One); *see also id.* at 34 (Count Two). If Sadr believed he was acting in compliance with the regulations, he cannot be criminally liable for willfully conspiring to violate them, or for willfully conspiring to impede OFAC's enforcement of them.

This is particularly true with respect to OFAC's enforcement of the sanctions enacted under IEEPA. That statute provides:

> No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

50 U.S.C. § 1702(3). Indeed, though this Court declined to instruct on this language for Count One (Tr. 1301-10) (charge conference), it did paraphrase this language in its instruction on Count Two (Dkt. 308, at 34). But even if the Court ignores § 1702(3) with respect to Count One, the same result obtains under the general principle of good faith on which the Court instructed. *See* Dkt. 308 at 23.

Sadr of course has no burden to prove good faith. Instead, the government must prove his lack of good faith beyond a reasonable doubt. Dkt. 308, at 23 (Instr. 16) (incorporated for all counts). But Sadr's defense case, including his own testimony, showed powerful evidence establishing Sadr's good faith, or at the very least creating reasonable doubt about whether he acted outside good faith. If a reasonable factfinder would have had reasonable doubt, acquittal is required. *See Jackson*, 443 U.S. at 317-19.

The government told the jury at the outset, "while the defendant's scheme was complex, the rules [*i.e.*, the sanctions] are not." Tr. 83-84 (opening statement). The evidence at trial, and the law known to the Court, showed the sanctions in fact are anything but simple. Sadr testified that he believed in good faith that his conduct complied with U.S. laws, and that the U.S. sanctions against Iran were directed at the Government of Iran and its related entities, SDNs, and transactions involving the nuclear, military or oil industries. Tr. 1501. The trial evidence showed that Sadr's good faith belief was not only reasonable, but was based on his contemporaneous knowledge of U.S. laws and pronouncements by U.S. officials, both of which confirmed in Sadr's mind that it was not illegal to engage in commercial or financial transactions that did not involve or benefit the Government of Iran, or promote its illicit conduct, which were what the sanctions were designed to prevent.

Sadr's knowledge of U.S. laws pertaining to Iranian sanctions was based on obtaining and reading the Comprehensive Iran Sanctions, Accountability, And Divestment Act Of 2010 ("CISADA"), DX 132 and 132A. As Sadr testified, that Act was entirely consistent with Sadr's understanding that the Iran sanctions were directed at the Government of Iran and those that facilitated Iran's illicit activities and human rights abuses. *See* Tr. 1529-35 (Sadr direct). CISADA also *directly* addressed the use of foreign banks to perform correspondent banking transactions through United States intermediaries, and confirmed for Sadr that the Venezuelan project transactions did *not* violate U.S. sanctions against Iran. Tr. 1533-34.

Specifically, Section 104 of CISADA, entitled "Mandatory sanctions with respect to financial institutions that engage in certain transactions," prohibits U.S. financial institutions from opening or maintaining correspondent accounts on behalf of foreign financial institutions that engage in certain activities, such as facilitating the efforts of the Government of Iran (including efforts of Iran's Revolutionary Guard Corps or any of its agents or affiliates) to

41

acquire or develop weapons of mass destruction or to provide support for terrorist organizations. *See* DX 132A, at 22.  Section 104 of CISADA also prohibits U.S. financial institutions from opening or maintaining correspondent accounts on behalf of a foreign bank that "facilitates a significant transaction or transactions or provides significant financial services for" the IRGC or other entities whose property interests have been blocked.  *See id.* § 104(c)(2)(E).  CISADA does *not* prohibit U.S. financial institutions from opening or maintaining correspondent accounts on behalf of foreign banks that engage in financial transactions, directly or indirectly, for or on behalf of a private Iranian entity that is *not* owned or controlled by the Government of Iran and is *not* involved in Iran's illicit nuclear or terrorist activities.  Sadr understood from CISADA that the correspondent banking transactions involving Hyposwiss and U.S. intermediaries were not prohibited.  *See* Tr. 1533-34.  Moreover, because Section 104 of CISADA addressed *directly* the exact correspondent banking activities that Sadr was considering at the time he obtained and read the statute, he would have had no reason to believe that there was another regulation, the ITR (later renamed ITSR), that addressed *indirectly* the same banking activities based on the legal interpretation of the meaning of the general prohibition on the export of services to Iran.

Sadr's good faith belief that U.S. sanctions against Iran targeted the Government of Iran and those that supported its illicit activities was also based on pronouncements by the Obama administration, including the president.  *See* Tr. 1522-25.  As Sadr testified, President Obama's public statements cemented his beliefs about the U.S. sanctions policy toward Iran: "It wasn't targeted towards us, it was to protect us.  It was targeted to the Iranian government's bad behavior."  Tr. 1525.

In sum, Sadr's good faith belief that his conduct did not violate the Iran sanctions was reasonably based on and consistent with his knowledge and understanding of U.S. law at the time and statements he heard emanating from the Obama administration, and it was utterly

42

consistent with the Obama administration's declared policy of focusing sanctions against those engaged in conduct that furthered Iran's illicit activities.  The government did not challenge Sadr's testimony about CISADA on cross-examination: the prosecutor's only questions about CISADA related to whether PDVSA was designated under the law.  Tr. 1794-95.  On this record, no reasonable jury could have found beyond a reasonable doubt that Sadr lacked good faith.

### 5.    The *Klein* conspiracy theory is not viable after *Marinello v. United States* (Count One)

Sadr respectfully preserves his challenge to the *Klein* theory of conspiracy to defraud the United States, because it is a common-law crime not defined by Congress, and because it is not consistent with constitutional requirements of vagueness and fair notice, as explained in Sadr's pretrial motion (Dkt. 83, 84) and in *United States v. Coplan*, 703 F.3d 46, 61-62 (2d Cir. 2012). *Marinello v. United States*, 138 S. Ct. 1101 (2018), confirms the non-viability of the *Klein* conspiracy theory.[21]

The *Klein* theory of conspiring to defraud the United States does not criminalize every action or course of conduct that makes it in any way more difficult for a government agency to conduct its business or enforce the law.  The qualifiers, "lawful and legitimate governmental functions" (Dkt. 308, at 19, 20, 22) in the "enforcement of economic sanctions laws" are important.  The law does not criminalize every action that hinders or impedes a government

---

[21] As explained below, the two rationales the Supreme Court applied in *Marinello*—concern for Congress's prerogative to define crimes by statute, and concern for fair notice—are the arguments already made in Sadr's pretrial challenge to the *Klein* theory.  *See* Dkt. 84 §§ II.A, II.C (arguing *Klein* has no basis in statute, but is rather a common-law crime); *id.* § II.B (arguing vagueness in the wake of *Skilling*).  *Marinello* thus presents not a new argument, but rather additional authority in support of the arguments already presented pretrial.  *Marinello* (decided in 2018) is intervening Supreme Court authority after *Coplan* (decided in 2012), that permits departure from *Coplan*'s holding.

Even if reliance on *Marinello* were a new argument, it may be presented in a timely motion for judgment of acquittal.  *See* note 19, *supra*.

agency in any way—if it did, *Klein* conspiracy law would know no bounds, and would

criminalize, at the government's whim, any action, even otherwise lawful, that the government

later argued hindered the agency's work in any way—including action intended to assert or stand

on one's rights, or to do in good faith what was not prohibited, even if it was not favored.  The

Supreme Court has repeatedly rejected such broad interpretations of criminal obstruction statutes

to reach conduct that is not otherwise obviously malign.

      For instance, in *Marinello*, the defendant was prosecuted for obstructing the IRS, under

26 U.S.C. § 7212(a), which "makes it a felony 'corruptly or by force' to 'endeavo[r]' to obstruct

or imped[e] the due administration of" the Internal Revenue Code.  138 S. Ct. at 1104, 1105.

The government contended there, similar to its argument here, that "the processing of tax returns

is part of the administration of the Internal Revenue Code and any corrupt effort to interfere with

that task can therefore serve as the basis of an obstruction conviction."  *Id.* at 1110.  The

Supreme Court rejected the argument, holding that under this obstruction statute, the IRS's "due

administration of" the tax laws did not mean every act carried out by IRS employees in the

course of their 'continuous, ubiquitous, and universally known' administration of the Tax Code."

*Id.* at 1109-10.  Rather than construe "due administration" broadly to cover the IRS's day-to-day

work, the Supreme Court held that "to secure a conviction" under this obstruction statute, "the

Government must show (among other things) that there is a 'nexus' between the defendant's

conduct and a particular administrative proceeding, such as an investigation, an audit, or other

targeted administrative action," *id.* at 1109, and that such "administrative conduct" "does not

include routine, day-to-day work carried out in the ordinary course by the IRS, such as the

review of tax returns."  *Id.* at 1110.

      The Court's requirement of a nexus with a particular investigative, enforcement, or

administrative proceeding was consistent with its "traditional[] exercise[] [of] restraint in

assessing the reach of a federal criminal statute," which is rooted both in "deference to the prerogatives of Congress" in defining crimes, and in "concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Id.* at 1106 (quoting *United States v. Aguilar*, 515 U.S. 593, 600 (1995), and *McBoyle v. United States*, 283 U.S. 25, 27 (1931)); *accord id.* at 1108. "A broad interpretation would ... risk the lack of fair warning and related kinds of unfairness that led this Court in *Aguilar* to 'exercise' interpretive 'restraint.'" *Id.* at 1108 (discussing *Aguilar*, 515 U.S. at 600 (interpreting 18 U.S.C. § 1503(a)); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005) (interpreting 18 U.S.C. § 1512(b)(2)); *Yates v. United States*, 135 S. Ct. 1074, 1087-88 (2015) (plurality) (interpreting 18 U.S.C. § 1519).

In *Marinello*, *Aguilar*, *Arthur Andersen*, and *Yates*, the Court was "exercising restraint" in interpreting obstruction *statutes*. Here, *Klein* conspiracy is not even statutory—as the government implicitly conceded in *Coplan*, it is "a common law crime, created by the courts rather than by Congress." *Coplan*, 703 F.3d at 61. Even if *Klein* remains a viable offense theory for obstructing an agency's enforcement of the law, *id.* at 61-62, it should at least be subject to the same limiting construction the Supreme Court has repeatedly placed on obstruction statutes—a nexus to a particular investigation or enforcement proceeding. Under *Marinello* and *Aguilar* before it, it cannot reach the agency's routine, every day activity administering and enforcing the law. 138 S. Ct. at 1109-10.[22] It would be quite a surprise if the actions the

---

[22] *Klein* law to the contrary, such as *United States v. Rosengarten*, 857 F.2d 76, 79 (2d Cir. 1988) (holding that impairment of a lawful governmental function need not have violated any other law), cannot be squared with *Marinello*. Nor can it be squared in this case with: (1) the plain text Congress enacted in 50 U.S.C. § 1702(3); (2) the principle that an agreement to do that which is lawful is not a crime; or (3) the principle that sanctions allow what they do not prohibit, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000). *See* Dkt. 185, at 29-30. Acknowledging this Court's contrary ruling in the jury charge, Dkt. 308 at 22; Tr. 1295-1310, Sadr respectfully preserves these arguments for further review.

Supreme Court held not to be criminal obstruction under the statutes in *Marinello, Aguilar*,

*Arthur Andersen*, and *Yates* could nonetheless be criminal obstruction under the non-statutory,

common-law crime of *Klein* conspiracy.[23]

### D.     Sadr Is Entitled to Acquittal for Money Laundering (Count Five)

To convict Sadr of money laundering, the government had to prove beyond a reasonable

doubt that Sadr (1) caused funds or monetary instruments to be transported, transmitted, or

transferred "to a place in the United States from or through a place outside the United States,"

and (2) "did so with the intent to promote the carrying on of specified unlawful activity."[24]  The

specified unlawful activity charged in Count Five was "(i) the illegal export of services to Iran as

charged in Count Two of this Indictment, and (ii) bank fraud as charged in Counts Three and

Four of this Indictment."[25]  The Court's instructions did not define "promote," but instructed, "If

---

[23] *United States v. Willner*, No. 07 Cr. 183 (GEL), 2007 WL 2963711 (S.D.N.Y. Oct. 11, 2007), is instructive.  Willner, like Marinello, was charged and convicted for obstructing the IRS's "due administration of" the Tax Code under 26 U.S.C. § 7212(a).  *See id.* at *1.  Based on the reasoning of *Aguilar*, Willner argued for the result the Supreme Court reached in *Marinello*: that § 7212(a) did not reach the IRS's routine, everyday actions in enforcing the tax laws, but instead required a nexus to a particular investigation or enforcement proceeding.  *See Willner*, 2007 WL 2963711, at *2, *4-5 (describing Willner's argument based on *Aguilar* and *United States v. Kassouf*, 144 F.3d 952 (6th Cir. 1998)).  Judge Lynch, ruling eleven years before *Marinello*, rejected the argument, largely by analogizing to *Klein*: "It has long been the law of this Circuit that a 'conspiracy to frustrate or obstruct the IRS's function of ascertaining and collecting income taxes' constitutes a conspiracy to defraud the United States," and "[s]uch *Klein* conspiracies' are routinely prosecuted, and have become a staple of federal law enforcement." *Id.* at *5, *6.  Because an agreement to impede the IRS's lawful collection of taxes, without more, would be a criminal *Klein* conspiracy, the court reasoned that the same conduct and circumstances must also constitute obstruction of the IRS under § 7212(a).  In *Marinello*, the Supreme Court rejected that result, unless the government showed something more: a nexus to an IRS investigation, enforcement action, or administrative proceeding.  138 S. Ct. at 1109-10.  Since the conduct in *Willner* and *Marinello* was the same, the result must be the same—such a nexus requirement must also be required under the *Klein* theory.  Were it otherwise, the non-statutory theory of obstruction (*Klein*) would swallow the statutory theory (§ 7212(a)).

[24] Dkt. 308, at 52 (Instr. 33).

[25] *Id.* at 51 (quoting Ind. ¶ 29).

46

you find that the defendant acted with the intention or deliberate purpose of promoting, facilitating, or assisting in the carrying on of either or both of these specified unlawful activities, then the [promotion] element is satisfied." Dkt. 308, at 54 (Instr. 35).

Because, for the reasons explained above, the evidence is insufficient as a matter of law to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr is guilty of either the exportation violation charged in Count Two or the bank fraud charged in Counts Three and Four, it is likewise insufficient as a matter of law to allow a reasonable jury to conclude beyond a reasonable doubt that Sadr had the requisite intent to promote the specified unlawful activity as charged in Counts Five.[26]  Thus, the Count Five money-laundering conviction falls with the insufficiency of the predicate sanctions conviction (Count Two) and bank fraud convictions (Counts Three and Four).

In addition, to the extent the government proved transfers of funds from outside the United States to places inside the United States as charged in Count Five, no reasonable jury could have concluded beyond a reasonable doubt that those transfers were for the purpose of promoting the charged specified unlawful activity: the exportation of financial services (clearing transactions) in Count Two, or bank fraud in Counts Three and Four).[27]  The only money transfer to the United States charged in the Indictment, the wiring of approximately $2 million to purchase property in Malibu, California, Ind. ¶ 13, neither promoted the exportation of the fifteen clearing transactions charged in Count Two, *see* Ind. ¶¶ 13, 16.q-zz, nor induced the bank to engage in those transactions by false or fraudulent representations, as charged under 18 U.S.C. § 1344(2) in Counts Three and Four.  Because Sadr can be convicted only for the act charged in the Indictment, *see Russell v. United States*, 369 U.S. 749, 766, 770-71 (1962); *United States v.*

---

[26] The jury acquitted on Count Six, the money laundering conspiracy charge.  *See* Dkt. 310, at 3 (verdict form).

[27] *See* Dkt. 308, at 51 (Instr. 32) (quoting Indictment).

47

*Burr*, 25 F. Cas. 55, 172 (C.C. Va. 1807) (Marshall, C.J.), and the only money transfer to the United States had no connection to promoting the charged specified unlawful conduct, the government put on no sufficient proof to convict for money laundering on Count Five.

The conduct making up the *actus reus* of the offense—here, the transport of funds exceeding $10,000 to a place in the United States from or through a place outside the United States—must be specified in the Indictment in order to protect Sadr's right to be tried only for conduct charged by the grand jury. *See Russell*, 363 U.S. at 766. Allowing conviction for any other conduct would violate Sadr's right to fair notice of the charges and his right to be tried only for conduct presented to the grand jury. *See id.* at 770-71. But even if reliance on other alleged acts not charged in the Indictment were permitted, the only other funds transfers to the United States shown at trial—transfers connected with Bolivar-to-dollar currency exchanges—did not promote either the fifteen clearing transactions charged in Count Two, or the allegedly fraudulent representations or missions charged to have induced them under § 1344(2) as charged in Counts Three and Four.

Because the only funds transfers to the United States charged had nothing to do with promoting the charged specified unlawful activity, there was no proof—much less proof sufficient to permit a reasonable jury to convict beyond a reasonable doubt—of the money laundering charged in Count Five.

## II. THE GOVERNMENT'S REPEATED, EGREGIOUS *BRADY* VIOLATIONS REQUIRE A NEW TRIAL

Less than two years ago, the Chief of the Criminal Division for the United States Attorney's Office appeared before this Court, to address that office's failure to disclose exculpatory information until the Friday before a Monday trial—the third of a series of repeated prominent disclosure failures at that time. That representative of the U.S. Attorney's Office's leadership told this Court that the office had conducted "an all-hands-on-deck internal training of

48

[its] unit chiefs," and had directed that "every AUSA in the criminal division ... receive additional training on" the office's obligation to "scrub[ its] files" to ensure complete and timely *Brady* disclosures, "to ensure no repeat of the errors that have come before your Honor."  Hr'g Tr. at 9, 10, *United States v. Pizarro*, No. 17-cr-151-AJN, Dkt. 135 (S.D.N.Y. May 22, 2018).

That training did not have lasting effect.  In this case, the government has time and again failed to disclose obviously exculpatory information on a multitude of topics.  Those failures continued despite the participation and supervision of the line prosecutors' unit chiefs, even after this Court called attention mid-trial to the very serious failures of disclosure and candor that were by then manifest.  Despite the supposed all-hands-on-deck search that the U.S. Attorney's Office represented it completed the day it rested its case on March 9, 2020 (Tr. 1204-05, 1222-25; Dkt. 283), the government has rolled out additional post-trial disclosures of powerfully exculpatory evidence on March 31, 2020; April 3, 2020; April 13, 2020; and April 21, 2020.

This continuing stream of new disclosures has not resulted from government diligence after March 9, nor from any newfound appreciation of the scope of the government's *Brady* obligations.  Instead, these disclosures have come only in grudging response to the *defense*'s diligence in reiterating Sadr's earlier *Brady* requests, and in following up on holes in the government's previous disclosures or conflicts in the government's representations.  Each new government disclosure has been accompanied by a rote statement that the new material is neither exculpatory nor *Brady*, but is supposedly being provided only as a courtesy.

At trial, the government's *Brady* failures were already blatant and egregious.  First, on March 8, 2020, the government disclosed that Commerzbank had flagged the first payment in the case to OFAC in real time (mistakenly conflating the payment's recipient, Stratus Turkey, with Stratus in Tehran, GX 411), and OFAC did nothing in response.  The following day, after the close of the government's case, the government revealed that one of the prosecutors, SAUSA

Lynch, had contacted OFAC's Enforcement Unit *in August 2016* to urge OFAC to initiate enforcement in this case, and further briefed that unit in September 2017 (along with the then-lead AUSA on the case) on the entire facts of this case, using a PowerPoint prosecution memo that highlighted the case theory and evidence that the government ultimately tried here.  Though it promised to consider this information, OFAC again did nothing.  *See supra* at 34-36.

Since trial ended, the government has made the following additional disclosures:

1. On March 31, 2020, the government disclosed that the FBI had possessed the recording of Venezuela Project Manager Bahram Karimi's January 22, 2020 interview since February 6, 2020, and that the case agents received it in New York on February 12, 2020—despite the government's repeated pretrial statements to the defense and midtrial representation to the Court that it had not received the recording yet.  The recording contains numerous exculpatory statements that were not memorialized in the interview notes disclosed to the defense before trial.

2. On April 3, 2020, the government disclosed that a senior PDVSA finance executive who approved the payments in this case came forward to the FBI in April 2016 to tell the FBI "specifically that he had done nothing wrong."  Dkt. 305-1, at 4.  The executive, Victor Aular, told the FBI that PDVSA's legal counsel reviewed the contracts and payments on the Nueva Ojeda project to ensure compliance with the U.S.-Iran sanctions.

