# Exhibit A

*to*

*Memorandum in Support of Defendant's Post-Trial Motion for Judgment of Acquittal or in the Alternative for a New Trial*

**Exhibit A – Rough Transcript of Recording A Excerpts (802_0030)**

**0:04:30-0:27:17**

| Constable Larsen (CCL) | Can you explain why you are here today? |
|---|---|
| Translator<br><br>0:04:40-0:07:02 | To tell the truth, there has been a case started two years ago.  I was contacted by FBI two years ago.  I was told to retain counsel and introduce the counsel to them.  And they said there is such a case and that you are involved in the case.  And at various instances I was asked to cooperate.  Otherwise, I would have been indicted. Four years ago, FBI started investigation before this indictment.  And even then I told them I would be completely honest and I have nothing to hide regarding this project. And I said I would be available to provide any further information if they need so and still I have nothing to hide. And I am here to.  I don't know. |
| CCL | Are you here today voluntarily and of your own free will to meet with the authorities? |
| Translator<br><br>0:07:08-0:07:33 | I walked here myself.  Nobody threatened to arrest me, but if I had my own choice I wouldn't be here. |
| CCL | You understand that you are not under arrest or detained in any way? |
| Translator<br><br>0:07:39-0:07:44 | I do. |
| Joseph Saulnier | Mr. Karimi, probably wait for the question to get translated.  Thank you. |
| CCL | Do you understand that you are free to leave at any time? |
| Translator<br><br>0:07:53-0:07:58 | I do. |
| CCL | Do you understand that you do not have to say or do anything or answer any question or questions that you do not wish to? |
| Translator<br><br>0:08:15-0:08:18 | Yeah, okay. |

| CCL | I said this before but the entire process is being recorded.  A copy may be provided to the foreign—to the US District Attorney.  Anything you do or say may be used or documented and used as evidence by the foreign agency. |
|---|---|
| Saulnier | I think I need to add that that would be subject to the terms of the proffer agreement. |
| Michael Krouse | Which we will then explain after |
| Saulnier | Yeah, of course.  Was there an answer … I missed it?  Was there any answer from Mr. Karimi? |
| Translator<br><br>0:09:22-0:09:29 | Subject to the proffer agreement. |
| CCL | You have brought a legal practitioner with you today.  If the lawyer can please state your full name for the purpose of voice recognition. |
| Saulnier | Joseph Saulnier.  Last name is S a u l n i e r, counsel for Mr. Karimi. |
| CCL | Thank you.  Just so we're clear.  Mr. Karimi, are you a Canadian citizen or are you a permanent resident? |
| Bahram Karimi<br><br>0:10:03-0:10:05 | Pure permanent resident. |
| CCL | If at any stage throughout this meeting with the officials you want to leave or speak with a lawyer or have a break, please advise me and I will arrange it |
| CCL | Do you have any questions at this time? |
| Translator<br><br>0:10:40-0:10:42 | No. |
| CCL | Do you remain willing to participate in an interview with the US attorneys? |
| Translator<br><br>0:10:55-0:10:56 | Yes. |

| CCL | The interview is now handed over to the visiting law enforcement officers. |
|---|---|
| Jane Kim | Okay, so again, my name is Jane Kim and this is Michael Krouse and we are federal prosecutors from New York. Thank you very much for taking the time to meet with us in person. We flew all the way here because we wanted to make sure that you understood sort of where we are and we wanted to get a better sense of where you are. So before we begin, I just want to make sure that you understand that you can leave this interview at any time. Do you understand that? |
| Translator 0:12:04-0:12:05 | Yes. |
| Kim | And if you need to take any breaks or you would like to consult with your attorney, you can feel free to do that at any time. |
| Translator 0:12:17-0:12:18 | Sure thanks. |
| Kim | So I thought we would start by just explaining where we are and how we're approaching this particular situation. And then we will walk through this proffer agreement. Which I understand you have already reviewed with your lawyer. Yes. And then if you would like to take some time to speak with your lawyer to do some thinking, we can take a break, and then when you are ready we would like to ask you some questions and we have some documents that we would like to review with you. So just starting of with the proffer agreement. I have a copy and you have a copy as well. Have you reviewed this with your lawyer? |
| Translator | Yes. |
| Kim | So I'm just going to go through some of the main points. Essentially this proffer agreement - it's not a cooperation agreement but it protects what you tell us in certain circumstances. So, for example, if you tell us something, we can't use that information directly against you. So one example that we always use is if you tell us you robbed a bank, we can't then go back to the US and charge you based on your statement that you robbed a bank. But we can use the things you tell us – the information you give us – to investigate crimes that you discussed with us. So for example, we can use your statement that you robbed a bank to then investigate and get surveillance footage or phone records or bank records. Your statements can also be used against you if you lie. And they can also be used against you if you either flee for whatever |

