UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                        18 Cr. 224 (AJN)

ALI SADR HASHEMI NEJAD,

                              Defendant.

# THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS FOR A JUDGMENT OF ACQUITTAL AND FOR DISMISSAL ON MULTIPLICITY GROUNDS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Michael Krouse
Jane Kim
Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
*Of Counsel*

# <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................... 2

I. The Charges ............................................................................................................... 2

II. The Evidence ............................................................................................................ 3

    A. IEEPA and the Iran Sanctions Program ............................................................ 3

    B. The Sadr Family Business:  The Stratus Entities .............................................. 3

    C. The Defendant ................................................................................................... 4

    D. Stratus – Iran's 2007 Formation of the Iranian International Housing Company to Execute the Venezuela Project ...................................................................................... 6

    E. OFAC's 2007 Designation of Stratus Subsidiary Oriental Oil Kish ................. 7

    F. 2008:  Mohammad Sadr Encounters Sanctions Problems With the First Project Payment ............................................................................................................... 8

    G. Early 2009:  The Defendant Begins Managing the Project Finances and Establishes a Stratus Front Company in St. Kitts and Nevis ..................................................... 9

    H. Mid-2009:  The Defendant Joins Stratus – Iran's Venezuela Project Committee ............. 9

    I. Late 2009:  The Defendant Establishes Clarity ............................................... 11

    J. Summer 2010:  Congress Enacts CISADA ...................................................... 13

    K. Summer 2010: The Defendant's Post-CISADA Communications Regarding Applicable Iran Sanctions ......................................................................................................... 15

    L. October 2010:   The Defendant Establishes Stratus – Turkey and a New Swiss Bank Account at Hyposwiss ............................................................................................. 18

    M. Late 2010: The Defendant Begins to Route Payments Through Front Companies and United States ........................................................................................................... 19

    N. January – April 2011:  Stratus – Turkey Creates Backdated Name-Change Documentation for IIHC In Anticipation of a $29.4 Million Payment .......................................... 22

    O. April – June 2011:  Commerzbank Inquires About Fondo Chino's $29.4 Million Payment to Stratus – Turkey and Makes Disclosures to OFAC ........................................ 26

    P. July 2011:  IIHC Re-Routes Payments to Clarity Following Scrutiny from Commerzbank ........................................................................................................... 29

    Q. September – December 2011:  Payments, Promotions, and Continued Sanctions Violations ......................................................................................................... 31

    R. December 2011 – February 2012: The Defendant Disburses Proceeds of the Sanctions Violations ......................................................................................................... 35

    S. January – April 2012:  UBS Blocks a Payment Due to Sanctions ................... 39

T. Mid 2012: The Defendant Shuts Down IIHC's Venezuela Website After OFAC Sanctions EN Bank ................................................................................................................... 40

U. September 2012 – February 2013:  PDVSA Continues U.S. Dollar Payments and Citibank Blocks One Payment Due to Sanctions ..................................................................... 41

V. December 2012:   The Defendant Alters Two Contracts to Paper the File at Hyposwiss ................................................................................................................................  44

W. January 2013:  The Defendant Seeks to Remove an Online Article Connecting Stratus – Iran and Mohammad Sadr to the Venezuela Project ............................................ 48

X. June – November 2013:   The Sadrs Seek Iranian Diplomatic Intervention To Obtain Further Payments for the Venezuela Project ........................................................ 50

Y. July 2014: The Defendant Reroutes a Payment to Avoid a Sanctions-Related Rejection ................................................................................................................................ 51

III. The Defense Case ........................................................................................................ 53

IV. Rule 29 Proceedings ..................................................................................................... 57

V. Jury Deliberations and Verdict ..................................................................................... 58

ARGUMENT ........................................................................................................................ 58

I. The Defendant's Rule 29 Motions Should Be Denied ...................................................... 58

A. Applicable Law ............................................................................................................. 58

B. The Government Established the Defendant's Guilt on Counts Three and Four............ 59

1. The Government Established That The Defendant Participated In A Section 1344(2) Scheme ....................................................................................................................... 60

2. The Government Established the "By Means of" Requirement .................................. 66

3. The Court Already Rejected The Defendant's Arguments Regarding Disclosure Obligations in Wire Instructions ................................................................................. 69

4. The Defendant Has Mischaracterized the Government's Section 1344(1) Theory ...... 71

5. Defense Counsel's Motion to "Retroactively" Strike Testimony Should Be Denied .. 75

6. The Defendant Is Not Entitled to a Judgment of Acquittal as to Section 1344(1) ....... 77

7. Fair Inferences From The Defense Evidence Further Supported The Jury's Verdicts on Counts Three and Four................................................................................................... 82

C. The Government Established the Defendant's Guilt on Counts One and Two................ 85

1. The Government Established The Existence of the Conspiracies Charged in Counts One and Two ..................................................................................................................... 85

2. The Government Established the Defendant's Criminal Intent and Lack of Good Faith ................................................................................................................................... 90

3. OFAC's Inaction Does Not Merit a Judgment of Acquittal on  Count One................. 93

ii

4. The Court Already Rejected the Defendant's Argument That Sanctions Authorized His Conduct and His U-Turn Arguments Are Unavailing ...................................................... 97

5. Fair Inferences From The Defense Evidence Further Supported The Jury's Verdicts on Counts One and Two ................................................................ 97

D. The Government Established the Defendant's Guilt on Count Five............................. 101

II. The Defendant's Motion To Dismiss Either Count One Or Count Two As Multiplicitous Should Be Denied ........................................................................... 104

A. Applicable Law ........................................................................ 104

B. Discussion ............................................................................. 105

CONCLUSION............................................................................... 107

# TABLE OF AUTHORITIES

## CASES

*Albernaz v. United States*, 450 U.S. 333 (1981) ........................................................ 104, 105, 106

*Blockburger v. United States*, 284 U.S. 299 (1932) ................................................... 104, 105, 106

*Loughrin v. United States*, 573 U.S. 351 (2014) ...................................................................... 59, 67

*Marinello v. United States*, 138 S. Ct. 1101 (2018) .......................................................................... 85

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478 (2d Cir. 1995) ....... 70

*Russell v. United States*, 369 U.S. 749 (1962) ............................................................................. 102

*United States v. Abdullaev*, 761 F. App'x 78 (2d Cir. 2019) ......................................................... 89

*United States v. Alcantara*, No. 13 Cr. 119, 2015 WL 13214927 (S.D.N.Y. Apr. 23, 2015) ...... 82

*United States v. Atilla*, No. 15 Cr. 867, 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018) ................... 92

*United States v. Autori*, 212 F.3d 105 (2d Cir. 2000) ..................................................................... 70

*United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996) .............................................................. 95

*United States v. Basciano*, 599 F.3d 184 (2d Cir. 2010) ............................................................. 105

*United States v. Burnett*, 10 F.3d 74 (2d Cir. 1993) ...................................................................... 66

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) ........................................................... 67, 68

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) ..................................... 104, 105, 106, 107

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ..................................................................... 85

*United States v. Cote*, 544 F.3d 88 (2d Cir. 2008) ......................................................................... 59

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ....................................................................... 59

*United States* v. *Dixon*, 509 U.S. 688 (1993) .............................................................................. 105

*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008) ................................................................... 58

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) .................................................................... 78

*United States v. Fiore*, 821 F.2d 127 (2d Cir. 1987) .................................................................... 105

*United States v. Flores*, No. 15 Cr. 765, 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017) .............. 94

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) ....................................................... 58, 81

*United States v. Gurary*, 860 F.2d 521 (2d Cir. 1988) ................................................................... 95

*United States v. Hedges*, 225 F.3d 647, 2000 WL 964767 (2d Cir. 2000) ................................ 102

*United States v. Heras*, 609 F.3d 101 (2d Cir. 2010) ..................................................................... 90

*United States v. Heyward*, No. 15 Cr. 445, 2017 WL 5624279 (S.D.N.Y. Nov. 21, 2017) ........ 82

*United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006) ......................................................... 104

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ................................................................... 58

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) .............................................................. 77, 78

*United States v. Mack*, No. 18 Cr. 834, 2020 WL 114509 (S.D.N.Y. Jan. 10, 2020) ............ 59, 81

*United States v. Middendorf*, No. 18 Cr. 36, 2018 WL 3443117 (S.D.N.Y. July 17, 2018) ........ 95

*United States v. Morgenstern*, 933 F.2d 1108 (2d Cir. 1991) ................................................. 65, 66

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) .............................................. 106

*United States v. Nakashian*, 820 F.2d 549 (2d Cir. 1987) .......................................................... 107

*United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361 (S.D.N.Y. Dec. 6, 2019)
.................................................................................................................................................. passim

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) ..................................................... 82, 98

*United States v. O'Brien*, 926 F.3d 57 (2d Cir. 2019) ................................................................... 92

*United States v. Pena*, 161 F. Supp. 3d 268, (S.D.N.Y. 2016) .................................... 73
*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ........................................... 58, 91
*United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994) ........................................ 102
*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ................................................ 59
*United States v. Pizarro*, No. 15 Cr. 151, 2019 WL 3406603 (S.D.N.Y. July 29, 2019)............. 76
*United States v. Roman*, 870 F.2d 65 (2d Cir. 1989) ................................................ 82
*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ............................................... 95
*United States v. Skinner*, 946 F.2d 176 (2d Cir. 1991) ............................................ 104
*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) .................................................. 77
*United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003) ......................................... 102, 104
*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997) .............................................. 94
*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012)......................................... 81, 94
*United States v. Weingarten*, 713 F.3d 704 (2d Cir. 2013)......................................... 106
*United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016)
.................................................................................................... 70, 102
*United States v. Zvi*, 168 F.3d 49 (2d Cir. 1999) .................................................. 106

## STATUTES

18 U.S.C. § 1344 ............................................................................... passim
18 U.S.C. § 1349 .................................................................................... 2
18 U.S.C. § 1956 ................................................................................. 2, 3
18 U.S.C. § 371 .............................................................................. 2, 106
50 U.S.C. § 1705 ............................................................................ 2, 107

## RULES

Fed. R. Cr. P. 29 .............................................................................. passim
Fed. R. Cr. P. 33 .............................................................................. 75, 81

## OTHER AUTHORITIES

*Black's Law Dictionary* ........................................................................ 73

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | 18 Cr. 224 (AJN) |
| ALI SADR HASHEMI NEJAD, | |
| Defendant. | |

The Government respectfully submits this memorandum of law in opposition to the defendant's motion for a judgment of acquittal and to dismiss either Count One or Count Two as multiplicitous. In responding to these motions, the Government does not minimize its untimely disclosures. The Government sincerely regrets its errors and will address each of them in detail in its response to the defendant's motion for a new trial. As set forth below, however, the Court should deny the instant motions.

*First*, the defendant seeks a judgment of acquittal as to Counts One through Five, arguing that there was insufficient evidence to support the guilty verdicts. However, under the Rule 29 standard, there was sufficient evidence to support the jury's guilty verdicts. The defendant's Rule 29 motions should be denied.

*Second*, the defendant asks the Court to dismiss either Count One or Count Two as multiplicitous. Each count, however, requires proof of an element that the other does not. The defendant also cites to no evidence that would clearly show that Congress intended to bar the prosecution of a defendant for both offenses. Because Counts One and Two are legally (and factually) distinct, the defendant's multiplicity motion should be denied.

## BACKGROUND

The Government established at trial that the defendant and others worked together in connection with a fraudulent scheme related to a $475 million construction project to violate and evade Iranian sanctions, to defraud FDIC-insured banks in the United States by causing them to illegally export payment-processing services to Iranians and Iranian entities, to make it more difficult for the United States to administer the Iranian sanctions, and to launder the proceeds of the offense. During the course of the scheme, the defendant took steps to conceal his Iranian citizenship, established front companies and Swiss bank accounts to obscure connections to Iran, created sham invoices and backdated contracts to fool bankers, and took other steps to lie about and obscure the fact that Iranian nationals in Iran were managing the construction project, and were the true beneficiaries of the project proceeds.

## I.     The Charges

Beginning on March 2, 2020, the Court conducted a jury trial on the six counts of Indictment 18 Cr. 224 (AJN), which charged the defendant as follows:

- Count One:  conspiracy to defraud the United States by impeding and obstructing OFAC's enforcement of its Iran sanctions program, in violation of 18 U.S.C. § 371;

- Count Two: conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), by exporting the processing services of U.S. correspondent banks for the benefit of Iranian entities and individuals, and by evading applicable OFAC sanctions, in violation of 50 U.S.C. § 1705;

- Count Three: bank fraud, in violation of 18 U.S.C. § 1344;

- Count Four: conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349;

- Count Five: money laundering by transmitting and attempting to transmit funds into the United States for the purpose of promoting the IEEPA violation charged in Count Two and the bank fraud charges in Counts Three and Four, in violation of 18 U.S.C. § 1956; and

- <u>Count Six</u>: conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.

## II.    The Evidence

### A.    IEEPA and the Iran Sanctions Program

Beginning in 1995, the President of the United States has repeatedly found pursuant to IEEPA that the actions and policies of the government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency to deal with the threat.  (Tr. 479-81).  In accordance with these presidential declarations, the United States has instituted a host of economic sanctions against Iran and Iranian entities.  In March 1995, OFAC promulgated sanctions against Iran as part of a comprehensive trade embargo.  (Tr. 481).

Two aspects of OFAC's sanctions against Iran are relevant to this case.  First, the Iran sanctions prohibit the exportation of payment-processing services by U.S.-based financial institutions, where the exported services are either on behalf of people or entities in Iran, or the benefit of the exported services is received in Iran.  (Tr. 1872-74 (jury charge on 31 C.F.R. § 560.204); Tr. 482). Second, the Iran sanctions prohibit transactions intended to evade or avoid the prohibition on the exportation of services.  (Tr. 1872-73 (jury charge on 31 C.F.R. § 560.203); Tr. 479).

### B.    The Sadr Family Business:  The Stratus Entities

Mohammad Sadr is an Iranian national who built one of the largest construction, banking, and insurance conglomerates in Iran.  (Tr. 157-59; GX 1001A (brochure of Stratus Holding Group's "History of Achievements")).  During all times relevant to this case, Mohammad Sadr

3

lived and worked in Iran.  (Tr. 172-75, 1411; GX 2148C (Mohammad Sadr's Iranian passport listing Iran as his domicile)).

In 1978, Mohammad Sadr established Stratus International Contracting Company in Iran, which he developed into an Iranian holding company known as the Stratus Holding Group and Sameneh Stratus Investment Company ("Stratus – Iran").  (GX 1001A at 2-3; GX 2195A at 3). As of 2013, Stratus – Iran employed over 2,000 people and had completed infrastructure projects worth approximately $3.1 billion.  (GX 1001A at 15-16).  The Iranian government paid for all of Stratus – Iran's projects in Iran.  (Tr. 201; GX 1001A at 24 (listing 12 civil projects performed in Iran); GX 2195A at 6 (listing ongoing and completed projects)).

Stratus – Iran also controlled dozens of companies, including, as relevant here, the Iranian International Housing Company ("IIHC"), Oriental Oil Kish, which was sanctioned by OFAC in 2007, and Eghtesad Novin ("EN") Bank, which was sanctioned by OFAC in 2012.  (GX 1001A at 8, 13-14; GX 2195A at 3; Tr. 158, 499-500).

### C.    The Defendant

The defendant was born in Tehran, Iran in 1980.  (Tr. 1410).  He was raised in Iran and completed some coursework at Tehran University.  (Tr. 190, 1419).  The defendant's mother and sisters emigrated to the United States in 1998, and the defendant followed in May 2000.  (Tr. 1426-27).  In January 2003, the defendant applied for, and received, political asylum in the United States. (Tr. 1432-33).[1]  He first attended Montgomery College outside of Washington, D.C., and by 2005

---

[1] In March 2009, the defendant received a letter from the U.S. Citizenship and Immigration Services ("USCIS"), informing him that USCIS had obtained evidence indicating that his application for asylum was fraudulent.  (Tr. 1754).  In April 2009, the defendant married his second wife, who was a U.S. citizen.  (Tr. 1755).  On May 13, 2009, the USCIS interviewed the defendant

had earned a bachelor's degree in Civil Engineering and a master's degree in engineering management from Cornell University.  (Tr. 1427-28).

After the defendant graduated from Cornell, Mohammad Sadr gave him several million dollars (Tr. 1741), and the defendant started a real estate development company called Span (Tr. 1428).  Span built a shopping center in Ashburn, Virginia, which the defendant later sold.  (Tr. 1430-31).  After the financial crisis in approximately 2008, the defendant created, with a banker at Wachovia named Rob Klingensmith, a private equity firm called A&R Capital Partners.  (Tr. 1431-32, 1448).

As discussed in more detail below, by approximately 2009, the defendant was living in the United States, *see* 31 C.F.R. § 560.314, and working with Mohammad Sadr, Stratus – Iran, IIHC, and others on a fraudulent scheme to cause U.S. banks to process dollar payments in violation of the Iran sanctions.  The defendant stopped living in the United States in March 2010 (Tr. 1436, 1440), but continued to participate in the scheme.  He returned to the United States as a lawful permanent resident in November 2012 (Tr. 1683), once again becoming a U.S. person for purposes of the Iran sanctions, and continued to provide services to Mohammad Sadr, Stratus – Iran, IIHC,

---

in connection with his asylum claim.  (Tr. 1756-57).  In June 2009, USCIS terminated the defendant's asylum status.  (Tr. 1757).  In March 2010, the defendant left the United States prior to his final hearing (Tr. 1757-58), and, in November 2010, a final order of removal was issued *in absentia*.  In March 2012, the defendant applied for permission to reapply for admission to the United States after deportation or removal.  (Tr. 1758-59).  Included with this application was a signed affidavit, dated March 5, 2012, in which the defendant claimed that he left the United States prior to his hearing due to the "dire economic circumstances of my family."  (GX 2509 ¶ 6).  Because his wife at the time was a U.S. citizen, the defendant was permitted to reapply for permanent residence status.  In November 2012, the defendant received a green card.  (Tr. 1437).

and others in connection with the scheme to cause U.S. banks to export their payment processing services to Iran.

> **D.    Stratus – Iran's 2007 Formation of the Iranian International Housing Company to Execute the Venezuela Project**

On February 22, 2006, the government of Venezuela ratified a memorandum of understanding with the government of Iran, which called for the two countries to work together to "study the possibility of contracting the construction of housing units from Venezuela and Iran, necessary for the housing supply plans of the governments"  (GX 2274A-T).  The ratification recognized "the excellent existing relations of friendship and cooperation" between the two governments, including a "cooperation framework agreement" dating back to 2004, as well as an "Iranian offer" relating to "contracting the construction of housing complexes in both countries." (*Id.*).  Thus, although the defendant argued at trial that he and his father were long-oppressed enemies of the Iranian government, the project that generated extensive wealth for the defendant's family and ultimately led to the defendant's conviction was in fact an Iran-backed endeavor pursuant to a formal agreement with the Venezuelan government.

Less than a month later, in March 2006, Desarrollos Urbanos S.A. ("DUCOLSA"), a subsidiary of Venezuela's state-owned energy company, Petroleos de Venezuela, S.A. ("PDVSA"), signed a contract in contemplation of IIHC building 7,000 housing units in a city in Venezuela called Nueva Ojeda (the "Venezuela Project" or "Project").  (GX 2203A at 2).  On December 26, 2006, Mohammad Sadr incorporated IIHC in Iran.  (GX 2203F-T at 6-7; GX 1003A-T at 1; Tr. 1478).  IIHC was led by a board of directors that included Mohammad Sadr; was domiciled in Tehran; and was funded through a transfer to an account at the Sadr family's EN Bank in Tehran.  (GX 2203F-T at 6-7; Tr. 158).  The "Corporate Purpose" of IIHC contemplated

work in Iran for the government of Iran, such as "development projects at home and abroad," including "[t]o participate in state, private, national and international bids and offers." (GX 2203F-T at 6). At the time of formation, two of the six shareholder companies that invested in IIHC were owned by the Iranian government, but Mohammad Sadr later "bought out" the other shareholders. (GX 1003A-T at 1; Tr. 1468).

On February 5, 2007, IIHC established a branch office in Miranda State, Venezuela. (GX 2203A at 1). On July 2, 2007, IIHC counter-signed the contract previously executed by DUCOLSA relating to the Venezuela Project (the "IIHC Venezuela Contract" or the "Contract"). (*Id.* at 3). The IIHC Venezuela Contract expressly contemplated payment to IIHC in U.S. dollars:

> **FOURTH:** **PRICE OF THE CONTRACT:** The price of this work contract to be executed by **"THE CONTRACTOR"** ads up to the amount of FOUR HUNDRED SEVENTY-FIVE MILLION SEVEN HUNDRED AND THRITY-FOUR THOUSAND Dollars of the United States of America (US$475,734,000.00), with the understanding that the Value Added Tax (V.A.T.) is not included in the amount indicated above. ------------------------------------

(*Id.*; GX 2203B at 27 (Attachment II to the Contract)).

### E.   OFAC's 2007 Designation of Stratus Subsidiary Oriental Oil Kish

Less than three months after IIHC executed the IIHC Venezuela Contract, on September 25, 2007, OFAC sanctioned both the Islamic Revolutionary Guard Corps ("IRGC") and Oriental Oil Kish, a Stratus – Iran subsidiary. (Tr. 499). Although the defense suggested during the trial— without any evidence—that Oriental Oil Kish was "stolen" by the IRGC (Tr. 639), Stratus continued to promote Oriental Oil Kish as part of the "Stratus Group of Companies" until at least May 2010 in a brochure that was sent to the defendant at the defendant's request.



(GXs 2195, 2195A at 3 (highlighting added)).

**F.     2008:   Mohammad Sadr Encounters Sanctions Problems With the First Project Payment**

In 2008, DUCOLSA paid IIHC a 30 percent advance on the IIHC Venezuela Contract worth the equivalent of approximately $142.5 million.  (Tr. 1464; GX 2203B at 28).  The payment was denominated in Euros, despite the fact that the Contract called for dollars, because the parties understood that the Iranian government investors in IIHC, in the defendant's words, "could not receive the dollars."  (Tr. 1465).  The parties tried to use an Iranian government-owned financial institution, the Export Development Bank of Iran ("EBDI") (Tr. 499-500), as a correspondent bank in connection with the advance.  (Tr. 1465).  The funds were "held up," or "blocked," for "more than six months."  (Tr. 1465, 1593).  Mohammad Sadr "consulted" the defendant about the problem (Tr. 1466) and asked him about another Iranian government-owned bank, Europäisch-

Iranische Handelsbank ("EIH"), which was also designated by OFAC (Tr. 498-99).  On June 21, 2008, the defendant wrote to his father that EIH was "on the OFAC list."  (GX 2276-T).

Mohammad Sadr eventually obtained at least some of the advance payment from DUCOLSA, and he used some of those funds to buy out the Iranian government investors in IIHC. (GX 1003A-T at 1; Tr. 1468).

