Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

**Steptoe**

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

May 22, 2020

By ECF

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

      Re:    *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

On behalf of Ali Sadr, we respectfully write to address the government's two most recent productions of documents on the night of May 19, 2020, after Sadr's letter earlier that day stating his then-existing intent not to file a supplemental *Brady* submission (Dkt. 340), and the night of May 21, 2020, the eve of the Court's deadline for Sadr to file a supplemental brief. The government's May 19, 2020 disclosure letter is attached as Exhibit A.

While a number of the government's disclosures since it requested an extension on May 13, 2020 are relevant to issues already discussed in Sadr's opening *Brady* brief, and can be addressed in Sadr's reply brief (such as additional disclosures related to the Commerzbank investigation, and to the prosecutors' communications with OFAC), Dkt. 340, at 1, the government's May 19 and May 21 productions contain several documents that are material under *Brady* on their own, or that powerfully add to the collective materiality of the government's many suppressions, *see* Dkt. 336, at 53, 70, 101-04, on subjects not necessarily addressed in Sadr's opening brief. We address those late-breaking disclosures here.

> **1. The government suppressed Bahram Karimi's September 14, 2016 statement to the FBI and DANY that he firmly believed neither he nor anyone else had broken any laws or done anything wrong**

On September 14, 2016, after the interview of that date that the government memorialized in an FD-302 and previously disclosed, Bahram Karimi, the Venezuela Project's manager, told FBI Special Agent Benjamin Denk and DANY ADA Christina Maloney that "neither he nor anyone else broke any laws" in connection with the Venezuela Project. Special Agent Denk's FD-1057 Electronic Communication "document[ing] the results of [that] discussion" is attached as Exhibit B.

Special Agent Denk documented that "[i]mmediately following the 09/14/16 interview, SA Denk explored with KARIMI the possibility of traveling to New York to testify before a Grand Jury." *Id.* at 2. Among other responses, Karimi "voiced his displeasure at the thought of having to testify as to the activities he was performing in Venezuela, at one point stating aloud neither he nor anyone else broke any laws." *Id.* Instead, Karimi said, they dealt with the "difficult[ies]" created by the sanctions for "normal, hard-working Iranians," *i.e.*, non-SDNs in the private sector, who were trying to earn a living in a manner he believed to be lawful. *Id.* at 2-3. Despite managing the Venezuela Project, requesting payments in USD, and submitting to DUCOLSA the account information letters requesting payments to Stratus Turkey and Clarity featured by the government at trial, Karimi expressed his opinion that "he had done nothing wrong," and said he did not see a need to receive use immunity for that reason. *Id.* at 3.[1]

The government suppressed this information from the time of Sadr's March 2018 indictment until 11:12 p.m. on May 19, 2020.

As noted in Sadr's opening brief, Sadr requested all exculpatory evidence from the government, including, among other things, all documents or information showing that any other person believed the charged conduct was not criminal, two weeks after he was indicted in 2018. *See* Dkt. 336, at 54; Dkt. 189-1, at 5. He reiterated this request on August 23, 2018; September 25, 2018; February 3, 2020; March 8, 2020; March 24, 2020; and April 1, 2020. *See* Dkt. 336 at 54-55; Dkt. 304-1, at 1-16. Despite these many explicit requests, and the government's rote responses that it had complied with its *Brady* obligations, *see* Dkt. 336, at 56, the government suppressed both Special Agent Denk's October 6, 2016 FD-1057, and the underlying fact that the Venezuela Project's manager—a purported co-conspirator on whose statements the government relied heavily at trial—told the FBI and DANY in September 2016 that he believed neither he nor anyone else had broken any laws in connection with the Venezuela Project, until two days ago (more than two months after trial).

This was not a mere failure of omission (though that alone would constitute suppression, *see Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)). The government actively concealed this obviously exculpatory fact. The government produced in discovery a set of handwritten notes taken during the September 14 interview (Dkt. 307-1, at 36-37), and Agent Denk's FD-302 memorandum of that interview (Dkt. 307-1, at 33-34). Neither those notes nor the FD-302 of the interview contained this exculpatory information. Instead, Karimi's insistence that neither he nor

---

[1] In addition to the obvious exculpatory nature of Karimi's statements that the Venezuela Project was lawful, the fact that Karimi made these statements in September 2016 is additional evidence that Karimi never made the inculpatory statements attributed to him in the June 2016 FBI 302. *See* Dkt. 336, at 86-89. No person who admitted to intentionally "circumventing" the sanctions in June 2016 would have stated just three months later—to the same FBI agent and ADA, no less—that he did not need immunity because he had done nothing wrong.

