U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 28, 2020

**<u>FILED BY ECF</u>**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

      The Government respectfully submits this letter brief in response to the Court's May 22, 2020 Order. (Dkt. No. 342). In Part IV of his May 1, 2020 post-trial motions (Dkt. No. 336 ("Def. Mem.")), the defendant made a series of discovery requests (the "Requests"). On May 26, 2020, the Government informed the Court by letter that, after consulting with the defense, the Government would comply with three of the five categories of the Requests by June 5, 2020, but that the Government opposes two of the categories. (Dkt. No. 343).

      First, the Government opposes the defendant's request for "search warrant returns from third parties" (the "Non-Sadr Accounts"). (Def. Mem. at 114-15). Second, the Government opposes the defendant's request for internal OFAC documents. (Def. Mem. at 116-17). The Government respectfully submits that both requests lack legal justification, and that the defendant has not established good cause to believe that these requests would assist the defendant in obtaining the relief he seeks. The Government also respectfully requests permission not to produce one interview report, which the Government will provide to the Court in a separate *ex parte* letter.

      **A.**    **Legal Standards**

      A district court has "broad discretion to fashion discovery mechanisms suitable to the case before it." *United States v. Williams*, No. 02 Cr. 1372, 2017 WL 3613661, at *2-3 (S.D.N.Y. Aug. 21, 2017) (citing *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007)). While the Federal Rules of Criminal Procedure "do not specifically provide for discovery procedure in aid of motions for a new trial pursuant to Rule 33," trial courts "may fashion appropriate discovery procedures by analogy to the Federal Rule of Criminal Procedure 16, or otherwise." *United States v. Bin Laden*, No. 98 Cr. 1023 (KTD), 2005 WL 287404, at *11 (S.D.N.Y. Feb. 7, 2005) (quoting *United States v. Yousef*, No. 93 Cr. 180 (KTD), 1999 WL 714103, at *4 (S.D.N.Y. Sept. 13, 1999)) (internal quotation marks omitted). Some courts have also applied, in this context, "the standards governing

discovery in *habeas corpus* petitions as an analogous collateral proceeding." *Williams*, 2017 WL 3613661, at *3 (citing *Velarde*, 485 F.3d at 559-60).

Discovery is available in connection with a *habeas* petition "only upon a showing of 'good cause' which requires the petitioner to 'present specific allegations that give the Court reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Id.* (quoting *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011)). "Generalized statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite 'good cause.'" *Pizzuti*, 809 F. Supp. 2d at 176. In the habeas context, a petitioner cannot "engage in a fishing expedition by seeking documents merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error." *Id.*

### B. The Court Should Deny The Defendant's Request For Unseized Data from the Non-Sadr Accounts

#### 1. Relevant Facts

From April 16, 2014, to April 20, 2016, the New York County District Attorney's Office ("DANY") obtained warrants to search 37 electronic accounts (the "Search Warrants").[1] Seven of these electronic accounts belonged to the defendant (the "Sadr Accounts"). The remaining accounts belonged to relatives and associates of the defendant, as well as other third parties linked to the defendant's complex criminal scheme—*i.e.*, the Non-Sadr Accounts. Internet service providers began to provide DANY with data in response to the Search Warrants in the spring of 2014 (the "Provider Data"). The Provider Data consisted of over one million documents. DANY processed and reviewed the Provider Data on a rolling basis as it was received. DANY's responsiveness review ended in April 2017. *United States v. Nejad*, 18 Cr. 224 (AJN), 2020 WL 429422, at *2 (S.D.N.Y. Jan. 28, 2020). Pursuant to the Search Warrants, DANY seized 2,817 documents during the responsiveness review.

In March 2018, the defendant was indicted and arrested. (Dkt. Nos. 2, 6). On April 5, 2018, the Government produced, in Rule 16 discovery, all of the Provider Data from the Sadr Accounts to the defendant. On May 15, 2018, the Government produced 420 of the seized documents to the defendant and identified them as responsive to the Search Warrants (the "May 2018 Seized Documents"). The May 2018 Seized Documents included emails that DANY seized from both the Sadr Accounts and the Non-Sadr Accounts.

