Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

**Steptoe**

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

June 3, 2020

<u>By ECF</u>

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

   Re:  *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

   On behalf of Ali Sadr, we respectfully reply to the government's letter brief of May 28, 2020 (Dkt. 345), regarding the government's claims that it should not be compelled to disclose:

   (a) documents obtained from third parties, *id.* at 3-5;

   (b) documents in the possession of OFAC regarding: (i) GX411 and any OFAC determination regarding whether action was to be taken regarding it, and (ii) OFAC's communications with DANY and the U.S. Attorney's Office about this case, *id.* at 7-9; and

   (c) a witness interview report withheld for undisclosed reasons submitted *ex parte*, *see* Dkt. 345, at 9-10.

   Sadr's *Brady* motion explained the reason for his disclosure requests: the government's thorough demonstration that it cannot be relied upon to fulfill its *Brady* obligations. *See* Dkt. 336, at 107-119; *see generally id.* at 48-105 (recounting *Brady* violations known by May 1, 2020); Dkt. 341 (identifying additional *Brady* violations revealed in May 19 and May 21 disclosures). As a general matter, though it maintains its rote insistence that it has not violated *Brady*, the government has consented to disclosure of all requested documents other than those described above. *See* Dkt. 343, at 1. For the reasons explained below and in Sadr's *Brady* motion, the Court should order the government to produce the above documents.

The Honorable Alison J. Nathan
June 3, 2020
Page 2

**Steptoe**

### 1.    The Court should order the government to disclose all documents obtained from third parties

The government argues it cannot disclose non-responsive materials obtained from third parties "because the Government did not seize those documents pursuant to the search warrants." Dkt. 345, at 3-4.[1]  The government's use of the term "seized" is strategic and crabbed.  The warrants authorized DANY "to seize, search, retrieve, and view *all* the data, information, and images provided to them by the [third parties'] email service provider[s]," *e.g.*, Dkt. 96-1, at 44 (page 000494) (emphasis added).  There is no dispute that is what DANY did, resulting in DANY's possession of the material.  The warrants further provide that they are "deemed 'executed' when [they are] served upon the email provider, and subsequent review is deemed analysis." *E.g.*, *id.* at 45 (page 000495).  The government contends, however, that it "seized" only those documents that it identified as useful for its case before it referred the case to the SDNY in April 2017.  *See* Dkt. 155, at 5-6.  There is now abundant reason to doubt the reliability of the government's claims about what it did or did not "seize" during its claimed responsiveness review.  *See* Dkt. 336, at 119-132.  But even accepting, *arguendo*, the government's claim that it distinguished between responsive and non-responsive materials received from third parties, and "seized" only the former,[2] the government may not now invoke the asserted privacy interests of others to avoid <u>any</u> *Brady* review of the non-Sadr returns.

"The prosecution, which alone can know what is undisclosed," has "the consequent responsibility ... to learn of any favorable evidence" in its possession, and to treat it in accordance with *Brady*.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  There is no doubt that the

---

[1] Sadr's request for production of *all* documents received from third parties includes documents received by any means, including through subpoena or voluntary production.  During a meet-and-confer session, the government represented that it has produced to the defense all third-party documents obtained other than through search warrant.

[2] The claim is inconsistent with the government's admission that it never—during three years of claimed responsiveness review—segregated materials deemed "responsive" from those deemed "not responsive."  Instead, DANY simply aggregated *all* warrant returns, from whatever source, into one consolidated database (the "Provider Data"), which it searched at will, on an ad hoc basis, from the time of the first warrant until it referred the case to the SDNY in April 2017.  *See* Dkt. 155, at 3, 5-6.  Even after that referral, the government *continued* to search the Provider Data for a variety of purposes, including opposing Sadr's bail application.  *See id.* at 8-9; Dkt. 156, at 7-12; Dkt. 336, at 125-26.  The government's determinations of what it "identified" as responsive, and thereby deemed "seized," appear to have been made entirely post-hoc, under a variety of shifting rationales.  *See* Dkt. 168, at 2-4 (describing thirteen different methods by which the government claimed, *in its December 2019 review*, that DANY had identified and seized documents in 2014-17); Dkt. 155, at 4-6 (setting out, without affirmation or any reference to contemporaneous evidence, the government's position *in October 2019* as to how DANY supposedly made determinations and seizures in 2014-17).

The Honorable Alison J. Nathan
June 3, 2020
Page 3

**Steptoe**

warrant returns are in the government's possession.  (Indeed, for months, the government resisted Sadr's demand for the return of his own overseized nonresponsive documents, insisting it was entitled to maintain possession of them.)  The government's claim that documents it possesses are nonetheless outside *Brady* because it did not "seize" them as responsive is foreclosed by the Second Circuit's opinion in *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc) ("*Ganias II*"), and the government's position taken there.

*Ganias II*, like this case, concerned evidence deemed nonresponsive after an initial overseizure of electronic data.  In *Ganias II*, the government retained the nonresponsive material for years, eventually searching it anew (under a new warrant) and finding evidence that led to Ganias's conviction.  *See id.* at 205-07.  On appeal, the *en banc* Second Circuit rejected Ganias's contention that the government had been required to return or destroy the nonresponsive material, noting that one reason for retaining the nonresponsive material was to protect the defendant's access to exculpatory evidence:

> Defendants may also require access to a forensic copy [of the hard drive] to conduct an independent analysis of what the government's forensic expert did[,] ... *or to locate exculpatory evidence that the government missed*.

*Id.* at 215 n.35 (emphasis added).

