Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

July 3, 2020

By ECF

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

      Re:    *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

      We are surprised and disappointed by the revelations in the government's letter of July 2, 2020 (Dkt. 354). We are nearly as surprised and disappointed at some of the positions taken by the U.S. Attorney's Office's "Criminal Discovery Coordinator and Professional Responsibility Officer" to minimize, deflect, and deny, avoiding any acknowledgment or acceptance of responsibility for the government's obvious, repeated failures and its notable lack of candor. These new revelations fully justify the relief sought by Sadr. We respectfully request that the Court enter forthwith Sadr's proposed order (Dkt. 349-2) granting a new trial, stating that the "verdict is vacated, and has no legal effect," and dismissing this case with prejudice.

      We identify a few of the most egregious examples:

      1.  The government reveals that when AUSA Lake realized in the middle of trial that GX 411 had not been disclosed to the defense, and AUSA Kim proposed disclosing it immediately, AUSA Lake responded, "i'm wondering if we should wait until tomorrow and bury it in some other documents"—to which AUSA Kim replied, "that's fine too." Ltr. at 11. That is exactly what they did. *See* Ltr. at 12-13 (reproducing Dkt. 280-1, at 4-5). A prosecutor's directive to "bury" a previously undisclosed document can only be viewed as an intentional effort to conceal a known violation of at least Rule 16, if not *Brady*.

      The defense of this action, by the U.S. Attorney's Office's lead officer in charge of criminal discovery and professional responsibility, is stunning. After "scrutiniz[ing] the production of GX 411 ... closely," Ltr. at 11, the government claims that "this transmission of GX 411, together with 14 other documents (mostly duplicates of 3500 material or revisions of exhibits)" was *not* "a burial," *id.* at 13, because the disguised disclosure was prompt: "the

document, which was in fact produced less than 24 hours later, was not buried." *Id.* at 11.  This is doublespeak, pure and simple.  AUSA Lake never proposed that the government *not* disclose the document.  Rather, she proposed to "bury it" by hiding it in plain sight, among a raft of innocuous documents—a suggestion to which AUSA Kim readily agreed, even recommending the other documents within which to bury it ("some of the FATF stuff").  *Id.*  The office's reluctance to condemn these prosecutors for what it deems a "Friday night lapse in thinking" is hard to see as anything other than covering for their own.  *Id.*  This action was a calculated effort to slide the disclosure failure past the defense, in the hope that "if the Government did not make a big deal about the document," the defense might not object (or notice).  *Id.* at 12.

This is a textbook example of bad faith.  *Contra* Ltr. at 1.  The bad faith was not limited to AUSAs Lake and Kim.  After this Court demanded explanation, AUSA Lake drafted a response that (to her credit) directly and candidly answered the Court's question: "The Government did not specifically identify that GX 411 had not previously been produced in discovery."  Ltr. at 14.  AUSA Krouse and Section Chiefs Crowley and Bove then revised that specific sentence, taking it from accurate to inaccurate.  *See* Ltr. at 15.  Their revision—"The Government made clear that GX 411 was a newly marked exhibit" (*id.*)—was both nonresponsive to the Court's order (Dkt. 290), and patently wrong.  *Compare* Ltr. at 12 (quoting AUSA Lake's 4:04 p.m. email).  In this Court's words, "That was false."  Tr. 991; *see also* Tr. 993-95.

On March 9, 2020, Section Chief Bove told this Court that he and Section Chief Crowley both "reviewed that letter in realtime before it was filed," and approved that specific language.  Tr. 997.  Four months later, "[r]ecollections [now] diverge."  Ltr. at 15.  AUSA Krouse "recalls opening AUSA Lake's draft during [a call with Chiefs Bove and Crowley immediately prior to filing] and making changes that he understood to reflect the input he was receiving from the unit chiefs."  *Id.*  That recollection is supported by AUSA Krouse's contemporaneous email: "They called me with some changes.  I made them and filed."  *Id.*  The unit chiefs, however, now "have advised that they did not request these changes," though they may have missed them over the phone, *id.*, and that "it was not until after this inquiry had begun that they realized the letter that had been filed differed from the draft that AUSA Lake had prepared."  *Id.*  The chiefs' new version of events is difficult to square with Section Chief Bove's contemporaneous representations to the Court.  Tr. 997.  The bottom line is that the revisions by AUSA Krouse and his supervisors took AUSA Lake's precise, accurate answer to the Court's question and replaced it with a statement they knew to be untrue, rendering the letter "false."  Tr. 991.

