

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 30, 2020

**BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States v. Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

    The Government respectfully submits this letter pursuant to the Court's Opinion and Order of September 16, 2020 (the "September Order"), which provided this Office's executive leadership an opportunity to address "why no further proceeding for additional fact-finding or credibility determinations is necessary." (Dkt. 379 at 33). We respectfully submit that no further proceeding is necessary. This Office is responsible for substantial failures in this case, which have been the subject of deserved scrutiny by the Court, the defendant, and the public. As discussed below, such issues require an institutional response, and remedying them has been and continues to be the focus of significant executive leadership attention. However, the six prosecutors' declarations (the "Declarations"[1]) and exhibits show that no one intentionally withheld exculpatory evidence or misled the Court. No additional fact-finding or credibility determinations are necessary to reach that conclusion.

    **No Government Lawyer Intentionally Withheld Exculpatory Evidence.** The Court sought the Declarations from Unit Chiefs, AUSAs, and the SAUSA in order to assess whether anyone had "acted in bad faith by knowingly withholding exculpatory material from the defense." (Dkt. 379 at 31). The Declarations and supporting documents are clear: No Government lawyer recognized GX 411's exculpatory value before producing it. The Declarations and exhibits uniformly reflect the case team's belief that they had failed to timely produce an exhibit that was *helpful* to the prosecution's case—as well as their confusion when the defense first identified it as *Brady*.[2] (*See, e.g.*, Kim Decl. ¶¶ 29(e), 32, 34, Exs. 34, 36, 47-48; Krouse Decl. ¶¶ 21, 23, 35; Lake Decl. ¶¶ 18, 27, 31; Lynch Decl. ¶ 10). The case team's immediate, real-time reactions to defense

---

[1] The executive staff played no role in drafting the Declarations or selecting their exhibits and did not see them until after they were filed.

[2] The Unit Chiefs did not learn of GX 411 until after the trial team had produced it, and the defense had asserted that it was *Brady*. (*See, e.g.*, Bove Decl. ¶¶ 6-8; Crowley Decl. ¶ 2(a)).

The Honorable Alison J. Nathan  Page 2
October 30, 2020

counsel's *Brady* assertion, in both internal communications and correspondence with defense counsel, reinforce the conclusion that the case team did not perceive GX 411's usefulness to the defense until the defense spelled out their arguments. (*See, e.g.*, Kim Decl. Exs. 33, 116-17; Krouse Decl. ¶ 46, Ex. 36; Lake Decl. ¶ 27).

That prosecutors missed GX 411's exculpatory features requires institutional attention by this Office. So, too, do the oversights that prevented the document's timely identification and production as Rule 16 discovery. (*See* Dkt. 379 at 14-25; Dkt. 354 at 7-15). Such failures fall well short of the high standard to which the Court rightly holds this Office—and which every defendant should expect us to meet. As discussed below, we are in the process of addressing these challenges. However, based on the facts set forth in the Declarations and supporting exhibits, we respectfully submit that an evidentiary hearing on this issue is unnecessary.

**No Government Lawyer Intentionally Misled the Court**. The Court also sought Declarations to better understand the process by which the Government drafted its 10:00 p.m. letter on March 8, 2020 (the "March 8 Letter") and "determine whether any of the prosecutors intentionally misled the Court." (Dkt. 379 at 31). Although the Declarations and supporting exhibits exhaust the AUSAs' recollections and the contemporaneous documentary record, they concededly do not fully illuminate how the March 8 Letter was edited. But they do shed enough light on that issue to show that no one intentionally misled the Court.

