UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALI SADR HASHEMI NEJAD,

Defendant.

DECLARATION

18 Cr. 224 (AJN)

I, EMIL J. BOVE III, pursuant to Title 28, United States Code, Section 1746, declare under penalty of perjury:

1) I am an attorney admitted to the bar of the State of New York and the bar of this Court. I respectfully submit this declaration in response to the Court's September 16, 2020 Order. That Order requested, among other things, information concerning my awareness of and involvement in disclosure issues relating to a document marked GX 411 at the trial in this matter, which took place between March 2 and March 16, 2020. (*See* Dkt. No. 379 at 32).

2) I have been an Assistant United States Attorney at the U.S. Attorney's Office for the Southern District of New York since October 1, 2012. Since September 19, 2019, Shawn G. Crowley and I have been Co-Chiefs of the Office's Terrorism and International Narcotics Unit (the "Unit"). Prior to becoming a Co-Chief of the Unit, I served as a line prosecutor in the Unit for approximately five years beginning on July 30, 2014.

3) As one of the two Co-Chiefs of the Unit, I share responsibility for overseeing investigations and prosecutions by prosecutors in the Unit, including the investigation and prosecution of this matter, which was handled by AUSAs assigned to the Unit and by a prosecutor from the Manhattan District Attorney's Office cross-designated as a Special Assistant United States Attorney for purposes of the case. My oversight responsibilities include providing guidance

to prosecutors regarding discovery and disclosure issues, helping to train prosecutors, and fostering a culture that prioritizes ethical conduct and candor to the Court and to adversaries.  As a Unit chief, I necessarily share responsibility for any failures in this regard, and for remediating those failures.

4)  On March 9, 2020, I committed to the Court that Co-Chief Crowley and I would undertake efforts to address the discovery and disclosure issues in this matter.  (Tr. 996).  These steps have included the following:

a)  Overseeing the post-trial discovery diligence that led to additional disclosures to the defense and to the decision to seek dismissal of Indictments in this case;

b)  Discussing this case with each AUSA in the Unit, individually and as a group;

c)  Talking to each AUSA in the Unit about other assigned cases and investigations in order to evaluate and identify any other staffing, resource, discovery, or disclosure issues;

d)  Participating in a training session with members of the Unit regarding disclosure issues, which included a segment conducted by a member of the Office's Disclosure Committee as well as a segment that was specific to the Unit's work, such as classified information handling, the Classified Information Procedures Act, and prudential searches involving reviewing case files and related holdings at other agencies for potentially discoverable information; and

e)  Discussing with the executive staff of the Office issues related to Office policy, training, staffing, and technological support, based in part on our findings from the foregoing post-trial diligence, review, and training activities, as part of the effort to address the concerns identified in the Court's September 16, 2020 Order.

5)  My answers to the Court's questions, as set forth more fully below, are as follows:

a)  I first learned of the existence of GX 411 during a telephone call with AUSA Stephanie Lake at approximately 10:08 p.m. on March 7, 2020, after the trial team had disclosed the document to defense counsel that afternoon.  *See infra* Section I.

b)  Prior to the night of March 7, I had no knowledge that GX 411 existed or was in the Government's possession, and therefore was unaware that GX 411 had not previously been disclosed to the defense.  *See infra* Section II.

c)  I do not recall any communications regarding GX 411 or its disclosure prior to the communication described in paragraph 5(a) above.  *See infra* Section III.

d)  I do not recall seeing the contents of GX 411 until the afternoon of March 8, 2020.  Around the time that I first saw the document that afternoon, I recognized that there were exculpatory aspects to the document.  *See infra* Section IV.

