The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight prosecutors did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted it to AUSAs Lake, Kim, and Krouse via email.  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[2]  The emails at issue are attached as Exhibit A.  ~~During the course of the communications reflected in these emails,~~ At no time did SAUSA Lynch ~~did not~~ discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.   The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank~~, which~~.  The Commerzbank investigation had commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[3] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act, as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation ~~of Commerzbank~~, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October

---

[2] The AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[3] The AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

2014.  GX 411 was one such disclosure.[4]  In March 2015, Commerzbank entered into a deferred prosecution agreement with DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[5]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's informal thoughts about whether the conduct under investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA

---

[4] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[5] *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and; *see also* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony. SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the N~n~ew York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness "should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015. SAUSA Lynch then sent an email to

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena ProductionCommerzbank subpoena production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV.    OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and was is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

employees who were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
       Jane Kim / Michael Krouse / Stephanie Lake
          Assistant United States Attorneys
       Garrett Lynch
          Special Assistant United States Attorney
       (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 90

**From:**        Bove, Emil (USANYS)
**To:**          Strauss, Audrey (USANYS); Birger, Laura (USANYS); Graff, Ilan (USANYS)
**Cc:**          Crowley, Shawn (USANYS)
**Subject:**     Sadr Letter
**Date:**        Monday, March 09, 2020 10:45:45 PM
**Attachments:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx

With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us
yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

Re:     *United States* **v.** *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC currently marked for identification as GX 411.  At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020.  If the defense wishes to offer GX 411 as a defense exhibit, the Government will stipulate to the authenticity of the document and consents to the curative instruction proposed by the defense yesterday (*see* Dkt. [X]).  The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider reasonable modifications to the stipulation based on the disclosures contained in this letter.

I.     **The Government's Review**

In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team:  AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States ("SAUSA") Attorney Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight prosecutors did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted it to AUSAs Lake, Kim, and Krouse via email.  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[2]  The emails at issue are attached as Exhibit A.  ~~During the course of the communications reflected in these emails,~~ At no time did SAUSA Lynch ~~did not~~ discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.    The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank~~, which~~.  The Commerzbank investigation had commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[3] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act, as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation ~~of Commerzbank~~, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October

---

[2] The AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[3] The AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

2014.  GX 411 was one such disclosure.[4]  In March 2015, Commerzbank entered into a deferred prosecution agreement with DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[5]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New York branch in connection with the investigation of the defendant, which requested the following:



For the time period of January 1, 2010 through the present (date of this subpoena), provide electronic copies of any and all wire transfers, book transfers, rejected wire transfers, originating from, benefiting, and/or otherwise referencing the following entities: Fondo Chino Venezolano (aka, Chinese Venezuelan Fund), Stratus International Contracting J.S., Stratus Global Investments Ltd., Clarity Trade and Finance S.A., Spantisc Holding GmbH, Petroleosa de Venezuela (aka, PDVSA), Straturk Insaat Ve Taahhut A.S., including, but not limited to, the following wire transfer information:

1. Possible Originating Bank: Banco Del Tesoro, Caracas, Venezuela, BDTEVECA
2. Possible Beneficiary Bank: Hyposwiss Private Bank, Zurich, Switzerland, SHHBCHZZ (aka, Hyposwiss Privatbank, Falcon Private Bank, Falcon Privatbank)
3. Possible Account Number: IBAN CH7708530519663100203
4. Possible CHIPS System Sequence Number: 0262787
5. Possible Credit/Debit Reference Number: FAAS109400150500
6. Possible Transaction Reference Number: 5111500094FC
7. Possible Transaction Date: 4/4/2011
8. Possible Amount: USD $29,442,967.57

Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's informal thoughts about whether the conduct under investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA

---

[4] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[5] *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and; *see also* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired."  *Id.*  On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers.  Ex. A at 10.  During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the N~n~ew York State grand jury investigation.  In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY.  Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails.  *See* Ex. A at 12-14.  During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation.  The phone call did not happen until September 21, 2017.  *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened.").  On that day, SAUSA Lynch spoke to OFAC Officer-1.  Ex. A at 11.  During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges.  Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case.  *Id.*; *see* Ex. A at 26-47 (the "Presentation").  OFAC Officer-1 responded:  "[T]hanks for passing along the information below/attached.  We'll take a look and will get back to you."  *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche.  Ex. A at 15.  OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have."  *Id.*  SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email.  Ex. A at 16.  Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case.  *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse.  *See* Ex. B.  AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411.  AUSA Lake stated a document previously provided by a witness "should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA."  AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411.  That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015.  SAUSA Lynch then sent an email to

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena ProductionCommerzbank subpoena production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV. OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and was is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

employees who were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
    Jane Kim / Michael Krouse / Stephanie Lake
      Assistant United States Attorneys
    Garrett Lynch
      Special Assistant United States Attorney
    (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 91

**From:** Bove, Emil (USANYS)
**To:** Krouse, Michael (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor]; Lake, Stephanie (USANYS)
**Cc:** Crowley, Shawn (USANYS)
**Subject:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx
**Date:** Monday, March 09, 2020 10:48:49 PM
**Attachments:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx

Here is a revised draft.  Please take a careful read for accuracy and stop by / call if you have any issues.  Thanks guys.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

  Re: *United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

  The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC currently marked for identification as GX 411. At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020. If the defense wishes to offer GX 411 as a defense exhibit, the Government will stipulate to the authenticity of the document and consents to the curative instruction proposed by the defense yesterday (*see* Dkt. [X]). The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider reasonable modifications to the stipulation based on the disclosures contained in this letter.

  I. **The Government's Review**

  In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team: AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States ("SAUSA") Attorney Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight prosecutors did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted it to AUSAs Lake, Kim, and Krouse via email.  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[2]  The emails at issue are attached as Exhibit A.  ~~During the course of the communications reflected in these emails,~~ At no time did SAUSA Lynch ~~did not~~ discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.  The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank~~, which~~.  The Commerzbank investigation had commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[3] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act, as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation ~~of Commerzbank~~, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October

---

[2] The AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[3] The AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

2014.  GX 411 was one such disclosure.[4]  In March 2015, Commerzbank entered into a deferred prosecution agreement with DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[5]

### III.     The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New York branch in connection with the investigation of the defendant, which requested the following:

> For the time period of January 1, 2010 through the present (date of this subpoena), provide electronic copies of any and all wire transfers, book transfers, rejected wire transfers, originating from, benefiting, and/or otherwise referencing the following entities: Fondo Chino Venezolano (aka, Chinese Venezuelan Fund), Stratus International Contracting J.S., Stratus Global Investments Ltd., Clarity Trade and Finance S.A., Spartan Holding GmbH, Petroleos de Venezuela (aka, PDVSA), Stratark Insaat Ve Taahhut A.S., including, but not limited to, the following wire transfer information:
>
> 1. Possible Originating Bank: Banco Del Tesoro, Caracas, Venezuela, BDTEVECA
> 2. Possible Beneficiary Bank: Hyposwiss Private Bank, Zurich, Switzerland, SHHBCHZZ (aka, Hyposwiss Privatbank, Falcon Private Bank, Falcon Privatbank)
> 3. Possible Account Number: IBAN CH7708530519663100203
> 4. Possible CHIPS System Sequence Number: 0262787
> 5. Possible Credit/Debit Reference Number: FAAS109400150500
> 6. Possible Transaction Reference Number: 5111500094FC
> 7. Possible Transaction Date: 4/4/2011
> 8. Possible Amount: USD $29,442,967.57

Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's informal thoughts about whether the conduct under investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA

---

[4] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[5] See https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and; see also https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony. SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the N~n~ew York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness "should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015. SAUSA Lynch then sent an email to

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production~~Commerzbank subpoena production~~, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV.   OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and ~~was~~ is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

employees who were familiar with the letter or any investigative or enforcement steps taken by
OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____

    Jane Kim / Michael Krouse / Stephanie Lake
      Assistant United States Attorneys
    Garrett Lynch
      Special Assistant United States Attorney
    (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 92

| | |
|---|---|
| **From:** | Crowley, Shawn (USANYS) |
| **To:** | Graff, Ilan (USANYS); Bove, Emil (USANYS) |
| **Cc:** | Strauss, Audrey (USANYS); Birger, Laura (USANYS) |
| **Subject:** | RE: Sadr Letter |
| **Date:** | Monday, March 09, 2020 10:56:30 PM |
| **Attachments:** | Ex. A.pdf |
| | Ex. B Email from GL.pdf |
| | K39TSADF.pdf |

Here are exhibits A and B and the transcript from this afternoon.

**From:** Graff, Ilan (USANYS) <IGraff@usa.doj.gov>
**Sent:** Monday, March 09, 2020 10:55 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Cc:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>; Birger, Laura (USANYS)
<LBirger@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Re: Sadr Letter

Could you possibly send Exhibit A as well?

On Mar 9, 2020, at 10:46 PM, Graff, Ilan (USANYS) <IGraff@usa.doj.gov> wrote:

Thanks, Emil. I just logged in and will start reading now.

On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov>
wrote:

With apologies about the timing, attached is a draft of the letter.  Judge
Nathan has not pinged us yet (we think she is working on the jury charge),
but our hope is still to file this tonight if possible.
<2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>

# EXHIBIT 93

| From: | Krouse, Michael (USANYS) |
|---|---|
| To: | Bove, Emil (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor]; Lake, Stephanie (USANYS) |
| Cc: | Crowley, Shawn (USANYS) |
| Subject: | RE: 2020.03.09 Letter re OFAC contacts.sgc.docx |
| Date: | Monday, March 09, 2020 10:58:56 PM |
| Attachments: | 2020.03.09 Letter re OFAC contacts.EB3.sgc (MKK).docx |

Looks good.  One tiny nit in the attached.

---

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 10:49 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4
<JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>; Lake,
Stephanie (USANYS) <SLake@usa.doj.gov>
**Cc:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx

Here is a revised draft.  Please take a careful read for accuracy and stop by / call if you have any
issues.  Thanks guys.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

    **Re:**    *United States* **v.** *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

    The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

    At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020. If the defense wishes to offer GX 411 as a defense exhibit, the Government will stipulate to the authenticity of the document and consents to the curative instruction proposed by the defense yesterday. (*See* Dkt. No. 274 at 2). The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

    **I.**    **The Government's Review**

    In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team: AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States ("SAUSA") Attorney Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3] The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.    The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.  Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with
DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to
the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New
York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the
subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the
defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the
subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC
("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and
OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the
case and solicited OFAC Officer-1's informal thoughts about whether the conduct under
investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed
that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New
York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA
Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide
grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015. SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV. OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect
to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
    Jane Kim / Michael Krouse / Stephanie Lake
        Assistant United States Attorneys
    Garrett Lynch
        Special Assistant United States Attorney
    (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 94

| | |
|---|---|
| **From:** | Kim, Jane (USANYS) 4 |
| **To:** | Krouse, Michael (USANYS); Bove, Emil (USANYS); Lynch, Garrett (USANYS) [Contractor]; Lake, Stephanie (USANYS) |
| **Cc:** | Crowley, Shawn (USANYS) |
| **Subject:** | RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx |
| **Date:** | Monday, March 09, 2020 11:02:32 PM |
| **Attachments:** | 2020.03.09 Letter re OFAC contacts.EB3.sgc.jk.docx |

Minor nits.

---

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Monday, March 9, 2020 10:59 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>
**Cc:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx

Looks good.  One tiny nit in the attached.

---

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 10:49 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>
**Cc:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx

Here is a revised draft.  Please take a careful read for accuracy and stop by / call if you have any issues.  Thanks guys.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

   Re:    *United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

   The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

   At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020.  ~~If~~ The Government has stipulated to the authenticity of GX 411 ~~If~~ if the defense wishes ~~to offer GX 411~~ it as a defense exhibit, ~~the Government will stipulate to the authenticity of the document~~ and consents to the curative instruction proposed by the defense yesterday.  (*See* Dkt. No. 274 at 2).  The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

   **I.    The Government's Review**

   In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team:  AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States ~~("SAUSA")~~ Attorney ("SAUSA")

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

Garrett Lynch.[1]  Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3]  The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.    The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.   Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

("IEEPA") and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately ~~period~~ 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New York branch in connection with the investigation of the defendant, which requested the following:

For the time period of January 1, 2010 through the present (date of this subpoena), provide electronic copies of any and all wire transfers, book transfers, rejected wire transfers, originating from, benefiting, and/or otherwise referencing the following entities: **Fondo Chino Venezolano (aka, Chinese Venezuelan Fund), Stratus International Contracting J.S., Stratus Global Investments Ltd., Clarity Trade and Finance S.A., Spantise Holding GmbH, Petroleos de Venezuela (aka, PDVSA), Stratek Insaat Ve Taahhut A.S.**, including, but not limited to, the following wire transfer information:

1. Possible Originating Bank: Banco Del Tesoro, Caracas, Venezuela, BDTEVECA
2. Possible Beneficiary Bank: Hyposwiss Private Bank, Zurich, Switzerland, SHHBCHZZ. (aka, Hyposwiss Privatbank, Falcon Private Bank, Falcon Privatbank)
3. Possible Account Number: IBAN CH7708530519663100203
4. Possible CHIPS System Sequence Number: 0262787
5. Possible Credit/Debit Reference Number: FAAS109400150500
6. Possible Transaction Reference Number: 5111500094FC
7. Possible Transaction Date: 4/4/2011
8. Possible Amount: USD $29,442,967.57

Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's informal thoughts about whether the conduct under

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

investigation potentially violated U.S. sanctions laws and regulations. OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email. Ex. A. at 7. In the email, SAUSA Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony. SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

J.S. for $29 million, which is described in GX 411.  AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411.  That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015.  SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said:  "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment."  None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email.  Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief.  At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been.  AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020.  GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails.  After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included.  The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense.  At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief.  AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV.    OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411.  During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter.  OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012.  In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter.  As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect
to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 95

| | |
|---|---|
| **From:** | Strauss, Audrey (USANYS) |
| **To:** | Bove, Emil (USANYS) |
| **Cc:** | Birger, Laura (USANYS); Graff, Ilan (USANYS); Crowley, Shawn (USANYS) |
| **Subject:** | Re: Sadr Letter |
| **Date:** | Monday, March 09, 2020 11:22:05 PM |

Sorry. Email sent prematurely.

I assume we have done all we can to be complete and accurate.

But if we did not have opportunity to complete any aspect of process of collecting and checking, we should say so. It would not be ideal but better than having to correct after submitting with no warning.

On the other hand if the team did complete the process and we have confidence in full accuracy,  do not caveat and we should be comfortable standing by our work.

I assume Ilan and Laura may have comments. I am signed off.


Sent from my iPhone


> On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov> wrote:
>
>
>  I have read it and agree with tone and approach: apologetic and appearing to make straightforward disclosure at relevant facts.
>
> Sent from my iPhone
>
>
>> On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov> wrote:
>>
>>
>> With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.
>> <2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>

# EXHIBIT 96

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Graff, Ilan (USANYS) |
| **Cc:** | Crowley, Shawn (USANYS) |
| **Subject:** | Re: Sadr Letter |
| **Date:** | Monday, March 09, 2020 11:25:36 PM |

No worries totally understand

On Mar 9, 2020, at 11:24 PM, Graff, Ilan (USANYS) <IGraff@usa.doj.gov> wrote:

> I know you guys need to get this filed.  I'm taking a pass through the exhibits now and
> should have my limited comments to you in the next 10-15 minutes.
>
> ---
>
> **From:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
> **Sent:** Monday, March 9, 2020 11:22 PM
> **To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
> **Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS)
> <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
> **Subject:** Re: Sadr Letter
>
> Sorry. Email sent prematurely.
> I assume we have done all we can to be complete and accurate.
> But if we did not have opportunity to complete any aspect of process of collecting and
> checking, we should say so. It would not be ideal but better than having to correct after
> submitting with no warning.
> On the other hand if the team did complete the process and we have confidence in full
> accuracy,  do not caveat and we should be comfortable standing by our work.
> I assume Ilan and Laura may have comments. I am signed off.
>
>
> Sent from my iPhone
>
>
> > On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS)
> > <AStrauss@usa.doj.gov> wrote:
> >
> >  I have read it and agree with tone and approach: apologetic and
> > appearing to make straightforward disclosure at relevant facts.
> >
> > Sent from my iPhone
> >
> >
> > > On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS)
> > > <EBove@usa.doj.gov> wrote:

With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.

<2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>

# EXHIBIT 97

| | |
|---|---|
| **From:** | Birger, Laura (USANYS) |
| **To:** | Bove, Emil (USANYS); Strauss, Audrey (USANYS); Graff, Ilan (USANYS) |
| **Cc:** | Crowley, Shawn (USANYS) |
| **Subject:** | RE: Sadr Letter |
| **Date:** | Monday, March 09, 2020 11:28:24 PM |
| **Attachments:** | 2020.03.09 Letter re OFAC contacts.EB3.sgc.docx |

A couple of typos noted in the attached.  The letter is very good.  One question:  we detail the emails that went to and from OFAC about the power point and the fact pattern here, but we don't say that we asked OFAC whether anyone asked them to take any action (that is, if there were communications other than what's in the emails).  Did we ask?  I noted it because with respect to 411 we were pretty careful to caveat that as of 5 p.m. today OFAC hadn't identified anyone familiar with the letter; we make no similar representation more broadly.

---

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 10:46 PM
**To:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>; Birger, Laura (USANYS)
<LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>
**Cc:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Sadr Letter

With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

     **Re:**    ***United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)**

Dear Judge Nathan:

     The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

     At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020. If the defense wishes to offer GX 411 as a defense exhibit, the Government will stipulate to the authenticity of the document and consents to the curative instruction proposed by the defense yesterday. (*See* Dkt. No. 274 at 2). The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

**I.    The Government's Review**

     In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team: AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States Attorney ("SAUSA") ~~Attorney~~ Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

emails, network folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3] The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.     The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.  Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with
DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.     The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to
the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New
York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the
subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the
defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the
subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC
("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and
OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the
case and solicited OFAC Officer-1's informal thoughts about whether the conduct under
investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed
that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New
York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA
Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide
grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015. SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV. OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect
to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
      Jane Kim / Michael Krouse / Stephanie Lake
         Assistant United States Attorneys
      Garrett Lynch
         Special Assistant United States Attorney
      (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 98

| | |
|---|---|
| **From:** | Graff, Ilan (USANYS) |
| **To:** | Bove, Emil (USANYS); Strauss, Audrey (USANYS) |
| **Cc:** | Birger, Laura (USANYS); Crowley, Shawn (USANYS) |
| **Subject:** | RE: Sadr Letter |
| **Date:** | Monday, March 09, 2020 11:35:33 PM |
| **Attachments:** | 2020.03.09 Letter re OFAC contacts.EB3.sgc (ig edits).docx |

Thanks, Emil.  A few nits, comments, and questions are in the attached (none of my comments are worth delaying filing into tomorrow if the answers aren't readily at hand).  I agree with Audrey and Laura that the letter is well done.

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 11:32 PM
**To:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
**Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** RE: Sadr Letter

Thanks, Audrey and Laura.

In response to Audrey's question, we're comfortable that the team has completed the review, with the caveat, which we note in FN 4 of the letter, that we do not have access to any SDNY investigative files related to Commerzbank.  Our approach on that is to be candid about that scoping limitation and leave it to the Court and the defense to decide how they want us to handle.  We also note in that FN that no AUSA who participated in this case represented the USG in connection with Commerzbank, but that Denton participated in private practice.

In response to Laura, we did not ask OFAC whether anyone other than Commerzbank asked them to take any action.

**From:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
**Sent:** Monday, March 9, 2020 11:22 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Re: Sadr Letter

Sorry. Email sent prematurely.
I assume we have done all we can to be complete and accurate.
But if we did not have opportunity to complete any aspect of process of collecting and checking, we should say so. It would not be ideal but better than having to correct after submitting with no warning.
On the other hand if the team did complete the process and we have confidence in full accuracy,  do not caveat and we should be comfortable standing by our work.
I assume Ilan and Laura may have comments. I am signed off.

Sent from my iPhone

On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov> wrote:

I have read it and agree with tone and approach: apologetic and appearing to make straightforward disclosure at relevant facts.

Sent from my iPhone

On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov> wrote:

With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.
<2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

<u>FILED BY ECF</u>

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

    **Re:**   *United States* **v.** *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

    The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

    At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020. If the defense wishes to offer GX 411 as a defense exhibit, the Government will stipulate to the authenticity of the document and consents to the curative instruction proposed by the defense yesterday. (*See* Dkt. No. 274 at 2.) The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

    **I.**    **The Government's Review**

    In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team: AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States ("SAUSA") Attorney Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3]  The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.   The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act, as well as OFAC sanctions programs targeting Iran, between approximately period 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such

> **Commented [GI(1):** It seems a little awkward to say that "the Government" preliminarily determined that the Office participated in a case that was publicly announced.  Does it make more sense in the footnote to say that the "prosecution team" made that determination?

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.  Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with
DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to
the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New
York branch in connection with the investigation of the defendant, which requested the following:



For the time period of January 1, 2010 through the present (date of this subpoena), provide
electronic copies of any and all wire transfers, book transfers, rejected wire transfers, originating
from, benefiting, and/or otherwise referencing the following entities: **Fondo Chino Venezolano**
**(aka, Chinese Venezuelan Fund), Stratus International Contracting J.S., Stratus Global**
**Investments Ltd., Clarity Trade and Finance S.A., Spanstar Holding GmbH, Petroleos de**
**Venezuela (aka, PDVSA), Stratusk Insaat Ve Taahhut A.S.**, including, but not limited to, the
following wire transfer information:

1.   Possible Originating Bank: Banco Del Tesoro, Caracas, Venezuela, BDTHVECA
2.   Possible Beneficiary Bank: Hypovreins Private Bank, Zurich, Switzerland, SHHBCHZZ,
     (aka, Hypovreins Privatbank, Falcon Private Bank, Falcon Privatbank)
3.   Possible Account Number: IBAN CH7708530651966310020S
4.   Possible CHIPS System Sequence Number: 0262787
5.   Possible Credit/Debit Reference Number: FAAS109400150500
6.   Possible Transaction Reference Number: 5111500094FC
7.   Possible Transaction Date: 4/4/2011
8.   Possible Amount: USD $29,442,967.57

Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the
subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the
defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the
subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

> **Commented [GI (2):** Can we be more precise about the
> production timing?

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC
("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and
OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the
case and solicited OFAC Officer-1's informal thoughts about whether the conduct under
investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed
that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New
York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A at 7.  In the email, SAUSA
Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide
grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

so you can take action on your own if so desired." *Id.*  On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10.  During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation.  In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY.  Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails.  *See* Ex. A at 12-14.  During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation.  The phone call did not happen until September 21, 2017.  *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened.").  On that day, SAUSA Lynch spoke to OFAC Officer-1.  Ex. A at 11.  During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges.  Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case.  *Id.*; *see* Ex. A at 26-47 (the "Presentation").  OFAC Officer-1 responded:  "[T]hanks for passing along the information below/attached.  We'll take a look and will get back to you."  *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15.  OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have."  *Id.*  SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16.  Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case.  *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse.  *See* Ex. B.  AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411.  AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411.  That same day, SAUSA Lynch located GX 411 in a file at his DANY office that contained Commerzbank's voluntary disclosures from 2015.  SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said:  "In the spirit of closing the loop on

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment."  None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email.  Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief.  At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been.  AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020.  GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails.  After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included.  The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense.  At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief.  AUSA Lake sent the document, along with others, to the defense.  The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

**IV.    OFAC's Handling of GX 411**

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411.  During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter.  OFAC reported further that the current absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012.  In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter.  As of approximately 5:00 p.m. tonight, OFAC had not identified any

> **Commented [G1(3]:** Any more context we can provide here?  It seems a little unusual that she was organizing emails midtrial and I could see the Court having questions as to why, whether it was case related, etc.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

employees who were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
    Jane Kim / Michael Krouse / Stephanie Lake
        Assistant United States Attorneys
    Garrett Lynch
        Special Assistant United States Attorney
    (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 99

**From:**       Bove, Emil (USANYS)
**To:**         Crowley, Shawn (USANYS)
**Subject:**    2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx
**Date:**       Monday, March 09, 2020 11:36:21 PM
**Attachments:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

This has everything but Garrett and Ilan.  For the folder, I changed it to:

That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

Re:    *United States* v. *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020. The Government has stipulated to the authenticity of GX 411 if the defense wishes it as a defense exhibit, and consents to the curative instruction proposed by the defense yesterday. (*See* Dkt. No. 274 at 2.) The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

I.    **The Government's Review**

In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team: AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States Attorney ("SAUSA") Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3]  The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.    The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.  Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with
DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to
the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New
York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the
subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the
defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the
subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC
("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and
OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the
case and solicited OFAC Officer-1's informal thoughts about whether the conduct under
investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed
that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New
York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA
Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide
grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so. SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

Kim and Krouse, which attached GX 411 and said:  "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment."  None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email.  Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief.  At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been.  AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020.  GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails.  After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included.  The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense.  At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief.  AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

### IV.    OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411.  During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter.  OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012.  In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter.  As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 100

| | |
|---|---|
| **From:** | Crowley, Shawn (USANYS) |
| **To:** | Bove, Emil (USANYS) |
| **Subject:** | RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx |
| **Date:** | Monday, March 09, 2020 11:36:58 PM |

Ok I'll add Garrett's and ilan's.

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 09, 2020 11:36 PM
**To:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

This has everything but Garrett and Ilan.  For the folder, I changed it to:

That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so.

# EXHIBIT 101

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Graff, Ilan (USANYS) |
| **Cc:** | Strauss, Audrey (USANYS); Birger, Laura (USANYS); Crowley, Shawn (USANYS) |
| **Subject:** | Re: Sadr Letter |
| **Date:** | Monday, March 09, 2020 11:39:08 PM |

Thanks everyone. We appreciate the help with this.

On Mar 9, 2020, at 11:35 PM, Graff, Ilan (USANYS) <IGraff@usa.doj.gov> wrote:

> Thanks, Emil.  A few nits, comments, and questions are in the attached (none of my comments are worth delaying filing into tomorrow if the answers aren't readily at hand).  I agree with Audrey and Laura that the letter is well done.
>
> ---
>
> **From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
> **Sent:** Monday, March 9, 2020 11:32 PM
> **To:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
> **Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
> **Subject:** RE: Sadr Letter
>
> Thanks, Audrey and Laura.
>
> In response to Audrey's question, we're comfortable that the team has completed the review, with the caveat, which we note in FN 4 of the letter, that we do not have access to any SDNY investigative files related to Commerzbank.  Our approach on that is to be candid about that scoping limitation and leave it to the Court and the defense to decide how they want us to handle.  We also note in that FN that no AUSA who participated in this case represented the USG in connection with Commerzbank, but that Denton participated in private practice.
>
> In response to Laura, we did not ask OFAC whether anyone other than Commerzbank asked them to take any action.
>
> ---
>
> **From:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
> **Sent:** Monday, March 9, 2020 11:22 PM
> **To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
> **Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
> **Subject:** Re: Sadr Letter
>
> Sorry. Email sent prematurely.
> I assume we have done all we can to be complete and accurate.
> But if we did not have opportunity to complete any aspect of process of collecting and checking, we should say so. It would not be ideal but better than having to correct after

submitting with no warning.
On the other hand if the team did complete the process and we have confidence in full accuracy,  do not caveat and we should be comfortable standing by our work.
I assume Ilan and Laura may have comments. I am signed off.


