UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | DECLARATION |
| ALI SADR HASHEMI NEJAD, | 18 Cr. 224 (AJN) |
| Defendant. | |

I, Stephanie Lake, pursuant to Title 28, United States Code, Section 1746, declare under penalty of perjury:[1]

1.      I am an attorney admitted to the bar of the State of New York and the bar of this Court, and one of the Assistant United States Attorneys for the Southern District of New York responsible for this matter.  I have been an AUSA since May 2016, and was assigned to this case in or about September 2019.

Question 1

2.      SAUSA Lynch sent an email to the Case Team on or about December 19, 2019, dealing primarily with a separate topic (the "December 19 Email").[2]  At the close of the email, SAUSA Lynch went "off on a tangent" and in a single sentence noted that Commerzbank had filed a report with OFAC in connection with the first charged payment after noticing the

_____

[1] I respectfully request that the Court accept this Declaration and the accompanying disc of communications for in camera review under seal.  *See Mourabit v. Klein*, 816 F. App'x 574 n.2 (2d Cir. 2020); *ACLU v. DOD*, 827 F. Supp. 2d 217, 228 (S.D.N.Y. 2011).  *Cf.* Second Circuit Local Rule 46.2(b)(6).

[2] AUSA Krouse, AUSA Kim, SAUSA Lynch, and I are collectively referred to throughout as the "Case Team."  AUSA Bove and AUSA Crowley are collectively referred to throughout as the "Unit Chiefs."

"Stratus" connection.  This appears to be a reference to the document later marked as GX 411 but SAUSA Lynch did not attach or specifically refer to that or any other document.[3]  I first saw a copy of GX 411 when SAUSA Lynch emailed the document to the Case Team on or about January 10, 2020 as we prepared for trial (the "January 10 Email").

<u>Question 2</u>

3.      I first realized that GX 411 had likely not been disclosed to the defense at approximately 7:45 p.m. on March 6, 2020.  While organizing responding to emails that had accumulated in my inbox, I came across the January 10 Email and concluded that GX 411 might be helpful in rebutting certain arguments being raised by the defense.  I did not recall seeing GX 411 in the weeks leading up to trial, which led me to wonder whether GX 411 had been produced in discovery; although it did not bear a bates production number, I knew that the prosecution team had produced documents obtained pursuant to subpoenas without utilizing bates stamping.  As it was a Commerzbank document, I attempted to locate it in the Commerzbank subpoena returns that the U.S. Attorney's Office had received from the Manhattan District Attorney's Office ("DANY") and produced to the defense.  It was not contained in that production.  I also thereafter attempted to locate it within the many other folders within the bank subpoena returns.

4.      As discussed below, and as can be seen from my contemporaneous correspondence, I did not understand the document to be *Brady* material at that time – I viewed it as a wholly inculpatory document.  (*See, e.g.*, March 6, 2020 email at 7:49 p.m. ("Given what defense did today, I think [GX 411] could be really valuable to put in.").)  I wanted to discuss with the rest of the team whether it was worth attempting to introduce the document at trial the

---

[3] For ease of reference, I will refer to this document as "GX 411" throughout, although (as the Court is aware) is was not marked as such by the Government until March 7, 2020.

following week given that I did not see it in the discovery production.  In addition to my 7:49 p.m. email to the Case Team, I sent a follow-up email to the Case Team at approximately 9:45 p.m. on March 6, 2020, asking to discuss the document the next morning.

5.  I also participated in a chat about the document with AUSA Kim, beginning at approximately 7:53 p.m.  In that chat, after discussing how we both viewed the document as inculpatory (*e.g.*, AUSA Kim: "[W]e gotta put it in, I can put it in in evading."), we discussed how to disclose the document if it had not been previously-produced.  AUSA Kim first suggested that we could turn it over that evening.  I responded that I was "wondering if we should wait until tomorrow and bury it in some other documents" we were already planning on sending to the defense.  AUSA Kim agreed.[4]

