UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>ALI SADR HASHEMI NEJAD,<br><br>                         Defendant. | DECLARATION<br><br>18 Cr. 224 (AJN) |

I declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746:

**INTRODUCTION**

1. I have served as an Assistant United States Attorney ("AUSA") for the Southern District of New York ("SDNY," the "U.S. Attorney's Office," or the "Office") since May 2015. I have served as an AUSA in the Terrorism and International Narcotics Unit ("TIN") since June 2017, after having served in the Office's General Crimes and Narcotics Units. I have served as Human Trafficking Co-Coordinator for the Office since September 2017. I became an AUSA to serve the public good and to advocate for the interests of the public, with a particular commitment to investigating and prosecuting human trafficking and child exploitation offenses, public corruption, criminal civil rights violations, and acts of domestic and international terrorism.

2. Prior to joining the U.S. Attorney's Office, I received an A.B. from Harvard College, an M.A. in International Law and Human Rights from the United Nations Mandated University for Peace, and a J.D. from Columbia Law School. After law school, I served as a law clerk to the Honorable Denny Chin, U.S. Circuit Judge for the U.S. Court of Appeals for the Second Circuit. I also worked as a litigation associate at Gibson, Dunn & Crutcher LLP, where I did extensive *pro bono* work on behalf of survivors of human trafficking and other forms of violence against women. For over two decades, I have worked or volunteered for public interest, non-profit, non-governmental, and governmental organizations in efforts to serve the public good.

3. I respectfully submit this declaration in response to the questions outlined in the Court's Opinion and Order of September 16, 2020. (Dkt. 379 (the "Court's Order")).[1]

4. In or about April 2019, I was first assigned to *United States v. Ali Sadr Hashemi Nejad*, 18 Cr. 224, six years after the investigation was initiated by the New York County District Attorney's Office ("DANY") and approximately one year after Ali Sadr Hashemi Nejad ("Sadr") was charged in this District with bank fraud, sanctions evasion, and money laundering offenses.

---

[1] This declaration includes facts that I believe are relevant to the Court's Order, but it does not include every fact relating to this matter. Where certain facts provide context, I offer them to provide the Court with information relevant to its assessments. All dates and times are approximate, and all communications are described in sum and substance.

5.      As a federal prosecutor and as a public servant, at no time have I acted in bad faith or intentionally withheld exculpatory material.  I have always upheld, and continue to uphold, my duty of candor to the Court.  I have never intentionally misled this or any other Court.

6.      As discussed in greater detail below, with respect to the June 2011 letter from Commerzbank to the Office of Foreign Assets Control ("OFAC"), also referred to as "GX 411":

   a.     I first received the document on January 10, 2020, when the Assistant District Attorney who had been appointed in 2017 as a Special Assistant United States Attorney in this matter (the "SAUSA") emailed the document to the trial AUSAs, including myself.  I assumed that the document had already been produced to the defense by the SAUSA and others working on the case at the time of the Government's 2018 discovery productions as a document that DANY had obtained from Commerzbank.  At the time, I was not aware that DANY had obtained the document in connection with a separate and unrelated DANY investigation, that the SAUSA had stored the document in a hard-copy folder in his office, and that the document had not been produced to the defense.

   b.     I first learned from another AUSA on the case ("AUSA-1") that the document had not been previously produced to the defense on the evening of Friday, March 6, 2020.  When I learned this information, I repeatedly expressed my view, in writing, that we should produce the document immediately—that is, that we should "produce it tonight," "produce it right now," "mark and produce it stat"—so that the defense would have "days to review" the two-page letter and attachments before the Government sought to offer it at trial.  I never used or adopted the word, "bury," that was used by a colleague.  And it never crossed my mind to do any such thing.  Instead, I was focused on getting the document to the defense quickly in order for them to have sufficient time to review it, so that the Government could offer it into evidence at trial.[2]  Consistent with my focus, I responded that it would be "fine" to produce the document the next day (Saturday, March 7, 2020), along with "FATF stuff" we were also considering offering as a newly-marked exhibit, which would still have given the defense sufficient time to review it.  I followed up the next day with AUSA-1 to make sure that she was producing the document that same day.  The document was produced that day (Saturday, March 7), marked as GX 411.[3]

7.      I was not involved in the drafting, editing, or filing of the Government's March 8, 2020, 10:00 p.m., letter to the Court.  (*See* Dkt. 277).  Nor did I address the Court with respect to the letter on March 9.  It was not until after I read the Court's Order of June 9, 2020 (*see* Dkt. 350) that I first learned that there had been a deletion from the draft version of the letter removing a sentence referring to "specifically identify."  I do not know why the sentence was deleted, and I was not involved in its deletion.

---

[2] At or about this time, as reflected in my contemporaneous communications with other prosecutors and with the defense, I and other prosecutors believed that the document was inculpatory with respect to the sanctions evasion and bank fraud charges against Sadr.  *See infra* ¶ 34.

[3] On or about July 2, 2020, following an internal investigation conducted by the U.S. Attorney's Office, the Office concluded that none of the prosecutors assigned to this case acted in bad faith or intentionally withheld exculpatory information.  (*See* Dkt. 354 at 1).

## RELEVANT FACTS

8. The history of this case is complex. The case began in 2013 as a four-year-long DANY investigation. Spanning approximately seven years, the prosecution has involved over a dozen state and federal prosecutors and numerous investigators and agents.[4] The offense conduct was allegedly committed over the course of approximately eight years (from in or about 2006 to 2014), and involved several co-conspirators, numerous entities and foreign jurisdictions, intricate financial transactions, and documents in multiple languages. The prosecution involved an extensive amount of investigative and discovery material, including search warrant returns of over a million emails, highly technical facts and legal arguments, and two privilege reviews, one of which limited prosecutors' access to case materials for a substantial period of time.

