UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>ALI SADR HASHEMI NEJAD,<br><br>Defendant. | DECLARATION<br><br>18 CR 224 (AJN) |

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury:

**Introduction**

1. I am a member of the New York State Bar and an Assistant United States Attorney ("AUSA") in the Southern District of New York. I graduated from Yale Law School in 2008 and worked for almost a year as an associate with Williams & Connolly LLP. I then served four years on active duty in the United States Marine Corps as a Judge Advocate. After the Marine Corps, I clerked for the Honorable Paul A. Engelmayer of the U.S. District Court for the Southern District of New York and the Honorable José A. Cabranes of the U.S. Court of Appeals for the Second Circuit. After my clerkships, I worked for almost a year as an associate with Skadden, Arps, Slate, Meagher & Flom LLP. In June 2016, I became an AUSA in the Southern District of New York. I am currently a member of the Terrorism and International Narcotics unit.

2. I submit this declaration in response to the Court's September 16 Opinion & Order. (Dkt. 379 (the "Opinion & Order")).

3. The investigation in this case was conducted by the Manhattan District Attorney's office (the "DA's office"). In mid-2017, the DA's office brought the case to the U.S. Attorney's Office. In March 2018, a grand jury in this District indicted the defendant, Ali Sadr Hashemi Nejad, on six counts relating to the evasion of U.S. sanctions against Iran, bank fraud, and money laundering. Between April 2018 and January 2019, the AUSAs who obtained the indictment produced Rule 16 discovery to the defense, which included grand jury subpoena returns and emails seized through search warrants obtained by the DA's office.

4. When I was assigned to the case in April 2019, trial was set for October 21, 2019. Trial ultimately commenced on March 2, 2020 and ended on March 16, 2020. During my time on the case, I endeavored to act in accordance with the highest standards of ethical conduct and my obligations under the law as a prosecutor. In so doing, I always sought to be fully honest and candid with the defense and the Court.

1

**GX 411 Before Trial**

5.     I handled the trial in this case with AUSA-1, AUSA-2, and a Special Assistant U.S. Attorney from the DA's office (the "SAUSA") (collectively, the "trial team"). The trial team was supervised by Unit Chief-1 and Unit Chief-2 (collectively, the "unit chiefs").

6.     At trial, I was responsible for examining a witness who had been employed by the defendant's company, and for delivering the initial summation. AUSA-1 was responsible for examining a civilian witness and a bank witness, and for delivering the opening statement. AUSA-2 was responsible for examining a law enforcement witness, a Treasury Department witness, an expert witness from the Office of Foreign Assets Control ("OFAC"), and for delivering the rebuttal summation. The SAUSA was responsible for examining a bank witness, cross-examining the defendant, and introducing the bank records for the payments charged in the indictment. Each member of the trial team was also responsible for offering documentary exhibits and emails through paralegal witnesses.

7.     On December 19, 2019, the SAUSA sent an email to AUSA-2, copying me and AUSA-1, which included the following parenthetical statement: "(Now I'm really going off on a tangent, but Commerzbank was an intermediary bank in the first USD payment (to Stratus Turkey) and they actually picked up on "Stratus" in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC.)" (Ex. 1). This parenthetical comment appears to have been a reference to the document that was later marked GX 411.[1] I do not recall reading this email at the time or responding.

8.     On January 10, 2020, I was copied on an email from the SAUSA to AUSA-1, which attached GX 411. The email stated, "In the spirit of closing the loop on the $29M payment through Commerzbank, attached is the voluntary disclosure [Commerzbank] made to OFAC re: the payment." (Ex. 2). I do not recall reading this email at the time or responding.

9.     Later in January, I was copied on an email chain between the SAUSA and AUSA-1, which concerned obtaining a Commerzbank witness for trial, and which also referenced GX 411. (Ex. 3). I do not recall reading these emails at the time or responding.

10.    As explained in greater detail below, I do not recall reading GX 411 until Sunday, March 8, 2020, during trial. (*See infra* ¶ 34).

11.    I do not recall participating in any discussions about GX 411 before trial.

12.    I did not know before trial that GX 411 was obtained in a separate investigation by the DA's office, rather than from the Commerzbank subpoena returns in this case.

---

[1] The document was not marked as a government exhibit until March 7, 2020. For ease of reference, I will refer to the document as GX 411 throughout this declaration.

13. I did not know before trial that GX 411 had not been produced to the defense in discovery.

## Trial

14. Trial started on March 2, 2020. The Court sat full trial days Monday through Thursday and a half day on Friday, March 6.[2]

15. The Government expected to rest its case on Monday, March 9, and I expected to deliver the initial summation that Tuesday, March 10. After the half day of court on Friday, March 6, I spent the afternoon and evening working on the summation.

16. That Friday evening, at 7:48 p.m., I was copied on an email from AUSA-1 to the SAUSA, which stated: "I'm cleaning up email and came upon this [GX 411]. Given what defense did today, I think this could be really valuable to put in. Among other difficulties with doing that is the fact that I don't know that it was ever produced to defense (it's not in the Commerzbank subpoena production). [The SAUSA] – do you know where it came from?" (Ex. 4). I do not recall reading this email at the time or responding.

17. At 9:45 p.m., AUSA-1 sent an email to the trial team. At the bottom of email, AUSA-1 asked, "Can we all talk briefly tomorrow morning about the Commerzbank thing?" (Ex. 5). I do not recall reading this email at the time or responding.

18. The Opinion & Order describes chats that occurred on the evening of Friday, March 6, between AUSA-1 and AUSA-2 concerning GX 411. I was not involved in or aware of these chats. I first learned of the chats on June 30, 2020, in connection with the Office's preparation of its response to the Court's June 9, 2020 Order.

19. At 10:48 p.m., I sent an email to the unit chiefs, informing them that I would be working from home Saturday morning on the summation. (Ex. 6). Based on my emails, it appears that I stopped working on the summation around 1:07 a.m., on Saturday, March 7. (Ex. 7).

