Brian M. Heberlig
202 429 8134
bheberlig@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

**Steptoe**

November 13, 2020

**ORIGINAL FILED UNDER SEAL[1]; UNSEALED BY FEB. 17 ORDER**

By ECF

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

    Re:  *United States v. Ali Sadr Hashemi Nejad*, Case No. 18-cr-224 (AJN)

Dear Judge Nathan:

On behalf of Defendant Ali Sadr Hashemi Nejad, we respectfully respond to the United States Attorney's Office's October 30, 2020 letter brief (Dkt. 390) and the prosecutors' October 16, 2020 declarations submitted in response to this Court's September 16, 2020 Order. *See* Dkt. 379 at 34.

We defer to the Court's discretion in determining whether to conduct additional fact-finding proceedings or make credibility determinations. To aid the Court, and mindful that the Court's concern after the dismissal of Sadr's case is with the larger issue of the credibility of the U.S. Attorney's Office (*see* Dkt. 379 at 3, 12-13, 33-34; Tr. 996-98), we respond to the Office executive leadership's supplemental submissions of October 30, 2020 (Dkts. 390, 392), and note some remaining unanswered questions.

    1.    <u>Did government attorneys intentionally withhold exculpatory information</u>? (Dkt. 390 at 1)

The Office reiterates the prosecutors' statements that each of them always viewed GX 411 as a wholly inculpatory document, and maintains the prosecutors' sworn statements and their "immediate, real-time reactions to defense counsel's *Brady* assertion" on March 7 are conclusive. *See* Dkt. 390 at 1-2.

---

[1] Sadr is filing this letter under seal because it discusses declarations and exhibits the government has requested remain under seal. For the reasons stated in Dkt. 389, Sadr requests that the Court unseal this letter in its entirety along with the declarations and exhibits.

The Hon. Alison J. Nathan
November 13, 2020
Page 2

An e-mail exchange among the government's trial team on January 31 and February 1, 2020, however, calls into doubt whether the entire trial team viewed GX 411 as 100% inculpatory. *See* Dkt. 379 at 29. In that exchange, SAUSA Lynch described Commerzbank's voluntary disclosure to OFAC (i.e., GX 411) as an "asterisk with Commerz," that raised "whether it's worth having the Commerz witness go into that," and suggested the team should "discuss how we would want to handle"—suggesting a possible reluctance to call a witness who might reveal the disclosure contained in GX 411. All four prosecutors were on this email exchange. *See id.* (citing Dkt. 341 at 8). The government ultimately did not call a Commerzbank witness.

The prosecutors' January 31-February 1 email exchange was first disclosed on May 21, 2020, two months after trial. Despite multiple opportunities and even orders, the government has never satisfactorily explained this exchange:

- Sadr brought the email exchange to the Court's attention the day after disclosure. *See* Dkt. 341 at 8-9. The government did not respond. Instead, on the day its *Brady* response was due, the government moved to drop the case. *See* Dkt. 348, 348-1.

- In its June 9, 2020 Order, this Court asked specifically: "Do the disclosures made by the Government after trial on May 21, 2020, discussed in Dkt. 341 at 7-9, cast doubt on any representations made to the Court, including in the March 9, 2020 letter, about the prosecution team's awareness of the contents of GX 411?" Dkt. 350 at 3 (Question 5).

  In its July 2, 2020 response, the Office leadership quoted the question (Dkt. 354 at 8), but did not answer it. The government's brief mention of the January 31-February 1, 2020 email exchange addressed only prosecutors' awareness of GX 411's provenance and nondisclosure, not its content. *See* Dkt. 354 at 9-10. The government said nothing about whether the email exchange cast doubt on the government's March 9, 2020 representations that the prosecutors always viewed GX 411 as nothing but inculpatory. *See* Tr. 981-86, 991-92.

- On July 3, 2020, the defense pointed out the government's failure to address this point. *See* Dkt. 355 at 3. The government did not respond.