3. On April 21, 2020, the government disclosed, among other things, a cache of 445 pages of new documents showing the internal communications within Commerzbank's compliance department that led to Commerzbank's letter to OFAC flagging the charged April 4, 2011 payment (GX 411).  Among those documents is a June 22, 2011 email from OFAC responding to Commerzbank's letter, stating OFAC had received Commerzbank's letter, "and we'll be in touch if further action is required."  *See* Dkt. 334-1, at 2.  The full set of new

disclosures also show that (a) Commerzbank was principally concerned with whether the payment was received in Iran; (b) when it concluded that the payment was received by a Turkish company, Commerzbank withdrew its initial conclusion that the payment violated the sanctions (and affirmatively concluded it raised no money laundering concerns); and (c) Sadr did not lie to Commerzbank, but instead precisely answered its questions accurately.  This evidence would have supported Sadr's understanding of the sanctions, refuted the government's argument that any payment with an Iranian nexus violated the sanctions, and rebutted the government's argument that Sadr lied to Commerzbank.

These ongoing disclosures reveal multiple egregious *Brady* violations, which individually and cumulatively undermine any confidence in the verdict, and require a new trial.  Beyond entitlement to a new trial, the full picture shown by these untimely disclosures reveals that the government's case regarding OFAC enforcement—the claim that OFAC would have imposed strict enforcement against the intermediary banks had it known of these transactions, and that the banks thereby faced a likely risk of economic harm—was either deliberately or recklessly misleading.  Although the government's witnesses did not commit perjury (because the OFAC witness, isolated from the facts of this case, lacked firsthand knowledge, and the bank witnesses testified only to their own subjective beliefs), the government's use of their testimony to present a deliberately or recklessly misleading narrative about the prospect of OFAC enforcement in this case warrants striking all of the government's evidence regarding such enforcement.  Without such evidence, the government's case on Count One and prong one of the bank fraud counts (Counts Three and Four) fail (to the extent they have not failed already) for insufficient proof, and Sadr is entitled to acquittal on those charges.

### A.       Governing Legal Principles

"*Brady* requires that the government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (citation omitted). "Evidence is favorable if it is either exculpatory or impeaching, ... and it is material if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citations omitted). "[T]he adjective [reasonable] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.*; *accord Mahaffy*, 693 F.3d at 127. Nor is materiality a sufficiency of the evidence test—"[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. Instead, "a conviction must be reversed 'upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Mahaffy*, 693 F.3d at 127; *accord Kyles*, 514 U.S. at 434.

When "deciding whether to grant a motion for a new trial," unlike when deciding a Rule 29 motion, "the judge is not required to review the evidence in the light most favorable to the prosecution." *United States v. Walker*, 289 F. Supp. 3d 560, 567 (S.D.N.Y. 2018).

 "The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. The prosecutor's good or bad faith is irrelevant: "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Id.* at 438. "This

52

means, naturally, that ... '[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure.'  This is as it should be."  *Id.* at 439 (citation omitted).  Doing so "will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations."  *Id.* at 440 (citations omitted).

The materiality of suppressed evidence is "considered collectively, not item-by-item." *Id.* at 436.  "[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative." *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (en banc).  Nor can the government rely on late disclosures during trial, or mid-trial ad hoc remedies for such disclosures, to excuse suppression.  *See United States v. Thomas*, 981 F. Supp. 2d 229, 239-40 (S.D.N.Y. 2013). Collective analysis requires assessing the effect of the entire iceberg, not merely the tip disclosed at trial.  Collectively, the undisclosed evidence is material under *Brady* if "there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'"  *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972), and *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

In sum, a *Brady* violation has three components: (1) the evidence must be favorable to the accused, (2) it must have been suppressed by the government, and (3) it must be material.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004); *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).  Here, we will first list the evidence unquestionably suppressed by the government, in the order of disclosure. Because its favorability to the defense is intertwined with its materiality, we will then analyze those two requirements together, by their effect on the issues as they were tried.

**B.      From the 2018 Indictment through April 21, 2020, the Government Suppressed Plainly Exculpatory Evidence That It Possessed As Far Back As April 2016**

**1.      Sadr diligently requested all *Brady* information**

Although the prosecution's duty to disclose exculpatory evidence does not depend on defense request, *Kyles*, 514 U.S. at 433, it is worth noting that Sadr diligently and steadfastly requested disclosure of all *Brady* information from the time he was indicted, up through and during trial, and continuing after trial. *Cf. United States v. Gil*, 297 F.3d 93, 105-06 (2d Cir. 2002). Sadr repeatedly and explicitly requested, among other things, all documents or information tending to rebut willfulness, including any documents or information showing that any other person believed the charged conduct was not criminal:

- On April 3, 2018, weeks after indictment, Sadr's original counsel sent a comprehensive discovery and *Brady* request, including seeking "any evidence in the government's possession that would demonstrate lack of willfulness, such as documents or information demonstrating that Mr. Sadr did not know that the Iran sanctions apply to a non-U.S. citizen engaged in a project with an Iranian company while living abroad." Dkt. 189-1, at 5.

- On Aug. 2, 2018, Sadr's counsel requested, by email, all data seized from "other sources" because "additional material [beyond the May 2018 pertinent documents]" could provide "context" that "would be helpful." Dkt. 149-2, at 9.

- On August 23, 2018, Sadr's counsel sent a letter reiterating the above requests. Ltr. from Baruch Weiss to Matthew Laroche et al., at 1 (Aug. 23, 2018) (Ex. T).

- On September 25, 2018, Sadr's present counsel adopted by reference all of the above requests. Dkt. 92-1, at 2-3. Counsel also made new detailed *Brady* requests, including any document or information tending to show that Sadr or anyone else "believed that any meeting, conversations, use of words, practice, or conduct that is the subject of the indictment or forms the basis of the indictment did not constitute a crime." *Id.* at p. 6, ¶¶ IV.3-4. Counsel's letter also specifically asked for disclosure of "How the government has satisfied its *Brady* obligations with respect to the purportedly non-pertinent data and documents from the search warrant returns for the non-Sadr accounts." *Id.* at 4.

- On February 3, 2020, Sadr reiterated all prior requests for *Brady* disclosure, based on the government's failure to promptly disclose Bahram Karimi's statement that he did not believe the charged payments were prohibited by the sanctions. *See* Dkt. 304-1, at

54

15-16.  Though Karimi made that statement in a January 22, 2020 interview with prosecutors, the defense did not learn of it until reading a January 31, 2020 DOJ press release announcing that Karimi had been indicted for that statement.  *See id.* at 16.[28]

- On March 8, 2020, after the disclosure of GX 411, Sadr again asked if there were other documents or *Brady* information in the government's possession that had not been produced, and attached his earlier *Brady* request.  Dkt. 280-1.

These requests were continuing in nature.  *See* Dkt. 189-1, at 2; Dkt. 92-1, at 3 n.2; Dkt. 304-1, at 15.

In light of the massive *Brady* failures that became evident during trial, the defense wrote to the government after trial reiterating its earlier requests and requesting new searches and full disclosure.  Dkt. 304-1, at 7.  The defense gave six non-exclusive examples of categories for which it appeared the government had not yet made full disclosure, demanding information regarding, among other things:

(1) any banks' awareness of links between the Venezuela Project and Iranian entities, and any banks' investigation, research, or clarification regarding the entities or facts involved in this case,

(2) OFAC's awareness of this case and its decision not to pursue enforcement;

(3) OFAC's participation in the preparation of Ted Kim's testimony;

(4) undisclosed witness statements of witnesses who either testified or were on either party's witness list;

(5) the then yet-undisclosed recording of the government's January 22, 2020 interview of Venezuela Project Manager Bahram Karimi; and

(6) information in the possession of DANY or SDNY that had not yet been reviewed for *Brady* compliance in this case.

Dkt. 304-1, at 7-13.

---

[28] *See also* DOJ, "Iranian National Charged with Bank Fraud and Lying to Federal Agents in Connection with a Scheme to Use the U.S. Financial System to Send More Than $115 Million to Iranian Individuals and Entities," Jan. 31, 2020, https://www.justice.gov/opa/pr/iranian-national-charged-bank-fraud-and-lying-federal-agents-connection-scheme-use-us (last visited April 29, 2020) (Ex. U).

### 2.      The government's rote representations of compliance

The government responded on at least seven occasions: "The Government recognizes its

obligations under *Brady* ... [and] is unaware of any *Brady* material regarding your client but will

provide timely disclosure if any such material comes to light."[29]

### 3.      The government suppressed a wealth of exculpatory information

Despite its mantra, and despite the defense's specific pre-, mid-, and post-trial requests,

the government withheld a wealth of exculpatory information going back to April 2016:

#### a.      GX 411

On March 7, 2020, a week into trial, the government disclosed for the first time that

Commerzbank flagged the first payment charged in this case in an April 2011 letter to OFAC,

highlighting the apparent connection between that payment, the "New Ojeda" Housing Project,

and Stratus International Contracting Company, based in Tehran.  *See* GX 411.  In response to

that report from Commerzbank's compliance officers, OFAC did nothing.  *See* DX 150, ¶¶ 3-4.

Both the defense and the Court understood immediately that this was exculpatory

information.  *See* Dkt. 279-1, at 2 (B. Heberlig email at 4:57 pm); Tr. 1111-12 (defense counsel

describing reaction); Dkt. 274 (March 8 letter to Court); Tr. 986, 991, 994-95 (Court colloquy).

The government did not.  *See* Tr. 986 ("Candidly, your Honor, no there was not that discussion.

The discussion was solely about how inculpatory the government viewed the document.");

Tr. 991 (Government: "[M]aybe this was just trial blinders --  THE COURT: It is."); Tr. 992

("With the benefit of hindsight, if we had thought there was *Brady* material in this, if that had

---

[29] Apr. 5, 2018 Ltr. from Gov't to Def. at 1 (Dkt. 147-1); Apr. 6, 2018 Ltr. from Gov't to Def. at 1 (Ex. P); Apr. 9, 2018 Ltr. from Gov't to Def. at 1 (Ex. Q); Apr. 24, 2018 Ltr. from Gov't to Def. at 1 (Ex. R); May 15, 2018 Ltr. from Gov't to Def. at 1 (Ex. S); Nov. 2, 2018 Ltr. from Gov't to Def. at 2 (Dkt. 92-2); *see also* Oct. 15, 2018 Ltr from Gov't to Def. at 5 (Dkt. 66-2) ("The Government recognizes, and has complied with, its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.").

56

been in our heads, we would have structured that correspondence with the defense much, much differently.").

The Court observed, "this has a bit of a tip-of-the-iceberg feeling to it."  Tr. 979; *see* Tr. 998.  The Court was right.

### b.   SAUSA Lynch's presentation of the entire case to OFAC

That evening, March 9, 2020, at 7:25 p.m., after the government rested its case, the government disclosed for the first time that SAUSA Garrett Lynch had contacted OFAC to urge OFAC enforcement in this case *in August 2016*, and that he and the then-lead AUSA on this case briefed OFAC's Enforcement Unit in *September 2017* on this case.  The prosecutors gave OFAC a PowerPoint prosecution memo setting out the government's entire case theory, and highlighting the exhibits that became the centerpieces of the government's evidence at trial.  *See* Dkt. 283, 283-1 (detailed in Section I.C.1, *supra*).  \ Despite OFAC's promised consideration of that information, OFAC again did nothing.  *See* DX 150, ¶¶ 5-6.[30]

Again, this Court observed that this was obviously exculpatory information: "All of this shows why this is *Brady*, but aside from that."  Tr. 1291.

_____

[30] This followed the midtrial disclosure of the significant exculpatory evidence that Citi had investigated a wire transfer mistakenly addressed to the Iranian International Housing Company instead of Stratus Turkey.  *See* GX 430-432.  After both PDVSA's bank and Hyposwiss confirmed that Stratus Turkey was the intended beneficiary—including the submission of documentation from PDVSA showing high-level Venezuela officials knew Stratus Turkey was receiving payments for the project (*see, e.g.*, DX 1915)—Citi cleared the wire transfer and reported nothing to OFAC despite the payment's apparent nexus to Iran.  Most importantly, these communications all occurred with no notice to or involvement by Sadr, showing conclusively that Hyposwiss was aware of and approved Stratus Turkey receiving payments due under IIHCO's contract with DUCOLSA.  The government represented that it only asked Citi for this information days before trial, and did not receive GX 432 until during trial.  Tr. 962.  The government's remarkably dilatory investigation and disclosure of these key facts deprived Sadr of the ability to address this evidence in his opening statement or seek additional corroborative evidence from PDVSA, Banco del Tesoro, Citi, or Hyposwiss, thereby compromising Sadr's ability to present a defense.

In response to the above two disclosures, (i) the government stipulated these facts, DX

150 ¶¶ 3-6; (ii) the Court struck OFAC witness Kim's testimony about "strict liability"

enforcement, Dkt. 299; and (iii) the Court gave the jury a curative instruction, Tr. 1822.  The

Court also allowed the defense to re-call Kim or another OFAC witness, *see* Tr. 1283-84, 1291,

an offer the defense declined given the government's representations that no one at OFAC had a

record of or recalled GX 411.  Dkt. 283, at 5-6; Tr. 1282-83.

### c.      The Karimi Recording

Two weeks after trial ended, in response to the defense's March 24, 2020 post-trial

request, the government disclosed on March 31, 2020 the recording of Bahram Karimi's January

22, 2020 interview, which was filled with exculpatory evidence not contained in the notes the

prosecutors previously disclosed.  *See* Dkt. 303.  Just as troubling, it also disclosed that the FBI

had possessed the Recording since February 4, 2020, and case agents in New York had it since

February 12, 2020.  *See* Dkt. 303, 303-1.  The government had previously represented on

February 3 (in a call with defense counsel), February 5 (in an email), February 23 (in an email

responding to the defense's follow-up), and March 10 (in court) that it did not yet have the

Recording and did not know how long it would take to receive it.  *See* Subsection ii, *infra*.

### i.      The substance of the Karimi Recording

The government had previously disclosed its handwritten notes of Karimi's January 22

interview.  That disclosure had come only in response to defense request, after the defense read

DOJ's press release announcing Karimi's indictment.  *See* Dkt. 304-1, at 1-5.

Once the notes were disclosed (*see* Dkt. 304-1, at 19), they revealed, on page six of the

seven pages, this 2-line statement:

> - Karimi knew about the existence of sanctions against Iran — but did not know the
>   details - did not think private companies or people were subject to sanctions at the time

Dkt. 307-1, at 44.  The government indicted Karimi for this statement.

The Recording, disclosed for the first time March 31, revealed powerfully exculpatory evidence on central issues in the case that was either obscured by cursory note-taking or omitted from the notes altogether, including:

- "What I knew about sanctions was that the government of Iran ... and [the Iranian] military and defense industries were subject to sanctions.  That was my understanding.  And the nuclear industry."  Recording B at 0:01:15-0:01:50 (Ex. B contains the cited excerpts from Recording B); *see also* Recording B at 0:07:58-0:08:19 (Karimi believed the sanctions against individual Iranians applied to individuals "related to the government").

- Karimi's forceful statement that "I had no idea whatsoever that the private sector or private companies or … the people of Iran would be subject to U.S. sanctions.  *We had no idea.  I thought the private sector and the Iranian people were not included in the sanctions.*[31]  Recording B at 0:01:50-0:02:57 (emphasis added to signify Farsi omitted by translator).

- Asked to confirm his understanding that the sanctions were "primarily focused against the government of Iran," Karimi responded, "Not primarily.  Absolutely.  100 percent.  Absolutely 100 percent on the government."  Recording B at 0:07:32-0:07:58.

- Karimi also stated, "No.  I had no idea that ordinary people would be facing restrictions as to U.S. dollar transactions … Companies, similarly.  Because it was private sector not related to the government, I had that same understanding that sanctions would not apply to that."  Recording B at 0:08:20-0:09:18.

- Karimi described the sanctions impacting his U.S.-dollar banking transactions and "the difficulty [he] faced as an Iranian" as a result of banks' de-risking.  Recording B at 0:04:35-0:05:50.  Whereas other people received money in their accounts within two days, Karimi, as an Iranian, had to answer banks' questions regarding the source of the money and what it was for, resulting in delays.  *Id.*  Karimi noted that "when they realized *that I was working for the private sector and* that I was not related to the government, then the problem would be solved.  *My understanding was that they would investigate to see if I am connected to the government or I am not, and then they would determine I was not.*"  *Id.* at 0:06:26-0:07:10 (emphasis added to signify Farsi omitted by Translator).

---

[31] Italics signify portions of the Farsi that were omitted by the translator during the interview.  Because the AUSAs and FBI agents present at the interview do not speak Farsi and did not obtain the recording before writing their notes (or indicting Karimi), the italicized statements were not known to the government or contained in their notes.

- When Karimi arrived at the project site in 2009, the company was using the abbreviation "IIHCO" openly and widely—having printed it on safety gear, hard hats, t-shirts, "on everything."  Recording A at 2:49:35-2:50:57 (Ex. A contains the cited excerpts from Recording A).

- Karimi said the Iranian government had no financial interest in the project and no interest in the "economic proceeds from the project."  Instead, Karimi said the government wanted the project to succeed for political reasons.  Recording A at 1:33:25-1:33:42.  Karimi further told the prosecutors that the company's interest in the project was its own financial interest, not the interest of the Government of Iran: "We were a commercial trading company, we had nothing to do with politics.  It was only the company interest that was important for us, nothing else."  *Id.* at 1:34:00-1:35:38.

- Asked about the Iranian ambassador's intervention when IIHCO was in a payment dispute with Venezuela, Karimi told the government that the Iranian government only "pretended to support [IIHCO], but they never [actually] supported [IIHCO's bid to get paid]."  The ambassador actually attempted to convince Venezuela to move the project to "a competitor company" that "the Ambassador had a very close relationship with," after which Venezuela ceased payments to IIHCO altogether.  Recording A at 1:21:15-1:22:36; *id.* at 1:13:51-1:14:13.

## ii.    *The government's suppression of the Karimi Recording*

Sadr requested the Karimi Recording on February 3, 2020 (Dkt. 304-1, at 15)—the Monday morning after the DOJ announced Karimi's indictment on Friday.  The government responded in a call that day, and in an email on February 5, that "we will provide you with a copy once we have it."  Dkt. 304-1, at 20 (AUSA Krouse email at 10:05 a.m.).

A month later, after the government rested, the defense had not yet received it.  Tr. 1357-58 (March 10, 2020).  The prosecutor explained to the Court:

> The FBI has requested copies of those recordings.  My understanding is that that process takes time.  It goes through, I believe the equivalent of the legal attaché up in Canada, and we don't have control over the timing of when we receive that.  As soon as we receive it, we will produce it.
>
> ....
>
> ... [A]fter we met with Mr. Karimi in Canada, the FBI agents who participated reached out to RCMP and asked for all of the recordings ....  The squad supervisor again reached out and asked again for the recordings.  Again, my understanding is that this process isn't immediate, that a foreign govern-

60

ment or foreign law enforcement agent typically doesn't produce this type of material immediately.

Tr. 1358, 1359-60.

This was consistent with what the government had told the defense on February 5 ("RCMP has not yet provided us with a copy," AUSA Krouse email, Dkt. 307-1, at 52), and February 23 ("The FBI has requested the recordings from Canada's RCMP, but we have not yet received them," AUSA Kim email, Dkt. 304-1, at 19).  But it was completely inaccurate.  In fact, the RCMP ***offered*** the Recording to the government the day after the interview (January 23, 2020).  By February 4, 2020, the FBI possessed it (in Vancouver).  The AUSAs were on the emails.  The case agents in New York received the Recording February 12, 2020.  Though one agent mistakenly told the AUSA Krouse that day that the Recording was still "in transit," the agent did not correct his misstatement after he learned later that day it had arrived, nor did the AUSAs ask again about the Recording—until March 29, 2020, in response to the defense's post-trial demand.

The January 22, 2020 interview was attended by Canadian Constable Christine Larsen. *See* Dkt. 307-1, at 49.  The next day, Constable Larsen emailed the prosecution team, "Please advise if you would like a copy of the interview recording from yesterday and advise where I should courier it to."  *Id.* (Cst. Larsen email, Jan. 23, 2020, at 1:37 p.m.) Special Agent Leigh Pond responded, "Yes, please," and gave the FBI's address at 26 Federal Plaza.  *Id.* (SA Pond email at 3:26 p.m.).  AUSA Kim and AUSA Krouse were on the email.  *Id.*

Ann Miller, an FBI Assistant Legal Attaché ("ALA") at the U.S. Consulate in Vancouver, who was also on the email, interjected, "If it is easier for you, you can give it to me and I can send it to New York.  Just let me know."  Dkt. 307-1, at 48.  Constable Larsen responded on January 24, "Yes I will courier the dvd statement to your office in Vancouver. Thank you!"  *Id.*  AUSA Kim and AUSA Krouse were on the email.  *Id.*

Thus, two days after the interview, AUSAs Kim and Krouse knew that the Canadian authorities had offered to courier the recording to the FBI, that no special process was required, and that Constable Larsen had said she would courier the Recording promptly.  Constable Larsen sent the Recording to the FBI's ALA not because it was required, but because the ALA had volunteered for the sake of convenience.