| | |
|---|---|
| | reason after-- if you were to be charged or if your attorney takes a position that is different than what you have told us.  So do you have any questions about this proffer agreement? |
| Translator 0:15:38-0:15:38 | No. |
| Kim | So what I am going to do is I will sign where it says Assistant US Attorney.  And I ask that you sign where it says client and that your attorney signs where it says attorney. |
| Saulnier | I am going to add one thing before I sign it just because I had to look this up.  The term fugitive from justice is in here.  My understanding of that term Is that if Mr Karimi say was in the US and then fled the US to avoid prosecution, he would be a fugitive from justice. But being a Canadian permanent resident, If US ever sought extradition, resisting extradition is not being a fugitive from justice.  Although fleeing from Canada when the US was seeking extradition could make him a fugitive. |
| Kim | And by resisting do you mean going through the process of challenging extradition? |
| Saulnier | Just going through the court process - yes.  That was something I had to look up so I just wanted to clarify. |
| Translator 0:17:24-0:17:35 | Extradition process does not mean fugitive from justice. |
| Saulnier | That's right – is not.  And I should add, I don't expect personally an indictment or extradition – I just felt I needed to add that.  And I'll sign the document. |
| Kim | Do you want to sign the second copy so you have a copy as well? |
| Saulnier | Sure, good idea – this will be our copy. |
| Krouse | And the only thing I'll add – and Ms. Kim said this already – but the proffer agreement is for your protection.  It's to ensure that nothing can be directly used against you – what you say in this room. And our hope is that that causes you to tell the truth.  Because you know that-- |
| Translator 0:18:46-0:18:47 | Definitely. |

| | |
|---|---|
| Krouse<br><br>0: 18:48-0:19:15 | And so we mentioned that the only way you can get in trouble in this meeting is if you don't tell the truth. And we have no reason to think that you aren't going to tell the truth. But to make this meeting useful and productive, I think it's important to stress that for us the truth means the whole truth. |
| Translator<br><br>0:19:23-0:19:35 | Absolutely. I cannot lie nor do I have any reason to lie. In this place. |
| Krouse | Exactly. |
| Kim | So, we often explain telling the truth as relation to sort of completeness, which means not telling certain parts of the truth or telling the complete story. That is to us not truthful. And then also in terms of accuracy and substance. |
| Krouse | And just, you know, we do not have any reason to think that you would do this, but we have a lot of experience in interviews and some areas where some people feel nervous about telling the truth is about their own conduct. Or about conduct of people they are close to or that they know well. |
| Translator<br><br>0:20:51-0:21:09 | This needs some clarification. I need to check this with my counsel. |
| Krouse and Kim | Okay. |
| | [Cross talk] |
| Saulnier | If we need to caucus, we will go to my office |
| Karimi | No. |
| Saulnier | No need? |
| Kim | Are you sure? |
| Karimi<br><br>0:21:27-0:21:29 | Yes, I am sure. |
| Translator<br><br>0:21:30-0:21:59 | I said that I have nothing to hide. You tell me that if I do not tell the whole truth, it means I am not telling the truth, is that right? Is my understanding right? |
| Kim | So, if there are certain things that are omissions or if there are certain things that are not telling us that would complete the story or |