### G.      Early 2009:  The Defendant Begins Managing the Project Finances and Establishes a Stratus Front Company in St. Kitts and Nevis

After experiencing problems with the routing of the first payment, in late 2008 or early 2009, Mohammad Sadr asked the defendant to "manage the finances" of the Venezuela Project. (Tr. 1448; GX 2113B-T at 6).   On February 2, 2009, the defendant and Mohammad Sadr established Stratus Global Investments in St. Kitts and Nevis ("Stratus – St. Kitts").  (GX 2005A at 1-2).  The defendant and Mohammad Sadr were the Directors and shareholders, and both men listed the same Post Office Box in St. Kitts and Nevis as their address.  (*Id.*).   In a separate document dated February 3, 2009—notwithstanding trial testimony that he lived in the United States until March 2010 (Tr. 1436)—the defendant listed an address in Dubai and was assigned authority to "open operate and close all bank accounts" of Stratus – St. Kitts.  (GX 2005A at 4).

### H.      Mid-2009:   The Defendant Joins Stratus – Iran's Venezuela Project Committee

On April 23, 2009, Mohammad Sadr created the Venezuela project committee (the "Venezuela Project Committee") at Stratus – Iran and named himself president.  (Tr. 176; GX 2113A-T; GX 2113B-T).  The Venezuela Project Committee met once every two weeks during the planning stage of the Venezuela Project, and about once a month thereafter.  (Tr. 199; GX 2113A-T at 1).  Mohammad Sadr held all committee meetings in his office in Iran (Tr. 195-96;

GX 2113B-T at 4), Mohammad Sadr was physically present for those meetings (Tr. 199), and he participated in all key decisions (Tr. 216, 217-18 (discussing GX 2066) 219-20 (discussing GX 2086); GXs 2253A, 2254A, 2255A).  The minutes of the first meetings of the Venezuela Project Committee reflect conversations regarding an anticipated visit to Venezuela by "the esteemed President of the Republic of Iran" for an "inauguration and groundbreaking ceremony" attended by "the esteemed presidents of the two countries," and the need for "proper planning" for the "presence of executives and experts" at such a function.  (GX 2113B-T at 1, 6).

The defendant was formally named to the Venezuela Project Committee on May 2, 2009. (Tr. 188; GX 2113-T at 1; GX 2113B-T at 6 ("Due to the need for proper financial management to provide cash flow for the Venezuela Project, Mr. Amir Ashraf Pourdeljou and Mr. Ali Sadr Hashemi Nejad were added to the Council with a focus on financing and trade activities.")).  The next month, the "Stratus Head Office" sent the defendant an email with materials relating to the Venezuela Project (GXs 2278, 2278A, 2278B), including a document that noted that "[o]ne of the important problems is to transfer money from Iran to Venezuela and vice versa and exchange the USD to Bolivar for local expenses."  (GX 2278A at 2).

The defendant attended about 20 percent of the Venezuela Project Committee meetings in person in Tehran, and he joined the other meetings by phone.  (Tr. 198-99).  Other members of the Venezuela Project Committee included Bahram Karimi, Abbas Taheri, Reza Moayed, Amir Ashraf Pourdeljou, Ebrahim Shariat, and Farshid Kazerani, all of whom were Iranian and resided in Iran.  (Tr. 1742-43; GX 2113A-T at 1).   Moayed was the Secretary of the Venezuela Project Committee.  (Tr. 197; GX 2113B-T at 4).  In June 2009, Karimi, who had more than 15 years' experience working at Stratus – Iran, was named the Project Manager.  (GX 2113B-T at 5, 9; Tr.

10

186-88).  During the planning stages of the Venezuela Project, Karimi resided in Tehran, Iran, and during construction, he moved to Venezuela.  (Tr. 188).    Kazerani, who testified at trial and resided in Tehran, Iran until 2013 (Tr. 151), was responsible for recruiting and hiring Iranians to travel to Venezuela to work on the Venezuela Project, and he also participated in project planning, assessment, and budgeting (Tr. 176-77; GX 2113B-T at 2).  Taheri was the head of a contracting subsidiary of Stratus – Iran when the Venezuela Project Committee was formed, but he died in early 2011 and Kazerani succeeded him as the CEO of that subsidiary.  (Tr. 173-74; GX 2113B-T at 1).  In 2009, the Venezuela Project Committee deployed two Turkish engineers, Mustafa Cetinel and Ekrem Cinar, as experts to work on the project in Venezuela.  (GX 2113B-T at 2, 9).  Cetinel was CEO of Stratus International Contracting in Turkey ("Stratus – Turkey") (Tr. 1488), and Project Director on the Venezuela Project (GX 2253A; Tr. 204).  Cinar was Vice President of Overseas Contracts on the Venezuela Project.  (GX 2255A; Tr. 206-07).  Cetinel and Cinar were also two of the six Stratus – Turkey shareholders.  (GX 2219M).

## I.   Late 2009:  The Defendant Establishes Clarity

On August 10, 2009, the defendant obtained a St. Kitts and Nevis passport pursuant to the country's "citizenship by investment" program, which permits individuals who have never resided in the country to purchase citizenship for hundreds of thousands of dollars.  (GX 201A; Tr. 415-16).

On December 11, 2009, Karimi asked the defendant to send "1000 USD" to Karimi's bank account.  (GX 2002).  On December 18, 2009, the defendant notified Karimi via email that he had wired the requested funds from his personal HSBC bank account.  (*Id.*).  The same day, Karimi

told the defendant that he had not yet received his account number and password, writing: "Maybe, such [a] trifle amount of money is under sanction too!" (*Id.*).

On February 25, 2010, Mohammad Sadr forwarded the defendant an email describing the establishment of a company in Switzerland named Clarity Trade & Finance SA ("Clarity"), and a "temporary" account for Clarity at UBS in Geneva. (GX 2187-T at 1-3). Mohammad Sadr instructed the defendant: "Just now we want to wire money for the registration of the Company in Switzerland. We have to do it very fast." (*Id.* at 1). The defendant capitalized Clarity with approximately 500,000 Swiss francs using funds from a U.S. bank account. (Tr. 1487, 1763; GX 2065A at 1).

On March 19, 2010, the defendant formally registered Clarity, which was listed in the Commercial Registry of Geneva with an address in Geneva and a single director named "Richard Pierre Bleich." (GX 2065A). The defendant claimed at trial that he established Clarity as a "trading hub in Switzerland to trade commodities, food mainly" (Tr. 1486), but the Commercial Registry indicated that Clarity's purpose was as follows:

> **Purpose, Observations**
>
> Purpose:
> wealth management; research and advice on investments; the acquisition of interests in companies and all commercial and financial operations and operations involving real and movable property within the limits permitted by the relevant legislation, notably the LFAIE (law on the acquisition of real estate by persons abroad); trading in all products, all types of management consultancy and execution of all instructions on behalf of its clients.

(GX 2065A).

The defendant established Clarity's permanent banking relationship with a Swiss firm named Hyposwiss. (Tr. 1489). On July 30, 2010, the defendant emailed his father a copy of Clarity's "USD and EUR accounts in order to shift our deposit routes." (GX 2201). The defendant

attached to this email fund transfer instructions for Clarity's U.S. dollar and Euro accounts at

Hyposwiss.  (GX 2201A).  For the U.S. dollar account, the fund transfer instructions listed "JP

Morgan Chase Bank New York" ("JP Morgan") as the "intermediary bank":



(*Id*. at 1).

**J.**     **Summer 2010:  Congress Enacts CISADA**

On July 1, 2010, the United States enacted the Comprehensive Iran Sanctions,

Accountability, and Divestment Act ("CISADA").   The defendant downloaded and read a

congressional report related to CISADA the following month (the "Report").  (DXs 132, 132A; Tr. 1530, 1794).

The Report described the history of U.S. sanctions against Iran, including the criminal violations of IEEPA at issue in the trial, and explained that "these measures have been exercised extensively by the Department of the Treasury's Office of Foreign Assets Control and the Department of Justice to enforce the U.S. trade embargo on Iran."  (DX 132A at 46; *see also id.* at 64 ("This section harmonizes penalties for violating export controls and U.S. sanctions across various statutes with the strongest such penalty standards in the U.S. Code, consistent with the International Emergency Economic Powers Enhancement Act of 2007 (P.L. 110–96).")).  The Report also emphasized, twice, that CISADA reflected congressional intent to expand existing "economic sanctions against Iran."  (*Id.* at 1, 43; *see also id.* at 60 (describing provision that "strengthens the current trade embargo" against Iran, "[c]onsistent with IEEPA")).  Elaborating on that theme, the report discussed "severe limitations on U.S. correspondent banking":

> ### TITLE I: SANCTIONS
>
> Title I of H.R. 2194 strengthens the U.S. sanctions regime by requiring severe limitations on U.S. correspondent banking for foreign financial institutions doing business with relevant Iranian banks. The Act further strengthens existing legislation by broadening the categories of transactions that trigger sanctions, increasing the number of sanctions the President can impose on foreign companies whose activities trigger sanctions, and requiring the President to investigate reports of sanctionable activities to determine whether sanctionable activity has indeed occurred.

(*Id.* at 47).  The Report also described "new sanctions" relating to (1) "Prohibitions on any transactions in foreign exchange that are subject to the jurisdiction of the United States and in which a sanctioned person has any interest," and (2) "prohibitions on any transfers of credit or

payments between, by, through, or to any financial institution, to the extent such transfers or payments are subject to the jurisdiction of the United States and involve any interest of the sanctioned person." (*Id.* at 54). Finally, the Report made clear that "U.S. companies," including "U.S. financial institutions," "already face severe civil and criminal penalties for doing business in Iran under IEEPA, as amended by the International Emergency Economic Powers Enhancement Act of 2007 (P.L. 110–96)." (*Id.* at 62).

Despite the foregoing language, the defendant testified, implausibly, that upon reading the Report he believed that CISADA's restrictions were limited to the "Iranian government." (Tr. 1532, 1794-95). When asked if he knew that PDVSA—a Venezuelan counterparty of IIHC on the Venezuela Project—was sanctioned after the passage of CISADA, the defendant initially claimed that such news would be "mind blowing." (Tr. 1795). He later admitted that he knew that PDVSA had been sanctioned. (Tr. 1795-96).

**K.    Summer 2010: The Defendant's Post-CISADA Communications Regarding Applicable Iran Sanctions**

On July 15, 2010, just weeks after CISADA was enacted, Alwin de Jongh, from a Curacao-based exchange broker named HBM Group,[2] wrote to the defendant that Mercantil Valores, or MV, had asked questions about the Venezuela Project in connection with diligence related to a potential foreign currency exchange relationship. (GX 2198; Tr. 1652-53). De Jongh informed the defendant that MV had requested "the name of the project, the name of your company running and financing the project, and the names of the principals (company directors and shareholders)."

---

[2] According to the defendant's passport, the defendant traveled to Curacao on or about June 22, 2010. (GX 201A at 6).

(GX 2198 at 2).   The defendant summarized the Venezuela Project and IIHC, noting that its

"ultimate shareholder" is "my family," but warned that he had "no intention of

disclosing/providing all such documentations to MV or anyone else for that matter."   (*Id.* at 1).

On July 16, de Jongh sent the defendant an email in which he ("Alwin") had been asked about

"certain sanctions," the "domicile of IIHC," and "where Mr. Sadr himself is based":

Alwin -

Thank you for your detailed response.

The issue is not that the Govt of Venezuela is the source of funds, it is that we are dealing with an Iranian owned entity which may or may not be subject to certain sanctions around the world.  What is the jurisdiction of formation/domicile of IIHC?  Please confirm where Mr. Sadr himself is based.

(GX 2199 at 2).  De Jongh explained to the defendant that MV still had "some concerns" following

the defendant's first "explanation of the project and the parties involved," but that these were the

"normal type of compliance and [know your customer] issues that a financial institution like MV

needs to address."   (*Id.* at 1).   De Jongh offered to have an HBM colleague, "Herman" Oosten

provide "a company document for IIHC" to MV, but added:

However, how would you like to respond to the concerns raised below? You are probably the best person to do so.

Please note these are normal type of compliance and KYC issues that a financial institution like MV needs to address.

Looking forward to hear from you.

(*Id.*).

The same day, the defendant responded emphatically to de Jongh, copying Oosten:

16

Sent:        Fri, 16 Jul 2010 12:06:04 -0400
Subject:     Re: Conference Call with Mercantil Valores Uruguay
From:        Ali Sadr <ali.sadr@stratus-global.com>
To:          HBM Funds - Alwin de Jongh <alwin.dejongh@hbmgroup.com>
Cc:          HBM Funds - Herman Oosten <Herman.Oosten@hbmgroup.com>

Dear Alwin.

NO ONE is dealing with an Iranian entity. The clients are 1) Clarity Trade and Finance which is domiciled in Switzerland
with a non-Iranian Shareholder, 2) Pinnacle Investments SA Domiciled in Venezuela with non-Iranian Shareholders.

The issue of the iranian concern should be completely out of the picture!!! why do you think all these enteties are set up in
different countries with no Iranian connections! I'm sure it's now clear that MV's client/costumer is in no shape or form an
Iranian entity or shareholder.

Fianlly IIHC is completely irrelevant to this whole process. A legitimate Swiss company wants to exchange USD to Bs. to a
Venezualan entity, I only brought up IIHC to prove the source of funds and nothing else.

(GX 2199 at 1 (highlighting added)).

On August 16, 2010, one of the defendant's Dubai-based "banker[s]" sent him an article

titled "Banks put on notice over Iran business." (DX 141; DX 141A). The defendant testified that

the email prompted him to read about CISADA. (Tr. 1525). Approximately ten days later,

Cetinel—one of the Turkish experts working on the Venezuela project—forwarded the defendant

an email that described a "ban" on "money transfers" to "Iranian counterparts":

Related to yesterdays' meeting held in Ankara headed by state
undersecretary, have assesed the continuation of business relation with
Iran under US ambargo.

However, it is clear that Turkish state-owned and including private banks
having connections with Iranian banks, have been seriously warned to cease
money transfers to their Iranian counterparts otherwise United States will
enforce sactions against them.

In addition to the sanctions threat, firms that continue relations with
Iran risk losing all business connections with the United States.

On the other hand it is decided that our government will try it's best
to find a solution to overcome this ban.

(GX 2210).

**L.    October 2010:  The Defendant Establishes Stratus – Turkey and a New Swiss Bank Account at Hyposwiss**

On October 22, 2010, the defendant established Stratus International Contracting in Turkey ("Stratus – Turkey").  (GX 2215B-T; Tr. 1487-88).  The defendant admitted at trial that the purpose of Stratus – Turkey was to "replicate" Stratus – Iran.  (Tr. 1488).

According to documentation filed in Turkey, Stratus – Turkey's "head office" was in Istanbul, and the entity's shareholders were the defendant (as vice-chairperson of the board), Mohammad Sadr (as chairperson of the board), one of the defendant's sisters, Taheri, Cetinel, and Cinar.  (GX 2215A-T at 1, 7; GX 2219M)  All three of the Sadr family shareholders and Taheri listed their citizenship as "St. Kitts and Nevis," with the same address in Dubai:



18

(GX 2219M).  The Sadr shareholders each owned 30 percent of Stratus – Turkey—for a total of 90 percent—and the three other shareholders together owned ten percent.  (GX 2215A-T at 4; GX 2219J).

Six days after establishing Stratus – Turkey, on October 28, 2010, the defendant sent an email to his main banker at Hyposwiss, Urs Schneider, to set up a bank account for the new front company.  (GX 2215).  The defendant attached documents related to Stratus – Turkey, and wrote that he would "be the sole signatory on the account for now, till I add my father and sister later on."  (*Id.* (attaching GXs 2215A-T, 2215B-T, 2215C-T)).  The defendant also told Schneider: "I've promised them that we shall have the account number sometime [m]id next week.  I would very much appreciate it if we could live up to my promise."  (*Id.*).  Among the documents the defendant attached to the email were the list of Stratus – Turkey's six shareholders (GX 2215A-T at 1), as well as the breakdown of shares owned by those shareholders (*id.* at 4).

**M.     Late 2010: The Defendant Begins to Route Payments Through Front Companies and United States**

That same day, October 28, 2010, IIHC sent a payment request letter to DUCOLSA, requesting a Euro payment into Stratus – Turkey's Hyposwiss account.  (GX 2220A).  In the request, IIHC directed that, "[i]n the view of the current difficulties for transfer and movements of funds," DUCOLSA should route the payment to Stratus – Turkey's Hyposwiss account:



To: Eng. José Luis Parada Sánchez
       Chairman of the Board of DUCOLSA

Dear Sir,

I hereby write you with my cordial and revolutionary greetings.

In the view of the current difficulties for transfer and movements of funds and to facilitate the process we have decided to appoint a company in Istanbul-Turkey (Stratus International Contracting Insaat ve Taahhut A.S) to act as our agent and propose to make the payment of IPCs through this agent.

(GX 2220A).

The following day, October 29, 2010, the defendant sent an email to "Leyla Estir," at an email address with the domain "istanbul.com," requesting that she mail copies of Stratus – Turkey's corporate documentation to Urs Schneider at Hyposwiss.  (GX 2217).  The defendant described the request as having "the highest priority on our schedule right now."  (*Id.*).  On November 2, 2010, Estir sent the Stratus – Turkey documents to Hyposwiss in Zurich.[3]  (GX 2219).

---

[3] On November 15, 2010, the defendant traveled to Zurich, Switzerland.  (GX 201A at 9).

On November 9, 2010, Banafshe Yadegarzade from the Venezuela Project's Management Office sent an email to the defendant, copying Karimi and attaching IIHC's October 28, 2010 payment request to DUCOLSA.  (GXs 2220, 2220A).

On December 18, 2010, Cetinel sent Mohammad Sadr an email,[4] copying the defendant, expressing concern about a bank named Albaraka Türk Katılım Bankası A.Ş. having declined to "render any services to any direct or indirect transaction originating from or associated with IRAN."  (GX 2237-T).  The underlying email, which the bank sent to Stratus – Turkey director Celal Tatlıcıbaşı, contained the subject line "Iran Transactions."  (*Id.*).

Around the same time in December 2010, the defendant and Cetinel had problems with Hyposwiss related to a payment to a subcontractor on the Venezuela Project named Alper.  (GXs 2238, 2136B-T (describing November 2012 transaction with Alper)).  The defendant had asked Hyposwiss to send a payment in the amount of "USD 305'448" to Alper, and Urs Schneider responded with a request for a "contract" related to the payment.  (GX 2238 at 2-3).  Because there was no existing contact between Alper and Stratus – Turkey, on December 20, 2010, the defendant asked Cetinel to instruct Alper "to issue their formal invoice to 'Stratus Turkey' for their work in Venezuela."  (*Id.* at 2).  Cetinel responded that "Alper Company has the official work team agreement with IIHCO not with Stratus – Turkey," and that "Stratus – Turkey has no contract yet

---

[4] The defendant testified at trial that Mohammad Sadr's secretary used the email address sadr@samanehstratus.com, and that, if someone wanted to get in contact with Mohammad Sadr, he or she would "go through that secretary to get in contact."  (Tr. 1779; GXs 2052, 2088, 2171-T, 2296.

in Venezuela," but added that he would "ask Alper Co to issue a dummy invoice." (*Id.*). The

defendant replied that using "the name "Iranian' anywhere" would cause "serious problems":

On Mon 20/12/10 10:24 , Ali Sadr ali.sadr@stratus-global.com sent:

Dear Mustafa jan,

This is only a formality that the bank asks me to do for their compliance filings, and nothing more. Even if you have an invoice that only mentions "IIHC", then we are still fine, but if that invoice show the name "Iranian" anywhere then we will have serious problems.

(*Id.* at 1 (highlighting added)).

On December 30, 2010, the defendant sent an email to Karimi and Behrooz Zangeneh, to

which he attached "the USD account information as requested." (GX 2240). The attachment

provided the account number for Stratus – Turkey's U.S. dollar account with Hyposwiss, and listed

the "Intermediary Bank" as "JPMORGAN CHASE BANK (New York, New York)." (GX

2240A).

### N.    January – April 2011:  Stratus – Turkey Creates Backdated Name-Change Documentation for IIHC In Anticipation of a $29.4 Million Payment

On January 14, 2011, the defendant, on behalf of Stratus – St. Kitts, and Celal Tatlıcıbaşı,

on behalf of Stratus – Turkey, executed a contract naming Stratus – St. Kitts as an administrator

to, *inter alia*, "[c]arry out all activities related to management and financial control of income and

expenses" of Stratus – Turkey in connection with the Venezuela Project. (GX 2071A at 2). The

January 2011 agreement identified Stratus – Turkey as a "major subcontractor" of the Venezuela

Project. (*Id.* at 1). The agreement also authorized annual payments to Stratus – St. Kitts,

represented by the defendant, of "USD1,000,000.00" per year for 2011, 2012, and 2013. (*Id.* at 1,

3).

On February 12, 2011, Zangeneh sent a payment request letter on IIHC letterhead to DUCOLSA. (GX 2018A). Referring back to the October 28, 2010 request (GX 2220A), the February 12, 2011 payment request explained that IIHC had "already appointed" Stratus – Turkey to "act as our agent for receiving the payment of IPCs [Interim Payment Certificates]" due to "the current difficulties for transfer and movements of funds and to facilitate the process" (GX 2018A). IIHC's letter requested payment in U.S. dollars for IPCs 7, 8, 9, and 10 into the Hyposwiss bank account for Stratus – Turkey, through "Correspondent Bank: J P MORGAN CHASE (New York, New York)." (*Id.*). The account details in IIHC's letter were identical to the information the defendant sent to Karimi and Zangeneh on December 30, 2010. (*Compare* GX 2018A, *with* GX 2240A).

On February 28, 2011, Karimi forwarded to the defendant a document purporting to be minutes relating to an "Extraordinary General Meeting" by IIHC management, which the document claimed occurred on an unspecified month and date in 2010, *i.e.*, before IIHC sent the first letter requesting U.S. dollar payments from DUCOLSA. (GXs 2015, 2015B). The purported IIHC meeting minutes claimed that the "Chairman," Mohammad Sadr, led a discussion that resulted in unanimous board approval to use IIHC's "abbreviation name . . . instead of [the] company's full name":

> The Chairman then declared the meeting duly convened to consider the agenda as follows:
>
> *"Using company's abbreviation name instead of its full business name"*
>
> Mr. …. stating project manager points of view in respect of using company's abbreviation name, i.e. "*IIHC*" instead of company's full name, i.e. "*IRANIAN INTERNATIONAL HOUSING COMPANY, C.A – SHERKATE BEINULMELALI – E – KHANESAZI IRANIAN*" in all documents and correspondences of the company as well as formal notification of the subject to Venezuela's legal authorities emphasizing on using full legal capacities to make Venezuela's project as convenient and smooth as possible, taking due account to local circumstances of the project's location, and required shareholder's consideration and opinions of general meeting's members.

(GX 2015B).  Karimi's February 28, 2011 email to the defendant also attached a letter from Karimi to Zangeneh bearing the date "September twenty-nine, two thousand and ten."  (GX 2015D-T).  In the letter, Karimi instructed Zangeneh to use the IIHC acronym "in official company documents and correspondences" and to file the IIHC meeting minutes with Venezuelan authorities.  (*Id.*).