The Honorable Alison J. Nathan
May 22, 2020
Page 3

**Steptoe**

anyone else had broken the law was recorded separately in Special Agent Denk's FD-1057, which was somehow immediately deemed "classified" and withheld from the defense.[2]

Worse still, the government then denied the existence of any classified evidence in this case. At a May 16, 2018 status conference, Judge Carter asked the government "if there's going to be any sort of classified information or anything like that," given "the nature of the case," so that the Court could prepare for handling any classified discovery matters. Dkt. No. 32, at 18. The government responded, "Understood, your Honor. We do not anticipate any classified discovery or any [C]IPA litigation in this case." *Id.*

The government is not free to bury the existence of exculpatory information by classifying it and then declining to reveal it. The Classified Information Procedures Act, 18 U.S.C. app. 3 ("CIPA"), to which the prosecutor referred, "neither adds to nor detracts from the substantive rights of the defendant or the discovery obligations of the government." DOJ Justice Manual § 2054. Instead, the government remains bound by its discovery obligations, including its constitutional obligations under *Brady*. Where classified information bears on the case, CIPA requires the United States to file a motion requesting a hearing to determine the use, relevance, or admissibility of the classified information. 18 U.S.C. app. 3 § 6(a).

Thus, Judge Carter's question whether there was "any sort of classified information or anything like that" was not limited to evidence the government intended to use—it encompassed any classified information relevant to the case, including *Brady* and *Giglio* evidence.[3] Under *Brady*, "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect" of defense-favorable information, "and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including," here, the FBI and DANY. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). SAUSA Lynch, who had been leading the DANY investigation when Karimi was interviewed in 2016, was present for the government at the May 16, 2018 status conference when then-lead AUSA LaRoche stated there would be no classified discovery or CIPA litigation. Dkt. No. 32, at 1.

---

[2] The FD-1057 does not appear to have any information related to state secrets, national security, or any other topic that would justify its classification. The government has not explained why this document was classified before trial or why it was de-classified after trial.

[3] The government's obligations also included disclosing information material to the defense under Rule 16. CIPA's parallel standard for discovery of classified evidence is whether that evidence is "relevant and helpful" to the defense. *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012); *United States v. Mejia*, 448 F.3d 436, 456-57 (D.C. Cir. 2006) ("at least helpful to the defense").

The Honorable Alison J. Nathan
May 22, 2020
Page 4



      The suppression did not end with the government's statement to Judge Carter. On March 9, 2020, the government assured the Court that "each member of the prosecution team has gone through its files one more time to make sure there's nothing else like this, that this [GX 411] is the only document that relates to the case that hasn't been turned over to [the] defense, and we can make that affirmation to the Court." Tr. 976-77. That assurance proved inaccurate. At the charge conference the following day, after the government represented (again inaccurately) that it had not yet received the recording of Karimi's January 2020 interview, the government assured the Court, with regard to the January 2020 interview *and* "prior interviews of Mr. Karimi," that:

> MS. KIM: … I just want to make clear for the record that we have produced all of our underlying notes and materials in connection with those interviews.
>
> THE COURT: I hope so. It sounds like you have.
>
> MS. KIM: It's not a hope. We have.

Tr. 1359-60. That again turns out to have been false.

      The government did not disclose the existence of any classified information in this case until after defense counsel noticed, reviewing the government's April 13, 2020 production, that a case agent's March 27, 2020 e-mail inexplicably referred to "the unclass 302s." Dkt. 307-1, at 91. The defense asked the government that day "whether SA Pond's email means that there are classified FBI 302s related to this investigation." Dkt. 336-23, at 1. The government responded, "[N]one of the materials referred to or transmitted by Special Agent Pond in her March 27, 2020 email are discoverable." Dkt. 334-1, at 1.

      More than a month later (now two full months after trial), the government produced the now-declassified FD-1057.[4] But for the defense picking up on the case agent's use of the word "unclass" in an email on page 91 of a 92-page exhibit, Special Agent Denk's FD-1057, and with it Karimi's exculpatory statement in 2016 that he believed no one on the Venezuela Project was breaking the law, would never have seen the light of day.