On November 2, 2018, the Government sent the defense a letter in response to various requests for discovery. (*See* November 2, 2018 Letter (attached as Ex. A)). In the letter, the Government informed the defense that, with respect to the Non-Sadr Accounts, "DANY seized

---

[1] In some instances, DANY sought a second search warrant to obtain more recent emails from certain accounts. In other instances, DANY obtained a search warrant for certain Non-Sadr Accounts but ultimately did not serve or execute the warrant.

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 3

only those documents it identified as responsive to the search warrants." (Ex. A at 1). The Government further advised the defense that:

> We do not believe we are currently authorized to provide to the defendant the remaining portions of the Non-Sadr Accounts. As noted above, the search warrants did not permit DANY to seize the entirety of the Non-Sadr Accounts and, thus, providing the defendant with the remaining portions of those accounts would potentially run afoul of the search warrants and the Fourth Amendment. Nevertheless, we appreciate your concern regarding the Non-Sadr Accounts and propose that the parties meet and confer on this issue.

(*Id.*). The defense did not seek to meet and confer on this issue, did not again ask the Government to produce the full search returns from the Non-Sadr Accounts, and did not file a motion with the Court before trial seeking those returns.

On February 25, 2019, the defendant filed pretrial motions, including a motion to suppress evidence obtained pursuant to the Search Warrants. (Dkt. 96). On April 26, 2019, the Government opposed the defendant's pretrial motions. (Dkt. 108). In May 2019, the prosecution team determined that, in addition to the May 2018 Seized Documents, DANY had seized other materials from the targeted email accounts, and that some of these additional seized materials had not been produced in discovery. To comply with its discovery obligations, the prosecution team instructed a filter team at DANY to identify additional seized documents through a manual review of DANY's files without accessing the Provider Data, remove duplicates within that data set, and compare the de-duplicated set to the documents that previously had been produced to the defendant. During this review, the DANY filter team determined that DANY had seized 622 additional documents from the Non-Sadr Accounts, and 1,775 additional documents from the Sadr Accounts.

On September 17, 2019, the Government produced to the defendant the additional 622 Non-Sadr Account documents, and identified for the defendant (and re-produced) the 1,775 Sadr Account documents. (Dkt. 134, 149, Ex. C). In response to this disclosure, the Court allowed the defendant to supplement his motion to suppress and, on October 10, 2019, the defendant filed motions to suppress and exclude the search warrant evidence. (Dkt. 147, 149). On October 30, 2019, the Government opposed these motions, and stated that it would not offer at trial the 622 additional documents from the Non-Sadr Accounts or the 1,775 additional documents from the Sadr Accounts. (Dkt. 155). On January 28, 2020, the Court issued an order granting in part and denying in part the defendant's motion to suppress. *Nejad*, 2020 WL 429422, at *1. At trial, the Government introduced into evidence a subset of the emails from the May 2018 Seized Documents.

### 2. Discussion

The defendant now requests the Provider Data for the Non-Sadr Accounts. (Def. Mem. at 115). However, as the Government informed the defendant on November 2, 2018, the Government cannot produce the entirety of the Non-Sadr Accounts to the defendant, because the Government

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 4

did not seize those documents pursuant to the search warrants, and because such a production would violate the Fourth Amendment rights of those account holders.