Although this portion of *Ganias II* was dicta,[3] "it is instructive nonetheless."  *United States v. Lumiere*, No. 16 Cr. 483, 2016 WL 7188149, at *4 (S.D.N.Y. Nov. 29, 2016).  Moreover, the reasoning above was not a stray remark by the Second Circuit.  The *government* urged that proposition, arguing that one reason it needed to retain the data was to comply with *Brady*:

> [T]he retention of complete forensic images allows the government to comply with its discovery obligations, including those obligations imposed by the Constitution.  If the government were to delete data, or only maintain small portions of computer data that it seized, it could be accused of destroying exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)....
> Courts have recognized the government's 'valid' concern about deleting potentially exculpatory data.  *See, e.g.*, *In re Search of Information Associated with [Redacted]@Mac.com,* 13 F. Supp. 3d 157, 167 n.10 (D.D.C. 2014) ....

---

[3] It was dicta because the *Ganias II* court did not decide whether the government's years-long retention of the nonresponsive information violated the Fourth Amendment, as the panel had held.  *See United States v. Ganias*, 755 F.3d 125, 137-39 (2d Cir. 2014) ("*Ganias I*").  Instead, the *en banc* court decided the case on good-faith reliance grounds, leaving the Fourth Amendment question open.  *See Ganias II*, 824 F.3d at 200, 220-21 ("Having noted Ganias's argument, we do not decide its merits.").

The Honorable Alison J. Nathan
June 3, 2020
Page 4

**Steptoe**

Brief on Rehearing *En Banc* for the United States, *Ganias II*, 2015 WL 5112418, at *34-35 (Aug. 28, 2015). Of course, preserving information because deleting it might violate *Brady* does little good if the government categorically refuses to review or disclose "non-responsive" information.

Nor can the government assert the Fourth Amendment rights of the non-Sadr account holders to prevent *Brady* review. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). The non-Sadr account holders have their own available mechanism to protect their Fourth Amendment rights: a motion to return their property under Federal Rule of Criminal Procedure 41(g). *See Ganias II*, 824 F.3d at 218-19 ("[P]arties with an interest in retained storage media are not without recourse.... Rule 41(g) permits a defendant or any "person aggrieved" by either an unlawful or *lawful* deprivation of property ... to move for its return ....").[4] The government may not invoke their rights vicariously to avoid its own *Brady* obligations, or to prevent the Court or Sadr from protecting rights the government refuses to protect.

Arguing otherwise, the government cites two unpublished bench rulings, and one published decision in this District. *See* Dkt. 345, at 4 (citing *United States v. Galanis*, No. 16 Cr. 371 (RA), Dkt. 213 (Tr. of Aug. 3, 2017 conference) (attached to the government's May 28 letter here as Ex. B, Dkt. 345-2); *United States v. Grant*, No. 16 Cr. 468 (GHW), Dkt. 562 (Dec. 26, 2018 Trial Tr.) (attached to the government's May 28 letter as Ex. C, Dkt. 345-3); *United States v. Collins*, 409 F. Supp. 3d 228, 244 (S.D.N.Y. 2019). Those cases are distinguishable, for multiple reasons.

*First*, in each of those cases, it was the *owner of the data at issue* who objected to the government's production of nonresponsive information, and demanded its return or suppression. *See* Dkt. 345-2, at 4, 13 (granting Archer's and Cooney's motions to return or destroy materials inadvertently produced); Dkt. 345-3, at 7115, 7120-24 (addressing Grant and Reichberg's challenge to the production of their entire warrant returns, whether responsive or not); *Collins*, 409 F. Supp. 3d 243, 244 (noting that the owner of the non-responsive iCloud data, Individual-5, "has declined, through counsel, to consent to further review of this data by either the Government or the defendants"). Here, no non-Sadr account owner has objected to *Brady* review of his or her seized materials.

*Second*, in the two of those cases that concerned *Brady*, the government *reviewed for Brady in its responsiveness review* of the returns. In *Collins*, "the Government already conducted a search for Brady/Rule 16 Material when it searched Individual-5's iCloud data for responsive documents." 409 F. Supp. 3d at 243. Asked whether that *Brady/Giglio* review was "limited to the review of responsive documents," the government responded, "So the answer to

---

[4] If the third parties believe their materials were seized unlawfully, they may seek further remedies, such as "damages for the violation of [their] Fourth Amendment rights," or "redress under state law for invasion of privacy or trespass." *Rakas*, 439 U.S. at 134 (citation omitted).

The Honorable Alison J. Nathan
June 3, 2020
Page 5

**Steptoe**

that is I think no." *Collins*, Dkt. No. 98, at 61-63 (Tr. May 3, 2019).  The government explained that it culled for responsiveness not by search terms but by time periods, and that it "looked at almost all of these communications during the relevant time period," reviewing those items for not only inculpatory but also exculpatory evidence.  *See id.*  Although in *Galanis*, the district court granted the other defendants' motion to return or destroy the inadvertently produced nonresponsive documents, Dkt. 345-2 at 13, the court did order that the responsive documents had to be reviewed and treated in accordance with *Brady*, *id.* at 14, an order with which the government presumably complied.  (The government's third case, *Grant*, did not concern *Brady* at all—it addressed the issue solely under the Fourth Amendment, with no mention of *Brady*. *See generally* Dkt. 345-3.)

Here, unlike *Collins* and *Galanis*, there is no reason to be confident that the government reviewed for *Brady* during its responsiveness review, or did so reliably.  On the contrary—the justification for compelling the current production is the thorough *unreliability* of the government's *Brady* process—as the Court and the defense began to learn on March 8 through 10, and as the record of the government's post-trial disclosures has thoroughly borne out.  *See* Dkt. 336, at 107-119.[5]

*Finally*, the government argues that *Collins* "rejected the defense argument that 'the Government's *Brady* obligation is superior to and takes precedence over an individual's Fourth Amendment rights.'"  Dkt. 345 at 5 (quoting *Collins*, 409 F. Supp. 3d at 244).  Again, the applicability of a third party's "Fourth Amendment rights" depends on that party's invoking them, *see Collins*, 409 F. Supp. 3d at 243, 244, not the government's vicarious assertion, *Rakas*, 439 U.S. at 133.  But even if there were a contest between a third party's privacy rights and the defendant's *Brady* rights, the Second Circuit has recognized that the defendant's rights must prevail.