The government's explanation to the Court focuses exclusively on who made the changes to the letter, and chalks up the letter's misleading statement (euphemistically described as "the shortcomings of the letter") to a rushed review process that it now claims "was a last-minute effort Sunday night to get things right."  Ltr. at 15.  Tellingly, however, the government offers no analysis or explanation of why the letter was substantively changed to make a true statement false—a change that makes it difficult to credit the government's conclusion that "we do not see any indication of any intent to mislead the Court here."  *Id.*

All of this explanation—especially all three AUSAs' collective decision to "bury" GX 411 in a pile of innocuous documents—is precisely what the Court asked for on Sunday, March 8. *See* Dkt. 290. The government does not explain why this explanation is coming now, not then. These new revelations at a minimum reveal a lack of candor with the Court on March 8 and 9.

2. The government doubles and triples down on its contention that the prosecutors always believed GX 411 was 100% inculpatory, never thinking for a moment it had any exculpatory value. Ltr. at 8, 10, 11, 13; *see also* Tr. 981-86, 991-92. That core assertion is essential to the government's asserted belief that none of its attorneys "acted in bad faith or intentionally withheld exculpatory information." Ltr. at 1.

More than a month ago, Sadr pointed out that SAUSA Lynch's previously undisclosed emails to all three AUSAs on January 31 and February 1, 2020 call that claim into serious doubt. *See* Dkt. 341, at 8-9. Lynch notified the rest of the trial team that Commerzbank's so-called "voluntary disclosure with OFAC"—GX 411—was an "asterisk" that the prosecutors should "discuss how we would want to handle," to decide "whether it's worth having the Commerz witness go into that." *Id.* at 8. Lynch's reticence to have a Commerzbank witness disclose what became GX 411 reflected obvious awareness that such disclosure could undercut the government's case. *See id.* at 8-9. It also strongly suggests that all members of the trial team knew on February 1 that that document had not been disclosed to the defense, in tension with the government's March 9 statement that AUSA Lake discovered the nondisclosure on March 6. *See* Dkt. 283, at 5.

Three weeks ago, this Court ordered the government to address whether these disclosures, made the night of May 21, 2020, "cast doubt on any representations made to the Court, including in the March 9, 2020 letter, about the prosecution team's awareness of the contents of GX 411[.]" Dkt. 350, at 3 (Question 5). Despite quoting the Court's question (Ltr. at 8), the government fails to answer it or to address the obvious implications of the January 31 and February 1, 2020 e-mails. *See* Ltr. at 8-13.

3. Though it acknowledges that SAUSA Lynch's actions and omissions are imputed to the government, Ltr. at 2 n.2, the government continues to distance itself from SAUSA Lynch, stating again and again that the AUSAs did not know of suppressed items like the Karimi FD-1057, *id.* at 5; the existence of classified discovery, *id.* at 5, 16; or full information about how DANY conducted the electronic search and seizures, *id.* at 6-7, 16.

A principal example is the government's statement that "[t]here was no delay in disclosing Karimi interview material in the possession of the prosecutors" (Ltr. at 5)—meaning, the AUSAs. The government does not mention SAUSA Lynch's possession of his own contemporaneous email recounting Karimi's "firm[] belie[f] he and others did nothing wrong," Dkt. 341, at 5, or Lynch's knowledge of the undisclosed Karimi FD-1057, which the government claims "the prosecutors" learned of for the first time when AUSA Krouse found it in the FBI's files in mid-May 2020. Likewise, when addressing the government's failure to identify GX 411

to the defense as a newly produced document, the government claims that there was nothing to suggest "to the trial AUSAs" that the document came from "some other, forgotten and rediscovered, set of Commerzbank documents," Ltr. at 9, even though SAUSA Lynch clearly knew the document's provenance.  The government tries to further distance itself from SAUSA Lynch by suggesting that Lynch fabricated a recent recollection that he told AUSA Lake in January 2020 "'how and from where' the Commerzbank OFAC disclosure had been obtained." *Id.* at 10 n.6.

This Court has already firmly rejected the notion that SAUSA Lynch was not a full member of the prosecution team.  *See* Tr. 977-78, 1004.  His knowledge and actions count.  *See* Tr. 1287.  Yet despite a footnote paying lip service (Ltr. at 2 n.2), the government continues to shirk responsibility for SAUSA Lynch's silence while his colleagues denied the existence of evidence that he knew of but did not disclose.  *See id.* at 5, 16 (discussing Karimi interviews, classified information, and suppression matters); *id.* at 10 n.6.  Virtually all of the government's claims that no evidence was intentionally withheld unravel when SAUSA Lynch is considered, as he must be, as part of the prosecution team.