As reflected in the Declarations, the Court circulated its order seeking more information about GX 411's production at 9:05 p.m. (*E.g.*, Krouse Decl. Ex. 65). After receiving the Order, AUSA Lake drafted a response that, among other things, included a sentence that stated that the Government had failed to alert defense counsel that GX 411 had not previously been produced.[3] (*see* Lake Decl. ¶ 40; Krouse Decl. ¶ 85, Ex. 67). AUSA Lake circulated that draft response to AUSA Kim, AUSA Krouse, and SAUSA Lynch. (*Id.*) In the minutes before and after she circulated her draft to the trial team, AUSA Lake, who was seriously ill, alerted her colleagues and supervisors that she had to leave. (Lake Decl. ¶ 40; Krouse Decl. ¶ 86; *see* Crowley Decl. ¶ 18, Ex. 25).

AUSA Krouse did not realize, until approximately ten minutes before the filing deadline, that AUSA Lake had not copied the Unit Chiefs on her email circulating the draft. (Krouse Decl. ¶¶ 88-89, Ex. 70). At 9:49 p.m., he sent the draft letter to the Unit Chiefs. (Krouse Decl. Ex. 70; Crowley Decl. Ex. 28). Approximately two minutes later, Chiefs Bove and Crowley spoke briefly to each other before conferencing in AUSA Krouse for a conversation that lasted less than one minute. (Crowley Decl. Exs. 24, 30 (phone records)). A few minutes later, AUSA Krouse filed an edited version of AUSA Lake's draft, which replaced her accurate language with the inaccurate statement that the Government had "made clear" that GX 411 "was a newly marked exhibit." (Krouse Decl. ¶ 90). He then emailed AUSA Kim "they [the Unit Chiefs] called me with some changes. I made them and filed." (Krouse Decl. ¶ 92, Ex. 71).

---

[3] As the Declarations and supporting documents reflect, neither AUSA Kim nor the SAUSA participated in drafting or editing the letter. (*E.g.*, Kim Decl. ¶ 7; Lynch Decl. ¶ 11).

The Honorable Alison J. Nathan                                                                                       Page 3
October 30, 2020

AUSA Krouse, Chief Bove, and Chief Crowley are each unequivocal that they did not purposefully mislead the Court or direct anyone else to do so. (Bove Decl. ¶¶ 44-46; Crowley Decl. ¶¶ 2(e), 22; *see* Krouse Decl. ¶ 91). The Declarations do not conclusively resolve how the March 8 Letter was edited. However, they illustrate several points that are consistent with each AUSA's account and support the conclusion that no one intentionally misled the Court:

First, AUSA Krouse and the Unit Chiefs had only approximately ten minutes between when they first read the March 8 letter draft and when it was filed.

Second, before those ten minutes, neither the Unit Chiefs nor AUSA Krouse had focused on what became the March 8 Letter's key issue, that is, the deficiencies in the transmittal email producing GX 411 (the "Transmittal Email"). When they received the draft letter, Unit Chiefs Bove and Crowley were still collecting information about GX 411 and the circumstances of its identification and production.[4] That night, they were, among other things, trying to address the immediate logistical challenges AUSA Lake's illness presented for the next trial day, and navigating additional issues GX 411 presented (as described below). (*See, e.g.*, Bove Decl. ¶¶ 13-19, 26, 28, Exs. 16, 18; Crowley Decl. ¶¶ 14-15 24, Exs. 9, 16-17). For his part, AUSA Krouse had not drafted the Transmittal Email, thought until at least 9:30 p.m. that AUSA Lake would be handling the filing, believed that the Unit Chiefs were reviewing her draft until he realized that they had not received it and forwarded it to them shortly before the deadline, and was working on other issues in the interim. (*See* Krouse Decl. ¶¶ 30, 83-89, Ex. 70).