e)  I did not draft the Government's March 8, 2020 10:00 p.m. letter.  (Dkt. No. 277).  AUSA Michael Krouse emailed me a draft of the letter at approximately 9:49 p.m., and I subsequently discussed the draft with Co-Chief Crowley and AUSA Krouse during a conference call that lasted approximately one minute and ended at approximately 9:53 p.m.  I did not delete, or authorize the deletion of, the sentence in the 9:49 p.m. draft of the letter that stated, "The Government did not specifically identify that GX 411 had not previously been produced in discovery."  I did not draft, or propose, the phrase in the filed version of the letter that stated, "The Government made clear that GX 411 was a newly marked exhibit. . . ."   *See infra* Section V.

f)  When I addressed the Court on the morning of March 9, 2020, I had not yet realized that the accurate and responsive sentence from the 9:49 p.m. draft that I reviewed the night before had been removed from the filed version of the letter.  I identified this modification to the

3

9:49 p.m. draft on or about June 9, 2020, the day on which the Court issued an Order containing questions related to disclosure issues in the case. (*See* Dkt. No. 350). I reported this information to Associate United States Attorney John McEnany on the day I identified the change. *See infra* Section VI.

**I.    When did you first learn of GX 411?**

6)  I first learned of the existence of GX 411 during a telephone call with AUSA Lake on the night of Saturday, March 7, 2020. According to telephone records obtained by the Office and which I have reviewed, my call with AUSA Lake occurred at approximately 10:08 p.m. that night, and lasted approximately nine minutes. I described the call to Co-Chief Crowley in text messages sent after the call concluded. (*See* Ex. 1). I believe that the primary focus of the call was issues related to a letter that the trial team was drafting and ultimately filed at docket entry 272, and I do not recall having a thorough discussion of the substance of GX 411 with AUSA Lake that night. According to my text messages with Co-Chief Crowley, AUSA Lake informed me, consistent with subsequently filed email correspondence (*see* Dkt. No. 280-1 at 3), that the trial team "can't understand how it's exculpatory" and defense counsel had responded that "it was 'self evident' why." (Ex. 1). Consistent with guidance that Co-Chief Crowley and I had provided to the trial team on discovery and disclosure issues dating back to at least approximately October 2019 (*see, e.g.*, Dkt. Nos. 144, 153, 163, 168), I expected that we would further discuss the issue as a group the following day.

**II.   When did you first realize that GX 411 had not been disclosed to the defense? Why did you not immediately disclose the document at that time?**

7)  It is my understanding that the trial team disclosed GX 411 to the defense, via email, at approximately 4:04 p.m. on March 7, 2020. I first became aware of the existence of the

document, as described above, in a conversation with AUSA Lake later that night.  Prior to that conversation, I had no knowledge that the document existed or was in the Government's possession, and therefore no knowledge that the document was subject to disclosure and had not been turned over.

**III.    What specific communications did you have regarding GX 411 or the disclosure of GX 411 with other prosecutors, whether oral, written, or electronic in any form? When did these communications occur? Attach any record you have of any such communication**

8)  All of my communications regarding GX 411 occurred after the trial team disclosed the document to the defense.  In addition to the March 7, 2020 telephone call with AUSA Lake and the text messages with Co-Chief Crowley described in paragraph 6 above, I participated in a series of additional oral and electronic communications regarding GX 411 during the trial.  The communications during the trial regarding GX 411 and related disclosure issues that I recall and/or have a record of are described below and attached hereto.

9)  During the afternoon and night of March 8, 2020, I participated in oral and electronic communications with Co-Chief Crowley, the executive staff of the Office, and members of the trial team regarding the disclosure of GX 411.  I cannot specifically recall the timing of each conversation or which members of the trial team participated in each of them.  I do recall that over the course of those communications, based on the information provided by the trial team, Co-Chief Crowley and I conveyed to the trial team—and to the executive staff—our view that GX 411 should have been disclosed to the defense sooner; that GX 411 was not, in fact, entirely inculpatory, as the trial team appeared to believe; and that the trial team should acknowledge to the defense and to the Court that we had made a mistake by failing to timely disclose the document.