Sent from my iPhone


> On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov> wrote:
>
>  I have read it and agree with tone and approach: apologetic and appearing to make straightforward disclosure at relevant facts.
>
> Sent from my iPhone
>
>
>> On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov> wrote:
>>
>>
>> With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.
>> <2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>

<2020.03.09 Letter re OFAC contacts.EB3.sgc (ig edits).docx>

# EXHIBIT 102

**From:** Crowley, Shawn (USANYS)
**To:** Krouse, Michael (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett
**Cc:** Bove, Emil (USANYS)
**Subject:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx
**Date:** Monday, March 09, 2020 11:45:17 PM
**Attachments:** 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

Here's the final version from us.  We are signed off.  Garrett, please make sure this is accurate:  That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

Re:   *United States* **v.** *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020.  The Government has stipulated to the authenticity of GX 411 if the defense wishes it as a defense exhibit, and consents to the curative instruction proposed by the defense yesterday.  (*See* Dkt. No. 274 at 2).  The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

### I.    The Government's Review

In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team:  AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States Attorney ("SAUSA") Garrett Lynch.[1] Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

      Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2]  In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3]  The emails at issue are attached as Exhibit A.  In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.     The Commerzbank Investigation

      In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank.  The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System.  The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act (IEEPA) and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately 2002 and 2008.  During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to OFAC between March 2010 and October 2014.  GX 411 was one such

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the Government preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case.  *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and.  Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation.  The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States.  One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

disclosure.[5]  In March 2015, Commerzbank entered into a deferred prosecution agreement with
DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III.    The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to
the defendant.  On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New
York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4.  In October 2015, Commerzbank provided DANY with records in response to the
subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the
defense during Rule 16 discovery in this case.  GX 411 does not appear to be responsive to the
subpoena, and Commerzbank did not re-produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC
("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and
OFAC regulations.  Ex. A at 6.  During that call, SAUSA Lynch outlined the general facts of the
case and solicited OFAC Officer-1's informal thoughts about whether the conduct under
investigation potentially violated U.S. sanctions laws and regulations.  OFAC Officer-1 confirmed
that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New
York County, SAUSA Lynch sent OFAC Officer-1 an email.  Ex. A. at 7.  In the email, SAUSA
Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide
grand jury testimony.  SAUSA Lynch also offered in the email "to provide you with information

---

[5] SAUSA Lynch has been unable to determine when DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

so you can take action on your own if so desired."  *Id.*  On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers.  Ex. A at 10.  During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation.  In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY.  Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails.  *See* Ex. A at 12-14.  During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation.  The phone call did not happen until September 21, 2017.  *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened.").  On that day, SAUSA Lynch spoke to OFAC Officer-1.  Ex. A at 11.  During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges.  Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case.  *Id.*; *see* Ex. A at 26-47 (the "Presentation").  OFAC Officer-1 responded:  "[T]hanks for passing along the information below/attached.  We'll take a look and will get back to you."  *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche.  Ex. A at 15.  OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck."  OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have."  *Id.*  SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email.  Ex. A at 16.  Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case.  *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse.  *See* Ex. B.  AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411.  AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA."  AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411.  That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so.  SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. Neither AUSA Lake nor SAUSA Lynch recall the substance of the call, other than that it was brief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

## IV.    OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database at the present time may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

were familiar with the letter or any investigative or enforcement steps taken by OFAC with respect
to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
    Jane Kim / Michael Krouse / Stephanie Lake
      Assistant United States Attorneys
    Garrett Lynch
      Special Assistant United States Attorney
    (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 103

| | |
|---|---|
| **From:** | Lynch, Garrett |
| **To:** | Crowley, Shawn (USANYS); Krouse, Michael (USANYS); Kim, Jane (USANYS) 4 |
| **Cc:** | Bove, Emil (USANYS) |
| **Subject:** | RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx |
| **Date:** | Monday, March 09, 2020 11:53:39 PM |

That's right.



-------- Original message --------
From: "Crowley, Shawn (USANYS)" <Shawn.Crowley@usdoj.gov>
Date: 3/9/20 11:45 PM (GMT-05:00)
To: "Krouse, Michael (USANYS)" <Michael.Krouse@usdoj.gov>, "Kim, Jane (USANYS) 4"
<Jane.Kim@usdoj.gov>, "Lynch, Garrett" <LynchG@dany.nyc.gov>
Cc: "Bove, Emil (USANYS)" <Emil.Bove@usdoj.gov>
Subject: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

Here's the final version from us.  We are signed off.  Garrett, please make sure this is accurate:  That
same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had
segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but
does not recall when he did so.



This email communication and any files transmitted with it contain privileged and confidential
information from the New York County District Attorney's Office and are intended solely for
the use of the individuals or entity to whom it has been addressed. If you are not the intended
recipient, you are hereby notified that any dissemination or copying of this email is strictly
prohibited. If you have received this email in error, please delete it and notify the sender by
return email.

# EXHIBIT 104

| | |
|---|---|
| **From:** | Kim, Jane (USANYS) 4 |
| **To:** | Lynch, Garrett; Crowley, Shawn (USANYS); Krouse, Michael (USANYS) |
| **Cc:** | Bove, Emil (USANYS) |
| **Subject:** | RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx |
| **Date:** | Tuesday, March 10, 2020 12:05:27 AM |

Filed.

**From:** Lynch, Garrett <LynchG@dany.nyc.gov>
**Sent:** Monday, March 9, 2020 11:54 PM
**To:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Krouse, Michael (USANYS)
<MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>
**Cc:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Subject:** RE: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

That's right.

-------- Original message --------
From: "Crowley, Shawn (USANYS)" <Shawn.Crowley@usdoj.gov>
Date: 3/9/20 11:45 PM (GMT-05:00)
To: "Krouse, Michael (USANYS)" <Michael.Krouse@usdoj.gov>, "Kim, Jane (USANYS) 4"
<Jane.Kim@usdoj.gov>, "Lynch, Garrett" <LynchG@dany.nyc.gov>
Cc: "Bove, Emil (USANYS)" <Emil.Bove@usdoj.gov>
Subject: 2020.03.09 Letter re OFAC contacts.EB3.sgc.v2.docx

Here's the final version from us.  We are signed off.  Garrett, please make sure this is accurate:  That
same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had
segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but
does not recall when he did so.

This email communication and any files transmitted with it contain privileged and confidential
information from the New York County District Attorney's Office and are intended solely for
the use of the individuals or entity to whom it has been addressed. If you are not the intended
recipient, you are hereby notified that any dissemination or copying of this email is strictly
prohibited. If you have received this email in error, please delete it and notify the sender by
return email.

# EXHIBIT 105

**From:**       Crowley, Shawn (USANYS)
**To:**         Graff, Ilan (USANYS)
**Subject:**    Re: Sadr Letter
**Date:**       Tuesday, March 10, 2020 1:16:25 AM

We made the prosecution team edit. The other two we unfortunately don't know and couldn't figure out tonight. Thanks for reviewing.

On Mar 9, 2020, at 11:35 PM, Graff, Ilan (USANYS) <IGraff@usa.doj.gov> wrote:

Thanks, Emil.  A few nits, comments, and questions are in the attached (none of my comments are worth delaying filing into tomorrow if the answers aren't readily at hand).  I agree with Audrey and Laura that the letter is well done.

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 11:32 PM
**To:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
**Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** RE: Sadr Letter

Thanks, Audrey and Laura.

In response to Audrey's question, we're comfortable that the team has completed the review, with the caveat, which we note in FN 4 of the letter, that we do not have access to any SDNY investigative files related to Commerzbank.  Our approach on that is to be candid about that scoping limitation and leave it to the Court and the defense to decide how they want us to handle.  We also note in that FN that no AUSA who participated in this case represented the USG in connection with Commerzbank, but that Denton participated in private practice.

In response to Laura, we did not ask OFAC whether anyone other than Commerzbank asked them to take any action.

**From:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
**Sent:** Monday, March 9, 2020 11:22 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Re: Sadr Letter

Sorry. Email sent prematurely.
I assume we have done all we can to be complete and accurate.

But if we did not have opportunity to complete any aspect of process of collecting and checking, we should say so. It would not be ideal but better than having to correct after submitting with no warning.

On the other hand if the team did complete the process and we have confidence in full accuracy,  do not caveat and we should be comfortable standing by our work.

I assume Ilan and Laura may have comments. I am signed off.


Sent from my iPhone

> On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov> wrote:
>
>  I have read it and agree with tone and approach: apologetic and appearing to make straightforward disclosure at relevant facts.
>
> Sent from my iPhone
>
>> On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov> wrote:
>>
>>
>> With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.
>> <2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>
>> <2020.03.09 Letter re OFAC contacts.EB3.sgc (ig edits).docx>

# EXHIBIT 106

| | |
|---|---|
| **From:** | Strauss, Audrey (USANYS) |
| **To:** | Bove, Emil (USANYS); Crowley, Shawn (USANYS) |
| **Subject:** | RE: Sadr Letter |
| **Date:** | Tuesday, March 10, 2020 8:32:40 AM |

When convenient, pls send final around.
Thanks.

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Monday, March 9, 2020 11:39 PM
**To:** Graff, Ilan (USANYS) <IGraff@usa.doj.gov>
**Cc:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>; Birger, Laura (USANYS)
<LBirger@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Re: Sadr Letter

Thanks everyone. We appreciate the help with this.

On Mar 9, 2020, at 11:35 PM, Graff, Ilan (USANYS) <IGraff@usa.doj.gov> wrote:

> Thanks, Emil.  A few nits, comments, and questions are in the attached (none of my
> comments are worth delaying filing into tomorrow if the answers aren't readily at
> hand).  I agree with Audrey and Laura that the letter is well done.
>
> **From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
> **Sent:** Monday, March 9, 2020 11:32 PM
> **To:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
> **Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS)
> <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
> **Subject:** RE: Sadr Letter
>
> Thanks, Audrey and Laura.
>
> In response to Audrey's question, we're comfortable that the team has completed the
> review, with the caveat, which we note in FN 4 of the letter, that we do not have access
> to any SDNY investigative files related to Commerzbank.  Our approach on that is to be
> candid about that scoping limitation and leave it to the Court and the defense to decide
> how they want us to handle.  We also note in that FN that no AUSA who participated in
> this case represented the USG in connection with Commerzbank, but that Denton
> participated in private practice.
>
> In response to Laura, we did not ask OFAC whether anyone other than Commerzbank
> asked them to take any action.
>
> **From:** Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov>
> **Sent:** Monday, March 9, 2020 11:22 PM

**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Cc:** Birger, Laura (USANYS) <LBirger@usa.doj.gov>; Graff, Ilan (USANYS) <IGraff@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Subject:** Re: Sadr Letter

Sorry. Email sent prematurely.
I assume we have done all we can to be complete and accurate.
But if we did not have opportunity to complete any aspect of process of collecting and checking, we should say so. It would not be ideal but better than having to correct after submitting with no warning.
On the other hand if the team did complete the process and we have confidence in full accuracy,  do not caveat and we should be comfortable standing by our work.
I assume Ilan and Laura may have comments. I am signed off.


Sent from my iPhone

> On Mar 9, 2020, at 11:11 PM, Strauss, Audrey (USANYS) <AStrauss@usa.doj.gov> wrote:
>
>  I have read it and agree with tone and approach: apologetic and appearing to make straightforward disclosure at relevant facts.
>
> Sent from my iPhone
>
>> On Mar 9, 2020, at 10:45 PM, Bove, Emil (USANYS) <EBove@usa.doj.gov> wrote:
>>
>>
>> With apologies about the timing, attached is a draft of the letter.  Judge Nathan has not pinged us yet (we think she is working on the jury charge), but our hope is still to file this tonight if possible.
>> <2020.03.09 Letter re OFAC contacts.EB3.sgc.docx>
>
> <2020.03.09 Letter re OFAC contacts.EB3.sgc (ig edits).docx>

# EXHIBIT 107

**From:**          Crowley, Shawn (USANYS)
**To:**            Strauss, Audrey (USANYS)
**Cc:**            Bove, Emil (USANYS)
**Subject:**       Re: Sadr Letter
**Date:**          Tuesday, March 10, 2020 8:36:18 AM
**Attachments:**   127126538697.pdf
                   ATT00001.htm

Attached. Thanks.

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

Re:    *United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

    The Government writes to provide further facts regarding (1) the prosecution team's contacts with the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") regarding the defendant, the defendant's entities, and the banks that processed the payments at issue in this case, and (2) the circumstances surrounding the Government's untimely production of the June 16, 2011 letter from Commerzbank to OFAC that is currently marked for identification as GX 411.

    At the outset, the Government reiterates its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020.  The Government has stipulated to the authenticity of GX 411 if the defense wishes it as a defense exhibit, and consents to the curative instruction proposed by the defense yesterday.  (*See* Dkt. No. 274 at 2).  The Government is also prepared to execute the stipulation that defense counsel proposed this afternoon, and to consider any reasonable modifications to the stipulation based on the disclosures contained in this letter.

    I.    **The Government's Review**

    In response to the questions raised by the Court and counsel this morning, the unit supervisors overseeing this prosecution—Emil Bove and Shawn Crowley—communicated with the AUSAs previously assigned to this case—Andrew DeFilippis, David Denton, Rebekah Donaleski, and Matthew Laroche—and the current prosecution team:  AUSAs Jane Kim, Michael Krouse, Stephanie Lake, and Special Assistant United States Attorney ("SAUSA") Garrett Lynch.[1]
Based on the supervisors' instructions, today these eight prosecutors reviewed emails, network

---

[1] SAUSA Lynch is employed full-time with the District Attorney's Office of New York ("DANY") as an Assistant District Attorney ("ADA").

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 2

folders, hard copy files, and notes, for materials reflecting communications or correspondence with OFAC.

Based on today's review, the undersigned represent to the Court and counsel that (1) the eight line prosecutors named in the preceding paragraph did not at any point inquire of any OFAC employee about whether and to what extent OFAC considered or pursued regulatory enforcement action against the defendant, the defendant's entities, or the banks at issue based on their processing of the payments in this case (including but not limited to Commerzbank), and (2) the seven AUSAs named in the preceding paragraph were unaware of GX 411 prior to January 10, 2020, when SAUSA Lynch transmitted the document to AUSAs Lake, Kim, and Krouse via email.[2] In connection with today's review, SAUSA Lynch identified email communications with OFAC personnel that the Government produced to the defense for the first time tonight at 7:25 p.m. because they reflect somewhat substantive communications with OFAC regarding the case.[3] The emails at issue are attached as Exhibit A. In addition to representations (1) and (2), the undersigned represent to the Court and counsel that (3) at no time did SAUSA Lynch discuss GX 411 or Commerzbank's role in this case with anyone at OFAC.

## II.     The Commerzbank Investigation

In January 2012, while at DANY, and prior to the initiation of DANY's investigation into the defendant, SAUSA Lynch was assigned to work on an ongoing investigation into Commerzbank. The Commerzbank investigation commenced in approximately January 2011 and involved the United States Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of New York ("SDNY"),[4] OFAC, and the Board of Governors of the Federal Reserve System. The investigation focused on Commerzbank's violations of U.S. sanctions laws and regulations, including violations of the International Emergency Economic Powers Act and the Bank Secrecy Act as well as OFAC sanctions programs targeting Iran, between approximately 2002 and 2008. During the course of the Commerzbank investigation, Commerzbank provided to DANY 15 voluntary disclosures that the Commerzbank branch in New York City had sent to

---

[2] There is no dispute that SAUSA Lynch is a member of the prosecution team and that, as a result and as explained herein, GX 411 was in the hands of the prosecution team since 2015.

[3] The seven AUSAs identified additional communications with OFAC personnel, but they related principally to OFAC's verification that it did not issue licenses relevant to this case and to the preparation of OFAC witness Ted Kim.

[4] At approximately 9:00 p.m., the undersigned preliminarily determined that SDNY participated in the investigation of Commerzbank based on a press release related to the case. *See* https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and. Due to the timing of this discovery, the Government has not reviewed any SDNY case files related to the Commerzbank investigation. The seven AUSAs who participated in the investigation at issue in this case did not participate in the investigation of Commerzbank on behalf of the United States. One of the AUSAs, David Denton, participated in the investigation while in private practice prior to joining SDNY.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 3

OFAC between March 2010 and October 2014. GX 411 was one such disclosure.[5] In March 2015, Commerzbank entered into a deferred prosecution agreement with DOJ, SDNY, DANY, OFAC, and the Federal Reserve.[6]

### III. The Investigation of the Defendant

In May 2015, SAUSA Lynch was assigned to work on the DANY investigation related to the defendant. On or about August 31, 2015, DANY issued a subpoena to Commerzbank's New York branch in connection with the investigation of the defendant, which requested the following:



Ex. A at 4. In October 2015, Commerzbank provided DANY with records in response to the subpoena (the "Commerzbank Subpoena Production"), which the Government produced to the defense during Rule 16 discovery in this case. GX 411 does not appear to be responsive to the subpoena, and Commerzbank did not produce GX 411 to DANY in response to the subpoena.

On May 19, 2016, SAUSA Lynch spoke to a supervisory enforcement officer at OFAC ("OFAC Officer-1") with whom he had dealt on past cases involving U.S. sanctions laws and OFAC regulations. Ex. A at 6. During that call, SAUSA Lynch outlined the general facts of the case and solicited OFAC Officer-1's informal thoughts about whether the conduct under investigation potentially violated U.S. sanctions laws and regulations. OFAC Officer-1 confirmed that the facts outlined by SAUSA Lynch would constitute a violation.

On August 1, 2016, when DANY was preparing to present the case to a grand jury in New York County, SAUSA Lynch sent OFAC Officer-1 an email. Ex. A. at 7. In the email, SAUSA

---

[5] SAUSA Lynch has been unable to determine when specifically DANY received GX 411 from Commerzbank.

[6] *See* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/12/commerzbank_deferred_prosecution_agreement_1.pdf.

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 4

Lynch asked OFAC Officer-1 about the possibility of arranging for an OFAC witness to provide grand jury testimony. SAUSA Lynch also offered in the email "to provide you with information so you can take action on your own if so desired." *Id.* On August 2, 2016, OFAC Officer-1 responded and introduced his management team, including a Section Chief (the "Section Chief"). Ex. A at 8.

On or about August 5, 2016, SAUSA Lynch participated in a phone call with the Section Chief and two other OFAC enforcement officers. Ex. A at 10. During this call, SAUSA Lynch briefed OFAC on the general facts of the investigation into Mr. Sadr's alleged conduct.

DANY and the Federal Bureau of Investigation ultimately decided to pursue federal charges at SDNY rather than proceeding with the New York State grand jury investigation. In June 2017, SAUSA Lynch was appointed as a SAUSA at SDNY. Between July 12, 2017 and September 20, 2017, SAUSA Lynch and OFAC Officer-1 exchanged a series of emails. *See* Ex. A at 12-14. During those emails, SAUSA Lynch informed OFAC Officer-1 that he had been designated a SAUSA, and raised the possibility of arranging a phone call in July to discuss the ongoing investigation. The phone call did not happen until September 21, 2017. *See* Ex. A at 12 ("This call with SDNY that I tried to set up back in July never happened."). On that day, SAUSA Lynch spoke to OFAC Officer-1. Ex. A at 11. During that call, SAUSA Lynch summarized his understanding of the then-existing evidence in this case and solicited OFAC Officer-1's thoughts regarding the potential for federal charges. Following the call, SAUSA Lynch sent OFAC Officer-1 a PowerPoint presentation outlining some of the evidence in the case. *Id.*; *see* Ex. A at 26-47 (the "Presentation"). OFAC Officer-1 responded: "[T]hanks for passing along the information below/attached. We'll take a look and will get back to you." *Id.*

On September 26, 2017, OFAC Officer-1 responded again to the email attaching the Presentation, this time copying the Section Chief, another OFAC enforcement officer, and AUSA Laroche. Ex. A at 15. OFAC Officer-1 thanked SAUSA Lynch for "passing along the slide deck." OFAC Officer-1 stated that the two other OFAC officials copied would "coordinate with you on next steps or follow-up with any questions they have." *Id.* SAUSA Lynch does not recall anyone from OFAC following up with SAUSA Lynch to discuss next steps or questions.

On March 28, 2019, after an unrelated phone call with OFAC Officer-1 during which this case was mentioned, OFAC Officer-1 sent SAUSA Lynch an email. Ex. A at 16. Attached to the email were two documents related to a public enforcement action OFAC had taken with a fact pattern that OFAC Officer-1 believed to be similar to this case. *Id.* at 17-25.

On January 10, 2020, while preparing for trial, AUSA Stephanie Lake sent an email to SAUSA Lynch, copying AUSAs Jane Kim and Michael Krouse. *See* Ex. B. AUSA Lake's email mentioned the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411. AUSA Lake stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—"should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA." AUSA Lake's email triggered for SAUSA Lynch a recollection of GX 411. That same day, SAUSA Lynch located GX 411 in a hard copy file at his DANY office; SAUSA Lynch had

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 5

segregated letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so. SAUSA Lynch then sent an email to AUSA Lake, copying AUSAs Kim and Krouse, which attached GX 411 and said: "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." None of the three AUSAs responded to SAUSA Lynch's email.

AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. SAUSA Lynch recalls that he and AUSA Lake discussed the substance of GX 411 and whether to introduce it in the Government's case-in-chief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been. AUSAs Lake, Kim, Krouse, and SAUSA Lynch do not recall any other conversations about GX 411 between January 10, 2020 and March 6, 2020. GX 411 was not produced to the defense or marked as a Government Exhibit before trial.

On March 6, 2020, AUSA Lake found the January 10, 2020 email from SAUSA Lynch while organizing her emails. After reviewing GX 411, AUSA Lake looked at the Commerzbank Subpoena Production, and discovered that GX 411 was not included. The next morning, AUSA Lake consulted with the other members of the prosecution team, and concluded that GX 411 had not been produced to the defense. At that time, AUSAs Lake, Kim, Krouse, and SAUSA Lynch viewed GX 411 as an inculpatory document and decided to seek to admit GX 411 during the Government's case in chief. AUSA Lake sent the document, along with others, to the defense. The transmittal email failed to disclose that GX 411 had not been produced previously, and there is no dispute that was a failure in judgment on the part of the undersigned.

IV.     OFAC's Handling of GX 411

At approximately 6:00 p.m. on March 8, 2020, SDNY contacted OFAC in an effort to determine what, if anything, OFAC did in response to the letter from Commerzbank reflected in GX 411. During telephone calls today, OFAC reported that it has searched its database of correspondence, and is unable to find a copy of the letter. OFAC reported further that the absence of GX 411 from this database may have been caused by modifications to the database in approximately 2012. In addition to searching the database, OFAC asked personnel in OFAC's Enforcement, Compliance, and Global Targeting components if they were familiar with the letter. As of approximately 5:00 p.m. tonight, OFAC had not identified any employees who were

The Honorable Alison J. Nathan, U.S.D.J.
March 9, 2020
Page 6

familiar with the letter or any investigative or enforcement steps taken by OFAC with respect to the letter.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 108

| From: | Krouse, Michael (USANYS) |
|---|---|
| To: | Bove, Emil (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett; Lynch, Garrett (USANYS) [Contractor] |
| Subject: | Ted Kim |
| Date: | Tuesday, March 10, 2020 7:52:02 PM |
| Attachments: | Ted Kim testimony to strike 2020.03.04-c2.pdf |
| | Ted Kim testimony to strike 2020.03.05-c2.pdf |

Defense is proposing to strike the highlighted portions of Kim's testimony.  The didn't do as much as they probably could have, so we could just agree.

That said, if we want to push back at all, the first two we could push back on.

First attachment:

Page 473, line 10-19 **(Striking testimony on blocked assets in general is not a remedy to the late disclosure.)**
Page 501, line 15 - Page 502, line 2 **(I think the first couple of questions should stay, but think we can strike lines 23 to the next page.)**
Page 502, line 25 – Page 503, line 5 **(agree to cut)**
Page 507, line 5 – Page 510, line 25 **(agree to cut)**

Second attachment:

Page 600, line 23-25 (partial) **(agree to cut)**
Page 601, line 4-9 (partial) **(agree to cut)**
Page 652, line 18-20 **(agree to cut)**
Page 653, line 19 – Page 656, line 11 **(agree to cut)**
Page 659, lines 1-5 **(agree to cut)**

K34nsad1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                      18 CR 224 (AJN)

5    ALI SADR HASHEMI NEJAD,

6                 Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       March 4, 2020
9                                      9:00 a.m.