6.  Beginning at approximately 9:23 a.m. on March 7, 2020, the Case Team discussed GX 411 over the phone.[5]  Although I do not recall every aspect of that conversation, I recall confirming that nobody thought GX 411 had been produced and expressing reservations about trying to use the document at trial in light of its late production.  I further recall AUSA Krouse suggesting an argument that the late production would not constitute a Rule 16 violation because we had not intended to use the document until the defense made certain arguments during the first week of trial.  In the course of the conversation, the Case Team collectively determined that we should mark the document as an exhibit and send it to the defense in the

---

[4] I regret this suggestion and this wording.  To be clear, however – and as discussed in greater detail below – it had not occurred to me that GX 411 was anything other than wholly inculpatory.  Although I readily acknowledge the connotations involved in using the word "bury," my intent was not to hide the document from the defense.  It was a wrongheaded attempt to avoid signaling to the defense that we viewed GX 411 as essential to our case.

[5] As discussed below, SAUSA Lynch joined the call for the last ten minutes.

hopes of introducing it at trial on Monday.  At no point did anyone on the call suggest that GX 411 could be exculpatory.

7.      Once I arrived at the office, at approximately 10:47 a.m., I asked a paralegal to mark the document with an exhibit stamp.  The paralegal was not immediately available.  As the day went on, I became focused on other matters, including speaking with a witness who was scheduled to testify on Monday morning and working with paralegals from DANY to prepare complex summary charts relevant to the money laundering charges.

8.      I turned my attention to producing documents to the defense that afternoon.  I attempted to send GX 411 to the defense as part of a document production email at approximately 4:04 p.m., but the email did not go through immediately.  GX 411 was successfully transmitted at approximately 4:24 p.m. on March 7, 2020.

## Question 3[6]

9.      The first communication I recall or have located regarding GX 411 is the December 19 Email, in which SAUSA Lynch referred to facts that I later learned were the subject of GX 411.  At the end of the email, SAUSA Lynch wrote "(Now I'm really going off on a tangent, but Commerzbank was an intermediary bank in the first USD payment (to Stratus Turkey) and they actually picked up on 'Stratus' in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC.)"  I do not have a record or recollection of responding to or discussing this email.

10.     The next communication I recall or have located regarding GX 411 is the January 10 Email, in which SAUSA Lynch wrote to the Case Team, "In the spirit of closing the

---

[6] All of the written communications that I have located and identified as responsive to the questions in the Court's September 16 Order have been provided to the Court on a disc.  Most of those communications are discussed below.

loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerz[]

made to OFAC re: the payment" and attached GX 411.  That email was the last message in an

exchange we had regarding which payment-related documents from the banks' subpoena returns

to mark as exhibits for trial.  I do not have a record or recollection of responding to the January

10 Email.

        11.    At some time following my receipt of the January 10 Email, I recall

briefly discussing GX 411 with SAUSA Lynch.[7]  While I cannot recall every detail, I believe

that during the conversation we discussed whether to include GX 411 on the list of potential

Government trial exhibits.  I recall that SAUSA Lynch thought the document was worth

including as an exhibit.  However, I believe he stated that he thought Commerzbank had

identified the transaction following a "look back" at old transactions that the bank had processed,

which it conducted as a result of an unrelated DANY investigation into the bank.

        12.    I recall thinking that it was not worth the time and potential distraction of

calling a witness from Commerzbank to testify about an unrelated investigation and "look back"

in order to introduce the document for two reasons.  First, at the time, I thought that GX 411 was

useful because it referred to the defendant's untruthful answers to the bank in response to its

questions about the payment at issue; however, I recall discussing that email exhibits (GX 2032

and 2034) more clearly demonstrated that the defendant had provided Commerzbank with

---

[7] The Court's September 16 Order states that "the AUSAs . . . say they did not discuss GX 411 with the SAUSA in January 2020."  I believe there may have been a misunderstanding on this point.  As the Government stated in its March 9, 2020 and July 2, 2020 letters (the "July 2 Letter"), and as I discuss above, I did speak with SAUSA Lynch about GX 411 following my receipt of the January 10 Email.  The July 2 Letter explains that although SAUSA Lynch and I did discuss GX 411, the other AUSAs and I "did not have a conversation with ADA Lynch at that time about how and from where the Commerzbank document had been obtained," (Dkt. 354 at 10, n.6 (second emphasis added)).