9. In April 2019, another AUSA ("AUSA-3") and I were assigned to this matter. I was not involved in the investigation, charging decisions, the prudential review for potentially discoverable classified information, or the initial Rule 16 discovery productions in this case. My understanding when I joined the case was that discovery was complete (*see* Dkt. 45 at 2-3), there was no classified discovery (*see* Dkt. 32 at 18), and that my role was to assist with the pretrial litigation and take the case to trial. I assisted in drafting portions of the Government's April 2019 briefing (Dkt. 108), but my involvement in this case was limited until in or about the fall of 2019, in part because I had been working on a separate investigation that took up the substantial majority of my time. At the time I was assigned to the case, because of the ongoing privilege review, I was not able to access a vast majority of the case files, including discovery, until in or about July 2019. (*See* Dkt. 53).[5] As discussed below, from September through December 2019, my work on this case focused largely on the suppression litigation. *See infra* ¶¶ 12, 14. From in or about December 2019 through February 2020, I began to closely examine and fully understand the documentary evidence in this case.

I.  **The Suppression Litigation**

10. During the course of DANY's investigation, from approximately April 2014 to April 2016, DANY obtained search warrants to search 37 electronic accounts (the "DANY Search Warrants"). On February 25, 2019, Sadr moved to suppress the email evidence obtained through these search warrants (Dkt. 95), and supplemented his motion on October 11, 2019 (Dkt. 148).

11. As of approximately July 2018, I was not yet assigned to the matter, but I understand that the AUSAs on this case believed that discovery was complete. (*See* Dkt. 45 at 2-3; Dkt. 354 at 17-18). In or about May 2019, however, the SAUSA advised an AUSA previously assigned to the case that some materials that had been seized pursuant to the DANY Search Warrants may not have been produced to Sadr. As a result, on or about September 17, 2019, the Government produced to the defense 622 additional documents (the "622 Documents"), which

---

[4] After SDNY accepted this case in 2017, ten prosecutors (including two AUSAs assigned to the privilege review), supervised by six unit chiefs, have worked on the matter at various times.

[5] Because of Sadr's privilege claims, from approximately September 2018 through July 2019, the Government (apart from the privilege review team) did not have access to the documents produced in discovery or even internal memoranda referencing these documents. (*See* Dkt. 53).

came from email accounts not belonging to Sadr. (Dkt. 155 at 4). The Government decided not to rely on these documents at trial in part because of their belated production. (*Id.*).

12. At or about the time of Indictment, I understand that the prosecutors then assigned to the case discussed the Fourth Amendment and *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) in relation to DANY's execution of the DANY Search Warrants. On or about September 26, 2019, I understand that the Government sent a letter to the defense with the representation that DANY had completed its search of the search warrant returns in early 2017, based on the SAUSA's representation. I and the other prosecutors on the case later learned that DANY had continued to search the search warrant returns up through at least in or about May 2018, which we disclosed to the defense and to the Court. (*See* Dkt. 155 at 11-12 (Government's October 30, 2019, letter)). From in or about September through November 2019, I and other prosecutors on the case worked diligently to understand how DANY had executed the DANY Search Warrants. This process included interviewing former and current DANY employees and trying to reconstruct DANY's search, which began in 2014 and involved over a dozen DANY personnel. (*See* Dkt. 155 at 5 & n.3). I and other prosecutors on the case worked to transparently and fairly disclose what we had learned about DANY's searches to the Court and to the defense. (*See* Dkt. 155 at 5-13). I was not aware that DANY may have searched the search warrant returns for evidence of federal crimes until in or about late May 2020, after trial.

13. In light of the DANY search and the 622 Documents, during the fall of 2019, the prosecutors on the case, including myself, had multiple meetings, including with unit chiefs and with DANY supervisors, to emphasize that we needed to be sure that there wasn't "anything else" that had not been produced in discovery to the defense, and that precision was paramount in our communications with the Court and with defense counsel.[6]

14. In November and December 2019, the Government worked to establish that each page of the email evidence had been identified as responsive to the DANY Search Warrants by DANY prior to April 2017. (*See* Dkt. 172). On January 28, 2020, the Court permitted the Government to proceed to trial with 2,549 pages of emails seized pursuant to the DANY Search Warrants. (Dkt. 197 at 42; Dkt. 201 at 1). As a result of the format in which discovery had been produced, as well as the privilege review and suppression litigation, the Government was not able to begin pulling the original, digital copies of its trial evidence until on or about February 10, 2020. (Dkt. 201 at 5). The page-by-page analysis and exhibit pulls were both very time-intensive.[7]

## II.     GX 411 and Responses to the Court's Questions

### A.     The Document

15. At trial, I believe that the Government established that Sadr and others conspired to execute a fraudulent scheme in connection with a $475 million construction project in Venezuela (the "Venezuela Project"). (*See* Dkt. 339). The trial evidence showed that, during the

---

[6] In September 2019, two new unit chiefs were appointed to supervise TIN ("Chief-1" and "Chief-2").

[7] The time-intensive nature of these processes is noted in part to explain what I and the other prosecutors were working on in the months prior to trial.

course of the scheme, Sadr took multiple steps to hide the fact that payments for the Venezuela Project were for the benefit of Iran—that is, an Iranian company and Iranian nationals residing in Iran—in order to evade Iran sanctions, defraud OFAC and U.S. banks, and launder the crime proceeds. (*See id.* at 66-72, 91-98, 107-10). These concealment efforts included purchasing non-Iranian citizenship, establishing front companies and bank accounts in countries other than Iran, creating sham invoices, backdating contracts, and misrepresenting and withholding information about the project payments. (*See id.* at 9-59).