## Saturday, March 7

20. **Question #1:** The first time I recall discussing GX 411 was on Saturday morning, March 7, when AUSA-1 and AUSA-2 called me on a conference call. At some point, the SAUSA also joined the call. I recall that I was home at the time, that I had not read GX 411, and that I did not have my computer in front of me during the call.

21. I recall that AUSA-1 said on the call, in sum and substance, that: (1) she had found GX 411 in her emails the night before; (2) that GX 411 was good evidence of the defendant's guilt; (3) that GX 411 had not been produced to the defense in discovery; and (4) that we should try to offer GX 411 on Monday. I recall that AUSA-1 expressed concern about getting into a fight with

---

[2] The sections that follow are organized as a chronology. For the Court's reference, I have indicated within the chronology where I answer the six questions included in the Opinion & Order.

3

defense counsel over the document. Because AUSA-1 was talking about a document that I had not read, I do not recall contributing much to the discussion. I recall, however, that everyone agreed that GX 411 should be sent to the defense.

22. I do not recall any discussion during the phone call regarding how to send GX 411 to the defense. Specifically, I do not recall any discussion about what language to include in the transmittal email or whether to identify GX 411 as a document that had not been produced in discovery.

23. I do not recall anyone on the call stating that they believed GX 411 was exculpatory. Rather, my understanding on the call was that the document was solely evidence of the defendant's guilt.

24. **Question #2:** This phone call was the first time I learned that GX 411 had not been disclosed to the defense.

25. After this call, I was copied on a 10:48 a.m. email from AUSA-1 to the paralegal, which stated: "Can you let me know when you think you'll have a chance to mark this GX 411? If you won't be in for a while and can tell me how to do it, I'm happy to do it myself!" At 10:51 a.m., the paralegal replied all: "Hey, I'm at the gym right now but can do it as soon as I get back to my apartment. I should be done in about an hour. Is that okay?" (Ex. 8). I do not recall reading these emails, but they are consistent with my understanding from the phone call that AUSA-1 would have GX 411 marked as a government exhibit.

26. **Question #3:** I have provided under separate cover the communications regarding GX 411 or the disclosure of GX 411.[3]

27. The Opinion & Order states that "the Government states that the prosecutors discussed how to disclose GX 411 before sending [the transmittal] email" and that "according to their own after-the-fact account, the Government lawyers knew that GX 411 had not previously been disclosed, but nonetheless thought it best to call no attention to the document and hoped that the defense would stipulate to its authenticity with little fanfare." (Opinion & Order at 24).

28. To be clear about my recollection, as reflected in Associate U.S. Attorney McEnany's letter, I do not recall having a conversation with AUSA-1 regarding how to send GX 411 to the defense or what to say in the transmittal email. (Dkt. 354 at 12). This is also what I recall telling AUSA-1 in a conversation shortly after the Court issued its June 9, 2020 Order. During that conversation, I recall asking AUSA-1 whether the unit chiefs had seen the transmittal email before she sent it. I recall that AUSA-1 said no, but that she vaguely recalled speaking to

---

[3] I have provided the Court with a disc containing the email communications and chats from before trial to the end of trial that are responsive to the Court's Opinion & Order. I was unable to retrieve any text messages. I have marked as exhibits to the declaration the communications that I believed to be most relevant to the Court's questions. I have also described the in-person and telephone communications that I recalled and deemed responsive to the Court's questions.

either me or AUSA-2 about whether to identify GX 411 as a document that had not been produced in discovery.  I recall telling AUSA-1 then that I did not recall such a conversation.

29.     After the Saturday morning phone call with AUSA-1 and AUSA-2, I recall that I continued working on the summation from home and spent some time with my family.  At 12:51 p.m., 1:09 p.m., and 1:25 p.m., I sent the trial team brief emails from my iPhone in response to questions from AUSA-2 about the rebuttal summation.  I am not certain when I arrived at the office that day, but the first email I sent from my office computer was at 3:23 p.m.  I recall that I started working on the summation when I arrived in the office.  The only two emails I sent before being copied on the transmittal email concerned AUSA-2's rebuttal argument (at 3:23 p.m. and 3:38 p.m.).  (Ex. 9).

30.     At 4:04 p.m., AUSA-1 sent the transmittal email to the defense, copying the trial team.  (Ex. 10).  I do not recall participating in the drafting of the transmittal email or seeing it before it was sent.

31.     At 4:43 p.m., I replied all (including the defense) and stated: "Just to also flag that our position on [Prospective Witness-1] is also in the email below.  I also wanted to let you know that the Government is not going to offer GX 502, so no need to file a brief on that."  (Ex. 11).  I sent this email because GX 502 was an exhibit I was responsible for introducing, Prospective Witness-1 was a witness I was going to examine, and because the Court had directed the Government to inform the defense whether Prospective Witness-1 would testify by 5:00 p.m. on Saturday.  (Tr. 965).

32.     At 4:57 p.m., the defense responded to the transmittal email: "We request immediate disclosure of (1) where GX 411 came from, (2) how long it has been in the government's possession, (3) why we are only receiving it today.  This is the second episode— along with GX430, GX431, and GX432—of the government producing fundamentally exculpatory documents mid-trial.  In this instance, the document was produced after the government's OFAC witness, who would have been subject to cross-examination on this document.  Provide this information by 6 pm or we will see the intervention of the Court."  (Ex. 12).

33.     **Question #4:**  This was the first time I learned that GX 411 could be considered to be exculpatory.

34.     After I read the defense's 4:57 p.m. email, I recall that I read GX 411 for what I believe was the first time.  I decided to read GX 411 then because of the defense's claim that GX 411 was exculpatory evidence.