- In its September 16 Order, this Court yet again pointed out that the January 31 and February 1 emails "call the Government's contention into doubt." Dkt. 379 at 29. The Court's discussion was directed specifically at whether the prosecutors ever saw exculpatory value in GX 411. *See id.* The Court again specifically invited the Office to respond. *See id.* at 33, 34. The Office's October 30, 2020 letter again ignores the question. *See* Dkt. 390 at 1-2.

The Hon. Alison J. Nathan
November 13, 2020
Page 3

      This Court and the defense both immediately recognized the exculpatory value of GX 411 upon first seeing it.  *See* Tr. 980-81, 994-95 (Court); Tr. 1111-1113 (defense).  Both of the Unit Chiefs also recognized its exculpatory value on sight.  *See* Bove Decl. at 16 ¶ 43; Crowley Decl. at 2 ¶ 2.c.  "On its face, it's not a good piece of evidence for the government."  Tr. 980-81.

      The Office nonetheless maintains that the prosecution team "missed GX 411's exculpatory features," accepting their statements that they did not appreciate, or intentionally try to hide, GX 411's exculpatory value.  Dkt. 390 at 1-2.  But even if the exculpatory value of Commerzbank's disclosure was not apparent to the line prosecutors when SAUSA Lynch first emailed in December 2019 that Commerzbank had "actually picked up on 'Stratus' in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC," Lynch Ex. 1 at 1 (Dec. 19, 2019 email), or on February 1, 2020 when SAUSA Lynch emailed that this disclosure (GX 411) was an "asterisk" that the team should "discuss how we would want to handle," Lynch Ex. 4 (Jan. 31 and Feb. 1, 2020 emails), it should have been readily apparent by the end of the first week of trial. *See* Tr. 986; Dkt. 379 at 29.

      By that time, the prosecution team well understood Sadr's defense that he believed these transactions were lawful and that they would not subject either him or the banks to OFAC enforcement.  Indeed, SAUSA Lynch captured these contentions in a list of defense themes he circulated on March 7, 2020—the same day the prosecutors discussed their shared recognition that GX 411 had not been disclosed to the defense.  *See* Krouse Decl. Ex. 9 at 2 (SAUSA Lynch March 7, 2:25 PM email summarizing defense themes); Lake Decl. at 3, ¶ 6 (confirming that on Saturday morning, March 7, "nobody" on the case team "thought GX 411 had been produced").

      On Sunday afternoon, March 8—after the parties' contentious meet-and-confer call, but before this Court ordered any explanation—the Unit Chiefs assessed the prosecution team's attitude toward *Brady*:

> Emil J. Bove 4:16 PM:
> we need to sit down with these guys
> they need to scrub, tonight
> and be sure they are in compliance with brady
> bc they are going to be asked in open court what they did
> and right now it is, actually we don't give a shit.
>
> Crowley, Shawn (USANYS) 4:18 PM:
> yes i agree

Crowley Ex. 9 at 1.

      The Court's questions regarding whether the prosecutors ever recognized any exculpatory value for GX 411 prior to March 8, 2020 remain unresolved.

The Hon. Alison J. Nathan
November 13, 2020
Page 4

        2.      <u>Did government attorneys attempt to intentionally mislead the Court regarding whether they deliberately concealed from the defense that GX 411 had not been previously disclosed?</u>  (Dkt. 390 at 2)

The night of Sunday, March 8, "the Court asked the Government a direct question: When and how did it inform the defense of the failure to timely *disclose* GX 411?" Dkt. 379 at 26.  "[T]he Government did not respond to that direct question with a direct answer." *Id.*  This Court has already determined that the answer the government gave was a misrepresentation. *See id.* ("[T]hat was not the truth."); Tr. 991 ("That was false.").  The question remains: was that intentionally so?