On February 6, FBI ALA Miller emailed the case agents, "I have the recording from the interview on Jan 22nd.  What is a good address to FedEx it to you guys."  Dkt. 307-1, at 47 (email at 10:51 a.m.).  Special Agent DePresco responded with the FBI's 26 Federal Plaza address.  *Id.* (SA DePresco email, at 7:53 a.m.).  ALA Miller wrote, "I just got it Tuesday," *i.e.*, February 4, "as the one she had sent over to my office never made it.  We will get it out to you guys."  *Id.* (ALA Miller email, at 10:54 a.m.).

 Thus, by February 6, both case agents knew that the FBI possessed the Recording.  From there it was a simple matter of the FBI Fedexing a package from the consulate's office in Blaine, Washington to New York.

On February 11, 2020, the Recording arrived at the FBI Field Office in New York.  *See id.* at 66 (Fedex tracking statement).

On February 18, 2020, AUSA Krouse asked SA DePresco whether the agents had received the Recording yet.  Dkt. 307-1, at 74 (AUSA Krouse email, at 12:38 p.m.).  SA DePresco, unaware that the Recording had arrived, emailed ALA Miller in Vancouver, "Did you receive the [Jan. 22, 2020] recording from Christine yet?"  *Id.* at 68-69 (SA DePresco email at 10:12 a.m. Pacific time, *i.e.*, 1:12 Eastern time.).  Without waiting for a response, SA DePresco then replied to AUSA Krouse, "It is in transit, still waiting for it."  *Id.* at 74 (SA DePresco email, at 1:13 p.m.).  Minutes later, ALA Miller responded to SA DePresco, "Yes and we sent it via FedEx.  You should have it soon."  *Id.* at 68 (ALA Miller email, 1:19 p.m.).

AUSA Krouse replied to SA DePresco, "Great, thanks!" *Id.* at 74 (AUSA Krouse email at 1:26 p.m.). AUSA Kim and AUSA Lake were on the email thread between AUSA Krouse and SA DePresco, *id.* at 74, but not the thread between SA DePresco and ALA Miller, *id.* at 68-69.

At 10:57 that evening, SA DePresco emailed ALA Miller, "Sorry leigh ann [SA Pond] got it already. I just caught up with her earlier today." *Id.* SA DePresco did not follow up to let the AUSAs know that the case agents had received the Recording, even though AUSA Krouse had asked about it earlier that day. *See* Dkt. 307-1, at 74. SA DePresco later explained that was oversight:

> Yes we [the agents] notified you on 2/18 the audio recording was in transit and realized later that day the audio recording was actually in our squad's possession, an oversight on our end. However, you never communicated to us that you would need that recording as soon as it was received. And before today, none of you ever stated to us that the Judge was told we do not have the recording. Did you notify her of this on 2/18 or sometime after and failed to follow up with us to see if we had it?

Dkt. 307-1, at 89 (SA DePresco email, Mar. 30, 2020).

On February 23, 2020, Sadr's counsel emailed the government, "We are writing to renew our request for the recording of the Karimi interview in Canada. Please let us know if we will receive it this week." Dkt. 307-1, at 80 (B. Heberlig email at 5:30 p.m.). AUSA Kim responded three minutes later, "The FBI has requested the recordings from Canada's RCMP, but we have not yet received them. Any recordings that we receive from Canada will be promptly produced to you." *Id.* (J. Kim email at 5:33 p.m.). None of the AUSAs followed up with the case agents that day, or at any time between February 18 and March 30, 2020, to learn whether the agents had received the recording. *See* Dkt. 307-1, at 89 (SA DePresco email, Mar. 30, 2020). Nor did the agents follow up with the AUSAs. SA DePresco explained:

> Additionally, I emailed you, [AUSA] Kim and [AUSA] Lake on 2/27 stating that RCMP did not record the interviews with Karimi in 2016 and none of you responded to that e-mail following up on the audio from the January 2020

> interview.  It was logical to think if you needed it, one of you would have communicated that to us at some point since you knew it was in transit over a week prior to this email.

*Id.*

Thus, when AUSA Kim told the Court on March 10, 2020 that the government had not yet received the Recording, in fact the case agents had possessed the Recording for nearly a month.  But they had not told the AUSAs, and after February 18, the AUSAs had not asked.  AUSA Kim's earlier representation to the defense on February 23 that the Recording was "in transit" was also wrong.  That was what SA DePresco mistakenly told AUSA Krouse on February 18, but after he discovered his mistake hours later, again, the agents never told the AUSAs, and the AUSAs never again asked.

AUSA Kim's suggestions to the Court that the Recording was tied up in an intergovernmental process are more problematic.  Her statements that "[i]t goes through, I believe the equivalent of the legal attaché up in Canada, and we don't have control over the timing of when we receive that," Tr. 1358, and that "my understanding is that this process isn't immediate, that a foreign government or foreign law enforcement agent typically doesn't produce this type of material immediately," Tr. 1360, were counter to the facts.  Constable Larsen in fact offered to produce the material immediately—the day after the interview, she offered the government a recording of the interview, and asked where to send it.  Dkt. 307-1, at 49.  AUSA Kim was on the email.  *Id.*

The reason Constable Larsen sent the Recording to the FBI's Legal Attaché was not because it was a required intergovernmental process.  It was because ALA Miller had offered, for convenience.  Dkt. 307-1, at 48.  She was otherwise prepared to send them to New York, as SA Pond asked.  *See* Dkt. 307-1, at 49.  This process did not "take[] time," Tr. 1358; it was done in the two days following the interview.  AUSA Kim was on the emails.  *Id.* at 48-49.

The only thing left was for the FBI in Vancouver to FedEx a package to the FBI in New York. That is not an intergovernmental process, nor is it one the U.S. government does not control. Either the AUSAs or the case agents could have sped up the process at any time, simply by sending an email or picking up a phone and asking. Indeed, "the individual prosecutor has a duty" to do just that—"to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.

Thus, there is no question that miscommunications between the AUSAs and the FBI do not excuse the government's suppression of the Recording. Since "the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles*, 514 U.S. at 439.

### d.    Statements by PDVSA Chief Financial Officer Victor Aular

On April 3, 2020, the government disclosed that a senior PDVSA CFO who approved the payments in this case came forward to the FBI in April 2016 to make clear "specifically that he had done nothing wrong." Dkt. 305-1, at 4. The executive, Victor Aular, was the official who reviewed and approved the U.S. dollar installment payments from PDVSA to Clarity or Stratus Turkey for the Venezuela project. *See id.* at 11. Aular told the government he was aware of the U.S. sanctions against Iran, and reiterated, *at least five times*, that all contracts and payments were reviewed by PDVSA's attorneys for legality before any payments were made:

- "AULAR stated that all PDVSA contracts went through internal legal review prior to any payments being made." Dkt. 305-1, at 8.

- "AULAR reiterated [from his last interview on February 19, 2016] he would always ask PETROLEOS DE VENEZUELA'S (PDVSA) internal legal team to

review contracts to ensure they were in order legally and that no violations were being committed." Dkt. 305-1, at 11.

- "Again, AULAR reiterated he had knowledge of some sanctions but all of PDVSA's operations and contracts were reviewed by its internal legal team to ensure their legality." Dkt. 305-1, at 11.

- "AULAR insisted he was aware of some sanctions but that again all payments and contracts were reviewed by PDVSA's internal legal department." Dkt. 305-1, at 12.

- "AULAR operated on the recommendations of PDVSA's legal department." Dkt. 305-1, at 14.

Aular came to the United States of his own accord, was represented by American counsel, and was interviewed twice at the FBI's New York Field Office. *See* Dkt. 305-1, at 4, 11 (302s for April 1, 2016 and April 26, 2016 interviews). The attorneys who participated in the interview were from DANY, led by Garrett Lynch. DX 305-1, at 4.

At no time between Sadr's March 19, 2018 Indictment and the government's disclosure on April 3, 2020 did the prosecution team disclose that SAUSA Lynch and the FBI had interviewed Aular, or the contents of his statements.

### e.   Commerzbank's internal documents regarding its investigation of the first charged payment

Finally (so far), on April 21, 2020, the government disclosed, among other things, a cache of 445 pages of new documents showing the internal communications within Commerzbank's compliance department that led to Commerzbank's letter to OFAC flagging the charged April 4, 2011 payment (GX 411). Among those documents is a June 22, 2011 email from OFAC responding to Commerzbank's letter, stating OFAC had received Commerzbank's letter, "and we'll be in touch if further action is required." *See* Dkt. 334-1, at 2. The full set of new disclosures also show that:

- Commerzbank was principally concerned with whether the payment was received in Iran;

66

- when it concluded that the payment was received by a Turkish company, Commerzbank withdrew its initial conclusion that the payment violated the sanctions (and affirmatively concluded it raised no money laundering concerns); and

- Sadr did not lie to Commerzbank, but instead precisely answered its questions accurately.

This evidence would have supported Sadr's understanding of the sanctions, refuted the government's argument that any payment with an Iranian nexus violated the sanctions, and rebutted the government's argument that Sadr lied to Commerzbank.

The first thing that alerted the Court and defense to a serious *Brady* problem mid-trial was the disclosure of Commerzbank's letter flagging the first charged payment to OFAC, GX 411. The defense and the Court immediately recognized its exculpatory nature, *see* Sec. I.C, *supra*. The government acknowledged it only after it was ordered by the Court to respond. *Compare* Dkt. 280-1 (government denying that GX 411 was *Brady* exculpatory), *with* Dkt. 275, at 1 ("The Government concedes that it erroneously failed to timely disclose the document at issue, and apologizes to the Court and counsel for its error.").

The government began the next day by stressing to the Court "each member of the prosecution team has gone through its files one more time to make sure there's nothing else like this, that this is the only document that relates to the case that hasn't been turned over to [the] defense, and we can make that affirmation to the Court." Tr. 976-77.

The Court, with good reason to be skeptical, asked the government directly:

> And is the representation that you've checked and there's nothing else dependent on Mr. Lynch's recall after the fact as to what may be relevant, or there's been an independent analysis of the Commerzbank documents?

Tr. 978. The government answered both questions in the affirmative:

> MR. KROUSE: Mr. Lynch went back over the weekend to his office and to the DANY offices and went through the file of the Commerzbank investigation. Most of that investigation, as I said, relates to conduct that well preceded this case, I believe it was 2002 to 2007 conduct, *and so I think in an abundance of caution we reviewed that....*

67

I will say Commerzbank, in relation to conduct in this case, related to the
single payment, so the payment that this GX411 relates to. So it's not a
situation where Commerzbank had a large role in the conduct of this case and
we would have an expectation that there would be a lot of other documents
related to this case. It was just this single transaction. *But we had made an
independent review to make sure there's nothing else that needs to be turned
over to the defense*.

Tr. 978-79 (emphasis added).

One of the strongest concerns was whether GX 411 was merely the tip of the iceberg:

THE COURT: ...  We also need—I need assurance, defense needs
assurance, as to the certainty and the carefulness and the process by which the
government has reviewed the potential relevant documents, because this has a
bit of a tip-of-the-iceberg feeling to it ....

Tr. 979; *see also* Tr. 998 ("My concern is the tip-of-the-iceberg concern. What else is there?

And I'm sure that's the defense's concern as well.").

To address that concern, the Court did not accept the government's representation that it

had already looked again (Tr. 976-78). It called the prosecutors' unit chiefs, and after those

chiefs were examined about the effect of this matter on the credibility of the U.S. Attorney's

Office, they left court and purportedly enlisted all of the AUSAs who had previously worked on

this case, to go back through their files and identify all communications they may have had at

any time with OFAC in any way related to the facts of this case and to any "decisions or actions

taken or not taken by OFAC related to the entities in this case, including the defendant, all of the

named corporate entities, and the processing banks." Tr. 1222-23; *see also* Tr. 1204-05. At the

same time, SAUSA Lynch also returned to the DANY office, to review all of his emails and

prepare a detailed chronology of his contacts with OFAC, Tr. 1223-25, which resulted in that

night's disclosures detailed above.

The prosecutors' claimed comprehensive search that the government stressed to the Court

on March 9—to "make sure there's nothing else like this, that [GX 411] is the only document

that relates to the case that hasn't been turned over to the defense"—was unsuccessful. At no

68

point between that promise and April 21, 2020—much less at any point between SAUSA

Lynch's investigation into Commerzbank and Sadr—did the government disclose, or give any

indication of the existence of, the hundreds of pages of documents related to GX 411 that it

disclosed on April 21.  Further, AUSA Krouse convinced the Court—with the defense's

acquiescence based on the mistaken view that the government could be trusted—to accept mere

"representations by the government in a letter" instead of the formal declarations by every

member of the prosecution team that the Court had originally ordered.  Tr. 1226-27 (although the

Court correctly observed, "declaration or not, there's implications to any misrepresentation ...

whether it's in a letter or declaration or orally.").

      The letter submitted by the government in lieu of the declarations did not disclose any of

the Commerzbank documents produced post-trial.  The government stated that it had just

"determined that SDNY participated in the investigation of Commerzbank based on a press

release related to the case," Dkt. 283, at 2 n.4—even though SAUSA Lynch knew that

information because he led the DANY team that conducted the joint state-federal Commerzbank

investigation.  Due to this claimed late discovery, the government had not "reviewed any SDNY

files related to the Commerzbank investigation," *id.*, which it apparently never did until

responding to Sadr's post-trial letter.  This failure led to the government to report in its letter to

the Court that OFAC had no record of receiving GX 411 and no OFAC employee was familiar

with the letter.  *Id.* at 5-6.  AUSA Krouse reiterated to the Court the next morning that "we still

are not aware of any OFAC investigation to the facts of this matter."  Tr. 1282.  These represen-

tations were flatly inconsistent with documents in the government's possession that it suppressed

until after trial.  *See* Dkt. 334-1, at 2 (June 22, 2011 email from OFAC compliance officer

responding to Commerzbank's letter, stating OFAC had received Commerzbank's letter, "and

we'll be in touch if further action is required.").

**C.** **The Suppressed Evidence Is Material:  There Is A Reasonable Likelihood That The Trial Outcome Would Have Been Different Had It Been Disclosed**

All of the suppressed evidence shown above was exculpatory.  All of it—individually and collectively—undermines confidence in the verdict.  *See Kyles*, 514 U.S. at 434.

In determining the materiality of suppressed exculpatory evidence, the Court assesses the evidence "collectively, not item-by-item."  *Kyles*, 514 U.S. at 436.  The evidence is considered in light of the entire record—both the evidence admitted at trial, the evidence suppressed until after trial, and, here, the evidence that was belatedly disclosed mid-trial, immediately before and after the government rested.  To satisfy *Brady*, of course, evidence must be disclosed "in time for its effective use at trial," *Coppa*, 267 F.3d at 135, and not merely under the wire by the day trial concludes.  *See Thomas*, 981 F. Supp. 2d at 239-40.  The Court must determine whether the suppressed evidence, collectively, undermines confidence in the verdict: that is, whether "'there is any reasonable likelihood' it could have 'affected the judgment of the jury.'"  *Wearry*, 136 S. Ct. at 1006.

Here, the wealth of suppressed evidence affected the judgment of the jury in myriad ways.  *First*, the suppression of GX 411, and of SA Lynch's having presented the entire case to OFAC's Enforcement Unit, prevented the defense from investigating those matters.  Had those issues been disclosed timely—when Sadr was indicted, since SAUSA Lynch knew those facts at that time—Sadr could have investigated OFAC's decision making, and uncovered documents and called witnesses to testify regarding why OFAC chose to do nothing despite being fully apprised of the facts of this case.  Such evidence from OFAC would have undercut the government's claims that OFAC required disclosure of what in fact was not required, that it enforced such matters strictly, and that Sadr's conduct interfered with OFAC's administration and enforcement of the law.  Sadr also could have investigated how Commerzbank investigated the first payment that led to GX 411, why it reached the conclusions it reported to OFAC, and

70

could have established the things ultimately revealed after trial (discussed in Subsection II.C.3, *infra*)—that Commerzbank believed the issue of a potential sanctions violation turned on whether the money was received in Iran, an interpretation that aligned with Sadr's interpretation of the regulations, and further that Sadr gave Commerzbank precisely the information the bank requested from him, and did not lie to the bank. This evidence would have been the centerpiece of Sadr's opening statement and a recurring theme at trial; not an afterthought at the close of the case in a dry stipulation.

*Second,* a wealth of suppressed information would have shown that Sadr's belief that his conduct was not prohibited by the sanctions was not absurd, as the government characterized it, but in fact was shared by the Venezuela Project Manager (Bahram Karimi), the PDVSA CFO and Executive Director of Budgeting who approved the payments (after having them vetted by PDVSA's lawyers) (Victor Aular), and Commerzbank's compliance officers. This would have been powerful evidence on two fundamental points about Sadr's state of mind: countering the government's unfounded claim that while the charged scheme was complex, the sanctions rule was simple; and showing the reasonableness of Sadr's beliefs, thereby supporting an inference that he held them in good faith.

*Third,* the cache of Commerzbank documents revealed on April 21 shows that Sadr did not lie to Commerzbank in response to GX 411, as the government argued. Instead, he responded precisely to what the bank asked—identifying the recipient of that payment and the country where it was organized and located. That Sadr answered the bank truthfully rather than falsely directly undercuts the bank fraud counts (and derivative prong of the money laundering count), which turn centrally on the government's claim that Sadr lied to the banks. But more broadly, it undercuts the government's entire case. The government's central theory was that Sadr lied to the banks, thereby defrauding them, inducing them to export services in violation of

the sanctions, and frustrating OFAC's sanctions enforcement.  The government countered Sadr's testimony that he acted in good faith with a broad effort to paint Sadr as a blatant liar, and GX 411 was central to that effort.  The fact that Sadr answered Commerzbank truthfully, not falsely—shown by the new Commerzbank documents—is an arrow to the heart of the government's case.

> 1.    **The government's suppression of GX 411, and the fact that OFAC did nothing after the government disclosed the entire case and urged it to enforce, undermine confidence in the verdict**

The foundation for this Court's materiality analysis is the government's late disclosures, (a) the day before it closed its case-in-chief, that Commerzbank notified OFAC that it had flagged the very first payment charged in this case as subject to monitoring in light of an apparent nexus to Iran (though *not* for a sanctions violation), and that OFAC, in response, did nothing, DX 150 ¶¶ 3-4,  and (b) the evening after it rested, that SAUSA Garrett Lynch informed OFAC of all of the facts of this case, so that OFAC could initiate its own enforcement, and OFAC still did not initiate any investigation or enforcement, *id.* ¶ 6.  As this Court observed, these issues, especially the latter, are "no small thing."  Tr. 1288.  The latter issue alone creates sufficient reasonable doubt in the mind of any reasonable factfinder to require acquittal—on all counts, but certainly at the very least on the counts that depend on a prospect of OFAC enforcement (Count One and prong one of the bank fraud counts).

But to the extent any counts survive Rule 29, these two egregious suppressions at a minimum, and for the same reasons, undermine confidence in the verdict.  They alone show that those suppressions were material, and require a new trial.

There is no doubt that they were suppressed.  The Commerzbank letter, GX 411, was in the possession of DANY, and likely SAUSA Lynch, since at least 2015.  Dkt. 283, at 3 & n.5.  SAUSA Lynch has been a member of the prosecution team since "before the case was charged,

so for the entire relevant period." Tr. 977-78; *see also* Tr. 1287.  GX 411 never saw the light of day until the government marked it as an exhibit on Saturday, March 7, and sent it to the defense without revealing that it had not been disclosed before or constituted *Brady* material.  *See* Dkt. 279-1, at 3; Tr. 990.  SAUSA Lynch's 2017 presentation of the entire case to OFAC's Enforcement Unit, with the participation of then-lead AUSA Laroche, was not disclosed until 7:25 p.m. on March 9, 2020.  Tr. 1288; Dkt. 283.  But for the government's late decision to use GX 411, it would have remained hidden to this day (and likely forever).

There is also no doubt they are exculpatory.  They were obviously so at first sight, to the defense and to the Court.  *See* Dkt. 279-1, at 2 (B. Heberlig email at 4:57 pm); Tr. 1111-12 (defense counsel describing reaction); Dkt. 274 (March 8 letter to Court); Tr. 986, 991, 994-95 (Court colloquy).  As the Court observed, "All of this shows why this is *Brady*."  Tr. 1291.

The only remaining question is materiality: whether there is any reasonable likelihood that this information could have affected the judgment of the jury.  *Wearry*, 136 S. Ct. at 1006. That likelihood is not only reasonable, but abundant, for reasons already explained (*see supra* at 10-11), and indeed obvious, *see* Tr. 1291.