|  | would complete our understanding of the facts, that in our minds is not being truthful. |
|---|---|
| Translator<br><br>0:22:29-0:22:49 | You mean I am only supposed to answer completely only all the questions you ask me. |
| Kim | Yes. |
| Krouse | And we can also ask follow up questions or if we are not asking the question in a way that make sense, you can ask for clarification. |
| Translator<br><br>0:23:07-0:23:19 | You may ask me questions that are not relevant to this case and I don't want to answer, now what about that? |
| Kim | So, not wanting to answer is – that's fine. That's your choice. That's different, for example, telling us five facts about something, but leaving out three important details. |
| Saulnier | I think there is a disconnect between what you are saying and what my client was understanding. So, actually we will caucus for a moment. |
| Kim | Okay. |
| Saulnier | I want to make sure his answer is clear. |
| CCL | Okay. I will now suspend this recording for the purpose of Mr. Karimi meeting with legal counsel. The time now is 10:03 am. The interview is now resuming. The time now is 10:08 am. |
| Saulnier | Okay. Thank you. If I can just clarify, because I felt there was a disconnection. Mr. Karimi is going to answer all of your questions and answer them fully. He is going to tell the whole truth. I think his worry was that you would later say you never told us about this when you had never asked anything about it. Right. He will answer all of your questions fully. He just doesn't know if there are other things you would want to know about, he might not know what that is. So, he didn't quite understand that part. Okay. And as for relevance, again, he will answer all of your questions. If I have a concern about relevance, which I think is unlikely, I would step in. But he understands he is going to answer your questions. |

1:13:51-1:14:13

| Kim | And do you know if the embassy did help the company? |
|---|---|
| Translator 1:14:01-1:14:13 | They pretended to support, but they never supported. |

**1:21:15-1:25:50**

| | |
|---|---|
| Translator<br><br>1:20:47-1:21:28 | [Discussing what Karimi was told by Safavardi about the Iranian Ambassador attempting to oust IIHCO from its project] In-person it was told to me in-person. After the meeting, I mean at the end of the meeting the ambassador asked us to leave the meeting, so he could talk to Mr. Parada in person. The ambassador had a very close relationship with a competitor company in Venezuela. |
| Kim | So just to be clear, you are hearing that Safavardi and others told you about a conversation that the ambassador had with Mr. Parada? Was Safavardi in that meeting with Parada and the ambassador? |
| Translator<br><br>1:21:51-1:22:09 | Yes he was in the meeting. And he had connections with the embassy: he worked with them, he was in charge of communicating with the embassy. |
| Krouse | Safavardi |
| Translator.<br><br>1:22:11-1:22:51 | Yes, Safavardi. And it was mentioned in that meeting [that] the ambassador proposed to Mr. Parada to take the project from us and to give it to the competitor company. And after this meeting, this money was never paid to us, until the day I was there. |
| Krouse | Who was the competitor company? |
| Translator<br><br>1:22:57-1:23:04 | Kayson it's an Iranian company. |
| Kim | And why would he, why would the ambassador have said that, if you know? Did Safavardi tell you why the ambassador said that he would take the project and give it to another company? |
| Translator<br><br>1:23:34-1:23:38 | That was between the two of them, I don't know. |
| Krouse | And what was Safavardi's role in the company? |
| Translator | Communicating with…well I had no good relationship with the embassy. I didn't like the government. And I can't pretend to like |

| 1:23:46-1:24:51 | someone, who I don't really like. And one of the issues we had with the project, was my attitude towards the embassy. I was very proficient in executing and completing the project, but I wasn't good at communicating with them. So, there was always someone between me and the ambassador to make this connection. |
|---|---|
| Krouse | So, why did you communicate with the embassy? |
| Translator  1:25:08-1:25:50 | When working …. in a foreign country, the only support you have is your legal embassy. Any natural or legal entity can have a problem in a foreign country, they have to go to their embassy. |