On March 7, 2011, the defendant sent Zangeneh the backdated meeting minutes and letter from Karimi.  (GX 2015).  The defendant told Zangeneh that the documents would "make our transactions a bit easier" and that the "name change" was "crucial" because "we have requested for our last invoice to be paid in USD":

> Dear Mr. Zangeneh,
>
> Hope all's well. I've already sent the transfer to Dubai this morning and will provide you with the swift as soon as I receive it.
>
> Please see attached the documents frowarded by Mr. Karimi in order to make some necessary changes to our TRADE name in Venezuela so that we can make our transactions a bit easier.
>
> Let me know when we can conclude on this as we have requested for our last invoice to be paid in USD which makes this name change a bit more crucial.
>
> Thanks and best regards

(*Id.*).

24

Also on March 7, 2011, a Hyposwiss employee sent the defendant, "as requested," the authorized signature forms for his accounts with Hyposwiss.  (GX 2016).  Attached to the email were the Hyposwiss signatory forms for the bank accounts associated with Stratus – St. Kitts (GX 2016A), Clarity (GX 2016C), and Stratus – Turkey (GX 2016F).  The defendant and his sister were listed as signatories for all three accounts, and they each listed "St. Kitts and Nevis" under the section for nationality.  (GXs 2016A, 2016C, 2016F).  Mohammad Sadr was not a signatory on any of the three accounts.   (GXs 2016A, 2016C, 2016F).

On March 16, 2011, Karimi forwarded to the defendant IIHC's February 12, 2011 letter to DUCOLSA requesting a U.S. dollar payment to Stratus – Turkey.  (GXs 2018, 2018A).  The following day, Karimi wrote to the defendant that "Fondo chino," which the defendant described at trial as a joint fund between China and Venezuela (Tr. 1483), "has asked a bank co[n]firmation that verifies the characters of the account's owner" (GX 2019).  The defendant responded, in part, that he would "get the bank letter as soon as possible today" (GX 2019), and communicated with Schneider at Hyposwiss about the letter (including confirming that the intermediary bank for the requested transfer was JP Morgan Chase in "New York, New York").  (GX 2020).

On March 25, 2011, Karimi wrote to the defendant that the "net amount of IPCs is 29,442,967.60 USD."  (GX 2022).  In a separate message, Karimi asked the defendant to "please call me urgently" because "[c]lient" (GX 2248)—*i.e.*, Venezuelans following up on Fondo Chino's inquiry regarding the "characters of the account's owner" (GX 2019)—had "asked if the owner of the account in the [intermediate] bank is Iranian" (GX 2248).  The defendant responded to Karimi on March 26:

```
Sent:       Sat, 26 Mar 2011 00:36:24 -0400
Subject:    Re:
From:       Ali Sadr <ali.sadr@stratus-global.com>
To:         B Karimi <bkarimi_66@yahoo.com>

There's no Iranian behind any of the accounts provided.
This is a simple answer.
```

(GX 2248).

Contrary to the defendant's "simple answer," but consistent with the reality of the Venezuela Project, the defendant confirmed in an April 2011 email to Cetinel regarding collective frustration about the pace of payments that "everyone in Tehran including myself" was tracking the issue.  (GX 2026; *see also* GXs 2021-T, 2021A-T (March 2011 email from Karimi to defendant regarding "Suspension plan")).

> **O.**   **April – June 2011:  Commerzbank Inquires About Fondo Chino's $29.4 Million Payment to Stratus – Turkey and Makes Disclosures to OFAC**

On April 4, 2011, Fondo Chino sent the $29.4 million payment requested by IIHC to Stratus – Turkey's account at Hyposwiss.  (GX 410).  The defendant sent Schneider at Hyposwiss a copy of the payment routing information, which reflected that the ordering banks used by Fondo Chino were Banco del Tesoro and Commerzbank AG, in Frankfurt, Germany, and the intermediary bank was JP Morgan in New York.  (GXs 2023, 2023A).

On April 27, 2011, based on an alert related to Fondo Chino, Commerzbank sent six inquiries to Banco del Tesoro regarding the $29 million payment to Stratus – Turkey:

> 1. **Full address of the Beneficiary of Stratus International Co.**
> 2. **Country of registration of Stratus Co.**
> 3. **Please indicate the names of the beneficiaries and citizenship of the owners of Stratus [Co.]**
> 4. **Please indicate the full reason for the payments.**
> 5. **Was this payment for the services provided? What type of services and please provide a copy of the invoice.**
> 6. **Please indicate the countries in which Stratus [Co.] operates.**

(GX 2032-T at 6).  Commerzbank requested a response by May 2, 2011.  (*Id.* at 5, 7).  Banco del Tesoro sent Commerzbank's questions to Fondo Chino with a request that the inquiries be sent "immediately to DUCOSLA in order to avoid the blocking" of the payment.   (*Id.* at 4). Commerzbank's requests eventually made it to Karimi, who forwarded the email thread to the defendant with a note regarding the "urgency of the letter."  (*Id.* at 1).

On the May 2, 2011 deadline set by Commerzbank, the defendant emailed Karimi and Cetinel with responses (in blue) to Commerzbank's questions:

> Please see below our response to their request:
>
> 1- Please provide the full address of the Beneficiary, Stratus International Contracting?
> Stratus International Contracting
> Gardenya Plaza 5, K:3 D:3 (floor 3, Suite 3)
> 34758 Atasehir,  Istanbul
> 2- Please provide the country of registration for Stratus International Contracting?
> Istanbul, Turkey
> 3- Please provide the beneficial owners and citizenship of the owners of Stratus International Contracting?
> See attached the Operating Certificate and Registration Confirmation
> 4- Please provide a detailed purpose of the payment? Was this payment for services provided? If so, what type of services and please provide a copy of the invoice(s)? Please provide the countries in which Stratus does business?
> Please see attached as a suggested sample, since this will be provide by the Employer with their letterhead
> Stratus Provides Construction Services in Turkey, Dubai, Venezuela

(GX 2034).  Thus, rather than responding to Commerzbank's request for identification of "the beneficial owners and citizenship of the owners" of Stratus – Turkey, the defendant provided an "Operating Certificate and Registration Confirmation."  (*Id.*).  Neither document attached by the

defendant (GXs 2034B-T, 2034C-T) identified the actual shareholders of Stratus – Turkey:  the defendant, Mohammad Sadr, Negrin Sadr, Cetinel, Cinar, and Taheri (GX 2215A-T at 1).

Two days later, on May 4, 2011, Moayed, the Secretary of the Venezuela Project Committee (Tr. 197; GX 2113B-T at 4), sent an email stating that a "delegation came from the U.S. to Turkey around two weeks ago to warn banks and private companies not to do business with Iranian companies" (GX 1103).  Cetinel (a Turkish national) responded to the email, copying the defendant, Karimi, Zangeneh, and others, and stated that the "news" sent by Moayed was "not new," and that "[i]n spite of this we exported several goods for Vavan project."  (GX 1103; *see also* GX 1001A at 31 (listing "1,540 Units Residential Complex Vavan, Islamic Republic of Iran")).  On May 9, Cetinel sent the defendant an email regarding "restructuring" Stratus – Turkey, noting that "non[e] of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran."  (GX 2037).

On June 16, 2011, Commerzbank sent a letter to OFAC regarding Fondo Chino's April 4, 2011 payment of $29.4 million to Stratus – Turkey, which stated that Commerzbank decided "to share this information with OFAC, since Stratus may be an Iranian company."  (GX 411).  In the letter, Commerzbank compared information from Stratus – Iran's website indicating that it was an Iranian company working on the Venezuela Project, with the information provided by the defendant (GXs 2034, 2034B-T, 2034C-T), including that Stratus – Turkey was based in Istanbul and working on the Venezuela Project.  (GX 411 at 1).  Commerzbank also informed OFAC that it had "added Stratus into our sanctions filter to monitor any future payments."  (*Id.* at 2).

At trial, the parties stipulated that, in response to Commerzbank's June 16, 2011 letter:

OFAC did not open an investigation into the April 4 payment to determine, among other things, whether or not Stratus Turkey's association with Stratus Iran would

have rendered the April 4 payment an export of U.S. services in violation of the Iran sanctions.  OFAC also did not seek any enforcement action against any of the parties, including the banks, that participated in the April 4 payment.

OFAC did not notify Stratus Turkey or Stratus Iran, or its owners, about a potential sanctions violation, inquire about their ownership, or designate either company as an entity whose property U.S. financial institutions were required to reject or block.

[. . .]

In fact, in September 2016, the prosecutors in this case informed OFAC about the conduct in this case, including the allegedly wrongful actions.  OFAC chose not to take any enforcement action.

(DX 150 ¶¶ 3-4, 6; Tr. 1399).

## P.     July 2011:  IIHC Re-Routes Payments to Clarity Following Scrutiny from Commerzbank

On July 1, 2011, Zangeneh and Cetinel, on behalf of IIHC, requested payment from DUCOLSA for IPCs 11, 12, and 13.  (GXs 2048, 2048A).  Like the prior IIHC payment requests described above (GXs 2018A, 2220A), IIHC's July 1, 2011 request referenced "current difficulties for transfer and movement of funds" and sought payment into a Hyposwiss account via JP Morgan (GX 2048A).  The July 1 request, however, asked DUCOLSA to send the funds to Clarity rather than Stratus – Turkey (*id.*), which had been the subject of Commerzbank's April 2011 inquiries (GX 2032-T).



(GX 2048A).  Cetinel forwarded IIHC's July 1, 2011 payment request to the defendant on July 2.

(GX 2048).

On July 5, 2011, PDVSA sent approximately $20.7 million to Clarity's Hyposwiss account.

(GX 401; GX 2076B at 6).  In addition to using Clarity rather than Stratus – Turkey to receive the

funds for IIHC, the payment differed from the prior payment in that the funds originated from

PDVSA rather than Fondo Chino (the entity that caused the alert at Commerzbank in the first

place, as confirmed in an email sent to the defendant (GX 2032-T)), and the funds were not routed

through Banco del Tesoro or Commerzbank (for this payment or any subsequent payment).  (GX

401; GX 2076B at 6).   On July 6, 2011, the defendant sent an email to Cetinel attaching

confirmation of the payment and noting "[i]t seems like our strategy has worked so far."  (GX

2051).

On July 22, 2011, Zangeneh sent a payment request letter from IIHC to DUCOLSA for

IPC 14.  (GX 1501A).  The July 22, 2011 request included the same routing request language as

the July 1 payment request seeking payment to Clarity.  (*Compare* GX 1501A (July 22 request), *with* GX 2048A (July 1 request)).  On August 11, 2011, PDVSA sent approximately $5.4 million to Clarity's Hyposwiss account, once again avoiding routing through Fondo Chino, Banco del Tesoro, and Commerzbank.  (GX 402; GX 2076B at 6).

### Q.   September – December 2011:   Payments, Promotions, and Continued Sanctions Violations

On September 1, 2011, the defendant authorized Stratus – St. Kitts to pay Mohammad Sadr a total of two million British Pounds—including a one million-Pound "Signing Bonus"—as the defendant's father's "full compensation package till the end of fiscal year, 2011."  (GX 2071B). Also on September 1, 2011, Mohammad Sadr authorized a series of formal appointments related to the Venezuela Project:  Cetinel became "Project Director" (GX 2253A), Karimi was again appointed "Project Manager" (GX 2254A), and Cinar was named "Vice President (Overseas Contract)" (GX 2255A).

On September 19, 2011, Cetinel sent the defendant an email coordinating the defendant's travel plans to Venezuela, and explaining that Karimi was in Caracas for a meeting with the "Iranian delegation." (GX 2070).  Cetinel also explained that the "Iranian Minister of Housing" would be traveling from Caracas to the project site, and offered to arrange for the defendant to travel on the "same plane."  (*Id.*).  The defendant agreed to accompany the "Iranian delegation." (*Id.*).

On September 27, 2011, IIHC sent DUCOLSA a payment request letter for IPCs 15 and 16.  (GX 1502A).  The main difference from the IIHC requests on July 1 and July 22, 2011 was that Karimi, rather than Zangeneh, signed the request.  (*Compare* GX 1502A (September 27 request), *with* GXs 1501A (July 22 request), 2048A (July 1 request)).  On October 12, 2011,

PDVSA sent approximately $5.9 million to Clarity's Hyposwiss account via JP Morgan in New York.  (GX 403).

On October 17, 2011, Cetinel sent an email to Cinar regarding a "change of the name of company," which included the following:

Dear Mr.Cinar,

Due to developing circumstances it is decided that name of company will be changed from Iranian International Housing Company (IIHC) to International Housing Company (IHCO).

(GX 2074).  Cetinel forwarded the message to the defendant, noting that he had "commenced the procedure."  (*Id.*).  On October 24, 2011, the defendant and Cetinel further discussed a "name change of IIHCO"; Cetinel proposed changing IIHC's name to "International Industrial Housing Company" or "International Iron Housing Company," but the defendant preferred "Industrial International Housing Company."  (GX 2077).

On October 24, 2011, Karimi sent an IIHC payment request letter to DUCOLSA for IPCs 17 and 18.  (GX 1503A).  Karimi's request was nearly identical to the September 27, 2011 IIHC request (GX 1502A), and he attached the two Interim Payment Certificates that covered IPC 17 (August 2011) and IPC 18 (September 2011).  (GX 1503A at 2-3).  Both invoices bore the IIHC logo and IIHC's full name, "Iranian International Housing Company":





(*Id.*).  In response to the October 24, 2011 request from IIHC, on November 9, 2011, PDVSA sent approximately $12.9 million for IPCs 17 and 18 to Clarity's Hyposwiss account via JP Morgan in New York.  (GX 404).

On November 12 and November 28, 2011, Karimi sent IIHC's payment request letters to DUCOLSA for IPCs 19 and 20 (relating to September and October 2011), again requesting payment for these IPCs to Clarity's Hyposwiss account via JP Morgan.  (GXs 1504A, 1506A).

On December 9, 2011, the defendant sent Schneider an email regarding the $12.9 million transfer from PDVSA on November 9, 2011, which the defendant characterized as "the recent incoming funds."  (GX 2087).  The defendant's email purported to attach "the IPC's" related to the transfer, which were labeled "Venz IPC_17_Confidential.pdf" and "Venz IPC_18_Confidential.pdf."  (GXs 2087, 2087A, 2087B).  But the defendant did not attach the IPCs

33

that IIHC had sent to DUCOLSA in connection with the payment request.  (GX 1503A at 2-3).
Rather, the IPCs that the defendant attached to his December 9, 2011 email to Hyposwiss were
altered so that they referred to "IIHCO" instead of "Iranian International Housing Company":





(GXs 2087A, 2087B).

On December 18, 2011, Cetinel sent the defendant a report Karimi had prepared regarding
a December 12, 2011 meeting at the Iranian Embassy in Venezuela between Karimi and Abdolreza
Mesri ("Mr. Ambassador MESRI"), Iran's ambassador to Venezuela at the time.  (GXs 2088,
2088A).  In the report, Karimi explained that Mesri expressed frustration that IIHC would not meet
the request of the Venezuelan government to complete "1760 housing units up to the end of the
year 2011," which Mesri believed had "caused disgrace of the Islamic Republic of Iran."  (GX
2088A at 1).  Karimi's report also described prior efforts by Mesri on behalf of IIHC to obtain
"outstanding payments of 2010 which were realized in the first quarter of 2011," which had

34

included presentation of IIHC's "positions" in "all sessions" of the "Joint Commission between Iran and Venezuela," outreach to PDVA's then-president Rafael Ramírez ("Mr. Ramirez"), a "strongly-worded letter" to Iranian president Mahmoud Ahmadinejad ("Mr. Ahmadinejad"), lobbying the "Iranian Bank of Development and Minister of Industry," and obtaining a bridge loan "to IIHCO by the BID." (*Id.* at 2). Karimi reported that Mesri would not advocate further to Ramírez on behalf of IIHC, and that Mesri had threatened to tell Ahmadinejad that he no longer supported IIHC and would "do anything to deny the departure of managers of this company from Iran." (*Id.*).

### R.    December 2011 – February 2012: The Defendant Disburses Proceeds of the Sanctions Violations

Despite Mesri's threats, on December 27 and December 30, 2011, PDVSA sent a total of approximately $10.9 million to Clarity's Hyposwiss account for IPCs 19 and 20. (GXs 405, 406, 420-21, 702 (rows 6-7)). In total, as described above, PDVSA transferred approximately $55.8 million to Clarity's Hyposwiss account, via JP Morgan and Citibank accounts in the United States, in connection with Venezuela Project IPCs 11-20 between July 2011 and December 2011. (GX 702 (rows 2-7)).

On December 22, 2011, the defendant sent an email to "Faramarz Shadloo" attaching 52 pages of wire instructions addressed to Schneider at Hyposwiss. (GXs 2090, 2090A). Pursuant to the wire instructions, during less than a month between November 24 and December 11, 2011, the defendant transferred nearly $8.2 million from "the USD account" of Clarity at Hyposwiss to the Stratus – St. Kitts Hyposwiss account, and then transferred those funds to more than 30 other people and entities in China, Curacao, Italy, Panama, Spain, Venezuela, Portugal, and the United States. (GXs 2090A, 2090A-T; *see also* GX 705A (summary of transfers)).

For example, the defendant signed wire instructions, dated December 6, 2011, for a $60,000 transfer to Vincenzo and Alessandra Conte at a Citibank account in Staten Island:



(GX 2090A at 32). The defendant's instructions stated that the "Purpose" of the transfer was "Legal Fees-Claims Management-IPC40." (*Id.*). But IPC 40 had not been completed as of December 2011. (GX 702 (reflecting December 2011 PDVSA payments related to IPCs 19 and 20)). Conte is from Venezuela, but moved to Staten Island in 2000. (Tr. 1092). She owns a hardware store, and her father, Vincenzo Conte, is retired. (Tr. 1095-96). Although Conte practiced law in Venezuela, she had not done so since 1999. (Tr. 1095). In August 2011, she sold an apartment that she owned in Caracas for approximately $170,000. (Tr. 1092). The buyer had difficulty obtaining U.S. dollars to complete the purchase, and told Conte that he made

arrangements to have "Straus" do the transfer.  (Tr. 1092-93).  Conte had never heard of Stratus, Clarity, or the defendant.  (Tr. 1094).  Nor had she completed any work, legal or otherwise, for Stratus, Clarity or the defendant.  (Tr. 1095).

Beginning in January 2012, the defendant transferred millions of dollars from Clarity's Hyposwiss accounts to Stratus – St. Kitts and a series of family entities and investments, including the defendant's A&R Capital and other entities in the United States.  (GX 703 (summary chart); GXs 452, 454C, 480E, 480F, 480K, 490A, 2284A, 2284D).  During the same month, on January 28, 2012, Stratus – Iran's "Export & Int'l. Relations Manager" sent the defendant an email expressing concerns about, *inter alia*, "US sanction issues" arising from the registration of Stratus – Iran's "global domain name" (stratusholding.com) with an "Iranian entity."  (GX 2261 at 1-2). To avoid the connection between Stratus – Iran and the Iranian Internet service provider, the employee proposed using "trustworthy non-Iranian registrar or preferably, a reliable individual having a credit card (e.g. Mr. Ali Sadr) to register [the domains] directly with one of [the] top ranking domain registrars in the US or Canada."  (*Id.* at 1).

On February 1, 2012, the defendant used Clarity to transfer approximately $2.2 million for the purpose of purchasing land in California (GX 703; 480K).  During the same month, on February 16, 2012, one of the defendant's sisters sent the defendant a pamphlet regarding U.S. sanctions against Iran with the note:  "This applies to U.S. persons and whomever is present in the U.S., regardless of what visa they hold."  (GX 2265).

37



(GX 2265B).   The pamphlet explained that the Iran sanctions "significantly restrict activities involving Iran," including "receiving or sending funds to friends and family" and "the ability to bring, receive, take, or send goods, services, technology and money from and to Iran."  (*Id.* at 2).[5] The pamphlet explained that "[i]n practice, funds transfers between U.S. and Iran that do not violate the Iran Sanctions are few and far between because most transactions with Iran are prohibited."  (*Id.* at 4).  The pamphlet discussed the concept of prohibited sanctions evasion, and, similar to the CISADA report that the defendant reviewed in August 2010 (DX 132A), described "severe" criminal penalties for sanctions violations:

---

[5] Citations to the brochure use page numbers within the brochure.

> **Even though I am a U.S. person, I have family members who live abroad (e.g., Europe) and are not U.S. citizens or residents. May I ask them to take care of some of the transactions that I'm prohibited to conduct myself?**
>
> **No.** You cannot ask, pay or help non-U.S. persons (including family and friends) to do what you are prohibited to do yourself. In addition to prohibiting you from directly engaging in most transactions with Iran, the Iran Sanctions also expressly prohibit you from attempts to evade the import/export restrictions and from facilitating, approving, financing, or guaranteeing prohibited transactions undertaken by other people, even if they themselves don't qualify as a U.S. person.[4]

> **What happens if I don't comply with the Iran Sanctions?**
>
> Failure to comply with the Iran Sanctions can result in *severe* criminal and civil consequences:[2]
> - Criminal penalties may include a fine of up to 1 million dollars, imprisonment up to 20 years, or both;
> - Civil penalties may be the greater of up to $250,000 or twice the amount of the transaction.

(*Id.* at 2-3).

### S.      January – April 2012:  UBS Blocks a Payment Due to Sanctions

On January 26, 2012, Karimi sent an IIHC payment request letter to DUCOLSA for IPC 21.  (GX 2267A).  Karimi directed that the payment be made in U.S. dollars to a Clarity account at Hyposwiss, via UBS AG in Zurich.  (*Id.*).  Centinel forwarded the payment letter to the defendant on February 17.  (GX 2267).

On February 23, 2012, PDVSA sent a payment of approximately $7.4 million for IPC 21 to Clarity, via Citibank and the UBS Stamford Branch in New York City.  (GX 422).  That same day, the defendant deposited the payment into another Clarity account at Hyposwiss.  (GX 2284A).  On March 5, 2012, the defendant transferred $7 million to another of his companies, Perse Swiss Finance and Asset Management, S.A.  (GX 2284A at 1; Tr. 1472 (defendant's testimony that he was "running Perse Swiss, it's an asset management company in Switzerland"); GX 2145 (September 2012 email from defendant with subject line "Cirrus and Perse")).

One week later, on March 12, 2012, the defendant learned that UBS Stamford had rejected a payment made by Clarity to a shipping company in Dubai because it violated sanctions.  (GXs 2114, 2114A).  A Hyposwiss representative emailed the defendant:

> Dear Ali,
>
> Unfortunately, we have received the money back referring to the payment of USD 45'000.- to LAFTTIZ SHIPPING FZE.
> After all, UBS Stanford return us USD 44'980.- minus fee. They rejected this payment due to the Iranian transaction regulations (see attachment).
> Up to now, they have also not reacted on our request for perceiving their compliance reports/lists.
>
> I am sorry to provide such bad news.

(GX 2114).  Attached to the email was a message from UBS Stamford, which stated:  "Please reject this payment pursuant to the Iranian Transactions Regulations."  (GX 2114A).  Although the defendant testified at trial that he believed the payment was for food and therefore did not violate sanctions (Tr. 1545-46), there is no record of him responding to his banker's email or following up on the rejected payment.