      In the leadup to trial, the government took the position that Karimi had admitted in a June 2016 interview that "Everyone associated with Stratus and the project in Venezuela recognized the international sanctions placed on Iran but believed that circumventing those sanctions was a matter of survival" because Stratus "needed to be able to conduct business in U.S. dollars." Dkt. 307-1, at 12 (quoting 6/16/2016 302, at 5). That version came not from a recording, but from an FBI 302 completed two weeks after an interview conducted without defense counsel or a

---

    [4] The government still has not complied with the defense's request for access to the rest of the classified evidence, *see* Dkt. 336, at 112-14, though a few of the disclosures last night are also recently declassified. *See, e.g.*, Ex. E, discussed *infra*.

The Honorable Alison J. Nathan
May 22, 2020
Page 5

translator. *See* Dkt. 336, at 87. The recording of Karimi's January 2020 interview, undisclosed until after trial, tells a very different story. *See id.* at 86-89; *see also id.* at 80-81. SA Denk's FD-1057 shows that Karimi told the FBI and a DANY ADA *in September 2016* the same version he gave in January 2020—a statement 180 degrees from the version in the FBI's June 2016 FBI 302. *Compare* Ex. B, at 2-3, *with* Dkt. 336, at 86-89.

Lest there be any doubt that Karimi's highly exculpatory statement was known to the prosecutors, on September 14, 2016, immediately after the Karimi interview, SAUSA Lynch emailed his colleagues at DANY:

> **From:** Lynch, Garrett
> **Sent:** Wednesday, September 14, 2016 9:19 PM
> **To:** Conroy, Christopher; Hochhauser, Rachel
> **Cc:** Maloney, Christina
> **Subject:** Karimi
>
> Christina and Ben just met with him. In summary, he agreed to go to the consulate to get a visa but essentially said he wouldn't use it and wouldn't come. Aside from his safety, etc. concerns it became clear that he doesn't want to get his former colleagues and friends in trouble. ==He also firmly believes he and others did nothing wrong.== The way they left it is Ben would call him in a couple days to follow up (in theory, they left open the possibility of him coming, but, for all intents and purposes he said he wouldn't). They didn't explicitly tell him that he also is exposed, but he seemed to get it and also seemed to indicate that he'd rather be charged then come testify. Last, at the end he apparently privately asked the RCMP agent what he should do, and the agent told him he may want to get a lawyer. Wouldn't be the worst thing at this point.
>
> At the end of the day, sort of what we expected, and not a big blow. Our case is what it is – if he was never going to testify at trial, there really is no use in him only testifying in the grand jury. Back to assessing the case based on the docs and analysis.
>
> Garrett A. Lynch

*See* USAO-00543 (attached as Exhibit C) (highlighting added). Again, this exculpatory statement is nowhere to be found in the FBI 302 memorializing the interview of Karimi that same day. *See* Dkt. 307-1, at 33-34. SAUSA Lynch's email containing confirmation of Karimi's exculpatory statement was suppressed by the government until it was produced to the defense at 10:11 p.m. last night.

The suppressed FD-1057 and Lynch's email memorializing Karimi's September 14, 2016 statement to the FBI have a number of consequences:

(1) Like the Karimi recording, Karimi's suppressed September 14, 2016 statement, considered collectively with all of the voluminous suppressed evidence in the case, is material under *Brady*, and requires a new trial. *See* Dkt. 336, at 70-105.

The Honorable Alison J. Nathan
May 22, 2020
Page 6

(2) These suppressed documents further demonstrate, yet again, that the government continues to fundamentally misunderstand its *Brady* obligations. *See* Dkt. 336, at 107-112. The September 14, 2016 Karimi interview was not part of some other investigation. It was part of this case against Sadr—the case that then-ADA Lynch was leading, the case he intended to present to a New York State Grand Jury in Fall 2016, *see* Ex. B, at 3; the case that he brought to OFAC to encourage OFAC to "take action on your own if so desired." Dkt. 283-1, at 8. Then-ADA Lynch knew what Karimi told the FBI, *and credited the sincerity of Karimi's belief*: he emailed his colleagues immediately afterward that Karimi "*firmly believes he and others did nothing wrong.*" He must have known, when he received SA Denk's FD-302 memorializing Karimi's interview, that this exculpatory statement was deliberately omitted from the 302 and inexplicably recorded in a separate FBI memorandum that was then "classified" with no basis whatsoever. He knew or should have known of his responsibility to treat it in accordance with *Brady*. *See Kyles*, 514 U.S. at 437. Yet in real time, Lynch viewed this information only in tactical terms, advising his colleagues that Karimi's explicit denial of wrongdoing and exculpation of Sadr and others involved in the project was "sort of what we expected, and not a big blow," that meant the case would simply need to be "based on the docs and analysis." Ex. C.