Courts in this District have accurately identified the Fourth Amendment problems attended to the defendant's request for the Provider Data for the Non-Sadr Accounts. In *United States v. Galanis*, the Government executed search warrants on email accounts associated with two of the defendants (Archer and Cooney), and produced the entirety of those search warrant returns to the other five co-defendants. *See* 16 Cr. 371 (RA), Dkt. No. 213 (Transcript of August 3, 2017 Court Conference) (attached as Ex. B). Archer and Cooney filed motions requesting that the Court order the other defendants in the case to return or destroy the Government's production of the entirety of their email accounts. *See* 16 Cr. 371 (RA), Dkt. No. 191, 192. At the August 3, 2017 court conference, Judge Abrams granted Archer and Cooney's motion, and directed all defendants "to return or destroy the government's production materials obtained pursuant to the warrant." (Ex. B at 13). The Court also directed the Government to make a new production "consisting solely of materials responsive to the warrant," since the Government "cannot seize or use files unless they are within the scope of the warrant." (*Id.* (citing *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)). With respect to the Government's *Brady* obligations, the Court held that the Government "need not and *may not* review files or emails for *Brady* or otherwise once they are determined to be nonresponsive." (*Id.* at 14 (emphasis added)).

Similarly, in *United States v. Grant*, the two trial defendants, Grant and Reichberg, sought, among other things, suppression of the contents of their personal email accounts. *See* 16 Cr. 468 (GHW), Dkt. No. 562 (December 26, 2018 Trial Transcript) (relevant portions attached as Ex. C). In that case, the Government produced to all three co-defendants, Reichberg, Grant, and Harrington, as well as to defendants in other criminal cases, the complete universe of data from Reichberg and Grant's personal email accounts, which the Government obtained from Internet service providers pursuant to search warrants. (Ex. C at 7114). The defendants asserted that suppression was required "because the government's production of their emails and other data violated the Fourth Amendment." (*Id.* at 7113). While Judge Woods found that the production of complete account returns to co-defendants was "not a clearly established violation of the Fourth Amendment," (*id.* at 7124), and thus denied the motion to suppress, the Court expressed concern regarding the overproduction of non-responsive electronic information in discovery. Specifically, the Court noted that the Department of Justice has instructed prosecutors to "protect the privacy interests of defendants with respect to electronically stored information in multi-defendant cases," and explained that "Rule 16 does not require such a dramatic overproduction." (*Id.* at 7131-33).

Finally, in *United States v. Collins*, the defendant asked the Court to compel the Government to "either conduct another search of Individual-5's non-responsive iCloud data for *Brady*/Rule 16 Material or to turn over the entirety of Individual-5's iCloud data over Individual-5's objection." 409 F. Supp. 3d 228, 244 (S.D.N.Y. 2019). Judge Broderick concluded that "[e]ven if the Government's search of Individual-5's iCloud data was an insufficient search for *Brady* material," the Government could not, consistent with the Fourth Amendment, conduct another search of the non-responsive material for *Brady*/Rule 16 Material. *Id.* at 243-44. The Court held that "[t]he Government—having conducted a search of Individual-5's iCloud data consistent with the Fourth Amendment and a search warrant—does not have the legal authority to

go back and search materials that are non-responsive, *i.e.*, outside the scope of the search warrant." *Id.* at 244. In so holding, the Court rejected the defense argument that "the Government's *Brady* obligation is superior to and takes precedence over an individual's Fourth Amendment rights." *Id.*

Consistent with these legal principles and the guidance provided by courts in this district, the defendant has argued in this case that the Government *cannot* access the Provider Data. For instance, in the defendant's motion for return of property, the defendant asserted that the Fourth Amendment required the Government to return the Provider Data from the Sadr Accounts. (Dkt. No. 98 at 5 ("The government cannot continue to hold and search private documents that it has not flagged as non-privileged and pertinent during its years-long investigation.")). At trial, the defense again asked the Court to grant its motion for return of seized property. (Tr. 30-31). The same Fourth Amendment concerns preclude the Government from producing the Provider Data for the Non-Sadr Accounts, and the defendant's request should therefore be denied.