An instructive case is *Fuentes v. T. Griffin*, a rape prosecution where the defendant testified that the encounter was consensual, and that the complainant, acting erratically later, had falsely accused him out of anger and vindictiveness.  829 F.3d 233, 240, 252 (2d Cir. 2016).  The prosecution possessed, but did not disclose, a psychiatric record reporting the complainant's unrelated depression and suicidal ideation, and a diagnosis of Dysthymic Disorder that "would have substantiated [the defendant's] account of [her] erratic behavior," *id.* at 241, 249, and potential motivation by anger, *id.* at 249.  The prosecutor had withheld the record out of concern for the complainant's psychiatrist-patient privilege, *id.* at 241, a privacy interest at least as powerful as an unasserted Fourth Amendment interest in lawfully seized emails.  The Second

_____

[5] One example alone shows the complete absence of *Brady* consideration from DANY's process at the time.  Immediately after Bahram Karimi told DANY and the FBI that he firmly believed he and others did nothing wrong, SAUSA Lynch emailed that statement to his colleagues, and reported that it was "not a big blow"; the case would just have to proceed "based on the docs and analysis."  Dkt. 341, at 5; Dkt. 341-3.  The statement's exculpatory nature was not considered for even a moment (and not produced to the defense until May 21, 2020).

The Honorable Alison J. Nathan
June 3, 2020
Page 6

**Steptoe**

Circuit found a *Brady/Giglio* violation, indeed one clear enough that it ruled the New York Court of Appeals had acted unreasonably under the AEDPA in rejecting it.  *See id.* at 247-53.

This Court is not bound by the district court decisions the government cites, particularly where those cases involved third parties asserting their own Fourth Amendment rights, and a reliable *Brady* review by the government—neither of which is present here.  This Court is, however, bound by *Fuentes*, which holds that a third party's privacy interest, even where it is the complaining witness's psychiatrist-patient privilege, does not overcome the defendant's right to disclosure of exculpatory evidence under *Brady*.  Where, as here, no third party has objected—despite the availability of the motion for return identified by the *en banc* Second Circuit in *Ganias*—there is no Fourth Amendment right at issue here, much less one that overcomes Sadr's Due Process rights under *Brady*.  The government is not barred from disclosing the third-party documents sought by Sadr.

> **2.      The government's presentation of a recklessly misleading narrative regarding OFAC enforcement requires it to obtain and disclose any contrary evidence in the possession of OFAC**

To begin with the problem revealed at trial: the government put on a case contending that Sadr's concealment that the recipients of the wire transfers were affiliated with entities based in Iran was a matter that seriously interfered with OFAC's enforcement of IEEPA and the ITSR; that OFAC depended on parties' "transparency" with U.S. intermediary banks in order to enforce those sanctions laws; and that Sadr's concealment exposed the banks to significant, indeed potentially staggering, risk of economic harm from OFAC enforcement.  This outcome was likely, so the argument went, because had OFAC learned of Iranian connections to these transfers, it would have initiated investigation and enforcement against even unwitting banks under the principle of "strict liability," leading to fines that could have potentially ranged into the tens or hundreds of millions of dollars.  The government put this case on principally through OFAC Senior Enforcement Agent Ted Kim and jury argument, and also by eliciting testimony from bank witnesses about OFAC's "strict liability" enforcement and imposition of penalties.

All the while, the government knew what the Court, the defense, and even its OFAC witness personally did not: that SAUSA Lynch had presented all of the facts of this case to OFAC, and OFAC had done nothing.  The government, finally cognizant of that fact's importance, has belatedly searched its files and produced (or is in the act of producing) the prosecutors' side of their communications with OFAC about this case.  But the government steadfastly resists the other side of that interaction, insisting that it need not disclose information from OFAC concerning its determination in the case, because OFAC is not an "arm of the prosecution."  The government is wrong.

The Honorable Alison J. Nathan
June 3, 2020
Page 7

**Steptoe**

> ### a.    OFAC is within the government's *Brady* obligation under *United States v. Wood*

To support its contention that OFAC is not an "arm of the prosecution," the government argues at length that OFAC did not participate in a joint investigation with the U.S. Attorney's Office, as that issue has been considered in numerous securities cases in this district involving the U.S. Attorney's Office and the SEC.  *See* Dkt. 345 at 7-8.  The government's "joint investigation" analysis entirely misses the point.  It is undisputed that OFAC did not jointly investigate the facts of the case with the prosecutors—*OFAC deliberately passed on SAUSA Lynch's invitation to initiate its own enforcement proceeding, despite Lynch peddling his PowerPoint prosecution memo*.  But the government does not cite any Second Circuit authority—or indeed any authority—holding that a "joint investigation" theory is the only theory under which the prosecution has an obligation to disclose exculpatory evidence in the hands of another executive branch agency.

Where, as here, the government (a) claims that an agency charged with enforcing a statutory or regulatory scheme was the victim of the offense; (b) does so through the testimony of a witness from that agency regarding that agency's enforcement of the law, and the effect of the conduct in the case on that agency's enforcement; (c) consults with the agency in charging, preparing, and putting on that case; and (d) knows or has reason to know that the agency possesses evidence that is contrary to that contention and would undercut the agency witness's credibility, it has a duty to obtain that information from the agency and disclose it to the defense, to prevent misleading the defense and the jury and violating the defendant's Due Process rights. *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995), was exactly such a case.  *See* Dkt. 336, at 116-17.  Though out of circuit, *Wood* is squarely on point—much more so than the SEC-investigation cases cited by the government:

1.    In *Wood*, as here, the government charged the defendant with a *Klein* conspiracy: conspiring to defraud the United States, by obstructing the agency charged with enforcing the statute in that agency's lawful function (in *Wood*, the FDA's function of ensuring that prescription drugs are safe, effective, and dispensed through prescriptions from qualified practitioners, 57 F.3d at 735; here, OFAC's function of enforcing IEEPA and the ITSR).