4.  The government reveals that all four prosecutors knew the contents of PDVSA CFO Victor Aular's FBI interviews well before trial, and considered whether they should be disclosed under *Brady*.  Ltr. at 4.  But the government's page-long discussion of those interviews (*id.* at 3-4) omits the most important statement in them: Aular's emphatic insistence that he and PDVSA had done nothing wrong.  *See* Dkt. 336, at 50, 65-66 (discussing Dkt. 305-1).  Evidence that this essential actor in the Venezuela Project payment chain thought the charged payment transfers were not prohibited is obviously exculpatory because it confirms the reasonableness of Sadr's belief that this conduct did not violate U.S. sanctions—and counters the government's argument to the jury that Sadr's defense was "absurd."  *See* Dkt. 336, at 77-78, 92-95.  This exculpatory value was hardly "attenuated" (Ltr. at 4) or unknown to the government—Sadr explained it in his September 2018 request for precisely this type of information.  *See* Dkt. 336, at 54 (quoting Dkt. 92-1, at 6, ¶¶ IV.3-4).  Nor did it depend on Sadr's knowledge of Aular's belief, as the government rationalizes (Ltr. at 4).

The government's letter confirms that this evidence was intentionally withheld.  The government reveals an email exchange among the three AUSAs more than a month before trial in which one AUSA asked if these witness statements were "Brady we need to disclose," and another AUSA responded that his question "could be worth running by a chief."  Ltr. at 4.  Yet the prosecutors "did not further pursue the question," and the plainly exculpatory evidence was suppressed.  As the government now concedes, that decision prevented Sadr from using the information to investigate and develop other evidence for trial, or from addressing the admissibility of Aular's statements with the Court.  *Id.*  That the prosecutors had to ask themselves if the evidence was *Brady* and come up with excuses about potential inadmissibility to avoid disclosure, reveals that the evidence should have been disclosed and confirms its suppression was intentional.

The Honorable Alison J. Nathan
July 3, 2020
Page 5

**Steptoe**

     5.   The government states that after the *Pizarro* hearing in 2018, the U.S. Attorney's Office implemented a revised new Discovery and Disclosure Policy stressing "[b]road, early disclosure," which "has led, among other things, ... to earlier disclosure of witness statements (including non-testifying witnesses)." Ltr. at 17. That statement, while laudable in theory, cannot be squared in practice with the government's effort in this case to disclose its fact witnesses and 3500 material one week before trial, and its stark representation that "it is standard practice in our office to do it that way." Dkt. 217, at 6.

     6.   The government minimizes its disclosure violations related to classified evidence, and remarkably defends AUSA Laroche's statement to the Court that there would be no classified discovery or CIPA litigation by claiming that AUSA Laroche's "evaluation has in fact proven to be correct." Ltr. at 16. To be clear: the only reason there was no classified discovery or CIPA litigation is that the government improperly failed to disclose exculpatory evidence located in "classified" materials prior to trial. The government's explanation of AUSA Laroche's search for exculpatory evidence in classified materials is dense and difficult to follow. *See id.* at 5. It discusses a "prudential search" for classified evidence in the hands of other government agencies, without addressing how AUSA Laroche failed to obtain the FD-1057 from the agency that actually held it: the FBI. *See id.* (explaining that is where AUSA Krouse found it in mid-May 2020). Nor does the government address the dubious reason why this exculpatory statement by Karimi was segregated and classified in the first place. *See* Dkt. 341, at 2-3 & n.2. Given the existence of the classified FD-1057 in the FBI's files that the government now concedes it was obligated to disclose, Ltr. at 5, AUSA Laroche's statement at the May 16, 2018 status conference was an active suppression of material exculpatory evidence. *See* Dkt. 341, at 1-7; *Kyles v. Whitley*, 514 U.S. 419, 437-39 (1995). Though it may have been unwitting on the part of AUSA Laroche, it was known to SAUSA Lynch, who stood silently by.

     7.   Finally, and most significantly, the government acknowledges that it made misrepresentations about the execution of the email search warrants, and all but concedes that the email evidence would have been suppressed had the government told Sadr and the Court the truth. The government reveals that "early on in the DANY investigation" the FBI directed DANY personnel to run searches in the email search warrant returns to further the FBI's "investigat[ion of] federal crimes rather than the state-law offenses at issue in the warrants, contrary to arguments we made during suppression litigation." Ltr. at 6. The government further acknowledges that the post-trial disclosures show "that the FBI was seeking to use material gathered in response to the state email search warrants in aid of FBI interviews, and to further investigation of federal charges." *Id.* at 7. The government states that the post-trial disclosures give rise to "a substantial risk that essential email evidence would be suppressed" if the government proceeded against Karimi, *id.*—a concession demonstrating that had the government disclosed the true facts to Sadr, the email evidence would have been suppressed, and the trial would have been avoided altogether.