Third, and most importantly, the Unit Chiefs and AUSA Krouse's actions before and after the March 8 Letter's filing are inconsistent with an intent to mislead the Court. In the hours after learning of GX 411, the Unit Chiefs met with the trial team, sought more information about GX 411, reported the issue to Office leadership, and directed the trial team to get answers from OFAC regarding any actions associated with GX 411 and scour their files for any additional materials subject to disclosure. (Bove Decl. ¶¶ 13-19, Exs. 16, 18; Crowley Decl. ¶¶ 14-15, 24). In advance of the next morning's conference the Unit Chiefs highlighted the March 8 Letter's deficiency to the team, and they and AUSA Krouse agreed that the Government should take responsibility for its error. (Bove Decl. Ex. 35; Crowley Decl. Ex. 40; Krouse Decl. Ex. 83). At the next morning's conference, AUSA Krouse and Chief Bove each acknowledged and apologized for the letter's shortcomings. (Tr. 995, 997) ("I apologize for the imprecision of the language"; "[T]he language should have been more precise . . . and you pointed out exactly why, and it was an error. . . I don't think there's much more for us to do on that point other than to apologize for that error."). Chief Bove also assured the Court that these issues would receive the Unit Chiefs' and the Office's continued attention. (Tr. 996). These and other actions by the Unit Chiefs and AUSA Krouse reflect their intent to address the errors that had occurred in this case and ensure the transparency to which the defendant, the Court, and the public are entitled.

---

[4] They only received a copy of the Transmittal Email at 9:41 p.m. (Bove Decl. Ex 21). Chief Crowley was unable to open that email until after the filing deadline. (*See* Crowley Decl. ¶¶ 19, 26, Ex. 22, at 3).

The Honorable Alison J. Nathan                                                                                                    Page 4
October 30, 2020

      Over the days and weeks that followed, continued attention by the Unit Chiefs, AUSA Krouse, and other members of the trial team yielded greater clarity on disclosure issues that had surfaced at trial, as well as additional materials subject to disclosure that the case team identified and produced to defense counsel. (*See, e.g.*, Bove Decl. ¶ 4; Crowley Decl. ¶¶ 3, 43-44; Krouse Decl. ¶¶ 141(b)-(c)). The fruits of this process informed this Office's determination that continued prosecution of this case would not be in the interest of justice and this Court's conclusion that additional inquiry was required. (*See generally* Dkt. 379; *see also* Dkt. 354 at 6-7). The Unit Chiefs' and trial team's work to surface these issues for the defendant and the Court helped further reveal the errors that marred the defendant's trial.

      To be clear, the belated disclosure of materials that the Government should have identified and produced well in advance of trial is not a point of pride for this Office or anyone involved in this case. Nor do the rushed timing and circumstances of the March 8 Letter's editing excuse the provision of inaccurate information to the Court. However, all of these factors contextualize that flawed letter's drafting, editing, and filing, and support the good faith of everyone involved with that process. The Government respectfully submits that the Declarations reflect the sum-total of the AUSAs' recollections and all associated contemporaneous records. A hearing will not bring greater clarity to the ten minutes during which the letter was edited than those materials have already provided. The existing record shows that no one intentionally misled the Court.

      We respectfully submit that a sanctions hearing for any of the involved attorneys is neither necessary nor warranted.

\*    \*    \*

      For an Office and a Department entrusted with the enforcement of the criminal laws, the absence of intentional wrongdoing by prosecutors cannot be the end of the analysis. Executive leadership has been engaged in a process to identify the root causes of the failures in this case and institute appropriate changes to the functioning of the Office. This began with the post-trial review of issues in this case and continued this past summer when we conducted additional disclosure training for all AUSAs and SAUSAs. (*See* Dkt. 354 at 18). In recent months, I and the Office's executive staff have sought information and input from supervisors across the Criminal Division and, through them, from the line assistants throughout our Office to help diagnose and address the problems in this case and others, and to identify, among other things, deficiencies in infrastructure that detract from our capabilities in this area. These efforts benefitted from our careful reading of the September Order.

      As our review process moves forward, we are planning for improvements to our policies, staffing, training, and technology. Some of these we can execute in the short term. Others will take

The Honorable Alison J. Nathan                                                                                                   Page 5
October 30, 2020

more time. The nature of our duties requires that we remain vigilant to prevent problems like these and strive to address them when they occur. We are committed to doing so.

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    Acting United States Attorney

by: _____
      JOHN M. McENANY
      Associate United States Attorney
      (212) 637-2571