A.  <u>March 8, 2020 Communications Regarding the Defendant's First Submission</u>

10) At approximately 4:03 p.m. on March 8, AUSA Krouse sent to me and others a copy of a letter filed by the defense relating to GX 411 (Dkt. No. 274).  (*See* Ex. 2).  In the letter, defense counsel explained why they viewed GX 411 as exculpatory and asked the Court to give a curative instruction to the jury regarding the late production of the document.  Around the time of AUSA Krouse's email, the Court issued an Order directing the trial team to respond to the defense submission by 7:00 p.m.  (*See* Dkt. No. 286).[1]

11) At approximately 4:06 p.m., in response to a request from Co-Chief Crowley, AUSA Krouse emailed me and others a copy of GX 411.  (*See* Ex. 3).

12) At approximately 4:16 p.m., in an effort to understand how the trial team had come into possession of GX 411 and why it previously had not been disclosed, I asked AUSAs Lake, Krouse, and Jane Kim to provide me with a copy of the email they had described in which SAUSA Garrett Lynch had sent the document later marked as GX 411 to the AUSAs.  (*See* Ex. 4).  AUSA Lake responded at approximately 4:20 p.m. by forwarding a January 10, 2020 email from SAUSA Lynch attaching the document.  (*See* Ex. 5).

B.  <u>March 8, 2020 Communications Regarding the Court's First Order</u>

13) At approximately 4:32 p.m., and again at approximately 4:54 p.m., I asked the trial team to come to my office for a meeting.  (*See* Exs. 6, 7).  At approximately 5:00 p.m., the Court issued another Order relating to GX 411, directing the prosecutors to include in the submission due by 7:00 p.m. an explanation of why GX 411 was not previously disclosed and what led to its

---

[1] I do not have an independent recollection of the time at which the Court issued the Order, but understand from the July 2, 2020 letter filed by Associate United States Attorney McEnany that the Court issued the Order at approximately 4:04 p.m.  (*See* Dkt. No. 354 at 13).

disclosure on March 7.  (*See* Dkt. No. 287).  I cannot recall whether I in fact met with the trial team prior to receiving the Court's second Order, which AUSA Lake forwarded to Co-Chief Crowley and me at approximately 5:03 p.m. (*See* Ex. 8).[2]

14) By the evening on March 8, Co-Chief Crowley and I had conveyed, in person, to the members of the trial team who were in the office at the time, that GX 411 contained exculpatory information, and we instructed each member of the trial team to review the case files at the Office and at the Manhattan District Attorney's Office for any additional discoverable material.  We also instructed the trial team to complete the review that night so that the team could either address any other disclosure issues uncovered by the review, or assure the Court and the defense the following morning that the Government had otherwise complied with its discovery obligations.

15) Co-Chief Crowley and I briefed members of the Office's executive staff as our understanding of the situation developed.  In the first of those briefings, at approximately 5:20 p.m. on March 8, I emailed a copy of the Court's Order (Dkt. No. 287) to Laura Grossfield Birger, the Chief of the Criminal Division, copying Co-Chief Crowley, asking to speak with her.  (*See* Ex. 9).  Criminal Chief Birger responded to my email at approximately 5:35 p.m., and it appears from the email thread that Co-Chief Crowley and I spoke to Criminal Chief Birger from Co-Chief Crowley's office shortly thereafter.  (*See* Ex. 10).  We explained to Criminal Chief Birger our then-existing understanding of the trial team's handling and disclosure of GX 411, and our instructions to the team that they should accept responsibility for the untimely disclosure, review the case file to correct any other issues and ensure compliance with discovery obligations, and be prepared to

---

[2] I did not enter a notice of appearance in this case until June 5, 2020.  Therefore, during the trial, court filings in the case were not being sent to me directly.

answer detailed questions from the Court on the morning of March 9, 2020.