10

11   Before:

12              HON. ALISON J. NATHAN,

                                       District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     JANE KIM
17   MICHAEL KROUSE
     STEPHANIE LAKE
18        Assistant United States Attorneys

19   STEPTOE & JOHNSON
          Attorneys for Defendant
20   REID WEINGARTEN
     BRIAN HEBERLIG
21   BRUCE BISHOP

22

23

24

25
```

K34TSAD6                          Kim - Direct

1   sent to another non-Iranian foreign bank.  This general license

2   was referred to as the U-turn license.

3         On November 10, 2008 U.S. Department of Treasury

4   revoked the U-turn license.  The parties do not dispute that

5   prior to November 10, 2008, transactions of the type charged in

6   the indictment, that is international wire fund transfers from

7   one non-Iranian foreign bank to another non-Iranian foreign

8   bank processed by a U.S. intermediary bank, would not have

9   violated the ITR.

10         It is further stipulated and agreed that this

11   stipulation may be received in evidence as Government Exhibit

12   105 at trial, and government offers Government Exhibit 105.

13         MR. HEBERLIG:  No objection.

14         THE COURT:  Thank you, 105 is admitted.

15         (Government's Exhibit 105 received in evidence)

16         THE COURT:  And Mr. Kim may come forward.

17   TED KIM,

18      called as a witness by the Government,

19      having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. KIM:

22         THE COURT:  You may inquire.

23         MS. KIM:  Thank you, your Honor.

24   Q.  Good afternoon, Mr. Kim.

25   A.  Good afternoon.

K34TSAD6                          Kim - Direct

1    Q.  Where do you work?

2    A.  I work in Washington, DC.

3    Q.  Who do you work for?

4    A.  I work for U.S. Department of the Treasuries, Office of

5    Foreign Asset Control.

6    Q.  Does the Office of Foreign Assets Control also go by OFAC?

7    A.  Yes, by acronym, it is usually called OFAC.

8    Q.  What is your current title?

9    A.  My current title is senior enforcement officer.

10   Q.  How long have you been an enforcement officer at OFAC?

11   A.  Six years.

12   Q.  What did you do before you joined OFAC?

13   A.  I worked as an intelligence analyst at the Federal Bureau

14   of Investigation.

15   Q.  For how long were you an intelligence analyst at the FBI?

16   A.  Five years.

17   Q.  Do you have a law degree?

18   A.  Yes, I do.

19   Q.  When did you obtain your law degree?

20   A.  I have two law degrees, one is bachelor's and the other one

21   is master's.  I obtained bachelor's degree in 1992 and master's

22   in 2002.

23   Q.  Could you please explain for the jury what OFAC's primary

24   responsibilities are.

25   A.  OFAC's primary responsibility is to implement and enforce

1   economic sanctions rules established by U.S. president.

2   Q.  And at a very basic level, what are economic sanctions?

3   A.  Economic sanctions is one of foreign policy tools U.S.

4   government employs to change foreign countries or governments'

5   actions and policies that pose a threat to U.S. national

6   security.  So economic sanctions usually cut off and exclude

7   target country or government from U.S. and international

8   finance and economic system, thereby creating economic pressure

9   on the targeted country or government so that they can change

10  their behavior.

11  Q.  Approximately how many sanctions programs does OFAC

12  administer?

13  A.  About 30.

14  Q.  Is there a sanctions program in place for Iran?

15  A.  Yes.

16  Q.  And as an enforcement officer at OFAC, what are your

17  primary responsibilities?

18  A.  As an enforcement officer I investigate sanctions

19  violations and take enforcement actions to sanctions violators

20  according to U.S. sanctions rules and regulations.

21  Q.  Have you worked on cases involving the Iran sanctions

22  program?

23  A.  Yes, I have.

24  Q.  Approximately how many?

25  A.  Hundreds of cases involving Iran.

K34TSAD6                          Kim - Direct

1    Q.   In your position as an enforcement officer at OFAC, have

2    you led trainings about the Iran sanctions program?

3    A.   Yes, I have.

4    Q.   Have you advised others with respect to the Iran sanctions

5    program?

6    A.   Yes, I have.

7    Q.   And again, at a very basic level, we'll go into it in more

8    detail, but could you please describe what you mean when you

9    say the Iran sanctions program?

10   A.   The Iran sanctions program -- among 30-something sanctions

11   programs we administer of OFAC, the Iran sanctions program is

12   one of the most comprehensive trade embargoes put in place

13   against Iranian banks, individuals, government, companies.  So

14   it is one of the comprehensive sanctions programs.

15   Q.   And what do you mean when you say "comprehensive?"

16   A.   Comprehensive means the sanctions program like Iran

17   sanctions program prohibits virtually all of Iranian entities

18   having transactions from U.S. persons' engagement.  So when

19   comprehensive trade embargo was put in place, then U.S. persons

20   cannot import or export, cannot deal with any transaction

21   related to Iran.  So virtually all or most of all the

22   transactions are cut off and excluded from U.S. finance and

23   economy.

24   Q.   When you say "U.S. persons," what do you mean?

25   A.   U.S. persons is defined in the economic sanctions rules.

K34TSAD6                          Kim - Direct

1  U.S. persons include U.S. citizens and green card holders and

2  U.S. companies organized under U.S. jurisdiction and its

3  branches overseas and any personal entity present within the

4  United States.  So U.S. persons includes those entities and

5  persons I mentioned.

6  Q.  I would like to start just by talking a little bit about

7  sanctions programs generally before we move to the Iran

8  program.  How are U.S. sanctions typically established?

9  A.  U.S. sanctions are typically established when the President

10  of the United States declares national emergency with regard to

11  a threat posed by foreign country or government.  And at the

12  same time the President exercise his authority to regulate U.S.

13  international commerce to deal with the threat against what is

14  declared national emergency.  The way that the President wants

15  to deal with the threat becomes the content of the economic

16  sanctions program.

17  Q.  And under what authority is the President able to declare a

18  national emergency?

19  A.  U.S. Presidents, such authorities are granted by a law, it

20  is called International Emergency Economic Powers Act.  By the

21  law the Congress granted U.S. President to declare national

22  emergency and regulate international commerce and establish

23  economic sanctions program.

24  Q.  Is the declaration of a national emergency typically issued

25  through an executive order?

K34TSAD6                         Kim - Direct

1    A.   That's correct.

2    Q.   And are executive orders also called EOs for short?

3    A.   Yeah.

4    Q.   And what types of actions, if any, are typically taken

5    after a President declared a national emergency?

6    A.   As I said, when President declares national emergency, then

7    he also issues order in the executive order how to deal with

8    the threat that caused him to declare national emergency.  So

9    in the typical -- typically when President issues an executive

10   order, he declares national emergency and the actions he wants

11   to take to handle this national emergency.  And in here he

12   lists the prohibitions and then he also mandates U.S.

13   government agencies like the Treasury and OFAC to implement the

14   orders he listed in the executive order.  That is how it goes

15   from declaration under IEEPA and then the issuance of the

16   executive order to deal with the threat, the foreign threat

17   U.S. national security, and then in the EO mandates his own

18   administration to deal with those national emergency.

19   Q.   And at a very basic level, what kinds of prohibitions are

20   typically included in a sanctions program?

21   A.   As I said, it could be comprehensive and it could be

22   partial, there are multiple, many options.  So importation from

23   Iran can be prohibited, and also exportation to Iran, any

24   dealing with Iran, for solicitation, as I said, and so on.  So

25   there are many options.

K34TSAD6                         Kim - Direct

1    Q.  And to what kinds of entities do these prohibitions

2    typically apply?

3    A.  Prohibitions apply to any person or any entity, can be

4    applied to individual, can be applied to companies,

5    associations, government.

6    Q.  So I would like to talk about two concepts before we turn

7    to the Iran sanctions program.  Are you familiar with licensing

8    in the sanctions context?

9    A.  Yes.

10   Q.  What is licensing generally?

11   A.  Licensing is permission issued by the agency I work for,

12   OFAC's permission given to the licensee, normally U.S.

13   companies, to conduct a transaction that is prohibited without

14   the license.

15   Q.  Can a person apply for a license?

16   A.  Yes.

17   Q.  Can companies apply for a license?

18   A.  Yes.

19   Q.  And who grants a license, the license?

20   A.  OFAC does.  After reviewing the license application filed

21   by those applicants, the individuals or companies, we review,

22   and OFAC makes a determination and issues an answer.

23   Q.  So the second term I want to talk about is SDNs.  In the

24   context of sanctions, are you familiar with OFAC's Specially

25   Designated Nationals and blocked persons list?

K34TSAD6                        Kim - Direct

1     A.  Yes.

2     Q.  And is this list also called the SDN list?

3     A.  Yes.

4     Q.  What is the SDN list?

5     A.  The SDN list is a collection of names of individuals,

6     persons or cooperations and government units, that are

7     designated by OFAC as a person to be blocked, a person U.S.

8     people should be very careful when they deal with.  So SDN list

9     is, again, let me rephrase, is a list of designated entities

10    and individuals.

11    Q.  And when you say "blocked," what do you mean by blocked?

12    A.  Blocked means when an entity or person becomes an SDN and

13    their name is listed on the SDN list then their property or any

14    interest related to this property has to be blocked when that

15    property and property interest comes under U.S. person's

16    position or control.  So then when it's blocked, then it cannot

17    be transferred, it cannot be sold or leased, it cannot be lent.

18    So no action can be taken to this blocked property.

19    Q.  Who administers the designation of SDNs?

20    A.  OFAC does.

21    Q.  And when you say that dealings with SDNs are prohibited,

22    can you give us an example of what kinds of dealings we're

23    talking about?

24    A.  Yes.  As I talked a little bit before, when SDN's property

25    is blocked, for example, SDN's money is blocked, then that

K34TSAD6                          Kim - Direct

money should be put into a blocked account.  And then you
cannot do anything with it, just have to report to OFAC what is
blocked, when it is blocked, how it is blocked now.  And then
also, if a blocked person's property is blocked, like a diamond
ring, for example, is blocked, then the diamond ring has to be
placed in blocked property storage and then maintained there.
It cannot be lent, it cannot be used, it cannot be displayed
for anything, it just be -- it has to be stayed there.
Q.  So what happens if an SDN tries to transact with a U.S.
bank, what, if anything, would happen?
A.  When an SDN wants to transact with U.S. bank, then the
transaction, whatever it is, the property that is subject to
the transaction must be blocked when it touch U.S.
jurisdiction.
Q.  By property, is money or a financial transaction a form of
property?
A.  Yeah, if it is a financial transaction, like sending money,
receiving money, then that money is subject to -- that money
that is an object to financial transaction must be blocked.
Q.  And is there a time when OFAC learns about blocked
transactions?
A.  Yes, within I believe it's ten days, U.S. bank, when they
block those SDN's property, they have to report to OFAC the
blocking they exercised.
Q.  What kinds of information do banks report to OFAC when a

K34TSAD6                    Kim - Direct

1   transaction is blocked?

2   A.  Banks are required to provide OFAC as much information as

3   possible, and those information include the sender's identity

4   and address, recipient of the money, the funds, and the

5   recipient's address and how much was it, when blocking was

6   done.  And if there's any additional information it's recorded

7   in the money transfer instruction, and all those information

8   should be selected and reported to OFAC in the form of blocking

9   report.

10  Q.  Is it important for OFAC to receive this blocking report?

11  A.  Yes.

12  Q.  Why?

13  A.  This is how we -- this is why we exist, the Office of

14  Foreign Asset Control.  It's blocked assets.  We administer how

15  many blocks -- what assets, what properties are blocked, and we

16  manage -- we regulate these blocked properties so that these

17  are staying as blocked, so unless -- we have to know, we have

18  to know to implement the sanctions program.  So it's the core,

19  one of the core of the sanctions program.

20              MS. KIM:  Your Honor, may I approach?

21              THE COURT:  Showing?

22              MS. KIM:  Government Exhibit 601, or what's marked as

23  Government Exhibit 601, I'll start with this one.

24              THE COURT:  Okay.

25  Q.  So I handed you what is marked as Government Exhibit 601.

1    Could you please take a look at this document.

2            MS. KIM:  And Mr. Milione, if you could pull up 601

3    and publish it just for the witness.

4    Q.  Do you recognize this document?

5    A.  Yes, I do.

6    Q.  Did you review it before your testimony today?

7    A.  Yes.

8    Q.  Did you participate in its creation?

9    A.  Yes.

10   Q.  Would displaying this document assist you as you testify

11   today about the Iran sanctions program?

12   A.  Yes.

13           MS. KIM:  Your Honor, the government would like to

14   publish this as a demonstrative.

15           MR. WEINGARTEN:  No objection.

16           THE COURT:  601 may be published as a demonstrative.

17           MR. WEINGARTEN:  One second.

18           (Pause)

19           MR. BISHOP:  There's a question about this document.

20           THE COURT:  We're about to take our afternoon break.

21   Why don't we do this now as we're sorting this out.

22           Members of the jury, we'll resume in 15 minutes.

23           (Jury not present)

24           THE COURT:  Mr. Kim, you may step down.

25           (Witness not present)

K34TSAD6                          Kim – Direct

1            THE COURT:  Do you need me?

2            MR. BISHOP:  I think we can work it out, it's

3    confusing on the different versions.

4            (Recess taken)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Matters to take up?

2          The document issue is resolved?

3          MR. KROUSE:  Yes.

4          MR. WEINGARTEN:  Yes.

5          THE COURT:  I do just want to confirm that Mr. Kim's

6    testimony, the scope of it, is what the parties agreed to, no

7    surprises.

8          Obviously, the defense isn't objecting, but no

9    surprises in terms of what's coming out regarding the level of

10   generality as to the sanctions and the like.

11         MS. KIM:  I think that's correct, your Honor.

12         THE COURT:  I know you're not surprised.  You wrote

13   your outline.  I suppose most specifically it was a question

14   for Mr. Weingarten.

15         MR. WEINGARTEN:  I am at the edge of my seat, your

16   Honor.

17         THE COURT:  So that means it's what you expected, no

18   surprises?

19         MR. WEINGARTEN:  So far.

20         THE COURT:  All right.

21         Ms. Kim, you were saying you conferred?

22         MS. KIM:  Well, we produced, there were multiple

23   iterations what's marked as Government Exhibit 601, and so the

24   scope of his testimony is largely based on that document.

25         THE COURT:  All right.  Thank you.

K34nsad7                    Kim - Direct

1              We can bring Mr. Kim back in and to the stand, please.

2              Thank you.  I was going to make a joke that maybe when

3    we took the break the construction noise would stop and --

4              MS. KIM:  It did.

5              THE COURT:  Now that I've said that, we're about to

6    hit traffic.

7              You may come forward, Mr. Kim.  Thank you.

8              (Witness resumed)

9              THE COURT:  Ms. Kim, your time estimate?

10             MS. KIM:  Time estimate, your Honor?

11             THE COURT:  Yes.

12             MS. KIM:  I think around two hours total, so probably

13   around an hour and a half more.

14             THE COURT:  OK.  That will work well.

15             It is good to stand and stretch.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you.  Everyone may be seated.

3              Thank you, members the jury.  I know I can't say you

4     enjoyed the outdoors, but I hope the cookies were at least a

5     small compromise.

6              We will continue with the direct testimony of Mr. Kim.

7              Ms. Kim, you may proceed.

8              MS. KIM:  Thank you, your Honor.

9              If we could please publish what's marked as Government

10    Exhibit 601, turning to page 2.

11             THE COURT:  Again, so we have agreement on this

12    document, Mr. Weingarten, as a demonstrative?

13             MR. WEINGARTEN:  No objection as a demonstrative.

14             THE COURT:  Thank you.

15    BY MS. KIM:

16    Q.  Mr. Kim, could you please explain to the jury generally

17    what is depicted on this slide.

18    A.  Yes.  These are the executive orders issued by the

19    president and sanctions regulations issued by OFAC.  These five

20    documents are in fact the most important documents that

21    formulate the framework of the Iran sanctions program.

22    Q.  Let's start with the first one.

23             MS. KIM:  If we could turn to the next slide.

24    Q.  This is executive order 12957.  When was this executive

25    order issued?

1    A.  It was issued March 15, 1995.

2    Q.  Could you please describe this executive order generally

3    for the jury.

4    A.  This executive order is the executive order where the

5    president issued a national emergency with regard to the threat

6    posed by Iran, Iranian government policy and actions.  This

7    executive order has certain prohibitions, and also like, this

8    executive order includes prohibition against evasion, and this

9    prohibition against evasion clause is one of the prohibitions

10   in the executive orders.

11              MS. KIM:  Your Honor, may I approach with what's

12   marked as government Exhibit 603.

13              THE COURT:  Yes.

14   Q.  I just handed you what's marked as Government Exhibit 603.

15              Are you familiar with this document?

16   A.  Yes.

17   Q.  Is this a copy of the executive order issued on March 15,

18   1995?

19   A.  Yes.

20   Q.  Do you work with this executive order on a regular basis?

21   A.  Yes.

22              MS. KIM:  Your Honor, the government offers Government

23   Exhibit 603.

24              MR. WEINGARTEN:  No objection.

25              THE COURT:  603 is admitted.

1           MS. KIM:  Permission to publish for the jury.

2           THE COURT:  OK.

3           MS. KIM:  If we could zoom on in on the second

4    paragraph starting I William J. Clinton.

5    BY MS. KIM:

6    Q.  Mr. Kim, could you please read this paragraph for the jury.

7    A.  Yes.  "I, William J. Clinton, President of the United

8    States of America, find that the actions and policies of the

9    government of Iran constitute an unusual and extraordinary

10   threat to the national security, foreign policy, and economy of

11   the United States, and hereby declare a national emergency to

12   deal with that threat."

13   Q.  Thank you.  Was this the first time that a U.S. president

14   declared a national emergency with respect to Iran?

15   A.  Not the first time.  There was a time a U.S. president

16   declared a national emergency to Iran before.

17   Q.  And was this the first time that the U.S. had imposed

18   sanctions on Iran?

19   A.  There was a time before.  No, this is not.

20   Q.  Is there a national emergency with respect to Iran still in

21   effect today?

22   A.  Yes.

23   Q.  Just so we can better understand this process, after a

24   national emergency is declared by a U.S. president, how does

25   that emergency continue to be in effect?

1    A.   In order to -- in order for the national emergency declared

2    initially to continue in effect, the U.S. president has to

3    confirm or redeclare the emergency, national emergency

4    annually.  So here the national emergency was declared to a

5    threat from Iran, and this emergency was confirmed every year

6    and announced to the public.

7    Q.   So has the national emergency with respect to Iran

8    continued to be in effect since March 15, 1995?

9    A.   Yes.

10   Q.   So if we can turn back to what's marked as Government

11   Exhibit 601, and if we could turn to page 4.  Let's talk about

12   the executive order that was issued on May 6, 1995.

13           Executive Order 12959, could you please describe this

14   executive order generally for the jury.

15   A.   Yes.  This executive order is significant in terms of the

16   Iran sanctions program because this executive order created the

17   comprehensive trade embargo against Iran and prohibited

18   virtually all imports and exports, and all Iranian commerce and

19   business were prohibited under this executive order.

20           As a safety measure, again, there is a prohibition

21   against any evasive actions for the purpose of going around the

22   primary prohibition on Iranian commerce and business.

23   Q.   So let's turn to the next slide, to the Iranian

24   transactions regulations, or the ITR.  What is the ITR?

25   A.   The ITR is the obligation of the Iranian sanctions

K34nsad7                        Kim - Direct

1    regulations that was issued by OFAC in here, September 11,

2    1995.

3    Q.   And did the ITR include prohibitions?

4    A.   Yes.  Actually, ITR incorporates all the prohibitions

5    issued in the EO issued by the president.  The prohibitions

6    ordered by the president is included here, and what OFAC added

7    is defining some words and some interpretation by which OFAC

8    applies and interprets the executive orders issued by the

9    executive order.

10   Q.   What kinds of prohibitions in terms of exports are

11   included?

12   A.   In terms of exports, the prohibition is the prohibition of

13   exportation or reexportation of goods, services, and technology

14   from the United States or by a U.S. person to Iran or the

15   Iranian government.

16   Q.   What are some examples of services?

17   A.   The typical examples of the services is like engineering

18   consulting services given to an Iranian construction company,

19   or another typical example is the services provided by U.S.

20   banks and financial institutions to Iran when U.S. banks

21   process money transfers that involve Iran, whether directly or

22   indirectly.  When Iran is involved in a money transfer

23   transaction, that goes through United States banks, if U.S.

24   banks process that, that typical financial service is

25   prohibited.

K34nsad7                          Kim - Direct

Q.   Let's turn to the next slide.  Are you familiar with an
amendment to the ITR that was implemented on November 10, 2008?
A.   Yes.
Q.   So, taking a step back, in the context of the Iran
sanctions program, are you familiar with something called the
U-turn license?
A.   Yes.
Q.   What is the U-turn license?
A.   U-turn license, before explaining the U-turn license, I
would like to describe what U-turn transfer is first.
          U-turn transfer is a U.S. dollar transfer between two
foreign banks which is going through United States banks.  So
it starts outside of the United States and ends outside of the
United States.  This type of U-turn transfer in itself is
commonly used by any foreign business entities, but when Iran
gets involved in any U-turn transfers, then under the Iran
sanctions program, the EO and ITR, U.S. banks are not allowed
to process those Iran-related U-turn transfers, because if U.S.
banks do it, then it will be considered as an exportation or
provision of services for the benefit of Iran.
          So it was the foundation, but OFAC created an
exception to this overall ban on Iran-related U-turn transfer
prohibition.  So by issuing U-turn license, OFAC give
permission to United States financial institutions to process
U-turn transfers even if Iran is involved on the condition that

K34nsad7                        Kim - Direct

1    U.S. banks are not dealing with Iran directly.  So money can

2    flow from Iran to a third country bank, U.S. bank, third

3    country bank and Iran, like this.

4    Q.   Did there come a time when the U-turn license was revoked?

5    A.   Yes.

6    Q.   When was the U-turn license revoked?

7    A.   The U-turn license was revoked effective November 10, 2008.

8    Q.   What were some of the reasons why the U turn license was

9    revoked?

10   A.   OFAC revoked the U-turn license because Iranian banks and

11   companies used the U-turn license for their unlawful purposes.

12   Because Iranian banks and companies abused and misused the

13   U-turn license, OFAC revoked this license at the time.

14   Q.   And what do you mean by abused?

15   A.   Abused means like Iranian banks and companies were using

16   the U-turn license, were sending money, U.S. dollars to

17   entities that are conducting illicit, illegal, unlawful

18   activities, and Iranian banks and companies were using

19   deception so that U.S. banks wouldn't know what's going on.

20   So, using these deceptive practices, Iranian banks and

21   companies were using the U-turn license to send money to

22   entities to conduct unlawful acts.  So if OFAC let it go, then

23   we couldn't do that, because then U.S. banks will end up --

24          MR. WEINGARTEN:  I respectfully object, your Honor.

25   This is running far afield from the original understanding we

1    had.

2              THE COURT:  Sustained.

3    Q.  Mr. Kim, when you say that transactions were passing

4    through U.S. banks, what you do mean by that?

5    A.  When an international transaction is conducted in U.S.

6    dollars and the international transaction is settled in U.S.

7    dollars, in order to settle in U.S. dollars, then buyers, the

8    purchaser's, buyer's bank should send money to seller's bank

9    through the United States.  Because it's a dollar transaction

10   between foreign bank and foreign bank, the dollar transaction

11   is settled, usually, in most of the cases, it is settled

12   through its buyer's bank, correspondent bank in the United

13   States, and seller's bank, correspondent bank in the United

14   States.  These correspondent banks settle the money transfer

15   between these two foreign banks in the United States.

16             So it doesn't look like U.S. is involved from outside,

17   but whenever foreign --

18             MR. WEINGARTEN:  Respectfully, your Honor, this is

19   coming --

20             THE COURT:  Sustained.

21   Q.  Mr. Kim, I would appreciate it if you could just listen to

22   the question --

23   A.  OK.

24   Q.  -- and make sure you're responding to the question.  Thank

25   you.  You testified a minute ago that the U-turn license was

1    revoked on November 10, 2008.

2    A.  Yes.

3    Q.  Was this a substantial sanction against Iran?

4    A.  Yes.

5    Q.  Why?

6    A.  Because when the U-turn license is revoked, Iranian access

7    to U.S. financial services is cut off.  So Iranians will be

8    difficult to conduct international business in U.S. dollars

9    when they deal with third country business entities.

10   Q.  And what is the significance of U.S. dollars?

11   A.   In international business, the U.S. dollar is the most

12   reliable and most widely used currency, so most of the

13   international business people want to buy and sell in U.S.

14   dollars.  So if you cannot buy and sell in U.S. dollars, then

15   it will be difficult for Iranian banks and companies to find

16   business partners.

17   Q.  What about the euro?

18   A.  Euros can be used as transaction currency, but the euro is

19   not popular as much as the U.S. dollar is.

20   Q.  Was the U-turn revocation made public in 2008?

21   A.  Yes.

22   Q.  Do you know if the U.S. Department of Treasury issued a

23   press release about the U-turn revocation?

24   A.  Yes.

25   Q.  Did it issue a press release?

K34nsad7                        Kim - Direct

1   A.  Yes.

2   Q.  Do you know if there was news coverage about the U-turn

3   revocation?

4   A.  Yes.

5            MS. KIM:  Your Honor, may I approach with what's been

6   marked as Government Exhibits 607 through 611?

7            THE COURT:  OK.

8   Q.  I just handed you what's been marked as Government Exhibit

9   607 through 611.  If you could please focus on the first three

10  exhibits, Government Exhibits 607, 608 and 609.

11           MS. KIM:  Mr. Milione, if you could just publish 607

12  for the witness.

13  BY MS. KIM:

14  Q.  So I would like to walk through these documents with you.

15  Are you familiar with this document, Government Exhibit 607?

16  A.  Yes.

17  Q.  Is this a document that you reference as an enforcement

18  officer at OFAC?

19  A.  Yes.

20  Q.  Is this a press release issued by the U.S. Department of

21  Treasury on November 6, 2008, in connection with the U-turn

22  revocation?

23  A.  That's correct.

24           MS. KIM:  Your Honor, the government offers Government

25  Exhibit 607.

K34nsad7                          Kim - Direct

1          MR. WEINGARTEN:  Respectfully, I ask for a proffer,

2    your Honor, as to why, just the purpose.

3          THE COURT:  You can confer.

4          (Counsel conferred)

5          MR. WEINGARTEN:  Can we have one minute at sidebar.

6          THE COURT:  OK.

7       (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. WEINGARTEN:  I guess this is being offered as a

3    display of how this was publicized, with the suggestion that my

4    client must have known about it.  It is a goose and a gander

5    thing.  I have never been entirely clear on what legal

6    documents we can use and what public documents we can use.  I

7    guess I can't ask for an anticipatory ruling, but I am offering

8    my views about this that I hope we get equal treatment from the

9    government if we agree to this.

10         THE COURT:  Well, let's be clear.  The suggestion is

11   that this somehow opens the door to something that you want to

12   get in that you have concerns otherwise wouldn't?

13         MR. WEINGARTEN:  Obviously.

14         THE COURT:  So, for example, what?

15         MR. WEINGARTEN:  I don't have a specific thing in my

16   head.  These are public statements offered by officials of the

17   Department of the Treasury.  We have only had a thousand of

18   those, so we'll go through them tonight.  I mean, I guess I

19   would -- I don't know what I am asking for.  I apologize for

20   wasting your time.

21         THE COURT:  It is not a waste of time because I think

22   it's important in light of all that we have discussed.

23         MR. WEINGARTEN:  Yes.

24         THE COURT:  If there is going to be an argument about

25   opening the door that somehow contradicts that, it should be

K34nsad7                          Kim - Direct

1    raised before the door is opened.

2             MR. WEINGARTEN:  I agree.  The general sense that

3    these documents were being offered for notice to the world that

4    the U-turn has been revoked, we're fine with that.

5             THE COURT:  No objection?

6             MR. WEINGARTEN:  No objection.

7             THE COURT:  OK.  Any questions from the government?

8             MR. LYNCH:  Opening the door to what.

9             MS. KIM:  Opening the door to any press about the

10   sanctions program.

11            MR. KROUSE:  This is mainly just responsive to the

12   defendants' argument that the existence of the U-turn

13   previously was somehow relevant to the defendant's state of

14   mind because he thought that the U-turn was still in effect or

15   something like that.  This is addressing that as widely

16   publicized.  It's relevant in the context of what the defense

17   has argued.  The government moved *in limine* to keep the U-turn

18   out entirely and the defense opposed that on the state of mind

19   theory.  The government would introduce this to show that state

20   of mind was unreasonable.

21            MR. WEINGARTEN:  I think what is the most interesting

22   legal issue in this entire case is what evidence can be

23   introduced on either side to show state of mind that the

24   defendant hasn't seen.

25            MR. KROUSE:  This is directly tied to something that

1    the defendant is arguing.  It is with a competent witness.  I

2    don't think it's opening up the door to anything.

3            MR. WEINGARTEN:  OK.  We're fine with this.

4            MR. KROUSE:  We can take up the defense's exhibits

5    when they offer them.

6            MS. KIM:  If you think this opens the door to any

7    press release by the Treasury Department, we don't need to

8    offer it.

9            MR. KROUSE:  We don't believe that.  We are offering

10   it.  It doesn't open the door to anything I don't think.

11           THE COURT:  I suppose they can try to elicit, for

12   example, a thousands press releases, who reads those?  You can

13   call into question the inference you are seeking to draw.  It

14   opens the door to that, to rebutting that.  To be clear, I have

15   said for evidence of sort of state of the law to be relevant to

16   Mr. Sadr's state of mind he has to show evidentiary his

17   awareness of it, his knowledge of it.  You are seeking an

18   inference of general availability of a press release to infer

19   Mr. Sadr's knowledge.

20           MS. KIM:  I think it's also connected to some evidence

21   in the case where, for example, there is an e-mail where Sadr

22   checks the OFAC website for whether or not his particular

23   entity has been designated.  That shows that he is familiar

24   with the Treasury OFAC, with OFAC website, and has access to

25   its press.

1          MR. KROUSE:  Your Honor, to your point, if the defense

2     is going to argue it opens the door for certain things, it

3     would be helpful to know before the door was opened.  We don't

4     want the horse running out of the barn.  If the view from the

5     Court is that introducing this document somehow opens the door

6     to a wide ranging introduction of press articles about various

7     topics, we are making what we think is a pretty narrow point to

8     rebut the defense argument that --

9          THE COURT:  There was some press release on the same

10    website that Ms. Kim just proffered there's evidence of

11    Mr. Sadr checked.  They wanted to use it to counter the

12    inference that you are making or to suggest a different

13    understanding of the law.  The same inference will be available

14    for the defense as the inference that you are seeking to be

15    made here.

16         MR. KROUSE:  Yes.  If there exists anything like that,

17    that would be open to the defense.

18         THE COURT:  I am always the last to know.  I just want

19    to make sure because we have spent a lot of time talking about

20    the state of mind piece.

21         MR. WEINGARTEN:  Yes.

22         THE COURT:  What I have said to the defense is for it

23    to be relevant and nonprejudicial there has to be an

24    evidentiary link to Mr. Sadr's knowledge.  I think that link,

25    there is an inferential link available here.  By what the

K34nsad7                          Kim - Direct

1    government is doing, that certainly opens the door to a

2    comparable inferential link for the defense.

3              MR. KROUSE:  What we will do is not actually offer the

4    documents into evidence, the press release and the articles,

5    and just ask Mr. Kim was the revocation of the OFAC license or

6    was --

7              THE COURT:  It's the same inference, but OK.

8              MR. KROUSE:  May we have a moment to confer?

9              THE COURT:  You may.

10             (Counsel conferred)

11             THE COURT:  You are going to move on?

12             MS. KIM:  We are going to move on.

13             THE COURT:  You are not going to offer the document?

14             MS. KIM:  We are not.

15             THE COURT:  OK.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (In open court)

2            MS. KIM:  All right.

3    BY MS. KIM:

4    Q.  The last point on the U-turn, you had stated that this was

5    a substantial sanction against Iran.

6            What was the impact of this, of the U-turn revocation?

7    A.  Do you mean impact on each side?

8    Q.  What was the impact of the U-turn revocation on

9    transactions, financial transactions involving Iran?

10   A.  Because the U-turn license is -- when the U-turn license is

11   revoked, then Iran's access to U.S. financial services

12   regarding U-turn transfer is cut off.  So it means Iran will

13   have a difficult time in conducting international transactions

14   based on U.S. dollars.

15   Q.  At the time that the U-turn was revoked in 2008, was the

16   European Union also imposing sanctions on Iran?

17   A.  Yeah.

18   Q.  At the time the U-turn was revoked in 2008, was the United

19   Nations Security Council also imposing sanctions on Iran?

20   A.  Yes.

21   Q.  And from 2008 forward, were there any trends in

22   international sanctions against Iran?

23   A.  The sanctions on Iran was getting more serious and more

24   restrictive since the revocation.

25   Q.  If we can turn to the next slide, this is a slide on the

Executive Order 13599 that was issued on February 5, 2012.
Could you please describe briefly for the jury this executive
order.

A.   Yes.   This executive order is unique in the Iranian
sanctions program history because this executive order blocked
the property of the government of Iran and Iranian financial
institutions.   All previous executive orders were about issuing
orders to prohibit this act and that act, but this executive
order was announced to block Iranian government property and
the property of Iranian, all Iranian financial institutions.

Q.   Are you familiar with the term rejected transaction or that
concept?

A.   Yes.

Q.   What does that mean, when a transaction is rejected?

A.   Rejected is when a U.S. financial institution finds out the
money transfer going through that bank is a prohibited
transaction, then it rejects, returns the money to the sender.
That is different when it is blocked.   As I explained
previously, when it's blocked the money will not be sent back
to the sender.   The blocked property will stay with the bank
that froze the property.

          MS. KIM:   Mr. Milione, if we could turn to the next
slide, please.

Q.   Are you familiar with the Iranian transactions sanctions
regulations, or the ITSR?

1  A.  Yes.  ITSR is a restatement of ITR made October 22, 2012.

2  The ITSR included the executive order we previously have seen,

3  the blocking executive other.  The ITSR included that blocking

4  provision in the Iran sanctions regulations.

5         MS. KIM:  Your Honor, may I approach with what's

6  marked as Government Exhibit 602?

7         THE COURT:  OK.

8  Q.  Directing your attention to what's been marked as

9  Government Exhibit 602, do you recognize this document?

10  A.  Yes.

11  Q.  Is this a license history check?

12  A.  Yes.

13  Q.  Is this a license history checking that you ran on or about

14  February 11, 2012?

15  A.  That is correct.

16         MS. KIM:  Your Honor, the government offers Government

17  Exhibit 602 into evidence.

18         MR. WEINGARTEN:  No objection.

19         THE COURT:  Thank you.  602 is admitted.

20         (Government Exhibit 602 received in evidence)

21         MS. KIM:  If we could publish this exhibit.

22  BY MS. KIM:

23  Q.  Could you please explain for the jury briefly what a

24  license history check is.

25  A.  A license history check is to our record search, OFAC's

K34nsad7                        Kim - Direct

1    record search to find out whether a specific individual or

2    company have ever applied for license or whether they received

3    a license, so this is the history check of certain entities'

4    license applications.

5    Q.  Based on OFAC's records has Ali Sadr Hashemi Nejad ever

6    applied for a license to provide goods or services to Iran?

7    A.  No.

8    Q.  Did he ever obtain a license to provide goods or services

9    to Iran?

10   A.  No.

11   Q.  I'm just going to read the other individuals and entities

12   on this license check:  Mohammad Sadr Hashemi Nejad, Iranian

13   International Housing Company, Stratus International

14   Contracting Company, Stratus Group, clarity Trade and Finance,

15   and Stratus International Contracting, J.S.

16          So looking at all these entities, did any of these

17   entities ever apply for a license to provide goods or services

18   to Iran?

19   A.  According to OFAC's records, no.

20   Q.  Based on OFAC's records, did any of these entities ever

21   obtain a license to provide goods or services to Iran?

22   A.  No.

23   Q.  So I would like to talk now a bit more about SDNs.  You

24   explained the concept of SDNs and designations earlier.  So,

25   just to be clear, even if you are not an SDN, can Iran

K34nsad7                         Kim - Direct

1    sanctions prohibitions apply to you?

2    A.   Yes.

3    Q.   And OFAC is the primary agency that administers the SDN

4    list, correct?

5    A.   That's correct.

6    Q.   So if we can turn to the next slide in what's marked as

7    Government Exhibit 601.  This side reflects identifications

8    from August 10, 1995, of Iranian government-owned financial

9    institutions.

10          Mr. Kim are you familiar with a bank called Bank

11   Saderat?

12   A.   Yes.

13   Q.   What is Bank Saderat?

14   A.   Bank Saderat is one of the Iranian government-owned banks.

15   Q.   Does Bank Saderat have branches in the UAE?

16   A.   Yes.

17   Q.   And was Bank Saderat later designated by OFAC as an SDN on

18   October 25, 2007?

19   A.   That's correct.

20   Q.   Are you familiar with an entity called Europaïsch-Iranische

21   Handelsbank, or EIH?

22   A.   Yes.

23   Q.   What is EIH?

24   A.   This is a bank in located in Europe, but it is also owned

25   by the Iranian government.

1    Q.  Was EIH also later designated by on OFAC as an SDN on

2    September 7, 2010?

3    A.  That's correct.

4          MS. KIM:  If we could turn to the next slide please.

5    Q.  Are you familiar with an entity called the Revolutionary

6    Guard Corporation or IRGC?

7    A.  Yes.

8    Q.  What is IRGC?

9    A.  IRGC is Iran's special military force that, its goal is to

10   protect Iran's Islamic revolution.

11   Q.  Was the IRGC designated by OFAC as an SDN in 2007?

12   A.  That's correct.

13   Q.  Are you familiar with an entity called Oriental Oil Kish?

14   A.  Yes.

15   Q.  Was Oriental Oil Kish designated as an SDN by OFAC also on

16   September 25, 2007?

17   A.  Yes.

18          MS. KIM:  If we could go to the next slide please.

19   Q.  Are you familiar with an entity called Export Development

20   Bank of Iran or EBDI?

21   A.  Yes.

22   Q.  What is EBDI?

23   A.  This is another Iranian government-owned bank, and it is

24   known to -- yeah, it is a government-owned bank.

25   Q.  Is it a bank that is known to provide financial services to

K34nsad7                         Kim - Direct

1    Iran's ministry of defense and armed forces?

2    A.  Yes, it was the reason why it was designated.

3    Q.  And was EBDI designated by OFAC as an SDN on October 22,

4    2008?

5    A.  Yes.

6    Q.  So moving on to Eghtesad Novin Bank, or EN Bank, are you

7    familiar with EN Bank?

8    A.  Yes.

9    Q.  What is EN Bank?

10   A.  EN Bank is, unlike the other banks we talked about, it is a

11   private bank in Iran, but it was designated as an SDN by OFAC

12   in 2012.

13   Q.  And are SDN designations made public by OFAC?

14   A.  Yes.

15   Q.  How are they made public?

16   A.  The list of designated entities, the SDN list, is always

17   posted on OFAC's website, and it is -- whenever the list

18   changes, then we announced the changes on the website regularly

19   to the public.  It stays there, so anybody can check the name

20   on the list through OFAC's website.

21          MS. KIM:  Mr. Milione, I think you can take the slide

22   down.  Thank you.

23   Q.  So I just have some questions now about banks.  Under the

24   ITR and the ITSR, can U.S. banks be held liable for sanctions

25   violations?

1    A.  Yes.

2    Q.  And are you familiar with the term U.S. correspondent bank?

3    A.  Yes.

4    Q.  What is a U.S. correspondent bank?

5    A.  Correspondent bank is a foreign bank's -- a bank for a

6    foreign bank's U.S. dollar transactions.

7    Q.  OK.  Sorry.  Could you say that one more time?

8    A.  The correspondent bank -- I don't know how much detail I

9    should explain, but correspondent banks is foreign bank's U.S.

10   bank.

11   Q.  A foreign bank's U.S. bank?

12   A.  U.S. bank, and then when the foreign bank wants to transact

13   in U.S. dollars, then U.S. correspondent bank follows the

14   foreign bank's request and process the money transfer order.

15   Q.  Under the ITSR, can U.S. correspondent banks also be held

16   liable for sanctions violations?

17   A.  Yes.

18   Q.  Can U.S. banks be held liable for sanctions violations even

19   if they didn't know about the Iranian connection to the

20   transaction?

21   A.  Yes.

22   Q.  And why is that?

23   A.  Because U.S. sanctions regulations are enforced under the

24   principle of strict liability.  So no matter whether you know

25   it or not, once you are involved in the transaction that is

K34nsad7                      Kim - Direct

1    prohibited, then you are in violation of sanctions violation, a

2    sanctions prohibition.

3    Q.  Are you familiar with the term called stripping in the

4    context of bank transactions?

5    A.  Yes.  Stripping is one of the deceptive practices used by

6    problematic banks and companies.  Stripping means removing the

7    true identity of the parties involved in a transaction.  So

8    when foreign banks send money transfer orders to the United

9    States, they may strip, meaning remove their client's identity

10   so that U.S. bank wouldn't know who are they acting for.

11   Q.  So I just have a few concluding questions.  You stated

12   earlier that the Iran sanctions program involves a

13   comprehensive trade embargo that was implemented in 1995 and

14   that that trade embargo prohibits virtually all imports and

15   exports.

16        From 1995 forward, was there ever a time when the

17   comprehensive trade embargo was lifted?

18   A.  No.

19   Q.  You also stated that, you testified that in 2008 the U-turn

20   was revoked and after that revocation, U.S. banks were

21   prohibited from transacting with Iran.

22        From 2008 forward was there ever a time when that

23   prohibition was lifted?

24   A.  No.

25   Q.  We talked earlier about OFAC's responsibility to administer

K34nsad7                    Kim - Direct

1    and enforce the Iran sanctions program.

2              When Iranian involvement in a transaction is

3    concealed, does that matter to OFAC?

4    A.   Yes, it matters a lot.

5    Q.   Why?

6              MR. WEINGARTEN:  I am going to respectfully object.  I

7    think this transgresses the line.

8              THE COURT:  I understand the objection.  Just a

9    moment.

10             MS. KIM:  Your Honor, could we have a sidebar.

11             THE COURT:  Yes, I need to get a proffer.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K34nsad7                         Kim - Direct

1          (At sidebar)

2              MS. KIM:  This is important for the 371.

3              MR. KROUSE:  It is an element, Judge.

4              MR. WEINGARTEN:  Materiality with him is not an

5     element.

6              MR. KROUSE:  It is an element of what it obstructed.

7              MS. KIM:  Conspiracy to defraud the U.S.

8              MR. KROUSE:  Obstructed OFAC's ability to do its job.

9              THE COURT:  I want to hear what the answer is going to

10    be because I want to make sure we are not crossing over into

11    the -- the objection is based on?  State the objection.

12             MR. WEINGARTEN:  It is a materiality question.  He has

13    no materiality obligations.  Giving his opinion about whether

14    or not conduct is fraudulent or obstructive is wildly beyond

15    what the proffer was.

16             MR. KROUSE:  I think Mr. Weingarten is

17    misunderstanding, though.  This goes directly to Count One, the

18    Klein conspiracy under Section 371, which charges the defendant

19    with the conspiracy to defraud the United States, meaning

20    defraud OFAC and obstruct OFAC's ability to enforce the laws

21    against sanctions.

22             We can ask the OFAC witness whether conduct like this

23    would have obstructed the ability of him as an enforcement

24    officer to do his job.  How else can the government prove that

25    the conduct that we're going to prove beyond a reasonable doubt

1    meets the element of the offense?

2            MR. WEINGARTEN:  Through objective evidence consistent

3    with your instructions, how you traditionally do it, not

4    offering the opinion of a law enforcement agent that a

5    particular kind of conduct --

6            MR. KROUSE:  You can ask him why would it obstruct

7    your ability to do your function as an enforcement officer.

8            THE COURT:  That question is OK.

9            What's the next question?

10           MS. KIM:  That's the last question.

11           THE COURT:  All right.  I will allow that question.  I

12   am just curious whether I should tell --

13           MR. KROUSE:  Our proposal would be for the defense to

14   conduct its cross.  Mr. Kim --

15           THE COURT:  We are not at 4:45 yet.

16           MR. WEINGARTEN:  I don't have much stuff.

17           THE COURT:  You can do some, right?

18           MR. WEINGARTEN:  I listened to you.  My person left.

19   I don't have my stuff here.

20           THE COURT:  What do you mean listened to me?  You said

21   4:45.

22           MR. WEINGARTEN:  She told me -- I don't have anything

23   here right now.  I'm sorry.  I relied on the conversation we

24   had.  I apologize.

25           MR. KROUSE:  Just for the record, we did put this

K34nsad7                         Kim - Direct

1   witness on our list for the witnesses we expected to go today.

2             MR. WEINGARTEN:  Judge, I relied on -- I don't have my

3   stuff.  The person who was helping me is gone.

4             MS. KIM:  Is it on Trial Director?

5             MR. WEINGARTEN:  No.

6             THE COURT:  Let's finish.

7             MR. WEINGARTEN:  I have not disclosed to them --

8             THE COURT:  Let me be clear.  We are not doing this

9   again.  I forgave 15 minutes.  I didn't forgive an hour.

10  Things moved faster, so prepare for it next time --

11            MR. WEINGARTEN:  Yes.

12            THE COURT:  -- if they're on the list.  Let's finish.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K34TSAD8                        Kim - Direct