misleading information about Stratus International Contracting Company.  Second,

Commerzbank only processed one of the 15 transactions at issue in the case, and we already

intended to call witnesses from two other banks to testify about the transactions they had

processed and sanctions enforcement.  I did not think it was necessary to call a third bank

witness, from a bank that had processed only one transaction, to explain this document.  A

significant part of the trial preparation process was geared at culling and condensing our

evidence to avoid redundancy and unnecessarily prolonging the trial or confusing or distracting

the jury.  At the time, I viewed GX 411 as somewhat helpful but unnecessary to proving our

overall case.  For those reasons, I did not think it was necessary to include the document as an

exhibit.[8]

       13.     I did not know at the time of this conversation, or at any time until March

6, 2020, that GX 411 had not been produced to the defense.  I assumed when SAUSA Lynch

emailed the document that it, like so many others that were emailed among and discussed by

members of the trial team, was part of the discovery that had been produced to the defense (in

this case, specifically, that it was part of the bank subpoena returns).[9]

---

[8] By this time, I had been assigned to the case for approximately four months.  Much of that time had been spent focusing on the suppression litigation, and I had only just begun to engage in earnest with the merits of the case in January.  I was struggling to get up to speed on both the facts and the law (having had very limited exposure to sanctions and bank fraud) while under significant time pressure given the imminence of trial.  I believe this context may help to explain my failure to grasp the full importance of this document, first in January and again in March.

[9] On July 2, 2020, I learned that SAUSA Lynch had recently stated for the first time that during the above-referenced conversation he told me that DANY had not obtained GX 411 through the grand jury subpoena process, but from another source.  I do not remember learning this fact before March 6, 2020.  If I had understood that the document had not been part of the grand jury subpoena returns (which had been produced to the defense), I believe that I would have thought to confirm that it had been produced elsewhere in discovery.  This was consistent with my reaction when presented with other potential Rule 16 material that I thought might not have been produced in discovery before I joined the case.

14.     The next communication I recall or have located regarding GX 411 is a January 30, 2020, email from SAUSA Lynch to the Case Team about securing document custodians from the banks relevant to the case.[10]  I responded that it would "make sense for [SAUSA Lynch] to go ahead and reach out [to Commerzbank] about getting a witness."

15.     On January 31, 2020, in a separate email thread, SAUSA Lynch forwarded the Case Team an email from someone in Commerzbank's legal department.  In that email, SAUSA Lynch referenced GX 411, noting "[t]he other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment – we should discuss whether it's worth having the Commerz witness go into that.  It was signed by the head of AML/Anti-Fraud/Sanctions Compliance in NY – I'll see if she's still with the bank." On February 1, 2020, I responded asking whether SAUSA Lynch had spoken with a representative of Commerzbank's legal department, and whether "we know what the basis for the disclosure was?"  Later that day, SAUSA Lynch responded that Commerzbank would provide a witness if needed, and that his contact "believes (I think rightly) that they discovered the Stratus payment and filed the voluntary disclosure due to our investigation into the bank. That makes sense since they discovered the payment retroactively; it wasn't flagged in real time. So we can discuss how we would want to handle."

16.     Although I do not recall my specific thoughts about this email at the time or discussing this email with SAUSA Lynch, consistent with our previous conversation, I believe

---

[10] At this time, the defense had not yet stipulated to the authenticity of bank documents reflecting the wire transfers relevant to the case.  The Case Team accordingly thought it might be necessary to have custodial witnesses authenticate each of those documents.  At the time the March 9, 2020 letter was drafted, I did not recall this email chain and I imagine that the rest of the Case Team did not either, as no one raised it.

this was a reference to whether we wanted to call a Commerzbank witness with knowledge of GX 411 to testify and explain to the jury DANY's investigation into Commerzbank, and why Commerzbank may have been disclosing more to OFAC than was required.

17.     I do not recall and have not located any communications about GX 411 or Commerzbank between the above-referenced February 1, 2020 email and March 6, 2020.

*Friday, March 6, 2020*

18.     As discussed above, on March 6, 2020 at approximately 7:49 p.m., after coming across the January 10 Email in my inbox, I forwarded the email and GX 411 to the other members of the Case Team, stating "I'm cleaning up email and came upon this.  Given what defense did today, I think this could be really valuable to put in.  Among other difficulties with doing that is the fact that I don't know that it was ever produced to defense (it's not in the Commerzbank subpoena production).  Garrett – do you know where it came from?"  Nobody responded to this email.