16. The first key transaction in this case was an April 2011 payment of approximately $29.4 million that was routed through Commerzbank to "Stratus International Contracting, J.S." or "Stratus-Turkey," a front company for the Iranian International Housing Company ("IIHC") and Stratus International Contracting Company in Iran ("Stratus-Iran"). (*See id.* at 32; GX 410). On or about April 27, 2011, after processing the payment, Commerzbank inquired about the payment's beneficiary and the identities and citizenship of the beneficiary's owners. (GX 2032-T). The trial evidence showed that, in response, Sadr falsely stated that the payment's beneficiary was Stratus-Turkey rather than IIHC or Stratus-Iran (GX 2034), and he refused to identify Stratus-Turkey's beneficial owners and their citizenship (GX 2215A-T at 1). (*See* Dkt. 339 at 32-33).

17. On or about June 16, 2011, Commerzbank reported the $29.4 million payment it had processed to OFAC, stating that "Stratus may be an Iranian company" and informing OFAC that it had "added Stratus into our sanctions filter to monitor any future payments." (GX 411).[8]

18. Following Commerzbank's April 2011 inquiries and up until in or about September 2012, Sadr exclusively used Clarity Trade and Finance ("Clarity")—rather than Stratus-Turkey—to receive the next eight U.S. dollar payments for the Venezuela Project. (GX 702). Sadr and his father had established Clarity, a company not bearing Stratus's name, in Switzerland in or about February 2010. (GX 2187-T at 2-3). No other payments for the Venezuela Project were routed through Commerzbank. (GX 702).

### B.  Question 1 of the Court's Order

19. On January 10, 2020, the SAUSA first circulated the document later marked as GX 411 to the trial AUSAs, including myself, in response to an email discussion between the SAUSA and AUSA-1 regarding payments. (Exs. 9, 9-1). I do not have a specific recollection of reviewing the SAUSA's email or the attachment at the time the SAUSA forwarded it, but based on my general practices, I likely read his email and opened the attachment. I believe this was the first time that I received or reviewed the document.[9]

---

[8] The document is a two-page letter with attachments. The attachments included two documents that had already been produced to the defense with Sadr's responses to Commerzbank's inquiries (GXs 2032A, 2034C), and screenshots of Stratus-Iran's website (GX 411 at 4-11).

[9] On December 19, 2019, the SAUSA emailed the trial AUSAs about the technicalities of SWIFT messaging, among other things (Exs. 1, 2), and also noted: "Now I'm really going off on a tangent, but Commerzbank was an intermediary bank in the first USD payment (to Stratus Turkey) and they actually picked up on 'Stratus' in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC" (Ex. 2). I do not have a specific recollection of reading the

5

20. I assumed that the document had already been produced to the defense for the following reasons, among others:

      a. I believed at the time that we were generally working with a closed universe of evidence. The prosecutors previously assigned to the case, as well as the SAUSA, had completed the Government's discovery productions in or about July 2018, long before I joined the case in April 2019. These productions included records obtained by DANY from Commerzbank.

      b. I thought that the SAUSA, who had participated in the DANY investigation and the discovery phase of the prosecution, would have flagged any new documents that needed to be produced to the defense. I was not aware at this time that DANY had obtained the document through a separate DANY investigation into Commerzbank.

      c. As discussed above, in connection with the 622 Documents, in the fall of 2019, the trial team, including myself, the unit chiefs, and prosecutors previously assigned to the case discussed the importance of ensuring that there were no other Rule 16 materials within DANY's possession that had not been produced to the defense. Given this context, I assumed that any other evidence that had not yet been disclosed to the defense would have been immediately identified and produced to the defense in the fall of 2019 if not well before.

      d. As discussed above, because the trial team was blocked from accessing the discovery until approximately July 2019 and because of the extensive suppression litigation, it was not until in or about December 2019 through February 2020 that I began to closely examine and fully understand the email evidence in this case. In addition, the division of labor during trial preparations and for trial was such that the SAUSA and AUSA-1 were focused on the bank and payment evidence. As a result, in or about January 2020, I was focused on other aspects of the case, including culling through the email evidence, identifying which emails needed to be translated, selecting the email exhibits we wanted to offer at trial and how we would offer them, and preparing to proffer Bahram Karimi in Vancouver, Canada.

### C. Question 2 of the Court's Order

21. I first learned that the document that was later marked as GX 411 had not been produced to the defense at approximately 8:00 p.m. on Friday, March 6, 2020. As discussed below, I believed that the document was inculpatory, and my view was to produce the document to the defense as soon as possible. Given the document's short length, I believed that it was fine to produce it with another newly marked exhibit the following day (Saturday, March 7), after we could precisely confirm where it came from and why it had not previously been produced.

22. On the evening of Friday, March 6, 2020, I was at home working on my rebuttal. Friday was the end of a long trial week, the first week of our expected two-week trial. This was my third trial since joining the Office and my first sanctions trial, and I was operating on very little

---

SAUSA's email at the time it was sent. At or about the time the email was sent, I had not seen the document later marked as GX 411, nor was I aware of DANY's separate investigation into Commerzbank or the SAUSA's possession of the document.

sleep. The night before, the unit chiefs had directed me to circulate a draft of the rebuttal by Saturday and to focus solely on drafting my rebuttal that weekend, which is what I was doing.

23. At 7:49 p.m., AUSA-1 sent an email to the trial team, replying all to the SAUSA's January 10, 2020, email. AUSA-1 stated: "I'm cleaning up email and came upon this. Given what defense did today, I think this could be really valuable to put in. Among other difficulties with doing that is the fact that I don't know that it was ever produced to defense (it's not in the Commerzbank subpoena production). [SAUSA] – do you know where it came from?" (Exs. 17, 17-1).