35.     GX 411 is a letter informing OFAC that a transaction Commerzbank processed may have violated U.S. sanctions against Iran because a Turkish company had received dollar payments for an Iranian project.  I remember thinking that GX 411 was consistent with the Government's theory that the defendant used front companies to evade U.S. sanctions, and that banks would have stopped such payments if they knew that they would benefit an Iranian company or person.  Even after having read the document, I still did not understand the defense's exculpatory theory.

5

36. At 5:23 p.m., AUSA-1 circulated to the trial team a proposed response to the defense's 4:57 p.m. email. (Ex. 13). I do not recall reading this email at the time or responding.

37. At 5:36 p.m., AUSA-2 sent the response (unchanged from AUSA-1's proposal) to defense counsel, copying the trial team. (Ex. 14). The response stated: "We do not agree with your characterization of GX 430, 431, 432, or 411 as *Brady*. These are all exhibits the Government has introduced or is seeking to introduce in our case. Perhaps you can explain how it is you think GX 411 is helpful to your case. In any event, we have been aware of the letter since mid-January. We thought it was part of the Commerzbank subpoena return that was produced in discovery. We now understand that it came from an unrelated DANY investigation, and therefore was not in the Commerzbank subpoena return. It is not clear to us how this document would have been relevant to the OFAC witness's testimony." I recall reading this response, but I do not recall participating in its drafting.

38. At 10:09 p.m., defense counsel wrote back to the trial team: "If you have been aware of the letter since mid-January, why wasn't it on the government's pretrial exhibit list instead of appearing the day before the government rests its case? The exculpatory nature of the exhibit is self-evident." (Ex. 15). I recall reading this email at the time, but I do not recall discussing this email with the trial team.

39. Separately, between 5:02 p.m. and 7:19 p.m., emails were exchanged between the trial team concerning a motion on proposed defense witnesses. AUSA-1 and AUSA-2 took the lead on this filing, and I provided suggestions in emails at 5:15 p.m. and 5:16 p.m. (Ex. 16). AUSA-1 and AUSA-2 sent versions of the motion to the unit chiefs, who provided detailed edits and suggestions. (Ex. 17). At 10:17 p.m., AUSA-1 sent an email about this motion, stating "[Unit Chief-1] has some worries that the cross stuff will come across as chilling. He's fine if we want to talk it through in the morning and then decide whether to leave it in when we file. So let's plan to do that." At the end of the email, AUSA-1 appears to make a reference to defense counsel's 10:09 p.m. email concerning GX 411. I do not recall reading this email at the time or responding.

40. I recall that I worked almost exclusively on my summation from when I arrived in the office until I sent a draft at 3:19 a.m., on Sunday, March 8.

### Sunday, March 8

41. At 3:19 a.m. on Sunday, March 8, I sent the draft summation to the unit chiefs and trial team, stating: "Still a work in progress, but here is a draft to review. I'm going to keep working on it tomorrow, but welcome any suggestions, and available to talk any time." (Ex. 18).

42. At 3:27 a.m., I replied to an email from AUSA-2, copying the trial team, which had provided suggestions to the summation. I stated, "Thanks! I accepted the changes and kept working until now. I sent a draft to the chiefs so they have it in the morning, since I'll probably try to sleep until around 9 (if kids allow). I'm planning to come in around 1." (Ex. 19).

6

43. Between 7:30 a.m. and 9:41 a.m., AUSA-1 and AUSA-2 exchanged emails concerning a response to the defense's email from 10:09 p.m. the night before. (*See supra* ¶ 38). I was copied on the following emails, but I do not recall reading them at the time or responding.

   a. At 7:30 a.m., AUSA-2 circulated a draft response to the defense's 10:09 p.m. email. (Ex. 20).

   b. At 7:54 a.m., AUSA-1 replied with comments to the draft response. (Ex. 21).

   c. At 9:32 a.m., AUSA-2 replied with a revised draft response. (Ex. 22).

   d. At 9:36 a.m., AUSA-1 replied with some proposed edits. (Ex. 23).

   e. At 9:37 a.m., AUSA-2 replied all, "Will send now.  Thanks!" (Ex. 24).

   f. At 9:41 a.m., AUSA-2 sent the response to the defense and copied the trial team. (Ex. 25).  The response stated: "As I explained in my last email, when we first saw the document in mid-January, we thought it had been part of Commerzbank's subpoena return and had been produced.  We didn't think it would be necessary to use given our other evidence about that payment.  Given some of the arguments you made on Friday, we decided that we did want to introduce it at trial.  Again, we don't see this document as exculpatory, as we would like to offer it tomorrow.  Can you please let us know your position on an authenticity stipulation for this document and the other bank records we sent yesterday, as well as whether you have any issues with the summary charts?"

44. At 11:52 a.m., the unit chiefs sent the trial team an email indicating that they had read the drafts of the summations.  I replied-all at 12:01 p.m., "Great.  At lunch now but heading in after.  Let me know if you want to meet or talk by phone." (Ex. 26).

45. At 12:14 p.m., the defense sent an email to the trial team, stating that they intended to request a curative instruction concerning GX 411.  The defense asked for a response by 2:00 p.m.  (Ex. 27).

46. At 12:16 p.m., AUSA-1 responded to the trial team, "Wtf." (Ex. 28).  At 12:23 p.m., I responded, stating, "Yeah, we do not consent." (Ex. 29).  My reaction was based on the fact that, at the time, I did not think the proposed instruction was appropriate as drafted.

47. After further reflection, at 12:48 p.m., I replied to the same email chain and stated, "What do you think about proposing a phone call on [the requested curative instruction] and the defense witnesses?" (Ex. 30).

48. At 12:53 p.m., AUSA-1 replied all, "That's fine, although I feel like it'll just be a scream fest." (Ex. 31).

7

49.     At 1:11 p.m., AUSA-2 replied all, "It'll just be a screamfest.  Unless there's specific information you think we'll get."  (Ex. 32).