In court on March 9, the government stated it was not.  The government said its letter was "imprecise," Tr. 991, and that the prosecutors "could have been more proactive in communicating" to the defense that GX 411 had not previously been disclosed, Tr. 992.  But it insisted, "We weren't trying to hide anything." *Id.*

What the government did not reveal in court that morning was its weekend strategy "to 'bury' GX 411 by deceptively hiding it among several other documents that had previously been disclosed." Dkt. 379 at 27; *see id..* at 22-25; Dkt. 354 at 11.  Contrary to the March 9 representation to the Court, that strategy was designed precisely to hide (in plain sight) the fact that GX 411 had not been disclosed before—a fact every one of the trial prosecutors knew on Saturday morning, March 7.  *See* Lake Decl. at 3 ¶ 6; Krouse Decl. at 3 ¶ 21; Dkt. 379 at 23 ("[T]he bulleted list deliberately obscured the fact that GX 411 ... had not been previously turned over to the defense").

"Bury it" can have no other meaning.  The suggestion originated in a discussion between AUSA Lake and AUSA Kim about "how to disclose the document if it had not been previously-produced." Lake Decl. at 3 ¶ 5.  In the same chat, AUSA Lake openly noted the "'need to come up with some explanation for why the defense is just seeing this for the first time.'" Dkt. 379 at 22 (quoting Dkt. 354 at 11); *see* Kim Ex. 19.  Though AUSA Lake states her intent was "not to hide the document" itself "from the defense," Lake Decl. at 3 n.4, she admits it was an attempt to hide the document's significance: "It was a wrongheaded attempt to avoid signaling to the defense that we viewed GX 411 as essential to our case." *Id.*  Even if the Court credits this explanation, it is still flatly inconsistent with the in-court representation that "We weren't trying to hide anything." Tr. 992.

AUSA Lake was not in court when that representation was made.  But AUSA Kim, who had responded "that's fine too" to AUSA Lake's proposal,[2] was in court and sat silent.

---

     [2] AUSA Kim now insists that she "never used or adopted the word, 'bury,'" and that "it never crossed my mind to do any such thing." Kim Decl. at 2 ¶ 6.b.  She states she "was not intending or agreeing to 'bury' or hide anything," but instead "was focused on just the opposite: on getting the document to the defense so they could review it." *Id.* at 8 ¶ 26.b.  In real time, however, when AUSA Lake said, "i'm wondering if we should wait until tomorrow and bury it in some other documents," AUSA Kim replied, "that's fine too – some of the FATF stuff" (*i.e.*,

The Hon. Alison J. Nathan
November 13, 2020
Page 5

AUSA Lake and AUSA Krouse disagree about whether AUSA Krouse was involved in the strategy of how to disclose GX 411 to the defense. AUSA Lake recalls "having a conversation with AUSA Krouse while I was drafting the transmittal email about whether we needed to highlight for the defense that GX 411 had not been previously produced." Lake Decl. at 9-10 ¶ 25; Dkt. 354 at 12. Her recollection is that she and AUSA Krouse agreed that "the defense would be aware that it was a newly produced document, so it would be sufficient to produce it without doing so and to wait for the defense to raise the issue." Lake Decl. at 10 ¶ 25; Dkt. 354 at 12; *see* Dkt. 379 at 24.

AUSA Krouse denies recalling any such conversation. Krouse Decl. at 4 ¶ 28. He told Associate U.S. Attorney McEnany he did "not recall being consulted about the transmittal email or seeing it before it was sent, and believes he would remember any discussion about how the item should be produced had he participated in one." Dkt. 354 at 12; Krouse Decl. at 4 ¶ 28. AUSA Krouse also told AUSA Lake, shortly after this Court issued its June 9, 2020 Order, that he "did not recall such a conversation." Krouse Decl. at 4-5 ¶ 28.

But AUSA Krouse's in-court statements on March 9 echo the reasoning AUSA Lake says she discussed with him. AUSA Krouse told the Court that the "government's view, wrongly or rightly, was that the defense would realize that this was a new exhibit because we had never produced it and never marked it and never asked for the authenticity for it" (Tr. 992-93)— precisely the view that AUSA Lake recalls discussing with AUSA Krouse "while [she] was drafting the transmittal email." Lake Decl. at 10 ¶ 25; *see also* Dkt. 354 at 12.