It is no answer for the government to respond that these issues were disclosed during trial (the day the government rested), so they don't count.  *Brady* requires that exculpatory evidence be disclosed "in time for its effective use at trial," *Coppa*, 267 F.3d at 135, not "before the government rests."  Disclosure the day the defense is to begin is too late.  *See Leka v. Portuondo*, 257 F.3d 89, 100-01 (2d Cir. 2001) (ruling that a disclosure nine days before trial, which was twenty-three days before the defense began its case, was too late to be useful); *Gil*, 297 F.3d at 106 (finding *Brady* violation where exculpatory document was disclosed in § 3500 material the Friday before a Monday trial).

As the Second Circuit explained in *Leka*, when disclosure

73

is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired.  The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case....

Moreover, new witnesses or developments tend to throw existing strategies and preparations into disarray...  [I]t can be [difficult] to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available.

257 F.3d at 101.

Although the Court offered what slim remedies were available under the circumstances— informing the jury of the new facts through stipulation and a curative instruction, and allowing Sadr to recall Ted Kim or another OFAC witness—those remedies are not effective substitutes for what the defense could have done had the information (which the government possessed since before indictment) been disclosed to the defense in timely fashion.  "[D]efense strategies are largely formed prior to trial ..., and the necessary predicate is that the strategies were chosen after careful consideration of all constitutionally-compelled disclosure."  *United States v. Thomas*, 981 F. Supp. 2d 229, 239-40 (S.D.N.Y. 2013) (quoting *St. Germain v. United States*, No. 03-cv-8006 (CM), 2004 WL 1171403, at *18 (S.D.N.Y. May 11, 2004)).  As Sadr's counsel explained, the entire defense strategy would have been different: the defense would have opened on the very first $29 million payment, to counter the government's opening that this was an elaborate scheme that kept OFAC from stopping $115 million in payments.  That alone would have changed the complexion of the case (or the government's theory of it), and would have hugely undercut the government's credibility.  In addition, the defense's cross-examination of OFAC's witness "would have been very, very different."  Tr. 999.

Additionally, the defense would have investigated.  *See*, *e.g.*, *Leka*, 257 F.3d at 101 (noting "[t]here may be instances where disclosure of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled

74

and presented") (citation omitted).  At a minimum, the defense would have gotten discovery

from OFAC, learned who the decisionmakers were who decided to take no action, obtained their

relevant documents, and interviewed them to learn what they had to say.  (The defense takes the

position that OFAC's evidence is within the government's possession and control and is

discoverable, and the government argues otherwise.  *See* Sec. IV.B.4, *infra*.)  But if the

information had been disclosed at the outset of the case, when required, the defense would have

had time to resolve that dispute in orderly fashion—it could have moved to compel the

government to furnish OFAC responses, or it could have subpoenaed the information from

OFAC.  The accused is constitutionally entitled, under the Fifth and Sixth Amendments, to

compel the production of evidence and witnesses for his defense, and to prepare his defense

based on reasonable pretrial investigation.  *See, e.g.*, *Washington v. Texas*, 388 U.S. 14, 19

(1967).  Sadr was deprived of all of these rights by the government's decision—SAUSA Lynch's

decision—to remain silent about what he knew since 2016, well before Sadr was charged.

     The Court's offer to permit Sadr to re-call Ted Kim or another OFAC witness was not a

sufficient substitute for timely disclosure.  Kim of course had already disclaimed any firsthand

knowledge of the facts of this case or OFAC's decision making regarding any enforcement in it.

*See* Tr. 580-81.  Having him repeat his lack of knowledge would not have been productive.

Tr. 1282.  As for the possibility of another OFAC witness, calling such a witness on the fly—

when the parties (other than SAUSA Lynch) had no knowledge even of who the decisionmakers

had been or how decisions had been made—was no substitute for discovering the relevant

information in an orderly pretrial investigation and then calling the appropriate witness to give

testimony that has been prepared for in more orderly fashion than a mid-trial overnight.  *See*

*Thomas*, 981 F. Supp. 2d at 242 ("While Thomas could have recalled Jean Jacques to question

him about the description he gave [that was untimely disclosed], that ad hoc improvisation

involved substantial risks—including reinforcement of Jean Jacques's powerful testimony—but uncertain reward.  Thomas cannot be faulted for declining to engage in that perilous calculus.").

Even worse, the government had represented to the Court that OFAC had no record of receiving GX 411, no OFAC employee recalled it, and the government was not aware of any OFAC review of the matter.  Dkt. 283, at 5-6; Tr. 1282.  Thus, when the Court offered Sadr the opportunity to recall an OFAC witness, the defense had been misled into believing no one at OFAC could have provided substantive information on these issues.  In fact, the government made these misrepresentations while possessing undisclosed evidence that an OFAC compliance officer named "Leslie" had affirmatively responded to GX 411 in real time by informing Commerzbank that OFAC would follow up "if further action is required."  Dkt. 334-1, at 2.  Had the defense known this information, it would have accepted the Court's offer to compel the government to locate this OFAC compliance officer and make her available to testify.  That would not have solved the problem of such testimony being on the fly, *see Thomas*, 981 F. Supp. 2d at 242, but it at least it would have been far better than a cold and inaccurate stipulation that gave the misimpression that OFAC did not review or consider the allegations.  .

This sequence reveals precisely why no on-the-fly remedy could have put Sadr in the same position to use the belated disclosures he would have occupied if they had been timely disclosed before trial.  The suppression until the day the government rested hampered Sadr's ability to use the disclosed information in his defense.  There is more than a reasonable likelihood that the late disclosure affected the judgment of the jury, *Wearry*, 136 S. Ct. at 1006. Sadr is entitled to a new trial on the basis of the mid-trial disclosures alone.  The post-trial disclosures remove any doubt.

Even if the Court concludes otherwise based on consideration of these two pieces in isolation, they were still suppressed under *Brady*, and are part of the Court's materiality analysis

of all of the evidence on a collective, not item-by-item basis.  *Kyles*, 514 U.S. at 436.  Thus, they

form the baseline for the assessment of the other suppressed evidence that followed.

> **2.      Suppressed evidence from key IIHCO and PDVSA witnesses and Commerzbank supported Sadr's understanding of the sanctions and de-risking**

> *"The sanctions laws were not complicated....  You understand the law.  It is not complicated.  And of course the defendant understood it."*

> Prosecution Rebuttal, Tr. 2064

> *"While the defendant's scheme was complex, the rules are not."*

> Prosecution Opening Statement, Tr. 83-84

The most important issue in this trial was Sadr's knowledge and intent.  Did he act in the

good faith belief that the sanctions did not prohibit his conduct, as he testified?  If so, acquittal

was required.  Or did he know the sanctions prohibited his conduct, and conspire willfully to

violate them, and to impede OFAC's enforcement of them, as the government was required to

prove beyond a reasonable doubt for conviction?  Other issues were specific to specific counts,

but this issue was paramount across the board.

The government's core argument was that the sanctions were simple: "You will learn that

while the defendant's scheme was complex, the rules are not.  U.S. companies cannot do

business with Iran."  Tr. 83-84 (opening).  The prosecution told the jury that it would be

"absurd" for anyone in international business to be unfamiliar with the government's

interpretation of exportation of services, and that Sadr's belief that sanctions only applied to the

government and SDNs was "complete nonsense" concocted for litigation.  Tr. 1963-64.

According to the government, "the sanctions laws were not complicated," Tr. 2064, and it was

"just not possible" for Sadr to believe they did not apply to his private companies' work outside

Iran.  Tr. 2065; *compare* Tr. 1500-01 (explaining that Sadr understood the sanctions to apply to

the government of Iran, the people on the sanctions list, the military of the government of Iran, and anything related to the military or oil sectors, and that he understood the SDN list to be the red line of people not do business with); Tr. 1502 (Sadr thought that the sanctions protected private Iranians, instead of targeting them).

The government's post-trial disclosures reveal that the government suppressed multiple pieces of evidence that would have decimated its argument that the sanctions laws were so uncomplicated that it was impossible or absurd for someone in Sadr's position to have believed that the Venezuela Project payments were lawful.

*First*, the Project Manager who requested those payments, in a recorded government interview, explained at length that he believed that the sanctions applied only to the government of Iran and certain entities involved in the government of Iran's nuclear proliferation, but that the sanctions often have unintended consequences for the Iranian people. The government knew this, omitted it from the interview notes turned over to the defense, indicted the Project Manager a month before trial, and failed to disclose the recording despite the defense's repeated requests.

*Second*, the PDVSA CFO who approved the contracts and the U.S. dollar payments at issue told the government over four *years* ago that those contracts and transactions were reviewed and approved by a team of lawyers who assured him they were lawful. The PDVSA official affirmatively came forward when he learned these events were under investigation to tell the prosecutors that he did nothing wrong.

*Third*, the mid-trial disclosure of GX 411—a letter to OFAC mistakenly claiming that an April 2011 payment of $29.4 million was made to an account owned by Stratus Iran was only *part* of that exculpatory story. The rest of the story (suppressed until April 21, 2020) revealed that Commerzbank's Compliance Department understood that Stratus Turkey and Stratus Iran were two separate, but affiliated, companies. To ensure that the payment was lawful,

78

Commerzbank issued a request for information to verify that Stratus Turkey was receiving the money, not Stratus Iran.  Upon confirming that was the case, the bank did *not* classify the transaction as a sanctions violation, did *not* self-disclose a violation to OFAC, and did *not* refuse to process future transactions involving Stratus as it did with other companies on its internal sanctions monitoring list.  As Commerzbank's compliance department noted, they just needed "to ensure the funds were not received at [Stratus's] Iranian office."  Email from Donna Carbonaro to Asim (Sam) Ibrahim (Apr. 8, 2011) (Ex. C).  OFAC received the report, affirmatively responded that it would notify Commerzbank if more information or action was required, and concluded the inquiry without further action.

### a.    Project Manager Bahram Karimi

#### i.    *The government suppressed critical content of Karimi's recorded interview*

Bahram Karimi was the Project Manager of the Venezuela Project from 2009 until approximately 2014.  As Project Manager, he was a member of the Venezuela Committee, and was in charge of operations in Venezuela including overseeing Ekrem Cinar, the Legal Department, and the construction apparatus.  *See* GX 2049B.  Karimi signed approximately twenty different payment instruction letters offered into evidence by the government.  When Venezuela's banks or DUCOLSA had questions for IIHCO, those questions went through Karimi.  Karimi left Iran in 2009 and currently lives in Canada.

Karimi was interviewed by the government in Canada on January 22, 2020.  On Friday, January 31, 2020, the government indicted Karimi for "falsely stat[ing] that …. Karimi believed that international sanctions against Iran did not apply to Iranian companies or persons" during a January 22, 2020 interview (the "Interview").  Dkt. 199, ¶ 13.  The following Monday morning, Sadr requested all *Brady* information be turned over, including all notes and recordings from the

Interview.  The government produced one set of notes from the Interview, apparently taken by

AUSA Krouse, which included the following three-line snippet near the bottom of page 6 of 7:



Dkt. 307-1, at 44.  Those three lines fell far short of memorializing the exculpatory information

the government learned from Karimi.

In fact, those three lines of notes represented over *nine minutes* of recorded interview

time, from approximately 0:00:20 until 0:09:29 on Recording B.  The interview was translated to

English from Farsi in real time, giving the two FBI case agents and two AUSAs present plenty of

time to memorialize exculpatory information while the translator and Karimi spoke in Farsi.  The

government, knowing its *Brady* obligations, chose to be extraordinarily selective in fulfilling—

more accurately, failing to fulfill—them.  Its failure to write down or disclose the full content of

Karimi's exculpatory statements was not due to insufficient time or manpower.

The three lines of notes omitted substantial *Brady* information about Karimi's

understanding of the sanctions:

1.  Karimi said, "what I knew about sanctions was that the government of Iran …

and [the Iranian] military and defense industries were subject to sanctions.  That was my

understanding.  And the nuclear industry."  Recording B at 0:01:15-0:01:50.  With that

baseline, Karimi continued, "I had no idea whatsoever that the private sector or private

companies or … the people of Iran would be subject to U.S. sanctions.  *We had no idea.*

*I thought the private sector and the Iranian people were not included in the sanctions*.

Recording B at 0:01:50-0:02:57. (italics added to signify Farsi that was not translated, *see*

*supra*).

2. Asked to confirm his understanding that the sanctions were "primarily focused against the government of Iran," Karimi responded, "Not primarily. Absolutely. 100 percent. Absolutely 100 percent on the government." Recording B at 0:07:32-0:07:58. Karimi believed the sanctions against individual Iranians applied to individuals "related to the government," such as members of the government of Iran, the Iranian military, or industries where the government exerted substantial control. Recording B at 0:07:58-0:08:19.

3. In response to a question about restrictions on ordinary Iranian people or private companies being restricted in their right to use U.S. dollars, Karimi responded, "No, I didn't know. I had no idea that ordinary people would be facing restrictions as to U.S. dollar transactions … Companies, similarly. Because it was private sector not related to the government, I had that same understanding that sanctions would not apply to them." Recording B at 08:20-09:18.

These details, not reflected in AUSA Krouse's notes, reveal that Karimi shared the same understanding of the sanctions as Sadr: the sanctions prohibited transactions with designated members of the government of Iran, the Iranian military, the Iranian defense industry, and the Iranian nuclear industry. It was a reasoned belief based on the publicity surrounding of the sanctions' purposes and focus. Further, although the interview notes suggest that Karimi only held this understanding of the sanctions "at the time" of the project, in fact, AUSA Krouse concluded this line of questioning by asking whether Karimi ever changed that understanding and Karimi responded: "No. Never." Recording B at 0:09:19-0:09:26.

The interview notes also omitted information that would have supported Sadr's position that bank de-risking and the unintended effects of the sanctions harmed private Iranians:

1.   Karimi opined that the sanctions impede the day-to-day functioning of the private sector.  Recording B at 0:03:34-0:04:08 ("It is the people of Iran that is paying for the sanctions.  The government is just [going about] its usual business.").

2.   In response to a question about the effects of the sanctions on his U.S.-dollar transactions, Karimi explained:

> When money was supposed to go to other people's accounts it would go within two days.  For me, it took longer; and then they called me, they asked me what the money, why the, what the source of money was for, what was the money for and I had to answer these questions.  Yeah, and once I had answered the questions, the money would be available.  That was the difficulty I faced as an Iranian.

Recording B at 0:04:35-0:05:50.

3.   Karimi attributed this de-risking to the U.S. sanctions, and noted that "when they realized that *I was working for the private sector and that* I was not related to the government, then the problem would be solved.  *My understanding was that they would investigate to see if I am connected to the government or I am not, and then they would determine I was not.*"  Recording B at 0:06:26-0:07:10.

None of this exculpatory information was apparent from the government's sparse notes, which said only: "Had difficulty receiving his pay in dollars – took longer."  1/22/20 Gov't Notes at 6 (Dkt. 303-2).  Karimi's statements on the effects that de-risking had on him both confirmed the existence of de-risking and showed why Iranians might be reluctant to emphasize their ties with their birth country.

Four members of the prosecution team were in the room, and none of them properly memorialized Karimi's clear understanding that U.S. sanctions prohibited only transactions with the Iranian government, SDNs, and certain industries related to the Iranian military and proliferation.  All four of them again either figuratively or literally "put their pens down" to avoid memorializing Karimi's understanding that banks processing U.S. dollar transactions

would subject Iranians to additional questioning, until they determined that the Iranians were affiliated with private industry, not the government of Iran, at which point they would process the transaction.  These two facts went to the core of Sadr's defense at trial and were present only in the Recording, not in the government's misleading and incomplete snippets of notes from the most important part of the Karimi interview.

There were two other notable omissions in the government notes that suppressed exculpatory information contrary to the government's arguments at trial.  *First*, Karimi informed the government that—far from being a scheme to hide the reference to "Iran" from U.S. banks— when he arrived at the project site more than a year before the first U.S. dollar payment, people were already using the abbreviation "IIHCO" to refer to the Iranian International Housing Co. "IIHCO" had already been printed on safety gear, hard hats, t-shirts, and "on everything." Recording A at 2:49:35-2:50:57.  This rebuts the government's contrary argument at trial that Sadr was alone in seeking to use "IIHCO" and was lying about others' use of the name.  *See* Tr. 1941-42 (government closing: "This one email is crushing evidence.  It explodes Ali Sadr's made-up story on the stand that other people wanted to change the name and that he just went along with what other people wanted to do.").  And despite the prosecutors listening carefully to Karimi and even asking a follow-up question on this topic, the notes completely omit any reference to this evidence that employees used the abbreviation "IIHC" for lawful purposes unrelated to the sanctions long before Sadr even joined the project.

*Second*, Karimi rebutted a key government argument at trial that "[t]he Iranian government knew all about this project and helped IIHC and Mohammad Sadr get paid." Tr. 1964 (government closing).  The Indictment alleged—without any supporting facts—that Sadr exported financial services for the benefit of the Iranian government.  *E.g.*, Ind. ¶ 19.  Yet, when Karimi told the government that was untrue, key aspects of his comments were excluded

from the government's notes.  When pushed in the Interview, Karimi said that although the Iranian government had no financial interest in the project and no interest in the "economic proceeds from the project," the government wanted it to succeed for political reasons.  Recording A at 1:33:25-1:33:42.  Karimi continued, telling the government, "But, we always considered our own interests. … Because they didn't pay us, we suspended the work, and both parties from Venezuela and Iran were angry at us.  We were a commercial trading company, we had nothing to do with politics.  It was only the company interest that was important for us, nothing else.  They always expected me to protect the company interests and nothing else."  Recording A at 1:34:00-1:35:38.  Karimi emphasized that contrary to the government's argument at trial, the Iranian government only "pretended to support [IIHCO], but they never [actually] supported [IIHCO's bid to get paid]."  Instead, Karimi explained, the Iranian Ambassador attempted to convince Venezuela to move the project to a different Iranian company—"a competitor company" that "the Ambassador had a very close relationship with,"—after which Venezuela ceased making payments to IIHCO altogether.  Recording A at 1:21:15-1:22:36; Recording A at 1:13:51-1:14:13 (noting that the Ambassador's efforts never resulted in collecting payments).

The government's notes stated only



- To his knowledge, Iranian Gov't did not have an interest in the Venezuela project

…

- Karimi heard after the meeting (from Sataverdi, he thinks) – in person that the Ambassador proposed to move the project to ⊕ Keyson (another Iranian company)

…

- Iran wanted the project to be successful – was part of the MOU

1/22/2020 Notes at 2, 3 (Dkt. 303-2).

84

There was no mention of the Iranian government's pretenses of support, lack of actual support, the Ambassador's close relationship with IIHCO's competitor, or the resulting cessation of payments by Venezuela.[32]

<div align="center">

ii.  *Sadr would have used Karimi's suppressed interview statements at trial*

</div>

"One consideration that bears on *Brady* materiality is admissibility."  *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).  Where suppressed evidence contains hearsay, it can still be material if: (1) it is nonetheless admissible; (2) it could lead to admissible evidence; or (3) it could be "an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise," *i.e.*, impeachment.  *Id.* at 104.  If Sadr had been able to review the Recording weeks before trial, when it was requested, promised, and available, Sadr would have called Karimi as a witness or otherwise introduced his statements.  *See, e.g.*, *Mahaffy*, 693 F.3d at 132.

<div align="center">

(a)  Sadr would have called Karimi as a trial witness

</div>

Had the government disclosed the Karimi Recording when it received it weeks before trial (rather than suppressed it until weeks after trial), that would have led to admissible evidence: Sadr would have called Karimi as a trial witness.  If Karimi was unwilling to come to the United States, Sadr would have moved for permission to use live closed-circuit testimony from Canada, *see United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (affirming use of live

---

[32] This section does not contain a complete list of the government's omissions and inaccurate notes.  For example, the government's notes failed to memorialize Karimi's multiple statements that the account information letters about the bank accounts to be used due to the "current difficulties" with transactions in Euros and U.S. dollars were based on the "protocols" created by DUCOLSA and were "required" by DUCOLSA.  Recording A at 2:38:15-2:38:50, 2:41:05-2:41:30.  These suppressed statements were fully consistent with Sadr's defense that the account information letters were not part of an effort to violate or evade the sanctions; they were part of the ordinary bureaucratic protocol for getting paid.

<div align="center">85</div>

video testimony as within the discretion of the trial court on equal footing with Rule 15 depositions), or to depose Karimi under Rule 15.