**1:33:25-1:35:38**

| Translator  1:33:25-1:33:40 | What I meant was that there was no financial or economic proceeds from the project-- |
|---|---|
| Kim | --So, no direct profit. |
| Translator  1:33:43-1:33:57 | Yeah, indirectly, definitely because of that MOU and politically definitely they wanted it to be a success. |
| Kim | Okay. Okay. |
| Translator  1:34:01-1:34:07 | But, we always considered our own interests. |
| Male agent | Prior to the involvement of the Iranian ambassador, was Iran aware of the construction project in Venezuela? |
| Translator  1:34:23-1:34:35 | Yes, but they were not happy. They were not satisfied with us. |
| Male agent | Venezuela was not satisfied or the government of Iran was not satisfied? |
| Translator  1:34:42-1:34:44 | Neither of them. |

| Male agent | Were satisfied with the project? |
|---|---|
| Translator<br><br>1:34:47-1:34:49 | Neither was satisfied with the project. |
| Kim | Why weren't they satisfied? |
| Translator<br><br>1:34:51-1:35:38 | Because they didn't pay us, we suspended the work, and both parties from Venezuela and Iran were angry at us.  We were a commercial trading company, we had nothing to do with politics.  It was only the company interest that was important for us, nothing else.  They always expected me to protect the company interests and nothing else. |

**2:03:15-2:12:37**

| Translator<br><br>2:03:15-2:03:28 | And that committee had been formed for sustaining this coordination in order to avoid problems. |
|---|---|
| Krouse | Meaning Venezuela committee? |
| Translator<br><br>2:03:30-2:03:32 | Venezuela, yes. |
| Kim | I think you had said earlier that the Sadrs made the decisions for IIHCo, is that right? |
| Translator<br><br>2:03:44-2:03:49 | He was the owner of the company, he made all the decisions. |
| Krouse | And by he you mean Mohammad Sadr? |
| Translator<br><br>2:03:53-2:04:13 | Mohammad Sadr.  The main purpose of the committee and the role of us was just to provide Mr. Sadr with the information and he would make the final decision and tell us what to do. |
| Kim | And how often would the Venezuela Committee meet? |
| Translator<br><br>2:04:22-2:04:58 | In the first three or four months it met regularly, but after that maybe once a year.  Actually the role faded because the works |

|  |  |
|---|---|
|  | were being done smoothly so no need for the committee, once or twice a year maybe. |
| Kim | And then after the period where the work was being done sort of smoothly and you were having payment issues were there more meetings of the Committee? |
| Translator<br><br>2:05:17-2:05:41 | For a long time, I suppose it didn't meet, but later on when there were payment issues it met two or three times … an informal video conference. |
| Kim | So that was my next question. Were the meetings by video conference or were they by phone or in person? |
| Translator<br><br>2:05:53-2:06:01 | Video conference…the last two by video conference. |
| Kim | Did you ever have to travel back to Iran for the meetings? |
| Translator<br><br>2:06:08-2:07:05 | Not merely for the meeting. I was in Iran there was a meeting. Oh… I suppose once I went to Iran for a meeting and I will tell you why. The client wanted us to change the contract condition. It was my responsibility to change the contract condition. They wanted us … our contract currency was 100% U.S. dollars. |
| Krouse | The original contract? |
| Translator<br><br>2:07:09-2:07:20 | Yes, the contract made by and between DUCOLSA in 2007. |
| Krouse | Specified the Venezuelans would pay in dollars? |
| Translator<br><br>2:07:28-2:07:36 | All the currency units were U.S. dollars. |
| Male agent | Was Venezuela paying in cash or electronic wire? |
| Translator<br><br>2:07:45-2:08:05 | We invoiced them, provided them with banking details, the payments were made through bank, how, I don't know the details. |
| Kim | Okay, so you said the original contracts were for payment in U.S. dollars? |