On April 13, 2012, PDVSA paid approximately $15.7 million dollars for IPC 22 to Clarity via Citibank and the UBS Stamford Branch.  (GXs 423, 702, 2119, 2119A, 2284A at 2).  In April and May 2012, the defendant disbursed more than $3.6 million from Clarity to entities he and his family controlled.  (GX 703).

### T.    Mid 2012: The Defendant Shuts Down IIHC's Venezuela Website After OFAC Sanctions EN Bank

In mid-2012, OFAC sanctioned EN Bank.  (Tr. 500, 1445-46; GX 1001A at 8 (brochure listing EN Bank as part of Stratus Holding Group); GX 2195A at 3 (brochure listing EN Bank under the Stratus Group of Companies)).  Although the defendant initially claimed during his testimony that his father "maintained a minority shareholdership" in EN Bank (Tr. 1445), he later

admitted that Mohammad Sadr was the Chairman of the bank (Tr. 1736), which he characterized as the "Wells Fargo" of Iran (Tr. 1445).

About a month after OFAC's announcement, the defendant demanded that Cetinel shut down IIHC's Venezuelan website:

---

On Sun 12/08/12 00:10 , Ali Sadr ali.sadr@stratus-global.com sent:

Mustafa jan,

Please order to bring the website www.iihco.com.ve immediately down. I can't believe with all that we go through something so dangerous like this gets uploaded. I've several times reminded Bahram that such website shall never be contsructed for "any reason".

Thanks and best regards

--
-Ali

---

(GX 2139).  The next day, Cetinel responded:  "I instructed now to shut this website down.  I did not know when has been constructed and why[.]"  (*Id.*).

### U.   September 2012 – February 2013:  PDVSA Continues U.S. Dollar Payments and Citibank Blocks One Payment Due to Sanctions

On August 31, 2012, Zangeneh sent a payment request letter on behalf of IIHC to DUCOLSA for IPCs 23, 24, and 25.  (GX 1405A)  For the first time, the letter requested that the payment be made in two separate installments—one in U.S. dollars and the other in bolivars—and directed that the installments be transferred to different beneficiaries, with the dollar portion going to Stratus – Turkey's Hyposwiss account via Citibank and the bolivar payment to IIHC's account at Banco de Venezuela (the "IIHC Banco de Venezuela Account"):

Referring to our meeting held in Miranda Building dated on 30.08.2012 we hereby according to the minutes of the said meeting request you to order to make the payment for IPC 23 & 24 to the following accounts with the below details, in USD currency and in BsF :

**USD Account:**

| | |
|---|---|
| Beneficiary: | Stratus International Contracting J.S |
| Account nr: | 0519.6631.2003 |
| IBAN#: | CH08 0853 0051 9663 1200 3 |
| Address: | Gardenya Plaza 5 K:3 D:3 |
| | Atasehir/Istanbul |
| | 34758 Turkey |

| | |
|---|---|
| Beneficiary's Bank: | Hyposwiss Private Bank Ltd. |
| | Zurich, Switzerland |
| Swift: | SHHBCHZZ |

| | |
|---|---|
| Intermediary Bank: | CITIBANK N.A. |
| | New York |
| Swift: | CITIUS33 |

And

**BSF Account:**

| | |
|---|---|
| Beneficiary: | Iranian International Housing CA |
| Account No: | 0102-0874-29-0000001009 |
| Beneficiary's Bank: | Banco De Venezuela |
| Type of Account: | Corriente |

(*Id.*).

Two weeks later, on September 10, 2012, the defendant berated two of his employees for allowing the "name of Iran" to be used in draft marketing materials for Cirrus General Trading ("Cirrus"), a Dubai-based company that Mohammad Sadr started and the defendant later owned and ran (Tr. 1480):

```
Sent:      Mon, 10 Sep 2012 04:57:11 -0400
Subject:   Cirrus and Perse
From:      Ali Sadr <ali.sadr.h@gmail.com>
To:        Linet Estiroti <linet.estiroti@stratusinternational.com.tr>, Victoria Reid <victoria.reid@perseswiss.ch>

How the hell did you two people from the same organization cooperate/coordinate on Cirrus's package?????
I can tell from what you've sent to me as the initial draft of Cirrus you did not cooperate together at all!!!! Why the hell do I
see the name of Iran in there. Why wasn't the same format of Clarity followed?!!!!

Cirrus needs to fully done by tomorrow, with pictures even if no one sleeps tonight.
Such a waste of time for me to even read that.
```

(GX 2145).

On September 21, 2012, PDVSA sent a payment of approximately $1.9 million to Stratus – Turkey's Hyposwiss account via Citibank.  (GX 424).

On October 15, 2012, Karimi sent an IIHC payment request letter to DUCOLSA for IPCs 26 through 29, once again seeking a dollar payment to Stratus – Turkey's Hyposwiss account via Citibank and a payment in bolivars to IIHC's Venezuela branch at the IIHC Banco de Venezuela Account.  (GX 1601A).  On November 14 and 15, 2012, PDVSA wired a total of $1,938,717.60 to Stratus – Turkey's account with Hyposwiss via Citibank in New York.  (GXs 425, 426, 427; GX 702 (rows 11-13)).

On November 29, 2012, Linet Estiroti, who was an assistant at Stratus – Turkey (GX 2177), sent Cetinel and the defendant an email confirming that Hyposwiss had credited Stratus – Turkey's account with $87,141.67 based on a payment from PDVSA relating to IPC 30.  (GXs 2149-T, 2149A).  Although Hyposwiss had already extended the credit to Stratus – Turkey, Citibank's payment-processing filter blocked the transfer because PDVSA or its bank, Banco Espirito Santo, listed the beneficiary as the "Iranian International Housing Company" in its SWIFT payment instruction.  (GX 432 at 4).  On November 29, Citibank asked Banco Espirito Santo (the "remitting bank") to provide more details about the "Iranian International Housing Company," "in accordance

43

with OFAC guidelines." (*Id.* at 3-4). On January 12, 2013, Banco Espirito Santo responded to Citibank that Hyposwiss (the "beneficiary bank") had "confirmed" that the name of its client was "in fact Stratus International Contracting JS (a Turkish Company providing contracting services) and not the one that eventually appeared" in the original payment instruction. (*Id.* at 2-3 (all caps in the original)). On January 14, 2013, a Citibank employee asked for "documentary evidence of this error," and stated that "[a]t the very least, we would need to cancel and not report. If we don't get anything further, please reject/report" to OFAC. (*Id.* at 1). On January 28, Banco Espirito Santo faxed Citibank a Swift message from Hyposwiss, in which Hyposwiss asked Citibank to "deblock cover urgently as [the payment] was already credited and we need to receive outstanding cover." (GX 430 at 3 (all caps in the original)). On February 5, in reliance on this assurance from Hyposwiss, Citibank canceled the transaction rather than reporting it to OFAC. (GX 431; Tr. 893). Two days later, Citibank cleared an $87,141.67 payment based on a SWIFT message that listed Stratus – Turkey as the beneficiary. (GX 428).

## V.   December 2012:  The Defendant Alters Two Contracts to Paper the File at Hyposwiss

Between April and mid-October 2011, Venezuelan entities paid Stratus – Turkey and Clarity a total of approximately $61.4 million, all routed through U.S. correspondent banks, in connection with the Venezuela Project. (GX 702 (rows 1-4)). By October 20, 2011, the defendant started to work on a purported "accounting" of these funds and the related million-dollar transfers between his front companies. (GX 2076 at 1). "Alex" Frei identified "missing documents/contracts" for some of Clarity's transactions, and asked the defendant to confirm which transactions were "based on the agreement with IIHCo. (in and out)." (*Id.*). In June 2012, Martina Schuler emailed the defendant regarding "preparation of the accounting 2012" for Clarity's

44

Hyposwiss accounts.  (GX 2284).  Schuler told the defendant that it was "a little bit difficult to distribute [Clarity's] different incoming and outgoing payments," requested "invoices, payments instructions, etc.," and, like Alex Frei, asked the defendant to clarify which payments related to the "project with IIHCO."  (GX 2284).

The defendant returned to the United States as a lawful permanent resident in November 2012.  (Tr. 1437, 1683, 1766).  On December 19, 2012, related to the requests from Frei and Schuler, Estiroti emailed the defendant the first three pages of a sub-contract between IIHC's Venezuela branch and Stratus – Turkey.  (GX 2153-1).  The sub-contract attached to Estiroti's email was dated February 2, 2012.  (GX 2153-2).  Minutes later on December 19, the defendant responded by directing Estiroti to change the date on the contract to February 2, 2010, and to send only the first three pages to "Alex" Frei:

| | |
|---|---|
| Sent: | Wed, 19 Dec 2012 08:18:45 -0500 |
| Subject: | Re: Stratus-IIHCo Contract |
| From: | Ali Sadr <ali.sadr.h@gmail.com> |
| To: | Linet Estiroti <linet.estiroti@stratusinternational.com.tr> |

Must be 02 February 2010. Both on the top and on the bottom
We give the one with 2010 to Alex, and we use 2012 for our own purposes. Only send Alex the first 3 pages, and nothing more, and tell him that remaining is protected by the confidentiality Stratus has signed with IIHCo.

(GX 2153-1).

On December 21, 2012, Estiroti emailed the defendant with the subject line "IIHCO documents."  (GX 2154-1).  Estiroti told the defendant that she had "requested Deniz to make the changes accordingly," to the "02 July 2007 Contract between Ducolsa & IIHCo" and the "01 Nov 2010 Subcontract between IIHCo and Stratus Int," in addition to two other documents.  (*Id.*).  Estiroti told the defendant that she would change the date on the sub-contract to November 1, 2010, but that Cetinel wanted "to keep it as 2012."  (*Id.*).  The defendant responded:  "Mustafa bey

[Cetinel] doesn't know the use of that contract.  Yes, our actual contract is in 2012, and that's what

Evrim [Ekrem Cinar] and others will see.  But the contract you show Alex [Frei] should be 2010."

(*Id.*).  Estiroti altered the sub-contract between IIHC and Stratus Turkey:

Authentic Contract (GX 2153-2 at 1, 3)





Backdated Contract (GX 2154-2 at 7, 9)





These contracts were otherwise identical.

46

Estiroti also altered the July 2007 contract between DUCOLSA and IIHC, changing "Iranian International Housing Company," "an Iranian company" registered in Iran to "Internacional Industrial Compañía de Housing [Industrial International Housing Company]" (the name change the defendant selected on October 24, 2011 (GX 2077)), a company registered in Venezuela:

Authentic Contract (GX 2203A at 1, 3)



CONTRACT AGREEMENT BETWEEN
DESARROLLOS URBANOS S.A. (DUCOLSA) AND
THE IRANIAN INTERNATIONAL HOUSING COMPANY C.A.



conferred upon him by Clause Twenty-Second of the By-laws, who hereinafter and to the purpose of this contract shall be known as **"THE CONTRACTING PARTY"**, on one hand and on the other, mercantile company **IRANIAN INTERNATIONAL HOUSING COMPANY C.A.**, an Iranian company, duly registered under No. 286445, in the Registry Office of Teheran, under the laws of the Islamic Republic of Iran with headquarters located at Office No. 7, 22/1, DAFINEH Street, West Mirdamad Blvd.,



made. -------------------In Teheran City, Islamic Republic of Iran, at the date of its signing. -------------------Date of Signing 2 JULY 2007 -------------
By "THE CONTRACTING PARTY"   By "THE CONTRACTOR" -------------

ENG. JOSÉ LUIS PARADA SÁNCHEZ   AHMAD FARSHCHIAN -------------
Presidente   Presidente -------------
**Presidential Decree No. 4313, dated**   IRANIAN   INTERNATIONAL   HOUSING
**02MARCH2006**   COMPANY C.A. -------------

Altered Contract (GX 2154-2 at 2, 4)



These contracts were also otherwise identical.  Estiroti told the defendant that she would send the backdated and altered versions of these contracts to "Martina" Schuler.  (GX 2154-1).

**W.   January 2013:  The Defendant Seeks to Remove an Online Article Connecting Stratus – Iran and Mohammad Sadr to the Venezuela Project**

Just two weeks after directing his assistant to backdate the Stratus – Turkey contract and to alter the July 2007 contract between DUCOLSA and IIHC to remove IIHC's Iranian identifiers,

the defendant demanded that an article connecting Stratus – Iran and Mohammad Sadr to the Venezuela Project be removed from the Internet.  (GX 2156).  On January 7, 2013, the defendant sent an email to Business Year asking that it remove from its website a profile of Mohammad Sadr. (*Id.* at 2).  The profile referred to Mohammad Sadr as the "Chairman, Stratus Group Holding Iran" (Stratus – Iran), and quoted him as saying that "Stratus is the only private conglomerate in Iran," and explaining that his company had a project "in Venezuela, where we are constructing 7,000 residential units."  (GX 2282A at 1, 3).  In the request to Business Year, the defendant stressed the need to act urgently because the publication of the piece "has created so many problems due to the sanctions":

**From:** Ali Sadr <ali.sadr.h@gmail.com>
**Date:** Mon, 7 Jan 2013 06:16:33 -0500
**To:** PEGGY ROSIAK <peggy@thebusinessyear.com>
**Subject:** Website Take Down

Dear Peggy,
Hope all's well and you've enjoyed your short Holiday. Please take down our page from the website, since this has created so many problems due to sanctions and this might damage us further if this is not done urgently.

We are under the following link:

http://www.thebusinessyear.com/publication/article/7/489/iran-2011/nothing-too-difficult

Please also make sure that for 2012 and 2013 we are not published on the website.

(GX 2156 at 2).  When the Business Year representative confirmed that the article would be "removed shortly," the defendant requested that it also be deleted from the website's server:

**From:** Ali Sadr <ali.sadr.h@gmail.com>
**Date:** Tue, 8 Jan 2013 04:34:43 -0500
**To:** PEGGY ROSIAK <peggy@thebusinessyear.com>
**Subject:** Re: Website Take Down

Dear Peggy,
Thanks for your prompt action in this regard. Could you please also delete the link off the server, as it seems that the link comes up when I google, "seyed mohammad sadr hasheminejad".

(GX 2156).

X.    **June – November 2013:  The Sadrs Seek Iranian Diplomatic Intervention To Obtain Further Payments for the Venezuela Project**

By mid-2013, DUCOLSA had again fallen behind on payments for the Venezuela Project (GX 2171-T; DX 139-T; Tr. 1684-85), and the Iranian Government once again intervened to mediate disputes between the Sadrs and the Venezuelan government.  On June 13, 2013, Hossein Tehrani, a Stratus – Iran employee, emailed Mohammed Sadr and the defendant, updating them as to the status of communications between the Iranian ambassador and certain Venezuelan government officials concerning the Venezuela Project.  (GX 2171-T).  Tehrani noted that, "[f]ollowing a phone conversation with the Honorable Ambassador Prof. Soltani," the Iranian ambassador to Venezuela, "a detailed confidential letter was sent, as well as an e-mail from 06/06/2013 stating that the official note is likely to be sent to the Venezuelan Foreign Ministry along with a Spanish translation of the company letter and an effective follow-up." (*Id.*).  Tehrani reported that he and others had "a good meeting with the Honorable Foreign Minister of Venezuela," who said that he would discuss the "Iranian company" and the payment problems with the Venezuelan president. (*Id.*).  Tehrani emphasized that "the ambassador is fully supportive of the company [*i.e.*, Stratus – Iran] and recent actions taken under current circumstances."  (*Id.*). He asked for the Sadrs' "guidance and decisions at this critical juncture . . . for the strategy of the company for participating in the potential negotiations," as well as "maximum flexibility . . . to resolve this chronic dilemma" of unfulfilled payments, "given all the dimensions of the situation and position of . . . Stratus Group in and out of our country."  (*Id.*).  Tehrani attached to the email, among other things, a "Letter to [Iranian Ambassador Soltani]," dated June 10, 2013.  (GX 2171).

The Sadrs' efforts to obtain additional support from the Iranian government appear to have had their intended effect.  On October 8, 2013, Cetinel sent the defendant an email, which attached documents reflecting that DUCOLSA owed IIHC approximately $3.1 million for IPCs 31 through 38.  (GXs 2269, 2269A-H).  On October 31, 2013, the defendant received an email from an account with "iihco" in the username, which stated:  "Please find attached the image of the Export Development Bank of Iran's letter regarding the renewal of the prepayment guarantee."  (GX 2271-T).  The email attached an October 2013 letter from the "Export Development Bank of Iran" seeking fees and cash collateral in connection with a "[r]enewal of prepaid guarantee credit."  (GX 2271A-T).  The defendant responded to the email:  "Please DO NOT send these items to my email."  (GX 2271-T).  On November 21, 2013, PDVSA sent approximately $3.1 million to Stratus – Turkey via U.S. correspondent banks.  (GXs 429, 702; Tr. 878).

**Y.    July 2014: The Defendant Reroutes a Payment to Avoid a Sanctions-Related Rejection**

Toward the end of 2013, Kazerani left his job as CEO of Stratus – Iran and moved to the United States.  (Tr. 249).  For approximately four years after he arrived in this country, Kazerani continued working for the defendant as a paid consultant, first with Stratus – Turkey and later with the defendant's company Altitude Capital, earning $6,000 a month.  (Tr. 266, 269; GXs 805, 806).

 In July 2014, the defendant learned that JP Morgan had blocked one of Kazerani's salary payments.  (GX 2297).  On July 3, 2014, Estiroti forwarded the defendant an email from a representative at Falcon Bank, explaining:  "Mr. Ali, the intermediary bank has rejected the payment to Mr. Kazerani.  The reason is the U.S. sa[n]ctions to pay Iranian institution/individual.  Please advise what to do."  (GX 2297).  Ms. Estiroti attached JP Morgan's message rejecting the payment "in accordance with the United States Treasury Department and OFAC regulations":

```
20 : Transaction Reference Number  JPM140701-005531
21 : Related Reference             40671170/1XXXXXX
79 : Narrative
     REGARDING YOUR PAYMENT ORDER DATED 7/1/2014 FOR
     6,000.00/USD PLEASE BE ADVISED THAT IN ACCORDANCE
     WITH THE UNITED STATES TREASURY DEPARTMENT AND
     OFAC REGULATIONS, TRANSACTIONS INVOLVING IRAN
     ARE RESTRICTED. PAYMENT INVOLVING AN IRANIAN
     INSTITUTION, ENTITY AND/OR INDIVIDUAL NOT
     CONFORMING TO THE GUIDELINES ESTABLISHED BY THE
     OFFICE OF FOREIGN ASSET CONTROL, WILL NOT BE
     EXECUTED.
     SUCH PAYMENT INSTRUCTIONS WILL BE CANCELLED AND NO
     ACTION TAKEN ON OUR PART. IN COMPLIANCE WITH THE
```

(GX 2297A).

The defendant responded to Estiroti the next day: "Ok.  [L]et's pay [him] from our US company.  Let me talk to him."  (GX 2298).  The defendant told Kazerani that a salary payment had been blocked due to U.S. sanctions, and that he would move Kazerani to Altitude Capital, another company he controlled, which was based in the United States.  (Tr. 269, 1544; GX 806). On September 1, 2014, Kazerani signed a consulting agreement with Altitude Capital, under which he was paid the same salary of $6,000 per month and performed the same duties he provided when he worked for Straturk.  (Tr. 267, 269; GX 806).  The new contract also provided for an advance payment of $18,000 in order to make up for the $6,000 July payment that was blocked, the missed payment for August, and for "the expenses of the trips that [Kazerani] had made."  (Tr. 272; GX 806).

On December 29, 2014, Estiroti sent a message to an IIHC email address and Shadloo, copying Cetinel and the defendant, stating: "Please find attached the breakdown of the management payments from the beginning till [November 30, 2014] for your records."  (GX 2304).

Attached to the email were summaries of payments related to the Venezuela Project, including the salaries paid to Karimi, Cinar, and Cetinel.  (GX 2304A).  These payment summaries showed that IIHC paid for project expenses using accounts controlled by Stratus – Iran (abbreviated "Stratus Int."), Stratus – St. Kitts (abbreviated "SG" or Stratus Global), Stratus – Turkey (abbreviated "Straturk"), and from the defendant's personal account.  (*Id.*).

## III.    The Defense Case

The defendant offered a defense case in which he presented documentary evidence and testified in support of his principal argument at trial that he "did not have any criminal intent, and acted in good faith at all times."  (Tr. 1899 (theory of the defense jury instruction)).

The defendant testified that he "hated" the Iranian government (Tr. 1417, 1424), and that he believed the Venezuela Project had "nothing to do with the government of Iran" (Tr. 1504). The defendant acknowledged, however, that former Iranian president Mohammad Khatami had backed the Venezuela Project (Tr. 1469 (discussing GX 1003A-T)), and that IIHC's original investors included two Iranian "government related" entities (Tr. 1462), which the defendant's father subsequently "bought out" in approximately 2008 using early payments by DUCOLSA pursuant to the IIHC Venezuela Contract (GX 1003A-T at 1; Tr. 1468, 1470).  Notwithstanding, for example, the defendant's receipt of Karimi's December 2009 email referencing "sanctions" related to a wire transfer (GX 2002), his sister's February 2012 email attaching the pamphlet titled "The Impact of U.S. Sanctions Against Iran on You" (GX 2265B), and the fact that one of his salary payments to Kazerani was blocked because "U.S. sanctions" prohibited payments to an "Iranian institution/individual" (GX 2297), the defendant also testified that he believed U.S. sanctions against Iran applied only "[t]o the government of Iran, people on the sanctions list, and

the military of the government of Iran, and their own activities with nuclear things that they were involved in, with military things that they were involved in, and the oil sector of Iran" (Tr. 1501; Tr. 1525 ("[The Iran sanctions program] wasn't targeted towards us, it was to protect us.  It was targeted to the Iranian government's bad behavior.")).

The defendant explained that he lived in the United States from approximately 2000 until March 2010.  (Tr. 1426, 1436).  He applied for asylum in approximately 2003, claiming that he feared persecution in Iran because he "received a notice from [his] uncle to appear before the [Iranian] court for the protest that took place in 1999."  (Tr. 1433; Tr. 1424 (defendant's testimony regarding 1999 detention and "torture[]")).   On cross-examination, however, the defendant acknowledged that he had traveled to Iran approximately 50 times between 2010 and 2015, and that he nonetheless made a similar claim in 2018 about fear of returning to Iran in connection with a bail application.  (Tr. 1774-75).  The defendant's asylum status was revoked in 2009 (Tr. 1754), and he testified that he left the United States in March 2010 based on legal advice concerning a pending application for permanent residency and related travel restrictions (Tr. 1434-35).   On cross-examination, however, the defendant admitted that he had submitted a sworn statement to immigration authorities in 2012, in which he claimed that he left the United States in March 2010 due to his "dire economic circumstances."  (Tr. 1761-62 (discussing GX 2509)).  The defendant also admitted facts undermining the accuracy of that sworn representation, including that his father gave him "several million dollars" after he graduated from college in 2005 (Tr. 1741), that he paid $250,000 for his St. Kitts and Nevis citizenship in 2009 (Tr. 1764), that he capitalized Clarity in March 2010 with a $500,000 wire transfer from an account in the United States (Tr. 1764), and

that Clarity received more than $85 million in the six months following the defendant's departure from the United States (Tr. 1764).