Even worse, in May 2018, then-SAUSA Lynch sat silent next to AUSA LaRoche as the government told Judge Carter that this case would not involve classified information or CIPA. And in March 2020, alerted to the urgency of *Brady* disclosure, and sent to search both his SDNY and ADA offices to ensure there was nothing else undisclosed, SAUSA Lynch did not alert this Court that there was classified evidence in this case. Even in its May 19, 2020 disclosure letter, the government still "does not concede that any of the[se] materials are discoverable pursuant to Rule 16 or otherwise should have been disclosed pursuant to *Brady* or *Giglio*." Ex. A at 1; *see also* Dkt. 334-1, at 1.

The exculpatory nature of the FD-1057 and Lynch's email is obvious. *Compare* Tr. 991, 994-95, 1111-12. Equally obvious is the government's refusal to acknowledge that fact. *Compare* Tr. 984-86, 991-92. Because the government cannot be trusted to carry out its *Brady* obligations with respect to evidence that remains undisclosed (and perhaps even unreviewed), the Court should compel the production of the information sought in Dkt. 336, at 112-19.

(3) The suppression of SA Denk's FD-1057 and Lynch's email, and the government's inaccurate statements (a) about the existence of classified information in this case; (b) about whether all notes and summaries of Karimi's prior interviews had been produced; and (c) about what Karimi told the government in 2016, show again that the government's representations can no longer be relied upon. (Indeed, Lynch's acceptance in September 2016 that Karimi "firmly believes he and others did nothing wrong" is hard to square with the government's portrayal of Karimi as a central co-conspirator at trial.)

In particular, the government's unsworn representations that formed the foundation of this Court's pretrial suppression ruling are untrustworthy. The details about how DANY conducted its seizure and searches were critical; they shifted in important respects throughout that litigation; and they came exclusively from the government's briefs, unsupported by

The Honorable Alison J. Nathan
May 22, 2020
Page 7

**Steptoe**

declarations or any contemporaneous evidence, based almost entirely on SAUSA Lynch's account of DANY's investigation. *See* Dkt. 336, at 123-27. The revelation of SA Denk's FD-1057 and Lynch's email shows conclusively (if the earlier experiences of GX 411, Commerzbank, and SAUSA Lynch's presentation of the case to OFAC did not already) that the foundation on which the Court rested its suppression ruling is no longer sound. Accordingly, the Court should reopen the suppression matter. *See* Dkt. 336, at 119-132.

> **2.    A newly disclosed email calls into question the government's account of GX 411**

After the midtrial disclosure of GX 411, this Court ordered the government to give a detailed accounting of how GX 411 (Commerzbank's letter alerting OFAC to the first $29 million payment charged in this case) came to light and why it was not timely produced to the defense. *See* Dkt. 287; Dkt. 290 (requesting specific information not provided in response to the first Order). In lieu of sworn declarations, the government convinced the Court and the defense to accept a letter containing, among other things, "the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411." Dkt. 283, at 1. In that letter, and in Court on March 9, the prosecutors told the Court:

> (a) that each member of the trial team had exhaustively searched his or her files and email to ensure there was nothing else that needed to be turned over, Tr. 976-77;

> (b) that SAUSA Lynch reviewed all of his emails on March 9, 2020, in order to represent to the Court where GX 411 came from and when it was transmitted to the rest of the team, Tr. 1224;

> (c) that SAUSA Lynch emailed GX 411 to the AUSAs on the prosecution team on January 10, 2020, and SAUSA Lynch and AUSA Lake discussed it in a telephone conversation shortly thereafter, Dkt. 283 at 4-5; Dkt. 283-2;

> (d) that when it was discovered, the prosecutors viewed GX 411 as "a nice piece of evidence," Tr. 982, "a wholly inculpatory document on its face," Tr. 984; and

> (e) that none of the prosecutors recalled discussing it between January 10 and March 6, when AUSA Lake found her January 10 e-mail and had GX 411 marked as a trial exhibit, Dkt. 283, at 5.