### C. The Court Should Deny The Defendant's Request For Internal OFAC Documents

#### 1. Relevant Facts

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant. On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations. (Dkt. 283, Ex. A at 6). During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's thoughts about whether the conduct under investigation potentially violated U.S. sanctions laws and regulations. OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email. Ex. A. at 7. In the email, SAUSA Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony. SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). (*Id.*, Ex. A at 8). On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. (*Id.*, Ex. A at 10). During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges with SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. (*Id.*, Ex. A at 12-14). During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. (*Id.*, Ex. A at

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 6

12).  On that day, SAUSA Lynch and AUSA Laroche spoke to OFAC Officer-1.  (*Id.*, Ex. A at 11).  During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges.  Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case.  (*Id.* Ex. A at 26-47 (the "Presentation")).  OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached.  We'll take a look and will get back to you."  (*Id.*, Ex. A at 11).

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche.  (*Id.*, Ex. A at 15).  OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." (*Id.*).  OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." (*Id.*).  SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email.  (*Id.*, Ex. A at 16).  Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case.  (*Id.*, Ex. A at 17-25).

Since the trial, the Government has produced additional email communications between the prosecution team and OFAC.  These communications concerned efforts to secure an expert witness to testify at trial, to arrange for meetings with the expert witness, to consult with OFAC about the statutes, executive orders, and regulations at issue in the case (including the U-Turn license), and to obtain an OFAC license check to show that the entities and individuals in this case did not obtain a license to conduct the transactions at issue (*i.e.*, GX 602).

The Government also produced, at the defendant's request, post-trial communications between the prosecution team and OFAC officials, which were made during the Government's post-trial due diligence concerning OFAC's response to Government Exhibit 411 and the information about this case received from SAUSA Lynch.  These communications included email correspondence and notes from two telephone calls on April 17 and April 21, 2020.  By email, an OFAC official confirmed that OFAC received Government Exhibit 411, but that the letter "was not a self-disclosure or other correspondence requiring a response from OFAC."  The OFAC official also stated: "[I]t is possible that the information contained in the letter was passed to other components within OFAC for their consideration," but that OFAC "cannot confirm at this time how or whether the information contained in the letter was used."  On two phone calls with an official at OFAC, the Government discussed OFAC's response to receiving information about this case in 2016 and 2017 from SAUSA Lynch.  The OFAC official stated on the calls, in substance, that OFAC makes enforcement decisions after considering OFAC's enforcement guidelines and factors, and that one factor that OFAC considers is whether the case is being prosecuted criminally.  The OFAC official also stated that, after receiving the information from SAUSA Lynch, she personally assessed that, based on the general factors, the case was not a promising lead for OFAC.  Finally, the OFAC official stated that an enforcement officer was assigned to the case and provided

with the Presentation, but that, based on the official's review of OFAC's internal database, no internal case was opened by that enforcement officer or anyone else at OFAC.

### 2. Discussion

The defendant asks the Court to "order the government to produce all documents in the possession of OFAC regarding GX 411 and this determination [not to seek an enforcement action], as well as "all documents in OFAC's possession regarding its communications with DANY and the U.S. Attorney's Office about this case." (Def. Mem. at 116). Contrary to the defendant's assertion, however, OFAC is not a part of the prosecution team. (Def. Mem. at 116-17 (citing *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995)). The case cited by the defendant is readily distinguishable. In *Wood*, two defendants were charged with a conspiracy to defraud the FDA by obstructing the FDA's function of ensuring that prescription drugs are safe, effective, and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs. 57 F.3d at 735. In that case, the FDA "s[ought] the prosecution" of the defendant, and the district court had directed the Government, before trial, to provide to the defendant "all information falling within Rule 16, including information in the custody of the FDA, forthwith." *Id.* at 736. Accordingly, there was no dispute in that case that the FDA and U.S. Attorney's Office had conducted a joint investigation.