2.    In *Wood*, as here, the government put that case on largely through the testimony of an agency expert (in *Wood*, an FDA medical officer who testified about the safety of the substance of an issue; here, an OFAC enforcement officer, who testified about OFAC's enforcement policies and practices).

3.    In *Wood*, as here, the agency "consulted with the prosecutor in the steps leading to prosecution."  57 F.3d at 737.  In *Wood*, those contacts included consulting with the prosecution in determining to seek the prosecution, 57 F.3d at 736; telling the prosecution what the agency relied on to make the determinations it was charged with making (there, that a drug was prohibited), *id.*; and providing the witness, *id.* at 737.  Contrary to the government's argument, those kinds of interactions—"for a prosecutor to consult with an enforcement agency before

The Honorable Alison J. Nathan
June 3, 2020
Page 8

**Steptoe**

charging an individual for conduct that falls within that agency's expertise, particularly if the prosecution may need an expert witness to testify about that agency's enforcement mission and the relevant regulations," as well as "communications between the [prosecutors] and [the agency] in the lead up to trial"—were precisely enough to make the agency "be considered as part of the prosecution in determining what information must be made available to the defendant charged with violation of the statute." *Wood*, 57 F.3d at 737. After all, "[t]he government cannot with its right hand say it has nothing while its left hand holds what is of value." *Id.* (citing, *inter alia*, *Santobello v. New York*, 404 U.S. 257, 262 (1971)).

Here, the prosecutors' consultations with OFAC were not nearly as minimal as the government makes them out to be. Instead, the prosecutors—including but not limited to SAUSA Lynch—consulted extensively with OFAC, not merely to obtain an expert witness, but to sound out ideas, confirm the supposed illegality of the conduct charged here, and shape the prosecution's case. The evidence shows that:

*First*, SAUSA Lynch repeatedly contacted Michael Dondarski, OFAC's Assistant Director for Enforcement, while developing the case before charging, to discuss and confirm the strength of DANY and SDNY's case against Sadr:

- On May 19, 2016, then-ADA Lynch informed a colleague that he had consulted Michael Dondarski, OFAC's Assistant Director of Enforcement, regarding the strength of Sadr's case and the theory of sanctions violation. Dkt. 283-1, at 7.

- On August 1, 2016, Lynch reminded Dondarski that he had spoken to Dondarski about Sadr's case "in general terms before," and informed Dondarski that he wished to discuss "an Iranian company doing business in South America and receiving USD payments (cleared through the US) through front company accounts in Switzerland." Dkt. 283-1, at 8. Lynch specifically referenced his views of the strength of the case against Sadr, stating, "[O]ur evidence is pretty strong that our targets were aware of US sanctions and structured the USD payments to evade them and to disguise the Iranian connection to the payments (moreover, our primary Iranian targets was a U.S. person for a chunk of the relevant period – he got his green card in 2012)." *Id.* Lynch then informed Dondarski that DANY would "like to coordinate with OFAC" to "provide you with information so you can take action on your own if so desired." *Id.*

- The next day, Dondarski confirmed that "OFAC Enforcement" was the "right shop/unit for you to touch base with on the issues." Dkt. 283-1, at 9. Dondarski connected Lynch with the OFAC Enforcement "management team," copying Section Chiefs Jeremy Sausser, Rachel Fiorill, and Rosanna Wells; as well as Senior Advisor for Enforcement Julie Malec. *Id.*

The Honorable Alison J. Nathan
June 3, 2020
Page 9

**Steptoe**

- On August 5, 2016, Lynch spoke with OFAC Enforcement Section Chief Rosanna Wells about Sadr's case. Dkt. 283-1, at 11. After the meeting, Lynch thanked Wells, and noted "we'll be in touch soon." *Id.*

- On August 8, 2016, Wells "loop[ed] in" then-Senior Enforcement Officers Kaveh Miremadi and Alonzo Bell on Lynch's follow-up email. Dkt. 283-1, at 11.

- On October 21, 2016, the government discussed OFAC's formal rejection and reporting procedures with Malec and Sara Liebschutz. *See* USAO 00528-00528, at 00528 (Ex. A hereto). The government has not produced records of the communications that led to this meeting or contextualize the discussion.

- On July 12, 2017, Lynch emailed Dondarski to schedule a call with SDNY prosecutors regarding their potential indictment on the *Klein* theory later presented at trial. Dkt. 283-1, at 15. Dondarski responded that he "remember[ed] the case," and that OFAC "had some questions with regard to which entities or persons were being charged and the roles they played in the transactions/conspiracy." *Id.* SAUSA Lynch recommended scheduling a "call to refresh [Dondarski's] memory" about the case. *Id.*

- On September 20, 2017, Lynch reached out to Dondarski apologizing that the "call with SDNY that I tried to set up back in July never happened," and asked for another call in the next day or two to "run this case by you again," because SDNY was "planning to go in to a grand jury in the near future." Dkt. 283-1, at 13. Dondarski responded that he was "happy to chat," noting, "I'd normally have someone else from my office join or participate so they could continue the conversation in my absence, but my team is absolutely stretched thin at the moment, so it'll just be me for the time being." *Id.*

- The next day, September 21, 2017, SAUSA Lynch and then-lead-prosecutor AUSA Matthew LaRoche spoke by telephone with Dondarski about the facts of this case and promised to send additional materials about the facts of the case and theory of prosecution. Dkt. 283-1, at 12.