     The government avoids any detail about these damning post-trial disclosures, and acknowledges that "we cannot discount the possibility that additional information supporting a motion to suppress might be identified" if the government continued to look. Ltr. at 7. The

government also states that if the suppression issues were further litigated, "FBI involvement during the state responsiveness review would have to be carefully investigated in order to provide the Court with a thorough new statement of the circumstances of the searches." *Id.* at 16. This begs the question, nowhere explained by the government, why the prosecutors did not conduct a thorough review of the circumstances of the responsiveness review before they categorically defended DANY's conduct to this Court during the suppression litigation and zealously (successfully) fought Sadr's requests for discovery, contemporaneous evidence, declarations, and an evidentiary hearing to challenge the government's unsworn and shifting representations about what happened.

Two examples from the post-trial disclosures, not addressed in the government's letter, reveal conclusively that DANY routinely shared the raw, unfiltered state search warrant returns with the FBI to advance its investigation of federal crimes, and that DANY and the FBI were treating the entirety of the search warrant returns as fair game upon receipt, contrary to the government's position during the suppression litigation and to specific representations to the defense.

First, on October 30, 2015, FBI Special Agent Ben Denk asked then-ADA Lynch and his colleagues: "Also, would it be possible to get a copy of the most recent round of email search warrant returns?" An ADA immediately responded, "Hi, Yes, of course. Matt, can you please take care of getting Ben the most recent results. I believe there should be at least three returns already." USAO_001318 (attached as Exhibit A). This exchange shows that DANY was sharing entire unfiltered search warrant returns with the FBI, with no mention of any responsiveness review, or any limitation to evidence responsive or pertinent to the state law offenses in the warrants.

Second, on May 6, 2016, a DANY employee emailed Special Agent Denk, copying ADA Lynch and others: "As requested, I am emailing you the latest search warrant data we received from Google for Hossein Tehrani and Farshid Kazerani." USAO_001234 (attached as Exhibit B). DANY appears to have shared the entire raw returns for those warrants: the email states, "Due to size constraints, I am only able to attach the account and subscriber info," a total of nine attached files, and continues, "The MBOX files, which have the actual email content, will be copied to a CD or USB," which will be hand-delivered. *Id.*

The government claims not to have identified a "specific" misrepresentation to the Court on the suppression issues, but essentially concedes that it made misrepresentations in (1) its "theme" that DANY's responsiveness review focused on state law offenses, and (2) its specific representations to the defense that the search warrant returns were reviewed by DANY and only "hot documents" were provided to the U.S. Attorney's Office. *See* Ltr. at 16. The government tries to evade responsibility by blaming SAUSA Lynch for these misrepresentations, *id.*, even though the whole prosecution team litigated the suppression issues and bore a responsibility to learn the truth before making representations to the Court. The government's entire discussion of the suppression issues minimizes the scope of the egregious wrongdoing by the government—in DANY's fatally flawed execution of the warrants, in the FBI's improper access of these state



The Honorable Alison J. Nathan
July 3, 2020
Page 7

law warrant returns to investigate federal crimes, and in the prosecution's false narrative to the Court to save the search warrant returns from suppression.  Had the government told the truth about these matters, the Court would have suppressed the entire search warrant returns and Sadr's trial would have been avoided.

      Now that the government's submission is in, Sadr respectfully requests that the Court enter forthwith his proposed order granting a new trial, stating that the "verdict is vacated, and has no legal effect," and dismissing the case with prejudice.  This proposed relief is amply justified by the government's misconduct and disclosures in the July 2 letter.

                        Respectfully submitted,

                        */s/ Brian M. Heberlig*
                        Reid H. Weingarten
                        STEPTOE & JOHNSON LLP
                        1114 Avenue of the Americas
                        New York, NY 10036
                        Tel: (212) 506-3900
                        Fax: (212) 506-3950
                        rweingarten@steptoe.com

                        Brian M. Heberlig (*Pro Hac Vice*)
                        Bruce C. Bishop (*Pro Hac Vice*)
                        David M. Fragale
                        Nicholas P. Silverman (*Pro Hac Vice*)
                        STEPTOE & JOHNSON LLP
                        1330 Connecticut Avenue, N.W.
                        Washington, DC 20036
                        Tel: (202) 429-3000
                        Fax: (202) 429-3902
                        bheberlig@steptoe.com

                        *Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:      Counsel of Record (via ECF)