16) At approximately 6:25 p.m., AUSA Lake circulated a draft response to the Court's Orders from that afternoon (Dkt. Nos. 286, 287).  (*See* Ex. 11).  Co-Chief Crowley and I exchanged a series of drafts with the trial team, and AUSA Lake ultimately filed the letter at docket entry 275.  (*See* Exs. 12, 13).  Exhibit 14 is a redline comparing AUSA Lake's first draft to the version of the letter that Co-Chief Crowley sent AUSA Lake before AUSA Lake filed the letter.  As filed, the letter apologized to the Court and counsel for the untimely disclosure, acknowledged the exculpatory dimensions of GX 411, and offered a stipulation regarding the absence of OFAC enforcement action in the matter.

17) At approximately 7:08 p.m., Co-Chief Crowley sent an email asking the trial team to come to her office.  (*See* Ex. 15).  I do not have an independent recollection of the meeting, although there is a reference to the meeting in the email described below in paragraph 19.  (*See* Ex. 17 ("Tonight, our team is scouring the case file – here and at DANY – to verify that we are in compliance with our disclosure obligations.  They are also preparing to answer detailed factual questions from Judge Nathan tomorrow morning about the situation, which we discussed during a team meeting after we filed the letter.")).

18) At approximately 7:32 p.m., I sent an email to the trial team reminding them to contact OFAC, as we had committed to do in the recently filed letter (Dkt. No. 275).  At approximately 7:43 p.m., AUSA Kim responded, "I emailed them.  I can call them now."  (Ex. 16).

19) At approximately 7:53 p.m., I sent an email to additional members of the executive staff—Geoffrey Berman, Audrey Strauss, Craig Stewart, and Ilan Graff—as well as Criminal Chief Birger and Co-Chief Crowley.  I attached to the email the parties' submissions regarding GX 411, and summarized the instructions that Co-Chief Crowley and I had conveyed to the trial

8

team in an effort to address the situation.  (*See* Ex. 17).[3]  Criminal Chief Birger responded briefly to the email at approximately 8:22 p.m., and I replied that we would keep her updated regarding the situation.  (*See* Ex. 18).

      C.   March 8, 2020 Communications Regarding the Court's Third Order

20) At approximately 9:15 p.m., AUSA Kim emailed Co-Chief Crowley and me a copy of the Court's third Order relating to GX 411.  (*See* Ex. 19).  I was at my apartment when I received AUSA Kim's email and stayed there for the remainder of the night.  The Order directed the Government to explain, by 10:00 p.m., among other things, "precisely when and how it realized that [GX 411] had erroneously been withheld and when, if at all, upon learning of the failure to disclose this was communicated to the defense." (Dkt. No. 290).  Beginning at approximately 9:16 p.m., AUSA Crowley and I exchanged text messages regarding our obligation to respond to the Order within the hour, and expressing frustration at the time pressure.  (*See* Ex. 20).

21) At approximately 9:22 p.m., I replied to AUSA Kim's 9:15 p.m. email:  "Thanks guys. We're around to turn the draft."  (*See* Ex. 21).

22) At approximately 9:31 p.m., Co-Chief Crowley asked the trial team to forward the March 7 email from the trial team to defense counsel first transmitting GX 411.  At approximately 9:41 p.m., AUSA Kim replied by attaching the relevant email.  (*See* Ex. 21).

23) At approximately 9:40 p.m., I sent Co-Chief Crowley a text message expressing frustration that the trial team had not yet sent us a draft response to the Court's Order.  (*See* Ex. 22).

---

[3] In response to this email, Chief Counsel Stewart promptly reminded me that he was recused from the case.

24) At approximately 9:49 p.m., AUSA Krouse forwarded me and Co-Chief Crowley by email a draft response to the Court's third Order. (*See* Ex. 23). The letter was due to be filed with the Court approximately ten minutes later, at 10:00 p.m., and both Co-Chief Crowley and I had left the office. According to the email thread forwarded by AUSA Krouse with the 9:49 p.m. draft, it appears that AUSA Lake had sent a draft of the letter to the other members of the trial team at approximately 9:31 p.m. that night. (*See* Ex. 23).