```
 1                   (In open court)
 2                   MS. KIM:  Your Honor, may I proceed?
 3                   THE COURT:  Yes, you may.
 4       BY MS. KIM:
 5       Q.  So I asked before we broke when Iranian involvement in a
 6       transaction is concealed, I asked whether or not that matters
 7       to OFAC and you said yes.  And my next question is:  Why does
 8       that matter?
 9       A.  Because the concealment, it is the core purpose of the
10       sanctions program, and the concealment -- this is all
11       enforcement action it wants to take, that's the reason.  If the
12       entities are not transparent, then U.S. financial institutions
13       and other U.S. persons wouldn't know what kind of transition
14       they are going into.  So making all the transactions
15       transparent is one of the goals we want to achieve.
16       Q.  And when you say "transparent," transparent about what?
17       A.  Iranian sanctions program context, whether the Iranian
18       entity or interest is involved in the transaction.  So when
19       that information is concealed, then that concealment will make
20       every party involved in the transaction a sanctions violator.
21       Q.  And just a few more questions about banks.  You had said
22       earlier that U.S. correspondent banks and U.S. banks can be
23       held liable for sanctions violations.  What are some
24       consequences that U.S. banks could face for sanctions
25       violations?
```

K34TSAD8                         Kim - Direct

1   A.  When they are found to be in violation of sanctions

2   regulation, then they are subject to OFAC's enforcement's

3   actions.  It can be like non-public action or it can be public

4   OFAC action, like imposition of penalty, and if not, if not

5   that serious, then you will receive cautionary letter by us.

6   Q.  And is a cautionary letter public or non-public?

7   A.  Not public.

8   Q.  Is a monetary penalty public or not public?

9   A.  It's publicly announced.

10  Q.  And how often, if at all, are monetary penalties imposed?

11  A.  Among the transactions we found in violation of the

12  regulation less than ten percent.

13  Q.  And how are monetary penalties calculated?

14  A.  Monetary penalties are calculated based on the regulation

15  that sets forth the calculation method, but basically what it

16  is is like every transaction -- for every transaction that led

17  to a violation, the maximum penalty is about $250,000 for

18  transaction or twice of the value of the transaction that led

19  to a violation.  So if the transaction has big amount, like a

20  million, then two million will be a maximum penalty amount to

21  that transaction that led to the violation.

22  Q.  And generally, what is the range of monetary penalties that

23  have been imposed on U.S. banks for sanctions violations?

24  A.  For banks, the penalty amount was quite bigger than

25  compared to other trading companies.  It could be like

K34TSAD8                        Kim - Direct

1   millions, tens of millions, or sometimes it could be hundreds

2   of millions dollars were imposed as a penalty to U.S. banks,

3   and other foreign banks, too.

4   Q.  We talked a little bit about banks reporting to OFAC when

5   transactions are blocked.  What does OFAC do with the

6   information that it gets from banks -- sorry, take a step back.

7          Does OFAC receive information from banks about

8   transactions involving Iranian entities?

9   A.  Yes.

10  Q.  And what kinds of information does OFAC get from banks

11  about transactions involving Iranian entities?

12  A.  Those information -- sorry, what kind of?

13  Q.  What kinds of information does OFAC get from banks about

14  transactions involving Iranian entities?

15  A.  What kind of information.

16          Any information bank collected from the rejected or

17  blocked transaction comes to OFAC, and those include the

18  parties involved in the transaction and the transaction amount,

19  if there is any -- about any the information what are the

20  transaction for and when the transaction rejected or blocked

21  and address and the name, if it is a corporation, company name

22  of the sender or recipient of the money transfer if it is a

23  money transfer.  If it's just a simple transaction, then the

24  money -- if it is money received from somebody who wants to

25  just deposit, then the depositor's information is obtained.

K34TSAD8                          Kim – Direct

1   Q.   What does OFAC do with the information from banks about

2   transactions involving Iranian entities?

3   A.   Those are one of the important source for us that lead to

4   open an investigation, because the banks collects other

5   information and other country's information involved in

6   rejected and blocked transaction.   That means those entities'

7   management teams are blocking and report a lot of other

8   information about other parties other than the bank, the other

9   parties that has potential to be in violation of sanctions

10  regulation.

11  Q.   So would the information -- OFAC takes that information and

12  it leads to investigations?

13  A.   That's correct.

14  Q.   And in some instances, those investigations lead to

15  enforcement actions?

16  A.   Yes, that's correct.

17  Q.   As an enforcement officer with OFAC, are you able to do

18  your job if the Iranian connections to a transaction are

19  stripped or hidden?

20  A.   It would make it very difficult for me to do my job, but

21  that's why we have -- we are trying to set up tools and network

22  to find out those deceptive practices.

23  Q.   Why does it make it difficult for you to do your job?

24  A.   It's hiding, so I don't know.   I don't know how to explain.

25  The hiding of money is difficult to catch.

K34TSAD8

1            MS. KIM:  Your Honor, may I have a minute?

2            THE COURT:  You may.

3            (Pause)

4            MS. KIM:  No further questions, your Honor.

5            THE COURT:  All right.  Thank you.

6            Members of the jury, although we have the

7    cross-examination and redirect of Mr. Kim, we're actually

8    making pretty good time, and we'll break a little early today.

9            It's about ten after 4:00.  I will try to provide an

10   update on the schedule tomorrow after I meet with the lawyers

11   this afternoon, but same schedule tomorrow.  Please be ready to

12   go at 9:30 in the morning, and bear all my instructions in

13   mind.  Very grateful for your continued diligence and

14   attention.  Have a good night.

15           (Jury not present)

16           THE COURT:  Mr. Kim may step down.  We'll resume at

17   9:30 tomorrow.

18           (Witness not present)

19           THE COURT:  Matters to take up?

20           MR. KROUSE:  Just on the scheduling point, your Honor,

21   just first with respect to this witness, the government does

22   feel a little bit sandbagged with the defense.  They came to us

23   and said we haven't given you any of the exhibits we said we

24   would give you because we didn't think we would get to Mr. Kim.

25           THE COURT:  I will set a schedule if that's where

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3     FARSHID KAZERANI

4     Direct By Mr. Krouse . . . . . . . . . . . . 333

5     Cross By Mr. Weingarten  . . . . . . . . . . 345

6     Redirect By Mr. Krouse . . . . . . . . . . . 377

7      CRINA EBANKS

8     Direct By Ms. Kim  . . . . . . . . . . . . . 411

9     Cross By Mr. Heberlig  . . . . . . . . . . . 417

10     MATTHEW NELSON

11    Direct By Ms. Lake . . . . . . . . . . . . . 424

12    Cross By Mr. Heberlig  . . . . . . . . . . . 457

13    TED KIM

14    Direct By Ms. Kim  . . . . . . . . . . . . . 464

15

16

17

18

19

20

21

22

23

24

25