19.     On March 6, 2020 at 7:53 p.m.,[11] I called SAUSA Lynch.  He did not pick up.  At the same time, I initiated a chat with AUSA Kim, as referenced above.

20.     At 7:57 p.m., I sent SAUSA Lynch a text message asking him to call me about GX 411.  SAUSA Lynch promptly called me back, and we spoke for approximately eight minutes.  I recall asking him where GX 411 came from because I could not locate it in the bank subpoena productions.  He responded that he had obtained it from Commerzbank through an unrelated DANY investigation into the bank.  I asked him to confirm whether he had any record of it having been produced in discovery, and he said he would do so.  I relayed some of what

---

[11] All dates and times of phone calls are based on cellphone records.

SAUSA Lynch told me to AUSA Kim, including that "apparently DANY got [GX 411] through an unrelated case . . . [SAUSA Lynch] thinks it was through a DPA with commerzbank."

       21.     At 8:07 p.m., I called AUSA Krouse to get his opinion on whether we should attempt to introduce GX 411.  He did not pick up.

       22.     At 8:46 p.m., SAUSA Lynch emailed someone in Commerzbank's legal department to ask whether it would be possible to secure a trial witness for Monday.  We thought this might be necessary in the event the defense declined to stipulate to GX 411's authenticity.

       23.     At 9:45 p.m., I sent an email to the Case Team about another trial-related matter.  At the end of the email, I asked to talk about GX 411 the next morning.  Shortly thereafter, beginning at 10:02 p.m., AUSAs Krouse, Kim, and I exchanged text messages about timing for a call the next morning.

### Saturday, March 7, 2020

       24.     On March 7, 2020, at 9:23 a.m., after exchanging more text messages to coordinate timing, I initiated a conference call with AUSA Krouse and AUSA Kim.  I attempted to add SAUSA Lynch to the call, but he did not pick up.  However, SAUSA Lynch called me back at 9:39 a.m., at which point I added him to the conference call.[12]  The call lasted until approximately 9:49 a.m.  The substance of the call is discussed above.

       25.     At 10:47 a.m., after I arrived at the Office, I emailed a paralegal to ask him to mark GX 411 as an exhibit, as discussed above.  I recall having a conversation with

---

[12] The July 2 Letter does not reference SAUSA Lynch's participation in the conference call.  I believe this is a result of a misreading of the cellphone records.  As I read the call records, which I have provided to the Court, SAUSA Lynch joined for the last 10 minutes of the conference call. This is consistent with my recollection that all members of the Case Team were on the call, which I shared with the Office before the July 2 Letter was filed.  Because I was not given a copy of my cellphone records until after the Court issued its September 16 Order, I was unable to confirm the details surrounding this call previously.

AUSA Krouse while I was drafting the transmittal email about whether we needed to highlight for the defense that GX 411 had not previously been produced.  My recollection is that we agreed that the defense would be aware that it was a newly produced document, so it would be sufficient to produce it without doing so and to wait for defense to raise the issue.  As has been said previously, this was an error in judgment which I deeply regret and will not repeat.

26.     At 4:04 p.m., I attempted to transmit GX 411 to the defense.  As discussed above, the email did not go through until approximately 4:24 p.m.  At 4:57 p.m., defense counsel responded stating that they viewed the document as *Brady* material, and asking why they had not received it earlier in discovery.

27.     I have a general recollection of discussing the defense's *Brady* claim with the other members of the Case Team that day after receiving the defense's 4:57 p.m. email.  I do not recall all of the specifics of these conversations, but do recall members of the Case Team expressing that they, like I, did not understand the basis for the *Brady* claim or view the document as *Brady*.  Following the defense's 4:57 p.m. email, I sent a proposed draft response to the Case Team, which was later sent to the defense.

28.     At approximately 5:37 p.m., I sent AUSA Crowley a chat.  In the chat, I told her that the defense had accused us of committing a *Brady* violation.  I do not believe we had an opportunity to discuss the issue further before AUSA Crowley had to leave the office for the evening.[13]

---

[13] I have records of three short telephone calls with SAUSA Lynch between 9:37 and 10:08 p.m. on March 7, 2020.  I do not specifically recall what those calls were about.  SAUSA Lynch and I had been working together that day on summary charts and other trial tasks, and I suspect the calls may have been about that.