24. At 7:53 p.m., AUSA-1 messaged me on an internal "chat" application.[10] AUSA-1 wrote: "i feel like it might be too late to do anything about it, but i can't believe we all missed that commerzbank document. it's also what prompted him to set up clarity, i think." (Ex. 19). At this point, I had not seen AUSA-1's email, and so I assumed she was referring to another document regarding the $29.4 million payment. I responded: "isn't that going in tomorrow?" (*Id.*). AUSA-1 responded: "no, not that letter[.]" (*Id.*). Still thinking that AUSA-1 was referring to a different document, I wrote "what!!! we gotta put that in, I can put it in evading."[11] (*Id.*).

25. At 7:54 p.m., AUSA-1 messaged: "i have no idea where that letter came from[.] i don't think it has ever been produced to the defense[.]" (*Id.*). At this point, I had realized that we were talking about different documents and I saw AUSA-1's email shortly thereafter. I believe this was the first time that I learned that the document later marked as GX 411 may not have been produced to the defense.

26. Upon learning that the document may not have been produced to the defense and that AUSA-1 wanted to offer the document into evidence, I believed that we should disclose it as soon as possible so that the defense had sufficient time to review the document before we potentially tried to offer it in our case-in-chief, and I conveyed this view.

    a. At 7:55 p.m., I messaged AUSA-1: "oh that letter[.] we can produce it tonight[.] produce it right now and the defense can have 3 days to review[.] that's more than enough time for one document[.] mark and produce it stat – i think we should at least try[.]" (*Id.*). At 7:57 p.m., AUSA-1 responded: "i'm wondering if we should wait until tomorrow and bury it in some other documents." (*Id.*). That same minute, at 7:57 p.m., I responded: "that's fine too – some of the FATF stuff." (*Id.*).

---

[10] The "chat" function allows individuals to communicate real-time and is generally faster than email. It is typically used for quick, extemporaneous conversations, which is how I usually use it. During the course of the Associate United States Attorney's review of the case, I flagged for him that I recalled a chat conversation with AUSA-1 about the document on the evening of March 6, 2020. He explained how I could find the chat; I then found it and provided it to him.

[11] "Evading" was shorthand for a collection of documents the Government intended to offer that highlighted Sadr's evading of sanctions; other categories of documents, for instance, included "Knowledge of Sanctions" and "Iran." Because the Government was close to resting and needed to ensure that any remaining critical documents were admitted into evidence, I noted that I could offer the document I thought AUSA-1 was referring to (not GX 411) when I offered the documents highlighting Sadr's evasion of sanctions.

    b.  In my reply, I was not intending or agreeing to "bury" or hide anything. Instead, I was focused on just the opposite: on getting the document to the defense so that they could review it. I responded that it would be "fine" to produce the document the following day with another potential new exhibit (which was ultimately not selected, produced, or offered).[12] I did not respond "fine" in response to the "bury" comment; my remark was an acknowledgement that it was okay by me to produce the document the next day, as AUSA-1 had suggested, and a continuation of my prior statement that we should produce the document as quickly as possible. At this time, I was not aware that other documents would be transmitted to the defense with these newly marked exhibits. I believed that it was okay to produce the document the next day after we more fully understood where the document came from, why it had not been produced, and whether we wanted to offer it in our case-in-chief. I did not believe that the defense would be prejudiced by receiving the document on Saturday, rather than on Friday night.

    c.  Given the crush of events during trial and my focus on my rebuttal preparation, and having worked closely with AUSA-1 on this case, I did not focus on AUSA-1's "bury" reference or ascribe any particular meaning to it. I did not believe that the comment was a serious suggestion by AUSA-1, and so I did not give it much thought at the time or think that it warranted a response. I focused, instead, on ensuring that we produce the document promptly so that the defense would have time to review it, and I continued to press that view until the document was produced on the following day.

  27.  At 8:05 p.m., AUSA-1, who appeared to have spoken to the SAUSA by this time, wrote: "[The SAUSA] has a high-level contact at Commerzbank[.] he's reaching out to her to see if she can get us a witness for Monday[.] . . . [i] do think we need to come up with some explanation for why the defense is just seeing this for the first time, though apparently DANY got it through an unrelated case[.]" (*Id.*).

  28.  At 8:09 p.m., I responded: "how- through subpoena?" (*Id.*). AUSA-1 responded: "he [the SAUSA] thinks it was through a DPA with Commerzbank[.]" (*Id.*). I responded: "ahhh[.] was he involved w that?" AUSA-1 responded: "unclear[.]" (*Id.*). This was the first time that I learned that DANY may have investigated Commerzbank, and that the SAUSA may have been involved in that investigation.

---

[12] On March 6, 2020, the defense began asking one of the Government's bank witnesses about de-risking guidance from the Financial Action Task Force ("FATF"). (Trial Tr. at 955; DX 96-R). The defense argued that de-risking suggested that Sadr did not believe that he was violating sanctions. (*See* Trial Tr. at 2028-30). Earlier that day, I had suggested to members of the trial team that, depending on how the cross-examination progressed on March 9, the SAUSA (who was in charge of the re-direct of the bank witness) could consider preparing a FATF exhibit that discussed the serious risks banks were managing. I did not have a particular exhibit in mind. That evening, I circulated three potential exhibits on FATF's risk assessments to the trial team, one of which was the complete, unredacted version of DX 96-R. (Exs. 22, 22-1–22-3). I assumed that the prosecutors who were in charge of the bank-related evidence would select a document or excerpts of a document, if warranted. (*See* Ex. 24). I believe that because the issue was so technical, among other things, a document was never selected or offered.