50.     At 1:16 p.m., I replied all, "I think it's worth a try to avoid having this be a big blowout in court.  I'm happy to speak.  On the train now."  (Ex. 33).

51.     At 1:16 p.m., AUSA-1 replied all, "I talked to [Unit Chief-1].  Are you guys here / can we gather."  (Ex. 34).

52.     At 1:18 p.m., the SAUSA replied all, "There will be a blowup either way.  I had a perfectly civil conversation with [defense counsel] about GX 432 on the phone the night before.  Then he went bananas in court."  (Ex. 35).

53.     At 1:19 p.m., AUSA-1 replied all: "[Unit Chief-1] thinks we should say we're not offering [GX 411].  Then if they actually want it in themselves / can articulate some real *Brady* theory, we'll have to deal with it.  Apparently Crotty gave a similar instruction in Shulte."  (Ex. 36).

54.     At 1:29 p.m., I replied all, "I'm fine with that."  (Ex. 37).

55.     At 1:35 p.m., I sent an email to the trial team: "I'm focusing on slides and pulling from the transcript this afternoon.  If you guys have any suggestions about evidence or arguments that I'm missing, please send.  Trains were messed up, so walking from Fulton now."  (Ex. 38).  I arrived at the office around 10 minutes later.

56.     At 1:37 p.m., defense counsel ("Defense Counsel-1"), sent the trial team an email that, among other things, asked additional questions about GX 411, stated that the defense would stipulate to the authenticity of GX 411, and asked questions about other exhibits.  (Ex. 39).

57.     At 1:50 p.m., in an effort to engage with the defense on why they believed GX 411 was exculpatory, and to assess whether a curative instruction was appropriate, I replied all to the Defense Counsel-1's 1:37 p.m. email, stating: "Are you available to have a quick call about these points?  We also think it makes sense to confer about tomorrow.  Depending on who the defense plans to call in its case-in-chief, we may want to flag some potential areas of cross that you may have an objection to.  But it probably doesn't make sense for us to file now if you're not going to call those witnesses."  (Ex. 40).

58.     At 2:02 p.m., Defense Counsel-1 replied all to the earlier 12:14 p.m. email about the curative instruction, and stated "Do you consent to the proposed instruction?  We will file at 2:15 p.m. if we have not heard from you."  (Ex. 41).

59.     At 2:03 p.m., another defense counsel ("Defense Counsel-2), replied all to my 1:50 p.m. email and suggested speaking at 2:30 p.m.  (Ex. 42).

60.     At 2:04 p.m., I replied all to Defense Counsel-1's 2:02 p.m. email: "I wrote in response to your other email to see if the defense side wanted to have a call to discuss various

8

topics before filing more motions. I just saw [Defense Counsel-2] respond and suggest 2:30 p.m. That works for us. Can you hold off filing until after we speak?" (Ex. 43).

61. At 2:06 p.m., Defense Counsel-1 replied all, "I apologize. My email crossed with [Defense Counsel-2's]. We will not file anything on this until after the 2:30 call." I responded, "No worries. Thanks." (Ex. 44).

62. Shortly after 2:30 p.m., I recall that we had a call with the defense. I believe each member of the trial team participated in the call. I recall that the defense explained their exculpatory theory during the call, and that we told the defense, consistent with Unit Chief-1's guidance, that we would not seek to offer GX 411 during our case-in-chief. I also recall that we discussed the defense's proposed witnesses and possible areas of cross examination.

63. At 3:03 p.m., AUSA-1 replied all and stated, "Sorry, we had one more issue to raise if you're available." I may have participated in a second phone call, but I do not recall if I did or what issue was discussed. (Ex. 45).

64. At 3:21 p.m., the defendant filed a motion requesting a curative instruction. (Dkt. 274).

65. At 3:51 p.m., I sent an email to the trial team, stating "This could have been worse, I think." (Ex. 46). I remember thinking that the defense motion was reasonable and that we should consent to the requested instruction.

66. At 4:03 p.m., I sent the unit chiefs an email, copying the trial team, which attached the defense submission and stated, "This is what they filed." (Ex. 47).

67. At 4:04 p.m., Unit Chief-2 replied all, "Thanks. Can you send us the document itself?" (Ex. 48). At 4:06 p.m., I replied all and attached GX 411. (Ex. 49).

68. At 4:04 p.m., the Court issued an order directing the Government to respond to the defense motion by 7:00 p.m.

69. At 4:16 p.m., Unit Chief-1 replied, "Thanks. I dropped [the SAUSA] from this. Can we please have the full thread with the January transmittal email + attachment." (Ex. 50). At 4:20 p.m., AUSA-1 forwarded the SAUSA's January 10 email, and stated: "This is the chain. None of us responded. I briefly discussed with [the SAUSA]." (Ex. 51). I recall reading this email.

70. At 4:29 p.m., AUSA-1 sent an email to the unit chiefs, copying the trial team, regarding the separate defense witness issue: "We filed the letter on the expert de-risking testimony this morning, but per the chilling conversation w/[Unit Chief-1] last night and the team this morning, did not file the cross portion of the letter. Based on our conversation with defense, who wants us to tee up these issues, we're looking to file the attached under seal. This contains what you looked at last night, plus a section on their character witness." (Ex. 52). At 4:33 p.m., Unit Chief-1 replied all and stated, "We're working through the summations, but let's circle up in

9

15-20 mins to talk strategy." At 4:54 p.m., Unit Chief-1 replied all again, asking us to stop by his office. (Ex. 53). I recall being present for an in-person meeting, and I vaguely recall that the meeting concerned the proposed under-seal filing that AUSA-1 had sent.

71. At 5:01 p.m., the Court issued another order directing the Government to respond to specific questions concerning GX 411 by 7:00 p.m.