The Unit Chiefs who backed up the government's representation that its March 8 letter arose from "a lack of precision ... as opposed to an intentional issue" (Tr. 997) do not appear to have known of the line prosecutors' express decision to "bury" GX 411 among thirteen other already-disclosed documents. That decision was not revealed until the Office leadership's subsequent investigation in June. *See* Dkt. 354 at 11-12; *see also* Lake Decl. at 3 (not mentioning any discussion of this decision with the Chiefs). Indeed, the night of March 8, 2020, the Unit Chiefs complained to one another that the trial team had not informed them of all the facts regarding how GX 411 was turned over. *See* Bove Ex. 29 (11:32 p.m. text exchange).

But by the next morning, before court convened, the Chiefs had concluded that the transmittal email was deceptive. Chief Crowley, after reviewing the transmittal email and the March 8 10 p.m. letter, came to "fully appreciate[] that the March 8 10 p.m. Letter did not accurately convey how GX 411 had been produced to the defense." Crowley Decl. at 14 ¶ 34. She texted Chief Bove that "it was apparent that we, the Government, had 'lied in that letter' by failing to accurately respond to the Court's question about whether the Government had identified GX 411 as not having been previously produced." *Id.* ¶ 35 (quoting Crowley Ex. 39, at 1). She then emailed the trial team that "I think we need to fall on our sword big time here.

---

she suggested burying it in some other evidence that AUSA Kim intended to introduce Monday). Kim Decl. at 7 ¶ 26.a & n.11.

The Hon. Alison J. Nathan
November 13, 2020
Page 6

We didn't make that clear in the transmittal email and shouldn't have represented that we did." Crowley Ex. 40 (Mar. 9, 2020 7:24 a.m. email).

For his part, Chief Bove characterized AUSA Kim's statement to the defense that "We now understand that [GX 411] came from an unrelated SDNY investigation" (Dkt. 280-1 at 3, Kim 5:36 p.m. email) as a "Flat lie." Bove Ex. 27 (Mar. 8, 2020 11:05 p.m. text exchange between Bove and Crowley). He also agreed with Chief Crowley the next morning that the prosecutors had "done some pretty aggressive stuff here over the last few days." Bove Ex. 34 (7:13 a.m. text). The Chiefs' assessment of the prosecutors' representations in the transmittal email were candid and accurate, and sharply contrast with the government's representation in court that "We weren't trying to hide anything" from the defense. Tr. 992.

Yet despite her conclusion that "we lied in that letter," Crowley Ex. 39 (March 9, 7:24 am text to Chief Bove), Chief Crowley did not speak up when AUSA Krouse, backed by Chief Bove, told the Court that the letter had arisen from imprecision, not intent to mislead, and that the prosecutors "weren't trying to hide anything" from the defense. Tr. 991-92, 997.

The Office leadership ignores its Unit Chiefs' real-time assessments, and ignores the government's in-court representation that the prosecutors "weren't trying to hide anything." Instead, the Office embraces the "unequivocal" declarations by AUSA Krouse, Chief Bove, and Chief Crowley "that they did not purposefully mislead the Court or direct anyone else to do so." Dkt. 390 at 3. Those statements are directed to the Court's focused question about the particular misrepresentation in the March 8 10 p.m. letter, Dkt. 379 at 29. They do not address the larger question of whether the government was truthful and candid with the Court, including in the explanations it offered in court on March 9. *See, e.g.*, Tr. 993 (Court asking about "what you are continuing to maintain in the face of evidence that it's false").

    3.    <u>Did government attorneys intentionally mislead the Court in the March 8, 2020 10:00 p.m. letter</u>? (Dkt. 390 at 2-3)

The Unit Chiefs have now clarified that, despite Chief Bove's in-court statement on March 9 that "Ms. Crowley and I reviewed that letter in real time before it was filed," Tr. 997, in fact Chief Bove saw only the draft, not the final filed letter, and so did not realize the sentence in question had been revised. *See* Bove Decl. at 3-4 ¶ 5.f. Chief Crowley states she did not see the draft letter at all—she saw only the final filed version on March 9, Crowley Decl. at 2 ¶ 2.d-f; *id.* at 10-11 ¶¶ 21-23; *id.* at 14 ¶¶ 34-35, and did not know there was a differing earlier draft until the Office's June 2020 investigation. *See* Crowley Decl. at 14 ¶34; *id.* at 18-20 ¶¶ 51-54. Both Unit Chiefs are emphatic that they did not authorize the revision, and would remember if they did. *See* Bove Decl. at 3 ¶ 5.e; *id.* at 16-17 ¶¶ 44-46; Crowley Decl. at 10 ¶ 22.