The recording revealed that Karimi was a credible and consistent witness, not the vacillating liar portrayed by the government's indictment and press release.  Any claim by the government that Sadr knew enough about Karimi's statements in the interview to call him as a witness before disclosure of the Recording would be completely unfounded.  Before receiving the recording, Sadr understood from the government's pretrial comments that (1) Karimi had previously admitted in a 2016 interview that "everyone associated with Stratus and the project in Venezuela" understood that the Iran sanctions prohibited the U.S. dollar payments at issue and intentionally "circumvent[ed] those sanctions," Dkt. 307-1, at 2 (6/16/2016 302, at 5), and (2) Karimi's contrary statements in this abbreviated Interview were so incredible that the government cut the interview short and returned a federal indictment within nine days, without even waiting for a copy of the recording of the statements.[33]  Thus, Sadr erroneously believed that Karimi would have been an ineffective witness because the government could have used Karimi's purportedly inconsistent statements to destroy his credibility, and could arrange for the

---

[33] The prosecutors' haste in indicting Karimi—less than two weeks before Sadr's final pretrial conference, without conducting any of the basic due diligence that would typically accompany a false statement charge—suggests the government was motivated by a desire to keep Sadr from calling Karimi as a witness.  The prosecutors indicted Karimi before obtaining the Recording; before obtaining any 302 of the January 2020 interview, or waiting for one to be prepared; before ascertaining whether either of Karimi's 2016 interviews were recorded; before reviewing the 302 from Karimi's September 2016 interview; and (possibly) before they received the 302 from Karimi's June 2016 interview.  *See* Dkt. 307-1 Ex. H (PDF pp. 57-59), Ex. I (60-61).  The prosecutors did not even wait to see whether Karimi's January 2020 statements were translated accurately.  Karimi spoke through his own private translator during the January 2020 interview.  Without reviewing the Recording, the prosecutors could not verify the accuracy of the translation, yet they did not wait for the in-transit Recording to arrive.

The government took no steps to advance the Karimi case in the weeks between Karimi's indictment and Sadr's trial.  Nor, to our knowledge, have they taken any such steps since Sadr's trial concluded.  This lack of any action in Karimi's case—other than charging him—is fully consistent with a motivation to keep him off the stand.

use of a recording to impeach Karimi with his own voice.  In reality, the Karimi recording revealed that he is a credible, reliable witness, and provided context showing that the government's previous summaries misrepresented Karimi's prior interviews.

The FBI 302 of Karimi's June 16, 2016 interview states: "Everyone associated with Stratus and the project in Venezuela recognized the international sanctions placed on Iran but believed that circumventing those sanctions was a matter of survival" because Stratus "needed to be able to conduct business in U.S. dollars."  Dkt. 307-1, at 12 (6/16/2016 302, at 5).  If true, this prior statement would directly contradict Karimi's statements in the Interview and undermine his credibility.  The reality, however, appears much different.  The above statement comes not from a recording, but from an FBI 302 completed more than two weeks after the 2016 interview.  The interview was conducted by two FBI agents, two DANY ADAs including SAUSA Lynch, and two Canadian Constables, but without the presence of defense counsel or a translator.  The government's contemporaneous rough notes of the June 16, 2016 interview state:



Karimi was likely asked in the June 2016 interview why they got paid in U.S. dollars and

responded that it was necessary to sustain the project.  This similar exchange took place in the

2020 Interview:

> AUSA Kim: Okay, so you said the original contracts were for payment in U.S.
> dollars?  … Was there a reason for that?
>
> Karimi: [Farsi]
>
> Translator: Well it was an international agreement and international trade is
> based on U.S. dollars.  Neither rial nor bolivar are stable currencies.  They are
> subject to a lot of fluctuation.  The day I entered [Venezuela]the exchange rate
> of a bolivar and dollars was 2.6.  But when I left it was 1 to 80; one dollar for
> 80 bolivars.  How could you possibly sustain a contract with such a currency?
> It's impossible.

Recording A at 2:08:05-2:09:25.  In other words, Karimi explained that they had to get paid in

U.S. dollars *instead of bolivars* because it would have been impossible to sustain the contract in

bolivars.  The government, attempting to memorialize a likely similar exchange in the June 2016

interview, appears to have extrapolated from Karimi's statements, and attributed back to him, the

view that circumventing the sanctions was a matter of survival.  The Recording clarifies that

*avoiding payment in bolivars* was the matter of survival for the project—violating the law was

not.  Indeed, the contract payments could have just as easily been made in Euros or any other

hard currency that did not fluctuate like the bolivar.

In 2020, Karimi believed that he had told the same truth in 2016 that he was telling the

government then.  *See* Recording A at 0:06:13-0:06:53 ("[In 2016] I told them I would be

completely honest and I have nothing to hide regarding this project. And I said I would be

available to provide any further information if they need so and still I have nothing to hide.");

Recording A at 0:19:22-0:19:35 ("Absolutely.  I cannot lie nor do I have any reason to lie.").

The government could easily have confronted Karimi with his supposedly inconsistent

statements from 2016.  But that would have provided Karimi with the opportunity to clarify and

reveal that the government's summary of those statements was inaccurate at best.  The

government's decision not to ask these basic questions calls into even greater question the reliability of the statements from the 2016 FBI 302.  In court, with Karimi's testimony translated before them in real time, and able to see Karimi's demeanor, the jury likely would have credited Karimi's testimony over a questionable, second-hand summary prepared by the government.

Finally, Karimi's integrated description of the sanctions, in contrast to the cherry-picked snippet in the government's notes, would have provided jurors with a reason to doubt the veracity of the government's version of his 2016 statements and any allegation that his testimony was incredible.

(b)    Alternatively, Sadr would have offered the Recording into evidence

If Sadr were unable to obtain Karimi's testimony at trial (through video link testimony or a Rule 15 deposition), Sadr would have introduced the Recording into evidence, under Federal Rule of Evidence 807, because (1) Karimi's sincere belief that the sanctions did not apply to private companies and citizens is self-evident and corroborated, and (2) the recording is the best evidence available of Karimi's perception of the law.

Rule 807 makes admissible a statement otherwise violative of the hearsay rule if the statement is (1) "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a).[34]

Karimi's January 2020 statements contain multiple indicia of trustworthiness and are, therefore, sufficiently reliable to be admitted under Rule 807.  To start, the prosecutors spent the

---

[34] The Rule also requires that the proponent of the statement have given reasonable notice of the intent to offer the statement.  *Id.* § 807(b).  Sadr would have given such notice upon hearing the Recording and learning its contents and reliability.  Such notice was made impossible by the government's suppression of the Recording.

first 25 minutes of the 2020 voluntary interview discussing with Karimi the need to be truthful and reviewing the proffer agreement he executed (which was not mentioned in the notes or produced to Sadr).  The prosecutors informed Karimi that his statements could be used against him if he lied and that "the only way you can get in trouble in this meeting is if you don't tell the truth."  Karimi responded, "Absolutely.  I cannot lie nor do I have any reason to lie."  Recording A at 0:18:48-0:19:30.  These warnings and Karimi's acknowledgments are a strong indicator of trustworthiness.  *United States v. Int'l Bhd. of Teamsters*, 964 F.2d 1308, 1312-13 (2d Cir. 1992) (hearsay statement was reliable because, *inter alia*, declarants "faced possible criminal sanctions for making false statements").

Further, during the course of the interview, Karimi openly implicated himself in conduct that he knew the prosecutors alleged to constitute a violation of international sanctions.  *E.g.*, Recording A at 2:03:15-2:08:20. (describing his role as a member of the Venezuela Committee and personal responsibility for negotiating the currency change in the Addendum); Recording A at 2:11:00-2:12:37 (describing how Karimi and his management team were paid for their work on the project in U.S. dollars).  "[R]easonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  *Williamson v. United States*, 512 U.S. 594, 599 (1994).

Last, Karimi's statements in the January 2020 interview regarding his understanding of the sanctions are corroborated by the testimony of Ali Sadr and Farshid Kazerani that neither of them knew that they were violating the sanctions.  *See* Fed. R. Evid. 807(a0)(1).  Corroborated statements made under threat of criminal prosecution if false are sufficiently reliable.  *Teamsters*, 964 F.2d at 1312-13.

There is no serious dispute that the recording, if admitted for its truth, represents probative evidence of a material fact crucial to Sadr's defense that Sadr was unable to obtain

elsewhere.  Fed. R. Evid. 807(a)(2).  The Recording directly corroborates Sadr's understanding of the sanctions and rebuts the government's claim that Sadr's testimony was an absurd story concocted for litigation.  The government's suppression of *Brady* information and grossly incomplete notes of Karimi's statements, and ultimately its hurried indictment of Karimi (without extraditing him), kept Sadr from offering any similarly probative evidence at trial.  The Recording would have been admissible under Rule 807.

Because it is trustworthy and the best available probative evidence regarding the common understanding within the Venezuela Project of how the Iranian sanctions applied, the recording of Karimi's January 2020 interview would have been admissible under Rule 807.

<div align="center">(c)    Sadr also could have used the Recording to impeach<br>Karimi's co-conspirator statements</div>

If Karimi refused to testify or be deposed, and the Court did not admit the recording under Rule 807, then Sadr would have offered the recording under Rule 806 to impeach the co-conspirator statements of Karimi admitted at trial.  The government relied on Karimi's alleged intent to violate the sanctions to qualify him as a co-conspirator, and to admit his statements in the account information letters and emails regarding dealings with DUCOLSA.  The government argued in closing that Karimi was a co-conspirator who "worked closely with" Sadr to "set[] up those front companies," Tr. 1935, that Karimi signed letters intended to communicate "due to sanctions, they have set up a Turkish front company to receive the money," Tr. 1948, and that Karimi sent "dozens of e-mails" in which he "talk[ed] openly about sanctions, and where [he] discuss[ed] their strategy for getting around those sanctions."  Tr. 1974.  The Recording reveals that the government mischaracterized Karimi's intent and his understanding of the purpose of the account information letters.

Prior statements of a co-conspirator declarant that are "inconsistent with the existence of any conspiracy at all" are "for that reason … inconsistent with [the declarant']s co-conspirator

statements" and admissible for impeachment purposes as if Karimi had testified, under Rule 806.
*United States v. Grant*, 256 F.3d 1146, 1154-55 (11th Cir. 2001).  "To render … statements
inconsistent for purposes of Rule 806, it [i]s enough that excerpts from [an] FBI interview varied
from his earlier [hearsay] in a manner such that they cast a different meaning on [the subject]."
*United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018) (vacating conviction).  Karimi's
statements that the U.S. sanctions did not apply to private Iranian companies unaffiliated with the
government and did not apply to the Venezuela project rebutted the government's suggested
inference from the documents (a conspiracy to evade the sanctions through those payments) and
are therefore admissible under Rule 806.  At a minimum, Sadr would have used the Recording to
rebut the argument that Karimi's communications, upon which the government's case so heavily
relied, were made in furtherance of a conspiracy to violate the sanctions.

### b.       PDVSA Chief Financial Officer Victor Aular

Victor Aular, the PDVSA Chief Financial Officer and Board Member who approved the
U.S.-dollar payments to Clarity or Stratus Turkey, Dkt. 305-1, at 11, told SAUSA Lynch and the
FBI in no uncertain terms that PDVSA's contracts and payments for the Venezuela Project had
been vetted by PDVSA's lawyers for sanctions compliance before approval.  Aular further told
SAUSA Lynch and the FBI that PDVSA's "principle currency was [] U.S. dollars," which would
have supported Sadr's argument that PDVSA made the decision for the contract to be in U.S.
dollars; it was not IIHCO's prerogative.  Dkt. 305-1, at 8.  Aular came forward to the FBI on his
own, and flew to New York to speak with them, to specifically inform the government that by
approving PDVSA's payments to Clarity and Stratus Turkey, Aular had nothing wrong.  Dkt.
305-1, at 4.

The Aular 302s are exculpatory on their face: they support the reasonableness of Sadr's
testimony that he understood the Venezuela project payments were not prohibited by the Iran

sanctions.  Though the government repeatedly argued to the jury that the sanctions were so simple that it was impossible for someone in Sadr's position to have believed the payments were lawful, Aular's April 2016 statements to SAUSA Lynch and the FBI showed that the most senior PDVSA finance executive responsible for approving the payments shared Sadr's understanding, not the government's: that despite the existence of the sanctions, the payments were entirely proper.  Aular directed PDVSA's attorneys to review the contracts and payments to ensure they did not violate the sanctions, and made sure that review was completed "prior to any payments being made."  Dkt. 305-1, at 8.  Based on that review by PDVSA's legal counsel, Aular insisted that in approving the payments he had done nothing wrong.  *Id.* at 14.

The government—both the FBI, which interviewed Aular at the New York Field Office, and SAUSA Garrett Lynch, a member of this prosecution team—have known of Aular's statements since April 2016.  Those statements were obviously exculpatory information that should have been disclosed immediately after Sadr was indicted in March 2018, both under the prosecution's independent duty to disclose irrespective of request, *see Kyles*, 514 U.S. at 432-33, and certainly in response to Sadr's prior counsel's discovery demand on April 3, 2018.  Dkt. 189-1, at 4-5 (requesting *Brady* material including evidence that would tend to demonstrate lack of willfulness); *see United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) ("*Brady* material must be disclosed in time for its effective use at trial.").

Moreover, Aular's role could not have escaped the prosecutors' attention during this trial. SAUSA Lynch introduced GX 430 during his examination of Citi witness Peri, which reflected correspondence from PDVSA's bank, Banco Espirito Santo, to Citi clarifying that Stratus International Contracting JS (Stratus Turkey), not the Iranian International Housing Co., was the correct beneficiary of a $87,141.67 payment related to the Venezuela project.  (Sadr admitted a translated version as DX 1915, *see* Tr. 915).  The exhibit included a payment instruction letter to

Aular from the head of Venezuela's Department of Housing and Urban Development, approving the payment.  *See* DX 1915, at 2-3.  SAUSA Lynch even directed Peri to the relevant (untranslated) page during his examination but asked no questions about the author or recipient (Aular).  Tr. 892.  On cross, Sadr's counsel directed Peri to the letter and observed that it was addressed to Victor Aular, with the title "director of PDVSA."  Tr. 916.  Peri did not know the significance of that title, Tr. 916, and counsel moved on.  All the while, SAUSA Lynch sat silent, not disclosing what he knew about Aular's statements that the payments were proper and vetted by PDVSA's lawyers.

Had the government made timely disclosure, Sadr would have sought Aular's testimony at trial.  Aular was represented by U.S. lawyers in his government interviews, and Sadr's counsel would have sought Aular's cooperation to appear as a trial witness.  Upon learning that PSDVA was under investigation for its dealings with Iran, Aular decided to "come in" and appear for his government interviews voluntarily "to clarify his actions and specifically that he had done nothing wrong."  Dkt. 305-1, at 4.  Aular may well have agreed to testify if asked to clarify that DUCOLSA and PDVSA did nothing wrong in this case.  If Aular declined to appear voluntarily, Sadr's counsel would have attempted to serve him with a Rule 15 subpoena through the letters rogatory process.[35]  *See United States v. Salim*, 855 F.2d 944, 948-49 (2d Cir. 1988); *United States v. Korogodsky*, 4 F. Supp. 2d 262, 265 (S.D.N.Y. 1998).  Likewise, Sadr would have sought documentary evidence from PDVSA about the payment approval process through the letters rogatory process.  *See United States v. Hoskins*, Crim. No. 3:12-cr-238 (JBA), 2015 WL 4874921, at *5 (D. Conn. Aug. 14, 2015).

---

[35] Preparation of Letters Rogatory, Travel.State.Gov, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html.

Admission of Aular's testimony—the testimony of PDVSA's senior finance official responsible for approving the payments—would have dramatically supported the reasonableness of Sadr's belief that the payments did not violate the sanctions, and would have strongly undercut the government's claim that the sanctions were so simple that anyone connected to any of the payments would have known otherwise. The government's suppression of Aular's statements—when SAUSA Lynch had known for years what he said—easily and reasonably could have affected the jury's judgment. *See Wearry*, 136 S. Ct. at 1006.

### c. Suppressed documents from Commerzbank's compliance department

At trial, the government argued that Commerzbank's letter to OFAC (GX411) was "devastating proof of guilt" showing that Commerzbank wanted to know if "Iran was behind" the April 4, 2011 payment or if the payment was "connected to Iran," and that Sadr's response to the inquiry prevented Commerzbank from concluding that the payment violated the sanctions. Tr. 1955. The government highlighted the language from GX 411 that Commerzbank decided "to share this information with OFAC since Stratus may be an Iranian company"—with the obvious implication that Commerzbank believed the payment would have violated the sanctions if Stratus was connected to Iran. *Id.* In reality, the suppressed Commerzbank compliance documents reveal that at least some members of Commerzbank's compliance department knew that Stratus International Contracting J.S. in Turkey and Stratus International Contracting Company in Iran were separate but related companies, and nonetheless concluded that the April 4, 2011 payment from PDVSA to Stratus Turkey neither violated the Iran sanctions nor involved money laundering. Moreover, Commerzbank's conclusion was based on the determination that no funds went to Iran, the same understanding of the Iran sanctions shared by Sadr.

*First*, the undisclosed Commerzbank documents reveal that the bank initially believed that the payment violated the sanctions based on a mistaken assumption about the beneficiary,

but changed its view when it identified the correct information.  Specifically, the second draft OFAC letter in the suppressed documents, dated June 9, 2011,[36] reveals that Commerzbank *initially* intended to report that the April 4, 2011 payment "indicated an OFAC violation," because Commerzbank had misidentified the name of the beneficiary as "Stratus International Contracting Company" (and not "Stratus International Contracting J.S.") and therefore mistakenly believed that the beneficiary was *located in* Iran.  Email from Neda von Rimon-Lipinski to Vinay Jepal (June 9, 2011) (Ex. H).

The next draft OFAC letter contained in the suppressed Commerzbank documents, dated June 13, 2011, included the correct beneficiary name of "Stratus International Construction J.S.," and removed the language that the payment "indicated an OFAC violation."  *See* Ex. I. Importantly, all subsequent versions of the OFAC letter, including GX 411, omit any representation that the payment violated the sanctions even though Commerzbank assumed there was a connection between the Iranian and Turkish companies using the Stratus name.  *See* Ex. J (another June 13 draft), Ex. K (June 14 draft), Ex. L (June 16 draft), Ex. M (June 20 transmission to OFAC Compliance).

*Second*, the suppressed Commerzbank documents also reveal powerful exculpatory evidence that Commerzbank compliance personnel shared Sadr's view that the sanctions did not prohibit payments received outside Iran.  In closing, the government argued that in its request for information about the April 4, 2011 payment, Commerzbank "want[ed] to know is Stratus Turkey owned by Iranians, were these payments for services provided by Iranians?  That's the question."  Tr. 1952.  But the suppressed documents reveal that Commerzbank was actually focused on ensuring the funds were not received in Iran.  Specifically, on April 8, 2011, a Commerzbank compliance officer sent an email to a colleague stating:

---

[36] The first draft OFAC letter is not contained in the government's April 21 production.

> Rey Duma brought an alert to my attention in which the beneficiary, Stratus
> International Contracting, is a construction company headquartered in Iran. On
> the wire, no address was provided for Stratus International, which is banking in
> Switzerland. The company does have other branches outside of Iran. I'm
> thinking we should send an RFI to ask for the address of Stratus *to ensure the*
> *funds were not received at their Iranian office.*

*See* Email from Donna Carbonaro to Asim (Sam) Ibrahim (Apr. 8, 2011) (emphasis added) (Ex.

C).  In other words, a compliance officer at a major international bank—reviewing one of the

charged payments in real time with the mistaken belief that the beneficiary was Stratus Iran—

believed, like Sadr, that a payment to a company headquartered in Iran would only violate the

sanctions if it was physically received in Iran.  That is powerful, objective evidence that would

have supported the reasonableness of Sadr's interpretation of the Iran sanctions and contradicted

the government's claim that the Iran sanctions were simple to understand.

 *Third*, the suppressed documents reveal that Commerzbank's manual screening list did

not require all transactions involving Stratus International Contracting to be returned or

cancelled.  For some parties on the list, Commerzbank required all transactions to be returned

with a notation: "Due to internal compliance risk decisions, Commerzbank is unable to process

this transaction."  Email from Vinay Jepal to Stefan Hofmann et al. (June 16, 2011) (Ex. O).

Other parties had notations to "cancel/return" transactions or flagging that transactions were

"rejectable."  *Id.*  The fact that Stratus had no such notation supports the conclusion that

Commerzbank did not believe all transactions with Stratus International Contracting violated the

sanctions despite its known nexus to Iran.

 *Fourth*, the suppressed documents also reveal that Commerzbank concluded that the

April 4, 2011 payment did not involve any money laundering.  Banks with offices in the United

States are required to report suspicious payments that potentially involve money laundering.  We

now know that Commerzbank reviewed the April 4, 2011 payment for possible money

laundering issues, and determined there were none.  *See* Ex. G (May 19 email from

97

Commerzbank compliance officer stating: "The alert [relating to the April 4 payment] has been cleared as there are no AML issues").  This contemporaneous evidence would have supported Sadr's good faith belief that the payments did not involve money laundering.