| Translator 2:09:19 | Yes. |
|---|---|
| Kim | Was there a reason for that? |
| Translator 2:08:23-2:09:25 | Well it was an international agreement and international trade is based on U.S. dollars. Neither rial nor bolivar are stable currencies. They are subject to a lot of fluctuation. The day I entered the exchange rate of a bolivar and dollars was 2.6. But when I left it was 1 to 80; one dollar for 80 bolivars. How could you possibly sustain a contract with such a currency? It's impossible. |
| Kim | And before you had worked for the Venezuela project had you been paid in U.S. dollars by Stratus? |
| Saulnier | For his paycheck? |
| Kim | Yes. So before the Venezuela project, how were you paid by Stratus? |
| Translator 2:09:44-2:09:49 | When I was in Iran, rials. |
| Kim | And approximately how much was your salary? |
| Translator 2:09:55-2:10:02 | It's personal. Should I say? |
| Saulnier | It's okay. |
| Translator 2:10:04-2:10:50 | The last payment I received before I went to Venezuela was equivalent of $10,000 a month. Six thousand or so was my fixed salary and the balance was my benefits and entitlements, allowances. |
| Kim | And you may have said this earlier, but approximately how long did you work for Stratus? |
| Translator 2:10:57-2:11:05 | Twenty years and some months. |

| Kim | And that includes the time you worked on the Venezuela project? |
|---|---|
| Translator<br><br>2:11:10 | Yes. |
| Kim | And then when you worked on the Venezuela project how were you paid? |
| Translator<br><br>2:11:18-2:12:20 | As I said, since I wanted to immigrate and I didn't want to return to Iran, I agreed that my payments be made in U.S. dollars and our management team, including Mr. Cetinel and Mr. Cinar we received our payments in dollars because I no longer lived in Iran. That wouldn't be wise or reasonable to get rials and exchange it to dollars and get it transferred, I wasn't after such headaches. |
| Kim | And so were you paid through transfers to your bank account or in some other way? |
| Translator<br><br>2:12:30-2:12:37 | It was transferred to my bank account. |

2:37:24-2:38:55

| Kim | And who else was involved in the payments for the project? |
|---|---|
| Translator<br><br>2:37:33-2:38:55 | The project payments were made by DUCOLSA. We did the work every month. We prepared and invoice, presented it to the client, to DUCOLSA, and at the same time, based on the protocol for DUCOLSA, we had to attach a progress report to the invoices and the bank details should be attached to the invoice and we presented it or we gave it to DUCOLSA. And DUCOLSA made the payments into the account introduced to them. |

2:40:55-2:41:30

| Kim | So, we'll go through these documents more tomorrow, but is this an example of one of the letters that you are talking about? |
|---|---|
| Translator | That was banking details that the client DUCOLSA required we attach to invoices. |

| 2:41:06-2:41:21 | |
|---|---|

| 2:47:00-2:50:57 ||
|---|---|
| Kim 2:47:15 | This is Tab 25.  So, moving on to a different topic, based on your participation in the Venezuelan committee meetings, did you understand that members of the Venezuelan committees were aware of sanctions against Iran? |
| Translator<br><br>2:47:39-2:48:10 | We never discussed even a single word in those committee meetings regarding sanctions or this project being subject to sanctions.  Never ever. |
| Kim | Okay, do you remember a time when the Iranian International Housing Company decided to change its name? |
| Translator:<br><br>2:48:31-2:49:33 | A couple of times, it was, such a decision was made I supposed when it was discussed in the committee.  But officially, such name change never occurred.  It was not officially notified to contract party, DUCOLSA, that our name has changed.  Once I guess it was changed in Iran but it was never brought to the attention of DUCOLSA and then it came back to its original name |
| Kim 2:49:35 | Did there come a time when the Venezuela committee decided that the company should only be referred to as IIHC rather than the Iranian International Housing Company? |
| Translator<br><br>2:50:00-2:50:44 | Well that IIHC matter, when I entered the project it was already going on.  It was not something new.  All the logos on the safety, on hard hats, on the t-shirts, it had already been printed on everything-- |
| Kim | So, I guess just to be-- |
| Krouse | Printed as how?  IIHC, you're saying-- |
| Kim | Just to be more specific-- |
| Karimi | [Farsi] |
| Translator 2:50:57-2:51:06 | There was an O added to it, and it became IIHCO. |