Regarding his role in the Venezuela Project, the defendant testified that, in "late 2008, early 2009," his father asked him to "manage the finances of the project." (Tr. 1448). Perhaps sensitive to the fact that providing services to Iranian companies such as Stratus – Iran and IIHC while in the United States was itself a violation of the Iran sanctions, as cautioned in the email message and pamphlet his sister sent him in 2012 (GXs 2265, 2265B at 3, 10),[6] the defendant testified that he only "committed" to the Venezuela Project after he left the United States in March 2010 (Tr. 1454). Somewhat inconsistent with that claim, the defendant also testified about communications with Rob Klingensmith—a "colleague" at the defendant's U.S.-based A&R Capital and a "senior" banker at Wachovia in the United States—during which the "whole idea was to keep the money outside of Iran" and Klingensmith did not raise sanctions-related objections. (Tr. 1448-49, 1454). Similar to the defendant's claim that he did not commit to the Venezuela Project prior to departing the United States, he testified that he returned to the United States in November 2012 and, thereafter, "to the extent that people would send stuff to me to take certain action, I was not there to do it." (Tr. 1684; *see contra* GXs 2153-1, 2154-1 (December 2012 emails by the defendant relating to contract backdating); GXs 2298 (July 2014 email by defendant to Estroti, "let me talk to him" after payment to Kazerani was "rejected" due to "U.S. sa[n]ctions")).

---

[6] (GX 2265 (email message from the defendant's sister to the defendant stating: "This applies to U.S. persons and whomever is present in the U.S., regardless of what visa they hold."); GX 2265B at 3 ("You have to comply with the Iran Sanctions if . . . You are physically in the United States (regardless of your immigration status) . . . ."); *id.* at 10 ("You are generally prohibited from the following transactions . . . Exporting goods, technology, and services to Iran . . .")).

The defendant also endeavored to provide favorable explanations regarding certain Government exhibits and testimony.  For example, regarding his March 2011 email asserting "[t]here's no Iranian behind any of the accounts provided" in response to a question from Karimi about whether "the *owner of the account* in the [intermediate] bank is Iranian" (GX 2248 (emphasis added)), the defendant testified that he believed Karimi "was asking about the intermediate bank, whether or not that bank is Iranian" (Tr. 1608).  Regarding his decision not to identify the owners of Stratus – Turkey in response to Commerzbank's April 2011 inquiries (GX 2034), the defendant testified that he was "worried about how legitimate this request was" and that there were "safety issues for these individuals" (Tr. 1616-17), which he failed to state in the response he proposed to Karimi and Cetinel (GX 2034), and notwithstanding that he personally traveled to Venezuela between 10 or 15 times in connection with the project (apparently without incident) (Tr. 1458).

On the topic of his December 2011 wire instructions to Schneider to move dollars at Hyposwiss from Clarity's account to Stratus – St. Kitts's account and then disburse the funds (GX 705A; GX 2090A), the defendant told the jury that he was facilitating exchanges of dollars and bolivars (Tr. 1663-64).  The defendant acknowledged that he had preliminary negotiations regarding currency exchange with Mercantil Valores, but that he did not hear from the bank again after he asserted in response to a KYC inquiry that "NO ONE is dealing with an Iranian entity," "IIHC is completely irrelevant to this whole process," and "[t]he issue of the iranian concern should be completely out of the picture!!!" (GX 2199).  (Tr. 1655-56).  Following that terse communication, the defendant used a Venezuelan currency broker named Leonel Garcia who tried, but failed, to open an account at Hyposwiss.  (Tr. 1659-60).  As a result, the defendant conducted some of the foreign-exchange transactions with Garcia using a Panama-based account named

"GFH Short Interest Private Fund, Inc.," and other exchanges through his Hyposwiss accounts. (Tr. 1662-63; *see, e.g.*, GX 705A (rows 1-2, 40-41)).  Regarding the $60,000 transfer from Clarity to Alessandra Conte for purported legal fees that Conte testified she did not provide (Tr. 1095 (discussing GX 2090A at 32), the defendant testified that the transfer was an example of him using Clarity's Hyposwiss account to execute foreign exchange-transfers pursuant to instructions from Garcia to his assistant, Estiroti—in that instance related to "the sale of their apartment" (Tr. 1664). Despite the defendant's use in the wire instructions of the same "IPC" acronym that IIHC used in payment requests to DUCOLSA and the defendant himself used during the trial to describe project-related payments (*e.g.*, Tr. 1479), the defendant testified that Estiroti told him that the term "IPC 40" from the wire instructions was the "payment number, I guess, and her way of reflecting it for the broker [Garcia] to keep track of all these different individuals that are getting paid" (Tr. 1665; Tr. 1664 (defendant testifying that, according to Estiroti, Garcia "[told] me what to reflect on the payments so that on the receiving end he can set off with this bulk that he passed on to IIHCO")).

Defense counsel also asked the defendant about a September 2012 email regarding the above-referenced draft Cirrus marketing materials that discussed Ahmadinejad's support of the Venezuela Project (DX 1019C), in which the defendant asked Estiroti and another employee, "Why the hell do I see the name of Iran in there." (Tr. 1637 (discussing GX 2145)).  The defendant testified that the email was part of a "last-minute effort to look for typos." (Tr. 1638).

## IV.   Rule 29 Proceedings

On March 9, 2020, the defendant moved for a judgment of acquittal on all counts pursuant to Rule 29, and he filed a brief in support of the motion the following day.  (Tr. 1208; Dkt. No. 289).  The Court reserved judgment on the motion.  (Tr. 1475).  The defendant renewed following summations on March 11.  (Tr. 1821).

## V.     Jury Deliberations and Verdict

On March 16, 2020, after approximately two days of deliberations, the jury returned a verdict of guilty as to Counts One, Two, Three, Four, and Five, and not guilty as to Count Six. (Tr. 2120-25; Dkt. No. 310 (verdict form)).   As to Counts Three and Four, the jury found the defendant guilty under the second prong of bank fraud, Section 1344(2).   (Dkt. No. 310).   The Court declared a mistrial as to the first prong of bank fraud for Counts Three and Four.   (Tr. 2121).

## <u>ARGUMENT</u>

## I.     The Defendant's Rule 29 Motions Should Be Denied

The defendant moves for judgments of acquittal on Counts One through Five, claiming that the "evidence on every count is insufficient to support conviction."  (Def. Mem. at 1).   To the contrary, the evidence of the defendant's guilt was sufficient for a reasonable jury to convict on the challenged counts.   Under Rule 29, the defendant is not entitled to the benefit of the inferences he seeks with respect to his challenges to witness credibility and reliance on defense testimony and exhibits.   Therefore, the defendant's motion for judgments of acquittal should be denied.

### A.     Applicable Law

"[A] defendant challenging the sufficiency of the evidence bears a very heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict."  *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).  The Court must analyze the pieces of evidence "'in conjunction, not in isolation,'" *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

58

"The Court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury," *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008), and must "credit[] every inference that the jury might have drawn in favor of the government," because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court," *United States v. Cuti*, 720 F.3d 453 461-62 (2d Cir. 2013) (internal quotation marks and citations omitted).  "The deference accorded to the jury's verdict 'is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'"  *United States v. Mack*, No. 18 Cr. 834, 2020 WL 114509, at *2 (S.D.N.Y. Jan. 10, 2020) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).

## B.    The Government Established the Defendant's Guilt on Counts Three and Four

The defendant challenges his bank fraud convictions on Counts Three and Four principally on the bases that (1) there was insufficient evidence of a scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises under Section 1344(2); (2) "the charged scheme did not obtain money by means of such alleged concealment"; and (3) the wire instructions "contained no misrepresentations" and "no fraudulent admissions."  (Def. Mem. at 15).[7]  The defendant also seeks a judgment of acquittal with respect to Section 1344(1), on Counts Three and Four, as to which the jury did not return a verdict.  (*Id.* at 6).  The Court has already

---

[7] The defendant also re-argues a "fourth contention" related to *Loughrin v. United States*, 573 U.S. 351 (2014), which he acknowledges the Court already rejected.  (Def. Mem. at 15).

found some of these contentions unpersuasive in connection with pretrial motions, and none of them has merit for purposes of Rule 29.

### 1. The Government Established That The Defendant Participated In A Section 1344(2) Scheme

The Government established the defendant's knowing participation in the bank fraud scheme under Section 1344(2), which included several knowing co-conspirators as charged in Count Four, such as Mohammad Sadr.  Prior to trial, the Court held that the Indictment sufficiently alleged a Section 1344(2) scheme based on "a series of wire transfer orders accompanied by additional circumstances from which an implied misrepresentation may arise."  *United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019).  At trial, the Government established all of the allegations upon which the Court relied in reaching that conclusion, and more.

From its inception, the Venezuela Project faced a significant obstacle to obtaining payment that, to overcome, required criminal conduct by the defendant and others.  The deal was an Iranian state-sponsored venture, with Iranian beneficiaries based in Iran, designed and intended to generate millions of U.S. dollars for its participants.  Iranian government officials backed the Venezuela Project from the outset based on a 2004 bilateral cooperation framework (GX 2274A-T), and remained involved in the project throughout.  (GX 2113B-T at 1 (Iranian president attended Venezuela Project ground breaking); GX 2070 (defendant agreeing to accompany "Iranian delegation" in Venezuela); GX 2088A at 1 (describing meeting with Iranian ambassador, letter to Iranian president, and lobbying of Iranian agencies); GXs 2171, 2171-T (describing communications with the Iranian ambassador who "is fully supportive" of the Project, and attaching a letter to the Iranian ambassador)).  Venezuela awarded the project to IIHC, which was

an Iranian company, incorporated and headquartered in Iran, and run by Iranian residents. (*E.g.*, GXs 1001A at 2, 13-14; 2203F-T at 6-7; GX 2148; Tr. 158-59, 172-75, 1411). The IIHC Venezuela Contract expressly contemplated payment in dollars. (GX 2203A at 3; GX 2203B at 27).

Even if the jurors believed that the sophisticated actors involved in the Venezuela Project were unaware of the obvious sanctions implications of the venture, sanctions risk was brought to the forefront for the Sadrs almost immediately. In September 2007, OFAC sanctioned Oriental Oil Kish (Tr. 499), a subsidiary of the Sadr family's Stratus – Iran holding company (GX 2195A at 3). In June 2008, the defendant corresponded with his father about whether a German bank, EIH, was "on the OFAC list." (GX 2276-T). The jury could infer that, by that time, the Iranian participants in the Venezuela Project fully understood that in order to access the millions of dollars they were owed by Venezuela pursuant to the IIHC Venezuela Contract, they would need to defraud U.S. correspondent banks with respect to the true beneficiaries of the deal in order to obtain U.S. dollar payments processed through those banks.

The defendant was one of several key participants in that scheme to fraudulently obtain property from FDIC-insured institutions, which also included, among others, Mohammad Sadr, Karimi, Cetinel, and Zangeneh. In early 2009, Mohammad Sadr named the defendant to the Venezuela Project Committee, and asked the defendant to manage the finances of the project. (Tr. 1448, 1471; GX 2113B-T at 6). In June 2009, Stratus – Iran sent the defendant paperwork stating that "[o]ne of the important problems" with the status of the Venezuela Project was to "transfer money from Iran to Venezuela and vice versa and exchange the USD to Bolivar for local expenses." (GX 2278A at 2). During the same year, the defendant purchased citizenship in St.

Kitts and Nevis and became a director of Stratus – St. Kitts, with authority to "open operate and close all bank accounts" for that entity.  (GX 2005A at 1-2, 4).  Although he was living in the United States at the time (GX 2509 at 1; Tr. 1426, 1436), the defendant claimed in related paperwork that he lived in St. Kitts and Nevis (GX 2005A at 2) and Dubai (*id.* at 4).  In December 2009, while the defendant was living in the United States, Karimi sent the defendant an email expressing concern about whether a transfer to him from the defendant's personal HSBC account was "under sanction too!"  (GX 2002).  As discussed in more detail in connection with Counts One and Two below, *see infra* Argument, Part I.C., the jury could infer from that correspondence that in 2009 the defendant was aware of the applicable sanctions, and that he knew U.S. banks would not participate in transactions related to the Venezuela Project—as correspondent banks or otherwise—if the banks were aware that the ultimate beneficiaries of the Project included Stratus – Iran, IIHC, Mohammad Sadr, and other residents of Iran and Iranian entities who were investors in IIHC.

With that context, in February 2010, Mohammad Sadr instructed the defendant to establish Clarity in Switzerland "very fast" (GX 2187-T at 1), and the defendant not only did so but also opened accounts for Clarity at Hyposwiss (GXs 2065A, 2201, 2201A).  Leaving little doubt that the targets of the defendant's deception included U.S. correspondent banks, the defendant described Clarity's Hyposwiss accounts in a July 2010 email as being part of an effort to "shift our deposit routes" and attached wire instructions that contemplated dollar-denominated transfers through a correspondent account at JP Morgan in New York.  (GXs 2201, 2201A; *see also* GX 2210 (August 2010 email to defendant describing "US [e]mbargo" involving "ban" on "money transfers" to "Iranian counterparts")).  In a separate email in July 2010, the defendant falsely

claimed to HBM Group that "NO ONE is dealing with an Iranian entity," and he laid bare his intent with the assertion that "[t]he issue of the iranian concern should be completely out of the picture!!!"  (GX 2199).  A few months later, the defendant pointed out in an email that, for purposes of Hyposwiss's "compliance filings," "we will have serious problems" if "that invoice show the name 'Iranian' anywhere."  (GX 2238).  Government Exhibits 2199 and 2238 reflected the defendant's fraudulent state of mind.  And the jury could infer from these communications that the defendant's deceitful intent was not limited to Hyposwiss's compliance department or foreign-currency exchange partners.  Rather, the defendant's instructions reflected his intent to deceive any potential roadblocks to his family obtaining the huge sums of money at stake in the Venezuela Project—including the U.S. correspondent banks that would have blocked transactions related to the Venezuela Project had the banks known of the true nature of the deal.  (Tr. 745-46, 898).

To further obscure the "[I]ranian concern" from the "picture" of the Venezuela Project that the defendant made available to U.S. correspondent banks (GX 2199), the defendant established Stratus – Turkey in October 2010 using a Dubai address and the St. Kitts & Nevis citizenship that he and his relatives purchased.  (GX 2215A-T at 1; GXs 2215C-T, 2219M).  The defendant set up an account for Stratus – Turkey at Hyposwiss shortly thereafter (GX 2215), and IIHC transmitted a payment request to DUCOLSA at the end of October 2010 (GX 2220A).  The defendant proffered alternative explanations for the statement in that and subsequent IIHC letters seeking payments due to "the current difficulties for transfer and movements of funds."  (*Id.*).  But the jury was not required to credit his arguments, and the Court cannot credit his self-serving interpretation in a motion pursuant to Rule 29 following the jury's guilty verdicts.  The most natural reading of the letters given surrounding events is that the "difficulties" were presented by

the Iran sanctions, and the defendant and his co-conspirators inserted front companies—here, Stratus – Turkey, and later Clarity—in an effort to secure U.S. dollar proceeds from the Venezuela Project being executed by IIHC while hiding from the U.S. banks that would provide the dollars that the ultimate beneficiaries were Iranian.

Although the defendant now argues that his conduct reflected transparency with financial institutions (Def. Mem. at 16), there was abundant evidence to the contrary:

- In March 2011, the defendant sent Zangeneh backdated meeting minutes purporting to change IIHC's full name to the "abbreviation name" (GX 2015B), which the defendant wrote in the transmittal email was "crucial" to "make our transactions a bit easier" because "we have requested for our last invoice to be paid in USD" (GX 2015).

- In March 2011, the defendant falsely asserted in an email to Karimi that "[t]here's no Iranian behind any of the accounts provided."  (GX 2248).

- In April and May 2011, in response to inquiries from Commerzbank, the defendant flatly refused to identify "the beneficial owners and citizenship of the owners" of Stratus – Turkey.  (GX 2034).

- In May 2011, Cetinel sent the defendant an email regarding a potential "restructuring" of Stratus – Turkey in which he confirmed that "non[e] of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran."  (GX 2037).

- In July 2011, following Commerzbank's investigation of the April 2011 payment to Stratus – Turkey, the defendant changed front companies and started using Clarity to receive payments related to the Venezuela Project.  (*E.g.*, GX 2048A (July 2011 IIHC payment request letter); GX 1502A (September 2011 IIHC payment request letter)).

- In October 2011, the defendant and Cetinel discussed a "name change of IIHCO" designed to remove the word "Iranian," with options such as "International Industrial Housing Company," "International Iron Housing Company," and "Industrial International Housing Company," which the defendant preferred.  (GX 2077).

- In December 2011, the defendant sent doctored IPCs to Hyposwiss that the defendant attached by changing references to "Iranian International Housing Company" to IIHCO."  (*Compare* GXs 2087A and 2087-B (doctored IPCs sent to Hyposwiss changing "Iranian International Housing Company" to "IIHCO"), *with* GX 1503A at 2-3 (authentic IPCs bearing IIHC's logo and full name, "Iranian International Housing Company")).

- In August 2012, about a month after OFAC designated EN Bank, an affiliate of Stratus – Iran, the defendant instructed that the website for IIHC's Venezuelan branch be shut down "immediately" because it was "dangerous" after "all that we go through," which the jury could infer was a reference to the ongoing scheme.  (GX 2139).

- In September 2012, the defendant berated Estiroti and another employee in connection with draft marketing materials related to Cirrus, demanding, among other things, "Why the hell do I see the name of Iran in there."  (GX 2145).

- In December 2012, the same month the defendant tried to remove information about his father from the Internet based on "problems due to sanctions" (GX 2156), the defendant instructed Estiroti to backdate a February 2012 contract between Stratus – Turkey and IIHC (GXs 2153-1, 2153-2), in order to suggest that DUCOLSA had been paying Stratus – Turkey millions of dollars pursuant to a documented sub-contractor relationship with IIHC rather than as a vehicle for bank fraud and sanctions evasion, which the defendant tried to paper over with the doctored contract.  (*Compare* GX 2154-2 at 7-9 (doctored contract with altered date of November 1, 2010), *with* GX 2153-2 (authentic contract with original date of February 2, 2012)).

- In December 2012, the defendant also instructed Estiroti to doctor the July 2, 2007 contract between DUCOLSA and IIHC, changing "Iranian International Housing Company," a company registered in Iran to "Internacional Industrial Compañía de Housing [Industrial International Housing Company]" (the name change the defendant selected on October 24, 2011 (GX 2077)), a company registered in Venezuela, in order to suggest that a Venezuelan company rather than an Iranian company was the general contractor on the Venezuela Project.  (*Compare* GX 2154-2 at 2-4 (doctored contract), *with* GX 2203A (authentic contract)).

In sum, the Government proved at trial those facts that the Court already held were sufficient to make out a Section 1344(2) scheme.  *See Nejad*, 2019 WL 6702361, at *14; (Tr. 1883 (instructing jury that "the concealment of material facts where that concealment makes an affirmative statement misleading . . . may constitute false or fraudulent representations under the statute")).  The evidence established that the defendant "deliberately engaged in a pattern of deceptive conduct designed to convince the bank[s]" that the ultimate beneficiaries of the payments were someone other than IIHC, Stratus – Iran, and Mohammad Sadr.  *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991); *see also United States v. Burnett*, 10 F.3d 74,

65

78, 78-79 (2d Cir. 1993) (discussing "deceptive practices" under Section 1344(2), including where defendant "concealed his control" over an account).  The "deceptive course of conduct" toward the FDIC-insured banks "extended well beyond the silent presentation" of wire instructions and "amounted to a false representation," *Morgenstern*, 933 F.2d at 1113, that, in the defendant's words, "NO ONE is dealing with an Iranian entity" in connection with the transactions (GX 2199).  The defendant was "able to obtain the money only by means of fraudulent conduct directed" at these banks, which "induced the bank[s]" to participate in transfers "that, in the absence of fraud, [they] never would have permitted." *Morgenstern*, 933 F.2d at 1114.

### 2. The Government Established the "By Means of" Requirement

The Government also established that the defendant and his co-conspirators obtained dollars under the FDIC-insured banks' control "by means of" his fraudulent scheme under Section 1344(2).  The defendant's misrepresentations about the true beneficiaries of the payments "cause[d] the bank[s] to part with the money in [their] control."  (Tr. 1883).

The defendant and his co-conspirators caused JP Morgan and Citibank to process payments through U.S.-based correspondent accounts, which led these FDIC-insured banks to send dollars in their custody and control to the defendant's front companies.  (Tr. 836-37, 880).  Witnesses from JP Morgan and Citibank—Matthew Blair and Robert Peri, respectively—testified that if the defendant had disclosed the Iranian beneficiaries to the payments, the payments would have been stopped for review, escalated, and investigated; and if found to be related to an Iranian entity, the payments would have been rejected or blocked.  (Tr. 745-46 (Blair); Tr. 898-900 (Peri)).  Blair testified that it is important to JP Morgan to understand who is ultimately getting the money so that the bank "can perform accurate sanctions screening."  (Tr. 838).  Similarly, Peri testified that,

"because Iran is subject to comprehensive country sanctions, we are looking for any nexus, any connection to Iran as a jurisdiction," and that "we, for the most part, have an obligation to prevent such transactions from passing through Citi." (Tr. 858). Based on this testimony, the jury could easily infer that the banks released the dollars in their possession based on deceptive practices by the defendant that caused the transmission of wire instructions that did not identify the actual beneficiaries of the payments.

When discussing causation, the *Loughrin* Court spoke in terms of "false statement[s]" because that was the type of artifice that the defendant in that case deployed—a "forged or altered check." *Loughrin*, 573 U.S. at 364. The guidance in *Loughrin* that Section 1344(2) "demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money," *id.*, applies every bit as much to other types of schemes identified in the statute, including, as relevant here, a defendant's use of "fraudulent pretenses," 18 U.S.C. § 1344(2). The defendant's scheme was the mechanism that "naturally induc[ed]" the banks to "part with [their] money." *Loughrin*, 573 U.S. at 365. The Second Circuit's decision in *United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019), regarding Section 1344(1) and restitution is hardly "illustrative." (Def. Mem. at 27). In *Calderon*, the court did explain, however, that "[t]he central goal of a proximate cause requirement" in the restitution statute at issue in that case "is to limit the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability." 944 F.3d at 95. Here, causing FDIC-insured banks to transmit dollars in payments they would have otherwise investigated and potentially rejected—under circumstances that subjected the banks to regulatory and criminal exposure based on applicable sanctions—was not "too far outside the

67

risks" that the defendant's scheme "created."  *See id.*  To the contrary, foisting these risk upon the banks was central to the plan that he and his co-conspirators designed.