An email exchange between SAUSA Lynch and AUSA Lake on January 31 and February 1, 2020, disclosed for the first time at 10:11 pm on May 21, 2020 (attached as Exhibit D), calls several aspects of this account into serious doubt.

The Honorable Alison J. Nathan
May 22, 2020
Page 8

**Steptoe**

On January 31, 2020, SAUSA Lynch e-mailed Christina Spiller, an executive at Commerzbank NY, to ask for a Commerzbank witness to be available for trial, "to (a) authenticate the wire transfer record" for the $29 million April 2011 payment, "and possibly (b) testify about Commerz's payment screening at that time in NY." Ex. C at USAO_00547. After receiving a reply from Ms. Spiller, SAUSA Lynch e-mailed his AUSA colleagues:

> **From:** Lynch, Garrett <LynchG@dany.nyc.gov>
> **Sent:** Friday, January 31, 2020 11:05 AM
> **To:** Lake, Stephanie (USANYS) <SLake@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
> **Subject:** FW: Trial witness
> I'll reach out to her today. Let me know if anyone wants to join. ==The other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment – we should discuss whether it's worth having the Commerz witness go into that==. It was signed by the head of AML/Anti-Fraud/Sanctions Compliance in NY – I'll see if she's still with the bank.

*Id.* at USAO_00546 (highlighting added). The so-called "voluntary disclosure" to which Lynch referred was GX 411.

The next day, February 1, AUSA Lake, copying the other AUSAs, responded, "Did you talk to her / how'd it go? *Do we know what the basis for the disclosure was?*" *Id.* (emphasis added). SAUSA Lynch, again copying the entire trial team, responded:

> **From:** Lynch, Garrett
> **To:** Lake, Stephanie (USANYS); Kim, Jane (USANYS) 4; Krouse, Michael (USANYS)
> **Subject:** RE: Trial witness
> **Date:** Saturday, February 1, 2020 12:53:55 PM
>
> I did. They're happy to provide a witness (obviously happier to just provide a custodian). She believes (I think rightly) that they discovered the Stratus payment and filed the voluntary disclosure due to our investigation into the bank. That makes sense since they discovered the payment retroactively; it wasn't flagged in real time. ==So we can discuss how we would want to handle.==

*Id.* (highlighting added).

At a minimum, this disclosure shows that GX 411 was not completely forgotten between January 10, 2020 and March 6, 2020, as the government stated in its March 9, 2020 letter to the Court. Dkt. 283, at 5. SAUSA Lynch and AUSA Lake addressed it on January 31 and February 1, in their discussion of whether a Commerzbank witness would testify, and what she would say. Lynch did not need prompting; he volunteered, in his initial email to the other AUSAs, that "[t]he other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment," *i.e.*, GX 411. The other prosecutors were on the emails.

More troubling, the exchange calls into question whether the prosecutors viewed GX 411 as "wholly inculpatory ... on its face," as the government told this Court on March 9.  Tr. 984.  In their January 31-February 1 exchange, SAUSA Lynch and AUSA Lake did not portray Commerzbank's communication to OFAC as "a good piece of evidence"; "a nice piece of evidence" that was "wholly inculpatory," as the government described on March 9.  Tr. 981-82.[5] Instead, Lynch described it as an "asterisk" the prosecutors would need to "discuss how we would want to handle," telling his colleagues, "we should discuss whether it's worth having the Commerz witness go into that."  *Id.* (highlighted above).  Lynch also reported that the Commerzbank executive "believes (I think rightly) that [Commerzbank] discovered the Stratus payment and filed the voluntary disclosure due to [the ongoing DANY/SDNY] investigation into the bank."  *Id.*  Far from suggesting a "wholly inculpatory" view, this suggests the prosecutors weighed carefully whether to even call a Commerzbank witness because of the risk that doing so would cause Commerzbank's disclosure to OFAC to come out at trial.  Indeed, Lynch credited the Commerzbank executive's belief that Commerzbank sent GX 411 to OFAC not because the payment was an obvious sanctions violation that Commerzbank was required to report, but rather in an abundance of caution "due to [the ongoing DANY/SDNY] investigation into the bank."  *Id.* The obvious reason Lynch flagged for discussion "how we would want to handle" GX 411 was his appreciation of the disclosure's exculpatory nature and its potential to undermine the government's case.