In this Circuit, the prosecution's obligation to disclose *Brady* material extends to material that is in the possession of an entity that has acted as "an 'arm of the prosecutor'" in a given case. *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975)). Therefore, when the prosecution "'conducts a joint investigation with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence.'" *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (quoting *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012)). "A number of factors are relevant in determining whether the prosecution conducted a 'joint investigation'" with another agency. *Middendorf*, 2018 WL 3956494, at *4. The factors include "whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Id.* (citing *Blaszczak*, 308 F. Supp. 3d at 741–42).

In *Middendorf*, the Government and the SEC conducted joint witness interviews and charged the same group of defendants on the same day. Judge Oetken nonetheless found that the Government and the SEC had not conducted a joint investigation, because the SEC was not involved in the grand jury presentation, had not reviewed documents gathered by the Government or shared the fruits of its investigation with the Government, and did not participate in the overall development of prosecutorial strategy. *Id.* at *5. Judge Kaplan reached the same result in *Blaszczak*, concluding that, notwithstanding that the SEC had "furnished documents it collected to the USAO, that the SEC and the USAO interviewed a number of witnesses at the same time, and that the SEC and USAO ultimately informed one another of the enforcement actions each intended

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 8

to take," the SEC was not an arm of the prosecution because it was not involved in the grand jury presentation, did not review documents gathered only by the prosecution, did not develop prosecutorial strategy, and did not accompany the prosecution team to court proceedings in the SDNY case. *Blaszczak*, 308 F. Supp. 3d at 741. Similarly, Judge Broderick held in *Collins* that the SEC was not an arm of the prosecution where the Government and SEC "both participated in only 16 of 60 interviews," the Government and SEC did not share "personnel, information [or] documents in any material way, and each agency made charging decisions independently of each other." *Collins*, 409 F. Supp. 3d at 241-42.

By contrast, Judge Gardephe in *Martoma* concluded that the Government's *Brady* and *Giglio* obligations extended to communications between the SEC and counsel for two witnesses that were in the sole possession of the SEC, because the Government and SEC had conducted a joint investigation. *United States v. Martoma*, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014). There, the Court held that the SEC and the Government had been "engaged in joint fact-gathering," because the Government and the SEC had conducted "20 joint interviews of 12 witnesses," the SEC had provided the Government with documents that it obtained during its investigation, and the SEC and Government coordinated their efforts in conducting depositions. *Id.* at 461. Similarly, Judge Rakoff found a joint investigation in *Gupta*, relying principally on the fact that the Government and the SEC "jointly interviewed no fewer than 44 witnesses," that the SEC attorney had "within a day or two of each interview, prepared memoranda that summarized what he felt were the relevant parts of the interviews," and that the agencies were thus "engaged in joint fact-gathering." *Gupta*, 848 F. Supp. 2d at 493-94.

The defendant asserts, without reference to the caselaw summarized above, that the communications between SAUSA Lynch and OFAC in 2016 and 2017 rendered it part of the prosecution team. (Def. Mem. at 117). But those communications concerned questions about whether the conduct in this case violated the regulations at issue, a request to potentially secure an OFAC witness to testify in the New York grand jury (although DANY never presented the case to a grand jury), and information about the case (including a PowerPoint presentation that summarized the evidence in this case) that SAUSA Lynch provided to OFAC. (Def. Mem. at 117; Dkt. 283, Ex. A at 7, 11). While it appears that OFAC reviewed the PowerPoint presentation, OFAC did not itself engage in any fact-finding, share any documents or evidence with the Government, participate in any of the prosecution team's witness interviews, or provide input on the Government's charging strategy. It is not uncommon for a prosecutor to consult with an enforcement agency before charging an individual for conduct that falls within that agency's expertise, particularly if the prosecution may need an expert witness to testify about that agency's enforcement mission and the relevant regulations. Nor did the communications between the Government and OFAC in the lead up to trial constitute "joint fact-gathering" such that OFAC was an arm of the prosecution in this case. *Gupta* 848 F. Supp. 2d at 494. Those communications concerned OFAC's understanding of the various statutes, executive orders, and regulations at issue in the case, including the U-Turn license, and the Government's efforts to secure an expert witness to testify at trial, to arrange for meetings with that witness, and to obtain an OFAC license check to offer into evidence at trial.