- On September 22, 2017, SAUSA Lynch sent an email to Dondarski, copying AUSA LaRoche, in which he thanked Dondarski "for the call yesterday," and attached a PowerPoint "which gives a rough sketch of the case, the players, and evidence." Dkt. 283-1, at 12. SAUSA Lynch added that PowerPoint is "obviously" the "tip of the iceberg," and that SDNY is "happy to share more information, records, etc." *Id.* The PowerPoint was effectively a prosecution memo that comprehensively reviewed the facts and theory of the case the government tried against Sadr. *See id.* at 27-48.

The Honorable Alison J. Nathan
June 3, 2020
Page 10

**Steptoe**

- Dondarski thanked SAUSA Lynch "for passing along the information," noting that OFAC would "take a look and will get back to you."  Dkt. 283-1, at 12.

- On September 26, 2017, Dondarski thanked Lynch again for "speaking last week and for passing along the slide deck," and copied "Ethan Walpole and Rosie Wells from OFAC enforcement on this email so they can coordinate with you on next steps or follow-up with any questions they have."  Dkt. 283-1, at 16.  The government has not produced the follow-up discussion between Wells, Walpole, and Lynch in which Wells and Walpole likely discussed the merits of the government's case and its *Klein* theory.

*Second*, the government's consultation with OFAC continued after the case was indicted, to include consultation about responding to Sadr's motions to dismiss:

- On March 28, 2019—after Sadr had filed his pretrial motions to dismiss, but before the government's opposition was due—Dondarski emailed SAUSA Lynch documents relating to OFAC's publication of a civil monetary penalty enforcement action taken against a Singaporean company, and marked the email's importance as "high."  Dkt. 283-1, at 17.

- Dondarski noted "that the apparent violations related to U.S. Dollar transfers sent *through* U.S. financial institutions from the Singaporean entity to third-country parties for commercial projects/work conducted in Iran, so there are similarities to your fact pattern."[6]  Dkt. 283-1, at 17; *see also id.* at 18-26 (OFAC publication regarding enforcement information and settlement).

From the timing and substance of this communication, it is obvious that the government consulted with OFAC's Assistant Director of Enforcement on how best to respond to Sadr's motions to dismiss the sanctions-related charges.

*Third*, OFAC Enforcement personnel, introduced to Lynch through Dondarski, are the same officials who selected Ted Kim to testify at Sadr's trial:

- On July 17, 2019, Maria-Helene Van Wagenberg, Attorney-Advisor in OFAC's Office of the Chief Counsel, introduced Malec, Wells, and Miremadi to AUSA Dave Denton, who was briefly the lead prosecutor on this matter at the time.  *See* USAO 00680-00682, at 00681-82 (Ex. B hereto).  Van

---

[6] There were more differences than similarities.  The Singaporean case that OFAC pursued involved a contract with an SDN.  In addition, the payments through US banks in that case went to multiple third-party vendors (some Iranian) for goods and services that were *provided to Iran* or were for the benefit of the project involving the Iranian oil sector, *located in Iran*.  *See* Dkt. 283-1, at 18.

The Honorable Alison J. Nathan
June 3, 2020
Page 11

Steptoe

Wagenberg explained to her OFAC colleagues that AUSA Denton "asked about a potential OFAC witness for the prosecution of Ali Sadr Hashemi Nejad for sanctions violations. *Id.* Van Wagenberg noted that SDNY had previously been in touch with Mike Dondarski, who "confirmed that there were no licenses in place, but still needs to obtain a formal license check." *Id.* Malec and Wells had previously discussed Sadr's case with Lynch in 2016. *See* Dkt. 283-1, at 11; Ex. A, at 00528.

- On July 18, 2019, Malec asked AUSA Denton if he had "any rough estimate of a timeline for testimony on this matter." *See* Ex. B, at 00681. That same day, AUSA Denton informed Malec that Sadr's trial was scheduled for October 21, and offered "to jump on a call ... to just explain a little more of the lay of the land." *See id.* at 00680.

- On January 3, 2020, OFAC Enforcement Section Chief Samantha Sultoon, following up on AUSA Denton's July 18 email, reached out to AUSA Denton "regarding the schedule for the trial before reassigning staff to assist." *See* Ex. B, at 00680. Minutes later, AUSA Denton forwarded Sultoon's email to AUSAs Lake, Krouse and Kim. *Id.*

- On January 22, 2020, AUSA Lake emailed Van Wagenberg, asking, "[C]an you send me the resume of whoever will be testifying as the OFAC expert? We need to include this in a disclosure that is due today." *See* USAO 00683-00687, at 00684 (Ex. C hereto). Minutes later, Wagenberg replied to AUSA Lake's request, "Copying Kaveh [Miremadi], a chief in our Enforcement division who is tracking this request." *See id.* at 00684. Miremadi had been "looped in" on Sadr's case by Section Chief Wells in August 2016. *See* Dkt. 283-1, at 11.

- Later that evening, AUSA Lake asked Miremadi whether he was "free first thing tomorrow to discuss this over the phone?" Ex. C, at 00683.

- On January 23, 2020, Miremadi stated that he "just got off the phone with [AUSA Lake], and that he is "adding Enforcement Officer Matt McGrath to this email" because McGrath "has agreed to serve as the OFAC witness in the trial." Ex. C, at 00683.

- Later that day, AUSA Kim and Miremadi spoke by phone to "talk[] through what [the government] expect[ed] out of [its] OFAC witness." USAO 00776-00781, at 00776 (Ex. D hereto). Miremadi then informed AUSA Kim that "Senior Enforcement Officer Ted Kim has agreed to serve as your witness." *Id.*

The Honorable Alison J. Nathan
June 3, 2020
Page 12

**Steptoe**

*Fourth*, AUSA Kim consulted senior OFAC officials (but not Ted Kim, the OFAC expert witness) regarding the prosecution's strategy for rebutting Sadr's anticipated expert witnesses at trial:

- On February 24, 2020, AUSA Kim contacted Miremadi, Van Wagenberg, and Jacqui Brewer regarding "expert disclosures we just received from defense counsel," and asked to arrange "a call tomorrow to discuss briefly?" *See* USAO 00721-00721, at 00721 (Ex. E hereto); *see also* USAO 00675-00679 (Ex. F hereto) (defense expert disclosures).