25) At approximately 9:51 p.m., according to telephone records, I used my personal cellphone to call Co-Chief Crowley on her work cellphone.[4] At approximately 9:52 p.m., Co-Chief Crowley added AUSA Krouse to the call. The telephone records indicate that the conference call with AUSA Krouse lasted approximately one minute. At approximately 9:53 p.m., I used my work cellphone to call Co-Chief Crowley's work cellphone. That call lasted approximately six minutes. AUSA Krouse did not participate in the six-minute call. *See* n.4, *supra*. Although I do not have a specific recollection of this, the telephone records lead me to believe that I used my personal cellphone to call Co-Chief Crowley so that while I was speaking with Co-Chief Crowley and AUSA Krouse I could use my work cellphone to view the 9:49 p.m. draft that AUSA Krouse had emailed to me.

---

[4] Associate United States Attorney McEnany provided these telephone records to me beginning on October 2, 2020. On October 11, Co-Chief Crowley and I brought to his attention the fact that the records reflect a conference call with AUSA Krouse that began at 9:52 p.m. rather than 9:53 p.m., lasting approximately one minute, rather than approximately six minutes, as had been erroneously stated in AUSA McEnany's letter to the Court dated July 2, 2020. (*See* Dkt. No. 354 at 14-15 ("At 9:53 p.m., Chiefs Crowley and Bove called AUSA Krouse. Mobile phone records indicate this call lasted until 9:59 p.m., one minute before the Court's deadline.")). On October 15, 2020, AUSA McEnany informed me via email, in substance, that an investigator employed by the Office had reviewed the relevant records and agreed that the conference call between and among myself, Co-Chief Crowley, and AUSA Krouse began at 9:52 p.m. and lasted approximately one minute.

26) During the one-minute conference call, I recall that in addition to discussing the 9:49 p.m. draft of the letter, we also discussed the fact that AUSA Krouse would need to be prepared to answer questions from the Court regarding GX 411 the following morning because AUSA Lake was unavailable due to illness.  I do not recall seeing or being shown another draft of the letter before AUSA Krouse filed the submission at docket entry 277.  The Court's specific questions regarding the letter are addressed below in Part V.

27) At approximately 9:55 p.m. on March 8, 2020, AUSA Kim sent an email inquiring about the status of the filing due to the Court at 10:00 p.m.  (*See* Ex. 24).

28) According to telephone records, I spoke to Co-Chief Crowley for approximately 15 minutes beginning at 10:04 p.m., and for approximately three minutes beginning at 10:19 p.m. Co-Chief Crowley added Criminal Chief Birger to the call that began at approximately 10:04 p.m. During that conference call with Criminal Chief Birger, which lasted approximately 13 minutes, Co-Chief Crowley and I provided a status report, discussed Criminal Chief Birger notifying the Court in the morning, *ex parte*, that AUSA Lake would be absent from Court due to her illness, and agreed that the trial team would also provide notice to defense counsel the next morning regarding AUSA Lake's illness.

29) At approximately 10:31 p.m., I sent a text message to Co-Chief Crowley expressing my expectation that the Court would have additional questions regarding GX 411 and concern that the Court may issue another Order during the night of March 8, 2020.  (*See* Ex. 25).

D.  March 8, 2020 Communications Regarding the Defense Reply Submissions

30) At approximately 11:03 p.m., Co-Chief Crowley sent an email to AUSAs Kim and Krouse requesting a copy of any defense reply to the trial team's most recent submission.  At approximately 11:15 p.m., AUSA Kim responded by attaching the first defense reply (Dkt. No.

11

279).  (*See* Ex. 24).   At approximately 11:19 p.m., AUSA Krouse circulated the same defense submission.  (*See* Ex. 26).