```
                          GOVERNMENT EXHIBITS

Exhibit No.                                          Received

  2148    . . . . . . . . . . . . . . . . . 330

  104C    . . . . . . . . . . . . . . . . 422

   2278, 2278A, 2278B, 2049, 2049B, 2218, . . . 424

            1401, 1401A, 1401T, 1401A-T,

            2026, 2050, 2070, 2072, 2072A,

            2078, 2078A, 2084, 2088,

            2088A, 2135, 2171, 2171-T,

            1003, 1003A, 1003T, 1003A-T,

            2103, 2103A, 2104, 2104A,

            2296, and 2296A

  105    . . . . . . . . . . . . . . . . . 464

  602    . . . . . . . . . . . . . . . . . 496

                          DEFENDANT EXHIBITS

Exhibit No.                                          Received

  27 and 27A  . . . . . . . . . . . . . . 370

  27A-T   . . . . . . . . . . . . . . . . 370
```

K35TSAD1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                        18 CR 224 (AJN)

ALI SADR HASHEMI NEJAD,

            Defendant.

------------------------------x

                                 New York, N.Y.
                                 March 5, 2020
                                 8:50 a.m.

Before:

                HON. ALISON J. NATHAN,

                                 District Judge

                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
JANE KIM
MICHAEL KROUSE
STEPHANIE LAKE
GARRETT LYNCH
     Assistant United States Attorneys

STEPTOE & JOHNSON
     Attorneys for Defendant
REID WEINGARTEN
BRIAN HEBERLIG
BRUCE BISHOP

1          (Jury present)

2          THE COURT:  Thank you so much, members of the jury.

3          You were all here completely on time and the lawyers

4    and I tried to get through the issues that would arise now that

5    might cause us to have sidebars, and we couldn't quite get it

6    done by 9:30.

7          I appreciate your patience.  I figured you would be

8    more comfortable waiting for that in the jury room than here.

9    I hate to make you wait and try to avoid that as much as

10   possible.  Thank you for your patience.  I think what we did

11   while you were waiting will expedite the morning, and we are

12   moving well.  I said I will have some updates on timing, but

13   things are moving more quickly than had been anticipated so we

14   are in good shape.  More on that later today.

15         With that, Mr. Krouse, you are going to finish your

16   direct?

17         MR. KROUSE:  Ms. Kim.

18    TED KIM, resumed.

19         THE COURT:  I will ask Mr. Scott to, since it is a new

20   day, readminister the both to Mr. Kim.

21         (Witness sworn)

22   DIRECT EXAMINATION

23   BY MS. KIM:

24         THE COURT:  Thank you.

25         Go ahead, Ms. Kim.

K35nsad2                         Kim - Direct

1          MS. KIM:  Thank you, your Honor.

2     Q.  Mr. Kim, you testified yesterday about the U.S.

3     government's comprehensive Iran sanctions program implemented

4     and enforced by OFAC --

5     A.  Yes.

6     Q.  -- is that right?

7     A.  Yes.

8     Q.  And you testified that after 2008 the U.S. government

9     imposed a comprehensive ban on the export of all financial

10    transactions to Iran, is that right?

11    A.  Yes.

12    Q.  Or for the benefit of entities in Iran or for the

13    government of Iran?

14    A.  That's correct.

15    Q.  Is it fair to say that this is the baseline sanctions

16    regime in force today?  Sorry.  Is it fair to say that this is

17    the baseline sanctions regime that has been in force since 1995

18    to the present day?

19    A.  I don't understand your question.

20    Q.  OK.  So, in terms of the comprehensive ban on the export of

21    all financial services, is it fair to say that that has been

22    the baseline of the Iran sanctions program from 1995 forward?

23    A.  That's correct.  From 1995, from the beginning, until to

24    date exportation of financial services to Iran has been

25    prohibited.

K35nsad2                         Kim - Cross

1            MR. WEINGARTEN:  I respectfully, object, your Honor.

2    This is not what the instruction was.

3            MS. KIM:  I'm getting to the question.

4            THE COURT:  Next question.

5    BY MS. KIM:

6    Q.  We talked about some of the foundational documents for the

7    Iran sanctions program.  Have additional laws and regulations

8    been added that have targeted specific entities, industries,

9    and economic sectors in Iran?

10   A.  Yes.

11   Q.  And none of these additional laws and regulations have

12   altered the baseline that all?

13           MR. WEINGARTEN:  Objection.

14   Q.  Financial services from the U.S. to Iran --

15           THE COURT:  Sustained.

16   Q.  And none of these additional laws and regulations have

17   altered --

18           THE COURT:  Sustained.

19           I think we've covered what was discussed, unless

20   I'm --

21           MS. KIM:  That's fine, your Honor.

22           THE COURT:  Cross-examination, Mr. Weingarten.

23   CROSS-EXAMINATION

24   BY MR. WEINGARTEN:

25   Q.  Good morning, Mr. Kim.

1   A.  Good morning.

2   Q.  My name is Reid Weingarten.  I represent Mr. Sadr.  We

3   actually met outside yesterday, did we not?

4   A.  Yes, we did.

5   Q.  OK.  So just a little bit about your background.

6   A.  Uh-huh.

7   Q.  So did I understand you correctly to say that you have two

8   law degrees?

9   A.  Yes.

10  Q.  One in the States and one in South Korea?

11  A.  Yes.

12  Q.  You have had a variety of jobs.  Were you actually inside

13  counsel for Daewoo, am I saying that correctly?

14  A.  That's correct.

15  Q.  That is a huge South Korean company?

16  A.  Yes.

17  Q.  That does many different things?

18  A.  Yes.

19  Q.  Including selling things to Iran, correct?

20  A.  I'm --

21          MS. KIM:  Objection, your Honor.

22  A.  All I can say is possibly.

23          THE COURT:  I'm sorry.

24          Let me just read the question.

25  Q.  Probably, correct?

K35nsad2                        Kim - Cross

1            THE COURT:  Just a moment.  There's an objection.

2            MR. WEINGARTEN:  I'm sorry.

3            MS. KIM:  Can we have a time frame on the question.

4            THE COURT:  All right.

5    BY MR. WEINGARTEN:

6    Q.  I am just getting a general understanding of the sanctions

7    here.  It is true, is it not, that South Korean companies do a

8    tremendous amount of business with Iran, correct?

9            MS. KIM:  Objection, your Honor.  Relevance.

10           THE COURT:  Sustained.

11   Q.  So you were general counsel, Daewoo, correct?  Inside

12   counsel?

13   A.  Yeah.

14           THE COURT:  What's the time frame?  When were you --

15           THE WITNESS:  From 1994 through 19 -- through 2001.

16           THE COURT:  OK.

17   BY MR. WEINGARTEN:

18   Q.  Then you were in private practice in the States?

19   A.  Yes.

20   Q.  And you have been at OFAC for how long?

21   A.  Six years.

22   Q.  Is there an OFAC section devoted entirely to Iran?

23   A.  In my division, no.

24   Q.  OK.  Are there employees of OFAC who work exclusively on

25   Iran?

K35nsad2                           Kim - Cross

1    A.  There are, yeah.  Yes.

2    Q.  OK.  Are you one of them?

3    A.  Yes and no.  Can I explain?

4    Q.  Sure, of course.

5    A.  Because most of our -- my division is enforcement division

6    so all the --

7    Q.  I missed that.  I'm sorry.

8    A.  My division is called enforcement division.

9    Q.  OK.

10   A.  In my division, most of the work is related to Iran

11   sanctions.  But in my division, everybody is a generalist.

12   Q.  OK.

13   A.  But actually most of our work is related to Iran.

14   Q.  OK.  So what you're --

15   A.  So we had to constantly work with those persons in other

16   divisions whose mostly specialized in the Iran program, so we

17   worked together.  So it is really difficult to say somebody is

18   only devoted to the Iran program.  We are not officially Iran

19   expert enforcement officer --

20   Q.  OK?

21   A.  -- but most of our work is Iran.

22   Q.  OK.  In this case, was there an allegation that came to

23   OFAC's attention relating to Mr. Sadr or this particular case?

24   A.  Could you --

25   Q.  In your work as enforcement --

K35nsad2                          Kim - Cross

1     A.  Uh-huh.

2     Q.  -- relating to Iran --

3     A.  Uh-huh.

4     Q.  -- did it come to your attention that there was an

5     allegation made relating to anything having to do with this

6     case?

7     A.  Not until I got instruction to get involved in this.

8     Q.  So, to your knowledge, this matter was never investigated

9     by OFAC, correct?

10             MS. KIM:  Objection, your Honor.

11             THE COURT:  Overruled.

12    A.  In my knowledge, no.

13    Q.  OK.  To your knowledge, was there ever a referral made by

14    J.P. Morgan to OFAC relating to this case?

15    A.  In my knowledge, no.

16    Q.  OK.  How long have you been involved in this case?

17    A.  Since --

18             MS. KIM:  Objection, your Honor.

19             What does "involved in this case" mean?

20             MR. WEINGARTEN:  Working with the prosecutors.

21             MS. KIM:  Objection, your Honor, "working with the

22    prosecutors."

23             THE COURT:  Overruled.

24    A.  Yes.  I started to work with the prosecutors from end of

25    February, like 12 months.

1    Q.  How many meetings have you had with them?

2    A.  Meetings, six or seven meetings.

3    Q.  OK.  During that period of time, it never came to your

4    attention that OFAC had received a referral from J.P. Morgan

5    that has to do with this case, is that fair?

6    A.  I cannot say that.

7    Q.  Well, is it true or is it not true?

8    A.  I don't know.

9    Q.  So you have no knowledge that that occurred, right?  No one

10   has brought that to your attention?

11   A.  Not my attention.

12   Q.  Well, to OFAC's attention.

13   A.  That I don't know.

14   Q.  So the answer is no?

15   A.  That I don't know.

16   Q.  So just to start with the general contours of the

17   sanctions, you have testified that what is in play is the

18   relationship between the United States and Iran, correct?

19   A.  Yes.

20   Q.  And the reason I asked you about Daewoo, I want to make it

21   clear that other countries, like South Korea can trade with

22   Iran back and forth and that happens, isn't that true?

23              MS. KIM:  Objection, your Honor.

24              THE COURT:  Sustained.

25   Q.  Well, isn't it true, for example, that the sanctions don't

K35nsad2                         Kim - Cross

1    include Iranians who live in Canada and do business with the

2    United States?

3    A.   That is not true.

4    Q.   The Iranians in Canada can't do business with the United

5    States?

6    A.   It depends.

7    Q.   Well, isn't it true that an Iranian businessman who works

8    outside of Iran and does business with the rest of the world

9    and none of the proceeds make it to Iran, is exempted from

10   these sanctions?

11   A.   I'm sorry.  It's difficult to understand your question.

12   Q.   Well --

13   A.   It's too long.  I need to draw a picture to understand.

14            THE WITNESS:  Can I do that?

15            THE COURT:  Sure.

16   A.   Could you -- because I usually to understand the scenario.

17   I this is my habit.

18   Q.   Fair enough.

19            MR. WEINGARTEN:  With the Court's permission, I will

20   withdraw that question and get to it after I do a few other

21   things.

22            THE COURT:  That's fine.

23   BY MR. WEINGARTEN:

24   Q.   Now, yesterday, you testified that basically these

25   sanctions are a foreign policy tool for the president.  Did I

K35nsad2                          Kim - Cross

1    get that correctly?

2    A.  Yes.

3    Q.  So, in other words, if the president of the United States

4    wants a particular country to conform to certain foreign policy

5    objectives, he can impose sanctions?

6    A.  Yes.

7    Q.  And that happens, correct?

8    A.  Yes.

9    Q.  And the sanctions sometimes change?

10   A.  Yes.

11   Q.  For the same country?

12   A.  Yes.

13   Q.  Sometimes they're harsh and then the country changes its

14   attitude and they become gentle, fair?

15   A.  Yes.

16   Q.  And sometimes they are withdrawn?

17   A.  Yes.

18   Q.  And isn't it true that the sanctions against Iran have been

19   in place in a variety of forms from Jimmy Carter forward?

20   A.  No.

21   Q.  Haven't there been sanctions against Iran for 40 years.

22   A.  No.  Shall I explain?

23   Q.  Sure.

24   A.  There was for a brief period, from 1979 to 1981, and that

25   program was related to another incident, and then it was almost

K35nsad2                    Kim - Cross

1   resolved.  The current Iran program is completely separate from

2   the old one.  So the current one, when we talk about Iran

3   program, we need to think about the program starting from 1995.

4   Q.  I am not talking about the current program.  I'm talking

5   about United States sanction against Iran.  Haven't they been

6   in place in a variety of forums for 40 years?

7   A.  I don't know.  That is not my --

8   Q.  OK.  Fair enough.  Isn't it true that the sanctions against

9   Iran have changed dramatically depending upon who the president

10  is?

11  A.  I wouldn't say so.

12  Q.  You would or would not?

13  A.  Wouldn't.

14  Q.  OK.  Isn't it true that under President Reagan there were

15  sanctions against -- there was a ban on imports, true?

16  A.  Yes.

17  Q.  Isn't it true that Bill Clinton changed those to exports or

18  included imports with exports and made an entire trade embargo?

19  A.  That's true.

20  Q.  Isn't it also true that President Obama changed the focus

21  of the sanctions from these gross weapons against Iran to

22  specific --

23           MS. KIM:  Objection, your Honor.

24  Q.  -- targeted objectives --

25           THE COURT:  Just a moment.

1           Overruled.

2    Q.  Isn't it true that President Obama's focus was on getting

3    the bad guys, getting the government of Iran, the national

4    banks of Iran, the Islamic Revolutionary Guard Corps and the

5    SDNs, isn't it true that that is what he focused on?

6           MS. KIM:  Objection.

7           THE COURT:  Overruled.

8    A.  No.

9    Q.  You disagree with that?

10   A.  I disagree --

11   Q.  OK.

12   A.  -- with what --

13   Q.  I'm sorry.

14   A.  I disagree to what you described.

15   Q.  OK.  That's fine.  Isn't it true that the sanctions law,

16   that sometimes the same language can be used for different

17   countries for different sanctions programs using the same

18   words, and the words can have different meanings depending on

19   the context of the sanctions?

20          MS. KIM:  Objection, your Honor.  Form.

21          THE COURT:  Yes.  I will ask you to rephrase, please.

22          MR. WEINGARTEN:  OK.

23   BY MR. WEINGARTEN:

24   Q.  Isn't it true that there are sanctions programs I think you

25   said yesterday against 30 countries?

K35nsad2                    Kim - Cross

1    A.  Uh-huh.

2    Q.  Isn't it true you can find the same language in the

3    different sanctions programs?

4    A.  Uh-huh.

5    Q.  And isn't it true that OFAC has said to the world that

6    using the same words --

7              MS. KIM:  Objection, your Honor.

8    Q.  -- can mean different things depending on the context and

9    the particular sanctions agenda?

10             THE COURT:  One word, grounds?

11             MS. KIM:  Relevance.

12             MR. WEINGARTEN:  Confusion.

13             MS. KIM:  It goes to the law.

14             THE COURT:  Overruled.

15   Q.  Isn't that true, sir?

16   A.  Not exactly.  It's true it can be interpreted differently,

17   but not in a substantial way, yeah.

18   Q.  Can't the same words mean different things depending upon

19   the context?

20             MS. KIM:  Asked and answered, your Honor.

21             THE COURT:  Sustained.

22   Q.  I would like to refresh the --

23             THE COURT:  No time for that.

24             MR. WEINGARTEN:  OK.  I'm sorry.

25             THE COURT:  I thought you were explaining your -- go

1    ahead.

2              Next question.

3              MR. WEINGARTEN:  I would like to put up Government

4    Exhibit 623 just for the witness.

5              THE COURT:  I misunderstood.  Thank you, you may.

6              MS. KIM:  Objection, your Honor.

7              He hasn't said that he doesn't remember something.

8    Q.  Do you know, sir, whether or not there is a reg in OFAC --

9              MS. KIM:  Objection, your Honor.

10             THE COURT:  Move on.  We'll come back to it.

11             MR. WEINGARTEN:  OK.

12   BY MR. WEINGARTEN:

13   Q.  So I believe you testified yesterday and perhaps this

14   morning as well that there are a number of statutes, executive

15   orders and regs applying to the Iranian sanctions, correct?

16   A.  That's correct.

17   Q.  OK.  Just so we're clear laws passed by Congress, correct?

18   A.  Uh-huh.

19   Q.  Would that be what you are talking about?

20   A.  Including the laws passed by Congress.

21   Q.  And the executive order would be when the president of

22   United States declares an emergency and says why, correct?

23   A.  I'm sorry.  Could you --

24   Q.  The executive order would be the president's declaration

25   that there is an emergency and he explains why, correct?

K35nsad2                        Kim - Cross

1    A.   Yes.

2    Q.   Then OFAC will issue regulations, correct?

3    A.   Yes.

4    Q.   And often the regulations are abundant, are very

5    complicated and very long, fair?

6    A.   No.

7    Q.   They're not?

8    A.   Not to me.

9    Q.   So they're brief?

10   A.   They're not unusual.

11   Q.   And they're simple to understand?  Anybody who reads them

12   would understand them in two seconds?  Is that what you are

13   saying?

14           MS. KIM:  Objection, your Honor.  Mischaracterizes.

15           THE COURT:  Overruled.

16   A.   Anybody who is involved in international business would

17   understand.

18   Q.   Isn't it true that there is a whole -- you are a lawyer,

19   right?

20   A.   Yeah.

21   Q.   Isn't there a whole branch of the bar of lawyers who do

22   nothing but interpret your regs at OFAC?

23   A.   Yes.

24   Q.   So they're so simple that there just emerged in the world a

25   discipline of lawyers because it was easy to understand, is

K35nsad2                          Kim - Cross

1   that your testimony?

2   A.  Yes.  What I'm saying is it's not unusual.  It is not

3   unusually difficult to understand what the sanctions rules are

4   demanding.

5   Q.  OK.  Isn't it true that the regs change all the time or

6   frequently?

7   A.  No.

8   Q.  No.  OK.  Let's talk about Persian rugs.  Everybody knows

9   what a Persian rug is, right?

10  A.  Yes.

11  Q.  Isn't it true that Persian rugs were legal in terms of

12  coming into the United States until 2010, isn't that true?

13  A.  The carpet case is not really a serious thing to me.  So I

14  know it was allowed, prohibited, allowed, prohibited.  It

15  changed a couple of times.

16  Q.  So let's be clear.  So it was legal until 2010; then it

17  became illegal?

18          MS. KIM:  Objection, your Honor.  Relevance.

19          THE COURT:  Overruled.

20  Q.  Isn't it true that in 2016 it became legal again and then

21  in 2018 it became illegal?  So isn't it true in eight years it

22  changed four times?

23          THE COURT:  You'll calm down and break out the

24  question.

25          MR. WEINGARTEN:  OK.

K35nsad2                      Kim - Cross

1    BY MR. WEINGARTEN:

2    Q.  So let's do it one step at a time.

3    A.  Yes.

4    Q.  Up until 2010, if I'm sitting here in New York City and I

5    want to buy a Persian rug from Tehran, I can do that, right?

6    A.  I'm sorry.  I don't follow the carpet rules because I've

7    never -- I did a couple of cases involving carpets, but it's

8    not -- I don't exactly remember the dates and years, but always

9    I have to go to the regs, if it was not, if it was yes, but it

10   is not, not like important -- very important matter for overall

11   sanctions enforcement.

12   Q.  So you will agree with me that it changed four times in

13   eight years, correct?

14   A.  I'm sorry.  I don't know whether it's four times, but it

15   changed.

16   Q.  OK.  What about the subject of foreign subs of U.S.

17   corporations?

18   A.  Uh-huh.

19   Q.  Isn't it true that that also changed four times in terms of

20   whether or not they were subject to the sanctions?

21   A.  Let me count.

22           THE COURT:  You are asking about foreign --

23           THE WITNESS:  Yeah.

24           THE COURT:  Just a moment.  You are asking about

25   foreign subsidiaries of U.S. companies; is that the question?

1          MR. WEINGARTEN:  Yes.

2          THE COURT:  Go ahead.

3   A.  It was outside of the definition and then put it back, put

4   it in, and then it went out and put it in.  So isn't it two

5   times?  But --

6   Q.  Isn't it true that from '97 until '12 they were outside the

7   program; from '12 to '15, they were inside the program; and

8   then from '18 on -- so just three times, I misspoke, not four,

9   but three.

10  A.  So it was -- I wouldn't describe it as inside the program,

11  outside the program.  I would say U.S. corporations, foreign

12  subsidiaries was not defined as part of U.S. person.

13  Q.  OK.

14  A.  But even if -- it's not -- you know, something could be in

15  the program while they were outside of the U.S. person's

16  definition.

17  Q.  I think we are saying the same thing.  That's fine.  I will

18  move on.  These changes take place at the political whim of the

19  president, isn't that true?

20          MS. KIM:  Objection, your Honor.

21          Lack of foundation.

22          THE COURT:  Sustained.

23  Q.  These programs change because the president says they are

24  changing or the executive branch?

25          MS. KIM:  Objection.

1    A.  Yes.

2              MS. KIM:  Can he explain what he means by "program,"

3    "regulations."

4              MR. WEINGARTEN:  Let's take a simple one, the Persian

5    carpets.  The Persian carpets changed four times because the

6    executive branch wanted them to change four times, correct?

7    A.  Yes.

8    Q.  Was there any say in Congress about any of those changes?

9    A.  I don't know.

10   Q.  Was there any notice given to anybody, or was it just the

11   executive branch said, boom, and it happened?

12   A.  Notice of?  Notice of what?

13   Q.  I'll ask it this way.  Does OFAC have to give notice to

14   anybody when they make these changes, or do they just do it?

15   A.  Oh, are you asking how OFAC's involved in the

16   decision-making process?

17   Q.  Yes.

18   A.  Yes.  We are involved --

19             MS. KIM:  Your Honor, can the defense specify if he's

20   talking about Persian carpets or about the sanctions program.

21             THE COURT:  Sustained.

22   BY MR. WEINGARTEN:

23   Q.  Let me ask this:  Isn't it true that OFAC can change an

24   interpretation of a rule without giving any notice to the

25   public?

1   A.  We do.

2   Q.  I'm sorry?

3   A.  OFAC gives out notice to the public when we change the

4   interpretation.

5   Q.  But you don't have to?

6   A.  I don't know, but what I know is we do.

7            MR. WEINGARTEN:  1339, just for the witness to take a

8   look.

9            MS. KIM:  Objection, your Honor.

10           THE COURT:  Sustained.

11  BY MR. WEINGARTEN:

12  Q.  Isn't it true, sir, that OFAC can change its previously

13  stated nonpublished interpretation or opinion without first

14  giving public notice, isn't that true, sir?

15           MS. KIM:  Objection.  Asked and answered.

16           THE COURT:  Overruled.

17  A.  I'm sorry.  I didn't get the question correctly.  So --

18  Q.  All right.  I'm just ask it again, and if you get it,

19  great; if you don't, I'm fine with that, too.

20  A.  Yes.

21  Q.  Isn't it true that OFAC can change its previously stated

22  nonpublished interpretation or opinion without first giving

23  public notice?

24  A.  Yes.

25  Q.  So the decision to give public notice is up to OFAC?

1    A.  I'm sorry.  If you ask like that, then I don't get it.  Can
2    you repeat that last question?
3    Q.  That's fine.  I'll move on.  We have a lot to cover.
4            You gave some indication yesterday about the process,
5    about how a regulation gets established.  Just a sum, I think,
6    of your testimony, there is a statute in place, there is a law
7    in place that says if the president of the United States sees
8    an emergency, he can declare it, and then he can impose
9    sanctions, correct?
10   A.  That's correct.
11   Q.  OK.  And regs can follow from that executive order from
12   OFAC imposing what is sanctioned and what is not sanctioned,
13   fair?
14   A.  Yes, that's fair.
15   Q.  Then OFAC will also issue guidance to the world as to what
16   these sanctions may or may not mean, correct?
17   A.  That's correct.
18   Q.  Then OFAC also issues something called frequently asked
19   questions so that people who have questions can write in and
20   then you put them on your website so the whole world can see
21   what's going on, correct?
22   A.  That's correct.
23   Q.  That's what the lawyers who work in this area work with,
24   all those documents that we just talked about, correct?
25   A.  Probably.

1          MS. KIM:  Objection, your Honor.

2          MR. WEINGARTEN:  All right.

3          THE COURT:  Just a minute.

4          You withdraw the question?

5          MR. WEINGARTEN:  Yes.  I withdraw the question.

6          THE COURT:  The question is withdrawn.

7  BY MR. WEINGARTEN:

8  Q.  So when it comes to the OFAC regs that you all put out,

9  they have nothing to do with Congress, right?  In fact --

10         MS. KIM:  Objection.

11 Q.  -- Congress doesn't pass on them; there are no hearings

12 about them?

13         THE COURT:  Just a second.

14         MS. KIM:  Objection to form.

15         Compound question.

16         THE COURT:  Let's break them apart.

17         MR. WEINGARTEN:  OK.

18 BY MR. WEINGARTEN:

19 Q.  When OFAC decides what regs to pass, they're not subject to

20 Congressional hearings; OFAC issues those regulations, correct?

21 A.  That's correct.

22 Q.  And there's no vote on the Hill whether or not those

23 regulations are appropriate or not appropriate, correct?

24 A.  Correct.

25 Q.  So if the President of the United States wakes up today and

1    says, you know, I'm angry at Turkey --

2                   MS. KIM:  Objection, your Honor.

3                   MR. WEINGARTEN:  I am following with the hypothetical.

4                   THE COURT:  Sustained.

5    BY MR. WEINGARTEN:

6    Q.  Just so we're sort of grounded in the enforcement work that

7    you do, OK, it is true, is it not, that U.S. dollars are not

8    prohibited from going into Iran?

9    A.  It depends.  But U.S. dollars can go into Iran without --

10   Q.  OK.

11   A.  Yes.

12   Q.  It is also true to your knowledge that virtually every

13   international bank in the world has U.S. dollars?

14   A.  Yes.

15   Q.  And OFAC does not regulate those U.S. dollars that are in

16   foreign banks, isn't that correct?

17   A.  It depends.  As long as that money is not involved in

18   prohibited transaction, it's fine.

19   Q.  OK.  And for example, in Hong Kong --

20   A.  Uh-huh.

21   Q.  -- there are many banks in Hong Kong that clear dollar

22   transactions, aren't there?

23   A.  What do you mean?  The Hong Kong banks clearing as U.S.

24   banks clearing --

25   Q.  Yes.

1   A.  -- dollars?

2   Q.  Yes.

3   A.  They clear, yes.

4   Q.  Yes.  I mean, there are clearing banks in Hong Kong over

5   which you have no responsibility, isn't that true?

6   A.  Yes.  It's true.

7   Q.  OK.  And an American Iranian can walk down the street and

8   open an account in Wells Fargo and that doesn't violate the

9   sanctions, isn't that true?

10  A.  Excuse me.  Could you repeat?

11  Q.  An Iranian American can open an account in Wells Fargo here

12  in New York, and that implicates no sanction, isn't that true?

13  A.  That's true.

14  Q.  Isn't it also true that Iranians who are working outside of

15  Iran --

16  A.  Uh-huh.

17  Q.  -- doing business with Germany or Greece involving no U.S.

18  financial institution are not violating any sanction either?

19  A.  That's not our business.

20  Q.  That's not your position?  That's not your business?

21  A.  No.  What I'm saying is they can do the business you

22  described without getting subject to U.S. sanctions.

23  Q.  OK.  So let's say an Iranian was in Switzerland and he was

24  building houses in Venezuela and no money went back to Iran.

25  That wouldn't be your business, would it?

1            MS. KIM:  Objection.

2            THE COURT:  Sustained.

3            MR. WEINGARTEN:  With the Court's indulgence.  Sorry.

4   BY MR. WEINGARTEN:

5   Q.  Let's look at the PowerPoint that you talked about

6   yesterday?

7   A.  Yes.

8            MR. WEINGARTEN:  Let's turn to GX 601, page 2.  No,

9   let's go back to page 1, if we may.

10  Q.  So this is the front page.  "OFAC administers and enforces

11  economic and trade sanctions based on U.S. foreign policy and

12  national security goals."

13           That's what you've testified before, correct?  And

14  that's true?

15  A.  Yes.

16  Q.  The whole point is to impose foreign policy restrictions on

17  countries that the president wants to punish, fair?

18           MS. KIM:  Objection, your Honor.

19           THE COURT:  Just a moment.  Overruled.

20  A.  Yes.

21  Q.  OK.  No. 2, so we are in agreement that there are many,

22  many more statutes and orders and regs --

23  A.  Uh-huh.

24  Q.  -- involving Iran than are represented on GX 2, correct?

25  A.  That's correct.

1    Q.  OK.  Let's turn to 3.

2              OK.  And now let's turn to 4.

3              So you say, "Prohibits virtually all imports and

4    exports to and from Iran."

5              Again, we are not talking about South Korea; we are

6    talking about the United States, correct?

7    A.  Can you repeat the question.

8    Q.  It prohibits virtually all imports and exports to and from

9    Iran to the United States.  We are not talking about Turkey, we

10   are not talking about Switzerland, we are not talking about

11   Venezuela, we are talking about the United States.  Correct?

12   A.  Not correct.

13   Q.  So are you saying that Iran can't import or export anything

14   to anybody?

15   A.  It depends, because the imports and exports here includes

16   direct or indirect and indirect exportation importation to.  So

17   if the goods go to Turkey and eventually come to the United

18   States, as long as Iran's --

19   Q.  OK.  Let's go the other way.  Let's see --

20             MS. KIM:  Your Honor, can he finish answering the

21   question.

22             THE COURT:  You may.  You were cut off.

23             Go ahead.  Finish your answer.

24   A.  OK.  Importation exportation, if the exportation from U.S.

25   goes to Taiwan, but it was intended to Iran eventually, then

K35nsad2                         Kim - Cross

1    the U.S. exportation to Taiwan matters.

2    Q.  I'm glad you said that.  So thank you.  What you are saying

3    is that if there is a middleman and the middleman's only

4    purpose is to get the end product to Iran, then the sanctions

5    would apply, correct?

6    A.  I lost your description of the middleman.

7    Q.  Let's say hypothetically that someone in the United States

8    or someone -- an American person --

9    A.  Uh-huh.

10   Q.  -- wanted to get something to Iran, and didn't send it

11   directly, but had a middleman in Switzerland, and used that

12   middleman to get the product to Iran, correct?  That would

13   implicate the sanctions?

14   A.  That's correct.

15   Q.  But if nothing went to Iran, then it wouldn't implicate the

16   sanctions?

17   A.  It does.  I'm sorry, but it does.

18   Q.  OK.  So if there is a middleman who receives something and

19   then doesn't send it to Iran and never intended to send it to

20   Iran, that's your business?

21   A.  Yes.

22   Q.  OK.

23   A.  If it eventually landed in Iran, because that's what I said

24   yesterday, because our rules operate under strict liability.

25   It doesn't matter actually what you intended or not.

K35nsad2                    Kim - Cross

1    Q.  Well --

2    A.  What we are prohibiting is not that the person, we are

3    prohibiting the transactions.  So exportation to Iran is

4    prohibited.  So how those parties are involved in this

5    particular transaction is next question.

6    Q.  All right.

7    A.  They are all involved in the violation of sanctions.

8    Q.  You are assuming everybody is involved with everything and

9    everybody is guilty?  Is that what you are saying?

10           MS. KIM:  Objection, your Honor.

11           THE COURT:  Sustained.

12           The jury will regard.

13           MR. WEINGARTEN:  Let's clarify this point.

14           THE COURT:  Excuse me.

15           The jury will disregard the answer and the question.

16   BY MR. WEINGARTEN:

17   Q.  So I just want to be -- directly and indirectly a point I

18   want to clear.  OK?

19   A.  Uh-huh.

20   Q.  So it's your testimony that if someone in the United States

21   wants to send something to Iran --

22   A.  Uh-huh.

23   Q.  -- and uses a middle person in Germany --

24   A.  Uh-huh.

25   Q.  -- that involves the sanctions?

K35nsad2                         Kim - Cross

1   A.  Yes.

2   Q.  OK.  The critical issue is whether or not the intent is for

3   the product to get to Iran, correct?

4   A.  In this -- but the -- that one matters when -- it is not

5   that simple.  I'm sorry.  If the product goes to Iran, it

6   matters, but if not, if it didn't land in Iran, then -- I'm

7   sorry.  The intention is really -- it doesn't really work here.

8   Q.  I missed that.  I'm sorry.  The intention is important?

9   A.  It's important when we consider the nature of the violation

10  but the violation is not related to the intention.

11  Q.  Well, does the violation turn on whether or not the product

12  gets to Iran?

13  A.  That's what I'm confused actually.  So there can be many

14  different scenarios to answer your question.

15  Q.  OK.  Let's move on.  So back to "prohibits virtually all

16  imports and exports to and from Iran."

17          It is true, is it not, that OFAC has established

18  humanitarian exceptions for product going to Iran?

19  A.  That's correct.

20  Q.  And it includes food?

21  A.  Yeah.

22  Q.  All right.  So the United States and U.S. people can export

23  food to Iran, correct?

24  A.  That's correct.

25  Q.  OK.  And medicine?

K35nsad2                    Kim - Cross

1   A.   Yes.

2   Q.   There can be the transfer of family remittances?

3   A.   That's correct.

4   Q.   And that means that if there's family on either side, in

5   Iran or in the United States, money can go back and forth to

6   support those family members; that's completely legal.

7   Correct?

8   A.   That's correct.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K35TSAD3                          Kim - Cross

1   BY MR. WEINGARTEN:

2   Q.  And in instances there have been exceptions made for

3   disaster relief, correct?

4          MS. KIM:  Objection, your Honor.

5          THE COURT:  Sustained.

6   Q.  Let's take a look at number 5.  So you testified yesterday

7   that the comprehensive trade embargo against Iran prohibits

8   export of goods and services directly or indirectly to Iran or

9   to the government of Iran, correct?

10  A.  Correct.

11  Q.  So that's the general prohibition, right?

12  A.  The general prohibition includes more than that, but it is

13  fair to say it's the basic in terms of commerce, import and

14  export.

15  Q.  So it seems from that statement that you -- let's break it

16  apart a little bit:  Prohibits goods or services directly or

17  indirectly to two places, to Iran or the government of Iran, is

18  that what that sentence says?

19  A.  Yes.

20  Q.  And "to Iran" means that territory of Iran, doesn't it?

21  A.  Yes.

22  Q.  And the government of Iran is the mullahs and the

23  Ayatollahs and government that runs the country, correct?

24  A.  Yes.

25  Q.  And let's talk about goods and services.  Yesterday you

K35TSAD3                      Kim - Cross

1    said that services could mean engineers going into Iran and

2    helping projects.  You said that yesterday.

3    A.  Can you repeat?

4    Q.  Well, I'm trying to recall in a simplistic way what you

5    said.  You gave two examples yesterday, you talked about

6    engineers going into Iran and working.  Do you remember that?

7           MS. KIM:  Objection, I think that mischaracterizes the

8    testimony.

9           THE COURT:  Sustained.

10   Q.  You gave two examples.  Tell me what you said yesterday.

11   A.  The engineering services.

12   Q.  Okay.  And the second was financial services, right?

13   A.  Yeah.

14   Q.  Okay.  Is the word "services" defined anywhere in any OFAC

15   law, reg, guidance, anything?  Is there a place we can go to

16   see what "services" mean?

17           Isn't the answer no?

18   A.  Yes, but I don't know.  There is the services defined in

19   the reg, but I don't know whether that description serves as

20   the meaning of service you're looking for.

21   Q.  Isn't it true, sir, that what you're looking at here is a

22   reg from 1995?

23   A.  Mm-hmm.

24   Q.  And in all the documents in your building, the first time

25   services are applied to financial transactions is in 2012.

1          MS. KIM:  Objection.

2     Q.  Isn't that true?

3     A.  No.

4          MS. KIM:  The Court will explain the law to the jury.

5          THE COURT:  It's your exhibit, isn't it, Ms. Kim?

6          MS. KIM:  The meaning of services and the definition

7     of services.

8          THE COURT:  Yes, I will, I certainly will, but this

9     is -- well, actually what we're going to to do, because I hoped

10    we resolved all the issues, but I will give the jury a little

11    bit of a break.  We'll break now so we can discuss this.

12         Members of the jury, thanks for your patience, I will

13    see you in 15 minutes.

14         (Jury not present)

15         MS. KIM:  Your Honor, could the parties have a

16    two-minute bathroom break?

17         THE COURT:  We'll take a couple minutes and come back

18    to discuss this issue.  But first of all, let me say both sides

19    of been guilty of this:  If I haven't been clear going forward,

20    when there are objections, say the word "objection."  If I want

21    a ground, I'll ask for it.  Nothing more, no more commentary

22    feeding witnesses, getting suggestions in front of the jury.

23    So for example, don't say in the courtroom I'll instruct you as

24    to law.

25         Obviously this is an issue we'll have to deal with.  A

1           (Jury present)

2           (Witness resumed)

3           THE COURT:  Thank you, everyone.  A little shorter

4    distance to the jury box this way.

5           Please be seated.

6           Thank you, members of the jury.  We will continue with

7    the cross-examination of Mr. Kim.

8           Mr. Weingarten, you may continue.

9    BY MR. WEINGARTEN:

10   Q.  Mr. Kim, good afternoon.

11   A.  Good afternoon, sir.

12   Q.  Just a little bit more.

13   A.  OK.

14   Q.  So, we were looking at the slides that the government put

15   up.  Why don't we turn to slide 7.  So slide 7 talks about or

16   represents that there was an executive order in 2012 about

17   blocking.

18          Do you see that?

19   A.  Yes.

20          THE COURT:  Let me just check.  Any issues --

21          JUROR:  I can see.

22          THE COURT:  You can't see it?

23          Raise your hand if you can't see.  OK.  We're good.

24   Thank you.

25   BY MR. WEINGARTEN:

K35TSAD3                          Kim - Cross

1    Q.  I believe, as you testified on direct, blocking is and

2    freezing are essentially the same, and in 2012 there was a new

3    remedy that was given to OFAC for blocking that didn't exist

4    before; is that fairly stated?

5    A.  Yes.

6    Q.  OK.  And it's the freezing of property of the government of

7    Iran and Iran financial institutions, correct?

8    A.  Yes.

9    Q.  OK.  And those were the targets of the blocking provisions,

10   correct?

11   A.  Of this executive order, that's correct.

12           THE COURT:  If you could just speak into the

13   microphone.

14           THE WITNESS:  Sure.

15           THE COURT:  Mr. Kim.  Thank you.

16   BY MR. WEINGARTEN:

17   Q.  Let's turn to slide 9 and Bank Saderat.  This is

18   identification of Iranian government-owned financial

19   institutions where sanctions were imposed.

20           Is that what we have here?

21   A.  Yes.

22   Q.  OK.  And you talked in your testimony about SDNs.  An SDN

23   is what?

24   A.  SDN is whose property is blocked.

25   Q.  Before 2012 were there SDNs?

K35TSAD3                        Kim - Cross

1   A.  Before 2012 there were SDNs, yes.

2   Q.  But there was no blocking before 2012?  Isn't that what you

3   just said?

4   A.  No.

5   Q.  All right.  So there was a statute or a reg passed in 2012

6   for blocking for government property, and -- government of Iran

7   property and Iran financial institutions, blocking and freezing

8   property.  That's the slide we just saw.  That's 7, correct?

9   A.  Yes.  But I need to explain a little bit too to answer

10  correctly.

11          THE COURT:  Go ahead.

12  A.  The Executive Order 13599 we saw before, that's the

13  blocking EO about government of Iran and Iranian financial

14  institutions, but Iranian financial institutions and

15  subdivisions of Iranian government were blocked under other

16  programs.

17  Q.  OK.

18  A.  So Iranian -- the remaining program, the objectives of each

19  of those programs overlapped.

20  Q.  OK.

21  A.  So other banks were blocked too.

22  Q.  So the government of Iran in 2012 in a special program had

23  a new block reg?  Is that what you are saying?

24          MS. KIM:  Objection.

25  A.  What I'm saying --

1          THE COURT:  Just a moment.

2          Overruled to the extent I think it was a clarifying

3    question.

4          Go ahead.

5    A.   What I'm saying is Iranian financial -- some of Iranian

6    financial institutions were blocked before.

7    Q.   OK.  The focus on -- never mind.  I'll move on.

8          On 9, it's Bank Saderat.  Bank Saderat is one of the

9    larger banks, one of the larger I think you testified

10   government-owned banks in Iran?

11   A.   Yes.

12   Q.   And there are many, many local offices of Bank Saderat in

13   Iran and elsewhere?

14   A.   Yes.

15   Q.   Obviously it's not OFAC's business who is the depositor in

16   Iran in Bank Saderat, that's not what you're interested in,

17   correct?

18   A.   Not exactly because -- can I explain?

19   Q.   Sure.

20   A.   Yes.  If Bank Saderat's clients are SDNs, then Bank

21   Saderat, of course, will be under our monitoring, and then Bank

22   Saderat, there's a huge chance to be designated as --

23   Q.   I guess here's the issue.  Obviously OFAC is interested if

24   Bank Saderat is working with the Iranian government building

25   nukes or supporting terror around the world, fair?

K35TSAD3                         Kim - Cross

1    A.   That's fair.

2    Q.   Of course.  But if mom and pop down the street in Tehran is

3    depositing money or writing checks on a Bank Saderat account

4    you are not interested in?

5    A.   No.

6    Q.   You are not interested in the typical everyday transactions

7    that Bank Saderat engages in with Iranians, correct?

8    A.   That's correct.

9    Q.   And if Bank Saderat had a transaction with someone outside

10   of Iran in euros, that wouldn't be your business either,

11   correct?

12   A.   It could.  That's too generalized a question to me.

13   Q.   OK.  Too general?

14   A.   Yes.

15   Q.   Let's look at 10.  So, October 25, 2007, OFAC designation,

16   and you have Iran Islamic Revolutionary Guard Corps, IRGC,

17   correct?

18   A.   That's correct.

19   Q.   That's the paramilitary or military organization that

20   supports the theocracy, correct?

21   A.   That's correct.

22   Q.   And there are any number of sanctions imposed against them,

23   correct?

24   A.   That's correct.

25   Q.   Because there's a belief on your part in OFAC that they are

1    primarily responsible for any nukes and any activity relating

2    to terrorism, fair?

3    A.   That's fair.

4    Q.   OK.   Now, you also have Oriental Oil Kish in your list

5    here, Iranian oil company owned or controlled by IRGC.   Did you

6    do an investigation as to what is the story what Oriental Oil

7    Kish?

8    A.   OFAC did.

9    Q.   And did you learn that there was a property that we are

10   talking about with Oriental Oil Kish that used to be owned by

11   Halliburton?

12   A.   I cannot say that I knew, but OFAC -- this designation is

13   done by another division in OFAC.   It is not my division.   So I

14   would probably, of course, but I cannot say from my own

15   knowledge.

16   Q.   Well, did you learn that my client's father participated

17   with others in an investment into this property for

18   Halliburton?

19            MS. KIM:   Objection.

20            THE COURT:   Just a minute.

21            Sustained.

22   Q.   Did you learn that Oriental Oil Kish property was stolen by

23   the IRGC?

24            MS. KIM:   Objection.

25            THE COURT:   Sustained.

K35TSAD3                          Kim - Cross

1           MR. WEINGARTEN:  He said he knew, your Honor.

2           THE COURT:  Sustained.

3   Q.  So you don't know of your personal knowledge what happened

4   to this property?

5   A.  What I know is they are designated, and then what I know is

6   when designation happens we internally provide very brief

7   summary that why it is designated so that the other OFAC

8   internally know, but actual designation and the information in

9   the designation package that belongs to a specific division.

10  Q.  You don't have personal knowledge?

11  A.  I don't.

12  Q.  OK.  Moving on to page 11, so more designations.

13          Were you told to look to see whether or not there were

14  designations for these people?  How did these people appear or

15  how did these institutions on appear on the chart?

16  A.  The prosecution asked.

17  Q.  The prosecution asked you to look for these people?

18  A.  They said, Do you know this bank?  I said, yes.

19  Q.  OK.  Let's look at the bottom one, the EN Bank.

20  A.  Uh-huh.

21  Q.  The EN Bank was designated July 12, 2012.  Do you see that?

22  A.  Yes.

23  Q.  Did you come to learn that on July 12, 2012, all the

24  financial institutions of Iran were designated, not just EN

25  Bank?

K35TSAD3                          Kim - Cross

A.  I didn't know all the financial institutions of Iran.

Q.  You didn't know?

A.  Not this one.  This one was the -- one, 13599, the blocking
EO, it designates, it says, All Iranian financial institutions
are blocked, right.  That executive order is blocking.  And
then in order to make that blocking order into, put into SDN's
system, then we need to have OFAC's designation as an SDN so
that they go into it.

Q.  However you did it, when you hit EN Bank to look in the
computer to see if on that day EN was designated, did you see
hundreds and hundreds of other banks that were also designated?

A.  Yes.  I don't know whether hundreds but --

Q.  Many?

A.  Yes.

Q.  Did you come to learn several years later all the banks
were taken off the SDN list in 2016?  Did you come to learn
that?

A.  I know many of them were.

           MS. KIM:  Objection.

           THE COURT:  Overruled.

A.  Many of them were delisted temporarily, but that was
conditional, and most of the banks were -- remained.  The
effect of delisting was not, was not significant because
Iranian programs designated stayed there.  But what is lifted
temporarily was other programs' designations.  So one bank can

1     be designated multiple times based on many different programs.

2     So, for example, one designation is lifted doesn't mean that

3     this bank is now free to transact with.

4     Q.  Are you suggesting that EN Bank was still listed in 2016?

5     A.  As far as I know, yes.

6     Q.  All right.  To your knowledge, when you looked at EN Bank,

7     did you see any special designation for wrongdoing by EN Bank?

8     A.  That I don't remember.

9     Q.  All right.  You introduced yourself as a person in the

10    enforcement division of OFAC, is that correct?

11    A.  That's correct.

12    Q.  So you handle cases and make a judgment whether or not

13    people dealing in some form or fashion should be punished?

14    A.  Yes.

15    Q.  I believe you testified that about 90 percent of the

16    violations that you find there's no actual punishment, is that

17    what you said?

18    A.  Not exactly.

19    Q.  So there's a letter that you send?

20    A.  Yes.

21    Q.  So you have a hundred cases that come on your desk and the

22    worst you do for 90 of them is you send somebody a letter?

23    A.  Yes.

24              (Continued on next page)

25

K35TSAD5                         Kim - Cross

1    BY MR. WEINGARTEN:

2    Q.  No fine?

3    A.  No, no.

4    Q.  No referral to the prosecutors?

5    A.  In those instances, probably not.

6    Q.  Of the hundred OFAC cases that you handle at a time, how

7    many referrals do you make to the prosecutors, average?

8    A.  Out of hundred, two or three.

9    Q.  Two or three.  Isn't the percent actually 95 percent are

10   occasions when nothing happens to the person dealing with Iran

11   other than, at worst, a letter, as opposed to 90 percent?

12   A.  That description is not exactly correct because receiving

13   the warning letter or cautionary letter has a lot of meaning to

14   it and it has a consequence if you receive that.

15           MR. WEINGARTEN:  Maybe we'll get some help.  DX47 is

16   the document we talked about this morning, your Honor.

17           THE COURT:  Okay.

18           MR. WEINGARTEN:  Put it in front of the witness,

19   please.

20           MS. KIM:  It's not in evidence, your Honor.

21           MR. WEINGARTEN:  I thought you ruled it in.

22           THE COURT:  It hasn't been admitted.

23           MR. WEINGARTEN:  Sorry.

24   Q.  Do you see the document in front of you, sir?

25   A.  Yeah.

K35TSAD5                          Kim - Cross

1   Q.  And is it a document entitled U.S. Department of Treasury

2   and Federal Banking Agency's Joint Fact Sheet on Foreign

3   Correspondent Banking Approach to BSA AML and OFAC Sanctions,

4   Supervision and Enforcement.  Do you see that?

5   A.  Yes.

6   Q.  OFAC is your organization, correct?

7   A.  That's correct.

8   Q.  And this is a summary of two things, basically, is it not,

9   the enforcement procedures that you're talking about and the

10  responsibilities for correspondent bank, fair?

11             MS. KIM:  Objection.

12             THE COURT:  Just a moment.

13             MS. KIM:  Your Honor, we ask that the witness have an

14  opportunity to review the document.

15             THE COURT:  That's fine.  Can you give the witness a

16  full copy?

17             MR. WEINGARTEN:  May I approach?

18             THE COURT:  You may.

19  Q.  Have you seen this document before?

20  A.  No.

21  Q.  So you are familiar with the United States Department of

22  Treasury, correct, you work there?

23  A.  Yes.

24  Q.  And you work at OFAC, correct?

25  A.  That's correct.

K35TSAD5                     Kim - Cross

1    Q.  And this is a joint fact sheet on foreign correspondent

2    banking, and it also talks about enforcement, is that correct?

3              MS. KIM:  Objection.

4              THE COURT:  Sustained.

5              MR. WEINGARTEN:  I move it into evidence, your Honor.

6              MS. KIM:  The government objects.

7              THE COURT:  Anything different than what we discussed?

8              MR. WEINGARTEN:  It's what we discussed.

9              THE COURT:  For the government, grounds?

10             MS. KIM:  Not for impeachment purposes and all the

11   other reasons we discussed.  He has never seen this document.

12             THE COURT:  Overruled.

13             (Defendant's Exhibit 47 received in evidence)

14   Q.  Let's move to FINCEN and OFAC.

15             What is FINCEN, sir?

16             MS. KIM:  Your Honor, could we make clear what the

17   date is on this document from the first page?

18             MR. WEINGARTEN:  August 30, 2016, document entitled

19   United States Department of Treasury and Federal Banking

20   Agency's Joint Fact Sheet on Foreign Correspondent Banking

21   Approach to BSA, AML and OFAC Sanctions, Supervision and

22   Enforcement.

23   Q.  Let's turn to page 3, and we see FINCEN and OFAC, correct?

24   A.  Yes.

25   Q.  And what is FINCEN?

K35TSAD5                          Kim - Cross

1   A.  FINCEN is one of the Treasury's -- one of agencies that

2   belongs to the Treasury, and it collects reports from banks

3   about suspicious banking activities, and it works as like

4   information center about what is going on in banks.

5   Q.  Let's see what this report says.  FINCEN and OFAC are also

6   essential to the effectiveness of the United States BSA, AML

7   framework and sanctions regime.  What is BSA and AML?

8   A.  BSA is the Bank Secrecy Act, and AML is Anti-Money

9   Laundering.

10  Q.  So FINCEN has independent enforcement authority to impose

11  CMPs and may seek equitable relief against financial

12  institutions for non-compliance with BSA.  What are CMPs?

13  A.  Civil Monetary Penalties.

14  Q.  Let's jump down and move from FINCEN to OFAC, fourth line

15  from the bottom.

16          Similarly, in certain circumstances, OFAC -- and

17  that's you, of course, correct?

18  A.  Yes.

19  Q.  -- will consult with relevant FBAs regarding the quality

20  and effectiveness of an institution's compliance program when

21  determining the appropriate enforcement response.

22          And when talking about an institution's compliance

23  program, you're talking about a bank, right, or financial

24  institution?

25  A.  Yeah.

K35TSAD5                         Kim - Cross

1    Q.  OFAC investigates cases of sanctions violations, many of

2    which, over 95 percent, are closed with administrative measures

3    such as cautionary or no action letters.

4             That's what you said before, correct?

5    A.  Yes.

6    Q.  But you said 90, they're saying 95, right?

7             MS. KIM:  Objection, your Honor, it's a

8    mischaracterization of what he actually said.

9             THE COURT:  Overruled.

10   A.  I said less than ten percent.

11   Q.  Sorry?

12   A.  I said less than ten percent.

13   Q.  I beg your pardon, I believe you said ten.  This means that

14   less than five percent of all cases of sanctions by --

15   sanctions-related violations investigated by OFAC have resulted

16   in a civil monetary penalty or other public enforcement

17   response.  Do you see that?

18   A.  Yes.

19   Q.  So we're clear, for every hundred cases you get, 95 result

20   in something less than a monetary penalty, correct?

21   A.  That's correct.

22            MR. WEINGARTEN:  Can I have one second, please.

23            THE COURT:  Yes.

24            MR. WEINGARTEN:  Could I have DX1352 put up, please?

25            THE COURT:  Sorry, what was the number?

K35TSAD5                       Kim - Cross

1           MR. WEINGARTEN:  1352, just for the witness.

2    Q.  Now is there such a thing at OFAC as frequently asked

3    questions and answers?

4    A.  Yes.

5    Q.  What is that?

6    A.  That's OFAC's notice to the public saying that this will be

7    our answers if anybody has these types of questions.

8    Q.  So people -- do you make up the questions or do people

9    actually write them in?

10   A.  Both.

11   Q.  And have you ever seen the question on 1352?

12   A.  Yes.

13           MR. WEINGARTEN:  Move it in, your Honor.

14           MS. KIM:  The government objects.

15           THE COURT:  As discussed, overruled.

16           (Defendant's Exhibit 1352 received in evidence)

17   BY MR. WEINGARTEN:

18   Q.  Would you like a paper copy or can you read it up there?

19   A.  It would be all right.

20   Q.  On February 14, 2008, OFAC issued guidance stating that the

21   property and interests in property of an entity are blocked if

22   the entity is owned, directly or indirectly, 50 percent or more

23   by a person whose property and interests in property are

24   blocked pursuant to an executive order or regulations

25   administered by OFAC.

K35TSAD5                         Kim - Cross