29.     At 10:08 p.m., I spoke with AUSA Bove on the phone for approximately nine minutes.  I believe we principally discussed a draft letter regarding potential cross-examination of defense witnesses that I had been working on that evening, but I think I also raised the defense's *Brady* claim during that call.

*Sunday, March 8, 2020*

30.     Between 7:30 a.m. and 9:39 a.m., AUSA Kim and I exchanged several emails regarding a response to a message defense counsel had sent the night before with questions about GX 411's late production.[14]

31.     At approximately 9:43 a.m., AUSA Kim sent a text message to AUSA Krouse and me in which she stated that she had an email exchange with defense counsel about GX 411.  In response, I asked whether defense counsel had "explain[ed] how they think [GX 411 is] Brady?"  She said that defense counsel had not provided an explanation.

32.     The Case Team exchanged emails on March 8, 2020, between approximately 12:16 p.m. and 1:33 p.m., about defense counsel's request for a curative instruction regarding the late production of GX 411.  In the exchange, among other things, I informed the other members of the Case Team that I had spoken with AUSA Bove about GX 411, as set forth below.

33.     I recall discussing with AUSA Bove in person that defense counsel had claimed that that we committed a *Brady* violation, but that none of us understood the basis for the *Brady* claim.  As reflected in a 1:19 p.m. email I sent to the Case Team, AUSA Bove suggested to me that we agree not to offer GX 411.  However, AUSA Bove recognized that if the

---

[14] AUSA Kim's drafts contained several errors, which I corrected in my responses.

defense actually intended to introduce the document and could explain how it was *Brady*, we would need to engage with the requested curative instruction.

34.    At approximately 2:17 p.m., in a chat message, AUSA Crowley asked to discuss the *Brady* issue that had come up.  I clarified that I had explained the situation to AUSA Bove, and offered to explain it to her before a call with defense counsel that was scheduled for 2:30 p.m.  I believe I likely spoke with AUSA Crowley in person following this exchange, but do not have a clear recollection of a conversation.[15]

35.    At 4:04 p.m., AUSA Krouse provided the Unit Chiefs with defense counsel's filing requesting a curative instruction, which revealed the bases for the *Brady* claim. AUSA Bove responded requesting a copy of GX 411 and the January 10 Email attaching GX 411.  At 4:20 p.m., I forwarded the Unit Chiefs the January 10 Email with GX 411, explaining "This is the chain.  None of us responded.  I briefly discussed it with [SAUSA Lynch]."

36.    At 5:03 p.m., I forwarded the Unit Chiefs the Court's 5:00 p.m. Order.

37.    At approximately 5:25 p.m., I opined to AUSA Crowley in a chat message about one of the bases for the defendant's *Brady* claim.  At approximately 5:49 p.m., AUSA Crowley asked me to come to her office to discuss the Government's response to the Court's 5:00 p.m. Order, which was due at 7:00 p.m. (the "7:00 p.m. Letter").  I believe I went to AUSA Crowley's office and spoke with AUSA Crowley and AUSA Bove about the 7:00 p.m. Letter, but do not recall the specifics of the conversation.

38.    At approximately 6:25 p.m., I sent a draft of the 7:00 p.m. Letter to the rest of the Case Team and the Unit Chiefs.  AUSA Crowley subsequently provided edits and

---

[15] I recall that, at some point on March 8, the Unit Chiefs directed SAUSA Lynch to return to his office to review files from the DANY Commerzbank investigation, but I do not recall specifically when on March 8 this happened.

asked that the case team meet in her office after we had filed the letter.  I do not recall what was discussed during the meeting in AUSA Crowley's office.  AUSA Crowley sent a follow-up email at 7:32 p.m. to confirm that we had reached out to OFAC regarding their response to GX 411.