### D. Question 3 of the Court's Order

29. I had the following communications about GX 411 with other prosecutors:[13]

    a. As discussed above: the SAUSA's December 19, 2019 email referencing Commerzbank's disclosure to OFAC (Ex. 2); the SAUSA's January 10, 2020, email (Exs. 9, 9-1); the March 6, 2020, email from AUSA-1, forwarding the SAUSA's January 10 email (Exs. 17, 17-1); and the March 6, 2020, chat (Ex. 19).

    b. On January 30, 2020, the SAUSA emailed the trial team about finding a Commerzbank witness, whom I believed at the time would serve as a custodian witness if the defense did not agree to an authenticity stipulation. (Ex. 10). The SAUSA wrote that he had "contacts in their legal department if you want me to reach out to them about getting a witness (at the very least, we need someone to authenticate the wire transfer record in the event the defense doesn't stipulate)." (*Id.*). During trial preparations, the trial team decided to call two bank witnesses in order to avoid offering potentially duplicative testimony, and to call a Commerzbank witness if the defense did not stipulate to the authenticity of the Commerzbank documents. At the time of this email, the defense had not yet agreed to an authenticity stipulation, and so I assumed that any Commerzbank witness would serve principally as a custodian witness, and that we might take the opportunity to ask the witness questions relevant to bank fraud if he or she testified. AUSA-1 responded that it made sense for the SAUSA to "reach out about getting a witness." (Ex. 11). Because we expected to hear the defense's position on authenticity stipulations the following Monday, February 3, I responded: "[d]epending how things go on Monday [with defense's stipulation decision], we should also send trial subpoenas to the email providers." (Ex. 12).

    c. On January 31, 2020, the SAUSA emailed a contact at Commerzbank, copying the trial AUSAs, attaching an April 2011 wire transfer record, and requesting a witness to "(a) authenticate the wire transfer record and possible (b) testify about Commerz's payment screening at that time in NY." (Exs. 13, 13-1). After the contact responded with her availability, the SAUSA emailed the trial AUSAs, noting that he would "reach out to [the contact] today" and that "[t]he other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment – we should discuss whether it's worth having the Commerz witness go into that." (Ex. 14). The following morning, AUSA-1 responded: "Did you talk to her / how'd it go? Do we know what the basis for disclosure was?" (Ex. 15). The SAUSA responded: "I did. They're happy to provide a witness . . . She believes (I think rightly) that they discovered the Stratus payment and filed the voluntary disclosure due to our investigation into the bank. That makes sense since they discovered the payment retroactively; it wasn't flagged in real time. So

---

[13] Based on multiple searches of my files, I provide a CD by hand delivery to the Court and to the Associate United States Attorney, and by overnight mail to the defense, with all of the internal communications that I have found about GX 411 from the time I was assigned to this case through the end of trial. I highlight and quote from key communications in this declaration. I do not enclose post-trial communications, which were principally transmitted in connection with drafting the Government's post-trial motions and disclosures, because I assume that the Court's questions do not relate to these communications, but I can certainly provide these communications to the Court if needed. With respect to in-person communications, I have included the conversations, in sum and substance, for which I have a recollection at this time.

9

we can discuss how we would want to handle." (Ex. 16). I do not have a specific recollection of reading the SAUSA's January 30 and 31 emails at the time they were sent, nor do I recall connecting these emails to the SAUSA's January 10 email. As discussed above, because of the division of labor before and during trial, I was focused at the time on examining the email evidence, among other things. *See supra* ¶ 20(d). In addition, during trial preparations, the trial team discussed simplifying our presentation of evidence to the jury. For this reason, we did not offer very much evidence about, for example, euro payments, other front companies, or other construction projects, and, as noted above, we were only planning on calling two bank witnesses. Reading these emails now, I interpret the SAUSA's references to "go into that" and "how . . . to handle" as references to whether or not certain testimony was necessary or whether it was too technical, tangential, or complicated for the jury, and I believe that is how I would have interpreted these emails at the time they were sent.

        d.        On March 6, 2020, at 9:45 p.m., AUSA-1 emailed the trial team about exhibits, and asked: "Can we all talk briefly tomorrow morning about the Commerzbank thing?" (Ex. 20). I and the other trial AUSAs then exchanged messages to schedule a call. (Exs. 112-15).

        e.        I recall a phone conversation on the morning of Saturday, March 7, 2020, with AUSA-1 and AUSA-3 (and possibly the SAUSA) regarding the document later marked as GX 411.[14] At the time of the call, I was working from home, reviewing transcripts and working on my rebuttal. I recall that discussion, in sum and substance, was about how the document was a powerful piece of evidence for the Government, and that the defense would likely object to its admission because it had not been produced earlier under Rule 16. I do not recall any discussion or suggestion that the document had any potential exculpatory value, or any discussion, apart from timing, about the way in which the document would be transmitted to the defense. I believe that AUSA-1 relayed information she had received from the SAUSA regarding where the document came from. I recall taking the position that we should get the document "out the door" as soon as possible so that the defense would have the opportunity to review it. Again, my view was that the more time the defense had to review the document before we offered it, the less they would be able to claim prejudice. I recall a consensus being reached that we would try to offer the document into evidence in the Government's case-in-chief the following week, and we would produce the document as soon as possible to the defense. I also recall discussing other trial tasks that needed to be completed that weekend.

        f.        At 9:58 a.m., on March 7, approximately nine minutes after the call ended, I circulated a task list to the trial team noting, among other things, that AUSA-3 and I were responsible for the "Closing" and "Rebuttal"; AUSA-1 and the SAUSA were responsible for tasks relating to the "Banking testimony"; AUSA-1 was responsible for the "Commerzbank production," the SAUSA was responsible for the "Commerzbank custodian," and AUSA-1 and possibly the SAUSA were responsible for "[a]ny FATF, Hyposwiss, or other docs we want to admit" related to the bank witnesses. (Ex. 24).