72. At 5:19 p.m., AUSA-1 sent the trial team an email, which stated, "I'll circulate a draft shortly." (Ex. 54). I continued working on the summation in my office.

73. At 5:58 p.m., AUSA-2 sent an email to three OFAC employees, copying the trial team, which attached GX 411 and asked whether OFAC took any actions in response to GX 411. (Ex. 55).

74. At 6:05 p.m., Unit Chief-2 sent me an email, copying Unit Chief-1, which attached my draft summation with detailed line edits, comments, and suggestions. (Ex. 56).

75. At 6:06 p.m., I replied all, "Thanks!" (Ex. 57). I began working on incorporating the edits into the summation.

76. At 6:25 p.m., AUSA-1 sent a draft response to the defense motion to the unit chiefs, copying the trial team. (Ex. 58). I do not recall reviewing AUSA-1's draft.

77. At 6:54 p.m., Unit Chief-2 sent the trial team a redline version of AUSA-1's draft response, copying Unit Chief-1. (Ex. 59).

78. At 7:00 p.m., AUSA-1 filed the response. (Dkt. 275). I do not recall participating in the drafting or editing of this letter, and I do not recall reading it until the next morning.

79. At 7:08 p.m., Unit Chief-2 sent an email to the trial team and Unit Chief-1 stating, "Sorry, can you guys swing by my office once you've filed this letter? Thank you!" (Ex. 60). I have a vague recollection of being present for an in-person meeting where GX 411 was discussed, but I do not recall what was said.

80. At 7:32 p.m., Unit Chief-1 sent an email to the trial team, "Really sorry to be annoying, but want to make sure we've put down a call and an email to OFAC on this issue – basically to the point in our letter about seeking to confirm their (non) response to [GX 411]." (Ex. 61). At 7:42 p.m., AUSA-2 replied all, stating "I emailed them. I can call them now." (Ex. 62). I recall reading this email chain.

81. At 8:05 p.m., Unit Chief-1 sent detailed line edits, comments, and suggestions to AUSA-2's rebuttal argument. Unit Chief-1 stated, "Thanks again guys. Long weekend, but you're in the home stretch and putting in the time to be successful as we close it out. We really appreciate it." (Ex. 63). I recall reading this email.

82. At 8:43 p.m., I sent an email to our paralegal, asking "Are you still working on the PowerPoint, or can I go into it now?" (Ex. 64). I continued working on the summation and recall that I started working on the accompanying PowerPoint slides in my office.

**Question #5:  The 10 p.m. Letter**

83. At 9:05 p.m., the Court issued another order. At 9:15 p.m., AUSA-2 forwarded the order to the unit chiefs, copying the trial team. (Ex. 65). I recall that I read the order and saw that the deadline for our response was 10 p.m. I believed that AUSA-1 would draft the response with input from the unit chiefs.

84. At 9:22 p.m., Unit Chief-1 replied all, "Thanks guys, we're around to turn the draft." (Ex. 66). I recall reading this email.

85. At 9:31 p.m., I recall receiving an email from AUSA-1 attaching a draft response. (Ex. 67). I did not notice at the time that AUSA-1 had not copied the unit chiefs on the email. I do not recall reviewing the draft response.

86. Around that time, I recall that AUSA-1 came to my office and told me that she felt sick and had to go home. I do not recall AUSA-1 mentioning the pending response to the Court's order. I continued working on the summation.

87. At 9:31 p.m., Unit Chief-2 sent an email to the trial team and Unit Chief-1, which stated "Can you guys forward the transmittal email we sent to [the defense] when we produced the doc yesterday?  Thanks." (Ex. 68). I do not recall seeing this email until AUSA-2 replied all, at 9:41 p.m., and attached the transmittal email. (Ex. 69).

88. Around 9:49 p.m., I noticed that the 10 p.m. deadline was fast approaching, and that the unit chiefs had not yet responded with a redline. I recall that I then looked at AUSA-1's email and saw for the first time that the unit chiefs had not been copied.

89. Because I believed that the unit chiefs expected to review the letter before filing, I forwarded AUSA-1's draft (unchanged) to the unit chiefs, copying AUSA-1 and AUSA-2, and stated, "Not sure [AUSA-1] sent this to you." (Ex. 70). I did not open or read AUSA-1's draft before forwarding it to the unit chiefs.

90. I recall that shortly thereafter, the unit chiefs called me. I recall that I was in my office and that it was a brief phone call. I recall that both unit chiefs were on the call, and that one or both of them provided comments to the draft. Below is a redline of the changes to the draft that I created after the Court's June 9, 2020 Order:

11

> Dear Judge Nathan:
>
> The Court writes in response to the Court's order from 9:00 this evening. The Government apologizes for the lack of clarity in its prior email.
>
> The Government found GX 411 in its emails on Friday night, looked at the ~~Commerzbank~~Bank-1 subpoena production, and did not find it. The members of the team discussed the document the next morning and confirmed that it likely had not been produced to the defense previously. The Government promptly had a paralegal ~~stamp~~mark it ~~later in the day,~~as an exhibit and produced it to the defense~~.~~ along with other exhibits and 3500 materials. The Government ~~did not specifically identify~~made clear that GX 411 ~~had not previously been produced in discovery~~was a newly marked exhibit and that we intended to offer it, and asked the defense if they would stipulate to authenticity. Defense counsel responded shortly after the Government provided GX 411 and asked how long the Government had GX 411, and why they had not previously received it. The Government responded and explained that we had been aware of the letter since mid-January, and that, at the time, the Government had mistakenly believed ~~that~~ it was part of the discovery in the case.
>
> When SAUSA Lynch sent what is now GX 411 to the AUSAs in the case in January, the AUSAs assumed that this was a document that came from this case (specifically, the subpoena to ~~Commerzbank~~Bank-1), and that it was therefore a document that had been previously produced to the defense as part of the Rule 16 discovery. This was an incorrect assumption. The document in fact was obtained in an unrelated DANY investigation and was not provided to this Office before January 2020.