AUSA Krouse acknowledges making the changes to the letter that he reproduces in a redline in his declaration:

The Hon. Alison J. Nathan
November 13, 2020
Page 7

> Dear Judge Nathan:
>
> The Court writes in response to the Court's order from 9:00 this evening. The Government apologizes for the lack of clarity in its prior email.
>
> The Government found GX 411 in its emails on Friday night, looked at the ~~Commerzbank~~Bank-1 subpoena production, and did not find it. The members of the team discussed the document the next morning and confirmed that it likely had not been produced to the defense previously. The Government promptly had a paralegal ~~stamp~~mark it ~~later in the day,~~as an exhibit and produced it to the defense; along with other exhibits and 3500 materials. The Government ~~did not specifically identify~~made clear that GX 411 ~~had not previously been produced in discovery~~was a newly marked exhibit and that we intended to offer it, and asked the defense if they would stipulate to authenticity. Defense counsel responded shortly after the Government provided GX 411 and asked how long the Government had GX 411, and why they had not previously received it. The Government responded and explained that we had been aware of the letter since mid-January, and that, at the time, the Government had mistakenly believed ~~that~~ it was part of the discovery in the case.
>
> When SAUSA Lynch sent what is now GX 411 to the AUSAs in the case in January, the AUSAs assumed that this was a document that came from this case (specifically, the subpoena to ~~Commerzbank~~Bank-1), and that it was therefore a document that had been previously produced to the defense as part of the Rule 16 discovery. This was an incorrect assumption. The document in fact was obtained in an unrelated DANY investigation and was not provided to this Office before January 2020.

AUSA Krouse attributes his edits to a "misunderst[anding]" or "inadvertent[] ... error." Krouse Decl. at 12 ¶ 91. He states, "I do not recall the specific comments that the unit chiefs provided" in the phone call shortly before filing. *Id*. "But I do recall that the changes I made were based on what I understood at the time to be the unit chiefs' requests." *Id*. He also states that before court on Monday morning March 9, he "focused on the letter filed at 10 p.m., and the language that the Court had asked about in the 1:05 a.m. order," and "did not appreciate in court that morning that the accurate sentence responsive to the Court's question had been edited or deleted." *Id*. at 14 ¶ 112. He states that "[t]he first time I appreciated the change at issue was when I created [a] redline ... after the Court's June 9, 2020 Order." *Id*. In court on March 9, however, AUSA Krouse stated he understood what the filed sentence said, Tr. 991:2-3; that it was inaccurate, Tr. 993:25 to 994:1; and that it was directed at the precise question asked by the Court the previous evening, Tr. 995:11-14.

Chief Crowley states that on September 22, 2020, AUSA Krouse came to her office and, among other things, "explained that, while he did not remember the [March 8 phone] call, he fully credited that Chief Bove and I did not intend for him to delete AUSA Lake's accurate sentence in the March 8 10 p.m. Letter and that he took responsibility for the mistakes in the letter." Crowley Decl. at 20 ¶ 55. Chief Crowley took notes of the conversation "immediately after" AUSA Krouse left her office and reported this conversation to members of the Office's executive staff. *Id*.