Had the government timely disclosed the Commerzbank information, the defense would have been able to subpoena relevant information from Commerzbank, both documentary evidence and trial testimony, in the orderly course of pretrial preparation.  Commerzbank has a New York location, and would be subject to subpoena power under Rule 17.  Sadr would have called the compliance officers identified in the exculpatory documents as trial witnesses. Because the government suppressed this evidence, however, Sadr had no knowledge of it or ability to assess it before trial and use it to obtain admissible evidence.  *See Leka*, 257 F.3d at 101 ("The limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation.  When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired."); *Thomas*, 981 F. Supp. 2d at 239-40 ("The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought.").

### 3. The suppressed Commerzbank documents supported Sadr's defense against the bank fraud charges

#### a. The additional Commerzbank documents refute the government's claim that Sadr lied to obtain $29 million

Had the government not suppressed the additional Commerzbank documents, Sadr would have used them to refute the government's claim that he obtained $29 million by lying to Commerzbank.  The government's rebuttal argument described GX 411 as "devastating" evidence of Sadr's guilt:

> And this brings us to Government Exhibit 411. This is the bank letter to OFAC
> flagging its concerns with the defendant's company's connections to Iran. As
> Mr. Krouse told you earlier, this document is devastating for the defendant.  It

> shows you exactly how his deception worked. The defendant lied to this bank,
> to Commerzbank. This is in Government Exhibit 2032T and A. He concealed
> the fact that IIHC was domiciled in Iran, incorporated in Iran, and run from
> Iran.  And because of those lies, the bank processed a transaction worth $29
> million. That's bank fraud. That's sanctions abuse.  And that's what
> Government Exhibit 411 shows you, that the defendant's scheme worked. And
> after the payment went through, the bank wrote to OFAC. The bank admitted,
> we processed this transaction for Stratus. We saw from the Stratus website that
> the company is Iranian. We followed up with the company. And what did they
> learn? The defendant lied. He denied that the company was Iranian.

Tr. 2061; *see also* Tr. 1953-54 (closing).  The suppressed Commerzbank documents show that

the government's characterization of GX411 was false and misleading for the following reasons.

*First*, Sadr did not conceal from Commerzbank that "IIHC was domiciled in Iran,

incorporated in Iran, and run from Iran," because Commerzbank did not ask for that information.

Instead, the suppressed documents show that Commerzbank, upon initially mistakenly conclud-

ing that the beneficiary was Stratus International Contracting headquartered in Iran but having

"other branches outside Iran," decided to send a request for information "to ask for the address of

Stratus to ensure the funds were not received at their Iranian office."  *See* Ex. C (Apr. 8, 2011

email from Commerzbank Compliance); *see also* Ex. D (Commerzbank Compliance Alert

Narrative: "an RFI will be sent to ask for the address of the beneficiary, Stratus International

Contracting").  Sadr's response that Stratus International Contracting J.S., the beneficiary of the

payment, was domiciled in Turkey at an Istanbul address was accurate and responsive.

*Second*, the suppressed Commerzbank documents refute the government's argument that

GX411 shows that Commerzbank processed the $29 million wire transfer and then "saw from

the Stratus website that the company is Iranian."  Although initially confused, Commerzbank

realized before sending GX411 to OFAC that the beneficiary of the $29 million payment was not

the Iranian company it had mistakenly identified from "the Stratus website" and that the correct

beneficiary was Stratus International Contracting J.S.  *Compare* Ex. H ("2nd draft" letter to

OFAC stating "the beneficiary customer Stratus International Contracting Company, client of the

99

beneficiary institution Hyposwiss Privatbank AG, Zurich") *with* Ex. I ("final Draft" letter to OFAC stating that the "[b]eneficiary of the payment was Stratus International Contracting J.S. a client of Hyposwiss Privatbank AG, Zurich") (emphasis added).  However, for reasons not explained in the documents produced on April 21, the letter emailed to OFAC on June 20, 2011 (GX411) reverted back to misidentifying the beneficiary as "Stratus International Contracting Company," which it referred to as "Stratus," and falsely stated that the response to its RFI indicated that "Stratus" is located and registered in Turkey.  *See* GX411 and Ex. M.  Because GX 411 was the only version available at trial, these errors allowed the government to argue that Commerzbank believed that the beneficiary of the April 4 payment was "Stratus International Contracting Company" (or "Stratus") located in Iran and that Sadr misled Commerzbank by claiming that "Stratus," the same name as the Iranian company, was located in Turkey.[37]  The government would have been prevented from misleading the jury by repeating the mistakes contained in GX 411 if it had not withheld the additional Commerzbank documents from Sadr.

*Finally*, the suppressed Commerzbank documents also show that, contrary to the government's claim, GX411 does not prove that Sadr lied to Commerzbank by denying that "Stratus" was Iranian.  Commerzbank wanted Sadr to confirm the location of the "beneficiary" listed in the April 4, 2011 wire transfers.  *See, e.g.*, Ex. E (email chain re RFI).  The beneficiary was, in fact, Stratus International Contracting J.S., a Turkish, *not Iranian*, company.

> **b.** **The suppressed Commerzbank documents provide additional evidence that the banks were not at risk of violating the Iran sanctions**

After disclosing GX411 mid-trial, the government repeatedly represented to the Court that OFAC did not do *anything* in response to the Commerzbank letter regarding the April 4,

---

[37] Sadr informed Commerzbank that Stratus International Contracting J.S. was located and registered in Turkey (*see* Ex. F at 6-7), a true statement that Commerzbank appeared to understand, as evidenced by multiple draft letters to OFAC.  *See* Ex. I, Ex. J, Ex. K.

2011 payment, implying that OFAC may not have seen or simply ignored the letter. *See, e.g.*, Tr. 1004 (the government representing it was not aware of OFAC doing "anything with this letter, that there is any investigation open or anything like that") *and* Tr. 1005 (the government stating that "our strong suspicion is, as OFAC has -- that OFAC did nothing with this letter"). The government also represented to the Court that OFAC had no record of receiving GX 411, and that no OFAC employee recalled it. Dkt. 283, at 5-6.

Based on those representations, Sadr agreed to a stipulation that, in part, states: "Upon receiving [the letter from Commerzbank], OFAC did not open an investigation into the April 4 payment to determine, among other things, whether or not Stratus Turkey's association with Stratus Iran would have rendered the April 4 payment an export of U.S. services in violation of the Iran sanctions. OFAC also did not seek any enforcement action against any of the parties, including the banks, that participated in the April 4 payment." *See* DX 150. But once again, the stipulation turns out to be misleading: the suppressed Commerzbank documents include exculpatory evidence that OFAC in fact *received and reviewed* the April 4, 2011 before making an affirmative, informed decision not to pursue the matter. OFAC's review appears to have been a form of internal "investigation," contrary to the stipulation Sadr agreed to with only half the story.

### 4. The number and cumulative effect of the government's violations likely would have affected the judgment of the jury

Apart from the substance of any individual violation, the sheer number of the government's disclosure violations, on a variety of topics, would have had an effect on the jury's evaluation of the case—both by raising doubts about one government contention after another, and by calling into question the very credibility of the prosecution as a whole.

It is one thing to show doubt about the testimony of one witness, or the meaning of one document, or the effect of evidence rebutting one key argument in the government's case. Such

is the stuff of usual *Brady* cases, either successful or unsuccessful.  It is quite another to confront

one violation after another, one late-disclosed or undisclosed piece after another, that undercuts

element after element of the government's case.  The multiple, independent, violations here

undercut the government's case on: (1) the likelihood of OFAC enforcement against the U.S.

banks, and consequent economic harm to those banks; (2) whether Sadr's conduct mattered to

OFAC, and thus whether it interfered with OFAC's administration or enforcement; (3) whether

others shared Sadr's understanding that the sanctions did not reach IIHCO's private construction

work outside of Iran, and getting paid in dollars if the money was kept out of Iran (which showed

the reasonableness of such belief, counter to the government's argument that such belief was

"absurd" and "not possible"); and the fundamental, cross-cutting issues of (4) whether Sadr lied

to the banks; (5) whether he intended to defraud them and OFAC; (6) whether he knew his

conduct violated sanctions and intended to do so; or (7) whether he acted in good faith.  The

cumulative effect of so much doubt makes it impossible to conclude that there is no reasonable

likelihood this could have affected the judgment of the jury.  *See Kyles*, 514 U.S. at 453-54.

The jury would also have been given pause by repeated revelations that the government

had violated its obligations, or advanced arguments while hiding contrary evidence, over and

over again.  The jury saw two such violations during this case (GX 411, and SAUSA Lynch's

briefing of OFAC), on which it received one combined stipulation, and one combined curative

instruction.  Post-trial revelations show that the government's multiple acts of suppression kept

the jury from learning of at least another three (so far) (the Karimi Recording, the statements of

Victor Aular, and Commerzbank's investigation and internal deliberations regarding GX 411).

Five *Brady* violations and counting, in a government case-in-chief that lasted only five days.

This is beyond the tipping point at which a reasonable jury would conclude that this bore

on the credibility and good faith of the prosecution team itself, and add that concern to the

"reasonable doubt" side of the scale.  *See Kyles*, 514 U.S. at 445, 446 (noting that revelations of suppressed evidence may cause a jury to doubt "the thoroughness and even the good faith of the investigation, as well," and that it is common and legitimate for the defense "to discredit the caliber of the investigation or the decision to charge the defendant, and [courts] may consider such use in assessing a possible *Brady* violation").  The jury's evaluation of credibility is not limited to witnesses who take the stand.  The jury also judges the credibility of the arguments put before it, and the credibility of those who make those arguments, based on whether the evidence supports them.  Repeated disclosures that the government had suppressed evidence contradicting its case would raise a reasonable doubt about whether the government was telling the truth.

Both of these effects—doubt about the government's case, and doubt about the government's credibility—are reinforced by the thinness of the government's trial presentation. In most prosecutions, the government presents multiple witnesses who recount the facts of the case, and in most *Brady* challenges, an essential question is whether, after one witness or piece of evidence has been discredited, the government's case still holds up in light of the testimony of other witnesses.  Here, the government called only one fact witness, Farshid Kazerani, who gave limited testimony about the Venezuela Project and identified the players.  *Not a single witness with knowledge described any wrongdoing associated with the Venezuela Project*.  Instead, the government put in a paper case—admitting the rest of its evidence through paralegal readers and hearsay exceptions.  While it did so, it knew it was concealing a wealth of information about exculpatory information from others whom it did not call.

We do not know, given the record so far, what else is out there.  There is no reason to have confidence in any assurance that "this is it," in light of past assurances.  *See* Tr. 976-77 (making the "affirmation to the Court" that "there's nothing else like this, that this is the only document that relates to the case that hasn't been turned over to [the] defense"); Tr. 978-79

(representing that SAUSA Lynch "went through the file of the Commerzbank investigation," and the prosecution "made an independent review to make sure there's nothing else that needs to be turned over to the defense"); Tr. 982 ("THE COURT: Fool me once."). We are at the point where the cumulative effect of revelation upon revelation, violation upon violation, makes it impossible to say that there is no reasonable likelihood that the violations affected the trial result.

### 5. The government's suppressions kept Sadr from obtaining a mistrial

There is one certain and concrete way that the government's suppressions changed the outcome of the trial—they kept the defense from obtaining a mistrial. On the final day of deliberations, when two jurors did not appear due to illness issues potentially related to COVID-19, a mistrial was all but guaranteed if the defense wanted one. Under Rule 23(b)(3), the Court could not have ordered the trial to proceed without Sadr's stipulation, as the Court and the government acknowledged. *See* Tr. 2103-04. At that point, a mistrial was not a matter of uncertainty or discretion. Indeed, the government *had moved for a mistrial. See* Tr. 2105. All Sadr had to do to obtain a mistrial was decline to proceed with ten jurors and agree with the government's motion. *See id.*[38]

Sadr's decision to proceed was based on a belief that the evidence had gone in well for the defense, and on a collective determination that the pros of a retrial in which he could more fully develop evidence and arguments from the mid-trial *Brady* disclosures were slightly outweighed by the cons of a retrial in which the government would have a complete roadmap of Sadr's defense. It was an agonizingly close call that necessarily depended on our belief that the government had been accurate and truthful in representing that no other relevant or exculpatory

---

[38] Although the Court in theory could have recalled one or more alternate jurors, it was apparent given the impending COVID-19 crisis that March 13, 2020 was likely to be the final day the jury could deliberate, and neither the parties nor the Court even considered the possibility of delaying and restarting deliberations with alternate jurors.

evidence had been withheld.  *See* Tr. 976-77, 978-79.  Had the defense known that in fact the government continued to possess a wealth of additional undisclosed exculpatory evidence that directly countered the arguments the government made to the jury, that decision, and the outcome of the trial, would have been different.  That is not a "reasonable likelihood" that the trial outcome would have been different.  *Wearry*, 136 S. Ct. at 1006.  *It is a certainty*.

## III.   THE GOVERNMENT'S RECKLESS PRESENTATION OF A FALSE NARRATIVE REGARDING OFAC ALSO ENTITLES SADR TO A NEW TRIAL

Sadr is also entitled to a new trial for an independent reason: the government's presentation of a recklessly false narrative regarding the risk of OFAC enforcement.

The prosecution "has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth."  *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962).  "The prosecutor is an officer of the court whose duty is to present a forceful *and truthful* case to the jury, not to win at any cost."  *Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) (citing *Jenkins v. Artuz*, 294 F.3d 284, 296 n.2 (2d Cir. 2002)) (emphasis added).  Due process does not permit prosecution or conviction based on false evidence, *Napue*, 360 U.S. at 269, and "[t]he same result obtains when the [government], although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.*  If a lawyer comes to know that evidence the lawyer elicited through a witness is false, the lawyer must take reasonable measures to correct, including disclosure to the tribunal.  N.Y. R. Prof. Cond. 3.3(a)(3).  The New York Rules of Professional Conduct bind the conduct of prosecutors by statute. 28 U.S.C. § 530B(a).

Here, the prosecutors did not simply fail to disclose exculpatory evidence.  Instead, they crafted a narrative about the prospect of OFAC enforcement, and what OFAC would have done under its supposed "strict liability" regime if it had known the facts of this case that Sadr had allegedly hidden.  The prosecutors presented that narrative to the jury through carefully crafted

witness testimony and argument, even though the prosecutors knew that the narrative was not true. The prosecutors knew by at least mid-January 2020 that OFAC had declined in real time to pursue enforcement against Commerzbank over the first charged transaction in the case despite a disclosed Iranian nexus. The prosecutors also had should have known (and at least one of them clearly knew) that OFAC in fact had been fully informed of the facts and theories of this case, *by the prosecutors*, and had done *nothing*.

SAUSA Lynch is a full member of the prosecution team, and has been since well before the case was charged. Tr. 977-78. The prosecution is accountable for his knowledge and his actions. Tr. 1287. SAUSA Lynch and then-lead AUSA Matthew Laroche personally briefed OFAC's Enforcement Unit on this entire case, and gave OFAC a PowerPoint prosecution memo outlining the theories and evidence tried here, so that OFAC could consider enforcement. Dkt. 283, at 3-5; Dkt. 283-1; *see supra* at 32-33. OFAC, so apprised, did nothing, and both of those prosecutors knew it.

This prosecution team took its lead from SAUSA Lynch, who was on the case from the beginning and had the government's institutional knowledge. Tr. 983. This team, charged with the knowledge held by SAUSA Lynch and former prosecution team member AUSA Laroche, presented argument and witness testimony telling the jury that if OFAC had learned the facts that Sadr allegedly hid, it would have initiated "strict liability" enforcement, stopping the claimed sanctions violations, and exposing the banks to fines into the hundreds of millions. Tr. 508-09. The centerpiece of that case was a witness from OFAC—not a witness who knew the facts of this case (though such witnesses in the OFAC Enforcement Unit exist), but one who did *not* know the facts of this case, and who could *not* testify (because he did not know) whether OFAC in fact had taken any action regarding any of the actors in this case. Tr. 580-81. The prosecution also turned to bank compliance witnesses to advance its "strict liability" narrative, even in the

face of published Treasury and OFAC guidance to the contrary.  SAUSA Lynch personally participated.  *See id.*

     *The prosecutors should have known their narrative was not true*.  Because the prosecution itself—SAUSA Lynch, and then-lead AUSA Laroche—told OFAC these exact facts. They knew what OFAC would do with those facts, from their own direct interactions: nothing. The government cannot wash its hands of what prosecutors on this team knew because one was a SAUSA and the other was replaced by new AUSAs for trial.

     This is not ordinary *Brady*.  It is reckless deception of the jury, and the Court.  Had the prosecutors put on witnesses who testified falsely to this narrative, Sadr would easily be entitled to a new trial: "[i]f the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *United States v. Walker*, 289 F. Supp. 3d 560, 566 (S.D.N.Y. 2018).  "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach*, 935 F.2d 445, 456 (1991).  Here, no witness committed perjury—Ted Kim lacked knowledge, and the bank witnesses testified based on their subjective belief.  But that does not make the prosecution's narrative any less false.  Nor does it have to have been deliberate—a new trial will result if prosecutors "should have known" they put on a false case. These prosecutors should have known.  Sadr is entitled to a new trial.

## IV.   THE GOVERNMENT'S BLINDERED VIEW OF ITS *BRADY* OBLIGATIONS REQUIRE SIGNIFICANT POST-TRIAL DISCLOSURES TO ENSURE COMPLIANCE WITH *BRADY*

     The U.S. Attorney's Office, and certainly this prosecution team, has lost any benefit of the doubt when it comes to its representations of *Brady* compliance.  The prosecutors have repeatedly refused to acknowledge plainly exculpatory evidence as *Brady*.  They have repeatedly

represented full compliance with their *Brady* obligations, only to be proven wrong time and

again.  They have minimized and downplayed their egregious disclosure failures.  *E.g.*, Tr. 1955

(flippantly arguing in closing, "that's our bad").  And they continue to withhold obviously

exculpatory documents and full explanations of how their failures happened.  If the Court does

not grant a judgment of acquittal or a new trial on the ample current record, it should order

wholesale the post-trial disclosures detailed below.

### A.     The Government Continues to Misconstrue Its *Brady* Obligations

#### 1.     GX 411

On January 10, 2020, SAUSA Lynch reviewed his files, found the Commerzbank letter

that later became GX 411, and shared it with his colleagues.  Despite its obvious exculpatory

value, the government did not produce GX 411 until more than halfway through trial.

When the defense immediately responded with questions about the origin and non-

disclosure of this"fundamentally exculpatory document[]," the government replied indignantly

that "We do not agree with your characterization of GX … 411 as Brady."  Dkt. 280-1, at 3

(AUSA Kim email, 5:36 p.m.).  Despite sitting through the first week of trial—during which the

government: opened on the risk of harm to banks from processing transactions (Tr. 84);

questioned Ted Kim on the "strict liability" nature of the sanctions (Tr. 501-02); saw the Court

overrule its objection to the relevance of a document showing that OFAC did not actually impose

strict liability (Tr. 568-70); then continued to question Blair (Tr. 736) and Peri (Tr. 866) about

supposed "strict liability"—the  government proclaimed ignorance as to why the lack of OFAC

enforcement action against the banks that processed the actual transactions charged here might

be exculpatory as to whether those transactions posed an actual risk of enforcement harm to

these banks.  Claiming "[i]it is not clear to us how this document would have been relevant to the

OFAC witness's testimony," the government glibly challenged the defense: "Perhaps you can

explain how it is you think GX 411 is helpful to your case." Dkt. 280-1, at 3 (AUSA Kim email, 5:36 p.m.). Told "[t]he exculpatory nature of the exhibit is self-evident," *id.* (B. Heberlig email, 10:09 p.m.), the government insisted, "Again, we don't see this document as exculpatory, as we would like to offer it tomorrow." *Id.* (AUSA Kim email, Mar. 8, 2020 9:41 a.m.).

The government's tune did not change until the Court became involved. The government held fast to its position until the defense emailed at 12:15 p.m. that it intended to move for a curative instruction, and asked for the government's position. The defense followed with a 1:36 p.m. email setting out questions and an explanation (Dkt. 280-1, at 2). On a 2:30 p.m. meet-and-confer call, the government insisted it had not violated *Brady*, and that it still viewed the document on its face as inculpatory, not exculpatory. The most the government would agree was that the document might have some impeachment value, that the government might have violated Rule 16, and that the government would not oppose the defense's admitting GX 411 if the government did not. Dkt. 274, at 2. At impasse, the defense filed its request with the Court at 3:40 p.m. Dkt. 274.