In arguing that the "relational component" is missing, the defendant cites to defense exhibits and cross-examination that the jury was not required to credit, and elides key aspects of the April 2011 Commerzbank incident in which the defendant affirmatively refused to identify the "beneficiaries" and "owners" of Stratus – Turkey in response to questions about Fondo Chino's April 4, 2011 payment of $29.4 million.  (Def. Mem. at 26, 28).  Commerzbank sent the questions to Venezuelan parties to the transaction on April 27, long after the payment was processed, as a "representative sample of the operations for which additional information is being requested" with respect to Fondo Chino.  (GX 2032-T at 4-5).  The inquiries serve as, at minimum, a counter-example to the defendant's claim that intermediary banks do not "conduct due diligence beyond the disclosed sender and recipient of each transfer."  (Def. Mem. at 25).  The defendant's deceptive intent in responding to Commerzbank's inquiries is corroborated by Cetinel's May 2011 email statement regarding Stratus – Turkey that "non[e] of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran."  (GX 2037).

Despite arguing elsewhere that payment processing involves "high-speed automated transactions," the defendant contends that Commerzbank's failure to stop the payment, and to determine based on "Internet research that the beneficiary might be affiliated with Stratus International Contracting Company in Tehran," suggest a lack of proximate causation between the scheme and obtaining FDIC-insured banks' funds.  (Def. Mem. at 26, 28).  The Venezuelan authorities who first received the inquiries certainly understood otherwise, as they expressed concern in communications that were ultimately sent to the defendant that the payment could be

"blocked."  (GX 2032-T at 3-4).  Similarly, when Commerzbank uncovered that "Stratus may be an Iranian company," it sent a letter to OFAC and "added Stratus" to its "sanctions filter to monitor any future payments."  (GX 411 at 2).  Thus, the defendant's arguments regarding banks' processing diligence establish only that the banks were vulnerable to the deceptive aspects of his scheme because of the high volume of transactions at issue, and the Commerzbank incident illustrates the causal mechanism between the scheme and the banks' release of funds.

In another example, which the defendant relegates to a footnote (Def. Mem. at 15 n.7), Citibank canceled a payment from PDVSA when the instructions referenced IIHC.  (GXs 431, 432 at 4).  The defendant argues that PDVSA instructed that the payment be sent to IIHC "mistakenly" (Def. Mem. at 15 n.7), but PDVSA can hardly be faulted for diverging from the defendant's sophisticated scheme by directing funds to the real party in interest instead of one of the front companies the defendant created to trick Citibank into processing the payment.  The incident provided the jury with yet another example of the motive and purpose driving the defendant's scheme to deceive FDIC-insured correspondent banks by preventing them from knowing the actual beneficiaries of these payments, and served as powerful proof that the scheme involved using deceit as a proximate cause of the FDIC-insured banks processing the payments.  Accordingly, the Court should reject the defendant's challenges to the sufficiency of the evidence on the "by means of" requirement under Section 1344(2).

### 3. The Court Already Rejected The Defendant's Arguments Regarding Disclosure Obligations in Wire Instructions

The defendant's arguments regarding the purported accuracy of the wire instructions and disclosure obligations to U.S. correspondent banks miss the mark.  (Def. Mem. 15-25).  As the Court already reasoned, "the wire transfer orders themselves impliedly misrepresented that the

beneficiaries of the fund transfers were Turkish and Swiss—and, importantly, not Iranian—entities." *Nejad*, 2019 WL 6702361, at *14.  In reaching that conclusion, the Court cited a recent opinion by Judge Berman in a case that also alleged violations of Iran sanctions.  *See id.* (citing *United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016)).  The Court also rejected the defendant's request for a jury instruction mentioning a "duty to disclose" with respect to material omissions.  (*Compare* Dkt. No. 185 at 89 (defense's proposed instruction that "the concealment of material facts *that the defendant has a duty to disclose* . . . may constitute false or fraudulent representations under the statute") (emphasis added), *with* Tr. 1883 (Court's instruction that "the concealment of material facts where that concealment makes an affirmative statement misleading . . . may constitute false or fraudulent representations under the statute")).

The defendant provides no valid reason for the Court to change course at this point in the proceedings.  While he notes the language from *Autori* that "[t]he fraud statutes are violated" only "by omissions of material information that the defendant has a duty to disclose" (Def. Mem. at 20), the *Autori* court went on to clarify that "[a] duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading."  *United States v. Autori*, 212 F.3d 105, 119 (2d Cir. 2000) (citing *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995)).   The Government established that type of disclosure obligation at trial:  the defendant orchestrated a fraudulent scheme in which he caused partial, misleading information about the transactions at issue to be provided to FDIC-insured banks such that further disclosures were necessary for the

banks to be able to understand, and assess the risks associated with, the true nature of the transactions and the ultimate beneficiaries at issue.

Finally, the defendant was free to—and in fact did—question witnesses, offer exhibits, and make arguments to the jury regarding disclosure obligations and the purported accuracy of the wire instructions in order to support his broader defense theory that he lacked criminal intent and acted in good faith. (*E.g.*, Tr. 768, 788-90, 951 (cross-examinations of Blair and Peri); DXs 96R, 1347, 1352, 1901-R; Tr. 94 (defense opening that the defendant had no "legal responsibilities to tell [JP Morgan] anything, to volunteer anything. . . . [h]e made no misrepresentations to [] JP Morgan."); Tr. 2054 (defense summation that the defendant "had no obligations to disclose anything to the underlying banks"); Tr. 2054 (arguing against the "idea that what Ali should have done is pick up the phone to JP Morgan, the correspondent bank that has this transaction for 60 seconds, and say I just want to make sure, you know, my daddy is an important Iranian, and then see what JP Morgan is going to do about that")). But the jury rejected that position based on the totality of the evidence, and the defendant's arguments to the contrary do not merit relief under the stringent Rule 29 standard.

### 4. The Defendant Has Mischaracterized the Government's Section 1344(1) Theory

The defendant seeks a judgment of acquittal on the Section 1344(1) components of Counts Three and Four based in part on a mischaracterization of the Government's arguments at trial. (Def. Mem. at 1 (referring to the "government's 'strict liability' theory"), 7, 9). The Government has already conceded that its mid-trial disclosures relating to inaction by OFAC in response to outreach from Commerzbank in 2011 and prosecutors in 2016 should have been made to the defense sooner. The Court imposed reasonable curative measures during the trial, including

71

striking OFAC officer Ted Kim's testimony related to "strict liability."  The defense turned down

additional relief, and expressly declined to seek a mistrial prior to the jury's verdicts.  Without

intending to minimize the Government's disclosure error, the Government respectfully submits

that the defendant's characterization of its trial arguments is not supported by the record.

Two witnesses testified regarding strict liability under the Iranian sanctions:  Ted Kim and

Robert Peri.  Kim testified that OFAC's "rules operate under strict liability" such that "[i]t doesn't

matter actually what you intended or not."  (Tr. 600; *see also* Tr. 602 ("[T]he violation is not

related to the intention.")).  Peri explained:  "I think there is that gamut of OFAC enforcement and

it's a strict liability regime, so that risk always exists.  But where there is no knowledge, I would

argue that the risk is somewhat limited."  (Tr. 1022).

Defense counsel's firm, Steptoe & Johnson, has used the term "strict liability" outside of

this case to describe OFAC's sanctions enforcement.  On February 11, 2019, Steptoe posted on its

"International Compliance Blog," an article titled "Foreign subsidiary trading with Iran?  OFAC

really means STRICT liability."[8]  The post stated:  "OFAC's civil enforcement authority applies

on a strict liability basis, meaning if the prohibited conduct occurs, the agency can impose civil

penalties, even if there is no negligence, intent, or other finding of fault."  Similarly, on August

10, 2015, Steptoe issued an international law advisory, which advised that U.S sanctions, as

enforced by OFAC, "are strict liability regimes that do not take intent into account for civil

violations."[9]

---

[8]  https://www.steptoeinternationalcomplianceblog.com/2019/02/foreign-subsidiary-trading-with-iran-ofac-really-means-strict-liability.

[9]  Steptoe & Johnson International Law Advisory, *OFAC Adds Rosneft and VEB Subsidiaries to SSI List, Designates Russian SDNs, Advises on Evasion* (Aug. 10, 2015), *available at*

Contrary to defense counsel's claims in this case, the term "strict liability" does not mean "zero tolerance" or "regulatory enforcement in response to all violations." "Strict liability" means, as Kim and Peri explained to the jury, that there is no intent element to establish a violation. It is "[l]iability that does not depend on proof of negligence or intent to do harm." *Black's Law Dictionary* (11ed. 2019); *see also id.* (defining "strict-liability crime" as "[a]n offense for which the action alone is enough to warrant a conviction, with no need to prove a mental state"); *United States v. Pena*, 161 F. Supp. 3d 268, 283 (S.D.N.Y. 2016) (Nathan, J.) (distinguishing between "strict liability" and "general intent" crimes). Peri testified that "sanctions is a strict liability regime," which meant to him that Citibank "can *potentially* face" enforcement action "whether or not Citi is witting." (Tr. 867 (emphasis added)). On cross-examination, defense counsel conflated the concepts of "strict liability" and "zero tolerance." (Tr. 1023). Peri corrected him: "You could have strict liability in conjunction with less than zero tolerance. That's to say we could be liable, but OFAC has discretion." (*Id.*). Counsel relied on the same mischaracterization a second time, and Peri corrected him again: "I'm not a lawyer, but it seems to me there is a distinction between zero tolerance and strict liability." (Tr. 1031).

Following the Government's disclosures regarding OFAC's inaction, the parties entered into a stipulation regarding the pertinent facts. (DX 150). The defense declined the Court's offers to re-call Kim or call additional witnesses from OFAC, and counsel made a strategic decision not to seek a mistrial. (Tr. 1228, 1284-85, 1561).[10] The Court struck Kim's testimony related to strict

---

https://www.steptoe.com/en/news-publications/ofac-adds-rosneft-and-veb-subsidiaries-to-ssi-list-designates-russian-sdns-advises-on-evasion.html.

[10] Defense counsel told the Court: "So we know the law on mistrials with prejudice. We are not asking for that." (Tr. 1285; *see also* Tr. 1284 ("[W]e want this trial to move.")).

liability and provided two curative instructions, including that the Government failed to timely turn over Government Exhibit 411 "as required by law," and that due to OFAC's inaction in this case the Court struck portions of Kim's testimony "describing OFAC as having a strict liability enforcement policy."  (Tr. 1391, 1822).  The Court gave the latter instruction following the defendant's testimony and just prior to the defense resting, thereby providing appropriate emphasis on the facts in question as part of the defense case.  The latter instruction also immediately preceded the Court's longer instructions to the jury, which brought the instruction to the forefront of the jurors' minds as a legal consideration related to the elements of the Counts they were considering.  Finally, by providing the instructions prior to closings, the Court put the defense in the position to further emphasize the Court's instructions during summations, which counsel did.  (Tr. 2000-01, 2008-09).  Collectively, these measures were reasonable, the defense made strategic decisions to reject some of them, and the steps taken by the Court were sufficient to address prejudice resulting from the Government's error.

The defendant now claims that the Government presented "argument and witness testimony telling the jury that if OFAC had learned the facts that Sadr allegedly hid, it would have initiated 'strict liability' enforcement, stopping the claimed sanctions violations, and exposing the banks to fines into the hundreds of millions."  (Def. Mem. at 106).  In fact, during three jury addresses at the trial, the Government did not make any arguments related to strict liability, and the defense did not object to any of the Government's assertions.  Elsewhere in the post-trial motions, the defendant cites to Kim's accurate testimony that banks "in violation of sanctions" are "subject to OFAC's enforcement actions."  (Def. Mem. at 7 (citing Tr. 508-09)).  The testimony is true and not misleading.  During the trial, the defense moved to strike the cited testimony from

pages 508 and 509 of the transcript (Dkt. Nos. 291, 291-1), and the Court denied the application.

Kim also testified that less than 10% of sanctions violations identified by OFAC are punished by

monetary penalties.  (Tr. 508).  He confirmed that information provided by banks "leads to

investigations" by OFAC, and agreed that "*in some instances*, those investigations lead to

enforcement actions."  (Tr. 510 (emphasis added)).  To the extent the defendant believed Kim's

testimony was misleading, the Court gave the defense an opportunity to recall him or call another

OFAC witness.  The defendant also, on February 24, 2020, noticed two expert witnesses, including

an expert on OFAC, but decided not to call either witness.  The defendant also offered exhibits

demonstrating that OFAC does not pursue what counsel called a "zero tolerance" policy.  (DXs

1347, 1352).

Put simply, no witness testified, and the Government did not suggest to the jury, that OFAC

pursues enforcement actions in response to every sanctions violation.  The Government did argue,

however, that the defendant was aware of *a risk* of enforcement by OFAC at the time of his

conduct.  (Tr. 1980).  That was a fair argument based on the record, the defense did not object to

it, and the defense was well-positioned to meet it.  Therefore, witness testimony related to strict

liability is not a basis for a judgment of acquittal under Rule 29 or, as the defense argues elsewhere,

a retrial under Rule 33.

### 5.  Defense Counsel's Motion to "Retroactively" Strike Testimony Should Be Denied

In a footnote, defense counsel moves to "retroactively" strike Peri's testimony concerning

strict liability, claiming that they "overlooked" the testimony "[i]n the heat of the trial moment."

(Def. Mem. at 12 n.3).  As this Court has found elsewhere, arguments "made only in a footnote"

are "inadequately raised." *United States v. Pizarro*, No. 15 Cr. 151, 2019 WL 3406603, at *7 (S.D.N.Y. July 29, 2019) (Nathan, J.). "Even on the merits, however, the argument fails." *Id.*

While the Government is relying on Peri's strict-liability testimony only in response to the defense claims that the Government presented a "false narrative" at the trial, the defense was well aware of Peri's testimony, had ample opportunity to timely pursue any remedy they thought appropriate, and declined to do so. Peri testified on March 6 and 9, 2020. (Tr. 845, 1009). He used the term "strict liability" five times: once during direct examination and four more times in response to questions by defense counsel. (Tr. 867, 1022, 1023, 1031). The first time that Peri used the term during cross-examination, counsel stated, "Let's get into this topic." (Tr. 1022). On March 9, during argument following the conclusion of Peri's testimony—and, apparently, a respite from "the heat of the trial moment"—defense counsel stated: "I know the bankers said strict liability." (Tr. 1209). On March 10, the defense proposed a series of remedies relating to the Government's mid-trial disclosures. (Tr. 1283-84). Despite having elicited testimony regarding strict liability during the afternoon session on March 9, they did not mention striking any of Peri's testimony.

On the night of March 10, defense counsel filed a letter seeking to strike vast swaths of Kim's testimony, including testimony regarding several topics not related to strict liability under the Iranian sanctions. (Dkt. No. 291). Defense counsel did not seek to strike any of Peri's testimony. The Government opposed the scope of the defendant's motion to strike insofar as it challenged aspects of Kim's testimony not related to strict liability. (Dkt. No. 293). The Court granted the defendant's application, subject to the Government's limited objections. (Dkt. No. 299; Tr.1561). In striking parts of Kim's testimony, the Court imposed, as only part of the package

of fair remedial measures related to the Government's mid-trial disclosures, "the most severe remedy a court can impose short of declaring a mistrial," which the defendant expressly declined to pursue.  *United States v. Thai*, 29 F.3d 785, 806 (2d Cir. 1994).

Defense counsel's failure to move to strike any aspects of Peri's testimony at trial, coupled with counsel's specific reference to the now-challenged testimony on March 9, is wholly inconsistent with a request to retroactively strike that testimony now.  The request to strike portions of Peri's testimony should be denied.

### 6. The Defendant Is Not Entitled to a Judgment of Acquittal as to Section 1344(1)

Apart from the mischaracterization of "strict liability," the defendant's motion for a judgment of acquittal relating to Section 1344(1) is based on the argument that the Government failed to establish that his scheme would "likely result in tangible economic harm to the victim, and the defendant knew such tangible economic harm was likely."  (Tr. 1879; *see also* Def. Mem. at 6-14).

Prior to trial, the Court explained that one way for the Government to meet its burden on these elements "is by way of inference where the defendant's misrepresentations foreseeably concealed economic risk or deprived the victim of the ability to make an informed economic decision."  (Dkt. No. 227 at 5 n.2 (citation omitted)).  In *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019), the Second Circuit found this aspect of the right-to-control theory satisfied, in connection with a wire fraud charge, where the defendant "disguise[d] Coin.mx's Bitcoin transactions through front entities . . . , so the institutions processing those transactions would be more likely to process and approve them."  *Id.* at 49.  In that case, the Government offered witness testimony that one of the processing banks "evaluate[d] regulatory risk, including potential fines

for doing business that is illegal, as well as economic risk posed by fraudulent transactions, and consider[ed] transactions with money services or money-transmitting businesses to carry a higher risk of fraud." *Id.* at 48-49.  The Second Circuit held that, "[o]n this basis, a reasonable jury could conclude that [the defendant] deprived the financial institutions of the right to control their assets by misrepresenting potentially valuable economic information."  *Id.* at 49.

Similar to *Lebedev*, Matthew Blair from JP Morgan testified that processing payments in violation of OFAC's sanctions presented regulatory risk, including potential "fine[s]" and "market restrictions" by OFAC, as well as "reputational risk" that could result in additional economic harm such as the bank "losing clients or not being able to establish relationships with clients."  (Tr. 736, 738).  Blair also explained that JP Morgan is forced to expend resources to investigate even "potential sanctions violation[s]."  (Tr. 737; *see also* Tr. 803).  Peri, Citibank's global head of U.S. sanctions, testified that processing payments in violation of OFAC's sanctions presents "risk of monetary penalties or other administrative action," "reputational risk," and "potential criminal liability."  (Tr. 864-65).  Reputational risks pose a "cost to the institution" because they "can be harmful to business."  (Tr. 868); *United States v. Finazzo*, 850 F.3d 94, 111 n.18 (2d Cir. 2017) ("The 'right to control' theory may be implicated if the Government can prove that the reputational harm to the retailer caused by the misrepresentation could lead or did lead to economic losses."). Peri also testified that "penalties for sanctions violations add up quickly; they're often in the billions of dollars," and that "remedial actions" in response to OFAC investigations "can be extremely costly."  (Tr. 864-66).  For example, "[t]here are internal costs even to nonpublic enforcement actions that are not insignificant to a financial institution." (Tr. 1030; Tr. 1032 ("[C]autionary letters and other things that are an enforcement action and do have a cost within

the bank."); Tr. 643 (testimony from Kim that "receiving the warning letter or cautionary letter

has a lot of meaning . . . and it has a consequence if you receive that"); Tr. 654 (testimony from

Kim that "[i]f that party accumulate[s] cautionary letter[s], it is a different story, it is a pattern for

them," and "next time that party will be on the list for monetary penalties")).

The testimony from Blair and Peri established that the defendant's scheme to "deprive[]

U.S. banks of information with respect to the true beneficiaries of the services these banks were

providing" was "economically valuable to these banks because they were allegedly lured—by the

concealment of this information—into providing these services in violation of the law." *Nejad*,

2019 WL 6702361, at *15. While the banks were not subjected to criminal liability, the testimony

established that their processing of these payments presented regulatory risk, reputational and

business risk, and resource costs related to time devoted to internal investigations. The evidence

(and related curative instructions) that OFAC did not take action against the banks following

notification by Commerzbank in 2011 and by prosecutors in 2016 did not foreclose a finding by

the jury that the scheme would likely result in economic harm. For example, Peri explained that,

irrespective of intent, a bank's processing of payments in violation of sanctions could support a

broader finding by a bank regulator that the bank had an "inadequacy in our program," "an

inadequacy in screening," or "a lack of resources dedicated to" payment screening. (Tr. 867-68;

*see also* Tr. 1023 ("There is risk to Citi, and the reason being that OFAC could find that systems

aren't applied appropriately, other things aren't working effectively, and then it can be much

stricter in any given case.")). The jury could reasonably conclude from that testimony that even

in the absence of an enforcement action related to this particular case, the banks still faced

economic harm because OFAC or other bank regulators could later rely on these issues, in

connection with imposing a penalty, as an example of the bank failing to maintain adequate compliance and anti-money laundering systems.

The jury could also infer a likely risk of economic harm posed by the defendant's scheme based on examples in evidence of banks expending resources to investigate potentially violative payments. The defendant cites two, which involved JP Morgan and Commerzbank. (Def. Mem. at 11). Citibank investigated PDVSA's non-transparent payment relating to IPC 30 in connection with the defendant's scheme, and there was also evidence of follow-up by UBS regarding a payment. (GXs 430-32 (Citibank inquiry about the payment's "accordance with OFAC guidelines" and cancellation of payment); GXs 2114, 2114A (UBS Stamford rejection of payment "pursuant to the Iranian Transactions Regulations")). While it is true that there was no evidence of a response by OFAC to the banks' outreach, these examples from the Government's proof reflect efforts by paid bank employees to investigate deceptive, non-transparent payments that the defendant caused to be sent. Peri explained that there are "[i]nternal investigations that can be quite resource intensive." (Tr. 1035; *see also* Tr. 737)).

The proof was also sufficient to support a finding that the defendant "knew that it was likely that the alleged fraudulent scheme would cause the banks tangible economic harm." (Tr. 1879). All of the evidence supporting the jury's finding regarding the defendant's criminal intent, lack of good faith, and knowledge of the sanctions with respect to Counts One and Two, *see infra* Argument, Part I.C., supports a finding of the defendant's knowledge on this element under Section 1344(1). The most directly relevant piece of that proof, though not the only piece, is the one identified by the defendant: Government Exhibit 2265B. The defendant acknowledges as much, but mischaracterizes the exhibit. (Def. Mem. at 13-14). In February 2012, the defendant's

sister sent him a pamphlet titled "The Impact of U.S. Sanctions Against Iran on You." (GXs 2265, 2265B). The pamphlet stated that "OFAC has imposed financial penalties on many U.S. banks, including their foreign branches, for unauthorized funds transfers to and from Iran" and "performing financial services in the United States on behalf of an account holder while the account holder was located in Iran." (GX 2265B at 5). The jury could infer from the defendant's receipt of this document and the other evidence described below that the defendant knew that his fraudulent scheme would likely result in tangible economic harm to the FDIC-insured banks he deceived into processing these payments.

In denying the defendant's motion to dismiss the Indictment, the Court noted that these issues presented a "question of fact to be resolved at trial." *Nejad*, 2019 WL 6702361, at *15. There is no dispute that the defense presented strong arguments in response to the proof summarized above. Some were stronger than others, as two of the Defense Exhibits relied upon at trial and in post-trial motions were dated in 2016 (DXs 96R, 1347)—after the conduct in this case—and Peri testified that FATF's guidance "is not typically targeting financial institutions" and "it is not guidance that relates to U.S. sanctions" (Tr. 940 (discussing DX 96R)). The Government also acknowledges the disclosure issues related to some of that evidence, and will address the defense's disclosure-related arguments in its Rule 33 response. But for purposes of Rule 29, the defendant cannot obtain a judgment of acquittal by pointing to pieces of evidence that he favors and arguing to the Court that they are more persuasive than the testimony of Peri, Blair, and Kim. "It [was] for the jury to decide how those arguments bear on 'the weight [it] should accord to the evidence.'" *Mack*, 2020 WL 114509, at *2 (quoting *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012)); *see also Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court

with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."); *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) ("[T]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury." (internal quotation marks omitted)).  Accordingly, the Court should deny the defendant's motion for a judgment of acquittal with respect to Section 1344(1) on Counts Three and Four.