Ultimately, the government did not call a Commerzbank witness.

### 3. The government's May 19, 2020 disclosure reveals that DANY and the FBI were searching the NY state warrant returns for evidence of federal crimes—outside the scope of the state-court warrants—for at least a year during the government's claimed "responsiveness review"

There is a more direct reason to re-open suppression as well.  The government's May 19, 2020 disclosures reveal that the FBI, together with DANY, was likely searching the NY state warrant returns for evidence of the federal crimes charged here—crimes outside the scope of the state-court warrants—at least as early as 2016.  Those outside-the-scope searches—at a time when the government claims DANY was engaged in a "responsiveness review" to identify documents responsive to *the New York state warrants, which were based on probable cause for New York state offenses*—show that DANY was not engaged in a bona fide responsiveness review as claimed, but instead was engaged, together with the FBI, in a general, unrestricted search of the entirety of the returns.  That general search was unconstitutional.

"'A search must be confined to the terms and limitations of the warrant authorizing it.'" *United States v. Nejad*, __ F. Supp. 3d __, 2020 WL 429422, at *16 (S.D.N.Y. Jan. 28, 2020)

---

[5] The Court responded to the government's characterization: "Boy, have I heard this song before....  Fool me once.  Go ahead."  Tr. 981-82.

The Honorable Alison J. Nathan
May 22, 2020
Page 10

**Steptoe**

(quoting *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)).  Here, the warrants were New York state warrants, that recited probable cause for "specific New York State Penal Law offenses—money laundering, offering a false instrument for filing, and falsifying business records." *Id.* at *10.  This Court ruled that the warrants were sufficiently particular because "they specif[ied] that the items seized ... should be those that tend to demonstrate commission of the aforementioned offenses." *Id.*

During the suppression litigation, the government maintained that from 2014 to April 2017, DANY conducted a rolling "responsiveness review" to identify which documents, among the entirety of Sadr's personal and business email accounts that were initially seized, were responsive to the warrants, *i.e.*, contained evidence of the New York state offenses cited therein.  This Court accepted, over Sadr's objection, the government's representations that DANY's responsiveness review was bona fide, and that the bulk of the May 15, 2018 Pertinent Documents to which the government limited itself (in a strategic effort to foreclose broader review of its search execution) were identified as responsive to the warrants during that review. *See id.* at *17-18; Dkt. 156, at 10-12 (Sadr arguing that what DANY called a "responsiveness review" was in fact an unrestricted search of the entirety of the warrant returns, to develop the government's case against Sadr); *see also id.* at 6-9; Dkt. 147, at 12-16.  For documents identified during that claimed responsiveness review, the Court found the government's search and seizure reasonable.  2020 WL 429422, at *17-18.  But the Court ruled that documents seized outside the scope of that responsiveness review were outside the scope of the warrants, and thus suppressed those documents. *See id.* at *19.

The May 19 disclosures now reveal that DANY personnel and the FBI, acting together, began running searches outside the scope of the warrant at least as early as 2016, during DANY's claimed "responsiveness review."  An FBI FD-1057 electronic communication dated June 7, 2016 (USAO_00509-514, produced on May 19 and attached as Exhibit E)[6] states that "FBI NY has been coordinating with the Manhattan District Attorney's Office (DANY)" in its investigation into Stratus, and that "FBI NY is investigating Stratus for" *federal* offenses including "violations of IEEPA (Iran Sanctions), Money Laundering, Bank Fraud, Wire Fraud, *and other violations to be determined*." *Id.* at USAO_00510 (emphasis added).  To support its June 7, 2016 request for aid in locating Kazerani to interview him, the FBI attached to its FD-1057 a copy of Kazerani's Iranian passport that appears to have been seized by DANY from the search warrant returns.  *See* Ex. E, USAO_00513-514.  Thus, it appears the FBI was either searching the DANY returns, or directing DANY to run searches in those returns (which had been seized under a NY state warrant for NY Penal Code offenses), to develop evidence of *federal* offenses, including "other violations to be determined." *Id.* at USAO_00510.  These searches were outside the scope of the NY warrants.