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 9

Although OFAC responded to each of the Government's inquiries concerning the statutes and regulation and supplied an expert to testify at trial, its responses did not amount to a "joint investigation" that trigger the Government's obligations under *Brady*. *Id.* In fact, the factors considered in the case law above strongly weigh against finding a joint investigation in this case. Although DANY unilaterally shared its PowerPoint presentation with OFAC, which summarized the evidence up to that point, OFAC and the Government never engaged in any form of *joint* fact-gathering. OFAC did not participate in any witness interviews, was not involved in presenting the case to the federal grand jury, did not play a role in the development of prosecutorial strategy, and did not accompany the prosecution to court proceedings. Because OFAC and the U.S. Attorney's Office did not engage in a joint investigation, the defendant's request for internal OFAC documents should be denied.

### D. The Court Should Permit the Government to Withhold One Interview Report

As previously stated, the Government will complete its production by June 5, 2020 of all notes or reports from witness interviews conducted by the prosecution team, with one exception that is the subject of an *ex parte* letter sent to the Court tonight. (Dkt. No. 243). As explained in greater detail in the letter, the FBI special agents assigned to this case conducted a witness interview in an ongoing investigation after the trial in this case. During that interview, the witness mentioned some of the individuals and entities from this case. However, the conduct discussed during the interview occurred several years after the charged conduct in this case.

The witness interviewed did not testify at trial (and in fact was not interviewed until after trial), so the Jencks Act does not apply. However, if the Jencks Act did apply, Rule 26.2 of the Federal Rules of Criminal Procedure would allow for the *in camera* review of statements the Government sought to withhold from the defense. *See* Fed. R. Crim. P. 26.2(c) ("If the party who called the witness claims that the statement contains information that is privileged or does not relate to the subject matter of the witness's testimony, the court must inspect the statement *in camera*."). As the Supreme Court explained in *Palermo*, "when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination." *Palermo v. United States*, 360 U.S. 343, 354 (1959). And as the Second Circuit has recognized, "[i]n *camera* inspection is the only practical way simultaneously to preserve the interests of the individual under surveillance and the interest of the Government in preserving the secrecy of ongoing criminal investigations." *Stoddard* v. *United States*, 710 F.2d 21, 23–24 (2d Cir. 1983).

The witness statement at issue is protected by the law enforcement privilege, which requires a court "to balance the public interest in nondisclosure against the need of a particular litigant for access to the privileged information." *Wells* v. *Connolly*, No. 07 Civ. 1390 (BSJ) (DF), 2008 WL 4443940, at *2 (S.D.N.Y. Sept. 25, 2008); *see also Rovario* v. *United States*, 353 U.S. 53, 77 (1957) (the purpose of the law enforcement privilege is to protect "the public interest in effective law enforcement"). To invoke the privilege, the Government must show that the documents contain information that the privilege is intended to protect, such as: (1) information pertaining to law enforcement techniques and procedures; (2) information that would undermine the confidentiality of sources; (3) information that would endanger witness and law enforcement

The Honorable Alison J. Nathan, U.S.D.J.
May 28, 2020
Page 10

personnel or the privacy of individuals involved in an investigation; or (4) information that would otherwise interfere with an investigation.  *In re The City of N.Y.*, 607 F.3d 923, 944 (2d Cir. 2010).  Once the Government shows that the privilege applies to certain information, there is a "strong presumption against lifting the privilege." *Id.* at 948.

As the Government explains in its *ex parte* letter, disclosing the report at issue would undermine the confidentiality of a witness, potentially endanger the witness's safety, and damage an ongoing investigation.  Accordingly, the Government respectfully requests permission not to produce the report of the interview to the defendant.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
   Assistant United States Attorneys
Garrett Lynch
   Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)