- The next day, February 25, 2020, Miremadi emailed AUSA Kim, stating, "As we noted in our call we believe Ted is best positioned to discuss the history and scope of the relevant General Licenses (pre- and post- revocation). He is also aware of, and can speak to, the policy topics that you mentioned." *See* USAO 00722-00722, at 00722 (Ex. G hereto).

- That same day, Miremadi sent AUSA Kim an attachment "regarding OFAC's practice and history involving the enforcement of the evasion prohibition and its application to the now revoked U-turn general license." *See* Ex. G. Miremadi sent AUSA Kim the attachment six days after AUSA Kim had requested that Miremadi and Brewer join Ted Kim's trial preparation session to discuss "the U-turn license in more detail." *See* USAO 00713-00714, at 00713 (Ex. H hereto).

*Fifth*, OFAC created and sent the prosecution team at least two documents that were subsequently used as either demonstratives or exhibits during trial:

- On February 4, 2020, Ted Kim provided AUSA Kim a "draft license history check" for the prosecutors' review, *see* USAO 00733-00735, at 00734 (Ex. I hereto); 3507-02, at 3-4, as well as a certified draft license check on February 11, 2020. *See* Ex. I, at 00733; 3507-02, at 1-2. AUSA Kim introduced the certified license check as exhibit GX602 at trial, and elicited testimony regarding the exhibit from Ted Kim. *See* GX602; Tr. 496-98.

- On February 23, 2020, AUSA Kim emailed Ted Kim GX601 – an exhibit that Ted Kim purportedly participated in creating for trial. *See* USAO 00696-00696 (Ex. J hereto); c*ompare* 3507-08 (Sanctions PowerPoint provided by OFAC), *with* GX601 (Sanctions PowerPoint presented to the jury as a demonstrative); *see also* Tr. 474 ("Q. Did you review (GX601) before your testimony today? A. Yes. Q. Did you participate in its creation? A. Yes.").

The above consultations were at least as extensive—perhaps more so—than the consultations that were sufficient in *Wood* to make the FDA considered part of the prosecution for *Brady* purposes. *See Wood*, 57 F.3d at 737; *see generally id.* at 736-38. They are more than

The Honorable Alison J. Nathan
June 3, 2020
Page 13

**Steptoe**

sufficient to require OFAC to be considered part of the prosecution here, whether or not OFAC conducted joint investigation and fact-finding as analyzed in the SEC cases. (To the extent that *United States v. Blaszczak*—the decision of a coordinate district court—requires that the agency be an Executive Branch agency, subject to Executive control, 308 F. Supp. 3d 736, 742-43, (S.D.N.Y. 2018), OFAC qualifies. OFAC is not a quasi-independent commission like the SEC. It exists within the Treasury Department, an Executive Department, for the purpose of carrying out the President's powers under IEEPA. Unlike an SEC commissioner, OFAC or any of its officers undoubtedly could be ordered by the President to disclose the materials sought or be fired. *Compare id.* at 743.)

>           b.      **The government's misleading narrative regarding OFAC
>                   enforcement obligated it to obtain and disclose contrary
>                   information from OFAC**

There is a second, equally powerful reason to require the government to obtain and make disclosure of information from OFAC. Like the FDA in *Wood*, OFAC is overwhelmingly likely to possess evidence that is directly contrary to the case that the government, using OFAC's evidence and witness, told the jury. "The government in the form of the prosecutor cannot tell the court that there is nothing more to disclose while the agency interested in the prosecution holds in its files information favorable to the defendant." *Wood*, 57 F.3d at 737.[7]

In *Wood*, the information FDA possessed—which the prosecutors had kept out of their own hands and in the hands of the FDA—was a set of "Investigational New Drug applications (INDs) that bear on the safety of the drug [the] defendant [was] charged with unlawfully dispensing." 57 F.3d at 735; *see id.* at 736-37. There, the prosecution put on an FDA medical officer who testified, based on toxicity experiments with cats, that the charged substance, GHB, "was a dangerous drug whose hallucinogenic properties could affect humans who ingested it." *Id.* at 737. Yet the INDs possessed by the FDA, unknown to the defense, court, or jury, showed that "GHB has been studied in man for more than two decades, and has been administered therapeutically to hundreds of individuals, ... [with] no significant long-term toxicity ... reported, [and] no [apparent] evidence of tolerance or addiction," and that "preliminary long-term data suggest that GHB continues to be effective without habituation, addiction or side effects." *Id.* at 738. Needless to say, "[t]hese reports would have been useful in impeaching [the FDA witness's] testimony." *Id.*

Here, the evidence yet undisclosed falls into two categories: (a) all evidence of the actions OFAC took (or did not take) after receiving GX411, and (b) all evidence of the actions

---

[7] *See* Dkt. 336, at 117 (arguing the government was "independently obligated to obtain and turn over information in the possession of OFAC regarding the credibility of Ted Kim's testimony about OFAC's purported strict liability regime and actions with respect to entities that hid connections to Iran").

The Honorable Alison J. Nathan
June 3, 2020
Page 14

**Steptoe**

OFAC took (or did not take) after it was briefed by the prosecutors and received the prosecution memorandum.