      31) Roughly around the time of these emails, Co-Chief Crowley sent me via text message a copy of the email thread filed by the defense, at docket entry 279-1, in connection with their first reply submission.  (*See* Ex. 27).  The email thread contained an exchange between the trial team and the defense between 4:57 p.m. and 5:36 p.m. on March 7, 2020, regarding the production and significance of GX 411.   In the email exchange, after the defense indicated GX 411 had not previously been produced, AUSA Kim responded:  "We thought it was part of the Commerzbank subpoena that was produced in discovery.  We now understand that it came from an unrelated DANY investigation, and therefore was not in the Commerzbank subpoena return."  (Dkt. No. 279-1 at 2).  After Co-Chief Crowley sent me the email chain, we exchanged text messages expressing frustration that we had not previously seen the full correspondence between the trial team and the defense, as well as frustration regarding the language used by the trial team in that email correspondence.  (*See* Ex. 27).  During the text-message exchange with Co-Chief Crowley, I quoted AUSA Kim's phrase "We now understand" from the email and characterized that phrase as a "Flat lie."   In hindsight, I believe that is an unfair characterization.   At the time, I was concerned that the phrase could be read to suggest, inaccurately, that the trial team believed GX 411 had been produced in pretrial discovery until the defense team noted otherwise, when in fact the trial team knew at the time they first emailed the defense and proposed to offer GX 411 as an exhibit that the document had not previously been produced.  Co-Chief Crowley and I concluded the 11:05 p.m. text-message exchange with communications regarding whether we should reemphasize to the trial team the need to review the case file; we elected not to do so based on the concern that reiterating the instruction would add to the stress the trial team faced at the time.  (*See*

12

Ex. 27).

32) At approximately 11:30 p.m., AUSA Kim forwarded Co-Chief Crowley and me the defense's second reply (Dkt. No. 280), which included additional emails between the trial team and defense counsel at docket entry 280-1 that I had not yet seen. (*See* Ex. 28). Co-Chief Crowley and I then exchanged additional text messages expressing further frustration about the trial team's explanations to us regarding GX 411 up to that point. (*See* Ex. 29). In particular, I wrote "this stuff is trickling in and they aren't telling us . . . the whole story," and Co-Chief Crowley wrote, "This is now the third time we've learned a material fact about how this was turned over from Nathan or the defense." (Ex. 29).

33) At approximately 11:35 p.m., Co-Chief Crowley sent an email asking AUSAs Kim and Krouse: "Did we (it doesn't matter who) respond to their last email at 1:30? Can you guys please forward us all correspondence relating to this document?" (Ex. 30). At approximately 11:36 p.m., AUSA Kim replied: "We spoke to them by phone at 2:30 and walked through each category of their questions. I think this is it but will double check." (Ex. 31).

E. March 9, 2020 Communications

34) On Monday, March 9, 2020, at approximately 5:43 a.m., I sent an email to Criminal Chief Birger that summarized my understanding of the situation at that time, attached some of the relevant filings, and noted that Co-Chief Crowley and I had "found the [trial team's] answers to the [Court's] questions to be unfortunate, particularly the fact that the team did not flag for defense counsel that the document was being produced for the first time." (Ex. 32). In hindsight, I do not believe that I fully appreciated at the time I sent this email the material differences between the filed version of the letter at docket entry 277 and the 9:49 p.m. draft that I reviewed the night before.

13

35) At approximately 5:48 a.m., AUSA Kim sent Co-Chief Crowley and me the Court's March 9, 2020 Order, issued at approximately 1:08 a.m., directing the parties to appear at 8:30 a.m. and for the trial team to "be prepared to discuss, among other matters, its representation to the Court (in response to the Court's March 8, 2020 Order) that it 'made clear' in its March 7 correspondence with Mr. Sadr's counsel 'that GX 411 was a newly marked exhibit.' *See* Dkt. No. 277." (Ex. 33).

36) At approximately 6:57 a.m., Co-Chief Crowley forwarded the Court's Order to Criminal Chief Birger. (*See* Ex. 33).