```
 1             Does that mean if more than 50 percent of an entity is
 2    an SDN, the property is blocked, is that what you're saying?
 3             Is that the import of that sentence?
 4    A.  Can you repeat?
 5    Q.  Maybe if I read the next sentence it will be clear.
 6             We act as an intermediary bank in wire transfers
 7    between other banks.
 8             So that's the correspondent bank that you described
 9    yesterday, right?
10    A.  Mm-hmm.
11    Q.  Does OFAC expect banks that are acting as financial
12    intermediaries to research non-account parties that do not
13    appear on the SDN list but are involved with or referenced in
14    transactions that are processed on behalf of correspondents?
15             You got that question?
16    A.  Yeah.
17    Q.  Could you translate that in simple English?
18             Can I help you here, maybe?  Isn't the issue --
19             MS. KIM:  Could you give him a minute to read the
20    document?
21             MR. WEINGARTEN:  That's fine.
22    A.  Yes.  In other words, in plain language, does OFAC expect
23    banks to do due diligence on the bank's client's client.
24    Q.  So is the question:  If the correspondent bank has a
25    transaction, wired funds that go through the correspondent
```

1  bank, and neither party, not the party presenting the money or
2  the party receiving the money, is on the SDN list, correct?
3            Isn't the question --
4  A.   The question is whether OFAC expects the correspondent
5  banks to know about not only sender -- not about the bank that
6  send the transfer order, whether correspondent bank should know
7  about the parties involved in the transaction.
8  Q.   And isn't the answer if neither party is on the SDN list,
9  then the correspondent bank has no responsibilities at all?
10  A.   Answer to question is no.
11  Q.   Well, isn't that what is said on this piece of paper?
12            MS. KIM:   Where, your Honor?
13  Q.   Let's see.
14  A.   This is the question, but I didn't look at the answer part
15  yet.
16  Q.   Okay.  Let's see what is actually written here, second
17  paragraph, last sentence.  Let's highlight it, beginning with
18  "In instances where all three conditions are met," I guess we
19  have to look at the conditions.  Let's go back to the top
20  paragraph 2.  The answer to question 116.
21            A wire transfer in which an entity has an interest is
22  blocked property if the entity is 50 percent or more owned by a
23  person whose property and interests in property are blocked.
24            That's an SDN, right?
25  A.   Yes.

1    Q.  Let's continue.  This is true even in instances where such

2    a transaction is passing through a U.S. bank that, one, is

3    operating solely as an intermediary.  That's the correspondent

4    bank, correct?

5    A.  That's correct.

6    Q.  And two, does not have any direct relationship with the

7    entity, for example, the entity is a non-account party, so

8    that's a standard wire procedure, and three, does not know or

9    have reason to know the entity's ownership or other information

10   demonstrating the blocked status of the entity's property, EG,

11   the entity is located in Cuba.

12           That means the correspondent bank has no reason to

13   believe on either side of a transaction is a SDN, fair?

14   A.  Not fair because of the third condition, does not know.

15   Q.  So we're saying the same thing, the correspondent bank

16   doesn't know, has no reason to believe anybody is an SDN?

17   A.  Yeah, right.

18   Q.  Okay.  OFAC would not expect the bank to research the

19   non-account parties listed in the wire transfer that do not

20   appear on the SDN list, and accordingly, would not pursue an

21   enforcement action against the bank for having processed such a

22   transaction.

23   A.  That's correct, yeah.

24   Q.  And you agree with that, right?

25   A.  Yeah.

K35TSAD5                      Kim - Cross

1    Q.  So if the correspondent bank has no reason to believe that

2    anybody on either side of the transaction is on the SDN list,

3    that correspondent bank has no issues with you?

4    A.  That is not exactly true.  We have issue, but we will not

5    take like monetary penalties.  Here, will not pursue an

6    enforcement action.  When we say this, this one usually means

7    public enforcement action, if they keep doing this, is that

8    they receive cautionary letter and it goes onto their file.

9    Q.  Is that what is said here?  Is there another sentence that

10   says what you just said?

11                MS. KIM:  Objection.

12                THE COURT:  Sustained.  That wasn't the question.

13   Q.  Is there any further guidance -- is there anywhere that

14   this question is supplemented in the OFAC records where

15   additional information is provided?

16                MS. KIM:  Objection.

17                THE COURT:  Sustained.

18   Q.  So you said in your direct testimony that OFAC is a strict

19   liability organization, is that correct?

20   A.  That's correct.

21   Q.  So of the 100 cases that typically fall on your desk, how

22   many are cases where entities or individuals have been punished

23   in any way, shape or form for conduct where there was

24   absolutely no knowledge on their part that they did anything

25   wrong?

K35TSAD5                     Kim - Redirect

```
 1   A.  It depends how you interpret punishment, but we take

 2   enforcement action to -- that includes cautionary letter to

 3   party who unwittingly getting involved in the transaction that

 4   is in violation of a regulation.