39.     At 9:05 p.m., I received the Court's order directing the Government to clarify various points from the 7:00 p.m. Letter by 10:00 p.m.  At 9:15 p.m., AUSA Kim forwarded the order to the Unit Chiefs, copying the Case Team.  At 9:22 p.m., AUSA Bove responded that the Unit Chiefs were available to review a draft.[16]

40.     At 9:31 p.m., I emailed the Case Team (not including the Unit Chiefs) a draft of the Government's 10:00 p.m. letter (the "10:00 p.m. Letter").[17]  After I circulated the draft, I recall going to AUSA Krouse's office to tell him that health issues that had become exacerbated during the trial had worsened and I did not think I would be able to continue.  At that point, I went home.

---

[16] I had three calls lasting between one and three minutes with AUSA Crowley between 9:21 p.m. and 9:32 p.m.  I believe that I told AUSA Crowley that I did not think I would be able to continue with the trial due to significant health issues and asked for help reassigning my remaining witnesses.  At 9:38 p.m., AUSA Crowley sent a text message confirming that she spoke to AUSA Krouse and he would handle one of my remaining witnesses.  I then had a five-minute call with AUSA Crowley at 9:59 p.m., during which I recall discussing my health issues in more detail.

[17] At 9:42 p.m. and 9:47 p.m., SAUSA Lynch sent me emails regarding his review of material from DANY's Commerzbank investigation at his office.  By this time, I had left the office and do not have a record of responding.  I also spoke to SAUSA Lynch three times, for a total of eight minutes, between 6:09 p.m. and 6:47 p.m. on March 8, 2020.  I believe these conversations related to SAUSA Lynch's review of DANY's Commerzbank material.  I recall SAUSA Lynch expressing concern about the volume of material, and stating that he did not believe there was anything else in the Commerzbank material that related to the defendant or his entities.  I recall saying that he should do as the Unit Chiefs asked and get through as much material as possible.

41.     Also at 9:31 p.m., AUSA Crowley emailed the Case Team and AUSA Bove asking for the March 7, 2020 transmittal email to defense counsel. At 9:41 p.m., AUSA Kim provided the March 7, 2020 transmittal email to the Unit Chiefs.

42.     At 9:41 p.m., I sent a text message to AUSAs Kim and Krouse in which I raised the question of whether it would "help[] or hurt[] to say [in the 10:00 p.m. Letter] that when we sent [GX 411] we didn't think it was a rule 16 violation because we didn't think it helped them and hadn't intended to use it until we sent it."  AUSA Krouse responded "I think that helps."

43.     At 9:50 p.m., AUSA Krouse forwarded the Unit Chiefs, copying AUSA Kim and myself, the draft of the 10:00 p.m. Letter that I had circulated at 9:31 p.m.  At 9:55 p.m., AUSA Kim responded to say that the response was due by 10:00.

*Monday, March 9, 2020 – Wednesday, March 11, 2020*

44.     On Monday, March 9, I recall speaking with AUSA Crowley on the phone.[18]  AUSA Crowley told me that the Court was going to require declarations from the AUSAs regarding GX 411 and AUSA contacts with the Office of Foreign Assets Control ("OFAC").  She later told me that the Court had decided to accept a letter in lieu of declarations. I recall telling AUSA Crowley that I remembered talking to SAUSA Lynch about GX 411 following the January 10 Email and that I remembered him saying something about

---

[18] I believe she called my personal cellphone, as I do not have a record of the call on my work cellphone.

Commerzbank finding the transaction through a "look back," but did not remember any further

discussion of GX 411 until I found it in my email on March 6.

45.     On Monday, March 9, at 10:41 p.m., I sent a text message to AUSA Kim

expressing concern that the defense would claim I was lying about my belief, until March 6,

2020, that GX 411 had previously been produced to the defense.

46.     On March 11, at 1:55 p.m., I had a text message exchange with AUSA

Kim in which she updated me on the progress of the trial, to which I had not returned since

health concerns caused my departure on March 8.  She noted that the Court had remarked that

SAUSA Lynch did not have any credibility.  I asked whether it was "because [SAUSA Lynch]

knew [GX 411] was a new doc[ument] but didn't tell us?"