---

[14] According to the Associate United States Attorney, phone records reflect that the trial AUSAs spoke by phone beginning at approximately 9:23 a.m., for approximately 26 minutes, and that the SAUSA joined this call at approximately 9:39 a.m.

      g.      At 10:48 a.m., AUSA-1 forwarded the Commerzbank document to an SDNY paralegal, asking the paralegal to mark the document as GX 411. (Exs. 25, 25-1). The paralegal responded that he was unavailable at that moment, but that he would mark the document in approximately one hour. (Ex. 26).

      h.      That afternoon, around the time that I arrived in the office, I recall walking into the team's trial room, where AUSA-1 was working. I recall asking AUSA-1 about the status of GX 411 and noting that we should send it to the defense as soon as possible. I then went to my office to continue working on my rebuttal.[15] Again, at the time, I believed it was important to get the exhibit to the defense that day.

      i.      At 4:04 p.m., AUSA-1 sent GX 411 to the defense. (Exs. 27, 27-1–27-14).[16]

      j.      Key internal communications regarding the inculpatory or exculpatory nature of GX 411 are discussed below. *See infra* ¶ 34. Key internal communications regarding the Government's March 8, 2020, letter to the Court are discussed below. *See infra* ¶¶ 36-43. Internal communications regarding GX 411 in the context of the Government's March 9 letter to the Court (*see* Dkt. 283) are enclosed. *See supra* at 9 n.13.[17]

    30.    I did not review the March 7, 2020, email transmitting GX 411 to the defense before it was sent, and I was not involved in drafting the transmittal email or in selecting or ordering the documents transmitted with GX 411.

    E.    **Question 4 of the Court's Order**

    31.    I first learned that the defense believed that GX 411 was favorable to the defense at or about 4:57 p.m. on March 7, 2020, when defense counsel wrote to the Government and

---

[15] In or about the afternoon of March 7, 2020, I recall AUSA-1 informing me that she was keeping at least one of the unit chiefs in the loop about the document (*i.e.*, Chief-2). I am not sure if this was communicated before or after the transmittal of GX 411.

[16] AUSA-1 tried to send the email again at 4:11 p.m. (Ex. 28). At 4:24 p.m., AUSA-1 notified the defense that the Government would upload the files online because it appeared that the defense's servers blocked the email. (Ex. 29). The defense confirmed receipt at 4:34 p.m. (Exs. 30, 31).

[17] These communications include: (i) the SAUSA's draft declaration describing his participation in DANY's investigations of Commerzbank and of Sadr, and stating: "Later, in preparation for trial, in an effort to uncover any document possibly relevant to the case, I searched a file in my office containing records received from Commerzbank during the course of the separate investigation . . . and identified the document later marked as GX 411, which I emailed to [the trial team] on January 20 [sic], 2020." (Ex. 105-2); (ii) an email from Chief-2 to the SAUSA, AUSA-3, Chief-1, and me, stating in part: "[SAUSA], please make sure this is accurate: That same day, [January 10, 2020,] [the SAUSA] located GX 411 in a hard copy file at his DANY office; [the SAUSA] had segregated [the] letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so." (Ex. 110); and (iii) the SAUSA's response, stating: "That's right." (Ex. 111). In addition to the enclosed emails, I recall meeting with Chief-1 and AUSA-3 on March 9, 2020, at approximately 6:15 p.m., to discuss the Government's March 9 letter. I emailed notes from this meeting to AUSA-3 at 6:18 p.m. (Ex. 104).

11

described the document as exculpatory. I appreciated the exculpatory value of GX 411 on the afternoon of March 8, after a phone call with defense counsel and the defense's filing. (Dkt. 351).

32.     I believed that GX 411 was wholly inculpatory and constituted strong evidence of Sadr's guilt with respect to the bank fraud and sanctions evasion counts for the following reasons, among others:

a.     GX 411 showed that Sadr's misrepresentations and omissions in response to Commerzbank's inquiries were material. That is, because Sadr denied any connection between Stratus-Turkey and Stratus-Iran, and between Stratus-Iran and the Venezuela Project, and because he did not provide the identities and citizenship of the beneficiary's owners, Commerzbank was unable to confirm that the $29.4 million payment was for the benefit of Iran.

b.     GX 411 showed that the banks did not want to be sanctioned by OFAC, they were expending resources to comply with sanctions regulations, and there was a real risk that they could face penalties for violating sanctions. Commerzbank reported the fact that it had already processed the $29.4 million payment that may have been for the benefit of Iran because the bank did not want to be sanctioned. Commerzbank reported that it had added "Stratus" to its sanctions filter to "monitor any future payments," and that it was sending the letter "to report the good faith efforts of Commerzbank" in complying with sanctions regulations. (GX 411 at 2).

c.     The $29.4 million payment, and Sadr's misleading responses to Commerzbank in connection with that payment, were powerful pieces of evidence against Sadr. GX 411 provided the jury with a more complete picture of what Commerzbank did with Sadr's responses. It also highlighted for the jury that what Sadr did after the inquiry—*i.e.*, he stopped using Stratus-Turkey to receive U.S. dollar payments for approximately 17 months and exclusively used Clarity during this time, and did not receive any other payments through Commerzbank— showed his intent to evade sanctions and defraud OFAC and U.S. banks.