91. I do not recall the specific comments that the unit chiefs provided. But I do recall that the changes I made were based on what I understood at the time to be the unit chiefs' requests. I recall that I then proofread the draft, converted it to PDF format, logged on to ECF, and filed the letter. I acknowledge that I may have misunderstood the unit chiefs' comments over the phone or inadvertently made an error in a rush to meet the filing deadline. But at the time I filed the letter, I did not understand that the letter was inaccurate or misleading. I did not at any time intend to mislead the Court.

92. At 10:01 p.m., after filing the letter, I emailed AUSA-2, and stated, "They [the unit chiefs] called me with some changes. I made them and filed." (Ex. 71). This email was in response to a 9:55 p.m. email from AUSA-2 to the trial team and unit chiefs, which had stated, "And really sorry for the quick turnaround – the order said we had to file by 10."

93. At 10:02 p.m., AUSA-2 responded, "ok." (Ex. 72).

94. At 11:03 p.m., Unit Chief-2 sent an email to me, AUSA-1, AUSA-2, and Unit Chief-1, which stated, "Thanks guys. Can you forward along any reply [to the 10 p.m. letter]? Thank you." (Ex. 73). I recall reading this email.

12

95. At 11:15 p.m., AUSA-2 sent an email to me and the unit chiefs, which attached the defense reply. (Ex. 74). It appears that I did not see AUSA-2's email, because, at 11:19 p.m., I also sent the defense reply to the unit chiefs, AUSA-1, and AUSA-2. (Ex. 75).

96. At 11:23 p.m., Unit Chief-2 responded, "Thank you. We'll leave you guys alone tonight unless you need us. Hang in there—we'll get through this just fine. We're excited for your summations." (Ex. 76). I recall reading this email.

97. At 11:30 p.m., AUSA-2 replied all and attached a second set of replies from the defense. (Ex. 77). At 11:34 p.m., Unit Chief-2 replied all and stated, "Did we (it doesn't matter who) respond to their last email at 1:30? Can you guys please forward us all correspondence relating to this document?" (Ex. 78). At 11:35 p.m., AUSA-2 replied all and stated, "We spoke to them by phone at 2:30 and walked through each category of their questions. I think this is it but will double check." (Ex. 79). I recall reading this email chain, but I do not recall responding.

98. I do not recall exactly when, but sometime during the evening of March 8, I recall that the unit chiefs told me that they wanted me to take the lead in court on responding to questions about GX 411.

99. After filing the letter at 10 p.m., I continued working in my office on the summation and slides until around 2 a.m.

**Monday, March 9**

100. At 1:09 a.m., on March 9, the Court issued an order, stating that Court would begin at 8:30 a.m. The Court stated that the Government should be prepared to discuss its representation "that it 'made clear' in its March 7 correspondence with Mr. Sadr's counsel 'that GX 411 was a newly marked exhibit.'"

101. At 2:04 a.m., I sent an email to the unit chiefs and the trial team, which attached the latest version of the closing argument. (Ex. 80). I stated in the email, referring to the PowerPoint, "The slides are also 90% done if you want to review." I recall that I left the office after sending this email.

102. At 5:48 a.m., AUSA-2 sent the Court's March 9, 1:09 a.m., order to the unit chiefs, copying me. (Ex. 81).

103. At 7:24 a.m., Unit Chief-2 replied all and stated: "Thanks guys. I know you've got this, but I think we need to fall on our sword big time here. We didn't make that clear in the transmittal email and shouldn't have represented that we did. We'll see you soon. It's going to be ok." (Ex. 82).

104. I understood Unit Chief-2's email to mean that I should apologize on behalf of the team in court that morning. At 7:34 a.m., I replied all, "I'm ready to fall. I'm here if you'd like to discuss." (Ex. 83).

13

105. At 7:58 a.m., I sent an email to the trial team: "I will handle the argument about GX 411. Can one of you handle: (1) making sure we have admitted everything we want to admit as exhibits; (2) arguing defense exhibits?" (Ex. 84).

106. At 8:00 a.m., AUSA-2 replied all: "Yes. I can also put in [AUSA-1]'s stuff and put [the civilian witness] on." (Ex. 85). I replied all, "Great, thanks!" (Ex. 86).

107. Before going to Court, I recall reviewing the relevant documents concerning GX 411, including the exhibit, the transmittal email, the email correspondence with defense counsel, the defense motion, the Court's orders, the 7 p.m. and 10 p.m. letters, and the defense replies. I tried my best to prepare to address all of the issues surrounding GX 411 with the Court.

108. I do not recall discussing GX 411 or the 10 p.m. letter with the unit chiefs before Court that morning.

109. I arrived in court shortly before 8:30 a.m.

110. At 8:37 a.m., I sent an email to the SAUSA asking him to come to court. (Ex. 87). I recall that the SAUSA arrived in court shortly thereafter. AUSA-2 and the SAUSA sat with me at counsel table. The unit chiefs were present in the courtroom gallery.

111. That morning, I attempted to provide the Court with candid and accurate information, based on my own personal knowledge, on my review of the filings, and on what others on the team had told me.

112. **Question #6:** As to the 10 p.m. letter, I did not appreciate in court that morning that the accurate sentence responsive to the Court's question had been edited or deleted. Before court, I had focused on the letter filed at 10 p.m., and the language that the Court had asked about in the 1:05 a.m. order. I did not review AUSA-1's earlier draft or compare it to the letter I filed on ECF. The first time I appreciated the change at issue was when I created the redline above after the Court's June 9, 2020 Order.

### **The March 9 Letter**

113. On March 9, the Court directed the Government to submit a letter regarding GX 411 and any contacts that the Government had with OFAC.