The Hon. Alison J. Nathan
November 13, 2020
Page 8

The Office's contention that "No Government Lawyer Intentionally Misled the Court," Dkt. 390 at 2, credits AUSA Krouse's, Chief Bove's, and Chief Crowley's "unequivocal" (but conclusory) statements "that they did not purposefully mislead the Court or direct anyone else to do so." *Id.* at 3. The Office acknowledges that the "[d]eclarations do not conclusively resolve how the March 8 Letter was edited." *Id.* As it did in its July 2 letter (Dkt. 354), the Office continues to credit AUSA Krouse's and Chief Bove's in-court acknowledgments of what it euphemistically calls "the letter's shortcomings," Dkt. 390 at 3; *accord* Dkt. 354 at 15, without shedding any new light on how or why the draft letter's accurate answer to the Court's question was revised to make it inaccurate. *See* Dkt. 379 at 27, 30-31. Despite this lack of answers, the Office upholds "[t]hese and other actions by the Unit Chiefs and AUSA Krouse" as "reflect[ing] their intent to ... ensure the transparency to which the defendant, the Court, and the public are entitled." Dkt. 390 at 3.

We respectfully leave it to the Court to determine whether all of these actions by the prosecutors "support the good faith of everyone involved," as the Office continues to maintain. *Id.* at 4.

4. <u>Did government attorneys intentionally mislead the Court regarding whether review of the seized Sadr email evidence was restricted to state law offenses</u>? (Dkt. 392 at 2-3)

As this Court noted in its September 16 Opinion and Order, the central premise of the government's opposition to Sadr's suppression motion—that the government's review of the search warrant returns was restricted to material pertinent to the state law violations alleged—was not accurate. The government has now confessed that "the FBI was investigating federal crimes rather than the state-law offenses at issue in the warrants, contrary to arguments [the Government] made during suppression litigation." Dkt. 379 at 7 (quoting Dkt. 354 at 6) (emphasis removed).

This Court noted "it is certainly possible ... that had the Government [disclosed the true facts] ..., the email evidence would have been suppressed, and the trial would have been avoided altogether." *Id.* at 7-8 (citation omitted). And it concluded that "if any of the Government lawyers made (or allowed others to make) knowing misrepresentations to the Court in opposing the motion to suppress, ... their conduct would constitute an egregious ethical violation." *Id.* at 8. Because the suppression issues will not be further litigated in light of the dismissal of the indictment, the Court referred the suppression issues to the Department of Justice's Office of Professional Responsibility for investigation. *Id.*

The Office leadership's supplemental letter on October 30, 2020 (Dkt. 392) reveals additional new information that the government admits would support a motion to suppress. Dkt. 392 at 2. This new information shows the egregiousness of the government's earlier misrepresentations regarding the existence and scope of the federal

investigation using the state warrant returns, and strongly suggests that the government made intentional misrepresentations to the Court.

"Specifically, on October 23, 2020, a Supervisory Special Agent ('SSA') at the FBI informed [the] Office that the FBI had loaded *some or all of the raw email search warrant returns* in this case onto an FBI review platform known as 'BIDMAS.'" Dkt. 392 at 2 (emphasis added). These were the "raw search warrant returns," not "material identified by DANY as responsive to its warrants." *Id.* at 2 & n.3. The FBI established the BIDMAS database in December 2014—shortly after the first warrants in this case were executed. *Id.* And by April 18, 2016—a year before DANY referred this case to the USAO—an FBI forensic accountant had generated a 28-page report titled "BSA [the federal Bank Secrecy Act] Summary for Stratus Global Investments LTD—Suspicious Activity," which was based on "search warrant material provided by DANY." *Id.* at 2. *The U.S. Attorney's Office received this FBI Forensic Accountant Report in September 2017—six months before this case was indicted. Id.* at 2 n.3.

According to the FBI's BIDMAS logs, the FBI searched the database "approximately 636 times between January 2015 and January 2017." *Id.* at 3. That is more than a search a day—636 searches in approximately 500 business days. That is far more than the few searches in aid of witness interviews that the government identified to this Court in its July 2, 2020 letter. *See* Dkt. 379 at 7 (citing Dkt. 354 at 6, 16).