At 4:04 p.m., the Court ordered the government to respond by 7:00 p.m. Dkt. 286. At 5:01 p.m., the Court ordered the government to include in that response

> a detailed representation to the Court that explains why Government Exhibit 411 was not previously disclosed and what led to its disclosure for the first time yesterday. That representation shall further specify all attorneys involved in the decision-making with respect to both the non-disclosure and the subsequent disclosure yesterday of this document.

Dkt. 287.

The Court's obvious interest brought about a prompt change in attitude. The government began its 7:08 p.m. letter with an apology: "The Government concedes that it erroneously failed to timely disclose the document at issue, and apologizes to the Court and counsel for its error." Dkt. 275, at 1. Though the government attributed its changed view on the document's probative

value to "conversations the Government has had with defense counsel this weekend," *id.* at 2, the Court's demand for explanation had at least as much to do with it.

The Government's concession and apology, however, did not answer the Court's question. The Court again ordered an explanation, to be filed by 10:00 p.m. Dkt. 290. The Government's 10:06 letter still ignored the *Brady* issue, explaining only the government's mistaken belief that GX 411 had been produced in Rule 16 discovery, when it had not. Dkt. 277.

The next morning in court, the government began:

> MR. KROUSE: Your Honor, the government filed letters, the defense filed letters. I want to stress from the outset the government takes this very seriously. We made a mistake, we own that mistake, and it's an unfortunate situation. We acknowledge that, and it's our fault. So I want to put that out first.
>
> I also want to stress that ... that mistake was inadvertent entirely. Nothing was purposely withheld from the defense.... It was a mistake. And like I said, we're not minimizing anything, but that was an oversight, and we're very sorry to the Court and the defense for that oversight.

Tr. 976.

Despite being quick to characterize the episode as an oversight, the government still resisted characterization of GX 411 as *Brady*, insisting that it had "viewed it as a wholly inculpatory document on its face," Tr. 984; *see also* Tr. 985. Asked whether, sitting through the first week of trial, it had occurred to the government that the document needed to be turned over, the government answered, "Candidly, your Honor, no, there was not that discussion. The discussion was solely about how inculpatory the government viewed the document." Tr. 986; *see also id.* ("And I think the correspondence ... reflects that the government was genuinely confused or unsure about how the document would be used – how it would be helpful to [the] defense. It's, in many, many ways, a very inculpatory document.").

The Court saw that "On its face, it's not a good piece of evidence for the government." Tr. 980-81. The government insisted it had not seen that:

110

> MR KROUSE: … [I]t had not entered the government's mind that this was potentially *Brady* material or that this was helpful to the defense. It was solely in our mind, and maybe this was just trial blinders --
>
> THE COURT: It is.
>
> MR. KROUSE: I think that's fair, but in the government's mind, … what we were thinking was: This is a good piece of evidence for the government.

Tr. 991.

The government's insistence that if a document could be viewed as aiding the government's case then it is not exculpatory is the essence of "trial blinders." *Id.*  It is also not the law. "Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred."  *Mahaffy*, 693 F.3d at 130 (quoting *United States v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008); *accord United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004).  The prosecution is the party charged with setting aside its own view to assess whether a piece of evidence's potential exculpatory value could be significant enough to materially affect the trial result.  *See Kyles*, 514 U.S. at 437, 439; *Coppa*, 267 F.3d at 143-44.  "The prudent prosecutor will resolve doubtful questions in favor of disclosure[.]  This is as it should be."  *Kyles*, 514 U.S. at 439 (citation and alteration marks omitted).  The government is not free to ignore exculpatory value merely because it views a piece of information as having inculpatory implications as well.

### 2.        Other midtrial and post-trial disclosures

The government's specious position that GX 411 was not exculpatory was no isolated mistake.  When the government produced GX 430-432, which confirmed that Hyposwiss was aware of the Iranian International Housing Company's connection to the Venezuela Project and the payments to Stratus Turkey and Clarity, it also disclaimed any understanding that GX 430-432 were exculpatory.  Dkt. 280-1, at 3.  Even after its experience with GX 411, the government continues to routinely insist that its disclosures are not *Brady* or otherwise discoverable, *e.g.*,

111

Dkt. 334, at 2 (post-trial production of 445 pages of documents related to Commerzbank, *see supra* Sec. II.C); Dkt. 305-1, at 2 (FBI 302s of Victor Aular interviews, *see supra* at II.C), but instead are furnished only as a "courtesy."  *See* Dkt. 305-1, at 2.

> **B.      The Court Should Compel the Government to Disclose Information and Documentation to Ensure that Sadr's Rights Are Protected**

To ensure that Sadr receives all *Brady* material to which he is entitled, the Court should compel disclosures that do not require any discretion by the prosecutors to determine what evidence is exculpatory.  Sadr requests that the Court compel disclosure of (1) information and documentation regarding witness statements; (2) undisclosed documents from third parties; (3) information and documentation obtained from Commerzbank and other banks; and (4) information and documentation in the possession, custody, or control of OFAC; and (5) information and documentation regarding the Karimi Recording

> **1.      The Court Should Compel Disclosure of Information and Documentation Regarding Witness Statements**

The prosecutors have refused to produce witness interview summaries that they appear not to have reviewed or even possessed before trial, and have declined to answer how they complied with their *Brady* obligations if that is correct.  The Court should compel the government to produce all FBI 302s, summaries, and notes of every witness the government interviewed in connection with this investigation, including all interviews by DANY that bear on the issues in this case.

Buried within the internal email communications produced by the government about the Karimi recording is a March 27, 2020 email from SA Pond to the trial team—three days after Sadr's post-trial *Brady* demand—in which SA Pond sent the AUSAs a "list of people FBI interviewed in connection with our Stratus/Sadr case" and attached "the unclass[ified] 302s in case [the AUSAs] don't already have them."  Dkt. 307-1, at 91.  Upon receiving this disclosure,

Sadr promptly sent the government a follow-up request (a) asking how the government had discharged its *Brady* obligations with respect to interviews of which it was apparently unaware, (b) asking if there were any previously-undisclosed classified 302s and, if so, how Sadr could review them, and (c) requesting a copy of the interviewee list.  Email from B. Heberlig to Gov't (Apr. 13, 2020 5:12 p.m.) (Ex. W).  The government responded,"none of the materials referred to or transmitted by Special Agent Pond in her March 27, 2020 email are discoverable."  Dkt. 334-1, at 1.  The government identified the interviewees in the so-called "obscure" reports, including both of Sadr's ex-wives, but declined to provide the complete list of interviewees or any witness statements.  *Id.* at 1-2.

To avoid the government applying its blindered view of *Brady* to these materials, Sadr requests that the Court compel the government to produce all witness statements from the investigation—classified or unclassified—along with a copy of SA Pond's interview list to ensure full compliance.  Among other reasons, it appears likely that the interviews of Sadr's ex-wives would contain exculpatory information regarding his lack of intent to violate the sanctions or engage in criminal activity.  Moreover, Sadr was not contemporaneously alerted to these interviews or asked whether he would waive his privilege against disclosure of any communications that he made to his then-spouse in confidence.[39]  To the extent the government

---

[39] "The confidential communications privilege … provides assurance that all private statements between spouses … will be forever free from public exposure."  *In re Witness Before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986).  Any interview of Sadr's ex-spouse would therefore require Sadr's waiver if it asked questions about what the spouse learned from Sadr during their marriage.  *See United States v. Premises Known as 281 Syosset Woodbury Rd.*, 71 F.3d 1067, 1069 (2d Cir. 1995) ("[The confidential marital communications privilege] allows either spouse to compel the non-disclosure of the substance of confidential communications between the two."); 2 Federal Evidence § 5:40 (4th ed. May 2020 Update) ("Both spouses hold the privilege, and each may refuse to disclose, and may prevent the other from disclosing, confidential communications between spouses during marriage.").  During the search warrant litigation, when Sadr argued that the government failed to screen his emails for spousal communication, the government never disclosed that it had interviewed Sadr's ex-wives.

solicited privileged information in these interviews, disclosure may reveal evidence of misconduct that violated Sadr's rights and bears on the government's credibility.

This request encompasses information from trial preparation sessions of fact witnesses the government chose not to call who were on the government's original witness list.  At least one of the witnesses—a mid-level project manager for DUCOLSA—had a highly unusual arrangement with DANY in which he stood to gain 30 percent of any monetary recovery in this case, and received roughly $40,000 from the FBI and the U.S. Attorney's Office to live in the United States while awaiting this trial.  *See* Tr. 1113-14.  If the government learned exculpatory information in its trial preparation sessions that caused it to reconsider calling this witness in whom it had invested so much, Sadr is entitled to disclosure of that information.

### 2.   The Court Should Compel Disclosure of Documents Obtained from Third Parties

During discovery, Sadr requested production of all documents the government obtained from third parties, including search warrant returns from third parties.  The government responded that it had produced all such documents that it was permitted to turn over under the warrants and the Fourth Amendment.  Dkt. 92-2, at 2 (stating government's belief that it had produced over all materials it could turn over); Dkt. 134 (noting that the government had identified 622 additional documents from non-Sadr accounts and that they would be produced).  Those statements turned out to be false.  On April 21, 2020, the government disclosed several relevant third-party documents, including a document used to interview Aular revealing that the Venezuelan government could easily transfer Euros to Iranian companies' bank accounts in Iran to settle its obligations.  This evidence would have supported Sadr's arguments that he intentionally kept money out of Iran and could have easily received payments in Euros if he believed that U.S. dollar payments were unlawful.  This document was an attachment to an email produced in discovery in this case but without the attachment.  Sadr has no way of knowing what

other third-party documents the government has maintained contrary to its previous misrepresentations.  The government should be ordered to produce the raw materials obtained or seized from third parties so that Sadr can review them for exculpatory documents that should have been produced.

### 3.    The Court Should Compel Disclosure of Information and Documentation Obtained From Commerzbank and Other Banks

The government's post-trial disclosures regarding Commerzbank show that the prosecutors' mid-trial affirmation to the Court—that they had searched DANY and SDNY's files and found nothing further regarding Commerzbank's inquiry into PDVSA's payment to Stratus Turkey, Tr. 796-98—was incorrect.  Moreover, the government has refused to respond to Sadr's requests for similar information obtained from other banks.  Dkt. 304-1, at 9 (requesting similar information related to other banks' awareness or investigations on March 24); Dkt. 305-1 at 2 (answering only with respect to Citibank, JPMorgan, and Commerzbank on April 3); Ltr. from B. Heberlig to Gov't at 2 (Apr. 8, 2020) (Ex. V) (requesting again with examples of other banks whose awareness or investigations would be material on April 8); Dkt. 334-1 (ignoring April 8 examples on April 21).  Sadr therefore requests that the government be compelled to produce all documents or information in the possession of DANY, the FBI, or SDNY regarding banks' investigations, evaluations, or research conducted to evaluate payment requests related to any of Sadr's entities, the Iranian International Housing Co., or the Venezuela project.  This breaks down into two categories.

*First*, the Court should compel the government to produce all documents or information in the possession of DANY, the FBI, or SDNY referencing Stratus or the Venezuela Project or are otherwise relevant to this case that were obtained from Commerzbank.  The government produced several of these documents on April 21, 2020, but omitted key documents such as the

response of a supervisor when a compliance analyst concluded that the bank only needed to ensure that payments went to Stratus Turkey (not Stratus Iran) and all of the drafts of GX 411.

*Second*, the government has refused to acknowledge Sadr's requests that it conduct similar reviews of the files obtained from other financial institutions, such as UBS, Hyposwiss, Banco del Tesoro, and Banco Espirito Santo, and produce all documents that reference any of Sadr's entities, the Iranian International Housing Co., or the Venezuela project. *See* Ltr. from B. Heberlig to Gov't at 2 (Apr. 8, 2020) (Ex. V); Dkt. 334-1. The Court should compel the government to produce any such documents.

### 4.  The Court Should Compel Disclosure of Information and Documentation From OFAC

During trial, the government represented to the Court that OFAC had no record of receiving GX 411, no OFAC employee recalled it, and the government was not aware of any OFAC review of the matter. Dkt. 283, at 5-6; Tr. 1282. Yet on April 21, 2020, the government produced a previously undisclosed email from an OFAC compliance officer to Commerzbank that acknowledged receipt of GX 411, and stated that OFAC Compliance would contact Commerzbank "if further action is required." Ex. N (OFAC Compliance Response). OFAC appears not to have responded, indicating that no further action was required.

The Court should order the government to produce all documents in the possession of OFAC regarding GX 411 and this determination. The Court should similarly order the government to produce all documents in OFAC's possession regarding its communications with DANY and the U.S. Attorney's Office about this case.

*First*, OFAC is subject to the government's *Brady* obligations because it is responsible for administering the ITSR and it consulted with the prosecutors on this prosecution. "[U]nder *Brady* the agency charged with administration of the statute, which has consulted with the prosecutor in the steps leading to prosecution, is to be considered as part of the prosecution in

116

determining what information must be made available to the defendant charged with violation of the statute." *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995) (vacating conviction for defrauding the FDA for failure to produce drug applications in FDA's possession that would have been useful for impeaching FDA witness). OFAC's consultations with SAUSA Lynch in February 2016 regarding charging strategy (Dkt. 283-1, at 7), with SAUSA Lynch and other ADAs in August 2016 regarding potential OFAC enforcement (*id.* at 9-11), and with SAUSA Lynch and AUSA Laroche in 2017 regarding the government's theory of the case render OFAC part of the prosecution team.

> *Second*, the government was independently obligated to obtain and turn over information in the possession of OFAC regarding the credibility of Ted Kim's testimony about OFAC's purported strict liability regime and actions with respect to entities that hid connections to Iran. "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (vacating conviction for failure to ask agency for material that could impeach a government witness's credibility). The prosecution has an obligation to obtain and turn over information bearing on a witness's credibility. *Id.* The government failed to fulfill that obligation when, during trial, GX 411 cast doubt upon the veracity of Kim's testimony. Based on a cursory "investigation" that spanned the course of a few hours, the government represented that OFAC was "unable to a find a copy of the letter" anywhere in "its database of correspondence," and had been unable to identify any employees who were familiar with the letter. Dkt. 283, at 5. Only weeks after trial did the government disclose that OFAC in fact acknowledged receipt and stated that it would follow up if further action was necessary. Sadr is entitled to all OFAC documents on these critical issues.

5.      **The Court Should Compel Disclosure of Information and Documentation Regarding the Karimi Recording**

Upon hearing that Karimi had been indicted, Sadr immediately requested the Recording of that interview.  Dkt. 304-1 at 16.  His request and subsequent follow-ups were met with misdirection, material omissions, and in-court misrepresentations.  When it turned out that the government had obtained the Recording before trial after all, its post-trial explanation of this serious disclosure violation was incomplete and filled with finger pointing between the FBI and the AUSAs.  Dkt. 307-1.  The Court should compel production of five categories of evidence related to the suppressed Recording.

*First*, the Court should compel any remaining notes, documents, and information regarding communications with Karimi.  This includes but is not limited to (a) any FBI agent or unproduced AUSA notes from the January 2020 meeting or instructions not to take notes, (b) any discussion with Karimi's counsel in January 2020 regarding Karimi's statements, (c) any communications regarding the government's attempts to convince Karimi to testify as a government witness (purportedly beginning in May 2019) and his responses whether directly or through counsel, and (d) any recordings of Karimi's prior interviews in 2016.

*Second*, the Court should compel declarations summarizing all material facts regarding the Recording, including when each member of the prosecution team learned that they had obtained the Recording; the content, date, time, location, and any material facts regarding any conversation about the Recording; when the team member became aware of Sadr's request for the Recording; and when the team member became aware of AUSA Kim's representations to the Court on March 10, 2020.

*Third*, the Court should compel disclosure of all government communications about the Karimi Recording, including call logs, text messages, emails, calendar appointments, and documentation of the transmission from the RCMP to the LEGAT.

*Fourth*, the Court should compel disclosure of information regarding the discussion between AUSA Kim and Special Agent Pond "in Washington, DC on or about February 18 or 19." Dkt. 307-1, at 4 n.2. What is each person's recollection—with specificity—of the conversation? Where and when—with specificity—did this conversation take place? If they cannot recall, the Court should compel disclosure of AUSA Kim's and Special Agent Pond's calendars for February 18-19, 2020.

*Fifth*, the Court should compel disclosure of information regarding AUSA Kim's conversation with Special Agents Pond and DePresco during trial. *Id.* What is each person's recollection—with specificity—of the conversation? Where and when—with specificity—did this conversation take place? Was it before or after AUSA Kim's representations to the Court about the Recording on March 10?

## V.   BECAUSE THE GOVERNMENT'S REPEATED MISSTATEMENTS TO THE COURT SHOW ITS REPRESENTATIONS CANNOT BE RELIED UPON, THE COURT SHOULD REOPEN AND RECONSIDER ITS SUPPRESSION RULING

The government's dissembling regarding its failure to disclose GX 411 or SAUSA Lynch's case presentation to OFAC's Enforcement Unit is sadly not the first time this Court has encountered shifting stories from the government. *See* Tr. 981 ("Boy, have I heard this song before."). The litigation of Sadr's suppression and discovery motions was equally marked by changing accounts of the facts, and representations that turned out just not to be true. Adapting to each shift in the government's factual positions was time-consuming and frustrating, for both the Court and the defense.

Unfortunately, one of the government's representations was potentially outcome-determinative: its representation that DANY conducted a bona fide responsiveness review, from 2014 through April 2017, to determine which documents seized from Sadr's email accounts were responsive to the seizure warrants. Without such a review, DANY's search was an unconstitu-

119

tional general search.  The Court's dispositive ruling that DANY conducted the responsiveness review it claimed, at the time and in the manner that it claimed, was based entirely on taking the government's word for it.  The prosecution's many inaccurate representations to the Court since then, on matters also involving Sadr's constitutional rights, have amply shown that the government's word simply can no longer be trusted in matters of such importance.  This unfortunate revelation requires reopening the suppression matter, and re-looking into whether the government's representations were accurate, to determine whether this entire case is based on a violation of Sadr's Fourth Amendment rights.

### A.  The Government's Shifting Account of the Number of Documents On Which It Would Rely at Trial

Almost the first thing this Court encountered, at the second hearing after inheriting this case, was a dispute about the number of documents that were provided in discovery and could be used at trial.  On April 11, 2018, weeks after indictment, Judge Carter ordered the government to complete discovery within 60 days.  The government made two productions before that cutoff. The first, on April 5, 2018, contained the entire raw returns of all of Sadr's personal and business email accounts, from their inception to the date of seizure, which had been seized by DANY under New York state warrants.  The second, on May 15, 2018, was of 420 PDF files containing some 3,135 pages (the "May 15, 2018 Pertinent Documents").  At a July 17, 2018 hearing, the government represented that the May 15, 2018 Pertinent Documents were "a very discrete, very limited set of documents that we expect would be what we would introduce at trial or the vast majority of what we would offer at trial."  From May 15, 2018 through September 9, 2019, the parties treated the May 15, 2018 Pertinent Documents as the documents that would be used at trial.  *See* Dkt. 147, at 4-6; Dkt. 149, at 3-6.

At the September 9, 2019 *Curcio* hearing, the current AUSAs—who entered the case at approximately the same time as Your Honor—represented for the first time that the government

had identified an additional approximately 2,200 documents (later revised to 2,395 documents) that the government said DANY had previously identified as pertinent although they were not contained in the May 15, 2018 production.  The new team of AUSAs for the first time described the May 2018 Pertinent Documents as a collection of "hot documents," a subset of a larger universe of pertinent documents that included the new previously unidentified documents.  *See* 9/9/19 Tr. 30-39 (Dkt. 137).  This came as a surprise to the defense, who, together with prior counsel, had spent a year and a half preparing for trial on the understanding that the universe of trial documents, the ones that the government had deemed pertinent (i.e., responsive to the warrants) was the May 15, 2018 Pertinent Documents—no more, no less.  *See id.* at 39-41.

In the wake of the September 9, 2019 hearing, the parties disputed the number of documents DANY had identified as pertinent, the method by which they were so identified, whether they were treated as part of the universe of trial documents, and why they were not identified by the June 2018 discovery cutoff.  *See* Dkt. 147 (including Exs. A-D thereto); Dkt. 149 (including Exs. A-C thereto).  The government's positions depended principally on representations from DANY, who had originally developed the case.  *See* 9/9/19 Tr. 31.  After Sadr moved to exclude the new documents under Rule 16, the government conceded it would not use them in its case-in-chief, and contended the Rule 16 motion was therefore moot.  *See* Dkt. 155, at 11, 12.

### B.    The Government's Shifting Accounts of Its Search and Seizure of Documents From Sadr's Email Accounts

The issue was important not just for the scope of documents at trial, but because it was also intertwined with Sadr's suppression motion.  Most of the documents in this case come from the seizure of the entire contents of Sadr's personal and business email accounts, from the time of those accounts' inception through the time of seizure.  Sadr contended the search warrants

were unconstitutional general warrants, and that DANY's execution of those warrants were unconstitutional general seizures. *See, e.g.*, Dkt. 147.