### 7.    Fair Inferences From The Defense Evidence Further Supported The Jury's Verdicts on Counts Three and Four

The defendant's renewed Rule 29 motion fares no better.  While the Court can consider evidence from the defense case in addressing the motion under Rule 29, in addition to all of the evidence described above, the Government is still entitled to the benefit of all fair inferences from the defense evidence.   *United States v. Nersesian*, 824 F.2d 1294, 1314 (2d Cir. 1987) ("That the evidence permits inferences that are consistent with innocence does not detract from its sufficiency.  To be sufficient, the evidence need not have excluded every possible hypothesis of innocence."); *United States v. Alcantara*, No. 13 Cr. 119, 2015 WL 13214927, at *4 n.3 (S.D.N.Y. Apr. 23, 2015) ("Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a)." (internal quotation marks omitted)).  For example, in analysis under Rule 29(c), a defendant's testimony can "suppl[y] additional grounds to support a guilty verdict," including where, as here, "[t]he jury was entitled to find various aspects of [the defendant's] testimony false and obfuscatory, and to infer from these evasions consciousness of guilt and thereby guilt."  *United States v. Heyward*, No. 15 Cr. 445, 2017 WL 5624279, at *3 (S.D.N.Y. Nov. 21, 2017).  The Government has described "false and obfuscatory" aspects of the defendant's testimony above,

*see supra* Background, Part III, and will not recount them here.  In several additional ways, the defendant's evidence did not advance his cause with respect to Counts Three and Four.

To start, the defendant testified that the purpose of Stratus – Turkey was to "replicate" Stratus – Iran.  (Tr. 1488).  It was not a stretch for the jurors to consider the term "replicate" as shorthand for the phrase "create a front company to hide Iranian connections" in the context of the other evidence.  The defendant elaborated that he pursued the so-called replication "to get my dad out of Iran" (*id.*), but the jurors could easily look beyond that explanation because it never happened.  Instead, in September 2011, the defendant directed that Stratus – St. Kitts pay his father two million British Pounds in Venezuela Project proceeds while his father was an Iranian resident (GX 2071B), notwithstanding the defendant's testimony that "[t]he whole idea was to keep the money out of Iran" (Tr. 1449).  Because these inferences are reasonable and supported by the evidence, and in light of the jury's verdict, the Court should credit them in the Government's favor in its Rule 29 analysis.

The defendant acknowledged that two of IIHC's original investors were Iranian government entities.  (Tr. 1462).  He explained that one of the first Euro payments in connection with the Venezuela Project was temporarily "blocked" in Germany due to the participation of "an Iranian bank" in the transaction named "the Export Development Bank of Iran" (Tr. 1465, 1593), which appears to be distinct, at least nominally, from the Iranian-backed EIH bank in the defendant's 2008 email to Mohammad Sadr about the "OFAC list" (GX 2276-T).  The jury could infer that the Export Development Bank of Iran remained an active supporter of the deal, despite this early problem, based on the October 2013 letter from "the Export Development Bank of Iran" seeking fees and cash collateral in connection with a "[r]enewal of prepaid guarantee credit," to

which the defendant responded "Please DO NOT send these items to my email." (GXs 2271-T, 2271A-T; Tr. 248 (testimony that the Export Development Bank of Iran issued the prepayment bond for the Venezuela project)).

The defendant also testified that, following the temporarily blocked Euro-denominated advance payment on the Venezuela Project, Mohammad Sadr used part of the payment to buy out the Iranian government investors in IIHC. (Tr. 1468, 1470). While the defendant presented a self-serving explanation for that decision, the jury could infer that removing government-affiliated investors from IIHC documentation was another step by members of the conspiracy charged in Count Four to obscure the actual beneficiaries of the payments. With regard to the buy-out, the inculpatory inference is further supported by the subsequent continued support of IIHC from high-ranking Iranian politicians, including the president and ambassador to Venezuela. (GXs 2088, 2088A, 2171-T). For example, Defense Exhibit 1019C described a June 2012 trip to Venezuela by Ahmadinejad and Ahmadinejad's declaration that he was "glad that Iran was able to contribute to the happiness of Venezuelan citizens" through the IIHC Venezuela Project. (DX 1019C).

Finally, the defendant testified that he had "[g]eneral knowledge" of the sanctions from "the newspapers," which led him to believe "[t]hat if you break the law, you're going to be liable, *large banks were liable for giant fees*, that was the common theme for their own wrongdoing, or whatever you can call that." (Tr. 1547 (emphasis added)). This testimony provided additional evidence to support the inferences of likely economic harm and the defendant's knowledge of such harm for purposes of Section 1344(1)

Accordingly, while the Court may consider evidence from the defense case when evaluating the defendant's renewed Rule 29 motion, the Government—not the defendant—is

entitled to the reasonable inferences from that evidence in light of the jury's verdict. Those fair inferences further support denial of the defendant's motion.

### C.     The Government Established the Defendant's Guilt on Counts One and Two

Counts One and Two charged related conspiracies to impede OFAC's administration of the Iran sanctions and to violate and evade those sanctions. The defendant seeks a judgment of acquittal on these Counts based on challenges to the sufficiency of the evidence related to the charged fraudulent scheme and his state of mind, as well as previously rejected arguments regarding the scope of the sanctions. (Def. Mem. at 31).[11]    The Court should reject these arguments because the jury's verdicts are supported by the record.

### 1.     The Government Established The Existence of the Conspiracies Charged in Counts One and Two

The Government established at trial that the defendant and his co-conspirators used substantially the same scheme that they used to defraud FDIC-insured banks to achieve the following additional unlawful objects: (1) to make it "more difficult," through "fraudulent and dishonest means," for OFAC "to carry out its lawful and legitimate functions," as charged in Count One (Tr. 1838); (2) to cause payment processing services by U.S. correspondent banks to be exported on behalf of "a person, entity, or business in Iran" or "where the benefit of such services [was] otherwise received in Iran," as charged in Count Two (Tr. 1874); and (3) to evade the Iran

_____

[11] The defendant re-argues that the *Klein* conspiracy theory is not viable after *Marinello v. United States*, 138 S. Ct. 1101 (2018). (Def. Mem. at 43-46). The Court already rejected this argument. *Nejad*, 2019 WL 6702361, at *10. Because *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) remains binding law in the Second Circuit, the defendant's motion to dismiss Count One based on *Marinello* should be denied.

sanctions' prohibition on the exportation of services by U.S. correspondent banks, also as charged in Count Two (Tr. 1873).

The evidence demonstrating the existence of the defendant's fraudulent and deceptive scheme is described above at length.  *See supra* Background, Part II, and Argument, Part I.B. (discussing Counts Three and Four).  The Venezuela Project presented obvious sanctions risk from its inception.  The Project arose out of a bilateral agreement between Venezuela and Iran, was backed throughout by the Iranian government, was executed in large part by Iranian entities based in Iran (Stratus – Iran and IIHC), was managed in many respects by Iranian nationals living in Iran (including Mohammad Sadr), and—it bears repeating—contemplated $475 million worth of transfers from Venezuela to Iranian parties based in Iran.  It is no surprise, then, and entirely consistent with the jury's verdicts, that the defendant and his father were communicating about the "OFAC list" in 2008 following OFAC's designation of a Stratus – Iran subsidiary in 2007.  (Tr. 499; GX 2276-T).

In 2009, after OFAC revoked the U-Turn license, Mohammad Sadr appointed the defendant to the Venezuela Project Committee to "focus on financing and trade activities."  (GX 2113B-T at 6; GX 2113-T at 1).  The defendant set up front companies in St. Kitts and Nevis, Turkey, and Switzerland, established Swiss bank accounts for the front companies at Hyposwiss, *see supra* Background, Parts II.G., II.I., and II.L., communicated about stripping references to Iran from documents (*e.g.*, GXs 2145, 2238), doctored contracts, *see supra* Background, Part II.V., and caused the Venezuelans to start routing payments to his front companies instead of IIHC via U.S. correspondent banks (*e.g.*, GXs 1501A, 1502A).  The defendant's use of U.S. correspondent banks in the scheme was not incidental; the defendant and his father could not obtain U.S. dollars through

this Iranian-run project any other way.  (Tr. 733-34; Tr. 763-64).  The scheme was also successful, as it resulted in U.S. banks exporting payment-processing services in connection with 15 payments, worth approximately $115.5 million in aggregate, between April 2011 and November 2013.  (GX 702).

The 15 transfers violated OFAC's Iran sanctions because the services the defendant caused to be exported by U.S. banks were provided "indirectly to Iran," *i.e.*, "on behalf of" and "for the benefit" of Stratus – Iran, IIHC, Mohammad Sadr, and other Iranian residents participating in the management of these entities such Moayed, the Secretary of the Venezuela Project Committee. (Tr. 1874 (jury charge)).  The jury could easily conclude that Mohammad Sadr and the Iran-based entities he controlled were the ultimate beneficiaries of the services the defendant caused to be exported and the payments the defendant helped complete.  The inference that the defendant was providing services "indirectly to Iran" was further supported by the evidence that the defendant traveled to Iran approximately 50 times between 2010 and 2015 (Tr. 1774; GX 704), and attended in person at least approximately 20 percent of the meetings of the Venezuela Project Committee in Tehran (Tr. 199).  The "directly or indirectly to Iran" language from the applicable Iran sanctions prohibited the defendant's conduct whether or not payments were sent from U.S. banks to Iran, and the defendant's extensive travel to Iran for activities related to the Venezuela Project served as additional compelling evidence that his criminal efforts were "for the benefit of" people and companies in that country.

The defendant argued strenuously at trial, and repeats the claim in post-trial motions, that he did not believe that the Iran sanctions prohibited his conduct.  (Def. Mem. at 40-43).  The jury's

opposite conclusion was strongly supported by numerous emails related to the Iran sanctions, after

OFAC's revocation of the U-Turn license, between 2009 and 2014:

- In December 2009, Karimi sent the defendant an email relating to an expected payment from the defendant's HSBC account, noting that, "[m]aybe, such a trifle amount of money is under sanction too."  (GX 2002).

- In December 2010, Cetinel sent the defendant and Mohammad Sadr an email relaying the following message from a Turkish bank:  "we are unable to render any services to any direct or indirect transaction originating from or associated with IRAN."  (GX 2237-T).

- In May 2011, Cetinel sent the defendant, Karimi, Zangeneh, and others a warning relating to a "delegation [that] came from the U.S. to Turkey around two weeks ago to warn banks and private companies not to do business with Iranian companies."  (GX 1103).

- In January 2012, a Stratus – Iran employee sent the defendant an email expressing concerns about, *inter alia*, "US sanction issues" arising from the registration of Stratus Group's "global domain name" with an "Iranian entity."  (GX 2261).

- In February 2012, Hyposwiss notified the defendant that a UBS branch in the United States had "rejected" a payment "due to the Iranian transaction regulations."  (GXs 2114, 2114A).

- In January 2013, the defendant sent emails seeking to remove an interview of Mohammad Sadr from the Internet because the publications had "created so many problems due to sanctions."  (GX 2156).

- In July 2014, Estiroti sent an email to the defendant notifying him that a payment to Kazerani was "rejected" due to "U.S. sanctions to pay Iranian institution/individual" (GX 2297), and attaching a notice stating that "in accordance with the United States Treasury Department and OFAC regulations, transactions involving Iran are restricted." (GX 2297A).

Finally, in addition to all of the foregoing evidence reflecting the defendant's active

participation in sanctions-related dialogues throughout the course of his scheme, as discussed

above, the defendant's sister sent him a pamphlet in February 2012 titled, "The Impact of U.S.

Sanctions Against Iran on You."  (GX 2265B).  In the transmittal email, she correctly asserted that

"[t]his applies to US persons and whomever is present in the US" (GX 2265), using language that

applied directly to the U.S. banks that the defendant was in the process of causing to export services

for the benefit of IIHC, Mohammad Sadr, and others.  *United States v. Abdullaev*, 761 F. App'x

78, 81-82 (2d Cir. 2019) (finding evidence supporting IEEPA violation sufficient where

"substantial knowledge of the regulatory regimes" was demonstrated by "emails from suppliers"

and other evidence proved that defendant was "practiced in [the regulations'] evasion").  The

pamphlet itself described prohibitions on exporting services and sanctions evasion, as well as the

criminal penalties at issue.  (GX 2265B at 2-3).  The defendant claims the pamphlet "was directed

at enforcement against individuals, not banks."  (Def. Mem. at 14).  The pamphlet made clear,

however, that "U.S. banks are allowed to handle funds transfers to and from Iran" only under

circumstances specifically delineated in the document, and explained that:

> In the last seven years, OFAC has imposed financial penalties on many U.S. banks,
> including their foreign branches, for unauthorized funds transfers to and from Iran,
> operation of accounts of individuals living in Iran, improper closure of such
> accounts, or performing financial services in the United States on behalf of an
> account holder while the account holder was located in Iran.

(GX 2265B at 4-5; *see also id.* at 5 ("On or about May 22, 2006, an individual attempted to transfer

funds to an entity in a third country in order to pay a debt on behalf of an entity in Iran. OFAC

penalized the individual $550 for violating Iran Sanctions.")).  The pamphlet also explained that

the Iran sanctions' "export prohibitions include . . . exports through a third country (U.S. to third

country to Iran)."  (*Id.* at 10).

Based on this evidence, the jury could infer that the defendant, as a sophisticated

international businessman with a master's degree from an Ivy League school, was aware of the

pertinent prohibitions in OFAC's Iran sanctions, and actively took steps in concert with others to

impede OFAC's enforcement of those sanctions by knowingly violating them.  The evasive aspects

of the defendant's scheme provide an additional, alternative basis supporting his conviction.  Even

if the jury credited the defense's technical arguments about the claimed accuracy of the wire instructions to correspondent banks—and the opposite must be presumed under Rule 29—the jurors could still have concluded that the defendant's purpose in using front companies to structure the transactions in that fashion was to impede OFAC's function by evading applicable regulations. Therefore, the evidence was sufficient to establish that the defendant participated in a scheme whose objects included making it more difficult for OFAC to enforce the Iran sanctions (Count One), violating the Iran sanctions by exporting services on behalf of and for the benefit of Iranians (Count Two), and evading the applicable provisions of the Iran sanctions (Count Two).

### 2.   The Government Established the Defendant's Criminal Intent and Lack of Good Faith

Relying on "his own testimony," the defendant argues that the Government failed to establish his criminal intent on Counts One and Two. (Def. Mem. at 40). While the Government bore the burden of proof at trial, the defendant cannot escape a guilty verdict under Rule 29 by crediting his own evidence over the proof offered by the Government. *United States v. Heras*, 609 F.3d 101, 103 (2d Cir. 2010) (reasoning that the rule that "the evidence must be viewed in the light most favorable to the government . . . required the district court . . . to assume that the jury did not credit [defendant's] self-serving protestation that he had 'nothing to do' with . . . drug deal"). The Government's evidence established, to a properly instructed jury, that (1) the defendant knowingly and willfully joined a conspiracy to obstruct OFAC's functions for purposes of Count One (Tr. 1835); (2) the defendant knowingly and willfully joined a conspiracy to violate and evade OFAC's Iran sanctions for purposes of Count Two (Tr. 1871); and (3) the defendant did not act in good faith (Tr. 1840, 1875).

90

The defendant's intent must be evaluated based on the totality of the evidence as summarized above, *see supra* Background, Parts II and III, *e.g.*, *Persico*, 645 F.3d at 104, and the jury could infer criminal intent from the overall structure of the scheme the defendant created:  in a project backed by the Iranian government, pursuant to a contract between an Iranian firm and DUCOLSA, the defendant persuaded DUCOLSA to transfer funds to non-party front companies that the defendant established based in part on purchased citizenship and lies about the shareholders' domiciles in order to mask the ultimate beneficiaries of the project in Iran.

A few pieces of evidence stick out on the issue of the defendant's criminal intent:

- In July 2010, the defendant categorically lied, in writing:  "NO one is dealing with an Iranian entity . . . . The issue of the [Iranian] concern should be completely out of the picture!!!"  (GX 2199).

- In December 2010, the defendant directed Cetinel to ask a sub-contractor (Alper) to create false documentation (a purported contract between Alper and Stratus – Turkey), in order to avoid "serious problems" in Hyposwiss's "compliance filings."  (GX 2238 at 1).  Cetinel accurately interpreted the defendant's instruction as a request for a "dummy invoice."  (*Id.* at 2).

- In March 2011, the defendant wrote to Zangeneh that a "name change" for IIHC was "crucial" because "we have requested for our last invoice to be paid in USD."  (GX 2015).

- Also in March 2011, the defendant categorically lied again, in writing:  "There's no Iranian behind any of the accounts provided."  (GX 2248).

- In April and May 2011, the defendant refused to identify to Commerzbank the beneficial owners of Stratus – Turkey and to disclose their citizenship.  (GX 2034; *see also* GX 2037 ("[N]on[e] of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran.")).

- Following the inquiries from Commerzbank, the defendant stopped using Stratus – Turkey as a front company to receive IIHC-related payments for more than a year (GX 702), and Venezuela stopped using Fondo Chino to send payments (*id.*), which was the entity that triggered the alert at Commerzbank in the first place (GX 2032-T at 6).

- In December 2011, the defendant sent altered IPCs to Urs Schneider at Hyposwiss, which hid IIHC's full name and did not reference Iran.  (GXs 2087, 2087A, 2087B).

91

- In December 2012, the defendant instructed Estiroti to backdate a sub-contract between IIHC's Venezuela branch and Stratus – Turkey, over Cetinel's objection, to remove all Iran identifiers from the July 2, 2007 contract between DUCOLSA and IIHC, and to send the altered document to people working on an "accounting" of Clarity's Hyposwiss accounts. (GXs 2153-1, 2153-2, 2154-1, 2154-2).

- In January 2013, the defendant, in essence, sought to destroy evidence when he asked Business Year to remove an article from the Internet that connected the Venezuela Project to Stratus – Iran and Mohammad Sadr because the article had "created so many problems due to the sanctions." (GX 2156 at 2; GX 2282A; *see also* GX 2139 (defendant demanding in December 2012 that IIHC's Venezuela branch take down its website because it was "so dangerous")).

- In October 2013, the defendant sought to avoid creating further evidence of his crimes when he instructed an IIHC employee, "Please DO NOT send these items to my email," after the employee sent him a letter related to the Venezuela Project from the Export Development Bank of Iran. (GXs 2271-T, 2271A-T).

Thus, the defendant lied to project participants, tried to remove references in project documentation to Iran, sent altered documents to Hyposwiss and accountants, and sought to keep additional evidence outside the reach of law enforcement by removing it from the Internet and preventing additional email correspondence. *United States v. Atilla*, No. 15 Cr. 867, 2018 WL 791348, *6 (S.D.N.Y. Feb. 7, 2018) (reasoning that "falsification of documents that were received by" foreign bank probative of IEEPA, bank fraud, and *Klein* conspiracy charges); *United States v. O'Brien*, 926 F.3d 57, 79 (2d Cir. 2019) ("Efforts a defendant has made toward concealment, for example, of either the nature of an activity or his participation in it, may support an inference that he knew the activity was unlawful."). Taken together with the other evidence of the defendant's conduct and role in the deceptive scheme, this proof provided a compelling basis for the jury's conclusion that the defendant acted with criminal intent and not in good faith.

### 3.   OFAC's Inaction Does Not Merit a Judgment of Acquittal on Count One

The Government does not dispute the relevance of OFAC's lack of an enforcement action related to the payments at issue in this case, and acknowledges now, as it did at trial, that its disclosures on this issue were untimely.  But OFAC's inaction does not mean that "[a]quittal on Count One is required."  (Def. Mem. at 35).

As the defendant acknowledges, "[t]hese facts were communicated to the jury."  (Def. Mem. at 34).  Specifically, the jurors learned that: (1) OFAC did not take action in response to Commerzbank's June 2011 letter (GX 411; DX 150 ¶¶ 304); (2) OFAC "chose not to take any enforcement action" after being notified by "the prosecutors in this case" in September 2016 "about the conduct in this case including the allegedly wrongful actions" (DX 150 ¶ 6); (3) the Government "failed to turn [GX 411] over before trial, as required by law" and "the defendant learned of that evidence on [March 7, 2020] when the government disclosed it" (Tr. 1391); and (4) portions of Kim's testimony relating to OFAC's "strict liability enforcement policy" were struck "[i]n light of these facts" (Tr. 1822).  Because this information was disclosed to the jury, and ably emphasized during the defense summation,[12] the post-trial defense argument that the jurors "may have overlooked" the "full significance" of these facts is not viable under Rule 29. (Def. Mem. at 34).

---

[12] Defense counsel reminded the jury of the Court's curative instructions (Tr. 2000), and the defense stipulation marked DX 150 relating to OFAC's inaction in 2011 and in 2016 (Tr. 2003-04).  Counsel argued that OFAC told the prosecution team to "take a hike" with "their story" (Tr. 2008); that "this whole notion of this rigorous enforcement [by OFAC] about anything having to do with Iran is utter nonsense" and "[p]atent nonsense" (Tr. 2009); and "that OFAC didn't have the slightest interest in picking up this case," which "speaks volumes" (Tr. 2009).

Although the defendant now argues that the jury only "learned these facts in a summary fashion" (Def. Mem. at 34), the information was communicated to the jurors by the Court through two instructions and a stipulation crafted by the defense that both parties signed. (Tr. 1391, 1398-99, 1822; DX 150). The Court also made "abundantly clear" to the defendant that the defense could "recall [Ted] Kim and additional OFAC witnesses" if they wanted to present the jury with additional information. (Tr. 1563; Tr. 1283, 1291). The Government agreed to make the witnesses available. (Tr. 1286). The defense declined to call the witnesses, or even to seek a mistrial, because they "want[ed] this trial to move." (Tr. 1284; *see also* Tr. 1285, 1561). Given the curative measures imposed by the Court, and the additional available remedies the defense declined to seek, the Court should "decline [the defendant's] invitation to usurp the jury's function." *United States v. Flores*, No. 15 Cr. 765, 2017 WL 1133430, at *3 (S.D.N.Y. Mar. 24, 2017) (citing *Truman*, 688 F.3d at 139).

OFAC's inaction did not foreclose a finding of guilt on any of the Counts. For purposes of the Count One conspiracy charge, it was not necessary for the Government to establish that the defendant succeeded in obstructing or impeding OFAC from bringing an enforcement action that the agency otherwise would have pursued. The ultimate question for the jury on Count One was *not* "[w]hether Sadr's conduct interfered with OFAC's 'lawful and legitimate governmental functions.'" (Def. Mem. at 32). The issue was whether he agreed with others to seek to do so. "The crime of conspiracy is complete upon the agreement to violate the law . . . and is not at all dependent upon the ultimate success or failure of the planned scheme." *United States v. Trapilo*, 130 F.3d 547, 553 n.9 (2d Cir. 1997). The Court told the jury as much. (Tr. 1836).