---

[6] Like SA Denk's FD-1057 documenting Karimi's September 14, 2016 exculpatory statement, the FD-1057s regarding its search for Kazerani was originally classified, and has only recently been declassified.

This federal usurpation of a state-law criminal warrant was unconstitutional. *See Nejad*, 2020 WL 429422, at *16 (noting searches outside the terms of the authorizing warrants are unconstitutional); *United States v. Hulscher*, No. 16-cr 40070, 2017 WL 657436, at *2 (D.S.D. Feb. 17, 2017) (holding that it was unconstitutional for local police to obtain a warrant for state-law forgery, counterfeiting, and identity theft, then turn over the raw returns to the Bureau of Alcohol, Tobacco and Firearms to search for evidence of federal firearms offenses). As the *Hulscher* court noted, "[t]his specific fact scenario is relatively new to Fourth Amendment analysis." 2017 WL 657436, at *2 (citing Orin Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 562 (2005)). The Second Circuit has twice recently considered the issue of the government's querying databases of information earlier seized, without reaching firm resolution. *See United States v. Ganias*, 824 F.3d 199, 211, 221 (2d Cir. 2016) (en banc) ("*Ganias II*") (avoiding issue by relying on good-faith exception); *United States v. Hasbajrami*, 945 F.3d 641, 669-73 (2d Cir. 2019) (considering issue of FBI's warrantless querying of NSA database, and remanding for district court determination of whether such querying comported with Fourth Amendment). But the clear trend, especially in light of the vast amounts of personal information that can be captured in seizures of electronic data, is to require a new warrant for new queries outside the scope of earlier warrants. The Second Circuit strongly suggested as much in *Hasbajrami*, 945 F.3d at 670-73 (citing, inter alia, *Riley v. California*, 573 U.S. 373, 401 (2014)), and the Second Circuit panel so held in *Ganias*, 755 F.3d 125, 137-40 (2d Cir. 2014), a ruling superseded (and left open) by the Court's en banc decision to rely on good faith instead. This Court's January 2020 ruling, however, was clear: searches by DANY within the scope of the NY warrants were reasonable (based on the record as DANY represented it); searches outside the scope of those warrants were unconstitutional and called for suppression. 2020 WL 429422, at *16, *18-19.

Ordinarily, only evidence seized pursuant to the unconstitutional seizures is subject to suppression. *Id.* at *16. "[T]he drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted in 'flagrant disregard' of the warrant's terms." *Id.* (quoting *Matias*, 836 F.2d at 747). "Executing agents are considered to have 'flagrantly disregarded' the warrant's terms where '(1) they effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in good faith." *Id.* (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018)); *see also id.* at *20 n.7. Here, the record strongly suggests that the executing agents did "flagrantly disregard the warrants' terms," when DANY made its database of warrant returns available for FBI queries that were part of the FBI's investigation of federal offenses, outside the scope of the NY state offenses for which the warrants authorized seizures and searches. Moreover, the government's consistent suppression of evidence, and its history of dubious representations to the Court, strongly suggest bad faith—circumstances that would warrant blanket suppression of all evidence seized.

These matters call for reopening of suppression for the Court to determine whether the government in fact treated the warrants as general warrants, authorizing unrestricted search of the entirety of the warrant returns. That determination should be made based on competent, contemporaneous evidence (including production of the documents seized, in hard copy and

Case 1:18-cr-00224-AJN   Document 341   Filed 05/22/20   Page 12 of 12



The Honorable Alison J. Nathan
May 22, 2020
Page 12

native format with metadata), rather than on the government's shifting representations that have repeatedly proved unreliable.

\*   \*   \*

The government has made five productions since the Court's May 14, 2020 Order granting the government's request for extension, and it will shortly produce SDNY's approximately 1-terabyte file of its Commerzbank investigation.  With such a volume of material disclosed in such a compressed and belated time frame, there are other disclosed materials that relate to the subjects discussed in Sadr's opening brief, and still others that need further analysis to determine their materiality.  Sadr will address those materials, as well as any new disclosures that arrive, in his *Brady* reply brief.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
Bruce C. Bishop (*Pro Hac Vice*)
David M. Fragale
Nicholas P. Silverman (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:   Counsel of Record (via ECF)