The first category concerns OFAC's determination in 2011 that GX411 did not disclose a violation and did not require further investigation or questioning. *See* USAO 00076-USAO 00081 at USAO 00076 (Ex. K hereto). During trial, the prosecutors and OFAC spoke via telephone but the government provided no recording or other memorialization of that telephone call to the defense. *Id.* at USAO 00078. After trial, Kaveh Miremadi, OFAC Enforcement Section Chief, informed the prosecutors that GX411 did not constitute a self-disclosure of a violation and did not require any response from OFAC, but that it may have been passed on from OFAC Compliance to other OFAC components for their consideration. *See id.* at USAO 00076; *accord* Dkt. 336-14 (response of Leslie Devereaux, former Chief of OFAC's Sanctions Compliance & Evaluation Office that OFAC would contact Commerzbank if further action was required). The prosecutors did not ask why OFAC concluded that GX411 was not a self-disclosure of a violation (a conclusion contrary to their argument at trial, Tr. 1954-55), who at OFAC reached that exculpatory conclusion and when, or which other components of OFAC were notified of the facts in GX411 but chose not to take any action. The prosecutors decided not to inquire about any of these basic facts of OFAC's evaluation of GX411, leaving the defense to seek this material evidence in its motion.

The second category concerns OFAC's determination, after SAUSA Lynch disclosed the entire facts and theory of Sadr's case, that the case did not warrant *any* action by OFAC. In 2016 and 2017, Lynch apprised OFAC's most senior enforcement personnel—the Assistant Director of Enforcement (Dondarski), three Section Chiefs (Jeremy Sausser, Rachel Fiorill, and Rosanna Wells), Senior Advisor for Enforcement Julie Malec, and then-Senior Enforcement Officers Kaveh Miremadi and Alonzo Bell about Sadr's case. He included his PowerPoint presentation that amounted to a prosecution memo, which Dondarski acknowledged, copying Section Chief Rosie Wells and Ethan Walpole "from OFAC enforcement on this email so they can coordinate with you on next steps or follow-up with any questions they have." Dkt. 283-1, at 16. Having acknowledged Lynch's presentation and promised potential "coordinat[ion] with you on next steps or follow-up with any questions," OFAC must have given the matter some consideration or determination. That matter remains undisclosed. But given that OFAC ultimately did nothing, its determination was overwhelmingly both favorable and material to Sadr.

OFAC's determination, and its inaction, is not limited to its decision not to initiate investigation or enforcement against Sadr, Sadr's companies, Sadr's father, any Stratus-affiliated companies, or any of the U.S. banks. OFAC also never added any of the above people or entities to the SDN list—a fact contrary to the government's insinuations based on the fact two Stratus-affiliated entities wholly unrelated to the case were sanctioned, *see* Tr. 79, 1784-90, 1924-26; *see also* Dkt. 339, at 4, 40-41, 61, or that PDVSA was sanctioned also for reasons wholly unrelated to this case. *See* Tr. 1925-26; *but see* Tr. 1795-96. OFAC also never took any action against Hyposwiss—a fact at odds with the government's characterization of Hyposwiss as "the perfect place to set up bank accounts for a fraud scheme." Tr. 1939-40. Sadr is entitled to production of

The Honorable Alison J. Nathan
June 3, 2020
Page 15

**Steptoe**

any OFAC documentation bearing on these determinations to show the conflict with the government's misleading trial narrative.

OFAC need not have conducted a joint investigation or been an "arm of the prosecution" for the prosecution to have a duty to learn of and disclose OFAC's exculpatory information. When the government puts on a narrative like the one it presented here, through an agency witness like Ted Kim, it has the obligation to obtain and disclose contrary evidence that would impeach that account and that witness's testimony. *See* Dkt. 336 at 117. That includes evidence in the hands of the witness's agency. "The government cannot with its right hand say it has nothing while its left hand holds what is of value." *Wood*, 57 F.3d at 737; *see also Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (cited Dkt. 336, at 117) (finding *Brady* violation where State told the jury its key witness was a truthful man, not a liar; a burglar but not an armed robber, while the witness's undisclosed Department of Corrections file showed he had a long history of violent rages, armed robberies, a claimed shootout with police, a strong reputation for dishonesty well beyond that even in the generally dishonest prison environment, and a lifelong pattern of falsely blaming others for his crimes).

The government's obligation to obtain and disclose information impeaching the OFAC narrative it put on through Kim flows not only from *Brady*, but also from the government's duty not to put on a recklessly misleading narrative. *See* Dkt. 336 at 105-107. That is an independent duty, akin to the duty not to suborn perjury, and is an independent basis for a new trial here. *See id.* at 107 (citing *United States v. Wallach*, 935 F.2d 445, 456 (1991)). The government concedes that the Court has broad discretion to order discovery on a new trial motion, *see* Dkt. 345 at 1. This Court should order such discovery on its own authority, whether or not OFAC is technically subject to the government's *Brady* obligation. This is no fishing expedition; Sadr has shown good cause. *See id.* at 1-2 (arguing good cause is required to obtain discovery under the rules governing habeas proceedings, which may apply by analogy). Without disclosure of what OFAC knew and determined, the narrative the government presented about what was important to OFAC and what OFAC was likely to do was at the very least recklessly misleading. *See* Dkt. 336 at 105-07.

If there were a bona fide separation between the U.S. Attorney's Office and OFAC as the government contends, the Court could order the discovery directly from OFAC. If necessary, Sadr will prepare and submit a subpoena to the Court. We submit, however, that would be unnecessary quibbling over form. Given OFAC's close cooperation with the government, "it is not unreasonable to treat the records as being within the Government's control at least to the extent of requiring the Government to request the records on the defendant's behalf." *United States v. Kilroy*, 523 F. Supp. 206, 215 (E.D. Wis. 1981). "It would be unconscionable for [the government], relying on the technical inapplicability of *Brady*, to refuse disclosure of evidence it knows to be exculpatory." *United States v. Gallo*, 653 F. Supp. 320, 329 (E.D.N.Y. 1986).