37) Beginning at approximately 7:13 a.m., Co-Chief Crowley and I exchanged text messages expressing that the trial team would be under scrutiny from the Court when proceedings resumed that morning. (*See* Ex. 34). During the exchange, I wrote that the trial team had "done some pretty aggressive stuff here over the last few days." In the same exchange, Co-Chief Crowley wrote, "we lied in that letter." (Ex. 34).

38) At approximately 7:24 a.m., Co-Chief Crowley emailed AUSAs Kim and Krouse, encouraging them to accept responsibility that morning: "Thanks guys. I know you've got this, but I think we need to fall on our sword big time here. We didn't make that clear in the transmittal email and shouldn't have represented that we did. We'll see you soon. It's going to be ok." At approximately 7:34 a.m., AUSA Krouse replied, "I'm ready to fall. I'm here if you'd like to discuss." (Ex. 35).

39) At approximately 8:03 a.m., Criminal Chief Birger notified Co-Chief Crowley and me via email that, due to problems with her commute, she would not be available to contact the Court that morning regarding AUSA Lake's illness. (*See* Ex. 36). Co-Chief Crowley agreed to place the call instead. At approximately 8:30 a.m., Co-Chief Crowley reported via email that the Court

14

had asked during the call "if we were aware of the disclosure issues," that Co-Chief Crowley had "assured [the Court] that we are and have been working with the team on them all weekend," and that it seemed "important to [the Court] that this has been elevated."  (Ex. 36).

F.  March 9, 2020 Communications Regarding Additional Diligence Efforts and the Government's March 9, 2020 Submission

40) On the morning of March 9, 2020, I traveled directly from my apartment to the courthouse.  While I observed the proceedings, I expressed concern to Co-Chief Crowley in a text message that the case would end in a mistrial.  (*See* Ex. 37).  Following the colloquy with the Court in which I participated (Tr. 976-98), Co-Chief Crowley, AUSA Krouse, and I exchanged text messages regarding the need for current and former members of the prosecution team to examine their past interactions relating to the case with OFAC, if any, and we asked AUSA Krouse to notify us if there was any further discussion of disclosure issues at the trial so that we could return to the courtroom.  (*See* Ex. 38).

41) Throughout the rest of the day, and into the night, I helped the trial team and prosecutors previously assigned to the case conduct diligence relating to the filing directed by the Court (*see, e.g.*, Tr. 1005, 1207, 1226); monitored the trial proceedings and provided guidance to the trial team regarding developments with the diligence efforts (*see, e.g.*, Tr. 1222-24); updated members of the executive staff regarding the situation; and reviewed, edited, and implemented feedback and guidance from the executive staff regarding the trial team's submission that night (Dkt. No. 283).  (*See* Exs. 39-96).[5]

---

[5] Exhibit 41 is a set of handwritten notes dated March 9, 2020.  I do not recall when I took the notes and, based on the differences in the ink, it appears that I may have added to the entries over time.

15

    G.  <u>March 10, 2020 Communications Regarding the Admission of GX 411 and Related Curative Measures and Trial Strategy</u>

42) After the trial team filed the March 9, 2020 submission (Dkt. No. 283), Co-Chief Crowley and I continued to monitor the progress of the trial and provide guidance to the trial team regarding, among other things, curative measures related to the untimely disclosure of GX 411 and related submissions to the Court, the cross-examination of the defendant, and arguments that the team could reasonably make in summations regarding GX 411.  (*See* Exs. 97-114).

**IV.**    **When did you first recognize GX 411 as having exculpatory value?**

43) I recognized that there were exculpatory aspects of GX 411 during the afternoon of March 8, 2020, around the time that I was provided with a copy of the document.  (*See* Ex. 3).  At that point, the document had been produced to the defense.