 5   Q.  And they got a letter from you?

 6   A.  Yep.

 7   Q.  So that was the punishment, they got a letter?

 8   A.  Yep.

 9   Q.  Which cases were they?

10           MS. KIM:  Objection to form.

11           THE COURT:  Sustained.

12           MR. WEINGARTEN:  I have nothing further.

13           THE COURT:  Okay.  Ms. Kim.

14   REDIRECT EXAMINATION

15   BY MS. KIM:

16   Q.  Just a few questions, Mr. Kim.

17           MS. KIM:  Mr. Milione, if we could please pull up

18   Defense Exhibit 1352, which was just on the screen.

19   Q.  And actually, while you're doing that, I'll ask you a

20   little bit about enforcement actions at OFAC.

21           So you testified on direct and also a minute ago when

22   defense counsel asked you about OFAC's enforcement actions,

23   about monetary penalties as well as cautionary letters.  Can

24   you describe for the jury what a cautionary letter is?

25   A.  Yes, the way OFAC operate is we investigate the potential
```

1    violation, the transaction, and then when the transaction is in

2    violation, for example, U.S. food was exported to Iran, then we

3    look at the transaction and all the parties involved in that

4    transaction and we see U.S. manufacturer, freight forwarder,

5    carrier and so on and up to the Iranian recipient.

6              THE COURT:  I didn't hear you.

7              THE WITNESS:  Up until the Iranian recipient of the

8    goods.

9              THE COURT:  Iranian recipient, okay.

10   A.  Then we analyze who was the most responsible for this

11   transaction, and then somebody -- if everybody did it by

12   mistake, then it's one story, but if somebody hide some key

13   information there so all other get involved in this without

14   knowing, then we definitely go after the party who did

15   something to hide the key information that the other parties'

16   compliance was not able to catch, then we go after the most

17   responsible party with monetary penalty as much as we can.

18             For others, if you look at their compliance program

19   it's so weak so they are prone to fall into this kind of

20   problems, then we issue cautionary letter.  If that party

21   accumulate cautionary letter, it is a different story, it is a

22   pattern for them, they seriously let something, if something

23   comes up involving that party, next time that party will be on

24   the list for monetary penalties.  That's how it goes.

25             So cautionary letter, we issue can cautionary letter

1    normally to a party who unwittingly committed the violation,
2    but yeah, the intentional -- for a party who intentionally
3    tried to get around or intentionally tried to breach the rule,
4    then we go after them with monetary penalty as much as we can.
5    Q.   And so I'm sorry, Mr. Kim, when you speak could you be sure
6    to speak into the microphone, thank you.
7            So earlier I think you started to say that cautionary
8    letters have meaning?
9    A.   Yes.
10   Q.   And fair to say that you just testified that part of that
11   meaning is because if you receive multiple cautionary letters,
12   that could impact the decision of OFAC to bring an enforcement
13   action down the line?
14   A.   Yes, but that's the second one.  The first one is the party
15   who received cautionary letter is in violation of the
16   transaction, that's why they received the cautionary letter; if
17   they don't, they will receive no action letter.  There's a
18   special name for that.  But a cautionary letter means you
19   violated, but we are just giving a pass this time because looks
20   like you unwittingly fell into this problem.
21   Q.   And earlier there was some discussion about what
22   percentage, approximately, of cases where OFAC finds there was
23   a violation.  What percentage of those cases results in
24   monetary penalties?
25   A.   Normally I say less than ten percent, around, but if he

1   shows the other calculation is five percent, that range.

2   Q.  Somewhere around less than ten percent, five percent.

3            And you testified yesterday on direct that the

4   potential penalties could reach hundreds of millions of

5   dollars, is that correct?

6            MR. WEINGARTEN:  Beyond the scope, your Honor,

7   repeating yesterday.

8            THE COURT:  Sorry?

9            MR. WEINGARTEN:  Beyond the scope of my cross and it

10  was repeated yesterday.

11           THE COURT:  Sustained.

12  Q.  So now if we could move to Defense Exhibit 1352.  And do

13  you see this was the exhibit that defense counsel just walked

14  you through.  Are you familiar with something called the 50/50

15  rule or referred to as a 50/50 rule?

16  A.  It is called -- we call it 50 percent rule.

17  Q.  50 percent rule.  Very generally, could you please explain

18  what the 50 percent rule is.

19  A.  Yes, if an entity is owned 50 percent or more by a blocked

20  person, then the first entity's property is also blocked.

21  Q.  So just clarify, does this document refer to the 50 percent

22  rule, does it discuss the 50 percent rule?

23  A.  I think so, yes.

24           MS. KIM:  If we could take this down, Mr. Milione.

25  Q.  And apart from the 50 percent rule, when an entity is not

1    partially owned or controlled by SDN, so is not an SDN, not

2    affiliated with an SDN but is Iranian and headquartered in

3    Iran, do Iran sanctions apply to that entity?

4    A.  Yes.

5    Q.  Defense counsel asked you some questions, I think it was

6    this morning, about the comprehensive ban on exports to Iran,

7    also known as the ITSR.  Do you remember that?

8    A.  Yes.

9    Q.  And you testified on cross-examination that the ITSR can be

10   violated if services are sent directly or indirectly to Iran.

11   Do you remember that?

12   A.  Yes.

13   Q.  Mr. Kim, are you familiar with the term "front company?"

14   A.  Yes.

15   Q.  What does that term mean?

16   A.  Front company is a company used to hide --

17              MR. WEINGARTEN:  Excuse me.  Respectfully, Judge,

18   that's beyond the scope, your Honor, and also subject to all --

19              THE COURT:  I didn't hear you.

20              MR. WEINGARTEN:  This is the subject that was

21   discussed extensively before.

22              THE COURT:  Yes.

23              MR. WEINGARTEN:  I think we were about to --

24              THE COURT:  I think you misremember.  So on that

25   second ground, overruled, the first ground which was scope,

1   overruled.

2   Q.  Mr. Kim, could you please explain to the jury, what does

3   the term "front company" mean?

4   A.  Front company is a company used to hide the true identity

5   of the principal or the true parties of the transaction that is

6   conducted through the front company.

7   Q.  And is the use of a front company, or as you described it,

8   hiding the identity of a principal, that is headquartered in

9   Iran, does that matter to OFAC?

10  A.  Yes.

11  Q.  Why?

12  A.  That matters to OFAC because that makes -- as I said, if

13  one transaction is to be done, then there are so many

14  participants involved.  If one is to go to Iran or one is

15  delivered to Iran, there is so many parties involved.  If front

16  company is used, then the parties' effort to be in compliance

17  with the sanctions program get frustrated, get compromised,

18  because the key information that they're looking for as a red

19  flag is hidden.

20          In comparison, if a transaction is to be done, it was

21  planned to be done or trying to be done without mistake, then

22  normally in those situations, from my experience, there's --

23  the key information is there, because nobody wants to

24  intentionally hide those.  So if front company is used and

25  looks like it is not even related to transaction, then it goes

1   through step by step the transaction process.  And that process

2   made all the parties involved in violation of the regulation,

3   and also it makes U.S. services or goods going to Iran.  That

4   is the ultimate problem of the sanctions program.  That's why I

5   said it defeats the purpose of sanctions program.  That's why,

6   again, the use of front company matters to OFAC.

7               MS. KIM:  Your Honor, just one minute, please.

8               THE COURT:  Okay.

9               (Pause)

10              MS. KIM:  No further questions.

11              THE COURT:  Mr. Weingarten.

12              MR. WEINGARTEN:  Just one.

13              THE COURT:  Go ahead.

14  RECROSS EXAMINATION

15  BY MR. WEINGARTEN:

16  Q.  So it's your understanding the whole point of these front

17  companies in Iran, in your work, is to secretly get the money

18  to the mother ship in Iran, correct?

19              MS. KIM:  Objection.  What is "mother ship?"

20  Q.  Remove mother ship.

21              THE COURT:  I'll sustain.  Reask it, please, for

22  clarity.

23  Q.  So the point of the front company is to secretly get the

24  money into Iran so that you don't see it, correct?

25  A.  That's correct, but I -- I need some explanation for that.

K35TSAD5

1    We call those companies front company.  If the purpose is not

2    to hide, then we use other term.

3    Q.  So if there's no reason to hide, then they're not front

4    companies, right?

5         The front companies are secretly getting that money

6    into Iran, that's their whole point, right?

7    A.  Yes.

8         MR. WEINGARTEN:  Thank you.

9         THE COURT:  Ms. Kim.

10        MS. KIM:  Nothing from the government, your Honor.

11        THE COURT:  Thank you, Mr. Kim, you are excused.

12        Counsel, I'm going to give the limiting instruction

13   now unless there's any objection to timing.

14        MS. KIM:  No objection.

15        THE COURT:  No objection.  Thank you.

16        Members of the jury, I have a limiting instruction:

17   You have heard testimony about the meaning of the words

18   "inapplicable laws and regulations."  That testimony was

19   admitted as relevant to the defendant's state of mind.  That is

20   the sole purpose for which you may consider it.  As I mentioned

21   in my initial instructions to you, I, as the judge, will

22   instruct you on the law and the meaning of the law, and you

23   will be required to follow my instructions.

24        Thank you.  Ms. Kim, you may call your next witness.

25        MR. LYNCH:  Your Honor, the government calls Talya

```
1                           INDEX OF EXAMINATION

2    Examination of:                                     Page

3     TED KIM

4    Direct By Ms. Kim  . . . . . . . . . . . . . 574

5    Cross By Mr. Weingarten  . . . . . . . . . . 576

6    Redirect By Ms. Kim  . . . . . . . . . . . . 653

7    Recross By Mr. Weingarten  . . . . . . . . . 659

8    TALYA NEVINS

9    Direct By Mr. Lynch  . . . . . . . . . . . . 663

10   Cross By Mr. Heberlig  . . . . . . . . . . . 700

11    MATTHEW NELSON

12   Direct By Mr. Krouse . . . . . . . . . . . . 703

13   MATTHEW JORDAN BLAIR

14   Direct By Ms. Lake . . . . . . . . . . . . . 731

15   Cross By Mr. Heberlig  . . . . . . . . . . . 760

16                           GOVERNMENT EXHIBITS

17   Exhibit No.                               Received

18    104D    . . . . . . . . . . . . . . . . . 661

19    104D 1401A-T, 1403T, 1405T, 1501T,  . . . . 662

20             1503T, 1503A-T, 1506A-T.

21             1601T, 2032T, 2034T, 2034B-T,

22             2034C-T, 2090T, 2090A-T,

23             2149T, 2187T, 2237T, 2269A-T,

24             2269B-T, 2269C-T, 2269D-T,

25             2269E-T, 2269F-T, 2269G-T,
```

```
 1                    2269H-T, 2271T, 2271A-T, and

 2                    2276T

 3      2002, 2210, 2114 and 2114A, 2210, 2237  . . . 663

 4                    and 2237T, 2257, 2265, 2265B,

 5                    2276 and 2276T, 2277, 2297,

 6                    2297A and 2298

 7      2005, 2005A, 2016, 2016A, 2016C, 2016F, . . . 703

 8                    2065, 2065A, 2071, 2071A,

 9                    2071B, 2187, 2187-T, 2188,

10                    2190, 2198, 2199, 2201, 2201A,

11                    2215, 2215A, 2215A-T, 2215B,

12                    2215B-T, 2215C, 2215C-T, 2217,

13                    2219, 2219A through M

14      103 . . . . . . . . . . . . . . . . . . . . 729

15      103, 401 through 406 . . . . . . . . . . . 730

16                        DEFENDANT EXHIBITS

17      Exhibit No.                               Received

18      47 . . . . . . . . . . . . . . . . . . . . 645

19      1352 . . . . . . . . . . . . . . . . . . . 648

20      1905 . . . . . . . . . . . . . . . . . . . 771

21

22

23

24

25
```

# EXHIBIT 109

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Krouse, Michael (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Ted Kim |
| **Date:** | Tuesday, March 10, 2020 8:01:18 PM |

Can we talk about these?  We're in my office.  Thanks.

---

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 7:52 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett <LynchG@dany.nyc.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** Ted Kim

Defense is proposing to strike the highlighted portions of Kim's testimony.  The didn't do as much as they probably could have, so we could just agree.

That said, if we want to push back at all, the first two we could push back on.

First attachment:

Page 473, line 10-19 **(Striking testimony on blocked assets in general is not a remedy to the late disclosure.)**
Page 501, line 15 - Page 502, line 2 **(I think the first couple of questions should stay, but think we can strike lines 23 to the next page.)**
Page 502, line 25 – Page 503, line 5 **(agree to cut)**
Page 507, line 5 – Page 510, line 25 **(agree to cut)**

Second attachment:

Page 600, line 23-25 (partial) **(agree to cut)**
Page 601, line 4-9 (partial) **(agree to cut)**
Page 652, line 18-20 **(agree to cut)**
Page 653, line 19 – Page 656, line 11 **(agree to cut)**
Page 659, lines 1-5 **(agree to cut)**

# EXHIBIT 110

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Bove, Emil (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | Letter re: striking Ted Kim"s testimony |
| **Date:** | Tuesday, March 10, 2020 9:54:29 PM |
| **Attachments:** | 2020.03.10 Letter re Ted Kim testimony.docx |

Michael Krouse

Assistant United States Attorney

Southern District of New York

One St. Andrew's Plaza

New York, NY 10007

(212) 637-2279



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 10, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

    **Re:**    *United States* **v.** *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

       The parties have met and conferred in accordance with the Court's order, but were not able on to agree on: (1) which parts of Mr. Kim's testimony should be struck; or (2) the language the Court should use in describing to the jury the testimony it may not consider.  The defense letter proposes striking the following testimony:

- Tr. 473 (lines 10-19)
- Tr. 501 (line 15) – Tr. 502 (line 2)
- Tr. 502 (line 25) – Tr. 503 (line 5)
- Tr. 507 (line 5) – Tr. 510 (line 25)
- Tr. 600 (lines 23-25)
- Tr. 601 (line 4-9)
- Tr. 652 (line 18-20)
- Tr. 653 (line 19) – Tr. 656 (line 11)
- Tr. 659 (lines 1-5)

       The Government's proposal is for the Court to explain to the jury that they are not to consider any testimony they may recall from Mr. Kim regarding the concept of strict liability enforcement, and to strike the following testimony concerning strict liability enforcement:

- Tr. 501 (line 22) – Tr. 502 (line 2)
- Tr. 600 (lines 23-25)
- Tr. 652 (lines 18-20)

       The Government respectfully submits that this remedy is appropriate, because defense counsel could have possibly impeached Mr. Kim's testimony regarding strict liability by asking him: (1) whether he was aware that a bank had sent a letter to OFAC regarding the April 4, 2011

The Honorable Alison J. Nathan, U.S.D.J.
March 10, 2020
Page 2

payment, (2) whether he was aware that OFAC was provided with information concerning the Government's investigation in September 2016, and (3) whether he was aware that OFAC took no action.

However, the Government respectfully submits that the Court should not strike testimony concerning OFAC's general practices and processes. Mr. Kim testified on cross examination that he was not aware of any OFAC action in this case. *See* Tr. 580 ("Q: So, to your knowledge, this matter was never investigated by OFAC, correct?  A: In my knowledge, no.  Q:  Ok.  To your knowledge, was there ever a referral made by J.P. Morgan to OFAC relating to this case?  A: In my knowledge, no.").  Moreover, the parties entered into a stipulation, Defense Exhibit 1901-R, which states that Ted Kim was unaware of any allegations related to this case.  Accordingly, there is no basis to strike Mr. Kim's general expert testimony regarding OFAC's role in administering the U.S. sanctions program, which included:

(1) The blocking of assets;

(2) The fact that U.S. correspondent banks *can* be held liable for sanctions violations, even if they do not know of the Iranian connection to the transaction;

(3) The fact that OFAC's mission is made more difficult to perform when parties hide Iranian connections;

(4) The various penalties, in general, that OFAC can impose on banks, ranging from cautionary letters to monetary penalties; and

(5) The fact that banks are a source of information that can lead OFAC to open an investigation or pursue enforcement actions.

During this testimony, Mr. Kim does not discuss any of the facts of this case, or make any representations about what, if anything, OFAC would have done had it known these facts. Accordingly, there is not a basis to strike the testimony.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 111

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Krouse, Michael (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Letter re: striking Ted Kim''s testimony |
| **Date:** | Tuesday, March 10, 2020 9:56:34 PM |

Can you please send AJN's order and their letter?

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 9:54 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** Letter re: striking Ted Kim's testimony

Michael Krouse
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279

# EXHIBIT 112

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Bove, Emil (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Letter re: striking Ted Kim"s testimony |
| **Date:** | Tuesday, March 10, 2020 9:58:28 PM |
| **Attachments:** | 18cr224 Order 3.10.20.pdf |
| | Defense letter re Ted Kim.pdf |

Here is the defense letter, which I'm just now seeing.   Also, the Court's order.

**From:** Krouse, Michael (USANYS)
**Sent:** Tuesday, March 10, 2020 9:54 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** Letter re: striking Ted Kim's testimony


Michael Krouse
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 0 2020
```

United States of America,

—v—

Ali Sadr Hashemi Nejad,

Defendant.

18-cr-224 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

The parties are ordered to meet and confer regarding whether specific passages of Mr.

Kim's testimony should be struck.  They shall submit a joint letter outlining their respective

positions by 9 p.m.

SO ORDERED.

Dated: March 10, 2020
       New York, New York

ALISON J. NATHAN
United States District Judge



Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

March 10, 2020

By ECF

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

Re:   *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

The parties have met and conferred, in response to this Court's order of this evening, regarding what portions of Mr. Kim's testimony should be stricken from the record.

Although the Court ordered a joint letter setting out both parties' respective positions, by the time of filing, the government has not yet finalized its position with the chiefs of its office. This letter sets out the defense position. The government will file its position by separate letter.

***Defense Position***:

"The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962). "The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost." *Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) (citing *Jenkins v. Artuz*, 294 F.3d 284, 296 n.2 (2d Cir. 2002)).

As discussed in Court, and without repeating the details, the defense submits that the government's belated disclosures, first, of GX 411, and later, of SAUSA Lynch's extensive communications about the facts of this case with OFAC (in response to which OFAC did not initiate any investigation or enforcement proceedings), reveal a deliberately misleading strategy when juxtaposed with the government's presentation through Mr. Kim. On the one hand, the government told the jury, the Court, and the defense, in opening and through Mr. Kim's testimony, that OFAC had a "strict liability" enforcement approach, under which, had OFAC learned of Iranian connections to the wire transfers in this case, it would have initiated an investigation and enforcement proceedings, threatening the banks with a high risk of potential

The Honorable Alison J. Nathan
March 10, 2020
Page 2

**Steptoe**

monetary penalties that could reach into the tens and hundreds of millions. At the same time, the government knew, but did not tell the defense, the jury, or the Court, that the intermediary bank that processed the first payment notified OFAC regarding Stratus Turkey's connection to Stratus Iran, in response to which OFAC did nothing. And, what is an order of magnitude more significant, a member of this prosecution team laid out the facts of this case directly to OFAC, in response to which OFAC initiated no investigation or enforcement proceeding whatsoever.

The defense submits that one appropriate curative measure, among others, would be for the Court to strike those portions of Mr. Kim's testimony, elicited by the government, that furthered this deceptive narrative. Those passages would include Mr. Kim's testimony regarding: (a) the claimed importance to OFAC of notice or "transparency" regarding information about wire transfers, senders, recipients, connections with sanctioned countries or entities, and rejected or blocked transactions, because such information implicates OFAC's core enforcement function; (b) OFAC's claimed "strict liability" enforcement regime; (c) the liability U.S. correspondent banks could face under that enforcement regime, for either knowing or unknowing violations; (d) OFAC's initiation of investigations and enforcement proceedings against such banks; (e) the forms of penalty or enforcement OFAC could visit upon U.S. correspondent banks under that regime; (f) the size of such penalties; and (g) the frequency or relative risk of such penalties. Striking such testimony elicited by the government would cleanse the record of the deliberately deceptive narrative presented in Court.

This remedial measure is an appropriate exercise of this Court's inherent power and discretion to ensure the integrity of its proceedings, and the integrity of the evidence introduced therein. *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (affirming federal courts' inherent power to remedy frauds upon the court, in order to protect "the institutions set up to protect and safeguard the public"); *United States v. Nixon*, 418 U.S. 683, 709 (1974) ("The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts.").

Thus, the defense submits transcripts reflecting its proposals, highlighted in yellow, for the passages to be stricken from Mr. Kim's direct and redirect testimony. Those passages correspond to the topics listed above. The strikes are limited to testimony elicited by the government, the party that engaged in eliciting a misleading narrative from Mr. Kim. Sadr has not proposed striking testimony on cross-examination that rebuts the government's misleading narrative, except for passages that directly repeat Mr. Kim's stricken contentions on direct.

*Mechanics of Striking the Testimony*:

During our meet and confer, the parties tentatively agreed (subject to supervisory approval on the government's side) that the jury should not receive transcripts or a readback reflecting the precise parts to be stricken. Such a procedure would serve only to redirect their attention to what they are being told to disregard. Instead, the jury should receive only a brief curative instruction explaining that parts of Mr. Kim's testimony have been stricken from the record. The actual striking should be performed out of the jury's view, so that those portions of



The Honorable Alison J. Nathan
March 10, 2020
Page 3

Mr. Kim's testimony are simply no longer part of the record and will no longer be available as the basis for closing arguments or to respond to any jury requests for readback of testimony.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (*Pro Hac Vice*)
Bruce C. Bishop (*Pro Hac Vice*)
David M. Fragale
Nicholas P. Silverman (*Pro Hac Vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000Bishop
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:     Counsel of Record (via ECF)

Attachments:  Transcripts of Mr. Kim's testimony March 4 and March 5, 2020

# EXHIBIT 113

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Crowley, Shawn (USANYS); Bove, Emil (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Letter re: striking Ted Kim"s testimony |
| **Date:** | Tuesday, March 10, 2020 10:03:10 PM |

9pm.

**From:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:03 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

What time did the defense file their letter?

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 9:58 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

Here is the defense letter, which I'm just now seeing.   Also, the Court's order.

**From:** Krouse, Michael (USANYS)
**Sent:** Tuesday, March 10, 2020 9:54 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** Letter re: striking Ted Kim's testimony

Michael Krouse
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279

# EXHIBIT 114

**From:** Bove, Emil (USANYS)
**To:** Crowley, Shawn (USANYS)
**Subject:** 2020.03.10 Letter re Ted Kim testimony.EB3.docx
**Date:** Tuesday, March 10, 2020 10:26:29 PM
**Attachments:** 2020.03.10 Letter re Ted Kim testimony.EB3.docx

Thoughts?



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 10, 2020

<u>FILED BY ECF</u>

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

     **Re:**   *United States* **v.** *Ali Sadr Hashemi Nejad*, **18 Cr. 224 (AJN)**

Dear Judge Nathan:

     The parties have met and conferred in accordance with the Court's order, but were not able on to agree on: (1) which parts of Mr. Kim's testimony should be struck; or (2) the language the Court should use in describing to the jury the testimony it may not consider.

**I.    Testimony to be Stricken**

     The defense letter proposes striking the following testimony:

- Tr. 473 (lines 10-19)
- Tr. 501 (line 15) – Tr. 502 (line 2)
- Tr. 502 (line 25) – Tr. 503 (line 5)
- Tr. 507 (line 5) – Tr. 510 (line 25)
- Tr. 600 (lines 23-25)
- Tr. 601 (line 4-9)
- Tr. 652 (line 18-20)
- Tr. 653 (line 19) – Tr. 656 (line 11)
- Tr. 659 (lines 1-5)

     The Government's proposal is for the Court to strike the following testimony ~~explain to the jury that they are not to consider any testimony they may recall~~ from Mr. Kim regarding the concept of strict liability ~~enforcement~~, and to strike the following testimony concerning strict liability enforcement:

- Tr. 501 (line 22) — Tr. 502 (line 2)
- Tr. 600 (lines 23-25)

**Formatted:** Font: Bold

**Formatted:** List Paragraph, Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Right + Aligned at:  0.25" + Indent at:  0.5"

**Formatted:** Indent: First line:  0.5"

The Honorable Alison J. Nathan, U.S.D.J.
March 10, 2020
Page 2

- Tr. 652 (lines 18-20)

The Government ~~respectfully~~ does not dispute ~~submits~~ that ~~this~~ striking testimony related to this more limited topic ~~remedy~~ is appropriate ~~.~~ because defense counsel could have possibly impeached Mr. Kim's testimony regarding strict liability by inquiring about his knowledge of ~~asking him~~: (1) ~~whether he was aware that a bank~~ Commerzbank's ~~had sent a~~ letter to OFAC regarding the April 4, 2011 payment, (2) the prosecution team's September 2016 communication with OFAC ~~whether he was aware that OFAC was provided with information concerning the Government's investigation in September 2016~~ regarding evidence related to this case, and (3) ~~whether he was aware that~~ OFAC's apparent inaction in response to these two source of ~~took no action~~ information.  That said, appropriate remedial steps have already been imposed, including today's adverse inference instruction and the Government's execution of the stipulation, and the defense has declined the Court's further invitation to recall Mr. Kim and put these questions to him.

~~However,~~

In this context—while the Government in no way seeks to minimize the disclosure issues that have been discussed with the Court and counsel—the Government respectfully submits that the Court should not strike Mr. Kim's ~~the~~ testimony concerning OFAC's general practices and processes.  Mr. Kim testified on cross examination that he was not aware of any OFAC action in this case, and the parties have so stipulated.  *See* Tr. 580 ("Q: So, to your knowledge, this matter was never investigated by OFAC, correct? A: In my knowledge, no. Q: Ok.  To your knowledge, was there ever a referral made by J.P. Morgan to OFAC relating to this case? A: In my knowledge, no."); .  DX ~~Moreover, the parties entered into a stipulation, Defense Exhibit~~ 1901-R~~s~~, ~~which states that Ted Kim was unaware of any allegations related to this case.~~  Accordingly, there is no basis to strike Mr. Kim's general expert testimony regarding OFAC's role in administering the U.S. sanctions program, which included:

(1) The blocking of assets;

(2) The fact that U.S. correspondent banks *can* be held liable for sanctions violations, even if they do not know of the Iranian connection to the transaction;

(3) The fact that OFAC's mission is made more difficult to perform when parties hide Iranian connections;

(4) The various penalties, in general, that OFAC can impose on banks, ranging from cautionary letters to monetary penalties; and

(5) The fact that banks are a source of information that can lead OFAC to open an investigation or pursue enforcement actions.

During this testimony, Mr. Kim ~~does~~ did not discuss any of the facts of this case, or make any representations about what, if anything, OFAC would have done had it known these facts.

The Honorable Alison J. Nathan, U.S.D.J.
March 10, 2020
Page 3

Accordingly, and particularly in light of the defense's strategic choice not to recall Mr. Kim, there is not a basis to strike the testimony. the additional testimony identified by the defense should not be stricken.