47.     I do not recall any other communications about GX 411 during this period.

The members of the Case Team were discussing GX 411 throughout Sunday, March 8, however,

and it is possible there were additional in person conversations I do not remember at this time.  I

do not believe I participated in any additional conversations with members of the Case Team

about GX 411 until we responded to post-trial briefing from the defense and the questions raised

by the Court.[19]

Question 4

48.     I first recognized that GX 411 might have exculpatory value after defense counsel

responded to the March 7 transmittal email stating that they viewed the document as *Brady*

material.  I recall that I did not understand the basis for the *Brady* claim immediately after

---

[19] I have generally limited my responses to the time before and during trial, although have
referenced any post-trial communications I have located or recalled that have particular
relevance to the issues the Court has identified.  I have also not detailed facts relating to the
suppression litigation based on the Court's referral of that issue "to the Department of Justice's
Office of Professional Responsibility for a full investigation."

receiving defense counsel's email and remained skeptical of the claim.  I believe I only came to understand the reasoning behind the *Brady* claim after reviewing defense counsel's letter to the Court requesting a curative instruction, which was filed at approximately 4:00 p.m. on March 8. At all times before then, I believed that GX 411 was a wholly inculpatory document.

49.     By way of background, the Government alleged that the defendant was involved in causing 15 U.S. dollar payments to be made from Venezuela to companies that the defendant established in Turkey and Switzerland, for the ultimate benefit of an Iranian entity and Iranian individuals.  Based on my understanding of the evidence, Commerzbank processed the first of the 15 relevant payments, and the remaining payments principally were processed by Citibank and J.P. Morgan Chase.

50.     The second prong of bank fraud under 18 U.S.C. § 1344 requires that the Government prove:

> First, that there was a scheme to obtain money or property owned by or under the custody or control of a bank by means of *materially false or fraudulent pretenses*, *representations or promises* as charged in the indictment; Second, that the defendant executed or attempted to execute the scheme knowingly and with the intent to obtain money or property owned by or under the control or custody of the bank; Third, that at the time of the execution of the scheme the bank had its deposits insured by the FDIC.

(Trial Tr. at 1882:14-23 (emphasis added).)  With respect to the first element, specifically:

> The fraudulent representation must relate to a material fact or matter. A material fact is one you would reasonably expect to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. This means that if you find a particular statement of fact to have been false, you must also determine whether that statement was one that a reasonable person would have considered important in making his or her decision. It does not matter whether the bank actually relied on the misrepresentation; however, the misrepresentation had to be capable of influencing the bank. The same principle applies to fraudulent half-truths or the concealment of material facts where that concealment makes an affirmative statement misleading.

(Trial Tr. at 1883:22-1884:10.)

51.     GX 411 is a letter from Commerzbank to OFAC in which Commerzbank stated that its anti-money laundering monitoring program had flagged a $29,442,967.57 payment from Venezuela to Stratus International Contracting Company.  (GX 411 at 1.)  Commerzbank stated that it conducted Internet research and concluded that "Stratus may be an Iranian Company." (*Id.*)  It further noted that the bank in Venezuela provided conflicting information, indicating, in sum and substance, that Stratus was based in Turkey.  (*Id.*)   In light of the conflicting information it received, Commerzbank "added Stratus into our sanctions filter to monitor any future payments."  (GX 411 at 2.)

52.     When I received the January 10 Email, to which GX 411 was attached, it did not occur to me that GX 411 could have any exculpatory value.  It was sent in the context of discussing what evidence the Case Team should offer at trial, and I viewed it exclusively through that lens.  Because I believed that it was part of the discovery in the case, it did not occur to me to conduct any *Brady* analysis.  Similarly, when SAUSA Lynch and I discussed GX 411 following the January 10 Email, the discussion was centered on whether the Government should offer the document or whether its presentation would distract from other evidence the Government planned to adduce.  I do not recall considering or discussing the possibility that the defense would want to offer GX 411.

53.     When I came across GX 411 again on March 6, 2020, I believed that GX 411 would help the Government establish that the defendant's concealment of connections between the payments he received and Iran was material to Commerzbank's decision making.  This was based on my belief that GX 411 showed that Commerzbank intended not to process transactions that benefited an Iranian company – indeed, it added Stratus to its sanctions filter as a result of the payment, and none of the following 14 payments were routed through Commerzbank.