33.     The defense has argued that GX 411 has exculpatory value because it shows that OFAC knew about Stratus-Turkey's relationship with Stratus-Iran and did not take action. Up until March 8, 2020, I believe I did not think about this potential defense argument because OFAC indisputably does not and cannot investigate every case or tip that it receives, nor does it impose sanctions for every sanctions violation, so the idea of OFAC not taking action was not particularly meaningful to me. Indeed, as the defense was aware, OFAC had not taken action or imposed penalties in connection with this case. Moreover, while the defense argued that OFAC's "strict liability" regime meant that it had a "zero tolerance" policy at trial, that is not accurate. OFAC's "strict liability" regime simply means that OFAC "*can* impose civil penalties, even if there is no negligence, intent, or other finding of fault"[18]—it does not mean that OFAC does or must impose such penalties for every single sanctions violation. (*See* Dkt. 339 at 77-79).

---

[18] Steptoe & Johnson LLP, International Compliance Blog, "Foreign subsidiary trading with Iran? OFAC really means STRICT liability," (Feb. 11, 2019), available at https://www.steptoeinternationalcomplianceblog.com/2019/02/foreign-subsidiary-trading-withiran-ofac-really-means-strict-liability (emphasis added).

34. I had the following communications with other prosecutors regarding the inculpatory or exculpatory nature of GX 411:

     a. On March 7, 2020, after receiving the defense's 4:57 p.m. email, I recall standing in AUSA-3's office with AUSA-1 (and possibly the SAUSA), and the group noting, in sum and substance, that we did not understand how the document was favorable to the defense.[19]

     b. I recall the SAUSA stating, in sum and substance, that he did not understand how GX 411 was exculpatory, but I am not sure when the SAUSA made this statement (I assume it was either on the evening of March 7 or on March 8, 2020).

     c. I recall AUSA-1 asking me to send a response to the defense's email because, in sum and substance, she did not want to engage in another caustic dispute with the defense. As a result, AUSA-1 sent the trial team a proposed response (Ex. 34), which I forwarded to the defense without revisions at 5:36 p.m. (Ex. 36).[20]

     d. On March 8, 2020, at 12:15 p.m., defense counsel asked if the Government consented to a curative instruction regarding GX 411. AUSA-1 forwarded the email to the trial team and wrote: "Wtf." (Ex. 47). AUSA-3 responded: "Yeah, we do not consent" (Ex. 48), and proposed setting up a call with the defense (Ex. 49).[21]

     e. At 1:16 p.m., AUSA-1 emailed: "I talked to [Chief-1]. Are you guys here / can we gather?" (Ex. 53). A few minutes later, AUSA-1 wrote: "[Chief-1] thinks we should say we're not offering. Then if they actually want it in themselves / can articulate some real Brady theory, we'll have to deal with it. Apparently Crotty gave a similar instruction in Shulte." (Ex. 56). AUSA-3 responded that he was "fine with that." (Ex. 57).[22]

     f. At 3:20 p.m., the defense filed a request for a curative instruction. (Dkt. 274). At 4:04 p.m., AUSA-3 forwarded the defense's letter to the unit chiefs and the trial team. (Exs. 61, 61-1). Chief-2 responded, asking for "the document itself" (Ex. 62), which AUSA-3 forwarded (Exs. 63, 63-1). Chief-1 removed the SAUSA from the email chain and asked for the "full thread with the January transmittal email + attachment?" (Ex. 64). At 4:20 p.m., AUSA-1

---

[19] At 5:22 p.m. on March 7, 2020, I wrote to defense counsel: "Really, Reid??" (Ex. 33). Defense counsel responded in part, "it's strange we never saw it before…(or did we?)," and I replied that we thought the document had already been produced to the defense. (Exs. 36, 39). I relayed this communication to the trial AUSAs. (Ex. 116). AUSA-1 asked in part if defense counsel had "explain[ed] how they think it's Brady?," to which I responded in part: "No[.]" (Ex. 117).

[20] The defense replied to my email later that evening. The following morning, I assumed that AUSA-1 again preferred not to send a reply to the defense, so I drafted one and circulated it to the trial team. (Ex. 41). AUSA-1 proposed revisions (Exs. 42-44), and I ultimately sent a response to the defense later that morning (Ex 46).

[21] AUSA-1 and I responded, in sum and substance, that we did not think a call would be productive. (Exs. 50, 51). We ultimately did have a call with the defense that day at approximately 2:30 p.m..

[22] I was not in the office at this time (Ex. 58), and I do not recall meeting in response to this email chain.

13

forwarded the SAUSA's January 2020 email to the unit chiefs, copying me and AUSA-3, noting: "This is the chain. None of us responded. I briefly discussed it with Garrett." (Ex. 65, 65-1).

        g.    Later that day, I recall meeting with the unit chiefs and the trial team. The unit chiefs advised, in sum and substance, that we needed to review our files to confirm that there wasn't anything else that needed to be produced, and that we should contact OFAC to see what actions, if any, OFAC took in response to GX 411. (*See* Exs. 70-72).

        h.    At 9:41 p.m., around the time she left the office, AUSA-1 wrote to the trial AUSAs: "I don't know if it helps or hurts to say that when we sent it we didn't think it was a rule 16 violation because we didn't think it helped them and hadn't intended to use it until we sent it[.]" (Ex. 118). AUSA-3 responded: "I think that helps[.] We also did not have it in our possession, and it was from a different case, until Jan 2020[.]" (*Id.*).

### F.    <u>Question 5 of the Court's Order</u>

35.    I was not involved in the drafting or editing of the Government's March 8, 2020, 10:00 p.m., letter to the Court, nor did I review it prior to its filing. I did not participate in the March 8 call discussing edits to the letter, and I do not know why revisions were made to the letter.