114. At 9:23 a.m., an OFAC official replied all to AUSA-2's email about GX 411 from 5:58 p.m. Sunday, March 8. (*See supra* ¶ 73). The OFAC official stated: "Do you know who or what division in OFAC this letter was sent to? I'm searching our records now. We may not be able to get you a comprehensive answer this morning." At 10:04 a.m., AUSA-2 replied all, "I don't. I'm adding my chiefs to this chain." At 10:25 a.m., Unit Chief-1 responded, "what number can we reach you at?" At 10:50 a.m., the OFAC official sent a phone number. (Ex. 88). I was in court and do not recall reading these messages at the time.

14

115. At 4:07 p.m., AUSA-2 replied all to the OFAC official's message, "just tried your cell. Please let me know when you're free to talk. Thanks." At 4:36 p.m., the OFAC official stated that he was available for a phone call. (Ex. 89).

116. I recall that AUSA-2 was handling a witness in court at the time, so I stepped out of court and called the OFAC official. At 4:49 p.m., I emailed myself notes from that call. (Ex. 90).

117. At 6:18 p.m., AUSA-2 sent me an email, which appears to contain her notes on GX 411 and OFAC. I do not recall reading this email. (Ex. 91).

118. At 6:24 p.m., I sent the unit chiefs the January 10, 2020, email from the SAUSA, which had attached GX 411. (Ex. 92). AUSA-1 had previously sent the unit chiefs this email (*see supra* ¶ 69), but it appears the unit chiefs asked me to send it again.

119. At 6:26 p.m., the SAUSA sent me a draft declaration and the email communications he had with OFAC concerning this case. (Ex. 93). At 6:32 p.m., I forwarded these materials to AUSA-2 and the unit chiefs. (Ex. 94).

120. At 6:43 p.m., after I reviewed these materials, I sent an email to the unit chiefs and AUSA-2, which stated, "Email on page 15 references the powerpoint. We don't have the powerpoint included. Asking [the SAUSA] now." (Ex. 95).

121. At 6:44 p.m., I sent a follow-up email to the unit chiefs and AUSA-2: "[The SAUSA] says he can't find the sent email. So doesn't know exactly which powerpoint was sent. [One of the AUSAs who charged the case ("AUSA-4")] is on the email, though, so maybe he has it." (Ex. 96).

122. At 6:46 p.m., AUSA-2 sent AUSA-4 an email copying me, requesting the email with the PowerPoint attached. (Ex. 97).

123. At 6:47 p.m., Unit Chief-1 sent me, AUSA-2, and Unit Chief-2 an email, "Makes sense to give [AUSA-4] a call. Thanks guys." AUSA-2 replied all, "We just emailed and called. Will keep you posted." (Ex. 98).

124. At 7:00 p.m., AUSA-4 forwarded the email with the PowerPoint attached to me and AUSA-2. At 7:01 p.m., AUSA-2 forwarded the email and attachment to the unit chiefs, copying me. (Ex. 99).

125. At 7:07 p.m., I sent the SAUSA an email asking, "What's the exact date you became a SAUSA." At 7:20, the SAUSA replied, "June 6, 2017." (Ex. 100).

126. At 7:19 p.m., AUSA-2 circulated to me, the SAUSA, and the unit chiefs a proposed email to send to the defense. (Ex. 101). I recall reading the email but do not recall suggesting any changes.

15

127. At 7:25 p.m., AUSA-2 sent defense counsel an email, copying me and the SAUSA, which stated: "Attached are email communications with OFAC related to this case that the SAUSA found today. The PowerPoint attached at the end of this PDF was attached to the SAUSA's email on Page 15 of the PDF. Please see, in particular, Pages 7 and 15 of the PDF. We will describe these materials in our letter to the Court this evening, but we are producing all of it to you now. Also, we agree to the stipulation you presented to the Court this afternoon. If you'd like to discuss any of the attached or revisions to the stipulation, we are available any time." (Ex. 102).

128. At 8:40 p.m., I sent a draft of the OFAC letter to the unit chiefs, AUSA-1, and AUSA-2. (Ex. 103).

129. At 9:58 p.m., Unit Chief-1 replied all to my 8:40 p.m. email and asked, "Can you send me [exhibits] a and b please." At 10:10 p.m., AUSA-2 replied all and attached the exhibits to the draft letter. (Ex. 104).

130. At 10:11 p.m., Unit Chief-1 replied all and asked, "Did we produce the document in the material [Prospective Witness-2] gave to us?" AUSA-1 had been assigned to examine Prospective Witness-2 and had produced 3500 materials for that witness to the defense. At 10:22 p.m., AUSA-1 replied all, "Yes we produced the [Prospective Witness-2] documents." (Ex. 105).

131. At 10:20 pm., Unit Chief-1 emailed me, copying Unit Chief-2, and asked me to "fill this in and add any more detail you got from the call" with the OFAC employee. At 10:22 p.m., I replied all with the additional information. (Ex. 106).[4]

132. At 10:48 p.m., Unit Chief-1 sent a revised version of the letter to the trial team and Unit Chief-2. (Ex. 109).

133. At 10:58 p.m., I replied all and said, "Looks good. One tiny nit in the attached." (Ex. 110). At 11:02 p.m., AUSA-2 replied all and said, "Minor nits." (Ex. 111).

134. At 11:45 p.m., Unit Chief-2 emailed me, the SAUSA, AUSA-2, and Unit Chief-1, and attached a final version of the OFAC contacts letter. The email stated, "Here's a final version from us. We are signed off. [The SAUSA], please make sure this is accurate: That same day, [the SAUSA] located GX 411 in a hard copy file at his DANY office; [the SAUSA] had segregated [the] letter from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so." (Ex. 112).