This new revelation confirms that what occurred was a comprehensive investigation of federal offenses using the raw returns of state warrants alleging ostensible state law offenses—precisely what Sadr argued had taken place. *See* Dkt. 147 at 2-3; *see also* Dkt. 96 at 14-16; Dkt. 116 at 10-11. Indeed, in May 2020, the government disclosed FD-1057s prepared by SA Denk confirming that "FBI NY is investigating Stratus for violations of IEEPA (Iran Sanctions), Money Laundering, Bank Fraud, Wire Fraud and other violations to be determined." Dkt. 341-5 at 2. In the suppression litigation, however, the government "consistently argued that DANY searched those state email search-warrant returns for material pertinent to violations of state law alleged in those warrants." Dkt. 379 at 6; *see* Dkt. 134 at 1; Dkt. 147-3; Dkt. 155 at 3, 13, 16, 20; *see also* Dkt. 108 at 83, 88; Dkt. 173 at 36, 40-41.

The Office leadership states it is "confident that none of the AUSAs involved in this prosecution were aware that the FBI possessed or searched its own database of raw search warrant returns." Dkt. 392 at 3. That may be, but the government's own characterization of the federal-sanctions-based nature of the investigation (Dkt. 108 at 56), as well as its obligation to learn what law enforcement was doing, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), should have led the AUSAs to inquire of the FBI and find out, rather than simply take DANY's word for it. That obligation was especially strong given the Office's possession of the FBI Accountant Report, which stated it was based on "search warrant material provided by DANY," since September 2017. Dkt. 392 at 2 n.3. Instead, no AUSA undertook a personal review of the full FBI case file until two months after trial. *See* Dkt. 379 at 10 (citing Dkt. 354 at 5). Of course it goes without saying that SAUSA Lynch, the source of information about DANY's investigation, was also a full

The Hon. Alison J. Nathan
November 13, 2020
Page 10

member of the government team.  Dkt. 379 at 20-21; Dkt. 354 at 292 n.2; *see* Tr. 977-78, 1287.

With respect to SAUSA Lynch, the Office credulously endorses his representation that he "understood throughout the period when he was assigned to the case, beginning in May 2015, that DANY was not providing search warrant returns to the FBI."  Dkt. 392 at 3.  But emails disclosed on May 21, 2020, unaddressed by the Office, show SAUSA Lynch was copied on multiple communications showing that DANY was sharing its raw returns with the FBI routinely, on request.

For instance, SAUSA Lynch was copied when the FBI asked DANY in October 2015 for "a copy of the most recent round of email search warrant returns?"  Dkt. 355-1.  He was also copied on ADA Hochhauser's reply, "Yes, of course.  Matt, can you please take care of getting [SA Denk] the most recent results.  I believe there should be at least three returns already."  *Id.*  This exchange was near the outset of DANY's investigation, long before DANY referred the case to the USAO in 2017.  Similarly, SAUSA Lynch was copied on a May 6, 2016 email sending to the FBI "the latest search warrant data we received from Google for Hussein Tehrani and Farshid Kazerani."  Dkt. 355-2.  That raw data set—the entire returns for that warrant—was large enough that it could not be emailed, but had to be furnished on CD or USB drive.  *Id.*  The email's author "CC'd Garrett just so he is aware."  *Id.*

\*     \*     \*

Sadr respectfully requests that the Court take whatever further action it deems necessary in its sound discretion.  For the reasons explained in Dkt. 389, we respectfully request that the Court unseal this letter.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

The Hon. Alison J. Nathan
November 13, 2020
Page 11

                                                         Brian M. Heberlig (*Pro Hac Vice*)
                                                         Bruce C. Bishop (*Pro Hac Vice*)
                                                         David M. Fragale
                                                         Nicholas P. Silverman (*Pro Hac Vice*)
                                                         STEPTOE & JOHNSON LLP
                                                        1330 Connecticut Avenue, N.W.
                                                         Washington, DC 20036
                                                         Tel: (202) 429-3000
                                                         Fax: (202) 429-3902
                                                         bheberlig@steptoe.com

                                                         *Counsel for Defendant Ali Sadr Hashemi Nejad*

cc:      Counsel of Record (via ECF)