As this Court explained in its suppression ruling, Rule 41(e)(2)(B) generally authorizes a two-step process for seizures and searches of electronic data. In the first step, law enforcement is permitted to over-seize the electronic data specified, by taking the entire contents of an electronic storage device, or the entire contents of a stored communications account (such as an email account), for later review at an offsite location. That overseizure, however, requires a second step—a responsiveness review—in order to make it constitutional. In the responsiveness review, law enforcement conducts an initial review of the seizure returns to determine what falls within the particularity requirements of the authorizing warrant. The data that is responsive to the warrant—*i.e.*, within its commands to seize, which must be particularized—may thereafter be retained, further searched, and used in preparation of the case. Data that is not responsive to the warrant—*i.e.*, outside the warrant's particularity requirements—is off limits. This responsive-ness review must be completed within a reasonable time. Without a timely and reasonable responsiveness review, data seized on a blanket basis would be unconstitutionally seized. *See* Dkt. 197, at 33-34, 37.

In this case, the parties vigorously disputed whether DANY, which controlled the investigation at that time and executed the warrants, conducted a bona fide responsiveness review. Sadr contended it had not: that DANY agents, having received the entire contents of Sadr's email accounts from his email vendors, loaded the contents into a general, aggregate database and thereafter conducted unrestricted searches on them, believing themselves free to do so under the language of the warrants. According to Sadr, what DANY now called a responsiveness review had actually simply been ordinary case preparation, and the government's claim of a responsiveness review, asserted in response to Sadr's suppression motion, was

actually a post-hoc rationalization of what had been an unconstitutional general seizure.  The government contended that DANY conducted a bona fide responsiveness review, which it completed by April 2017 (the time when DANY referred the case to the United States Attorney's Office for the SDNY).

Sadr requested that the government disclose, in discovery, information on criteria that governed DANY's claimed responsiveness review—the procedure to be followed, the search terms and protocols, the time period of the review, the procedure for segregating results, and the like.  Sadr asked the government to disclose the documents found to be responsive, through identification of Bates numbers, provision of metadata, and disclosure of the hard-copy binders that DANY said it turned over to the SDNY.  Sadr also challenged the government to prove its contentions regarding the claimed responsiveness review by competent evidence, through submission of declarations and contemporaneous evidence.  The government snubbed all of Sadr's disclosure requests, and set out its account of DANY's claimed search procedures in unsworn narrative in its response brief.  *See generally* Dkt. 155.  Many of those assertions were generalized, based on the purported recollections of participants, and unsupported by reference to any contemporaneous documentation.  The representations were based principally on what DANY told the SDNY AUSAs.  The DANY team was led by ADA and SAUSA Lynch.

Sadr argued that DANY's unreasonable execution procedures, showing that they treated the warrants as general warrants, could be seen by analyzing documents produced in the September 2019 Production—including, for example, the limited metadata disclosed for those documents, or the facial irrelevance of some of them.  The government resisted any request that the Court analyze the September 2019 documents in its suppression analysis, arguing that since it had conceded it would not use those documents, they were moot and out of the case.  Sadr rejoined that the manner in which those documents were searched and seized was still relevant to

123

suppression, because it showed how DANY had treated the entirety of what it had seized, and showed unreasonable search procedures indicative of an unconstitutional general seizure. According to Sadr, DANY could not overseize everything under a general warrant procedure, review it broadly to identify offense conduct and charging theories, and then cull it down to "greatest hits" for that conduct, and argue that Fourth Amendment review was restricted only to those greatest hits, rather than the entire search and seizure process.  The government argued the opposite: that the scope of the Court's review was cabined by what the government agreed to use or not use.

At the same time, however, the government tried to reserve the right to use any documents it possessed in rebuttal, even if not in its case-in-chief.  Recognizing the implications of the government's position, the Court put the government to a choice—reserve the right to all documents, in which case all documents would be part of the Court's suppression analysis, or forgo some documents for all purposes, thereby putting those documents outside the Court's suppression analysis.  With that choice, the government promptly limited itself to the May 2018 Pertinent Documents.

The Court ultimately drew a bright line.  It accepted the government's representations that DANY had conducted a bona fide responsiveness review, which concluded in April 2017. Thus, the Court's bright-line ruling: documents seized before April 2017 were constitutional; documents seized after April 2017 were not, and would be suppressed.  Dkt. 197.

The government resisted every attempt by Sadr to challenge through the adversarial process the facts surrounding that bright line.  Sadr had requested disclosure of, among other things: (1) the instructions to the executing agents and a summary of how the pertinent documents were selected; (2) the timeframes over which the searches were conducted; (3) the search terms used; (4) copies of the binders and folders into which the government said DANY

had saved responsive documents; and (5) metadata of the documents reflecting when they were saved.  The government refused all requests.

Even worse, the government's stories kept shifting.  Most troubling was the government's representations of when it completed its claimed responsiveness review.  In a September 26, 2019 letter, the government stated it stopped searching for responsive documents in early 2017:

> Since the time DANY completed its responsiveness review in early 2017, no one from DANY, the U.S. Attorney's Office, or the FBI has reviewed the email evidence to identify any additional responsive material.

Dkt. 147-3.  That turned out not to be true: in its opposition brief, the government admitted DANY continued to search from April 2017 until as late as May 2018, at the direction of the SDNY, including searching for documents for use in Sadr's bail litigation.  Dkt. 155 at 8-9.

Sadr challenged the government's changes in story in his reply brief, Dkt. 156, at 7-9. The government made no real effort to explain its change in story, or why its September 26, 2019 representation had been inaccurate.  Instead, it simply breezed past its earlier inaccuracy with an assertion that after "further inquiry" DANY's representation had changed:

> MR. KROUSE: ... DANY brought the case to the U.S. Attorney's office in April 2017 previously – and the government has explained this in its motion – previously made representations that that was the point when all reviews stopped.  Further inquiry by the government has revealed that there were additional searches conducted between April 2017 and the time of this document as well as for the bail issue.

11/25/19 Tr. 40 (Dkt. 169).  The government simply asserted the new version of the facts in its brief as the new truth, based on what "DANY has represented to the government."  Thus, its account went from no searches after April 2017, Dkt. 147-3, to the vast majority of documents were identified as responsive by April 2017, but in any event by May 2018 (*13 months later*) "all documents clearly had been identified and had been disclosed to the defense."  11/25/19 Tr. 40.

Even though it had conceded the September 2019 documents issue under Rule 16, the government also explained that its change in position about the scope of the documents was based on a change in what it learned from DANY.  "[I]n May 2018 the government provided this full set of 420 documents, 3,145 pages and told the defense these are the documents that were responsive to the warrant and that the government will rely on at trial."  *Id.* at 40-41.  But "[a]fter the briefing in May 2019," (a whole year later), "the government learned from DANY—the U.S. Attorney's office learned from DANY for [the] first time that there was in fact other documents that had been identified as responsive," which turned out to be the 2,395 September 2019 documents.  *Id.* at 41.

Equally troubling was the government's change in stories about *how* it "seized" documents, *i.e.*, identified them as responsive, in its responsiveness review.  First, of course, it said simply that there were no searches "to identify additional responsiveness material" after "the DANY completed its responsiveness review in early 2017."  Dkt. 147-3.  Then, in its brief, the government said that from May 2014 to April 2017, DANY seized documents as responsive to the warrants "by printing to PDF and saving the documents, or portions of documents, into electronic folders on the DANY network," which were named by subject matter in the context of the investigation.  Dkt. 155 at 6.  Sadr sought copies of those electronic folders, and the metadata of the documents within the May 2018 Production, to ascertain when those documents had been saved to PDF, but was rebuffed.

After this Court drew a bright line at April 2017 (11/25/19 Tr. 43-44)—the government changed its story as to how documents were seized, to argue that as many as possible of the documents it had admitted were the result of post-April 2017 searches somehow still qualified as having been identified pre-April 2017.  Whereas it had previously said that the government printed responsive documents to PDF and stored them to electronic folders, Dkt. 155, now, that

was merely one among thirteen different methods by which the government had supposedly "identified" documents it had seized before April 2017.  *See* Dkt. 168, at 2-4.  The government made no claim that these methods of seizure were used in real time during the review.  Instead, these thirteen "categories" were created in the government's December 2019 retrospective review to support the claim that it had somehow "identified" the documents as responsive two years earlier.  Dkt. 168, at 2.

During the suppression litigation, Sadr did not even know, and could not see or test, *what* documents were supposedly seized.  Sadr repeatedly asked the government to identify the documents that were the subject of the suppression analysis—by Bates number, by metadata, by producing the electronic folder contents, by producing the contents of the binders that DANY provided to SDNY in April 2017, etc.—all to no avail.  Even after this Court ordered the government to provide a "page-by-page" analysis of whether every page of the May 2018 Pertinent Documents was identified as pertinent by April 2017, the government did not identify any of the pages or any of the documents.  Instead, it provided only a six-page letter identifying thirteen "categories" or methods by which the government claimed to have identified documents, with conclusory assertions of the number of pages that fell into each category.  *Id.* at 2-4.  Sadr had no way of testing any of the government's assertions, by viewing any of those documents himself—just as he had no way to view the documents by print date, or by metadata, or by whether they had been printed to PDF and saved to electronic folders, or put in hard copy binders given to SDNY.  Every one of Sadr's requests to learn this information so he could verify the government's assertions was met with delay, excuse, or silence.  *E.g.*, Dkt. 147-4, at 4 ¶ 5.b; Dkt. 175 at 4.

### C.    The Court's Suppression Ruling Turns Entirely On the Government's Now-Discredited Word

The Court's suppression findings and ruling were based solely on the government's representations.  The government never did, and was never required to, disclose or submit any evidence regarding the documents it seized or the process by which it seized them.  It submitted no declarations, no documents, no evidence of any kind.  Despite Sadr's requests, and despite his identification of the many changes to the government's story, no hearing was held.  Dkt. 197. Sadr could not test any of the government's representations.

Instead, every fact necessary to the Court's suppression analysis and findings was taken from the government's briefs—its supplemental opposition brief to Sadr's suppression motion, Dkt. 155, and its purported page-by-page analysis, Dkt. 168.  *See* Dkt. 197 (suppression order).

Sadr did not learn which specific documents were in each category the government identified—which ones were in, and which ones were out—until two days after the Court ruled, when the government sent him a January 30, 2020 letter identifying the Bates numbers of the documents the Court suppressed, and the Bates numbers of the documents for which the Court had requested more information in order to rule.  *See* Dkt. 206-1.  Before that letter, during the conduct of the suppression litigation, Sadr was largely an outside spectator.  Sadr submitted arguments, but the actual disclosure and analysis—which documents were supported by which argument, which ones were in, which ones were out—occurred solely within the government's black box, supported only by the government's say-so.

### D.    The Government's Many Changed and Shifting Stories Since the Suppression Ruling

Sadly, the government's long history of inaccurate representations and changing stories since then has shown that the government's word is simply unreliable.  The government has told Sadr and the Court too many things that have turned out to be simply incorrect for its word to any longer be reliable on any matter of consequence.  Its word is certainly no longer reliable for

128

something as important as determination of whether Sadr's constitutional rights have been protected in these proceedings.

The government's inaccuracies have been big and small. They have been grave, and flippant. They have been quickly corrected, or long festering. They have been express, or by omission. But they have been too many for the government any longer to be believed.

Many have been catalogued in this brief above. One—the government's representation to the Court that it identified GX 411 as a newly disclosed document to the defense—has already been determined by this Court. *See* Tr. 991 ("That was false."). Two of the most notable, and most grave, have been by omission: the government's silence regarding the existence of GX 411, and regarding its knowledge that SAUSA Lynch presented this entire case to OFAC's Enforcement Unit in 2017, when both of those facts were (or should have been) known to be exculpatory, but were withheld from Sadr and the Court. Falling into that same category of omission are the government's silence regarding Victor Aular's 2016 interview statements, the existence of the cache of undisclosed Commerzbank documents, and the content of Bahram Karimi's full January 2020 interview, all of which were known to the prosecutors.

Some of the government's misstatements have been to minimize or deflect—like its quickness to apologize and claim inadvertence (and, ironically, to state it is not minimizing), rather than to fully explain when explanation has been demanded. *See* Tr. 796-98; Dkt. 275. And some have been to rationalize—coming up with a better-sounding reason for a delayed disclosure, like the requirements of an intergovernmental transfer, Tr. 1358, 1359-60, rather than a worse-sounding reason, like not knowing the case agents have had the Karimi Recording for a month, because of lack of follow-up. *See supra* at 60-65 Some misstatements have been reflexive, to have something to say on the spot—like insisting the prosecutors did not meet with a witness, because it was a phone call instead. *See* Tr. 833. And some were solemn promises to

the Court, that just turned out not to be true—like the government's affirmative representations that it had painstakingly searched its files, to ensure that there were no other documents related to this case that had not yet been turned over to the defense.  Tr. 796-98.

We are not suggesting that any of these misstatements are deliberate.  The prosecutors are officers of the Court; we do not argue that they have calculated to mislead it.  But the frequency of the prosecutors' misstatements has revealed at the very least a casual neglect for accuracy that makes their representations as unreliable as if they did intend to mislead.

### E.  This Court Should Reopen Suppression to Ensure That the Case Was Not Based on an Unconstitutional General Search

When it became apparent on March 9 that the government had concealed violations of Sadr's constitutional right to disclosure of exculpatory information, this Court took swift, decisive action.  When the prosecutors, asked for explanation, made an additional misrepresentation, this Court dealt with that sternly.  When it appeared the prosecutors' *Brady* violations might be the tip of the iceberg, this Court ordered additional disclosures to determine whether there was more iceberg there.  (Sadly, there was.)

Sadr's Fourth Amendment rights are no less important.  This entire case is based on the government's seizure and long-continuing searches of documents taken from the entirety of Sadr's personal and business email accounts covering the years-long duration of those counts—a large chunk of Sadr's entire digital life.  That search resembles, and possibly may have been, an unconstitutional general search.  Whether that search was constitutional turned on whether DANY conducted a bona fide responsiveness review, and whether that responsiveness review was reasonable under the Fourth Amendment.  That determination, in turn, depended wholly on the truthfulness and accuracy of the government's unsworn representations—the representations of SDNY prosecutors who obtained their information, unverified, from the representations of DANY.

That chain of representation is the chain that led to the violation of Sadr's *Brady* rights. It is also the chain of representation that concealed additional *Brady* violations that came to light only after this Court followed up on the first one exposed. The federal prosecutors' instinct in explaining that violation was to tell the Court, "we relied on DANY"—until the Court reminded them that that SAUSA Lynch is a member of this trial team, and that is no excuse. Tr. 977-78, 1287. Last summer and fall, however, that was the same excuse—"we relied on DANY"—that the prosecutors gave to explain why their story kept changing about when and how the seizure and searches of Sadr's data were conducted. *E.g.*, 11/25/19 Tr. 40.

Reliance on DANY's representations—which are this prosecution team's representations—is no longer sufficient to protect Sadr's Fourth Amendment rights. To ensure that the government's seizures and searches met constitutional muster, this Court should reopen Sadr's suppression motion. It should require the government to submit sworn declarations and evidence explaining how the seizures and searches were conducted—including electronic and paper versions of the documents seized, printed, and analyzed, and metadata that would show when and how those documents were searched, saved, modified, or otherwise manipulated by the government actors who reviewed them. The Court should allow rebriefing based on that evidence, and should conduct a hearing if necessary to resolve any disputes. Only by conducting adversary evidentiary proceedings can the Court be assured that the government's seizure and search of Sadr's data was as constitutionally compliant as the government said it was.

There is precedent for doing so. In *United States v. Perez*, No. 01 CR 848 (SWK), 2002 WL 31368108 (S.D.N.Y. Oct. 21, 2002), the district court conducted a suppression hearing and initially denied suppression, but reopened the hearing after the government belatedly disclosed the arresting officer's notes. The officer had originally testified that the defendant asked to speak to counsel at the end of a long question and answer session, after making the incriminating

statements at issue.  But the officer's notes, which were required to be disclosed under the Jencks Act but had been withheld because the officer forgot, began with the officer's recollection of Perez requesting his attorney.  The court rejected the officer's testimony that the notes were made "in no particular order," found that the request for counsel came at beginning of the interview, and consequently reversed its earlier ruling and suppressed the statements.  *Id.* at *3.

The Court can and should do the same here.  If the Court does not grant acquittal, it should reopen suppression, to ensure Sadr's Fourth Amendment rights have been protected.

## VI.    SHOULD ANY COUNTS SURVIVE, THE COURT SHOULD DISMISS ANY THAT ARE MULTIPLICITOUS

Sadr moved before trial to dismiss certain counts as multiplicitous.  Dkt. 89, 90.  Though the motion was submitted by the pretrial motions deadline as required under Rule 12(b)(3)(B)(ii), Second Circuit precedent required that the Court defer decision until after the verdict.  *See United States v. Josephberg*, 459 F.3d 350, 355-56 (2d Cir. 2006); Dkt. 113, at 3 (Sadr reply brief, acknowledging that "*Josephberg* precludes pre-trial relief").  Two of Sadr's multiplicity arguments are now moot.[40]  But his principal argument that Counts One and Two are multiplicitous (Dkt. 90, at 4-6) remains live.  Sadr's motion to dismiss either Count One or Count Two as multiplicitous is now ripe for decision.

As explained in Sadr's pretrial motion brief, Counts Two (conspiracy to violate IEEPA) and One (conspiracy to impede OFAC's enforcement of IEEPA) are multiplicitous because Count Two is a subset of Count One: every conspiracy to violate IEEPA and the ITSR will necessarily also be a conspiracy to impede enforcement of those laws.  Dkt. 90, at 4-6.  That is a logical necessity "no matter the particular regulation being violated, or the particular conduct

---

[40] Sadr's contention that Count Six is multiplicitous of Count Two (Dkt. 90 at 7-8) was mooted by the jury's acquittal on Count Six.  His argument that Counts Three and Four were multiplicitous to the extent that both relied on an allegation of attempt (Dkt. 90 at 9-10) was resolved through jury instructions.

alleged to constitute the violation," *id.* at 6 (citing *Whalen v. United States*, 445 U.S. 684, 694 (1980); *United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999)), but it is particularly true when both counts are based on identical factual allegations. *Id.* at 5; *see* Ind. ¶¶ 14, 16 (Count One) and ¶¶ 17, 21 (Count Two) (both incorporating the same set of factual allegations).

The government's response to Sadr's multiplicity motion was due by, and submitted on, April 26, 2019. *See* Dkt. 101 (schedule extension order); Dkt. 108 (government's omnibus opposition brief). That opposition made no response on the merits—it addressed only the timing of relief. *See* Dkt. 108 at 45 (arguing only that relief could not be granted pre-trial under *Josephberg*); Dkt. 113, at 2 (Sadr's reply, pointing out the lack of any merits response). Any argument the government may now offer in opposition to Sadr's multiplicity motion was available and due in April 2019, and is now untimely. *See* Tr. 314. The issue is thus conceded. *See Perez*, 2011 WL 1431985, at *1 & n.2 (noting opposing party's failure to respond to a motion "alone constitutes a sufficient basis for granting" the motion) (citations omitted); *United States v. Rodriguez*, 582 F. Supp. 2d 486, 487-88 (S.D.N.Y. 2008) (assuming that a party who did not submit an opposition did not oppose the motion).

In any event, on the merits the Court should grant the motion for the reasons explained in Sadr's pretrial brief, Dkt. 90, at 4-6. If, after the Court's resolution of Sadr's Rule 29 and *Brady* motions, Counts One and Two both remain, one of them must be dismissed as multiplicitous.

## CONCLUSION

For all of the foregoing reasons, this Court should enter a judgment of acquittal under Rule 29(c), or in the alternative order a new trial under *Brady* and its progeny. The Court should also order a new trial to remedy the government's presentation of a recklessly false narrative regarding OFAC enforcement. To ensure compliance with *Brady* (or to uncover the full extent of what the government has refused to review and disclose), the Court should order the

additional disclosures requested in Part IV above, and permit further submissions should such disclosures reveal additional suppressed exculpatory or impeachment evidence.

In light of the government's repeated misrepresentations, the Court should reopen and reconsider its suppression ruling, and suppress all of the email evidence seized from Sadr, because the government seized that evidence pursuant to a general seizure, without conducting a responsiveness review to seize only evidence that fell within the warrants' probable cause findings.  At a minimum, the Court should order the government to submit sworn declarations substantiating the factual representations the government made in opposing Sadr's suppression motion, and should conduct a suppression hearing at which those assertions may be tested through adversarial examination.

Finally, should Counts One and Two both remain standing, one of them must be dismissed as multiplicitous.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel: (202) 429-3000
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

</div>

Dated: May 1, 2020