Moreover, as stated above, the object of the Count One conspiracy was "to *make it more difficult*" for OFAC to "to carry out its lawful and legitimate functions." (Tr. 1838 (emphasis added)). That aspect of the Court's jury instructions was grounded in Second Circuit precedent. *United States v. Shellef*, 507 F.3d 82, 104 (2d Cir. 2007) ("All that is necessary is that the scheme had the object of making it more difficult for the IRS to carry out its lawful functions and that the scheme depend on 'dishonest or deceitful means.'" (citing *United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996))). And the requisite "'intent to defraud the United States may be incidental to another primary motivation or purpose.'" *United States v. Middendorf*, No. 18 Cr. 36, 2018 WL 3443117, at *4 (S.D.N.Y. July 17, 2018) (quoting *United States v. Gurary*, 860 F.2d 521, 525 (2d Cir. 1988)).

Kim confirmed that concealment of Iranian involvement in a transaction mattered to OFAC because the agency's goal is transparency, so that "U.S. financial institutions and other U.S. persons . . . know what kind of [transaction] they are going into." (Tr. 507). Based on the evidence summarized above, the jury could reasonably conclude that the defendant and his co-conspirators agreed to make it more difficult for OFAC to achieve this goal and enforce the Iran sanctions through a deceitful scheme to make their transactions non-transparent. Their scheme caused U.S. correspondent banks to process payments ultimately destined for Iranian beneficiaries based on SWIFT documentation that contained, at best, half the story of the transactions. As in *Gurary*, "[i]mpeding [OFAC], though not defendant['s] primary purpose, was part and parcel of the scheme." 860 F.2d at 525. The Government also provided the jurors with concrete examples of the regulatory difficulties that the scheme created for OFAC, including (1) Citibank's threat to report a payment to OFAC when PDVSA's bank referenced IIHC in a SWIFT message (GX 432),

95

which Citibank retracted when Hyposwiss brought the message into conformity with the defendant's scheme by sending a replacement SWIFT message describing Stratus – Turkey as the beneficiary (GXs 428, 431); and (2) the defendant's refusal to provide complete information to Commerzbank about Stratus – Turkey (GX 2034), which the jury could conclude impacted the content of Commerzbank's letter to OFAC (GX 411), as well as OFAC's inaction in response to the disclosure.    The jury could also reasonably infer that OFAC's inaction following communications about the case with the prosecution team resulted from an internal decision by a regulator facing scarce resources that a criminal prosecution was sufficient to vindicate the agency's enforcement and deterrence objectives.

At bottom, while the Government does not dispute that "[a]n agency's 'legitimate and lawful' enforcement functions do not include punishing what the sanctions permit" (Def. Mem. at 36), the evidence demonstrated that the defendant's scheme made it more difficult for OFAC to determine "what the sanctions permit" with respect to the payments at issue because he routed them through front companies to obscure their true Iranian beneficiaries.   OFAC's inaction did not, as the defense argued, reflect a judgment on the merits of the Government's theory of the defendant's violations and evasion of the Iran sanctions.   In any event, a properly-instructed jury agreed with the Government's theory of sanctions violations, beyond a reasonable doubt, in Count Two.   With respect to Count One, the evidence supported the jury's conclusion that—irrespective of OFAC's decisions in this case—it would be easier for OFAC to enforce its sanctions if parties were transparent about the ultimate beneficiaries of payments, and that the defendant's scheme made it more difficult for OFAC to enforce the sanctions because he and his co-conspirators did not provide that information.

96

### 4. The Court Already Rejected the Defendant's Argument That Sanctions Authorized His Conduct and His U-Turn Arguments Are Unavailing

The defendant renews his arguments that the sanctions authorized his conduct, which the Court rejected prior to trial, *Nejad*, 2019 WL 6702361, at *6-10, and again on the merits following an untimely motion for reconsideration (Tr. 22, 313-16; *see* Dkts. 252, 257 (supplemental briefing)).  In rejecting the motion during the trial, the Court found it "facially incredible that a newfangled argument that Mr. Sadr's counsel himself only fully understood on the first day of trial was plausibly in Mr. Sadr's mind during the relevant time period." (Tr. 315).  The defense adduced no evidence to the contrary, and his post-trial arguments on this issue are therefore unavailing.

The defense also argues that the Government "did not elicit any evidence that Sadr knew the U-Turn license had been revoked." (Def. Mem. at 38).  Although Kim testified that the revocation was publicized (Tr. 486), there was no evidence that the defendant knew about the U-Turn license much less relied on it prior to November 2008.  On the defendant's telling, he did not even "commit[]" to the Venezuela Project until March 2010. (Tr. 1454).  Because the defendant did not mention the U-Turn license during his direct examination, the defense is correct that the Government "did not even ask him about the revocation when he was on the stand." (Def. Mem. at 38).  Defense counsel presented arguments about the U-Turn license during his summation, which he said were "important" (Tr. 2052-53), and the jury rejected them.  Accordingly, the evidence related to the U-Turn license does not merit a judgment of acquittal.

### 5. Fair Inferences From The Defense Evidence Further Supported The Jury's Verdicts on Counts One and Two

As with the defendant's challenges to Counts Three and Four, he impermissibly seeks the benefit of inferences from the evidence to which he is not entitled when pursuing a judgment of

acquittal on Counts One and Two. *See Nersesian* 824 F.2d at 1314. As with the defendant's challenges to Counts Three and Four, several reasonable inferences from the defense case further support the jury's verdicts on the challenged Counts.

First, similar to the defendant's admission that the purpose of Stratus – Turkey was to "replicate" Stratus – Iran (Tr. 1488), he testified that "[t]he whole idea was to keep the money outside of Iran" (Tr. 1449). The defendant also testified about a meeting between himself, Mohammad Sadr, Hyposwiss's CEO ("Ziggy"), and Schneider, in which the group discussed that "dad wanted to keep this stuff out." (Tr. 1582). The defendant clarified that, by "stuff," he meant "the entire project, the entire mechanics of the payments and what was going through Hyposwiss." (Tr. 1582). The jury could infer from this testimony—in the context of other evidence such as the fact that Mohammad Sadr remained in Iran to run the Venezuela Project Committee and IIHC— that the phrase "keep the money outside of Iran" was a candid description of the defendant's efforts to violate and evade applicable OFAC sanctions by using front companies to avoid U.S.-dollar transfers from FDIC-insured correspondent banks to accounts in Iran when the proceeds were in fact controlled by and for the benefit of Iran-based entities and individuals such as IIHC and Mohammad Sadr.

Second, based on the defendant's above-described testimony regarding his "[g]eneral knowledge" of the sanctions from "the newspapers," and that "large banks were liable for giant fees" as a "common theme for their own wrongdoing" (Tr. 1547), the jury could infer that the defendant was aware of the relevant portions of the Iran sanctions, that the U.S. correspondent banks he was deceiving had been the subject of enforcement actions by OFAC due to violations

of those sanctions, and that his scheme therefore made it more difficult for OFAC to enforce the sanctions.

Third, with respect to the defendant's knowledge that the services he was causing the U.S. banks to export were for the benefit of entities and individuals in Iran, the defendant testified that it "might be accurate" that he traveled to Iran approximately 50 times between 2010 and 2015. (Tr. 1774; GX 704).  The defendant's admission regarding extensive travel to Iran during the course of the Venezuela Project corroborated testimony from Kazerani about the defendant's presence at meetings of the Venezuela Project Committee in Tehran (Tr. 198-99), and further supported the inference that the defendant knew he was illegally causing payment-processing services to be exported on behalf of and for the benefit of Iranian entities and individuals.

Fourth, the defendant all but admitted to violating the Iran sanctions when he confirmed that he lived in the United States between approximately 2000 and March 2010 (Tr. 1426, 1436), and again beginning in November 2012 after obtaining a green card (Tr. 1437, 1683, 1766).  The defendant's physical presence in this country and subsequent permanent residency served as an alternative basis for him to be subject to the sanctions, 31 C.F.R. § 560.314, and during those periods he was exporting services for the benefit of Stratus – Iran, IIHC, and Mohammad Sadr, including by setting in motion the broader scheme to cause U.S. banks to export payment processing services, *id.* §§ 560.204, 560.410.[13]  The defendant testified that he did not "commit[]"

---

[13] The defendant provided services to Stratus – Iran, IIHC, and others prior to his March 2010 departure from the United States.  (*E.g.*, GX 2276-T (June 2008 email regarding OFAC list); Tr. 1448 (describing conversation in 2008 or 2009 with Mohammad Sadr about defendant "manag[ing] the finances" of the Venezuela Project); GX 2113B-T at 6 (May 2009 minutes naming defendant to Venezuela Project Committee); Tr. 1623 (trial testimony that defendant reviewed minutes of Venezuela Project Committee meetings when he received them); GX 2002

to the Venezuela Project until he "knew [he] was leaving" the United States in March 2010 (Tr. 1454), and that his role in the Project after he returned to the United States was limited to imparting "institutional knowledge" but he was "not there" if asked to "take certain action" (Tr. 1684).  The jury could reject these self-serving characterizations, which are contrary to the evidence, *see supra* at 99 n.13, and conclude that for periods of the offense conduct the defendant was living in the United States and providing services to Iranian entities in blatant violation of the sanctions.

Finally, although the defendant places much weight on his review of the July 2010 congressional report (the Report), *see supra* Background, Part II.J., relating to CISADA to support his good-faith defense (DX 132A), the jury could infer that a careful reading of the Report by a sophisticated businessman such as the defendant put him on further notice of the applicable sanctions that he was in the process of violating and seeking to evade, and that non-transparency in financial transactions would make it more difficult for OFAC to enforce the sanctions.  The Report did not state that CISADA superseded or abrogated existing sanctions, and instead made clear that there were other applicable statutes.  (*E.g.*, DX 132A at 62; *id.* at 64 ("This section harmonizes penalties for violating export controls and U.S. sanctions across various statutes with the strongest such penalty standards in the U.S. Code, consistent with the International Emergency

_____

(December 2009 email regarding wire transfer to Karimi); GX 2187-T at 2-3 (February 2010 email with Mohammad Sadr about establishing Clarity's Hyposwiss account)).  He also continued to provide services to these Iranian entities upon his return to the United States as a permanent resident in November 2012.  (*E.g.*, GX 2153-1 (December 2012 email regarding contract backdating and doctoring); GX 2156 at 2 (January 2013 email seeking to remove article from Business Year website); GX 2269 (October 2013 email to defendant attaching IIHC payment request); GXs 2297, 2297A, 2298 (July 2014 emails regarding rerouting a blocked payment to Kazerani); GX 2304A (listing 2013 and 2014 payments in "USD" to Karimi, Cinar, Cetinel, and others)).

Economic Powers Enhancement Act of 2007 (P.L. 110–96).")).  The Report made clear that "U.S. companies," including "U.S. financial institutions," "already face severe civil and criminal penalties for doing business in Iran under IEEPA."  (*Id.* at 62).  The defendant also admitted that he knew PDVSA had been sanctioned pursuant to CISADA (Tr. 1796), which supported inferences that the defendant followed sanctions issues carefully, understood the scope of CISADA, and appreciated the obvious sanctions risk attendant to the Venezuela Project.  Thus, although the defendant asked the jurors to draw defense-friendly inferences about CISADA, the Report he offered also supported reasonable inferences toward his guilt—particularly in light of the fact that his sister later sent him a pamphlet describing in more detail the applicable prohibitions of IEEPA (GXs 2265, 2265B), the statute repeatedly referenced in the Report (*e.g.*, DX 132A at 62, 64).  Accordingly, to the extent the Court credits any inferences from the defense evidence in connection with its Rule 29 analysis of Counts One and Two, those inferences support the jury's verdicts.

### D.    The Government Established the Defendant's Guilt on Count Five

The defendant challenges the jury's guilty verdict on Count Five by incorporating his arguments relating to Counts Two, Three, and Four, which were the specified unlawful activities at issue in Count Five, and by arguing that the Government failed to offer proof of international funds transfers intended to promote the specified unlawful activities.  (Def. Mem. 46-48).  For the reasons already stated, the Government established predicate specified unlawful activities involving violations of IEEPA (Count Two) and bank fraud (Counts Three and Four).  *See supra* Argument, Parts I.B and I.C.  For the reasons set forth below, the defendant's challenge to the promotion element of Count Five is meritless.

For purposes of Count Five, the 15 payments related to the Venezuela Project that were summarized in Government Exhibit 702 promoted the specified unlawful activities charged in

Counts Two, Three, and Four. The defendant suggests that these transactions were not "charged in the Indictment" (Def. Mem. at 47), but the wires were described in paragraph 13 of the Indictment, which was incorporated by reference into Count Five in paragraph 28 (Dkt. No. 2 ¶¶ 13, 28).[14] Transactions are effectuated "with the intent to promote the specified underlying unlawful activity, be it, for example, by promoting continued illegal activity or by *being essential to the completion of the scheme*." *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003) (emphasis added). The 15 wires, all of which were initiated abroad and entered the United States as alleged in the Indictment (Dkt. No. 2 ¶¶ 13, 28), promoted the specified unlawful activities because, "[w]ithout these transfers," the defendant and other participants "would not have realized their goal of profiting from the fraudulent scheme" at issue in Counts Two, Three, and Four. *United States v. Hedges*, 225 F.3d 647, 2000 WL 964767, at *2 (2d Cir. 2000); *see also United States v. Piervinanzi*, 23 F.3d 670, 679 (2d Cir. 1994) ("Because transferring the funds overseas (and beyond the perceived reach of U.S. officials) was integral to the success of both fraudulent schemes, it is undeniable that the attempted transfers were designed to 'promote' the underlying crime of bank fraud."); *Zarrab*, 2016 WL 6820737, at *16 ("Zarrab's argument that the conspiracy to commit money laundering charge 'merges' with the IEEPA and bank fraud conspiracies is unpersuasive." (discussing *Piervinanzi*, 23 F.3d at 679)). Therefore, because the success of the

---

[14] *Russell v. United States*, 369 U.S. 749 (1962), the only case the defendant cites for his notice argument, concerned Indictments charging six defendants for refusing to answer certain questions when summoned before a congressional subcommittee. (Def. Mem. at 47-48). In *Russell*, the Indictments failed "to identify the subject under congressional subcommittee inquiry at the time the witness was interrogated." 369 U.S. at 752. The Indictment here, by contrast, explained the defendant's criminal scheme in detail. (Dkt. No. 2 at 1-34).

defendant's scheme depended on the 15 wire transfers being sent from Venezuela to U.S. correspondent banks so that dollars could be dispatched abroad, the wires promoted the specified unlawful activities for purposes of Count Five.

The trial evidence included other international wire transfers that promoted the defendant's IEEPA violation and bank fraud in a similar fashion. The defendant did not object to this evidence during the trial based on lack of notice, and there was no meritorious objection on that basis to be made because all of the exhibits were produced prior to the trial. The defendant's currency exchange transactions promoted the scheme because IIHC needed bolivars to pay project expenses, such as employee salaries, in Venezuela. (Tr. 1653, 1656). The defendant routed at least one international wire into the United States in connection with that process: the $60,000 that he sent from Stratus – St. Kitts to Vincenzo and Alessandra Conte in Staten Island. (GX 2090A at 32). The defendant and other participants in the scheme also used international wire transactions, which were denominated in dollars and transited U.S. correspondent accounts, to pay Stratus – Iran and IIHC management. (GX 2304A (listing 2013 and 2014 payments in "USD" to Karimi, Cinar, Cetinel, and others)). These transfers promoted the specified unlawful activities by compensating participants in the scheme so that they would continue to carry out their functions; without their efforts, there would be no basis for the Sadrs to demand payments from the Venezuelans. Finally, Government Exhibit 703 summarized trial evidence relating to over $8.6 million in proceeds of the Venezuela Project from Stratus – St. Kitts and Clarity, which the Sadrs sent to the United States to purchase assets here. (GX 703). The transfers depicted in the exhibit promoted the defendant's sanctions violations and bank fraud, albeit less than the other transfers described above, because moving the profits of the venture to the United States so that they could be used to purchase other

assets represented completion of the fraud.  *See Thorn*, 317 F.3d at 132 (reasoning that promotional money laundering occurred, though "'de minimis,' because the transactions in reality represented only the completion of the sale'") (quoting *United States v. Skinner*, 946 F.2d 176, 179 (2d Cir. 1991)).

Accordingly, there was sufficient evidence to support the defendant's money laundering conviction, and his Rule 29 motion as to Count Five should be denied.

## II.     The Defendant's Motion To Dismiss Either Count One Or Count Two As Multiplicitous Should Be Denied

On December 6, 2019, the Court denied without prejudice the defendant's motion to dismiss multiplicitous counts.  *See Nejad*, 2019 WL 6702361, at *15.  The defendant has now renewed this motion with respect to Counts One and Two.  (Def. Mem. 132-133).  Because these counts have different elements under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), the defendant's motion should be denied.[15]

### A.  Applicable Law

In assessing a multiplicity challenge, it is "not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999).  As the Supreme Court explained in *Albernaz* v. *United*

---

[15] The defendant contends that the Government has "conceded" his multiplicity motion, and that any opposition would be "untimely."  (Def. Mem. at 133).  In 2019, however, the defendant correctly observed that *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) "preclude[d]" the relief he sought.  (Dkt. No. 90 at 11).  The Government responded to the motion, and the Court denied the motion as premature.  *Nejad*, 2019 WL 6702361, at *15.  Accordingly, the defendant's post-trial argument that the Government is somehow procedurally barred from responding to the renewed motion, after the Court's pretrial denial of his first one, should be rejected.

*States*, "[i]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause.  This is true even though the 'single transaction' is an agreement or conspiracy."  450 U.S. 333, 344 n.3 (1981) (citations omitted).

To conduct the multiplicity inquiry, courts are directed to apply the *Blockburger* test.  *See Chacko*, 169 F.3d at 146.  Under this test, charges are not multiplicitous "[i]f there is an element in each offense that is not contained in the other."  *Id.* (citing *United States* v. *Dixon*, 509 U.S. 688, 696 (1993)).  "[T]he *Blockburger* test is to be applied to the statute alone, irrespective of the facts alleged in a particular indictment."  *United States v. Fiore*, 821 F.2d 127, 131 n.5 (2d Cir. 1987).  If the two offenses are distinct offenses under the *Blockburger* test, the defendant's multiplicity challenge fails unless the court finds clear Congressional intent to bar prosecuting a defendant for both offenses.  *See Albernaz*, 450 U.S. at 339-42 (*Blockburger* test controls multiplicity analysis absent a "clear indication of contrary legislative intent").

### B.  Discussion

The defendant asserts here that Counts One and Two are multiplicitous "because every alleged conspiracy to violate any component of IEEPA will also constitute a corresponding *Klein* conspiracy to impede IEEPA's enforcement."  (Dkt. No. 90 at 4).  The defendant concedes that "Count One and Two *charge separate conspiracies*," but asserts that the conspiracies are "based on precisely the same *conduct*."  *Id.* at 5 (emphases added).  But this focus on the conduct underlying the charges is precisely what the Supreme Court rejected in *Dixon*.  *United States v. Basciano*, 599 F.3d 184, 197 (2d Cir. 2010) (*Dixon* foreclosed the "same conduct" test, which "looked past the statutory elements of a charged offense to the particular facts the government intended to prove in the challenged prosecution"); *Chacko*, 169 F.3d at 147 (*Dixon* precludes

examining "the specifics of the indictment and the nature of the counts charged").  The defendant

relies on a 1999 Second Circuit case, *United States v. Zvi*, 168 F.3d 49 (2d Cir. 1999), for his claim

that the *Blockburger* analysis is not "blind to the facts of the case."  (Dkt. No. 90 at 3).  But in

2013, the Second Circuit confirmed that *Dixon* abrogated *Zvi*:  "[T]o the extent that *Zvi* suggested

that 'sometimes the facts at hand' may require a finding of multiplicity, such an approach would

be inconsistent with [*Dixon*], which overruled the fact-based 'same-conduct' test . . . and restored

the *Blockburger* 'same-elements' test."  *United States v. Weingarten*, 713 F.3d 704, 710 n.5 (2d

Cir. 2013); *Chacko*, 169 F.3d at 145 (rejecting defendant's multiplicity claim where "the same

conduct was charged as underlying the false statement counts and bank fraud counts").  What

matters for purposes of *Blockburger* is the "language of the statute itself, recognizing that 'a single

transaction can give rise to distinct offenses under separate statutes without violating the Double

Jeopardy Clause.'"  *United States v. Mostafa*, 965 F. Supp. 2d 451, 463 (S.D.N.Y. 2013) (quoting

*Albernaz*, 450 U.S. at 344 n.3).  "It makes no difference that the same conduct underlies multiple

counts of [the defendant's] indictment, so long as the statutes proscribe distinct offenses."

*Weingarten*, 713 F.3d at 710 n.5.

In this case, Counts One and Two are not multiplicitous under *Blockburger* because they

are distinct offenses with different elements.  Count One charged the defendant with conspiring to

defraud the United States, in violation of 18 U.S.C. § 371.  The elements of that offense are:  (1) an

agreement or understanding between two or more people to impair, impede, obstruct, or defeat the

lawful and legitimate governmental functions and operations of OFAC through fraudulent or

dishonest means; (2) the defendant knowingly and willfully became a member of that conspiracy

with knowledge of its unlawful objective; and (3) one of the conspirators knowingly committed at

least one overt act in furtherance of the conspiracy.  (Tr. 1835-36).  Count Two charged the defendant with conspiring to violate IEEPA, in violation of 50 U.S.C. § 1705.  The elements of that offense are: (1) an agreement or understanding among at least two people to violate regulations § 560.204 and § 560.203 of OFAC's Iranian sanctions; and (2) the defendant knowingly and willfully became a member of that conspiracy with knowledge of its unlawful objective.  (Tr. 1870-71).

Each offense therefore has an element that is not contained in the other.  *Chacko*, 169 F.3d at 146.  Count One requires an agreement to impair, impede, obstruct, or defeat OFAC's lawful and legitimate governmental functions through fraudulent means—Count Two does not.  Count Two requires an agreement to violate the Iranian sanctions by, for instance, exporting services directly or indirectly to Iran—Count One does not.  Moreover, a defendant can be guilty of Count Two merely by agreeing to violate IEEPA, while, in order to be guilty of Count One, an overt act in furtherance of any such agreement is required.  *United States v. Nakashian*, 820 F.2d 549, 553 (2d Cir. 1987) (narcotics conspiracy counts are not multiplicitous to a Section 371 conspiracy count in part because the Section 371 conspiracy "requires proof of an overt act, something which does not have to be shown" for the narcotics conspiracy counts).  Thus, while the defendant argues that "any violation of IEEPA and the [Iranian sanctions] impedes the [Iranian sanctions]" (Dkt. No. 90 at 6), it does not follow that Count Two is "*subsumed* within" Count One (*id.* at 4).

Because the two counts at issue here are legally distinct under *Blockburger*, the defendant's motion to dismiss either Count One or Count Two on multiplicity grounds should be denied.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny

the defendant's Rule 29 and multiplicity motions.

Dated:  New York, New York
        May 15, 2020

                                        Respectfully Submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York


                            By:         _____/s/_____
                                        Michael Krouse / Jane Kim / Stephanie Lake
                                            Assistant United States Attorneys
                                        Garrett Lynch
                                            Special Assistant United States Attorney
                                            212-637-2279/2038/1066


Cc:     Defense Counsel
        (Via ECF)