> 3. **The Court should reject the assertion of "law enforcement privilege" contained in the government's *ex parte* submission**

The Honorable Alison J. Nathan
June 3, 2020
Page 16

**Steptoe**

Finally, the government urges the Court to permit it to withhold an undisclosed witness interview under an asserted "law enforcement privilege." Dkt. 345, at 9. In support, it relies on an *ex parte* submission. While it is difficult for Sadr to argue against a black box, the Court should reject the submission and the assertion of "law enforcement privilege."

"Traditions of fairness that have long been honored in American jurisprudence support the strongest possible presumption against ex parte proceedings." *Brock v. Roadway Express*, 481 U.S. 252, 278 (1987). *Ex parte* communications are disfavored both because they are fundamentally unfair,[8] and because they create the risk of erroneous fact finding.[9] For that reason, the Second Circuit has recognized even in the context of grand jury secrecy that "In camera proceedings ... can only be justified and allowed by compelling state interests." *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977). "Whenever the legal rights of individuals are to be adjudicated, the presumption is against the use of secret proceedings." *Id.*

The government claims that nondisclosure is justified by "the law enforcement privilege," which protects confidential law enforcement tactics or sources. Dkt. 345 at 9-10. Its claim boils down to protecting the confidentiality of a witness and the witness's safety. *Id.* at 10. The Court has heard such claims before. At the final pretrial conference, the government claimed "witness safety" as grounds for not disclosing the identity of its fact witnesses or their Jencks Act materials until one week before trial. Feb. 10, 2020 Tr. at 6-7, 13 (Dkt. 217). The Court ordered disclosure four days earlier than that, and allowed the government the opportunity to make an *ex parte* proffer regarding specific concerns. *See id.* at 13-14. As far as we know, the government made no such proffer, and the Court and defense never (as far as we know) heard the issue of witness safety again. Similarly, while the government indicted Bahram Karimi shortly before trial, at least facially signifying a legitimate ongoing investigation, *see id.* at 9-10, there are reasons an objective observer might conclude that Karimi's indictment was as consistent with an effort to keep him off the stand as with a bona fide effort to prosecute him. *See* Dkt. 336, at 86 n.33.

The Court should closely scrutinize the government's *ex parte* submission and claimed need for secrecy. If, as Sadr respectfully submits is likely, the claimed need for secrecy does not

---

[8] *See In re Taylor*, 567 F.2d 1183, 1187-88 (2d Cir. 1977) ("In camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process," *i.e.*, notice and a hearing); *accord United States v. Microsoft*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) ("Ex parte communications generally are disfavored because they conflict with a fundamental precept of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them.") (citation omitted).

[9] *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Joint Anti-Fascist Refugee Comm'n v. McGrath*, 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring) ("Secrecy is not congenial to truth-seeking.").

The Honorable Alison J. Nathan
June 3, 2020
Page 17



warrant such secrecy, or outweigh Sadr's right to disclosure of exculpatory information, the
Court should order disclosure.

4.     **The Court should order production of all five categories of documents
sought in Sadr's motion**

In response to this Court's May 22, 2020 order, the government, after consulting with the
defense, has agreed to produce three of the five categories of documents sought by Sadr by
June 5, 2020.  *See* Dkt. 343, at 1.  This welcome development eliminates the need for the Court
to consider and rule on any dispute as to the justification for those requests.

Until production is complete, however, the government's concession does not moot the
issue.  As the Court well knows, the government's assurances about the completeness of its
productions in this case have often fallen short.  Apart from its mid-trial assurances that it had
searched its files exhaustively, and independently reviewed the Commerzbank investigation file,
to make sure that everything relevant to the defense had been turned over (Tr. 376-79; Dkt. 283;
*but see* Dkt. 336, at 50-51, 66-69; Dkt. 341, at 7-9), or that it had turned over all notes and
materials relating to all prior interviews of Bahram Karimi (Tr. 1359-60; *but see* Dkt. 341, at 2-
7), even some of the government's post-trial assurances about the completeness of its post-trial
productions have continued to be subject to revision.

For instance, after revealing the existence of classified evidence for the first time after
trial (in response to the defense's post-trial request), *see* Dkt. 336, at 112-13; Dkt. 341, at 4, the
government assured the defense at the beginning of a May 25, 2020 meet-and-confer
teleconference that all classified materials in the possession of DANY, the FBI, or SDNY had
been declassified and produced.  The next day, the government disclosed that there were
additional classified files that would not be declassified, and asked whether any of the defense
lawyers had the clearance required to review classified documents.  *See* Dkt. 343, at 3.
Likewise, in the May 25, 2020 meet-and-confer teleconference, the government represented to
the defense that all witness interview memoranda had been produced.  Yet the government's
letter to the Court the next day disclosed the existence of an additional witness memorandum,
which the government seeks to avoid producing to the defense.  *See* Dkt. 343, at 2; *see also*
Dkt. 345, at 9-10.

To ensure full compliance, and to give Sadr the basis for a remedy if the government's
current productions again fall short, this Court should order the government to make complete
production of all five categories of documents sought in Sadr's motion.  *See* Dkt. 340; Dkt. 336,
at 112-19.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP



The Honorable Alison J. Nathan
June 3, 2020
Page 18

> 1114 Avenue of the Americas
> New York, NY 10036
> Tel: (212) 506-3900
> Fax: (212) 506-3950
> rweingarten@steptoe.com
>
> Brian M. Heberlig (*Pro Hac Vice*)
> Bruce C. Bishop (*Pro Hac Vice*)
> David M. Fragale
> Nicholas P. Silverman (*Pro Hac Vice*)
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue, N.W.
> Washington, DC 20036
> Tel: (202) 429-3000
> Fax: (202) 429-3902
> bheberlig@steptoe.com
>
> *Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:     Counsel of Record (via ECF)