**V.**    **With specificity, what role did you play in drafting the Government's March 8, 2020 letter?** *See* **Ex. C. What role did you play in deleting the accurate sentence responsive to the Court's question that was originally drafted by AUSA-1?** *See* **Dkt. No. 354 at 14 ("The Government did not specifically identify that GX 411 had not previously been produced in discovery."). What role did you play in drafting the sentence that the Court has concluded was a misrepresentation?** *See* **Dkt. No. 277 at 1 ("The Government made clear that GX 411 was a newly marked exhibit . . . ."). Why was this sentence changed? Attach any communications related to this change.**

44) I did not draft the trial team's second March 8, 2020 letter.  (Dkt. No. 277).  As described above, AUSA Krouse forwarded a draft of the letter to Co-Chief Crowley and me at approximately 9:49 p.m. that night.  (*See* Ex. 23).  At the time, I was at my apartment without access to a computer that could be used to review or edit the draft.  Based on the above-described telephone records, *see* paragraph 25 and footnote 4, *supra*, I believe that I reviewed the draft on my work cellphone, including while using my personal cellphone to speak to Co-Chief Crowley beginning at approximately 9:51 p.m., and while participating in a conference call with AUSA Krouse at approximately 9:52 p.m. that lasted approximately one minute.  I do not recall reviewing

another draft of the letter before AUSA Krouse filed it.  Exhibit 115 is a redline comparing the 9:49 p.m. draft to the filed version of the letter.

45) I played no role in deleting the sentence from the 9:49 p.m. draft that stated:  "The Government did not specifically identify that GX 411 had not previously been produced in discovery."  The sentence is accurate and responsive to the Court's question that night and I did not authorize or suggest it be deleted or changed.  Nor did Co-Chief Crowley.

46) I did not draft, or propose, the sentence from the filed version of the letter that stated: "The Government made clear that GX 411 was a newly marked exhibit and that we intended to offer it, and asked the defense if they would stipulate to authenticity."  (Dkt. No. 277).[6]  I do not recall that sentence being mentioned during the one-minute conference call with AUSA Krouse on the night of March 8.  In particular, I do not recall AUSA Krouse explaining that he planned to modify or replace the accurate and responsive sentence, and I believe I would recall such a discussion if it had occurred.

---

[6] I also did not draft, or propose, the other phrase identified in the Court's September 16, 2020 Order:  "The Government promptly had a paralegal mark [GX 411] as an exhibit . . . ."  (Order at 26).  I had little, if any, information about this issue and was in no position to suggest characterizing the timing of the team's communications in that manner to AUSA Krouse during the one-minute conference call on the night of March 8, 2020.

**VI.** **When the Court asked specific questions at trial on March 9, 2020 regarding the Government's misrepresentation, were you aware that the accurate sentence responsive to the Court's question had been edited or deleted? If so, explain why this was not conveyed to the Court.**

47) When I addressed the Court on the morning of March 9, 2020, I had not yet realized that the 9:49 p.m. draft of the March 8, 2020 letter contained an accurate and responsive sentence that was removed or edited before the letter was filed.  Although I apologized to the Court regarding the sentence from the filed version of the letter that the Court determined was a misrepresentation (Tr. 997), I was not aware of the extent of the issues with the trial team's handling of GX 411 and the editing of the 9:49 p.m. draft at the time I was speaking, and I would have addressed the Court differently had I been fully informed.  I did not identify the omission of the accurate and responsive sentence from the filed version of the letter until on or about June 9, 2020, when I compared the 9:49 p.m. draft to the filed version of the letter after the Court directed the Government to respond to questions regarding disclosure issues in the case.  (Dkt. No. 350). On the day that I realized the responsive sentence had been removed from the 9:49 p.m. draft before the letter was filed, I reported this information to Associate United States Attorney McEnany.

Dated:     October 16, 2020
           New York, New York

                                             _____/s/_____
                                             Emil J. Bove III
                                             Assistant United States Attorney
                                             (212) 637-2444

18