## II.     Mechanics of Striking the Testimony

The Government does not object to the Court identifying specific page and line numbers to be stricken outside the presence of the jury.  The Government respectfully submits, however, that the jury must be given, at minimum, a general description of the testimony that they are no longer permitted to consider.  The defense proposal that the Court instruct the jury that unspecified "parts" of Mr. Kim's testimony are stricken would leave the jurors to guess which parts of the testimony are still in the record.  While the Government understands that the defense feels there is a strategic disadvantage to identifying the stricken testimony in some fashion, it bears repeating that the defense has elected to pursue this strategy rather than to recall Mr. Kim.  Moreover, the risk of juror confusion regarding the state of the record far outweighs this strategic consideration, as the jury is presumed to follow the Court's instruction to disregard the testimony.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Jane Kim / Michael Krouse / Stephanie Lake
    Assistant United States Attorneys
Garrett Lynch
    Special Assistant United States Attorney
(212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

---

**Formatted:** Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Right + Aligned at:  0.25" + Indent at:  0.5"

# EXHIBIT 115

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Krouse, Michael (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Letter re: striking Ted Kim"s testimony |
| **Date:** | Tuesday, March 10, 2020 10:38:49 PM |
| **Attachments:** | 2020.03.10 Letter re Ted Kim testimony.EB3.docx |

Our thoughts in the attached.

---

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:03 PM
**To:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

9pm.

---

**From:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:03 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

What time did the defense file their letter?

---

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 9:58 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

Here is the defense letter, which I'm just now seeing.   Also, the Court's order.

---

**From:** Krouse, Michael (USANYS)
**Sent:** Tuesday, March 10, 2020 9:54 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** Letter re: striking Ted Kim's testimony

Michael Krouse

Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 10, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

      **Re:**    ***United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)**

Dear Judge Nathan:

      The Government respectfully submits this letter regarding: (1) which parts of Mr. Kim's testimony should be struck; and (2) the mechanics to be employed in connection with the striking.

**I.    Testimony to be Stricken**

      The defense proposes striking the following segments of Mr. Kim's testimony:

- Tr. 473 (lines 10-19)
- Tr. 501 (line 15) – Tr. 502 (line 2)
- Tr. 502 (line 25) – Tr. 503 (line 5)
- Tr. 507 (line 5) – Tr. 510 (line 25)
- Tr. 600 (lines 23-25)
- Tr. 601 (line 4-9)
- Tr. 652 (line 18-20)
- Tr. 653 (line 19) – Tr. 656 (line 11)
- Tr. 659 (lines 1-5)

      The Government consents to the Court striking the following testimony from Mr. Kim regarding the concept of strict liability, only:

- Tr. 501 (line 22)-Tr. 502 (line 2)
- Tr. 600 (lines 23-25)
- Tr. 652 (lines 18-20)

The Government does not dispute that striking testimony related to this more limited topic is appropriate because defense counsel could have sought to impeach Mr. Kim's testimony regarding

The Honorable Alison J. Nathan, U.S.D.J.
March 10, 2020
Page 2

strict liability by inquiring about his knowledge of: (1) Commerzbank's letter to OFAC regarding the April 4, 2011 payment, (2) the prosecution team's September 2016 communication with OFAC regarding evidence related to this case, and (3) OFAC's apparent inaction in response to these two sources of information. That said, appropriate remedial steps have already been imposed, including today's adverse inference instruction and the Government's execution of the stipulation regarding these issues, and the defense has declined the Court's further invitation to recall Mr. Kim and put these questions to him.

In this context—while the Government in no way seeks to minimize the disclosure issues that have been discussed with the Court and counsel—the Government respectfully submits that the Court should not strike Mr. Kim's testimony concerning OFAC's general practices and processes. Mr. Kim testified on cross examination that he was not aware of any OFAC action in this case, and the parties have so stipulated. *See* Tr. 580 ("Q: So, to your knowledge, this matter was never investigated by OFAC, correct? A: In my knowledge, no. Q: Ok. To your knowledge, was there ever a referral made by J.P. Morgan to OFAC relating to this case? A: In my knowledge, no."); DX 1901-R. Accordingly, there is no basis to strike Mr. Kim's general expert testimony regarding OFAC's role in administering the U.S. sanctions program, which included:

(1) The blocking of assets;

(2) The fact that U.S. correspondent banks *can* be held liable for sanctions violations, even if they do not know of the Iranian connection to the transaction;

(3) The fact that OFAC's mission is made more difficult to perform when parties hide Iranian connections;

(4) The various penalties, in general, that OFAC can impose on banks, ranging from cautionary letters to monetary penalties; and

(5) The fact that banks are a source of information that can lead OFAC to open an investigation or pursue enforcement actions.

During this testimony, Mr. Kim did not discuss any of the facts of this case, or make any representations about what, if anything, OFAC would have done had it known these facts. Accordingly, and particularly in light of the defense's strategic choice not to recall Mr. Kim, the additional testimony identified by the defense should not be stricken.

## II. Mechanics of Striking the Testimony

The Government does not object to the Court identifying specific page and line numbers to be stricken outside the presence of the jury. The Government respectfully submits, however, that the jurors must be given, at minimum, a general description of the testimony that they are no longer permitted to consider. The defense proposal that the Court instruct the jury that unspecified "parts" of Mr. Kim's testimony are stricken would leave the jurors to guess which parts of the testimony are still in the record. *See* Dkt. 291 at 3. While the Government understands that the

The Honorable Alison J. Nathan, U.S.D.J.
March 10, 2020
Page 3

defense feels there is a strategic disadvantage to identifying the stricken testimony to the jury in some fashion, it bears repeating that the defense has elected to pursue this strategy rather than to recall Mr. Kim. *See id.* Moreover, the risk of juror confusion regarding the state of the record far outweighs this strategic consideration, as the jury must be presumed to follow the Court's instruction to disregard the testimony, which the Court can reiterate as a general matter during its final instructions following summations. *E.g.*, *United States v. Cox*, 324 F.3d 77, 87 (2d Cir. 2003) ("[A]bsent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court.").

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
     Jane Kim / Michael Krouse / Stephanie Lake
         Assistant United States Attorneys
     Garrett Lynch
         Special Assistant United States Attorney
     (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)

# EXHIBIT 116

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Bove, Emil (USANYS); Crowley, Shawn (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Letter re: striking Ted Kim's testimony |
| **Date:** | Tuesday, March 10, 2020 10:55:21 PM |
| **Attachments:** | Defense Proposed Curative Instruction re Ted Kim.pdf |

I filed the letter.  Defense just filed this proposed "curative instruction," which is bananas.

**From:** Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:39 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Crowley, Shawn (USANYS)
<SCrowley@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS)
[Contractor] <GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

Our thoughts in the attached.

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:03 PM
**To:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

9pm.

**From:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 10:03 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

What time did the defense file their letter?

**From:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Sent:** Tuesday, March 10, 2020 9:58 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Letter re: striking Ted Kim's testimony

Here is the defense letter, which I'm just now seeing.   Also, the Court's order.

**From:** Krouse, Michael (USANYS)

**Sent:** Tuesday, March 10, 2020 9:54 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>;
Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** Letter re: striking Ted Kim's testimony

Michael Krouse
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279

Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

March 10, 2020

<u>By ECF</u>

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

      Re:    *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

      In our 9:08 p.m. letter this evening (Dkt. No. 291), the defense reported that after meeting and conferring regarding striking portions of Ted Kim's testimony, the parties agreed that the jury should be informed of that striking through a curative instruction, rather than by being told the precise passages stricken. *See* Dkt. 291 at 2-3. Though the parties agree on that procedure, they have not agreed on the language of a proposed instruction. At the time of this filing, the defense has not heard back from the government regarding any more specifics of its position.

      In addition to striking from the record the passages of Mr. Kim's testimony that the defense proposed in Dkt. 291-1 and Dkt. 291-2, the defense proposes that the Court give the jury the following instruction:

      Ladies and Gentlemen of the Jury,

      On March 4 and March 5, 2020, the Government put on testimony from OFAC senior enforcement officer Ted Kim. Part of Mr. Kim's testimony was about OFAC's enforcement of the Iran sanctions regime against U.S. banks that violated them. Mr. Kim testified that OFAC had a "strict liability" enforcement policy; that OFAC investigated and enforced sanctions violations involving U.S. intermediary banks whether or not the banks knew of the facts giving rise to the violations; and that if OFAC learned of the involvement of Iranian companies in connection with wire fund transfers like those charged in this case, OFAC would have initiated an investigation and enforcement proceedings that could have exposed those banks to financial penalties that could reach into the tens or hundreds of millions of dollars.



The Honorable Alison J. Nathan
March 10, 2020
Page 2

     After Mr. Kim gave that testimony, the Government disclosed Government Exhibit 411, the letter from Commerzbank to OFAC about the April 2011 payment charged in this case, about which you heard testimony and a stipulation yesterday.  Also after Mr. Kim's testimony, the Government disclosed that one of the prosecutors here disclosed the facts of this case to OFAC, so that OFAC might initiate enforcement proceedings.  Despite the prosecutor's giving OFAC that information, OFAC has never initiated an investigation or enforcement proceeding involving the transactions charged in this case.

     In light of these facts, I have stricken the portions of Mr. Kim's testimony that I just described from the record of this trial.  You are not to consider those portions of Mr. Kim's testimony.

                Respectfully submitted,

                */s/ Brian M. Heberlig*
                Reid H. Weingarten
                STEPTOE & JOHNSON LLP
                1114 Avenue of the Americas
                New York, NY 10036
                Tel: (212) 506-3900
                Fax: (212) 506-3950
                rweingarten@steptoe.com

                Brian M. Heberlig (*Pro Hac Vice*)
                Bruce C. Bishop (*Pro Hac Vice*)
                David M. Fragale
                Nicholas P. Silverman (*Pro Hac Vice*)
                STEPTOE & JOHNSON LLP
                1330 Connecticut Avenue, N.W.
                Washington, DC 20036
                Tel: (202) 429-3000Bishop
                Fax: (202) 429-3902
                bheberlig@steptoe.com

                *Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:    Counsel of Record (via ECF)

# EXHIBIT 117

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Crowley, Shawn (USANYS); Bove, Emil (USANYS); Kim, Jane (USANYS) 4; Lynch, Garrett (USANYS) [Contractor]; Lynch, Garrett; Lake, Stephanie (USANYS) |
| **Subject:** | FW: Order in 18cr224 |
| **Date:** | Wednesday, March 11, 2020 12:22:09 AM |
| **Attachments:** | 18cr224 Order 3.10.20.pdf |

A win for the good guys!

**From:** Nathan NYSD Chambers <NathanNYSDChambers@nysd.uscourts.gov>
**Sent:** Tuesday, March 10, 2020 11:54 PM
**To:** Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>; Bbishop_steptoe.com <Bbishop@steptoe.com>; Fragale, David <DFragale@steptoe.com>; Levin, Michelle <mlevin@steptoe.com>; Silverman, Nicholas <nsilverman@steptoe.com>; Weingarten, Reid <RWeingarten@steptoe.com>; Lynch, Garrett <LynchG@dany.nyc.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>; Heberlig, Brian <BHeberlig@steptoe.com>; Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Subject:** Order in 18cr224

Counsel,

Attached please find an Order from Judge Nathan that will appear on the docket tomorrow.  Please confirm receipt.

Sincerely,
Alyssa O'Gallagher
Law Clerk to the Hon. Alison J. Nathan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

United States of America,

         –v–

Ali Sadr Hashemi Nejad,

               Defendant.

18-cr-224 (AJN)

ORDER

---

ALISON J. NATHAN, District Judge:

       The Court has reviewed the parties' proposals as to testimony of Mr. Kim that should be struck in light of the Government's late disclosures.  The Court will adopt the Government's more limited striking proposal, coupled with the curative instruction and stipulation regarding GX 411 already given to the jury.  To the extent the defense also wishes to recall Mr. Kim to cross-examine him further on the late disclosed materials, it may do so.  The Government shall forthwith arrange for Mr. Kim to be available to testify tomorrow afternoon.  If the defense decides not to recall Mr. Kim, defense counsel shall inform the Government immediately.


       SO ORDERED.


Dated: March    10   , 2020
      New York, New York

_____
           ALISON J. NATHAN
        United States District Judge

# EXHIBIT 118

| | |
|---|---|
| **From:** | Bove, Emil (USANYS) |
| **To:** | Kim, Jane (USANYS) 4; Crowley, Shawn (USANYS) |
| **Cc:** | Krouse, Michael (USANYS); Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Suggested language for notice to gov |
| **Date:** | Wednesday, March 11, 2020 8:14:56 PM |

Definitely happy to discuss, but this doesn't seem crazy.  Underscores how we have to pivot to prong 2 on bank fraud.

---

**From:** Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>
**Sent:** Wednesday, March 11, 2020 8:01 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Cc:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Subject:** FW: Suggested language for notice to gov

---

**From:** Bishop, Bruce <BBishop@steptoe.com>
**Sent:** Wednesday, March 11, 2020 7:57 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>
**Cc:** Weingarten, Reid <RWeingarten@steptoe.com>; Heberlig, Brian <BHeberlig@steptoe.com>; Silverman, Nicholas <nsilverman@steptoe.com>; Fragale, David <DFragale@steptoe.com>; Purce, James <jpurce@Steptoe.com>
**Subject:** Suggested language for notice to gov

Counsel,

We do intend to make argument based on GX 411, the stipulation regarding it (DX 150), the Court's striking Mr. Kim's testimony regarding "strict liability" enforcement, and the Court's curative instruction in connection with that.

For bank fraud under 1344(1), the government must prove that the scheme, if it were to succeed, would likely result in tangible economic harm to the banks, and that Sadr knew such tangible economic harm was likely.  The government's theory is that the likely tangible economic harm came from the prospect of OFAC enforcement, specifically, OFAC fines.  As proof, the government is likely going to rely on Mr. Kim's testimony, the majority of which is still in evidence.

GX 411, DX 150, the Court's striking of Mr. Kim's testimony, and the Court's curative instruction are all relevant to rebut any reliance on Mr. Kim's testimony, and to show the lack of any likely harm or of Sadr's knowledge of such likelihood.  GX 411 and the Court's curative instruction both show that OFAC had notice of the facts of this case—GX 411 about the first wire transfer charged, and the Court's curative instruction about the entire facts of the case generally.  DX 150 (the stipulation) and the Court's curative instruction show that despite such notice to OFAC, OFAC did nothing.  That is

relevant to show the lack of any actual likely risk of harm from OFAC enforcement.  It is also relevant to rebut any urged reliance on Mr. Kim's testimony.  To the extent the government argues Mr. Kim's testimony shows the required risk, Sadr is entitled to rebut by arguing these facts, showing any such risk is illusory.

The facts shown by these exhibits and instructions also directly rebut the credibility of the government's theory.  The government opened on the high risk of OFAC enforcement caused by Sadr allegedly concealing information from the banks, and thus from OFAC as well (which is also relevant to the Count One Klein charge).  These exhibits and instructions show OFAC was not deprived of such information—in fact it had such information, and did nothing.

Finally, these facts undercut the credibility of the government's assertion of that theory.  When the jury decides whether it should believe the government's argument for conviction, it is entitled to consider that the government possessed these facts – GX 411, Mr. Lynch's prosecution memo, and the knowledge that OFAC had declined to enforce in light of that information—for a significant length of time, but did not disclose them to the defense or the court in a timely fashion as required. To point that out in challenging the competence or integrity of law enforcement is standard and proper use of disclosed Brady information.  *See Kyles v. Whitley* (1995).

# EXHIBIT 119

| | |
|---|---|
| **From:** | Kim, Jane (USANYS) 4 |
| **To:** | Crowley, Shawn (USANYS); Bove, Emil (USANYS) |
| **Cc:** | Krouse, Michael (USANYS); Lynch, Garrett (USANYS) [Contractor] |
| **Subject:** | RE: Suggested language for notice to gov |
| **Date:** | Wednesday, March 11, 2020 8:40:43 PM |

Yes

**From:** Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Sent:** Wednesday, March 11, 2020 8:39 PM
**To:** Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Bove, Emil (USANYS) <EBove@usa.doj.gov>
**Cc:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** RE: Suggested language for notice to gov

Can one of you guys call or email the court reporters and ask them to send you the draft transcript?
This is ridiculous

**From:** Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>
**Sent:** Wednesday, March 11, 2020 8:01 PM
**To:** Bove, Emil (USANYS) <EBove@usa.doj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Cc:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor]
<GLynch@usa.doj.gov>
**Subject:** FW: Suggested language for notice to gov

**From:** Bishop, Bruce <BBishop@steptoe.com>
**Sent:** Wednesday, March 11, 2020 7:57 PM
**To:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4
<JKim4@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>; Lynch, Garrett (USANYS)
[Contractor] <GLynch@usa.doj.gov>
**Cc:** Weingarten, Reid <RWeingarten@steptoe.com>; Heberlig, Brian <BHeberlig@steptoe.com>;
Silverman, Nicholas <nsilverman@steptoe.com>; Fragale, David <DFragale@steptoe.com>; Purce,
James <jpurce@Steptoe.com>
**Subject:** Suggested language for notice to gov

Counsel,

We do intend to make argument based on GX 411, the stipulation regarding it (DX 150), the Court's
striking Mr. Kim's testimony regarding "strict liability" enforcement, and the Court's curative
instruction in connection with that.

For bank fraud under 1344(1), the government must prove that the scheme, if it were to succeed,
would likely result in tangible economic harm to the banks, and that Sadr knew such tangible

economic harm was likely.  The government's theory is that the likely tangible economic harm came from the prospect of OFAC enforcement, specifically, OFAC fines.  As proof, the government is likely going to rely on Mr. Kim's testimony, the majority of which is still in evidence.

GX 411, DX 150, the Court's striking of Mr. Kim's testimony, and the Court's curative instruction are all relevant to rebut any reliance on Mr. Kim's testimony, and to show the lack of any likely harm or of Sadr's knowledge of such likelihood.  GX 411 and the Court's curative instruction both show that OFAC had notice of the facts of this case—GX 411 about the first wire transfer charged, and the Court's curative instruction about the entire facts of the case generally.  DX 150 (the stipulation) and the Court's curative instruction show that despite such notice to OFAC, OFAC did nothing.  That is relevant to show the lack of any actual likely risk of harm from OFAC enforcement.  It is also relevant to rebut any urged reliance on Mr. Kim's testimony.  To the extent the government argues Mr. Kim's testimony shows the required risk, Sadr is entitled to rebut by arguing these facts, showing any such risk is illusory.

The facts shown by these exhibits and instructions also directly rebut the credibility of the government's theory.  The government opened on the high risk of OFAC enforcement caused by Sadr allegedly concealing information from the banks, and thus from OFAC as well (which is also relevant to the Count One Klein charge).  These exhibits and instructions show OFAC was not deprived of such information—in fact it had such information, and did nothing.

Finally, these facts undercut the credibility of the government's assertion of that theory.  When the jury decides whether it should believe the government's argument for conviction, it is entitled to consider that the government possessed these facts – GX 411, Mr. Lynch's prosecution memo, and the knowledge that OFAC had declined to enforce in light of that information—for a significant length of time, but did not disclose them to the defense or the court in a timely fashion as required.  To point that out in challenging the competence or integrity of law enforcement is standard and proper use of disclosed Brady information.  *See Kyles v. Whitley* (1995).

# EXHIBIT 120

| | |
|---|---|
| **From:** | Krouse, Michael (USANYS) |
| **To:** | Bove, Emil (USANYS); Crowley, Shawn (USANYS) |
| **Cc:** | Kim, Jane (USANYS) 4; Lake, Stephanie (USANYS) |
| **Subject:** | RE: Due diligence and production tonight |
| **Date:** | Thursday, May 21, 2020 3:19:52 PM |
| **Attachments:** | RE Trial witness.msg.msg |
| | RE Commerzbank.msg.msg |

Sorry, we also think these two emails should be produced, since they concern discussions about setting up a witness from Commerzbank, and mention the OFAC disclosure.

**From:** Krouse, Michael (USANYS)
**Sent:** Thursday, May 21, 2020 3:02 PM
**To:** Emil J. .Bove (Emil.Bove@usdoj.gov) <Emil.Bove@usdoj.gov>; Crowley, Shawn (USANYS) <SCrowley@usa.doj.gov>
**Cc:** Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lake, Stephanie (USANYS) <SLake@usa.doj.gov>
**Subject:** Due diligence and production tonight

I spoke to Garrett.  He has now re-searched all the Commerzbank files at DANY, and can confirm, based on those searches, that DANY's files do not include the 36 emails we found in our Concordance database relating to GX 411.  He did not find anything related to this case in DANY's Commerzbank files, except for GX 411, which was in a separate folder related to Commerzbank's voluntary disclosures to OFAC (just the disclosure, no associated emails).

According to Garrett, the DANY and SDNY investigations were separate.  DANY's investigation (with MLARS and USAO DC) was into global sanctions evasion by the German bank.  SDNY's investigation was a BSA investigation focused on the NY branch and Singapore/Asian branches, which touched on accounting fraud at a Japanese company called Olympus.  The reason the investigations were settled together is that DANY's case was on the verge of settling with Commerzbank, SDNY heard about pending settlement discussions, and SDNY joined the discussions in order to obtain a global resolution (which is what happened).

Separately, we are planning a production today, which will include 2 emails from Laroche and 6 emails from Garrett.  They are saved here:

\\Usa.doj.gov\cloud\NYS\StAndrews\Shared\Iran_VEHousing-2017R01160\###Post-trial
Motions\PRODUCTIONS TO DEFENSE\To produce 5.21

Also saved here are three witness statements from DANY, which we want to discuss with you.

Two of the statements are from the Derwick investigation, which is separate to this case.  We discussed this before, but DANY really does not want to produce these, and since they are not related to our case (and do not speak to any of the conduct in our case), we do not think there is a basis to disclose them.  Let us know what you think.

The third file is notes of an interview with Julie Malec from OFAC (Sarah Liebschutz from OFAC was also present).  The interview is from October 2016 when DANY was looking for an OFAC witness for

their grand jury.  There is nothing in the notes, really, and nothing about the facts of the case, but because of the sensitivity around OFAC, we thought we'd run this by you to see if you think we should disclose them.

Also, just to flag, we have in our email various communications with OFAC and the banks to set up a witness and to arrange for prep sessions, etc..  We do not think those need to be produced, but let us know if you disagree.  So far, we have produced our OFAC communications related to GX 411 (mid-trial and post-trial), and all the communications Garrett had with OFAC about the facts of this case.

Finally, there are some Martin Rodil related emails.  Our view is that he's not a percipient witness to anything, just a broker, so do not think any of the emails with him need to be produced, but let us know if you disagree.

Jane, anything else to raise?

Mike

Michael Krouse
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2279

| | |
|---|---|
| **From:** | Lynch, Garrett |
| **To:** | Lake, Stephanie (USANYS); Kim, Jane (USANYS) 4; Krouse, Michael (USANYS) |
| **Subject:** | RE: Trial witness |
| **Date:** | Saturday, February 01, 2020 12:53:55 PM |

I did. They're happy to provide a witness (obviously happier to just provide a custodian). She believes (I think rightly) that they discovered the Stratus payment and filed the voluntary disclosure due to our investigation into the bank. That makes sense since they discovered the payment retroactively; it wasn't flagged in real time. So we can discuss how we would want to handle.


-------- Original message --------
From: "Lake, Stephanie (USANYS)"
Date: 2/1/20 9:54 AM (GMT-05:00)
To: "Lynch, Garrett" , "Kim, Jane (USANYS) 4" , "Krouse, Michael (USANYS)"
Subject: RE: Trial witness


Did you talk to her / how'd it go? Do we know what the basis for the disclosure was?


**From:** Lynch, Garrett
**Sent:** Friday, January 31, 2020 11:05 AM
**To:** Lake, Stephanie (USANYS) ; Kim, Jane (USANYS) 4 ; Krouse, Michael (USANYS)
**Subject:** FW: Trial witness

I'll reach out to her today. Let me know if anyone wants to join. The other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment – we should discuss whether it's worth having the Commerz witness go into that. It was signed by the head of AML/Anti-Fraud/Sanctions Compliance in NY – I'll see if she's still with the bank.


**From:** Spiller, Christina (NY) [mailto:Christina.Spiller@commerzbank.com]
**Sent:** Friday, January 31, 2020 10:41 AM
**To:** Lynch, Garrett <LynchG@dany.nyc.gov>
**Cc:** Lake, Stephanie (USANYS) <Stephanie.Lake@usdoj.gov>; Krouse, Michael (USANYS) <Michael.Krouse@usdoj.gov>; Kim, Jane (USANYS) 4 <Jane.Kim@usdoj.gov>
**Subject:** RE: Trial witness

Hello Garrett,

I just got your message and am happy to speak at your convenience. I'm free for most of today (except between 4.30 and 5.30 pm) and next week is pretty flexible as well.

Best,

Christina

Christina Spiller

Commerzbank AG

New York Branch

+1 (212) 895-5267

---

**From:** Lynch, Garrett [mailto:LynchG@dany.nyc.gov]
**Sent:** Friday, January 31, 2020 10:18 AM
**To:** Spiller, Christina (NY)
**Cc:** Lake, Stephanie (USANYS); Krouse, Michael (USANYS); Kim, Jane (USANYS) 4
**Subject:** Trial witness

Hello Christina,

I left you a voicemail yesterday about a case I'm handling with the Southern District that is going to trial in early March. It involves a series of USD payments cleared through banks in New York in violation of U.S. sanctions against Iran in the 2011-2013 time period. In particular, one payment in April 2011 was processed through Commerzbank's Frankfurt and New York branches in the amount of $29 million (the wire transfer record is attached). At trial, we likely will need a witness from Commerz to (a) authenticate the wire transfer record and possibly (b) testify about Commerz's payment screening at that time in NY. Can you let us know a good time to discuss?

Thanks,

Garrett

Garrett A. Lynch

Deputy Bureau Chief

Major Economic Crimes Bureau

New York County District Attorney's Office

(212) 335-4335

lynchg@dany.nyc.gov

This email communication and any files transmitted with it contain privileged and confidential information from the New York County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

**From:** Kim, Jane (USANYS) 4
**To:** Lake, Stephanie (USANYS); Lynch, Garrett; Krouse, Michael (USANYS)
**Subject:** RE: Commerzbank
**Date:** Thursday, January 30, 2020 2:38:09 PM

Thanks, GL. Depending on how things go on Monday, we should also send trial subpoenas to the email providers.

**From:** Lake, Stephanie (USANYS)
**Sent:** Thursday, January 30, 2020 2:11 PM
**To:** Lynch, Garrett ; Kim, Jane (USANYS) 4 ; Krouse, Michael (USANYS)
**Subject:** RE: Commerzbank

Good call. I think it makes sense for you to go ahead and reach out about getting a witness. Thanks!

**From:** Lynch, Garrett <LynchG@dany.nyc.gov>
**Sent:** Thursday, January 30, 2020 1:02 PM
**To:** Lake, Stephanie (USANYS) <SLake@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>
**Subject:** Commerzbank

One thing to flag: I don't think anyone has spoken to someone at Commerz. We need them for the first USD payment from Fondo Chino to Stratus International (which is a big one: $29.4 million). All of the other payments involve either JPMC or Citi, but the first solely involved Commerz. I have contacts in their legal department if you want me to reach out to them about getting a witness (at the very least, we need someone to authenticate the wire transfer record in the event the defense doesn't stipulate).

Garrett A. Lynch
Deputy Bureau Chief
Major Economic Crimes Bureau
New York County District Attorney's Office
(212) 335-4335
lynchg@dany.nyc.gov

This email communication and any files transmitted with it contain privileged and confidential information from the New York County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.