54.     I believed that this evidence was particularly helpful in light of arguments the

defense appeared likely to make following the Citibank witness's (the "Citibank Witness") cross

examination on March 6, 2020.  Defense counsel questioned the Citibank Witness about a

transaction Citibank processed in which the beneficiary was initially listed as the Iranian

International Housing Company.  After Citibank received the payment request, it requested more

information about the beneficiary from the other banks involved.  (Trial Tr. 902-04.)  In response

to Citibank's inquiry, among other things, Hyposwiss Bank stated that the correct beneficiary

was Stratus International Contracting J.S., and Citibank ultimately processed the payment to that

entity.  (Trial Tr. at 908.)  Defense counsel asked the Citibank Witness whether "Citigroup . . .

conduct[ed] any research regarding the Iranian International Housing Company when it was

reviewing" this transaction.  (Trial Tr. at 931-32.)  I believed that defense counsel was laying the

foundation to argue that, because Citibank did not, in response to this information, do additional

research or say "[w]e're not letting this transaction through. No payments made to Stratus

International Contracting; they appear to have a nexus to Iran," it was not actually material to the

Citibank whether the Iranian International Housing Company was the ultimate beneficiary of the

transaction.  (Trial Tr. at 931-32, 935-37.)  I believed that, even if the jury somehow agreed with

this argument with respect to Citibank, GX 411 would demonstrate that the defendant's

misrepresentations were material to Commerzbank.

55.     It simply did not occur to me at any point prior to receiving defense counsel's

email on March 7, 2020, that GX 411 might be an exculpatory document.  I do not remember

thinking about the fact that GX 411 was a disclosure to OFAC or what that might or might not

entail.  I remember focusing solely on what GX 411 reflected with respect to Commerzbank's

sanctions compliance.  I believe my contemporaneous communications about GX 411, discussed

above, confirm this.[20]

Question 5

56.     I wrote the initial draft of the 10:00 p.m. Letter, which accurately stated that

"[t]he Government did not specifically identify [to the defense] that GX 411 had not previously

been produced in discovery."  I circulated that draft to the other members of the Case Team at

approximately 9:31 p.m.  As discussed above, I recall that, after I circulated the draft, I went to

AUSA Krouse's office and told him that I did not think I would be able to continue the case as a

result of health issues that had been worsening throughout the trial.  AUSA Krouse was

understanding, and at that point I left the office and went home.  The only subsequent

communication I have located or recall regarding the 10:00 p.m. Letter is the 9:41 p.m. text

message I sent to AUSAs Krouse and Kim, suggesting a possible point to note in the letter

(which was not ultimately included).

Question 6

57.     I was not present in Court on March 9, 2020 when the 10:00 p.m. Letter was

discussed.  At some point on March 9, 2020, I saw the Court's 1:08 a.m. order directing the

Government to be prepared to address at 8:30 that morning the statement in the March 8, 2020

letter, "that it 'made clear . . . that GX 411 was a newly marked exhibit.'"  I did not believe I had

written the sentence the Court identified but did not investigate further at the time due to my

---

[20] The Court has expressed concern that the Case Team intentionally withheld GX 411 prior to
March 7, 2020.  (Sept. 16 Order at 28-29.)  I assure the Court that I had no idea that GX 411 had
not been produced until March 6, and that I did not have any idea that it might be *Brady* material
until receiving the defense's email on March 7.  Had the I or other members of the Case Team
intended to withhold GX 411 from the defense, which we did not do and would not have done,
there would have been no reason to disclose it on March 7.

19

health issues.  I confirmed that my recollection was correct during post-trial litigation in May

2020, when I located the 9:31 p.m. email I had sent attaching the draft letter.  Shortly thereafter, I

mentioned to AUSA Crowley that the draft I circulated did not contain the sentence about which

the Court had been concerned.  I do not recall her specific response, but her reaction suggested to

me that she had not realized that the sentence had been changed.

*     *     *

58.     I have made my best efforts to answer the Court's questions and to gather

documents responsive to the Court's order.  At no time have I ever intended to suppress material

I knew or suspected to be exculpatory, in this or in any other matter.  Should the Court have any

additional questions, I am prepared to answer them.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing

information is true and correct.

Dated:       New York, New York
             October 16, 2020

_____
Stephanie Lake
Assistant United States Attorney