### G.    <u>Additional Context Regarding the Government's March 8, 2020, Letter</u>

36.    At 4:04 p.m., on Sunday, March 8, 2020, the Court directed the Government to respond to the defense's request for a curative instruction by 7:00 p.m. (Exs. 60, 60-1). At 5:01 p.m., the Court directed the Government to provide a "detailed representation" about why GX 411 was not previously disclosed, among other things. (Exs. 66, 66-1). At 6:25 p.m., AUSA-1 circulated to the unit chiefs and trial team a draft letter to the Court. (Exs. 67, 67-1). At 6:54 p.m., Chief-2 circulated revisions to the letter (Ex. 68, 68-1), which AUSA-1 filed (Dkt. 275).

37.    At 9:05 p.m., the Court issued an Order directing the Government to provide more information regarding GX 411. (Exs. 73, 73-1). At 9:16 p.m., I forwarded the Order to the unit chiefs and the trial team. (Exs. 75, 75-1). At 9:22 p.m., Chief-1 responded in part: "We're around to turn the draft." (Ex. 76). At 9:31 p.m., Chief-2 responded: "Can you guys forward the transmittal email we sent to them when we produced the doc yesterday? Thanks[.]" (Ex.78). At 9:41 p.m., I forwarded the transmittal email to the unit chiefs. (Exs. 79, 79-1).

38.    At 9:31 p.m., AUSA-1 circulated to the trial team a draft letter to the Court. (Exs. 77, 77-1). At or about this time, AUSA-1 stopped by my office and told me, in sum and substance, that that she was leaving because she was not feeling well, and that she may not be joining us the next day in court. I recall telling AUSA-1, in sum and substance, to go home and take care of her health, and that I would take care of her responsibilities at trial that week if necessary. I recall AUSA-1 telling me that she had circulated a draft letter to the Court regarding GX 411, and that she either would tell or had told AUSA-3 to finish and file the letter.[23]

---

[23] By around 9:30 p.m., I had finished examining the approximately 60 exhibits that the defense might offer the next day and had just filed a letter to the Court with objections to many of these exhibits. (Dkt. 276; *see* Ex. 75). That evening, among other things, I prepared for my remaining

14

39. At 9:50 p.m., AUSA-3 forwarded AUSA-1's draft letter to the Court to the unit chiefs, noting: "Not sure [AUSA-1] sent this to you." (Exs. 80, 80-1). At 9:56 p.m., I replied all to AUSA-3's email and wrote: "And really sorry for the quick turnaround – the order said we had to file by 10." (Ex. 81). I believe I may have briefly talked to AUSA-3 by phone before he emailed the unit chiefs to confirm that he was filing the letter. I believe I called AUSA-3 shortly before 10:00 p.m. to confirm that he was filing, but did not connect with him.

40. At 10:01 p.m., AUSA-3 emailed me the following: "They called me with some changes. I made them and filed." (Ex. 82). I responded: "ok[.]" (Ex. 83).

41. At 11:15 p.m. and 11:30 p.m., I forwarded the defense's replies to the Government's letter, which attached the transmittal email and other correspondence, to the unit chiefs and AUSA-3. (Exs. 86, 86-1, 86-2, 90, 90-1, 90-2). At 11:35 p.m., Chief-2 replied in part: "Can you guys please forward us all correspondence relating to this document?" (Ex. 91). At 11:36 p.m., AUSA-3 responded in part: "I think this is it but will double check." (Ex. 92).

42. At 1:08 a.m. on March 9, 2020, the Court issued an Order directing "[t]he Government [to] be prepared to discuss, among other matters, its representation to the Court . . . that it 'made clear' in its March 7 correspondence with Mr. Sadr's counsel 'that GX 411 was a newly marked exhibit.'" (Exs. 97, 97-1). At 5:48 a.m., I forwarded the Order to the unit chiefs and AUSA-3. (Exs. 98, 98-1). Chief-2 responded: "Thanks guys. I know you've got this, but I think we need to fall on our sword big time here. We didn't make that clear in the transmittal email and shouldn't have represented that we did. We'll see you soon. It's going to be ok." (Ex. 99).

43. At 7:37 a.m., I messaged AUSA-3, in part: "Wasn't that a change the chiefs made[?] Do you want to take this or do you want me to[?]" (Ex. 120). I assumed that AUSA-3 would speak in court about GX 411 because, among other things, he had filed the letter and had spoken to the unit chiefs the night before. AUSA-3 responded: "I can do the arg[ument.]" (*Id.*).

**H.** **Question 6 of the Court's Order**

44. As discussed above, I was not involved in the drafting or editing of the Government's March 8, 2020, 10:00 p.m. letter, nor did I participate in the March 8 phone call discussing the letter. Given the substance of the Court's March 9 Order, I believe that I looked at the filed letter and the draft letter for the sentence quoted in the Order ("The Government made clear that GX 411 was a newly marked exhibit"), but because AUSA-3 was speaking in Court on the issue and because I was focused on several other preparations for the trial day, I did not examine other edits made. It was not until after I read the Court's Order of June 9, 2020 (*see* Dkt. 350) that I learned that the "specifically identify" sentence had been deleted from the draft version of the letter. I do not know why the sentence was deleted, and I was not involved in its deletion.

---

witness (a document reader), began preparing materials for AUSA-1's remaining trial responsibilities (a civilian witness and a document reader, certain financial summary charts, the charge conference, and confirming that all exhibits had been received into evidence), prepared documents for the potential cross-examination of the defense's OFAC witness, revised my rebuttal, and reviewed my files for any other material that needed to be produced to the defense.

\* \* \*

I declare under penalty of perjury that, to the best of my knowledge, the foregoing information is true and correct.

Dated: October 16, 2020

_____
Jane Kim
Assistant United States Attorney