135. At 11:53 p.m., the SAUSA replied all, and stated: "That's right." (Ex. 113).

---

[4] After trial, on April 14, 2020, I sent an email to the same OFAC official, copying the unit chiefs and AUSA-2, asking if the official could learn more about what OFAC did in response to receiving GX 411. On April 27, 2020, the OFAC official provided additional information in an email. (Ex. 107). I produced this email chain to the defense in post-trial discovery. Additionally, on April 17 and 21, 2020, I had phone calls with another OFAC official to determine what, if anything, OFAC did after receiving information regarding this case from the SAUSA. (Ex. 108). I produced the notes from these phone calls to the defense in post-trial discovery.

136. Shortly before midnight, AUSA-2 filed the letter on ECF. (Dkt. 283).

## Other Issues

137. I will briefly address other issues raised in the Court's Opinion & Order.

138. The Opinion & Order discusses the email search warrants executed by the DA's office.

   a. When I joined the case in April 2019, I understood that all responsive emails seized pursuant to the DA's office's warrants had been produced in discovery. In or about mid-August 2019, I learned that the DA's office had, during its search process, identified additional emails as responsive to its search warrants, and that some of the responsive emails from third-party accounts had not been produced in discovery.

   b. After Your Honor was assigned the case, I raised this issue at a conference on September 9, 2019. (Dkt. 137). On September 17, 2019, I arranged for the production of 622 additional emails to the defense and informed the Court of this production by letter. (Dkt. 134, 142).

   c. I helped the trial team handle the resulting suppression litigation. Based on discussions with the SAUSA and other members of the DA's office, I understood that the DA's office had been solely responsible for conducting all of the email searches in the case, and that they had only searched for evidence of the state law crimes listed on their warrants.

139. The Opinion & Order discusses the audio recording of a January 22, 2020 interview with Bahram Karimi.

   a. On February 5, 2020, I produced the notes and reports from three interviews and one phone call with Karimi, including the January 22 interview. In my cover email, I informed defense counsel that the January 22 interview was recorded by Canadian law enforcement, and that they had not yet provided a copy of the recording. (Ex. 114).

   b. I asked the case agents three times before trial—once in person on January 31, and twice by email on February 5 and 18—whether they had received the recording from Canadian law enforcement and was told each time they had not. (Exs. 115, 116).

   c. After trial, on March 30, I learned for the first time that the FBI's office in Canada had received the recording on February 4, and that the case agents had received the recording on February 12. On March 31, 2020, the trial team, in consultation with the unit chiefs, provided the recording to the defense in post-

       trial discovery, along with a letter explaining the late disclosure. (Ex. 117). The same day, the trial team filed a letter informing the Court of the late disclosure. (Dkt. 303). On April 13, 2020, the trial team filed an additional letter with exhibits on this issue. (Dkt. 307).

140. The Court's Opinion & Order discusses the interview reports for Victor Aular.

   a. On January 10, 2020, the SAUSA sent the interview reports to the trial team and raised the possibility of trying to locate Aular as a witness for the Government's case. (Ex. 118).

   b. On January 30, 2020, I sent an email to AUSA-1 and AUSA-2, stating "Did we ever respond to [the SAUSA] on this? Do you guys think it's worth trying to track [Aular] down." (Ex. 119).

   c. AUSA-1 replied all a few minutes later and stated: "My view was that this was all very interesting, but unlikely to advance the ball at trial. This was because he denied knowing Sadr, and based on my view that the fact that the payments were made to IIHC in U.S. dollars isn't going to be too tough to establish." (Ex. 120).

   d. I replied all a few minutes later: "Got it. If he denied knowing Sadr, do you think it's Brady we need to disclose?" (Ex. 121).

   e. AUSA-1 replied all a few minutes later, "I don't think he should have known Sadr, given their respective positions. But could be worth running by a chief." (Ex. 122).

   f. I recall that I thought about AUSA-1's response. Aular is a former Venezuelan government official who had expressed concerns for his safety, and the interview reports established that he did not know the defendant and did not deal with the defendant's company. It was my judgment, which I understood to be shared by the trial team, that Aular's statements were not exculpatory or otherwise discoverable. I agree that it would have been better practice, however, to raise this issue with the unit chiefs before trial.

   g. On April 3, 2020, the trial team, along with the unit chiefs, decided to produce the Aular reports in post-trial discovery. The cover letter to the defense stated: "Although they do not constitute Rule 16, Jencks Act, *Brady*, or *Giglio* material, and although we have no obligation to produce them, we are enclosing as a courtesy reports of interviews and correspondence with other individuals who provided substantive information relevant to this case but were not called as witnesses at trial." (Ex. 123). This letter was drafted in consultation with the unit chiefs. (Ex. 124, 125).

141. The Court's Opinion & Order discusses classified information produced to the defense after trial.

   a. My understanding when I joined the case was that there was no classified information related to this case. (Dkt. 32 at 18).

   b. In late March, after the trial team learned that the case agents had the Karimi recording, the trial team and unit chiefs decided that it was prudent to conduct an in-person review of the entire FBI case file. This review was delayed, however, due to precautions associated with the COVID-19 pandemic.

   c. On May 18, I went in person to the FBI's New York office to review the file with the case agents. During this review, I learned of classified reports that I had not known about. I informed the unit chiefs of this additional information and requested that the FBI immediately declassify the reports.

   d. On May 19, the reports were declassified, and I produced them to the defense in post-trial discovery.

   e. On May 19, the case agents also informed me of additional classified information that I had not known about. The case agents stated that they were also not aware of this information. I immediately informed the unit chiefs.

   f. On May 26, the Government notified the Court and defense counsel that it was working with the FBI to obtain authorities necessary to produce this additional information to defense counsel in post-trial discovery. (Dkt. 343 at 3).

   g. On June 5, the Government requested a *nolle prosequi* order from the Court. (Dkt. 348). Because the Court dismissed the indictments, the classified information that I learned about on May 19 was not produced to the defense.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing information is true and correct.

Dated:    New York, New York
          October 16, 2020

_____
Michael K. Krouse
Assistant United States Attorney